JUDGE BATTS

07 CV 1358

RECEIVED
FEB 2 3 2007
U.S.D.C. S. D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

GEOFFREY OSBERG

On behalf of himself and on
behalf of all others similarly situated,

                             **Plaintiff,**

                  - against -

FOOT LOCKER, INC.,

FOOT LOCKER RETIREMENT PLAN,

                       **Defendants.**

----------------------------------------------------------------X

: Case No.: 07 CV

## Class Action Complaint

Plaintiff, by and through his counsel, alleges as follows:

### Nature of Action

1.    This is a class action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001, *et seq.*

### Jurisdiction and Venue

2.    This Court has subject matter jurisdiction over this action by virtue of 28 U.S.C. § 1331 and ERISA § 502(a), 29 U.S.C. § 1132(a).

3.    This Court has personal jurisdiction over Defendants because, for among other reasons, ERISA provides for nationwide service of process and both Defendants have continuous and systematic general business contacts with the nation a whole as well as this District. *See* ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

4.      Venue here is proper for both Defendants because this District is where the Plan is administered, where some or all of the alleged breaches took place, where either or both Defendants may be found, and where either or both Defendants reside.  *See* ERISA § 502(e), 29 U.S.C. § 1132(e).

## The Parties

5.      Plaintiff Geoffrey T. Osberg was employed by Defendant Foot Locker, Inc. or one of its predecessors or subsidiaries or affiliates for approximately 20 years, from 1982 to 2002.  Plaintiff participated in the Foot Locker Retirement Plan or one of its predecessors (the "Plan") during his period of employment with Foot Locker.  Plaintiff remains a participant in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. §1002(7), because although he received a distribution from the Plan in 2002, he has a claim to vested benefits under the terms of Plan including Plan terms implied by law or under the terms of the Plan once it is reformed as required by law and/or is administered in accordance with the law.  At the time Plaintiff requested and received his distribution in 2002, he was 48 years old.

6.      Defendant Foot Locker, Inc., referred to herein as "Foot Locker" or the "Company," is a New York corporation, with its headquarters and principal place of business located at 112 W. 34th Street, New York, NY.  The Company is the sponsor of the Plan, the Plan's administrator and a named fiduciary of the Plan, within the meaning of ERISA §§ 3(16)(A)-(B), 402(a), 29 U.S.C. §§ 1002(16)(A)-(B), 1102(a).  Prior to November 2001, Foot Locker was known as Venator Group, Inc. and prior to June 1998, Woolworth Corporation.

7.     Defendant Foot Locker Retirement Plan (the "Plan") is and was at all relevant times an "employee pension benefit plan," and more specifically a "defined benefit plan," within the meaning of ERISA §§ 3(2)(A) and 3(35), 29 U.S.C. §§ 1002(2)(A) and 1002(35). Prior to November 1, 2001, the Plan was known as the Venator Group Retirement Plan and prior to June 11, 1998, known as the Woolworth Retirement Plan.  A reference to the Foot Locker Retirement Plan should be read to refer or also refer to either or both of these predecessor plans.  The Plan is administered from Foot Locker's corporate headquarters.

8.     A reference to one Defendant should be construed as a reference to the other Defendant or both Defendants, and applies equally to the Defendants' predecessors, successors, subsidiaries or affiliates, participating employers, current and former directors, officers, employees, agents, fiduciaries and/or service providers.

## Class Action Allegations

9.     Plaintiff brings suit on behalf of himself and on behalf of all other participants and beneficiaries similarly situated under the provisions of Rule 23 of the Federal Rules of Civil Procedure with respect to violations alleged herein.  Judicial economy dictates that the issues raised here be resolved in a single action.

10.     The proposed Class is defined as follows:

All persons who were participants in the Foot Locker Retirement Plan (the "Plan") as of December 31, 1995 and on or after January 1, 1996; and the beneficiaries and estates of such persons.

11.     The requirements for maintaining this action as a class action under Fed. R. Civ. P. 23(a) are satisfied.

12. First, there are too many Class members for joinder of all of them to be practicable. There are thousands of members of the proposed Class dispersed among many states.

