**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
**GEOFFREY OSBERG**                                          :
                                                            :
**On behalf of himself and on**                             :
**behalf of all others similarly situated,**                :
                                                            :  **Case No.: 07 CV 1358 (KBF)**
                                              **Plaintiff,** :
                                                            :
                        **- against -**                     :
                                                            :
**FOOT LOCKER, INC.,**                                      :
                                                            :
**FOOT LOCKER RETIREMENT PLAN,**                            :
                                                            :
                                        **Defendants.**     :
-------------------------------------------------------------X

<u>**Class Action Complaint**</u>

Plaintiff, by and through his counsel, alleges as follows:

<u>**Nature of Action**</u>

1.      This is a class action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001, *et seq.*

<u>**Jurisdiction and Venue**</u>

2.      This Court has subject matter jurisdiction over this action by virtue of 28 U.S.C. § 1331 and ERISA § 502(a), 29 U.S.C. § 1132(a).

3.      This Court has personal jurisdiction over Defendants because, for among other reasons, ERISA provides for nationwide service of process and both Defendants have continuous and systematic general business contacts with the nation as a whole as well as this District. *See* ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

4.      Venue here is proper for both Defendants because this District is where the Plan is administered, where some or all of the alleged breaches took place, where either or both Defendants may be found, and where either or both Defendants reside.  *See* ERISA § 502(e), 29 U.S.C. § 1132(e).

## The Parties

5.      Plaintiff Geoffrey T. Osberg was employed by Defendant Foot Locker, Inc. or one of its predecessors or subsidiaries or affiliates for approximately 20 years, from 1982 to 2002.  Plaintiff participated in the Foot Locker Retirement Plan or one of its predecessors (the "Plan") during his period of employment with Foot Locker.  Plaintiff remains a participant in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. §1002(7), because although he received a distribution from the Plan in 2002, he has a claim to vested benefits under the terms of the Plan, including Plan terms implied by law or under the terms of the Plan once it is reformed as required by law and/or is administered in accordance with the law.  At the time Plaintiff requested and received his distribution in 2002 he was 48 years old.

6.      Defendant Foot Locker, Inc., referred to herein as "Foot Locker" or the "Company," is a New York corporation, with its headquarters and principal place of business located at 112 W. 34th Street, New York, NY.  The Company is the sponsor of the Plan, the Plan's administrator and a named fiduciary of the Plan, within the meaning of ERISA §§ 3(16)(A)-(B), 402(a), 29 U.S.C. §§ 1002(16)(A)-(B), 1102(a), and is sued in each of these capacities.  Prior to November 2001, Foot Locker was known as Venator Group, Inc. and prior to June 1998, as Woolworth Corporation.  A reference to Foot Locker should be read to also refer to either or both of these predecessors.

7.     Defendant Foot Locker Retirement Plan (the "Plan") is and was at all relevant times an "employee pension benefit plan," and more specifically a "defined benefit plan," within the meaning of ERISA §§ 3(2)(A) and 3(35), 29 U.S.C. §§ 1002(2)(A) and 1002(35). Prior to November 1, 2001, the Plan was known as the Venator Group Retirement Plan and prior to June 11, 1998, as the Woolworth Retirement Plan.  A reference to the Foot Locker Retirement Plan should be read to also refer to either or both of these predecessor plans.  The Plan is administered from Foot Locker's corporate headquarters.

8.     A reference to one Defendant should be construed as a reference to the other Defendant or both Defendants, and applies equally to the Defendants' predecessors, successors, subsidiaries or affiliates, participating employers, current and former directors, officers, employees, agents, attorneys, fiduciaries and/or service providers.

## Class Action Allegations

9.     Plaintiff brings suit on behalf of himself and on behalf of all other participants and beneficiaries similarly situated under the provisions of Rule 23 of the Federal Rules of Civil Procedure with respect to violations alleged herein.  Judicial economy dictates that the issues raised here be resolved in a single action.

10.     The proposed Class is defined as follows:

All persons who were participants in the Foot Locker Retirement Plan (the "Plan") as of December 31, 1995, who had at least one Hour of Service on or after January 1, 1996 (as defined under the Plan), and who was either paid a benefit from the Plan after December 31, 1995 or is still entitled to a benefit from the Plan; and the beneficiaries and estates of such persons.

11.     The requirements for maintaining this action as a class action under Fed. R. Civ. P. 23(a) are satisfied.

12.     First, there are too many Class members for joinder of all of them to be practicable.  There are thousands of members of the proposed Class dispersed among many states.

13.     Second, there are common questions of law and fact affecting the rights of the members of the proposed Class.

14.     Third, the claims of the named Class representative are typical of the claims of the proposed Class.

15.     Fourth and finally, the named representative will fairly and adequately protect the interests of the proposed Class.

16.     Additionally, all of the requirements of Fed. R. Civ. P. 23(b)(1) are satisfied in that the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for defendants, and individual adjudications present a risk of adjudications which, as a practical matter, would be dispositive of the interests of other members who are not parties.

17.     All of the requirements of Fed. R. Civ. P. 23(b)(2) also are satisfied in that the Plan's actions affected all Class members in the same manner making appropriate final declaratory and injunctive relief with respect to the Class as a whole.

## Statement of Facts

### The Traditional Benefit Formula

18.     For years prior to January 1, 1996 (the "conversion date" or "date of conversion"), Plaintiff participated in the Plan and accrued benefits under the Plan's traditional defined benefit formula.

19.     Prior to January 1, 1996, the Plan was a "career average pay" plan that calculated and paid benefits according to a formula that based accruals on a specified percentage of employees' annual compensation.  The Plan generally provided for an annual benefit, commencing at normal retirement age (age 65), equal to the sum of 1% of the first $10,800 of W-2 compensation *plus* 1.5% of W-2 compensation in excess of $10,800 for each year of credited service.

**The 1995 Amendment and 1996 Cash Balance Conversion**

20.     By means of a plan amendment purportedly adopted in late 1995 and purportedly effective January 1, 1996 (the "1995 amendment"), the Company converted the Plan to a "cash balance" plan for years of service beginning January 1, 1996 and froze accruals under the terms of the traditional Plan as of December 31, 1995 (the "cash balance conversion").

21.      Under the terms of the amended Plan, a hypothetical or notional "account" was established for Plaintiff and all other active participants in the Plan at the time or who joined the Plan at a later date.  Benefits under the amended Plan's cash balance formula were and are calculated by reference to each participant's notional "account balance," the amount of which was and is determined by reference to the "initial" or opening account balance, if any, and thereafter increased by "compensation credits" and "interest credits" added to the account for years of service beginning on or after January 1, 1996.

22.     Compensation credits were and are credited on the first day of each Plan (calendar) year according to a schedule set forth in the Plan document which calls for credits

of between 1.10% and 13.35% of pay depending on a participant's years of credited service with the Company and compensation level.

23.     Participants' notional accounts were and are also adjusted on the first day of each calendar year by an "interest credit" of 6% per annum.

