Myron D. Rumeld (MR-3941)
Bridgit M. DePietto (BD-1110)
Howard Shapiro (*admitted pro hac vice*)
Page W. Griffin (*admitted pro hac vice*)
Proskauer Rose LLP
Eleven Times Square
New York, NY 10036-8299
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| **GEOFFREY OSBERG**<br>**On behalf of himself and on**<br>**behalf of all others similarly situated**<br><br>                              **Plaintiffs,**<br><br>          **v.**<br><br>**FOOT LOCKER, INC. and**<br>**FOOT LOCKER RETIREMENT PLAN,**<br><br>                    **Defendants.** | 07 Civ. 1358 (KBF)<br><br>**ECF CASE** |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................1

FACTS ...................................................................................................................3

    I.     Foot Locker's Business..............................................................................3

    II.    The Plan and its Design Before and After January 1, 1996 .......................4

    III.   Calculation of Cash Balance Benefits for Participants Who Accrued Benefits Under the Pre-1996 Plan ...........................................................................6

    IV.   Plaintiff's Employment and Benefit History .............................................6

    V.    Osberg's Complaint..................................................................................8

    VI.   Defendants' Motion to Dismiss .................................................................9

    VII.   Subsequent Proceedings..........................................................................10

    VIII.  The Amended Complaint ........................................................................10

    IX.   Evidence Relevant to Plaintiff's Assertions of Harm ...............................12

ARGUMENT .........................................................................................................13

    I.     STANDARD OF REVIEW ....................................................................13

    II.    PLAINTIFF HAS FAILED TO ASSERT A VIABLE CLAIM FOR RELIEF.........14

         A.    *Amara's* Ruling on the Standards for Proving Harm and Causation Limit Osberg's Ability to Demonstrate an Entitlement to Equitable Relief....................................................................................................14

         B.    Plaintiff Cannot Satisfy the Supreme Court's Requirements for Demonstrating Causation and Harm...................................................17

    III.   COUNT III IS BARRED BY THE STATUTE OF LIMITATIONS .......................20

         A.    A Three-Year Limitations Period Should Apply to Plaintiff's SPD Claim....................................................................................................20

         B.    Osberg's SPD Claim Accrued More Than Three Years Before Suit Commenced.............................................................................................22

    CONCLUSION.....................................................................................................24

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Barry v. Trustees of the Int'l Ass'n Full-Time Salaried Officers & Employees of Outside Loc. Unions & Dist. Counsel's (Iron Workers) Pension Plan*,
404 F. Supp. 2d 145 (D. D.C. 2005) ...................................................................18

*Bell v. Pfizer*,
626 F.3d 66 (2d Cir. 2010) ...............................................................................15

*Burke v. Kodak Retirement Income Plan*,
336 F.3d 103 (2d Cir. 2003) .........................................................................15, 21

*Burke v. PricewaterhouseCoopers LLP Long Term Disability Plan*,
572 F.3d 76 (2d Cir. 2009) ...........................................................................20, 21

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)..........................................................................................13

*Chang v. Safe Horizon*,
No. 03 CIV 10100WHP, 2005 WL 2125660 (S.D.N.Y. Sept. 1, 2005),*aff'd*, 245 F.
App'x 838 (2d Cir. 2007) ...................................................................................13

*Charles v. Pepco Holdings, Inc.*,
No. 05-702-SLR, 2006 U.S. Dist. LEXIS 38941 (D. Del. June 12, 2006) ...........................22

*Cigna Corp. v. Amara*,
131 S. Ct. 1866 (2011) .................................................................................passim

*Cigna Corp. v. Amara*,
Nos. 08-3388-cv (L), 2009 WL 3199061 (2d Cir. Oct. 6, 2009)..........................................10

*Coraggio v. Time Inc. Magazine Co.*,
No. 94 CIV 5429 (MBM), 1996 WL 139786 (S.D.N.Y. Mar. 28, 1996), *aff'd*, 108
F.3d 329 (2d Cir. 1997).....................................................................................13

*Cordero v. Astrue*,
574 F. Supp. 2d 773 (S.D.N.Y. 2008) ...................................................................20

*DelCostello v. Int'l Bhd. of Teamsters*,
462 U.S. 151 (1983)..........................................................................................20

*Durand v. Hanover Insurance Group, Inc.*,
No. 3:07CV-130-JDM, 2011 U.S. Dist. LEXIS 35531 (W.D. Ky. Mar. 31, 2011) ..............22

*Esden v. Bank of Boston,*
    229 F.3d 154 (2d Cir. 2000) .................................................................5

*Estate of Becker v. Eastman Kodak Co.,*
    120 F.3d 5 (2d Cir. 1997) ...................................................................16

*Ferrer v. Chevron Corp.,*
    484 F.3d 776 (5th Cir. 2007) ..............................................................16

*Forschner Group, Inc. v. Arrow Trading Co., Inc.,*
    124 F.3d 402 (2d Cir. 1997) ...............................................................16

*Frommert v. Conkright,*
    433 F.3d 254 (2d Cir. 2006) ...............................................................21

*Glanton v. AdvancePCS Inc.,*
    465 F.3d 1123 (9th Cir. 2006) ............................................................19

*Goenaga v. March of Dimes Birth Defects Found.,*
    51 F.3d 14 (2d Cir. 1995) ...................................................................13

*Kendall v. Employees Ret. Plan of Avon Products,*
    561 F.3d 112 (2d Cir. 2009) ...............................................................18

*Layaou v. Xerox Corp.,*
    238 F.3d 205 (2d Cir 2001) ................................................................21

*Novella v. Westchester County,*
    661 F.3d 128 (2d Cir. 2011) ...............................................................23

*Osberg v. Foot Locker, Inc.,*
    656 F. Supp. 2d 361 (S.D.N.Y. 2009) ..........................................20, 21

*Pearson v. Voith Paper Rolls, Inc.,*
    656 F.3d 504 (7th Cir. 2011) ..............................................................17

*Romero v. Allstate Corp.,*
    404 F.3d 212 (3d Cir. 2005) ...............................................................22

*Schad v. Stamford Health Sys., Inc.,*
    522 F. Supp. 2d 416 (D. Conn. 2007) ................................................21

*Schwapp v. Town of Avon,*
    118 F.3d 106 (2d Cir. 1997) ...............................................................13

*Shrader v. CSX Transp., Inc.,*
    70 F.3d 255 (2d Cir. 1995) .................................................................20

*Skinner v. Northrop Grumman Ret. Plan B*,
    673 F.3d 1162 (9th Cir. 2012) ........................................................................17

*Skinner v. Northrop Grumman Retirement Plan B*,
    No. CV 07-3923-JFW, 2010 WL 679061 (C.D. Cal. Jan. 26, 2010) ...................17

