UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
GEOFFREY OSBERG                                    :
                                                   :
On behalf of himself and on                        :
behalf of all others similarly situated,           :
                                                   :   Case No.: 07 CV 1358 (KBF)
                    Plaintiff,                      :
                                                   :
        - against -                                :
                                                   :
FOOT LOCKER, INC.,                                 :
                                                   :
FOOT LOCKER RETIREMENT PLAN,                        :
                                                   :
                    Defendants.                    :
---------------------------------------------------------------X

### PLAINTIFF'S (CORRECTED) OPPOSITION TO DEFENDANTS'
### MOTION FOR SUMMARY JUDGMENT

Eli Gottesdiener
Gottesdiener Law Firm, PLLC
498 7th Street
Brooklyn, New York 11215
Telephone:  (718) 788-1500
Telecopier:  (718) 788-1650
Email:    eli@gottesdienerlaw.com

*Attorney for Plaintiff and the proposed
Class*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

FACTS .............................................................................................................6

ARGUMENT ...................................................................................................11

I.      Plaintiff Has an Eminently Viable Reformation Claim ..........................11

II.     Plaintiff Has an Eminently Viable Surcharge Claim ............................15

III.    Defendants' Statute of Limitations Defense to Mr. Osberg's

        SPD Claim Fails ...........................................................................18

        A.      Plaintiff's SPD Claim Did Not Accrue Until Shortly

                Before He Filed Suit ...........................................................18

        B.      6-Year Limitations Period Applies .......................................23

IV.     Conclusion ...................................................................................25

# TABLE OF AUTHORITIES

**CASES**                                                                                            **Page(s)**

*Amara v. Cigna*, 01-CV-2361 (D. Conn. Sept. 22, 2011) ........................................................4, 14

*Bouley v. Bouley,* 19 A.D.3d 1049 (2005) ................................................................................25

*Campanella v. Mason Tenders' Dist. Coun. Pens. Plan*,
    299 F.Supp.2d 274 (S.D.N.Y. 2004).................................................................................24

*Caputo v. Pfizer, Inc.*, 267 F.3d 181 (2d Cir. 2001) ..................................................................21

*Carollo v. Cement and Concrete Workers Dist. Coun. Pension Plan*,
    964 F.Supp. 677 (E.D.N.Y. 1997) ...................................................................................24

*Cigna Corp. v. Amara*, 131 S. Ct. (2011) .............................................................1, 3-4, 11-16, 25

*DeVito v. Pension Plan of Local 819 IBT*, 975 F. Supp. 258 (S.D.N.Y. 1997) ...........................24

*Donovan v. Bierwirth*, 754 F.2d 1049 (2d Cir. 1985)..................................................................16

*Harnett v. NYC Transit Authority*, 86 NY2d 262 (1995)...........................................................25

*Harris Trust & Sav. Bank v. Salomon Bros.*, 530 U.S. 238 (2000) .............................................12

*Kenseth v. Dean Health Plans, Inc.*, No. 11-1560 (7th Cir. June 13, 2011)................................15

*LaFlamme v. Carpenters Local #370 Pension Plan*,
    212 F.R.D. 448 (N.D.N.Y. 2003) ....................................................................................24

*Loengard v. Santa Fe Indus.,* 70 NY2d 262 (1987) ...................................................................25

*Novella v. Westchester County*, 661 F.3d 128 (2d Cir. 2011) ....................................................18

*Simmons Creek Coal Co. v. Doran*, 142 U.S. 417 (1892) ............................................................4

*Tokio Marine & Fire Ins. Co. v. National Union Fire Ins. Co.*,
    91 F.2d 964 (2d Cir. 1937)...............................................................................................12

*Varity Corp. v. Howe*, 516 U.S. 489 (1996) ........................................................................12, 21

*Young v. Verizon's Bell Atlantic Cash Balance Plan*,
    615 F.3d 808 (7th Cir. 2010) ...........................................................................................12

## STATUTES

29 U.S.C. § 1002(7) ...................................................................................................14

ERISA § 102 .....................................................................................................19, 23

ERISA § 102(a) ..............................................................................................................3

ERISA § 104(b) .............................................................................................................3

ERISA § 204(b)(5)(B)(ii)-(iii) ..................................................................................1

ERISA § 204(g) ...........................................................................................................11

ERISA § 204(h) ......................................................................................................3, 24

ERISA § 502(a) ..............................................................................................................3

ERISA § 502(a)(1)(B) ...........................................................................................4, 13

ERISA § 502(a)(3) ...........................................................................................3-4, 12-13

## RULES

C.P.L.R. § 213(1) ......................................................................................................25

C.P.L.R. § 213(2) ......................................................................................................24

C.P.L.R. § 214(2) ...................................................................................................24-25

## OTHER AUTHORITIES

*Handbook of Equity Jurisprudence,* J. Eaton (1901) .................................................11

*Restatement (Second) of Contracts* .............................................................................11

## PRELIMINARY STATEMENT

This case concerns Foot Locker's January 1, 1996 conversion of its traditional pension plan into a "cash balance" plan which was implemented in a way that resulted in an extended "wear-away" period during which many Plan participants earned no benefits whatsoever for several years (7 years in Plaintiff's case). Plaintiff alleges the company violated ERISA's SPD and fiduciary duty provisions by falsely portraying the effect of the conversion, concealing the freeze it imposed and fraudulently obtaining employees' services without providing with the pension benefits Defendants told them they were earning. Compl. (Doc. 57) ¶¶ 52-114, 130-35.

The evidence shows, and for purposes of this motion Defendants do not dispute, Defs. Br. (Doc. 69) at 2, 12, 19, that Defendants knowingly presented the pension revision as entitling employees to benefits equal to the benefits each employee had earned under the pre-amendment traditional formula up to the conversion date (*i.e.,* as of December 31, 1995) ***plus*** the benefits earned under the new cash balance formula after the conversion such that they would immediately be experiencing new pension growth going forward (from January 1, 1996 onwards). (In pension jargon, this would have been an "A plus B" or a no-wear-away form of conversion, which since 2006 has been mandated by law, ERISA § 204(b)(5)(B)(ii)-(iii), but at the time was lawful – ***if*** and only if, properly disclosed to employees). The truth was, however, that the governing plan terms effectively started employees off in a pension hole (via a steep "initial" or opening account balance discount and the use of a greater-of "A ***or*** B" formula) that required employees to effectively re-earn or "wear-away" old plan benefits (their "A" benefit), in most cases for years before the new account-based cash balance formula was even relevant (*i.e.,* yielded them any "B" benefits). (Facts ¶¶ 20-22).[1] At least for purposes of this motion, then, there is no meaningful difference between the pension hoax perpetrated against Foot Locker employees here and that visited upon the Cigna employees the Supreme Court held must be allowed to pursue equitable relief in *Cigna Corp. v. Amara*, 131 S. Ct. 1866 (2011).

---

[1] Citations to "Fact(s)" refer to Plaintiff's Response to Defendants' Local Rule 56.1 Statement and Plaintiff's Local Rule 56.1 Statement of Additional, Material Undisputed Facts, filed as Doc. No. 86.

Nevertheless, Defendants have filed an "absence of evidence" motion for summary judgment.  While conceding for purposes of the motion that Foot Locker violated ERISA's SPD and related fiduciary disclosure standards *and* that these violations permitted Foot Locker to include the wear-away-induced freeze of employees' benefits as a feature of the conversion, *see* Defs. Br. at 2, 12, 19, Defendants argue Mr. Osberg does not have a viable claim because he supposedly lacks evidence showing that he was harmed by Defendants' misrepresentations and the resultant wear-away effect.  *Id*.  Defendants' motion lacks merit, legally and factually.

