# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

GEOFFREY OSBERG                    :

On behalf of himself and on         :
behalf of all others similarly situated,    :

                           :  Case No.: 07 CV 1358 (KBF)

          Plaintiff,       :

                           :

   - against -          :

                           :

FOOT LOCKER, INC.,         :

                           :

FOOT LOCKER RETIREMENT PLAN,  :

                           :

        Defendants.     :
------------------------------------------------------------X

**SUPPLEMENT TO REBUTTAL EXPERT REPORT OF LAWRENCE DEUTSCH, E.A.**

      I hereby submit this supplement to my June 7, 2012 rebuttal report to address Dr. Niden's June 22, 2012 declaration.

**I.    Introduction**

      In my June 7 rebuttal report, I lodged a number of criticisms of Dr. Niden's May 11, 2012 report.  As a threshold matter, I noted that it did not appear that Dr. Niden's inquiry into whether members of the proposed class were better or worse off under the cash balance pension plan and 401(k) plan introduced in 1996 than they would have been had the prior plan formula remained intact was of particular relevance given the current posture of the case, where Plaintiff is not pursuing a remedy of rescission and a return to the old pension plan formula.  The remedy sought by Plaintiff, as I understand it, is to require Foot Locker to calculate benefits in the manner members of the proposed class were told they would be calculated following the conversion:  under a cash balance plan formula that did not cause a wear-away-induced freeze of benefit accruals and pursuant to which participants would earn benefits at an annual rate that was equal to the rate at which they were told they were accruing benefits under the cash balance plan.

      I nevertheless addressed Dr. Niden's analysis that purported to show that a majority of plan participants were "winners" as a result of the cash balance conversion because they were purportedly better off than they would have been had the old plan formula remained in place.[1]  I

---

[1] Dr. Niden's method for determining a participant's "one-time gain or loss" is to take a snapshot on the day of the conversion, January 1, 1996, that compares two sets of values that Dr. Niden represents could have been calculated by a reasonable economist based on information available at the time.  Set one is the supposed present value of the retirement benefits that members of the proposed class ultimately could have expected to receive had the pre-amendment plan remained in place and statistical probabilities

showed that her winners and losers analysis, that purports to demonstrate that up to 60% of the proposed class members "prefer" the post-conversion pension plan offered by Foot Locker to the pre-conversion pension plan because up to 60% of the proposed class purportedly experienced a "one-time gain" from the conversion, is deeply flawed for a number of reasons. I explained that Dr. Niden commits three fundamental errors. First, I showed that her analysis ignores ERISA and basic pension valuation principles because the concept of winners and losers done based upon probabilities of payment at various ages and based solely on an expected value of future benefits is inconsistent with how benefit levels would be determined and communicated to a participant. Second, I showed that even judging her analysis under general financial valuation principles, her methodology is invalid because, among other things, the assumptions she used are inappropriate for this purpose and lead to invalid results, generally biased in the direction of favoring the new plan formula. Third, I showed that Dr. Niden's analysis improperly takes the 401(k) plan into account as bolstering the benefits provided under the cash balance plan but not the benefits that would have been earned had the traditional pension remained in place.

I had assumed that in performing her quasi-actuarial/financial calculations that purport to determine the "one-time gain or loss" enjoyed by a participant upon Foot Locker's conversion of its traditional pension plan to a cash balance plan that Dr. Niden had performed or had someone perform for her the actuarial calculations underlying her analysis correctly. Dr. Niden's June 22, 2012 declaration demonstrates that my assumption was misplaced.

