UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X

GEOFFREY OSBERG, on behalf of himself and
all others similarly situated,

                           Plaintiffs,

           -v-

FOOT LOCKER, INC. and FOOT LOCKER
RETIREMENT PLAN,
                           Defendants.
-------------------------------------------------------------- X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: DEC 0 6 2012
```

07 Civ. 1358 (KBF)

MEMORANDUM
DECISION & ORDER

KATHERINE B. FORREST, District Judge:

How – or even whether – employers should assist employees in financially preparing for retirement is a topic about which there are many views, many laws and innumerable lawsuits. This is one of them.

In 1996, Foot Locker, Inc., best known for its athletic footwear, changed what had been a defined benefit pension plan (the "Plan") to a cash balance formula.[1] It did so at a time when it was experiencing financial difficulties – drastically cutting employees and looking for cost savings. At the time Foot Locker made this change, plaintiff Geoffrey Osberg was a store manager. He left the company in 2002 and took a lump-sum cash payment representing what he was owed under the Plan as it then existed. Nearly five years later, lawyers reviewing another issue determined that Osberg (and 16,000 others) might have a claim regarding the plan conversion – and this lawsuit followed in 2007. Osberg is the only named plaintiff.

---

[1] Foot Locker, Inc. is the successor corporation to Venator Group, Inc. and F.W. Woolworth, Inc. Woolworth was technically the entity adopting the change in the Plan. The Court refers to "Foot Locker" throughout for ease of reference.

Four years after this lawsuit was commenced, the Supreme Court decided Cigna Corp. et al. v. Amara, et al., 131 S. Ct. 1866 (2011). Amara clarified that various forms of equitable relief may be available in certain cases brought pursuant to the Employee Retirement Income Security Act ("ERISA") relating to changes in pension plans, but also that entitlement to such relief requires a showing of harm by a preponderance of the evidence for those remedies that required such a showing in courts of equity. Id. at 1881. In Amara, Cigna was alleged to have made several misrepresentations to plan participants regarding the changes it was making in its plan – and, upon a showing of harm by the plaintiffs, the Court found it appropriate to hold Cigna to what it had promised. Id. at 1881-82.

Osberg filed this lawsuit in 2007 as a representative of a proposed class of plaintiffs – all of whom are or were Foot Locker employees and have allegedly been impacted by the changes in the Plan. Osberg's core claim is that Foot Locker's benefits department did not adequately explain the impact of the changes it was making in its pension plan to upper management or employees. According to plaintiff, had the changes been fully explained, employees would have understood that the Plan would "freeze" their benefits for at least some period of time, there would have been an employee rebellion, the rebellion would have led management to adopt some other plan (or somehow maintain the status quo despite the company's financial difficulties), and the employees would now be better off (and not have suffered "harm").

2

The problem with plaintiff's case is that it requires that this Court accept the various leaps of faith that plaintiff so willingly makes: that employees would in fact have rebelled; that whatever form that reaction took would have had a causal effect on management, driving management away from adoption of the cash benefit formula it had adopted, that another – not yet designed – Plan would have been implemented in its place, and finally, that this new, replacement Plan would have left the employees in the proposed class better off than they were and are under the cash balance Plan.  In short, the lawsuit is premised on a hypothetical that after years of active litigation, plaintiff cannot show is more reality than speculation.

Now before this Court are several motions: by defendants for summary judgment (Dkt. No. 68), to strike plaintiff's response to its Rule 56.1 statement of undisputed material facts (Dkt. No. 100), to exclude plaintiff's proposed expert on causation (Dkt. No. 106), to certify a Rule 23 class (Dkt. No. 95) and a motion by plaintiff for relief as a result of defendants' alleged spoliation (Dkt. Nos. 100, 106).

For the reasons set forth below, this Court grants defendants' motion for summary judgment.[2] It denies the remainder of the motions as moot.

## FACTS

The parties have spent years developing a factual record in this case, but only a few undisputed facts really matter and no disputed issues of fact are required for resolution of defendants' summary judgment motion.

