UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

GEOFFREY OSBERG, on behalf of himself     :
and on behalf of all others similarly situated,     :
                                                              :
                                        Plaintiff,       :                    07-cv-1358 (KBF)
                                                              :
                    -v-                                     :                CORRECTED OPINION
                                                              :                    & ORDER[1]
FOOT LOCKER, INC., et al.,                       :
                                                              :
                                        Defendants.    :
                                                              :
-----------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

On February 23, 2007, plaintiff Geoffrey Osberg initiated this action against

his former employer, Foot Locker, claiming that it violated the Employee

Retirement Income Security Act ("ERISA") through converting its "defined benefit"

pension plan to a "cash balance" retirement plan by (1) issuing false and misleading

plan descriptions in violation of Section 102(a) of ERISA, (2) breaching its fiduciary

duties in violation of Section 404(a) of ERISA, and (3) failing to give plan

participants notice in violation of Section 204(h) of ERISA.

Before the Court is plaintiff's motion for spoliation sanctions.  (ECF No. 126.)

For the reasons set forth below, that motion is GRANTED.

---

[1] The Court has corrected pages 20 and 21 of this opinion to reflect that the Court will be the
factfinder rather than a jury.  The Court has made no other changes.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JUL 2 5 2014

I.     BACKGROUND

A. <u>Factual Background</u>

Prior to this lawsuit, two other lawsuits relating to similar subject matter regarding the Foot Locker Retirement Plan were filed on June 23, 2006 and November 30, 2006. Despite these pending lawsuits, defendants did not issue a litigation hold on the relevant subject until October 8, 2009. In short, two to three years passed between the filing of the first lawsuit and the third before a litigation hold relating to the relevant subject matter was put in place. During this period, relevant documents were destroyed.

On June 23, 2006, defendants were sued in <u>Patino v. Foot Locker</u>, 06-cv-4879 (LBS). As in this case, plaintiff alleged that Foot Locker had misled its employees concerning the conversion of the company's retirement plan from a defined-benefit plan into a cash-balance plan. (Compl., <u>Patino v. Foot Locker</u>, No. 06-cv-04879 ¶¶ 2, 6, 18, ECF No. 1.) As in this case, plaintiff alleged that Foot Locker violated ERISA through concealing the "wear-away" effect caused by the conversion, by which certain older plan participants would have their retirement benefits frozen and would accrue no new benefits unless and until their cash balance caught up to and exceeded their frozen benefits. (<u>See id.</u> ¶ 44.) Plaintiff voluntarily dismissed that lawsuit on September 25, 2006. (Shapiro Decl. Ex. 2, ECF No. 130.) No litigation hold was put into place with regard to the <u>Patino</u> suit.

This Court has previously stated that, based on the <u>Patino</u> lawsuit, defendants should have issued a litigation hold in June or July 2006. (ECF No. 90.)

2

At the time of the 2006 lawsuit, Foot Locker had in place a set of document retention guidelines that compelled its General Counsel to immediately distribute a "document retention memorandum" to individuals with control over documents "needed for a legal action in which the Company is involved or expects to become involved." (June 8, 2012 Gottesdiener Decl. ("June 2012 Gottesdiener Decl.") Ex. 1 (Eichberger Decl.), at Ex. C, at FL-OSB 009770, ECF No. 78.)  On July 6, 2006, Proskauer Rose LLP, defendants' outside legal counsel, stated on a "To Do List" that defendants should issue a "[d]ocument preservation memo." (Sept. 13, 2012 Gottesdiener Decl. ("Sept. 2012 Gottesdiener Decl.") Ex. 3, at FL-PRIV 000163, ECF No. 128.)  In addition, defense counsel discussed with Foot Locker the need to collect documents from Foot Locker personnel, issue a litigation hold memorandum, and notify third parties of the litigation. (Shapiro Decl. Ex. 5 (Sheehan Dep.), at 236:23–238:15.)  Foot Locker did notify certain third parties of the lawsuit and collected certain relevant documents from Foot Locker personnel. (Id. Ex. 8.)  However, defendants did not implement a litigation hold when the Patino case was filed in 2006. (Sept. 2012 Gottesdiener Decl. Ex. 4 (Sheehan Dep.), at 180:23–181:08.)

