F4UJOSBM                          Motions

 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    GEOFFREY OSBERG,

 4                   Plaintiff,

 5              v.                            07 Civ. 1358 KBF

 6    FOOT LOCKER, INC., et al.,

 7                   Defendants.

 8    ------------------------------x

 9

10

11                                           April 30, 2015
                                             10:00 a.m.
12

13

14

15    Before:

16                   HON. KATHERINE B. FORREST,

17                                           District Judge

18

19

20

21

22

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

1            (In open court)

2            (case called)

3            THE COURT:  Hi, good morning, everyone.  Please be

4     seated.  Good morning, all of you.

5            Let me start by describing what I believe the agenda

6     is and also giving you folks some initial thoughts so that you

7     can know in some respects where my head is right now, and you

8     may choose to have that impact what you folks and how you folks

9     want to taylor your arguments.  That will be up to you.

10           We have the two motions before us.  We have got the

11    plaintiff's motion for summary judgment, and then we've got the

12    defendant's motion for partial summary judgment and to preclude

13    Mr. Deutsch.  Let me just describe my thoughts as to these and

14    again where my head is, and I'll take them in the same order in

15    which I've just described them.

16           In terms of plaintiff's motion, the bottom line, my

17    bottom line view right now is that summary judgment should be

18    denied for at least one reason that is itself sufficient, but

19    you folks can tell me what you think about this one reason or

20    others.

21           The reason is the factor relating to the existence of

22    fraud or similar inequitable conduct.  In particular, the legal

23    standard applicable to that, the Tokio case or, for instance,

24    the AMEX case, the AMEX case being a Second Circuit 2003 case

25    appears to suggest that you need more than negligence; in other

F4UJOSBM                      Motions

1    words, no matter what the misstatement is, it is not strict

2    liability.  It is not okay you've got a misstatement or you've

3    got an omission.  We can deduce from that that there must have

4    been inequitable or unconscionable conduct because of the

5    nature of that omission or statement.  So the case law is

6    suggestive of a legal standard higher than what the Tokio case,

7    for instance, says or the Capital Gains, SEC versus Capital

8    Gains is another one.

9              In any event, it seems to me to be imprudent at this

10   late date to make a legal determination as to that issue

11   without hearing the evidence on that particular factor because

12   if I do, and we end up back here because of a reversal on the

13   legal standard, we then have to pick up with where we are right

14   now as opposed to being able to have the record in the can on

15   what would be otherwise quite a factually intensive issue.

16             On that issue let me just state that the facts which

17   would be potentially relevant and would be dispositive on a

18   motion for summary judgment in terms of denial of that motion

19   are, for instance, the facts, the same facts that the

20   defendants present and proffer with respect to individualized

21   issues; namely, the potential, the facts the plaintiffs have

22   proffered and the potential that at least some folks knew as of

23   the time a plan was amended, the SPD came out, that the

24   calculation of the initial account balance was done in the

25   manner that it was done.  That is all of the various

F4UJOSBM                    Motions

 1    individualized communications, the call center, the letters and

 2    the exhibits.  That inferentially could be used to suggest that

 3    there is not clear and convincing evidence of fraud because it

 4    would seem to suggest gosh, it is not a very good fraud, at the

 5    time you're purporting to pursue your fraud, you're telling

 6    some people the truth.

 7          Similarly -- and I am going to get into this more in a

 8    moment -- the facts relating to disclosures at the time of

 9    employment termination, whether voluntary, through retirement,

10    some other manner, relating to the actual impact of the plan,

11    the amendment to the plan over a period of time, and this is on

12    pages I believe 7 to 8 and 10 of the defendant's opposition

13    which lists the evidence in this regard, that evidence again

14    seems to be similarly contrary to at least, or raises a

15    question of fact as to clear and convincing evidence for the

16    same reason.  While the temporal proximity to the SPD is not

17    the same as in the first instance, it still raises a potential

18    question.  On that basis alone it strikes the court, strikes me

19    that summary judgment would be imprudent at this time.

20          Let me circle back and do one other thing, which is

21    tell you how I perceive the overall case.  We have the 102

22    claims, the 404 which really relate in many ways to the same

23    allegations.  I break the misstatements and omissions into two

24    categories.  There is a lot of talk about A plus B, and the A

25    plus B remedy, as a for instance, but the A being the balance,

1    the cash balance as of the date of conversion, and there are

2    disputes as to what that is or should be; and, B, being the

3    credits for time, for additional time and growth effectively,

4    so A plus B.  I see the misstatements and omissions as breaking

5    generally into those two categories, into some misstatements,

6    alleged misstatements as to A and to some misstatements,

7    alleged misstatements and here omissions as to B.

8            I also perceive the evidence and the issues relating

9    to class as different between A and B.  Let me circle back.  As

10   to A, A is the question whether or not there was a misstatement

11   as to the balance, the cash balance at the date of conversion.

12   This is the language where, and it is critical language,

13   whether or not the actuarial value plus the additional

14   disclosures as to interest rate, et cetera, in the SPD

15   adequately convey to a reasonably attentive person that what's

16   happening is not equal value which is, by the way, is more

17   along the lines of the Amara case, but it is something else, it

18   is the actuarially equal value.

19           So there is one set of questions as to whether the

20   statements as to the initial balance as of date of conversion

21   are misleading or don't disclose what they're supposed to

22   disclose or, in fact, do disclose what they're supposed to

23   disclose.  This is where the additional and most of the facts

24   relating to the additional individualized communications come

25   into play that are contemporaneous -- and this is very

1    important, put a star next to that -- with the adoption of the

2    plan.

3            So the individualized communications themselves fall

4    into two buckets.  They fall into communications as of date of

5    the amendment, and then they fall into communications that are

6    subsequent to, namely, possibly the Year 2000 or later as an

7    employee terminates which goes to the effect of wear-away.

8            The communications that are relatively contemporaneous

9    are things like the individualized letters that are now I think

10   we have all reviewed them clearly, the call center in

11   Wisconsin, et cetera, et cetera, which gave additional color to

12   the manner in which the initial cash balance was arrived at.

13   That is what I call the A misrepresentations because I break

14   them into A plus B misrepresentations.

15           B is frankly I think where the case is.  I think B is

16   where the action is in this case.  B is whether or not the

17   effect of wear-away was omitted.  There is a legal question

18   which I note as to whether or not the effect ever has to be

19   included in the SPD as of that period in time.

20           However, there is also potential misrepresentation

21   with respect to B, which is language in the SPD that is

22   suggestive of future growth, that you can watch your account

23   grow, for instance.  That is suggestive of a lack of wear-away,

24   of immediate potential growth.  At least there is a question as

25   to that.

1          It also raises whether or not there could, in fact, be

2     a difference as to how this case is treated in terms of whether

3     the effect must be disclosed when there is the possibility of

4     an affirmative misrepresentation; in other words, in the

5     absence of an affirmative misrepresentation, perhaps the effect

6     need not be disclosed as a matter of law.

7          But if there is something which is potentially

8     construed as an affirmative misrepresentation which implicates

9     an omission, have you then eliminated the ability to hide

10    behind or stay -- I don't mean hide behind in any nefarious

11    way, but to use the legal argument most comprehensively.

12         So I think B, the effect of wear-away is a much more

13    likely place for there to be liability.  I think that when you

14    go through the -- first of all, when you look at the words

15    actuarial value and what that means, and you look at all of the

16    various places where there is disclosure, it raises two things:

17         One, as to A, misrepresentations A, it does seem there

18    are a lot of individualized information;

19         Two, it may well be that there is sufficient

20    information in the SPD itself that if you're a reasonably

21    attentive person, you can understand that actuarial value is

22    not telling you that it is equal value.

23         So that I think is not the most likely place for a

24    misrepresentation.  That has implications for the reformation,

25    and we'll talk about that in a moment.  The point, however,

F4UJOSBM                     Motions

1   with respect to B is I don't find that there is contemporaneous

2   disclosure of the B potential; in other words, B has got the

3   quote effect of, you know, you see growth in your account, that

4   is what the plan says and you don't find out until a couple of

5   years later, if you leave a couple of years later, that that

6   meant you aren't going to have growth.

7           There is disclosure for a few people at least a couple

8   of years later, but it doesn't seem to be nearly automatic in

9   the order of magnitude as the way in which initial cash balance

10  is calculated.  That is suggestive that it is not, even though

11  there is individualized disclosure, it may not be predominant

12  for the purposes of undoing the class.

13          There may be some individualized statute of

14  limitations issue which is where that may come into play most

15  acutely.  Again there are cases even where there are

16  individualized issues on some statute of limitations that does

17  not negate an entire class, you can't show some form

18  inferentially predominance on that issue.  That is how I think

19  about the plaintiff's motion.

20          If you bear with me for a moment, I'll tell you what I

21  think of the partial summary judgment motion. .

22          In terms of the partial summary judgment motion, I go

23  back again to my basic point that it looks to me as if the

24  initial account balance is clearly disclosed as the actuarial

25  equivalent of a lump sum value and that I don't find any huge

1    mystery in terms of the disclosures as to the interest rate

2    used or the mortality assumption used as set forth in the IRS

3    code, Section 417 (e), I believe, and I believe, based upon the

4    additional materials provided as to the individualized

5    communications, that those things are relatively

6    straightforward.

7            However, again the B omission does come into play, and

8    the question ultimately becomes if the B omission is found to

9    be A, or misrepresentation found to be actionable, and the

10   clear and convincing evidence is found to make that actionable

11   and/or breach of fiduciary duty under 404 for the same things,

12   what's the right reformation?

13           It strikes me the right reformation is A plus B, but

14   because I am not of the view that A is wrong right now, or that

15   A has been not properly disclosed, it is really a change in B

16   that I think is appropriate.

17           So it is A, as frankly the defendants did A.  It is B

18   in terms of giving credit for additional service time and

19   interest, you know, sort of the growth component.  Then the

20   real swing I think is the enhancements, which I'm not sure I

21   entirely get.  It seems to me I understand the concept that

22   enhancements is giving -- somebody is getting something twice.

23   In the law, equity is quite clear with equitable reformation,

24   you're not supposed to get a windfall.  On the other hand, you

25   are supposed to get what you reasonably expected.  I am sorting

F4UJOSBM                    Motions

my way through those two principles.

I don't think that I would preclude Mr. Deutsch.  He
certainly seems to have the expertise in this area, quite a
definite expertise, and the issues go to the weight that the
court gives to his view.  I don't have to accept it in total.
I can listen to him and review it, but it seems to me it should
go to the weight, and I am wary of an exclusion in a Bench
trial that could create an inability to discuss reformation.
There is certainly value to what Mr. Deutsch says even if I end
up disagreeing with portions of his reformation argument.  He
explains the concepts in a way that the court has found useful.
So I would, in other words, for the partial summary judgment,
my impression is to grant in part and deny in part that motion.

All right.  So I am sorry for taking such a long time
with that, but I thought maybe it would be helpful so you know
where I am going and know where my head is in your view not
screwed on right, and you folks can then seek to position me in
a manner that is in your view the right legal and factual
position to be in.

Why don't we take these motions in the order in which
I just described them.  Mr. Gottesdiener, why don't we proceed
first with your motion, sir.  Again you can address anything
you want.  I am just telling you where my thoughts are leading
me.

MR. GOTTESDIENER:  With the Court's indulgence, would

F4UJOSBM                          Motions

1   you like me to stand?

2              THE COURT:  Yes, if you could.  I actually would like

3   you at the podium if that is possible.

4              MR. GOTTESDIENER:  There are so many papers, could I

5   stay here as long as I speak up?

6              THE COURT:  As long as you speak up and we can hear

7   you clearly.  I don't think you speak too quickly, and so I

8   think we'll be able to understand you.  Go ahead.

9              MR. GOTTESDIENER:  Could I have the court's indulgence

10  for a moment to gather my thoughts given what the court said?

11             THE COURT:  We'll take five minutes.  You can confer.

12  There is a lot of counsel at the table.  You may want to pick

13  what you address and how you reemphasize things.  We will take

14  five minutes and come back.

15             (Recess)

16             THE COURT:  Let's all be seated.  Thank you.

17             Mr. Gottesdiener.

18             MR. GOTTESDIENER:  Thank your Honor.

19             How much time would your Honor allot to me for my

20  presentation?

21             THE COURT:  I have got until noon, and so

22  altogether -- so we need to be relatively fair about that.  Why

23  don't you start right now with half an hour and see where we

24  are.  How is that?

