*Osberg v. Foot Locker, Inc., et al.*, 07-cv-01358 (KBF) (S.D.N.Y.)

# Joint Pretrial Order

## July 1, 2015

# Exhibit 13A

# Expert Opening Report of Lawrence Deutsch, E.A.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
**GEOFFREY OSBERG**                          :
                                         :
**On behalf of himself and on**        :
**behalf of all others similarly situated,**   :
                                         :   **Case No.: 07 CV 1358 (KBF)**
              **Plaintiff,**            :
                                         :
       **- against -**                  :
                                         :
**FOOT LOCKER, INC.,**               :
                                         :
**FOOT LOCKER RETIREMENT PLAN,**   :
                                         :
             **Defendants.**           :
-------------------------------------------------------------X

**EXPERT REPORT OF LAWRENCE DEUTSCH, E.A.**

**May 10, 2012**
**As Supplemented on May 22, 2012**

# REPORT OF LAWRENCE DEUTSCH, E.A.

**Qualifications**

I am an Enrolled Actuary under ERISA.  I am also a member of the American Academy of Actuaries, a member of the American Society of Pension Professionals and Actuaries ("ASPPA") and a member of the ASPPA College of Pension Actuaries.  I am a past president of the College of Pension Actuaries and a former member of the Advisory Committee of the Joint Board for Enrollment of Actuaries.  I am being compensated for my services in connection with this assignment at the rate of $300 per hour.  Within the past ten years, I have authored: "Comments on Reductions of Accruals and Allocations Because of the Attainment of Any Age; Application of Nondiscrimination Cross-Testing Rules to Cash Balance Plans," The ASPA Journal (May-June 2003), and "Issues with 412(i) plans," The ASPPA Journal (Sept-Oct 2003).  Within the past four years I have testified as an expert in the following cases: *Meadow Burke Products v Electrical Contractors Association of the City of Chicago and Local Union 134, I.B.E.W. Joint Pension Trust of Chicago Pension Plan No. 4* AAA Case No. 51 621 01573 04 (hearing, December 16-17, 2008 and December 1-3, 2009); *Plan Board of Sunkist Retirement Plan v, Harding & Legett, Inc*., No. CV05-8659 AG (RCx) (C.D. Cal.) (deposition and trial, February 24, 2009 and July 28-30, 2009); *Shartsis Friese LLP, Plaintiff v. JP Morgan Chase & Co., JP Morgan Compensation and Benefit Strategies as Successor in Interest of CCA Strategies LLC and Chicago Consulting Actuaries, LLC,* CV 08-1064 (SC) (N.D. Calif.) (deposition and trial, May 14 and June 12, 2009); *Traylor, et al. v. Avnet, Inc.,* No. 08-cv-00918-PHX-FJM (D. Ariz.) (deposition, July 24, 2009); *Thompson, et al. v. Ret. Plan for Employees of S.C. Johnson Sons, Inc.*, *et al.*, 2:07-cv-01047-JPS (E.D. Wis.) (deposition, August 6, 2009); *Ruppert v. Alliant Energy Cash Balance Pension Plan*, 3:08-cv-00127-bbc (W.D. Wis.) (deposition, trial and post-trial hearing, January 4-5, 2010, June 21, 2010 and May 26, 2011).  The documents, data and other information I considered in forming my opinions are identified in this report; to the extent not cited they are listed in Exhibit A.  I may modify my opinions to the extent I become of aware of additional pertinent information.

**Scope**

I have been retained by counsel for Plaintiff in this matter to offer expert actuarial analysis concerning the conversion of the Woolworth Retirement Plan from a traditional annuity plan to a cash balance plan and its impact on employees' benefits.

I have been unable to fully complete my analysis because of the problematic nature of the data I have received from the defense (via Plaintiff's counsel).  The Excel file Defendants first produced on March 20, 2012 containing 16,411 records has numerous deficiencies that Defendants have acknowledged but failed to remedy.  The result is that, due to a lack of information, certain calculations cannot be performed for certain participants, requiring exclusion of those participants from those calculations, as indicated below.[1] [2]

---

[1] I note that while for purposes of this report I have attempted to calculate benefits paid (or that will be paid) by the Plan in the same manner as the calculations were performed by the Plan, I do not necessarily agree that the Plan Administrator's calculation methodologies are consistent with the terms of the Plan and/or the law.  For example, I do not agree that the pre-retirement mortality discount applied by the Plan

Discussion

1.      **The 1996 Conversion Imposed on All, or Nearly All, Participants a Transition Period of Zero Pension Growth known as a "Wear-away period" That Was or Should Have Been Readily Foreseeable to the Plan, Plan Administrator and Plan Sponsor.**

Foot Locker (then known as Woolworth) amended its pension plan (the "Plan") effective January 1, 1996 to change the benefit formula.  Before 1996, benefits were defined as an annual benefit commencing at age 65 equal to the sum of 1% of each year's compensation plus 0.5% of each year's compensation in excess of $10,800.[3]  Effective January 1, 1996, benefits were defined by reference to the balance of a hypothetical account.  Foot Locker transitioned participants from the old formula to the new formula by "converting" the age-65 annual benefit accrued as of December 31, 1995 to an initial account balance that would be used to calculate the benefit under the new formula.

As explained below, the translation of the accrued annual benefit payable at age 65 to a cash balance account was done in a way that the benefits payable according to the new account-based formula were in almost all cases initially lower (in many cases more than 50% lower) than the benefit that had been payable under the prior formula.  This resulted in a post-conversion transition period of *zero pension growth* known as a "wear-away period."  In my opinion, this extended wear-away was or should have been readily foreseeable to any plan of this size and to any administrator and sponsor of such a plan.  To put it simply, the wear-away was in the math.  Foot Locker performed the calculations that were used to purportedly "convert" a participant's December 31, 1995 accrued benefit into an "actuarial equivalent lump sum value" (for use as the opening account balance) using conversion factors that assured the opening balance would *not* be the "actuarial equivalent lump sum value" of the participant's accrued benefit under any reasonable interpretation of that term in this context.

The "actuarial equivalent lump sum value" (or present value) of a future payment, is the amount, which when increased with an assumed rate of interest (that the present value would be expected to increase at) and survivorship to the date of the future payment, equals the amount of the future payment.  On December 31, 1995, each participant in the Plan had an accrued benefit expressed in terms of an annual benefit commencing at age 65.  The "actuarial equivalent lump

---

Administrator to calculate lump sums was appropriate, or that benefits for participants older than age 65 were calculated according to the Plan's terms.

[2] I am supplementing the May 10 version of this report with 1996-1999 compensation, pay credits, hours of service and account balance data of which I was unaware as of May 10 that Defendants provided to Plaintiff in April.  While this data resolves compensation amounts for those years, it created new issues such as regarding participants who should have had compensation amounts for those years, but for whom no compensation amounts were reported during those years.  I assume that these new data issues will be resolved when other data issues are resolved.

[3] For all years prior to 1988, the compensation is treated as equal to the average of the compensation from January 1, 1985 through January 31, 1988.

sum value" of that accrued benefit could be reasonably calculated by using one of two alternative assumptions about the lump sum: (1) that the lump sum would be immediately cashed out and invested by the participant, or (2) that the lump sum would remain in the Plan in the form of a participant's hypothetical opening account balance and be "invested" under the terms of the Plan. Under scenario one, because ERISA requires a plan to use an assumed rate of interest published by the IRS (the 417(e) applicable interest rate) that was 6.06% at the time of the conversion, to determine a lump sum present value, that same rate would be used for this purpose. Under scenario two, because the Plan specified that accounts would earn interest at a fixed annual rate of 6%, the only reasonable assumed rate of interest would be 6%. Foot Locker used neither of these rates. Instead, it used an interest rate of 9%.

Use of a 9% interest rate assured that a participant's initial account balance would represent an accrued benefit on January 1, 1996 that was always necessarily less than what the participant's accrued benefit had been the day before, on December 31, 1995. In other words, if a 35-year-old participant had an accrued benefit of $10,000 on December 31, 1995, use of the 9% interest rate means that his initial account balance would have been $6,481.56 which under the terms of the Plan and ERISA translates to an accrued benefit on January 1, 1996 of $3,512.97.[4] An account balance that represents an accrued benefit that is significantly smaller than the benefit from which it was "converted" is not the "actuarial equivalent lump sum value" of the starting benefit under any reasonable understanding, because it is not sufficient to grow back into the benefit it is supposed to be the equivalent of.

Because Foot Locker performed the cash balance conversion in the manner just described, a provision of ERISA known as the anti-cutback rule was triggered. ERISA requires that a participant's benefit entitlement, once earned, can never be reduced due to a plan amendment (except in certain narrow circumstances not present here). Consistent with this rule, the Foot Locker Plan was required to include a provision stating that the Plan would in no case pay a participant less than the benefit the participant had accrued under the Plan as of December 31, 1995 before the conversion. (I will refer to this minimum benefit as the "frozen accrued benefit" or "prior plan benefit"). This Plan provision meant that notwithstanding its 1-to-1/2 (sometimes more, sometimes less) cash balance conversion methodology Foot Locker used, the Plan was able to comply with ERISA's accrued benefit nonforfeiture requirement by retaining the pre-conversion frozen accrued benefit as a minimum benefit until a participant's cash-balance benefit became large enough (if ever) that it supplanted the benefit calculated under the old formula (as of 1/1/96, *i.e.*, the frozen accrued benefit). But the Plan's reliance on its anti-cutback provision to satisfy ERISA nonforfeiture standards meant that during an often-extended transition period following the Plan conversion, every participant's accrued benefit under the Plan was *frozen* – because a participant's accrued benefit calculated under the old (now frozen) formula did not change after December 31, 1995, regardless of whether the participant continued to work or not. This freeze lasted until the benefit derived from the new cash balance formula grew large enough that it became greater than the frozen accrued benefit and the anti-cutback provision no longer needed to be invoked to comply with ERISA.

---

[4] As discussed below, Foot Locker included a discount for mortality prior to age 65 in performing the conversion that actually made the situation even worse than reflected by this illustration.

3

The period during which the prior plan benefit was the "winning" benefit is called a "wear-away period" because the difference between the prior plan frozen accrued benefit and the new cash balance benefit was gradually worn away as long as a participant continued to work.  If the participant continued to work, the participant's account balance increased due to pay credits (consequently, increasing the associated accrued benefit) and ultimately (if the participant worked long enough) overtook the frozen accrued benefit and became the operative benefit.  Once that happened, accrued benefits would begin to grow again.

To summarize, the method Foot Locker used to convert its traditional pension plan into a cash balance plan resulted in a wear-away period.  The impact of the wear-away on participants was the same as a temporary pension freeze:  during the wear-away period, a participant's accrued benefit under the Plan was frozen at the level earned as of 12/31/95.  Following the conversion, a participant's cash balance hypothetical *account* increased with pay credits each year that the participant continued to work.  But the account growth did not represent *benefit* growth until the account grew enough that the benefit derived from the account became larger than the 12/31/95 frozen accrued benefit.  As long as the frozen accrued benefit remained greater than the account-derived benefit under the new formula – a period that for many participants lasted several years – the participant's accrued benefit remained unchanged.  In other words, the participant's benefit accrual pattern was as follows:

     A.   Entry into pension plan-to-12/31/95:    Pension grew under old formula

     B.   1/1/96-to-end of wear-away period:    Pension was **frozen** at 12/31/95 level

     C.  After wear-away period ended:     Pension grew under new formula

All of this was eminently foreseeable: as noted, it was in the math.  The next section addresses the conversion math in more detail.

It should be noted that in stark contrast to the pay credits, the growth in the hypothetical account due to interest credits does not represent any growth in the benefit at all.  For example, in order to determine which benefit was the winning benefit, the Plan projected a participant's account to age 65, at the Plan's fixed 6% interest rate, and then converted that projected account into an annuity.  This was the accrued benefit attributable to the cash balance account.  Assuming that the account only grew with a 6% interest credit, one year later the account would have grown by 6%, but the projected account at age 65 would have remained the same, because the 6% larger account balance had one year less of 6% projection to age 65.  The increase in the lump sum benefit that a participant would be entitled to is not a reflection of an increase in benefits, but merely that the participant is one year closer to age 65.

2.       **Wear-Away Mechanics**

The conversion formula was the same for all impacted participants:  there was a single conversion methodology that applied to all participants in the Plan as of 12/31/95 (and actively employed at some point after 12/31/95).  However, just as a pension plan with a single benefit formula that applies to all participants produces different benefit amounts based on each employee's years of employment, compensation history, age, form and timing of distribution, etc. (*e.g.*, lump sum now vs. annuity at age 65), the conversion formula produced different wear-away patterns based on these same factors.

