*Osberg v. Foot Locker, Inc., et al.*, 07-cv-01358 (KBF) (S.D.N.Y.)

# Joint Pretrial Order

## July 1, 2015

# Exhibit 13B

# Expert Rebuttal Report of Lawrence Deutsch, E.A.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

| | |
|---|---|
| **GEOFFREY OSBERG** | : |
| | : |
| **On behalf of himself and on** | : |
| **behalf of all others similarly situated,** | : |
| | : **Case No.: 07 CV 1358 (KBF)** |
| **Plaintiff,** | : |
| | : |
| **- against -** | : |
| | : |
| **FOOT LOCKER, INC.,** | : |
| | : |
| **FOOT LOCKER RETIREMENT PLAN,** | : |
| | : |
| **Defendants.** | : |

-------------------------------------------------------------X


**REBUTTAL EXPERT REPORT OF LAWRENCE DEUTSCH, E.A.**


**June 7, 2012**

**REBUTTAL REPORT OF LAWRENCE DEUTSCH, E.A.**

I hereby submit this rebuttal report to address the points made by Dr. Niden and Mr. Sher in their reports referenced below.

## I.      Introduction

### A.      Dr. Niden's Report

[Deleted material]

```
[Deleted material]
```

## B.     Mr. Sher's Report

Mr. Sher's report makes three main points:

*First*, Mr. Sher endeavors to show that Foot Locker's conversion to a cash balance plan was consistent with the company's "objectives to save costs, modernize its retirement program, and provide more portability and flexibility of benefits to its employees."  Sher Rpt. ¶ 6.  This is irrelevant:  this case is not about whether it was appropriate or advisable for Foot Locker to amend its pension plan – it is about whether Defendants communicated the amendments and their impact honestly, as required by ERISA.  Thus, while Mr. Sher's depiction of cash balance plans (most of which are in generalities that do not apply to this Plan because of its fixed interest crediting rate and other design features) contains comments that are not applicable to this plan, I will refrain from rebutting most of the inaccuracies in the section of his report touting the purported benefits to participants of Foot Locker's cash balance conversion.

*Second*, Mr. Sher argues that more open and honest communications about the potential impact of the plan amendments on participants "would do more harm than good."  Sher Rpt. ¶ 95.  I generally defer to my colleague Prof. Stratman for his reaction to this novel suggestion,

but provide limited comments rebutting Mr. Sher's challenges to the technical accuracy of the hypothetical communication suggested by Plaintiff's counsel during Mr. Kiley's deposition.

*Third*, Mr. Sher pursues a theme that "[a]t the time of the Foot Locker conversion, nobody could have known the extent to which wear-away would affect any given participant. Reductions in the interest rates used to convert protected annuities to lump sums caused a significant portion of the wear-away effect that the plaintiff complains about." Sher Rpt. ¶64. Mr. Sher implies that the wear-away experienced by all, or nearly all, participants in the plan as of the conversion date was to a large extent unpredictable. That is false. Almost all of the wear-away was attributable to the fact that Foot Locker used a 9% interest rate assumption, with mortality, to calculate opening balances even though the plan's rate of return was fixed at 6%, without mortality. This interest rate spread guaranteed that nearly every participant would experience a material period of wear-away (with the only reason it wasn't 100% being the one-time enhancement for certain people that meant certain participants who received a lump sum did not have lump-sum wear-away – though even these participants experienced an annuity wear-away period). The impression Mr. Sher seeks to convey, that much of the wear-away was a surprise to Foot Locker, is incorrect. I address this point in more detail below.

## II.   Dr. Niden's Report

[Deleted material]

[Deleted material]

1. **Dr. Niden's Analysis Does Not Purport to Identify *Actual* Winners and Losers – It is Clear that Almost All Proposed Class Members Were In Fact Harmed by the Conversion.**

First, it is necessary to understand that the addition of a lump sum option and the conversion to a cash balance plan, from a design perspective, are independent events. Many non-cash balance plans allow lump sums. Likewise, many non-cash balance plans that allow lump sums set the actuarial equivalence as the better of a fixed rate or the applicable interest rate under 417(e), which avoids the variations in lump sums that Mr. Sher suggests is only available in cash balance plans. *See, e.g.*, Sher Rpt. at 28. (This issue is disused in more detail below). Conversely, there is no requirement that a cash balance plan allow lump sum benefits. As discussed in more detail below, almost the entire "one time gain" that Dr. Niden attributes to the conversion is, in fact, directly tied to the addition of a lump sum option and is ultimately misplaced (as discussed below).

Second, the manner of Dr. Niden's analysis is to say that of, say, 100 participants with a particular demographic, 20 will eventually receive better benefits after the amendment, but we don't know which 20 – in the same manner that out of 100 retirees of a particular age, we may know that 20 will die in the next 5 years but we don't know which 20. Her analysis is based upon probabilities of occurrences and so, for example, some percent of the employees will remain employed until a particular age, coupled with a conclusion that at that age the participant would be better or worse off with the new cash balance lump sum vs. the prior formula annuity (or deferred annuity). Thus, for many individuals in her analysis, they are better off in the prior plan in some years, and better off in the new plan in other years. She balances these two results with probabilities, potentially marking a participant who is worse off as history actually unfolded as better off, because, under the probabilities that she employees, they were "more likely" to be better off.

The reality is that virtually no participant for whom I have data was actually better off after the amendment when the benefit is measured as an annuity at age 65 (*i.e.*, the official ERISA accrued benefit, the measurement ERISA uses to assess compliance with the statute's

benefit accrual, vesting and other minimum standards).  I measured the accrued benefit produced by the cash balance account balance as of the date of payment (or January 1, 2010, if not paid), divided it by the service from January 1, 1996 to the date of termination (or January 1, 2010, if not terminated) and by the average compensation earned since January 1, 1996.  Under the prior formula, a participant would have accrued a minimum of 1% of compensation per year, with the rate being larger for participants who earned in excess of $10,800.  The rate of accrual under the new formula was less than 1% for the vast majority of participants.  (As described in my prior report at 41, ignoring the integration level, it would be anticipated that participants who entered the plan under age 22 and 8 months would on average accrue a benefit in excess of 1% of pay under the new formula, and conversely, if a participant entered the plan over age 22 and 8 months, they would on average accrue a benefit of less than 1% of pay under the new formula.  I count 4,608 participants who entered the plan under age 22 and 8 months, but this isn't sufficient to have an average accrual rate above 1%).

But even most members of the proposed class whose scheduled rate of accrual under the cash balance formula *was* above 1% (i.e., entered the plan under age 22 and 8 months) did not actually have an effective rate of accrual above 1%.  This is because a participant impacted by the conversion first had to first overcome the wear-away.  For example, if a participant was accruing 1% of pay per year, but took one year to overcome the conversion-induced wear-away, then after 5 years of participation, they would have 1 year of no accrual and 4 years of 1% accrual, for an average of 0.8% per year.  Thus, it is not surprising that only 517 members of the proposed class show an average accrual rate above 1%, and most of those (506) are less than 1.30%, which is roughly what the average accrual rate under the prior formula was when taking into consideration the 0.5%-of-compensation accrual rate on pay in excess of $10,800.  The average rate of accrual per year experienced by individual members of the proposed class is summarized in the following chart:



6

The break down by rate of accrual is as follows:

| Benefit Accrual Per year as percent of compensation rounded to the nearest 0.1% | Count | Total with same or lower rate |
|---|---|---|
| 0.0% | 10,013 | 10,013 |
| 0.1% | 397 | 10,410 |
| 0.2% | 426 | 10,836 |
| 0.3% | 418 | 11,254 |
| 0.4% | 374 | 11,628 |
| 0.5% | 435 | 12,063 |
| 0.6% | 430 | 12,493 |
| 0.7% | 397 | 12,890 |
| 0.8% | 432 | 13,322 |
| 0.9% | 375 | 13,697 |
| 1.0% | 363 | 14,060 |
| 1.1% | 287 | 14,347 |
| 1.2% | 154 | 14,501 |
| 1.3% | 65 | 14,566 |
| 1.4% | 8 | 14,574 |
| 1.5% | 1 | 14,575 |
| 1.6% | 0 | 14,575 |
| 1.7% | 1 | 14,576 |
| 1.8% | 1 | 14,577 |

Note, that if a person was earning $30,000, the prior accrual was 1% plus ½% of excess over 10,800 = 1.32% of pay.  As reflected in the numbers above, 14,566 out of 14,577 **(more than 99.9% of) members of the proposed class for whom I have usable data ended up with an average annual rate of accrual under the cash balance plan that was less than the average rate of accrual under the old plan**.

In light of these numbers, I do not know how Mr. Sher can state that "many proposed class members experienced net increases in benefits from the conversion." Sher Rpt. n.24.  I find nothing in Mr. Sher's report (or the record) that supports this conclusion.

