UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **GEOFFREY OSBERG**<br>**On behalf of himself and on**<br>**behalf of all others similarly situated,**<br><br>                          **Plaintiffs,**<br><br>      v.<br><br>**FOOT LOCKER, INC. and**<br>**FOOT LOCKER RETIREMENT PLAN,**<br><br>                          **Defendants.** | 07 Civ. 1358 (KBF)<br><br>DECLARATION OF LINDA INE |

I, LINDA INE, under penalty of perjury pursuant to 28 U.S.C. § 1746, declare the following:

    1.    I was employed by Woolworth Corporation and then Venator Group, Inc. (collectively, "Woolworth" or the "Company") from 1979 until 1999. During the period 1996 though the end of my employment, I held the position of Corporate Benefits Manager. In that capacity, my particular responsibilities included supervision of a staff of approximately thirty human resources employees in the Company's Milwaukee facility that collectively comprised what was known as the Human Resource Operations Center ("HROC"). HROC was responsible for all benefits matters other than policy decisions, which emanated from the Company's executive offices in New York.

**Responsibilities of HROC Employees With Respect to the Cash Balance Plan**

    2.    Effective January 1, 1996, the Company converted the Woolworth Retirement Plan (the "Plan") from a traditional career average pay plan to a cash balance plan. Following the Plan amendment and until my departure from the Company in 1999, the employees I supervised were responsible for: calculating (or reviewing calculations of) participant retirement benefits when they terminated their employment; preparing (or reviewing) pension benefit

estimates, and operating a call-in phone center that responded to questions from employees about their pension and welfare benefits. As part of my responsibilities, I tried to make sure that the members of my staff responsible for these functions had an adequate understanding of the cash balance Plan.

3. In general, information and advice concerning the Plan's terms, as well as how best to provide information to inquiring Plan participants, was provided by the Human Resources personnel of the Corporate Benefits Department in the Company's New York headquarters, as well as the Plan's actuaries from William M. Mercer Inc. ("Mercer"), particularly James Grefig.

4. In the months immediately preceding and following the Plan's conversion to a cash balance Plan, I expressed concerns that members of my staff were not adequately informed about the Plan, and that my staff lacked the resources to calculate benefits and provide high volumes of benefit estimates in an automated, streamlined fashion. Annexed hereto as DX114 and DX73 are examples of internal emails and memos I sent and maintained in the ordinary course in order to advise my staff and individuals in New York about the status of HROC's operations, and in which I expressed these concerns. Due in part to instructional materials provided by Mercer and the Corporate Benefits Department in New York, and the development of internal processes for calculating benefits and completing benefit estimates, these issues were eventually resolved. I believe that my staff became well-enough informed to calculate benefits, complete benefit estimate forms, and provide information in response to inquiries from Plan participants. Whenever my staff was uncertain as to how best to respond to participant inquiries, they sought advice from the Corporate Benefits Department and used that advice as the basis for framing responses to other participants with similar questions.

2

### Calculating Benefits Under the Cash Balance Plan

5. Approximately six members of my group were responsible for preparing pension estimates and pension calculations. These employees constituted a team referred to internally as the "Outlaws." In the initial period following the conversion, pension estimates and pension calculations were prepared manually, which was a time-consuming process for the Outlaws. Later, the calculations were generated by computer, but the Outlaws were responsible for reviewing and ensuring their accuracy. As a result, it was essential that the Outlaws have a complete understanding of how participants' benefits were calculated under the Plan.

6. In order to ensure that the Outlaws could perform their responsibilities properly, Mercer and the Corporate Benefits Department provided us with detailed written instructions that illustrated the mechanics of how to calculate the different forms in which a participant could take the benefit to which he/she was entitled. Annexed hereto as DX110 is an example of written instructions we received, and annexed hereto as DX125 is a version of calculation guidelines, based on those instructions, that we created and referred to.

7. Among other things, the instructions from Mercer made clear that:

(a) A participant's initial cash balance amount was calculated by Mercer, the Plan's actuary, by actuarially converting a participant's accrued benefit as of December 31, 1995 into a lump sum amount.

