UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

**GEOFFREY OSBERG**
**On behalf of himself and on**
**behalf of all others similarly situated**

       **Plaintiffs,**

   v.

**FOOT LOCKER, INC. and**
**FOOT LOCKER RETIREMENT PLAN,**
        **Defendants.**

---

07 Civ. 1358 (KBF)

**ECF CASE**

**DECLARATION OF PATRICIA A.**
**PECK**

---

I, Patricia A. Peck, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that:

1.  In 1976, and then from January 1978 until February, 2015, I was employed by

Foot Locker, Inc. and its predecessor corporations, Woolworth Corporation and Venator Group,

Inc. (collectively, "Foot Locker" or the "Company").  During the period from February 1992

through February 2015, I was Vice President, Human Resources for the Company.

**Responsibilities in Connection With the Cash Balance Conversion**

2.  As Vice President, Human Resources, my responsibilities included, among other

responsibilities, the supervision of Foot Locker's Corporate Benefits Department in New York

and the Human Resources Operation Center ("HROC") in Milwaukee, Wisconsin.

3.  In late 1994 or early 1995, Foot Locker's management announced that, in light of

the Company's poor financial condition, it was necessary for the Company to cut costs, including

with respect to retirement benefits.  Members of senior management instructed me to provide

them with a suitable recommendation.  Because I did not have any specialized training in

employee benefits or finance, I asked Thomas Kiley, who was then serving as Manager of

Benefits Planning and Design, to work with the Corporate Benefits Department and William M.

Mercer Incorporated ("Mercer"), the actuary to the Woolworth Retirement Plan (the "Plan"), in providing me with a recommendation for management.  After lengthy internal deliberations, and based on advice received from James Grefig of Mercer, Kiley recommended that the Plan be converted from a traditional career average pay defined benefit plan to a cash balance plan, and that this change occur simultaneously with the institution of a 401(k) plan with corporate matching contributions.

4.     As explained to me, the recommended changes were designed to address management's desire to save costs, while at the same time modernizing Foot Locker's retirement benefits in a manner that was more consistent with the needs of its increasingly mobile workforce.  The cash balance plan formula was viewed as an appropriate means to address the employees' desire for a portable benefit that they could elect to take in the form of a lump sum. The portability feature was particularly important at this time, given the large number of employees who would soon be leaving the Company.  We were at the time in the process of closing many Company locations and concentrating in the specialty shoe arena, and as a result many thousands of employees were being let go.

5.     The 401(k) plan presented a means for employees to supplement their retirement savings, which was particularly important in light of the reduced retirement savings that many of them would realize under the new cash balance plan formula, when compared to the previous formula.

**Internal Understanding of Cash Balance Terms**

6.     As confirmed by my internal notes (a copy of which is annexed hereto as DX140), in early 1995 I participated in at least one meeting in New York with the Corporate Benefits Department, as well as James Grefig and other Mercer staff, during which the terms of

the proposed cash balance plan were described.  Although I do not recall the specifics of these

discussions, I do recall being told that under the new Plan design there would be an initial period

of time during which the minimum benefit to which a departing participant was entitled, based

on his/her benefit accruals under the prior Plan formula, would be greater than the amount

accumulated in the cash balance account.  I did not at the time consider this "wear-away" effect

to be a significant aspect of the Plan design.  From my perspective, the significant features of the

cash balance plan were that it was more affordable for the Company and it provided benefits in a

more popular form for participants.

**Communications to Foot Locker's Board and Senior**
**Management About Recommended Plan Amendments**

7.      I participated in meetings, first with senior management (known as the

Chairman's Group) on July 20, 1995, and then with the Company's Retirement Investment

Committee on August 8, 1995, during which the recommended changes to the Plan were

explained.  The minutes of the meeting with the Retirement Investment Committee are annexed

hereto as DX9.  As indicated by the minutes of the Board of Directors meeting (annexed hereto

as DX10), a presentation was also made to the Board concerning the recommended changes,  I

did not participate in this meeting.

8.      To assist us in conducting these discussions, we used presentation materials that

were prepared by Mr. Kiley, with assistance from Mercer.  The presentation materials shown to

the Chairman's Group are annexed hereto as DX41.  The presentation materials shown to the

Retirement Investment Committee are annexed hereto as DX42.

9.      Annexed hereto as DX43 is a memo I sent to the Board members containing a

brief explanation of the proposed changes to the Plan, and attaching an abbreviated version of the

presentation that was made to the Retirement Investment Committee.  This presentation is

3

annexed hereto as DX39.

10.     Although the presentations materials contained the recommendation to convert the Plan to a cash balance formula, they did not provide all the details about the formula, including the manner in which initial account balances would be calculated under the converted Plan, or the wear-away effect of the Plan design. Although I likely played a role in editing these materials, it would not have been my practice to add content to them, as the content was supplied by Mr. Kiley and Mr. Grefig and their respective assistants.

11.     The presentation materials identified other options for effecting savings that the Corporate Benefits Department had decided against recommending. The rejected options included a temporary or permanent plan freeze. Although I don't recall specifically thinking about these options, I would have at the time considered a plan "freeze" to mean a complete cessation of plan benefits, and would have concluded that such a "freeze" would be detrimental to employee morale. I did not, however, consider the cash balance plan to be an alternative to a plan freeze, and a plan freeze was never presented to me as an alternative worth pursuing.

