UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **GEOFFREY OSBERG**<br>**On behalf of himself and on**<br>**behalf of all others similarly situated**<br><br>                    **Plaintiffs,**<br><br>             **v.**<br><br>**FOOT LOCKER, INC. and**<br>**FOOT LOCKER RETIREMENT PLAN,**<br>                    **Defendants.** | 07 Civ. 1358 (KBF)<br><br>**ECF CASE**<br><br>**DECLARATION OF THOMAS J.**<br>**KILEY, JR.** |

I, Thomas J. Kiley, Jr., declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that:

1.      During the period from 1974 until 2000 I served as a Manager of Benefits Planning and Design for Woolworth Corporation and then Venator Group, Inc. (collectively, "Woolworth" or the "Company"). I worked in Woolworth's Corporate Benefits Department in New York, New York.

2.      Among my activities for Woolworth was my assistance in recommending the amendments to the Woolworth Retirement Plan (the "Plan") that resulted in the conversion of that Plan from a traditional career average pay defined benefit plan into a cash balance plan effective January 1, 1996, and the simultaneous creation of a 401(k) plan with corporate matching contributions.

3.      The Plan changes were recommended in response to a request I received from my direct supervisor, Patricia Peck, Vice President-Human Resources. Ms. Peck requested that, in light of the Company's deteriorating financial condition, I come up with recommended changes to the retirement Plan that would save costs, but that I try to do so in a manner that was most

suited to the needs of the Plan participants.

4.      My recommendations were based in large part on the advice of the Plan's actuary, James Grefig of William M. Mercer Incorporated ("Mercer").  However, my recommendations were also based on my own past research and familiarity with what competitor companies were doing.

5.      For several years before the cash balance amendment went into effect, I conducted research into means by which the Plan could be modernized, so as to be more responsive to the needs of Woolworth's workforce.  Among other things, I participated in meetings and phone conferences with benefits employees of 20-30 other retail companies.  This group was formed several years earlier in order to create a forum for exchanging ideas and discussing issues pertaining to benefits.  In addition to phone conferences, this group conducted in person meetings on about an annual basis, at different locations.

6.      With respect to pension benefits, there was a general recognition at these meetings that companies were looking to transition away from traditional defined benefit plans because these plans were very costly, cumbersome to administer, and less suitable to a mobile workforce.  I learned that some companies had begun to sponsor 401(k) plans and that several had converted – or had considered converting – their defined benefit plans to a cash balance design.  Cash balance plans were viewed favorably at the time because they enabled participants to take their benefits in the form of a lump sum when they changed jobs, rather than to wait to receive a monthly annuity commencing at retirement age.  They also offered the advantages of a defined contribution plan – a benefit that could be rolled over when a participant left employment – without the attendant risks since the income earned on the account was guaranteed by the employer.  My understanding of cash balance plans was bolstered by literature that I

periodically reviewed.  DX169, annexed hereto, is consistent with the type of literature I would have read.

7.     Although I do not recall specifically when I first recommended that the Plan be converted to a cash balance plan, accompanied by a 401(k) plan, the documents in my files indicate that this recommendation was reached no later than January 1995.  Attached hereto as DX289 are presentation materials that include a listing of alternative plan designs together with a recommendation to adopt a cash balance design.  The portions of this document describing the pension Plan options likely would have been prepared by Mercer and/or another consulting firm, with input from me.

**Design of the Cash Balance Plan**

8.     As I previously mentioned, the decision to recommend the cash balance Plan was based in part on the advice of Mercer.  Mercer was also responsible for recommending the specific design of the cash balance Plan.  I would not have had sufficient knowledge to come up with the design terms on my own and, for the reasons stated, I lacked the expertise to calculate the cost implications of the various Plan terms.  Annexed hereto as DX159 and DX245 are communications from Mercer containing examples of the type of advice provided by Mercer concerning the terms of the Plan.

9.     My interactions with Mercer concerning the design of the cash balance Plan are codified in my detailed notes of my communications with them during the period of February through November of 1995, copies of which are annexed hereto as DX141, DX142, DX143, DX146, DX147, DX148 (at FL-OSB011848-52), and DX149.  I generally took verbatim notes of what occurred at meetings and telephone conferences like these.

