*Osberg v. Foot Locker, Inc., et al.*, 07-cv-01358 (KBF) (S.D.N.Y.)

# Joint Pretrial Order

## July 1, 2015

# Exhibit 11C

# Declaration of Michael T. Steven

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
GEOFFREY OSBERG                                          :
                                                         :
On behalf of himself and on                              :
behalf of all others similarly situated,                 :
                                                         :   Case No.: 07 CV 1358 (KBF)
                       Plaintiff,                        :
                                                         :
      - against -                                        :
                                                         :
FOOT LOCKER, INC.,                                       :
                                                         :
FOOT LOCKER RETIREMENT PLAN,                             :
                                                         :
                       Defendants.                       :
-------------------------------------------------------------X

## DECLARATION OF MICHAEL T. STEVEN

I, Michael T. Steven, declare under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      My name is Michael Steven. I live in Manasquan, New Jersey. I am 77 years old. I have a Master of Business Administration in Finance from Fordham University and am a retired Certified Public Accountant licensed in New York and New Jersey.

2.      I worked for Woolworth from April 1982 until May 1997 in the Woolworth Building. I was the Assistant Controller for Financial Planning and Analysis of the Woolworth Corporation from 1982 until 1995. Between 1995 and 1997, I served as the Chief Financial Officer of the F.W. Woolworth division. After determining that the Woolworth division would never make an adequate return on investment, I recommended to CEO Roger Farah that the division be closed and it was, soon thereafter.

3.      I am testifying at trial because I can say with a high degree of confidence that no Woolworth employee had any idea that their benefit was being frozen in 1996. Over the course of my 15 years at Woolworth, I came to have a good understanding of the average Woolworth

employee from interacting with them at various levels of the company.  There was nothing in the communications that Woolworth issued that informed me or anyone else that the company was planning on freezing (or potentially freezing) our benefits for a period of time.

4. I was surprised to learn from class counsel that my benefits had not grown between 1996 and May 1997 and that the benefit I received in May 1997 was actually a lump sum of the annuity benefit I had earned under the company's traditional pension plan as of December 31, 1995.  That was not explained to me, even though I received some estimates in 1996 that HR manager Tom Kiley prepared specially for me in response to a personal request I made.

5. I believe that what the company did to its employees here was wrong.  I don't believe it would be right to let Woolworth get away with misleading me and others about what was happening to our pensions in and after 1996.

6. I am also testifying because I want to make clear that Woolworth Corporation was not "months from bankruptcy" as I saw was referenced in some case-related filings.  I was an executive who was very familiar with the financial health of the overall company.  I was very familiar with the company's financials.  While some divisions – among them, F.W. Woolworth – were not doing well in 1995-1996, some of the company's athletic divisions such as Foot Locker and Champs were extremely profitable.  Foot Locker had a 17% return on investment during the 1990s.  The company was nowhere close to going bankrupt based on the status of those high-performing units.  The company certainly had restructuring issues and needed to rid itself of underperforming subsidiaries at the time.  But closing up shop was not something that was on the table or being considered for the entire company.  Any attempt to make that kind of assertion after the fact strikes me as an attempt to now rationalize freezing everyone's benefits without

telling them.  The truth is that the company remained profitable long after 1995-1996 and there's no way to reasonably argue that a years-long benefits freeze of its employees' pensions was the only possible option the company had at the time.

7. Based on the communications I received from Woolworth, my understanding was that my pension was growing the entire time that I worked there.  I believed that the company had converted the full amount of the benefit that I had earned up through December 31, 1995 into an opening account balance and that for each year that I continued working after January 1, 1996, the company added credits to my account so that my pension grew each year.  I understood that the opening account was my pension benefit and that my growing account meant that my benefit was growing.

8. I did not know at the time that the credits made to my account after January 1, 1996 were not included in the lump sum payment that I received in 1997 because Woolworth did not inform me of that fact.  I never had any reason to think that my entire December 31, 1995 accrued benefit was not included in my account.  I had zero familiarity with the concept of "wear-away" at the time.

9. I was very loyal to Woolworth and trusted the company to be upfront with me, as I knew Woolworth was also my pension fiduciary.  That is why I am surprised that this happened.

10. During my employment with Woolworth, I read all of the communications I received from the company about the pension plan.  Based on my reading of those materials, I understood that under the pension plan before its modification in 1996, I could take an annuity beginning when I retired at age 65.  My understanding was that as I worked for the company, I earned pension benefits under a percentage formula based on my annual compensation.  I

3

received annual benefit statements that showed the growth in the benefit I earned each year as part of my overall compensation package.

11. I first learned that the company was changing the pension plan from a September 1995 letter from Roger Farah and Dale Hilpert. That document is trial exhibit PX2. I remember the letter being a very positive, uplifting announcement about the big improvements that Woolworth was making to the plan – specifically that the pension was going to be expressed as an account that I would have the ability to watch grow, which would make it easier for me to track the increasing value of my pension benefit. The letter was clearly written. I had no reason at the time to question that anything in it was inaccurate or misleading. I recall that there being some scattered talk in the office about the changes, but heard no concerns, complaints or negativity surrounding the changes.