13. Second, there are common questions of law and fact affecting the rights of the members of the proposed Class.

14. Third, the claims of the named Class representative are typical of the claims of the proposed Class.

15. Fourth and finally, the named representative will fairly and adequately protect the interests of the proposed Class.

16. Additionally, all of the requirements of Fed. R. Civ. P. 23(b)(1) are satisfied in that the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for defendants and individual adjudications present a risk of adjudications which, as a practical matter, would be dispositive of the interests of other members who are not parties.

17. All of the requirements of Fed. R. Civ. P. 23(b)(2) also are satisfied in that the Plan's actions affected all Class members in the same manner making appropriate final declaratory and injunctive relief with respect to the Class as a whole.

## Statement of Facts

### The Traditional Benefit Formula

18. For years prior to January 1, 1996 (the "conversion date" or "date of conversion"), Plaintiff participated in the Plan and accrued benefits under the Plan's traditional defined benefit formula.

19.     Prior to January 1, 1996, the Plan was a "career average pay" plan that calculated and paid benefits according to a formula that based accruals on a specified percentage of employees' annual compensation.  The Plan generally provided for an annual benefit, commencing at normal retirement age (age 65), of 1% for the first $10,800 of salary *plus* 1.5% of the balance of W-2 compensation for that year.

**The 1995 Amendment and 1996 Cash Balance Conversion**

20.     By means of a plan amendment purportedly adopted in late 1995 and purportedly effective January 1, 1996, the Company converted the Plan to a "cash balance" plan for years of service beginning January 1, 1996, and froze accruals under the terms of the traditional Plan as of December 31, 1995.

21.      Under the terms of the amended Plan, a hypothetical or notional "account" was established for Plaintiff and all other participants in the Plan at the time or who joined the Plan at a later date.  Benefits under the amended Plan's cash balance formula were and are calculated by reference to each participant's notional "account balance," the amount of which was and is determined by reference to the "initial" or opening account balance, if any, and thereafter increased by "compensation credits" and "interest credits" added to the account for years of service beginning on or after January 1, 1996.

22.     Compensation credits were and are credited the first day of each Plan (calendar) year according to a schedule set forth in the Plan document which calls for credits of between 1.10% and 13.35% of pay depending a participant's years of service with the Company and compensation level.

23.     Participants' notional accounts were and are also adjusted at the end of each calendar year by an "interest credit" of 6% per annum.

24.     Employees who were participants as of December 31, 1995, *i.e.,* Plaintiff and the members of the proposed Class, received an initial account balance based upon a determination of the purported "actuarial equivalent" lump sum value of their accrued benefits under the Plan's prior formula as of December 31, 1995.  This lump sum value was determined actuarially based upon a 9% rate of interest and the applicable mortality table as set forth in IRS Revenue Ruling 95-6.  Employees who joined the Plan after the conversion date had initial account balances of zero.

25.     For participants who remained participants in the Plan after the date of the conversion, *i.e.,* for Plaintiff and the members of the proposed Class, the Plan employs a "greater-of" formula under which participants are entitled to the greater of (A) their "frozen" benefit derived from the Plan terms as of December 31, 1995, or (B) their notional account balance calculated under the Plan's cash balance formula as of the date of retirement or separation from service.

26.     However, as explained more fully below, the way in which Defendants determined Plaintiff's and the proposed Class members' initial notional account balances under the Plan's cash balance formula created a significant "wear-away" such that Plaintiff and the members of the proposed Class effectively ceased accruing additional benefits from the point of the conversion forward for varying periods of time until they "wore away" the benefits they had already earned under the old formula.

**The Wear-Away Effect**

27.     The problem of "wear-away" is essentially as follows.  A participant's accrued benefit cannot be decreased by plan amendment by virtue of the protections of ERISA's anti-cutback provision, ERISA § 204(g), 29 U.S.C. § 1054(g).  *See also* 26 U.S.C. (Internal Revenue Code or "IRC") § 411(d)(6).  That means, in the context of the kind of conversion involved here, that a participant's benefit upon termination or retirement can never be less than the participant's frozen accrued benefit calculated under the old formula as of the date of conversion, or a benefit of actuarially equivalent value.

28.     In light of this requirement, a common method used by employers to convert a traditional pension plan to a cash balance plan was to calculate the actuarial present value of each participant's frozen accrued benefit at the time of conversion and use that value as the "opening balance" of the participant's notional cash balance account.  That way, each participant would start out under the cash balance plan with a benefit equal in value to the benefit he or she had accrued to date under the old formula, with the only difference being that future benefits would accrue under the new cash balance formula instead of the old traditional formula.