24.     Employees who were participants as of December 31, 1995, *i.e.,* Plaintiff and the members of the proposed Class, received an initial account balance based upon a determination of the purported "actuarial equivalent" lump sum value of their accrued benefits under the Plan's prior formula as of December 31, 1995.  This lump sum value was determined actuarially based upon a 9% rate of interest and the applicable mortality table as set forth in IRS Revenue Ruling 95-6.  Employees who joined the Plan after the conversion date had initial account balances of zero.

25.     For participants who remained active participants in the Plan after the date of the conversion, *i.e.,* for Plaintiff and the members of the proposed Class, the Plan employs a "greater-of" formula under which participants are entitled to the greater of (A) their "frozen" benefit derived from the Plan terms as of December 31, 1995, or (B) their notional account balance calculated under the Plan's cash balance formula as of the date of retirement or separation from service.

26.     However, as explained more fully below, the way in which Defendants designed and implemented the cash balance conversion resulted in an extended "wear-away" period during which Plaintiff and the members of the proposed Class ceased accruing additional benefits from the point of the conversion forward for varying periods of time until

they "wore away" the benefits they had already earned under the old formula and began earning new benefits.

**The Wear-Away Effect**

27.     The wear-away period that followed Foot Locker's conversion of its traditional pension plan to a cash balance plan was no accident:  a post-conversion period of wear-away was an integral part of the conversion's design.

28.     A participant's accrued benefit and certain other benefits and rights (such as the right to an early retirement benefit) cannot be decreased by plan amendment by virtue of the protections of ERISA's "anti-cutback" provision, ERISA § 204(g), 29 U.S.C. § 1054(g). *See also* 26 U.S.C. (Internal Revenue Code or "IRC") § 411(d)(6).  That means, in the context of the kind of conversion involved here, that a participant's benefit upon termination or retirement can never be less than the participant's benefit calculated under the old formula as of the date of conversion.

29.     In light of this requirement, a common method used by employers to convert a traditional pension plan to a cash balance plan was to "freeze" the traditional benefit formula as of an identified date, open new cash balance accounts for each participant with an opening balance of zero, and provide that each participant's benefit under the Plan is equal to the sum of (A) the benefit calculated based on service performed by the participant through the freeze date under the traditional formula *plus* (B) the benefit based on the participant's cash balance account balance which reflect benefits earned for service performed after the freeze date. This is commonly referred to as an "A+B" cash balance conversion.  It guarantees compliance

with ERISA's anti-cutback standards because the benefit payable at termination or retirement will never be less than the "A" benefit earned under the plan as of the conversion date.

30.     There is no wear-away period following an A+B conversion:  benefits grow every year after the conversion by an amount equal to the increase in each participant's cash balance account.

31.     Another conversion method that was sometimes used by employers (before the method was outlawed by Congress in 2006) was to freeze the traditional benefit formula as of an identified date and open new cash balance accounts for each participant, as under the A+B method; but rather than provide that a participant's benefit would equal the sum of the frozen traditional "A" benefit and a new separately-calculated cash balance "B" benefit, a participant's benefit at retirement was expressed solely as a function of his or her new cash balance account.

32.     This was often achieved by calculating the actuarial present value of each participant's frozen accrued benefit under the traditional formula at the time of conversion and using that value as the "opening balance" of the participant's new cash balance account. That way, each participant would start out under the "new" cash balance plan with a benefit that was equal to the amount the participant would have received under the old formula had he or she terminated on the conversion date.  Benefits would thereafter accrue under the new cash balance formula, and the participant's benefit would be based on his or her account balance at retirement.

33.     Unlike the "A+B" conversion methodology, this alternative method did not inherently satisfy ERISA's anti-cutback standard because it did not express a participant's

post-conversion benefit as his or benefit as of the conversion date (the "A" benefit) *plus* an additional amount – which by definition will produce a benefit at least as large as the participant's benefit earned as of the conversion date.  To ensure compliance with the anti-cutback rule, therefore, a plan using the alternative conversion methodology was required to add a caveat stating that in no event would a participant's benefit at retirement be less than the benefit earned as of the conversion date.  As a result, the alternative methodology was commonly referred to as a "greater of A or B" (or simply "A or B") cash balance conversion, with "A" referring to the frozen traditional formula benefit and "B" referring to the cash balance formula benefit.

34.     It was well-known by pension consultants and attorneys (including Defendants' consultants and attorneys) at the time of Foot Locker's cash balance conversion that "A or B" conversions could result in periods of wear-away.  One reason for this was because an "A or B" conversion could result in the opening account being worth less than the "A" piece of the formula if the growth of the account (*i.e.*, the interest crediting rate) was lower than the discount rate used to calculate the opening account.  It was precisely for this reason that in the Pension Protection Act of 2006, Congress outlawed the "greater-of A or B" conversion method.  Congress determined that the "A or B" often resulted in extended periods during which employees earned no additional benefits, or reduced benefits, following a cash balance conversion merely as a result of the post-conversion interest rate being less than the rate used in the conversion.

35.     Foot Locker followed the general "greater of A or B" conversion approach, but with a sinister twist that it knew would materially exacerbate the wear-away problem inherent

9

in "A or B" conversions, transforming what in ordinary "A or B" conversions was a strong likelihood of a post-conversion period of wear-away into a *guarantee* that a period of wear-away would occur.

36.     Foot Locker calculated the opening balance of each Plan participant's notional cash balance account based on the "actuarial present value" of each participant's frozen accrued benefit at the time of conversion – but used patently unreasonable assumptions when determining "actuarial equivalence."  The result was that participants' cash balance account opening balances were significantly lower than the benefits participants had already accrued under the traditional formula – so that in a very real sense, the participants started their participation under the cash balance formula in a hole.

37.     Because they started in a hole, participants in the Plan experienced a rate of benefit accrual of *zero* for varying periods of time until the notional balances of their cash balance accounts caught up with the value of their frozen accrued benefit (and the participants had worked their way up out of the hole).  Only then, after participants "wear away" their already-accrued frozen traditional plan benefits, do these participants see daylight, *i.e.,* experience a positive accrual rate.

38.     That is precisely what occurred here to Plaintiff and the members of the proposed Class as a result of Defendants' decision to use a 9% interest rate to establish opening cash balance account balances.  Defendants determined that a Plan participant's opening balance would be equal to the actuarial present value of the monthly benefit to which the participant would have been entitled commencing at age 65 were he to terminate employment on December 31, 1995.  For purposes of calculating present value, Defendants

assumed that the employee's opening account balance would grow at a rate of 9% from January 1, 1996 through the date of each projected monthly payment. This translated to a present value discount rate of 9%. (The higher the discount rate, the lower the corresponding present value.)

39. The 9% interest rate assumption was more than 50% higher than the 6% interest rate that the Plan credited to cash balance accounts each year – *i.e.*, the locked-in actual rate of return on participants' cash balance accounts. The 9% assumption was also 50% higher than the 6% interest rate used by the Plan to calculate a participant's "accrued benefit" under the post-conversion benefit formula.