*Veilleux v. Atochem North America, Inc.*,
    929 F.2d 74 (2d Cir. 1991) ..............................................................................18

*Wilkins v. Mason Tenders Dist. Council Pension Fund*,
    445 F.3d 572 (2d Cir. 2006) ....................................................................... 15, 21

*Willett v. Blue Cross & Blue Shield of Ala.*,
    953 F.2d 1335 (11th Cir. 1992) ........................................................................16

STATUTES

C.P.L.R. § 214...................................................................................................22

C.P.L.R. § 213...................................................................................................21

29 U.S.C. § 1055 (2006) .....................................................................................7

OTHER AUTHORITIES

Fed. R. Civ. P. 56(c)(2)......................................................................................13

## PRELIMINARY STATEMENT

Geoffrey Osberg ("Osberg") commenced this lawsuit in 2006, over four years after terminating his employment with Foot Locker, Inc. ("Foot Locker" or the "Company"). His Complaint asserts, on behalf of himself and a putative class of over sixteen thousand other participants, claims arising from the amendment of the Foot Locker Retirement Plan (the "Plan") to a cash balance formula back in 1996. Osberg concedes that he had no complaints about the Plan or its amendment while employed with Foot Locker; or with the manner in which his benefits were calculated when he terminated his employment in 2002 and elected to receive a lump sum in lieu of a retirement annuity. Nevertheless, Osberg now seeks to recover additional benefits based on his alleged misunderstanding as to how the cash balance formula operated.

Of four claims originally asserted, two remain. Each is based on the contention that Foot Locker and the Plan failed to properly advise Plan participants of the consequences of the Plan amendment. Specifically, Osberg claims that participants were not made aware that, as a result of the manner in which the starting balance in their cash balance accounts was calculated, they experienced "wear-away" – a period during which the benefit they were already entitled to under the prior Plan formula exceeded their benefit under the cash balance plan. Based on this allegation, Osberg asserts claims for breach of fiduciary duty and violation of the statutory provisions governing the content of the Summary Plan Description ("SPD").

With factual discovery now effectively completed,[1] it is clear that Osberg's claims should be dismissed because the harm that Osberg claims resulted from the alleged communication violations does not entitle him to the monetary relief he is seeking. Osberg's statutory claim challenging the content of the SPD should be dismissed in any event because it is time-barred.

---

[1] The only discovery outstanding relates to document preservation issues, and the completion of expert discovery with respect to expert reports that have already been exchanged. Neither of these impact the undisputed facts cited in the instant Motion.

Both grounds for Defendants' Motion follow from the Supreme Court's recent ruling in *Cigna Corp. v. Amara*, 131 S. Ct. 1866 (2011), a case presenting similar (but factually distinguishable) claims arising from a cash balance conversion.  In *Amara*, the Supreme Court ruled that, while monetary relief for plan communication violations may be available as a matter of equity, to recover such relief the participant bears the burden of proving that he/she was actually harmed by the communications in question, and that the relief he/she is seeking would remedy that harm.  In so ruling, the Court rejected two arguments that served as the premise for Osberg's claims for relief as originally pled: that participants can recover benefits based on their understanding of the terms the SPD, without more; or, alternatively, that participants can recover benefits based merely on a showing of "likely harm" from the communications violations.

Osberg has tried to plead his way around the obstacles presented by the *Amara* decision, but this effort fails.  Osberg now contends that better disclosures about the terms of the Plan and the consequences of wear-away would have led to complaints that somehow would have caused Foot Locker to adopt different Plan amendments without wear-away.  Even if, for purposes of summary judgment only, it is assumed that Osberg has put forth proof that some formula other than the existing cash balance formula might have been adopted,[2] there is no evidence to suggest what formula that would be.  Without knowing the particulars of this alternative plan, there is no way to tell whether it would have resulted in greater benefits for Osberg, let alone for the class of dissimilarly situated participants whom he purports to represent, than the changes adopted (which included the addition of a 401(k) plan).  Thus, Osberg's entire claim for additional benefits is based on nothing more than speculation and conjecture.  He cannot sustain his burden of proving harm or an entitlement to relief linked to that harm, as *Amara* requires.

---

[2] Defendants would, if necessary, demonstrate that this evidence should be struck as unreliable under *Daubert* or that it is contradicted by evidence showing that Foot Locker would not have varied the Plan changes it adopted.

*Amara* also establishes why Count III of Osberg's Amended Complaint, alleging a violation of the statutory rules governing summary plan descriptions, should be dismissed as time-barred.  When first presented in Defendants' motion to dismiss, this argument was rejected because the Court concluded that the "analogous" state law limitations period to apply was the six-year limitations period governing breach of contract claims.  *Amara* holds, however, that the SPD claim is not contractual in nature.  The contractual limitations rule is thus no longer appropriate.  Instead, the three-year limitations rule governing statutory violation claims should apply.  Under the standards for determining the accrual of a statutory claim under ERISA, as recently articulated by the Second Circuit, Osberg's claim accrued well over three years before commencing this suit.

Accordingly, the Court should grant this motion for summary judgment and dismiss the lawsuit or, alternatively, dismiss Count III of the Complaint.

## FACTS

### I.    Foot Locker's Business

Foot Locker, Inc. was, for the relevant period, a "leading global retailer of athletic shoes and apparel." (Fact ¶ 1).[3]  Prior to June 1998, Foot Locker was known as Woolworth Corporation.  (Fact ¶ 2).

As of 1995, Woolworth had two operating segments, General Merchandise and Specialty Retail, and approximately 119,000 employees.  (Fact ¶¶ 3, 11).  The General Merchandise segment offered staple household items.  (Fact ¶ 4).  The Specialty Retail segment was comprised of Foot Locker stores, the Kinney shoe store chain, and other types of specialty stores including cosmetic jewelry, music boxes, watches, and women's apparel.  (*Id.*).

---

[3] Defendants' accompanying Local Civil Rule 56.1 Statement Of Undisputed Material Facts Pursuant to Local Rule 7.5(c) in Support of Motion for Summary Judgment is cited herein as "Fact ¶ _."

By late 1995, when the cash balance conversion was adopted, the Company was experiencing financial difficulties that led to a restructuring of its operations and the displacement of over half of its existing workforce within two-years. (Fact ¶ 9). It had experienced significant losses, its stock price was at a three-year low, its earnings had fallen significantly, and its credit rating had been downgraded. (Fact ¶¶ 5-8). As a result, by 1997 the Company decided to eliminate the General Merchandise businesses and focus on specialty retail stores. (Fact ¶ 10). By early 1998 its workforce was down to 75,000 employees. (Fact ¶ 12).