*First*, Defendants' motion simply ignores the very considerable documentary evidence, and fact and expert witness testimonial evidence, that they know Plaintiff has amassed during discovery on the very point on which Defendants say Mr. Osberg necessarily falls short – namely, "harm" and entitlement to equitable relief.  Indeed, as discussed below, a fair amount of the relevant facts that Defendants overlook lie just beneath the surface of their concessions for purposes of their motion that:

(1)     In violation of ERISA, Defendants did indeed trick employees into believing Foot Locker was going to take the monthly retirement benefit they had earned to date, convert it into an account balance of equal value, and then make annual contributions to the accounts so that as employees saw their accounts grow they would also be watching their *benefits* grow (which was patently false); and

(2)     Had the truth been told, *i.e.,* that the conversion caused a pension *freeze* for sometimes years because Foot Locker had pushed the line of scrimmage back on many employees by 50 yards or more, "*some formula other than the existing cash balance formula might have been adopted*."  Defs. Br. at 2 (emphasis added).

In other words, Defendants concede, but then never examine or discuss, the existence of evidence that, even on Defendants' own (mistaken) terms, goes a long way towards carrying the burden Defendants assert Plaintiff has to show harm.[2]

---

[2] Note:  because no class has yet been certified in the case, Defendants are incorrect in their repeated suggestion that Plaintiff is required at this stage of the proceedings to address the viability of claims asserted on behalf by potential

*Second*, Defendants misunderstand the applicable legal standards, *i.e.*, the Supreme Court's landmark *Amara* decision and the equitable relief principles on which it rests.  As the Supreme Court explained in *Amara*:

> The relevant substantive provisions of ERISA do not set forth any particular standard for determining harm.  They simply require the plan administrator to write and to distribute written notices that are "sufficiently accurate and comprehensive to reasonably apprise" plan participants and beneficiaries of "their rights and obligations under the plan." [ERISA] § 102(a); see also §§ 104(b), 204(h). Nor can we find a definite standard in the ERISA provision, § 502(a)(3) (which authorizes the court to enter "appropriate equitable relief" to redress ERISA "violations").  **Hence any requirement of harm must come from the law of equity**.

*Amara*, 131 S. Ct. at 1881 (emphasis added).

Plaintiff seeks two alternative forms of equitable relief, reformation and surcharge – both of which were endorsed by the Court in *Amara*:  (1) "reformation of the terms of the plan, in order to remedy the false or misleading information [Foot Locker] provided," *id*. at 1879; and (2) "surcharge" – *i.e.*, "monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment."  *Id*. at 1881.  *See, e.g.,* Compl., Prayer for Relief (specifically seeking reformation and "all other" equitable relief available under ERISA § 502(a)).

**Reformation**.  Oddly, Defendants' motion almost entirely ignores Plaintiff's claim for reformation of the terms of the Plan.  This is all the more striking given the close parallels between this case and *Amara,* where the district court remediated Cigna's misleading statements to participants concealing the wear-away caused by that conversion via an order of reformation, an order the Supreme Court said the district court was authorized to re-enter upon remand under ERISA § 502(a)(3).  131 S.Ct. at 1871, 1875-76.  Defendants' reluctance to discuss Plaintiff's reformation contentions in a motion premised on Plaintiff being unable to establish "harm" presumably stems from Defendants' awareness that, as *Amara* makes clear, "harm" is *not an element* of a claim seeking equitable reformation.  *Id*. at 1879.  Reformation is simply an

---

members of the class, rather than only himself personally.  *E.g.,* Defs.  Br. at 2, 15.

3

application of the power of a court "to reform written instruments, where there is a mutual mistake, or mistake on one side and fraud or inequitable conduct on the other." *Simmons Creek Coal Co. v. Doran*, 142 U.S. 417, 435 (1892), *cited by* Department of Labor ("DOL") Amicus Brief, Doc. 329 at 15-19, *Amara v. Cigna*, 01-CV-2361 (D. Conn.  Sept. 22, 2011).

In *Amara,* the district court retroactively reformed the terms of the Cigna plan (from an "A *or* B" formula to an "A *plus* B" formula) after finding Cigna acted inequitably (*i.e.,* violated ERISA) in concealing the wear-away freeze and issuing misleading statements designed to make employees believe they were accruing benefits on an effectively "A plus B" basis.  The Supreme Court held that while the district court order could not be premised on ERISA § 502(a)(1)(B), which only authorizes courts to *enforce* ERISA plan terms, the district court was authorized to effectively re-enter it upon remand under ERISA § 502(a)(3), which authorizes courts to equitably *reform* ERISA plan terms in cases of fraud or mistake.  131 S.Ct. at 1879-80.  Except perhaps for a passing suggestion made in a single-sentence footnote, *see* Defs. Br. at 15 n.11, Defendants' brief contains no argument as to how the Court could find Mr. Osberg is not entitled to an order of reformation, despite the fact that Defendants concede for purposes of this motion that Foot Locker's communications to Mr. Osberg (and others) improperly concealed the wear-away here and in so doing violated ERISA; and despite the fact that the unrebutted evidence further shows that Mr. Osberg continued working for Foot Locker post-conversion with the reasonable but mistaken expectation that he was continuing to earn new pension benefits and that as he watched his account grow he was watching his pension grow.  (Facts ¶ 128).  Because Defendants adduce no defense to Plaintiff's claim for relief on this basis, their motion should be denied without more.

However, Defendants' avoidance of Plaintiff's reformation contentions extends even further because Plaintiff has an additional ground for reformation apparently not available to the *Amara* plaintiffs:  in addition to unilateral mistake coupled with fraud or inequitable conduct on Foot Locker's part, this is a case where *mutual* mistake on the part of both *Foot Locker's Board of Directors* (the sole entity directly empowered under the Plan to amend it, Doc. 71-5 § 12.01), *and*

Mr. Osberg as to true effect of the amendment should result in the Plan being retroactively reformed from an "A or B" formula plan to "A plus B" formula plan. There is compelling evidence that a cash balance conversion *without* a zero-accrual wear-away period is the conversion that senior management and the Board of Directors thought they were adopting. *See* (Facts ¶¶ 17a, 66-70). That is precisely how, in substance, the Corporate Benefits managers who came up with the recommended design communicated it to senior management and ultimately Foot Locker's Board. *Id.* Defendants' motion, however, passes over all this evidence, like it passes over Plaintiff's reformation contentions themselves, in almost total silence.

**Surcharge.** The only theory of recovery Defendants discuss (other than in passing) is surcharge. Defendants' theory is that Plaintiff cannot establish the harm required to make out a claim for equitable surcharge because, even assuming Defendants' communications violated ERISA and there is proof " that some formula other than the existing cash balance formula might have been adopted," that is still not good enough because, supposedly:

> there is no evidence to suggest what formula that would be. Without knowing the particulars of this alternative plan, there is no way to tell whether it would have resulted in greater benefits for Osberg.

Defs. Br. at 2 (footnote omitted). In other words, Defendants is arguing that Mr. Osberg cannot establish that wear-away actually hurt him because – who knows? – the alternative to wear-away might have been something just as bad or even worse for Mr. Osberg. *Id*. at 19-20.

The problem for Defendants is two-fold. First, although Plaintiff disputes that he has the reverse-crystal ball burden of proof that Defendants imply he has, the fact is that, as indicated above, Plaintiff *can* prove exactly what Foot Locker would have done had it not been able to surreptitiously include wear-away in the Plan design: namely, the same formula it adopted except without the wear-away (*i.e.,* the plan that senior management and the Board of Directors thought they were adopting). (Facts ¶ 44). But, as noted above, because Defendants never grapple with either set of Plaintiff's reformation contentions, they present no evidence that Plaintiff cannot prove the no-wearaway design is what would have occurred had the handful of managers in the Corporate Benefits department who knew it was a feature in design disclosed

that fact to senior management.