## II.     Dr. Niden Corrects Only Some of the Errors Pointed Out to Her and Overlooks Others

In Dr. Niden's June 22, 2012 Declaration and Revised Expert Reports, she identifies 5 corrections she made, which she said were based on Plaintiff's counsel's questions during her June 13 deposition. These 5 corrections are: (1) a correction for her failure to assume that participants who are assumed to terminate prior to age 55 would maximize their benefit under the prior formula by electing to receive their benefit at age 55; (2) a correction that participants who terminate with a lump sum value of their benefit less than $3,500 receive a lump sum under the prior benefit formula (Dr. Niden mistakenly had them benefitting from the "addition" of a lump sum option due to the amendment); (3) a correction that plan compensation (which she incorrectly refers to as "Qualifying Compensation") is limited to $150,000 in any plan year; (4) a correction in determining the rate of annual compensation for participants who terminated during 1996; and (5) a correction in how to determine years of credited service when determining a participant's pay credit. Plaintiff's counsel asked about the first 4 items but he did not ask about the last one: presumably, Dr. Niden's inability to calculate vesting years (see Niden 6/13/12 Tr. 251:14-22) made her question the determination of service and make that credited service correction. Plaintiff's counsel did point out during the deposition that vesting service was

---

(retirement patterns, interest rates, benefit form and timing of elections, etc.) had played out exactly the way Dr. Niden says her hypothetical economist would have projected they would play out. Set two is the supposed present value of the benefits that proposed class members could have expected to receive under the new cash balance plan and 401(k) plan, using the same interest rate and termination pattern assumptions, but radically different assumptions about benefit forms and timing. In each set, there is one determination assuming that the applicable interest rate under IRC § 417(e) would be 6.06%, and another assuming it would be 7.5%.

improperly determined, but Dr. Niden appears not to have understood that criticism so she did not correct it and recommits this error. This recommitted error is discussed below along with its side effects, namely that she incorrectly determines when participants first become vested, incorrectly determines which participants are eligible for the enhanced account balance, and incorrectly determines when participants become eligible for the more valuable early retirement subsidy. Dr. Niden still overstates the participants who would have been winners because she did not correct and hence recommits basic errors, including these and others discussed below. Once these errors are corrected in the manner discussed below, the percentage of winners drops to about **1%** of the population (**178** total participants). When the analysis is corrected for Dr. Niden's revisions and for further erors she fails to address, the actual dollars gained by winners and lost by losers is dramatic. The "winners" cumulatively gain just $45,000 while the more than 15,000 "losers" are worse off by over $100 million.

      With regard to the 5 corrections above, their effect was that Dr. Niden significantly overestimated the number of winners in her original analysis. More specifically:

1) **The Undervalued Early Retirement Subsidy.** This error consistently understated the value of the prior plan formula for participants who were under age 55. Based upon how Dr. Niden valued the benefit for a participant who was anticipated to terminate prior to age 55, she assumed that the participant would elect to forgo any early retirement subsidy and commence his or her benefit at age 65. As shown in the chart on pages 23 and 24 of my report (all references to which are to my May 22 supplemental report), the value of the benefit payable at age 55 for participants with less than 15 years of vesting service is worth slightly more than the value of the benefit payable at age 65, when valued at 7.56% with mortality prior to age 65. For participants with 15 or more years of vesting service, the benefit payable at age 55 is roughly double the value of the benefit payable at age 65, when valued at 7.56% and mortality prior to age 65. Dr. Niden's error significantly reduced the relative value of the benefit payable under the prior plan formula, and significantly increased the number of participants for whom Dr. Niden would classify as having a "gain" due to the plan amendment. The correction of this error significantly reduces the number of purported "winners" from the conversion that she originally reported.

2) **Ignoring the impact of the $3,500 mandatory cash out provision.** This error also understated the value of the prior plan formula, under Dr. Niden's approach. Both Dr. Niden and Mr. Sher repeatedly state that there is a significant increase in the value of a person's benefit due to the addition of the lump sum option.[2] By ignoring the fact that some benefits would be paid under the prior benefit formula in the form of a lump sum, Dr. Niden incorrectly decreases the value of the prior plan formula benefit in her original analysis. As Dr. Niden points out on page 9, footnote 23 of her revised report, over half of the participants who have been paid were affected by this plan provision. This is clearly not a minor oversight. In essence, she treats the "addition" of the lump sum option as significantly increasing the benefits under the plan for participants who would have received a lump sum whether under the prior plan formula or under the plan post-conversion. Thus, Dr. Niden's error significantly understated the value of the prior plan

---

[2] I have disputed this contention previously. See, for example, page 13 of my June 7 rebuttal report.

benefit in her determination of the one-time gain due to the plan amendment. The correction of this error significantly reduces the number of purported "winners" from the conversion in her original analysis.