---

[2] At oral argument held on September 28, 2012, defendants stated that the resolution of the spoliation motion was not necessary to resolve defendants' motion for summary judgment; the Court finds that any inferences that might come out of granting plaintiff's spoliation motion do not impact resolution of the summary judgment motion either. Tr. of Oral Arg.at 11-13, 37-38, Osberg v. Foot Locker, Inc. et al., 07 Civ. 1358 (KBF) (S.D.N.Y. Sept. 28, 2012).

Osberg worked for Foot Locker from November 1982 to September 2002, ending his career as a store manager. (Rumeld Decl., Ex. 24, at 24-25.) In 1995, Foot Locker's parent company (Woolworth) was having financial difficulties. (Defs.' Local R. 56.1 Statement of Undisputed Facts ("Defs.' 56.1 Statement") ¶¶ 5-6.) Its stock price had lost over fifty percent of its value in three years. (Id. ¶ 7.) Between 1995 and 1998, the payrolls of Foot Locker's parent company and various subdivisions decreased from 119,000 to 75,000 employees. (Id. ¶¶ 11-12.) Foot Locker did what rational companies seeking to shore up their finances do (thereby saving jobs): it looked for ways to cut costs.

A. The Plan Conversion

As part of that cost-cutting effort, in 1995 the Corporate Benefits Department recommended changes to the company retirement benefits program. (Id. ¶ 15.) The Corporate Benefits Department recommended that as of January 1, 1996, inter alia, the company convert its defined benefit pension plan to a cash balance plan. (Id. ¶ 16.) Under the defined benefit plan in effect until January 1996, participants earned an annuity, payable upon reaching age 65, that utilized a career average pay formula with a bonus for early retirement after 15 years of service.[3] (Id. ¶ 13; Pl.'s 56.1 Statement ¶ 13.) At the time of disbursement, participants earned an accrued benefit defined as a percentage of their annual compensation earned for each year of service and distributed monthly. (Defs.' 56.1 Statement ¶ 14.) Participants in the

---

[3] Plaintiff disputes a number of facts related to plan structure, but the Court does not find these facts to be material to the summary judgment motion. For example, plaintiff points out that participants with balances at an actuarial equivalent present value of less than $3,500 received lump sum payments even under the defined benefit plan. (Pl.'s 56.1 Statement ¶ 14.)

defined benefit plan did not have the option to receive a lump-sum payout; their only option was to receive the defined benefit annuity.

As explained in a presentation assembled by the Corporate Benefits Department, the cash balance plan would convert each participant's accrued amount in the defined benefit program to an amount in a hypothetical or notional account.  (Id. ¶ 17.)  The amount of that account would be determined by discounting the future value of the defined benefit annuity balance by a 9 percent interest rate and adjusting for mortality risk, resulting in an "initial" or opening account balance. (Id. ¶ 21.)  That initial balance would thereafter be increased by compensation credits measured as a percentage of earnings and interest on the outstanding cash balance account at the rate of 6% annually. (Id. ¶ 19.)  If the participants had no right to a defined benefit annuity (i.e. those participants who joined the Plan after January 1, 1996), they began the cash balance conversion with an initial account balance of zero. (Id. ¶ 23.)

The final account amounts were set upon a participant's termination from Foot Locker under a so-called "A or B" formula. Under that formula, employees were entitled to the greater of the value of their defined benefit plan (at retirement age) as of December 31, 1995 (when the conversion occurred), or the value of the retirement-age annuity in the cash balance plan.  (Id. ¶ 26) Because the initial cash balance amount was discounted from its retirement-age value by a fairly large 9 percent interest rate and an additional mortality adjustment, the opening balance

of the cash balance plan ended up being lower than the equivalent present value of the defined benefit for many long-time employees (including Osberg).

As such, those employees experienced a period of "wear-away"—lasting in some cases for several years—in which the value of their pre-1996 defined benefit annuities exceeded that of their cash balance accounts. Their retirement accounts were thus effectively frozen until, via service credits and accrued interest, the cash balance amount exceeded the defined benefit amount. Once the cash balance amount was greater than the pre-1996 amount, the participant would receive a benefit based on the cash balance amount. (Id. ¶ 29.)