On November 20, 2006, plaintiff in the instant case sued defendants claiming that Foot Locker had miscalculated his pension benefit under the cash-balance plan. Osberg v. Foot Locker, Inc., et al., No. 06-cv-6620 (N.D. Ill. Nov. 30, 2006).  On February 12, 2007, plaintiff voluntarily dismissed that complaint. (Shapiro Decl. Ex. 4.)

3

On February 23, 2007, plaintiff initiated the instant litigation, claiming that the converted plan's "wear-away" effect effectively "froze" certain employees' benefits, and that defendants' adoption of the plan thereby violated ERISA. (ECF No. 1.) Again, defendants collected relevant documents and notified third parties of the lawsuit. (Shapiro Decl. Exs. 8–10.) However, defendants did not issue a litigation hold until October 8, 2009. (Eichberger Decl. ¶ 15.)

Defendants claim that, after distributing the litigation hold memorandum, they worked with counsel to determine whether any information had been lost. This investigation revealed that certain electronic documents were not retained, and that certain hard-copy documents related to human resources ("HR") were stored at the HR File Room in Foot Locker's headquarters. (Shapiro Decl. Exs. 14–16.) Certain other HR-related documents, including those related to benefits for subsidiaries, wage-and-hour matters, and fair employment practices, were typically stored at an off-site facility at Camp Hill, Pennsylvania rather than in the HR File Room. (Shapiro Decl. Ex. 18 (Peck Dep.), at 143:24–144:17.) However, Dennis Sheehan, Foot Locker's vice president and deputy general counsel, testified that he could only "speculat[e]" as to whether any such investigation occurred. (Sept. 2012 Gottesdiener Decl. Ex. 4 (Sheehan Dep.), at 359:13–360:05.)

Documents subsequently produced during discovery demonstrate that certain potentially relevant documents were lost or destroyed between June 2006 and October 2009, the period during which no litigation hold was in place. Later discovery revealed two categories of documents that could not be recovered: (1)

4

boxes stored at Foot Locker's long-term storage facility at Camp Hill and (2) handwritten notes and other documents kept by Carol Kanowicz, a Foot Locker manager.

On March 1, 2012, in response to plaintiff's discovery requests, defendants admitted that "some boxes that could have contained potentially relevant information were purged/destroyed," and that "certain boxes of hard-copy documents sent off-site by various personnel in Defendants' Human Resources Department were destroyed in 2007 and 2008." (Eichberger Decl. ¶¶ 15, 18(c)–(d).) However, defense counsel also stated that they "reviewed the hard-copy box i.d. slips of those identified as destroyed in this period" at the Camp Hill facility "and ascertained that those boxes did not contain potentially relevant information." (Id. ¶ 18(e).) Defense counsel also claimed that the untimely distribution of the litigation hold memorandum would not have affected electronic documents: electronic documents created after 1998 were not subject to routine retention and destruction policies, and other electronic "materials on the Proskauer system are, as a practical matter, never destroyed." (Shapiro Decl. Ex. 30, at 2.)

Later in 2012, plaintiffs learned that defendants had destroyed documents other than those at Camp Hill. On March 29, 2012, Carol Kanowicz, a Foot Locker manager and member of the team that designed the cash-balance plan, testified that two or three large filing "cabinet drawers" of handwritten notes and other hard-copy documents that had been "generated during the design phase" were "definitely in the file room" when she retired in fall 2006. (June 2012 Gottesdiener

5

Decl. Ex. 26 (Kanowicz Dep.), at 107:08–108:05.) She further testified that defense counsel were unable to locate all the materials that they expected to find and that they were "surprised not to find" them. (Id. at 135:14–136:17.) Moreover, documents in the file room were at times destroyed due to "periodic" "spring cleanings." (Sept. 2012 Gottesdiener Decl. Ex. 23 (Peck Dep.), at 39:23–40:14.)