25             MR. GOTTESDIENER:  That is perfect.

F4UJOSBM                       Motions

1          THE COURT:  Why don't you take all your issues and at

2     the end you can address some of the other issues as well on the

3     other motion, or do you prefer to do it the other way?  They

4     may fold themselves in.

5          MR. GOTTESDIENER:  I think they will.

6          I think our contention in our brief is that you are in

7     a position and you should grant us summary judgment on

8     liability and relief on all issues, and that would encompass

9     the enhancements and the pre-retirement mortality discount

10     issue that they say is somehow not part of our theory that is a

11     windfall or something like that.

12          So our motion covers the entire waterfront, and while

13     I want to address your Honor's concerns about the specific

14     intent to deceive, I don't want to spend too much time on that

15     starting off because while I do think your Honor, after hearing

16     my presentation, might reconsider in terms of the law, the

17     facts are also extremely compelling when put in the context of

18     the Amara case that went to the Supreme Court, and the Amara 5

19     decision from the Second Circuit where they make clear we are

20     not talking about fraud at common law, we're talking about

21     fraud in equity which does not require specific intent to

22     deceive.

23          This is a case like the Amara case that is a contract

24     case, and we are not trying to put anybody in jail.  We are

25     just trying to enforce the reasonable expectations that arose

F4UJOSBM                    Motions

1    out of the statements that Foot Locker made to people.

2              THE COURT:  Do you want to go -- you said you didn't

3    want to spend a lot of time on this point now.  I am about to

4    pepper you with some questions.  Would you rather circle back

5    to this?  My view it is not really about specific intent so

6    much, although -- and I understand your point that specific

7    intent is not required.

8              It is really whether or not, for instance, the AMEX

9    case is more persuasive as to the Second Circuit's view as to

10   what was required.

11             MR. GOTTESDIENER:  That was not an ERISA case.

12             THE COURT:  It is instructive.

13             MR. GOTTESDIENER:  It was dicta, and it is not an

14   ERISA case, and if I could step back and give the context of

15   ERISA because the law, the statute, Justice Breyer in the Amara

16   3 decision said we are taking equity, but we are overlaying the

17   ERISA statute, the rights and obligations under the ERISA

18   statute.  And what are the obligations of a fiduciary under the

19   ERISA statute?

20             THE COURT:  I will let you go, but I want to make sure

21   you fold this into this exact point, which is, is what you're

22   arguing different from something that is equivalent to strict

23   liability?

24             In other words, if the omission is really, really bad,

25   you get to assume the rest, you get to assume ignorance and

1    mistake and the fact people were misled, and you also get to

2    assume unconscientious behavior?

3           MR. GOTTESDIENER:  Because it is a fiduciary, two

4    points.  The fiduciary is not present in these other cases, and

5    when you talk about strict liability, that is oops, too bad.

6    That is not what this is about.  It is a fiduciary.  Point 1.

7           Point 2.  Where the facts are undisputed that the

8    fiduciary had at the time they were issuing these statements

9    actual knowledge that the information contained in the

10   statements was false and/or misleading.

11          Important point.  It does not have to be shown by a

12   plaintiff in an ERISA 502 (a)(3) case under Amara that the

13   reason that the fiduciaries issued the false and/or misleading

14   statements which, of course, includes omissions, was in order

15   to deceive.  It is just you take these two things and you make

16   a sandwich.  You say you guys were our fiduciaries, not the

17   ordinary situation.  We had trust in you and we were allowed to

18   repose our trust in you.

19          You take their fiduciary responsibilities and then you

20   take the undisputed facts.  Even if they put the word

21   "disputed" in part in front of them in their factual

22   statements, the undisputed facts which start with the documents

23   they don't dispute, and they can't dispute what is in there and

24   what is not in there.

25          THE COURT:  So it is the equivalent to strict

1    liability.

2              MR. GOTTESDIENER:  Why, your Honor?

3              THE COURT:  Because it means if you've got an

4    undisputed fact that this is the disclosure and this makes it

5    misleading -- let's accept it is misleading for the purpose of

6    this argument.  Let's accept the court was able to find it was

7    misleading.  What you're saying is in the fiduciary context,

8    that's enough to give you the third element because of the

9    special obligations that a fiduciary owes here to the

10   participants?

11             MR. GOTTESDIENER:  Absolutely.  There is another

12   element to it.  It is not just a general fiduciary duty.  It is

13   an obligation harkening back to Justice Breyer and what he is

14   says 502 (a)(3) is about.  It is an obligation, affirmative one

15   under the SPD statute and the SPD regulations that have the

16   force of law.

17             With the court's indulgence, I'll hand up a copy, a

18   summary, handing a copy to defense counsel, of the SPD

19   requirements that make it an affirmative obligation for a

20   fiduciary when issuing a summary, the official summary of the

21   plan has to be a plain English statement that is written in a

22   way that the average person could understand.  They must

23   affirmatively disclose the circumstances that could lead to not

24   being eligible for benefits, which is what was going on here,

25   and I'll get factual in a moment to put meat on these bones.

F4UJOSBM                          Motions

1          They basically violated every single requirement under

2     the regulations.  You cannot talk in technical jargon.  That is

3     what they did.  The things that your Honor's referring to which

4     I want to circle back to is the ultimate jargon.  It is math.

5     It is dumping a calculation in somebody's lap and saying see if

6     you can figure it out.

7          THE COURT:  But SPDs do that all the time.  If we were

8     to have a rule that -- oh, that is why I was using the phrase

9     reasonably attentive -- that an SPD had to be able to be read

10    by John Doe on the street and every nuance understood in all of

11    its glory on the first reading as opposed to careful, attentive

12    review, one would think that that would result in many, many

13    SPDs found to be in violation of the 1022 requirements.

14          MR. GOTTESDIENER:  I am handing you the SPD.

15          The SPD is a 24-page document and it conveys one idea.

16    The idea it conveys is you had an annuity as of 12-31-95.  We

17    are now going to roll out, as they announce in their

18    announcement letter, this great new plan.  Were going to take

19    your annuity and we are going to deposit it in cash.  We are

20    going to give you the cash value of your annuity in an account.

21    It is going to be easier to understand and you are going to be

22    able to watch it grow and you are going to not have to worry

23    any more about this 12-31-95, the day before the conversion,

24    annuity.  We are going to open this account for you.

25          Page 1 says we are going to convert your annuity to an

F4UJOSBM                    Motions

account just like a 401 (k) plan, and it sends you to Page 11.

It says on Page 11, the bottom of Page 11, it says your initial

account balance is your 12-31-95 annuity, the value of that is

being put in the opening account.

          The case --

          THE COURT:  It says actuarial value.

          MR. GOTTESDIENER:  No, it doesn't.  Turn, please, to

the bottom of Page 11, you see where it says the initial

account balance.

          THE COURT:  The initial account balance versus the

cash balance, right.

          MR. GOTTESDIENER:  That is one and the same.

          THE COURT:  Yes.

          MR. GOTTESDIENER:  What I am asking your Honor to

direct her attention to is the statement --

          THE COURT:  I see.

          MR. GOTTESDIENER:  -- how your retirement benefit is

determined.  Your plan benefit is based on the account balance

you accrue and earn or earn, a statement I want to come back

to.  If you're in wear-away, that is false, you don't earn

anything while a participant.

          That account balance is made up of, the first thing

they say, this is the A, your initial account balance which is

the value of your plan benefit as of 12-31-95 before the plan

was amended.  I'll continue in a moment.  Let's focus on that.

1          That is the solid statement, your Honor, for a mere

2     mortal.

3          THE COURT:  Can I stop you for one second because I

4     was not I think incorrect, nor were you in my insertion of the

5     word "actuarial" because "initial account balance" on Page 11

6     is italicized, which indicates it is a defined term, which on

7     Page 12 is defined to include actuarial, and the actuarial

8     equivalent lump sum value on Page 12.  I wanted to clarify that

9     because I reread these transcripts, and that will lead me to

10    where I need to go, okay?

11         MR. GOTTESDIENER:  What your Honor's saying in all due

12    respect is your Honor was wrong the second time your Honor

13    ruled that the standard is not to be a Mr. Deutsch an actuary,

14    but it is to be a mere mortal, that the summary plan

15    description rules you said in your order after initially

16    agreeing with the defense last year, you recognized that the

17    rules that I handed up in summary, that one page, you had a

18    very nice summary of them when you said that is the point of

19    many rules regarding summary plan descriptions and other

20    communications to participants is that they're supposed to be

21    comprehensible to mere mortals.

22         THE COURT:  I think the word "actuarial" is understood

23    by a reasonably attentive mortal who, if they don't understand

24    the word "actuarial," would go to a dictionary and realize it

25    doesn't mean necessarily the same thing.

F4UJOSBM                    Motions

1          That has nothing to do with assumptions, with

2     assumptions and calculations regarding their expected lifespan

3     pursuant to various kinds of department of whatever it is who

4     has the statistics.

5          MR. GOTTESDIENER:  Let me try it this way.

6          You give somebody a summary plan description and you

7     don't put in the summary plan description.  We are starting you

8     out at a fraction of the value.  What they put at the bottom of

9     Page 11 is we're giving you the value.  If you look at the

10    definition section, it says we're defining some things, but it

11    doesn't say you are not going to be able to understand what

12    we're saying unless you look at the definitions.

13         But stepping back, your Honor, they don't say

14    actuarial value on Page 11.  They, secondly, say at the top of

15    Page 12, they do say actuarial lump sum value but, your Honor,

16    the Greenville document that they rely on so much actually

17    shows that what they were saying was false.

18         If you're correct, the actuarial equivalent lump sum

19    value is something people --

20         THE COURT:  No.  I am saying they don't just

21    understand necessarily in their head they can do the

22    mathematical exercise, nor is that what is required.  They know

23    this means something special, actuarial equivalent includes

24    terminologies that I need to look up in the dictionary.  It

25    doesn't mean ERISA does not require that a reader never have

F4UJOSBM                          Motions

1    any kind of vocabulary need or requirement.  So I don't think

2    they have to be able to do the math in their head.  They have

3    to know enough to be attentive, to look more deeply into it.

4              MR. GOTTESDIENER:  I disagree.

5              THE COURT:  I know you do.

6              MR. GOTTESDIENER:  I am saying your Honor also

7    disagreed with --

8              THE COURT:  No.  I am saying mere more talk, a

9    reasonably attentive mere mortal understands the word

10   "actuarial" means there is something here not meaning equal to

11   equal.  Your view is the word "actuarial" could and should be

12   struck, that the word "actuarial" has no meaning.  Indeed, it

13   is misleading because it would be incomprehensible to an

14   average person.

15             I give people a little more credit than that.  I don't

16   think it should be struck.  If it is not struck, then you're

17   stuck with the concept of actuarial value.

18             MR. GOTTESDIENER:  My response to your Honor's

19   statements, in all due respect, your Honor, is that the law

20   does not require people to distrust what they're reading and

21   take it at face value, and when the summary plan description is

22   handed to them, there is nothing in here that provides a single

23   coherent statement that we are starting you off at less than

24   the amount that you earned as of 12-31-95, that you could have

25   received had you not worked for Foot Locker a day more.

F4UJOSBM                    Motions

1        THE COURT:  That is absolutely true if you ignore the

2   word "actuarial."  Maybe you know of cases, and this is what is

3   informing your view, that a plan participant may ignore

4   vocabulary which is unfamiliar, and that if in reading a plan

5   unfamiliar language is used, that they can essentially discount

6   that.

7        MR. GOTTESDIENER:  I would answer your Honor this way,

8   by handing up the Greenville summary.  I just handed a copy to

9   defense counsel.  The Greenville summary says, hey, actuarial

10  equivalent lump sum value.  What that means is, if you look at

11  Paragraph 4, the term actuarial equivalent lump sum or present

12  value means what the benefit payable to you at age 65 is worth

13  today.  It is the amount that is needed to fund your benefit

14  for life beginning at normal retirement date, and then

15  discounted or brought back to today's time-frame by taking into

16  account interest which may be earned between now and normal

17  retirement date.

18       Elsewhere in this document they say we used 9 percent,

19  which is the retirement plan's assumed rate of return on

20  assets.  If you put those two things together, what they're

21  saying to the participant is we've got your back, that the

22  opening account balance that we have created for you is the

23  amount that is needed to fund your benefit for life beginning

24  at normal retirement date and then discounted or brought back

25  to today's time-frame by taking into consideration interest

1    which may be earned between now and normal retirement date.