Under the pre-conversion Foot Locker Plan, a participant's accrued benefit was defined in terms of an annual amount commencing at age 65 and continuing for life.  Participants who retired or terminated before age 65 generally could either wait to start drawing benefits at age 65 or commence early retirement distributions between age 55 and 65.[5]  For participants with fewer than 15 years of service, early retirement benefits were equal to the participant's age-65 benefit reduced by 6% per year (or fraction of a year, measured in months) for early commencement. For participants with 15 or more years of service, early retirement benefits were equal to the participant's age-65 benefit reduced by 4% per year for early commencement.  Because the 4% annual reduction factor was relatively low, this last benefit was the most valuable benefit available under the Plan; but even the early retirement benefit with the 6% annual reduction at some years and at some ages was more valuable than the benefit payable at age 65.

The discussion in part 1 above focused on the conversion of a participant's age-65 benefit to the initial account balance and explained that the conversion produced an initial account balance that in every case represented a post-conversion age-65 benefit[6] that was less than the participant's pre-conversion accrued benefit.  The loss of value was even more pronounced when the availability of a pre-conversion early retirement benefit is taken into account.  For ease of presentation, the discussion that follows addresses the impact of the 1996 cash balance conversion on participants' normal retirement "accrued benefits," lump sum benefits and early retirement benefits separately.

a.       **Normal Retirement Benefit Wear-Away**

I will refer to the impact of the conversion on participants' age-65 normal retirement benefits as the "primary wear-away" because it reflects wear away of the core ERISA-defined accrued benefit.  As will be seen in detail below (and referenced above), the primary wear-away was a direct consequence of the math used to establish opening cash balance accounts on January 1, 1996.

---

[5] If the ERISA-calculated present value was less than $5,000 (or before July 1, 1998, $3,500), the benefit would be immediately cashed out in a single lump sum.

[6] Throughout the report, when I refer to benefits at age 65, for participants past age 65 this should be read to mean at the later of age 65 or current age.

ERISA provides that a participant's "accrued benefit" under a pension plan means "the employee's accrued benefit determined under the plan . . . expressed in the form of an annual benefit commencing at normal retirement age."  ERISA § 3(23)(A), Internal Revenue Code ("IRC") § 411(a)(7).  This statutory definition of "accrued benefit" (what I will call the "statutory accrued benefit") requires that the "accrued benefit determined under the plan" (what I will call the "plan-defined accrued benefit") be translated into an annuity payable at normal retirement age (here, age 65) for purposes of calculating benefits.  The statute requires this translation (or rendering) of the plan-defined accrued benefit into its statutory "accrued benefit" form so that any plan, regardless of how its benefit formula may be contractually defined, can be tested to determine if it satisfies ERISA's minimum standards.[7]

In the case of a cash balance pension plan, the determination of the accrued benefit associated with the current account balance is determined by projecting the participant's hypothetical account balance to normal retirement age, at the plan's interest crediting rate, and then converting that projected account balance into an annuity, under the plan's terms for converting an account into an annuity at retirement.[8]  In other words:

| **Accrued Benefit** | = | Current Account Balance | + | Future interest credits through age 65 |

with the resulting sum converted into an annuity commencing at normal retirement age.

Under the cash balance plan design Foot Locker adopted effective January 1, 1996, participant account balances were credited with an interest credit at a fixed annual rate of 6%.  Thus, under the Plan's cash balance formula, a participant's "accrued benefit" is equal to his or her current account balance projected to age 65 at an annual rate of 6% and then converted into an annuity commencing at that age using an interest rate equal to the greater of 6% or the applicable interest rate under IRC § 417(e) and the applicable mortality table under § 417(e).  In other words:

| **Accrued Benefit** | = | Current Account . . . Balance | *projected* to age 65 at 6% |

with the resulting sum converted into an annuity commencing at normal retirement age using Plan-mandated assumptions that at the time of the conversion were an interest rate of 6.06% and the applicable mortality table under IRC § 417(e).

---

[7] Note that under Plan § 1.02, the Plan-defined accrued benefit appears to be consistent with the ERISA defined accrued benefit.  I say appears, because the document appears to have a typo, making the definition of accrued benefit not completely clear.

[8] This is the method established by Rev. Rul. 96-8, the method contained in the Plan document, and appears to be the method actually used to administer the Plan.

6

As noted above, when Foot Locker amended its pension plan to change the benefit formula from one that directly expressed benefits in terms of an annuity commencing at age 65 to a formula that expressed benefits as an amount derived from a hypothetical account balance, an integral part of the transition was the calculation of an "initial account balance" for each participant that would be used as the basis for calculating benefits under the new cash balance formula. The 1996 Summary Plan Description ("SPD") described the calculation as a "conver[sion]" of each participant's accrued benefit as of December 31, 1995 into an "actuarial equivalent lump sum value." The Foot Locker Plan performed the conversion calculation in what can be broken down into three steps:

1. *First*, the Plan calculated a lump sum value of a participant's age-65 annuity at age 65.

2. *Second*, the Plan discounted this age-65 lump sum to January 1, 1996 to reflect the time value of money.

3. *Third*, the Plan discounted this January 1, 1996 present value by a factor to reflect the possibility that a participant might not live until age 65 and begin collecting his benefit (a mortality discount).

For example, if a 35-year-old participant's accrued benefit as of December 31, 1995 was an annual benefit of $10,000 commencing at age 65, step 1 was to convert that annual benefit into an "equivalent" lump sum value at age 65 of $85,995.20. Step 2 was to discount this lump sum to its "equivalent" January 1, 1996 value of $6,481.56. Step 3 was to apply a mortality discount, to end up with a lump sum that purportedly reflected the "actuarial equivalent value" of the $10,000 accrued benefit payable at age 65 equal to $5,839.80.

Underlying each of these calculations were Plan provisions specifying the interest rate and mortality risk that would be used to make each conversion. The higher the specified interest rate, the lower the present value of a future sum because a smaller amount today (the present value) will grow at the higher interest rate to produce the target future sum. The longer someone is anticipated to live, the higher the present value of a lifetime annuity stream of a fixed annual amount. Foot Locker used the standard mortality table specified under IRS regulations for purposes of determining lump sum benefits. But the interest rate Foot Locker used to make conversion calculations was a special, much higher rate the any of the interest rates used for other calculations: 9%. Use of a 9% discount rate for purposes of the cash balance plan conversion **guaranteed** that *every* participant's initial account balance would represent an accrued benefit on January 1, 1996 that was **necessarily less** – typically much less – than what the participant's accrued benefit had been the day before, on December 31, 1995.

Why? Because under the cash balance formula Foot Locker adopted, once a participant's initial account balance was established, the account was credited with interest at a fixed rate of 6% per year. By law, this means 6% is the interest rate that must be used to calculate a participant's statutory "accrued benefit" by projecting the account balance to age 65 and converting that projected balance into an actuarially equivalent annuity commencing at that age. *See* IRS Notice 96-8. The problem was this: if a participant's initial account balance of

7

$5,839.80 calculated using the three steps outlined above was projected to age 65 and converted to a lifetime annuity commencing at that age, the corresponding normal retirement annuity was $3,165.14, *less than half* the amount of the annuity the participant had earned to date as of December 31, 1995 (*i.e.*, $10,000.00).

The main culprit for this incongruity between a participant's age-65 accrued benefit as of December 31, 1995, and his cash-balance-derived age-65 benefit the next day on January 1, 1996 – benefit amounts participants were told were actuarial equivalents of one another – was Foot Locker's decision to use 9% as the conversion discount rate.  This impacted two of the three calculations described above that were used to "convert" a participant's December 31, 1995 accrued benefit into an "actuarially equivalent" initial account balance, resulting in loss of value in each successive computation, as follows:

1. In step one, the Plan calculated what purported to be the age-65 lump sum value of a participant's age-65 annuity *using an interest rate of 9%* -- even though when a participant's projected age-65 account balance was converted back into an annuity to determine his or her accrued benefit, the rate was the greater of 6% or the typically-much-lower IRS-mandated interest rate.  (The IRS rate was 6.06% at the time of the conversion.  The IRS rate had not exceeded 9% since September 1990, and has not exceeded 6.60% since January 1996.)

2. In step two, the Plan discounted the calculated age-65 lump sum to January 1, 1996, again *using an interest rate of 9%* -- even though when a participant's account balance was projected to age 65 to identify his or her projected age-65 account balance the rate was the Plan's fixed 6% interest rate.

3. In step 3, the Plan further reduced the calculated January 1, 1996 "present value" by a mortality discount – even though if a participant lived to age 65 (or intermediate ages), his or her account was not credited with an increase for survivorship to reflect that the participant had not died.

The 3-percentage-point disconnect between the Plan's interest crediting rate (6%) and the rate used to calculate opening accounts (9%), and to a lesser extent the mortality discount that was used to reduce the account value even further, necessarily meant that a participant's opening cash balance account represented a much smaller "accrued benefit" than the December 31, 1995 benefit it purportedly replaced.  It would be difficult to believe that the actuaries for the Plan were not aware of this, or that they did not communicate this fact to Foot Locker.

As discussed in more detail below, another aspect of Foot Locker's conversion of its traditional pension plan to a cash balance plan was that for many participants the rate of accrual under the cash balance formula – even once they emerged from wear-away and began to earn pension benefits again – was less generous than under the old formula.  I raise this point here only to explain that, apparently in recognition of the particularly harsh impact this reduction could have on older, long-service employees, Foot Locker provided that participants who were at least age 50 with at least 15 years of service on December 31, 1995, would receive an

"enhancement" to their opening account balance.[9]  The formula for the enhancement was that the opening account would be multiplied by $1 / [1 - 4\%$ x (years to age 65, but not more than 10 or less than 0)].  At the optimal ages of 50-55, the enhancement was $1 / (1 - 4\%$ x $10) = 1 / 60\% = 166.67\%$ or a 66.67% increase in the account balance.  For participants older than age 55, this enhancement decreased, disappearing at age 65.  Of the 10,945 participants for whom there is sufficient data to make this determination, 1,277 received some level of enhancement, and 513 received the maximum 66.67% enhancement.  The enhancement shortened the wear-away period for older long-service employees who qualified, but it did not eliminate wear-away:  **even with the enhancement, *no participant* had an opening balance that represented an accrued benefit that was as large as the accrued benefit they had already earned on December 31, 1995**.

Viewing some numbers makes the adverse impact of the 3-percentage-point differential (9% versus 6%) on the value of participant benefits calculated under the cash balance formula quite clear.  If the IRS-specified interest rate factor is less than the Plan's 6% interest rate when a participant's benefits commence (as was the case in most years), the factor used to convert a participant's cash balance account to an age-65 annuity is determined using 6% interest, producing the following results:

|  | 30 year old | 45 year old | 55 year old without enhancement | 55 year old with enhancement | 65 year old |
|---|---|---|---|---|---|
| Frozen Accrued Benefit | $1,000 | $1,000 | $1,000 | $1,000 | $1,000 |
| Factor to create Initial Account | 0.37852 | 1.39592 | 3.39523 | 3.39523 | 8.59952 |
| Enhancement | 1.00000 | 1.00000 | 1.00000 | 1.66667 | 1.00000 |
| Initial Account | $379 | $1,396 | $3,395 | $5,659 | $8,600 |
| Years to age 65 | 35 | 20 | 10 | 10 | 0 |
| Projected Account | $2,909 | $4,477 | $6,080 | $10,134 | $8,600 |
| Factor to Convert to an annuity | 10.64635 | 10.64635 | 10.64635 | 10.64635 | 10.64635 |
| Cash Balance Benefit | $273 | $421 | $571 | $952 | $808 |

Thus, the anticipation would be that participant's benefits under the new formula, as of January 1, 1996, were significantly less than the frozen accrued benefit, requiring participants to effectively re-earn the deficit before there benefit commenced growing again.  Until such time, the benefit remained as equal to the frozen accrued benefit.

---

[9] *See, e.g.*, FL-OSB 002253-58 (memorandum to certain Plan participants explaining that "[s]ince account balances take time to build to adequate levels, a one-time formula was developed to enhance account balances for participants who were age 50 or older with at least 15 years of service as of January 1, 1996").