Dr. Niden might argue that the addition of the ability to take old benefits in a lump sum offset any loss of additional benefit accruals and bolstered the value of the new formula over the prior formula. But as discussed below, this is incorrect as a matter of law. The addition of a lump sum option can never increase the value of a participant's benefit, unless the lump sum exceeds the ERISA minimum lump sum benefit.  However, it can cause participants to *forfeit* a portion of the value of an accrued right to a subsidized early retirement benefit. This is lawful if the

forfeiture occurs as a result of an election made by a participant who is fully informed about the consequences of electing a lump sum in lieu of a more valuable early retirement annuity.  But it is unlawful if the forfeiture occurs unwittingly because a participant if offered the choice of a lump sum that he or she does not know will result in a partial forfeiture, which I understand Plaintiff alleges occurred in this case.

Dr. Niden may contend that setting aside legal niceties, the ability to take benefits in the form of a lump sum offers "value" to certain individuals that is not recognized by ERISA. Perhaps, but that is a slippery slope that leads to a potentially endless debate about the relative value of lump sums and life annuities.  A lump sum may offer additional value to a participant on her death bed or who has immediate medical needs.  But an annuity may offer additional value to a healthy participant who is risk-averse or whose ancestors typically lived to their late 90's.  A lump sum may offer additional value to Warren Buffet who can invest the proceeds and beat the market.  But an annuity may offer additional value to the rest of us mere mortals.  This is a debate that has no resolution.  Congress settled the matter by declaring that lump sums calculated using ERISA-specified interest rate and mortality assumptions have the same value as the annuity from which the lump sum is derived (as discussed in more detail below).

> **2.    Dr. Niden's Analysis Does Not Purport to Excuse Foot Locker's Alleged Failure to Inform Participants that Benefit Accruals Were Frozen for a Period of Years.**

Even were Dr. Niden correct that the retirement benefits some participants could have expected to ultimately earn under the cash balance plan and 401(k) plan would be greater than the benefits the participants would have earned had the pre-amendment plan remained in place, Dr. Niden does not conclude that this means Foot Locker's disclosures to participants were accurate.  After all, Plaintiff's claim is not that the SPD and other disclosures failed to tell participants that the present value of their expected pension benefits might be higher than what they would have earned under the old plan.  Rather, Plaintiff's primary claim is that the SPD and other disclosures misled them about the *rate* at which participants would earn benefits after the conversion:  misleading participants to believe benefit grew steadily, at the same rate their accounts were growing.  It is irrelevant to an employee Mr. Osberg to be told that, had he stuck around for another 20 years or so, he might have ended up earning more than he would have under the old plan (which is what Dr. Niden's analysis measures).

It is precisely for this reason that ERISA requires SPDs and other disclosures to clearly disclose the manner in which a participant's benefits accrue.  For example, a plan amendment that reduces the rate of future accruals must be preceded by a notice even if the rate drop is only temporary and employees who stick around long enough are expected to come out "winners." Such a notice must summarize the material terms of the amendment.  The November 17, 1995 Memorandum does not do this:  it does not describe the actuarial assumptions used to calculate opening cash balance accounts.  I am a trained enrolled actuary, but if I had been a participant in plan at the time of the conversion, I would have been unable to calculate my initial account balance or calculate my rate of benefit accrual under the plan as amended.  The situation is analogous to a plan that provides a 3% rate of benefit accrual; but is amended so that the rate of accrual will be temporarily reduced to 0% for 4 years, then increased back up to 3% in year 5.  A

notice "summarizing" this amendment would obviously be defective if it merely told participants that the rate of accrual under the plan "would in the future be 3%."  That is precisely the situation here:  the November 17, 1995 memo only discloses what the rate of accrual will be after several years.  The notice does not summarize the terms of the amendment which provide that the "permanent" rate of accrual advertised in the memo does not take effect immediately.

More to the point, neither the SPD nor any other communication provided by Foot Locker was sufficient for a participant to determine their benefit under the plan, in that these communications repeat the themes that the benefit is solely the account balance and that the initial account balance was set equal to the value of the prior accrued benefit.  Nowhere do they disclose that the initial account balance was insufficient to provide the prior accrued benefit, or that the benefit would remain at the level of the prior accrued benefit for some period of time.  In fact, as described in my original report at 50-51, the SPD actually provides an example of the determination of benefits that never discloses that the person in the example would receive a benefit distinctly different than the benefit that the example states the participant would receive.

[Deleted material]

[Deleted material]

**D.    Dr. Niden's Analysis Conflicts with ERISA and Basic Pension Valuation Principles**

  **1.    Under ERISA (as amended by TEFRA), the Present Value of an Annuity Benefit (when paid as a lump sum) is not less than the Present Value Determined Based on the 417(e) Applicable Interest Rate and Applicable Mortality Table**

  Dr. Niden hypothecates that the lump sum benefits were significantly more valuable to most participants than annuity benefits (see Niden report at 38-45).   [Deleted material]

---

[Deleted material]

[Deleted material]

The problem with Dr. Niden's analysis is not just that it purports to manufacture "value" out of thin air (through the availability of a lump sum and an interest rate arbitrage) – but that her methodology is contrary to ERISA.  Treasury Regulation § 1.417(e)-1(d) provides:

> Present value requirement – (1) General rule.  A defined benefit plan must provide that the present value of any accrued benefit and the amount (subject to section 411(c)(3) and 415) of any distribution, including a single sum, must not be less than the amount calculated using the applicable interest rate described in paragraph (d)(3) of this section (determined for the month described in paragraph (d)(2) of this section) and the applicable mortality table described in paragraph (d)(2) of this section.

Thus, by definition, the Treasury Department and IRS have determined (based on the statute) that the present value of a pension participant's accrued benefit is appropriately determined using the applicable 417(e) interest rate, not using some higher rate.

In essence, Dr. Niden's argument is that a payment of the ERISA lump sum value is a payment in excess of the true value of the benefit owed, because participants actually value cash much more than the IRS and Congress assumes they do.  But the issue is not up for debate – the IRS (following Congress's instruction in the ERISA statute) has determined that the correct discount rate for determining the present value of a pension benefit is the 417(e) rate.  In *Berger v. Xerox Corp. Ret. Income Guar. Plan,* 338 F.3d 755 (7th Cir.2003), Judge Posner writing for the court rejected a pension sponsor's argument that it should be able to calculate lump sums using an interest rate higher than the government-mandated rate (which before IRS was delegated that authority resided under the Pension Benefit Guarantee Corporation's jurisdiction).  Judge Posner explained that using a higher discount rate was akin to inviting employees "to sell their pension entitlement back to the company cheap, and that is a sale that ERISA prohibits.  **They might be happy with such a sale, because their personal discount rate may exceed that fixed by the PBGC** (or, for plans of more recent vintage, the 30-year T-bill rate). . . .  But the PBGC has decreed otherwise, and Xerox challenges neither its authority to fix a discount rate applicable to the Xerox cash balance plan nor the discount rate it did fix." *Id.* at 762(emphasis added).

To me, as an enrolled actuary, what Judge Posner is saying is that it doesn't matter what the individual may feel the value of money is (or how the plan's expert economist thinks the individual *should* value a lump sum), it is set by law as the applicable 417(e) rate.  Thus, when Dr. Niden argues that the true value of the annuity should be the value discounted at the 417(e) rate plus 1.5%, what she is really arguing is that 417(e) is wrong.  I am not an attorney, so I do not opine on whether Dr. Niden is bound by law to use the 417(e) rate when performing theoretical value calculations (I suspect she is not).  But I know that when I perform pension

valuations, I am bound by the law to use the 417(e) rate for this purpose.  Even if Dr. Niden is not *required* to use 417(e) assumptions, it means her calculations do not reflect the reality of the way the benefits would be valued in real life by the plan's administrator and actuary – which in my view makes the calculations a mere curiosity with no practical application or meaning.

[Deleted material]

14

[Deleted material]

**III.    The Projected Cash Savings from the Conversion Would Have Been Only Slightly Less Had Foot Locker Implemented the Cash Balance Conversion Without a Wear-Away Period**

Dr. Niden's report suggests that Foot Locker might not have been able to afford a cash balance conversion that did not include an embedded wear-away feature, because the wear-away effectively allowed Foot Locker to freeze benefit accruals (and thereby reduce costs). The relevant question, as I understand it, is not what Foot Locker would have in fact have been able to afford – but whether management and the Board would have approved a cash balance conversion that did not include wear-away. Plaintiff's counsel asked me to put myself in the shoes of the Plan actuary in 1995 and, using the same assumptions he used at the time to perform cost projections, and estimate what the actuary would have told management regarding the projected cost of a cash balance plan without wear-away.

**A.    Projected Cash Savings from a Conversion Without Wear-Away**

Included in the formal presentations to Foot Locker senior management and the Board of Directors (*e.g.*, FL-OSB 009829-56) was an analysis, presumably performed by the Plan's actuary, of the expected costs for 1996 and 1997 done as if the plan remained unchanged and as if the plan was amended to the cash balance plan design that was ultimately adopted. This analysis appears to be based upon the 1995 data. Based upon the data provided, I have estimated how much of the projected cost reduction, as determined by the Plan actuary, was attributable to the wear-away.