(b) Each year, the amount in the cash balance account would increase as a result of: interest credits, calculated at a rate of 6% per annum; and pay credits, calculated as a percentage of a participant's salary, with the percentage dependent on the participant's years of service.

(c) Upon terminating employment, a participant could elect to receive an immediate lump sum or an immediate annuity benefit, in lieu of waiting until retirement age to receive a benefit.

3

(d) Since the Plan remained a defined benefit plan, the basis for calculating participants' benefits remained the accrued benefit payable at age 65 (the "Accrued Benefit"). The Accrued Benefit to which a participant was entitled under the cash balance formula was the greater of: (i) the annuity calculated based on the cash balance account; or (ii) the annuity benefit accrued under the prior formula as of December 31, 1995. (This is explained in DX110 at FL-OSB001841-42; DX125 at FL-OSB010125.)

(e) For participants electing to take their benefit in the form of an immediate lump sum, the participant would be entitled to the greater of: (i) the amount in the cash balance account; or (ii) a Minimum Lump Sum, which was calculated by actuarially converting the "Accrued Benefit" referred to above into its lump sum equivalent. The calculation was performed by multiplying the "Accrued Benefit" by a factor that incorporated the prevailing interest rate and mortality assumption mandated by the Internal Revenue Service, or "GATT" factor. (*See* DX110 at FL-OSB001842-43; DX125 at FL-OSB010126-27.)

8. During my deposition, I was confused as to how the Minimum Lump Sum was calculated. Specifically, I was confused as to whether the Minimum Lump Sum was attributable to the pre-1996 accrued benefit, or to the fact that the participant is entitled to the lump sum equivalent of the age 65 annuity generated by the cash balance account, rather than the account balance itself. From reviewing internal documents such as DX110 and DX125, I realize now that both concepts were incorporated into the Minimum Lump Sum calculation, in that: the Minimum Lump Sum was the actuarial lump sum value of the "Accrued Benefit"; and, as stated above, the "Accrued Benefit" was based on the pre-1996 annuity if that annuity was larger than the annuity generated by the cash balance account.

4

9. Among other things, the written instructions provided to my staff specifically explained how to compare the age 65 annuity generated by the cash balance account balance to the pre-1996 annuity for purposes of arriving at the "Accrued Benefit," and then to calculate the Minimum Lump Sum by taking the lump sum value of that "Accrued Benefit." (*See* DX110 at FL-OSB001841-42.) Furthermore, the guidelines relied upon by my staff contained examples of circumstances in which the pre-1996 annuity was greater than the annuity generated by the cash balance account, and circumstances in which the Minimum Lump Sum would be greater than the amount in the cash balance account. (*See* DX125 at FL-OSB010125-27.)

10. These instructions and guidelines therefore demonstrated to the members of HROC who calculated benefits that there could be circumstances in which, notwithstanding increases to the cash balance account due to pay credits and interest credits, the pre-1996 annuity benefit might still be greater than the annuity generated by the cash balance account, and that the lump sum equivalent of that annuity would be greater than the amount in the cash balance account. In those cases the increases in the cash balance account would not actually benefit the participant. I believe that my staff was aware of and understood this.

11. The Outlaws' understanding of the instructions received from Mercer is evident from the benefit calculation worksheets that they regularly prepared and maintained in connection with calculating, or reviewing the calculation of, participant benefits. An example of one such worksheet is annexed hereto as DX207, at FL-OSB009394-95. The example shows a participant with an initial account balance of $42,752.29, which was arrived at by actuarially converting the pre-1996 annuity of $20,576.74 to a lump sum. By the time the participant terminated employment in mid-1998, the cash balance account had grown to $65,614.32 through the addition of pay and interest credits. However, the participant's annuity based on his/her cash

balance account – 13,120.33 – was exceeded by his/her pre-1996 annuity of $20,576.74. The "Accrued Benefit" based on the pre-1996 annuity was used to calculate the Minimum Lump Sum of $95,136.15, which was nearly $30,000 greater than the account balance. Annexed hereto as DX111 is a similar example of an internal calculation, in this case for a participant who terminated in 1996.