12.     During my deposition, I conceded that, with the benefit of hindsight, the wear-away effect of the Plan could be viewed as a plan "freeze," insofar as participants did not during the period of wear-away end up benefitting from the additions to their cash balance account. At the time of the cash balance Plan conversion, however, I did not equate the wear-away effect of the Plan with a benefit "freeze." From my perspective, the cash balance plan added a lump sum option that was not previously available, which is not something that would have occurred if the Plan were simply frozen. Furthermore, at the time the cash balance formula went into effect, my understanding was that the wear-away period would not last for very long.

**Internal Understanding of Wear-Way**

13.     It is my understanding that Plaintiff has asserted that I testified to having made

sure that wear-away was known by only a small number of employees in the New York office.  I

have reviewed the video-taped transcription of my deposition testimony and do not find this to

be an accurate characterization of what I said, and certainly not what I meant to say.  At the time,

it was my understanding that not many Human Resource employees were familiar with the term

"wear-away," or how the Plan's design features resulted in wear-away.  But this was not the

result of anything I did or intended.  Furthermore, while few people may have understood "wear-

away" as such, it was my understanding that all the terms of the Plan impacting the calculation of

Plan benefits, including those giving rise to wear-away, were fully explained to the HROC

personnel in Wisconsin who were responsible for calculating Plan benefits.

**Communications to Plan Participants About the Cash Balance Plan**

14.     It is also my understanding that the Plaintiff in this lawsuit alleges that Foot

Locker adhered to a policy of not informing participants of wear-away and that this is evident

from my deposition testimony.  It is not true that Foot Locker had any such policy, and I did not

intend to suggest in my prior testimony that it did.

15.     There were several means by which Plan participants were advised of their

benefits under the cash balance plan.  Among other things: (i) there were two Company-wide

communications during the period when the Plan first went into effect; (ii) employees received

individualized communications (*e.g.*, benefit statements) on a periodic basis;

(iii) employees at various central locations received presentations concerning their benefits; (iv)

employees received benefit estimates, upon request and shortly before terminating their

employment; and (v) many employees received information in response to individual questions

posed to Human Resource representatives, either in writing or verbally by accessing Foot

Locker's call-in center in Wisconsin.

16.     Although I had responsibility for overseeing the personnel responsible for these

communications, I played a direct role only in connection with certain of the Company-wide communications, including: (i) a letter distributed by Foot Locker's CEO and COO announcing the 401(k) plan and cash balance plan amendments in September 1995 (annexed as DX20 hereto); (ii) a memorandum distributed in November 1995 that described the cash balance plan changes (annexed as DX29 hereto); and (iii) the Summary Plan Description that was distributed several months after the cash balance plan went into effect (annexed as DX37 hereto).

17.     Even with respect to these communications, my role was limited, in that each was initially drafted, in collaboration with the staff at Mercer, by: (i) someone in the Corporate Benefits Department, (ii) someone on Foot Locker's internal legal staff, or (iii) W. Barry Thomson, Foot Locker's Chief Administrative Officer at the time.  Each communication was also reviewed and edited by more senior officers and outside professionals, who I understood to be responsible for ensuring that these documents contained whatever information was legally required.

18.     For example, the September 1995 announcement letter (DX20) was reviewed and edited by: (i) Barry Thomson, who may have also drafted the document; (ii) Foot Locker's outside counsel; and (iii) Gary Bahler, Foot Locker's General Counsel at the time.  This is confirmed by drafts of the document, relevant copies of which are attached hereto as DX18 and DX19.

19.     The November 1995 memorandum (DX29) was reviewed and edited by: (i) Barry Thomson; (ii) Gary Bahler; (iii) James Grefig; and (iv) Foot Locker's outside counsel. This is confirmed by drafts of the document, relevant copies of which are attached hereto as DX21, DX25, DX26, DX27, and DX28.

20.     Finally, the Summary Plan Description (DX37) was reviewed and edited by: (i)

James Grefig and other Mercer staff; (ii) Foot Locker's outside counsel; (iii) Gary Bahler; and (iv) Jeremy Nowak, Foot Locker's Vice President of Taxation at the time. This is confirmed by drafts of the document, relevant copies of which are attached hereto as DX31, DX32, DX33, DX34, and DX36.

21.    It was generally my practice to accept and implement the changes recommended by these individuals. And I would never have excluded any information that I was advised we were required to include.

22.    In my testimony, I stated that in certain of these Company-wide communications, I tried to put in a positive light the changes made to the Plan, so as not to unnecessarily harm employee morale. I viewed that to be consistent with my practice generally as the head of Human Resources. But in performing that function, I did not alter through either addition or subtraction the substantive content of the communications that were prepared by others. At most, I edited style and phrasing of the language that had been provided to me.

23.    The information about the cash balance formula that was set forth in Company-wide communications was supplemented by information provided by the Corporate Benefits Department in New York and the members of HROC in Wisconsin when communicating with individual employees and groups of employees. I always encouraged these departments to fully respond to employee inquiries and never inhibited their efforts to do so.

24.    To the best of my recollection, I did not have any direct involvement in connection with the presentations made at the various locations, or the preparation of benefit statements or benefit estimates sent to individual participants. I also did not draft responses to individual participant communications, although I may have reviewed some of these responses. I did not instruct anyone who had prepared a response to an individual participant to omit or

delete any explanations of how the initial account balance was calculated, or the fact that the initial account balance could be less than the benefit to which the participant would be entitled if he/she left employment the next day.  In other words, I took no action to prevent members of my staff from communicating the wear-away effect of the Plan's benefit formula.


DATED:  June 26, 2015                    *Patricia A. Peck*
New York, New York                       Patricia A. Peck