10.    Among the terms that Mercer recommended were: (i) that each participant would

have a starting balance derived from the benefit accrued under the prior Plan; (ii) the methodology for actuarially converting the prior accrued benefit into the starting balance; (iii) a formula for enhancing the benefits of participants who were age 50 or older with at least 15 years of service at the time of the cash balance conversion; (iv) the rates at which to award compensation credits that were added to the accounts, based on a percentage of a participant's compensation; and (v) the interest rate to be applied for purposes of calculating interest credits added to the account.

11.    Mercer recommended that the cash balance Plan have an initial account balance that was determined based on the benefit accrued under the prior Plan formula. I do not recall any discussion with Mercer of an alternative "A plus B" design, pursuant to which participants would continue to receive the annuity accrued under the prior formula and their account balances would start at zero. I also do not recall ever discussing this approach with benefits employees from the 20-30 retailers described in paragraphs 5 and 6. I do not think such a proposal would have been viewed favorably since it would have deprived participants of the ability to obtain their prior accrued benefits in the form of a lump sum.

12.    Mercer advised that the initial account balances should be determined by actuarially converting the annuity accrued under the prior Plan formula into a lump sum, using a 9% interest rate and mortality assumption. Mercer advised that the 9% interest rate was an appropriate rate for determining a starting balance that was actuarially equivalent to the prior accrued benefit and never recommended a lower rate.

13.    At one point during my deposition, I appear to have conceded that the 9% interest rate was not selected because it corresponded with the Plan's assumed investment return date.

4

Having reviewed my notes, and other communications, I now recall that this was in fact at least one of the reasons why this rate was chosen.

**Wear-Away Feature of the Plan**

14.     Together with other members of the Corporate Benefits Department in New York, I learned from Mr. Grefig that the cash balance plan he was recommending would have a "wear-away" effect.  This meant that there would be a period of time during which a participant's cash balance account balance would be less than the sum to which he/she would be entitled based on the benefits accrued prior to the cash balance conversion.  My general recollection is that the wear-away resulted from the fact that the assumptions used to determine the initial account balances were different than the assumptions that we were required by the IRS to use when calculating the benefit to which a participant would be entitled, based on the accrued benefit under the prior Plan formula.

15.     My internal notes indicate that wear-away was first discussed at a meeting in February 1995, sometime after we had decided to recommend that the Plan be converted to a cash balance formula.  A copy of my notes from this meeting is attached hereto as DX143.  I doubt that I would have been aware of wear-away before receiving this explanation from Mr. Grefig.  Thus, my recommendation to Pat Peck that the Company adopt a cash balance formula must have been made independently of any awareness of savings generated by wear-away.

16.     From reviewing my notes, I recall that when the design of the cash balance Plan was first discussed in early 1995, Mr. Grefig projected that wear-away would last a short period of time.  My notes from a meeting on April 10, 1995 (attached hereto as DX142), for example, indicate that Grefig advised that the cost savings associated with wear-away would be eliminated within two to three years.

5

17.     During my deposition opposing counsel suggested that I would have been aware in 1995 that interest rates were dropping and thus that the expected period of wear-away would be longer than Grefig had originally forecast.  Although I testified at the time that I generally kept track of interest rate movements, I do not recall doing so on a month-to-month basis; and in 1995, I would not have had the ability to do so without assistance from Mercer.  As I testified, it was likely that Mercer updated us on the pertinent interest rate only once a year, since benefit calculations throughout the year were based on the interest rate in effect at the end of the prior year.  I do not see any evidence in my notes that Mercer ever suggested during the course of 1995 that the conversion rate should be adjusted in light of interest rate movements. Furthermore, from reviewing internal communications and my notes, I realize that we originally intended to implement the cash balance conversion in 1995. (*see* DX 172, DX147.)  In that case, participants terminating employment shortly after the conversion would have been entitled to a lump sum that was calculated using the interest rate in effect as of the end of 1994, and not the lower rate that was in effect at the end of 1995.

**Presentations to Corporate Management About the Plan Amendments**

18.     Beginning in July 1995, presentations were made to senior management and to the Company's Retirement Investment Committee about the recommended amendment of the Plan to a cash balance design and sponsorship of a 401(k) plan with corporate matching contributions.  I was responsible for drafting the presentation materials, with assistance from Mercer, and these materials were likely edited by Pat Peck, among others.  I may have attended at least one such presentation.  The presentation materials that were shown in July 1995 and thereafter are annexed hereto as DX39, DX41 and DX42.  The presentation materials for the

Chairman's Group, annexed hereto as DX41, include handwritten notes that I prepared to assist Pat Peck in making this presentation. (*See, e.g.*, FL-OSB004390, FL-OSB004405.)