12. The next communication about the plan changes I received came later in November 1995 from the benefits department. That document is exhibit PX4. I understood from that memo that the company would be taking the monthly benefit I had already earned and converting it into a cash balance account. I understood that the account would continue to grow year-after-year until I ultimately retired. I also understood that the plan was making a lump sum option available for my benefit, something that wasn't available prior to 1996.

13. I remember continuing to receive annual benefit statements in 1996 and thereafter. The initial 1996 plan statement showed that the company had put about $140,000 in my cash balance account and told me that this account balance was the amount that I could expect to receive upon termination of employment or retirement if I elected a lump sum form of payment. I assumed that statement to be true at the time. The statement also showed my prior monthly benefit on the left-hand side and the new account on the right-hand side, so it looked to

4

me like the age 65 annuity benefit I had previously earned was being deposited directly into my cash balance account. The statement also referenced compensation credits that I would earn during 1996. I took as a given that those compensation credits would have value for me. That estimated statement was updated a few months later, based on my actual pay for 1995.

14.     After receiving the announcement letter and follow-up memorandum in Fall 1995, I requested an estimate of my retirement benefit from Tom Kiley, who I knew from working near him in the Woolworth Building. My wife and I intended to retire early and I had concluded that a good time to retire would be in or around 1997, after reaching 15 years of service with the company.

15.     I received an estimate from Tom Kiley sometime after January 19, 1996, which I believe came about two to three months after I made the request of him. That first benefit estimate is trial exhibit PX329. I reviewed the estimate after I received it, but did not feel that I understood all the information provided. I knew that my opening account balance was about $140,000 and that estimate showed me that I could receive a lump sum of about $217,000 if I retired on July 1, 1996. I assumed at the time that the larger lump sum amount was due to actuarial calculations required under pension laws and government policies that were mentioned in the November memorandum. I also assumed that these figures would grow as I continued working. I did not inquire further about what I didn't understand because I assumed all the information was prepared by my fiduciary in accordance with pension laws and that the information provided was trustworthy. My understanding from the estimate was that my service in 1996 was counting towards my pension, especially because the memo said that it took into account my estimated earnings during 1996.

5

16. Later in 1996, I requested a second estimate from Tom Kiley because I wanted an update on where my retirement benefit stood. I believe that I received the second estimate in or around October 1996, shortly after making the request. That estimate is trial exhibit PX330. I reviewed that estimate, but it did not change or clarify what I understood about my benefit calculation. I found the calculations to be confusing, dense and complicated, with actuarial shorthand and beyond even my abilities as a CFO and CPA without any actuarial training. I also found Mr. Kiley's explanations in the cover memorandum to be confusing. Though I thought I understood the estimate at the time, I no longer believe that is the case.

17. The second estimate was the first time I was informed that an "interest rate of 9%" was used to calculate my initial cash balance. However, nowhere is it mentioned that 9% was used as a "discount" rate rather than a normal interest rate. I recall believing at the time and up until recently that the 9% interest rate used by the Plan was beneficial to me as an interest rate that increased the value of my benefit. I did not understand Mr. Kiley's memorandum or the attached computations as saying that the 9% "interest rate" or any of the other calculations, factors, and interest rates had an adverse effect on my pension benefit. I could not have fathomed that this was all just a roundabout way of saying that my pension was actually being frozen in 1996 and 1997.

18. During my deposition, defense counsel pointed out that the second estimate indicates that the minimum lump sum as of 12/31/96 was calculated by multiplying 12/31/95 accrued benefit by a factor tied to "Gatt Mortality 6.06%," terminology that had no meaning to me at the time or now, and that together with other calculations on the page I could have discerned that increases in my account balance might not increase the amount of the lump sum payment I ultimately would receive. I don't understand how that information could or should

6

have alerted me to the fact that my pension had been frozen – and I attest that it did not alert me to that fact. The possibility that I might be entitled to a payment even larger than my account which had been steadily growing since the cash balance conversion date was not then and is still not today an indication that my pension had been frozen on that date. The contention is absurd.

19. That the company's lawyers are even making this kind of argument now is frankly outrageous. If the company actually expected me to understand that my benefit had been frozen, someone would have told me that directly – particularly after I made it clear with my requests for information that I was trying to understand how the new plan worked. The proposition that "your benefits were frozen temporarily at their December 31, 1995 level" is easily stated. One can only surmise that the reason Woolworth did not say this to me (and other employees) directly is that the company did not want us to know.

20. Tom Kiley's cover memorandum certainly did not walk me through the calculations in a manner that would have alerted me to the benefit freeze. To the contrary, both of the estimates that were provided to me are so convoluted and uninformative, so disjointed and full of actuarial jargon that no one but a skilled pension actuary could possibly figure out the truth. (I knew Mr. Kiley to be an intelligent, competent employee who was very knowledgeable about pensions. There is no doubt in my mind he could have explained to me in English the plan change and what it meant for me and supported his explanation with calculations that didn't require me to have an actuarial certification to follow.)