29.     Some employers followed this general approach but with a sinister twist. These employers calculated the opening balance of each participant's notional cash balance account based on the "actuarial present value" of each participant's frozen accrued benefit at the time of conversion – but they instructed their actuaries to use patently unreasonable assumptions when determining "actuarial equivalence."  The result was that participants' cash balance account opening balances were significantly lower than the benefits participants had

already accrued under the traditional formula – so that in a very real sense, the participants started their participation under the cash balance formula in a hole.

30.     Because they started in a hole, participants in plans whose sponsors adopted this approach experienced a rate of benefit accrual of **zero** for varying periods of time until the notional balances of their cash balance accounts catch up with the value of their frozen accrued benefit (and the participants have worked their way up out of the hole).  Only then, after participants "wear away" their already-accrued frozen traditional plan benefits, do these participants see daylight, *i.e.,* experience a positive accrual rate.

31.     That is precisely what occurred here to Plaintiff and the members of the proposed Class as a result of Defendants' decision to use a 9% interest rate to determine the purported "actuarial equivalent" of participants' frozen benefit under the old Plan for purposes of establishing their opening cash balance account balances.  A 9% interest rate was not a reasonable actuarial assumption and/or an assumption a typical participant in the Plan likely understood was in the range of possible interest rate assumptions that would be used to determine "actuarial equivalence" for purposes of establishing opening account balances   The 9% interest rate was substantially higher than the interest rate used by the Plan to define Actuarial Equivalence for all other purposes under the Plan.  For example, the rate used by the Plan to determine Actuarial Equivalence for purposes of determining how much a participant would actually be paid in a single sum were he to retire on January 1, 1996 was 6.06%.

32.     Use of the 9% interest rate for purposes of establishing opening balance purposes guaranteed that for Plaintiff and the members of the proposed Class their opening notional account balances would be and in fact were significantly smaller than the benefits

they had already accrued under the Plan (*i.e.*, their ERISA-protected frozen benefit).  As a result of the opening account balances being established at levels below the values of the pension benefits already existing before the conversion, there was a period of time after the conversion – the "wear-away" period – when the accruals or pay credits under the cash balance formula were not really credited.  For that period of time – between the time of the conversion and the time each participant's cash balance account exceeded (or will in the future exceed) the value of the ERISA-protected frozen accrued benefit  – the effective rate of benefit accrual for each participant affected by the wear-away was and is zero.

33.     In Plaintiff's case, the wear-away period extended through the date of his termination of employment:  He accrued zero benefits for work performed from the date of the conversion until the date of his termination of employment.

**The Age Discriminatory Nature of the Wear-Away Effect**

34.     The problem with wear-away is not just that the participant's rate of new benefit accrual is zero for a period of time (and here, that Defendants violated ERISA by concealing the wear-away effect, as discussed further below) but that wear-away, at least in this context, is age discriminatory within the meaning of ERISA § 204(b)(1)(H) as well.

35.     At all times relevant to this action, ERISA § 204(b)(1)(H) provided in pertinent part:  "Notwithstanding the preceding subparagraphs, a defined benefit plan shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age."  ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H).

36.     The amended Plan's terms, as implemented, violated and violate this prohibition because the period of wear-away experienced by individual participants is longer the older they are, meaning that an employee's benefit accrual is or remains ceased or the rate of benefit accrual is or remains reduced for a longer period solely because of age. This is true regardless of whether benefit accruals are measured by reference to increases in a participant's notional account balance or by reference to increases in projected benefits at normal retirement age (age 65).

37.     The reason older participants' benefit accruals are ceased or reduced longer than a similarly situated younger employee's is because, all other things being equal, the amount by which an older employee's ERISA-protected accrued benefit exceeds his opening account balance is larger than the amount by which a similarly-situated younger employee's ERISA-protected accrued benefit exceeds his opening account balance. Because his cash balance account will thus have farther to go to catch-up to the benefit he has already accrued before real additional accruals begin under the Plan, the older employee is in the hole, *i.e.,* stuck in his frozen accrued benefit, for a longer time than a similarly-situated young employee simply because he is older.