40. Use of a 9% interest rate assumption to calculate present value accordingly meant that a participant's opening account balance was *not* equal to the benefit that the participant had already earned under the Plan as of December 31, 1995, but was necessarily less than that already-accrued benefit. In addition to using a 9% discount rate to calculate opening balances, Defendants also applied a mortality discount that reduced opening account balances still further to reflect the probability that a participant would die before reaching age 65. The Plan provided no offsetting increase to participant accounts to reflect survivorship.

41. Use of the 9% interest rate and the mortality discount for purposes of establishing opening balances guaranteed that for Plaintiff and each member of the proposed Class their opening notional account balances would be, and in fact were, smaller than the amount to which the individual would have been entitled (assuming benefits were fully vested) had he terminated employment on January 1, 1996. And the age-65 accrued benefit derived from the opening account balance was less than the age-65 benefit to which the

participant would have been entitled had he terminated employment on January 1, 1996. Defendants knew this by the date of the adoption of the 1995 conversion amendment, on January 1, 1996, and at all times thereafter.

42.     As a result of the opening account balances being established at levels below the values of the pension benefits already accrued before the conversion, there was a period of time after the conversion when Plaintiff and other members of the proposed Class did not accrue any additional benefits under the Plan.  Defendants knew this by the date of the adoption of the 1995 conversion amendment, on January 1, 1996, and at all times thereafter.

43.     For the period of time between the time of the conversion and the time each participant's cash balance account exceeded (or will in the future exceed) the participant's ERISA-protected frozen accrued benefit, the rate at which benefits accrued under the Plan for each member of the proposed Class who continued to work for the Company was and is zero.

44.     Other aspects of the cash balance plan conversion similarly resulted in (or extended) periods during which the benefits earned by Plaintiff and other members of the proposed Class following the conversion did not increase, or increased by less than the increase in the participant's notional account balance.  This outcome was reasonably foreseeable by Defendants.  Indeed, Defendants knew this outcome was likely to occur.

45.     For example, because the cash balance conversion had the effect of an interest arbitrage, where the Plan sold the already existing accrued benefit of participants to the participants in the form of an opening account at 9% interest plus mortality, but then promised to pay only 6% interest on that account, Plaintiff and every other member of the proposed Class experienced one or more periods of wear-away.  Defendants knew this would occur.

12

46.     Additionally, some members of the proposed Class also experienced one or more periods of wear-away because they were entitled to (or would become entitled to) subsidized (*i.e.*, enhanced) early retirement benefits calculated under the traditional formula, which delayed the "cross-over date" – *i.e.*, the date on which the benefit based on the participant's cash balance account was greater than the benefit calculated under the frozen traditional formula, and the date on which the participant's wear-away period ended. Defendants knew by the date of the adoption of the 1995 conversion amendment, on January 1, 1996, and at all times thereafter, that it was foreseeable, indeed predictable, that subsidized early retirement benefits would extend many participants' wear-away period.

47.     In Plaintiff's case, the wear-away period extended through the date of his termination of employment (and beyond that date, had he not terminated):  He accrued zero benefits for work performed from the date of the conversion until the date of his termination of employment. Defendants knew, by the date of the adoption of the 1995 conversion amendment, on January 1, 1996, and at all times thereafter, that Plaintiff would experience a post-conversion period of wear-away and that the wear-away period was likely to be lengthy.

48.     When Plaintiff left the Company in the fall of 2002 and his benefit was calculated, his "winning" benefit was his benefit frozen under the terms of the Plan as of December 31, 1995.  He worked from January 1, 1996 to the fall of 2002 – almost 7 years – without accruing a single additional dollar in retirement benefits.  Throughout that time, Plaintiff's rate of benefit accrual was zero.  It would have remained at zero even longer, beyond the fall of 2002, had he remained with the Company.

49.     Vis-à-vis younger, otherwise identically-situated employees, Plaintiff experienced a longer period during which his benefit accruals were ceased or reduced simply because he was older.

50.     At the time Plaintiff requested and received his distribution in 2002, he was 48 years old.  Had he waited until he was age 55 to receive his benefit, Plaintiff would have been entitled to a subsidized early retirement benefit under the terms of the Plan.  Defendants knew by January 1, 1996 and at all times thereafter, including on the date Plaintiff terminated employment, that Plaintiff would have been entitled to a subsidized early retirement benefit had he waited until age 55 to receive his benefit, yet Defendants intentionally never informed him of that fact after December 31, 1995, and indeed intentionally concealed the continued availability of the subsidy for participants who qualified.

51.     Defendants similarly intentionally did not disclose and intentionally concealed the potential availability of an early retirement subsidy from other members of the proposed Class who may have qualified for the subsidy had they retired between age 55 and age 65. Defendants withheld information about and concealed the potential availability of the early retirement subsidy from participants (in the SPDs and otherwise) to keep participants from delaying receipt of benefits, in order to meet the conditions necessary to qualify for the subsidy.

**Defendants' Misrepresentations, Omissions, and Concealment of the Impacts of the Cash Balance Conversion**

52.     One of the reasons the Company adopted the 1995 amendment to the Plan was to reduce its benefit costs.

53.     The Company knew that reducing benefit costs would require a decrease in benefits.  The Company knew it could not cut accrued benefits (to the extent already accrued), which meant it would have to reduce future benefit accruals.  However, the Company knew that doing so in a transparent manner would hurt employee morale and confidence, risk the Company's competitive stance in the employment marketplace, invite scrutiny by regulators, and have other potential negative repercussions.

54.     After consulting with the benefit consulting firm, Mercer, and other outside advisors and attorneys, the Company determined that it could reduce pension benefits (and therefore costs) by converting its traditional pension plan to a cash balance plan – and could do so in a way that employees would not realize that benefits had in fact been reduced.  *See, e.g., The Wall Street Journal*, May 5, 1999:   "You [can] switch to a cash-balance plan where the people are probably getting smaller benefits, at least the older-longer-service people; but they are really happy, and they think you are great for doing it" because they do not understand how the conversion negatively impacts their retirement benefits (*quoting* a Mercer consultant).

55.     The Company determined that it would convert its pension plan to a cash balance plan effective January 1, 1996 using a conversion methodology that would severely reduce the rate of future benefit accruals for most current participants, but that it would describe the conversion and resulting benefit formula in a manner that would lead current participants to mistakenly believe that they would continue to earn benefits under the Plan at a rate that was not significantly lower than they had been earning under the prior formula.

56.     Defendants knew that every participant in the Plan as of December 31, 1995

who continued in service on or after January 1, 1996 would earn no additional retirement benefits under the Plan for some period of time following the effective date of the 1995 amendment – *i.e.*, that every Plan participant who is a member of the proposed Class would experience a period of wear-away following the effective date of the cash balance conversion.

57.    Plaintiff and every member of the proposed Class did in fact experience a period of wear-away following the effective date of the cash balance conversion.