## II.   The Plan and its Design Before and After January 1, 1996

Before January 1, 1996, the Foot Locker Retirement Plan[4] was designed as a traditional career average pay defined benefit plan. (Fact ¶ 13). Participants received a monthly retirement benefit, commencing at the normal or early retirement age, which was based on years of service and a percentage of compensation. (Fact ¶ 14).

Responding to instructions issued to all departments to explore cost savings measures, in 1995 the Corporate Benefits Department recommended changes to the retirement benefits program. (Fact ¶¶ 15, 16). The changes were intended to save costs, as well as to modernize the retirement benefits in a fashion that would better serve the interests of the Company's mobile work force. Specifically, the Corporate Benefits Department recommended, and the Company implemented, amendments pursuant to which, effective January 1, 1996, (i) the Plan design was converted to a cash balance formula and (ii) a new 401(k) plan was simultaneously adopted. (Fact ¶¶ 16, 17).

---

[4] From its inception on January 1, 1946 until June 11, 1998, the Plan was titled the Woolworth Retirement Plan. Thereafter, as a result of Woolworth Corporation changing its name to the Venator Group, Inc., the Plan was renamed the Venator Group Retirement Plan. Effective November 1, 2001, the Venator Group, Inc. changed its name to Foot Locker, Inc., and since then the Plan has been known as the Foot Locker Retirement Plan. (Am. Compl. ¶¶ 6, 7; The Woolworth Retirement Plan As Amended and Restated Effective January 1, 1996, at Preface, attached as Exhibit ("Ex.") 5 to the Declaration of Myron D. Rumeld ("Rumeld Dec.")).

The 401(k) plan enabled employees to defer taxes on a portion of their earnings by making contributions to the plan with deductions from their earnings, and to receive matching contributions for these contributions in the form of company stock.  The match was equal to 25% of the participant's contribution, up to 1% of the participant's compensation.  (Fact ¶ 18).

Under the cash balance formula, each participant was assigned a notional account, the amount of which was determined by reference to the "initial" or opening account balance, if any, and thereafter increased by compensation credits, measured as a percentage of earnings, and interest on the outstanding cash balance account at the rate of 6% annually.  (Fact ¶ 19).  The schedule for pay credits increased as the participant's years of service increased.  (Fact ¶ 24).

Unlike the prior plan, which entitled participants to obtain their retirement benefit only in the form of an annuity (Rumeld Dec., Ex. 6, The Woolworth Retirement Plan As Amended and Restated January 1, 1989, § 4.03(B)), the cash balance plan enabled participants to take their retirement benefits either in the form of an annuity beginning at retirement or early retirement age, or in the form of a lump sum benefit that was available immediately upon termination.  (Fact ¶ 25).  The annuity was determined by taking the amount in the cash balance account, projecting future interest credit through age 65, and then converting the resulting amount to a monthly benefit using factors required by federal law and IRS regulations.  (Fact ¶ 28).  For participants electing a lump sum, the Plan would provide the amount in the cash balance account, unless, in light of the applicable prevailing interest rates prescribed by the IRS, the present value of the age 65 annuity would be greater than the amount in the account.  (Fact ¶ 29).[5]

The value of the lump sum option is evident from the fact that more than 90% of all Plan participants elected to take a lump sum distribution, in lieu of a retirement annuity.  (Fact ¶ 31).

---

[5]  To avoid an illegal cut back of accrued benefits, the lump sum benefit must be at least equal to the present value of the age 65 annuity.  *Esden v. Bank of Boston*, 229 F.3d 154, 159 (2d Cir. 2000).  An adjustment to avoid an illegal cut-back is needed when the IRS interest rate is, at the time of calculation, lower than the Plan's interest rate of 6%.

III.   **Calculation of Cash Balance Benefits for Participants**
**Who Accrued Benefits Under the Pre-1996 Plan**

For participants who joined the Plan before January 1, 1996, the initial account balance was the lump sum present value of their frozen accrued benefit under the prior Plan formula, as of December 31, 1995.  (Fact ¶ 20).  To calculate this amount, the Plan used a 9% rate of interest and the applicable mortality table as set forth in IRS Revenue Ruling 95-6.  (Fact ¶ 21).  For participants who, at the time of the conversion, had attained age 50 and completed at least 15 years of service, the initial account balance was enhanced because this group was likely to be adversely affected by the amendment.  (Fact ¶ 22).

The Plan guarantees that a departing participant never receives less than the benefit accrued under the prior plan formula.  Participants who accrued benefits before and after January 1, 1996 are entitled, at the time of their retirement or separation from service, to the greater of (A) their frozen accrued benefit as of December 31, 1995 under the prior formula, or (B) their benefit as calculated under the Plan's cash balance formula.  (Am. Compl. ¶ 25; Rumeld Dec., Ex. 5, §§ 1.02, 6.02).  Thus, when a participant terminates employment, the Plan compares the annuity to which the participant is entitled under the pre-1996 plan to the annuity under the cash balance account formula, and will award the larger of the two annuities or, if the participant so elects, the larger of the equivalent lump sums.  (Fact ¶¶ 26-27).

IV.   **Plaintiff's Employment and Benefit History**

Osberg worked for Foot Locker from November 15, 1982 to September 11, 2002.  (Fact ¶ 32).  He last worked as a Store Manager.  (Rumeld Dec., Ex. 24, at 24:17-24, 25:4-6).  Osberg left the Company to pursue a "better career opportunity" elsewhere, having concluded that his prospects for further promotion were not promising.  (*Id.* at 15:3-14, 34:8-36:3, 37:8-15).

When Osberg left Foot Locker, he elected to receive his Plan benefits in the form of a lump sum. (*Id.* at 44:22-45:2, 55:2-4; Rumeld Dec., Ex. 16). Osberg felt that, by investing his Plan holdings on his own, he could generate larger returns than he would have received had he left them in the Plan. (Fact ¶ 36). Osberg's lump sum was calculated based on his pre-1996 benefit, as this was larger than the benefit to which he was entitled under the cash balance formula. (Fact ¶ 38). Osberg was provided with a statement that showed him both the amount in his cash balance account – $20,093.78 – and the larger lump sum to which he was entitled – $25,695.96. (Fact ¶ 37).

The fact that Osberg's lump sum benefit, based on his pre-1996 Plan accruals, was worth more than his benefit based on his cash balance account was due in part to the fact that: (i) his starting balance was calculated based on a 9% interest rate; and (ii) pursuant to ERISA, his lump sum benefit was determined based on the 30-year Treasury rate which, when he departed, was only 5.82%.[6] (Fact ¶ 39). Because lower interest rates translate into higher lump sums, the lump sum value of Osberg's pre-1996 benefit exceeded the combined amount of his initial starting balance and his cash balance accruals since 1996.