Second, Defendants also nowhere acknowledge the evidence establishing nearly conclusively that literally *any* fall-back design Foot Locker could have adopted (among the options senior management had not already rejected) would have improved Mr. Osberg's lot – so even if the Company would not have adopted the same cash balance conversion it did, but without wear-away, whatever design it would have settled on would have benefitted Plaintiff. *See* Ex. 20, Deutsch 6/7/12 Rebuttal Rep. at 33-34 (Facts ¶¶ 48-58, 75).  Because Mr. Osberg can thus show that Defendants' ERISA violations harmed him, Defendants' motion also fails on its own (surcharge) terms.

*       *       *

Defendants alternatively argue that Count Three, the defective SPD claim – but not Count Four, the fiduciary breach claim – is time-barred because Plaintiff purportedly should have figured out at the time he received his pension benefits (in 2002) that Foot Locker had deceived him.  Defs. Br. at 22-24.  The contention is meritless, whether a six-year or three-year limitations period applies because, as shown below, Foot Locker's falsehoods were so well disguised, and the truth about wear-away buried so deep in the terms of the formal Plan document and the math of the pension calculations, that a non-actuary lay employee could never expect to figure out on his own that he had been duped into working pension-free – even at the time he received his pension payment.  (Facts ¶¶ 87-123).  Mr. Osberg did not discover and could not have been reasonably expected to have discovered that Foot Locker has misled him in the manners alleged in the Complaint until shortly before he filed suit in 2006 (when undersigned counsel discovered what had happened and so informed Mr. Osberg).  *Id.*

## FACTS

On September 15, 1995, Foot Locker CEO, Roger Farah, and President Dale Hilpert sent a letter on company letterhead to all Foot Locker employees that read as follows:

Dear U.S. Associate:

> We are excited to announce to you that we will be introducing important changes to update the company's retirement plans in the United States. They will put our company alongside today's best retailing companies in providing associates with options for their individual retirement planning. . .
>
> This new, contemporary approach will give associates a more competitive retirement benefits package. . . .
>
> We've listened to what associates have told us they would like to see, and we looked at what other companies do, and we have responded to the challenge. . . .

Ex. 46, 9/15/95 Farah/Hilpert Letter (Facts ¶ 90).

The changes announced in the letter became effective January 1, 1996, when Foot Locker converted its traditional formula-based pension plan to an account-based "cash balance" pension plan. Defs. PFOF ¶ 17. Under the provisions of the Plan in effect prior to January 1, 1996, benefits had been expressed in the form of a monthly benefit payable for life commencing at retirement. *Id.* ¶ 14. Under the revised formula, benefits were defined by reference to a hypothetical account balance, similar in appearance to a 401(k) plan. Defs. PFOF ¶ 19. The Plan's SPD explained the mechanics of the conversion as follows:

> To accomplish this change, participants' accrued benefits as of December 31, 1995 were converted to initial account balances. A new formula for years of service beginning January 1, 1996 was also added to the Plan. For more information on how benefits are determined under this cash balance pension plan, see page 11.

SPD (Doc. 71-17) at 1 (Facts ¶¶ 34, 101) (italics removed). Page 11 contained the following explanation:

> HOW YOUR RETIREMENT BENEFIT IS DETERMINED
>
> Your Plan benefit is based on the account balance you accrue, or earn, while a participant. That account balance is made up of:
>
> - Your initial account balance, which is the value of your Plan benefit as of December 31, 1995, before the Plan was amended;
> - interest credited to your account balance; and,
> - additions to your account balance, called compensation credits, which are based on years of service and a percentage of compensation.

*Id.* at 11.

Employees were delighted. (Facts ¶ 119). Foot Locker was going to take the monthly retirement benefit they had earned to date, convert it into an account balance of equal value, and then make annual contributions to the accounts so that employees could watch their benefits grow. *See* SPD, *supra*; 9/15/95 Farah/Hilpert Letter (the cash balance conversion will give

participants "a better ability to monitor their benefits. Each plan participant will have an individual account, to which the company will make a yearly contribution. . . . Participants will be able to see their individual account balance grow each year, and know its value").

There was one big problem: none of this was true. Nearly everything Foot Locker told employees about the conversion was "false," as the Foot Locker Benefits Department personnel responsible for the redesign of the Plan and its communication to employees eventually admitted in their depositions. (Facts ¶ 88). The company did indeed amend the Plan effective January 1, 1996 to change the benefit formula – but the conversion was purposefully implemented in a way that had the effect of freezing pension accruals for virtually every employee. (Facts ¶ 65).[3] Foot Locker's benefits personnel were well aware of this ruse, when listing Pros and Cons of various potential plan designs, listing as one of the Pros of the plan design actually adopted "*appears* attractive to associates while *reducing* costs and benefits levels." (Facts ¶ 58).

The evidence shows that members of the Foot Locker Corporate Benefits Department knew from the outset that the "conversion" they designed included an extended pension freeze (Facts ¶ 22); that this small handful of individuals knew that the communications distributed to participants touting only the purported positive aspects of the conversion and concealing the freeze were materially "false" and that they were designed to cause, and did cause, Plaintiff and others to mistakenly believe that the terms of the cash balance conversion amendment provided for an "A plus B" conversion pursuant to which his account balance would fully reflect the value of his accrued-to-date pension benefit and all subsequent credits to his account would represent growth in his pension entitlement (Facts ¶ 119-123); and that the concept of a pension freeze was apparently so toxic that the Benefits Department went so far as to conceal it from their own senior management and the Board of Directors (Facts ¶ 128), who approved the conversion as presented to them based on their mistaken impression that it would slightly *reduce* future benefit

---

[3] Based on the math, it was foreseeable that the conversion would condemn half of all participants to at least a 3-year benefit freeze; a third of participants to at least a 5-year benefit freeze; and more than 80% to at least a 1-year freeze. (Facts ¶ 75). Plaintiff Osberg worked for almost 7 years after the conversion and did not earn a dime of additional pension benefits. *Id.*.

accruals for some employees, not *freeze* benefits for virtually all employees for varying periods ranging from a few months to more than 8 years (Facts ¶ 69, 75).

The evidence further supports that had Foot Locker senior management and the Board of Directors been informed that the cash balance conversion design proposed by the Benefits Department included a feature that would have the effect of freezing pension accruals for an extended period, and that participants would have to be *told* about this in an ERISA-compliant manner they could understand, management and the Board would have instructed the Benefits Department to remove the wear-away effect from the conversion design. (Facts ¶ 44).  Indeed, based on documentary and testimonial admissions Plaintiff obtained in discovery, several of Plaintiff's experts have opined that had senior management been made aware of the wear-away effect embedded in the proposed cash balance conversion design and the devastating, demoralizing impact it was expected to have on current employees' pension accruals – *i.e.*, an extended freeze targeted solely at longer-term employees, with new and recent hires exempt from the freeze and continuing to earn pension credits; and had management further been informed that employees would have to be told about this discriminatory impact in a manner they would understand – management would have never approved the wear-away feature, but would instead of have instructed the Corporate Benefits Department to implement the conversion with the wear-away element removed.[4]

---

[4] Defendants effectively admit this in their brief when they concede that before implementing the ultimately adopted design, the Company considered an alternative of freezing the Plan, *i.e.*, ceasing future pension accruals, which would freeze the Plan temporarily," but the Company rejected that proposal because "it would provoke bad morale." Defs. Br. at 12.  What Defendants fail to note, however, is that that proposal -- an across-the-board temporary freeze -- was turned down even though it was clearly described as the option that would save the Company the most money.   (Facts ¶¶ 50-54).  This roughly $10 million annual savings was contrasted with a projected savings of between $1.2 million to $6.4 million for the cash balance conversion that was embodied in the draft plan document put before the Board for a vote on September 13, 1995.  If the $10 million annual savings that would result from an across-the-board freeze were seen as not worth the anticipated blow to morale and productivity, *a fortiori* Foot Locker would have chosen other ways to make up the projected cost savings from the proposed pension freeze, which was projected to save less than 4 *tenths* of one percent of the company's overall United States payroll expense in 1996-1997, and even less thereafter.  (Facts ¶¶ 62, 80, 83).  Such *de minimis* savings clearly would have been viewed as not worth the trouble of the widespread employee anger a targeted pension cut was sure to engender. (Facts ¶ 62).