3) **Using gross Compensation rather than Plan Compensation.** By failing to read or understand the Plan Document or the SPD, *see* Niden 6/13/12 Tr. 229:24-235:5, Dr. Niden incorrectly failed to limit compensation to the 1996 maximum compensation limit of $150,000. The impact of this was that for a small portion of the participants, the rate of future benefit accruals under both formulas was overstated. This had the result of reducing the impact of the wear-away, and thus, overstated the value of the new plan formula. In comparison to the prior 2 errors, this is relatively small in magnitude, only meaningfully impacting a few dozen participants. The correction of this error has an uncertain impact on the number of purported "winners" from the conversion.

4) **Improperly annualizing compensation.** Dr. Niden's analysis was based upon potential continued employment to age 70, so it required the use of compensation in future years. For participants who terminated during 1996, the compensation provided was based only upon the months they were actually employed, and, as such, needed to be annualized. When annualizing, Dr. Niden overstated the actual anticipated rate of compensation, and like in (3) above, this higher compensation minimized the impact of the wear-away, causing the results to overstate the value of the new plan formula. The impact of this was only for participants who terminated during 1996, and was small for participants who terminated early in a month or late in the year. The anticipated impact, like in (3) above, was not large, but would impact many more participants than were impacted by (3). The correction of this error reduces the number of purported "winners" from the conversion.

5) **Using a higher pay credit rate due to higher service.** Dr. Niden used rounded years rather than completed years when determining the number of years a participant had earned for purposes of determining pay credits. This would only impact half of participants, but for those who were impacted, this, on average, increased the value of the new plan formula by 6% (due to being one rung higher on the pay credit scale once every 5 years; see page 40 of my report for a discussion of the impact of moving from one rung to the next, with an average effect of 6% per year). For many participants who were classified as having a one-time gain, this 6% increase was more than the full amount of the gain. Thus, the sole reason that many participants were classified as having a gain was due to this error. The correction of this error significantly reduces the number of purported "winners" from the conversion.

As Dr. Niden states in paragraph 26 of her declaration, the impact of these 5 error corrections upon the comparison of the combined new plan formula and the 401(k) plan to the prior plan formula, assuming a GATT rate of 6.06%, is that "the median of the proposed class members' expected gain or loss from converting to the Cash Balance Plan and 401(k) Plan, expressed as a percentage of Pay, changes from 5.3% to 1.1%," a decrease of almost 80%. Other results from her report changed to a similar extent. The net result is that the percentage of purported "one-time winners" from the conversion, even under the *ad hoc* valuation methodology that Dr. Niden constructed for the sole purpose of trying to present Foot Locker's cash balance conversion as

4

something that benefitted many employees, dropped from 45.1% to 14.6% (using the actual 417(e) rate of 6.06% and excluding the 401(k) plan; see Niden declaration ¶ 26). However, she still overstates the participants who would have been winners, which if corrected, would only be approximately 1% of proposed class members.

## III.    Dr. Niden's Re-Commission of Basic Errors

As noted above, Plaintiff's counsel drew Dr. Niden's attention to the fact that she did not know how to calculate vesting service correctly (see Niden 6/13/12 Tr. 251:14-254:25), and, by inference, that she had calculated it incorrectly. Despite this, she makes no mention in her report of correcting this issue.[3]   The years of vesting service are used in determining benefits in three distinct ways:

1) **The determination of when a participant first vests under the plan** – Vesting is based upon years of vesting service, so by systematically understating the vesting service, as Dr. Niden has done, she delays when a person vests. By excluding years when a person was not vested, the measured impact of the wear-away on short-service employees is decreased (because the years immediately following the conversion for these employees would be effectively excluded from the analysis). By excluding years prior to when a participant is vested (and hence years in which the old plan would be better than the new plan), Dr. Niden understates the impact of the wear-away, thus overstating the relative value of the new plan formula versus the old plan formula.