Critically, one final choice remained for employees under the conversion plan once the "A or B" baseline had been determined: employees had a choice to receive an immediate annuity based upon the cash value of their accounts at retirement and subsequent interest accruals, or they could elect to receive a lump sum that reflected a discount to present value of the applicable annuity. (Id. ¶ 28.)

Within two years of the conversion between pension plans (e.g., by 1998— well before plaintiff left in 2002), more than half of the proposed class had terminated employment with defendants. (Id. ¶ 30.) Of those who terminated and were eligible to choose the annuity or the lump sum, over 70 percent—including Osberg—elected to receive the lump sum payments. (Pl.'s 56.1 Statement ¶ 31.)

B. Osberg's Retirement and Lump Sum Election

In late 1996 or early 1997, Osberg received a copy of the Woolworth Plan Summary Plan Description, dated September 30, 1996 (the "SPD"). (Defs.' 56.1

Statement ¶ 33.)  The SPD represented that "[y]our accrued benefit at the time your employment terminates is the greater of the amount determined under the Plan as amended on January 1, 1996 or your accrued benefit as of December 31, 1995."  (Id. ¶ 33-35.)

Plaintiff terminated his employment with Foot Locker in 2002.  At that time, he received a statement that showed both the lump sum based on the amount in his cash balance account, $20,093.78 – and the larger lump sum to which he was entitled based upon the pre-1996 plan, $25,695.96.  (Id. ¶ 37.)  Osberg chose to receive a lump sum payment based on the pre-1996 plan amount calculated under the career average formula, rather than the lesser benefit to which he was entitled under the cash balance formula. (Id. ¶ 38.)

C.  The Board's Awareness of the Plan and its Consequences

Certain board members testified that they were unaware of the wear-away effect and would not have adopted a plan that effectively "froze" employees' benefits until what they were owed under the cash balance formula caught up to what they had accrued. (Pl.'s 56.1 Statement ¶ 17(a); Gottesdiener Decl., Ex. 21 ("Deutsch Depo.") at 290:24 – 291:20, Ex. 13 ("Hilpert Depo.") at 146:8-15, Dkt. No. 84.)  In addition there is some evidence that the board considered and explicitly rejected a plan that would overtly freeze benefits for a period of time—without a lump sum option—on the grounds that such a plan would be bad for morale.  (Defs.' 56.1 Statement ¶¶ 50-54.)  However, no member of management testified as to a plan that would have been adopted as an alternative to the cash balance plan.  In

addition, there is no evidence in the record that every potential ERISA-compliant alternative plan would have been better for plaintiff or all members of the proposed class. Nor is there evidence in the record that defendants could have afforded to continue with the defined benefit pension plan indefinitely, that maintaining it was a viable alternative, or that they could have maintained the same level of employment with a higher-cost alternative plan.

## SUMMARY JUDGMENT STANDARD

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In making that determination, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings. Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine

issue of material fact where none would otherwise exist." <u>Hicks v. Baines</u>, 539 F.3d 159, 166 (2d Cir. 2010) (citations omitted).  Only disputes over material facts--<u>i.e.</u>, "facts that might affect the outcome of the suit under the governing law"--will properly preclude the entry of summary judgment.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see also</u> <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

## THE CLAIMS

Two claims remain of those plaintiff originally filed in 2007: Count Three – Violation of ERISA § 102, 29 U.S.C. § 1022, which alleges non-compliance with the detailed requirements for SPD explanations ("SPD Claim"), and Count Four – Violation of ERISA §404(a), 29 U.S.C. § 1132(a), which alleges a breach of fiduciary duty by the Plan trustees resulting from their alleged material misrepresentations and omissions surrounding the plan conversion.

A. <u>Count Three: Statute of Limitations</u>

<u>Amara</u> establishes that an SPD – or summary plan – is not the Plan itself and the terms of the SPD cannot be enforced as if they are the terms of the Plan itself.  131 S. Ct. at 1877.  Thus, as an initial matter, the SPD is not itself a contract.  This has implications for the applicable statute of limitations.  In this Court's prior decision on the motion to dismiss, it held that ERISA does not provide a statute of limitations for SPD-based claims.  <u>Osberg v. Foot Locker, Inc.</u>, 656 F.Supp.2d 361, 370 (S.D.N.Y. 2009).  The Court therefore used federal common law

principles to determine the appropriate limitations period. Id. at 370. This Court –
and a number of courts prior to Amara – treated the § 102 SPD claims as akin to
breach of contract claims and used the New York limitations period of six years.