Then, on July 27, 2012, defendants produced an excerpt from the database of their off-site storage facility at Camp Hill that identified 29,503 boxes that were destroyed at Camp Hill between June 2006 and October 2009. (Sept. 2012 Gottesdiener Decl. ¶ 2.) Of these 29,503 boxes, 305 were labeled as originating from the "HR," "HR/Benefits," or "Benefits" department, and 675 as originating from the "Legal" department. (Id. ¶ 3.) Plaintiff reviewed this database and determined that 141 potentially relevant boxes were destroyed between June 2006 and October 2009. (Id.) Plaintiff created a spreadsheet of these 141 boxes based on their database descriptions. (Id. Exs. 1, 2.) According to the box ID slips for those boxes, they contained documents relating to, inter alia, a "Cash Balance Plan Presentation," "Mercer CB + 401(k)," "Video – the coolest number 401(k)," "Meeting H.R.," "Pension Plan R[etirement] I[nvestment] C[ommittee]," "Benefit Comparisons – 1999," and "H.R. Confidential Info." (Id.)

Although those documents were apparently destroyed between 2006 and 2009, defendants produced other documents concerning the cash balance conversion in 1995 to 1996, including, inter alia, draft and completed presentation materials for management, draft and completed communications to participants, and notes of

6

meetings discussing the contemplated cash-balance design, including the wear-away feature. (See, e.g., Shapiro Decl. Ex. 24.) Plaintiff has not argued that these notes show any intention to conceal information about the new retirement plan's wear-away feature. (See, e.g., id.)

### B. Procedural History

On December 6, 2012, the Court granted defendants' motion for summary judgment on the basis that plaintiff failed to state a plausible Section 204(h) notice claim, that his Section 102(a) claim was time-barred, and that he failed to raise a genuine issue of material fact on his Section 102(a) and Section 404(a) claims. (See ECF No. 138.) The Court also denied plaintiff's motion for spoliation sanctions as moot, finding that, even if defendants had destroyed relevant documents, they would not have affected the outcome of defendants' motion, because plaintiff would nonetheless be unable to show actual harm. (Id. at 14–15.)

On February 13, 2014, the United States Court of Appeals for the Second Circuit affirmed this Court's dismissal of plaintiff's Section 204(h) claim, declined to decide whether plaintiff's Section 102(a) claim was time-barred, vacated this Court's dismissal of plaintiff's Section 404(a) claim, and remanded this case for further consideration of that claim. (ECF No. 144.) On June 5, 2014, the Court allowed plaintiff to renew his spoliation motion, and plaintiff did so on June 6, 2014. (ECF Nos. 152, 153.)

7

## II.    APPLICABLE LEGAL PRINCIPLES

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999).

"A party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002) (internal quotation marks omitted).

### A. Obligation to Preserve Evidence

"[A]nyone who anticipates being a party or is a party to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary." Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 217 (S.D.N.Y. 2003). "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 436 (2d Cir. 2001).

### B. Defendants' State of Mind and Relevance of the Evidence

8

"The state of mind of a party that destroys evidence is a major factor in determining whether an adverse inference is the appropriate sanction." Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 74 (S.D.N.Y. 1991).

"Where a party destroys evidence in bad faith, that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party. Similarly, a showing of gross negligence in the destruction or untimely production of evidence will in some circumstances suffice, standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party." Residential Funding Corp., 306 F.3d at 109 (citation omitted).

By contrast, "where the destruction was merely negligent," plaintiff must also "demonstrate that the destroyed evidence would have been favorable to" him, "since in those cases it cannot be inferred from the conduct of the spoliator that the evidence would even have been harmful to him." Zubulake, 220 F.R.D. at 221; see also Residential Funding Corp., 306 F.3d at 109 ("[T]he party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction.") (internal quotation marks omitted); Turner, 142 F.R.D. at 77 ("[W]here the destruction was negligent rather than willful, special caution must be exercised to ensure that the inference is commensurate with information that was reasonably likely to have been contained in the destroyed evidence.").

9

To establish the relevance of destroyed documents, plaintiff must
"demonstrate through extrinsic evidence, such as other existing documents or
deposition testimony, that a reasonable jury could find that the missing [evidence]
would have been favorable to his claims." Curcio v. Roosevelt Union Free Sch. Dist.,
283 F.R.D. 102, 113 (E.D.N.Y. 2012).