2              It is undisputed that the employee's opening account

3    would not fund their benefit for life.  The 12-31-95 benefit

4    was decimated with a 9 percent rate and a pre-retirement

5    mortality discount, but it was brought back, your Honor, only

6    at 6 percent.  It is undisputed that it would not bring people

7    back.

8              The standard under the statute is when you look,

9    please, if you would at the one-pager that I handed out,

10   starting at the top we already reviewed together, this has got

11   to be understood by the average person.  I appreciate what

12   you're saying, that you get this thing, it has got some

13   italices, maybe you should look it up.

14             I do want you to ask you to walk through with me the

15   SPD and realize they don't say there are going to be some

16   tricks here.  They don't say we are -- they present this we're

17   your fiduciary, here is this new plan.  They put something in

18   italics.  If you put in the definition section, it just says

19   some things may not be familiar to you.

20             I am sorry, your Honor, the first thing they say is

21   your initial account balance is the value of what you earned as

22   of 12-31-95.  Why would they want to go start looking up a

23   dictionary?  The only reason they would question the word

24   "value" would be is if they were suspicious, but there is

25   nothing suspicious going on.

1          THE COURT:  Presumably then one of the things you can

2    do is present at trial somebody who will say I saw actuarial

3    value and thought it was just meant value.  I thought it meant

4    equivalent.  So it may be that the court should not substitute

5    at this point its view as to the clarity of the language

6    because it may be that what I deem as reasonable and clear,

7    you're arguing would not be clear; and is, therefore,

8    unreasonable to a mere mortal.

9          Maybe I am not a mere mortal!

10         MR. GOTTESDIENER:  Well, I do think your Honor's very

11   educated and has spent a lot of time on multiple occasions with

12   this case, but respectfully, consider this point:

13         Look at the bottom of Page 11 and see that somebody is

14   opening this up.  They started at Page 1 and they're told we're

15   converting, if you look at Page 1, we're converting your old

16   benefit into this different form.  It is annuity on 12-31-95

17   and on 1-1-96 it is an account.

18         They say in the third paragraph participant's accrued

19   benefits as of December 31, '95 were converted to initial

20   account balances and a new formula for years of service

21   afterwards was added.  For more information, go to Page 11.

22         Now, right there if this is a trick, if they're

23   starting people out, if you're converting somebody's pesos to

24   dollars on 12-31-95, and it turns out that you're giving them

25   only a fraction of what it is worth on that day, 1-1-96, and

F4UJOSBM                        Motions

you're a fiduciary, and the statute requires you to hit people
over the head, that is what this document, the SPD requirement
document that I ask your Honor to look again at shows.

It shows not only do you have to make plain
statements, you can't make things appear unimportant.  You
can't put the bad things, the disadvantages, the restrictions
in jargon.  You can't minimize them.  You can't hide them.

You also must clearly identify -- if you look at the
bottom of the requirements -- clearly identify the
circumstances that could result in denial, ineligibility,
offset.  This is nothing if not an offset.  You're going to
have to re-earn half of your benefit.

You have to just on this provision alone, your Honor,
respectfully, their goose is cooked.  They started everybody
off in a hole, and they were required by law -- and this
overlays the equitable question -- they were required to tell
you about any kind of offset, clearly identifying if those
benefits might go away that you might other -- the last two
lines -- reasonably expect the plan to provide on the basis of
the description of the benefits.

There is 24 pages of B, but it doesn't tell you that
we're dropping you in a pension hole, so you're going to have
to work all the way for years just to maybe earn something in
B.  The case is about, in our view, A.

They say we could be tricksters and we could take your

F4UJOSBM                    Motions

1    12-31-95 annuity and we could drop a footnote that nobody in

2    the world would ever -- why are you looking if you're a

3    participant when they say value?  Why do you go need to look

4    up -- they don't italicize "value," do they, your Honor?  They

5    don't italicize equivalent lump sum value, either, on Page 12.

6    They italicize initial account balance.

7           If I am a participant and I am aware under your

8    Honor's standard, which I can hear you, one thing you

9    definitely would have to take into consideration is the

10   participant knows the law, knows this general backdrop, that

11   the participant is protected by somebody who is looking out for

12   their interest.

13          If I tell a participant your initial account

14   balance -- we are now back to Page 11, the introduction -- they

15   say it is converted.  You want to learn more, go to Page 11.

16   You start out with the value of your plan benefit, no ifs,

17   and/or buts, not a fraction of the value, not some tricky

18   complicated calculation, and it doesn't italicize the word,

19   "value."

20          What that means is you can apply your everyday sense.

21   Who in the world who has not read the Amara case goes out and

22   thinks well, if I've got a benefit and I am going to be

23   converted and they're telling me watch my growing account,

24   unless you tell somebody, unless you hit them over the head,

25   this was Judge Jacobs in the Second Circuit argument, Docket

F4UJOSBM                    Motions

1    151, it is in this docket, he says you've got to be really,

2    really, really clear if you're doing something other than what

3    is intuitive, they're starting people out in a hole.

4            Everybody, and the fiduciary knew it, all these

5    admissions, they knew about the wear-away.  That is why they

6    converted and used the 9 percent to save money.

7            THE COURT:  Are any of the misstatements in B that I

8    described part of your case or this case is about A?

9            I understand your argument about A, which is the

10   disclosure of the whole or lack of disclosure and combination

11   of misstatements and omissions.  Have I gotten the description

12   wrong?  Are there really not B misstatements?

13           Is B more just sort of a remedy issue that is the case

14   really about A?

15           MR. GOTTESDIENER:  The case is about A, but the way

16   your Honor broke it down, your Honor covered the things your

17   Honor was talking about the problems in B, they're part of A.

18           This is a very confusing area.  The reason why it is

19   all part of A is because what they describe -- here is what

20   they tell you.  They tell you they have this nice annuity for

21   you.  Now it is just going to be an account.  You are going to

22   start out at equal value.  They don't say anything about

23   actuarial equivalent lump sum there.  They don't say this is

24   tricky.

25           Then they say the rest of Page 12, 13 and 14, it is in

1    several pieces, but it is ultimately very easy.  You start out

2    at the same value.  It is the same benefit.  Who in the world

3    would think that you would be started out at not your same

4    benefit?

5          You would need to have red warning lights that say the

6    statement required here, DOL agrees with us, all the courts in

7    Amara agree with us, your Honor at some point agreed with us,

8    that you have to spell out the way your initial account balance

9    was created.  It is of less value than the benefit that you

10   earned to date.

11         We are putting less value on a cash balance basis,

12   less value on an annuity basis in the A opening account

13   balance.  What I was trying to say, your Honor, your points

14   about B, the reason there are problems with B that you're

15   correctly identifying is because those are all the problems

16   with A.  They belong -- focus there -- because B means nothing

17   if you're in a hole, and all those points that your Honor made

18   that are good points, they're just better focused on A because

19   that is what is separating the parties.

20         A is your true benefit, just a different form.  The

21   whole case is if we get the A, and I want to somehow, maybe

22   this will help simplify things as well, if I could show your

23   Honor what it is all that we are asking, a very limited

24   request, we just want the secret setback clause that they do

25   not disclose in the SPD.  We just want it minimally reformed to

1    change the 9 to a 6.

2            They were required to tell people that what we're

3    doing is, we are starting you out at far less than the value of

4    your benefit if you left today, and you will not experience any

5    new benefits until the amount in your account, which is not the

6    full benefit, exceeds the full benefit you already earned.

7            This is very complicated and tricky stuff.  There are

8    very few instances of these cases even being brought, but more

9    importantly, this is completely outside the ken, the average

10   experience of anybody.  Nobody in the world has ever been able

11   when I talk about this case to give me an example in the real

12   world of wear-away.

13           It is so unexpected that, in fact, now it is illegal.

14   No matter what amount of disclosure you make, Congress has said

15   it is just so unseemly, it is so counterintuitive that you

16   would start somebody off way below what they already earned,

17   but it is okay to do it under the period of time that is at

18   issue here if you tell them and you honor your basic, I mean

19   basic fiduciary duty.

20           Justice Breyer, you take equity and you overlay the

21   statute, the statute requires this is the official summary of

22   the promise we're making you.  The official summary says we

23   start you out at the same place where you just left off, like a

24   baton race.  They presented this thing as you earn this benefit

25   and now we are changing it.  It is just like a baton.  The cash

1    balance plan is saying we'll take it from here.

2              How are we going to do it?  That gets into their

3    motion and our misunderstanding of our claim.  You add to the

4    same benefit, just in a different form, plus E plus C plus I.

5    E is the enhancement.  They're enhancing something that is

6    already at equal value.  It is not an Orwellian idea of we

7    started you off in the hole.

8              THE COURT:  You know, only because we are running out

9    of time for this, why don't you discuss -- I understand what

10   the constituent pieces of it are, but why don't you discuss

11   enhancements and why enhancements does not constitute a

12   windfall, or why, if it does, it is simply corresponding with

13   the parties' understanding of what has been promised?

14             MR. GOTTESDIENER:  It is a windfall for Foot Locker.

15   It is not a windfall for plaintiffs.  The law is not here, your

16   Honor -- they have not made a counterclaim for reformation in

17   equity.

18             THE COURT:  I don't think they have to.

19             Reformation is an equitable remedy where you are to

20   reform the plan to correspond with the parties' expectations.

21   That sometimes requires tweaking different provisions, not just

22   only the provision that the plaintiffs suggest.

23             What you're looking for is the result, and in order to

24   get to the result, sometimes you have to tweak other things.

25   Indeed, the court can tweak things that neither of the parties

1    has suggested if it, in the court's view, results in the remedy

2    sought.

3              MR. GOTTESDIENER:  Respectfully, with one caveat that

4    is the decider here, and it is the McCutchen case in the

5    Supreme Court and again the statute.  The plan document

6    controls.  They put in an enhancement.  They say we are going

7    to enhance --

8              THE COURT:  So reformation then, in your view,

9    according to that line of logic -- the fact, I have to say it

10   because it just is driving me crazy.  Your facial expressions

11   to me, you look so annoyed at the court that it is really

12   difficult for me to concentrate, but I am trying very hard not

13   to engage with that because I am really focused on the

14   substance.  You may think that I am just dense, but I actually

15   think I spent a lot of time with this and really tried to get

16   it.  In any event, let me now engage.

17             Let's pick up where you left off.

18             MR. GOTTESDIENER:  I am not frustrated with the court.

19   If I am frustrated, this is a very complicated area.  What I

20   would agree with is that -- withdrawn.

21             If I could just make one more point if your Honor

22   wants to end my time at this point.

23             THE COURT:  I will give you more time after they have

24   gotten up.  I assume you want to respond to some of their

25   points.

F4UJOSBM                         Motions

1           MR. GOTTESDIENER:  Where I wanted to get to in my

2     presentation to your Honor is where the litigation as we saw it

3     was at, was they came to your Honor with a claim that said --

4     let me back up and make this point.

5           Remember I said they start you out with the same

6     benefit, then they add the enhancement and then they add

7     compensation credits and interest credits, all described on

8     Pages 11 and through 14.  They say okay, at retirement or

9     termination, you will get your accumulated account or -- on

10    Page 14, if you look at the bottom of Page 14 -- they say well,

11    in some instances you're going to get even more than your

12    account.  You're going to get either the greater of -- you're

13    going to get a minimum lump sum.  You are going to get a

14    minimum lump sum, the very bottom of Page 14, that is equal to

15    the amount of your account or the amount determined under

16    federal law and IRS regulations.

17          Their entire argument is why you should look at these

18    one-off communications, which you shouldn't under the Amara

19    case.  They don't count.  They're not part of the SPD.  They

20    don't amend the SPD.  They're not supplements to the SPD.  They

21    say because some people received statements like Mr. Osberg,

22    the facts are as you previously determined.  He received a

23    disclosure that he was getting more than his account.  He

24    received the disclosure that is akin to the Greenville document

25    that I gave you that they referred to and referred to

repeatedly.

He is given all this information that there is this
minimum lump sum and he is getting an amount larger than his
account.  Their entire argument is, number one, we don't have
to honor SPD requirements.  We can just give one-off
communications.  One-off communications do not count as a
matter of law.  Number two, the big point that I was getting
exorcized about, your Honor, and I was trying to convey to the
court is that all of these points that your Honor's making,
while they are intellectually correct, they respectfully miss
the point of the statute, which is plain talk.  They have to
say to you something as dramatic as you are not going to earn
anything, stop looking at the growing account thinking you're
earning something.