9

### b.      Early Retirement Benefit Wear-Away

As mentioned above, participants who retired or terminated before age 65 and elected to commence benefit distributions between age 55 and 64 received an "early retirement benefit" that typically was more valuable than the benefit otherwise payable at age 65.  This was the case because the Plan reduced benefits to reflect the early start of benefit payments by less than the reduction that would have fully-reflected the time value of money, particularly in the case of participants with 15 or more years of service.  Under ERISA, the right to receive this early retirement was part of a participant's accrued benefit (and the right to the most valuable early retirement benefit had to be preserved even for participants who completed 15 years of service after the conversion).

Conversion of a participant's right to receive a "subsidized" early retirement benefit like the ones available under the Foot Locker Plan is not as straightforward as a full-value conversion of the age-65 accrued benefit.  This is because the value of the early retirement subsidy depends on the age at which a participant commences distribution and certain other factors that are more variable in nature than those relevant to the conversion of the age 65 benefit.  Thus, as a practical matter, the only way to include the value of the accrued right to the payment of an early retirement benefit in connection with a cash balance plan conversion is to retain the formula used to calculate the early retirement benefit and use it to calculate an add-on to the accrued benefit derived from the account balance.[10]  Foot Locker did not do this.

As a result, many participants experienced a wear-away period during which the value of their pension, taking into account the right to receive the pension in the form of a subsidized early retirement benefit, that lasted longer than both their lump-sum and accrued benefit wear-away period.  In other words, even after a participant's lump sum under the cash balance formula exceeded the lump sum value of the frozen accrued benefit, and the accrued benefit as an annuity at age 65 under the cash balance formula exceeded the frozen accrued benefit, the frozen accrued benefit payable as an early retirement annuity (*e.g.*, an annuity at age 55) could easily exceed the annuity payable at the same age attributable to the cash balance benefit.  This issue is discussed below in more detail.

### 3.      Three Different Kinds of Wear-Away Based on Benefit Form Elected

As noted above, the fundamental wear-away mechanics were the same for every participant who had a pension benefit on December 31, 1995 that was converted to the new cash balance formula.  Of course, because participants had different benefit amounts, salaries, years of service and other characteristics that govern the amount of an employee's pension under the Plan, the wear-away mechanics impacted participants for different periods of time.  In addition to the impact of a participant's "demographic" characteristics, the length of the wear-away period for a particular participant also depended on the form in which the employee ultimately decided

---

[10] When the law was amended in 2006 with regard to cash balance plans to outlaw wear-away in cash balance conversions, this is the approach that was taken in IRC § 411(b)(5)(B)(iv), *i.e.*, that if a participant elects to receive a benefit after the conversion that would have been eligible for an early retirement subsidy, then the benefit must be increased to reflect the value of the early retirement subsidy payable with respect to the accrued benefit as of the conversion date.

to take his pension benefit.  There were three major benefit forms relevant to the length of the wear-away period:

**A.      Normal Retirement Annuity**

ERISA defines a pension plan participant's "accrued benefit" in terms of a life annuity commencing at normal retirement age (here, age 65).  Most measurements under the law are based upon the accrued benefit, defined in terms of an annuity payable at age 65, and in some respects, it is most appropriate and easiest to interpret the impact of wear-away in those terms rather than in terms of lump sums.  The following charts compare the annuity benefit payable at age 65 derived from participants' initial account balances as of January 1996, to a frozen accrued benefit of $1,000 per annum for participants of different ages on the conversion date.

The first chart shows the comparison for participants who did not receive an initial account balance enhancement:



As this chart shows, without the enhancement, the benefit payable as an annuity at age 65 under the new formula was between 20% and 80% of the frozen accrued benefit.

Here is the same chart for participants who did receive the initial account balance enhancement (note, participants were required to be a minimum of age 50, with 15 years of service to receive the enhancement, so no ages under 50 are shown):

11



As can be seen, even with the enhancement the benefit under the new formula, at best, only reaches about 95% of the frozen accrued benefit.  This is significant: Measured on the basis of ERISA's yardstick, the statutory "accrued benefit" payable at normal retirement age, the **initial account balance of *each and every participant* represented a benefit that was less than the benefit the participant had already accrued as of December 31, 1995**.

The next set of charts show the length of the accrued benefit wear-away periods for participants of different age, service and compensation levels.

The accrued benefit wear-away period for participants who did not receive an initial account balance enhancement was as follows (note that participants with 20 years of service on 1/1/96, who are at least age 50 on 1/1/96 received the enhancement, and so are not shown):

12



As can be seen it this chart, as would be expected, the wear-away period is longer, the longer the period of service, and increases with age, until in the 50's where it begins to decline. The reason that it would be anticipate that a longer service participant would have a longer wear-away period is that if the benefit is twice as large, then, the decrease caused by the initial account balance would be twice as large (at the same age), and therefore, it would take longer to re-earn the shortfall between the cash balance benefit and the frozen accrued benefit, despite the fact that the accrual rates under the new formula are higher for longer service employees than shorter service employees.

The reason that the wear-away period increases with age is that, while the percentage reduction is larger at smaller ages, the new accruals occur at a faster rate. For example, consider two participants with 11 years of service, earning $10,000 a year on 1/1/96, and with a frozen accrued benefit of $1,000. One is age 30 and one is age 45. For the 30 year old, as shown above, the cash balance benefit would be $273 (creating a shortfall of $727), and for the 45 year old the cash balance benefit would be $421 (creating a shortfall of $579). Under the cash balance plan, the 1996 pay credit would be 2.00% of pay, or $200 for each of them. For the 30 year old, this would grow with interest at 6% for 34 years to age 65 (interest is not provided in 1996 for the 1996 pay credit), to $1,450.21. Dividing this by the conversion factor of 10.64635 produces an accrual at age 65 of $136, which represents 19% of the shortfall. In contrast the $200 pay credit for the 45 year old only grows to an account of $605.12, which is an accrual of $57 at age 65, and represents only 9.8% of the shortfall. Thus, while the 30 year old has a bigger hole to dig out of, the 30 year old digs out of the hole at a much faster pace, causing the wear away period to be much shorter.

The reason that the wear-away period declines at older ages, is that while the cash balance accrued benefit increases due to payment after age 65 (because the conversion factor decreases at older ages), the Plan did not, in practice, increase the frozen accrued benefit for

13

payment after age 65.  While the age 65 conversion factor at 6% interest is 10.64635, the age 66 factor is 10.37535.  This causes the entire cash balance benefit to increase by 10.64635 X 1.06 (because of one year's interest credit) / 10.37535, or about 8.8% due to payment at age 66.  So, for example, consider a 65 year old participant who has a frozen accrued benefit of $10,000, and a cash balance benefit of $9,000.  During the next year, not only does the cash balance accrued benefit increase due to the pay credit, it would also increase by about $880 simply due to payment one year after age 65, thus, if a participant continues to work past age 65, the wear-away period decreases at an accelerated rate.

Here is the same chart, for participants with 10 years of service on 1/1/96, but comparing different compensations and different ages:



What can be seen on this chart is that there is a difference in the wear-away period due to different levels of compensation, but they are barely discernable.  This would be a quite predictable result.  In the prior plan formula, the formula was 1% of pay, plus 0.5% of pay in excess of $10,800.  The $10,800 is referred to as the integration level.  Under the cash balance formula, the pay credit is a particular percentage of pay (based upon service) plus one half of that percentage for compensation above $22,000.  Absent the integration level, two participants who are identical in all respects, except for compensation would have all benefit amounts at the same percentage of pay.  Thus, while a participant earning twice as much would have double the frozen accrued benefit, and double the shortfall, but would also have double the pay credits, so the portion of the shortfall worn away each year (the cash balance accrual divided by the shortfall) would be independent of the compensation level.  For participants with high compensation, the impact of the integration level is small, as a percentage of the total benefit, so the percentages would be very similar to participants with compensation consistently below the integration level.  For participant earning $20,000 they would receive a small boost under the prior formula, which they would not receive under the new formula.  More particularly, under

14

the old formula, the accrual would be 1% of compensation (or $200) plus 0.5% of compensation in excess of $10,800 (or $46).  Thus, their accrual would be boosted by 23% under the old formula, due to the 0.5% in excess over $10,800, while under the new formula, they would have no compensation in excess of $22,000, and thus, no similar boost.  This overstates the difference, in that if the 1996 compensation was $20,000, then it would be anticipated that the 1995 compensation was somewhat less, and so on, with the effective average compensation prior to 1/1/96 being about $15,400.  This reduces the impact of the integration from 23% to about 15%.  On the other side, while there would be no compensation in excess of $22,000 in 1996, the anticipation would be that there shortly would be, and that the participant would start receiving a boost from the compensation in excess of $22,000.  The end result is that the difference in the wear-away period, between a participant with 10 years of service, earning $10,000 and a participant with 10 years of service, earning $20,000 is between 10% and 15%.  Thus, for example, at age 30, the wear-away period would increase from 4.4 years to 5.0 years.

Here is the same chart for participants who did receive an initial account balance enhancement:



As can be seen, even with the enhancements *all* **participants** suffered a wear-away period in the amount of the formal ERISA "accrued benefit" payable at age 65.  The wear-away period decreases after age 50, because the shortfall is dominated by the discount period of the initial account balance, thus there is a smaller initial account balance, leading to a larger shortfall, at younger ages.  After age 55, as the amount of the enhancement declines, the wear-away period increases, approaching the wear-away period of participants without the enhancement.  Once the wear-away period extends beyond age 65, the wear-away period again begins to declines for the reasons described above.

15

**B.       Lump Sums**

Another way to measure wear-away is based on a comparison of the lump sum benefit a participant would be entitled to receive based on his or her frozen accrued benefit and the lump sum benefit to which the participant is entitled based on his or her hypothetical account balance. ERISA provides special rules governing the calculation of lump sums. A lump sum cannot be less than the present value of a participant's age-65 benefit using the interest rate and mortality assumptions required by IRC § 417(e) (which are published by the IRS). This makes it more difficult to estimate expected lump sum wear-away because the § 417(e) rate fluctuates from year to year. The § 417(e) rate fluctuates from one year to the next occurs because the lump sum is based upon the spot rate of the underlying basis (a one month average of the 30 year treasury rate, for years prior to 2008, and a blend of the one month average of the 30 year treasury rate and high quality corporate bond rates after 2007). The fluctuation in § 417(e) rates means that the lump sum value in a future year of even a frozen accrued benefit can be difficult to predict. For example, if the prescribed interest rates drop for one year to the next, the ERISA lump sum value of a participant's accrued benefit will be larger even if the accrued benefit remains unchanged (e.g., because it is frozen and/or the participant is no longer working). A drop in the prescribed interest rate from 6.00% to 5.50% can cause a 23% increase in the lump sum due a 30 year old. This increase in the lump sum does not reflect an increase in the participant's "pension benefit" – rather, it reflects a different spot present value based on the prescribed rate. The lump sum value of a frozen benefit will also increase each year because the participant is one year closer to age 65. Again, this does not reflect an increase in the participant's "pension benefit," but merely the fact that there is one less year of discounting necessary to reflect the present value of a stream of annuity payments scheduled to commence at age 65.

Most participants who have received benefits since the cash balance conversion in 1996 have elected to receive those benefits in the form of a lump sum. In fact, of the 13,474 participants who, according to the data supplied by Defendants, elected to receive benefits since January 1, 1996, 13,058, or **97%**, have elected a lump sum as their benefit form.

As explained above, most participants had an initial account balance, as of January 1, 1996, which was less than the ERISA lump sum value of their frozen accrued benefit calculated under the old formula. In fact, of the 15,499 participants for whom there is sufficient information to make this determination, as of January 1, 1996 only 223 or 1.4% of the participants had a higher initial account balance than the ERISA lump sum value of the frozen accrued benefit. For the remaining **98.6% of participants,** the ERISA lump sum value of the frozen accrued benefit, as of January 1, 1996, exceeded the initial account balance by some amount. The 223 participants whose initial balances were larger than their frozen accrued benefit received the enhanced initial account balance (discussed above), and were age 53, 54 or 55 on January 1, 1996.

Only the participant's age on 1/1/96 and eligibility for the enhancement impact the magnitude of the difference between the initial account balance and the 1/1/96 ERISA lump sum value of the frozen accrued benefit. A comparison, as of the conversion date (*i.e.,* January 1, 1996), of the initial account balance for a participant with an accrued benefit of $1,000 a year,

16

compared to the ERISA lump sum value of the frozen accrued benefit would look like this, for participants at various ages who were not eligible for the initial account balance enhancement:



As can be seen, the initial account balance is significantly less (as shown in more detail below) than the ERISA lump sum value of the frozen accrued benefit. This only makes sense when it is considered (as described above) that the initial account balance (without the enhancement) is the present value of the accrued benefit determined at 9% interest, while the ERISA lump sum is the same present value, but determined at the 1996 applicable interest rate of 6.06%.