Based upon the 1996 valuation, the cost of the amended Plan including wear-away was projected to be $14,553,191. According to the 1996 valuation report, the cost was reduced by

19

$4,793,311 due to the plan amendment (ignoring the 672,319 increase attributable to the enhanced account balance).  I have estimated that the projected cost reduction in 1996 due solely to the wear-away effect was about $3.3 million, and in 1997 would be expected to be about $3.0 million, based upon the 1996 data available to me.  I have estimated that the total cost reduction in 1996 was about $6.2 million (compared to the $4.7 million calculated by the Plan's actuary).  Therefore I would estimate that roughly ½ of the cost savings were attributable to the conversion to a cash balance plan, and ½ were attributable to the wear-away.  Reflecting this, the Plan's cost projections would look like this:[5]

|  | 1996 | 1997 |
|---|---|---|
| Required cash contribution without amendment, from presentations | $44,700,000 | $33,500,000 |
| Projected cash cost with cash balance conversion and wear-away, from presentations | $38,700,000 | $24,800,000 |
| Projected cash savings due to amendment (i.e., difference between two costs) | $6,000,000 | $8,700,000 |
| Estimated portion attributable to wear-away (based upon ½ cost attributable to wear-away) | $3,000,000 | $4,350,000 |
| Estimated cash cost with cash balance conversion and no wear-away | $41,700,000 | $29,150,000 |
| Estimated projected cash savings due to amendment without wear-away | **$3,000,000** | **$4,350,000** |

The Plan actuary did not provide an estimate of cash savings for 1998.  However, by 1999 or 2000, the projected cash savings attributable to the conversion without wear-away would have been about the same as the version with wear-away, consistent with Foot Locker's projections that the savings from wear-away would virtually disappear "after 3-4 years."  *See, e.g.* MercerFL 0002208 and MercerFL 0003002.

The net result is that had Foot Locker implemented the cash balance conversion without wear-away, according to my calculations the Plan actuary would have told management that the estimated cash savings from the cash balance conversion for 1996-1997 would have been about $7,350,000.  As I indicated in my original report, if Foot Locker had determined that it needed additional cash savings related to the pension plan, the company could have used employer stock to increase its cash savings to the same level as (or below) the projected cash savings from the cash balance plan design with wear-away.

---

[5] These estimates are rough, but apparently no rougher than the Plan actuary's estimates.  The Plan actuary estimated a 13.4% reduction in costs due to the amendment.  If the costs were reduced by a net of $4,491,881, as the 1996 valuation would indicate ($4,793,311 due to the normal cost decrease, offset by a $672,319 increase due to amortized unfunded liability, and then increased with interest at 9% to the end of the year), then the cost without the change would have been $19,045,072 had the plan not been amended, thus the actual reduction was $23.6%.  The point being that the quality of the original projections was actually off by 10 percentage points, *i.e.,* the error in the original projections was most likely larger than any error in my estimates.

**B.    The Plan's Enrolled Actuary's Unreasonable Assumptions to Value the Plan's Benefit Liabilities Explains the Difference Between My Estimate of the Harm the Wear-Away Inflicted and Foot Locker's Projections of Savings Attributable to Wear-Away**

Because of Dr. Niden's focus on Foot Locker's financial situation, I thought it would be beneficial to explain why my estimate of benefits lost as a result of wear-away (Section 7) is higher than that projected cash savings the Plan's actuary projected wear-away would produce. To put it bluntly, the Plan actuary used assumptions that significantly understated the Plan's benefit liabilities. This allowed Foot Locker to reduce its funding contributions to the Plan and defer cash funding costs.

The quickest way to see this is to consider the accrued liability for the active participants as of January 1, 1996, reported as $121,704,117 (see report page 6, FL-OSB 003282). The total initial account balance for the provided data is estimated at $121,735,597.[6] This cannot be correct: the accrued liability cannot possibly be less than the initial account balances.[7] In fact, if the account balances were $121,735,597, the accrued liability had to be significantly higher – for the same reason initial account balances significantly understated the present value 12/31/95 accrued benefits: liabilities were discounted at 9% with mortality, but payable at the lower § 417(e) applicable interest rate. In other words, Foot Locker's funding assumptions suffered from a similar flaw as did the conversion.

By way of illustration, I would estimate that as of the January 1, 2002 valuation, the plan would have been holding a liability for Osberg (based upon the 1996 assumptions and method) of approximately $9,800. Adding interest for 10 months from January 1, 2002 to the payment date of October 1, 2002, the estimated liability would have been about $10,500, contrasted with the actual benefit payment of $25,700. Thus, the Plan failed to recognize the liability for over ½ of Osberg's benefit.[8]

---

[6] It is important to remember that there are other participants who are not included in the data that Defendants provided, so the actual initial account balance would exceed $121,735,597, and the initial account balance does not reflect any value for the early retirement subsidy.

[7] As a generalized matter, it is quite common for funding liabilities to be less than the sum of the cash balance accounts, but, in this unique situation, where the account balance equaled the accrued benefit discounted at the same interest rate as the funding interest rate, and with mortality, but did not include the value of the death benefit, the early retirement subsidy, the subsidized joint and survivor benefit, or the value of the lump sum benefit that was due, that for most participants, significantly exceeded the value of the initial account balance (as Dr. Niden points out) the liability should have easily exceeded the sum of the account balances.

[8] The understatement of the liability carried by the Plan for Osberg was not merely attributable to the fact that his benefit was payable as a lump sum calculated at § 417(e) rates, but also to the enrolled actuary's unreasonable assumption that Osberg's benefit would not be paid until he was well into his 60's, with the result that he would enjoy only a small early retirement subsidy were he to take his benefit in the form of an annuity.

This effect is reflected in plan-wide results.  Reviewing the 1997 valuation (FL-OSB 017071), page 8, item 7 indicates a $22,915,116 loss on benefit payments (*i.e.*, the benefit payments exceeded the liability associated with those benefits by $22,915,116).  Based upon the data provided to me, there were $34,383,421 in lump sum benefit payments during 1996.  Item 4E indicates that, adjusted for interest, there were $88,902,466 of benefit payments during 1996.  Based upon the 1996 valuation, approximately $53 million of benefit payments were not lump sums, so the numbers would appear to be consistent.  Therefore, on $34,383,421 of lump sum payments, there was a $22,915,116 loss, which means the liability reflected in the Plan valuations was the difference between these two values, or only $11,468,305, or about 1/3 of the value of the actual benefit payments.  This confirms my conclusion that the plan systematically undervalued the liability associated with the plan benefits for active participants.  This means that the actual amount of benefits payable (and foregone) under the Plan were significantly larger than what the Plan valuations and Foot Locker cost projections reflected.

Therefore, the reason my estimate of the benefits members of the proposed class allegedly lost because of undisclosed wear-away are larger than what might be expected from looking at Foot Locker's 1995 projections, then, is because the 1995 projections of the benefit liabilities under the Plan (both before and after it was amended) were severely understated.

C.    **My Estimate of Foregone Benefits Almost Certainly Understates the Addition to Foot Locker's Income Attributable to Wear-Away Because Foot Locker's Return on Equity was Likely Greater Than 6%**

Because of Dr. Niden's focus on Foot Locker's financial situation and the discussion above regarding the Plan actuary's cost savings projections, I thought it would be prudent to point out that my estimates of the benefits participants lost as a result of wear-away, plus interest, likely understates the savings Foot Locker enjoyed by not paying these lost benefits.  This is because Foot Locker would have taken the cash it saved (that it actually saved, not what the Plan actuary mistakenly estimated it would save) because of reduced pension funding obligations and invested the cash at its internal rate of return.  My understanding from Dr. Maxam is that Foot Locker's internal rate of return is higher than 6%.

IV.   **Mr. Sher's Report**

A.    **The Wear-Away Here Was Built Into the Design and Was Not a Surprise**

Mr. Sher, in his report (at 6) states "Much of the wear-away effect was caused by reductions in interest rates that occurred after the 1995 Plan re-design."  This is simply wrong.  Sher goes on to explain at 64: "reductions in the interest rates used to convert protected annuities to lump sums caused a significant portion of the wear-away effect."  The fundamental flaw in Mr. Sher's analysis lies in that he misrepresents what wear-away is (an error similarly made by Dr. Niden).  He suggests that so long as the actual benefit available under the new plan exceeds the protected, prior accrued benefit then no wear-away exists.  This is not true, in that wear-away exists *to the extent* that the new benefit is less than the sum of the protected, prior accrued benefit plus what the benefit accrued after the amendment date would have been, but for the fact that the prior accrued benefit was smaller than the benefit produced under the new formula.