12. Although I no longer recall all of the intricacies of the benefit calculations, my general recollection is that many participants received a lump sum benefit that was based on the pre-1996 annuity. I also generally recall that this was because the interest rate used to determine the starting balance in the cash balance account – 9% – was higher than the IRS rate used to calculate a Minimum Lump Sum based on the pre-1996 annuity at the time the participant terminated his/her employment. As a result, a lump sum based on the pre-1996 annuity benefit could be greater than (i) the lump sum derived from the cash balance annuity benefit or (ii) the account balance itself, notwithstanding the addition of compensation and interest credits to that account.

13. When I terminated my employment in 1999, I was aware that the lump sum benefit that I received was calculated based on the value of my pre-1996 annuity benefit because the lump sum value of this amount exceeded the lump sum to which I was entitled based on my cash balance account. As a result, I was aware that the pay and interest credits that accumulated in my cash balance account did not add to my benefit.

14. I have learned that the Plaintiff in this lawsuit alleges that for participants who, like me, received a retirement benefit based on the pre-1996 benefit, the Plan was effectively "frozen." Even though I was aware of how the cash balance benefit was calculated, I did not consider my benefits, or those of similarly situated participants, to be "frozen." Rather, my

6

understanding was simply that the cash balance account was increasing in size due to interest and pay credits but that regardless of the amount in the cash balance account, the participant could potentially receive a larger lump sum benefit based on the value of the pre-1996 benefit. At the time, I viewed the opportunity to receive my benefits in the form of a lump sum to be a big advantage that was not available prior to the cash balance amendment, and that far outweighed the fact that the accruals in my cash balance account ended up not adding to the amount of my retirement benefit.

**Communications With Plan Participants About the Cash Balance Plan**

15. Plan participants received information concerning the Plan and the calculation of Plan benefits from a number of sources, in addition to the Summary Plan Description and other Company-wide communications. One such source was the benefit estimates that were provided to participants upon request or shortly in advance of the termination of their employment. Among other things, benefit estimates provided participants with information concerning the relationship between the Minimum Lump Sum and the account balances – and the fact that a participant's Minimum Lump Sum may exceed his/her account balance for years after the Plan conversion.

16. Annexed hereto as DX91 is an example of a benefit estimate showing exactly this: the cash balance account is equal to $93,214 as of August 1, 1999, yet as of that same date the participant is entitled to a Minimum Lump Sum in the amount of $101,177.36. This is the type of estimate that would have been completed by Marion Derham or a member of her staff in New York, and then ordinarily sent to a participant.

17. Members of HROC's staff also provided participants with detailed calculations of their benefits upon request. Annexed hereto as DX83 is an example of one such calculation,

completed and maintained in the ordinary course of business by Don Kappel, who served as a Benefits Department Manager at the time.

18. If a participant requested a benefit estimate shortly before retirement, that estimate would set forth, among other things, the participant's "Annual Accrued Benefit" as of the anticipated retirement date. Consistent with the "greater of both calculation" we performed, as described in paragraphs 7 and 8 above, the Annual Accrued Benefit as of the retirement date would be identical to the December 31, 1995 annuity in those instances where the December 31, 1995 annuity exceeded the annuity generated by the cash balance account.

19. I am also aware that participants received benefit statements in 1996, shortly after the cash balance conversion, which included their annual accrued benefit as of December 31, 1995. (DX310, DX311.) Thus, participants requesting a benefit estimate shortly before their retirement would have been able to see if the Annual Accrued Benefit as of their retirement date, as stated on the benefit estimate, matched the annual accrued benefit as of December 31, 1995, as stated on the benefit statement. This would mean that they had not accrued any benefit beyond what they had already accrued as of December 31, 1995.

20. Many participants received additional information concerning the calculation of their benefits in response to inquiries made to HROC. Participant inquiries concerning the cash balance Plan typically came in through the call-in center. The call-in center, which was in existence long before the cash balance conversion, was manned by a team of six to eight employees in my group, known internally as the "Ducks." The Ducks typically fielded several hundred calls per week; possibly as many as a thousand. Although many inquiries related to health or other benefits, in the period following the cash balance amendment, a large number of calls related to the cash balance Plan. Participants typically requested information as to how

8

their cash balance benefits, or the figures appearing in benefit estimates or benefit statements, were calculated. (*See* DX114, DX73.)