19.     A May 1, 1995 version of the presentation materials, which was not shown to senior management, contained a listing of alternative proposals to achieving cost savings, and the pros and cons of each. (*See* DX38, at FL-OSB005458.)  My recollection is that these alternatives were listed merely for purposes of explaining the alternatives that the Corporate Benefits Department had previously considered before recommending the cash balance conversion and 401(k) plan; they were not presented as alternatives that were still under consideration.

20.     One of the alternatives identified in the draft presentation materials was a temporary freeze of the Plan.  I understand that Plaintiff has suggested that Woolworth decided on the cash balance plan so as to achieve a temporary freeze of the Plan without the negative consequences identified for a plan freeze, including adverse publicity and poor employee morale. This is not true.  At the time, no one viewed the cash balance Plan as a temporary freeze, let alone a means of achieving a temporary freeze without announcing one and provoking negative publicity and poor morale.  Furthermore, another, later, draft of these presentation materials (which also was not shown to management) projected that a cash balance conversion would similarly generate adverse publicity and poor employee morale.  (*See* DX249, at MercerFL0003844.)

21.     Having now reviewed the materials prepared in connection with the presentations to senior management, I am aware that they contain no specific references to wear-away.  I do not believe that this reflects any intention on the part of Pat Peck or the Corporate Benefits Department to keep management in the dark about wear-away, as there were no internal

discussions to that effect.  Rather, the omission of a reference to wear-away was probably due to the fact that, while we generally understood and communicated that the cash balance amendment would generate savings to the Company, we did not specifically focus on the extent to which those savings might be attributable to the Plan's wear-away feature, and viewed reduced accrual rates under the converted Plan as the principal means of generating savings years into the future.

22.     I have reviewed videotaped portions of my deposition in which I may have suggested that I was inclined to disclose additional information to senior management (as well as to Plan participants), including with respect to wear-away, but that I was deterred from doing so by Ms. Peck.  I find this testimony to be inaccurate, and inconsistent with other portions of my deposition testimony during which I testified that we did not view wear-away to be a freeze and did not focus on wear-away as a key component of the converted Plan.  I likely agreed with opposing counsel's contentions to this effect as a result of (i) becoming fatigued (as is evident from my review of the video) and confused during the course of the extensive questioning by opposing counsel, and (ii) having failed to distinguish my contemporaneous views in 1995 with my views in March 2012, with the benefit of hindsight.

23.     Furthermore, although at my deposition, I testified that it would not have been my place to go around Ms. Peck and make disclosures that she had not authorized, I did not mean to suggest by this that I wanted to convey additional information to senior management but did not do so for fear of losing my job.  All I meant to say, and what in my view is standard workplace protocol, is that middle management employees (such as myself) generally do not communicate directly with company executives without first consulting with their supervisor.  If I was inclined to have additional information conveyed to senior management, I would have included it in the draft presentation materials that would be presented to Ms. Peck in the ordinary course, as I

8

never felt deterred from making written proposals.  Yet, I find no evidence to suggest that I ever included in the drafts a reference to wear-away, or even to the manner in which starting balances were calculated.

24.     My present recollection, after reviewing my notes and the draft and completed presentation materials, is that the substance of whatever I intended at the time to convey to senior management about the cash balance Plan amendment was in fact conveyed, and that there was no effort by Pat Peck to inhibit me in recommending what to convey or to edit out the substance of what I recommended we convey to senior management.

**Disclosure of Information About Wear-Away to Plan Participants**

25.     I am advised that the Company – and specifically Ms. Peck – is accused of purposefully concealing information concerning the wear-away feature of the Plan from Plan participants; and, specifically, the fact that it resulted in participants working for a period of time without accruing any new benefits.  These accusations are not true.

26.     To begin with, as I already testified, although the members of the Corporate Benefits Department understood that, for a period of time, the lump sum value of the benefit accrued under the prior Plan formula would be greater than the account balance, no one ever viewed the cash balance conversion, or the wear-away feature, as akin to a Plan "freeze," in the sense of participants working for no additional pension benefits.  At the time, we all viewed the cash balance plan very differently from a "freeze," among other reasons because it offered participants for the first time with the opportunity to take a lump sum benefit.  I also do not recall anyone at Mercer ever referring to wear-away as akin to a "freeze."