21. The bottom line is that, even after receiving and reviewing the estimates I was provided, I believed that growth in my account balance meant growth in my benefit, and that the lump sum I ultimately would receive from Woolworth would include and reflect that benefit growth.

22. If the estimate sent to me, or something like it, had been provided to the average Woolworth plan participant, there is no way they could have determined that their benefit had been frozen. Retail store workers and warehouse workers could not have made sense of these types of calculations. Even as a CFO and CPA, I could barely follow along with the calculations and the description. I'm sure that other Woolworth employees would have understood and expected that the growth they saw in their account was growth in their pension benefit.

23. Sometime in late 1996, I received a summary plan description that I remember reading through. That document is trial exhibit PX5. The SPD confirmed my understanding that the company had opened an account for me in 1996 and put into it the entire amount of the annuity I had earned through the end of 1995. I trusted the company to describe what was happening to my pension benefit. Consistent with the other communications I received, I didn't read anything in the SPD that indicated to me or signaled to me that my benefit would be frozen or might be frozen, or indeed that anything adverse had or might happen at all.

24. Like the second benefit estimate I received, the SPD mentioned that a 9% interest rate was used in creating my initial account balance. There was no indication that the 9% rate was used as a "discount rate" that actually decreased rather than increased the value of my pre-1996 benefit. I also recall understanding from reading the SPD that my lump sum payment amount could end up being larger because of actuarial calculations required under pension law and government policies. Thus, the picture I had in my mind was that my benefit under the new cash balance format was growing by *at least* as much as my account balance (though I understood that the focus should be on the account growth, since – unlike the growing account balance – the possibility of an additional positive adjustment at the time of payment was not guaranteed).

8

25. Based on what I read in the SPD and other communications, I did not understand that my old 1995 age 65 annuity benefit had any relevance on an ongoing basis except that it was what my initial account balance was created from.  I had no clue that my pension benefit had actually been frozen after reading the SPD.  Again, my understanding was that my benefit was now fully and solely represented by my account balance, and that growth in my account was growth in my benefit.  The mechanics were simple, just as the SPD and other summaries I was given said was the point of the plan update.

26. I do not recall there being any HR-led meetings or presentations at the Woolworth offices or anywhere else about the pension plan in 1995-1996.

27. When I ended my employment with Woolworth in 1997, I elected a lump sum form of payment.  The lump sum amount was larger than the account balances that I had been shown as of the end of 1996 and in the benefit estimates that I received from Tom Kiley.  My understanding at the time was that my account balance had grown with compensation credits and interest credits for the entire 17 months after January 1, 1996, and that my lump sum was based on that growing account balance.  I remember seeing that my lump sum amount, like my account balance, had increased after January 1, 1996.  I was not surprised that my lump sum amount was larger that my account balance (in light of the SPD's disclosure that was normal and on what I had seen in my 1996 estimates), and assumed that because the account balance had to be increased as part of actuarial calculations required under pension laws and government regulation.  Nothing in the documents I was provided and nothing about the lump sum amount itself gave me any reason to suspect that my benefit had been frozen on January 1, 1996.  I thought that the amount I received was what I was entitled to and that it was correctly calculated by the plan fiduciary.

9

28.     Based on the information that the company gave me, I had no idea whatsoever that that my benefit had been frozen from 1996 through 1997.  I still don't completely understand the mechanics of how Woolworth managed to freeze my pension the way it did.  I know that actuarial calculations were involved, but I do not understand actuarial principles, even as knowledgeable as I am about math as a CPA.

29.     I firmly believe that I and others who participated in the pension plan should receive the pension growth we were told and expected we would continue to receive after 1995 as part of our compensation based on the communications that the company sent us.  Woolworth certainly never told me that I would not earn any new pension benefits on and after January 1, 1996.  Woolworth also did not clearly or directly inform me when they paid my lump sum that the amount I received did not include any of the compensation and interest credits that I thought they had added to my pension benefit as I was watching my account grow over the years.

30.     What Woolworth achieved was a workforce-wide cut in compensation without telling anyone.  Even in the business world, cutting employees pay without telling them is at a minimum highly unethical, and it is difficult for me to believe not also illegal.  That is another reason why it never even crossed my mind that the company had frozen my pension with telling me that in a very clear way:  I would have assumed that would be against the law.

31.     Had I been told how the plan change actually worked, that my benefit would or might be frozen, and/or that my benefit would be calculated without including the credits added to my account after January 1, 1996, I would have questioned that.  My understanding was that my pension was continuing to grow and I would not have been happy to learn otherwise, especially given how hard I was working during those years as part of closing Woolworth stores down.  I believe that I and many others in would have complained loudly.  I and other co-

workers in the Woolworth Building who were not fearful of losing their job at the time would have voiced displeasure had the true plan changes been accurately communicated to us instead of the communications described above, which gave us the impression that our benefits were growing.

Dated: July 1, 2015

_____
Michael Steven

Case 1:07-cv-01358-KBF   Document 340   Filed 07/02/15   Page 13 of 13