**The Wear-Away Plaintiff Experienced**

38.     In Plaintiff's case, when he left the Company in the fall of 2002 and his benefit was calculated, his "winning" benefit was his benefit frozen under the terms of the Plan as of December 31, 1995. He worked from January 1, 1996 to the fall of 2002 – almost 6 years – without accruing a single additional dollar in retirement benefits. Throughout that time, Plaintiff's rate of benefit accrual was zero. It would have remained at zero even longer,

beyond the fall of 2002, had he remained with the Company. Vis-à-vis younger, otherwise identically-situated employees, Plaintiff experienced a longer period during which his benefit accruals were ceased or reduced simply because he was older.

**Defendants' Concealment of the Wear-Away Effect**

39.     The Company designed the 1995 amendment to the Plan for the purpose of reducing its costs. It was well-aware that if it adopted and implemented the amendment as written, it would have the effects described here.

40.     However, Defendants failed to disclose to Plaintiff and the members of the proposed Class, as Defendants were required to do by law, that they would not be earning additional retirement benefits for varying periods of time and could work for years after the conversion and still not have any more benefits than those to which they already were entitled under the old benefit formula. In fact, the Company intentionally undertook to conceal the wear-away effect from Plaintiff and the members of the proposed Class. It did so to prevent any possible interference with its planned implementation of the amendment; to avoid losing valued employees who, once informed that their new benefit accruals would as of January 1, 1996, cease for a period of years, would or could choose to work elsewhere; and to avoid the other adverse consequences had the amendment's true nature and effect become known. Thus, beginning in late 1995 and continuing to the present day, the Company issued materially false and misleading statements and omissions concerning the purported amendment and the amended Plan's cash balance formula which had the purpose and effect of concealing from Plaintiff and the members of the proposed Class the existence and extent of the wear-away problem.

41.     Defendants' materially false and misleading statements and omissions have been consistent and continuous since 1995 and were and are part of the Company's fraudulent concealment of the underlying ERISA violations alleged here.  These acts of concealment were and are not isolated incidents but part of a pattern of fraudulent concealment found in most if not all of the Company's communications with Plan participants about the Plan, designed in part to avoid incurring the liability that may result if the assertion of one or more of the claims made here is successful.

## ERISA § 204(h) Violations

42.     Because of the wear-away effect described above, the proposed 1995 amendment provided for a significant reduction in the rate of Plaintiff's and proposed Class members' future benefit accrual within the meaning of ERISA § 204(h), 29 U.S.C. § 1054(h).

43.     At the point at which the Company decided to adopt the 1995 amendment, ERISA § 204(h) provided that "[a] plan ... may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date" to, *inter alia*, each plan participant.  Former 29 U.S.C. § 1054(h).

44.     Notwithstanding the law's requirements, the Company failed to provide Plaintiff or other participants with a written notice setting forth the plan amendment and its effective date after the adoption of the amendment in 1995 and not less than 15 days before the amendment's purportedly effective January 1, 1996 date.

45.     Any written notice that was provided to Plaintiff or other participants did not set forth the plan amendment, did not set forth its effective date, was not provided after the adoption of the amendment and/or was not provided not less than 15 days before the amendment's purportedly effective date.

46.     Any written notice that was provided to Plaintiff or other participants did not state or otherwise disclose that Plaintiff or these other participants would or could experience a significant reduction in the rate of future benefit accrual.

47.     Any written notice that was provided contained false or misleading material misstatements or omissions that concealed that the proposed amendment provided for a significant reduction in the rate of future benefit accrual or concealed the extent to which it did so.  Any such purported notice gave no notice or effective notice of the wear-away problem, that participants' rate of future benefit accrual would be reduced to zero, or that under the amendment participants would not be earning additional retirement benefits for varying periods of time after the conversion and could work for years after the conversion and still not have any more benefits than those to which they already were entitled under the old Plan formula.

**ERISA § 102 Violations**

48.     Throughout the relevant time, ERISA § 102, 29 U.S.C. § 1022 has required that participants be furnished with a summary plan description ("SPD") that is "written in a manner calculated to be understood by the average plan participant," ERISA § 102(a), 29 U.S.C. § 1022(a), is "sufficiently accurate and comprehensive to reasonably apprise . . . participants and beneficiaries of their rights and obligations under the plan," *id.,* and includes

the plan's eligibility requirements, as well as the "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits." ERISA § 102(a)-(b), 29 U.S.C. § 1022(a)-(b); *see also* 29 C.F.R. § 2520.102-3(1).