58.    Defendants have conceded that Plaintiff and every member of the proposed Class did in fact experience a period of wear-away following the effective date of the cash balance conversion. *See, e.g.,* Defs. Mtn. to Dismiss, April 30, 2007 (Doc. 13) at 2, 5, 15; Defs. Reply in Support of Mtn. to Dismiss, June 15, 2007 (Doc. 18) at 8-9.[1]

59.    Under the Plan's traditional formula, all participants were eligible for an early retirement subsidy if the benefit was paid after their 55th birthday; after 15 years of vesting, the level of subsidy increased.  The 1995 amendment preserved the availability of the early retirement subsidies (as was legally required), but expanded the utility of the subsidy, by allowing participants to receive the subsidized early retirement benefit as a lump sum (which was not previously available, or legally required).  Defendants knew that almost all participants in the Plan as of December 31, 1995 could become, or were already, eligible for a subsidized early retirement benefit, and that some participants could qualify for more generous subsidies if they satisfied the conditions necessary to receive such subsidies. Defendants knew that these subsidies were available to qualifying participants under the terms of the Plan following the cash balance conversion.

---

[1] At the time of this concession, the proposed Class was broader than the proposed Class alleged in this First Amended Complaint.

16

60.   Defendants also knew that there could be periods of wear-away, or extensions of the wear-away period, when participants became eligible for subsidized early retirement benefits.

61.   Notwithstanding Defendants' knowledge of the facts described above (and below), Defendants intentionally and/or recklessly misled Plan participants about, and intentionally and/or recklessly omitted and concealed from Plan participants information about, the manner in which the cash balance conversion would, likely would, or could affect their benefits under the Plan and the rate at which retirement benefits would accrue under the post-conversion Plan formula.

62.   Specifically, Defendants prepared and issued Plan-related communications that were written in a manner that was designed to lead, and which would have led, an average Plan participant to mistakenly think, assume or otherwise believe that:

A.   Following the January 1, 1996 cash balance conversion, the participant would earn additional retirement benefits for each period of post-conversion service with the Company equal to the increase in his or her opening account balance; and

B.   Following the January 1, 1996 cash balance conversion, subsidized early retirement benefits were no longer available to participants who satisfied the conditions for such subsidies under the pre-conversion traditional benefit formula.

63.   Defendants intentionally undertook to conceal these facts from Plaintiff and the members of the proposed Class via omissions and/or misleading communications.

64.   It did so to reduce costs, to prevent any possible interference with its planned implementation of the amendment and/or to prevent any potential adverse action or reaction

by it employees, government officials or agencies, customers, the press, or other members of the public.

65.     The Company was concerned about negative publicity and a potential backlash from employees were they to become aware of the potentially lengthy periods of wear-away, which could for example result in a groundswell of discontent leading to demands from the employee population as a whole, or large groups of employees, for higher wages or other benefits to offset the freeze in pension accruals, or lead to a loss of employee productivity due to lowered morale, loyalty or confidence in Foot Locker as a caring employer.

66.     Thus, beginning in late 1995 and continuing to the present day, the Company issued communications to its employees that it knew contained materially false and misleading statements and omissions concerning the 1995 amendment and the amended Plan's cash balance formula.

67.     These communications had the purpose and effect of concealing from Plaintiff and the members of the proposed Class (a) the existence and extent of the wear-away that was certain or likely to occur following the cash balance conversion and (b) the continuing availability of early retirement subsidies under the pre-1996 traditional formula.  The Company's actions in this regard violated ERISA §§ 102, 204(h) and 404 in the manners described below.

68.     Defendants also intentionally attempted to conceal the facts necessary for Plaintiff and members of the proposed Class to discover that Defendants had violated ERISA in this manner.

69.     The false and misleading statements and omissions regarding wear-away and early retirement subsidies – described in detail below – which have been consistent and continuous since 1995, were and are self-concealing and were (and continue to be) part of the Company's attempt to fraudulently conceal the underlying ERISA violations alleged here.

70.     Other formal Plan communications – for example, annual benefit statements and the benefit election packages and benefit calculations provided to participants at the time they requested and received a distribution of benefits – were carefully crafted to keep participants from discovering that they were in the midst of experiencing, or already had experienced, a period of wear-away that had not been clearly disclosed.  These communications did not clearly disclose – even at the time participants terminated employment and requested distributions – that some or all of the post-conversion increases in a participant's *account balance* had not increased the participant's *benefit entitlement*.

71.     These examples of the false and misleading statements and omissions made by Defendants were not isolated incidents but part of a pattern of fraud and fraudulent concealment found in most if not all of the Company's communications with Plan participants about the Plan, designed in part to avoid incurring the liability that may result if one or more of the claims made here are successful.

**ERISA § 204(h) Violations**

72.     Because of the wear-away effect described above, the proposed 1995 amendment provided for a significant reduction in the rate of Plaintiff's and proposed Class members' future benefit accrual within the meaning of ERISA § 204(h), 29 U.S.C. § 1054(h).

73.     At the point at which the Company decided to adopt the 1995 amendment, ERISA § 204(h) provided that "[a] plan ... may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date" to, *inter alia*, each plan participant.  Former 29 U.S.C. § 1054(h).

74.     Notwithstanding the law's requirements, the Company failed to provide Plaintiff or other participants with a written notice setting forth the plan amendment and its effective date after the adoption of the amendment in 1995 and not less than 15 days before the amendment's purportedly effective January 1, 1996 date.

75.     Any written notice that was provided to Plaintiff or other participants did not set forth the plan amendment, did not set forth its effective date, was not provided after the adoption of the amendment and/or was not provided not less than 15 days before the amendment's purportedly effective date.

76.     Any written notice that was provided to Plaintiff or other participants did not state or otherwise disclose that Plaintiff or these other participants would or could experience a significant reduction in the rate of future benefit accrual.

77.     Any written notice that was provided contained false or misleading material misstatements or omissions that concealed that the proposed amendment provided for a significant reduction in the rate of future benefit accrual or concealed the extent to which it did so.  Any such purported notice gave no notice or effective notice of the wear-away problem, that participants' rate of future benefit accrual would be reduced to zero, or that

20

under the amendment participants would not be earning additional retirement benefits for varying periods of time after the conversion and could work for years after the conversion and still not have any more benefits than those to which they already were entitled under the old Plan formula.

**Additional Allegations Relating To Pre-Amendment Participant Communications**

78.    Defendants prepared a "Highlights Memorandum" dated November 17, 1995, which purports to constitute the notice required under ERISA § 204(h).

79.    The Memorandum did not state or otherwise disclose that Plaintiff or these other participants would or could experience a significant reduction in the rate of future benefit accrual.

80.    The Memorandum was written in a manner that was designed to lead, and which would have led, an average Plan participant to mistakenly think, assume or otherwise believe that:  (A) following the January 1, 1996 cash balance conversion, the participant would earn additional retirement benefits for each period of post-conversion service with the Company equal to the increase in his or her opening account balance; and (B) following the January 1, 1996 cash balance conversion, subsidized early retirement benefits were no longer available to participants who satisfied the conditions for such subsidies under the pre-conversion traditional benefit formula.