Osberg claims not to have understood at the time he received his lump sum payment in 2002 that this payment was based on his pre-1996 accrued benefit. (Rumeld Dec., Ex. 24, at 49:15-50:7). He claims to have first become aware of this sometime after November 2006, when he was solicited by the attorney he eventually retained to serve as a class representative in a different lawsuit against the Foot Locker Plan. (*Id.* at 50:8-10, 67:7-15, 73:11-24; Rumeld Dec., Ex. 17). Osberg admits, however, that on or before his receipt of his cash balance benefit, he

---

[6] Notably, Congress later concluded these interest rates were too low, and substituted the much higher corporate bond rate as the interest rate metric, instead of the 30-year Treasury rate. *See* Pension Protection Act of 2006, 29 U.S.C. § 1055 (2006) (amending 26 U.S.C. § 417(e)(3)(D) to incorporate the corporate bond yield in 25 U.S.C. § 430(h)). If these rates were in place in 2002, Osberg's minimum benefit, based on his pre-1996 benefit accrual, would have been much lower.

received: (1) a notice explaining that, for purposes of calculating lump sum benefits, the Plan used the 30-year Treasury rate; (2) a written explanation of the cash balance conversion, which, *inter alia*, explained that the starting balance for the cash balance account had been calculated using a 9% interest rate (not the 30-year Treasury rate); (3) a summary plan description explaining that "[y]our *accrued benefit* at the time your employment terminates is the greater of the amount determined under the *Plan* as amended on January 1, 1996 or your accrued benefit as of December 31, 1995"; and (4) a statement showing that his lump sum benefit was in fact over $5,000 greater than his cash balance account.  (Fact ¶ 33-35).

## V.   Osberg's Complaint

On November 20, 2006, Osberg filed a complaint in the Northern District of Illinois, asserting various legal challenges to the validity of the Plan.  (Rumeld Dec., Ex. 18).  On February 12, 2007, he withdrew that complaint (Rumeld Dec., Ex. 19); but on February 23, 2007, he filed a new Complaint in the Southern District of New York.  (Dkt. #1).

The new Complaint alleged four causes of action: one alleging that the Plan terms illegally violated ERISA's age discrimination provisions; and three challenging how Foot Locker and the Plan communicated with Plan participants regarding the cash balance conversation. (Dkt. #1, ¶¶ 64-75).  With respect to the communication claims, Osberg alleged that Foot Locker and the Plan failed to properly alert participants that, pursuant to the Plan's design, they would experience a period of time during which their pre-1996 benefit exceeded their cash balance benefit, or "wear-away."  (*Id.* ¶ 40).  Based on this allegation, Osberg asserted claims for alleged violations of Section 204(h) of ERISA, 29 U.S.C. § 1054(h), which requires a written notice to plan participants of plan amendments that could significantly reduce future accruals, and of Section 102 of ERISA, 29 U.S.C. § 1022, which sets forth the requirements of a summary plan description, as well as a claim for breach of fiduciary duty.  (*Id.* ¶¶ 42-59, 67-75).  These claims

8

purported to be brought on behalf of a class consisting of "[a]ll persons who were participants in the Foot Locker Retirement Plan (the "Plan") as of December 31, 1995 and on or after January 1, 1996 (as defined under the Plan), and who was either paid a benefit from the Plan after December 31, 1995 or is still entitled to a benefit from the Plan; and the beneficiaries and estates of such persons." (*Id.* ¶ 10).

In a section titled "Harm or Likely Harm as a Result of Defendants' Violations," the Complaint alleged that, by failing to inform plaintiffs of "wear-away," Defendants prevented Osberg and putative class members "from taking steps, including seeking injunctive relief, to stop the proposed amendment from taking effect," and from "seeking and obtaining suitable alternative employment elsewhere," and that it also "adversely affect[ed] their retirement choices, planning and understanding." (*Id.* ¶ 62).

## VI.  **Defendants' Motion to Dismiss**

Defendants moved to dismiss the Complaint on several grounds, including statute of limitations. (Dkt. # 11). Defendants argued that New York's three-year statute of limitations for statutory violation claims, CPLA 214(2), should apply to Osberg's statutory claims, and these claims accrued, at the latest, when he received his lump sum benefit in 2002. (*Id.*).

In a decision dated September 16, 2009, the Court dismissed the age discrimination and Section 204(h) claims (Counts I and II), but denied the motion as to the SPD and fiduciary breach claims (Counts III and IV). (Dkt. 33, pp. 25-28). The Court rejected the statute of limitations argument because it concluded that New York's six-year statute of limitations for contractual breach claims under CPLR 213 should apply to Osberg's SPD claim, rather than the three-year limitations period advocated by Defendants. (*Id.*, pp. 15, 17-18).[7]

---

[7] The Court also determined that there were factual issues as to whether Osberg was on notice of his claims more than six years before he commenced the lawsuit. (*Id.*, p. 18).

## VII.    **Subsequent Proceedings**

Following the Court's ruling, the parties engaged in discovery directed at class

certification issues.  In August 2010, however, the parties jointly moved to stay further

discovery, pending a ruling by the Supreme Court in *Cigna Corp. v. Amara*, Nos. 08-3388-cv

(L), 08-3460-cv (XAP), 2009 WL 3199061 (2d Cir. Oct. 6, 2009) (summary order).  (Rumeld

Dec., Ex. 20).  In a letter written in support of the stay, Plaintiff's counsel stated in pertinent part:

> *Amara* held that participants in the CIGNA cash balance plan were "likely
> harmed" by the SPD failures – because, for example, they were deprived of the
> opportunity to object to the new plan design, negotiate for a higher salary, or
> consider alternative employments – and as a result were entitled to relief under
> ERISA.
>
> * * *
>
> If the Supreme Court were to determine that "likely harm" is not the correct
> standard but that each participant must individually prove detrimental reliance,
> certification of a class in *Osberg* and even providing "proof" that Mr. Osberg in
> fact relied on the defective SPDs may be impractical – in which case Plaintiff
> would likely abandon his SPD-based claims and appeal one or more of the claims
> that the court previously dismissed.  If, on the other hand, the Supreme Court
> endorses the view that a materially-deficient SPD presumptively harms
> participants, discovery relating to likely harm could be avoided or greatly
> curtailed.  (*Id.*).