Even if Plaintiff and his experts are wrong about this, the evidence shows that had *employees* been told in an ERISA-compliant manner about the wear-away effect and the devastating impact it would have on their pensions (*i.e.*, an extended, discriminatory freeze), Foot Locker management would have been compelled to remove the wear-away effect to quell an employee uprising and/or destructive loss of morale.  (Facts ¶ 44) (citing, in addition to expert testimony by Drs. Bewley and Spell, testimony from Patricia Peck, the company's Vice President, Human Resources, that discriminatory freeze would have been perceived as "a kick in the face" to long-term employees).[5]

Thus, one way or another, had the truth been told, Foot Locker would have revised the cash balance conversion design to "remove the wear-away effect" as Defendants themselves seem to practically admit.  Defs. Br. at 12.  That is precisely the remedy Plaintiff proposes with his A+B relief demand:  to calculate opening account balances as *equal* in value to each employee's December 31, 1995 accrued-to-date-benefit instead of below value, all that is required is a simple amendment of Plan § 1.23 to change the discount rate used to calculate opening balances from 9% to 6%, and to clarify that opening balances will not be reduced to reflect pre-age-65 mortality risk. (Facts ¶ 43).  This one-line amendment to § 1.23 of the Plan would have thus aligned the Plan's terms with what senior management and the Board *thought* (based on the description of the conversion contained in formal presentations seeking their approval) was *already in* the conversion design they had adopted (Facts ¶ 17a, 66-68); making it clear this is exactly what management would have ordered had they been made aware of the wear-away element of the conversion design proposed by the Benefits Department.  (Facts ¶ 44).

Alternatively, Plaintiff can show that *any* ERISA-compliant alternative formula without wear-away that Foot Locker would have adopted would necessarily have left Mr. Osberg with greater benefits than what he actually accrued between January 1, 1996 and his termination in

---

[5] *See also id.* at 2, 19 (Defendants conceding Plaintiff has evidence that disclosure of the wear-away would have led to employee complaints that would have caused "Foot Locker to adopt different Plan amendments without wear-away").

2002, *i.e.,* zero.  The only way that Mr. Osberg could have been equally bad off is if Foot Locker had (a) terminated the Plan or (b) explicitly froze the Plan.  (Facts ¶ 75 (citing Ex. 20, Deutsch 6/7/12 Rebuttal Rep. at 33-34)).[6]  But the evidence conclusively establishes that Foot Locker specifically considered either a plan termination or a pension freeze and firmly rejected each option as too disruptive.  (Facts ¶¶ 48-58).  The only design choices left were:  (a) remaining with the status quo career average benefit formula, or (b) a Plan amendment that did not include wear-away.  Under either of these options, Mr. Osberg would have earned pension benefits for his post-conversion employment with Foot Locker (Facts ¶ 75 (citing Ex. 20, Deutsch 6/7/12 Rebuttal Rep. at 33-34)); and since something is better than nothing, he would have been better off.  Under any scenario available to Foot Locker then, Mr. Osberg would have been paid a higher pension in 2002 than what he received.

## ARGUMENT

### I.    Plaintiff Has an Eminently Viable Reformation Claim

Reformation is a type of equitable relief appropriate in defective notice cases so as "to remedy the false or misleading information [the employer] provided." 131 S.Ct. at 1879. When "a party . . . because of his position as a fiduciary or otherwise, [is] under a duty to disclose, in which event, if there is reason to believe that he knows more about the subject matter than the mistaken party, he will not be permitted by a court of equity to hold the latter to his agreement." J. Eaton, *Handbook of Equity Jurisprudence* § 116, p.274–75 (1901).  Thus, the power to reform contracts, a traditional power of equity courts, was used in cases of fraud *or* mistake. 131 S.Ct. at 1879 (collecting cases).[7]  Defendants thus misstate the law when they tell the Court that Plaintiff must prove fraud, *see* Defs. Br. at 16.   Rather, *Amara* makes clear that reformation of the Plan is

---

[6] The law precluded Foot Locker from *taking away* what Mr. Osberg (and other employees) had already earned, *see* ERISA § 204(g) – so the minimum amount that Mr. Osberg could have been paid when he separated in 2002 was his accrued-to-date benefit on December 31, 1995, the day before the conversion.  It is undisputed that Mr. Osberg earned *no addition pension* after the conversion.  (Facts ¶¶ 17b, 36-39, 75, 111, 124, 127, 131, 134-35).  Therefore, by law, Mr. Osberg could not possibly have been any worse off than he was with the design that was implemented.
[7] *Accord Restatement (Second) of Contracts* § 153 ("Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if … the other party had reason to know of the mistake or his fault caused the mistake").

appropriate if Plaintiff can prove that (1) he was misinformed about what the terms of the Plan provided, and (2) Foot Locker (a) was similarly mistaken about what the terms of the Plan provided, (b) fraudulently misrepresented the term of the Plan, or (c) engaged in inequitable conduct. *Amara* also establishes that reformation does not require individual proof of reliance. Indeed, the Court found that equity "would reform contracts" even if the complaining party "was negligent in not realizing its mistake." 131 S.Ct. at 1881. *Accord Young v. Verizon's Bell Atlantic Cash Balance Plan*, 615 F.3d 808, 819 (7th Cir. 2010).

Here, because Defendants have conceded, for purposes of the motion, that they violated ERISA's disclosure standards and that the violations permitted Foot Locker to surreptitiously include a wear-away freeze in the conversion, Plaintiff has necessarily satisfied the requirement that he show that Foot Locker's actions in this regard constituted fraud, or at minimum the type of inequitable conduct that courts sitting in equity have determined warrants reformation. *See, e.g., Varity Corp. v. Howe*, 516 U.S. 489, 507-15 (1996). Inequitable conduct clearly includes actions such as those here that caused another party to an agreement to form a mistaken view of what the agreement covered. *See, e.g., Tokio Marine & Fire Ins. Co. v. National Union Fire Ins. Co.*, 91 F.2d 964, 966-67 (2d Cir. 1937). Indeed, Defendants would not make the concession they do had Plaintiff not obtained through discovery clear admissions from the key players responsible for communicating with employees that Foot Locker, acting through them, knowingly misled employees, through admittedly "false" statements, regarding the cash balance conversion and its impact on pension accruals (Facts ¶¶ 88-123).[8]

---

[8] As both *Varity* and *Amara* make clear, there is no requirement that the Court parse too closely whether Foot Locker was speaking as the Plan's sponsor (*i.e.*, the employer) or as the Plan fiduciary when it misrepresented the cash balance conversion to employees. As Defendants themselves have admitted, Foot Locker spoke in both voices in a way that surely would have been difficult for employees to distinguish. *See* Defs. Answer (Doc. 58) at ¶¶ 78, 83 (characterizing the September 15, 1995 letter as issued on behalf of "Foot Locker, Inc." in its role both as sponsor/employer and Plan fiduciary). *See, e.g., Varity,* 516 U.S. at 503 ("reasonable employees, in the circumstances found by the District Court, could have thought that Varity was communicating with them *both* in its capacity as employer *and* in its capacity as plan administrator") (emphasis in original). Because this is equitable relief and the defendants under ERISA §502(a)(3) are not limited, *Harris Trust & Sav. Bank v. Salomon Bros.*, 530 U.S. 238, 246 (2000), there are no inflexible rules.