2) **The determination of the Initial Account Balance** – Participants are entitled to an early retirement enhancement if they have at least 15 years of vesting service (and meet an age requirement). By misstating the years of vesting service, Dr. Niden understates the initial account balance for impacted participants. It appears that this error only impacted several dozen participants, but for those participants, it understates the value of the new plan formula.

3) **The determination of the entitlement of the early retirement subsidy** – Of the three vesting service errors, this has by far the largest impact. By miscounting the vesting years, Dr. Niden delays entitlement (or future entitlement, for participants anticipated to terminate prior to age 55) to the early retirement subsidy. This can result in a 50% or higher difference in the value of the benefit due in a particular month. Consider a participant with an accrued benefit of $1,000. Without the subsidy, the benefit is $400 payable at age 55, whereas the benefit with the subsidy would provide a 50% higher benefit of $600 payable at age 55 (see page 23 and 24 of my report). By delaying the eligibility for the early retirement subsidy by as much as 18 months, this significantly reduces the measured value of the prior benefit formula in favor of the new plan formula

---

[3] Due to the short time frame in which this report was prepared, and the fact that Dr. Niden changed the program she used to conduct her analysis (requiring me to completely restart my analysis), I am not able to verify the validity of her explanation regarding what she did and did not correct, and must take her at her word for the time being.

During Dr. Niden's deposition, she was asked about the exclusion of the value of the pre-retirement death benefit during the period between termination of employment and commencement of the benefit (an issue that only impacts the value of the prior plan formula, because she assumes that benefits under the new plan formula are paid immediately) (see Niden 6/13/12 Tr. 341:14-342:15). Clearly, if a benefit is payable upon death, there is more value to the participant than if no benefit is payable upon death (and all other benefits remain constant). Therefore, there is a value to this benefit under the prior plan formula, but no similar value under the new plan formula. Despite the fact that Plaintiff's counsel pointed out this error to her, her revised report indicates (see paragraph 18 on page 50) "my analysis does not incorporate pre-retirement survivor benefits paid to a spouse upon the early death of an employee." This systematically lowers the value of the prior plan formula for participants below the age of 55, increasing the measured relative value of the new plan formula to the prior plan formula.

Based upon the original program provided by Dr. Niden, for purposes of valuing the prior formula, she assumes that some participants will retire between age 65 and age 70. For example, a participant who was age 40 on 1/1/96 would have some probability of still being employed at age 65. That participant would be assigned a probability of retiring at an age between 65 and 70 based upon probabilities that Dr. Niden assumed. In contrast, when valuing the new plan formula, Dr. Niden assumes that participants will not work past an optimal age between age 65 and 70. The impact is to accelerate when the benefit is paid under the new plan formula, with no similar acceleration under the prior plan formula. When the benefit is accelerated in this way, and the interest discount rate (i.e., 7.56% plus mortality) exceeds the value of the interest crediting rate plus the pay credits, the value of the benefit is increased. To see this, consider two participants, one with only 5 years of service at age 65, and one with 40 years of service at age 65. For the participant with only 5 years of service, they would most likely be in the wear-away period, so the value of their benefit would actually be decreasing due to their increasing age (i.e., their accrued benefit would not be going up, but the conversion factor to determine the lump sum would be declining due to a shorter life expectancy at the older age). Thus, by making the benefit payable at age 65, rather than age 66 or later, the value of the new plan benefit is increased. For a participant with 40 years of service, who is not in wear-away (for example, a participant who was age 55 on the conversion date, but now is expected to have a probability of payment after age 65), the pay credit would be less than 1/40[th] of their cash balance account (due to the enhancement), meaning that their benefit would be going up by less than 2.5% due to the pay credit. In addition, their benefit would be going up by 6% due to the interest credit. Thus, the increase in benefit from age 65 to 66 would be less than 8.5% of their account (note that these two effects do not compound, because there is no interest credit on the current year's pay credit). The discount back from age 66 to 65 would be the compounding of the 7.56% discount rate plus a 1.1328% mortality discount for the year. Compounded, these two effects cause an 8.778% additional discount in the value of the benefit from age 66 to age 65. Since this exceeds the increase of 8.5%, the value of the benefit at age 65 exceeds the value at age 66. As the participant ages, the impact of the mortality discount increases, making this impact more pronounced (between age 69 and age 70, the mortality discount is 1.7869%). Thus, for participants where this acceleration was taken into account, it systematically increases the measured value of the new plan formula in comparison to the prior plan formula.