Amara has now clarified that an SPD is not a contract – its terms are not subject to
enforcement.  Amara 131 S.Ct. at 1880.   Therefore, the appropriate limitations
period is the three year period governing statutory violations. See N.Y. C.P.L.R. §
214; cf. Romero v. Allstate Corp., 404 F.3d 212, 221 (3d Cir. 2005).

Osberg received his lump sum payment in 2002.  This lawsuit was not
commenced until nearly five years later – in 2007.  At the time that he received his
lump sum payment, Osberg had information sufficient to put him on notice of any
basis for a claim.  In the SPD he was told that he was entitled to the greater of the
pre-1996 defined benefit annuity or the cash balance amount accrued starting
January 1, 1996.  (Defs.' 56.1 Statement ¶¶ 33-35.) He was furnished with a written
explaination of the conversion which indicated that the initial cash balance would
be discounted by a 9 percent interest rate, rather than the (lower) 30-year Treasury
rate. (Id.)  Finally, he received a statement showing that the amount he had earned
under the cash balance program was more than $5,000 less than the amount to
which he was entitled under the defined benefit plan.  (Id.)

With those three pieces of information at his disposal, Osberg needn't have
been an actuary to realize that his benefit had been frozen as a result of the cash
balance conversion. If he did not come to such an actual realization, the evidence in
the record is clear that he should have.  The alternative would be unacceptable: that

a former employee who neglects to read even the summary plan documents could wait for an indeterminate number of years until an ERISA-savvy lawyer happens to come along and advise the retiree that he or she has a claim.

In this case, then, the three year period ran—at the latest—as of September 2005, three years after the date when Osberg retired and received his lump sum, a sum explicitly referenced to the benefits owed as of December 31, 1995. Count Three is thus time-barred.

B. <u>Counts Three and Four: Actual Harm</u>

Even if plaintiff had a live claim with respect to Count Three, <u>Amara</u> also requires that a plaintiff make a showing of actual harm—rather than "likely harm"—that satisfies the elements of the particular equitable remedies he seeks. <u>Amara</u>, 130 S. Ct. at 180-82. As such, the Court need not address the other substantive requirements of his two remaining claims unless there is a dispute of material fact as to actual harm.

Here, plaintiff's prayer for relief includes, <u>inter alia</u>, two of the equitable remedies identified in <u>Amara</u>: surcharge against the trustee and reformation of the Plan contract. (Amend. Compl. at 39-40.) A surcharge remedy for monetary compensation against a trustee (such as a pension plan administrator) requires the plaintiff to prove harm caused by the trustee's fiduciary breach or unjust enrichment. <u>Amara</u>, 130 S. Ct. at 1880. For reformation of a contract to be proper, the plaintiff must show a material error in the contract related to fraud or mistake. <u>Id.</u> at 1881.

Plaintiff has failed to raise a triable issue of fact with respect to the harm required for either remedy since the harm he alleges is entirely speculative. Plaintiff cannot rely merely on errors or omissions in the SPD because, under Amara, deprivation of an accurate SPD in itself is an insufficient harm—holding otherwise would subject plan administrators to strict liability on SPD claims. Id. at 1167.

Nor does plaintiff present evidence to raise a material dispute that he was harmed economically by the conversion; although an "A plus B" plan would have left plaintiff with a larger cash balance annuity upon his retirement than the annuity under the "A or B" formula, plaintiff in fact chose not an annuity, but a lump sum payment. There is no material dispute that the lump sum option for employees with significant years of service was not available under the pre-1996 plan. Such a lump sum appears on paper to be smaller than the actuarial present value of the annuity, but employees value the opportunity to obtain a sum immediately that they can spend or invest in an effort to receive higher returns than they would earn under an annuity. The record confirms the value placed on this option as more than 70 percent of plan participants have elected to take the lump sum since the conversion. Plaintiff has presented no evidence to show that he did worse under the lump sum option as awarded as compared to any other conceivable ERISA-compliant plan option. Nor does he provide evidence that he would not have preferred the lump sum even had the Plan administrators been clearer about the "wear-away" effects of the Plan. The evidence of plaintiff's economic harm is too

12

speculative for a reasonable jury to award him relief. See Pearson v. Voith Paper Rolls, Inc., 656 F.3d 504, 511 (7th Cir. 2011).