### C. Proper Sanction for Spoliation

"Although a district court has broad discretion in crafting a proper sanction
for spoliation, we have explained that the applicable sanction should be molded to
serve the prophylactic, punitive, and remedial rationales underlying the spoliation
doctrine. The sanction should be designed to: (1) deter parties from engaging in
spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully
created the risk; and (3) restore the prejudiced party to the same position he would
have been in absent the wrongful destruction of evidence by the opposing party."
West, 167 F.3d at 779 (citation and internal quotation marks omitted).

### III.   DISCUSSION

### A. Obligation to Preserve Evidence

It is clear that defendants were under an obligation to preserve the evidence
in question in this case. See Zubulake, 220 F.R.D. at 217 ("[A]nyone who
anticipates being a party or is a party to a lawsuit must not destroy unique,
relevant evidence that might be useful to an adversary."). Based on the record
before the Court, the destroyed documents related to the creation of Foot Locker's
new retirement plan, and thus to the question of whether defendants breached their

10

fiduciary duties under ERISA by concealing the "wear-away" effect caused by the plan.

Thus, as this Court has already found, defendants should have issued a litigation hold in June or July 2006 based on the filing of the Patino lawsuit. (ECF No. 90.) That hold—for documents relevant to the same subject matter as the instant suit—would have bridged the period from 2006 until 2007, when this suit was filed. Furthermore, at the time of the 2006 lawsuit, Foot Locker had in place a set of document retention guidelines, and Proskauer stated that defendants should issue a "[d]ocument preservation memo." (Eichberger Decl. Ex. C, at FL-OSB 009770; Sept. 2012 Gottesdiener Dec. Ex. 3, at FL-PRIV 000163.)  Plaintiff then filed another lawsuit in the Northern District of Illinois on November 20, 2006, and initiated the instant litigation on February 23, 2007. (ECF No. 1.)  Under such circumstances, defendants "should have known that the evidence may be relevant to future litigation." Fujitsu, 247 F.3d at 436.

### B. Defendants' State of Mind and Relevance of the Evidence

#### 1. Defendants' state of mind

Defendants acknowledge that they failed to issue a timely litigation hold, but assert that this failure was "inadvertent[]." (June 2012 Gottesdiener Decl. Ex. 3, at 3.)  Plaintiff argues that this failure and any consequent destruction of evidence were not inadvertent but conscious and willful and "in bad faith," or at a minimum due to "gross negligence." Residential Funding Corp., 306 F.3d at 109. Plaintiff offers several arguments in favor of his claim.

11

First, plaintiff argues that this Court may infer that defendants acted intentionally because they have stated elsewhere that they expected to prevail on the merits. (See Sept. 2012 Gottesdiener Decl. Ex. 13 (Eichberger Dep.), at 89:02–12, 91:12–93:08 (stating that defendants believed that "there was a high likelihood [that] the plaintiff's counsel [would] withdraw the case," and that "Foot Locker knew the case had the likelihood of being dismissed").) Additionally, defendants' failure to issue a litigation hold was contrary to defendants' own policy. (See Eichberger Decl. Ex. C, at FL-OSB 009770.)

This Court disagrees. A fair reading of the available evidence indicates that defendants' failure to timely issue a litigation hold memorandum was indeed inadvertent. Sheilagh Clarke, vice president and associate general counsel, and Dennis Sheehan, vice president and deputy general counsel, were responsible for supervising the instant lawsuit as well as the preceding lawsuits against Foot Locker. (Shapiro Decl. Ex. 6 (Clarke Aff.), at ¶ 4, Ex. 37 (Sheehan Aff.), at ¶ 4.) Both Clarke and Sheehan testified that the failure to timely issue a litigation hold was inadvertent (Clarke Aff. ¶ 5; Sheehan Aff. ¶ 5); each stated that he or she believed that a litigation hold was required, but that he or she mistakenly thought that the other was taking responsibility for preparing and distributing the memorandum. (Clarke Aff. ¶¶ 5–9; Sheehan Aff. ¶¶ 5–8; see also Eichberger Dep. 77:25–79:05, 93:12–15.) Additionally, defendants acted in other respects to collect and preserve relevant documents and to notify third parties of the litigation. (See, e.g., Shapiro Decl. Exs. 8–10.) Most significantly, while plaintiff proffers evidence

12

that defendants believed that they would prevail on the merits of this litigation,
plaintiff cites no testimony showing that the failure to timely issue a litigation hold
was attributable to the belief that the litigation would be dismissed.  (See generally
Sheehan Dep.; Eichberger Dep.; Clarke Aff. ¶¶ 5–9; Sheehan Aff. ¶¶ 5–10.)