The third and final point is technically their MLS,
minimum lump sum argument which is basically where they put all
of their eggs at this point both in for class and merits.
Their let's get technical argument falls of its own logic.

It falls of its own logic because just saying to
somebody you're going to get an amount that is based on your
old benefit, even if they put IT next to a 12-31-95, multiplied
by some factor that the federal government requires us to do,
and you've already told people in the SPD expect on occasion
that you will get more than your account, it is not a sign that
you've been defrauded.  It is not a sign that you've been had.

1    It is thank you, federal government.

2              So their whole argument, their logic is wrong because

3    they're telling the court that what we showed people was this

4    is your 12-31-95 benefit and it is bigger than your account.

5    So the only logical inference is how could I have been so

6    stupid?  I was started off in a hole and I didn't earn

7    anything, but that is not what their disclosures say.

8              They say not that it is the 12-31-95 benefit; it is

9    this 12-31-95 benefit multiplied by a factor.  It is boosted.

10   So nobody would think anything was amiss and nobody did think

11   anything was amiss including people in the HR department like

12   Sherry Fleisis.

13             All these people thought -- and Foot Locker itself

14   says in statements to your Honor -- that that amount is

15   growing, that MLS that they want to paint a picture in your

16   Honor's mind is a frozen amount.  They say in these disclosures

17   that they're so proud of that it is a constantly changing

18   amount.  In fact, they went even further and they said to the

19   court that Mr. Osberg, he earned benefits because the money

20   that represented his minimum lump sum, which was just his old

21   benefit, it went from $14,000 to $25,000 on the date that he

22   was paid.

23             They actually say that, and he didn't earn a dime, but

24   the fact that they say that shows how confused they are.  It

25   shows how complicated this is.  After eight years, and they did

F4UJOSBM                          Motions

1    it years ago in their answer, they say substantially increased

2    his amount, his minimum lump sum was substantially increased.

3    No, it wasn't.  It just changed in the nominal sense because

4    each year he got closer to age 65, there was one less year of

5    discounting.  14,000 the date of conversion and $25,000 when he

6    was paid, they're the same thing.  They're the same frozen

7    benefit, but nobody was shown a frozen benefit.

8           Nobody was shown a contrast between your old frozen

9    benefit, a word, of course, they never use the word "freeze."

10   They showed them some mystery amount that nobody is going to

11   question.  Why would you question when you're told the federal

12   government says you've got to do some calculation, it is not

13   further explained where you might end up more than your

14   account, you're going to be like hey, thanks, IRS, that is

15   great.

16          That is the way they presented it.  They never

17   explained what that 12-31-95 benefit represented.  That

18   represented a haircut of almost 50 percent that they started

19   you out in the hole.

20          THE COURT:  Okay.  Let me turn to counsel for the

21   defendant and then we'll have a chance to circle back.

22          MR. RUMELD:  Thank you, your Honor, and thank you for

23   the preliminary remarks because I certainly found them very

24   helpful in steering a bit what I am going to try to say right

25   now.

1          First of all, just a couple of kind of background

2     facts because I think it is important to keep some perspective

3     here.  The cash balance plan conversion was January 1, 1996.

4     The summary plan description that Mr. Gottesdiener has been

5     spending so much time talking about was not issued until at the

6     earliest the end of September 1996, some 9 months later, maybe

7     longer.  That is consistent with the statutory rules that

8     summary plan descriptions do not have to be issued

9     contemporaneously with the plan amendment.  I point that out

10    for at least a couple of reasons:

11         First of all, your Honor referred to, and I would like

12    to spend some time discussing some of these individual

13    communications.  The truth of the matter is for the nine-month

14    period between January and September, those individual

15    communications were really the communication that people were

16    getting because they didn't have the summary plan description

17    yet, okay?  To the extent those individual communications

18    contained a better, clearer, more explanatory description of

19    what was going on, it wasn't even negating the summary plan

20    description.  That was the communication, okay?

21         The second point is, it is precisely because the

22    summary plan description does not come out contemporaneously

23    that Congress, when given the opportunity to fix this problem,

24    did not change the rules about summary plan descriptions.  It

25    changed the rules about 204 (h) notices.

1          In our brief we have a rather extension -- Mr.

2     Gottesdiener spent a lot of time taking your Honor through what

3     the SPD rules say.  The larger perspective that is going on

4     here is that what he is accusing my clients of fraud for is a

5     problem that the entire Congress, the entire Department of

6     Labor, that the entire IRS eventually recognized was a problem,

7     but they didn't fix it until years after we amended our plan.

8          Sometime years later Congress realized that

9     participants were confused about cash balance conversions

10    specifically because of this wear-away problem.  When they

11    discussed how to fix the problem, the Department of Labor

12    recommended to fix the problem in the 204 (h) notice.  The

13    document that has to be issued before the amendment to tell the

14    participants the effect of the amendment, that was the document

15    that the Department of Labor recommended be amended, and that

16    is, in fact, what happened.

17         THE COURT:  Let me have you pause for a second because

18    isn't it the case that the Congressional action which occurred

19    later and led to the additional provisions you just described

20    in 204, isn't that indicative of just the kind of mistake that

21    is a notice element in plaintiff's claim?

22         In other words, can't one take away from the very fact

23    of the Congressional action not the legal standard which wasn't

24    yet in effect, but the point?  The point was that the Congress

25    was recognizing a sense of confusion and lack of clarity which

F4UJOSBM                    Motions

they then acted upon.

             MR. RUMELD:  I wouldn't debate for a moment that there
was confusion.  A, cash balance conversions are confusing; and,
B, there was confusion amongst people.  Whether it was amongst
everybody or some people, there was definitely confusion about
the effect.  That is why Congress fixed the problem.

             I think for the purposes of your Honor deciding, let
alone deciding a summary judgment motion as opposed to after
trying the case, my client acted fraudulently for failing to
spell out in their summary plan description more clearly
something that Congress didn't fix until years later and even
then didn't require any changes to the summary plan description
I think is a little farfetched.

             In any event, the Congressional history shows that
while there may be some discussion we can have about
communications, it is hard to say there is a summary plan
description violation, picking and choosing between the
language of the SPD statute when even the Department of Labor
recognized the way to communicate wear-away is not in the
summary plan description, but in the 204 (h) notice.

             As your Honor already ruled a couple of years ago, the
204 (h) claim was dismissed precisely because the rules
regarding what should be in the 204 (h) notice were not in
place back in 1996.  They were only put there a few years
later.  So my point, just to set the backdrop here, is we're

F4UJOSBM                    Motions

1    all mitigating in hindsight, we are all looking in the

2    rear-view mirror about a problem that lots of people failed to

3    recognize while it was happening.  To put a fraud label on what

4    people chose to communicate and how and where they chose to

5    communicate it is a very aggressive stance to take when you

6    look at this legislative history.

7            THE COURT:  Let me ask you about the discussion that

8    Mr. Gottesdiener and I had at the very beginning of his

9    argument relating to whether the combination of, for argument's

10   sake, a misrepresentation that is material with fiduciary

11   responsibilities is sufficient to demonstrate unconscionable

12   conduct or, you know, fraud and/or similar conduct.

13           MR. RUMELD:  Not surprisingly, I see it your Honor's

14   way that every breach of fiduciary duty does not become a case

15   for reformation based on fraud.  There is a certain set of

16   facts and circumstances that could lead to the conclusion that

17   a fiduciary breached his obligations of prudence with respect

18   to plan communications, and then there is a separate inquiry

19   whether that breach of fiduciary duty rose to the level of

20   fraud or inequitable conduct, or if Mr. Gottesdiener is right,

21   because I don't think the case law really supports it that way,

22   unconscionable conduct.

23           I think your Honor's right, and if you look at the

24   discussion in Pomeroy and also in the other cases, my

25   understanding of Pomeroy, there has to be a volitional act, an

1   act of intent, an intent to misrepresent or conceal. .

2           THE COURT:  Let's step back for a moment, which is the

3   elements for reformation, that the remedy to obtain the remedy

4   of reformation are what?

5           MR. RUMELD:  Well, in this case it is fraud or

6   inequitable conduct on our part and mistake on the other part.

7           I don't think, as your Honor said, the court can judge

8   even on our worst day in terms of how the court construes the

9   other arguments here, I don't see how the court can conclude

10  that the people responsible for these communications acted

11  unconscionably without hearing all the facts, including when

12  you got a dispute.

13          THE COURT:  It could be the case then, according to

14  what you're saying, that you could have an actionable breach of

15  fiduciary duty here without rising to the level of fraud in the

16  equity ERISA sense; and, therefore, not have reformation as a

17  remedy.

18          MR. RUMELD:  Yes.  I want to just to give one simple

19  example even at the risk of compromising our position.

20          If your Honor should find the summary plan description

21  should have said more about wear-away, perhaps your Honor would

22  conclude that is a breach of fiduciary duty or violation of the

23  SPD rules.  Whether there should be relief in the form of this

24  A plus B remedy or any other type of reformation of the plan

25  would require the additional showing of fraud.

1           There is one of several reasons why I respectfully and

2     strongly disagree with my adversary when he keeps saying this

3     case is Amara, because in Amara, the case goes through chapter

4     and verse about how these misrepresentations didn't occur by

5     accident, but occurred purposefully because all the way up

6     going to top management, there were instructions not to provide

7     this apples-to-apples comparison so that people could

8     understand wear-away.

9           It is actually directly opposite to the evidence we

10    have here.  Where we are, we have the vice president of HR

11    saying that every one of these documents that are at issue were

12    vetted with multiple professionals, including the actuary, and

13    she made whatever changes they recommended including, by the

14    way, the change to spell out that it is not equal as it says in

15    Amara, but it is actuarial equivalent and saying how actuarial

16    equivalent is calculated.  Those were the product of the

17    vetting process pursuant to which the human resources people

18    were told what to do.

19          It also contrasts significantly from Amara because no

20    matter what aspersions are being cast at the vice president of

21    human resources, we have affidavits from various other people

22    all from New York and Wisconsin about their efforts to

23    communicate with plan participants that were completely

24    uninhibited by any instructions from the top.  Whether they did

25    a better or worse job, they engaged in the good-faith process

1    of trying to tell participants what they needed to know and

2    respond to their questions.

3           This is a very different situation than Amara and now

4    in the district court's decision is a hundred pages long right

5    after the trial.  If you go to the part about this, you will

6    see the court goes into great detail about how management

7    instructed people not to provide the type of information that

8    was contained in our communications.

9           THE COURT:  I think, though, that the argument would

10   be that that may all be included, but it was unnecessary.  I

11   think this is posing the argument for you which is that if

12   you've got an actionable misstatement that is material, and

13   that results in a fundamental misunderstanding as to the nature

14   of the amendment, one can assume mistake and one can also

15   assume that reasonable people would have known, and while

16   intent is not an element, the argument would be that judge

17   didn't have to do all that.  He did, but he didn't have to do

18   all of it.

19          MR. RUMELD:  That would prove mistake on the part of

20   the participants.  It is pretty clear from the Supreme Court

21   decision in Amara, the standard is fraud and mistake, fraud by

22   us, mistake by them, okay?

23          THE COURT:  To get reformation.

24          MR. RUMELD:  That is why Mr. Gottesdiener spent all

25   this time in his brief trying to explain what he thinks is the

F4UJOSBM                         Motions

1    burden of proof for fraud or fraud or inequitable conduct

2    precisely because I think there is a recognition he has to show

3    some level of misconduct on our part, and what we are debating

4    is exactly what that level is.

5           THE COURT:  So then one of your points would be you

6    would agree then that the individual communications -- indeed,

7    you would argue the individual communications on both what I've

8    characterized as the A or B misstatement, I understand Mr.

9    Gottesdiener's point they're really all part of A, for the

10   purpose here A and B, that all those individual communications

11   are evidence that fraud is not at least clear and convincing.

12          MR. RUMELD:  Right.  I think the individual

13   communications do three things, and with your Honor's

14   permission, assuming the technology is working, I would like to

15   look at them in some detail, although I can tell your Honor

16   already did.  There are three reasons why these communications

17   are so important:

18          First, they interfere with the finding that there is a

19   class-wide misunderstanding, and I think the Second Circuit's

20   most recent opinion in Amara makes it clear a class-wide

21   misunderstanding is an element of the claim.  In Amara, the

22   court found the district court was not clearly erroneous in

23   finding a class-wide misunderstanding because the only

24   communications at issue were the ones sent to everybody that

25   were misleading.