For participants who were eligible for the initial account balance enhancement (*i.e.*, because they were between ages 50 and 64 and had at least 15 years of service as of December 31, 1995), the same chart looks like this:



As can be seen, with the enhancement the initial account balance approaches the value of the ERISA lump sum value of the prior accrued benefit at ages between 53 and 56, but the amount of the enhancement phases out between age 55 and 65.  Since the enhancement between ages 50 and 55 is a full 66.67% increase in the initial account balance, this significantly boosts the initial account balance when compared to the ERISA lump sum value of the frozen accrued benefit.  For some participants aged 53 to 55 (depending on the fractional age), the initial account balance actually slightly exceeded the ERISA lump sum value of the frozen accrued benefit.  The value of this enhancement begins to decrease after age 55, completely disappearing by age 65.

Another way to reflect the relationship between the initial account balance and the ERISA lump sum value of the frozen accrued benefit is to show the initial account balance as a percentage of the ERISA lump sum value of the frozen accrued benefit:



As this chart shows, at younger ages, the initial account balance is less than 25% of the ERISA lump sum value of the frozen accrued benefit, effectively wiping out 75% of a participant's previously earned benefit.  For participants who were older at the time of conversion, the percentage increases.  But even for a participant who was age 65 at the time of the conversion, for those participants not receiving the enhancement the best case scenario is that 20% of their previously earned benefit was effectively lost in translation, so that the participant was required to re-earn benefits before their benefit started to increase.  The following chart summarizes the same information in a different form:

| Age on 12/31/95 | Opening Balance without enhancement as Percentage of ERISA Lump Sum Value |
|---|---|
| 20 | 21% |
| 25 | 24% |
| 30 | 28% |
| 35 | 32% |
| 40 | 37% |
| 45 | 43% |
| 50 | 49% |
| 55 | 58% |
| 60 | 68% |
| 65 | 81% |

For participants who received the enhancement – 11% of the participants who were directly impacted by the conversion – the wear-away story was not as bad, but most participants

still had opening balances that were lower than the ERISA lump sum value of the frozen accrued benefit:



As explained above, for some participants aged 53 to 55 the initial account balance actually exceeded the ERISA lump sum value of their frozen accrued benefit.  But most participants who received the enhancement still had opening balances that were less than the ERISA lump sum value of their frozen accrued benefit.

Assuming that a participant consistently received a 5% salary increase per year (both before and after the plan amendment), and assuming that the 417(e) rates had remained constant at the 1996 level of 6.06%, the wear-away periods for participants of different age, service and compensation levels (for participants who did not receive an opening balance enhancement) would have been as illustrated in these charts:



What this charts shows is that for short service employees (e.g., those with only three years of service credits) the wear-away period is shorter than those with longer service as of the conversion date. This is only reasonable when it is considered that they have almost no prior accrued benefit. For participants who had between 4-10 years of service as of the conversion date, the wear-away period is significantly longer. For employees with more than about 10 years of service on the conversion date, the wear-away period does not change significantly (relative to someone with 10 years), because while the prior accrued benefit is larger, so is the pay credit rate under the new cash balance formula.

The same chart for a participant eligible for the enhancement looks like this:



As would be expected, participants eligible for the enhancement (*i.e.*, over age 50 with at least 15 years of service) have much shorter wear-away periods, with a handful of those near age 55 having no wear-away period on a lump sum basis, at all.  Of the 1,903 participants who were paid a lump sum during 1996 (and for whom there was sufficient data to make this determination), **only 59 or 3% received a lump sum in excess of the ERISA lump sum value of their frozen accrued benefit**.  Of those 59, 6 were age 23 or less, and had less than 2 years of credited service (*i.e.,* would be expected to have a wear-away period of less than one year), and the remaining 53 are between age 51 and 56 on January 1, 1996 and received the enhanced initial account balance (and again, would be expected to have a wear-away period of less than one year).

### C.      Early Retirement Annuity

Prior to the amendment, for participants who elected to receive the benefit in the form of an annuity, commencing between age 55 and age 65, the Plan provided an early retirement benefit, with a value generally higher than the actuarial equivalent of the age 65 benefit.  For those participants with at least 15 years of service, the age 65 benefit was reduced by 4% per year for each year payment commenced prior to age 65 (determined based upon years and months).  For participants with less than 15 years of service, the benefit was reduced by 6% per year for each year payment commenced prior to age 65.  Because these rates are generally lower than the rates that would typically be used to reflect the time value of money, these discount rates resulted in more valuable benefits for participants who satisfied the Plan's early retirement conditions (particularly for participants with at least 15 years of service).

The easiest way to understand the value of the subsidy inherent in the low early retirement reduction rates is to compare what the benefit would be under these reductions to what the actuarially reduced benefit would be using various interest rates reflecting the time

22

value of money (*i.e.*, a participant's assumed rate of investment return after receiving a cash benefit payment).  Such a comparison would look like this for participants with 15 of more years of service:



What this chart illustrates is that the early retirement reduction, for a participant with at least 15 years of service and who receives their benefit at age 55, is equivalent to a reduction based upon about 1% interest.  Thus, to the extent that prevailing interests rates are higher (*i.e.*, the rate at which the participant could invest the proceeds of early benefit payments exceeds 1%), the early retirement is more valuable than the benefit the participant would receive were he to wait and commence distributions at age 65.  The higher the prevailing interest rate, the more valuable the early retirement benefit compared to the age 65 normal retirement benefit.   For example, if the prevailing interest rate was around 7%, the early retirement benefit at age 55 would be worth 50% more than the actuarial equivalent of the benefit payable at age 65.

Here is a similar chart for participants with fewer than 15 years of service:



As can be seen, for a participant with less than 15 years of service, the benefit at age 55 is equivalent to the age-65 benefit discounted at about a 7% interest rate, but at age 60 the equivalent rate is about 3.75% -- *i.e.*, to the extent that the interest rate that a participant could earn on his benefit payments exceeds 3.75%, the early retirement benefit at age 60 is more valuable than the deferred benefit payable at age 65.

Even if a participant terminates prior to age 55, so long as they have at least 15 years of service when they terminate, the Plan allows them to receive the subsidized early retirement benefit when they do eventually reach age 55.  As discussed above, a participant who is age 30 on 1/1/96, with a frozen accrued benefit of $1,000 would have an initial account balance of $379. The benefit payable at age 55 can be calculated by projecting the $379 account balance at age 30, at 6% interest for 25 years to age 55 (which produces an account of $1,624.56, and then converting that account into an annuity (which produces an annuity at age 55 of $126.00).  In contrast, the frozen accrued benefit would be reduced by either 4% per year or 6% per year for payment prior to age 65 (depending upon whether the participant eventually has 15 years of service, not upon whether the participant has 15 years of service on 1/1/96), in other words, depending upon the participants potential future work history, the frozen accrued benefit at age 55 would either be 40% of $1,000 (or $400) or 60% of $1,000 (or $600).  Comparing the benefit attributable to the initial account balance, payable at the later of the current age on 1/1/96 or age 55, to the frozen accrued benefit payable at the same age (based upon a frozen accrued benefit of $1,000) would look like this, for participants not entitled to the enhanced initial account balance:

24



As can be seen from this chart, for the benefits payable at ages 55 or later, the frozen accrued benefit payable as an annuity is significantly larger than the benefit produced by the initial account balance payable as an annuity at the same age, whether the participant is entitled to the 6% reduction, or the more valuable 4% reduction.[11]

For participant who were entitled to the enhancement (who, by definition, have the 15 years of service to qualify for the more valuable 4% reduction), the chart would look like this:



---

[11] It is important to remember that if a participant is eligible for the enhanced initial account balance, then they have at least 15 years of service, and will be eligible for the more valuable early retirement benefit (although, they may have to wait to receive the benefit at age 55), but even if the participant is not eligible for the enhanced account balance, the participant may become eligible for the more valuable early retirement benefit because either: 1) while the participant has at least 15 years of service as of January 1, 1996, they are under age 50, and so do not get the enhanced initial account balance; or 2) that the participant will compete 15 years of service after January 1, 1996).

As this chart shows, even with the enhanced initial account balance, the 4% early retirement reduction is still more valuable than initial account balance increased by the enhancement.

The benefit shown above, provided by the initial account balance, without the enhancement, as a percentage of the early retirement benefit provided by the frozen accrued benefit is as follows:



This same chart for participants who receive the enhanced initial account balance would look like this:



What these charts show is that even with the best enhanced initial account balance, **the benefit provided by the initial account balance is always less than 80% of the benefit provided by the frozen accrued benefit.** For example, a participant age 55 with 15 years of service and a frozen accrued benefit would only be entitled to an immediate annuity of $438.88

as of January 1, 1996, based upon the enhanced initial account balance, compared to $600.00 due to the Frozen Accrued Benefit.

Assuming that a participant never competes 15 years of service (*i.e.,* the early retirement reduction on the frozen accrued benefit is determined at the 6% reduction per year prior to age 65), the wear-away periods for the benefit payable at early retirement of the latter of age 55, or the age on 1/1/96 can be determined.  For participants of various ages, who earned $10,000 in 1996, and who had various periods of service as of 1/1/96, the wear-away periods would look like the following (note, that if a participant never completes 15 years of service, then the participant could not have been eligible for an enhanced initial account balance):



What this chart shows, is that even at the lower level of early retirement benefit under the prior plan (*i.e.,* participants with fewer than 15 years at the time of separation), there was a substantial additional period that a participant had to work before benefits payable at age 55 (or the current age, if older) started to increase above the early retirement benefit from the frozen accrued benefit.

A complicating factor is that for many of these participants, by the time the participant had enough service to start earning an increase in his or her early retirement benefit under the new cash balance formula (over the frozen accrued benefit paid at early retirement), the participant would have become eligible for the more valuable early retirement subsidy (*i.e.,* completed 15 years of service, causing the early retirement reduction of the frozen accrued benefit to change from 6% to 4%).  For example, a 40 year old participant with 10 years of service would not have been out of the wear-away period associated with the 6% early retirement reduction for 6 years, but by that point the participant would have more than 15 years of service and be eligible for the more valuable 4% early retirement reduction.  Additionally, while a 40 year old participant with 7 years of service would be out of the wear-away period associated with the 6% early retirement reduction in about 6 years, 3 years after that they would be eligible for the more valuable 4% early retirement reduction, and again the value of the early retirement

benefit attributable to the frozen accrued benefit would exceed the benefit under the cash balance formula.  The wear-away periods for participants who would eventually become eligible for the more valuable early retirement benefit (but who were not eligible for the enhanced initial account balance) look like this:



What this chart shows is that as would be expected, if the early retirement benefit attributable to the frozen accrued benefit is larger, than the wear-away period is longer.  While a participant with 5 years of service would be out of their wear-away period before they completed the 15 years of service to be eligible for the more valuable early retirement subsidy, they would still be impacted by the longer wear-away period, in that it would mean that all of the cash balance pay credits during the longer wear-away period only served to get them even with the frozen accrued benefit, rather than towards actually accruing higher benefits.

For those participants eligible for the enhanced initial account balance (and, by definition, who also competed the 15 years of service necessary for the more valuable early retirement subsidy), the chart would look like this:

28



This chart also shows that even participants who received a significant enhanced initial account balance (*i.e.*, those in the chart with 20 years of service and between age 50 and age 60), the wear-away period was still in excess of 5 years.

## 4.     Wear-Away Statistics

### A.     Expected Length of Wear-Away Period as of January 1, 1996, Assuming Continued Service Through End of Wear-Away Period:

The expected length of the wear-away period for each participant could have been determined as of January 1, 1996, based upon the anticipated 1996 and later compensation. Based upon the actual 1996 compensation, and an assumed 5% salary increase per year after 1996, the estimated point at which the value of cash balance account would exceed the minimum lump sum value of the frozen accrued benefit, based upon the 417(e) rates in effect in 1996 was made.[12]   There are 15,495 participants with sufficient data to make this calculation.