Consider, as a starting point for this, Mr. Sher's comment at 59 where he states: "Plaintiff correctly points out that it took the Pension Protection Act in 2006 to require the A+B approach be used in future conversions, although he overstates that law change by incorrectly saying that providing opening balances is no longer legal.  Opening balances can continue to be provided in new conversions as long as the plan provides an A+B minimum benefit."  The last sentence quoted here, while true, hides that this plan does not comply with an A+B minimum.  Plaintiff did not overstate the law when stating in the first amended complaint at 31 (the paragraph I assume that Mr. Sher was referring to) that: "Another conversion method that was sometimes used by employers (before the method was outlawed by Congress in 2006) was to freeze the traditional benefit formula as of an identified date and open new cash balance accounts for each participant, as under the A+B method; but rather than provide that a participant's benefit would equal the sum of the frozen traditional "A" benefit and a new separately-calculated cash balance "B" benefit, a participant's benefit at retirement was expressed solely as a function of his or her new cash balance account."  To the casual reader, the method Mr. Sher describes (an opening balance with an A+B minimum) and the method Plaintiff describes (a benefit based upon the sum of the opening account of A plus the future cash balance benefit of B) are the same, but Congress recognized that they are not.

ERISA (as amended by the Pension Protection Act in 2006) at section 1054(b)(5)(B)(iii) states

> (iii) RATE OF BENEFIT ACCRUAL.—Subject to clause (iv), the requirements of this clause are met with respect to any participant if the accrued benefit of the participant under the terms of the plan as in effect after the amendment is not less than the sum of—
>> (I) the participant's accrued benefit for years of service before the effective date of the amendment, determined under the terms of the plan as in effect before the amendment, plus
>> (II) the participant's accrued benefit for years of service after the effective date of the amendment, determined under the terms of the plan as in effect after the amendment.

While the conversion of this Plan was not governed by this subsequent law change, it does succinctly define wear-away.  There is no way to construe the terms of this Plan that it did not contain wear-away (as described here, and elsewhere).

Consider one of Mr. Sher's comments that wear-away was due solely due to the 417(e) applicable interest rate.  At 72, Mr. Sher states: "Mr. Osberg's actual lump sum of $25,696 exceeded his account balance of $20,094 by about $5,600.  Plaintiff says that Mr. Osberg "suffered" a wear-away because all he received was the value of what he had already accrued as of the date of conversion."  This is not true, in that that is not Plaintiff's claim.  Plaintiff's claim is that Mr. Osberg was told that he was accruing benefits under the plan after the conversion that he was not, in fact, accruing.  Mr. Sher suggests at 74 that if the applicable interest rate had been 7.87%, "there would have been no wear-away at the time of termination."  But, as will be seen, **even at 7.87% Osberg would have suffered significant wear-away**.  Mr. Sher notes at 54-55

that there are two approaches to amending a plan.  Under the first "sometimes referred to an A+B method, the prior formula continues to be applied for years of service before the amendment (the A portion) and the new formula is applied with respect to future service (the B portion).  **The total benefit is the sum of the two distinct portions.**" (emphasis added)  This is clearly not the method employed by this plan.  Under the other method *(i.e.* the one with wear-away) he states: "if for any participant on the amendment date, there is a possibility that the new formula benefit will produce an amount at any future date that is less than the amount based on the accrued benefit under the prior formula as of the amendment date, a minimum benefit provision should be included in the plan in order to satisfy the ERISA anti-cutback rules.  Sometimes this approach is referred to as a 'greater of' or 'greater of A and B' approach."  This is what this plan did.  At 56, Mr. Sher ties the two to wear-away by stating: "The regulations referred to the all-service transition approach as the "with wearaway" approach and the A+B approach as the "without wearaway" approach."

Plaintiff's complaint is that Defendants communicated to participants that it was an A+B plan when it was really a greater of A and B plan.  For example, in early 2002, Osberg received a statement indicating that he had accrued a "2001 compensation credit" of $1,584.43, when, in fact, no credit was earned, because of wear-away.

So what did happen to Mr. Osberg's benefit?  Mr. Sher suggested that if the applicable interest rate had just gone up instead of down, there would have been no wear-away.  According to Mr. Sher, if the applicable interest rate had been 7.87%, then Plaintiff would have nothing to complain about.  But consider what would have happened if the applicable interest rate had been a constant 7.87% in all years from 1996 through 2002.  Mr. Osberg's account would have grown identically to how it did (since the account was not a function of the applicable interest rate), but the benefit would still have not grown as promised.  A comparison of the promised benefit growth to the actual benefit, based upon an applicable interest rate of 7.87%, for Mr. Osberg looks like this:

| Illustrated as of | "A" benefit, i.e. ERISA lump sum value of frozen accrued benefit | Pay Credit during prior period | "B" account, i.e. Post 1/1/1996 Pay credit with interest | A+B benefit as lump sum | Actual Account |
|---|---|---|---|---|---|
| 1/1/1996 | $8,813.78 | $0.00 | $0.00 | $8,813.78 | $6,411.67 |
| 1/1/1997 | $9,518.14 | $1,211.12 | $1,211.12 | $10,729.26 | $8007.49 |
| 1/1/1998 | $10,280.05 | $1,077.89 | $2,361.68 | $12,641.72 | $9,565.83 |
| 1/1/1999 | $11,104.53 | $1,262.06 | $3,765.44 | $14,869.97 | $11,401.84 |
| 1/1/2000 | $11,997.14 | $1,122.15 | $5,113.51 | $17,110.65 | $13,208.10 |
| 1/1/2001 | $12,963.97 | $1,579.24 | $6,999.56 | $19,963.53 | $15,579.83 |
| 1/1/2002 | $14,011.72 | $1,584.43 | $9003.97 | $23,015.69 | $18,099.05 |
| 10/1/2002 | $14,858.08 | $1,180.26 | $10,724.47 | $25,582.55 | $20,093.77 |

This can be illustrated on a graph as follows:



The difference between the ERISA lump sum benefit and the actual account represents the wear-away that would have occurred from 1996 through 1998. During those years, even at an applicable rate of 7.87% the ERISA minimum lump sum would exceed the account balance. But the effect of this lost accrual does not disappear. Mr. Osberg's would have permanently lost the value of the benefits that he was told he had accrued during 1996-1998. The A+B benefit represents the full value, as if there was no wear-away. Going back to how Mr. Sher described wear-away, to the extent that the benefit is less than the A+B benefit, there is wear-away. Thus the spread between the account balance and the A+B benefit represents a benefit accrual under the new formula, which Mr. Osberg never actually receives, because it only served to bring him even with the benefit he had previously earned. All of the increases after 1999 represent benefits earned after 1999 (plus interest).

A slightly less observable fact is that the margin between the account balance and the A+B benefit continues to grow after 1999. This is a continued, ongoing wear-away. Viewing the increase from 1999 to 2000 as an example, this ongoing wear-away can be seen. During 1999, Mr. Osberg received a $1,122.15 pay credit. So under Mr. Sher's logic, that he was now out of wear-away, the amount by which the account exceeds the ERISA lump sum value of the frozen accrued benefit should increase by $1,122.15 (plus interest) during 1999. As of January 1, 1999, the account exceeded the ERISA minimum lump sum by $297.31 ($11,401.84 - $11,104.53). As of January 1, 2000, the account exceeded the ERISA lump sum by $1,210.96 ($13,208.10 - $11,997.14). The reason that the difference did not grow by the full pay credit is (as explained in more detail below) ERISA lump sum value of the frozen accrued benefit would grow by the applicable interest rate plus mortality (i.e., in excess of 7.87% in this example) while the account only grows with 6%. If, instead of Mr. Osberg taking his lump sum when he was 48 ½, he had concurred with Mr. Sher's analysis at 43 that "the 6% interest crediting rate in the Foot Locker Plan is generous," and decided to take his lump sum benefit at

age 65, his account would have grown to $52,494.05 when he was 65.  Assuming that the applicable interest continued at 7.87%, and that the applicable mortality table was never changed, the ERISA lump sum value of the frozen accrued benefit would grow to $56,589.90, and Mr. Osberg would find that he had never actually accrued a benefit for any of his service after January 1, 1996.  In other words, even after Mr. Sher declares that wear-away is over (assuming that the applicable interest rate had been at 7.87%), Mr. Osberg's full accruals are still being chipped away at by the prior frozen benefit.

In my opinion, Mr. Sher tries to completely obscure the fact that the use of a 9% interest rate, with mortality, to create the initial account balances, when coupled with only a 6% interest crediting rate, necessarily and predictably created a massive wear-away in benefit levels.  To explain his position, Mr. Sher presents various arguments about cash balance plans in general, and presents a numeric illustration to support his conclusion, but fails to point out that most of his arguments are based upon plans that do not do what this plan did, *i.e.,* use a conversion rate in excess of 3% higher than the interest crediting rate.  While the conversion rate itself (9%) was exactly 3% higher than the interest crediting rate (6%), the inclusion of mortality in the discount rate but not in the crediting caused an additional discount in comparison to the crediting rate, making the effective spread between the conversion discount rate and the Plan's interest crediting rate even larger than 3%.  (I discuss below how far outside the norm a spread of this magnitude is).

Mr. Sher presents his Exhibit A as support for his position "that interest rate changes cause the employee to be better of (if interest rates increase) but not worse off (if interest rates decrease), both with respect to lump sums and annuities, under the opening balance approach as compared to the A+B approach."  Without regard to the validity of this statement as a generality, it is clearly not true for this Plan, and Mr. Sher makes no attempt to illustrate how the concept would apply to this Plan.