21. Because the Ducks' understanding of the cash balance Plan was not as deep as the understanding of the Outlaws, the Ducks were instructed to refer participant inquiries concerning the calculation of benefits to one of the Outlaws, or one of the team leaders responsible for supervising them. The volume of calls was so heavy that, as my internal communications indicate, the Outlaws were instructed to check their phone messages three times a day to listen to questions from callers. (See DX114 at FL-OSB007141-44.)

22. The Outlaws and the team leaders would in turn consult with the Corporate Benefits Department in New York on the best means to respond to these inquiries. Typically, the New York office would be consulted when there was a particularly difficult question or when there was an accumulation of similar inquiries for which HROC was seeking a model response. Members of the New York office, including in particular Thomas Kiley or Marion Derham, would then either email instructions as to how to respond to a particular type of question, or would prepare a letter response to a particular participant that would then be used as a model for responding to similar inquiries, whether orally or in writing. Examples of the type of model letters that were used as a resource are annexed hereto as DX49, DX50, DX52, DX53 and DX79.

23. Many of the inquiries we received stemmed from confusion as to how the initial account balances were calculated, and the relationship between the initial account balances and the annuity benefit that had been accrued under the prior Plan formula. Some of this confusion stemmed from a lack of understanding as to the difference between a monthly annuity, which was how the prior accrued benefit was depicted, and a lump sum, which was how the cash balance account was depicted. Participants also had difficulty understanding that their prior

accrued benefit was the benefit they would receive at age 65, and that this amount would be reduced for purposes of determining what a participant was entitled to at an earlier age. Annexed hereto as DX384 is an April 22, 1997 letter from a participant to Don Kappel, which serves as an example of participants' confusion over this issue.

24. Participants also expressed confusion as to why colleagues of theirs who had approximately the same amount of tenure at Woolworth appeared to be entitled to a greater benefit than they were. Sometimes this discrepancy was attributable to the fact that the other employee was entitled to a benefit enhancement, by virtue of his/her age and service at the time of the cash balance conversion. The discrepancy might also be attributable to the fact that a younger employee would appear to be receiving a lower benefit, when in fact this was merely the result of the actuarial calculation of the pre-1996 accrued benefit. (*See* DX114.)

25. Although I don't recall exactly what information was conveyed to participants about how the initial account balances were calculated or their relationship to the December 31, 1995 accrued benefit, I do recall that our practice was to follow the instructions received from the New York office. Annexed hereto as DX81 is an email chain from 1997, sent and maintained in the ordinary course of business, in which Don Kappel requests guidance from the New York office as to how to respond to participant inquiries about the relationship between the accrued benefit and account balance. While I do not specifically recall the response that was provided by the New York office, a September 2, 1997 letter by Marion Derham (DX52) is consistent with the sort of template that the New York office would have given us as a means to respond to such inquiries. A September 15, 1997 letter from Kappel (DX53) demonstrates the use of this template.

26. DX122 is a similar email chain from 1997, created and maintained in the ordinary course of business, in which Kappel requested from the New York office a standard response to participant inquiries about (i) why participants' accrued benefits did not change from year to year and (ii) why a participant's lump sum benefit shown on a current estimate would be less than the lump sum benefit shown on an estimate from the previous year. While I do not specifically recall the response that was provided by the New York office to these particular inquiries, the files contain a form letter for HROC's signature (DX79), which would have served as a template for responding to such inquiries, and which is consistent with the sort of document that the New York office would have given us. A May 15, 1997 letter from Kappel (DX49) demonstrates the use of this template.

27. During my deposition in this lawsuit, I stated at one point that participants were advised that the starting balances in their cash balance accounts were "equal" to the benefits that they had accrued through December 31, 1995 under the prior Plan formula. By stating this, I meant to convey that the pre-1996 annuity had been actuarially converted into a lump sum amount. For the reasons stated above, I was aware that, by virtue of the assumptions used to make that calculation, the starting balances might -- and in fact often did -- turn out to be less than a participant's Minimum Lump Sum benefit; and this same information was conveyed in the various written and oral communication to Plan participants.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

DATED: June 29, 2015
Milwaukee, Wisconsin

Linda Ine

11