27.     Second, although Ms. Peck was very involved in supervising the process pursuant to which Company-wide communications about the cash balance Plan were written, and she

generally favored positive messages for the sake of boosting employee morale, she never instructed me or anyone else to mislead participants about the cash balance formula, or to conceal the wear-away effect of the formula.  Nor did she deter me or anyone else from disclosing information about the cash balance formula, including its wear-away effect.  Because at the time we did not view the wear-away effect as causing any great hardship that warranted additional disclosures to the participants, we focused instead on how best to explain to participants more fundamental concepts regarding the calculation of their benefits.  The Plan formula was very confusing to the Plan participants for multiple reasons independent of its wear-away effect, and we were constantly focused on trying to provide the information participants needed to know in a manner that was understandable to them.

28.     Third, the Company-wide communications were reviewed by and vetted with, among others, Mr. Grefig and other Mercer employees, and the Plan's general counsel and outside counsel, who collectively proposed many revisions to these documents.  I was personally involved in distributing drafts for comments by some of these professionals.  Annexed hereto as DX15, DX22, DX23, DX27, DX33, DX34, DX35, and DX36 are examples of my efforts to solicit and transmit editorial comments on the documents.  My recollection is that the proposed changes we received were generally implemented.

29.     Fourth, independent of the Company-wide communications that are referenced in the Complaint, there were numerous other communications concerning the cash balance Plan that in the ordinary course of business were issued to individual participants as well as large groups of participants.  Unlike the information contained in Company-wide communications, which was typically limited to general information applicable to all participants – including participants who joined the Company after 1995 and thus had no prior accrued benefit or wear-

away issues – we included more detailed information in individual communications that addressed the inquiring participant's unique circumstances.

30.     For example, members of the Corporate Benefits Department in New York were responsible for conducting meetings at various central work sites to explain to the employees the changes to their pension benefits.  During these meetings they provided both oral and written explanations of the cash balance Plan.  An example of the written materials distributed is attached hereto as DX47.  These materials specifically explain that: (i) the opening account balance was calculated using a mortality assumption and a 9% interest rate; (ii) participants were entitled to a minimum benefit, based on the pre-1996 frozen accrued benefit calculated using what was at the time a 6.06% interest rate; and (iii) as a result, there were various scenarios under which this minimum lump sum could be worth considerably more than the starting account balance.  I believe that materials resembling DX47 were distributed to numerous work sites across the country.

31.     Additionally, members of the Corporate Benefits Department in New York prepared, or worked with the Human Resource Operations Center in Milwaukee, Wisconsin ("HROC") in framing, written responses to participant inquiries concerning the calculation of their cash balance benefits.  I was frequently consulted on how to frame responses to participant inquiries, and some of the responses I prepared served as templates for more widespread responses provided by HROC, which entertained thousands of participants' inquiries.  (*See* DX81 and DX122, which are examples of regularly maintained email records of HROC staff consulting with me and others in New York regarding specific inquiries about benefits HROC had received from participants.)  Some of the responses I framed more fully explained the features of the Plan, including the method by which the opening balance was calculated and the

circumstances under which the account balance might be less than the minimum lump sum to which a participant could be entitled. Ms. Peck did not instruct me on how to frame these responses. Examples of responses that I helped to prepare are annexed hereto as DX46, DX55 and DX78.

32.     DX46 advises a participant of his/her benefit entitlement as of January 1, 1996 and how it is calculated. Specifically, it advises that the minimum lump sum is the amount that would have been payable if the participant had left employment as of January 1, 1996, and is calculated based on the 6.06% Treasury Bill rate and mortality assumption prescribed by federal law. It also advises the participant that the initial account balance is calculated based on a 9% interest rate, which corresponds to the Plan's assumption for investment returns, as well as a mortality assumption, and that the initial account balance will be incremented over time by interest and pay credits. As both the initial account balance and minimum lump sum figures are presented, the participant is able to see that the minimum lump sum is greater than the initial account balance, and thus pay and interest credits added to the initial account balance may not increase the lump sum  benefit to which the participant later becomes entitled.