49. Publication of the SPD was and is governed by ERISA § 104(b), 29 U.S.C. § 1024(b). Since January 1, 1996, Defendants have been required to issue one or more SPDs pursuant to that provision and purported to do so. But those SPDs were and are not "written in a manner calculated to be understood by the average plan participant" with regard to their "greater of" benefit under the Plan, were and are not "sufficiently accurate and comprehensive to reasonably apprise . . . participants and beneficiaries of their rights" under the Plan, and did and do not disclose the existence or extent of the wear-away problem, *i.e.,* "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits."

50. To the contrary, the SPDs contain and contained materially false and misleading statements and omissions regarding Plaintiff's and the proposed Class members' benefit accruals and rate of benefit accruals under the amended Plan specifically designed to conceal the existence and extent of the wear-away problem.

51. For example, even though the amended Plan provides that participants, *i.e.,* Plaintiff and the proposed Class, are entitled to receive the greater of their cash balance account or their frozen benefit under the old Plan, the September 30, 1996 SPD barely mentions that central fact. This omission is all the more glaring (and misleading) because the September 1996 SPD was issued at a time when the vast majority of the participants receiving it were subject to the "greater-of" formula. Nevertheless, the September 1996 SPD omits any mention of the greater-of formula from the Introduction, the Table of Contents, the Highlights

pages, and the Definition of Terms section.   The single reference to the existence of the

greater-of formula is made in passing, situated illogically and without any (or any proper)

context, precisely so the average participant would have no effective notice of even the

possibility of a wear-away effect.

52.      Moreover, the omission of any reference to the greater-of formula from the

introductory portion "How Your Retirement Benefit is Determined" renders that section false

and misleading because, without any reference to the frozen accrued benefit, the reader is

misled to believe that the determination of all benefits is made solely by reference to the cash

balance formula.  (This is especially true given that the SPD misleadingly defines the

"Account Balance" as representing "the value of the *accrued benefit* on behalf of each *Plan*

*participant.*" (italics in the original)).  The purpose and effect of these false and misleading

material misstatements and omissions was to conceal from the average participant that he

might be working for a considerable time after the conversion without accruing any new

benefits.

53.      Elsewhere, the 1996 SPD makes three brief references to how participants'

accrued benefit as of December 31, 1995 is reflected in their opening account balance.  But

these references (which are substantially identical) were and are also materially misleading

and were designed to conceal the wear-away problem.  While the SPD references the

determination of the actuarially equivalent value of the accrued benefit and mentions the use

of the 9% interest rate, these references are false and misleading because the SPD makes no

disclosure that the resultant amount was less than the present value of the accrued benefit and

that even after working and "earning" benefits under the cash balance formula, the frozen

accrued benefit might very well exceed the value of participants' cash balance accounts. In other words, the SPD falsely and misleadingly suggests that no wear-away is possible and that the full present value of the frozen accrued benefit is reflected in the initial account balance.

54. Defendants have used the SPD and other similarly false and misleading communications to make participants think that since the conversion they were and are accruing benefits on an "A + B" basis, *i.e.,* since day one, January 1, 1996, they have been accruing new benefits under the cash balance formula and that those new cash balance accruals would be added to the present value of their frozen accrued benefit and to conceal the truth, *i.e.,* that the Plan only provided for an "A or B" benefit with "A" representing substantially less than the present value of participants' frozen accrued benefit.

**ERISA § 404(a) Violations**

55. Following the purported effective date of the proposed amendment, the Company continued making materially false and misleading statements and omissions designed to conceal the purportedly amended Plan's wear-away effect.

56. For example, as it did and does elsewhere, in the periodic statements the Company provided participants concerning their Plan benefit, the Company routinely concealed and conceals the existence of the greater-of formula and the value of individual participants' frozen accrued benefit. Thus, while the periodic account statements Defendants provide list the balance in participants' hypothetical cash balance accounts, they fail to disclose the amount or even the existence of their frozen benefits. This is true even when these benefits are greater than the cash balance benefits as they frequently are, and were.