81.    For example, the Memorandum explained the pending cash balance conversion to employees in the following manner:

- "Currently your benefit under the Plan is expressed as an annual annuity payable at your Normal Retirement Date.  Effective January 1, 1996, your benefit will be expressed as an account balance."

21

- "Initial Account Balance: Your accrued benefit as of December 31, 1995 is actuarially converted to an initial account balance. . . . Under the amended Plan, your account balance will increase in two ways.  First, interest on the account balance will be credited annually.  Second, while you are employed, your account balance will increase each year with pay credits.  The pay credits are arrived at using a formula based on your annual earnings and years of service."

- "At termination of employment, provided you are vested, you will have the option of taking a lump sum payment equal to your account balance."

82.     The clear implication of this language is that a participant's benefits would grow each year after the cash balance conversion by an amount equal to the increase in his or her cash balance account; and that the benefit payable upon termination of employment would be equal to the account balance.  The statement on the last page of the Memorandum that "[y]our accrued benefit as of December 31, 1995 will not be reduced as a result of Plan revisions" would not have put an average participant on notice that his or her benefit would not or might not increase each year by an amount equal to the growth in the participant's account balance; or that the benefit payable upon termination might not be based on the account balance (at all) but rather be equal to the benefit earned under the old formula as of December 31, 1995; or that if the participant was paid after attaining age 55, that he or she would be eligible for subsidized early retirement benefits.

83.     The Memorandum incorporates a September 15, 1995 letter signed by CEO Roger Farah and Chief Operating Officer Dale Hilpert, in which the Company told employees how "excited" Messrs. Farah and Hilpert were to announce changes that will "update the company's retirement plans" and "put our company alongside today's best retailing companies."  The letter informed employees not that they were getting *less* but rather

something worth markedly *more*:  a "more competitive retirement package" including a new pension plan that would allow employees "a better way to monitor their benefits" – *i.e.*, by expressing benefits in terms of an individual "account."  According to the letter, the account would enable participants "to see their individual account balance *grow each year, and know its value.*"

84.     The letter was intended to, and would have, led an average participant to think that his "benefit" under the "new" plan was reflected solely by his account balance, that he could monitor the increase in his benefit entitlement by watching the account grow, and that the account – and therefore his benefit – would indeed grow each year by the amount of the "yearly contribution" the Company would make to the account.  But all of this was false: a Plan participant's benefit was not reflected solely by his account balance; and the growth in the account balance would not necessarily represent an increase in the participant's benefit entitlement because the account balance had no "value" unless and until employees worked long enough to wear away the value of their frozen accrued benefit already accrued under the old Plan.  Defendants knew all of this, and accordingly knew that the representations in the letter were false and misleading.

85.     In summary, the quoted language and other language in the Memorandum and September 15, 1995 Letter contained intentionally or recklessly false or misleading material, misstatements, or omissions that concealed that the proposed amendment provided for a significant reduction in the rate of future benefit accrual or concealed the extent to which it did so.

86.     The Memorandum and Letter gave no notice or effective notice of the wear-away problem, that participants' rate of future benefit accrual would be reduced to zero, that under the amendment participants would not be earning additional retirement benefits for varying periods of time after the conversion and could work for years after the conversion and still not have any more benefits than those to which they already were entitled under the old Plan formula, or that subsidized early retirement benefits under the Plan's traditional formula were still available to qualifying participants.

87.     The Memorandum and Letter were intentionally and/or recklessly drafted in this manner for the purpose of deceiving Plan participants about the nature of the impact the 1995 amendment would have, would likely have, or could have on their retirement benefits.

**ERISA § 102 Violations**

88.     Throughout the relevant time, ERISA § 102, 29 U.S.C. § 1022 has required that participants be furnished with a summary plan description ("SPD") that is "written in a manner calculated to be understood by the average plan participant," ERISA § 102(a), 29 U.S.C. § 1022(a), is "sufficiently accurate and comprehensive to reasonably apprise . . . participants and beneficiaries of their rights and obligations under the plan," *id.,* and includes the plan's eligibility requirements, as well as the "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits."  ERISA § 102(a)-(b), 29 U.S.C. § 1022(a)-(b); *see also* 29 C.F.R. § 2520.102-3(1).

89.     Publication of the SPD was and is governed by ERISA § 104(b), 29 U.S.C. § 1024(b).  Since January 1, 1996, Defendants have been required to issue one or more SPDs pursuant to that provision and purported to do so.  But those SPDs were and are not "written

in a manner calculated to be understood by the average plan participant" with regard to their "greater of" benefit under the Plan, were and are not "sufficiently accurate and comprehensive to reasonably apprise . . . participants and beneficiaries of their rights" under the Plan, and did and do not disclose the existence or extent of the wear-away effect, *i.e.,* "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits."

90.     To the contrary, the SPDs contain and contained materially false and misleading statements and omissions regarding Plaintiff's and the proposed Class members' benefit accruals and rate of benefit accruals under the amended Plan intentionally designed to mislead participants about and/or conceal the existence and extent of the wear-away effect. The SPDs also were intentionally designed to prevent Plan participants from discovering that Defendants had failed to disclose to and had misled them about the existence of wear-away.

91.     Specifically, the SPDs were written in a manner that was designed to lead, and which would have led, an average Plan participant to mistakenly think, assume or otherwise believe that:  (A) following the January 1, 1996 cash balance conversion, the participant would earn additional retirement benefits for each period of post-conversion service with the Company equal to the increase in his or her opening account balance and (B) following the January 1, 1996 cash balance conversion, subsidized early retirement benefits were no longer available to participants who satisfied the conditions for such subsidies under the pre-conversion traditional benefit formula.

92.     For example, under the heading "How Your Retirement Benefit Is Determined" the SPD states:  "Your Plan benefit is based on the account balance you accrue, or earn, while a participant.  That account balance is made up of:  [1] Your initial account

balance, which is the value of your Plan benefit as of December 31, 1995, before the Plan was amended; [2] interest credited to your account balance; and [3] additions to your account balance, called compensation credits, which are based on years of service and a percentage of compensation.  When your employment terminates, you are entitled to receive payments on a monthly basis (an annuity) or in a lump sum.  The annuity is determined by [projecting your account balance to age 65 and converting it to an annuity payable at that age].  The lump sum payable to you is the greater of your account balance or the amount determined by multiplying the annuity payable to you by factors required by federal law and IRS regulations."  No mention is made of the possibility that the annuity or lump sum benefit payable upon termination might not be based on the account balance (at all), but could be an amount calculated pursuant to the traditional benefit formula that was discontinued on December 31, 1995.

93.     The omission of any reference to the greater-of formula from the introductory portion "How Your Retirement Benefit is Determined" renders that section false and misleading because, without any reference to the frozen accrued benefit, the reader is misled to believe that the determination of all benefits is made solely by reference to the cash balance formula (and the cash balance account).  This is especially true given that the SPD misleadingly defines the "Account Balance" as representing "the value of the *accrued benefit* on behalf of each *Plan participant*." (italics in the original).