## VIII.    **The Amended Complaint**

Following the Supreme Court's ruling in *Cigna Corp. v. Amara*, 131 S. Ct. 1866

(2011), Osberg moved unsuccessfully to reinstate his Section 204(h) claim.  (Dkt. ## 48,

52).  He then filed an Amended Class Action Complaint ("Amended Complaint") on

February 1, 2012.  (Dkt. # 57).  The Amended Complaint contained the same four legal

causes of action asserted in his prior Complaint,[8] but amended the claim of harm.  It now

---

[8] The Amended Complaint added an allegation that Osberg was not made aware of the fact that, had he
waited until age 55 to take his retirement benefit, he would have been entitled to a subsidized early
retirement benefit that was worth more than the lump sum benefit he elected to receive when leaving Foot
Locker.  (*Id.* ¶ 50).  The Amended Complaint contains no demand for relief specifically attributable to this
assertion, however, nor does it purport to define a class of participants who share this allegation.

contends that the alleged failure to advise participants of "wear-away" deprived Osberg and the putative class of:

> the right to the information required by [ERISA] and the opportunity to contest or react to these changes with that information; . . . the opportunity to benefit from action employees may have taken as a group to contest or protest the changes (*e.g.*, in the form of higher benefits); . . . the opportunity to benefit from action government officials or agencies, or customers, investors, the press, or other members of the public may have taken to challenge the changes (*e.g.*, in the form of higher benefits); and/or the greater benefits (and/or less significant reductions) that may have resulted had the Company known it would have to fully and honestly disclose the effects of any plan amendment." (*Id.* ¶ 118).

Although the Prayer for Relief is not specific as to the relief demanded for the communication claims,[9] in response to interrogatories Osberg stated that he is seeking

> a declaration that Putative Class Members are entitled, among other things, to benefits calculated in a manner consistent with the 1996 Summary Plan Description and other widely-disseminated official communications – specifically, a benefit calculated under the "A + B" method, where "A" is a participant's benefit properly calculated under the terms of the Plan in effect as of 12/31/95 (including any entitlement to an early retirement subsidy and/or optional form of benefit protected under ERISA § 204(g)), and "B" is the benefit attributable to cash balance credits on account of service performed on or after January 1, 1996, adjusted as necessary to maintain an overall rate of benefit accrual comparable to the rate of accrual participants would have experienced had the pre-1996 traditional defined benefit formula remained in place on and after January 1, 1996, and further adjusted to reflect the value of early retirement subsidies and other benefits, rights and features that Defendants' defective communications caused Plaintiff and participants to forfeit unwittingly.

(Fact ¶ 41). When asked to describe any other relief he was seeking (Fact ¶ 42), Osberg stated that he "is under no obligation to lock himself in at this stage of the proceedings to particular types of relief," that he had described "the types of relief he currently anticipates he will seek,"

---

[9] Without distinguishing between the age discrimination and communication claims, the Prayer for Relief requests that the court: "(D) reform the Plan and/or compel the Company to reform the Plan and/or compel Defendants to bring the terms and administration of the Plan into compliance with the law; (E) following entry of predicate relief and/or reformation of the Plan, order Defendants to recalculate the benefit amounts due or past due under the terms of the Plan in accordance with the requirements of ERISA, and, where applicable, for the Plan to pay the difference, plus interest, to or on behalf of all Class members who received less in benefits or benefit accruals than the amount to which they are entitled and/or to pay benefits to which Class members are entitled in all applicable optional forms; . . . and (H) all other such relief under ERISA § 502(a), 29 U.S.C. § 1132(a), or any other applicable law, that Plaintiff may subsequently specify and/or that the Court may deem appropriate." (Am. Compl. pp. 39-40).

11

and that he would not "take any options off the table at this point by purporting to describe 'any and all' relief he may seek if he prevails on one or more of his claims." (Fact ¶ 43).

## IX.   Evidence Relevant to Plaintiff's Assertions of Harm

Internal documents produced by Foot Locker show that the Company's benefits personnel, together with their actuarial consultants, considered various plan changes before the adoption of the cash balance plan. (Rumeld Dec., Ex. 8 at FL-OSB 005458). One alternative was to freeze the Plan temporarily. (*Id.*). The documents indicate that this change was deemed unhelpful because, at least if implemented in isolation, it would provoke bad morale. (*Id.*).

Several Foot Locker employees who were involved with the cash balance conversion were asked whether, in light of wear-away, the conversion functioned as a partial freeze of benefits since, even though participants may have accrued benefits under the 401(k) plan, they did not accrue benefits during the wear-away period. (*See, e.g.,* Rumeld Dec., Ex. 28, at 224:14-225:15, 228:5-12).[10]   The witnesses conceded this might be the case, but testified that they did not at the time view the amendment that way. (*Id.* at Tr. 315:24-316:5, 228:5-12; Rumeld Dec., Ex. 29, at 179:17-22; 249:10-16, 382:20-383:10; Rumeld Dec., Ex. 26, at 198:10-19, 208:20-209:3, 254:14-17; Rumeld Dec., Ex. 25, at 76:24-77:6).

In addition, several of Osberg's experts have opined that, had Defendants issued better communications concerning the operation of the cash balance amendment and the wear-away effect, or had management understood these issues better, the Company would have been obliged to amend the Plan differently, so as to remove the wear-away effect. (Fact ¶ 44). No evidence has been cited, however, and no opinions offered, to support the conclusion that the Company would have designed the cash balance plan in such a way as to provide participants with the

---

[10] As a legal matter, whether and to what extent accruals were "frozen" could only be determined at termination and/or benefit commencement, since only at those points the factors used to determine the participant's benefit would be fixed, including the interest rate used to value the minimum frozen benefit.

same level of benefits as provided for by the "A plus B" formula set forth in Plaintiff's interrogatory responses. Nor is there any evidence of a particular alternative form of benefits that Foot Locker would have adopted and that would have benefited all of the putative class members. As noted, more than half of the participants terminated within two years of the conversion (Fact ¶ 30), and thus their benefit was "frozen" for a very short time period. For those participants, the conversion provided an opportunity, not previously available, to receive a lump sum benefit based on a very favorable interest rate.

## ARGUMENT

### I.   STANDARD OF REVIEW

Summary judgment must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The moving party bears the burden of proving "an absence of material fact issues." *Coraggio v. Time Inc. Magazine Co.*, No. 94 CIV 5429 (MBM), 1996 WL 139786, at *4 (S.D.N.Y. Mar. 28, 1996) (Mukasey, J.), *aff'd*, 108 F.3d 329 (2d Cir. 1997). This burden is satisfied if, as in this case, the moving party can point to the absence of evidence to support an essential element of the non-moving party's claim. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).

To defeat a motion for summary judgment, the non-moving party may not simply rely on "conclusory allegations." *Chang v. Safe Horizon*, No. 03-civ-10100, 2005 WL 2125660, at *4 (S.D.N.Y. Sept. 1, 2005) (Pauley, J.) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)), *aff'd*, 245 F. App'x 838 (2d Cir. 2007). "[M]ere speculation or conjecture" also are not sufficient. *Id.* (citation omitted). Rather, a plaintiff "must come forward with evidence that would be sufficient to support a jury verdict in [her] favor." *Id.* (*citing Goenaga*, 51 F.3d at 18).