Indeed, if the evidence Plaintiff collected regarding these false and misleading communications is *not* evidence of fraud or inequitable conduct, it must be yet further evidence of *mutual mistake,* at least on the part of the Company acting through its Board.  As noted, Plaintiff has strong evidence that the Board of Directors mistakenly believed that it was adopting an "A plus B" conversion pursuant to which Plan participants' account balances would fully reflect the value of their December 31, 1995 accrued-to-date pension benefit and all subsequent credits to participants' accounts would represent growth in participants' pension entitlements.

Having no response, Defendants attempt to brush reformation under the rug, for Mr. Osberg at least in a footnote, where they assert:  "The [*Amara*] opinion indicated that, whereas reformation might be an available remedy for plan participants who had not yet received their benefits, participants who already cashed out of the plan (like Osberg) could seek relief via the surcharge remedy. *Amara,* 131 S.Ct. at 1880."  Defs. Br. at 15 n.11.  Defendants have invented this out of whole cloth:  *Amara* makes no such distinction between "cashed outs" and not-yet "cashed outs," nor does the law of reformation:  indeed, if it did, the Supreme Court could not possibly have green-lighted the *Amara* district court to re-enter its reformation order on remand albeit under ERISA § 502(a)(3) as to all participants its initial order benefited given that the *Amara* class consists of numerous members just like Mr. Osberg who have also "already cashed out of the plan."  *See Amara*, 131 S.Ct. at 1870-76.  If the Supreme Court saw the distinction Defendants pretend to see between those unpaid and paid as entitling and disentitling them to reformation relief surely it would have said so.  Not even Justice Scalia, in his concurrence joined by Justice Thomas, which saw obstacles to relief where the majority opinion saw none, suggested reformation would be unavailable on this basis. *Id.* at 1882-85 (Scalia, J. concurring).[9]

---

[9] Defendants citation to page 1880 of *Amara* is unavailing.  Indeed, on pages 1879-1880 of *Amara,* the Supreme Court describes, and later endorses, the types of remedies the *Amara* district court had entered as reformation "in order to remedy the false or misleading information CIGNA provided" and injunctions to "require the plan administrator to pay to already retired beneficiaries money owed them under the plan as reformed."  *Amara,* 131 S.Ct at 1879-80.  The fact that the Supreme Court said the type of reformation relief the *Amara* district court ordered could *also* be likened to surcharge provides no basis for limiting partially paid participants to surcharge relief if reformation relief is appropriate.  That is certainly the view of the Secretary of Labor which submitted an amicus brief to the *Amara* district court, specifically arguing that that court can and should now re-award the same reformation relief it previously awarded under ERISA § 502(a)(1)(B) under ERISA § 502(a)(3), *for all participants,*

13

If *Amara* stands for anything it is that equity abhors artificial barriers to relief.  It makes no sense as a matter of law or logic to treat two otherwise identical victims of Foot Locker's undisclosed wear-away freeze differently for remedial purposes based on the fortuity of whether or not or when they requested payments.  Indeed, ERISA defines a "participant" to include former employees who have cashed out their plan benefits if they "may become eligible to receive a benefit of any type [from the plan]," 29 U.S.C. § 1002(7), which would be precisely the outcome here if the Plan were reformed retroactive to January 1, 1996 to effectuate the A+B conversion participants were told was occurring and senior management thought they had approved.  (Facts ¶¶ 41-43).[10]

Plaintiff also seeks reformation of the Plan to include in his lump sum the value of the early retirement subsidy he unwittingly forfeited because the SPD did not disclose that by electing a lump sum, he would forfeit the value of the subsidy to which he had earned a right (conditioned only on delaying the commencement of his benefit until age 55).  *See* Compl. ¶¶ 50-51, 59-71, 112, 124-135, Prayer for Relief D).  Reformation of the Plan in this regard is warranted because the reason Plaintiff mistakenly believed election of a lump sum did not result in a forfeiture of value is because of Defendants' knowing misrepresentations and/or failure to correct the misimpression they knew he had or was likely to have.  Defendants' motion does not request summary judgment regarding this claim.[11]  Even if it did, any such request would be meritless because of the evidence Plaintiff has collected supporting the claim. (Facts ¶¶ 88-123).

---

whether they commenced their benefits or not.  *See* DOL *Amara* amicus brief, *supra* at 15-, Doc. 329 at 15-19, *Amara v. Cigna*, 01-CV-2361 (D. Conn.  Sept. 22, 2011).

[10] Defendants oddly characterize this "A plus B" conversion design as merely "a continuation of the accrual of benefits provided under the prior plan" and something that "bears no relationship to any benefit changes considered by the Company." Defs. Br. at 19 – but that is wrong on both fronts.  The evidence establishes that an "A plus B" conversion is exactly what literally everyone involved – senior management, the Board, employees – *except* the Benefits Department, thought was what the Company *had* implemented.  (Facts ¶ 128).  Reformation of the Plan's terms to make them match what both sides thought the deal had been all along is thus exactly in line with the purpose of equitable reformation.  As noted, it is also is the appropriate remedy if Foot Locker knew wear-away was a part of the design but knowingly misled employees (or were aware that employees were likely to believe there was no wear-away and yet sat idly by without clarifying matters) – which the evidence also supports.  (Facts ¶¶ 119-23).

[11] Indeed, in a footnote, Defendants merely suggests, contrary to law and without citation to authority, that the Court in effect disregard this legitimate claim  because Plaintiff does not make a demand for relief "specifically attributable to this assertion,"  *see* Defs. Br. at 10 n.8, whatever that means.

Finally, Plaintiff seeks reformation of the Plan to include in his lump sum the value of the benefits he mistakenly believed Defendants had committed to pay him – namely, benefits accruing at the same rate as had he had been earning under the pre-conversion traditional formula. *See* Compl. ¶¶ 55, 73-77, 118, 124-135, Prayer for Relief D). Again, reformation of the Plan in this regard is warranted because the reason Plaintiff mistakenly believed he was accruing benefits at the same rate as under the prior formula is because of Defendants' knowing misrepresentations and/or failure to correct the misimpression they knew he had or was likely to have. Although Defendants' motion does not explicitly request summary judgment regarding this claim, any such request would be meritless because of the evidence Plaintiff has collected supporting the claim. (Facts ¶¶ 88-123).

## II.    Plaintiff Has an Eminently Viable Surcharge Claim

Although it is not time for Plaintiff to elect remedies, Plaintiff seeks the alternative remedy explicitly endorsed by the Supreme Court in *Amara*:  surcharge of Foot Locker in an amount equal to the greater of (a) the benefits lost by participants as a result of the SPD violations, as described in the reformation section above (the difference between an "A plus B" conversion that was promised and the "A or B" conversion that was implemented) or (b) the profits unjustly earned by Foot Locker as a result of benefit cuts the misrepresentations permitted it to implement surreptitiously. *See Amara,* 131 S.Ct. at 1880; DOL Amicus Brief in *Kenseth v. Dean Health Plans, Inc.*, No. 11-1560 (7th Cir. June 13, 2011)  (injured plan participants entitled to surcharge of plan administrator equal to greater of lost benefits or disgorgement of unjustly earned profits made possible by the breach).