During Dr. Niden's deposition, it was pointed out to Dr. Niden that the plan called for benefits under the prior formula to be actuarially increased for payments after age 65.  Dr. Niden indicated that she didn't know what an actuarial increase is (see Niden 6/13/12 Tr. 195:16-204:17), and therefore she excluded this adjustment for benefits paid under the prior plan formula, for benefits paid after age 65.  This had the effect of lowering the value of benefits under the prior plan formula.

During her deposition, Dr. Niden was asked why she excluded participants who were over age 70 from her analysis (see Niden 6/13/12 Tr. 181:9-185:9).  Dr. Niden continues to exclude participants who are over age 70, but the stated reason in her report has changed.  Previously she simply stated in footnote 1 on page 44 that they were excluded because they "will terminate/retire for sure."  This is a very odd explanation, because by the manner in which Dr. Niden does the analysis, there is no cause for separation from service *other than* termination or retirement.   In Dr. Niden's revised report, she now states in a new footnote 2 on page 4 that "there are 162 participants older than the mandatory retirement age of 70.5."  This is even odder than the prior purported rationale, because the plan has no mandatory retirement age, and, as Dr. Niden points out, 162 people are still employed beyond the age that she identifies as the mandatory retirement age.  My only conclusion is that she lacked and still lacks a basic understanding of what happens at age 70 ½, as explained for example, on page 10 of the SPD.  As the SPD explains, the requirement is that benefit payments must commence by the April 1st following the year in which the participant attains age 70 ½ "even if you are still actively employed" (i.e., have not yet retired).  As pointed out on the bottom of SPD page 9, such a participant would continue to accrue compensation credits.  Dr. Niden goes on to explain in a revised footnote 3 (previously footnote 1) on page 44 that "one could include these participants, assume they terminate immediately on January 1, 1996 in accordance with the termination assumption."  This statement illustrates a basic lack of understanding of the assumptions used in valuing the Plan.  After age 55, the assumption is not a termination assumption, but a retirement assumption (see, for example, FL-OSB 003323 showing termination assumptions up to age 54, and FL-OSB 003324 showing retirement assumptions starting at age 55).  Also, the assumption is not that people will terminate or retire on the first day of the plan year, but during the plan year.  Thus a 70-year old would be assumed to have a 100% probability of retirement between age 70 and 71, but not a 100% probability of retirement on the January 1 on which the valuation is performed.  Finally, as I stated on page 14 of my rebuttal report, the assumptions used for valuing the Plan are not completely adaptable for the purpose for which Dr. Niden has used them, and this is an example of the inappropriate use of an assumption designed for one purpose applied to a different purpose for which it is not suitable.  It is not surprising that Dr. Niden would make mistakes such as these, given that, as I discussed in page 3 of my rebuttal report, Dr. Niden is not an enrolled pension actuary.

## IV.    Implications

A.      It is remarkable that nowhere in Dr. Niden's revised report does she reverse her conclusions from her original report despite the fact that the results of her calculations now show a result that is basically the opposite of what her original report showed.  For example, in her prior report, paragraph 76, she states "The results indicate that younger employees aged 30 and below vastly prefer the Cash Balance Plan to the Predecessor Plan."  The Exhibit being analyzed,

Exhibit L, shows that all participant under age 25 prefer the new plan formula, and roughly 2,800 out of roughly 3,100 participants between age 25 and 30 prefer the new plan formula. The new Exhibit L shows a different result, showing about 950 out of about 1,500 participants below age 25 preferring the new plan formula, and only about **450** out of about 3,100 participants between age 25 and 30 preferring the new plan formula. In other words, the revised calculation shows that her prior conclusion was wrong. The results indicate that younger employees aged 30 and below vastly (about 3,200 out of 4,600) prefer the prior plan formula. What does Dr. Niden do about her previous conclusion that "The results indicate that younger employees aged 30 and below vastly prefer the Cash Balance Plan to the Predecessor Plan" now that her revised calculation show that about 70% of the employees in this group (i.e., below 30) prefer the prior plan formula under her analysis? She deletes the sentence and says nothing further.