Further, even if he does allege harm, Plaintiff fails to provide evidence that the actions of the Plan and Foot Locker caused the harm. There is no evidence that the violation of ERISA – such as the breach of fiduciary duty, or an allegedly misleading SPD – caused plaintiff's harm. The essence of plaintiff's claim is that the benefits department did not inform management of the wear-away, and had it done so, management would have had the ability (through appropriate voting or otherwise) to have refused to implement the cash balance plan and, more importantly, that management would have implemented a not-yet designed plan that would have been more favorable to Osberg.

Osberg, however, presents no evidence as to what type of pension plan would have been adopted as an alternative to the cash balance plan had participants known of a "wear-away" period and, further, whether those plans would have necessarily been better than the lump sum he received. Because the lump sum option was part of the conversion package and might not have been included in any alternative plan, the Court rejects plaintiff's argument that any ERISA-compliant plan would have been better than the one actually adopted. In addition, while plaintiff points to record evidence that an explicit freeze option had been rejected by the board, that rejection does not indicate that his preferred "A plus B" approach would have been taken instead. Even if, as plaintiff's evidence suggests, some members of the board thought they were adopting a plan without a freeze, there is

no evidence that the board considered a true "A plus B" approach along with the costs associated with such a plan.  Without evidence in the record to suggest that the board thought such a plan was financially feasible, it strains credulity based on the evidence in the record that a reasonable jury could find causation.

In addition, there is also no evidence that had plaintiff known in late 1995 or 1996 that the change to the cash balance formula had a wear away, that employee discontent would in fact have caused management to choose an alternative that would have been better for this plaintiff.

On this record, fraud, mistake, and breach of fiduciary duty—the substantive requirements for the reformation and surcharge remedies—are irrelevant without a showing of actual harm.  Without a harm to analyze, the Court will not reach the issue of defendants' allegedly wrongful or mistaken conduct.[4]

## SPOLIATION

This Court's decision to grant summary judgment is unaffected by the outcome of the spoliation motion and the Court therefore need not reach the merits of that motion.  It is enough to note that the essence of that motion is that files relating to the benefits department may be missing.  Even if we assume that they are indeed files of the benefits department and, further, that they would have contained information relevant to the adoption of the cash balance plan, that does not solve the essential issue of speculative harm that underlies summary judgment:

---

[4] In addition, while the Court does not need to decide class certification in light of its decision herein, there would be significant issues with respect to commonality and typicality with any class:  each class member may have been harmed or not harmed by the cash balance plan based upon their years of service and pre- and post-1996 plan balances.  An inquiry into those claims would likely need to be individualized and plaintiff has not suggested a feasible means by which the Court could create subclasses that would meet the requirements of Fed. R. Civ. P. 23.

there is no proof through any witness that management had an alternative plan that it would have approved if it knew about wear away, and more importantly, that such a plan would have resulted in plaintiff being better off under that alternative (and therefore "not harmed," as Amara requires to sustain a claim).

Thus, the outcome of the spoliation motion is irrelevant and the Court need not reach its merits to decide the summary judgment motion.

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is GRANTED.  The motions for class certification and appointment of class counsel, to strike plaintiff's response to defendants' 56.1 statement, to exclude plaintiff's expert testimony on causation, and spoliation sanctions are DENIED AS MOOT.

The clerk of the court is directed to close the motions at Docket Nos. 68, 95, 96, 100, 106, and 126, to adjourn any remaining dates, and to terminate this action.

SO ORDERED:

Dated: New York, New York
        December **6**, 2012

K. B. Forrest
KATHERINE B. FORREST
United States District Judge