Plaintiff also argues that Foot Locker's destruction of evidence was willful
due to contradictions in defendants' so-called "recall" defense.  (See Pl.'s (Corrected)
Br. in Supp. of His Mot. for Sanctions ("Pl.'s Mot.") 22, ECF No. 127.)  On July 25,
2012, defendants stated that, when Foot Locker moved office locations to 34th
Street, "Ms. Kanowicz, and other New York HR employees, were told to box up and
store their documents," and that "all boxes of materials for New York HR employees
that related to benefits, including the Plan at issue here, were recalled from storage
and moved into file cabinets set up in the HR Storage room."  (Sept. 2012
Gottesdiener Decl. Ex. 11, at 6.)  Thus, defendants argue that no relevant
documents could have been destroyed at the off-site storage facility.

Plaintiff argues that certain facts contradict this story, thus indicating
defendants' bad faith.  This Court agrees that defendants' account is inconsistent
with other evidence.  For example, Patricia Peck testified that she and Marie
Campbell went to the Camp Hill facility to search for additional documents relevant
to the litigation after the litigation began.  (Peck Dep. 76:13–78:08, 99:02–124:08.)
Defense counsel, including Nicole Eichberger, also traveled to Camp Hill and
collected at least 34 boxes describing as originating from the "Benefits" department.
(Eichberger Decl. ¶ 10; Sept. 2012 Gottesdiener Decl. Ex. 17, at FL-OSB 022997,

Ex. 18, at FL-PRIV 000223–224.)  Dennis Sheehan testified, "I know there are HR documents in Camp Hill . . . [b]ecause I pulled boxes and looked." (Sheehan Dep. 125:07–11, 155:15–156:02.)  Such facts, however, do not necessarily show bad faith; rather, a fair reading of the evidence indicates an inadvertent failure to timely issue a litigation hold followed by a good-faith attempt to determine whether any boxes had inadvertently been lost.

Thus, plaintiff has failed to show that Foot Locker's failure to issue a timely litigation hold—as well as the loss or destruction of evidence that apparently occurred subsequently—was willful, in bad faith, or grossly negligent.  However, the Court does find that such loss or destruction was negligent.  Foot Locker's in-house counsel knew that the company had been sued regarding the legality of the cash-balance pension plan under ERISA; Foot Locker policy required the issuance of a hold; and outside counsel had advised the company to issue a hold.  Nonetheless, defense counsel, who were involved in meetings and phone calls about the litigation and who were aware of proper document retention procedures, did not issue a litigation hold until 2009.  Under such circumstances, defendants' actions were negligent.  See, e.g., Curcio, 283 F.R.D. at 112 (finding the unexplained loss of a notebook to be negligent); Zubulake, 220 F.R.D. at 221 (finding UBS's destruction or loss of backup tapes to be grossly negligent given that UBS failed to include those backup tapes in a preservation directive that it had issued); Turner, 142 F.R.D. at 76 (finding defendant's destruction of documents to be negligent when they were destroyed after litigation commenced).

14

2. <u>Relevance of the evidence</u>

The Court finds that defendants acted not willfully, in bad faith, or with gross negligence, but with simple negligence. Accordingly, plaintiff must "demonstrate that the destroyed evidence would have been favorable to" him. <u>Zubulake</u>, 220 F.R.D. at 221.