F4UJOSBM                    Motions

1          THE COURT:  Let me have you pause here because in the

2     interest of time, this is where in terms of class-wide

3     misunderstanding there are two points that are most relevant to

4     me.  One is the legal issue as to whether the individual

5     communications are even relevant.  You touched on that as a

6     matter of law to a 102 claim.

7          The second, separate and apart from that, which is I

8     am really sort of more convinced about the B, what I put into

9     the B.  The question there is that the individual

10    communications are not contemporaneous with the SPD, whether

11    before or at the time of the September 1996 SPD and are

12    relatively few compared to the Greenville and Wisconsin

13    individual communications.

14         There are a few that you've got on pages 7, 8 and I

15    think I said 11 of your brief, but there aren't that many and

16    they tend to be the years 2000 and later when people actually

17    left.  Those are the individual communications that are of

18    particular interest in terms of whether I've gotten that wrong.

19         MR. RUMELD:  So remarkably, this is one area where Mr.

20    Gottesdiener has said something that I think I agree with,

21    which is he said I think the phrase was B is part of A, and at

22    least looking at it my way, I do agree with him in this sense:

23         If on day one you are in the hole, as he described it,

24    you're starting your initial account balance is substantially

25    less than what you're entitled to if you leave work the next

 1   day and get your pre-'96 benefit calculated at the IRS rate.

 2   So you're here, you get told you're entitled to here, it kind

 3   of stands to reason that you're going to continue to accrue

 4   benefits and they're not going to be meaningful because you're

 5   not going to get up to that higher level.

 6          It is a little hard, by way of example --

 7          THE COURT:  I get what you're saying.  Both of you

 8   have said this.  So I take the point that the disclosure, if it

 9   does not tell you that you're in a hole, does not tell you

10   about wear-away.

11          On the other hand, and what the plaintiffs would say

12   is if the disclosure tells you that you're in a hole, then it

13   tells you about wear-away.  So you're both saying if A has been

14   disclosed, then necessarily B has been disclosed, too.

15          Now, I would take issue with that in the sense that I

16   think that this is where 102 comes into play.  It is possible

17   that you could disclose an initial balance, the initial balance

18   in terms of how you calculate it, but not really have clearly

19   conveyed that you're going to experience no growth.  It is a

20   nuance in terms of whether or not people would take the next

21   step.

22          MR. RUMELD:  And then I think it is helpful to look at

23   a couple of documents in context to make this point.

24          Mr. Osberg's papers clamor for the lack of an

25   apples-to-apples comparison.  This is how he describes the

F4UJOSBM                    Motions

1    claim in the class notice, basic description of the lawsuit.

2              The lawsuit alleges that Foot Locker falsely told

3    participants that the retirement annuity benefits they had

4    earned under the old defined benefit plan were converted into

5    initial account balances of equal value and that any subsequent

6    additions to those account balances represented additional

7    benefits.

8              In one sentence he captures what your Honor describes

9    as the A claim and the B claim.  The initial account balances

10   are too low and we didn't tell you, and we didn't tell you that

11   the going-forward accruals aren't going to amount to anything.

12             The next sentence says the lawsuit alleges that this

13   was untrue because the benefits represented by the initial

14   account balances in the cash balance plan were less than the

15   benefits already earned under the old plan.  In other words,

16   consistent with what Mr. Gottesdiener told you, the B claim

17   derives directly from the A, the alleged A misrepresentation

18   about the initial account balance.

19             What becomes difficult, your Honor, if you're trying

20   to give the participants an apples-to-apples comparison they

21   can see what we are talking about, on day one -- why don't we

22   show --

23             THE COURT:  Then the individual communications lead me

24   to the following issue, and you can put them up so we can all

25   be looking at the same thing.  There are some that would show a

1    significant difference between the accrued benefits and the

2    initial cash balance, right?  There are several which show that

3    in these -- right, take that.

4          Let me tell you my point.  If there is a 12 to 28,

5    what is missing from these is, for instance, what I would

6    consider like a sensitivity analysis, in 2000 should you work

7    at the same level and accrue the same, have the same number of

8    hours or however it is going to be calculated, your $14,000

9    number will only go up to 16.

10         So you could clearly see, and I will tell you this is

11   a problem for me because I didn't clearly see it, and I

12   understand that you don't, you could work for five years and

13   not get another dime in your initial account balance.  You

14   would be given a dime, you would get a dime, but you never get

15   up to the 28, you never really exceed what you already have.

16         MR. RUMELD:  I am hoping your Honor can agree if

17   you're at 14 in your initial account balance, and you're

18   entitled to 28,000 the day after you leave, that there is some

19   period of time you're going to work and you're going to add to

20   your cash balance account, and it is not going to get up to the

21   28.  I want to be careful about how to say this because this

22   makes it even more confusing, but the 28 is a moving number

23   because it depends on what the interest rate is at the time you

24   leave.

25         THE COURT:  It is not a growth number; it is a

F4UJOSBM                    Motions

 1  sensitive number.

 2          MR. RUMELD:  Right.  It is still the frozen benefit.

 3  It is still what the accrued benefit was as of 12-31-95, but

 4  its present day value changes depending on the dictates of the

 5  IRS.

 6          THE COURT:  Let me tell you where this puts me, and we

 7  have a lot of other examples like this.  It makes me feel like

 8  those examples where I sort of had separated things into A and

 9  B and not A wasn't such a problem, but B was a problem.

10          You folks have now convinced me if you understood

11  you're in the hole, you understood wear-away.  If you didn't

12  understand you were in a hole, you didn't understand you were

13  exposed to wear-away.  I am concerned the individual

14  communications don't help with A because they don't tell us

15  that second part that I'm so concerned about which is B --

16          MR. RUMELD:  Then let's go --

17          THE COURT:  -- my B.

18          MR. RUMELD:  -- let's go to the next one, two after,

19  right?  It is not so easy to see.  Does your Honor have the

20  screen, too?

21          THE COURT:  I don't today because of a trial I just

22  had where my screen is out.

23          MR. RUMELD:  What you see here is -- we have copies of

24  these.

25          THE COURT:  I will take it.

1          MR. RUMELD:  No, this example doesn't exist on day one

2    because it can't exist on day one because you can't walk a

3    participant through the apples-to-apples comparison on day one.

4          THE COURT:  But you can give them an indication on day

5    one, in that you could say something like this is terrific,

6    those of you who don't want to want to wait for a lump sum, you

7    get a lump sum.  The cost of that, you might work for three to

8    five years and not earn anything more in terms of your accrued

9    benefits.

10          That could be sort of here's your option.  We are

11    going to switch over, you're going to get this benefit because

12    you're mostly minimum wage workers and you're not -- or

13    slightly above that and you don't have access to these huge

14    lump sum values, and we are going to give you one.  Look at

15    that huge benefit, you can use it for some life event, putting

16    aside tax consequences, and you could have traded that off

17    against the wear-away.

18          MR. RUMELD:  Right.  So with respect, I think your

19    Honor is legislating retrospectively because that is what

20    Congress eventually decided should go into the 204 (h) notice

21    several years later, but there was no requirement to do that

22    then.  If the court finds that we told lies the way there were

23    in Cigna versus Amara, perhaps it doesn't matter that we didn't

24    affirmatively straighten people out about those things.

25          I think in terms of the legislative framework at this

1    time, to tell people how the starting balance is calculated, to

2    explain the 9 percent versus the 6 percent, to then numerically

3    show that that equals 14,000 versus 28,000 like we showed there

4    is pretty much all that your Honor should be expecting us to do

5    on day one.

6            Now, this participant asked for information not on day

7    one, but sometime later.  This is Page 9 of the slides.  What

8    this slide shows is that the participant gets to see the

9    accumulation of additional pay and interest credits because

10   there is first a calculation of what the participant gets under

11   the cash balance plan on day one, and then it progresses to

12   show what the participant gets on 12-31-95, so it grows from

13   140,000 to 154,000, and then in the next part it shows what the

14   minimum lump sum benefit is.

15           It is very clear the minimum lump sum benefit is

16   calculated off of that 12-31-95 accrued benefit and it says

17   hey, your minimum lump sum, your frozen benefit is 224,000, it

18   is $70,000 more than what you have in your cash balance account

19   even after you've worked for a year and earned credits.  So it

20   is kind of hard to show this so graphically on day one because

21   you don't know what is going to happen and you don't know what

22   the minimum lump sum is going to be, but we did

23   contemporaneously give this information to participants as they

24   asked for it or as they were retiring.

25           The other slide I was going to show you is one of the

F4UJOSBM                    Motions

1  benefit statements because my understanding from the testimony

2  is people got benefit statements upon request and people got

3  benefit statements shortly before they left.  Some of the

4  benefit statements, I don't know if -- yeah, okay -- goes in

5  chapter and verse.  It shows how you arrive at the 12-31-95

6  benefit.  It then rolls forward the accumulation that is in the

7  cash balance account.  If you look here, that box on the bottom

8  basically takes the starting balance, the 69,000, and this

9  incidentally is an enhanced starting balance, okay?

10        And, nevertheless, the participant works a couple of

11  years and gets pay and interest credits and doesn't work for a

12  couple of years, so there is just interest credits.  It grows

13  from 69 to 87.  On the next page, the statement says we're

14  required to give you this minimum lump sum calculated based on

15  the IRS rate.  At this point in time, by the way, the IRS rate

16  is down to 5.06 percent, so the minimum lump sum is bigger, and

17  we show the minimum lump sum which is based on this same $9200

18  accrued benefit the participants started with 12-31-95.  The

19  minimum lump sum is $95,000.  So this participant gets shown

20  point blank you had five years of accrual, but your benefit is

21  still going to be based on the minimum lump sum because it is

22  bigger.

23        Now, your Honor made some comments about the statute

24  of limitations in the beginning, which I have to confess I was

25  a little concerned about because in my view, if there are a

F4UJOSBM                    Motions

1    bunch of people who got a letter like this more than six years

2    before the lawsuit is started, their claim should be

3    time-barred.  I don't see why your Honor should be awarding

4    relief to 16,000 people if we know that well more than half of

5    them left more than six years before this lawsuit and many of

6    them got communications like this.

7            THE COURT:  Right, so the question is, and maybe I

8    don't remember where in the record this is, if you've got it,

9    but I was focused on certain pages in your brief and the

10   references in those pages.  Where do I find how many people got

11   disclosures like this?

12           Because the number of disclosures that show

13   effectively the wear-away, if you will, didn't -- they seemed

14   to be a handful.  So you're saying many.  Is there a

15   declaration or something in here in the record before me which

16   says many?  The reason I say that is because there is a lawsuit

17   in the Second Circuit even on the question of statute of

18   limitations which suggests that you can have some folks have an

19   issue, but it wouldn't be predominant unless you were able to

20   make that kind of factual finding.  You need to have not just

21   certain individualized issues, but individual issues must

22   predominate.

23           MR. RUMELD:  Right.  It is also true that one of the

24   reasons we have statute of limitations rules is because it is

25   hard to try cases that are 20 years' old, and there no question

F4UJOSBM                    Motions

1    here that many, many documents are no longer with us and many,

2    many recollections are not so good if you are including the

3    witnesses now in the graph.

4         Mr. Gottesdiener pointed out some of these documents

5    were lost and destroyed during the pendency of this case.  This

6    case wasn't started until 2007.  There were many documents

7    destroyed before this case started.

8         However, what we do know from a combination of

9    documents and witnesses' testimony, first of all, we know that

10   Greenville memo with the charts, okay, the one that at least

11   explains very clearly about being in the hole Mr. Gottesdiener

12   said is the genesis of the B claim, that that was shown, that

13   presentations were made like that at all the large locations in

14   the weeks following the cash balance conversion.  Even though

15   we have the Greenville memo, we have testimony from the person

16   who made the presentations that this was done at numerous

17   locations, and that is in our papers, okay?

18        Secondly, we know that those individual letters,

19   although we don't have a great many of them, the witnesses

20   testified that they were used as templates for other letters

21   and for responding on the telephone.  It is in Linda Imes'

22   declaration, I believe, and Tom Kayley's declaration talks

23   about it.  We also know that the benefit statements were issued

24   to everybody.  They're estimates, not statements.  The

25   estimates were issued to everybody shortly before they left.