### (i)     Expected Annuity Wear-Away

The Plan Valuations indicate that for purposes of IRS and U.S. Department of Labor reporting and disclosure requirements, Foot Locker assumed in 1996 that participants whose

---

[12] Normally, an analysis of this type done at the time would be based upon either the 1994 or 1995 compensations projected forward to estimate the 1996 compensation, but the 1994 and 1995 compensations are not available.  Thus, it seems more appropriate to me to use the actual 1996 compensation, rather than an estimate of that compensation.  This does create some distortion for participants who actually terminated during 1996, and thus only have a partial year's compensation in 1996.  I accounted for this distortion by annualizing the compensation (*i.e.,* if the participant terminated in 1996, I divided the compensation by the portion of the year employed), and in my opinion, any remaining distortion does not impact the point being made.  Part of this distortion caused a number of participants to show wear-away periods in excess of 10 years, which I excluded from the results.

benefit came due after 1996 would elect to receive their pension benefits in the form of lifetime annuities.  Thus, had the Plan administrator attempted to project the period during which participants impacted by the cash balance conversion were likely to experience a wear-away induced pension freeze, the administrator presumably would have, at a minimum, made determinations using this same assumption.

If the benefit payable as an annuity at age 65 was used as the proper way to project the expected wear-away period (assuming continued employment), a chart of the different wear-away periods for participants impacted by the cash balance conversion would have looked like this:[13]



The breakdown by percentile of participants that would have been expected to have an accrued benefit wear-away period of a particular period is as follows:

| Percentile | Number of participants | Shortest wear-away period of that percentile |
|---|---|---|
| 10th | 1,459 | 94 months |
| 20th | 2,917 | 76 months |
| 30th | 4,376 | 62 months |
| 40th | 5,835 | 52 months |
| 50th | 7,294 | 43 months |
| 60th | 8,752 | 36 months |
| 70th | 10,211 | 27 months |
| 80th | 11,670 | 19 months |
| 90th | 13,128 | 11 months |
| 100th | 14,587 | 0 months |

As can be seen, if the Plan administrator had assumed all participants were likely to elect annuities at age 65, the expectation on January 1, 1996 would have been that10% of participants would (assuming they remained employed) experienced an accrued benefit wear-away period of

---

[13] The spiking in the chart has to do with certain estimations techniques that I used, which caused some participants to show the wear-away period ending on integer years, rather than during the year.

at least 94 months – *i.e.*, 7.8 years.  The expectation would have been that half of participants would experience an accrued benefit wear-away period of at least 43 months – *i.e.*, 3.6 years. Using my assumptions, the Plan administrator would have expected that a full 90% of participants would experience an accrued benefit wear-away period of at least 11 months – *i.e.*, 0.9 years.

The average expected accrued benefit wear-away period as of January 1, 1996 (assuming continued employment) would have been 3.98 years.

The projections above actually understate what the Plan administrator would have estimated based on the assumption that all participants would have elected annuities, because the projections ignore the early retirement subsidies that would have been paid on annuities payable between ages 55 and 65.  Taking the early retirement subsidies into account, the expected wear-away periods would have been as follows:[14]



The breakdown by percentile of participants that would have been expected to have an early retirement benefit wear-away period of a particular period is as follows:

| Percentile | Number of participants | Shortest wear-away period of that percentile |
|---|---|---|
| 10th | 1,234 | 107 months |
| 20th | 2,468 | 92 months |
| 30th | 3,701 | 79 months |
| 40th | 4,935 | 68 months |
| 50th | 6,169 | 58 months |
| 60th | 7,403 | 49 months |
| 70th | 8,637 | 39 months |
| 80th | 9,870 | 26 months |
| 90th | 11,104 | 15 months |

---

[14] This analysis excludes participants who were not impacted by early retirement wear-away, for example, because they were over age 65 on January 1, 1996.

| 100th | 12,338 | 0 months |
|-------|--------|----------|

As can be seen, if the Plan administrator had assumed participants would potentially elect annuities at an early retirement age, the expectation on January 1, 1996 would have been that 10% of participants would (assuming they remained employed) experienced an early retirement benefit wear-away period of at least 107 months – *i.e.*, 8.9 years.  The expectation would have been that half of participants would experience an early retirement benefit wear-away period of at least 58 months – *i.e.*, 4.8 years.  Using my assumptions, the Plan administrator would have expected that a full 90% of participants would experience an early retirement benefit wear-away period of at least 15 months – *i.e.*, 1.3 years.

The average expected early retirement benefit wear-away period as of January 1, 1996 (assuming continued employment) would have been 4.95 years.

### (ii)    Expected Lump-Sum Wear-Away

If the Plan administrator had analyzed the wear-away period for participants who would elect (at some future point) to take their benefits in the form of lump sums, the administrator's projections would have looked something like the following:[15]



The breakdown by percentile of participants who would have been expected to have a lump-sum wear-away period of a particular period is as follows:

---

[15] There are 1,168 participants whose wear-away period ends after they turn age 65.  For simplicity I have reflected the decrease in the minimum lump sum value of the prior accrued benefit that occurs due to increasing age after age 65 at the end of the year, rather than during the plan year, which causes these participants to show up in integer years, rather than fractional years, but because they represent only about 7% of the total population, and are only reflected generally off by a fraction of a year, and I believe that it is sufficiently accurate for these purposes.

| Percentile | Number of participants | Shortest wear-away period of that percentile |
|---|---|---|
| 10th | 1,479 | 86 months |
| 20th | 2,958 | 69 months |
| 30th | 4,437 | 56 months |
| 40th | 5,916 | 46 months |
| 50th | 7,396 | 36 months |
| 60th | 8,875 | 29 months |
| 70th | 10,354 | 22 months |
| 80th | 11,833 | 14 months |
| 90th | 13,312 | 8 months |
| 100th | 14,791 | 0 months |

As can be seen, if the Plan administrator had analyzed participants who might elect lump sums, the expectation on January 1, 1996 would have been that 10% of participants would (assuming they remained employed) experienced a lump sum wear-away period of at least 86 months – *i.e.*, 7.2 years. The expectation would have been that half of participants would experience a lump sum wear-away period of at least 36 months – *i.e.*, 3 years. Using my assumptions, the Plan administrator would have expected that a full 90% of participants would experience a lump wear-away period of at least 8 months – *i.e.*, 0.7 years.

The average expected lump sum wear-away period as of January 1, 1996 would have been 3.51 years.

## B.     Using Actual Interest Rates and Dates of Employment Termination

On January 1, 1996, when the amendment first applied, based upon the 6.06% § 417(e) applicable interest rate, of the 15,495 participants for whom there is sufficient information to make the determination, all but 223 (*i.e.*, 98.56%) had a higher minimum lump sum value of the frozen accrued benefit than the initial account balance.

As time progressed, three things changed. First, additional benefits were accrued under the new formula; second, the applicable interest rate (and, in some years, the applicable mortality) under § 417(e) changed; and third, some participants terminated employment (and many of those participants elected to receive benefits).

The additional accruals under the cash balance formula did not eliminate the effect of the wear-away, but rather, masked its impact. For example, a participant who terminated the day after the wear-away period was up did receive some credit under the Plan for service after the amendment date, but only credit for the period after the wear-away period was up. Thus, as will be seen below, ultimately while the additional accruals ended the wear-away period, they did not by any means cure the Plan's failure to provide credits during the wear-away period.

## (i)     Participants Who Received Lump Sums

As described below, of the 16,411 participants for whom data was provided, 15,476 have a date of termination. Of those, 13,011 took lump sums. Of the 13,011, 12,912 have sufficient

data to calculate (either directly or through estimates) whether the participant was paid (or should have been paid) the ERISA lump sum value of the frozen accrued benefit (*i.e.*, was still in wear-away when paid).  Of those 12,912, 8,319 (or 64%) were (or would be estimated to have been) paid the prior frozen accrued benefit (*i.e.*, they had accrued no benefit between 1/1/96 and their date of termination).  Of those who were not in the wear-away period, the excess of the cash balance benefit paid, over the ERISA minimum lump sum only represented a portion of the pay credits (with interest)[16] that the participant had received.  The breakdown by year looks like this:

| Year | Number with no increase in benefit since 1/1/96 | Number with some increase | Total pay credits (with interest) with no increase in benefit | Total pay credits (with interest) not paid for those with some increase in benefits | Total Pay Credits not paid |
|---|---|---|---|---|---|
| 1996 | 2,812 | 124 | $4,331,142 | $1,518,812 | $5,849,954 |
| 1997 | 3,979 | 1,087 | $4,994,858 | $7,609,038 | $12,603,895 |
| 1998 | 680 | 540 | $2,671,335 | $2,108,874 | $4,780,209 |
| 1999 | 391 | 536 | $1,830,413 | $1,530,940 | $3,361,354 |
| 2000 | 166 | 809 | $630,620 | $2,392,889 | $3,023,509 |
| 2001 | 137 | 462 | $913,277 | $1,387,268 | $2,300,545 |
| 2002 | 30 | 149 | $291,796 | $1,161,759 | $1,453,555 |
| 2003 | 22 | 161 | $278,223 | $1,068,433 | $1,346,656 |
| 2004 | 13 | 103 | $151,362 | $678,753 | $830,115 |
| 2005 | 17 | 124 | $201,092 | $1,305,830 | $1,506,922 |
| 2006 | 7 | 97 | $43,538 | $820,389 | $863,927 |
| 2007 | 14 | 89 | $467,994 | $661,067 | $1,129,062 |
| 2008 | 4 | 44 | $14,819 | $967,527 | $982,347 |
| 2009 | 0 | 40 | $121,057 | $724,198 | $845,255 |
| 2010 | 3 | 76 | $4,761 | $1,491,691 | $1,496,452 |
| 2011 | 44 | 143 | $332,656 | $2,516,243 | $2,848,898 |
| Total | 8,287 | 4,625 | $17,568,164 | $28,216,045 | $45,784,209 |

It should be noted that in doing these calculations I determined the lump sum benefit associated with the cash balance account.  That lump sum benefit can exceed the actual cash balance account, when the 417(e) applicable interest rate is less than 6%.  In those instances, the lump benefit due, attributable to the cash balance benefit, is determined as not less than the ERISA minimum of the cash balance accrued benefit (*i.e.,* annuity payable at later of current age or age 65).  The cash balance accrued benefit is determined by projecting the cash balance account to age 65, using the Plan's interest crediting rate of 6% and then converting that projected benefit into an annuity using 6% interest and the applicable 417(e) mortality table for the year.  The ERISA minimum is determined in the same manner as the ERISA minimum on the frozen accrued benefit.  When I checked the lump sum paid against the lump sum determined

---

[16] As explained below, the enhancement to the initial account balance is treated as part of the increase in the account balance, and is therefore treated like a pay credit for this purpose.

in this manner (for participants who were out side of wear-away, and paid in years when the 417(e) applicable interest was in excess of 6%) I matched for most participants, and participants who did not match appeared to have data that was internally inconsistent (for example, the lump sum paid was less than the cash balance account).

### (ii)    Participants Who Received Annuities

Similar to participants who took lump sums, participants who took annuities, received no increase in the annuity that they received over the frozen accrued benefit, or received an increase smaller than what the increase would have been had they received full credit for the pay credits accrued since 1/1/96. As described below, of the 16,411 participants for whom data was provided, 15,476 have a date of termination. Of those, 445 took some form of annuity. Of the 445, 441 have sufficient data to calculate (either directly or through estimates) whether the participant was paid (or should have been paid) no more than the frozen accrued benefit (*i.e.*, was still in wear-away when paid). Of those 441, 385 (or 87%) were (or would be estimated to have been) paid the prior frozen accrued benefit (*i.e.,* they had accrued no benefit between 1/1/96 and their date of termination) (note that this includes participants whose benefits commenced after age 65). Of those who were not in the wear-away period, the excess of the cash balance benefit, over the frozen accrued benefit (with any appropriate early retirement reduction) only represents a portion of the increase in benefit attributable to the pay credits that the participant had received. The breakdown by year looks like this:

| Year | Number with no increase in benefit since 1/1/96 | Number with some increase | Total monthly benefits as a straight life annuity attributable to pay credits that was not paid for those with no increase in benefit | Total monthly benefits as a straight life annuity attributable to pay credits that was not paid for those with some increase in benefit | Total monthly benefits not paid |
|---|---|---|---|---|---|
| 1996 | 158 | 0 | $10,997 | $0 | $10,997 |
| 1997 | 142 | 9 | $12,905 | $184 | $13,088 |
| 1998 | 36 | 1 | $4,396 | $0 | $4,396 |
| 1999 | 13 | 0 | $2,158 | $0 | $2,158 |
| 2000 | 4 | 0 | $478 | $0 | $478 |
| 2001 | 4 | 0 | $527 | $0 | $527 |
| 2002 | 7 | 1 | $1,205 | $1,137 | $2,342 |
| 2003 | 4 | 5 | $307 | $1,779 | $2,086 |
| 2004 | 6 | 1 | $264 | $267 | $531 |
| 2005 | 5 | 4 | $1,229 | $763 | $1,992 |
| 2006 | 2 | 2 | $135 | $745 | $880 |
| 2007 | 0 | 2 | $0 | $843 | $843 |
| 2008 | 0 | 3 | $0 | $2,113 | $2,113 |
| 2009 | 1 | 6 | $4 | $3,337 | $3,341 |
| 2010 | 1 | 15 | $9 | $2,734 | $2,743 |
| 2011 | 2 | 7 | $19 | $4,698 | $4,718 |
| Total | 384 | 57 | $34,734 | $19,806 | $54,450 |

35

It should be noted that the above analysis was based upon the benefit measured as a straight life annuity.  It should also be noted that the value of $1 per month ranges from about $185 for a 55 year old, based upon 4.5% interest and the applicable § 417(e) mortality in 2005 to about $92 for a 70 year old, based upon 9% interest and the applicable § 417(e) mortality in 1996.  Assuming that an appropriate value would average approximately $125 per dollar per month, this represents approximately $7 million of liability at the time benefits commenced.