Mr. Sher's exhibit is based upon a 45-year-old participant with a $10,000 benefit as of the conversion date, and assumes that the 417(e) applicable interest rate and the conversion rate are both 7% on the conversion date.  The interest crediting rate in his example is the 417(e) applicable interest rate.

26

His exhibit looks like this:

| | Traditional Defined Benefit | Cash Balance A+B | Cash Balance Opening Balance |
|---|---|---|---|
| | | | |
| | If Interest Rate Rises to 9% | | |
| Annuity | | | |
|    Per Formula | $10,000 | $10,000 | $15,127 |
|    Protected | | $10,000 | $10,000 |
|    Actual (greater of) | $10,000 | $10,000 | $15,127 |
| | | | |
| Lump Sum | | | |
|    Per Formula | $13,959 | $13,959 | $23,211 |
|    Protected | | $13,959 | $13,959 |
|    Actual (greater of) | $13,959 | $13,959 | $23,211 |
| | | | |
| | | | |
| | If Interest Rate Fall to 5% | | |
| Annuity | | | |
|    Per Formula | $10,000 | $10,000 | $5,340 |
|    Protected | | $10,000 | $10,000 |
|    Actual (greater of) | $10,000 | $10,000 | $10,000 |
| | | | |
| Lump Sum | | | |
|    Per Formula | $39,547 | $39,547 | $23,211 |
|    Protected | | $39,547 | $39,547 |
|    Actual (greater of) | $39,547 | $39,547 | $39,547 |

One conclusion that Mr. Sher makes from this chart is that the lump sum under the cash balance plan using an opening balance approach is larger than under either a traditional plan or a cash balance plan converted using the A+B approach, because it protects the opening balance as $23,211. This actually can quite easily be accomplished in either the traditional plan or the A+B plan by making the lump sum equal to the greater of the lump sum using the applicable interest rate, or 7%, thus this is not dependent upon the plan being a cash balance plan with an opening balance approach.

Much more importantly, though, this illustration is completely unrelated to the plan at hand. First, in this Plan, the benefit was not converted at 7%, it was converted at 9%; and second, the interest crediting rate under the Plan is not the (variable) 417(e) applicable interest rate, it is a fixed 6%. Re-doing the exhibit, but with the provisions of this Plan, produces the following:

|  | Traditional Defined Benefit | Cash Balance A+B | Cash Balance Opening Balance |
|---|---|---|---|
|  |  |  |  |
|  | If Interest Rate Rises to 9% | | |
| Annuity |  |  |  |
| Per Formula | $10,000 | $10,000 | $5,206 |
| Protected |  | $10,000 | $10,000 |
| Actual (greater of) | $10,000 | $10,000 | $10,000 |
|  |  |  |  |
| Lump Sum |  |  |  |
| Per Formula | $13,959 | $13,959 | $13,959 |
| Protected |  | $13,959 | $13,959 |
| Actual (greater of) | $13,959 | $13,959 | $13,959 |
|  |  |  |  |
|  |  |  |  |
|  | If Interest Rate Fall to 5% | | |
| Annuity |  |  |  |
| Per Formula | $10,000 | $10,000 | $3,211 |
| Protected |  | $10,000 | $10,000 |
| Actual (greater of) | $10,000 | $10,000 | $10,000 |
|  |  |  |  |
| Lump Sum |  |  |  |
| Per Formula | $39,547 | $39,547 | $13,959 |
| Protected |  | $39,547 | $39,547 |
| Actual (greater of) | $39,547 | $39,547 | $39,547 |

What this shows is that despite Mr. Sher's statement that "the calculations reveal that interest rate changes can cause the employee to be better off (if interest rates increase) but not worse off (interest rates decrease)," Sher Rpt. ¶ 28, they actually reveal nothing like that. What they reveal is that *unless the applicable interest rate exceeds 9%*, the benefit under the cash balance plan with an opening balance is the least of the three options (and the only reason it complies with ERISA is because it promises to never pay less than the protected benefit). The 30-year treasury rate had not exceeded 9% since October 1990, and rates had been fairly consistently declining for over a decade. Therefore, it would not be reasonable to base a plan design on the 30-year treasury rate exceeding 9% when the current rate was approximately 6%.

What Mr. Sher's exhibit also fails to disclose is what happens over the years as the individual begins to earn pay credits. Using Mr. Osberg as an example, consider what his benefit would be like on January 1, 1997, if the applicable interest rate had risen to 9%. His initial account balance was $6,411.67. He received $1,211.12 in pay credits during 1996, producing a January 1, 1997 account balance of $8,007.49. This reflects a $1,211.12 increase in the *account balance* over what it would have been had Mr. Osberg not worked during 1996. But this is not a $1,211.12 increase in Mr. Osberg's *benefit* over what his benefit would have been if he had not worked. From the Plan's table of factors, the ERISA lump sum value of his frozen accrued benefit on January 1, 1997 would be his frozen accrued benefit of $6,098.57 times the conversion factor of 1.14725, which equals $6,996.58. Thus, his lump sum benefit would have

only increased by $1,010.91 (from $6,996.58 to $8,007.49) – which is less than the increase in his account balance.  In other words, Mr. Osberg would have experienced $200.21 worth of wear-away-induced benefit loss:  his *benefit* would have grown by $200.21 less than his account had grown.

What happened to the other $200.21?  The lions share was lost in the difference between the 9% conversion discount rate and the 6% interest crediting rate.  To see this, assume the 417(e) rate had been 9% instead of 6.06%.  The prior lump sum protected benefit of $6,411.67 would then have increased by 9% (because Mr. Osberg was one year closer to retirement) to $6,988.72.  But Mr. Osberg's account would still have only increased by 6% to $6,796.37.  Thus, the protected lump sum would have increased by $192.35 more than the account increased.  The protected lump sum would also have increased by one year less mortality discount, which at age 42 is a little larger than 0.1% additional increase or an additional $7.  Thus, even if the 417(e) applicable interest rate were 9% (under Mr. Sher's best case scenario), and the only benefit form considered was a lump sum, Osberg would still have had a wear-away in 1996 – because his account would have grown but at the end of the year it would still be less than the minimum lump sum to which he would be entitled based on his 12/31/95 accrued benefit.  He would have earned no new pension benefit.  This wear-away would have continued every year until his benefit was paid (or age 65), whether or not Mr. Osberg remained employed at Foot Locker.  This is because even if Mr. Osberg ceased employment at the end of 1996 (but delayed receipt of his benefit), if the applicable rate continued at 9% (again, Mr. Sher's best case scenario), the value of the benefit actually earned during 1996 – *i.e.*, the value of the 1996 account credits over the value of the ERISA lump sum value of the frozen accrued benefit – would decline by about the same $200 per year, until after a few years of delay, any value for the benefit earned for 1996 would have disappeared.

As explained in my original report, the use of a 9% interest rate to create the initial account balance, in conjunction with an interest crediting rate of 6% produces a distortion in the initial account balance which, as referenced in Sher Attachment 3 at 5, "leads to little or no accrual of benefits for years after a conversion."  This effect was entirely predictable (and indeed the Plan actuary did predict wear-away, he just vastly understated its expected impact on benefits).

**B.**     **Mr. Sher's Selective Citation of Surveys Cannot Hide the Fact that Foot Locker's Use of a 9% Interest Rate Assumption to Calculate Initial Account Balances was Extreme**

In Attachment 3 to his report, Mr. Sher includes the "Unifi Survey of Conversions from Traditional Pension Plans to Cash Balance Plans: July 2000," which survey (conducted by a consulting firm that was in the business of helping large employers design and implement cash balance plans) in my opinion is designed to put conversions in their most favorable light.  On page 3 and 4 it states:

Survey Findings Contradict Most Criticisms

Those opposed to the cash balance design have made various assertions about the plans and their sponsors.  We present below some of those assertions and the related findings.

Assertion:  Often, opening account balances are intentionally understated, which leads to little or no accrual of benefits for years after a conversion.

Survey Finding:  72% of plans that provide opening balances reflecting the present value of the benefit accrued under the prior plan formula calculated those amounts using an interest rate no higher than the prevailing 30-year US Treasury bond rates. [See following page.]

This is followed by a graph showing that only 2% of plans were converted using a rate in excess of 2% of the "Range of 30-Year Treasury Rates Around Conversion Date," the range this plan would be in.

The survey summary then concludes:

Observation:  This finding does no support any contention that it is a widespread employer practice to understate opening balances by using high interest rates, thereby **intentionally** causing "wear-away effect" (*i.e.*, a period of time when no additional pensions will be earned).

*Id.* (emphasis added).  The obvious implication of this conclusion: the 72% of plans that used the GATT rate or below were on firm ground – but the plans that used higher rates (particularly the 2% of plans that used rates more than 2 percentage point above GATT) could fairly be seen as "intentionally" causing the "wear-away effect" (at least according to the authors of this survey).

My observation based on the results of the survey would be that while the practice of using high interest rates to intentional cause wear-away may not have been wide spread, this plan used a rate spread that was definitely higher than all but 98% of the plans in the survey, and may have even been higher than *every* plan in the survey.