33.     DX55 provides similar information, but in somewhat greater detail and as of a later point in time. The participant is shown here that: (i) the annuity benefit accrued through December 31, 1995 under the prior Plan formula ($32,006.66) has been converted into an initial account balance of $140,667.67, by multiplying the annuity amount by a factor that corresponds to the 9% interest rate and mortality assumption; (ii) by the end of 1996 the account balance has grown to $154,234.75, based on compensation and interest credits; and (iii) notwithstanding these additional credits, the amount in the account balance as of the end of 1996 is exceeded by the minimum lump sum of $224,817.02, which is calculated by multiplying the pre-1996 accrued

annuity benefit referred to above ($32,006.66) by a factor corresponding to the mortality assumption and interest rate assumption (6.06%) prescribed by the IRS as of January 1, 1996. The cover memo further notes that the calculation of the minimum lump sum will need to be adjusted to reflect the prescribed IRS rate for 1997, which will be based on the Treasury Bill rate as of January 1, 1997.  Accordingly, through this communication, the participant is made aware that the compensation and interest credits that are accumulating in his account balance may not add to his retirement benefit, because the account balance may still be exceeded by the lump sum based on the pre-1996 accrued benefit, the value of which will fluctuate based on the Treasury Bill rate.

34.     In light of these communications, I would not agree that there was any purposeful effort to conceal from participants the fact that the accumulation of compensation and interest credits in their cash balance accounts might not ultimately contribute to their benefit because their account balances might be exceeded by the lump sum value of their pre-1996 accrued benefit.

35.     I have reviewed portions of the videotaped deposition of Carol Kanowicz, who at the time served as a Benefits Manager, in which she appears to agree with opposing counsel that nothing was said to disabuse participants of the belief that the compensation and interest credits would contribute to their benefit payment.  I think Ms. Kanowicz was confused or mistaken when she stated this, because the individual communications that I describe in this declaration clearly demonstrate to the contrary.  A number of these communications were prepared by Marion Derham, who worked under Ms. Kanowicz's supervision.  Furthermore, DX88 appears to have been initialed by Ms. Kanowicz.

36.     I have also reviewed examples of annual benefit statements that set forth the starting and ending balances in the cash balance accounts, and advise that a participant "could expect to receive" the account balance if he/she terminated employment and elected a lump sum benefit, without making reference to the minimum lump sum. (*See* DX310, DX311.) I no longer recall the discussions leading to the preparation of these statements, and thus cannot testify with any degree of certainty as to why the statements were prepared this way. However, I do not believe that this was attributable to any intention to conceal the facts leading to wear-away. As I previously stated, there were other communications that were generated in the ordinary course of business and that specifically alerted participants to the fact that their minimum lump sum might exceed their account balances, including, for example: the communications described by me in paragraphs 32 and 33 (DX46, DX55); letters and memos to participants sent by the Corporate Benefits Department or HROC, annexed hereto as DX47, DX49, DX50, DX52, DX53; and benefit estimates and/or calculations that were provided to participants upon request. Annexed hereto as DX56-DX60; DX88-DX103; DX105; DX214; DX291-DX302; and DX306 are examples of benefit estimates and/or calculations that were completed by Corporate Benefits Department member Marion Derham or her staff, and that were ordinarily then sent to participants.

37.     Although I do not recall discussing why the minimum lump sum did not appear in the annual benefits statement that participants received, I do recall that the minimum lump sum would go up or down, depending on the movement of interest rates. Therefore, disclosure of the minimum lump sum in annual benefit statements might have misled participants to believe that, when they eventually terminated their employment at a later date, they would receive a larger lump sum benefit than the amount to which they actually would become entitled. By instead

disclosing only the amount in the cash balance account, the statements advised participants of the lump sum amount that they were certain to receive.

**Concluding Remarks**

38.     In general, my recollection is that, while the cash balance conversion posed many challenges from an administrative standpoint, the Corporate Benefits Department did not view the conversion as a negative development to be concealed from employees. To the contrary, we viewed the cash balance formula in a positive light – one that, given the financial constraints faced by the Company, would provide reasonable retirement benefits to the Company's employees.

39.     Speaking for myself, I viewed the cash balance amendment as a positive development, and I felt this way despite my awareness of wear-away. As a long term-employee who was not old enough at the time of the conversion to qualify for an enhancement, I was among the employees most negatively impacted by the wear-away feature. Nevertheless, I did not regret the cash balance conversion because it afforded me the opportunity to take my benefits in the form of a large lump sum when my employment terminated in 2000. For me the opportunity to take the lump sum far outweighed the negative impact of wear-away.


DATED:  June 30, 2015
New York, New York

Thomas J. Kiley, Jr.