57. In early 2002, for example, Plaintiff was provided a "Personal Benefit Statement" that included information about his 401(k) plan, ESOP and health care and disability benefits as well as his Retirement Plan benefit – a Statement which the Company claims "provides a wealth of information about the benefit coverages [Plaintiff] enjoy[ed] as a Foot Locker associate." Page 6 of the Statement, entitled "Retirement Benefits," is devoted exclusively to Plaintiff's Retirement Plan benefit as of the beginning and end of 2001. However, while the Statement on page 6 lists and discusses the specifics of Plaintiff's notional cash balance account "benefit," it somehow manages to omit that Plaintiff was then and at all times entitled to **a significantly higher** frozen benefit, calculated based on his service and compensation prior to January 1, 1996 under the terms of the Plan as they existed on December 31, 1995.

58. In effect, there *is* no frozen accrued benefit according to the Statement – there is only the cash balance formula benefit. Indeed, the Statement went so far as to declare: "The amount shown in item 4 ["Total Account Balance as of December 31, 2001"] is the amount that you could expect to receive upon termination of employment or retirement if you elect the lump sum form of payment and do not receive future interest and Compensation Credits." Yet that was not true. As of December 31, 2001, and at all times following the conversion, Plaintiff's frozen accrued benefit under the traditional benefit formula would have generated and ultimately did generate a significantly higher lump sum amount than his cash balance account did.

59. The Statement claimed that it was "a measure of your yearly progress." In actuality, it was a measure of how far Defendants were willing to go to deceive employees

such as Plaintiff who had no idea that while he had been toiling away for the Company, for five years his retirement benefit had been standing still.

**Harm or Likely Harm as a Result of Defendants' Violations**

60.     Plaintiff and the members of the proposed Class were harmed or likely harmed by Defendants' violations of law and the false or misleading statements and omissions referenced above.

61.     Defendants' failure to provide notice of the significant reduction in the future rate of benefit accrual in accordance with the requirements of ERISA § 204(h), 29 U.S.C. § 1054(h), failure to provide adequate SPDs in accordance with the requirements of ERISA § 102, 29 U.S.C. § 1022, and breaches of fiduciary duty, led Plaintiff and the members of the proposed Class to believe that the Plan complied with ERISA, was not age discriminatory, and did not provide for a cessation or significant reduction in the rate of future benefit accrual. Participants were not provided notice of the fact that they may suffer periods of zero benefit accrual under the new Plan.

62.     Plaintiff and the members of the proposed Class were harmed thereby because they were thus prevented from taking steps, including seeking injunctive relief, to stop the proposed amendment from taking effect, and prevented from understanding that they were no longer earning pension benefits despite continuing to work for the Company, and thus from seeking and obtaining suitable alternative employment elsewhere.  Defendants' violations of law also caused or likely caused Plaintiff and the members of the proposed Class to believe that their retirement benefits were substantially less than they actually were, thus preventing

them from altering their retirement strategies and adversely affecting their retirement choices, planning and understanding.

## Exhaustion of Internal Claims Process

63.     Plaintiff did not exhaust the internal claims process provided under the terms of the Plan prior to initiating this lawsuit because his claims are based first and foremost on establishing statutory violations of ERISA which the Plan's internal claims process does not purport to cover.  Even if it did, this Court owes no deference to a plan official's legal conclusion.  Exhaustion would be futile as well because the statutory requirements discussed above have been the subject of numerous well-publicized agency rulings and court cases, including from the Second Circuit, yet Defendants failed to comply with them, indicating that they have already determined that they are in compliance with the law or need not be.

## Claims for Relief

## Count One - Violation of ERISA § 204(b)(1)(H)

64.     Plaintiff repeats and re-alleges the allegations contained in all foregoing paragraphs herein.

65.     Defendants' adoption and implementation of the 1995 amendment converting the Plan to a cash balance plan, and adoption and implementation of the terms of the amended Plan since such amendment, violated and violate ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H).  The terms of the amended Plan violated and violate these provisions because an older employee's benefit accrual was and/or remains ceased or the rate of benefit accrual was and/or remains reduced for a longer period than for an otherwise identically-situated younger employee, solely because of the older employee's age.  This is true

19

regardless of whether benefit accruals are measured by reference to increases in a participant's notional account balance or by reference to increases in projected benefits at normal retirement age under the Plan.

66.     Plaintiff and the proposed Class seek and are entitled to relief for and as a result of this violation under ERISA § 502(a), 29 U.S.C. § 1132(a).