94.     Under the heading "Initial Opening Balance," the SPD includes a sentence that states: "Your accrued benefit at the time your employment terminates is the greater of the amount determined under the Plan as amended on January 1, 1996 or your accrued benefit as

of December 31, 1995." This is the SPD's only reference to the post-conversion benefit formula's greater-of rule.

95.     This single reference to the existence of a greater-of rule is made in passing, situated illogically (under the heading "Initial Opening Balance") and without any (or any proper) context, precisely so the average participant would have no effective notice of even the possibility that he or she might experience a period of wear-away.

96.     When told that his opening account balance was equal to "the value of your Plan benefit as of December 31, 1995," a participant would take that statement on face value as true. When told that this opening balance would thereafter increase by at least 6% each year (*i.e.*, the 6% interest credit plus some compensation credit), an average participant would think that his account balance would always necessarily be equal to or greater than the benefit he had earned as of December 31, 1995. After all, if a participant starts with an account equal to the value of the existing benefit, then it is increased, how could the result be less than the value of the existing benefit that the account started with? As a result, the participant would view the statement that "[y]our accrued benefit at the time your employment terminates is the greater of the amount determined under the Plan as amended on January 1, 1996 or your accrued benefit as of December 31, 1995" as meaningless legal boilerplate, consistent with its placement at the bottom of a section that has no logical connection to the statement.

97.     The example on page 14 of the 1996 SPD would have confirmed the participant's understanding in this regard. The example, which appears under the heading "The Amount of Your Retirement Benefit," shows an opening account balance of $7,000 on January 1, 1996 which grows each year until it reaches $9,676 on December 31, 1998. The

27

example confirms that "[t]he lump sum payable to you is the greater of your account balance or the amount determined under federal law and IRS regulations." There is no mention of the possibility that the lump sum payable under the facts illustrated in the example might not be based on the December 31, 1998 account balance, but rather could be an amount calculated pursuant to the pre-1996 traditional benefit formula. This is the case even though, on the facts given, the lump sum benefit payable would in fact have been calculated under the pre-1996 traditional benefit formula for any participant who was younger than age 65 on the conversion date – *i.e.*, the vast majority of participants.

98.     The conclusion an average participant would draw from the example is that (a) benefits would increase each year by an amount equal to the increase in his or her account balance, (b) the benefit at retirement would be determined solely by reference to the participant's account balance, and (c) the old formula was no longer of any relevance. The example's message is clear: your benefit after the cash balance conversion is determined solely by your account balance. As you see your account balance grow, you will see how much your retirement benefits are increasing. It would not occur to an average participant that even though the account balance is growing, their benefit is not, and the SPD's example of how benefits are determined confirms that false impression.

99.     Elsewhere, the 1996 SPD makes three brief references to how participants' accrued benefit as of December 31, 1995 is reflected in their opening account balance. But these references (which are substantially identical) were and are also materially misleading and were designed to conceal the wear-away effect. While the SPD references the determination of the actuarially equivalent value of the accrued benefit and mentions the use

28

of the 9% interest rate, these references are misleading because the SPD makes no disclosure that the resultant amount was less than the present value of the December 31, 1995 accrued benefit and that even after working and "earning" benefits under the cash balance formula, the legally-protected accrued benefit might very well exceed the benefit attributable to the participants' cash balance accounts.  In other words, the SPD falsely and misleadingly suggests that no wear-away is possible and that the full present value of the legally-protected December 31, 1995 accrued benefit is reflected in the initial account balance.

100.    Further, the SPD makes no reference to the fact that a participant who receives his benefit after attaining age 55 is entitled to a subsidized early retirement benefit, nor does the SPD describe how such benefits would be calculated, or note that the level of subsidy increases after completion of 15 years of vesting service.

101.    Defendants continued to provide the 1996 SPD and later SPDs, which included substantially identical language, to participants throughout the period from 1996 to the present.

102.    The purpose and effect of these false and misleading material misstatements and omissions was and is to conceal from the average participant that he might be working for a considerable time after the conversion without accruing any new benefits and that if he receives his benefit after age 55 he is entitled to a subsidized early retirement benefit.  In other words, Defendants have used the SPD and other similarly false and misleading communications to make participants think that since the conversion they were and are accruing benefits on an "A + B" basis, *i.e.,* since day one, January 1, 1996, they have been accruing new benefits under the cash balance formula and that those new cash balance

accruals would be added to the present value of their frozen accrued benefit and to conceal the truth, *i.e.,* that the Plan only provided for an "A or B" benefit with "A" representing substantially less than the present value of participants' legally-protected accrued benefit.

103.    Defendants also intentionally and fraudulently attempted to use the SPDs to conceal the facts necessary for Plaintiff and members of the proposed Class to discover that Defendants had violated ERISA's disclosure and fiduciary standards.  The false and misleading statements and omissions regarding wear-away and early retirement subsidies, which have been consistent and continuous since 1995, were self-concealing and were (and continue to be) part of the Company's attempt to fraudulently conceal the underlying ERISA violations alleged here.

**ERISA § 404(a) Violations**

104.    Both before and following the purported effective date of the proposed amendment, the Company intentionally and/or recklessly made and continued making materially false and misleading statements and omissions designed to (and/or that did in fact) conceal the amended Plan's wear-away effect; and designed to (and that did in fact) prevent Plan participants from discovering that Defendants had failed to disclose to and had misled them about the existence of wear-away.

105.    For example, the November 17, 1995 204(h) Notice tells participants that a "statement showing your estimated benefits under the amended Plan will be mailed to you during December 1995."  The estimated retirement plan statements that were provided to participants describe the result of the cash balance conversion on their benefits in a manner that was designed to intentionally confuse and mislead an average participant.  The statement

includes 2 columns.  On the left, the statement describes the participant's estimated monthly benefit at age 65 accrued under the traditional formula as of December 31, 1995.  The right column describes the participant's opening account balance under the cash balance formula as of January 1, 1996.  Under the opening balance, the statement explains:  "The amount shown above is what you could expect to receive upon termination of employment or retirement if you accrue no further benefits and elect a Lump Sum form of payment."  In other words, the opening account balance is the lump sum value of the accrued benefit described in the left column.

106.    This was a patently false representation.  Take, for example, FL-OSB 010452, the statement provided to a participant who will be referred to here (because Defendants redacted his or her name) as Ms. Jones.  According to Ms. Jones' benefit statement, her age 65 accrued benefit as of December 31, 1995 was $2,657.13, and her opening balance was $20,973.46.  This was not the amount Ms. Jones "could expect to receive upon termination of employment or retirement if [she] accrue[d] no further benefits and elect[ed] a Lump Sum form of payment."   If Ms. Jones had terminated employment on January 1, 1996 and requested a lump sum payment on that date, she would have been entitled to a lump sum of approximately $27,500.