13

**II.**   **PLAINTIFF HAS FAILED TO ASSERT A VIABLE CLAIM FOR RELIEF**

This lawsuit is intended to recover class-wide, rather than individual, relief.  (Am. Compl. ¶¶ 1,9).  Osberg's  counsel, who sought Osberg out specifically to bring a class action (Rumeld Dec., Ex. 17), conceded as such when seeking a stay of the proceedings pending a ruling in *Amara*.  (Rumeld Dec., Ex. 20).  The claim for relief that Osberg has substituted is not viable, however, either for him or the putative class.  It is predicated on the notion that, had Foot Locker communicated more effectively the potential consequences of the cash balance conversion, Foot Locker would have received complaints that would have caused it to amend the Plan differently.  As there is no evidence of a particular alternative formula that would have been adopted, let alone one that would benefit all plan participants, Osberg's claim for relief must be dismissed.

   **A.**   ***Amara's* Ruling on the Standards for Proving Harm and Causation Limit Osberg's Ability to Demonstrate an Entitlement to Equitable Relief**

The Supreme Court's ruling in *Amara* addressed the showing of harm required to prevail on statutory violations claims arising from plan communications.  Amara contended that no showing of harm was needed because these claims could be brought under Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), as claims for benefits under the terms of the plan.  131 S.Ct. at 1877.  She argued that a participant could recover the benefits promised by the SPD, even if the SPD's terms conflicted with those in the formal plan document.  *Id.*  Alternatively, she claimed that she could recover based on a showing that she was "likely harmed" by the misrepresentations or material nondisclosures.  *Id.* at 1871, 1875.  Defendants contended that monetary relief required a showing of detrimental reliance.  *Id.* at 1881.

Prior to the Supreme Court's ruling, the Second Circuit required a showing of detrimental reliance for breach of fiduciary duty claims based on a material misrepresentation or

14

nondisclosure (*Bell v. Pfizer*, 626 F.3d 66, 75 (2d Cir. 2010), but required only a showing of likely prejudice for communication claims based on an alleged statutory violation. *See Wilkins v. Mason Tenders Dist. Council Pension Fund*, 445 F.3d 572, 585 (2d Cir. 2006); *Burke v. Kodak Retirement Income Plan*, 336 F.3d 103, 113 (2d Cir. 2003).

The Supreme Court ruled, first, that Section 502(a)(1)(B) of ERISA does not provide a remedy for a statutory violation based on improper plan communications. The Court reasoned that, because the SPD is merely a summary of the plan terms, not the plan itself, a participant cannot recover benefits based on the terms of the SPD. *Amara*, 131 S.Ct. at 1878. Instead, the Court stated, relief is available, if at all, only under Section 502(a)(3) of ERISA, 29 U.S.C. §1132(a)(3), which affords appropriate equitable relief for violations of the plan or ERISA. *Id.* at 1881.

Second, the Court stated that, to recover under Section 502(a)(3), a participant must satisfy the elements of a traditional equitable claim. The Court identified three types of equitable remedies that were potentially available in a misrepresentation/material nondisclosure suit: (i) equitable estoppel, which places the plaintiff in the position he/she would have been in had the representation been true; (ii) reformation, which allows the court to reform a document to reflect the mutual understanding of the contracting parties in cases of fraud or mistake; and (iii) surcharge, which allows the court to hold a fiduciary liable for benefits it gained through unjust enrichment or harm caused by fiduciary breach. 131 S. Ct. at 1878-80.[11]

Third, the Court stated that the participant bore the burden of proving the type of actual harm required for the equitable remedy. 131 S. Ct. at 1871. Although it acknowledged that equity courts did not require proof of detrimental reliance in all cases, the Court did not accept

---

[11] The opinion indicated that, whereas reformation might be an available remedy for plan participants who had not yet received their benefits, participants who already cashed out of the plan (like Osberg) could seek relief via the surcharge remedy. *Amara*, 131 S. Ct. at 1880.

that a participant could recover based merely on a showing of "likely harm." Rather, it found that each remedy has unique requirements for proving causation and concrete harm: for estoppel, a showing of detrimental reliance; for reformation, a showing that a fraudulent representation or omission materially affected the substance of the contract; and for surcharge, a showing of "actual harm," meaning that "the violation injured him or her." 131 S. Ct. at 1881-82.

The requirement of showing actual harm and causation is consistent with prior authority in ERISA disclosure cases and traditional trust law claims. *See, e.g., Ferrer v. Chevron Corp.*, 484 F.3d 776, 781 (5th Cir. 2007) (affirming dismissal of claims alleging misrepresentation of eligibility requirements for enhanced retirement benefits upon finding that plaintiffs' complaint that they lost chance to request involuntary termination is "missing the necessary causal link between the misrepresentations and the plaintiffs' eligibility for . . . benefits"); *Estate of Becker v. Eastman Kodak Co.*, 120 F.3d 5, 10 (2d Cir. 1997) (holding that employer breached fiduciary duty by failing to provide adequate SPD, but remanding to determine whether misleading communications caused plaintiff's harm); *Willett v. Blue Cross & Blue Shield of Ala.*, 953 F.2d 1335, 1343 (11th Cir. 1992) (remanding for determination of whether plaintiffs' damages were proximately caused by insurer/co-fiduciary's failure to notify them of suspension of medical plan). *See also Forschner Group, Inc. v. Arrow Trading Co., Inc.*, 124 F.3d 402, 406 (2d Cir. 1997) ("It is well-settled that the essence of equity jurisdiction has been the power to grant relief no broader than necessary to cure the effects of the harm caused by the violation, . . . and 'to mould each decree to the necessities of the particular case'…") (citing *Swann v. Charlotte-Mecklenburg Bd. Of Ed.*, 402 U.S. 1, 16 (1971) ("As with any equity case, the nature of the violation determines the scope of the remedy.") (other citations omitted)).