To make out the right to surcharge relief, Plaintiff must prove, by a preponderance of the evidence, that the ERISA breaches Defendants concede injured him. *Amara*, 131 S.Ct. at 1881. The reference to a "preponderance of the evidence" without limitation indicates that both direct and circumstantial evidence can be used. The Supreme Court illustrated this with its explanation that even employees who might not have seen the misleading SPDs "may have thought fellow employees, or informal workplace discussion, would have let them know if ... plan changes

15

would likely prove harmful," *id.*, and could therefore establish that the SPD's shortcomings harmed them even if they could not prove the syllogism "I read the SPD, I was misled, the misrepresentations harmed me." Indeed, this was one of the major teachings of *Amara*: misrepresentations in an SPD and other Plan communications can result in (cause) legally cognizable harm in any number of ways other than leading a participant to "detrimentally rely" on the SPD. *Id.*

Here, because Defendants have conceded, for purposes of the motion, that they violated ERISA's disclosure standards and that the violations permitted Foot Locker to include wear-away as a feature of the 1996 cash balance plan conversion, *see* Defs. Br. at 2, 12, 19, for purposes of the motion, the only issue is harm which is required to establish entitlement to surcharge relief. *Amara,* 131 S.Ct. at 1881. As already noted, Plaintiff *can* show harm in that he can show that Foot Locker's Board would have adopted the same plan formula it thought it did, *i.e.,* a cash balance formula without wear-away. But, contrary to Defendants' assertion, Plaintiff is not required to show **exactly** what formula Foot Locker would have adopted to surcharge Foot Locker. To prevail, Plaintiff "need only prove *harm*," *id.* (emphasis added) – not the precise ***amount*** of harm, as Defendants posit. This is because "[u]nder trust law, it is well established that once a beneficiary shows that a trustee's breach of duty caused some loss, uncertainties over the extent of the loss are resolved against the trustee." DOL *Amara* Amicus Brief at 23. "Courts applied that rule in pension cases arising under pre-ERISA law," *id*. at 23-24 (citing cases), and "[t]he same rule applies in ERISA cases." *Id.* at 24, *citing Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985) ("once a breach of trust is established, uncertainties in fixing damages will be resolved against the wrongdoer").

What this means for present purposes is that Plaintiff need only show the Court that he has evidence which, construed in the light most favorable to him and drawing all inferences and resolving all ambiguities in his favor, the Court could reasonably conclude that, even if it is not possible to know exactly what an ERISA-compliant Foot Locker would have done, it is clear enough that *whatever* the Company implemented would have been better for Mr. Osberg than the

16

design that was actually adopted in 1996.  As outline above, Plaintiff has such evidence, requiring denial of Defendants' motion.

Plaintiff has gathered compelling evidence that Foot Locker's failure to comply with ERISA's participant disclosure standards materially harmed Mr. Osberg (and other participants) because the violations enabled the Company to successfully conceal the wear-away effect and its devastating and discriminatory impact on employees' pensions.  The evidence shows that what Foot Locker was able to pull off under cover of darkness would not have occurred had the wear-away aspect of the cash balance conversion been exposed to sunlight.  Had Foot Locker designed the 1996 cash balance conversion with the knowledge that it would have to disclose that it was freezing the pensions of all *current* Plan participants for an indefinite period, but allowing *new hires* to earn pension accruals (which is the effect the wear-away had on employee's pensions), one of two things would have happened:

A.    The wear-away feature would never have been included in the conversion in the first place, because senior management would have refused to adopt a plan design they would have known would outrage employees and severely depress morale.  (Facts ¶¶ 15, 44, 49-72).  In other words, "had the company been required to tell employees about its impact on pension benefits, Woolworth would not have implemented the cash balance conversion with a 'wear-away' feature."  (Facts ¶ 44).  Rather, the Company "would have adopted the plan they did adopt, without wear-away").  *Id.*; Bewley 6/15/12 Tr. 210:9-11.  *See also id.* at 231:6-17 (agreeing "that what Foot Locker's management would have done here is the exact same plan with one change, which is they would have gotten rid of the wear-away feature").  *See generally* Doc. 71-34, Bewley 5/10/12 Rep.  *See also* Doc. 71-35, Spell 5/10/12 Rep. at 6-12.  Plaintiff has compelling evidence that not only "suggest[s]" what the formula would have been had Foot Locker complied with ERISA – it establishes precisely how the Plan would have been amended: the cash balance conversion that was implemented, but without wear-away.  (Facts ¶¶ 44, 50-88).

B.    Alternatively, had the wear-away feature been included in the conversion design and its discriminatory freeze-inducing effect disclosed to employees – either up front or after the

fact – the reaction of employees would have been so negative that the Company would have been forced to remove it.  *See* Doc. 71-35, Spell 5/10/12 Rep. at 6-12.  *See also* Ex. 51, Spell 6/18/12 Tr. 54:5-22; Doc. 71-34, Bewley 5/10/12 Rep. at 5-6.

Defendants contend that neither of these outcomes would have been likely because "[g]iven the undisputed evidence of Foot Locker's precarious financial position and the corresponding need to reduce costs, any alternative form of benefits would likely have been at a similar cost level."  Defs. Br. at 19.  But the evidence of the Company's "precarious" financial position is far from undisputed.  *See* Facts ¶¶ 77-86 (Woolworth "was in no danger of bankruptcy" in 1995 "and the company wasn't close to liquidation"); Ex. 61, Maxam 6/7/12 Rebuttal Rep. at 2-5, 10-12; Ex. 60, Maxam 6/27/12 Tr. 74:6-8, 159:13-185:2.  Moreover, the evidence shows that the "alternative form of benefits" Plaintiff asserts would have been provided – the same cash balance conversion sans the wear-away – would have been perceived by Foot Locker as to be essentially at the same cost level as the formula that was actually approved: removing wear-away would have increased the estimated cost of the cash balance conversion by less than $10 million, a drop in the bucket relative to Foot Locker's $ 4.1 billion in annual expenses, and significantly less than the savings Foot Locker rejected because it deemed the savings not worth the negative reaction it expected from employees.  *See* Facts ¶ 83; Ex. 61, Maxam 6/7/12 Rebuttal Rep. at 2; Ex. 20, Deutsch 6/7/12 Rep. at 19-20.

## III.   Defendants' Statute of Limitations Defense to Mr. Osberg's SPD Claim Fails

The Court should similarly deny Defendants' motion to reconsider Judge Batts' ruling that Count Three (the SPD claim) was timely brought under the applicable statute of limitations.  Defendants' motion is futile because regardless of the applicable limitations period, Plaintiff Osberg's claim under Count Three is timely.

### A.    Plaintiff's SPD Claim Did Not Accrue Until Shortly Before He Filed Suit

Defendants argue that under the standard set forth in *Novella v. Westchester County*, 661 F.3d 128 (2d Cir. 2011), Mr. Osberg's claim accrued for limitations purposes, at the latest, when he received his benefit payment in 2002.  According to Defendants, because Mr. Osberg (1)

purportedly "received an explanation as to how his initial cash balance amount was calculated, including the use of a 9% interest rate," (2) received an SPD which stated that "[y]our *accrued benefit* at the time your employment terminates is the greater of the amount determined under the *Plan* as amended on January 1, 1996 or your accrued benefit as of December 31, 1995," and (3) "was advised that the amount of his lump sum was significantly greater than the amount in his cash balance account," – "[t]he only logical inference to be drawn was that his lump sum benefit was based on his pre-1996 frozen accrued benefit." Defs. Br. at 24.  Once Mr. Osberg knew this, Defendants contend, "he reasonably should have understood" that he had been "impacted by wear-away."