B.    Because Dr. Niden's revised calculations still do not reflect the additional errors that were drawn to her attention in the deposition (like the error in the vesting service and the exclusion of the value of the pre-retirement death benefit), the 70% figure cited in the preceding paragraph is actually understated. In other words, the corrected results are even worse for Foot Locker than Dr, Niden is acknowledging.

I received this revised report late on Friday, June 22, 2012, and attempted to finish a response by Tuesday morning June 26. The problem of analysis is made even more difficult by Dr. Niden changing the programming language platform she claims that she is relying on from one based in MatLab to one based apparently in SAS, neither of which I had ever heard of prior to her use of them in this case. While I have managed to gain access to MatLab, I have no access to SAS and therefore cannot meaningfully review her new program, especially in the time frame available. In spite of the short timeframe and my unfamiliarity with the programming language, I have attempted to alter Dr. Niden's MatLab program to correct for the various errors. Based on my review, I am certain that Dr. Niden's new report is still significantly flawed in the calculations, even if the underlying flawed technique is forgiven (as discussed at length in my rebuttal report).

The charts below trace the evolution of Dr. Niden's "winners" from her original analysis to her revised analysis and finally to my analysis which corrects for even more of the errors Dr. Niden continues to make. It is abundantly clear that whereas her original analysis depicted winners, her revised analysis finds that a majority were actually losers and that, in the end, nearly all Foot Locker participants (approximately 99% of the proposed class) are losers and would have preferred the prior plan formula had they been given an opportunity to make an informed choice.

## Niden Original Report Results

**Distribution of Age for Workers who Preferred**
**The Old Plan Versus the New DB Plan (Excluding the 401(k) Plan)**
**Assuming an Expected GATT Rate of 6.06%**

Source Cash Balance Participant Data (Exhibit A xls), Historical Compensation Data (historical pays.xlsx), Appendix

## Niden Revised Report Results

**Distribution of Age for Workers who Preferred**
**The Old Plan Versus the New DB Plan (Excluding the 401(k) Plan)**
**Assuming an Expected GATT Rate of 6.06%**

Source Cash Balance Participant Data (Exhibit A xls) Historical Compensation Data (historical pays.xlsx), Appendix

## Deutsch Revised Results

**Deutsch Revised**
**Distribution of Age for Workers who Preferred**
**The Old Plan Versus the New DB Plan (Excluding the 401(k) Plan)**
**Assuming an Expected GATT Rate of 6.06%**

Source Cash Balance Participant Data (Exhibit A.xls), Historical Compensation Data (historical pays.xlsx), Appendix



## Niden Original Report Results

Source Cash Balance Participant Data (Exhibit A xls), Historical Compensation Data (historical pays xlsx), Appendix

## Niden Revised Report Results

Source Cash Balance Participant Data (Exhibit A.xls), Historical Compensation Data (historical pays xlsx), Appendix

## Deutsch Revised Results

Source Cash Balance Participant Data (Exhibit A.xls), Historical Compensation Data (historical pays xlsx) Appendix



## Niden Original Report Results

Source Cash Balance Participant Data (Exhibit A xls), Historical Compensation Data (historical pays xlsx), Appendix

## Niden Revised Report Results

Source Cash Balance Participant Data (Exhibit A xls) Historical Compensation Data (historical pays xlsx) Appendix

## Deutsch Revised Results

Source



C.      As the charts above illustrate,[4] when comparing Dr. Niden's results in her original report to her revised report, her conclusion that a large portion of the population prefers the new plan formula to the old formula starts to disappear.  When the additional corrections are made, it dissolves away almost completely.  As I stated in my original rebuttal report, at its heart, Dr. Niden's analysis technique is fatally flawed.  But, even when making that remark, I had presumed that Dr. Niden was sufficiently qualified so as to be able to correctly calculate the benefits upon which her analysis was based.  The errors that Dr. Niden made were neither mere typographical errors (i.e., she meant to do one thing, but accidentally did another), nor were most of the errors inadvertent (i.e., a point being accidentally overlooked).  Rather, the errors she committed indicate a lack of understanding of how to calculate participants' benefits and interpret data (such as compensation and the actuarial assumptions) that is presented in an industry-standard (for actuaries) manner.