Plaintiff has met this burden by presenting sufficient "extrinsic evidence, such as other existing documents or deposition testimony, that a reasonable jury could find that the missing [evidence] would have been favorable to his claims." <u>Curcio</u>, 283 F.R.D. at 113. Plaintiff alleges that missing documents—particularly contemporaneous notes accompanying the design of the plan—would have provided evidence that Foot Locker intentionally concealed the wear-away effect caused by the conversion and thus breached its fiduciary duty to plaintiff. (<u>See</u> Pl.'s Reply Br. in Supp. of His Mot. for Sanctions ("Pl.'s Reply"), ECF No. 132.) In plaintiff's account, Foot Locker management, wanting to save money but recognizing the loss of employee morale and confidence that would be associated with openly discussing the plan, decided to roll out a pension plan that would merely <u>appear</u> attractive while reducing benefits and cutting costs through the wear-away effect. (<u>See</u> <u>id.</u>)

This Court agrees that the missing documents would have been relevant to plaintiff's claims and that "a reasonable trier of fact could infer that the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction." <u>Residential Funding Corp.</u>, 306 F.3d at 109 (internal quotation marks omitted). The evidence demonstrates that certain files belonging

15

to Kanowicz, a Foot Locker manager who was involved in creating the plan, were lost or destroyed.  Kanowicz testified that two or three large filing "cabinet drawers" of handwritten notes and other hard-copy documents that had been "generated during the design phase" were "definitely in the file room" when she retired in fall 2006.  (Kanowicz Dep. 107:08–108:05.)  Defendants argue that Kanowicz's historical documents relating to the 1995–96 cash-balance conversion were stored in the HR File Room, where they were not destroyed and were in fact collected, reviewed, and produced if relevant.  (See id.; see also Shapiro Decl. Ex. 35.)  Marie Campbell, Kanowicz's successor, also stated that she complied with Kanowicz's instructions to preserve and not destroy any of her documents.  (Shapiro Decl. Ex. 17 (Campbell Aff.), at ¶¶ 4–8.)

However, Kanowicz's testimony indicates that certain documents were indeed lost.  According to her deposition testimony, Eichberger told Kanowicz that defense counsel had not found all the documents that they expected to find, including documents generated by Thomas Kiley, another Foot Locker employee; Peck also testified that documents in the HR File Room were at times destroyed due to "periodic" "spring cleanings. (Kanowicz Dep. 135:14–136:17, 141:03–10, 445:05–07 (stating that Kanowicz was a "hoarder"), 446:06–15 (stating that "the lawyers have told you that it's not just your stuff that's missing, it's other people's stuff, particularly Tom's"); Peck Dep. 39:23–40:14.)  Based on this evidence, "a reasonable jury could find that the missing" notes that accompanied the creation of the plan

16

were at a minimum relevant to plaintiff's claims, and indeed "would have been favorable to [plaintiff's] claims." Curcio, 283 F.R.D. at 113.

Based on the descriptions of the documents in the boxes that were destroyed at defendants' off-site location, a "reasonable jury" could again "find that the missing [evidence] would have been favorable to [plaintiff's] claims." Id. As stated above, 141 relevant boxes were lost or destroyed at the Camp Hill facility between June 2006 and October 2009. (Sept. 2012 Gottesdiener Decl. ¶ 2.) According to those boxes' ID slips' descriptions, the unrecovered boxes contained documents relating to, inter alia, a "Cash Balance Plan Presentation," "Mercer CB + 401(k)," "Video – the coolest number 401(k)," "Meeting H.R.," "Pension Plan R[etirement] I[nvestment] C[ommittee]," "Benefit Comparisons – 1999," and "H.R. Confidential Info." (Id. Ex. 1.)

Having reviewed the spreadsheet that plaintiff created based on database records, defendants argue that these boxes did not contain any relevant information. Peck testified that 132 of the 141 boxes in question are irrelevant, because Foot Locker personnel would not have labeled a box as related to the "HR," "Misc," or "Benefits" department if it contained documents relating to the 1996 cash-balance conversion. (See Shapiro Decl. Ex. 15 (Peck Aff.) ¶ 11.) However, the descriptions of the boxes that appear on the spreadsheet and that came from the Camp Hill database are the shorthand terminology of Camp Hill employees—not box ID slips written by Foot Locker or descriptions of the actual contents of a box. (See Norgard Decl. Ex. 38 (Humer Dep.), at 21:04–22:24, ECF No. 133.) Standard