1     At least some of those estimates appeared like the

2  version I just showed you.  We also know, just going back to

3  the individual letters, that apart from the witnesses'

4  testimony, one of the documents I cited in my papers is a

5  little internal e-mail exchange because what is going on here

6  is the folks in Wisconsin that, A trunk group, they're

7  responsible for taking the phone calls and responding to the

8  questions, they take guidance from the people in New York who

9  are even more familiar with the plan and they look for the

10 people in New York to draft letters that they can use as Amara.

11    One of the letters we attached to our papers is

12 preceded by an e-mail discussion where Don Capo, one of the

13 people responsible in Wisconsin, says I have 19 pending

14 requests for a better explanation of how the accrued benefit in

15 the cash balance account works.  Then we see a couple of weeks

16 later we see this letter from Mr. Kayley that is exactly

17 responsive to that.  I don't have 19 letters, but it stands to

18 reason 19 letters were written at that particular point in time

19 if Mr. Capo had 19 requests at that point in time.

20    I wish I had every single piece of paper that went out

21 to the participants, but I think your Honor has a lot of hard

22 and circumstantial evidence from which to construe that there

23 were a lot of people who got one of these explanations, one of

24 these apples-to-apples explanations and not just what was said

25 in the summary plan description.

1          I don't mean to be walking away from the argument we

2     don't think the summary plan description violated the law at

3     that time, but even if your Honor's troubled by whether the

4     summary plan description needed to say more, to grant class

5     relief when we know that there were a great many individualized

6     communications I think would be a mistake and a violation of

7     the burden that rests with plaintiff on class certification.

8          Let me just take a moment because I am conscious of

9     the time here, but in his reply papers Mr. Gottesdiener has

10    said that these documents, these individual communications are

11    virtually indistinguishable from what was shown in Amara versus

12    Cigna.  I would have done this a lot more slowly, but I really

13    think the court can see it for itself, that if you look at the

14    communications that are referred to in the sections of the

15    brief that Mr. Gottesdiener attached in the Amara case, and you

16    look at the district court decision, you'll see there were no

17    letters cited, there were no phone calls cited, there were no

18    individual, you know, apples-to-apples.  In fact, there was an

19    admission there were no apples-to-apples comparison done.

20    There were only these communications that were sent to

21    everyone, and they were the same communications that the court

22    found were laced with misrepresentations.

23          Simply put, this case is not Amara.  Amara, at least

24    the way the court found the facts, was really a case of the

25    fraud, and the fraud tainted everything or influenced

F4UJOSBM                    Motions

everything the court found.  Amara also did not have class

busting individual communications.  They had root

communications, communications of the same ilk that the

defendants didn't argue defeated class certification, by the

way.  That is not correct.

        They made other arguments to defeat class

certification.  What they argued was that these communications

cured whatever was missing along with the SPD, and the court

said no, they don't because they don't say anything about

wear-away or how to construe wear-away or starting with less

than you had or accumulating benefits and still having less

than you have.  They didn't say anything like that.  They

provided information how the starting balance was calculated.

        It said nothing, by the way, of the two principal

causes of wear-away different than here.  There the big causes

of wear-away were the mortality assumptions, which as your

Honor observed, we clearly did say in our papers, and these

generous retirement subsidies which was not captured when they

did the actuarial conversion, and none of these documents cited

said anything about that.

        So just bottom line is they weren't individualized and

they were not apples-to-apples comparisons.  I think if your

Honor doesn't have questions, I rest here.  I would like to

give Mr. Rachal a couple of minutes to talk about the other

motion, specifically the issue your Honor raised.

F4UJOSBM                              Motions

```
 1              THE COURT:  Yes.

 2              (Recess)

 3              THE COURT:  You may be seated.  Thank you.

 4              MR. RACHAL:  Ready to proceed?

 5              THE COURT:  Yes.

 6              MR. RACHAL:  I have a presentation I will hand out for

 7    Mr. Gottesdiener and for the Court.  Hopefully, I'll try to be

 8    very brief and respond to the points that your Honor raised in

 9    the initial discussion.

10              First off, I want to be clear that the motion is not

11    an attack on Mr. Deutsch's qualification or math.  It is a

12    legal motion focused on the legal standard related to

13    disclosure issues and what is required to qualify for

14    reformation of the pleadings.

15              That is why we started at Daubert partial summary

16    judgment.  It is not about expert qualifications per se.  It is

17    just saying his report does not still comport to the facts of

18    the case.  Part of what happened is when he started, originally

19    at the time he was doing his expert report in 2012 there was a

20    focus on surcharge relief.

21              The surcharge, even if he knew more he would have

22    revealed, would have been upset and Foot Locker would have been

23    a more fulsome remedy.  There was no need in the report at the

24    time he did it to tie it to for reformation and particular

25    promises.
```

1          In fairness to Mr. Deutsch, the landscape has changed.

2     Since then there has been, your Honor found it was a little too

3     speculative.  The second reform was being moot and on remand

4     plaintiff's counsel said they are not pursuing the recharge

5     theory but reform.  There is a little change in the dynamic.

6          Now, these issues matter in that why we are pursuing

7     them at this stage?  Damages in the partial summary judgment

8     and Daubert, damages go approximately 91 million to 35 million.

9     Mortality is 14 million of that.  Enhancement is 41 and a half

10    million of that.  If you would go to Slide 9.  I will cut to

11    the chase here.  We have the lay of reformation and I don't

12    think there is disputes on that.  On mortality, and your Honor

13    saw this, is that there was no uniform promise -- no uniform

14    promise that the initial account balance would be calculated

15    without mortality.

16         Instead, the participants were told the precise

17    opposite, that the initial account balance would be discounted

18    for this and would total less in the 1996 SPD.  We have the one

19    page retirement memo  and then the Greenville memo.  If you

20    would, we'll go to the SPD.

21         THE COURT:  What do you think about the page before

22    Page 6, just the ones that were before we get to the definition

23    of initial account balance, the one that I was reviewing with

24    Mr. Gottesdiener?

25         MR. RACHAL:  At Page 11 and 12?

1            THE COURT:  Yes.

2            MR. RACHAL:  That actually, yes, if you look at what

3    Page 11 is, you'll see -- and the court noted this -- is that

4    your initial account balance is an italicized term, defined

5    term.  You see italicized terms throughout this.  There is no

6    trick here.  It is used throughout.  You have to go to the

7    defined term to know what they're talking about.  Every time

8    you see initial account balance in this SPD, it is this right

9    here.

10           THE COURT:  So then I think the nub of the issue ends

11   up being whether the word "actuarial" clouds people's

12   understanding as to what's really going on, that it

13   incorporates so very much, that one word just incorporates a

14   whole host of things, so does it really convey to you that with

15   each additional interest, percentage, you're sinking lower and

16   lower into the hole?

17           MR. RACHAL:  It does.  You might have to look at not

18   just one communication, but multiples.  This one defines what

19   actuarial equivalent lump sum value is.  The value is

20   determined actuarially.  It tells you the percent rate of

21   interest in the mortality tables set forth in IRS rules.

22           Do we have any water, by chance?

23           THE COURT:  Yes.

24           MR. RACHAL:  I'll go to the next, the Greenville memo.

25           THE COURT:  Let me ask you, because the Greenville

F4UJOSBM                        Motions

 1   memo, and we're both arguing --

 2                  MR. RACHAL:  Sorry, I misstated it.  This is not

 3   Greenville.  This is a one-page communication.

 4                  THE COURT:  Let me just ask you, because it is

 5   relevant to your motion for partial summary judgment just as it

 6   is relevant to the plaintiff's motion for summary judgment, how

 7   does the court take this into consideration in connection with

 8   the 102 claim as opposed to a 404 claim, because a 404 claim

 9   you might suggest breach of fiduciary duty, additional

10   communications may have some relevance, but for a 102 claim it

11   would strike me that that is four corners of SPD.

12                  MR. RACHAL:  It comes into play on the reformation

13   side.  In other words, you could say well, is there an SPD

14   violation, yes or no.  We would agree you look to the four

15   corners of the SPD.

16                  THE COURT:  Hold on.  Where are you from?

17                  MR. RACHAL:  New Orleans.

18                  THE COURT:  You talk really fast, like a New Yorker.

19   You are an honorary New Yorker.  I need you to slow down.  Just

20   so I will tell you, I read these transcripts in order to

21   reinforce what people have said and to understand.  If we don't

22   have a clear transcript, it is going to be I will be confused

23   by it.

24                  Your point is you would agree that the 102

25   misrepresentation or omissions is what is within the four

1  corners of the SPD?

2          MR. RACHAL:  Correct, your Honor.

3          THE COURT:  But whether or not reformation is an

4  appropriate remedy assuming an SPD, but not conceding an SPD

5  violation, that is when you get to these additional

6  communications?

7          MR. RACHAL:  That's correct.

8          THE COURT:  So that would mean, Mr. Rumeld, just to

9  tie these things together, that as to the class for an SPD

10  violation, the individual communications wouldn't necessarily

11  have any relevance, but for the remedy, they might.  I am tying

12  it together.

13          MR. RUMELD:  May I make one small point which is kind

14  of good for the goose, good for the gander because some time

15  ago your Honor purported to quote from the SPD, making the

16  statement that participants will see their accounts grow, and I

17  want to be careful here because while your Honor can pick up

18  the SPD and construe it any way your Honor wants in terms of

19  whether people might have conferred that, that was a statement

20  that was not in the SPD.  That was in the letter sent by the

21  CEO back in the beginning, that informal letter saying you're

22  getting additional information.

23          I want to be careful here because if your Honor's

24  going to look at the four corners of the SPD to evaluate

25  whether there was a 102 violation, which we are not disagreeing

F4UJOSBM                        Motions

1    with, I don't think the district court in Amara was quite as

2    disciplined as your Honor in that regard, but let's also be

3    clear we shouldn't find an SPD violation based on these

4    collateral communications, either.

5            THE COURT:  I understand.  I thank you for that point.

6            MR. RACHAL:  So this is a communication that the class

7    representative, Mr. Osberg stated under oath that he received

8    that we believe is widely distributed, and it is one page to

9    explain what is going on.  You see it answers the question you

10   were asking.  Does it make it clear?

11           It is the amount that is needed to fund your benefit

12   for life beginning at normal retirement date and then discount

13   or brought back to today's time-frame by taking into

14   consideration interest which may be earned between now and then

15   normal retirement date, and elsewhere in that document they

16   said they use 9 percent rate of interest.

17           The probability of living to normal retirement date to

18   collect the benefit, that is retirement mortality.  We are

19   telling people directly there we are discounting for

20   pre-retirement mortal mortality.

21           Then here is in the Greenville memo, taken from the

22   table based on mortality and interest.  You see the same

23   language in the Greenville memo.  Go ahead, pop it up.

24           Discounted, brought back, interest in the probability

25   of living to normal retirement.

1        THE COURT:  Just to, not to interrupt your flow, but I

2    think I have looked at these extensively and I think I

3    understand the interest disclosure and mortality disclosure.

4    My real focus is the enhancements in terms of this argument.

5        MR. RACHAL:  I will move to the enhancement  part.  If

6    you go to Slide 15.  So our basic point on the enhancement is,

7    okay, Foot Locker offered a substantial enhancement, valued $41

8    million to the initial account balance for those who met

9    certain age and service requirements, at least 15 and 15 years

10    of service.

11        Mr. Osberg just missed that enhancement, just a few

12    years too young for it.  When I say Osberg claims, he is

13    claiming on behalf of the class, not entitled to just A or B

14    and equal -- (inaudible) -- enhancement to be awarded on top of

15    that remedy.  You can't use reformation to pick and choose

16    which part of the promise you want to keep.

17        The formula for enhancement which Osberg claims to

18    rely -- he mentions it and quotes it and quotes it four times

19    in its breach -- itself refers to initial account balance

20    formula in that same SPD which states it is based on mortality

21    and 9 percent.  The two are linked, the enhancement form is

22    linked to initial account balance form.  You can't --

23        THE COURT:  Let me ask about that.

24        The piece of it that I am confused by, it is not the

25    math, if you will, how the initial account balance reflects an

1    enhancement for certain individuals at a certain age with

2    service credits.  That I understand.  I do understand that if

3    you take away the concept of initial account balance,

4    effectively you shouldn't then allow people to hold onto the

5    enhancement that was all ready to take away from, to help you

6    with the effect of wear-away.