**5.     The New 401(k) Plan Did Not Replace Benefits Lost Via Wear-Away**

At the same time Foot Locker implemented the cash balance conversion, the company also introduced a new 401(k) plan.  The 401(k) plan allows participant's to defer a portion of their compensation into the 401(k).  In addition, Foot Locker matches the first 4% of compensation that a participant defers with 25% of that amount in Foot Locker stock.  For example, if an employee with compensation of $20,000 defers $400, Foot Locker will match that with $100 worth of company stock.  The company will continue this match up to a maximum of $200 worth of employer stock if the employee in the example defers $800 or more of compensation.

401(k) deferrals and employer matching contributions do not increase or, in fact, in any way relate to the benefits from the cash balance plan.  The pension wear-away period for a participant was the same whether the participant deferred 10% of pay into the 401(k) or declined to participate in the 401(k) plan altogether.

The 401(k) benefit consists of two parts, the employee deferral and the match in employer stock.  To the extent that an employee defers their compensation into the 401(k) plan, it directly causes a decrease in their cash take-home pay.  Effectively, the benefit is paid for directly out of the employee's pocket and therefore has the potential to immediately impact the employee's standard of living to the same extent as if Foot Locker had cut his salary.  The employer match is funded by the employer, and would generally be considered as an employer-provided benefit.  Of course, in order to receive the maximum contribution of 1% of pay, an employee must defer 4% of their compensation, so there is still an employee cost.

I understand that at least one of the Defense witnesses deposed by Plaintiff's counsel argued that the 401(k) plan should be viewed as offsetting the benefit reductions that occurred in connection with the cash balance conversion.  Hilpert 3/8/12 Tr. 104:1-2 ("You're taking away from one, you're giving back in another").  But even if properly viewed this way, the 1%-of-pay maximum employer-provided contribution under the 401(k) plan (which, as noted, requires an employee to effectively agree to reduce his take-home pay by 4%) did not offset the pension reductions (*i.e.*, wear-away) that resulted from the cash balance plan conversion.

The following chart shows what the 401(k) employer contribution, as a percentage of pay, would have been required to replace the benefit accruals under the prior benefit formula, at various ages and at various compensation levels (based upon the 1996 IRC § 417(e) applicable interest rate and mortality):



As explained, each participant whose traditional benefit was "converted" to a cash balance account on January 1, 1996 had zero pension growth during the wear-away period that followed – *i.e.*, his or her pension benefit was frozen.  To fully offset this freeze, Foot Locker would have had to contribute an amount to the 401(k) plan equal to the percentage of pay reflected in the chart, which as can be seen varies according to the participant's age and compensation.

For some participants younger than about age 25, a 1%-of-pay company contribution would have had about the same value as the pension accruals lost during the wear-away period. Of course, most 25-year-olds did not defer 4% of their take-home pay and therefore did not qualify for the 1% company match, which is hardly surprising for any number of reasons – among them being that Plaintiff's counsel has informed me that Plan participants were not told the cash balance conversion had the effect of freezing and/or reducing their pension and that participants accordingly needed to defer a portion of their cash pay into the 401(k) plan if they wanted to offset the pension reduction.

As reflected in the chart, for participants older than age 25, a 1%-of-pay company contribution would *not* have replaced the pension accruals lost during the wear-away period (even if it could legitimately be counted for that purpose).  Indeed, for middle-aged and older participants a 1% company match does not even come close to offsetting the pension accruals lost during the wear-away period.  For example, a 55-year-old making $30,000 earned an increase in the value of his pension benefit under the pre-conversion formula worth a little more than 7% of pay for each year of service.  Trading that for a 1% employer match under the 401(k) plan (at the price of what would feel like a pay cut of 4%) would represent an **86% reduction** in the value of the participant's pension accrual – *i.e.*, an 86% reduction in the participant's annual pension compensation.  For a 45-year-old with the same salary, the reduction would have been about 75%.  For a 60-year-old making $80,000, the reduction would have been about 91%.

6.      **The Cash Balance Formula Reduced the Rate of Benefit Accrual for Many Participants Even After the Wear-Away Period Ended**

As explained above the accrued benefit earned by a participant, during a plan year, prior to 1/1/96 was equal to 1% of pay plus 0.5% of pay in excess of $10,800.  Another way to view this formula is 1.5% of pay reduced by 0.5% of the lesser of pay or $10,800.  This leads to the construct that for participants earning less than $10,800, the formula is 1% of pay, and for participants earning more than $10,800, the formula is 1.5% of pay minus $56 (0.5% of $10,800).  In pension-speak, the $10,800 is called the integration level.

After 1/1/96 the benefit accrued (as an annuity payable at age 65) by a participant was equal the pay credit earned during the year, projected to age 65 at 6% interest, and then converted to an annuity using the more favorable of 6% interest or the § 417(e) applicable interest rate in the year of payment, and the applicable 417(e) mortality in the year of payment.  In most years, the 6% rate was the more favorable.  Prior to the change in the § 417(e) rate structure in 2008, only in 1996, 1997 and 2000 was the § 417(e) applicable interest rate more favorable than the 6% rate, being 6.06% in 1996, 6.55% in 1997 and 6.35% in 2000.  Of 2008, 2009, 2010 and 2011, only in 2009 was the conversion rate at age 65 more favorable using the § 417(e) applicable interest rate than using 6% interest.  In 1997, when the applicable interest rate was 6.55%, the conversion factor was approximately 6% lower than the rate determined using 6% interest, or the equivalent of 1 year's interest credit.  Because of this, for simplicity, I have analyzed the new formula assuming that the 6% interest rate is the prevailing rate for converting the cash balance account to an annuity at age 65.

Under the cash balance formula, the pay credits are determined as follows (per section 5.03A of the Plan):

| At least years of credited service | Not in excess of years of credited service | Percentage of compensation | Percentage of compensation in excess of $22,000 |
|---|---|---|---|
| 0 | 6 | 1.10% | 0.55% |
| 6 | 11 | 1.50% | 0.75% |
| 11 | 16 | 2.00% | 1.00% |
| 16 | 21 | 2.70% | 1.35% |
| 21 | 26 | 3.70% | 1.85% |
| 26 | 31 | 4.90% | 2.45% |
| 31 | 36 | 6.60% | 3.30% |
| 36 | No limit | 8.90% | 4.45% |

It is important to note that years of credited service are neither years of service, nor years of vesting service.[17]  In particular, years of credited service (as defined in Plan § 1.50) is a plan year, after meeting the plan eligibility requirement, during which the participant completes 1,000 hours of service.  Thus, for example, a participant hired on February 1, 2000, who works full

---

[17] Throughout the report, for simplicity, when service is used by the plan I have used the expression "years of service," but the underlying calculations reflect the appropriate plan definition of service applicable to that calculation.

time, would complete the plan eligibility requirement on February 1, 2001.  Under a special rule for the first year, they would receive a partial year credit in 2001, but only receive credit in any subsequent year if they work 1,000 hours during that year.  Since, under the last sentence of Plan § 5.03A, the years of credited service are determined for the entire plan year as of January 1 of that plan year, this participant would have 0 years of credited service in 2001, and a fraction of year of credited service in 2002 (most likely 11/12, but the fraction is ultimately not relevant).  In 2007, the participant would have credited service measured as of January 1, 2007, which would reflect a full year for 2002, 2003, 2004, 2005 and 2006 (or 5 years) plus 11/12 of a year for 2001, or 5-11/12 years.  Since this is still less than 6, the participant would be at the 1.10% level in the chart.  This is compared to 7 vesting years, and 6 years and 11 months of actual service.

The next thing to notice is that the percentage for compensation in excess of $22,000 is always exactly ½ of the percentage of total compensation.  Like the pre 1996 formula, this formula could be reworded as the sum of the two percentages, times total pay reduced by the excess percentage times the lesser of $22,000 or actual pay.  For example, for the first level, the formula could be viewed as 1.10% of pay, for participants with less than $22,000 of pay, and 1.65% of pay minus $121 for participants with pay in excess of $22,000.  Here the integration level has been increased from $10,800 to $22,000.

The third thing to notice is that the percentages increase every 5 years (up to a maximum of 40 years of credited service, *i.e.,* the next increase would be at 41 years, but it does not occur).  These increases are as follows:

| Increase at years | New Rate | Increase in Rate | Percentage Increase (*i.e.,* current Rate divided by Prior Rate minus 1) |
|---|---|---|---|
| 0 | 1.10% | | |
| 6 | 1.50% | 0.40% | 36.36% |
| 11 | 2.00% | 0.50% | 33.33% |
| 16 | 2.70% | 0.70% | 35.00% |
| 21 | 3.70% | 1.00% | 37.04% |
| 26 | 4.90% | 1.20% | 32.43% |
| 31 | 6.60% | 1.70% | 34.69% |
| 36 | 8.90% | 2.30% | 34.85% |

It does not seem a coincidence to me that the increases are about 34%.  1% increased at the Plan's interest crediting rate of 6% for five years is 1.3382%, or a 33.82% increase.  If the initial pay credit rate is increased at 6% per year, the rate at each interval, compared to the new pay credit rate would be:

| Number of years | 1.06 ^ number of years | Initial rate increase at 6% for that number of years | Increased Rate Rounded | Associated Rate from Table |
|---|---|---|---|---|
| 0 | 1.000 | 1.1450 | 1.10% | 1.10% |
| 5 | 1.338 | 1.5323 | 1.50% | 1.50% |
| 10 | 1.791 | 2.0505 | 2.10% | 2.00% |
| 15 | 2.397 | 2.7441 | 2.70% | 2.70% |
| 20 | 3.207 | 3.6722 | 3.70% | 3.70% |
| 25 | 4.292 | 4.9142 | 4.90% | 4.90% |
| 30 | 5.743 | 6.5763 | 6.60% | 6.60% |
| 35 | 7.686 | 8.8006 | 8.80% | 8.90% |

What this shows is that the actual pay credits are (within rounding) simply the same rate, adjusted at 6% interest, in five-year intervals.

If the integration level is ignored (*i.e.*, an individual is assumed to earn below the integration level in all years, for analysis purposes), the accrued benefit under the new cash balance formula, as an annuity at age 65, as a percentage of compensation, for participants who commence participation at various age would look like this



There are three things to notice about this chart. First, the saw tooth pattern is unmistakable. This pattern is caused by two factors. The first factor is that every 5 years, when the pay credit rate increases, the accrual rate jumps back up. The second factor is that since the

rate that the pay credit increases to is the prior rate, increase at 6% for five years (as discussed above), and the accrued benefit after the increase, is the pay credit, projected to retirement for 5 less years (because the participant is now 5 years older), the accrual rate after the increase is roughly the same as the accrual rate after the increase 5 years earlier, *i.e.*, the top and bottom of the saw tooth are roughly equal.

The second thing to notice is that the difference between the values on one line and the values on another line is exactly equal to 1.06 raised to the difference between the ages. For example, between the entered-at-age-30 line and entered-at-age-50 line is a 20 year difference in age. 1.06 raised to the 20th power is 3.21, so the values on the entered-at-age-30 line are all 3.21 times the values on the entered-on-age-50 line.