A survey by Watson Wyatt – which again was conducted by a consulting firm that was in the business of helping large employers design and implement cash balance plans – reported results similar to those reported in the PwC/Unifi survey:

There is a widespread - but very much mistaken - belief that sponsors converting to a hybrid design commonly establish an initial lump sum worth less than the present value of the participant's normal retirement benefit. *If that were the case, affected participants would have to work for quite some time simply to allow the lump sum benefit under the new plan formula to catch up to the benefit already accrued before the conversion.*

30

That may have been true in a few early conversions to hybrid plans, but it just isn't the case today. Before enactment of the 1994 Uruguay Round of the General Agreement on Tariffs and Trade (GATT), lump sum distributions had to be determined using Pension Benefit Guaranty Corporation (PBGC) rates, which were extremely low and resulted in overstated values for participants' benefits, compared to commercial annuity rates. Recognizing that PBGC rates did not reflect the true value of benefits - and in fact encouraged participants to elect lump sum benefits instead of annuity benefits - Congress changed the rates for determining lump sum benefits in the GATT legislation. The new rates are commonly referred to as GATT rates.

In a Watson Wyatt survey of defined benefit plans converted to a hybrid plan design since 1995, **22 out of 24 plans determined the initial lump sum amount using GATT rates - or a rate even more beneficial to participants than GATT rates**. In other words, in 92 percent of these plan conversions, participants' initial lump sum amounts were equal to the present value of their normal retirement benefits under the old benefit formula. Wear-away of participants' accrued benefits by establishing a low initial lump sum amount – in those few cases where it occurred - appears to have been essentially fixed by the GATT legislation.

"Whither Wearaway?" at 2, Watson Wyatt Worldwide, February 2000 (Doc. 16-7) (emphasis added).

*See also* Hubert V. Forcier, *Guide to Cash Balance Plans* ("Forcier treatise"), 13-12 (Aspen Pub. 2003) ("There are probably very few plans in which the spread between the interest rate used to establish the opening hypothetical account balance . . . and the 30-year Treasury rate . . . is [as large as 3%]") (Doc. 16-9).

There is really no escaping the fact that Foot Locker's use of a 9% conversion discount rate was extreme and way outside the norm.  In my view, this makes it clear that Foot Locker used a 9% rate assumption as a way to cut benefits, not merely convert benefits to a different form.  Mathematically, only a conversion rate equal to the crediting rate (i.e. 6%) would have guaranteed equivalence between the accrued benefit derived from the opening cash balance account and the 12/31/95 accrued benefit under the predecessor plan.  Moreover, the prevailing GATT rate on the conversion date was 6.06%, which obviously was very close to 6% and therefore would have made the plan fall squarely into the category of plans (92% according to the Watson Wyatt survey and 72% according to the PwC survey) "using GATT rates - or a rate even more beneficial to participants than GATT rates."

Given all this, if someone had shown me the description of the proposed conversion set forth on the "recommendations" slide of the presentations made to Foot Locker senior management and the Board of Directors (e.g., FL-OSB 005527), I would have understood that the conversion would convert 12/31/95 accrued benefits to an opening account using a 6% interest rate assumption.  This impression would have been confirmed by other sections of the presentation, which give no indication or even tell-tale clues of a potential wear-away period.  Indeed, while earlier drafts of the conversion presentation contained clues from which I could have figured out that the conversion included a wear-away period – *e.g.*, FL-OSB 005397

(showing first-year normal cost different from ongoing normal cost) – these clues were stripped from the presentation before they were shared with senior management (*e.g.*, FL-OSB 004387-436).

### C.      Mr. Sher's Focus of the Benefits of the New Lump Sum Feature is Misplaced

A general theme underlying Mr. Sher's report (as well as Dr. Niden's) is that Plaintiff is overlooking the substantial advantages conferred by the amendment of the Plan to allow participants to take their benefits as lump sums.  According to Mr. Sher:  "It is inconceivable that very many of such class members would have foregone the lump sums they received with respect to their December 31, 1995 accrued benefits (and instead received annuities beginning no earlier than age 55) in exchange for the compensation credits (and interest credits thereon) they might have received under an A+B approach for a short period of service."  Sher Rpt. ¶ 85.

Mr. Sher's criticism is based on a misperception of what I understand the issue in this case to be.  Nobody is suggesting that Foot Locker misled participants about the availability of lump sums under the new plan.  The claim is that Foot Locker misled participants about the rate at which they would earn benefits for service performed *after* the conversion:  Foot Locker told participants their benefits would grow at the same rate as their accounts were growing, when the truth was that benefits were actually frozen (permanently, as it turned out for most participants) for up to several years.  The remedy Plaintiff seeks, now that the § 204(h) claim has been dismissed, is not a reversion to the old plan.  The requested remedy, as I understand it, is first and foremost to have benefits recalculated under the new plan but without the wear-away-induced freeze.[9]  This would not result in the elimination of lump sums.  Therefore, it is unclear what Mr. Sher is talking about.

### D.      The Wear-Away for Benefit Payments in 1996-97 Was Not *De Minimis*

In Mr. Sher's report, Sher Rpt. at 80, he says of the 3,500 participant's he indicated terminated in 1996, "the extent of the wear-away was negligible."  I assume that Mr. Sher has the same data that I have.  He acknowledges that "almost all of these employees received the present value of their protected December 31, 1995 accrued benefit" – in other words, the wear-away would be the value of the benefit they were told that they accrued (*i.e.*, their 1996 pay credit), since they received no credit (or in a few cases, a minimal credit) for these pay credits.  I count 3,509 participants in the data with a 1996 date of termination, and pay credits for them totaling

---

[9] As I explained in my prior report, the core correction requested by Plaintiff is that benefits be re-calculated under the A+B formula that was promised.  In order to effectuate this, the initial account balance must be reset to the level that would produce the accrued benefit that it was intended to replace. The proper initial account balance would be the amount that, when grown at the plan's hypothetical interest rate and then converted to an annuity would produce the benefit accrued under the prior formula. Since the account would grow at a fixed 6% rate under the terms of the Plan (because the Plan's interest crediting rate is 6%) and the rate to convert the account into an annuity was 6.06% on the amendment date, the only way that the initial account balance can produce the accrued benefit that it was intended to be is the present value of is if that present value is determined at same rate as the interest crediting rate, i.e. 6%, with no pre-retirement mortality.  Any smaller initial account balance than this would produce some level of wear-away.

$1,647,348. In other words, Mr. Sher considers $1,647,348 a "negligible" amount. If this amount were in a cash balance account, it would have grown with 6% interest from January 1, 1997 through, today, *i.e.* about 15 ½ years, so this amount would be worth about $4,064,678 today.

In Mr. Sher's report, Sher Rpt. at 81, he likewise seems to suggest that the 6,000 participants he counts as terminated during 1997 did not have a meaningful wear-away. I count 6,076 participants terminated in 1997 with a total of $7,084,079 in pay credits between 1996 and 1997. Increased with interest to 1/1/13, this would be $16,489,915. Mr. Sher suggests that because approximately 1,000 participants who terminated during 1997 were paid an amount equal to their cash balance account, "to the extent that these proposed class members experienced wear-away in 1996 it was short-lived since it had disappeared by the time they received their distributions." As described above, I dispute this conclusion. Mr. Sher indicates that there were about 1,000 participants who terminated during 1997 who were paid their account balance. I count 976 such participants. These participants come in three varieties. 22 have various data issues (for example, they have no prior accrued benefit reported). 524 received an enhanced account balance. The remaining 430 had actually received sufficient pay credits to exceed the ERISA lump sum value of the frozen accrued benefit.

Analyzing those who received an enhanced account balance, consider PIN 00038 as example. This individual would have had an initial account balance of $12,861.30 but for the enhancement to the account balance. The plan informed this person that their initial account balance was increased by $4,355.98. In addition, the person was told that they received a $548.16 pay credit in 1996 and a $534.41 pay credit in 1997. Finally, this person was told that they received $1,315.02 in interest credits. These pieces total the account of $19,614.87. The ERISA lump sum value of this participant's frozen accrued benefit on the date of distribution was $19,215.74. Thus, after informing this participant that they received an enhancement of $4,355.98 and pay credits of $548.16 and $534.41, for a total of $5,418.55, they were paid only $399.13 more than they would have received had the plan simply paid them the value of their prior accrued benefit.

As I understand Plaintiff's claim, the participant should have received the full amount that they were told was credited to their cash balance accounts on top of their converted account balance, including both the account enhancement (which participants were told was an amount over and above the converted value of their 12/31/95 benefit) and subsequent pay and interest credits. Calculated on this basis, the total amount attributable to underpaid benefits promised to participants who terminated in 1997, increased with interest to 1/1/13, is $34,019,825 (note that this is effectively the $16,489,915 number quoted above, increased by the value of account balance enhancements, plus interest on those account balance enhancements).