### Count Two - Violation of ERISA § 204(h)

67.     Plaintiff repeats and re-alleges the allegations contained in all foregoing paragraphs herein.

68.     Defendants' failure to notify Plaintiff and other plan participants of a significant reduction in the rate of future benefit accrual in conformance with statutory requirements 15 days prior to the January 1, 1996 effective date violated the ERISA §204(h), 29 U.S.C. § 1054(h), prohibition on such plan amendments in the absence of such notice.

69.     Plaintiff and the proposed Class seek and are entitled to relief for and as a result of this violation under ERISA § 502(a), 29 U.S.C. § 1132(a).

### Count Three - Violation of ERISA § 102

70.     Plaintiff repeats and re-alleges the allegations contained in all foregoing paragraphs herein.

71.     Defendants' failure to explain the full import of the cash balance plan terms in a summary plan description distributed to plan participants, including but not limited to a complete explanation of the wear-away effect, violated and violates the minimum requirements for SPDs set forth in ERISA §102, 29 U.S.C. § 1022, and its implementing regulations found in 29 C.F.R. § 2520.102.

72.     Plaintiff and the proposed Class seek and are entitled to relief for and as a result of this violation under ERISA § 502(a), 29 U.S.C. § 1132(a).

### Count Four - Violation of ERISA § 404(a)

73.     Plaintiff repeats and re-alleges the allegations contained in all foregoing paragraphs herein.

74.     Defendants breached their strict fiduciary duties under ERISA § 404(a) by intentionally, recklessly or negligently making the materially false and misleading statements and omissions described above, by intentionally, recklessly or negligently violating ERISA §§ 102 and § 204(h), by fraudulently concealing or attempting to fraudulently conceal those violations and the violations of ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H), described above, and by intentionally, recklessly or negligently failing to disclose that the proposed 1995 amendment and the terms of the amended Plan resulted in the wear-away effect described above and otherwise caused a significant reduction in the rate of participants' future benefit accrual.

75.     Plaintiff and the proposed Class seek and are entitled to relief for and as a result of this violation under ERISA § 502(a), 29 U.S.C. § 1132(a).

### Prayer for Relief

WHEREFORE, Plaintiff prays that judgment be entered against Defendants and that the Court award the following relief:

A.     Certification of this action as a class action for all purposes of liability and relief and appointment of undersigned counsel as class counsel pursuant to Fed. R. Civ. P. 23.

B.     Judgment for Plaintiff and the Class against Defendants on all claims expressly asserted and/or within the ambit of this Complaint.

C.     An order enjoining the Plan Administrator from continuing to violate the law and/or the terms of the Plan including such terms of the Plan as are implied by law in the manners alleged or referenced in this Complaint or shown by the facts.

.     D.     An order reforming the Plan and/or compelling the Company to reform the Plan and/or compelling Defendants to bring the terms and administration of the Plan into compliance with the law, in all cases effective as of the date the alleged violations first occurred.

E.     Following entry of predicate relief and/or reformation of the Plan that conforms its terms to the requirements of the law, a further order requiring Defendants to re-calculate the benefit amounts due or past due under the terms of the Plan in accordance with the requirements of ERISA, and, where applicable, for the Plan to pay the difference, plus interest, to or on behalf of all Class members who received less in benefits or benefit accruals than the amount to which they are entitled and/or to pay benefits to which Class members are entitled in all applicable optional forms.

F.     An order awarding pre- and post-judgment interest.

G.     An order awarding attorney's fees on the basis of the common fund doctrine (and/or other applicable law, at Plaintiff's election), along with the reimbursement of the expenses incurred in connection with this action.

H.     An order awarding, declaring or otherwise providing Plaintiff and the Class all other such relief under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that Plaintiff may subsequently specify and/or that the Court may deem appropriate.

Dated:  February 23, 2007

By:

Eli Gottesdiener [EG 0111]

**GOTTESDIENER LAW FIRM, PLLC**
498 7th Street
Brooklyn, NY  11215
(718) 788-1500
(718) 788-1650
eli@gottesdienerlaw.com

*Attorney for the Plaintiff and the proposed Class*

Of Counsel:
Mark D. DeBofsky
**DALEY, DE BOFSKY & BRYANT**
55 West Monroe Street, Suite 2440
Chicago, Illinois  60603
(312) 372-5200
(312) 372-2778 (fax)
mdebofsky@ddbchicago.com