107.    Before sending the estimated benefit statement to Ms. Jones and other Plan participants, Defendants were warned that it misrepresented the truth – the truth being that the lump sum this and any other participant could expect to receive were she (or any other participant) to terminate immediately following the cash balance conversion would *not* be the opening account balance but rather the present value of the December 31, 1995 accrued

benefit described in the left column using ERISA-mandated assumptions.  Defendants ignored the warning and sent the notices with the false and misleading representation because Defendants did not want to alert participants that opening balances started them in a pension hole which would require them to work for a number of years just to break even before they would begin accruing any new benefits – *i.e.,* to conceal the fact that participants would effectively be required to "re-earn" benefits to which they were already entitled.

108.    As another example, in the periodic statements the Company provided participants concerning their Plan benefit, the Company routinely concealed and conceals the existence of the greater-of formula and the value of individual participants' frozen accrued benefit.  Thus, while the periodic account statements Defendants provide list the balance in participants' hypothetical cash balance accounts, they fail to disclose the amount or even the existence of their frozen benefits.  This is true even when these benefits are greater than the cash balance benefits as they frequently are, and were.

109.    In early 2002, for example, Plaintiff was provided a "Personal Benefit Statement" that included information about his 401(k) plan, ESOP and health care and disability benefits as well as his Retirement Plan benefit – a Statement which the Company claims "provides a wealth of information about the benefit coverages [Plaintiff] enjoy[ed] as a Foot Locker associate."  Page 6 of the Statement, entitled "Retirement Benefits," is devoted exclusively to Plaintiff's Retirement Plan benefit as of the beginning and end of 2001.  However, while the Statement on page 6 lists and discusses the specifics of Plaintiff's notional cash balance account "benefit," it intentionally omits that Plaintiff was then and at all times entitled to *a significantly higher* benefit, calculated based on his service and

compensation prior to January 1, 1996 under the terms of the Plan as they existed on December 31, 1995.

110.   In effect, there *is* no legally-protected minimum accrued benefit according to the Statement – there is only the cash balance formula benefit.  Indeed, the Statement went so far as to declare:  "The amount shown in item 4 ["Total Account Balance as of December 31, 2001"] is the amount that you could expect to receive upon termination of employment or retirement if you elect the lump sum form of payment and do not receive future interest and Compensation Credits."  Yet that was not true.  As of December 31, 2001, and at all times following the conversion, Plaintiff's legally-protected accrued benefit under the traditional benefit formula would have generated and ultimately did generate a significantly higher lump sum amount than his cash balance account did.  Defendants knew this.

111.   The Statement claimed that it was "a measure of your yearly progress."  In actuality, it was a measure of how far Defendants were willing to go to deceive employees such as Plaintiff who had no idea that while he had been toiling away for the Company, for five years his retirement benefit had been standing still.

112.   When Defendants paid Plaintiff in 2002, they did not tell him that the payment was based on the benefit he had earned under the old Plan formula as of December 31, 1995. Instead, Defendants intentionally concealed this fact so that Plaintiff would not discover that he had earned no additional benefits during the nearly 7 years since the cash balance conversion.  Although Defendants had prepared detailed calculation summaries that showed that his "winning" benefit was the benefit he had accrued as of December 31, 1995 rather than a benefit based on his cash balance account, Defendants withheld that information from

33

Plaintiff until his attorney demanded a copy of the calculations in 2007.  Furthermore,

Defendants did not tell Plaintiff that he was eligible for a subsidized early retirement benefit

and/or that he could be eligible for a subsidy (or a higher subsidy) were he to delay his

distribution.  This omission also was intentional.

113.    Similar acts of intentional deception and concealment were repeated in other

communications with participants.

114.    The intentional and/or reckless misrepresentations and omissions made by

Defendants in each of the September 15, 1995 Letter, the November 17, 1995 Highlights

Memorandum, the 1996 SPD and later iterations of the SPD, the Personal Benefit Statements,

benefit election and distribution packages, and other Plan communications, which were made

for the purpose of (1) misleading Plan participants about and/or concealing the existence and

extent of the wear-away effect and the continued availability of early retirement subsidies

and/or (2) preventing participants from discovering that Defendants had failed to disclose to

and had misled them about the existence of wear-away and early retirement subsidies,

constitute a breach of fiduciary duty under ERISA § 404(a).

**Harm as a Result of Defendants' Violations**

115.    Plaintiff and the members of the proposed Class were harmed by Defendants'

violations of law and the false or misleading statements and omissions referenced above.

116.    Defendants' incomplete and misleading communications were of a nature that

would have led reasonable employees to mistakenly believe that their benefits would increase

each year after 1995 by an amount equal to the increase in their cash balance account and that

early retirement subsidies were no longer available.  Indeed, this was precisely Defendants' intent in making the communication in the manner they did.

117.    The backlash that Defendants sought to avoid by misleading its employees in this manner was not one in which every employee (or every customer, investor, government regulator, or news outlet) would necessarily protest or react, but one in which enough employees (or customers, government agencies, or news outlets) would complain to make a difference.  To avoid that, Defendants visited harm on all members of the proposed Class, not just those likely to protest or react.

118.    Defendants' failure to provide notice of the significant reduction in the future rate of benefit accrual in accordance with the requirements of ERISA § 204(h), 29 U.S.C. § 1054(h), failure to provide adequate SPDs in accordance with the requirements of ERISA § 102, 29 U.S.C. § 1022, and breaches of fiduciary duty, harmed Plaintiff and members of the proposed Class by depriving them of the right to the information required by ERISA §§102, 204(h) and 404, and the opportunity to contest or react to those changes with that information; by depriving them of the opportunity to benefit from action employees may have taken as a group to contest or protest the changes (*e.g*., in the form of higher benefits); by depriving them of the opportunity to benefit from action government officials or agencies, or customers, investors, the press, or other members of the public may have taken to challenge the changes (*e.g*., in the form of higher benefits); and/or by depriving them of the greater benefits (and/or less significant reductions) that may have resulted had the Company known it would have to fully and honestly disclose the effects of any plan amendment.

**The Age Discriminatory Nature of the Wear-Away Plaintiff Experienced**

119. The problem with wear-away is not just that the participant's rate of new benefit accrual is zero for a period of time (and here, that Defendants violated ERISA by concealing the wear-away effect, as discussed further below) but that wear-away, at least in this context, is age discriminatory within the meaning of ERISA § 204(b)(1)(H) as well.

120. At all times relevant to this action, ERISA § 204(b)(1)(H) provided in pertinent part: "Notwithstanding the preceding subparagraphs, a defined benefit plan shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the attainment of any age."  ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H).

121. The amended Plan's terms, as implemented, violated and violate this prohibition because the period of wear-away experienced by individual participants is longer the older they are, meaning that an employee's benefit accrual is or remains ceased or the rate of benefit accrual is or remains reduced for a longer period solely because of age.  This is true regardless of whether benefit accruals are measured by reference to increases in a participant's notional account balance or by reference to increases in projected benefits at normal retirement age (age 65).