16

### B.   Plaintiff Cannot Satisfy the Supreme Court's Requirements for Demonstrating Causation and Harm

The Supreme Court's adoption of an "actual harm" standard has significant ramifications for this case.  In other contexts where a plan participant bore the burden of proving harm, courts have dismissed claims upon finding that the participant could not present sufficient evidence to lead a fact finder to conclude that the alleged breach resulted in harm that could be remedied by ERISA.  For example, in *Skinner v. Northrop Grumman Retirement Plan B*, 673 F.3d 1162 (9th Cir. 2012), the Ninth Circuit, in affirming summary judgment for the plan administrator, rejected a claim by a class of participants that they were entitled to plan reformation or surcharge under Section 502(a)(3) to remedy the plan administrator's failure to provide an accurate and unambiguous summary plan description.  *Id.* at 1166-67.  The ruling was based in part on the finding that plaintiffs could not establish that they were actually harmed by the allegedly misleading information.  *Id.* at 1167.  The court observed that the surcharge remedy referenced in *Amara* would be to put the beneficiary in the position he/she would have been in but for the SPD violation.  *Id.*  Plaintiffs had alleged that they remained employed longer than they would have chosen to had the SPD been accurate.  *See Skinner v. Northrop Grumman Ret. Plan B,* No. CV 07-3923-JFW (JTLx), 2010 WL 679061, at *8 (C.D. Cal. Jan. 26, 2010).  But since continued employment did not cause a loss of benefits, they failed to show that the inaccurate SPD caused any harm.  The court expressly rejected plaintiffs' argument that being deprived of their right to an accurate SPD was by itself a compensable harm because that approach would render the administrator "strictly liable for every mistake in summary documents."  673 F.3d at 1167.

Similarly, in *Pearson v. Voith Paper Rolls, Inc.*, 656 F.3d 504, 511 (7th Cir. 2011), the Seventh Circuit affirmed summary judgment for defendant because plaintiff's claim of economic harm was deemed too speculative to justify relief.  Plaintiff alleged that an erroneous pension

17

estimate that he was provided with caused him to negotiate a severance package that was not as generous as it would have been had he been provided with accurate pension information.  He contended that, with the benefit of accurate information, he would have negotiated for more assistance with health insurance premiums.  The court held that this "lost opportunity" claim was "insufficient to demonstrate economic harm unless [plaintiff] can also show that he had any realistic chance of striking a better deal."  *Id.*  Because the plaintiff made no attempt to show that "he would have done any better in the severance negotiations than the deal he ultimately signed," the court held plaintiff's claim was entirely speculative and he was not entitled to a remedy.  *Id.* *See also Veilleux v. Atochem North America, Inc.*, 929 F.2d 74, 76 (2d Cir. 1991) (per curiam) (affirming dismissal of class claim for severance benefits where, inter alia, plaintiffs merely speculated about what they or employer would have done had SPD been adequate); *Kendall v. Employees Ret. Plan of Avon Products*, 561 F.3d 112, 122 (2d Cir. 2009) (finding that participant failed to allege injury-in-fact sufficient to confer standing in action seeking reformation of plan because injury based on an as-yet-to-be-determined increase in benefits was entirely speculative and harm was hypothetical); *Barry v. Trustees of the Int'l Ass'n Full-Time Salaried Officers & Employees of Outside Loc. Unions & Dist. Counsel's (Iron Workers) Pension Plan*, 404 F. Supp. 2d 145, 156 (D. D.C. 2005) (holding that plaintiff's allegations were too speculative to support claim of damages for withholding material information absent evidence showing that different course of action would have been taken if information had been disclosed).

Applying these principles here, Osberg's statutory and fiduciary breach claims must be dismissed because he cannot establish the requisite showing of harm and causation needed to recover the equitable relief he is seeking.  In light of the Supreme Court foreclosing recoveries based on "likely prejudice," Osberg is limited to the relief that flows from the harm he can prove.

18

Even assuming (solely for purposes of summary judgment) that Osberg could somehow demonstrate that complaints about the Plan amendment would have caused the Company to reconsider the amendment, there is no evidence to suggest that the Company would have adopted the "A plus B" formula that Osberg is seeking as a measure of the putative class's monetary relief.  That formula, which in reality translates into a continuation of the accrual of benefits provided under the prior plan, plus any enhancements (such as the lump sums, transition benefits and 401(k) benefits) provided by the plan changes,[12] bears no relationship to any benefit changes considered by the Company, much less anything the Company ever would have adopted.

There is also no basis for granting any other form of monetary relief because there is no basis for finding that the Company would have adopted some other formula that would necessarily have benefitted Osberg and the entire class of participants he seeks to represent. Given the undisputed evidence of Foot Locker's precarious financial position and the corresponding need to reduce costs, any alternative form of benefits would likely have been at a similar cost level.  Thus, if the alternative formula benefitted some participants, it likely would have adversely impacted others.

In short, between Plaintiffs' hypothetical opportunity to complain about the Plan amendment and the desired result – *e.g.*, the "A + B" formula – lay another event unaffected by the alleged disclosure violations and beyond Plaintiffs' control: the Company's decision whether, and if so, what alternative plan formula to offer.  *Cf. Glanton v. AdvancePCS Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006) (finding that plan participants lack standing to assert fiduciary breach claim because they cannot show that their injury will likely be redressed through litigation where any prospective benefits depend on an independent actor exercising discretion that the court

---

[12]  "A plus B" normally would be understood to mean the full value of the accrued benefit through 1995 plus the full value of the cash balance benefit.

cannot control or predict).  Absent concrete evidence of what plan of benefits would have been offered in lieu of the plan that was adopted, Osberg has no legal basis for seeking a monetary recovery based on the theory of harm he has alleged.

**III.   COUNT III IS BARRED BY THE STATUTE OF LIMITATIONS**

Even if the Complaint is not dismissed in its entirety, Count III – alleging a violation of Section 102 of ERISA, regarding the content of the SPD – should be dismissed as time-barred. The Court's previous rejection of this argument should be reconsidered in light of the Supreme Court's decision in *Amara*, which establishes that the premise for the ruling was mistaken.  *See Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) (stating that reconsideration is warranted where "the moving party can point to controlling decisions . . . that might reasonably be expected to alter the conclusion reached by the court"); *Cordero v. Astrue*, 574 F. Supp. 2d 773, 379-80 (S.D.N.Y. 2008) ("The major grounds justifying reconsideration are 'an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'") (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Medication Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)).

**A.   A Three-Year Limitations Period Should Apply to Plaintiff's SPD Claim**

As this Court recognized, because ERISA does not provide a statute of limitations for claims other than claims for fiduciary breach, courts will determine the appropriate statute of limitations by borrowing from the most analogous state law limitations period.  *Osberg v. Foot Locker, Inc.*, 656 F. Supp. 2d 361, 370 (S.D.N.Y. 2009).  *See also DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 158 (1983); *Burke v. PricewaterhouseCoopers LLP Long Term Disability Plan*, 572 F.3d 76, 78 (2d Cir. 2009).  The date the claim accrues for statute of limitations purposes, however, is determined under federal common law principles.  *Osberg*, 656 F. Supp. 2d at 370 (citing *Guilbert v. Gardner*, 480 F.3d 140, 149 (2d Cir. 2007)).