Foot Locker's theory is flawed on many levels.  First, as summarized above, Count Three alleges that the SPDs violated ERISA in at least four distinct ways.  The Complaint alleges that the SPDs:  (1) falsely and misleadingly told Plan participants that their "accrued benefits as of December 31, 1995 were converted to initial account balances" that reflected "the value of your Plan benefit as of December 31, 1995, before the Plan was amended" (Facts ¶ 101); (2) falsely and misleadingly told Plan participants that following the conversion, they would earn additional retirement benefits equal to the value of the pay and interest credits allocated to his or her account (Facts ¶¶ 101-107); (3) misleadingly failed to inform participants that by requesting benefits in the form of a lump sum or a pre-age-55 annuity they would forfeit the value of any available subsidized early retirement benefit (Facts ¶ 14); and (4) misleading implied that the rate of benefit accrual under the cash balance formula would not be materially reduced relative to the rate of accrual under the old formula (Facts ¶¶ 90-91, 126).  Compl. ¶¶ 88-89, 128 (SPDs violated ERISA § 102 and its implementing regulations).

Defendants' benefit accrual theory posits only that Mr. Osberg's lump sum payment should have alerted him to the second violation – *i.e.*, that he had experienced a period of "wear-away" during which increments to his account "earned" because of continued service did not increase his pension benefit.  Defendants present no basis for dismissing alleged SPD violations (1), (3) and (4) on limitations grounds.

19

Regarding wear-away (alleged violation (2)), Defendants are mistaken that "[t]he only logical inference to be drawn" from the three "facts" asserted was that Mr. Osberg's lump sum benefit was based on his pre-1996 frozen accrued benefit.  As Judge Batts' already determined:

> [The] SPD's single reference to participants' 'greater-[of]' option was insufficient to inform participants of the reduced benefits under the amended Plan . . . .  Further, that the SPD disclosed that the initial account balance would be calculated based on a 9% discount rate can hardly be expected to be meaningful and understood by the average plan participant without further explanation as to the effect of that rate – that is, that it would create initial opening account balances that were significantly smaller than participants' to-date accrued benefit balances under the old Plan. These disclosures appear particularly obscure or unimportant next to repeated assertions in the SPD that the initial account balance under the amended Plan would be 'equal to the actuarial equivalent lump sum value of your accrued benefit ... as of [December] 31, [1995].'

2009 Order at 374.  Plaintiff's expert Dr. Stratman stated he "f[ou]nd it nearly impossible to believe that an average participant" would interpret this "cryptic sentence" to mean they "might not earn any new benefits for a period of time after the conversion" because it purportedly implied that the "accrued benefit as of December 31, 1995 might be larger than the accrued benefit derived from a participant's initial account balance."  Ex. 29, Stratman 5/11/12 Rep. at 26.  He also noted "[t]he suggestion that participants should have picked up on" the greater-of option's "supposed wear-away revealing implications – *i.e.* that participants' opening balances had not been converted at equal value, that the growth in their increasing accounts meant nothing for a time, and that they were working for the right to climb out of the pension hold into which the conversion had dropped them . . . depends on completely ignoring that participants had been conditioned for well over a years . . . to ***not*** notice the implication Defendants now say they see here."  *Id.*

In other words, the first two "facts" that Mr. Osberg supposedly learned about how his opening balance was calculated and the new Plan's "greater-of" rule could not have been expected to be meaningful to him – and indeed he testified they were not meaningful.  *See* Ex. 42, Osberg 2/29/12 Tr. 130:17-136:19.[12]

---

[12] As Plaintiff's expert reports explain, the SPD's cursory, out-of-context disclosures that a 9% interest rate was used to calculate actuarial value and that an incomprehensible "greater-of" rule applied would be like Greek to a typical

What the SPD and the communications that preceded and followed it conveyed consistently and repeatedly was that the cash balance conversion represented only a change in form (from annuity to account-based), not a material change in the rate at which participants would earn pension benefits and certainly not an outright cessation of accruals – *i.e.*, a *freeze*. *See* Facts ¶¶ 34-39, 44, 87-136.  As a result, when Mr. Osberg received a lump sum after terminating employment in 2002 that was greater than the amount in his cash balance account, it was far from "[t]he only logical inference" for him to assume that his *September 2002* benefit was equal to the benefit he had earned as of *December 31, 1995* and not a penny more.  The company for which he had been a well-regarded, loyal employee for approximately 20 years told him the pension conversion was a favorable development that he should be "excited" about; that it would allow him to "better . . . monitor [his] benefits" because he would have an "individual account, to which the company will make a yearly contribution" and could "see [his] individual account balance grow each year, and know its value."  Ex. 46, 9/15/95 Farah/Hilpert Ltr.  Mr. Osberg assumed Foot Locker was telling him the truth, as he had every right to assume.  This is particularly true because not only was Foot Locker Mr. Osberg's employer, but it was also the Plan fiduciary.  "To participate knowingly and significantly in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense" – precisely what occurred here – "is not to act 'solely in the interest of the participants and beneficiaries.'  As other courts have held, '[l]ying is inconsistent with the duty of loyalty owed by all fiduciaries . . . .'"  *Varity*, 516 U.S. at 506.

Defendants thus have it exactly backwards, then, when they tell the Court that the only "logical" inference Mr. Osberg could have made when he received a pension check greater than his account balance was that his employer and Plan fiduciary had duped him into working

---

Plan participant – the same as if the words were not in the SPD at all.  *See* Facts ¶¶ 34-39, 44, 87-136.  Judge Batts' holding can thus be reasonably interpreted to mean that the disclosures were insufficient to trigger discovery of Plaintiff's injuries.  Alternatively, the Court's ruling could be interpreted to mean that because of the repeated assurances and misinformation communicated to participants assuring them that the conversion had been implemented on an equal-value basis and that there was no wear-away, *id.*, Defendants are equitably stopped from asserting that the limitations period has run under the fraudulent concealment doctrine,, *see, e,g,, Caputo v. Pfizer, Inc.*, 267 F.3d 181 (2d Cir. 2001) which Plaintiff pleads in the Complaint.  *See* Compl. ¶¶ 68-71, 102-114, 134.

pension-free for almost 7 years.  Only a jaded conspiracy theorist would have jumped to that

conclusion: the thought that one's employer and Plan fiduciary would, or could under the law,

surreptitiously freeze pension accruals would never cross the mind of a rational employee.  As

Mr. Osberg testified, there was much more logical explanation.  In the section of the SPD

entitled "How Your Retirement Benefit Is Determined," the SPD explains the following:

> The lump sum payable to you is the greater of your *account balance* or the amount
> determined under federal law and *IRS* regulations.

SPD p. 14 (emphases in the original).  This greater-of rule at the bottom of page 14 summarizes

the more detailed explanation at the top of page 12 which concludes with same explanation:

"The lump sum payable to you is the greater of your *account balance* or the amount determined

by multiplying the [projected age-65 annuity derived from your cash balance account] by factors

required by federal law and *IRS* regulations."  *Id.* at 12 (emphases in the original).

The message these sections of the SPD convey is this:  when you terminate employment

and request a lump sum distribution, you will not simply be paid your account balance.  Rather,

you will be paid your account balance as "mysteriously increased due to a highly technical and

unintuitive IRS position."  *See* Ex. 48, Sher 6/7/12 Rebuttal Rep. at 21 ¶ 78.  That is precisely

what Mr. Osberg assumed had happened.

> **Defense Counsel**: So the lump sum amount that you received was a few thousand
> dollars more than the amount in your cash balance benefit?  **Mr. Osberg**: Yes.
> **Defense Counsel**: . . . Did you realize that at the time?  **Mr. Osberg**: Yes, there was --
> I assume there was a difference because of the -- one of the IRS adjustments that had to
> be made to reach the lump sum amount. Ex. 42, Osberg 2/29/12 Tr. 56:10-20.