The primary participant-specific building blocks of the benefits in this Plan are compensation, credited service and vesting service.  Without these three pieces of information, it is impossible to determine a participant's benefit.

- The first and most important piece is compensation.  The data provided by the defense lists two compensation figures for each participant, one for purposes of the tax-qualified pension plan and the other for the Foot Locker non-qualified deferred compensation plan.  Dr. Niden selected the wrong compensation to use when determining benefits.  Normally, I would assume that this was an inadvertent error of accidentally pulling data from the wrong column, but under questioning it became evident that Dr. Niden had no idea which compensation to use (see Niden 6/13 Tr. 219:18-23).[5]

---

[4] It should be noted that some participants had significantly larger values of benefits under the prior formula than under the new formula.  This results from various causes.  For example, a participant with only 5 years of service, who is age 45, would only be receiving a pay credit of 1.10% of pay, but would need a contribution of 4% of pay to accrue a benefit equal to the prior accrued benefit (see chart on page 37 of my revised report).  Thus, the prior plan would equal more than 200% of the new plan formula.

[5] Dr. Niden claims that the Plan document would explain which to use, but there is only one proper compensation figure for Plan purposes under the Plan document, so based upon her comments it would not have helped her at all.  In her deposition, she stated that she would have looked for the definition of qualifying compensation, and an explanation of the two compensations, but would have found no definition of qualifying compensation, and only one definition of W-2 compensation in Plan § 1.48, which would have shed no more light on the issue than did the SPD.  Since the SPD did not resolve the issue for her, the Plan document would have been no additional help.  She attempts to argue that "qualified" would refer to "qualified" for the plan, rather than realizing what should have been obvious, that there are actually two plans, the qualified plan and the non-qualified plan, and "qualified" refers to compensation for the qualified plan, not qualified wages (as mentioned above, she continues to repeat this error in her new report).  Even when confronted with the language in the SPD which states that plan compensation cannot exceed $150,000, she still failed to grasp the import of the difference between the two compensation figures, insisting that she would have to read the definition of qualified compensation, even after it was pointed out to her that no such definition exists (see Niden 6/13/12 Tr. 231:22-235:5).

- As already discussed above, Dr. Niden was also unable to identify how to determine vesting service.

- Finally, even though it was not raised in the deposition, Dr. Niden acknowledges that she learned after the deposition that she had determined credited service incorrectly.

The standard technique would have been to compare calculated results with actual results determined by the Plan. This would have confirmed whether Dr. Niden (and her staff, which apparently performed the vast majority of the calculations in her report outside her direct supervision) had a proper understanding of the Plan consistent with how the Plan was actually operated. Clearly this was not done because if it had been, all three of these errors would have surfaced.

**V.     The Change in the Personal Discount Rate to 17%**

I have reviewed and agree with Dr. Maxam's analysis criticizing Dr. Niden's newly-advanced claim that an assumed personal discount rate of 17%, rather than 7.56% (which itself is too high), is appropriate. In particular, I agree with Dr. Maxam's conclusion that it is absurd for Dr. Niden to argue that it is reasonable that individual participants investing relatively small sums through an IRA could achieve rates of return more than twice that assumed by multi-hundred million dollar pension plans like the Foot Locker Plan. I also agree with his conclusion that the paper Dr. Niden says supports her conclusion that 17% would be a reasonable discount rate is irrelevant because the facts in this case are so obviously different than the facts addressed in that paper, which I have reviewed.

<div align="center">*     *     *</div>

In my opinion, this report conforms to generally accepted actuarial principles and practices, and is in compliance with applicable Actuarial Standards of Practice.

I hereby declare under penalty of perjury under the law of the United States of America that this report is true and correct.

Lawrence Deutsch, E.A.
Dated:  June 26, 2012