17

Foot Locker practices thus do not bear on the contents of the destroyed boxes.  In addition, Peck testified at her deposition that she could not determine the contents of certain boxes based on the log from the Camp Hill facility, thus indicating that her methodology is imperfect.  (Peck Dep. 161:04–22.)  Because defendants fail to proffer evidence that these boxes were in fact irrelevant, a "reasonable jury could find that the missing" boxes—whose box ID slips indicated relevance, inter alia, to "Cash Balance Plan Presentation," "Mercer CB + 401(k)," "Pension Plan R[etirement] I[nvestment] C[ommittee]," and "H.R. Confidential Info" (Sept. 2012 Gottesdiener Decl. Ex. 1)—"would have been favorable to [plaintiffs] claims." Curcio, 283 F.R.D. at 113.

Defense counsel has further represented that, of the remaining nine out of the 141 boxes, four are not relevant because they share a box ID slip description with other boxes that defense counsel has determined are not relevant.  (See Shapiro Decl. Ex. 19A.)  Again, however, defendants rely not on the actual contents of the boxes, but on the spreadsheet created from the Camp Hill database or on the transcriptions of the box ID slips.  Furthermore, even assuming that those descriptions were correct, plaintiff has identified specific documents from production that would have arguably related in some way to those boxes' descriptions.  (See Pl.'s Reply 14 (citing June 2012 Gottesdiener Decl. Ex. 17, at 5–7).)  The box ID slip descriptions are not dispositive as to whether the documents would have been relevant to plaintiff's claims.

18

Finally, Peck claimed in an affidavit that the final five of the 141 boxes in question were moved to Camp Hill only temporarily to accommodate the relocation of Foot Locker's headquarters and were thereafter transferred back to the HR File Room.  (See Peck Aff. ¶¶ 4–11; Shapiro Decl. Ex. 19B.)  However, at her deposition, Peck did not describe any recall of the boxes related to the Retirement Plan from the Camp Hill facility.  Rather, Peck stated that documents reported as destroyed were in fact located based solely on the fact that "someone told me . . . that they got the documents that they were looking for" at Camp Hill.  (Peck Dep. 80:02–87:05.)

Notwithstanding defendants' representations, the record before the Court—including the descriptions of the boxes in the Camp Hill database and on the box ID slips as well as the descriptions of Kanowicz's files—contains "sufficient evidence from which a reasonable trier of fact could infer that the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction."  Residential Funding Corp., 306 F.3d at 109 (internal quotation marks omitted).

C. Proper Sanction

Because defendants were under an obligation to preserve evidence, yet negligently failed to implement a litigation hold and negligently destroyed documents that likely were relevant to this litigation, a sanction is appropriate.  See West, 167 F.3d at 779 (explaining that a proper sanction for spoliation "should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore

19

the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party").

In this case, which involves simple negligence rather than gross negligence or bad faith, the Court finds that an adverse inference is proper.  See Residential Funding Corp., 306 F.3d at 108 ("The sanction of an adverse inference may be appropriate in some cases involving the negligent destruction of evidence because each party should bear the risk of its own negligence."); Zubulake, 220 F.R.D. at 220 ("In this circuit, a 'culpable state of mind' for purposes of a spoliation inference includes ordinary negligence.").

Thus, the Court shall draw an adverse inference—whose scope shall be determined at a later date—that the missing evidence could have or would have been favorable to plaintiff.  See Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998) ("[A]n adverse inference should serve the function, insofar as possible, of restoring the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party."); Zubulake, 220 F.R.D. at 220.

IV.    CONCLUSION

For the aforementioned reasons, plaintiff's motion for sanctions is GRANTED.

The parties shall confer on the wording of an appropriate adverse inference that the Court shall draw at trial in this matter.  They shall provide proposals for

the scope of such an inference to the Court—jointly if possible, and separately otherwise—within 10 days, or by **Thursday, July 24, 2014.**

The Clerk of Court shall close the motion at ECF No. 126 and remove the Opinion & Order at ECF No. 156 from the docket.

SO ORDERED.

Dated:      New York, New York
            July 25, 2014

                                        _____
                                        KATHERINE B. FORREST
                                        United States District Judge