7           The question I have is if the disclosures, if I found

8    there was, in fact, a misstatement as to, or omission as to the

9    wear-away piece of it, it could be that a plan participant

10   understood the word "enhancement," understood that if he was or

11   she was 50 and had certain years of service, 15 years, they

12   were going to get an enhancement because that may have been

13   clear.

14          What they didn't understand was that they were going

15   to be getting it because they were in the hole and, by the way,

16   it is not necessarily the case they would be not in the hole at

17   all with the enhancement.  I think it might depend.

18          The question is not just what parts of the promise,

19   but isn't it part of reformation trying to arrive at the

20   reasonable expectations of the parties, in which case people's

21   understanding, which is I think I am getting the enhancement, I

22   don't know why quite, but I think I am going to get it, and I

23   think I am going to be better off tomorrow than I was today.

24          If the second one is not true, does that necessarily

25   mean we have to eliminate the first?  Do you see what I am

F4UJOSBM                    Motions

1    saying?

2          MR. RACHAL:  I do, your Honor.  Go ahead.  I am going

3    to try to respond by a little bit of focusing on the documents

4    and the query raised.

5          This is enhancement formula, and then you go to the

6    next, which is the initial account balance which is italicized

7    after enhancement and shows it is enhancing the initial account

8    balance.  That is what we -- (inaudible) -- look, I don't think

9    under the clear and convincing proof standards that applicable

10   reformation, we talk, and we have some of the cases quoted in

11   there about the evidence can't be loose or contradictory or

12   questionable.

13         I don't think you can parse it that fine to say that

14   within the same document the folks read the enhancement part

15   and said I am getting this enhanced formula here but didn't

16   read what it was linked.  I don't think you can assume that

17   that was done uniformly class-wide that no one got that.

18         THE COURT:  Let me have you pause because it is really

19   the legal issue I am focused on for the moment, which is the

20   clear and convincing evidence is as to the standard for

21   reformation.

22         If the court found, for instance, that there was clear

23   and convincing evidence as to the element of fraud for the

24   purposes not necessarily of the enhancement, but of the

25   wear-away effect, are you suggesting I need to make a separate

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F4UJOSBM                         Motions

1    determination before I can reform enhancement about clear and

2    convincing evidence with fraud as to that?

3            MR. RACHAL:  As to misstatement, your Honor.

4            THE COURT:  Why isn't it the case once the court has

5    arrived at a misstatement or omission as to the effect, effect

6    of the plan amendment, that the court's task, having met the

7    factors for reformation, is then to do what is fair, which may

8    be to have the entire package correspond to the parties'

9    reasonable expectations?

10           In other words, I don't know that I have to go back

11   and say there is clear and convincing evidence of this, so I

12   can now change this, clear and convincing evidence of that, so

13   I can change that.  I can take it as a whole.

14           MR. RACHAL:  I respectfully disagree.  This goes back

15   to Amara, the Supreme Court adopting the equitable remedy of

16   reformation and citing the learned treatise such as Dobbs and

17   the old reformation cases.

18           There is a body of law that goes with reformation.

19   Reformation, as Mr. Gottesdiener noted, this is contract

20   theory.  When you upset the written terms of the contract, and

21   the plan is clear how it is written, this is not a case about

22   the plan terms, but disclosures of the plan term.  When you're

23   upsetting the contractual terms of reformation, equitable

24   remedies, equitable law, the law of reformation, Dobbs, the

25   cases cited by Amara, cases cited in our brief and more, all

F4UJOSBM                         Motions

 1   said you need to have clear and convincing proof of the

 2   mistake, not just of the fraud.  The fraud has to cause a

 3   mistake and it has to be clear and convincing there was an

 4   agreement that is not loose, equivocal, doubtful.

 5           Here I just don't think you can fairly look at this

 6   SPD, for example, and there are other communications, but --

 7           THE COURT:  Why aren't you arguing against yourself?

 8           Because if I find that the enhancement is clearly

 9   disclosed so there is no mistake as to the enhancement, they

10   understand they're going to get an enhancement.  If I am 50 and

11   I get 15 years, I get an enhancement, clear as day.  I don't

12   know that anybody disagrees with that proposition.

13           It is how that fits into the package which results in

14   disagreement.  As to the fact of enhancement, I am not sure

15   there is a lot of disagreement.  If I agree with you, then I

16   shouldn't change it at all.  What you're arguing is if there is

17   no mistake as to that, I leave it alone.

18           MR. RACHAL:  Except it is linked.

19           A participant can't claim on behalf of a class that

20   they looked at one part of the document, the enhancement

21   formula in detail, read it closely and then in the same

22   document with the link cross-referenced definition, noting the

23   part of the formula that limited the enhancement.  I don't

24   think that is consistent with reformation in any way I've ever

25   seen.

F4UJOSBM                    Motions

1          It is the linking of it in the same document that

2    defeats the claim under reformation.  We are not saying

3    enhancement wasn't disclosed.  It was clearly disclosed, but it

4    was also clearly linked to the initial account balance formula

5    which disclosed 9 percent.  We have the other documents of

6    communications that went -- (inaudible) -- the impact of the --

7    (inaudible).

8          When you look at the reformation, I don't think you

9    can take part of it -- of course, part of the promise, when the

10   other part of the promise is in the document, that is my same

11   document on the enhancement with one other piece of it.

12         THE COURT:  Only if you go slowly.  Otherwise, I will

13   cut you off.

14         MR. RACHAL:  On the other piece is that enhancement on

15   the enhancement, which is that Mr. Gottesdiener and the

16   plaintiffs want to take the formula and then bump it up to the

17   6 percent and then run that through the same enhancement

18   formula which gives a benefit that was nowhere ever proposed,

19   disclosed, expected or anything else.  I will give you an

20   example.

21         People received benefit savings and said this is your

22   account balance with enhancement.  That showed particular

23   dollars.  What do people focus on?  They focus on dollars.

24   They were shown a $5,000.00 enhancement.  They're not going to

25   expect a $10,000.00 enhancement.  I don't think there is any

F4UJOSBM                    Motions

1    basis for an enhancement on enhancement.

2           My final point on the A plus B point, which is if you

3    go back and look at Amara and the remedy that was afforded,

4    what A plus B means, Part A is a benefit under the prior plan.

5    Part B are interest credits under the new plan.  Enhancement

6    doesn't fit within Part B.

7           THE COURT:  Your argument would be if the court were

8    to go with reformation to A plus B, the court goes to the

9    account balance as of the date of conversion and erases the

10   entire initial, entire balance concept.  It is just gone?

11          MR. RACHAL:  Correct.

12          THE COURT:  And then credits for time and service and

13   interest or whatever it is, B, are added thereto?

14          So the whole bit about mortality assumption and yadda,

15   yadda, yadda are gone, wiped clean.  Therefore, your argument

16   would be you don't have the enhancement because you're taking

17   away that whole amendment effectively.

18          MR. RACHAL:  Yes, your Honor.  That goes to what the

19   enhancement operated functionally to do.  We saw some examples

20   in the Greenville memo.  That is what it did.

21          Mr. Deutsch in his report showed this as well.  The

22   enhancement would lessen or in a few instances we saw lump sums

23   eliminated wear-away.  That is what it operated to do.  It

24   impacted your Part A.  It was an enhancement to the initial

25   account balances that cleared the SPD disclosure, I don't think

1    any dispute about that.

2           If you are changing the initial account balance and

3    upping it, to use an example, if you had an initial account

4    balance that was 60,000 and it had a $20,000 enhancement, that

5    brought it to 80,000, but a quote equal value benefit would

6    have been 90,000, and you changed the remedy to 90,000, you

7    then donate 20 on top of that.

8           THE COURT:  I get it.

9           MR. RACHAL:  That is the gist of it.

10          THE COURT:  Let me hear from Mr. Gottesdiener.

11          Mr. Gottesdiener, in particular let's assume for the

12   moment that the court were to find an actionable misstatement

13   or omission that, in fact, occurred as material.

14          MR. GOTTESDIENER:  I want to hand this up to the

15   court.

16          THE COURT:  And found that the elements of reformation

17   had been met, why would it not be the case that if reformation

18   were to include elimination of the initial account balance

19   altogether so that amendment is effectively going out the

20   window, that the court would carry along with that reformation

21   the enhancements?

22          MR. GOTTESDIENER:  Because the conversation your Honor

23   had is exactly right.  They disclosed the enhancement.  The

24   question is reasonable expectations.

25          The reasonable expectations were that if you continued

F4UJOSBM                    Motions

1    working for Foot Locker, you were going to, instead of adding

2    to your annuity, you would now be adding to your account

3    because they started you off with the same benefit, equal

4    value, and they added the enhancement and added compensation

5    credits and added interest.  There is no dispute that they

6    clearly disclosed the enhancement.

7           So what we want and what we handed up to the court in

8    terms of the reformation is a simple change that instead of

9    applying to the opening account balance the 9 percent and

10   pre-retirement mortality, you would just change that to be 6

11   percent.

12          Then we would meet Foot Locker's own definition in the

13   Greenville summary of actuarial equivalent lump sum value,

14   which they completely misled people about in that summary, they

15   made it sound like that's what they're doing for people.  But

16   they didn't do that, they didn't say we're doing the 6 to 9

17   percent arbitrage that your Honor spoke so eloquently of in the

18   court's September ruling.  Nowhere did anybody put that

19   together.

20          So all we want and all the fight is about is if we get

21   the initial account balance as promised, the official summary

22   in the SPD where you don't count the thing that is in the

23   weeds, these technical details.

24          THE COURT:  Why wouldn't it just be easier to say

25   let's not have the court have to choose between the various

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F4UJOSBM                    Motions

1   elements of an initial account balance.  Let's just stop that

2   altogether and go back with the accrued balance.  It is what

3   the parties thought they were getting.

4             MR. GOTTESDIENER:  That is what we are doing.

5             THE COURT:  Once you've done that, then your argument

6   would be the plaintiffs thought they were going to get the

7   accrued balance.  This was their reasonable expectation,

8   accrued balance plus enhancement for some reason.

9             MR. GOTTESDIENER:  That's right, actually the reason

10  why they misstated, and this is all in our brief and I would

11  like to submit on that.  The government got the early --

12            THE COURT:  Hold up.  No more submissions.

13            MR. GOTTESDIENER:  I submit on what we go back and

14  wrote.  If you look, we state very clearly their internal

15  documents show they were providing the enhancement because this

16  early retirement subsidy was going away.  We are not

17  complaining about that.  This was not to take care of

18  wear-away, and they didn't, of course, your Honor, say we're

19  starting you in a hole and here's something to make you less

20  out of the hole.

21            Our argument is very simple.  Our argument is the B

22  part.  If you have over here, if you look at my left hand and

23  you think A, the entire dispute between the parties is do we

24  get that as promised under an average participant's

25  understanding when you tell people watch the growing account,

1  you are effectively telling them, without disabusing them of

2  the opposite, that means benefit growth.

3          So if we get reformation of A to meet what the

4  reasonable expectations were of the parties and the

5  participants, then over here on B you get already what's not

6  disputed.  There is no dispute that the cash balance formula

7  adds to your account.  The question is they want to keep the

8  decimated account and they say what's their rationale?

9          The rationale is we never intended to pay the

10  enhancement on top of the real account.  Well, I am sorry, you

11  need to go back and read Amara, this whole holding of the case.

12  It doesn't matter they intended that or not.

13          THE COURT:  Let me, and that may be the answer to this

14  question, whether there is a factual question embedded here,

15  which is -- and you may argue, and I think your papers would

16  argue that it is without a trible issue associated with it.

17          Here is the question.  Do I need to find as a fact

18  that the enhancement is not meant to replace wear-away in order

19  to keep it for the purposes of reformation?  Because I have two

20  choices:  One, the plaintiffs argue that the enhancement is a

21  payment effectively for the elimination of the early

22  retirement; or, B, it is an attempt to make up for the effect

23  of wear-away for certain participants of a certain age.

24          Do I need to make that determination in order to keep

25  the reformation?

1          MR. GOTTESDIENER:  That is a great question, and the

2     answer is no.  We provide our version to counter their version,

3     a background irrelevant under McCutchen case and under the plan

4     document control case.