The third thing to notice is that if the saw tooth is average, the rate of accrual under the new formula is solely a function of the age at entry, and is not impacted (other than the short term saw tooth) by a participant's service. Viewing the results this way, a participant who enter at age 21 is actually accruing more than 1% of pay, the rate the benefit accrued under the pre 1996 formula, but a participant who entered at age 23 averages accruing at a rate lower than the 1% accrued under the pre 1996 formula. The age at entry that averages the same as the prior 1% is about 22 and 8 months, in other words, a participant who enters the Plan below age 22 and 8 months is better off under the new formula (absent the integration issue discussed below), and a participant who enters the Plan after age 22 and 8 months is better off under the pre-1996 Plan. (This is subtly impacted by the month of hire, so is not exact.) If the § 417(e) applicable interest rate in the year that the benefit is paid is higher than 6%, then this increases the break even age, but as pointed out earlier, even the highest year to date would increase benefits by 6%, which is equivalent to a one year increase in the break even age.

The change in the integration level may seem large, from $10,800 to $22,000, but is actually only a small change. For participants earning below $10,800, this change has no impact. As a participant's compensation increases from $10,800, the impact of this change increases, maximizing at $22,000, and then decreases as compensation increases above $22,000. Consider three participants, one earning $10,000, one earning $22,000 and one earning $100,000. The relationship between the benefit earned for compensation above and below the integration level is unchanged by the amendment, in that in both cases the rate the benefit earned for compensation above the integration level is one half the rate the benefit earned on total compensation, so for simplicity, consider the prior formula of 1% of total compensation plus 0.5% of compensation in excess of the integration level. For the participant earning $10,000, the benefit earned is 1% of pay, without regard to the integration level. For the participant earning $22,000, the benefit earned at the $10,800 integration level is (as described above) 1.5% of pay, minus $56, and with the $22,000 integration level it is 1.5% of pay reduced by $110. The difference in the benefit earned can quickly be seen to be the difference between $56 and $110, or $54. $54 is 0.25% of pay, so the change in the integration level has lowered the benefit earned from 1.25% of pay to 1% of pay, which is a 20% reduction. For the participant earning $100,000, the benefit accrual changes in the same way, *i.e.,* from 1.5% of pay minus $56 to 1.5% of pay minus $110, so it has the same $54 reduction. But $54 is only 0.05% of pay, so the reduction in the benefit accrued is from $1,500 (1.5% of $100,000) minus $56, or $1,444 to

$1,500 minus $110, or $1,390, which is only a 4% reduction.  Graphed for different compensation levels, the percent reduction looks like this:



**Percent Reduction in Benefit Accrued During the Year, due to Increase in Integration Level from $10,800 to $22,000**

What this chart shows is that, at most, the decrease is 20%, but is lower for both compensation lower and higher than $22,000.  Since a participant's compensation would be expected to increase over time, this causes, on average, what might be anticipated to be about a 10% decrease, over an extended period of time, depending upon a participant's compensation level on 1/1/96.

The combination of these two effects is that most participants would see a reduction in the benefit accrued under the new formula based upon a combination of their age at entry and their compensation level over time.  For some participants (those who entered the Plan at under age 22, and who have compensation levels in excess of $50,000), the reduction would be very slight, if at all.  For most participants, though, the reduction would vary from below 10% (due to entry near age 22, and compensation in the $40,000 range), to extreme (due to an age at entry at age 40 or above).

In addition to the formula change, the Plan removed the early retirement benefit (discussed in detail above) from benefits determined after 1/1/96.  In other words, the early retirement benefit was the greater of the early retirement benefit determined using the prior subsidy, but only on the frozen accrued benefit, or the account balance divided by the immediate annuity rate (which is equivalent to an actuarial equivalent benefit to the age 65 benefit, determined at 6% interest, or slightly higher, if the § 417(e) applicable interest rate exceeds 6%).  This reduction only reduced benefit for participant who would have actually taken their benefit as an annuity before age 65, but for a participant who would have taken an annuity at age 55 (the most extreme case) the reduction is significant.  If the benefit payable at age 65 is $1,000, then the prior early retirement reduction produced a benefit of $600 (as described above), while the

6% actuarial equivalence produces a benefit at age 55 of $428, a 29% reduction. Thus, for participant who eventually earned 15 years of service the removal of the subsidized early retirement benefit was a reduction between nothing (if the participant took the benefit at age 65 of later) to 29% (if the participant took the benefit at age 55).

## 7. Measurement of the Benefits Lost Due to Wear-Away and Foregone Early Retirement Subsidies[18]

    The benefit loss attributable to the cash balance conversion came in two major varieties. First, the lump sum and/or normal retirement age annuity available to participants is lower than it would have been had the initial account not understated the true value of the frozen accrued benefit (because of wear-away). Second, eligible participants who did not elect the early retirement subsidy (because they didn't know an early retirement subsidy was available) would have had an option of a larger annuity had they been told that a subsidized early retirement benefit was a distribution option under the Plan.

### A. Loss of Lump Sum and/or Normal Retirement Annuity Benefits: A + B Instead of Greater of A or B

    For purposes of estimating the aggregate value of the core retirement benefits (*i.e.*, ignoring for the moment the value of any foregone early retirement subsidies), I will make the simplifying assumption that all participants elect lump sums. Presuming that a participant will elect to receive a lump sum benefit, to measure the level of the reduction in benefit due to the wear-away I reset the initial account balance so that when the initial account balance is projected to age 65 it produces the frozen accrued benefit at normal retirement age.

    The theory is that the accrued benefit (*i.e.*, the benefit payable as an annuity at age 65) is the starting point to accrue the new benefit. Therefore, the initial account balance must be set such that the accrued benefit it produces equals the frozen accrued benefit. Since the initial account is increased with interest credits at 6% per year to age 65, and generally converted to an annuity using 6% interest (*i.e.*, in years when the § 417(e) applicable interest rate is less than 6%), creating the initial account balance using 6% interest (rather than the 9% used by the Plan) and with no mortality discount prior to age 65 would create an initial account balance with an associated accrued benefit equal to the frozen accrued benefit.

    Following the original method prescribed by the Plan, the new initial account balance is then increased for those entitled to an enhancement, so the new initial account balance would then be increased by the same enhancement (*i.e.*, multiplied by the same factor) as was previously used. To do otherwise would eliminate the impact of the enhancement on all but a very few participants (those discussed above where the initial account balance exceeded the lump sum), and for those participants, the value of the enhancement would be a fraction of what it was previously (*i.e.*, an enhancement of 67% would only lead to maybe a 1% actual increase in account balance). These participants were told that, as part of the conversion they were

---

[18] As discussed above, participants also lost benefits as a result of the reduction in the rate of benefit accrual under the new cash balance formula after they emerged from wear-away. Due to limitations in the data, I was unable to calculate the aggregate benefit losses associated with this reduction.

receiving an extra increase in their account balance, and they should continue to receive that increase in the same manner such that they should receive actual increases in their accrued benefit due to continued service after 1/1/96.

For purpose of calculations, the participants must be broken down into 2 groups, those who were paid, and those who were not:

For those who have not been paid, the cash balance account is re-determined with an initial balance determined using 6% interest and no pre-retirement mortality.

For those who have been paid, the lump sum due as of the original payment date would be determined as equal to the benefit from the cash balance account re-determined with an initial balance determined using 6% interest and no pre-retirement mortality.

The actual calculations must be broken down further, based upon the data available. For a majority of participants, there is sufficient information to do the full calculations. For those with most of the data (for example, the data has a frozen accrued benefit, but no cash balance account), estimates can be made to fill in the missing data, but these will, by definition, be estimates. For those with insufficient information to even make a reasonable estimate (for example, no frozen accrued benefit) the best estimate is to assume that there amounts would equal the average of the participants with all data.

**Illustration of calculations using Osberg.**

Taking the named plaintiff Osberg as an example:

- Osberg's frozen accrued benefit was $6,098.57
- The Plan determined an initial account balance based upon this of $6,411.67
- Osberg's cash balance account as of the benefit payment date was $20,093.78
- Osberg was paid $25,695.96
- Osberg was paid on October 1, 2002
- Osberg was still in his wear-away period

All of this information can be obtained from FL-OSB 000001-4

First the initial account balance is increased by the value of the frozen accrued benefit determined at 6% interest and no pre-retirement morality. For Osberg this would equal $6,098.57 X 10.64635 discounted with interest at 6% for the 23 years and 3 months to age 65 on January 1, 1996, or $16,752.03. This is an increase of $10,340.36 over the original initial account balance. This amount, increased with 6% interest for the 6 year and 9 months to the benefit payment date would be $15,328.05. Increasing the cash balance account by this amount would increase it from $20,093.78 to $35,421.83. The whipsawed value of this account would be $36,665.19. Since Osberg was already paid $25,695.96, this would leave $10,969.23 as still due.

44

For interest between the date of the underpayment and today, I used the assumption that the underpayment should grow at the Plan's interest crediting rate of 6% per year.

Applying these calculations to the data available produces the following results:

| | Count | Underpayment as of payment date (or 1/1/2010 if not paid) | Underpayment with interest to 1/1/2013 |
|---|---|---|---|
| Participants who were paid a lump sum and have complete data | 8,374 | $59,942,377 | $146,152,970 |
| Participants who were paid a lump sum and have sufficient data to make an estimate | 4,538 | $41,409,794 | $81,134,546 |
| Participants who were paid a lump sum with inadequate data | 146 | $533,276 | $1,300,246 |
| Total for participants who were paid a lump sum | 13,058 | $101,885,446 | $228,587,751 |
| Participants who were not paid with complete data | 1,565 | $15,493,003 | $18,452,414 |
| Participants who were not paid with sufficient data for an estimated | 594 | $5,471,457 | $6,516,593 |
| Participants who were not paid with inadequate data | 749 | $707,102 | $842,170 |
| Total for participants who were not paid | 2,908 | $21,671,562 | $25,811,177 |
| Total for all participants other than those paid annuities | 15,966 | $91,257,543 | about $186 million |

For participants who received annuities, I re-determined the cash balance account as for others, then determined what portion of that increased cash balance account was not used to provide the month benefit provided.  That remaining amount is as follows:

Participants who elected annuities:    441
Account that was unused after recalculation:  $4,909,873
Account that was unused increased with interest to 1/1/13:  $10,731,183

### B.      Loss of Early Retirement Benefits

For some participants who were age 55, or near age 55, and who had at least 15 years of service at the time they terminated employment, if they elected an annuity commencing at age after age 55, the value of that annuity in some cases would have been significantly larger than the lump sum that they received.  I measured the value of the early retirement benefit that any participants would have received had they waited until age 55, or elected it at the date they elected their lump sum, if already over age 55 (based upon the § 417(e) applicable interest rate at the time of the payment) and compared it to what the benefit payment would have been, had the corrections in the prior section been made.  This increase would only apply to participant who in fact elected to receive a lump sum (*i.e.*, would exclude participants who have not yet received a benefit, and participants who elected an annuity).  I determined that the total value of this forgone benefit was $3,809,123, and with interest to 1/1/2013, $8,916,991.  Of course, if the benefit in the prior section is reduced that would increase this amount for some participants.

### 8.     Wear-Away Cost Savings Anticipated by Foot Locker

### A.      The Anticipated Wear-Away Savings Were Relatively Insignificant

Plaintiff's counsel asked me to review the contribution and expense projections set forth in the presentations used to present the cash balance conversion proposal to senior management and the Board of Directors for their approval.  *E.g.*, FL-OSB 009829.  Pages 12-13 of the presentation contain the relevant data.  Page 12 presents the company's projections of expected contributions and FAS 87 accounting expenses for the company's 1996 and 1997 fiscal years if the traditional pension remained in place.  Page 13 presents the same information assuming the traditional plan was frozen and replaced with a cash balance plan and a new 401(k) plan was added.

The data reflects that Foot Locker was expecting a cash savings from the conversion and 401(k) addition of $2.1 million in the 1996 fiscal year ($44.7 million if the old plan remained in place vs. $42.6 million with the proposed changes) and $4.6 million in the 1997 fiscal year ($33.5 million vs. $28.9 million).   Thus, at the time Foot Locker management and the Board of Directors approved the cash balance conversion, the company projected that the total cash savings over two years would be $6.7 million.