E.    **Mr. Osberg Would Have Been Better Off Under Any Alternative Plan Design That Did Not Include an Explicit or Implicit Freeze**

Mr. Sher and Dr. Niden imply that for certain participants, it may be uncertain if the conversion implemented by Foot Locker made them a winner or a loser. Whatever the truth of that contention (I believe in virtually every case, it is untrue), it clearly is not the case for

Plaintiff Osberg.  Mr. Osberg worked for nearly 7 years after the conversion and earned *zero* new pension benefits.  Even Dr. Niden, applying her novel "one-time winners and losers" analysis that super-charges the value of lump sums does not put Mr. Osberg in the winners category. Showing how extreme his views are, Mr. Sher seems unwilling to concede that Mr. Osberg was a loser because of the conversion, based on Mr. Sher's argument that there were hypothetical scenarios where Mr. Osberg *could* have done better.  *See* Sher Rpt. ¶¶ 69-76.  Maybe so, but the way things turned out in real life – which followed a much more foreseeable path than the scenarios Mr. Sher hypothesizes – Mr. Osberg could not, by law, have possibly done any worse.

The only way Mr. Osberg could have been equally worse off is if Foot Locker, instead of adopting the cash balance conversion with wear-away, had terminated the plan, frozen the plan (temporarily or permanently), or adopted a different amendment that included a wear-away period.  My understanding is that Plaintiff has evidence indicating that these alternatives were considered and rejected.  Because any other alternative without wear-away or a freeze would have meant that Mr. Osberg would have earned at least $1 of additional new benefits (and almost certainly much more) – which would have been an improvement over the zero in new benefits he actually received, any such alternative would have been better.

F.    **Mr. Sher's Criticism's of Plaintiff's Hypothetical Wear-Away Disclosure Contains Technical Inaccuracies**

Mr. Sher's critique of Plaintiff's disclosure allegations in Part VII of his report contains a number of technical inaccuracies. Below, I reproduce selected paragraphs from Mr. Sher's report (with certain sentences bolded for emphasis) and then provide my observations.

**Sher ¶ 87**.  "In the 1990s, when major employers amended their benefit programs, their tendency was to **focus on the new program features and its advantages**. Because these programs could be modified or even terminated by the employer at any time, employers did not see the value in discussing 'what-if' hypotheticals involving continuation of the prior program. Any such discussions could lead employees to the false conclusion that they had attained some kind of right to program continuation."

My observations:  As required by ERISA (see IRC § 411(d)(6)), employees did have a right to "program continuation" in the sense that the pre-1996 traditional formula lived on and governed the calculation of benefits for most proposed class members for several years.  The old formula was merely modified to no longer take into account service after 12/31/95.  Other than that, the old plan provisions were fully functional and relevant (see Plan § 1.02).  For example, in the case of a participant who retired in 1997 and was still in a wear-away period, the plan administrator would have to refer to the old plan terms to determine the amount of the participant's available forms of distribution, including the amount of the benefit available in different forms (e.g., early retirement benefit vs. commencement at age 65).  So in a very real sense, the old plan did live on for several years because for several years it provided the winning benefit for many employees. Mr. Sher's statement here that Foot Locker "focus[ed] on the new program features and its advantages" is precisely the problem.  (*See also* Sher ¶ 103:  "Employers wanted employees to focus on the core cash balance benefits, and felt comfortable potentially

*understating* the actual benefit entitlement if it turns out that a higher benefit actually becomes payable.")  Indeed, it captures the essence of Plaintiff's claim:  In the 1996 SPD and other participant communications, Foot Locker focused exclusively on the cash balance formula that <u>never applied</u> to fully 2/3 of the proposed class members – because they terminated employment before the cash balance formula had any impact whatsoever on their benefit.  In other words, Mr. Sher is essentially admitting what Mr. Osberg's complaint is:  the disclosures that in effect told employees "here is the formula under which your benefits will be calculated after January 1, 1996" had nothing to do with reality.  The disclosures simply were not true.  When Mr. Osberg terminated employment nearly 7 years later his benefit was calculated solely by reference to the old formula.  But he did not know that because, as Mr. Sher concedes, the SPD and other participant disclosures "focus[ed] on the new program features and its advantages" – and in the process implied that the old plan formula was no longer relevant, a mere relic of the past.

Mr. Sher's criticism of "what-if" hypotheticals is ironic because the entire Foot Locker SPD was mostly a "what-if" document from the perspective of proposed class members.  The SPD describes the benefit formula that will apply only "if" a 12/31/95 participant were ever to escape from wear-away.  To make it accurate, the SPD should have had an introduction that stated:  "What is set forth in the following pages is the plan formula that may apply to you some day in the future if you work long enough to escape wear-away.  Until that time, please refer to the old SPD to determine the amount of your benefit (which will not increase after 12/31/95).  This SPD is relevant only for purposes of determining the form in which you may take your benefit."  Instead of conveying this honest message, Foot Locker told employees that the cash balance formula that might apply to some 12/31/95 participants in the future would apply immediately.  Plaintiff alleges that Foot Locker did this because it wanted to disguise the cuts that were being implemented and because it wanted participants to forego annuity payments with built-in early retirement subsidies.

**Sher ¶ 88**.  "The conversion from a traditionally designed defined benefit plan to a cash balance plan presents **challenges that would make any what-if comparisons difficult to communicate** to employees who may rely on them even though the communications must be predicated on multiple variables and assumptions as to future events.[10]  We have seen from the above analysis that multiple variables impact how any particular employee or even groups of employees will fare under the cash balance plan **as compared to how they would have fared** assuming the prior Plan had continued unchanged or under a hypothetical A+B scenario.  Any such comparisons, even if they could be made, also can be misleading to participants because they presume that the alternative to the cash balance conversion was continuation of the prior Plan formula."

<u>My observations</u>:  Mr. Sher misconstrues Plaintiff's claim.  The claim is not that the SPD should have compared the formula that was adopted with the old plan or a hypothetical

---

[10] Congress later changed the law to require communications on how conversions may impact participants, and the IRS has issued detailed regulations on these communications.  These regulations give employers a framework and detailed rules that now protect an employer's discussion of the impact of these conversions.

A+B formula.  The claim is simply that the SPD should have accurately described the terms and impact of the formula that was adopted.  The comparison issue is a red herring.

Mr. Sher says that there are aspects of cash balance conversions that are difficult to communicate.  I agree.  But the answer to that complexity is not to mislead participants by omitting details about the conversion and/or misleading participants into believing things about the conversion that are not true.  The answer is to try hard to be as clear as possible.  The book "Retirement Heist" by Wall Street Journal reporter Ellen Schultz includes a number of disappointing examples of actuaries and pension consultants who suggest that plan sponsors can take advantage of the complexity associated with cash balance conversions to mask pension cuts.

**Sher ¶ 89**.  In a deposition of Thomas Kiley on March 16, 2012, plaintiff's attorney Mr. Gottesdiener asked Mr. Kiley to consider whether adding the following language to the summary plan description would have made it clearer to employees that they would not be earning new pension benefits for a time:[11]

> "[1] Because of the actuarial assumptions used to convert your December 31, 1995 accrued benefit to an opening account balance, your opening balance was less than the benefit to which you would have been entitled had you terminated or retired on January 1, 1996. [2] For many employees, your opening balance was less than half of the value of the minimum benefit to which you are legally entitled based on your accrued benefit as of December 31, 1995. [3] After January 1, 1996, your account balance will increase with pay and interest credits, but until those credits increase the balance to an amount larger than the value of your December 31, 1995 accrued benefit, the increases will not represent growth in your accrued benefit under the Plan. [4] For many participants, it could take several years until the account balance is larger than your December 31, 1995 accrued benefit. [5] Once the account balance exceeds the value of your December 31, 1995 accrued benefit, you will once again begin to accrue pension benefits under the Plan."

**Sher ¶ 90**.  I find this suggested language to be inaccurate and misleading. The first sentence incorrectly **suggests that employees had been entitled to a benefit in the form of an account (i.e., a lump sum) before the conversion**. That sentence also does not give the employee any indication as to how that value comparison is or should be made, and leaves the impression that there is a single proper way of doing that.  The sentence also fails to acknowledge that the availability of a lump sum distribution could provide added value to some employees that overcome any **technical shortfall** that might exist under the non-specific comparisons.

<u>My observation</u>:  The first sentence does not suggest that lump sums were available under the old plan.  The sentence compares the opening balance to the benefit that would have been available on January 1, 1996, which could be in the form of an annuity or a lump sum.  The opening balance was unambiguously "less" than the benefit payable in either form.  Mr. Sher's characterization of the (often very large) difference between the dollar amount of a participant's opening balance and the dollar amount of the benefit to which

---

[11] See 218:11 et seq.; this was introduced as Exhibit 51.

the participant would entitled were he to terminate employment as a "technical shortfall" is odd.  If the account balance was $10,000 and the participant was entitled to a benefit of $15,000, the $5,000 shortfall is hardly "technical."  Mr. Sher's criticism that the sentence does not describe the value of a lump sum distribution is misplaced: after January 1, 1996, both the benefit accrued under the old formula and the new cash formula were available as lump sums, so the lump sum feature did not add any value to the cash balance benefit relative to the benefit accrued under the old formula.  More importantly, it is unquestionable that if the participant had terminated on January 1, 1996, they would have been entitled to a lump sum, and that lump sum was in most cases more than the account balance because the accrued benefit under the cash balance plan (but for the protection of the prior accrued benefit) was less than the December 31, 1995 accrued benefit.