122. The reason older participants' benefit accruals are ceased or reduced longer than a similarly situated younger employee's is because, all other things being equal, the amount by which an older employee's ERISA-protected accrued benefit exceeds his opening account balance is larger than the amount by which a similarly-situated younger employee's ERISA-protected accrued benefit exceeds his opening account balance.  Because his cash balance account will thus have farther to go to catch-up to the benefit he has already accrued

before real additional accruals begin under the Plan, the older employee is in the hole, *i.e.,* stuck in his frozen accrued benefit, for a longer time than a similarly-situated young employee simply because he is older.

### Exhaustion of Internal Claims Process

123.    Plaintiff did not exhaust the internal claims process provided under the terms of the Plan prior to initiating this lawsuit because his claims are based first and foremost on establishing statutory violations of ERISA, which the Plan's internal claims process does not purport to cover.  Even if it did, this Court owes no deference to a plan official's legal conclusion.  Exhaustion would be futile as well because the statutory requirements discussed above have been the subject of numerous well-publicized agency rulings and court cases, including from the Second Circuit, yet Defendants failed to comply with them, indicating that they have already determined that they are in compliance with the law or need not be.

### Claims for Relief

### Count One - Violation of ERISA § 204(b)(1)(H)

124.    Plaintiff repeats and re-alleges the allegations contained in all foregoing paragraphs herein.

125.    Defendants' adoption and implementation of the 1995 amendment converting the Plan to a cash balance plan, and adoption and implementation of the terms of the amended Plan since such amendment, violated and violate ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H).  The terms of the amended Plan violated and violate these provisions because an older employee's benefit accrual was and/or remains ceased or the rate of benefit accrual was and/or remains reduced for a longer period than for an otherwise identically-

situated younger employee, solely because of the older employee's age.  This is true

regardless of whether benefit accruals are measured by reference to increases in a

participant's notional account balance or by reference to increases in projected benefits at

normal retirement age under the Plan.

126.   Plaintiff and the proposed Class seek and are entitled to relief for and as a

result of this violation under ERISA § 502(a), 29 U.S.C. § 1132(a).

### Count Two - Violation of ERISA § 204(h)

127.   Plaintiff repeats and re-alleges the allegations contained in all foregoing

paragraphs herein.

128.   Defendants' failure to notify Plaintiff and other plan participants of a

significant reduction in the rate of future benefit accruals in conformance with statutory

requirements 15 days prior to the January 1, 1996 effective date violated the ERISA §204(h),

29 U.S.C. § 1054(h), prohibition on such plan amendments in the absence of such notice.

129.   Plaintiff and the proposed Class seek and are entitled to relief for and as a

result of this violation under ERISA § 502(a), 29 U.S.C. § 1132(a).

### Count Three - Violation of ERISA § 102

130.   Plaintiff repeats and re-alleges the allegations contained in all foregoing

paragraphs herein.

131.   Defendants' failure to explain the full import of the cash balance plan terms in

a summary plan description distributed to plan participants, including but not limited to a

complete explanation of the wear-away effect and continued availability of subsidized early

retirement subsidies, violated and violates the minimum requirements for SPDs set forth in

ERISA §102, 29 U.S.C. § 1022, and its implementing regulations found in 29 C.F.R. § 2520.102.

132.    Plaintiff and the proposed Class seek and are entitled to relief for and as a result of this violation under ERISA § 502(a), 29 U.S.C. § 1132(a).

<u>**Count Four - Violation of ERISA § 404(a)**</u>

133.    Plaintiff repeats and re-alleges the allegations contained in all foregoing paragraphs herein.

134.    Defendants breached their strict fiduciary duties under ERISA § 404(a) by intentionally, recklessly or negligently making the materially false and misleading statements and omissions described above, both before and after the adoption of the 1995 amendment; by intentionally, recklessly or negligently violating ERISA §§ 102, 204(h), and § 404(a); and by fraudulently concealing or attempting to fraudulently conceal those violations and the violations of ERISA § 204(b)(1)(H), 29 U.S.C. § 1054(b)(1)(H), described above.

135.    Plaintiff and the proposed Class seek and are entitled to relief for and as a result of this violation under ERISA § 502(a), 29 U.S.C. § 1132(a).

<u>**Prayer for Relief**</u>

WHEREFORE, Plaintiff prays that judgment be entered against Defendants and that the Court award the following relief:

A.    Certification of this action as a class action for all purposes of liability and relief and appointment of undersigned counsel as class counsel pursuant to Fed. R. Civ. P. 23.

B.    Judgment for Plaintiff and the Class against Defendants on all claims expressly asserted and/or within the ambit of this Complaint.

C.     An order enjoining the Plan Administrator from continuing to violate the law and/or the terms of the Plan including such terms of the Plan as are implied by law in the manners alleged or referenced in this Complaint or shown by the facts.

D.     An order reforming the Plan and/or compelling the Company to reform the Plan and/or compelling Defendants to bring the terms and administration of the Plan into compliance with the law, in all cases effective as of the date the alleged violations first occurred.

E.     Following entry of predicate relief and/or reformation of the Plan that conforms its terms to the requirements of the law, a further order requiring Defendants to re-calculate the benefit amounts due or past due under the terms of the Plan in accordance with the requirements of ERISA, and, where applicable, for the Plan to pay the difference, plus interest, to or on behalf of all Class members who received less in benefits or benefit accruals than the amount to which they are entitled and/or to pay benefits to which Class members are entitled in all applicable optional forms.

F.     An order awarding pre- and post-judgment interest.

G.     An order awarding attorney's fees on the basis of the common fund doctrine (and/or other applicable law, at Plaintiff's election), along with the reimbursement of the expenses incurred in connection with this action.

H.     An order awarding, declaring or otherwise providing Plaintiff and the Class all other such relief under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that Plaintiff may subsequently specify and/or that the Court may deem appropriate.

Dated:  February 1, 2012            Respectfully submitted,


                                    _____
                                    Eli Gottesdiener [EG 0111]

                                    **GOTTESDIENER LAW FIRM, PLLC**
                                    498 7th Street
                                    Brooklyn, NY  11215
                                    (718) 788-1500
                                    (718) 788-1650
                                    eli@gottesdienerlaw.com

                                    *Attorney for the Plaintiff and the proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 2, 2012, I caused Defendants to be served with the foregoing Plaintiff's Class Action Complaint by causing a copy to be served on defense counsel listed below in the manner shown:

Myron D. Rumeld (By Hand and courtesy copy via email)
Proskauer Rose LLP
Eleven Times Square
New York, NY  10036-8299
mrumeld@proskauer.com

Bridgit M. DePietto (courtesy copy via email)
Proskauer Rose LLP
1001 Pennsylvania Ave, N.W.
Suite 400 South
Washington, DC 20004-2533
bdepietto@proskauer.com

Howard Shapiro (courtesy copy via email)
Nicole A. Eichberger (courtesy copy via email)
Proskauer Rose LLP
650 Poydras Street
Suite 1800
New Orleans, LA  70130-6146
howshapiro@proskauer.com
neichberger@proskauer.com

_____ */s/Eli Gottesdiener*
Eli Gottesdiener