20

For contractual claims for benefits under Section 502(a)(1)(B), courts in this jurisdiction had routinely borrowed from New York's limitations period for breach of contract claims, C.P.L.R. 213. *Id.* *See also Burke*, 572 F.3d at 78. Consistent with these authorities, the Court here applied this limitations period to Osberg's statutory claims, including the claim under Section 102. *Id.* at 371. At the time of the Court's ruling, the Second Circuit had ruled that statutory claims under Section 102 are properly brought under Section 502(a)(1)(B) of ERISA. *See Wilkins*, 445 F.3d at 582-83 (concluding that a defective SPD claim is cognizable under Section 502(a)(1)(B)); *Burke*, 336 F.3d at 114 (2d Cir. 2003) (holding that Section 502(a)(1)(B) provides a remedy for a plaintiff who was likely prejudiced by a defective SPD); *Layaou v. Xerox Corp.*, 238 F.3d 205, 212 (2d Cir 2001) (stating that if summary plan description "'is inadequate to inform an employee of his rights under the plan, ERISA empowers plan participants and beneficiaries to bring civil actions against plan fiduciaries for any damages that result from the failure to disclose' under 29 U.S.C. § 1132(a)(1)(B).") (quoting *Howard v. Gleason Corp.*, 901 F.2d 1154, 1159 (2d Cir. 1990)); *Schad v. Stamford Health Sys., Inc.*, 522 F. Supp. 2d 416, 419 (D. Conn. 2007) (allowing amendment of complaint to allege a defective SPD claim under Section 502(a)(1)(B)). *See also Frommert v. Conkright*, 433 F.3d 254, 270 (2d Cir. 2006) (stating, with respect to plaintiff's statutory notice claims that, "[t]he relief that the plaintiffs seek, recalculation of their benefits consistent with the terms of the Plan, falls comfortably within the scope of § 502(a)(1)(B)"). Since claims under Section(a)(1)(B) are essentially contractual claims for benefits, one could logically infer from this that the appropriate, "analogous," limitations period is the statute of limitations period for breach of contract claims. *Burke*, 572 F.3d at 78 (quoting *Miles*, 698 F.2d at 598).

21

*Amara* now establishes, however, that claims under Section 102 of ERISA are **not** properly characterized as contractual claims for benefits, as they are not actionable under Section 502(a)(1)(B) of ERISA.  *Amara*, 131 S. Ct. at 1880.  The Supreme Court's ruling thus interdicts the reason for borrowing contractual limitations periods for these claims.  Because the SPD is not the plan, any misunderstanding Osberg entertained based on the terms of the SPD would not give rise to a claim for plan benefits; rather it would give rise to a claim for equitable relief for a violation of the statute.  As some jurisdictions had already recognized prior to *Amara*, the appropriate limitations period for such a claim is the state limitations period governing claims for statutory violations.  *See, e.g., Romero v. Allstate Corp.*, 404 F.3d 212, 221 (3d Cir. 2005) (determining that Pennsylvania's general limitations period (rather than contractual limitations period) was appropriate statute of limitations to apply to plaintiff's statutory notice claim under ERISA); *Durand v. Hanover Insurance Group, Inc.*, No. 3:07CV-130-JDM, 2011 U.S. Dist. LEXIS 35531, at *11 (W.D. Ky. Mar. 31, 2011) (applying state statutory limitations period to non-fiduciary 502(a) and 204(h) claims because "'statute liability,' rather than contract liability, provides the more analogous cause of action to an ERISA claim for benefits") (citation omitted); *Charles v. Pepco Holdings, Inc.*, No. 05-702-SLR, 2006 U.S. Dist. LEXIS 38941 (D. Del. June 12, 2006) (applying limitations period for state statutory breaches for claims under Section 204).

Accordingly, for Osberg's Section 102 claim, New York three-year limitations period under C.P.L.R. 214 is the appropriate limitations period.

**B.    Osberg's SPD Claim Accrued More Than Three Years Before Suit Commenced**

Under a three-year limitations period, Osberg's statutory SPD claim would be time barred, since (i) his claim accrued, at the latest, when he received his lump sum benefit; and (ii) Osberg did not commence this lawsuit until four years after he received this benefit.

The legal principles governing the accrual of a statutory claim, for statute of limitations purposes, were recently addressed for the first time by the Second Circuit in *Novella v. Westchester County*, 661 F.3d 128 (2d Cir. 2011).  In *Novella,* a participant brought a class action lawsuit alleging that the calculation of his pension benefits based on two different rates violated the plan terms and ERISA.  Defendants argued that the claims accrued "when the pensioner receive[d] his first check." *Id.* at 144.  Plaintiff argued that a claim does not accrue "until a prospective class member inquires about the calculation of his benefits and the Plan rejects his claim." *Id.* at 147.  The Second Circuit rejected both contentions and held that, "notice of a miscalculation can be imputed to a pensioner — and the statute of limitations will start to run — when there is enough information available to the pensioner to assure that he knows or reasonably should know of the miscalculation." *Id.* at 147.  The case was accordingly remanded for further consideration of when each plaintiff knew or should have known that his benefit payment was miscalculated.[13]

Applying the Second Circuit's rule here, Osberg's statutory claim accrued, at the latest, in 2002, when he terminated his employment and elected to receive his Plan benefits in a lump sum.  By this time, Osberg had been provided with the information on the basis of which he reasonably should have understood the basis for his claim: that his benefit was based on his pre-1996 frozen benefit, and thus was impacted by wear-away.  First, he had received an explanation as to how his initial cash balance amount was calculated, including the use of a 9% interest rate, as opposed to the 30-year Treasury rate used to calculate lump sums.  (Fact ¶ 34).  Second, he was in receipt of the Summary Plan Description, which stated that "[y]our *accrued benefit* at the time your employment terminates is the greater of the amount determined under the *Plan* as

---

[13] Tellingly, the Second Circuit vacated the district court's grant of class certification on this basis, stating: "[W]e are unable to determine whether, and if so when, each class member had information by which he knew or should have known of the miscalculation."  *Id.* at 148

amended on January 1, 1996 or your accrued benefit as of December 31, 1995." (Fact ¶ 33).

Third, he was advised that the amount of his lump sum was significantly greater than the amount

in his cash balance account. (Fact ¶ 37). The only logical inference to be drawn was that his

lump sum benefit was based on his pre-1996 frozen accrued benefit.

Accordingly, Osberg's SPD claim should be found barred by the statute of limitations.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion for summary

judgment and dismiss the Amended Complaint in its entirety or, alternatively, dismiss Count III

of the Complaint.

DATED:  May 21, 2012      Respectfully submitted,

             By: */s/ Myron D. Rumeld*
              Myron D. Rumeld (MR-3941)
              Bridgit M. DePietto (BD-1110)
              Howard Shapiro (*admitted pro hac vice*)
              Page W. Griffin (*admitted pro hac vice*)
              Eleven Times Square
              New York, NY 10036-8299
              d 212.969.3021
              f  212.969.2900

              *Attorneys for Defendants*