> **Defense Counsel**: So you weren't surprised that the lump sum was higher?  **Mr.
> Osberg**: Well, no, I knew they had to . . . use some type of IRS adjustments to the cash
> balance account to arrive at the lump sum amount. So I assume that's what that was.
> *Id.* at 51:17-23.

When pressed on the matter, Defendants' actuarial expert conceded that "I think

certainly, looking at the SPD" a participant could logically reach the conclusion Mr. Osberg did.

Ex. 47, Sher 6/20/12 Tr. 336:2-14.

A number of defense witnesses testified that they too believed that the reason that their lump sums exceeded their account balances when they were paid their benefit was because of the never-explained required IRS adjustment factor.  (Facts ¶ 112).  The IRS adjustment was a black box:  a participant's account at the time of payment was fed in and out came an adjusted, potentially higher, payment amount.  (Facts ¶¶ 109-111, 131-134).  The black box lump sum payment could be – and in Mr. Osberg's case, would have been – greater than his account balance *regardless* of how his opening account was calculated, and regardless of whether the Plan promised to pay the greater of a participant's cash balance benefit or accrued benefit under the old formula.  (Facts ¶ 38).  In particular, Mr. Osberg would have received a lump sum payment larger than his account balance even if the conversion and cash balance plan design had been implemented without wear-away – *i.e.*, if his opening account balance had actually been the same value as his December 31, 1995 accrued-to-date benefit (*e.g.*, using Plaintiff's opening balance A+B methodology described in Mr. Deutsch's expert report, *see* Ex. 23, Deutsch 5/22/12 Supp. Rep. at 43-45). (Facts ¶ 43).  The point is, Mr. Osberg's receipt of a lump sum larger than his account balance was not the red flag Defendants try to make it out to be.  In fact, every single Plan participant who received a lump sum distribution in 2002 got an amount larger than his or her account balance (including those who entered after January 1, 1996, and are therefore not part of the putative class, because they had no benefit converted as of January 1, 1996).  (Facts ¶¶ 38-39).  This was the norm, not some unusual event that would have alerted a reasonable employee something was amiss.  Mr. Osberg's claim did not accrue for limitations purposes until he learned from his lawyer in 2006 that he had been injured.

### B.       6-Year Limitations Period Applies

As Judge Batts correctly held, and Defendants acknowledge, Defs. Br. at 20, the applicable limitations period is borrowed from New York state law; but the date the claim accrues is determined under federal common law principles.  9/16/09 Order (Doc. 31) at 15-19. Foot Locker belatedly argues that because *Amara* established that SPD claims under ERISA § 102 are not properly characterized as contractual claims for benefits, the 6-year statute of

limitations for contract actions under New York C.P.L.R. 213(2) is not the most analogous limitations period.  Defs. Br. at 22.  According to Foot Locker:  "Because the SPD is not the plan, any misunderstanding Osberg entertained based on the terms of the SPD would not give rise to a claim for plan benefits; rather it would give rise to a claim for equitable relief for a violation of the statute."  *Id.*  According to Defendants, this means "the appropriate limitations period for [a defective SPD] claim is the [3-year] state limitations period governing claims for statutory violations," C.P.L.R. 214(2).  *Id.* (citing three decisions outside the Second Circuit, none of which address SPD claims but rather ERISA § 204(h) claims of the type that was dismissed here under Count One).

This is just a re-hash of the same argument defendant ERISA plans and their sponsors have been pushing unsuccessfully for more than two decades.  If Plaintiff wins, he will be entitled to an order directing Defendants to recalculate his pension benefits *under the terms of the Plan*, but using an equal-value "A plus B" conversion methodology instead of the below-value "A or B" methodology Foot Locker actually used.  This relief might come in the form of an injunction ordering Foot Locker to reform the Plan and recalculate benefits accordingly, or alternatively in the form of an order directly surcharging Foot Locker for the foregone benefits (or disgorged company profits) to which Mr. Osberg is entitled – but in either case, Defendants' liability will be calculated by reference to the terms of the Plan, not an ERISA statutory penalty. The applicable statute of limitations accordingly is CPLR § 213(2), actions upon a "contractual obligation," as Judge Batts held.[13]

Even if Defendants were correct that the 6-year statute of limitations for contract actions under New York C.P.L.R. 213(2) is no longer the most analogous limitations period after *Amara*,

---

[13] *See Carollo v. Cement and Concrete Workers Dist. Coun. Pension Plan*, 964 F.Supp. 677, 688-89 (E.D.N.Y. 1997) ("the present action seeks reformation of the Plan and recalculation of Carollo's benefits, and is sufficiently analogous to an action to recover benefits to warrant application of the six-year limitations period under § 213(2)"); *DeVito v. Pension Plan of Local 819 IBT*, 975 F. Supp. 258, 264 (S.D.N.Y. 1997) (applying § 213's six-year limitations period to claims seeking pension plan's reformation); *Campanella v. Mason Tenders' Dist. Coun. Pens. Plan*, 299 F.Supp.2d 274, 279-80 (S.D.N.Y. 2004), *aff'd*, 2005 WL 414844 (2d Cir. Feb. 22, 2005) (applying CPLR § 213 to statutory ERISA violation); *LaFlamme v. Carpenters Local #370 Pension Plan*, 212 F.R.D. 448, 454 n.5 (N.D.N.Y. 2003) (same).

they are mistaken that the 3-year period under C.P.L.R. 214(2) applies, as even a cursory review of the governing New York case law should have revealed to Foot Locker.  Under New York law, not every action to enforce a statutory right is governed by C.P.L.R. 214(2): "the pertinent inquiry is whether the statute creates a liability 'for wrongs not recognized in the common or decisional law, and which would not exist but for the statute.'"  *Harnett v. NYC Transit Authority*, 86 N.Y.2d 438, 444 (1995).  The 3-year limitations period under C.P.L.R. 214(2) applies only to statutorily-created liabilities that did not exist at common law.  "If the relief sought is equitable, the six-year period set forth in CPLR 213(1) applies." *Bouley v. Bouley,* 19 A.D.3d 1049, 1051 (2005).  *Accord Loengard v Santa Fe Indus.,* 70 N.Y.2d 262, 266 (1987) ("We have held that the choice of the applicable Statute of Limitations depends on the substantive remedy which the plaintiff seeks.  Here, the nature of the relief sought is equitable," which means the 6-year limitation period under C.P.L.R. 213(1) applies) (internal citations omitted).

In this case, both remedies Mr. Osberg seeks are classic forms of equitable relief that far pre-date the enactment of ERISA.  *See Amara*, 131 S.Ct at 1879-80 (before ERISA, lawsuits of this nature "could have been brought only in a court of equity, not a court of law").  Equitable reformation and surcharge obviously are not newly-created ERISA statutory remedies.  Defendants' suggestion that the 3-year limitations period for statutory claims applies accordingly is meritless.

## CONCLUSION

For the foregoing reasons and such other reasons as may appear to the Court, Plaintiff respectfully requests that the Court deny Defendants' motion.

Dated:  July 4, 2012                    Respectfully submitted,

                                        /s/ *Eli Gottesdiener*
                                        Eli Gottesdiener [EG 0111]

                                        **GOTTESDIENER LAW FIRM, PLLC**
                                        498 7th Street
                                        Brooklyn, NY  11215
                                        (718) 788-1500
                                        (718) 788-1650
                                        eli@gottesdienerlaw.com

                                        *Attorney for the Plaintiff and the proposed Class*