5          They put in the plan an enhancement.  The enhancement

6     needs to be applied to the correct account balance.  The

7     litigation, which is not litigation in hindsight, this is no --

8     the whole story you got was not accurate.  Congress didn't say

9     there was anything wrong with the SPD rules.  This is not

10     litigation in hindsight.  They told people you have the same

11     benefit as people would expect going forward.  Added to that,

12     it doesn't matter why, is what the explanation was.  We just

13     show you behind the scenes what their thinking was.

14          They are now trying to get credit for that to offset

15     this in the hole wear-away they created.  It is an enhancement.

16     Just think of the word.  You told people you're getting the

17     same benefit in this initial account.  If you stuck with us for

18     all these years, you're a senior participant, on top of

19     compensation and interest credits you're going to get an

20     enhancement.  The word itself is saying my reasonable

21     expectation is I'm going to do better than my buddy who is

22     selling shoes in the five and dime at Woolworth down the street

23     because I've been with Woolworth longer.  They want to reward

24     loyal service.

25          It doesn't matter.  It is in the plan document.  The

F4UJOSBM                         Motions

1  fight is over the initial balance.  If I could, in the thing I

2  handed up, this Power Point which I will do as quickly as I

3  can --

4           THE COURT:  Don't do it too quickly.  I have my next

5  conference is starting to arrive here.  I want to make sure we

6  make a clear record.

7           MR. GOTTESDIENER:  The entire defense comes down to

8  the logic that is presented and that I'll show you falls apart

9  on the Power Point.

10          Remember there are three arguments.  Before we get to

11 the third one, I will just review.  Number one is you have to

12 put what you're saying in the summary plan description and

13 you've got to do it in plain English and you've got to make a

14 statement that is we know there is going to be wear-away and

15 you need to know that, too.  You need to know you're not going

16 to earn any new benefits.

17          I want to pause and say that is the second point.  The

18 first point it has to be in the official SPD.  The second point

19 is, respectfully, all this conversation about people can figure

20 it out, it is just wrong.  The SPD standard is it is an 8th

21 grader.  You need to explain the significance.  You can't start

22 dumping calculations in people's lap.

23          The third point is on their own let's get technical

24 terms.  Their logic doesn't make sense.  On the second point,

25 the final point I want to make, it is undisputed, there is no

1    statement in any communication that says anything approaching

2    we started your initial account balance off at a value that was

3    less than the benefit you already earned.  Therefore, you may

4    or will not earn new benefits until your account balance

5    exceeds the value of the benefit you already earned.

6           In our view, your Honor, the case is that simple in

7    terms of the violation and how stark the omission and, in fact,

8    misrepresentations were when they knew and up and down the

9    documents don't lie and the testimony of the witnesses, they

10   all admit they knew up and down there were not going to be any

11   earnings.  Everyone was decimated by wear-away and it was going

12   to take most people years to get out of it.

13          In the absence, under those circumstances, of a clear,

14   simple, one-line statement, the 24 pages in the SPD we just

15   handed you, dear participants, please do not mistake all this

16   growth of B as meaning anything to you until you get out of the

17   setback that we caused you.

18          But then say your Honor rejects those first two

19   arguments and says okay, let's consider these one-off

20   communications.  Well, here is their logic, as you've heard.

21   Their logic is if an employee is told the minimum lump sum

22   is -- italicized -- the 12-31-95 benefit, then the MLS, minimum

23   lump sum is larger than the account, remember the example you

24   looked at with the 14,000 and the 28,000, if they say well,

25   hey, that is larger than the account.

1            Of course, they say you get the greater of.

2   Mr. Rumeld's argument is the only logical inference, they

3   should have just woke up and smelled the coffee, is that they

4   had been misled, that the account must have started off less

5   than the minimum lump sum.  They didn't actually get the

6   12-31-95 benefit because if it is less, there is no other

7   explanation other than that they only got a fraction of it,

8   which, of course, is the truth.

9            The greater of that is shown there, they tell you you

10  get the greater of your cash balance account, the initial

11  account -- or now careful, this is their slide because it is

12  not correct -- they say that they tell people the minimum lump

13  sum equals the 12-31-915 benefit.

14           For example, look at the bottom of the slide.  Their

15  depiction of that is they say the minimum lump sum is the

16  pre-'96 benefit, the 12-31-95 benefit.  But then you turn and

17  the next page of the handout, the logic is flawed because the

18  MLS, the minimum lump sum, is not described as the 12-31-95

19  benefit.  The MLS is a multiple of the 12-31-95 benefit.

20           Look at the Greenville summary that I handed up that

21  he has also been talking about.  These documents bury them.

22  They don't help them.  The document says the MLS is the

23  12-31-95 benefit times a factor.  So since it is the 12-31

24  benefit times a factor, there is no reason for a participant to

25  conclude that the account must be something less.  The logic

1    falls apart.

2              The SPD confirms the logic falls apart and that nobody

3    would think anything other than thank you, Foot Locker and

4    federal government, for this great plan.  It says the account

5    is the 12-31-95 benefit plus more.  Look at the greater of

6    here.  This is what the SPD says, your Honor.

7              Account equals, when you start out you get the

8    12-31-95 benefit plus you get E, which is the E enhancement,

9    and you get C, the compensation credits, all laid out on Pages

10   11 through 14 of the SPD, and interest, or you get the minimum

11   lump sum.  What do they explain the minimum lump sum as?  A

12   mystery federal gift, an amount determined under federal law

13   and IRS regulations.

14             So the employee would conclude since my account is the

15   same as my 12-31-95 benefit, how could it be otherwise, that is

16   what they told me, and it is common sense, plus additions, hey,

17   this MLS that the federal government requires them to give me

18   is even larger.  Thanks, IRS.

19             THE COURT:  So all of this goes towards the point of

20   whether there are misstatements or omissions.  Because we are

21   going to run out of time in about three minutes and I want to

22   make some comments on where we go from here, pick your last

23   point.

24             MR. GOTTESDIENER:  My last point is that if you keep

25   flipping through the chart that you now have, it says not only

F4UJOSBM                    Motions

 1   does the SPD confirm it, the MLS as reflected in the Greenville

 2   document is a moving target, so people would conclude, they

 3   would not conclude they hadn't earned anything.  Telling

 4   somebody -- and this is what you held in September -- telling

 5   somebody they're going to get more than their account is not a

 6   tip-off that they have been had.  There is an explanation for

 7   why they got more, and the explanation is the mystery federal

 8   factor.  Their logic falls apart.  They don't have any case.

 9           There is no question on class, your Honor, because

10   zero plus zero equals zero.  When you give somebody a

11   disclosure that doesn't say anything, these one-offs are a

12   desperate last attempt, just recycling the arguments they've

13   made before.

14           THE COURT:  Thank you.

15           MR. RACHAL:  May I have a brief response?

16           THE COURT:  We have only got like 30 seconds, but

17   don't talk too quickly because I have got to have a minute and

18   I don't want to have the other folk waiting.

19           MR. RACHAL:  I promise to be quick, but not talk

20   quick, if I can pull that off.

21           The only thing I will respond, the enhancement and the

22   question your Honor asked about whether it operates to

23   replicate or substitute for early retirement subsidies or

24   lessen wear-away, here I agree with Mr. Gottesdiener, it

25   doesn't matter.  It actually does both.  Dollars are fungible.

1   So it operates sort of like early an retirement subsidy but

2   also operates to lessen wear-away.

3          What we told people externally in the Greenville memo

4   was showing how it lessened the amount you are in the hole by

5   increasing your opening balance.  That gets to the point of

6   reformation.  We accept the plan as written.  The plaintiffs

7   say go reform the plan.  Once you start tinkering with one

8   term, changing 6 to 9, you have to have them fit within the

9   promise made to participants, which we submit linked the

10  enhancement to 9 percent.

11         THE COURT:  But you're agreeing the enhancement is

12  connected to also the elimination of early retirement?

13         MR. RACHAL:  It operates that way, your Honor, because

14  it operates also to lessen wear-away because dollars are

15  fungible.  It does both.

16         THE COURT:  It does both?

17         If the court were to reform, but not to change the

18  elimination of early retirement, it might be sensible to keep

19  the enhancement.  Otherwise, you might have an odd situation

20  where you had eliminated the enhancement's wear-away

21  implications, but you are left now with folks who would have

22  had the benefit of the enhancement without either the

23  enhancement or the opportunity for early retirement.

24         MR. RACHAL:  But that is the double-counting.

25         Then they would be getting an enhancement plus what it

1   operated to lessen the early retirement.  They would be going

2   from, to use an early example, going from 60 to 100 and then 20

3   on top instead of 60 to 80.  It ends up double-counting.  I

4   guess the most significant point is that they were told an

5   enhancement was linked to the initial account balance in the

6   same document.

7            THE COURT:  Got that!

8            MR. RACHAL:  Thank your Honor.

9            THE COURT:  Here's what I am thinking.

10           I don't know how I can grant summary judgment on the

11  plaintiff's motion, although there are bits and pieces where if

12  one fights their way through the thicket, but I can't get there

13  on reformation, I don't think.

14           I don't want to get there right now because I feel

15  that there is enough in terms of things that I am not convinced

16  on the legal standard.  I am not saying I won't become

17  convinced, so don't cite my words right now back to me that I

18  can't become convinced.  I am sufficiently unclear as to the

19  legal standard.  I want to hear the evidence and make a final

20  determination so that I can perhaps make alternative rulings in

21  some manner so that we don't have to all go through this again.

22  That is in terms of the plaintiff's motion, I am going to deny

23  it.

24           I will also say in terms of the plaintiff's motion,

25  but this now goes to the defendant's motion on enhancements, I

F4UJOSBM                       Motions

1    do think I need to hear from Dr. Deutsch as well as whomever

2    the defendants are going to put up.

3              MR. DEUTSCH:  Not doctor.

4              THE COURT:  Because I need to understand more about

5    this and I will be assisted by that testimony.  I understand

6    the parties' views as to the mortality assumption and the

7    interest rate.  Again I will be assisted by hearing from those

8    folks who are going to testify as to various remedies if there

9    is reformation in terms of how it would work; for instance, Mr.

10   Deutsch and whomever else the defendants are going to proffer.

11             Right now, as you have heard, and this is not so much

12   as a question of fact but question of law, but I will be

13   assisted by in-court testimony.  I should just go with accrued

14   benefits, something about enhancements plus B or the accrued

15   benefit without enhancements plus B.

16             That would eliminate really the mortality issue, the

17   interest issue.  We wouldn't be basing it on that.  I don't

18   want to make a final determination.  I would like to hear from

19   people because I am already into this so much right now, and

20   what today has confirmed for me is this is complicated stuff

21   that needs to be done deliberately, and I am sufficiently close

22   to the finish line, I want to get over it.  I want you folks to

23   get over it so that we're done.

24             In that respect, you have heard my views.  I haven't

25   really changed my views since we started today, but I have

F4UJOSBM                    Motions

1   learned a lot more about arguments and learned a lot more about

2   different, I would say, vulnerabilities in certain arguments on

3   both sides, to the extent that this has been extraordinarily

4   useful for me.

5          So proceed with preparations for the trial.  I do not

6   think at this point I would be decertifying the class.  I had

7   thought long and hard about that.  As you know, the class issue

8   has been an issue which I have been focused on.  I have spent a

9   lot of time.  I did a very serious reconsideration review.

10         As it stands right now, based upon the 102, it does

11  strike me that if the individual communications -- and I

12  understand the statute of limitations argument, I do have to

13  look at that, I will look at that.  I am not saying I won't

14  look at that.  For 102, it is all within the four corners of

15  the SPD.  That means liability is a class question.

16         It then means that reformation potentially in terms of

17  the individual communications might have some issues, but

18  nobody has really broken it down like that, which is do a

19  subclass or certify liability class but don't certify

20  reformation class.  So I am not at a point where I am going to

21  go there.

22         I do think that, frankly, there is a lot of stuff on

23  the individual communications.  They are not irrelevant, but

24  they're particularly relevant to reformation.  I find the

25  individual communications particularly relevant to whether

F4UJOSBM                        Motions

1    there is clear and convincing evidence of fraud.  I think that

2    is both a legal standard issue and a fact issue.  If the legal

3    standard is as Mr. Gottesdiener says, there is no fact issue.

4    If it is not, then there is a fact issue and those are highly

5    relevant.

6            All right, folks, you know your marching orders.  You

7    know where we're going to be when we start trial.

8            Thank you.  We are adjourned.

9            (Court adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25