The data reflects that Foot Locker was expecting a FAS 87 accounting expense reduction attributable to the conversion and 401(k) addition of $3 million in the 1996 fiscal year ($12.2 million if the old plan remained in place vs. $9.2 million with the proposed changes) and $1.9

million in the 1997 fiscal year ($9.5 million vs. $7.6 million).    Thus, at the time Foot Locker management and the Board of Directors approved the cash balance conversion, the company projected that the total reduction in FAS 87 accounting expense would be 4.9 million over two years.

I understand that Foot Locker's aggregate employee payroll in 1995 for associates in the U.S. and Puerto Rico was $861,602,787.87.  The projected cash savings for 1996 and 1997 thus represented 0.39% of Foot Locker's U.S. and Puerto Rico payroll expenses.  I understand that Foot Locker's worldwide payroll was materially larger, and thus the expected savings as a percentage of worldwide payroll even lower.

### B.  The Anticipated Near-Term Savings from the Conversion Appear to Have Been Exaggerated

The administrator of the Foot Locker Plan, like the administrator of any defined benefit pension plan, is required to retain an enrolled actuary to perform a valuation of the plan, and certify the funded status of the plan.  One of the values calculated as part of this valuation is the Plan's estimated benefit liabilities.  Calculating this value requires the Plan's enrolled actuary to make a number of assumptions.  One of the assumptions that the enrolled actuary for this plan made is the form in which it is expected participants will request their retirement benefits – *e.g.*, as an annuity or lump sum.

I understand that the testimony of one of Defendants' witnesses, Christopher Maikels, an enrolled actuary and principal at Mercer Consulting, the same entity that assisted Foot Locker with the 1996 Plan conversion and performed the Plan's actuarial valuations for a number of years following the conversion, establishes that both the Plan actuary and Plan administrator believed with a high degree of confidence that almost 100% of participants in the post-conversion Plan would elect to receive their benefits in the form of a **lump sum** (which, in fact was the case, as noted earlier).  Maikels 4/4/12 Tr. 261-263.  However, for purposes of preparing the Pension Plan's valuations for the plan years 1996-1998, the Plan's enrolled actuary, a now-retired Mercer enrolled actuary, assumed that 100% of participants would elect **annuities** – the exact opposite of what the actuary and Plan administrator expected.  I understand that there is no ambiguity about the fact that the Plan's enrolled actuary and Plan administrator expected one outcome (nearly 100% lump sums) but used a diametrically opposed assumption to perform the Plan valuations between 1996-1998.  See, e.g., Maikels 4/4/12 Tr. 263: 13-19 ("Maikels: . . . I am surprised that they used an assumption of 100 percent annuities.  Q.  Not a good assumption.  You would agree with that? Maikels:  Based on this information here, it appears to be an unreasonable assumption"); Tr. 276: 19-21 ("Maikels:  I would agree that based on this data, evidence, that an assumption of a 100 percent annuities is unreasonable").

Assuming that 100% of participants would take *annuities* when the expectation was that in fact 100% of participants would elect *lump sums* had the effect of understating the Plan's benefit liabilities.  Further, the assumption was that most participants would not elect to receive the most generous early retirement benefit (by delaying retirement, on average, to about age 62, thus by passing the more valuable benefit at age 55).  Understating the Plan's benefit liabilities

reduces the amount of required funding contributions to the Plan, in the short run, which reduced Foot Locker's out-of-pocket cash outlays in 1996-1998.

I understand that the evidence indicates that the Plan's actuary used the same 100%-annuity assumption to prepare the expense projections presented to senior management and the Board. This means the savings projections were overstated. Senior management and the Board therefore approved the cash balance conversions based on projected savings figures that were inaccurate – and that the Benefits Department knew were overstated.

## C.    If Immediate Cash Savings Was the Primary Goal, There was an Easier Way

Foot Locker's President and Chief Operating Officer in 1995, Dale Hilpert, has testified that the company was in dire financial straits in 1995, and that one of the reasons Foot Locker decided to convert the Plan from a traditional plan to a cash balance plan and reduce the rate of benefit accrual was that this was projected to save cash. According to Mr. Hilpert, the company's focus was on preserving cash, not necessarily reducing expenses (in the technical accounting sense). Hilpert 3/8/12 Tr. 102:22-25 ("when you run a company that's approaching or in bankruptcy, you run the company for cash, not earnings. And this fits in with that objective of hoarding cash"); 101:3-4 (reducing pension accruals "was going to save the company cash. And that we desperately needed to avoid bankruptcy").

If "hoarding cash" was the primary goal, at least in the short run, it appears there may have been a much simpler and efficient way to do that. The IRS Form 5500's filed by the Plan for 1995 and 1996 report that as of January 1, 1996, the Plan had total assets of $573,064,347. Of this total, $28,691,625 of the assets, or about 5%, was held in the form of employer securities and employer real property. ERISA § 407(a) permits pension plans to hold up to 10% of their assets in employer securities and real property, and to the extent that limit has not been reached an employer generally (subject to general fiduciary standards) may use employer stock to satisfy the employer's funding obligations. Notable examples of contributions of employer stock to defined benefit pension plans just in 2009 include:

1. 3M Co. ($600 million)
2. Ashland Chemical Company ($100 million)
3. Boeing Co. ($1.5 billion)
4. Caterpillar, Inc. ($650 million)
5. Honeywell International, Inc. ($800 million)
6. J.C. Penney Company, Inc. ($340 million)
7. Office Max, Inc. ($100 million)
8. PPG Industries, Inc. ($55 million)
9. The Brink's Company ($57 million)
10. United Technologies Corp. ($250 million)

N. Goldberg and D. Cohen, Employer Stock Contributions to Defined Benefit Plans, 907 PLI/Tax 725 (April 13, 2010).

In September 1995, Foot Locker projected that it would be required to contribute about $44.7 million to the Plan in the company's 1996 fiscal year.  FL-OSB 009848.  Had the company satisfied $28.6 million of this obligation by using $28.6 million worth of employer stock instead of cash, Foot Locker would have been able to save $28.6 million of cash in 1996, a far greater amount than the $2.1 projected cash savings in 1996 from the cash balance conversion.  Foot Locker did not appear to have qualms about using company stock to fund its retirement plans:  the Benefits Department proposed, and management approved, using company stock to fund the company's matching contribution under the new 401(k) plan unveiled in 1996.  The primary reason, according to Mr. Hilpert's testimony:  to preserve cash.  Hilpert 3/8/12 Tr. 94-95.

**9.      The 1996 Summary Plan Description Was Misleading**

> **A.      The SPD's Explanation of the Lump-Sum "Greater-of" Calculation On Pages 12 and 14 Describe Whipsaw, Not the Greater of the Account Balance or the Frozen Accrued Benefit**

Plaintiff's counsel asked me to explain how I would perform the benefit calculations described in the two "greater-of" benefit formulas described at the top of page 12 and the bottom of page 14 of the SPD.

Page 12 states:  "When your employment terminates, you are entitled to receive payments on a monthly basis (an annuity) or in a lump sum. The annuity payable to you is determined in the following manner. Your *account balance* is increased by interest credits (as described below) to *normal retirement date.* The resulting amount is converted to an annuity using factors required by federal law and *IRS* regulations. The lump sum payable to you is the **greater of** your *account balance* or the amount determined by multiplying the annuity payable to you by factors required by federal law and *IRS* regulations."  (emphasis added)

Page 14 states:  "The lump sum payable to you is the **greater of** your *account balance* or the amount determined under federal law and *IRS* regulations."  (emphasis added)

The "greater-of" formula on page 12 plainly describes the so-called "whipsaw" calculation described in IRS Notice 96-8 and incorporated in the terms of the Plan used to calculate lump sums.  The calculation is performed by projecting a participant's account balance to normal retirement age (here age 65) at the Plan's stated interest crediting rate (6%); converting the resulting age-65 account balance to an annuity using the applicable inters rate and mortality table described in IRC § 417(e) and IRS regulations; and then calculating the present value of this annuity again using the applicable inters rate and mortality table described in IRC § 417(e) and IRS regulations.  Consistent with the terms of the Plan, page 12 provides that a participant's lump sum benefit is equal to the greater of their account balance or the result of the "whipsaw" calculation just described.  *See* Plan §§ 1.02, 1.03, 4.03.C(2).  As can been seen, the only data required to perform the calculation is the participant's account balance, his birth date, and the applicable § 417(e) factors.  A participant's frozen accrued benefit as of 12/31/95 does not factor into the calculation.

I read the "greater-of" formula of page 14 to be referring to the same whipsaw calculation.  The sentence on page 14 formula is identical to the last sentence in the page 12 passage except for the clause in brackets:  "The lump sum payable to you is the **greater of** your

*account balance* or the amount determined [by multiplying the annuity payable to you by factors required by] federal law and *IRS* regulations." Based on the parallelism with the lump sum greater-of formula on page 12, I understand the sentence on page 14 to be summarizing the more detailed formula described on page 12. I can conceive of no other reasonable interpretation. In particular, I do not understand the page-14 sentence be referring to the greater of a participant's account balance or the present value of his frozen accrued benefit. There is simply no rational basis for reading the sentence to have that meaning. If asked to calculate a participant's lump sum benefit based solely on the page-14 sentence, I would perform the whipsaw calculation described on page 12, compare the result to the participant's account balance, and tell the Plan to pay the greater of the two amounts.

**B.      The Example on Page 14 Fails to Address the Impact of Wear-Away on the Participant's Benefit**

In the SPD, on page 14 there is an example of how benefits were purportedly calculated under the post-amendment benefit formula. The chart shows a participant with an initial account balance of $7,000 that grows over three years to $9,676. The implication is that the participant's benefit would be based on the $9,676 balance were the participant to terminate employment at the end of 1998:

| YEAR | ACCOUNT BALANCE ON JANUARY 1ST | INTEREST CREDITS | YEARS OF SERVICE AS OF JANUARY 1ST | COMPENSATION CREDITS DURING THE YEAR | ACCOUNT BALANCE ON DECEMBER 31ST |
|------|------|------|------|------|------|
| 1996 | $7,000 | $420 | 10 | $330 | $7,750 |
| 1997 | $7,750 | $465 | 11 | $460 | $8,675 |
| 1998 | $8,675 | $521 | 12 | $480 | $9,676 |

The example is almost certainly misleading: a participant with a $7,000 initial account balance would likely still be in wear-away at the end of 1998, which means he would have earned no new benefits.

The example does not provide the participant's age. If the participant were 30, the frozen accrued benefit would be the $7,000 initial account balance, divided by the age 30 factor for establishing the initial account balance, of 0.37852, which would mean that the frozen accrued benefit was $18,493. Three years later, the ERISA lump sum value of the frozen accrued benefit would be determined by multiplying the frozen accrued benefit by the age 33 lump sum factor of 1.49028, producing a lump sum benefit of **$27,560**, compared to the account balance of **$9,676**. Thus, after a full page of describing how the benefit is determined, the actual determination of the lump sum benefit would not be related to anything in that description. The participant's lump sum benefit entitlement at the end of 1998 would be $27,560, the present value of his 12/31/95 frozen accrued benefit – his account balance is irrelevant and the account growth reflected in the chart ultimately meaningless.

Repeating this for various ages would produce the following results:

50

| Age on 1/1/96 | 30 | 40 | 50 | 60 |
|---|---|---|---|---|
| Initial Account Balance | $7,000 | $7,000 | $7,000 | $7,000 |
| 9% conversion factor | 0.37852 | 0.90196 | 2.16976 | 5.36116 |
| Frozen Accrued Benefit | $18,493 | $7,461 | $3,226 | $1,306 |
| Age on 12/31/98 | 33 | 43 | 53 | 63 |
| Lump Sum Factor | 1.49028 | 2.68814 | 4.91690 | 9.30307 |
| **ERISA lump sum** | **$27,560** | **$20,862** | **$15,863** | **$12,147** |
| Account Balance | $9,676 | $9,676 | $9,676 | $9,676 |
| Account as percent of Lump Sum | 35% | 46% | 61% | 80% |

As reflected in the chart, for participants of almost any age, their actual lump sum would be significantly higher than the account balance.  Only for certain participants who were older than age 65 on the conversion date might the example accurately reflect the calculation of benefits under the cash balance formula.

\*      \*      \*

 In my opinion, this report conforms to generally accepted actuarial principles and practices, and is in compliance with applicable Actuarial Standards of Practice.

 I hereby declare under penalty of perjury under the law of the United States of America that this report is true and correct.

_____
Lawrence Deutsch, E.A.
Dated:  May 22, 2012