**Sher ¶ 91**.  The second sentence is also misleading. Employees were not legally entitled to lump sums under the prior Plan provisions.  The conditions underlying the contention that the opening balances had a value of less than half of the legally entitled benefits are also unstated. Would it be worth less than half if future interest rates rose back to their historical levels? Would a lump sum be worth less than half to an employee who terminates employment and needs the lump sum to pay for emergencies, to an employee who has an impaired life expectancy, or to an employee who feels he or she can invest the proceeds in outside investments or a new business and achieve returns of over 10% per year? Would it be worth less than half given that principal and accumulated interest are guaranteed and interest is credited at 6%, well above market rates for such an investment, while the account remains in the Plan? This kind of "many may be less" communication does not tell any employee whether that may apply to him or her, rendering this less than helpful. In reality, there is a wide variation in outcomes among proposed class members. Plaintiff is effectively seeking the type of detailed impact disclosures required by the change in the law under ERISA section 204(h) enacted by Congress in 2001, more than five years after the Foot Locker conversion to a cash balance plan.12

> My observation:  Again, the second sentence does not say employees were legally entitled to lump sums under the prior Plan provisions:  The sentence (which would have been in the SPD issued in the Fall of 1996) says "your opening balance was less than half of the value of the minimum benefit to which you *are* legally entitled" under the Plan as amended, which makes the sentence perfectly accurate.

**Sher ¶ 92**.  The third sentence is, again, misleading. It does not state how the "value of your December 31, 1995 accrued benefit" is to be determined for this purpose and suggests that there is only one way to make that calculation.  It also suggests that such value is a constant, or at least, a stable amount.  When employees actually terminate and elect a distribution, the value of the protected benefit is dependent on the interest rates at the time which could be lower or higher than the rates when the Plan was converted.

> My observation:  Sentence 3 is perfectly accurate:  "until th[e] [cash balance] credits increase the balance to an amount larger than the value of your December 31, 1995 accrued benefit, the increases will not represent growth in your accrued benefit under the

---

12 As noted, the IRS regulations implementing this change in the law gave employers a framework and detailed rules that now protect an employer's discussion of the impact of these conversions.

Plan." Mr. Sher complains that this "suggests that there is only one way to make the calculation" – but there *is* only one way to make the calculation. The value of the December 31, 1995 benefit is determined under the terms of the Plan and ERISA. If the benefit is paid as an annuity, the December 31, 1995 annuity benefit is established by the terms of the Plan. Until the cash balance account becomes large enough that, when projected to age 65 and converted to an annuity using 417(e) assumptions, it is larger than the December 31, 1995 annuity benefit, the growth in the account does not represent pension growth (i.e., the accrued benefit is not increasing). If the benefit is paid as a lump sum, the December 31, 1995 benefit is the present value of the annuity benefit calculated using 417(e) applicable interest and mortality assumptions. Until the account balance exceeds that amount, growth in the account does not reflect pension growth (i.e., the lump sum benefit is not increasing). Mr. Sher's attempt to undermine the accuracy of the third sentence is unsuccessful.

**Sher ¶ 93**. The fourth sentence does not give any employee an indication as whether it is likely or under what circumstances it "could take several years" for the account balance to catch up to his or her prior accrued benefit, thus making this less than helpful. Again, to make this communication meaningful, plaintiff is effectively seeking the type of detailed impact disclosures required by the change in the law under ERISA section 204(h) enacted by Congress in 2001.

My observation: We are talking about a "summary plan description." An SPD is intended to be general in nature and put participants on notice about plan features that could adversely impact them. Tailored descriptions are not feasible. As a result, an SPD must speak in general terms and give appropriate caveats to the extent necessary to make the general warnings accurate. If a feature or impact applies to some employees in some situations, the SPD must say so. As Mr. Sher recognizes, tailored impact statements belong in 204(h) notices. Tailored responses also can and should (indeed must) be provided in response to individual inquiries prompted by the general warning set forth in the SPD. To the extent that there is any validity to Mr. Sher's criticism, the proper correction would not be to fail to explain how benefits are determined, but to include additional detail, with examples. The rules governing the content of SPDs state (at Labor Reg. § 2520.102-2(b) "The format of the summary plan description must not have the effect to misleading, misinforming or **failing to inform** participants" (emphasis added) Mr. Sher's recurring theme is that failing to inform is okay, if informing participants would require any level of effort (like explaining that 30-year Treasury rates change each year).

**Sher ¶ 94**. Even the fifth and last sentence is misleading and inaccurate. It leaves the false impression that the number of years during which the value of the prior plan benefit might exceed that account balance is known and unchanging for all employees. Of course that is not the case. In one year the value of the protected benefit might exceed the account balance, the next year the account balance might exceed the value of the protected benefit (if interest rates rise, for example), and the following year the value of the protected benefit might again exceed the account balance (if interest rates fall, for example).

My observation:  Mr. Sher does not appear to have read the fifth (or any of the preceding four sentences) very carefully.  It does not state, hint, or imply "that the number of years during which the value of the prior plan benefit might exceed that account balance is known and unchanging for all employees."  It simply explains that "once" the account balance gets big enough, a participant will start earning new benefits again (after the wear-away-induced freeze).

**Sher ¶ 95**.  In sum, these kinds of simplistic communications likely would do more harm than good.  Moreover, this kind of communication fails to take into account the significant advantages that the conversion offered to participants, including guaranteed, flexible and portable benefits.

My observation:  The only sense I can make of Mr. Sher's summary is that he must mean that "simple" communications on the type in Plaintiff's hypothetical would do more harm than good to his client.  He cannot possibly mean that open, honest communication with employees would harm them.  Surely, if Mr. Sher had problems with the suggested communication he would try to correct the perceived inaccuracies – not simply declare that the wear-away feature of the plan was too hard to explain, so better just not to say anything at all (and fail to inform participants of the very provisions that controlled the benefits of the vast majority of them, up until their termination of employment).  It is inconceivable to me that participants could be better off being kept completely in the dark about wear-away than being put on notice of the feature, regardless of how imperfect the communications might be.  Surely, the answer to communicating a complex subject (of obvious relevance and interest to employees) is not to give up, but to try harder.  As Roger Farah, Foot Locker's CEO at the time of the conversion, explained: "One of the hallmarks of great leadership is communication and the ability to make complicated subjects easy to understand depending on the audience. . . .  Your ability to adjust the level of detail and complexity for the audience is critical."  Clark, E., Clear Channels: Farah, Rubel, Bekenstein: Effective communication enhances the organization (Women's Wear Daily, November 12, 2008) at 12.

Mr. Sher seems to believe that the "advantage that the conversion offered to participants," somehow forgives any shortcomings that the communications may have had.  What are those purported advantages?  First, he lists "guaranteed" benefits.  The benefits were no more guaranteed after the amendment than before.  As illustrated above, until participants were out of wear-away they did not receive the "guarantee" of not being impacted by changes in interest rates and, to the extent that a participant wanted an annuity (this is, after all, a retirement plan), they were still impacted by changes in the interest rates after the wear-away period was up.  Further, as explained above, this same guarantee could have been accomplished simply by allowing lump sums under the prior plan, but guaranteeing that the lump sum would be determined at a rate not more than 6%.  Next, he lists "flexible."  Other than the fact that participants could take an annuity or lump sum benefit at the time of termination of employment (so long as they requested it within 6 months of termination of employment), I fail to see how the cash balance plan was any more or less flexible than the prior plan.  Finally, Mr. Sher lists "portable."  The concept that a benefit is portable simply means that a participant can take a lump sum and roll it

into an IRA or another qualified pension plan (and, in so doing, lose any potential value to early retirement subsidies or other annuity benefits).   In essence, "portable" is a fancy word for participants can take lump sums.

So Mr. Sher's advantages boil down to the plan was amended to allow lump sums (which also summarizes Dr. Niden's purported advantages of the conversion).   Thus, both Dr. Niden's and Mr. Sher's opinions seem to be "we gave them a lump sum, so what are they complaining about."   The answer is that what Plaintiff is complaining about is that after Foot Locker gave participants the right to a lump sum option they told them they would continue to earn benefits equal to the value of the annual pay credit, when in fact they either were earning less than what they were told or nothing at all.   For Mr. Sher's and Dr. Niden's combined 80 pages of report, plus exhibits and other attachments, neither has a response to this simple complaint.   Where are the benefit accruals that Mr. Osberg was told he was being given every year from 1996 through his termination of employment?[13]

---

[13] For example, in early 2002, he received a personalized benefit statement that stated "benefits shown in this statement represents a significant portion of your total compensation," including $1,584.43 as a compensation credit in the cash balance plan.

*     *     *

In my opinion, this report conforms to generally accepted actuarial principles and practices, and is in compliance with applicable Actuarial Standards of Practice.

I hereby declare under penalty of perjury under the law of the United States of America that this report is true and correct.

_____
Lawrence Deutsch, E.A.
Dated: June 7, 2012