*Osberg v. Foot Locker, Inc., et al.*, 07-cv-01358 (KBF) (S.D.N.Y.)

# Class's Opposition to Defendants' Motion *in Limine* to Exclude Testimony of Christopher Maikels

## July 10, 2015

# PX1374

*GEOFFREY OSBERG VS.*

*FOOT LOCKER, INC.*

---

*JAMES GREFIG*

*March 27, 2012*

---



**126 East 56th Street, Fifth Floor New York, New York 10022**

**PHONE: (212) 750-6434   FAX: (212) 750-1097**

**www.ELLENGRAUER.com**

*Original File 99948.TXT*

*Min-U-Script® with Word Index*

Page 1

1  UNITED STATES DISTRICT COURT

2  SOUTHERN DISTRICT OF NEW YORK
   ----------------------------------------x
3  GEOFFREY OSBERG, on behalf of himself and on
   behalf of all others similarly situated,
4
          Plaintiffs,
5
       -against-
6
7  FOOT LOCKER, INC., FOOTLOCKER RETIREMENT PLAN,

8          Defendants.

   CASE NO.: 07 CV 1358(KBF)
9  ----------------------------------------x

10

11              1221 Avenue of the Americas
                New York, New York
12
                March 27, 2012
13              10:16 a.m.

14

15         VIDEOTAPED DEPOSITION of JAMES

16  GREFIG, a non-party witness herein, pursuant to

17  Notice, before Ronald A. Marx, a Notary Public

18  of the State of New York.

19

20

21

22

23        ELLEN GRAUER COURT REPORTING CO. LLC
          126 East 56th Street, Fifth Floor
24          New York, New York 10022
                 212-750-6434
25               REF: 99948

Page 2

1  A P P E A R A N C E S :

2

3  GOTTESDIENER LAW FIRM, PLLC

4  Attorneys for Plaintiffs

5       498 7th Street
        Brooklyn, New York 11215
6
   BY:  ELI GOTTESDIENER, ESQ.
7       PHONE 718.788.1500
        FAX 718.788.1650
8       E-MAIL eli@gottesdienerlaw.com

9

   PROSKAUER ROSE LLP
10
   Attorneys for Defendants
11
        Eleven Times Square
12      New York, New York 10036-8299

13  BY:  MYRON D. RUMELD, ESQ.
         PHONE 212.969.3021
14       FAX 212.969.2900
         E-MAIL mrumeld@proskauer.com
15

16  PAUL HASTINGS LLP

17  Attorneys for Deponent
        75 East 55th Street
18      New York, New York 10022

19  BY:  CARLA WALWORTH, ESQ.
   AND:  OWEN KEOUGH, ESQ.
20       PHONE 212.318.6000
         FAX 212.752.3511
21       E-MAIL carlawalworth@paulhastings.com

22

23  ALSO PRESENT:

24      LAWRENCE DEUTSCH

25      NICHOLAS GUZMAN, Legal Videographer

Page 3

1  ----------------  I N D E X  --------------------

2  WITNESS          EXAMINATION BY          PAGE

3  JAMES GREFIG      MR. GOTTESDIENER         8

4                    MR. RUMELD              334

5

6

7  ----------------  E X H I B I T S  ----------------

8  PLAINTIFF'S       DESCRIPTION          FOR I.D.

9  Exhibit 68    Letter                       31

10  Exhibit 69    1994 valuation plan          39

11  Exhibit 70    1996 valuation               79

12  Exhibit 71    1995 valuation               80

13  Exhibit 72    1996 IRS Form 5500           95

14  Exhibit 73    1997 IRS Form 5500           97

15  Exhibit 74    Valuation                   100

16  Exhibit 75    Communication dated 2/6/95  114

17  Exhibit 76    Letter dated 2/22/95        122

18  Exhibit 77    Benefit illustrations       124

19  Exhibit 78    Fax dated 3/15/95           126

20  Exhibit 79    Summary of cash balance     155

21             statement

22  Exhibit 80    Document                    164

23  Exhibit 81    Document                    165

24  Exhibit 82    E-mail                      165

25  Exhibit 83    Fax                         172

Page 4

1  ----------  E X H I B I T S  (Cont'd)  ------------

2  PLAINTIFF'S       DESCRIPTION          FOR I.D.

3  Exhibit 84    Fax                         205

4  Exhibit 85    Cost estimates              209

5  Exhibit 86    Fax dated 5/16/95           213

6  Exhibit 87    Fax                         215

7  Exhibit 88    Handwritten notes dated     216

8             6/12/95

9  Exhibit 89    Document                    218

10  Exhibit 90    Document                    221

11  Exhibit 92    Handwritten notes          232

12  Exhibit 93    Fax                         255

13  Exhibit 94    Notes                       261

14  Exhibit 95    Document dated 7/95         262

15  Exhibit 96    Notes                       264

16  Exhibit 97    Document                    265

17  Exhibit 98    Fax dated 8/14/95           272

18  Exhibit 99    Handwritten notes dated     275

19             8/15/95

20  Exhibit 100   Extract of 1998 valuation   283

21  Exhibit 101   E-mail                      303

22  Exhibit 102   Fax dated 10/13/95          306

23  Exhibit 103   Handwritten notes dated     307

24             12/1/95

25  Exhibit 104   Fax                         320

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 5

```
 1  ----------- E X H I B I T S (Cont'd) -----------
 2  PLAINTIFF'S    DESCRIPTION              FOR I.D.
 3  Exhibit 105    Final plan document        322
 4  Exhibit 106    Document                    322
 5  Exhibit 107    Document                    324
 6  Exhibit 108    Document                    325
 7  Exhibit 109    Sensitivity analysis        329
 8  Exhibit 110    Document                    330
 9  Exhibit 111    Document dated 11/21/96     331
10  Exhibit 112    Document                    332
11
12
13      (EXHIBITS RETAINED BY MR. GOTTESDIENER)
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

(10:20:56-10:21:34)

1 confidentiality agreement?
2 MR. GOTTESDIENER: Yes.
3 MS. WALWORTH: Thank you.
4 THE VIDEOGRAPHER: For the
5 record, will the court reporter
6 please swear in the witness?
7 J A M E S  G R E F I G, a non-party witness
8 herein, residing at 7 Ripley Place,
9 Croton-On-Hudson, New York 10520, having been
duly sworn by a Notary Public of the State of
New York, upon being examined, testified as
follows:

THE VIDEOGRAPHER: Counsel, you
may proceed.

Page 6

(10:20:10-10:20:54)

1 P R O C E E D I N G S
2 THE VIDEOGRAPHER: Good
3 morning.  This is the beginning of
4 Tape Number 1 in the videotaped
5 deposition of James Grefig on
6 March 27, 2012 in the matter of
7 Jeffrey Osberg, et al., Plaintiffs,
8 versus Foot Locker, et al.,
9 Defendants.
10 This case is filed in the
11 United States District Court,
12 Southern District of New York, Case
13 Number 07 CV 1358.
14 Today's deposition is being
15 held at 1221 Avenue of the Americas,
16 New York, New York 10020.
17 The time on the record is now
18 10:18 a.m.  My name is Nicholas
19 Guzman.  I'm the legal video
20 specialist.  The court reporter today
21 is Ron Marx, both on behalf of Ellen
22 Grauer Court Reporting.
23 At this time I'd ask counsel to
24 please introduce themselves for the
25 record.

Page 8

(10:21:34-10:22:20)

1 GREFIG
2 DIRECT EXAMINATION BY MR. GOTTESDIENER:
3 Q  Mr. Grefig, good morning.
4 A  Good morning.
5 Q  Thank you for coming in.  I
6 understand it's -- well, have you ever had your
7 deposition taken before?
8 A  No, I have not.
9 Q  You have here an attorney that is
10 representing you?
11 A  Yes.
12 MS. WALWORTH: I think there's
13 uncertainty.
14 MR. GOTTESDIENER: Excuse me.
15 MS. WALWORTH: The question.
16 It's not in the form of a question.
17 MR. GOTTESDIENER: I'm going to
18 stop the deposition.  Let's just --
19 would you let me ask my questions?
20 Please don't say anything.
21 MS. WALWORTH: Objection as to
22 form.
23 MR. GOTTESDIENER: We need to
24 stop the deposition and get the judge
25 on the line.

Page 9

(10:22:22-10:23:16)

1  GREFIG
2  You cannot say anything,
3  nothing.  The rule is Rule 30(c).
4  The examination occurs as if it's a
5  trial.  You would not be doing this
6  at trial.
7  The text of the rule reads,
8  "The examination and
9  cross-examination of a deponent
10 proceed as they would at trial."
11 Will you please refrain so we
12 do not have to stop the deposition?
13 MS. WALWORTH: You may proceed.
14 MR. GOTTESDIENER: Will you
15 please agree not to say anything?
16 MS. WALWORTH: No, I will not.
17 MR. GOTTESDIENER: We need to
18 the stop the deposition and call the
19 judge.
20 Myron, is it your position that
21 she's able to make statements, that
22 she's able to do what's she's doing?
23 MR. RUMELD: Depending on what
24 occurs.  She has the witness, and
25 she's here to represent him.

Page 10

(10:23:16-10:24:44)

1  GREFIG
2  And the one line that you read
3  from the rule I don't find
4  dispositive on the point you're
5  making, any more than I found it to
6  be dispositive of the point you tried
7  to make at previous depositions about
8  the right to consult with officers.
9  And I'm just letting you know,
10 I don't agree with your positions.
11 So if you want to call the court,
12 call the court.
13 MR. GOTTESDIENER: Mr. Marx --
14 MR. RUMELD: Let me just say
15 that if you want to save a little
16 time --
17 MR. GOTTESDIENER: I just
18 wanted to know what your position
19 was.
20 Mr. Marx, could you read back
21 the question that I asked?
22 (The requested portion was read
23 back)
24 MR. GOTTESDIENER: Mr. Grefig,
25 I'm sorry about this.  Ma'am,

Page 11

(10:24:46-10:25:34)

1  GREFIG
2  please -- I'm going to ask you to
3  please reconsider and take a moment
4  so we do not have to delay this
5  deposition.  We have a lot of
6  material to get through.
7  I asked him a question about
8  he's here with his counsel.  You
9  first commented, as he hesitated,
10 looked at you, didn't know what to
11 say obviously, you commented I think
12 there's some uncertainty.
13 That's not a proper objection,
14 and it's not a proper comment, and
15 even if you did have the right to
16 object, you can't say things like
17 that.
18 Then, seeing my reaction to it,
19 you tried to transmogrify that into
20 an objection and saying that you --
21 you think you want to make an
22 objection to the form of the
23 question.
24 You do not have standing to
25 make objections to the form of the

Page 12

(10:25:36-10:26:38)

1  GREFIG
2  question.
3  We have a lot of material to go
4  through.  I don't want to trouble Mr.
5  Grefig any more than he's already
6  being troubled.  I don't want to
7  trouble myself or anyone here.
8  Please.  I will agree that your
9  objections are noted.  You reserve
10 all of your objections, whatever they
11 are.  I have no idea what they are,
12 but they're not relevant here today.
13 Mr. Rumeld represents two
14 Defendants in the case.  He's a very
15 able lawyer.
16 Will you please agree that all
17 of your comments are reserved, all of
18 your objections are reserved?
19 The only thing you could do is
20 if there's some attorney-client
21 privilege matter, you need to
22 consult, the witness needs to consult
23 with you, I will allow that, but you
24 should not be speaking here.  Will
25 you agree or not?

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 13

(10:26:40-10:27:36)

1    GREFIG
2    MS. WALWORTH: Let me ask you
3  just to clarify.  You agree that all
4  objections are reserved.  Is that
5  correct?  And if that's correct, then
6  I will agree with your request.
7    MR. GOTTESDIENER: I agree.
8    MS. WALWORTH: That's fine.
9 Q  Now we can start over.  Good morning.
10 A  Good morning.
11 Q  You're here with your lawyer?
12 A  Yes.
13 Q  When did you first get a lawyer?
14 A  I don't know.  It's my understanding
15  that Mercer has retained my lawyer to represent
16  me, and I guess this occurred within the past
17  two weeks.
18 Q  Okay.  I asked you, and you may have
19  answered, have you ever had your deposition
20  taken before?
21 A  No.
22 Q  Have you ever testified in court
23  before?
24 A  No.
25 Q  So this process is foreign to you;

Page 14

(10:27:40-10:28:42)

1    GREFIG
2  fair to say?
3 A  Correct.
4 Q  I would like to honestly put you at
5  your ease, that you're just a witness in this
6  case, that Mercer is in effect just a witness in
7  this case.  Do you understand that?
8 A  Yes.
9 Q  Do you understand that Mercer is not
10  being sued by the Plaintiff in the case?
11 A  Yes.
12 Q  And at least as far as Plaintiff is
13  aware, Foot Locker hasn't sued Mercer or hasn't
14  sued you about this Woolworth conversion?
15 A  I believe the answer is yes.
16 Q  So I'm just here to try to find
17  facts, find out what occurred, get your best
18  recollection of things.
19    I know it occurred awhile back.  I
20  know you also do remember things about it, and
21  because of the magic of photocopying we have a
22  lot of documents, so we can refresh your
23  recollection and just get your truthful
24  testimony, okay?
25 A  Uh-huh.

Page 15

(10:28:44-10:30:14)

1    GREFIG
2 Q  So let me just begin by asking, could
3  you give me some biographical information?
4    Where did you grow up, go to school?
5  How did you come to be an actuary?
6 A  I grew up out in Southampton, Long
7  Island, went to Fordham University.
8 Q  Undergraduate?
9 A  Undergrad.
10 Q  You're how old now?
11 A  68.
12 Q  When did your graduate?
13 A  '65.  1965.  I was on a register to
14  be a Sandy Hook harbor pilot in New York.
15 Q  What is that?
16 A  A harbor pilot?  The pilot is the
17  individual that boards the ship outside of New
18  York harbor and relieves the captain of his
19  command and takes the ship into port.
20    And I was put on a list at the age of
21  14, and then once I graduated from college I
22  spent two years in the U.S. Coast Guard station
23  out of Floyd Bennett Field, search and rescue,
24  and then was called to the boats, as the phrase
25  goes, as an apprentice harbor pilot.

Page 16

(10:30:20-10:31:42)

1    GREFIG
2    And having spent two years in the
3  military, and then facing being the lowest
4  apprentice on the list, and the BS that you go
5  through in that environment, I resigned after a
6  week, which caused a lot of consternation in the
7  family.  And I needed a job.  So...
8 Q  And this is when you were how old?
9 A  Well, I got out of the service around
10  21, I guess.  So I had been encouraged when I
11  was in college by the head of the math
12  department to pursue an actuarial career.
13    And when I first got out of college I
14  hadn't been called to the boats yet, so I took a
15  position over at Mutual Benefit Life, and then
16  was drafted and then enlisted in the United
17  States Coast Guard.
18    So having left the pilot boat, I
19  needed a position, and went to work at Johnson &
20  Higgins down at Wall Street.
21 Q  So what year would that have been?
22 A  Probably December of '67.
23 Q  Okay.  And how did you land that job?
24 A  I went to a head hunter in Manhattan.
25 Q  What was the job title or function?

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 17

(10:31:46-10:33:42)

1     GREFIG
2 A   Oh.  The function was actuarial
3 technician.  I don't know that we have titles.
4 Q   And so you graduated Fordham '65 and
5 started at Johnson & Higgins December '67?
6 A   Right.
7 Q   And what did you do then?
8 A   I worked with J&H for a couple of
9 years, and was offered and took a position with
10 AS Hansen.  Used to be Arthur Stedry Hansen.
11 And about that time they changed to AS Hansen,
12 and I worked in midtown Manhattan.
13 Q   And how long did you work there?
14 A   I'm trying to recollect.  I think up
15 until 1974.  I think -- I think the year that
16 ERISA passed.
17     One of the senior individuals at AS
18 Hansen left the organization and was allowed to
19 attract or solicit employees of AS Hansen, even
20 though he started his own firm.
21     So at first I didn't accept the
22 offer, and then late '74 -- later in '74 I took
23 that position.
24     '74 until, I'm guessing, 1977 I
25 worked for Dreher Rogers & Associates.  Rodgers

Page 18

(10:33:50-10:35:22)

1     GREFIG
2 left the organization.  We sold the company to
3 Peat Marwick Mitchell & Company.
4     I was against the sale, but didn't --
5 you know, I was a minority stockholder.  Agreed
6 to give it a try, stayed with Peat Marwick
7 Mitchell for a year, and then left and went back
8 to AS Hansen, with a short stint at Buck.
9 Q   In between or --
10 A   Yeah.  It was -- like I left Peat
11 Marwick Mitchell.  I went to Buck for six
12 months.  I didn't like their structure.
13     I went back to Hansen, stayed with
14 Hansen until 1987, when I joined Mercer.  And
15 then early '87 Mercer turned around and bought
16 AS Hansen.
17     Stayed with Mercer's New York office
18 until 1984, and I transferred up to the Stamford
19 office, and then retired 1998.
20 Q   So you were how old when you retired?
21 A   54.
22 Q   Why did you retire when you did?
23 A   I've been doing this for over
24 30 years.  And if you look back at the business,
25 19 -- 1970s were -- were good.

Page 19

(10:35:24-10:36:44)

1     GREFIG
2     There was a lot of merger and
3 acquisition work.  Actually I had -- I was an
4 advisor to the Penn Central trustees in the
5 early '70s.
6     There was a lot of merger acquisition
7 work in the '70s going into the 1980s.
8 Companies decided that being a conglomerate
9 wasn't in their best interests, and they'd be
10 better off focusing on their core business, so
11 there was a lot of divestiture work during the
12 '80s.
13     And then I just got a sense that that
14 business itself was more and more constrained
15 by regulations and new laws, that we were less
16 of financial consulting than we were compliance
17 consultants.
18     And after a period of 30 years, you
19 know, decided I wanted to do something
20 different.
21     So I left.  I went back to graduate
22 school and never finished.  I was pursuing a
23 degree in environmental science, did not
24 complete that, was dissatisfied with the course
25 curriculum.  They were training -- trying to

Page 20

(10:36:46-10:38:06)

1     GREFIG
2 train lab technicians as opposed to
3 environmentalists.
4     And in the interim I served as chair
5 of the 4H youth and family development committee
6 of Cornell Cooperative Extension, Westchester.
7     I served a couple of years on the
8 Westchester County Best Management Committee,
9 which was a committee that reported to the board
10 of legislators.
11     I served on the board of directors of
12 Cornell Cooperative Extension on the finance
13 committee.  I'm a bee keeper.
14 Q   I was going to say that somebody in
15 my office tried to find you on the Internet and
16 found something.  Something about bees.  And
17 what does that entail?
18 A   That's where you found me on the
19 Internet?
20 Q   Somebody said you're a bee keeper.
21 Is that a hobby that you have?
22 A   Yes.  It's a -- it's a hobby.  It's a
23 pastime.  I had -- you know Ripley Place
24 Apiaries.  And I'm also a ham radio operator.
25     How I got involved in bee keeping, I

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 21

(10:38:08-10:39:28)

1    GREFIG
2  was also a master gardener with Cornell
3  Cooperative Extension, Westchester County.
4    And we held a fair every year at
5  Muscoot Farm, which is a county-owned farm. And
6  one of my fellow master gardeners was a bee
7  keeper and had been for decades, and he put on a
8  presentation.
9    And I thought -- I found it
10  interesting. So I went out. I bought a couple
11  of books. I read the books, ordered equipment,
12  and following year set up honeybee hives in my
13  backyard.
14  Q   How many hives do you have?
15  A   Well, in -- at my location I had -- I
16  had five standard hives, the kind of hives that
17  you see when you're driving down the roadway,
18  and I had one topper hive, which is a type of
19  hive that they use in Africa, southeast Asia,
20  but I also managed hives on an estate in North
21  Salem for a period of years.
22    But now I'm down to one hive. I
23  mean, I -- and mentoring one new bee keeper from
24  Somers.
25  Q   So I have a sense of what you've seen

Page 22

(10:39:34-10:41:04)

1    GREFIG
2  in the past month or so, if anything, could you
3  tell me, since you first received a subpoena to
4  testify here, have you looked at any documents
5  from the Woolworth conversion?
6  A   No. Absolutely nothing.
7  Q   Not a single one?
8  A   Not a single one. And I told Steve
9  Cohen when I spoke to him on the phone -- he's a
10  colleague of yours?
11  Q   Yes.
12  A   That the only thing I really remember
13  about this project was that one of my colleagues
14  designed the formula, and I reviewed the formula
15  for compliance with the benefit accrual rules
16  under ERISA.
17    That's what comes to mind. Other
18  than that, I don't have a recollection of
19  details.
20  Q   You -- have you met with counsel for
21  Foot Locker, formerly Woolworth?
22  A   Who's counsel for Foot Locker?
23  Q   The gentleman sitting over there
24  (indicating).
25  A   Yes.

Page 23

(10:41:04-10:42:12)

1    GREFIG
2  Q   You have?
3  A   Yes.
4  Q   Okay. When was that?
5  A   Last Friday.
6  Q   Okay. Can you tell me how that came
7  about?
8    MS. WALWORTH: Objection. I'm
9    just going to instruct you not to
10    state anything that I said to you or
11    Mr. Keough said to you.
12  Q   Other than that, I'm just -- how did
13  it come about?
14  A   What are my -- what are my options?
15  I mean --
16  Q   Let me -- you received the subpoena,
17  and then you spoke to Steve Cohen?
18  A   Steve Cohen.
19  Q   And you had a conversation with him
20  and you talked about the conversion as well as
21  the process of being deposed?
22  A   Well, we actually didn't talk about
23  the process of being deposed. I said what is
24  this about, and he said it had to do with the
25  cash balance plan.

Page 24

(10:42:14-10:43:16)

1    GREFIG
2    And I said that's a long time ago. I
3  said the only thing I remember is -- sticks out
4  in my mind, and why it does I have no idea, but
5  one of my colleagues designed a formula. I
6  reviewed it and, you know, that's what
7  immediately came to mind.
8    Subsequent to my conversation with
9  him, I got a call from Allison -I forget her
10  last name- at -- at Marsh & McClennan.
11    MS. WALWORTH: Please don't say
12    what Ms. Brecher said to you, but you
13    can state there was a call.
14  A   And then -- and that there was -- she
15  called me. And that --
16  Q   Then after she called you, did you do
17  anything?
18  A   No.
19  Q   Okay. You didn't go -- did you meet
20  with Mr. Rumeld in his office?
21  A   No.
22  Q   Did you speak with him on the phone?
23  A   No.
24  Q   Did you meet with him at some other
25  location?

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

---

Page 25

(10:43:18-10:44:06)

1    GREFIG
2  A  Yes.
3  Q  What location?
4  A  My home.
5  Q  Your home?
6  A  Yes.
7  Q  Okay.  Mr. Rumeld came to your home?
8  A  Yes.
9  Q  Did he come alone?
10  A  Yes.
11  Q  Was there anyone on speaker phone
12  listening in, as far as you're aware?
13  A  No.
14  Q  So it was just Mr. Rumeld and
15  yourself?
16  A  And my counsel --
17  Q  Okay.  So the --
18  A  -- was present.
19  Q  The three of you were at your home
20  speaking?
21  A  Yes.
22  Q  Okay.  And how long did that
23  conversation last?
24  A  An hour and a half and maybe an hour.
25  Q  An hour and a half?

---

Page 26

(10:44:06-10:45:04)

1    GREFIG
2  A  All -- all parties didn't show up at
3  the same time.
4  Q  Okay.  Your counsel arrived first?
5  A  My counsel arrived.  It was
6  conversation, and later that day we had another
7  conversation.
8  Q  Okay.  So you and your counsel met
9  for approximately how long?
10  A  I would say an hour and a half.
11  Q  And then --
12  A  I think.
13  Q  All right.  And subsequent to that
14  the three of you met, Mr. Rumeld, you and your
15  lawyer?
16  A  Uh-huh.
17  Q  How long was that meeting?
18  A  About an hour.
19  Q  About an hour you said?
20  A  I believe so.
21  Q  And what did Mr. Rumeld say?
22    MR. RUMELD: Objection.  That
23  meeting took place pursuant to a
24  joint defense agreement.
25    MR. GOTTESDIENER: So you're

---

Page 27

(10:45:04-10:46:12)

1    GREFIG
2  not going to allow any questions on
3  attorney-client privilege grounds?
4  MR. RUMELD: That's correct.  I
5  mean, Carla is representing him
6  today, so I suppose it's your
7  instruction, but I think that was the
8  understanding before the meeting took
9  place.
10  MS. WALWORTH: I agree with
11  you.  I agree with your position on
12  privilege.
13  I'm asking you to assert it,
14  given the agreement on the objections
15  I have.  If I have any disagreement
16  I'll let you know.
17  Q  While the three of you were speaking,
18  was Mr. Rumeld taking any notes?
19  A  I -- I don't know -- I didn't make
20  note of it myself.
21  Q  Was your lawyer taking notes?
22  A  My lawyer had her colleague Owen with
23  her.
24  Q  Then I misunderstood your previous
25  testimony.  I'm sorry.  I just want to -- your

---

Page 28

(10:46:14-10:47:34)

1    GREFIG
2  previous testimony you needed to add not just
3  one counsel.  You had two lawyers?
4  A  Okay.  Okay.  Two.  Right.
5  Q  Is that --
6  A  I believe he may have been taking
7  notes.
8  Q  And you're saying that at no time did
9  anybody show you any documents?
10  A  No.  I haven't seen -- no documents
11  whatsoever.
12  Q  Okay.  And you haven't -- when did
13  this occur?
14  A  The meeting?
15  Q  Yes.  You said Friday?
16  A  Last Friday.
17  Q  Last Friday.  Okay.  And since then
18  have you spoken with anyone about the matter?
19  A  Absolutely no one.
20  Q  Okay.  You mentioned a colleague.
21  Was that Jim Cassidy?
22  A  Yes, it was.
23  Q  And tell me, you were at Mercer you
24  said from '84 -- '86?
25  A  '86.

---

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 29

(10:47:34-10:49:04)

1    GREFIG
2  Q  To '98?
3  A  Correct.
4  Q  And when did you become involved in
5  doing any work for Woolworth?
6  A  I joined Mercer in '86.  And I don't
7  know whether I was introduced to the client in
8  '86 or whether I became involved with the client
9  as an actuary say in '87.  I believe there --
10  client may have been on a calendar year.
11    So there would have been a valuation
12  done on January 1, 1987, and that might have
13  been the first time that I had contact with the
14  client as -- as an actuary.
15  Q  As opposed to?
16  A  As opposed to a consultant or, you
17  know, a member of the team.
18  Q  What do you mean by the team?
19  A  Well, the way the firm is structured
20  you -- the way Mercer is structured, there is
21  a -- a client manager, relationship manager, and
22  then the various practice areas within Mercer.
23    There's a health and welfare
24  practice, so there would been a senior actuary
25  in the health and welfare practice that would

Page 30

(10:49:04-10:50:20)

1    GREFIG
2  have been assigned to the Woolworth account.
3    And then there'd be an actuary from
4  the retirement practice assigned to the
5  Woolworth account.  And then it's not clear in
6  my mind whether that assignment came about in
7  1986 or 1987.
8  Q  The assignment that you were --
9  A  The enrolled actuary for the plan.
10  Q  In the retirement practice?
11  A  In the retirement practice, correct.
12  Q  And you became the client manager at
13  some point with Woolworth?
14  A  Never the client manager.  Never the
15  client manager.  The client manager was Mark
16  Brandes.
17    And while he -- he was -- the reason
18  I'm saying, he had a stroke.  I don't know what
19  his current status is.
20    He was designated within the office
21  as the client manager, the client relationship
22  manager.  Sometimes you heard that expression.
23    And then I was the actuary for the
24  Woolworth retirement plan.  And there was
25  another actuary, another FSA, who was the health

Page 31

(10:50:24-10:53:48)

1    GREFIG
2  and welfare actuary.
3  Q  Who was that?
4  A  Steve Putterman.
5  Q  Okay.
6  A  And then depending upon what other
7  services Mercer offered, there would be other
8  people who would take a lead position in that
9  practice area, but I was never the client
10  manager for Woolworth.
11    (Exhibit 68, letter, was marked
12    for identification, as of this date.)
13  Q  Let me show you what I'm going to
14  mark as Exhibit 68.  Turning your attention to
15  Page 6, would you agree that Exhibit 68 is a
16  multi-page document that is -- started off with
17  a two-page letter from Paulette Welsing that
18  attaches a Mercer May 1995 proposal?
19  A  So starting at the first page of this
20  document?
21  Q  The first two -- yes.  The first two
22  pages consist of a letter to Thomas Kiley at
23  Woolworth dated May 25, 1995.  Are you able to
24  answer that question?
25  A  No.  I'm sorry.  What was the

Page 32

(10:53:50-10:54:36)

1    GREFIG
2  question?
3  Q  Are you able to tell me if in fact
4  that's a two-page letter?
5  A  It's a two-page letter.  Right.
6  Q  From --
7  A  Cover letter on --
8  Q  From Paulette Welsing?
9  A  From Paulette Welsing.  Right.
10  Q  Who was she?
11  A  She was in the communication
12  practice.
13  Q  In the New York office?
14  A  I don't know.  I don't remember.
15  Where did this come from?  No.  This came from
16  Tressor Bulghorn (phonetic) in Stamford,
17  Connecticut.
18  Q  And that's where you were located?
19  A  Correct.  At that time in 19 -- yes.
20  In 1994 I transferred up to the -- the Stamford
21  office.
22  Q  That's where you remained until '98?
23  A  Correct.  Right.
24  Q  And if you look at this document, it
25  appears to be what she's describing in the cover

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 33

(10:54:40-10:56:52)

1    GREFIG
2  letter that you read to Mr. Kiley.
3    Are you able to answer the question,
4  whether it appears to be the document that's
5  attached, what she's describing in the letter, a
6  proposal to provide administrative services for
7  cash balance and 401(k) plan?
8  A  It appears to be a letter.  Right.
9  Q  Okay.  Great.  So --
10  A  Covering a proposal.
11  Q  Okay.  And by 1995, May, you would
12  have been working on the Woolworth pension plan
13  for several years; is that fair?
14  A  Oh, yes.  Right.
15  Q  So when you became involved as an
16  actuary in '87, your involvement was continuous
17  from that time until the cash balance conversion
18  design got underway?
19  A  Yes.
20  Q  Okay.  So all of this was leading up
21  to asking you to take a look at Page 6, and see
22  if that refreshes your recollection as to --
23  that maybe you were the client manager by this
24  time?
25  A  No.  I was never the client manager.

Page 34

(10:56:56-10:58:10)

1    GREFIG
2  I'd like to read this to see how in the text she
3  categorizes this team that was put together.
4  Q  Could I -- could I suggest that I
5  don't necessarily need you to read all that.
6    Maybe we can get to a place where
7  we're both comfortable if I ask you a question?
8  A  Go ahead.
9  Q  Did this proposal as far as you're
10  aware ever get implemented in any form?
11  A  I don't know.  I don't -- I don't
12  recall ever having seen this proposal, to be
13  honest with you.
14    As I -- the -- the practice areas at
15  Mercer operated autonomously.  In other words, I
16  was the senior actuary for the retirement plan
17  in the retirement practice.
18    And we had Steve Putterman, who was
19  the senior guy over at health and welfare, and
20  Mark Brandes was the one that maintained an
21  ongoing client relationship management position
22  with the client.  That's why he was designated
23  within our structure as the client manager.
24  Q  Well, was he in a practice group?
25  A  Not really.  He was -- he was in --

Page 35

(10:58:20-10:59:28)

1    GREFIG
2  he was a worldwide partner I think what his
3  title was.
4  Q  Which means -- at the time it meant?
5  A  Well, it meant that he was -- I was a
6  principal, and then the next step above that is
7  worldwide partners.  It's a title.
8    And I think you earned that title
9  based on the amount of revenue that you're
10  controlling, I believe.  Okay?  So...
11  Q  Did Mark do any day-to-day work on
12  the plan?
13  A  On the plan?
14  Q  Yes.
15  A  No.  Just a client relationship
16  manager.
17  Q  Well, he was involved not at all, a
18  little bit in the design of the cash balance
19  plan?
20  A  I don't remember him being involved.
21  Q  Going to meetings with the client and
22  lawyers for the client and actuaries?
23  A  No.  I don't remember him being
24  involved at all.
25  Q  And am I understanding that looking

Page 36

(10:59:32-11:00:32)

1    GREFIG
2  at 6, Page 6, you're essentially saying that
3  Paulette is mistaken if she's describing you in
4  that way?
5  A  As with that title, that's correct.
6  I'm not a client manager within the Mercer
7  establishment.  I was not a client manager.
8  Q  How -- but functionally.  Did you
9  functionally serve as the main point of contact
10  that Woolworth had with Mercer for the
11  retirement plan?
12  A  For the retirement plan?
13  Q  Yes.
14  A  Probably the primary contact, yes.
15  Q  And you said you were the senior
16  actuary in the retirement practice?
17  A  Correct.  For Woolworth, right.
18  Q  For the Woolworth plan?
19  A  Correct.
20  Q  And you were the enrolled actuary for
21  the plan?
22  A  Yes.
23  Q  So you were responsible for the
24  day-to-day handling of Woolworth's plan-related
25  needs?

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

---

Page 37

(11:00:34-11:01:32)

GREFIG

1
2 A  Clearly the actuarial needs, yes.
3 Q  Yes.
4 A  Now -- but beyond that, no.  I
5 don't -- see, this proposal --
6 Q  I don't want to necessarily -- I
7 don't want to stop you from saying what you're
8 going to say, but I need you to understand that
9 I'm not -- the proposal is just a proposal.
10 That's as far as you're aware.  You don't think
11 it ever was adopted?
12     MR. RUMELD: Objection to the
13     form.
14 A  I don't believe so.
15 Q  Let me ask it again.  Did Mercer
16 while you were there ever provide these kinds of
17 administrative services for the cash balance
18 plan and the 401(k) plan?
19     MR. RUMELD: I object to the
20     form.
21     MR. GOTTESDIENER: I didn't
22     finish my question.
23     MR. RUMELD: Sorry.
24 Q  Did Mercer provide any administrative
25 services while you were there for the cash

---

Page 38

(11:01:34-11:02:56)

GREFIG

1
2 balance plan?
3 A  Not that I remember.  I don't -- I
4 don't remember this proposal, and I don't
5 remember that anything ever came to this.
6 Q  Let me take this away from you, okay?
7 Because I don't need you to stare at it.  I
8 just -- I need -- whatever you can recall using
9 documents, we'll get your testimony, okay?
10 A  Uh-huh.
11 Q  So my question is, on a day-to-day
12 basis, prior to the conversion and immediately
13 after the conversion, what was Mercer doing
14 actuarially with respect to the Woolworth plan?
15 A  We performed the actuarial -- I
16 always hated that word.  We completed the
17 actuarial valuations for funding, and somewhere
18 along the line expense purposes.
19     I forget exactly when the FASB
20 requirements came into effect.  FASB, Financial
21 Accounting Standards Board, accounting
22 requirements came in.
23 Q  So -- I'm sorry.  And what else --
24 that was -- so Mercer was acting both with
25 respect to the plan for the sponsor as well as

---

Page 39

(11:03:00-11:04:38)

GREFIG

1
2 enrolled actuary for the plan itself?
3 A  Yes.
4 Q  And that was the case throughout the
5 time that you were involved with the account?
6 A  Yes.
7 Q  Okay.  Let me show you 69, and ask
8 you if you could tell me if this is the
9 valuation for the plan for 1994.
10     (Exhibit 69, 1994 valuation
11     plan, was marked for identification,
12     as of this date.)
13 Q  Does that appear to be what it is?
14 A  That's that it appears to be.
15 Q  If you would turn to what is Page 3
16 in the right-hand corner.  You're on it now,
17 right?
18 A  Yes.
19 Q  Okay.  You see your signature there
20 as principal FSA EA, right?
21 A  Correct.
22 Q  Mr. Brandes is on here signing,
23 saying that he has reviewed and found acceptable
24 the actuarial assumptions, methods and
25 procedures used in preparing this actuarial

---

Page 40

(11:04:40-11:05:50)

GREFIG

1
2 valuation?
3 A  Yes.
4 Q  Does this refresh your recollection
5 that Mr. Brandes did have involvement
6 substantively with the actuarial work required
7 for the plan?
8 A  No.  We had -- what he's signing off
9 here as -- is he's a peer reviewer.
10 Q  Peer review?
11 A  Peer review, right.  That what he's
12 saying, he's found acceptable the assumptions,
13 methods and procedures used in preparing this
14 valuation.  Now --
15 Q  So he wasn't just a rain-maker?
16 A  No, no.  According to this he's more
17 rain-maker than he was involved in the
18 production of the valuation.  Yes.
19     But obviously for purposes of
20 completing the document, he did a peer review on
21 the document.
22 Q  And because you're under oath, I just
23 want to ask you to be candid.
24     Is this something that he, you know,
25 just signed?  Did you know that he actually

---

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 41

(11:05:56-11:06:50)

1     GREFIG

2 provided a real peer review?

3     MR. RUMELD: I object to the

4   form.

5     MR. GOTTESDIENER: I'll

6   withdraw the question.

7 Q  Did he really do a peer review when

8 he signed this?

9 A  The -- the documents that were made

10 available to him to perform the peer review. I

11 didn't stand over him to make sure that he did

12 what I would have done if I had done it myself,

13 but certainly the materials were available to

14 him.

15 Q  But you don't know for a fact that he

16 actually did what you would consider a peer

17 review?

18 A  That's correct. I could not -- I

19 could not sit here and say yeah, I know he did

20 it, because, number one, it's quite a number of

21 years ago.

22     And two, it -- it wasn't done in a --

23 in a manner in which I -- I sat down and watched

24 him go through the procedures.

25 Q  Well, you know, I'm kind of getting

Page 42

(11:06:52-11:07:40)

1     GREFIG

2 at something else, which is that him doing this

3 peer review is not consistent with the way that

4 you thought of him then and think of him now in

5 terms of his involvement with the plan.

6     MR. RUMELD: I object to the

7   form.

8 Q  Isn't that correct? You can answer

9 the question.

10 A  Please repeat it.

11 Q  You know, what I'm getting is that

12 you're a little surprised to see that he signed

13 that, doing a peer review.

14     That's not how you think and thought

15 of him at that time?

16 A  I'm not -- no. I'm not surprised to

17 see his signature in here on the peer review.

18 That doesn't surprise me at all. I didn't mean

19 to --

20 Q  Let me ask a different way. You're

21 not surprised by seeing his signature on the

22 peer review, but you agree that from what you

23 knew of Mark, he didn't do what you would do if

24 you had done a peer review?

25 A  I don't know.

Page 43

(11:07:42-11:08:38)

1     GREFIG

2     MR. RUMELD: Objection to form.

3 A  I don't know. I cannot testify that

4 he did what I would do when I perform peer

5 reviews.

6 Q  In your estimation, from what you

7 knew of him at the time, he was not involved at

8 that level of detail?

9 A  Correct.

10     MR. RUMELD: I object to the

11   form.

12 A  Let me -- there are other cases in

13 the -- in the -- in the office where, you know,

14 I might have had however many clients that were

15 unique to me, but I was called upon to peer

16 review reports that -- for clients where I

17 wasn't involved.

18 Q  And so I'm not sure I understand.

19 How does that relate to what you think Mark

20 Brandes would have done?

21 A  The fact that Mark's signature shows

22 up on here kind of distracts from the peer

23 review process that every valuation was required

24 to be subjected to.

25     And in order to get a peer review

Page 44

(11:08:42-11:10:38)

1     GREFIG

2 performed, completed, you didn't necessarily

3 have to have someone who was particularly

4 involved with the client to do a peer review.

5 So in this case, turned out to be Mark. Could

6 have been someone else.

7 Q  So what would you have expected him

8 to have done if he had done a proper peer view?

9 A  Well, a work sheet file. Look over

10 the summary of the work sheets that were in the

11 files.

12     And given that this is so many years

13 ago, I'm sure that my list is going to be

14 incomplete, because, you know, look at the

15 reasonableness of the assumptions, which would

16 include the investment return assumption,

17 consistency with the prior years valuation

18 results, reasonableness of the other economic

19 assumptions relative to, you know, like

20 compensation. Is that reasonable. Has it been

21 changed since the prior year. Have there been

22 any unusual exchanges, say, in the demographics

23 of the population that need explanation, any

24 significant change in the -- you know, to say

25 that the demographics of the population in terms

Ellen Grauer Court Reporting Co. LLC

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 45

(11:10:40-11:12:02)

1    GREFIG
2  of number of terminations that year, number of
3  retirements that year, number of new entrants,
4  you know.
5    With a population this large, you
6  expect certain stability in the demographics, so
7  that's one thing that you would look at.
8  Q  What if there had been a major plan
9  amendment?  What would you have expected him to
10  do?
11  A  If there was a major plan amendment
12  there would have been prior estimates of the
13  cost of the plan amendment.
14  Q  What --
15  A  So you just look at the contrast, the
16  estimates that were prepared with the final
17  results.  With this size population you expect a
18  great deal of stability in the demographics.
19  Q  So you would expect, if you were
20  doing a peer review, to see that the cost
21  estimate of the major plan amendment was pretty
22  much in line with what occurred?
23  A  Right.
24  Q  The -- and who else is on that third
25  page?

Page 46

(11:12:02-11:13:18)

1    GREFIG
2  A  Carla Edelstein.
3  Q  Can you tell me who she is?
4  A  No.  She's a fellow of the Canadian
5  Institute of Actuaries.  I recognize the name,
6  but I don't know where she was.
7    I don't know whether she was in
8  Stamford, New York or -- I mean, we talk about
9  Mark.  I have an image in the New York office of
10  where his office was relative to mine.
11  I haven't the -- I have no
12  recollection of where Carla Edelstein's office
13  was relative to mine, but I do recognize the
14  name.
15  Q  So you were in the New York office
16  from '86 to '94?
17  A  Correct.
18  Q  And where was Jim Cassidy during that
19  time?  Was he with Mercer?
20  A  He was with Mercer in the Stamford
21  office.
22  Q  Throughout that time?
23  A  Oh.  I don't know throughout -- we're
24  going from my -- my arrival from '86 to '94?  He
25  was in the Stamford office in 1994 when I

Page 47

(11:13:22-11:14:18)

1    GREFIG
2  arrived.
3  Q  Okay.
4  A  So he --
5  Q  Did you have any contact with him
6  before then?
7  A  No.  No.  Not unless it was at a --
8  at a practice meeting or something like that.
9    MS. WALWORTH:  Mr. Grefig,
10  could I ask you to let Mr.
11  Gottesdiener finish his question
12  before you answer, and he'll do the
13  same for you.  I know it's difficult
14  to do that during a deposition.
15  Q  So Mr. Cassidy, was he -- you were
16  working on a continuous basis on the retirement
17  plan from '87 to when you left?
18  A  Correct.
19  Q  When did he first render services
20  with respect to the retirement plan?
21  A  Most likely on or about the year that
22  I moved to Stamford.
23  Q  Prior to 1994, when you moved to
24  Stamford, who was performing functions that Mr.
25  Cassidy then began performing?

Page 48

(11:14:22-11:15:46)

1    GREFIG
2  A  There were two people involved in
3  different periods of time.  When I first joined
4  Mercer, New York and became involved with
5  Woolworth, there was person named Phil Mauer,
6  M-A-U-E-R, and he had had a long-standing
7  relationship with the Woolworth account.  He was
8  an associate of Mercer, I guess was the title.
9  Q  So he assisted you?
10  A  Right.
11  Q  And there was someone else?
12  A  He retired in -- and moved to middle
13  of New York.  Cooperstown I think it was.  I
14  think he retired and he moved to Cooperstown.
15  Q  Are you talking about the second
16  person or Phil?
17  A  Phil.  Phil.
18  Q  We're done with Phil for the moment.
19  There was a second person you had in mind.
20  A  Second person that became involved
21  was a young English actuary.  He went to -- he
22  left and he went to Hewitt.
23  Q  Okay.  There was Phil and the English
24  guy?
25  A  Right.

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 49

(11:15:46-11:17:00)

1      GREFIG
2  Q   Did they continue working on the
3  account when you go to Stamford?
4  A   Well, Phil stopped work on the
5  account because he retired and just went to
6  Cooperstown, retired.  So he had no further
7  contact.  David Baulter was the Englishman.
8  Q   So did David continue working after
9  '94 --
10  A   I don't --
11  Q   -- on the account?
12  A   I don't remember, because David left
13  Mercer and went to Hewitt, and I don't know the
14  exact timing of his departure.
15  Q   Okay.  But at some point Mr. Cassidy
16  joins the team?
17  A   Joins the team.  Right.
18  Q   Prior to that time, when Mr. Cassidy
19  joined the team -- withdrawn.
20      Why did you move to Stamford when you
21  did?
22  A   The Stamford office functionally,
23  personnel-wise was the remnants of the White
24  Plains Hansen office, so I knew most of the
25  people.

Page 50

(11:17:02-11:18:10)

1      GREFIG
2  Q   So you thought it would be more
3  enjoyable to work with people you knew?
4  A   During a course of a conversation
5  that I had with the office manager in -- they
6  had -- remember, I'm in New York now.
7      They closed down -- after the
8  acquisition -- they called it a merger, but
9  after the acquisition they closed down the White
10  Plains office, and everybody was relocated to
11  Stamford, Connecticut.
12      So the people who were in the
13  Stamford office, including the office manager at
14  that time, were former Hansen people.
15      And during the course of conversation
16  I had with the office manager, he said how would
17  you like to come to Stamford.  We've had some
18  pressing needs.
19  Q   Okay.  And were the needs any
20  connection with Woolworth?
21  A   No.  Oh, no, no, no, no.
22  Q   How much of the time that you
23  spent -- would you say on average you spent
24  working on Woolworth matters in the 1994, 1995
25  time frame?

Page 51

(11:18:12-11:19:42)

1      GREFIG
2  A   Well, '94 -- '94, '95 time frame was
3  when the cash balance conversion was underway?
4  Q   That's a question you're asking me?
5  A   I'm asking you.
6  Q   I'll represent to you that the
7  conversion was underway planning-wise in 1995,
8  and that it became effective January 1, '96.
9  A   Okay.  So this was a special study
10  undertaken in '95, but 1994, which was part of
11  your question as well, we had two different
12  environments then.
13      '94 would have been valuation work,
14  and I don't recall any special studies being
15  undertaken in '94.
16      I can't give you a -- I can't give
17  you a reasonable -- a reasonable estimate of the
18  timing, like ten percent or 20 percent.
19  Q   Okay.  I have that rough -- very
20  rough estimate.  Is that fair?
21  A   Yeah.  We'll use that as a reference
22  point, but I'm not sure that that's even a right
23  answer.
24  Q   We have a lot material to cover, so
25  I'd like to try to just have an agreement with

Page 52

(11:19:46-11:20:52)

1      GREFIG
2  you that we don't -- I really do appreciate your
3  thoughtfulness, but we have a lot of ground to
4  cover.
5      So the next question is, did you
6  consider Woolworth at the time to be a major
7  client of the firm?
8  A   Oh, yes.
9  Q   What did you know at that time as to
10  how Woolworth became a client of Mercer?
11  A   Nothing.
12  Q   Was Woolworth, as far as you knew at
13  the time, a very long-time client of Mercer?
14  A   I don't know for a fact that it was,
15  but certainly had the sense that it was.
16  Q   Was there anybody at the time that
17  you saw as being, in effect, the owner of that
18  relationship?
19      MR. RUMELD: I object to the
20      form.
21      THE WITNESS: I can answer?
22      MS. WALWORTH: Yes, you can.
23  A   Owner of that relationship.
24  Q   You said that Brandes was the client
25  manager; is that fair?

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 53

(11:20:52-11:22:04)

GREFIG

1   GREFIG
2  A  Yes.
3  Q  Okay.  So this question is slightly
4  different, which is who -- who inside of Mercer
5  was recognized and as far as you're aware
6  compensated for retaining Woolworth as a major
7  client of Mercer?
8  A  I don't know who that was, to be
9  honest with you.  I don't know who it was.  When
10  I -- when I came in, this individual Phil Mauer
11  was -- was the guy that seemed to have the
12  day-to-day contact with the client.
13  Q  He was an associate?
14  A  He was an associate of the firm, yes.
15  Q  And you were at that time?
16  A  Principal.
17  Q  So he was a subordinate to you?
18  A  Yes.
19  Q  And in the 1994 time frame --
20  withdrawn.
21      Who were the main points of contact
22  at Woolworth that you interacted with directly?
23  A  Tom Kiley and Carol Kanowicz.
24  Q  Is that true from the period '87 to
25  '98, or were you thinking of '94, '95?

Page 54

(11:22:08-11:23:42)

1   GREFIG
2  A  No.  That was true during my entire
3  relationship with the client.  Those were my --
4  those were my primary contacts to -- in the
5  sense that -- who did I have contact with most
6  often?  Tom Kiley and Carol Kanowicz.
7  Q  Throughout that approximate ten-year
8  period?
9  A  Correct.
10  Q  And tell me, who is Tom Kiley?
11  A  Ignoring the meaningfulness of the
12  title, okay, I'll put a title on him, but it may
13  not be his official title.
14      I saw him as the in-house
15  administrator of the Woolworth retirement plan.
16  I don't know whether he carried that title, but
17  functionally that's the way I saw him.
18  Q  And what did that mean to you as
19  in-house administrator?
20  A  Well, if there was -- or that the
21  contact that I had with Woolworth was -- for the
22  most part dealt with the funding valuation and
23  the accounting valuations.
24      So if we had a problem with the
25  employee data that was submitted for the

Page 55

(11:23:44-11:24:58)

1   GREFIG
2  valuation, we had some -- something abnormal
3  that needed to be resolved, he was the go-to
4  guy.  That's about it.
5  Q  Anything else about what you knew
6  that he did that caused you to think of him as
7  the in-house administrator, other than what you
8  mentioned so far?
9  A  Anything else that he did?
10  Q  Yes.  You knew that he did, that
11  caused -- causes you -- caused you to think of
12  him as the in-house administrator for the plan.
13  A  No.  He was the go-to guy on
14  Woolworth retirement plan matters, as I think
15  Carol Kanowicz was the go-to person on the
16  health and welfare side, although Carol also has
17  some history with -- with the Woolworth
18  retirement plan.
19  Q  Well, if you could help me out on
20  that score, the last comment you just made.
21      The question that I asked that you
22  gave the answer Kiley and Kanowicz to, you
23  understood that to be not limited to the
24  retirement plan?
25  A  Well, those were -- those were the

Page 56

(11:25:00-11:26:32)

1   GREFIG
2  people with whom I had most contact.  And since
3  my contact with Woolworth was with respect to
4  the retirement plan, and I did have contact with
5  Carol, somewhere along the line she had some
6  involvement with it, but I saw Tom as the lead
7  person on the -- on the retirement plan.
8  Q  And what function did she serve as
9  far as you observed from your contact with her
10  over the ten years?
11  A  I don't know.  She was knowledgeable
12  about the Woolworth retirement plan, okay, its
13  history.
14      She may have also had internal
15  contacts that helped Tom resolve data issues,
16  something like that, or she may have been
17  someone that -- may have been someone that Tom
18  turned to for help.
19  Q  And with respect to your involvement
20  with Tom, you would be -- over the ten years you
21  would be in contact with him on a regular basis,
22  I assume?
23  A  Well, I have difficulty with the word
24  regular, because that makes it sound like I
25  talked to him weekly, but that's not the case.

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

(11:26:34-11:27:42)

1  GREFIG
2  I talked to him as was necessary to,
3  you know, get -- get our work done, so we have
4  an actuarial valuation.  What do I need.  I need
5  to be pulling data.  We got an issue with
6  employee data.  One of my people would go back
7  to Tom.
8  Q   When you say one of my people, are
9  you referring to --
10  A   Somebody on the staff who would
11  handle data.  I mean, there were going to be
12  people that reported to Mauer for example, who
13  would reconcile data and do those types of
14  chores.
15  Now, that individual finds problem
16  with the data, that individual would go back
17  probably to Kiley or bring it to Mauer, and
18  Mauer would contact Kiley.  And that -- that's
19  the relationship.  So I would have contact with
20  Kiley probably less frequently than Mauer did.
21  Q   On an average basis?
22  A   On an average basis.
23  Q   So from -- let's take the period '94,
24  remembering that the conversion was effective
25  January 1, '96.

(11:27:42-11:28:32)

1  GREFIG
2  Let's take the period '94 forward,
3  because that's also a nice divider, because
4  that's when you moved to the Stamford office.
5  Okay?
6  A   Uh-huh.
7  Q   So Mauer is out of the picture at
8  that point, right?
9  A   Yes.
10  Q   Cassidy is in the picture?
11  A   Is brought into the picture, yes.
12  Q   And prior to that, you're not aware
13  that he did anything for the Woolworth plan?
14  A   Cassidy?
15  Q   Right.
16  A   I'm not aware of him doing anything
17  for the retirement.  Prior to that time?  No.
18  Q   And so moving forward from '94
19  forward, there's Chris Michaels?
20  A   I recognize the name.  Yes.
21  Q   An actuarial clerk?
22  MR. RUMELD: I object to the
23  form.
24  A   Yes.
25  Q   You hesitate, because you're trying

(11:28:34-11:29:32)

1  GREFIG
2  to remember, or you're not sure that's not the
3  right way to say it?
4  A   I stumble over the word clerk,
5  because we never used that word.
6  Q   Did you tell Steve Cohen that he was
7  an actuarial clerk?
8  A   No.  I probably told him he was a
9  technician.
10  Q   And the difference is just clerk
11  sounds pejorative?
12  A   We had mail clerks in the mail room,
13  and people in actuarial teams were called
14  technicians.
15  Q   And was there -- when did he become
16  an actuarial technician working on the
17  retirement plan, approximately?
18  A   I don't know.  I'll be honest with
19  you, I don't know.  I recognize the name
20  Michaels.  I have no recollection of him working
21  on the Woolworth retirement plan.
22  Q   Do you have any recollection of him
23  at all?
24  A   Name-wise, yes.
25  Q   But no image comes to mind?

(11:29:36-11:30:40)

1  GREFIG
2  A   No, no.  And again, you know, nothing
3  pops to mind about where he sat in the office
4  relative to where I sat.  So...
5  Q   Got it.  Got it.  So at the time
6  Cassidy and you are both working on the
7  Woolworth retirement plan say 1994, Cassidy is
8  clearly your subordinate?
9  A   Yes.
10  Q   And he is -- at that time was he an
11  enrolled actuary?
12  A   I don't know.  I don't know what his
13  credentials are.
14  Q   Or --
15  A   I don't remember what his credentials
16  were at that time.
17  Q   It's okay if you don't.  I just --
18  what I'm saying is you do take a lot of time to
19  answer questions, and it's fine.
20  It's just -- you need to understand
21  your -- your veracity is not being questioned as
22  to these questions.  Your -- just trying to find
23  out what you know.
24  A   I understand that, but there are --
25  it's been a long time.

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

---

Page 61

(11:30:40-11:32:06)

1      GREFIG
2  Q  I'm trying to refresh your
3  recollection and keep moving.
4      So with respect to this cash balance
5  conversion, had you ever done a cash balance
6  conversion prior to converting the Woolworth
7  plan?
8  A  No.
9  Q  Had you ever worked on a plan that
10  had been converted without your assistance to a
11  cash balance format?
12  A  Not that I remember.
13  Q  How did it come about that Cassidy,
14  your subordinate, was tasked with designing the
15  cash balance conversion?
16  A  I don't think he designed the cash
17  balance conversion.  What he did was he
18  developed a formula for future accruals under
19  the plan that I reviewed for purposes of meeting
20  the benefit accrual rules.
21      I'm not sure I would take that
22  activity that I do remember of him and expand it
23  to the concept of having designed the
24  conversion.
25      There are other elements to it,

---

Page 62

(11:32:08-11:33:32)

1      GREFIG
2  different versions, besides formula I would
3  guess.
4  Q  Okay.  Well, you know that the plan
5  was converted and had what in your mind you
6  would call a design.
7  A  Yes.  Yes.
8  Q  What was that design?
9  A  I don't know.  The old Woolworth
10  retirement plan was a career average plan.  The
11  thing that's stuck in my mind relative to Jim
12  Cassidy and his development of the future
13  accruals was that he put together a schedule of
14  future accruals, and to be honest with you I
15  don't remember what we were accruing, but future
16  accruals that had to satisfy the benefit accrual
17  rules under ERISA.
18  Q  So is it fair to say that as your
19  subordinate, you probably asked him to draw up a
20  schedule of accruals, and then reviewed it to
21  make sure that it wasn't --
22  A  Right.  I either asked him or he
23  volunteered to do it, but I was the one that did
24  the peer review on the -- on the formula.
25  Q  Okay.  And that was to make sure that

---

Page 63

(11:33:34-11:34:18)

1      GREFIG
2  it satisfied the back-loading rules?
3  A  Right.
4      MR. RUMELD: I object to the
5      form.
6      MS. WALWORTH: Could I ask you
7      to wait until the question is
8      finished so --
9      MR. GOTTESDIENER: Carla, you
10      did agree that you wouldn't be
11      speaking.  I can handle the witness
12      and --
13      MS. WALWORTH: I don't think I
14      agreed I wouldn't be speaking, but I
15      am going to ask him to let you finish
16      a question.
17      MR. GOTTESDIENER: I appreciate
18      it, but I don't want you to do that.
19      MS. WALWORTH: I'm going to go
20      ahead, but please finish.
21  Q  So the design -- I'll take that back.
22  Thanks.
23      The design of the plan -- can you --
24  you did meet for more than a couple of hours
25  with lawyers, including lawyers for the

---

Page 64

(11:34:20-11:36:02)

1      GREFIG
2  Defendants in this case.
3      So I'm asking you to tell me, best as
4  you can recall, sitting here now from whatever
5  sources jog your memory, tell me, how did the
6  conversion work?  You mentioned a career average
7  plan?
8  A  Right.
9  Q  How did it get converting to a cash
10  balance plan?  What were the actuarial
11  mechanics?
12  A  I'll answer -- I'll obviously answer
13  your question, but I need to refresh it, because
14  I don't recall how cash balance plans work.
15      I know we've got to take and convert
16  the accrued benefit, but as I said before, when
17  Jim Cassidy put together the accrual schedule, I
18  don't know what it was that was being accrued.
19  I don't recall the operation of the cash
20  balance.
21  Q  Let me show you Exhibit 9.  This is
22  the 204(h) notice that went out to employees in
23  November of 1995.  Does that look familiar?
24  A  No.  This document?  No.
25  Q  Okay.  You recall that a 204(h)

---

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

---

Page 65

(11:36:06-11:37:16)

1    GREFIG
2  notice did go out to participants?
3  A  I know that a 204(h) notice was
4  supposed to go out to participants, yes.  I
5  mean, that I remember.  Whether it was sent I
6  can't -- I can't attest to that.
7  Q  Okay.  Why don't you just put it
8  aside for a second.
9      You said it was supposed to go out.
10 Why did a 204(h) notice have to go out?
11 A  Because --
12     MR. RUMELD: I object to the
13     form.
14 A  -- there was a reduction in future
15 benefit accruals.
16 Q  And how did that reduction come
17 about?
18 A  The formula for future benefits
19 accruals was less than the rate of accrual under
20 the existing plan.
21 Q  And why don't you take a look again
22 at Number 9, and directing your attention to the
23 first page, where it discusses an initial
24 account balance at the bottom of the page.  You
25 see that?

---

Page 66

(11:37:16-11:38:04)

1    GREFIG
2  A  Uh-huh.
3  Q  Do you see where it says initial
4  account balance?
5  A  Uh-huh.  Yes.
6  Q  It says, "Your accrued benefit as of
7  December 31, 1995 is actuarially converted to an
8  initial account balance"?
9  A  Okay.
10 Q  You see that?
11 A  Yes.
12 Q  And that refreshes your recollection
13 as to how the career average formula as of
14 12/31/95 was converted to?
15 A  Well, it refreshes me that the
16 accrued benefit was converted to an account
17 balance.
18     And this -- that's about the only
19 thing I remember from the functioning of the
20 cash balance plan.  Now how -- what was done in
21 the future --
22 Q  That you would see on the next page?
23 A  Right.
24 Q  And you're looking on the next page
25 at the pay credits scale?

---

Page 67

(11:38:08-11:39:00)

1    GREFIG
2  A  Yes.
3  Q  Okay.  You -- you're aware that -- if
4  I could just take that back for a second.
5      You're aware that a nine percent
6  interest rate was used to convert the accrued
7  benefit to an initial account balance?
8      MR. RUMELD: I object to the
9      form.
10 A  We'll use nine percent as the
11 investment return assumption of the plan.
12 Q  And I represent to you that nine
13 percent was also used to convert --
14 A  It was?  Yes.
15 Q  Do you -- doesn't this jog your
16 memory?
17 A  No.
18 Q  And here you're saying that you've
19 not heard from any source since Steve Cohen
20 contacted you that nine percent was used?
21     MS. WALWORTH: Objection.
22     Instruct you not to answer anything
23     that was said to you by counsel.
24     MR. GOTTESDIENER: I'm asking
25     about jogging of his memory.

---

Page 68

(11:39:02-11:39:44)

1    GREFIG
2  Q  I'm not asking what was said to you.
3  Are you saying nothing comes to mind?
4  A  Nothing jogs my memory about the
5  assumptions that were used at the time that this
6  plan was converted, no.
7  Q  You've been -- just for the record,
8  you've been reaching out to get back from me
9  Exhibit 9, the 204(h) notice, for the last 20
10 seconds, right?
11 A  Yes.
12 Q  The reason is, is because you'd like
13 to see that nine percent assumption in the
14 204(h) notice?
15     MR. RUMELD: I object to the
16     form.
17 Q  Is that why you -- he makes
18 objections -- unless you're instructed not to
19 answer, you just keep answering.
20     You were reaching for it, and you're
21 reaching for it even now, because you want to
22 see nine percent?
23 A  No.  I want to see --
24     MR. RUMELD: I object to the
25     form.

---

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

---

Page 69

(11:39:44-11:40:46)

GREFIG

1    GREFIG
2  A  I want to see how the future benefit
3  accruals which I had mentioned before --
4  Q  Yes.
5  A  -- when I said I don't even know
6  what's being accrued, I'm looking at that to get
7  a better understanding of exactly how this cash
8  balance plan operated prospectively after the
9  accrued benefit was converted to a cash balance.
10  Q  That's a very understandable
11  interest, but because I get to ask the
12  questions, my focus is on the conversion moment,
13  not on the future, okay?  So could you focus on
14  that?
15  A  Okay.
16  Q  Now, how -- an interest rate was used
17  and it was nine percent; do you accept that?
18  A  If you say so, yes.  Take that.
19  Q  Okay.  How was the interest rate
20  assumption used -- how was it -- withdrawn.
21    Explain actuarially what that nine
22  percent did to the accrued benefit to yield the
23  initial account balance.
24  A  Converted the accrued benefit to a
25  present value.

---

Page 70

(11:40:48-11:41:44)

1    GREFIG
2  Q  Explain how that works.
3  A  Actuarial present value.
4  Q  Explain that.
5  A  Well, in performing -- in completing
6  an actuarial valuation, you need a variety of
7  assumptions.
8    And the nine percent investment
9  return assumption was derived from or would be
10  derived, and I'm generalizing this, because I
11  don't remember that Woolworth had what I'm about
12  to reference, an investment policy statement.
13    So the client -- the plan sponsor
14  would develop an investment policy statement,
15  directing the asset managers as to how to invest
16  the assets, setting forth the amount of equities
17  and fixed income and other types of investments
18  would be permitted or desirable in a portfolio.
19  Q  Sir, I'm sorry.  Your answer is
20  interesting, but my question is about a benefit
21  formula, not about --
22  A  Well, that's where the nine percent
23  came from.
24  Q  But you know that for a fact, or
25  you're just speculating?

---

Page 71

(11:41:48-11:42:36)

1    GREFIG
2  A  Well, it's in the actuarial valuation
3  report.
4  Q  That -- if I look in the actuarial
5  valuation report, it will tell me that the
6  interest rate used to create the opening balance
7  was selected because it was the same interest
8  rate as the plan's assumed rate of return of
9  assets?
10  A  I don't know.
11  Q  That's what I'm getting to.
12  A  I don't know.
13  Q  You do agree they're totally
14  different things, even if the number is
15  identical?
16    MR. RUMELD: I object to the
17    form.
18  A  They're -- they're totally different
19  things.  The -- the investment return assumption
20  that was used to convert the accrued benefit to
21  a cash balance of nine percent is -- is
22  different from the nine percent used for funding
23  the plan?
24  Q  You're hesitating, because they're
25  both -- they're both ways of --

---

Page 72

(11:42:38-11:43:32)

1    GREFIG
2  A  Well, I'm hesitating because I'm --
3  I'm trying to understand what -- what your
4  question really is.  I mean, yes.  They're the
5  same number, but they have a common source.
6  Q  Well, again, when you --
7  A  Which is what I was saying.  I
8  mean --
9  Q  The same rate of return and --
10  A  Where the assumed rate of return came
11  from, and my explanation may be long-winded, but
12  that's where the nine percent came from.
13  Q  The nine percent used to convert
14  accrued benefit?  I thought you said you didn't
15  remember.
16  A  I don't -- my memory -- when you
17  asked me about what rate of return was used to
18  make the conversion, nothing jogs my mind on the
19  conversion.  When we've identified the rate of
20  return is nine --
21  Q  Interest rate.  I didn't say rate of
22  return.
23    MR. RUMELD: I object to the
24    form.
25  A  Well --

---

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 73

(11:43:32-11:44:32)

1    GREFIG
2  Q  Do you recall that I asked you the
3  interest rate?
4  A  Okay.
5  Q  Okay.  Let's -- I think we're getting
6  tangled in an area that -- I'd ask you if you'd
7  agree to be summed up as follows.
8    There's an interest rate that is used
9  to take the accrued benefit and express it as an
10  initial account balance, and that rate you
11  accept was nine percent?
12  A  Yes.
13  Q  Okay.  You're saying that nine
14  percent also happened to be the plan's assumed
15  rate of return on assets for funding purposes,
16  correct?
17  A  Yes.
18  Q  And you would agree that they -- the
19  nine percent rate in both -- in both questions
20  is performing a present valuing function?
21  A  Yes.
22  Q  However, do you agree that the
23  present valuing function for funding is a
24  different present valuing function than for the
25  benefit formula?

Page 74

(11:44:34-11:45:42)

1    GREFIG
2  A  In what way?
3  Q  One's for -- one's for investments
4  and -- and assumed rate of return for funding,
5  and one is for the participants' starting
6  balance of a new benefit formula.
7  A  They're being used for different
8  purposes.
9  Q  That's all I'm asking.
10  A  Okay.
11  Q  Now they're being used for different
12  purposes --
13    MR. RUMELD: I object to form.
14  Q  -- the number is the same, and you're
15  saying you don't know how the nine percent rate
16  was selected for use to convert the accrued
17  benefit to create opening balances?
18  A  I don't remember how it was selected.
19  Q  Who selected it?
20  A  I don't know.  But I would -- I
21  would -- with a nine percent rate sitting out
22  there for funding purposes, I would think that
23  the -- the origin of the nine percent for
24  present valuing the accrued benefit was somehow
25  connected to the investment returns.

Page 75

(11:45:44-11:46:52)

1    GREFIG
2  Q  But if it turned out this -- well,
3  you do agree that from the plan's perspective,
4  nine percent is the rate of return on assets,
5  but from the participant's perspective, if the
6  participant were to be paid, the participant's
7  perspective would be set by ERISA?
8    MR. RUMELD: I object to the
9  form.
10  A  Yes.  Right.
11  Q  So if the GATT rate at the time of a
12  conversion was six percent, that would be from
13  the participant's perspective the right rate to
14  use for present valuing purposes?
15  A  No.
16  Q  Why not?
17  A  What's the GATT rate anyway?  That's
18  a -- GATT to me is -- has to something to do
19  with foreign countries, and I don't know --
20  Q  30-year treasury bond?
21  A  Okay.  Okay.
22  Q  When I -- you answered my question in
23  the affirmative when I said from the
24  participant's perspective what ERISA would
25  require.

Page 76

(11:46:54-11:47:58)

1    GREFIG
2    What did you have in mind when you
3  answered in the affirmative?
4  A  Well, could you repeat -- you gave me
5  a series of two questions there.
6  Q  I'll withdraw.  Let me ask you this
7  way.
8    An interest rate is used to
9  present-value a participant's accrued benefit in
10  a defined benefit pension plan if the
11  participant is to be paid a cash-out.
12  A  Okay.  That's the distinction that
13  was running through my mind.  If you're going to
14  pay a lump sum out of a plan, then you got
15  certain requirements that have to be satisfied.
16    Those requirements don't carry over
17  to the present valuing of an accrued benefit for
18  purposes of funding the plan.
19  Q  I agree.  We're talking --
20  A  Right.
21  Q  So the plan funding is different than
22  the -- well, there's three different functions.
23    There's paying somebody.  There's the
24  plan's funding assumption, and then what I've
25  been trying to get at, which is the creation of

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 77

(11:48:00-11:49:00)

GREFIG

1    GREFIG
2    an opening balance for a new benefit formula.
3    A   Okay.
4    Q   Do you see the distinction between
5    the three?
6    A   Yes.  I'm free to pick the two, and I
7    don't have any freedom on the third, because the
8    statute and regulations dictate what will be
9    used for lump sum purposes.
10       But within professional standards,
11   I'm free to choose the other two rates
12   independent of any regulations, because the
13   regulations don't cut in on those issues.
14   Q   And what standards applied -- you
15   said subject to standards you had the freedom to
16   chose.
17       What standards apply to the selection
18   of the interest rate for creating the opening
19   balance?
20   A   Oh.  For creating opening -- what
21   standards apply there?  I don't think there are
22   any standards that I'm aware of.
23       My standards go back to the standards
24   that are for funding standard account purposes
25   and the reasonableness of actuarial assumptions.

Page 78

(11:49:02-11:50:00)

GREFIG

1    GREFIG
2    Q   Right.  So putting aside funding, you
3    in your original answer said that it would be
4    subject to standards, the free choice of the
5    interest rate to create the opening balance, and
6    now you're amending that answer to say you don't
7    know that the standards apply to that.
8        MR. RUMELD: I object to the
9    form.
10   A   No.  My reference to standard has to
11   do with the funding.  I don't think I ever
12   ascribed standards to the conversion to the
13   initial account balance.
14   Q   What --
15   A   So I'm not amending a statement.  I
16   don't think there were any standards that
17   dictated what you did or didn't have to do.
18   Q   And the regulation that you reference
19   or regulations, what did you call that in a
20   shorthand way at the time?
21   I threw out the word GATT, and that
22   didn't resonate with you.  Did you guys call
23   that something in shorthand?
24   A   Not.  I don't -- I don't remember --
25   I don't remember GATT.  I remember, perhaps

Page 79

(11:50:04-12:01:44)

GREFIG

1    GREFIG
2    incorrectly, that lump sums had to be determined
3    using the PBGC rates, Pension Benefit Guarantee
4    Corporation, PBGC rates.
5        MR. GOTTESDIENER: We have to
6    stop.
7        MS. WALWORTH: I'd like to take
8    a comfort break.
9        THE VIDEOGRAPHER: This
10   concludes Tape Number 1.  The time is
11   11:47 a.m.  We're off the record.
12   (Recess taken)
13       THE VIDEOGRAPHER: This begins
14   Tape Number 2.  The time is
15   11:58 a.m.  We're back on the record.
16   CONTINUED DIRECT EXAMINATION BY MR.
17   GOTTESDIENER:
18   Q   I'm going to show you the 1996
19   valuation.  This is Exhibit 70.
20   (Exhibit 70, 1996 valuation,
21   was marked for identification, as of
22   this date.)
23   Q   This was the first valuation after
24   the plan amendment and reflects the fund
25   valuation, doesn't it?

Page 80

(12:01:48-12:03:20)

GREFIG

1    GREFIG
2    A   Okay.  Yeah.  It's -- Page 3 says
3    that it reflects -- Page 3.  Statement says
4    effective January '96 Woolworth retirement plan
5    was amended to a cash balance format.
6    Q   And --
7    A   Kinney Shoe Corporation pension plan
8    for manufacturing employees was merged.  I don't
9    remember that.
10   Q   Exhibit 71 is the prior year
11   valuation.
12   (Exhibit 71, 1995 valuation,
13   was marked for identification, as of
14   this date.)
15   A   May I make a comment?
16   Q   Can you answer the question?
17   A   What was the question?
18   Q   Is it the 1995 valuation?
19   A   Yes.
20   Q   Great.  Comment's welcome.
21   A   The peer review process that I spoke
22   about before, if you look at Page 4, both
23   valuation reports that you handed me, the peer
24   review process was done by two different people.
25   Neither of them had a regular ongoing -- had no

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

---

Page 81

(12:03:24-12:06:16)

1    GREFIG
2  relationship with.
3  Q  Understood, sir.
4  A  Their name is in there because of the
5  peer review process.  Okay.  So this is...
6  Q  '95 and '96.  Were there any funding
7  assumptions that changed between the '95
8  valuation and the 1996 valuation?  And if so,
9  could you indicate what those were?
10  A  Looking at Section 4.3 of the
11  valuation reports, which is on Page 42 of the
12  '95 report and Page 47 of the '96 report, the
13  OBRA '87 current liability rate was changed from
14  eight percent to 7.76.
15    And other than knowing what OBRA
16  means, I don't know what the '87 current
17  liability is used for.
18    The RPA '94 currently liability rate
19  changed from 7.93 to 7.62, and the threshold
20  current liability rate changed from 7.93 to
21  7.62.
22  Q  Those aren't funding assumptions, are
23  they?
24  A  I don't know.  I mean, OBRA is the
25  Omnibus Budget Reconciliation Act of 1987.

---

Page 82

(12:06:32-12:07:40)

1    GREFIG
2  Q  What -- you -- you said there was
3  different peer review people, but you were the
4  only enrolled actuary who signed both of
5  these --
6  A  And the Schedule B.  Correct.
7  Q  Just to finish the question, you were
8  the only enrolled actuary who signed these two
9  valuations?
10  A  Oh.  I'm sorry.  No.  Mark Hanrahan,
11  who signed the '95, is designated as enrolled
12  actuary.  Page 4.
13  Q  '96?
14  A  '9 -- '95 one.
15  Q  Right.  And '96?
16  A  And in '96 Doug Tinney was an
17  enrolled actuary.
18  Q  Right.  But both of those enrolled
19  actuaries are only signing the peer review.
20  A  Correct.
21  Q  You're the only enrolled actuary
22  signing?
23  A  Signing the -- signing the report,
24  but based upon the signatures that are presented
25  here, yeah.  We could make that conclusion, yes.

---

Page 83

(12:07:44-12:10:52)

1    GREFIG
2  Q  Okay.  Would you accept my
3  representation that these are -- what you read
4  into the record were fund assumptions?
5  A  Well, no.  I -- because I don't
6  recall what the OBRA and RPA rates were used
7  for.  I recognize nine percent as a funding
8  assumption.
9  Q  Can you tell me what the -- what was
10  the cost effect of the amendment according to
11  the valuation?  If you look at Page 3?
12    MS. WALWORTH:  Which are the
13    exhibits you would like him to look
14    at?
15    MR. GOTTESDIENER:  '96 and '95.
16  A  So you want me to go to 1995?
17  Q  Yes.  Both of those.  What I'm trying
18  to get at here is that there was no change in
19  assumptions between the two years.
20    MR. RUMELD:  I object to the
21    form.
22  A  What's the method change?  Oh.  Well,
23  '95 valuation report states on Page 2 that
24  "There were no changes in the actuarial
25  assumptions or valuation procedures made since

---

Page 84

(12:10:54-12:13:32)

1    GREFIG
2  the prior valuation.  However, there had been
3  changes to the asset valuation method and plan
4  provisions."
5    So when you used the term actuarial
6  assumptions, do you include the asset valuation
7  method in -- in your description?
8  Q  Well, first I'm talking about -- you
9  were -- you're reading from '95 now.
10  A  Correct.
11  Q  I'm talking about '9 -- from '95 to
12  '96.
13  A  Okay.  The question was has there
14  been a change as of '96, a change in the
15  actuarial assumptions for funding purposes.  Is
16  that the question?
17  Q  Yes.  From '95 to '96.  You're on
18  Section 4.3, right?
19  A  I'm on Section 4.3 in both valuation
20  reports, yes.
21  Q  You see there's -- other than current
22  liability interest rates you see there's no
23  change?
24  A  As far as I've gotten.  Right.
25  That's interesting.

---

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 85

(12:13:42-12:15:08)

1    GREFIG
2  Q   Are you able to answer the question
3  as posed?
4  A   Were there changes in the '96
5  valuation assumptions?
6  Q   Between '95 and '96, other than the
7  current liability interest rate there's no
8  change, right?
9  A   There doesn't appear to be any
10  changes.
11  Q   So your assumption regarding what
12  benefit form people would elect, that didn't
13  change?
14  A   What page are we on?
15  Q   4.3, or any other place you need to
16  look at.
17  A   Okay.  Your question is with respect
18  to the form of benefit payment?
19  Q   That's right.  Your assumption as to
20  what form people would elect.
21  A   To -- do we even list that
22  assumption?  Is that assumption listed in the
23  report?
24  Q   You do need to make that assumption.
25  You agree, don't you?  Look at Page 48.  That

Page 86

(12:15:20-12:16:24)

1    GREFIG
2  might help.
3  A   That's what I'm reading right now.
4  Q   Okay.
5  A   Yes.  Okay.  So Item Number 6 says
6  that funding is based 70 percent of the members
7  are married, female spouses four years younger,
8  upon retirement payment is assumed to be in the
9  form of 50 percent joint and survivor annuity.
10  Q   You're looking at the '96 document
11  right now?
12  A   Yes.
13  Q   So from '95 to '96, that doesn't
14  change.
15  Your assumption regarding what
16  benefit form people would take didn't change?
17  A   Correct.
18  Q   So after conversion to cash balance
19  format, you made no assumption that people would
20  take lump sums?
21    MR. RUMELD: I object to the
22  form.
23  A   That -- based upon this document,
24  that appears that it may be the case.
25  Q   I mean, it is the case according to

Page 87

(12:16:30-12:18:04)

1    GREFIG
2  the document?
3  A   According to the document, yes.
4  Q   So you assume that people would
5  continue to take the early retirement benefit in
6  exactly the same pattern as prior to the
7  amendment.
8  A   According to this document, yes.
9  Q   Go to Page 34 please.
10  A   Of...
11  Q   Of the '96 document.  You see that
12  over 7,000 people terminated?
13  A   Okay.
14  Q   And that's out of about 24,000?
15  A   Active members, yes.
16  Q   That's a large number?
17  A   Correct.
18  Q   Is that --
19  A   Although -- 15 percent of the work
20  force is not -- as I recall not an unusual
21  number.
22  Q   15 percent termination is not an
23  unusual --
24  A   No.
25  Q   It's not a -- well, you -- you don't

Page 88

(12:18:08-12:19:06)

1    GREFIG
2  agree that it's a large number?
3  A   Well, it's a large number.
4  Q   Relative to 24,000?
5  A   Yeah.
6  Q   You agree?
7  A   Yes.  Yes.
8  Q   Well, go to -- it's almost a third.
9  A   Okay.
10  Q   You agree?
11  A   Just shy of a third, yes.
12  Q   Go to Page 47.
13  A   Of the same --
14  Q   Yes.  Of the same document.  And --
15  A   Okay.
16  Q   Can you tell me, what's the assumed
17  turnover?
18  A   It's graded based upon age from --
19  from 18 percent down to three percent.
20  Q   But on average you agree that's about
21  ten percent on average?
22  A   Somewhere in that neighborhood.  Now,
23  that's just an average of the numbers in that
24  column.
25  That's not a population-weighted

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 89

(12:19:10-12:20:10)

1      GREFIG
2  average.  You'll get a different result if you
3  weight this by population.
4  Q   You agree that the -- the number of
5  terminated is a large number.
6      Is that something that would have
7  come up in the peer review?
8  A   Might have, sure.
9  Q   Would that have impacted your
10  turnover assumption?
11  A   No.
12  Q   Why not?
13  A   No, because we only had 14 people who
14  took cash-outs here too.  Because one year's
15  experience is not sufficient to establish your
16  actuarial assumptions.
17  Q   Well, would you have had a discussion
18  with the sponsor as to whether this was going to
19  continue?
20  A   Maybe yes, maybe no.  I don't know.
21  Q   I'm not asking if you did, because
22  you seem to be saying that you can't tell us
23  from memory.
24      I'm asking from your professional
25  practice, and knowing your standards, would you

Page 90

(12:20:14-12:21:42)

1      GREFIG
2  have not inquired as to whether that rate of
3  termination would continue?
4  A   It depends on how much I knew about
5  what may have been going on at the client.  I
6  mean, if -- if -- if we knew ahead of time that
7  some unusual event occurred, you know, shut down
8  a plant or something like that, we might have
9  expected to see that, so we would only raise
10  eyebrows with the client if we didn't see it.
11      If on the other hand, if we had no
12  knowledge whatsoever of what was going on at the
13  client and the number popped up, that would have
14  raised issues at the point at which the data was
15  being reconciled from one year to the next, to
16  confirm that these in fact were terminations,
17  and that there isn't a mistake in the data.
18  Q   Well, you knew what was going on with
19  Woolworth at the time of the plan conversion
20  planning?
21  A   I suppose I knew what was going on,
22  but I have no recollection of what was going on
23  at the time of -- of the plan conversion.
24      I mean, I -- that would have come out
25  of conversations, or may have been documented in

Page 91

(12:21:48-12:23:42)

1      GREFIG
2  the valuation report someplace.
3      You know, without having the
4  opportunity to read through the document, I
5  really can't offer much comment on terminations,
6  because the -- the valuation report may make
7  comment about the number of terminations.
8  Q   So the estimates -- the cost
9  estimates used the same assumptions, but I want
10  to concentrate on the -- when it was assumed the
11  benefit would be paid and in what form.
12  A   Okay.
13  Q   All right?  In the '95 valuation, if
14  you turn to that, if the participant terminated
15  at age 40, when would the participant be assumed
16  to commence his or her benefit payments?
17      And I don't know if this assists you,
18  but in '94 benefits couldn't begin prior to age
19  55.
20      Does that ring a bell?  Unless it was
21  below the de minimis 3,500.
22  A   Those are two different numbers,
23  aren't they?
24  Q   You mean 3,500 or 5,000?
25  A   3,500 is a lump sum payment?

Page 92

(12:23:46-12:25:24)

1      GREFIG
2  Q   Right.  Sometimes --
3  A   As opposed to -- okay.
4  Q   Some years it was 5,000.  Some years
5  it was 3,500.
6  A   Okay.  Because according to the
7  assumption here, it says that vested employees
8  may elect after age 55 to receive a reduced
9  early retirement benefit.
10  Q   My question is a 40-year old
11  terminated.
12  A   I don't see anything in the
13  assumptions that -- that specifies what
14  happens --
15  Q   If you go to 4.2.
16  A   Okay.
17  Q   You see the benefit's only available
18  after age 55?
19  A   Under retirement dates, yes.
20  Q   Okay.  So what is the -- what is the
21  assumption as to when, say, a 40-year old would
22  commence his or her benefits?  Can't take it
23  prior to 55.
24  A   You can't take annuity benefits prior
25  to 55.

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 93

(12:25:26-12:26:58)

1      GREFIG
2  Q   You can't take a lump sum, other than
3  a cash-out for de minimis values, correct?
4  A   I'm -- it does not appear that an
5  assumption has been made with respect to the
6  40-year old that you mention.
7  Q   There is a retirement rate assumption
8  in 4.3, isn't there?
9  A   Below 55?
10  Q   A general retirement rate assumption.
11  Page 48.
12  A   Yes.
13  Q   Yes?
14  A   42.  That's termination.
15  Retirement -- yeah.  Retirement starts at age
16  55.
17  Q   Right.
18  A   Okay.
19  Q   So under what you're looking at, what
20  is the time that's assumed that that participant
21  who terminates at age 40 will commence his or
22  her benefit payments?
23  A   I don't know.
24      MR. RUMELD: I object to the
25      form.

Page 94

(12:27:00-12:28:12)

1      GREFIG
2  A   I don't know.
3  Q   Well --
4  A   It doesn't look like there's an
5  assumption that has been set out for it.  So the
6  default -- and this is not a statement of fact,
7  but default might be normal retirement age or
8  early retirement age, but I don't see an
9  assumption specifying how they're treated.
10  Q   Well, you're not assuming obviously
11  that he's taking a lump sum, this 40-year old.
12  A   Again, based upon what's before me
13  here in terms of actuarial assumptions, it
14  doesn't appear that a provision has been made.
15  Q   Well, you're the actuary who signed
16  the report.
17      What assumption -- what do you think
18  the assumption is?
19  A   Probably a default deferred to 65 or
20  55.
21  Q   In the form of an annuity?
22  A   Yes.
23  Q   And did that change between 1995 and
24  1996?
25  A   I -- whatever existed in 1995

Page 95

(12:28:18-12:29:52)

1      GREFIG
2  relative to that specific situation does not
3  appear to have changed in the following
4  valuation report, based upon the summary of
5  assumptions.
6  Q   So the same assumption was used?
7  A   Presumably.
8  Q   Well, it was, is my question.  Can
9  you confirm that it was?
10      MR. RUMELD: I object to the
11      form.
12  Q   And if it was a different assumption,
13  could you show me where a different assumption
14  is?
15  A   No.  That's -- I can't find a
16  different assumption.  So I'm...
17  Q   You agree that it's the same
18  assumption?
19  A   In the absence of an indication that
20  it was changed, it probably was not changed.
21  Q   So let me show you the 1996 IRS Form
22  5500, Exhibit 72.
23      (Exhibit 72, 1996 IRS Form
24      5500, was marked for identification,
25      as of this date.)

Page 96

(12:29:52-12:32:30)

1      GREFIG
2  Q   If you look at the second page,
3  doesn't it looks like a large number of people
4  terminated and were paid in 1996?
5  A   On Page 2?
6  Q   Yes.
7  A   I don't see a reconciliation of
8  terminated participants.  What it says -- this
9  is a -- this is a status of participants, those
10  who are active, those who are retired and
11  receiving benefits, those entitled to -- who are
12  terminated entitled to future benefits.  So all
13  this -- this is a cumulative history of the
14  entire plan.
15  Q   You see how H, number participants
16  that terminated employment during the plan year
17  with accrued benefits that were less than a
18  hundred percent vested?
19  A   Oh, yeah.  3,800.
20  Q   Okay.  And then underneath I(2), the
21  aggregate -- sorry.  The number of separated
22  participants required to be reported, 2,700?
23  A   Let me see.  One -- was any
24  participant separated from service.  What's the
25  SSA?  Is that somebody who's terminated vested

Page 97

(12:32:34-12:33:48)

1      GREFIG
2  has to be reported to --
3  Q   Social Security Administration?
4  A   Social Security Administration?
5  Q   You agree with that, right?
6  A   And they're saying -- the number they
7  plugged in here was 2,728.  Terminated with a
8  vested benefit.  Okay.
9  Q   So let's look at 1997 now.  Just by
10  the way, on '96, before we look at that, 72, you
11  signed the Schedule B as the enrolled actuary
12  for the plan, right?
13  A   Is the Schedule B in this package?
14  Q   Yes.  It's on -- if you look in the
15  right-hand corner there's what's called a Bates
16  number.  There's a stamp.  It's on 767.
17  A   Okay.  Yes.
18  Q   You signed as the enrolled actuary
19  for the plan, right?
20  A   Yes.
21  Q   So let's look at the 1997 5500, which
22  is Exhibit 73, which I just handed you.
23      (Exhibit 73, 1997 IRS Form
24      5500, was marked for identification,
25      as of this date.)

Page 98

(12:33:48-12:36:18)

1      GREFIG
2  Q   If you look at the second page and
3  look at the number of actives and compare to the
4  prior year, you can see that the number dropped
5  from 24,000 to 4,000.
6  A   24,000?  Which -- where are we?
7  Q   Second page.
8  A   Yes.  Page 2 of the 5500 for 1996.
9  Q   Is the number of -- 24,000 is the
10  number of people reported at the beginning, the
11  number of people at the beginning of 1995.
12  A   Are you looking on the 5500?
13  Q   Yes, sir.
14  A   But there's no --
15  Q   I'm sorry.  Valuation.  That's on the
16  valuation.
17  A   1995 valuation.  There's no
18  reconciliation of head count in the 5500.
19  Q   Yes.  In the '95 valuation.
20  A   January 1, 1995, we had -- are you
21  adding Kinney and Woolworth together to come up
22  with your --
23  Q   Yes.
24  A   So it's 13,562 for Woolworth and
25  10,362 for Kinney.  Those are the numbers we're

Page 99

(12:36:22-12:38:18)

1      GREFIG
2  looking at?
3  Q   Page 34.  The number of actives is
4  24,780, is it not?
5  A   On Page 34?
6  Q   Yes.
7  A   Active participants.
8  Q   '96 valuation, Exhibit 70.
9  A   '96.  Okay.  '96 shows active
10  participants, January 1, 1995, 24,780, and as of
11  January 1, 1996, 21,461.
12  Q   Yes.  And if you look at --
13  A   We agree with those numbers?  Are we
14  looking at the same numbers?
15  Q   Yes.
16  A   Okay.
17  Q   So go back to the '97 5500, the
18  second page.
19  A   '97.  Okay.
20  Q   If you compare that -- look at the
21  number of actives.
22  A   Okay.
23  Q   Number of actives left, what's that
24  number?
25  A   There is an entry of 12,000 going on

Page 100

(12:38:30-12:40:04)

1      GREFIG
2  here.
3  Q   So now it's down by half?
4  A   Well, it also conflicts with the
5  other information we just looked at.
6  Q   Just answer the question.  Is it now
7  down by half, according to what we looked at?
8  A   I can't answer that question.
9  Q   You can't answer 24,000 take away
10  12,000?
11  A   I can tell you -- I can tell you that
12  12,000 is half of 24.  That I can say.  I don't
13  know that we're looking at the same set of
14  numbers.
15      Let me -- let me just look at the
16  documents that I have in front of me, make sure
17  that we're looking at the same plan, because
18  there were two other plans floating around at
19  one time, right?
20      So this is at the end of the plan
21  year.  This is at the end of the 1997 plan year.
22  So that would be 1/1/98.  I don't think we're
23  looking at the same set of documents -- same set
24  of numbers.
25      (Exhibit 74, valuation, was

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 101

(12:40:06-12:41:12)

1     GREFIG
2     marked for identification, as of this
3     date.)
4  Q   Let me show you Exhibit 74, sir.  I
5  have your answer to the last question.
6     If you would please look at Number
7  74.  74 --
8  A   What is the plan here on this thing?
9  This one says January 31, '98.  All of these
10 other documents are referencing a December 31st
11 plan year end.  What is this?
12    MS. WALWORTH: What document is
13    in front of you?  What are you
14    looking -- what are you reading from?
15    Exhibit 73.
16    THE WITNESS: Exhibit 73.  It's
17    Form 5500, purportedly for the
18    Woolworth -- it doesn't say.  Has a
19    plan sponsor's name.  It doesn't
20    have --
21    MS. WALWORTH: Do you want him
22    to look at a different document?
23    MR. GOTTESDIENER: I'd like you
24    to just not interrupt us.
25 A  I'll put that aside.

Page 102

(12:41:12-12:43:36)

1     GREFIG
2  Q   How about look at the Schedule B?
3  Maybe that -- that you signed.
4     MR. RUMELD: Schedule B of
5     which exhibit, please?
6     MR. GOTTESDIENER: 73.
7  A   I didn't sign the '97 Schedule B.
8  Q   Okay.  But look at -- it may help.
9  The exhibit that I showed you, the valuation
10 that's right under the exhibit you're looking
11 at?
12 A   Yes.
13 Q   If you turn to Page 51?
14 A   51?
15 Q   Yes.
16    MS. WALWORTH: Is that exhibit
17    Exhibit 74?
18    MR. GOTTESDIENER: It is.
19 A   January 1, 1999.  Okay.
20 Q   Does it help to see that the
21 participant count totaling 11,000?  So 12,000 --
22 A   Those are participant counts with
23 deferred vested benefits.  Those aren't active
24 employees.
25 Q   All right.  Look -- look at Page 11.

Page 103

(12:43:40-12:45:10)

1     GREFIG
2  A   Of that same report?
3  Q   Yes, sir.
4  A   Okay.
5  Q   You see how it has actives 5,000, and
6  then non-vested benefits 6,000?  Approximately
7  11,000, 12,000?
8  A   There -- we've got active
9  participants of 5,432?
10 Q   Yes.
11 A   We're looking at 11,468 deferred
12 participants.
13 Q   No.  The 6,000 number, the non-vested
14 benefit.
15 A   Non-vested.  Okay.
16 Q   So you put those together and you get
17 roughly 12,000?
18 A   Right.  A -- right.
19 Q   So 12,000 as of January 1, '98 would
20 be consistent with 11,000 as of 1/1/99?
21    MR. RUMELD: I object to the
22    form.
23 A   Yeah, but there's a major discrepancy
24 between the 5500 and the Schedule B that's
25 attached.

Page 104

(12:45:12-12:46:40)

1     GREFIG
2  Q   You do agree that there's -- in what
3  you've seen, even if you think this is not
4  reconcilable fully, that there's a significant
5  decline in the number of participants?
6  A   I mean, the Schedule B is the
7  beginning of the year, and 5500 is the end of
8  the year, so there's going to be a discrepancy.
9  Right.
10    MR. RUMELD: I object to form.
11 A   Is that right?  Number of
12 participants at the end of plan year.  Okay.
13 Q   Did you --
14 A   At the end of the '97 plan year there
15 were about 12,000 active participants.  Okay.
16 Q   And we've been looking at
17 significantly higher numbers not that long
18 before, you agree?
19 A   There are higher numbers before, but
20 what I'm unable to track through my mind right
21 now is are we looking at pre-Kinney Shoe merger
22 into the plan and post-Kinney Shoe merger into
23 the plan.  We've got all these various results
24 going on.
25    But based upon the numbers that

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

---

Page 105

(12:46:42-12:47:44)

1    GREFIG
2    you're referencing, it appears that it was a
3    decline in the population.
4    Q   A very significant decline.  Kinney
5    is about 600 people.
6    A   600?  Okay.
7    Q   You would agree, very significant
8    decline?
9    A   It appears to be.  Yes, it does.
10   Q   And you would agree that a very large
11   number of these people are taking lump sums?
12       MR. RUMELD: I object to form.
13   A   I don't know.  The last lump sum --
14   last lump sum count that I saw was 14.
15   Q   How about looking at the 1998
16   valuation?
17   A   1998.  You gave me the '99.  Did you
18   give me '98?  I don't think I have '98.  '96.
19       MR. GOTTESDIENER: Your counsel
20       suggested we take at break at 12:45
21       for lunch.  So why don't we take a
22       break at this point.
23       MS. WALWORTH: Thank you.
24   A   I don't think I have that valuation
25   report that you just referenced.

---

Page 106

(12:47:48-13:40:00)

1    GREFIG
2    THE VIDEOGRAPHER: This
3    concludes Tape Number 2.  The time is
4    12:45 p.m.  We're off the record.
5    (Recess taken)
6    THE VIDEOGRAPHER: This begins
7    Tape Number 3.  The time is 1:36 p.m.
8    We're back on the record.
9    CONTINUED DIRECT EXAMINATION BY MR.
10   GOTTESDIENER:
11   Q   Good afternoon.
12   A   Good afternoon.
13   Q   Tell me what's your earliest
14   recollection of Woolworth's plan to convert the
15   plan to a cash balance plan.
16   A   I -- I personally don't have a
17   recollection, but conversion came around in '95.
18   You know, would have been within months of that.
19       I don't -- I have no recollection of
20   the -- of communications or anything else like
21   that, but it doesn't seem to be something that
22   would drag on forever.
23   Q   What I'm asking, in your mind's eye,
24   you've now been subjected to all this stuff with
25   a subpoena and phone calls and then meetings

---

Page 107

(13:40:02-13:41:10)

1    GREFIG
2    with lawyers, spent hours talking about all
3    this.
4        There's something in your mind's eye
5    about how you first learned about cash balance
6    plans for example, how -- what do you recall
7    about your first experience with cash balance
8    plans?
9    A   Well, cash balance plans were
10   supposedly all of the rage in -- in the early
11   '90s, much like 401(k) plans all of a sudden
12   became a rage when they were discovered in the
13   internal revenue code.
14       So, you know, the actuarial firms
15   probably were sending out brochures and it was
16   discussion in perhaps the actuarial literature
17   or the New York Actuaries -- this is all
18   assumptions on my behalf.
19       This is where you would have
20   encountered conversations about cash balance
21   plans, or EA meetings in Washington.
22   Q   And you would go to those EA
23   meetings?
24   A   Uh-huh.
25   Q   And so there came a time that you

---

Page 108

(13:41:12-13:42:08)

1    GREFIG
2    became familiar with cash balance plans in
3    general?
4    A   Yes.  Conceptually, yes.
5    Q   Conceptually?
6    A   Yes.
7    Q   And then there came a time where you
8    understood that Foot Locker was thinking about
9    making change to the existing retirement plan
10   and maybe it be a cash balance change?
11   A   Right.  I had to become aware of it
12   because I became involved in the project to do
13   so, yes.
14   Q   So I'm asking you just to give us --
15   what are your recollections of the start of
16   that?  Phone calls?  Meetings?
17   A   Well, you know, I don't -- I don't
18   have any recollection.  And this is not just
19   Foot Locker or Woolworth.
20       I look back -- thought back about
21   some of the headline events that I've been
22   involved in in my life, and I don't remember
23   phone calls.  I don't remember meetings.
24   Q   How about then step back one level
25   and -- what -- how do you remember the -- the

---

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 109

(13:42:14-13:43:14)

1    GREFIG
2  design being handled?
3     Was that something that your shop was
4  principally responsible for or Foot Locker was
5  driving that process?  What's your sense?
6  A  My -- my sense, and it's only a sense
7  -it's not my recollection- is that it was a
8  project that was a communal event.
9  Q  A communal including --
10  A  Woolworth.
11  Q  Who at Woolworth?
12  A  What?
13  Q  Who at Woolworth?
14  A  Would have been -- probably fallen to
15  Tom Kiley, since he was, as I said before,
16  conceptually the co-administrator or
17  administrator of the plan.
18  Q  You just said co-administrator.  Who
19  were you thinking as the other?
20  A  That was a misstatement.  The other
21  one -- there were two people down there that I
22  constantly had contact with for one reason or
23  another, but to include Carol as a
24  co-administrator is inappropriate.  That's a
25  slip of the tongue.

Page 110

(13:43:14-13:44:20)

1    GREFIG
2  Q  Okay.  So tell -- tell us -- paint us
3  a picture of who Tom Kiley was around the time
4  of the conversion, in the sense of what was his
5  level of expertise as far as you gathered in
6  your interactions with him?
7  A  The people --
8  Q  Mr. Kiley in particular.  Let's focus
9  on him.
10  A  Struck me as self-sufficient people.
11  Q  As a self sufficient person?
12  A  Yes.
13  Q  And he was good with numbers?
14  A  Yes.
15  Q  And he was someone who you knew
16  had -- he had a math background and had some
17  actuarial training?
18  A  Well, I didn't know that he had a
19  math background.  I thought at one time that he
20  might have worked for Mercer before he went to
21  Woolworth, but I don't -- that is not a
22  statement of fact.
23  Q  But that's -- you thought that based
24  on his facility with these concepts and numbers?
25  A  Yes.  Right.  And constant -- and

Page 111

(13:44:24-13:45:20)

1    GREFIG
2  comments that may have been made by Phil Mauer.
3  Q  Based on -- as you understood it --
4  A  That we discussed before.
5  Q  Mr. Mauer's years of experience
6  working with Mr. Kiley?
7  A  Uh-huh.
8  Q  So -- and how about Ms. Kanowicz?
9  How was her facility with numbers and
10  understanding of the pension process?
11     MR. RUMELD: I object to the
12     form.
13  Q  How was her facility with numbers?
14  A  I think -- I think it was fine.  I
15  mean...
16  Q  Not as strong as Mr. Kiley's?
17     MR. RUMELD: I object to the
18     form.
19  A  I can't make a contrast there.  Okay?
20  Q  Well, at some point you had to have
21  meetings with them and discuss the conversion
22  possibilities, right?
23  A  Right.  But, I mean, in my -- in my
24  mind I have no recollection of ever having drawn
25  a distinction between the two of them in terms

Page 112

(13:45:22-13:46:26)

1    GREFIG
2  of ability.  Let's put it that way.
3  Q  Other people involved in this
4  communal process at Mercer, if I'm
5  understanding, Cassidy's involvement was
6  principally to come up with a pay credit and an
7  interest credit scale?
8  A  A pay -- pay credit scale, yes.
9  Based on the information that I looked at that
10  you gave me before.
11  Q  In the 204(h) notice?
12  A  Yes.
13  Q  And do you know how he went about
14  doing that?
15  A  No.
16  Q  Did you give him any guidance such --
17  A  I don't -- I don't remember, you
18  know.
19  Q  But he was your subordinate?
20  A  Yes.
21  Q  So -- and any -- so -- but from
22  Mercer's point of view -- withdrawn.
23     From Mercer, other than Cassidy's
24  involvement, as you described the principal
25  spokesperson for Mercer, acting on behalf of

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 113

(13:46:30-13:47:22)

1     GREFIG
2  Mercer, was yourself?
3  A  Yes.
4  Q  And on the Foot Locker end, the
5  conversion consideration process involved Kiley,
6  Kanowicz, and anyone else from Foot Locker
7  involved?
8     MR. RUMELD: I object to the
9     form.
10 A  I don't think so.  I don't remember
11 anybody else.  I don't specifically.
12 Q  I'll put some names in front of you
13 and we'll see how your recollection goes.
14 A  I don't specifically remember Kiley,
15 and I don't remember Kanowicz, but I do know
16 they were my primary contacts at -- at
17 Woolworth.  So...
18 Q  How about Pat Peck?
19 A  I know Pat Peck.  Had occasional
20 contact with her.
21 Q  And contact you mean you spoke with
22 her.
23 A  Spoke with her.  Right.
24 Q  And --
25 A  Would have spoke with her -- spoken

Page 114

(13:47:24-13:48:38)

1     GREFIG
2  with her.
3  Q  And attended meetings that she was
4  present in?
5  A  No.  I don't remember that.  I don't
6  remembering meeting.  Again, I don't remember
7  meetings or conversations.  Didn't mean didn't
8  happen, but I don't have a recollection of it.
9  Q  Okay.  You remember that Kiley was
10 the point person who was handling Foot Locker's
11 consideration of various design alternatives for
12 a converted plan?
13 A  I guess so, yes.
14    (Exhibit 75, communication
15    dated 2/6/95, was marked for
16    identification, as of this date.)
17 Q  Look at 75, and tell me if this is
18 not a communication from you to Mr. Kiley, dated
19 February 6, 1995, in which you write, "Dear Tom,
20 enclosed are one dozen copies of a draft
21 commentary on cash balance plans.
22    "There are no numerical examples, but
23 the more important concepts and issues are
24 presented.
25    "I've also enclosed a copy for your

Page 115

(13:48:40-13:49:50)

1     GREFIG
2  review of the Society of Actuaries outline on
3  the session on cash balance plans.
4     "Please let me know if there are
5  specific issues you would like me to address in
6  the commentary."
7     Is that correct?  I've accurately
8  described this, that this is something you sent
9  to Mr. Kiley?
10 A  Based on the cover letter, yes.
11 Q  And what is attached is, we were not
12 provided with the Society of Actuaries outline,
13 but we did get this draft commentary.
14    And you see that starting on the
15 inner page you're looking at, 10610?  That's
16 what page you're on now?
17 A  611.
18 Q  Okay.  You see this introduction to
19 cash balance plan.  This is your draft
20 commentary?
21 A  Uh-huh.
22 Q  You have to say yes or no for the
23 court reporter.
24 A  I'm sorry.  Yes.
25 Q  So you created this commentary based

Page 116

(13:49:52-13:50:46)

1     GREFIG
2  on materials that you had gathered while you
3  were getting up to speed on the latest in cash
4  balance plan design?
5  A  It appears to be the case, yes.
6  Q  And you're noting there no numerical
7  examples, but that the important concepts -- the
8  more important concepts and issues are
9  presented.
10    MR. RUMELD: I object to the
11    form.
12 Q  You say that to Mr. Kiley, right?
13 A  Yes.  In the cover letter, yes.
14 Q  And that's true.  You would agree
15 that that's an accurate -- you're accurately
16 describing your draft commentary that you're
17 sending to him?
18    MR. RUMELD: I object to the
19    form.
20 A  I'm accurately describing what's
21 attached to the letter, right.
22 Q  Which is your draft commentary?
23 A  Yes.
24 Q  And you're providing him with one
25 dozen examples -- one dozen copies so he could

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 117

(13:50:50-13:52:26)

1  GREFIG
2  share that with colleagues at Foot Locker?
3  A  Yes.  I stumble occasionally, because
4  I've always known them as Woolworth, and at that
5  time I think they still were Woolworth.
6  Q  Okay.
7  A  Right.
8  Q  And you'll notice that -- if you go
9  to Page 7, under transitional considerations,
10  you'll see that it says -- that the third bullet
11  point, "Traditional grandfathered benefit
12  provisions will be needed to protect older,
13  long-service employees nearing retirement.
14     "Alternatives include using lower
15  interest rates in the conversion calculation to
16  create larger initial account balances,
17  employing a dynamic grandfather for older
18  employees, so that the account retirement is the
19  greater of, one, the value of their cash balance
20  account or, two, the value of the benefit they
21  would have received under the prior plan pension
22  formula had it continued in effect."
23  A  Okay.  Conceptually I follow that.
24  Right.
25  Q  You follow that now, and because

Page 118

(13:52:28-13:53:14)

1  GREFIG
2  you've been out of the business, so to speak,
3  for awhile, it takes a moment for you to recall
4  this, but you knew at the time how all this
5  worked?
6  A  Well, it appears from this document
7  that I -- I was more conversant then than I am
8  now.  Yes.
9  Q  What I'm actually asking is slightly
10  different, is you know that you were conversant
11  with it at the time.  Otherwise you wouldn't
12  have been available to do your job.
13     MR. RUMELD: I object to the
14     form.
15  Q  You agree with that?
16  A  Yes.
17  Q  You agree that you -- I mean, you
18  were a careful fellow in what you did, and you
19  took pride in your work, right?
20  A  Uh-huh.
21  Q  Yes?
22  A  Yes.
23  Q  So you wanted to give your
24  understanding to your Woolworth interlocutory,
25  Mr. Kiley?

Page 119

(13:53:14-13:54:22)

1  GREFIG
2  A  Yes.
3  Q  And you wanted to make sure that he
4  was aware of all of the various options in
5  transitioning from the traditional formula to
6  the new cash balance formula?
7  A  Yes.
8  Q  And you made sure that you detailed
9  options such as using a lower interest rate in
10  the conversion calculation to create larger
11  initial account balances?
12  A  Uh-huh.  That's what this says.
13  Right.
14  Q  And just so you're clear, because
15  there's going to be a lot more questions like
16  this, I'm not asking what the document says.
17     I'm asking that you told him this.
18  You made sure that he understood these kinds of
19  things, because that's what you would have done,
20  knowing how you went about your job.
21     MR. RUMELD: I object to the
22     form.
23  A  You know, I can't really answer that
24  question, because you're putting me in an area
25  like we had before, where you're saying well,

Page 120

(13:54:26-13:55:22)

1  GREFIG
2  did this guy do the peer review the way that you
3  would have done it.  The answer is no.  Now, I
4  didn't hold Kiley to any kind of a test to
5  determine whether or not he --
6  Q  That's absolutely fine.  That's
7  not my question, is how well did Mr. Kiley go
8  about his job.  I'm asking how you discharged
9  your job.
10     You made sure that Woolworth was
11  aware of the various options, including the ones
12  that I just detailed here.
13     MR. RUMELD: I object to the
14     form.
15  A  To the best of my ability, I tried to
16  make sure that they understood what their
17  options were.
18  Q  Including not using a nine percent
19  interest rate to start off the initial account
20  balance?
21     MR. RUMELD: I object to the
22     form.
23  A  Well, to not -- again, I can't answer
24  that question.  I made them aware of the fact
25  that they did not have to use, according to this

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 121

(13:55:24-13:56:18)

1    GREFIG
2  document, a nine percent discount rate to make a
3  conversion.
4  Q   And that they could use lower rates,
5  which would create higher initial account
6  balances?
7  A   That's what this document says.
8  Right.
9  Q   I'm not asking you what the document
10  says.
11    I'm asking you, didn't you make it
12  your job to make sure that they were aware that
13  that was an option that they had?
14  A   I --
15    MR. RUMELD: I object to the
16  form.
17  A   By use of this document, yes.
18  Q   That's exactly why we use the
19  document, is to refresh your recollection, bring
20  it to your attention. That's exactly how I'm
21  asking the questions.
22    MR. RUMELD: I object to the
23  form.
24  Q   Now, additionally -- okay. I'll take
25  that exhibit back from you. Thank you. Show

Page 122

(13:56:42-13:57:58)

1    GREFIG
2  you Exhibit 76.
3    (Exhibit 76, letter dated
4    2/22/95, was marked for
5    identification, as of this date.)
6  Q   This is your February 22, 1995 letter
7  to Pat Peck, enclosing the FASB '87 for the
8  retirement plan and the Kinney plan; is that
9  correct?
10  A   Yes. That's what it -- that's what
11  the cover letter says.
12  Q   Can you tell me -- can you explain
13  what you're doing in sending this to her at this
14  time?
15  A   This is January 31, 1995. Their
16  fiscal year was January 31st? The plan year was
17  calendar year, but their fiscal year was
18  January 31st.
19  Q   Yes.
20  A   Yes.
21  Q   So could you just tell us for
22  somebody who watches this or reads this, what
23  are you doing functionally by sending her this
24  at this time?
25  A   Well, this is a disclosure that's

Page 123

(13:58:06-13:59:18)

1    GREFIG
2  required under the Financial Accounting
3  Standards Board for their Standard Number 87.
4  Q   Why were you sending it to Ms. Peck?
5  A   I don't know for sure. I would guess
6  that maybe she requested it or she was the
7  contact with the external -- the audit firm.
8  Vice-president of human resources. She must
9  have requested it.
10  Q   You mentioned a special -- I'll take
11  that back. Thank you.
12    You mentioned a special study that
13  you did in 1995 that you did not do in 1994,
14  when I was asking you questions about how much
15  time did you spend on the Woolworth account.
16    And because I was on a different
17  subject I didn't ask you at that point to tell
18  us what you meant by that special study. Could
19  you tell us now?
20  A   Well, your question to me as I recall
21  was how much time did I spend on the Woolworth
22  account in '94 and '95.
23  Q   Right. I'm now asking -- I got your
24  answer. You mentioned a special study. What
25  was that study about?

Page 124

(13:59:20-14:01:14)

1    GREFIG
2  A   I presume it was a conversion to a
3  cash balance plan.
4  Q   Okay. So you were talking about a
5  study that Mercer did that did projections for
6  benefit accrual purposes for --
7  A   I don't remember. I don't remember.
8  You're --
9  Q   How about look at 77.
10    (Exhibit 77, benefit
11    illustrations, was marked for
12    identification, as of this date.)
13  Q   And tell me what Exhibit 77 is.
14  A   Looks like benefit illustrations.
15  Q   What's being illustrated?
16  A   Looks like the old career average
17  plan, the age-based cash balance, whatever the
18  age-based means. That information you provided
19  to me before, the credit was based upon service,
20  wasn't it?
21  Q   Yes.
22  A   So age-based is -- is not what we
23  were looking at before, I would guess.
24  Q   Age-based was something that was
25  under consideration as a possibility?

Page 125

(14:01:16-14:01:58)

1    GREFIG
2    MR. RUMELD: I object to the
3    form.
4  Q   Correct?
5  A   I don't know.  I mean, age-based --
6  Q   It doesn't refresh your recollection
7    that that's -- was one of the options that was
8    being considered?
9  A   No.  No.
10  Q   It doesn't refresh your recollection?
11  A   No.  And then an integrated cash
12    balance plan, which probably meant that it
13    was -- had one accrual rate up to a break point
14    and another one over the break point.
15  Q   You see in the left-hand corner it
16    says W -- William M. Mercer, Inc.?
17  A   Yes.
18  Q   You don't have any reason to doubt
19    that you generated the printed portion versus
20    the handwritten portion of this?
21  A   Mercer purportedly produced the
22    printed version.  Yes.
23  Q   When I say you I mean you.
24  A   Me personally?  No.
25  Q   You think you did not produce this?

Page 126

(14:02:00-14:03:34)

1    GREFIG
2  A   No.  That's not my handwriting here.
3  Q   I'm not asking about the handwriting.
4    I said the printed portion of it.
5  A   No.  Not to my recollection.
6  Q   Okay.  I'll take that back from you.
7    Thank you.
8    Something that did have your
9    handwriting on it is -- is 78, which is a March
10    15, 1995 five-page fax that you sent Tom Kiley,
11    correct?
12    (Exhibit 78, fax dated 3/15/95,
13    was marked for identification, as of
14    this date.)
15  A   Okay.
16  Q   You agree with that?
17  A   I agree that this was sent to Tom
18    Kiley from me, with a summary of some
19    liabilities.  Yes.
20  Q   Okay.  And you created this document?
21  A   The attachments?  No.
22  Q   So you're saying you know that you
23    didn't create them, or you're just saying you're
24    not sure?
25  A   I don't remember -- I don't remember.

Page 127

(14:03:36-14:04:20)

1    GREFIG
2  Q   I'm not asking if you remember.  If
3    you don't remember --
4  A   I don't remember creating these
5    documents.
6  Q   Okay.  But you're not saying that --
7    I mean, you wouldn't have sent him anything you
8    didn't understand?
9  A   I would hope so.  Yes.
10  Q   Do you remember sending him something
11    you didn't understand?
12  A   No.
13  Q   Okay.  So what's showing here is a
14    comparison of career average existing plan
15    versus -- it says initial cash balance runs.
16    Right?
17    MR. RUMELD: I object to the
18    form.
19  A   Yes.
20  Q   Okay.  And what this is showing is
21    the cost comparison of what the old plan is
22    going to cost Woolworth versus the new?
23    MR. RUMELD: I object to the
24    form.
25  A   Yes.

Page 128

(14:04:20-14:05:46)

1    GREFIG
2  Q   Now, why would the initial normal
3    cost be less than after the first year?
4  A   You mean why is the 5.6 million less
5    than the 12.4?  Is that -- is the normal cost --
6    why is the normal cost --
7  Q   Normal cost after a first year is
8    8.5.
9  A   Wait a minute.  Where are you?  Okay.
10    After first year.  I don't know.
11  Q   Well, isn't that because you know
12    that -- you mentioned before that -- that a
13    204(h) notice was supposed to go out because
14    there was a reduction in the rate of future
15    benefit accrual?
16  A   Uh-huh.  Yes.
17  Q   And you know that the purpose of the
18    conversion to a cash balance format was to save
19    Woolworth money?
20    MR. RUMELD: I object to form.
21  A   No.  I was never -- I don't recall
22    ever being told that that was the purpose of any
23    conversion.
24  Q   You were told that Woolworth wanted
25    to --

Page 129

(14:05:46-14:06:30)

1    GREFIG
2  A  Change their plan.
3  Q  And save money in doing so?
4     MR. RUMELD: I object to the
5  form.
6  A  No.  No.
7  Q  You know that for a fact?
8  A  I don't remember.
9     MR. RUMELD: I object to the
10  form.
11  A  I don't remember anyone telling me
12  the reason we're doing this.
13  Q  So you went -- you were involved in
14  the design process, and at no time did you
15  understand why they wanted to change?
16     MR. RUMELD: I object to the
17  form.
18  A  I don't recall the details of what
19  was motivating their examination of alternatives
20  to their existing plan.
21  Q  I'm not asking about detail.  I'm
22  asking big picture.
23     You just said no, when I said that
24  their purpose was to reduce their cost.  You
25  know that that's -- was not a purpose?

Page 130

(14:06:32-14:07:12)

1    GREFIG
2     MR. RUMELD: I object to the
3  form.
4  A  No.  I don't know that that was the
5  purpose.  That's what I said.
6  Q  I'm agreeing that -- I'm
7  understanding that to be your answer.
8     What was the purpose?  Not the
9  details, the purpose.
10     If it was not to reduce cost, sir,
11  what was it?
12     MR. RUMELD: I object to the
13  form.
14  A  What was the purpose of their desire
15  to change their plan.
16  Q  As expressed to you.
17  A  I don't recall how it was expressed
18  to me.
19  Q  What was the idea, the message that
20  was communicated to you?
21  A  It --
22  Q  How -- go ahead.
23  A  Cash balance plans were the big thing
24  back then.  You know, everybody was looking at
25  cash balance plans.

Page 131

(14:07:16-14:08:18)

1    GREFIG
2     So there's nothing that sticks in my
3  mind as to a single purpose for them to be
4  looking at their plan, other than everybody else
5  may be doing it.  I mean...
6  Q  So you do agree that -- withdrawn.
7     You knew about -- you understood
8  normal cost at the time?
9  A  Uh-huh.  Yes.
10  Q  So why -- why is it going down?
11  A  I don't know.
12  Q  Isn't it because of wear-away?
13     MR. RUMELD: I object to the
14  form.
15  A  What's wear-away?
16  Q  Sir --
17  A  Wear-away is --
18  Q  I'm not handing you the document.
19  You're trying to reach for the document.
20  A  Right.
21  Q  You've spent time being refreshed by
22  a number of people since you first got a
23  subpoena in this case.  I understand this was
24  awhile back.
25     But wear-away is not a term that's

Page 132

(14:08:20-14:09:12)

1    GREFIG
2  completely unknown to you.
3  A  But wear-away in my mind is related
4  to floor offset plans.  That's what comes to
5  mind when you use that term, because floor --
6  Q  How about a stall in benefit
7  accruals?
8     MR. RUMELD: I object to the
9  form.
10  Q  Is that a phrase you know?
11  A  That -- no.
12  Q  How about a freeze of future benefit
13  accruals in connection with the conversion to
14  the cash balance plan?
15  A  Not in connection with the cash
16  balance plan.  A freeze in future benefit
17  accruals, I understand that term, yes.
18  Q  Okay.
19  A  But in connection with the cash
20  balance plan?  No.
21  Q  Well, what was the interest crediting
22  rate in this cash balance plan going forward?
23  A  I don't know.  It was in one of those
24  documents that --
25  Q  How about if I represent and you

Page 133

(14:09:14-14:10:06)

1    GREFIG
2  accept that it was six percent fixed?  Can you
3  do that?
4  A  Okay.  I'll accept that from you,
5  yes, if that's --
6  Q  How about you accept that the
7  interest rate used to convert the accrued
8  benefit into an initial account balance was nine
9  percent fixed?
10  A  Okay.
11  Q  Will you accept that?
12  A  Okay.
13  Q  Now, you're a smart guy, spent a lot
14  of years training and working as an actuary.
15    What effect does that have on a
16  participant's benefit going forward?
17    MR. RUMELD: I object to the
18    form.
19  A  Which benefit?  The accrued benefit
20  or the cash balance account?
21  Q  The benefit going forward in the
22  scenario that we have here, where the 12/31/95
23  benefit was frozen.
24  A  Okay.  And converted to a cash
25  balance.

Page 134

(14:10:08-14:11:10)

1    GREFIG
2  Q  Initial opening account balance.
3  A  Right.
4  Q  After which it grew at a rate of six
5  percent fixed per year.
6  A  Okay.
7  Q  What effect will that have on the
8  participant's benefit?
9    MR. RUMELD: I object to the
10    form.
11  A  It has no affect on the defined
12  benefit accrued benefit at the date of
13  conversion, and it has no effect on the lump sum
14  value the participant would be entitled to upon
15  termination of employment.  Right?  Because
16  isn't that where your GATT rate cuts in?
17  Q  How about directing yourself to my
18  question, which is what effect would it have?
19  You gave --
20  A  None.
21  Q  None.  None whatsoever?
22  A  None.  I mean, I'm trying to explain
23  to you what my reasoning is behind this.  If I
24  have no other choice but to respond, none.
25  Q  Do cash balance plans have an accrued

Page 135

(14:11:12-14:12:18)

1    GREFIG
2  benefit?
3  A  Well, if they're a defined benefit
4  plan, then yes.  They have -- they have an
5  accrued benefit.
6  Q  Are they a defined benefit plan?
7  A  That's what my summary says they are,
8  and I think they still are, right?
9  Q  So you're saying that cash balance
10  plan does have an accrued benefit?
11  A  Yes.
12  Q  So in effect going forward, wouldn't
13  there necessarily be a decrease in the benefit
14  the first year after the conversion?
15  A  A decrease in the accrued benefit?
16  Q  In the benefit -- the participant,
17  six -- there's a spread of three between six and
18  nine percent, correct?
19  A  Yes.
20  Q  And that's never made up in a plan
21  that is converted at nine with interest credits
22  going forward at six?
23    MR. RUMELD: I object to the
24    form.
25  A  Let me think about the mechanics of

Page 136

(14:12:24-14:13:58)

1    GREFIG
2  this.  So converted nine, you add a credit to
3  the account balance, according to that schedule
4  that we saw.
5    And then they add six percent
6  interest to the sum of those two.  Is that what
7  happens at the end of the first year?
8  Q  Let me try it this way.  Somebody is
9  40 years old.  They have an accrued benefit
10  they've earned.  Normal retirement age is age
11  65.
12    You take that accrued benefit age 65
13  benefit, and you present value it using nine
14  percent.
15  A  Okay.
16  Q  25 years back.  Correct?  You follow
17  so far?
18  A  Right.
19  Q  Now, because a cash balance plan has
20  an accrued benefit, that means an annuity is
21  starting at age 65, right?
22  A  Right.
23  Q  So under this conversion, you project
24  forward at six percent, right?
25  A  We accumulate a forward to six

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 137

(14:14:00-14:14:56)

1    GREFIG
2  percent?  Okay.  So we do that.  Then what?
3  Q   So what's that effect?
4      MR. RUMELD: I object to the
5  form.
6  A   It depends upon what the participant
7  elects to do with that projection.  I mean, if
8  they take an annuity, it's never less than the
9  benefit that they had when they -- if they --
10  Q   Let's assume they don't do anything.
11  Just compare those two benefits.
12  A   Well, they got the accrued benefit
13  that they had at the date of conversion, taken
14  as an annuity, right?
15  Q   Yes.
16  A   We never get less than that.  And
17  then the pay credits that they get into their
18  prospectively, those paid credits are
19  accumulated forwarded six percent and converted
20  back to an annuity.
21  Q   I'm not adding in pay credits.  I'm
22  just asking --
23  A   Why not?
24  Q   No.  It's even more basic.  I'm
25  asking you, don't you now recall, based on what

Page 138

(14:15:02-14:16:16)

1    GREFIG
2  we're talking about, that there was structurally
3  built in a wear-away using a nine percent
4  interest rate, where the projection to create
5  the cash balance annuity just on day one was
6  three percent less.
7  A   The credit -- the credit to the
8  account was three percent less than the interest
9  rate used for the conversion.  Yes.
10  Q   But the credit to the account you
11  understood was front-loaded insofar as at any
12  time to create the accrued benefit from the
13  account balance you would project forward at six
14  percent?
15  A   That's the way this document seems to
16  say it, yes.  That is an interest credit to the
17  account.
18      The account is the accrued benefit
19  converted at nine percent, and that's being
20  brought forward at six.
21  Q   Right.  So you compare those two
22  things, and there's just in a way no comparison.
23  There's a three-percent spread that's baked into
24  the cake.
25      MR. RUMELD: I object to the

Page 139

(14:16:18-14:17:26)

1    GREFIG
2  form.
3  A   There's a three-percent spread, yes.
4  Q   That is -- that would have the effect
5  of in many cases having a value that's about
6  half of what it is under the old frozen accrued
7  benefit.
8      MR. RUMELD: I object to the
9  form.
10  Q   So the person is starting out with a
11  benefit that's half the value of the one they
12  already accrued.
13  A   In terms of an expression of the
14  account balance, yeah.  But as you've explained
15  before with your GATT rate, and the fact that
16  the employee never loses -- gets anything less
17  than his accrued benefit under the DB plan of
18  conversion, that that account balance and the
19  accrued benefit at time of conversion is his,
20  hers.
21  Q   But I'm not asking about isn't it a
22  fact that someone is not going to be losing what
23  they already accrued.
24      I'm asking, you're starting somebody
25  out in a hole, aren't you?

Page 140

(14:17:28-14:18:10)

1    GREFIG
2  A   Why?
3      MR. RUMELD: I object to the
4  form.
5  A   I don't understand how.
6  Q   Would the benefit a year later --
7  while they couldn't get paid less, would the
8  benefit one year after the conversion
9  potentially be the same?
10  A   Would the benefit -- would the
11  defined benefit be the same?
12  Q   Yes.
13  A   Because we keep throwing these terms
14  around.  Benefit or -- what's the benefit, the
15  account balance or the -- or the annuity
16  benefit?
17  Q   You know that under the law and as an
18  actuary that the benefit is the accrued benefit,
19  the annuity starting at age 65.
20  A   The annuity benefit.  And that never
21  gets reduced.
22  Q   There's two benefit formulas, you
23  agree?  There's the old plan benefit formula --
24  A   Correct.
25  Q   -- that is stopped, frozen at

Page 141

(14:18:12-14:19:06)

1    GREFIG
2    12/31/95?
3    A   Correct.
4    Q   Then there's a totally new benefit
5    formula that is moving forward in time if the
6    participant continues to work.
7    A   Okay.
8    Q   That's based on an account?
9    A   With future accruals.
10   Q   But first you agree it's based on an
11   account?
12   A   The starting point is an account,
13   yes.
14   Q   But the benefit under the law and
15   actuarially is actually the projected account to
16   age 65 at six percent interest and converted to
17   an annuity?
18   A   No.  I don't think that's correct.
19   That's a projected benefit.  The accrued benefit
20   is what the account -- what the participant has
21   accrued as of the date of termination, and that
22   benefit is paid in the form of an annuity at
23   normal retirement age.  That's the definition of
24   accrued benefit.
25   Q   Don't you have two accrued benefits,

Page 142

(14:19:08-14:20:10)

1    GREFIG
2    and you get the greater of?
3    You have -- the 40-year old we're
4    still talking about has the accrued benefit up
5    until that point in time, 12/31/95, under the
6    old formula, and that never changes, correct?
7    A   Yes.  Correct.
8    Q   Then the participant has another
9    benefit, that they obviously only get one of
10   them, but if you take that benefit, the way you
11   create it is there's an account, and it's
12   projected to age 65 and converted to an annuity.
13   And that annuity under the cash
14   balance formula is compared to the annuity under
15   the traditional formula, and my question -- you
16   agree with that?
17   A   I'm not understanding the -- they've
18   got two benefits.  They've got one that they had
19   under the old plan, and they got another benefit
20   that is as a result of future accruals.
21   Q   No.  There's another benefit that is
22   the result of the conversion and the plan
23   contract that gives them the right to the
24   greater of these two accrued benefits.
25   A   Which two accrued benefits now?

Page 143

(14:20:12-14:21:06)

1    GREFIG
2    Q   The old one --
3    A   Which is an annuity.
4    Q   But the new one is an annuity in the
5    way the plan document is written.
6    A   Okay.
7    Q   But it's expressed -- communicated,
8    and part of the calculation involves an account,
9    but the account is not the benefit.  You agree
10   with that, don't you?
11   A   When we use the term accrued benefit
12   under a defined benefit plan, we're talking
13   about an annuity benefit and not an account
14   balance.  Correct.  I agree.
15   Q   And so you now are understanding --
16   maybe I didn't do it in a good way, but you're
17   now understanding that there are two accrued
18   annuity age 65 benefits once you do the
19   conversion that are always competing.
20   You never lose the one you already
21   accrued, but potentially you could have a bigger
22   accrued benefit under the cash balance formula
23   if you worked long enough.
24   A   Okay.
25   MR. RUMELD: I object to the

Page 144

(14:21:06-14:21:52)

1    GREFIG
2    form.
3    Q   You agree with that?
4    A   Well, I'm following you.  I'm not
5    sure I agree.
6    Q   Well, what is -- what is wrong
7    with --
8    A   Pencil to paper and --
9    Q   Well, I've got a calculator.  I've
10   got paper.
11   Do you want to take a minute to do
12   some calculations?
13   A   Yeah, or you do it and explain to me
14   what it is that you're doing, because this term
15   accrued benefit is just -- you know, I'm
16   focusing on accrued benefit, and we've brought
17   open an account balance.  That gets projected.
18   Then we have future accruals, and they get
19   projected.  Okay.  And then --
20   Q   Your account balance grows, but at
21   any moment the accrued benefit under the cash
22   balance formula is not your account, it's the
23   age 65 --
24   A   Right.
25   Q   -- annuity.  You've got that, right?

Page 145

(14:21:54-14:22:56)

1    GREFIG
2  You agree with that?
3  A  That's right.  But I'm -- we're still
4  on making a connection.  So we get to 65.  We
5  take the cash balance at the date of conversion.
6  We add in future accruals.
7  Q  If any.
8  A  If any.  They're all brought forward
9  with six percent interest, and that account
10  balance is converted back to an annuity.
11    But in no event can that annuity be
12  less than the defined benefit annuity that
13  existed at the day of conversion.  Is that what
14  we're saying?
15  Q  I agree with what you're saying.
16  A  Okay.
17  Q  And what I'm saying is the -- there
18  are two annuities that have to be compared.
19  A  Correct.
20  Q  What I'm asking is if the participant
21  doesn't -- they get into the plan and they're
22  converted, but then they quit the next day.
23    Those two accrued benefits, how do
24  they compare?
25  A  They're equal.

Page 146

(14:22:58-14:24:10)

1    GREFIG
2  Q  No.  One starts out using a nine
3  percent -- takes -- takes -- takes the accrued
4  benefit under the old formula --
5  A  Yes.
6  Q  -- and brings it back 25 years at
7  nine percent.
8  A  Correct.
9  Q  And then the participant says, thank
10  you for giving me a greater of benefit, where I
11  can get the old accrued or I can get this new
12  thing.
13    I'd like to know what my accrued
14  benefit is under this second formula.  And you
15  say to him, well, the way we started you out was
16  we took your other benefit, just as a measure.
17  We didn't change it.  It's over there.  We used
18  it as a measure.  We reduced it by nine percent
19  to give you an opening balance, 25 years.
20    Then the guy says well, I'd like to
21  know what is my cash balance annuity if I wait
22  to take it 25 years at age 65.
23    And you would say -- get out the
24  calculator, plug in six percent projected.  Then
25  convert it.

Page 147

(14:24:10-14:24:44)

1    GREFIG
2  A  How do we convert it though?
3  Q  Well, at 4.17 or six percent under
4  the plan document.
5  A  Okay.
6  Q  We're talking about the conversion at
7  age 65.
8  A  Right.
9  Q  We convert at six percent.
10    MR. RUMELD: I object to the
11    form.
12  A  Okay.  And then --
13  Q  And then nothing.
14  A  Oh, no.
15  Q  That's my --
16  A  What happened to the GATT rate?
17  Q  We're not talking about paying
18  anybody yet.
19  A  Well, his accrued benefit --
20  Q  We'll get to that.  We'll get to
21  that.  I just want to compare the tale of two
22  cities, the tale of two accrued benefits.
23  A  We have a six -- we have a six
24  percent annuity at 65 now.
25  Q  Started out though --

Page 148

(14:24:48-14:25:42)

1    GREFIG
2  A  With a nine percent account cash
3  balance.  Right.
4  Q  So you understand this concept of
5  wear-away, that essentially this other accrued
6  benefit, it may turn out with future accruals to
7  be bigger than the old, but it's impossible that
8  on day one it's anything other than
9  significantly in the hole, because you started
10  and took the original and you reduced it at nine
11  percent, and then you converted it back to an
12  annuity form at six percent, so there's a
13  three-percent spread.
14    MR. RUMELD: I object to the
15    form.
16  A  But it -- but that annuity is never
17  less than the accrued annuity that he had at the
18  date of conversion.
19  Q  You're mistaking the question of
20  payment with just the abstract question of the
21  comparison between the two.
22  A  You said the employee asked about his
23  entitlement.  So I'm bringing it back to the
24  issue of entitlement.
25  Q  I just want to know what my accrued

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 149

(14:25:44-14:26:46)

1    GREFIG
2  benefit is.
3  A   What is his annuity entitlement at
4  age 65.
5  Q   And in order to give him the
6  bottom-line answer, and this is where we're
7  not --
8  A   Not connecting.  Right.
9  Q   Because I think we understand each
10  other, but we're not connecting.
11  A   I understand the words.
12  Q   Before you give him the bottom line,
13  he has the entitlement to the comparison.  Do
14  you agree with that?
15  A   Oh.
16  Q   That's all I'm talking about, is how
17  do those two benefits compare.
18    MR. RUMELD: I object to the
19    form.
20  A   The two benefits -- the annuity
21  benefit that you just calculated by bringing
22  cash balance forward at six and converting to
23  six is going to be less than the accrued benefit
24  entitlement under the prior -- under the prior
25  plan.

Page 150

(14:26:46-14:27:36)

1    GREFIG
2  Q   And that is a mathematical truism.
3  It'll always be that way, right?
4  A   I believe so.
5  Q   You understood that at the time?
6    MR. RUMELD: I object to the
7    form.
8  A   You mean at the time this study was
9  going on?
10  Q   At the time you were involved in the
11  conversion of the Woolworth plan to a cash
12  balance plan.
13  A   If we did that type of analysis, yes.
14  I would have understood it, but the type of
15  analysis you're going through now is not.
16  Q   How could you possibly not have
17  understood that as one of the most fundamental
18  elements of the conversion itself?
19  A   Because you have --
20    MR. RUMELD: I object to the
21    form.
22  A   You have all these other overrides
23  out there.  The employee's accrued benefit can't
24  be reduced.
25  Q   But the employee --

Page 151

(14:27:38-14:28:24)

1    GREFIG
2  A   And any lump sum that he's entitled
3  to has to be paid out of the GATT rate or PBGC
4  rate or whatever rate is appropriate.
5    So the -- the fact that -- forget
6  future accruals at all.  Just let's say we
7  convert the account -- convert to a cash
8  balance.
9    That employee you just talked about,
10  that they just the day after the conversion,
11  nothing has changed for him.
12  Q   How about the employee that works for
13  years and doesn't accrue any new benefits
14  because his account balance has started in the
15  hole?
16    MR. RUMELD: I object to the
17    form.
18  A   You keep saying the account balance
19  is started in the hole, but I don't understand
20  how can an account balance get started in the
21  hole --
22  Q   Let's talk about it.
23  A   -- the way it's calculated under the
24  plan.
25  Q   Let's talk about it.  If the GATT

Page 152

(14:28:26-14:29:16)

1    GREFIG
2  rate or the PBGC or 30-year treasury bonds or
3  the ERISA required rate -- you understand those
4  are all synonyms for the same idea, right?
5  A   Those are the overrides that come
6  into this -- into this calculation.  Yes.
7  Q   If I am a participant and I on day
8  one ask for payment in this conversion --
9  A   A lump sum payment.
10  Q   A lump sum payment.
11    -- my lump sum payment is going to be
12  a whole lot more than my opening account
13  balance.
14  A   Okay.
15  Q   You agree with that?
16  A   Yes.
17  Q   You understood that at the time?
18  A   Yes.
19  Q   You made sure that the Foot Locker
20  people understood that at the time?
21  A   Presumably.
22  Q   You have no reason to doubt that, do
23  you?
24  A   No, but I have no recollection of
25  making a major issue of it.

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 153

(14:29:18-14:30:08)

1     GREFIG
2  Q  It wasn't a major issue.  It wasn't a
3  major issue if participants worked and didn't
4  accrue anything new for a period of potentially
5  years?
6  A   This was a fact of the structure of
7  the entire plan, as that summary that you showed
8  me before would have pointed out.
9  Q   The fact of no accrual?
10 A   These are the issues.  I don't know.
11 Did it say anything in there about no accruals?
12 Q   I'm not asking the document.
13     MS. WALWORTH: Excuse me one
14     second.  Just for our court
15     reporter's sake, if you wait until he
16     finishes his question and --
17     MR. GOTTESDIENER: Please stop
18     interrupting.
19     MS. WALWORTH: -- he'll give
20     you the same courtesy, I know.
21     THE WITNESS: Sorry.
22     MS. WALWORTH: That's all
23     right.
24 Q   You agree that you understood at the
25 time that a participant who was started out at a

Page 154

(14:30:12-14:31:40)

1     GREFIG
2  nine percent interest rate, with only a
3  guaranteed six percent projection to retirement,
4  was always starting out under the new formula in
5  a hole vis-a-vis the old formula benefit.
6     MR. RUMELD: I object to the
7     form.
8  A   Relative to the old benefit formula.
9  Q   For purposes of comparison prior to
10 payment.
11 A   Yes.  I think this is a source of
12 confusion here.
13 Q   I'll withdraw the question.  Did you
14 work -- the invoices that Mercer sent to Foot
15 Locker, you worked on those invoices, didn't
16 you?
17 A   In all likelihood I did, because as
18 we described before with the structure internal
19 to Mercer, the account manager sent out the
20 bills, but the people who were more senior in
21 the -- either the retirement practice or the
22 health and welfare practice would prepare those
23 fee statements for Mark Brandes for his review,
24 and I think he's the one that sent the fee
25 statements out.

Page 155

(14:31:42-14:32:58)

1     GREFIG
2  Q   Now, he wasn't the one who was doing
3  the day-to-day work in the conversion planning
4  process?
5  A   No.
6  Q   You were?
7  A   I was and Jim Cassidy.
8  Q   And if invoices went out, such as an
9  invoice in March of 1995, that said time spent
10 preparing for and attending the cost reduction
11 strategy meeting, approximately $9,600, has not
12 been charged to you, that would have been
13 something you made sure was an accurate
14 statement?
15 A   I guess so.
16     MR. RUMELD: I object to form.
17 A   Yes, yes.
18 Q   Hearing that, does that refresh your
19 recollection that the conversion to the cash
20 balance plan was part of a cost reduction
21 strategy?
22 A   No.
23     (Exhibit 79, summary of cash
24     balance statement, was marked for
25     identification, as of this date.)

Page 156

(14:32:58-14:34:02)

1     GREFIG
2  Q   79 is entitled Woolworth Corporation
3  summary of cash balance study; do you see that?
4  A   Yes.
5  Q   The special study that you were
6  talking about before we broke for lunch is the
7  cash balance study, right?
8     MR. RUMELD: I object to the
9     form.
10 A   The study that I made reference to
11 that took place in 1995?
12 Q   That's right.
13 A   Yes.  That would have been the cash
14 balance study.
15 Q   And you recognize this as one of the
16 documents that Mercer produced in performing
17 that study?
18     MR. RUMELD: I object to the
19     form.
20 A   It appeared to be, yes.
21 Q   And if you look at the sixth bullet
22 point down?
23 A   Okay.
24 Q   "Cost savings under any formula would
25 be limited to a reduction in normal cost.  There

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

---

Page 157

(14:34:06-14:35:02)

1    GREFIG
2  will not be any reduction in accrued liability.
3    "Generally, there will be a
4  significant reduction in normal cost for one or
5  two years, followed by a smaller savings in cost
6  after the initial savings wear-away."  Do you
7  see that there?
8  A  Yes, I do.
9  Q  That was written by you?
10  A  I don't think so.
11  Q  Jim Cassidy, sir, is still today not
12  even an enrolled actuary, right?
13  A  I don't know.  I don't know what his
14  status is now.
15  Q  You know that he never became an
16  enrolled actuary?
17  A  That I did not know.  I know he left
18  Mercer.
19  Q  Well, didn't he leave Mercer, sir,
20  because he gave you some bum numbers?
21    MR. RUMELD: I object to the
22    form.
23  A  He may have been unhappy at Mercer
24  because of some things that may have happened.
25  Q  Sir, didn't you tell Steve Cohen that

---

Page 158

(14:35:06-14:35:34)

1    GREFIG
2  Cassidy gave you bum numbers?
3  A  I don't -- you -- I don't remember
4  the word bum.
5  Q  How about --
6  A  I said there was an issue over some
7  numbers.
8  Q  That he gave you?
9  A  Yes.
10  Q  Could I have your attention, please,
11  instead of the document?
12  A  Yes.
13  Q  Didn't you tell Mr. Cohen that?
14  A  I didn't use the word bum numbers.  I
15  said there was --
16  Q  Other than the word bum, bad numbers?
17    MR. RUMELD: I object to the
18    form.
19  Q  The concepts -- other than the word
20  bum --
21  A  Yes.
22  Q  You told Mr. Cohen that?
23  A  Right.
24  Q  And you told him that because it was
25  true?

---

Page 159

(14:35:34-14:36:18)

1    GREFIG
2  A  I said he may have left because of an
3  issue over some numbers.
4  Q  No, no.
5  A  Maybe that's why he said bum numbers.
6  I said some numbers, not bum numbers.
7  Q  You told Mr. Cohen, did you not, that
8  Mr. Cassidy gave you some numbers that were bad,
9  they were badly done?
10  A  Okay.
11  Q  You agree with that, that you told
12  him that?
13  A  That was the intent of the comment,
14  yes.
15  Q  And that was a fact.  You were
16  telling the truth to Mr. Cohen?
17  A  Yes.
18    MR. RUMELD: I object to form.
19  Q  That is why you expressed your
20  unhappiness to Mr. Cassidy?
21  A  Yes.
22  Q  And it was Woolworth's numbers?
23  A  I don't recall whether this was
24  Woolworth or another client, but they were -- it
25  was an issue between Cassidy and myself, yes.

---

Page 160

(14:36:20-14:37:22)

1    GREFIG
2  Q  Don't you recall telling Mr. Cohen
3  that you think that they were Woolworth numbers?
4  A  No.  I don't remember having said
5  that to him.
6  Q  When did Mr. Cassidy leave?  How soon
7  after -- withdrawn.  How -- when did he leave?
8  A  I don't know.  I don't know whether
9  he left before I retired or after I retired, to
10  be honest with you.  I don't -- I don't recall
11  when those changes took place.
12  Q  Your understanding of these matters
13  as the enrolled actuary and as the superior to
14  Mr. Cassidy was better than Mr. Cassidy's,
15  wasn't it?
16  A  Understanding of these -- I don't
17  know.  The -- at that point in time the
18  understanding of the concepts that were
19  involved, we probably had an equal knowledge
20  base.
21  Q  How about chops?  Yours were much
22  better than Mr. Cassidy?
23  A  Chops.
24  Q  Your technique, your ability to
25  produce projections and runs.  There was nothing

---

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 161

(14:37:26-14:38:20)

1    GREFIG
2  that -- there was nothing that you --
3  A   Excuse me.  I didn't run a computer
4  at Mercer.  I didn't know how to run a computer,
5  and in fact I never ran a computer --
6  Q   I'm talking about the calculations.
7  A   -- ever in my life.
8  Q   I'm talking about the ability to
9  perform the calculations.
10  A   That I was better than he was?
11  Q   You were the enrolled actuary for the
12  plan.
13  A   We're talking about calculations for
14  a cash balance plan, and whether I was better
15  able to do it than Jim Cassidy?  The answer is
16  no.  I think we were equally capable.
17  Q   Okay.  So there was nothing however
18  that he could do that you couldn't replicate?
19  A   Yes.
20  Q   And there was nothing he was doing
21  that you didn't understand and couldn't perform
22  yourself, correct?
23  A   Correct.
24  Q   And you made sure that Foot Locker
25  and Mr. Kiley in particular, when you

Page 162

(14:38:22-14:39:08)

1    GREFIG
2  communicated with him, understood the
3  implication of the various formula designs that
4  you were looking at for Foot Locker?
5    MR. RUMELD: I object to the
6    form.
7  A   Yes.
8  Q   And you were -- withdrawn.
9    You see on the last bullet point
10  here, it says sample -- let me ask you one more
11  question, if you'd look up for a moment.
12    Mr. Cassidy didn't send anything to
13  Foot Locker on his own without making sure it
14  was okay with you?
15    MR. RUMELD: I object to the
16    form.
17  A   I hope not.  He should not have done
18  so.
19  Q   And in the ordinary course you saw
20  everything that went out?
21  A   In the ordinary course of business,
22  correct.  Yes.
23  Q   This last bullet point says, "Sample
24  employees show that the current formula is
25  insufficient to replace an employee's income

Page 163

(14:39:12-14:40:10)

1    GREFIG
2  without significant personal savings.  Any
3  reduction in cost introduced in a new plan
4  design will worsen this situation." That's what
5  it says there, right?
6  A   Okay.  Yes.
7  Q   And you made sure that this was
8  communicated to Foot Locker as -- Woolworth as
9  it considered its options --
10    MR. RUMELD: I object to the
11    form.
12  Q   -- in converting the plan?
13  A   Yes.  But I still don't think I
14  prepared --
15  Q   There's no -- okay.  There's no
16  question pending.  You don't think you prepared
17  that?
18  A   No.
19  Q   But why are you saying that -- you
20  think you didn't prepare -- withdrawn.
21    You're referring to an attachment.
22  You're not referring to the prose on the first
23  page we're talking about.
24  A   I'm talk about the first page as
25  well, because if you look at the signature down

Page 164

(14:40:12-14:41:06)

1    GREFIG
2  on the lower left, my initials aren't in there,
3  and that's contrary to the way that our
4  documents were prepared.
5    Our documents had in accordance with
6  peer review procedures the initials of the
7  preparer, meaning the administrative assistant,
8  the initials of the one consultant, and the
9  initials of the peer reviewer.
10  Q   But very often documents would go out
11  and be on somebody else's computer that you
12  participated in authoring, right?
13  A   This is somebody else's computer.
14  This should not have gone out unless they were
15  in accordance with the peer review process that
16  was in place.
17  Q   Unless they were in accordance with
18  your views of the matter?
19  A   Yes.
20  Q   Looking at Exhibit 80.
21    (Exhibit 80, document, was
22    marked for identification, as of this
23    date.)
24  A   Document should have been reviewed.
25  Q   80 is a document that has your

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 165

(14:41:10-14:43:12)

1    GREFIG
2  handwriting on it, does it not?
3  A  Looks like it.
4  Q  The edits on the second page -- if
5  you would turn to the second page, sir.  These
6  are your edits, right?
7  A  It looks like my handwriting, yes.
8  Q  If you would just flip through the
9  pages where there's a couple more pages of
10  handwriting, and just confirm that that's your
11  handwriting.
12  A  Yes.  It looks like my handwriting.
13  Q  Okay.  I'll take that back.  And
14  you're aware -- withdrawn.  Exhibit 81.
15    (Exhibit 81, document, was
16    marked for identification, as of this
17    date.)
18  Q  Whose handwriting is that, sir?
19  A  I don't know.
20    (Exhibit 82, e-mail, was marked
21    for identification, as of this date.)
22  Q  Exhibit 82 is an e-mail from you to
23  cash balance network, is it not?
24  A  Yes.  This is what the document says,
25  yes.

Page 166

(14:43:14-14:45:06)

1    GREFIG
2  Q  And you're looking at that and
3  recalling that you were asking in April of 1995
4  other actuaries in this cash balance network to
5  provide you with input, so you could in turn
6  provide Foot Locker with more information about
7  their options in the design of the new plan,
8  correct?
9  A  That's what it looks like, yes.  Let
10  me look at this.
11  Q  As you're reading this, is this
12  bringing back some memories of having sent this
13  e-mail and asked for input?
14  A  No.  It doesn't bring back anything
15  to memory.  I mean, obviously this was sent to
16  me and they -- the phrase cash balance network,
17  that rings a bell, but the rest of it is -- I
18  don't remember it at all.
19  Q  Well, you agree that you did an
20  informal survey, and that you got five responses
21  covering eight cash balance plans and two plans
22  with lump sum options, and that opinions were
23  mixed as to whether the manner in which the plan
24  was communicated influenced lump sum elections?
25    MR. RUMELD: I object to the

Page 167

(14:45:06-14:46:32)

1    GREFIG
2  form.
3  A  Is that what I asked?  Lump sum
4  election.  Okay.  Okay.  Yes.
5  Q  You don't doubt what I just asked
6  you?
7    MR. RUMELD: I object to the
8  form.
9  A  No.  I mean, that's what -- that's
10  what's written on the first page.
11  Q  But I'm asking you -- I'm not
12  inquiring of the e-mail.
13    I'm asking you that you don't have
14  any doubt that -- that you received these
15  responses, and the responses you estimated to be
16  mixed opinions as to whether the manner in which
17  the plan was communicated influenced lump sum
18  elections.
19  A  Okay.  Yes.
20  Q  And you also said that matters that
21  could impact on the employee decision by what
22  benefit form to elect included showing only
23  account balances on the benefit statement rather
24  than the annuity?
25    MR. RUMELD: I object to the

Page 168

(14:46:32-14:47:52)

1    GREFIG
2  form.
3  Q  Rather than annuity values.
4  A  I said that or someone else said
5  that?
6  Q  Look at the last column.
7  A  Showing only account balances on the
8  benefit statement rather than annuity values.
9  Opinions were mixed.
10    So that's a summary of responses that
11  I get.  Some other matters that could impact on
12  the employee decision were as I enumerate them
13  there, but those were responses from the people
14  where I was requesting their opinion.
15  Q  And you made sure that you and
16  discussing with Mr. Kiley design options, that
17  he understood matters that could impact the form
18  that people took?
19  A  Probably, yes.
20  Q  I'll take that back from you.  Thank
21  you.
22    So can you tell me, with respect to
23  the form that people could elect, if you recall
24  the earlier retirement subsidy under the old
25  Woolworth plan.

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

(14:47:58-14:49:20)

GREFIG

1
2  A  I don't recall the subsidy.
3  Q  You don't recall there was a subsidy
4  though, right?
5  A  No, I do not, other than what you've
6  shown me this morning.
7  Q  If I tell you that -- I'll show you
8  just to make sure that we have -- the '95
9  valuation, Exhibit 71.  If you look at Page 40,
10  Section 4.2?
11  A  Page 40?
12  Q  Page 40.
13  A  Okay.  January 3, 1995.  Okay.  Page
14  40.
15  Q  4.2.  You see at the early retirement
16  reduction.  Are you there?
17  A  No.
18  Q  Okay.
19  A  I'm in -- on Page 40.  I've got
20  payable at early.  I've got minimum.  I've got
21  debt.  Page 39 is retirement benefits.
22  Q  Page 40.
23  A  Okay.
24  Q  Payable at an early retirement.
25  A  Okay.  I'm sorry.  Go ahead.  Right.

(14:49:22-14:50:14)

GREFIG

1
2  Q  So the early retirement reduction for
3  a person with at least 15 years of credit is one
4  third of one percent for each month that
5  retirement is prior to age 65, right?
6  MR. RUMELD: I object to the
7  form.
8  A  Yes.
9  Q  In 1995 you would have considered
10  that a valuable benefit?
11  MR. RUMELD: I object to the
12  form.
13  A  Four and six percent.  It's a
14  subsidized -- subsidized benefit.
15  Q  But would you have considered that a
16  valuable benefit?
17  MR. RUMELD: I object to the
18  form.
19  A  I -- I have trouble with the term
20  valuable, because that's judgement.  What you
21  consider valuable and I consider valuable are
22  two different things.
23  This is a subsidized benefit.  It
24  provides more to the retiree than if we had made
25  the reduction on an actuarial basis.

(14:50:18-14:51:18)

GREFIG

1
2  Q  Well, if somebody asked you at a
3  cocktail party, as a friend, and they had that
4  as an option or taking -- taking -- or taking
5  a -- waiting to take their benefit, what would
6  you tell them?
7  A  I would say --
8  MR. RUMELD: I object to the
9  form.
10  A  -- look at the crossover point.  If
11  you take the early retirement benefit now, and
12  take it paid for life, when would the cumulative
13  benefits in receipt exceed what you would have
14  gotten had you waited until age 65.
15  And now you've got a crossover
16  horizon.  And without getting the guy bogged
17  down in financials, he can determine whether or
18  not gee, I can get this amount paid for
19  17 years, even though I take a small reduction
20  now.
21  And that's the way I would respond to
22  a plan participant who was not a client's
23  employee.
24  Q  If a large number of people
25  terminated and eventually elected to take this

(14:51:22-14:52:46)

GREFIG

1
2  benefit at age 55, what would the cost impact of
3  that be?
4  A  Take this benefit at 55?
5  Q  Yes.
6  A  Everybody went out?
7  Q  Well, I said if a large number of
8  people terminated, and that's what they elected.
9  They waited and they elected that.  What would
10  the cost impact of that be?
11  A  I don't know.  What -- there are old
12  rules of thumb about if you change the normal
13  from 65 to 60, and everybody took -- I think you
14  double your cost.  Maybe you --
15  Q  It would be expensive?
16  A  Oh, yeah.  Yeah.  Yes.
17  (Exhibit 83, fax, was marked
18  for identification, as of this date.)
19  Q  83 is another fax that you sent Mr.
20  Kiley, is it not?
21  A  According to the fax transmittal,
22  yes.
23  Q  Now, with respect to this expensive
24  proposition, if an employer was looking to lower
25  costs, they might want to avoid that expense of

Page 173

(14:52:50-14:53:46)

1     GREFIG
2  paying the early retirement subsidy if they knew
3  they were about to have a large number of
4  terminations?
5     MR. RUMELD: I object to the
6     form.
7  A  I don't know what they knew was going
8  to happen.
9  Q  Now, I'm -- I'm --
10  A  I can't respond to that question.
11  That's a hypothetical question.
12  Q  If they knew they were about to fire
13  a lot of people.
14  A  If they knew they were about to fire
15  a lot of people.
16  Q  Yes.  They might want to avoid that
17  expense?
18  A  They might want to avoid.
19     MR. RUMELD: I object to form.
20  Q  And we were discussing before lunch
21  how about half the people left in just a few
22  years.
23  A  Well, no.  We never resolved that,
24  but -- but rather than trying to reconcile data,
25  I'll concede that there was a reduction in

Page 174

(14:53:48-14:54:50)

1     GREFIG
2  force.  Okay.
3  Q  How about -- how about assume that
4  the reduction in force is as I say, and we'll
5  let the documents figure themselves out later.
6  A  As I say, based upon these -- yeah.
7  I'll accept that there appeared to be a
8  reduction in force.
9  Q  A reduction in force of about half is
10  what I want you to assume for purposes of this
11  question.
12  A  Okay.
13  Q  So if the employer knew that, they
14  might want -- wanted to minimize the cost impact
15  of those people leaving.
16  A  Yes.  Your statement -- they may have
17  wanted to reduce, but these subsidies were built
18  in.  Aren't they?
19  Q  Well, isn't there one way around the
20  subsidy?
21     MR. RUMELD: I object to form.
22  A  Aren't the subsidies part of the
23  accrued benefit?  Aren't they?
24  Q  Don't you forfeit the subsidy under
25  some circumstances?

Page 175

(14:54:50-14:55:50)

1     GREFIG
2  A  Not that I'm aware of.
3  Q  How about taking a lump sum?  Let me
4  have that.
5     MR. RUMELD: I object to the
6     form.
7  A  I'm sorry.
8  Q  Was -- withdrawn.
9  A  That's true even under a conventional
10  defined benefit plan, isn't it?
11  Q  Withdrawn.  Was the early retirement
12  subsidy paid in lump sum form?
13  A  I don't recall what was done in the
14  Woolworth plan, but I don't think it was
15  uncommon to not include subsidies in the -- in a
16  lump sum out of any DB plan.
17  Q  I'm asking -- withdrawn.
18     If you assume that the employer did
19  not offer the early retirement subsidy in the
20  form of a lump sum.
21     MR. RUMELD: I object to the
22     form.
23  A  Okay.
24  Q  You agree to assume.
25  A  Okay.

Page 176

(14:55:52-14:56:58)

1     GREFIG
2  Q  Well, prior to the conversion the
3  participant had no option, could not elect a
4  lump sum.
5  A  Okay.
6  Q  You agree with that?
7  A  Unless it was de minimis, correct.
8  Correct.
9  Q  And after the conversion you're not
10  aware that the early retirement subsidy was paid
11  in lump sum form.
12  A  I'm not aware, no.  No.
13  Q  So an employer looking to reduce
14  costs might want to encourage participants who
15  otherwise might qualify for early retirement
16  subsidy to elect lump sums?
17  A  I can't answer that question.  I need
18  to know what the requirements were in terms of
19  an employee coming in to an employer and asking
20  for a statement of their accrued benefits and
21  their entitlements under the plan, whether
22  they're -- they've got to be shown what they can
23  take as an early retirement annuity, right?
24  So...
25  Q  What you're talking about is not

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 177

(14:57:00-14:57:46)

1    GREFIG
2  responsive to my question.
3      I'm not asking about an individual
4  participant coming in and asking about
5  elections.
6  A  But you're looking for almost a yes
7  or no answer from me, and I don't understand how
8  an employer can encourage an employee to take a
9  lump sum.
10  Q  How about converting to a cash
11  balance plan?
12  A  And encourage to take a lump sum
13  rather than the annuity that they're entitled
14  to?
15      I mean, converting to a -- converting
16  to a cash balance plan doesn't wipe away the
17  subsidy related to the accrued benefit at the
18  time of conversion, does it?
19  Q  It doesn't wipe away the --
20  A  The subsidy in the early retirement
21  benefit.  That still attaches to the accrued
22  benefit at the date of conversion.
23  Q  But if the participant, as you were
24  telling me earlier, kept wanting to talk about,
25  if they asked for payment, if the participant

Page 178

(14:57:50-14:58:32)

1    GREFIG
2  asks for payment in the form of a lump sum, that
3  early retirement subsidy goes away, doesn't it?
4  A  Yes.
5  Q  And that's what happened --
6  A  Typically.  Typically it goes away.
7  Q  And that's what happened here.
8      MR. RUMELD: I object to the
9  form.
10  A  I -- I don't know.
11  Q  Was one of the reasons for the
12  conversion as you understood it at the time to
13  encourage participants to take lump sum?
14      MR. RUMELD: I object to the
15  form.
16  A  No.
17  Q  It was to discourage them to take
18  lump sum?
19  A  I don't think there was any
20  encouragement or discouragement to take a lump
21  sum.
22      That -- how to manipulate the
23  employee or encourage the employee to do one
24  thing or the other, I don't even think it was in
25  that survey that you showed me, where I was

Page 179

(14:58:34-15:00:02)

1    GREFIG
2  asking other people what their experience was.
3  Q  So are you saying that you have no
4  idea that -- withdrawn.
5  A  What -- refresh my memory.  If an
6  employee comes in and asks for a statement of
7  their accrued benefit, what are they entitled to
8  be shown?  What must they be shown?
9  Q  Do you remember trying to encourage
10  Foot Locker to use professional communications
11  services in discussing the conversion to a cash
12  balance plan with its employees?
13  A  I don't recall encouraging them, but
14  based upon the proposal that you put before me
15  before, it's apparent or obvious that I saw an
16  opportunity for an assignment for our
17  communications practice, and one way or another
18  either was asked for a proposal or -- or they
19  talked to our communications people and
20  requested a proposal, yes.
21  Q  I'm sorry.  Are you -- go ahead.  Did
22  you finish your answer?
23  A  I think I did, yes.
24  Q  But I didn't understand what you were
25  saying there at the end.

Page 180

(15:00:04-15:00:44)

1    GREFIG
2      You were shown a proposal for
3  administrative services, not for communications?
4  A  I'm sorry.  Did I say administration?
5  Q  The proposal I showed you earlier --
6  A  The communication services, right?
7  Q  No.
8  A  It wasn't?
9  Q  But you're remembering one.
10      MR. RUMELD: I object to the
11  form.
12  A  No.
13  Q  You're not?
14  A  No.  Paulette Welsing -- the proposal
15  you put before me before?  What was that
16  proposal for?
17  Q  I'll come back to it, sir.
18  A  Okay.
19  Q  But you believe from looking at it
20  that it was for communication services?
21      MR. RUMELD: I object to the
22  form.
23  A  From having the opportunity to glance
24  at it and not read it, I guess I may have
25  inappropriately concluded it was communication

Page 181

(15:00:48-15:01:34)

1  GREFIG
2  services.
3  Q  What you're missing here, sir, is I'm
4  just trying to jog your memory any way I can.
5    And what I'm asking you is looking at
6  that actually jog a memory in your mind,
7  whatever it was, whether it was about
8  communications or an administrative proposal to
9  handle plan administration.
10    It did jog a memory in your mind that
11  you sent Foot Locker, Woolworth a proposal, and
12  encouraged them to hire Mercer to handle
13  formally the communications surrounding the
14  conversion?
15    MR. RUMELD: I object to form.
16  A  Communications.
17  Q  Would it jog your memory though.
18  That's my question.
19  A  No.  That was a communications
20  proposal that you showed me.
21  Q  Okay.  I don't think it is.  But --
22  A  Well, let me give you another piece
23  of information then.
24  Q  Good.
25  A  Because this is why when I saw the

Page 182

(15:01:34-15:02:38)

1  GREFIG
2  proposal I filed it away as communications,
3  because Mercer wasn't in the administrative
4  services business back at that time.
5  Q  Was not?
6  A  Was not.  And, in fact, in the
7  Stamford office they sold off their group to
8  ADP, and they did that before I retired.
9    And -- and all of this was taking
10  place just before I retired or several years
11  before I retired.
12    So when I see something from Paulette
13  Welsing that you showed me before, maybe I
14  should have examined it in closer detail, but I
15  filed it away as a communications project.
16  Q  The document that I showed you was
17  Document 68.
18  A  Okay.  Administrative services.
19  Q  So I'm right about that.  That's not
20  a proposal about communications, is it?
21  A  Well, I don't know.  Let me look at
22  it.  She calls it administrative services.
23  Q  Sir, you didn't look at that long,
24  other than the front of it, to see the first two
25  pages, and then to see that you were not the

Page 183

(15:02:44-15:13:14)

1  GREFIG
2  correctly-named client manager in it, right?
3  A  Correct.
4  Q  So if you put down the document --
5  A  Yes.
6  Q  -- and look at me and tell me, didn't
7  looking at that, even though it's not a
8  communications proposal, jog your memory, your
9  mind, that there was such a proposal that was
10  sent to Woolworth?
11    MR. RUMELD: I object to the
12    form.
13  A  No.
14    MR. GOTTESDIENER: He needs to
15    switch the tape.  We'll switch the
16    tape.
17    THE VIDEOGRAPHER: This
18    concludes Tape Number 3.  The time is
19    3 p.m.  We're off the record.
20    (Recess taken)
21    THE VIDEOGRAPHER: This begins
22    Tape Number 4.  The time is 3:10 p.m.
23    We're back on the record.
24  CONTINUED DIRECT EXAMINATION BY MR.
25    GOTTESDIENER:

Page 184

(15:13:14-15:15:34)

1  GREFIG
2  Q  I'm going to show you an exhibit that
3  hasn't been shown to you before, but it was
4  shown to another witness in another deposition,
5  so you've never seen this before.
6    It's Exhibit 61.  Can you tell me
7  what this is, sir?
8  A  Okay.
9  Q  Will you be able to tell me without
10  reading ever word of the entire document?
11  A  Yeah.  I probably can.
12  Q  That's my question.
13  A  It's a letter to the client outlining
14  a communications assignment, and outlines the --
15  Q  Would you turn the letter over and
16  give me your recollection of it?  Not what you
17  read but --
18  A  I have no recollection of this.
19  Q  Okay.
20  A  As I said before I'm --
21  Q  Isn't this the whole truth --
22  A  This is a -- this along with many
23  other projects that I've had in my life is a
24  total blank.
25  Q  Okay.  But you do understand that

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 185

(15:15:36-15:16:34)

1    GREFIG
2    you're under oath here?
3    A   Yes, I do.
4    Q   And you're required to try to fill in
5    the blank if you think there's anything to be
6    filled in, including by having your memory
7    refreshed by hearing --
8    A   I understand what you're trying to --
9    Q   Let me ask you a question.
10    A   Yes.
11    Q   The question is, earlier we discussed
12    a communications proposal, and I put it to you
13    that the administrative proposal jogged a memory
14    in your mind about a communications proposal.
15       Isn't this document, 61, the
16    communications proposal that you were referring
17    to?
18       MR. RUMELD: I object to the
19       form.
20    A   No.  The communications issue came up
21    when your colleague, Steve Cohen, asked me on
22    the phone did I ever do or was I involved with
23    or do I remember communications assignment for
24    Woolworth.
25       And that's the first time that that

Page 186

(15:16:38-15:17:22)

1    GREFIG
2    phrase communications came up.  And I told him
3    no, but I may have seen an opportunity for a
4    communications practice to get an assignment for
5    Woolworth.
6    Q   Let me ask you about that comment.
7    A   So that's -- that's where this --
8    Q   An opportunity from your
9    communications --
10    A   For our communications.
11    Q   Excuse me.  An opportunity for your
12    communications group --
13    A   Practice.
14    Q   -- practice or group --
15    A   Right.
16    Q   -- to get an assignment from
17    Woolworth?
18    A   Correct.
19    Q   Was part of your compensation tied to
20    your bringing in additional business for Mercer?
21    A   No.
22    Q   What -- why would you have looked at
23    it as an opportunity for a Mercer practice group
24    to get more work from Woolworth?
25    A   It was a rational way to look for

Page 187

(15:17:26-15:18:18)

1    GREFIG
2    business.  You always look for opportunities to
3    bring more of your colleagues into an
4    assignment.
5       I mean is it -- isn't it rational to
6    develop new business with clients, new clients,
7    existing clients, by bringing in other practice
8    areas?  I don't -- but the -- the seed was
9    planted when -- with Steve Cohen's phone call.
10    Q   Can we just stick to one question,
11    one answer?
12       You just put to me that it --
13    wouldn't it be rational to do that, and my
14    question in response to your question is did you
15    perceive a need, or was it just give more
16    business to Mercer, even if Woolworth didn't
17    have the need?
18       MR. RUMELD: I object to the
19       form.
20    A   Probably the second.
21    Q   It was because you thought Woolworth
22    needed --
23    A   Not needed.  They could benefit from
24    it.
25    Q   And why?

Page 188

(15:18:18-15:19:10)

1    GREFIG
2       MR. RUMELD: I object to the
3       form.
4    A   Because they've got -- the only --
5    the benefit that any company accrues from having
6    a consultant come in and work with them is the
7    fact that the consultant has multiple exposures
8    to other clients, to other situations, and
9    therefore has a collection of experiences, and
10    may be helpful to a client when they're
11    operating either in the actuarial area or
12    communication area, asset strategy area.
13    Otherwise these companies may -- and some
14    companies used to have their own actuaries on
15    staff.
16    Q   When you said to Mr. Kiley that you
17    asked one of your colleagues in our
18    communications practice to scope a
19    communications strategy --
20    A   Yes.
21    Q   -- what did you mean by that?
22       MR. RUMELD: I object to form.
23    A   Give me an outline.
24       THE WITNESS: I'm sorry.
25       MR. RUMELD: That's okay.

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 189

(15:19:12-15:20:12)

1  GREFIG
2  Q  And what does that mean, to -- an
3  outline of the strategy that Mercer would
4  suggest that Woolworth follow?
5  A  Not suggest, but outline of how we --
6  we or they could work with Woolworth to design a
7  communications strategy.
8     We don't dictate to the client.
9  We -- we work with the client, offer our
10  opinions.
11    In the case of the study where Mercer
12  was involved in the conversion outline, things
13  that need to be considered along the way, but --
14  but we never walk in and say this is what you
15  should do.
16  Q  The client tells you what they want
17  and if --
18  A  They say we'd like to work with you
19  on this assignment, or we give them an outline
20  of a proposal of what can be done.  But...
21  Q  So you say as the project moves
22  forward --
23  A  We don't walk in with a package, like
24  an insurance company might say here, it's all
25  printed up.  Just send it out to your employees.

Page 190

(15:20:16-15:20:56)

1  GREFIG
2  Q  The third paragraph you say, "As the
3  project moves forward, I would like to review
4  the attached and work with you to develop the
5  final strategy."
6  A  Right.
7  Q  Okay?
8  A  Right.
9  Q  And did that occur?
10    MR. RUMELD: I object to the
11  form.
12  A  I don't recall.
13  Q  Actually didn't you tell Mr. Cohen
14  that you thought --
15  A  I don't think so.
16  Q  That's what you told Mr. Cohen?
17  A  Right.
18  Q  You told Mr. Cohen that, in fact --
19  that there was such a proposal, but that
20  Woolworth never took Mercer up on this?
21  A  No.  I said there may have been a
22  proposal, because as I just stated to you,
23  there -- I said to Cohen was there may have been
24  a proposal, because I may have seen an
25  opportunity to have one of our other practices

Page 191

(15:21:00-15:24:10)

1  GREFIG
2  work with Woolworth.
3  Q  And Woolworth declined the
4  opportunity?
5     MR. RUMELD: I object to the
6  form.
7  A  I have to take your statement on its
8  face.  I guess so.  Because I don't -- I don't
9  know -- I don't recall what happened.
10  Q  Well, when you -- were you aware of
11  anyone at Woolworth in-house who had the
12  communications experience and expertise that
13  your communications practice in communicating
14  benefit changes to employees?
15  A  No.
16  Q  Let me show you Exhibit 6, an
17  April 20, 1995 timeline.
18    Have you seen a document like this
19  before in connection with the Woolworth cash
20  balance conversion?
21  A  No, I have not.
22  Q  I'll take that back.  Thank you.
23  Showing you Exhibit 7.
24    Can you tell me what Exhibit 7 is?
25  Based on a review so far, are you able to tell

Page 192

(15:24:12-15:25:16)

1  GREFIG
2  me what Exhibit 7 is?
3  A  It appears to be a summary of other
4  highlights.  There are some --
5  Q  A summary of other highlights?
6  A  Highlights.  Looks like this cost
7  analysis in here.  There's cash balance
8  highlights.  There's presentation of strategy to
9  merge.
10  Q  I'm not asking you to give an
11  interpretation of the current document currently
12  in your mind, but rather to tell me, have you
13  seen it before?
14    Is it the kind of thing that you were
15  involved in either creating or using as a tool
16  to help Foot Locker, Woolworth make design
17  decisions?
18  A  I don't recall ever seeing this
19  document before.
20  Q  Well, is it the kind of document that
21  was generated in connection with their
22  consideration of design alternatives?
23  A  Not by Mercer.  This --
24  Q  You think this is something that
25  Woolworth would have created?

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 193

(15:25:18-15:26:26)

1    GREFIG
2 A  This -- yes.  This doesn't have the
3 flavor and the font, the verbiage.  It doesn't
4 have the flavor of a Mercer document.
5 Q  How about -- turn to Page 3, if you
6 would.
7 A  Okay.  That's it.
8 Q  You see how it has review of plan
9 alternatives?
10 A  Yes.
11 Q  And the alternatives in the left-hand
12 column are listed, and then in the middle
13 there's pros and cons and then estimated costs?
14 A  Yes.
15 Q  The alternatives listed are terminate
16 the current plan, freeze with the intent to
17 terminate, freeze temporarily, change the
18 current plan formula to one percent of W-2 comp,
19 or finally convert to cash balance plan.
20 A  Yes.
21 Q  Looking at the pros and cons, and in
22 particular the cons, you see -- let's take the
23 first couple.
24    Terminate current plan.  A con is
25 identified here as competitively

Page 194

(15:26:30-15:27:30)

1    GREFIG
2 disadvantageous, and another con, negative
3 publicity.  Do you see that?
4 A  Yes, I do.
5 Q  And that also is repeated for
6 freezing with the intent to terminate, the next
7 option?
8 A  Okay.
9 Q  Does looking at this and seeing this
10 refresh your recollection that options other
11 than just convert to cash balance were
12 considered but turned down because their cons
13 far outweighed any pros?
14 A  Well, the fact that other
15 considerations were looked at was in one of the
16 other documents that you gave me before.
17 Q  Which is not my question.  My
18 question is looking at this document it helps
19 refresh --
20 A  No, it does not, because I haven't
21 seen this document before.
22 Q  But --
23 A  And some verbiage in here is not
24 actuarial verbiage.  This -- I would not be in a
25 position to say that any -- that freezing with

Page 195

(15:27:32-15:28:30)

1    GREFIG
2 intent to terminate would be competitively
3 disadvantageous.  I mean, that's a business
4 decision.
5 Q  But I'm not asking -- I'm not asking
6 if you wrote this document.  I'm asking --
7 A  Well, I never saw the document
8 before, and what I'm trying to also communicate
9 to you is that this reason that I -- probably
10 never saw it before.  Because --
11 Q  I'm not asking about seeing it right
12 now.  I'm asking, does it help refresh your
13 recollection.  I'll take it back, because you're
14 saying no before I ask my question.
15    Does it help refresh your
16 recollection that considerations like
17 competitively disadvantageous, like negative
18 publicity, were considerations that you learned
19 during the design process that Foot Locker took
20 into account in making a decision?
21 A  This does not refresh my memory.  I
22 have no recollection of conversations that I had
23 with the people during the scope of this
24 project.
25 Q  When you --

Page 196

(15:28:30-15:29:34)

1    GREFIG
2 A  Conversations.  I mean, 17 years ago.
3 I have no recollection of conversations.
4 Q  I currently didn't have on the table
5 a question about conversations.
6    When you spent time in writing and
7 orally communicating with Tom Kiley and Carol
8 Kanowicz and anyone else at Foot Locker about
9 the various options and impacts of design
10 considerations that were on the table, were you
11 being truthful when you did so?
12 A  With them?
13 Q  Yes.
14 A  Yes.
15 Q  Were you being truthful with everyone
16 you communicated with on that topic?
17 A  I would always be truthful with the
18 people I'm communicating with.
19 Q  Were you careful in your
20 communications with them as to the impacts of
21 the various alternatives that you were
22 presenting to them?
23 A  Yes.
24 Q  Were you -- did you take care when
25 you were in meetings to ensure to the best of

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 197

(15:29:36-15:30:48)

1    GREFIG
2  your ability, without the ability to get inside
3  of someone's head, that they understood what you
4  were communicating to them?
5  A  Yes.  That is a matter of style.  I
6  would never leave the room without feeling
7  comfortable, that the client understood what was
8  being said and what the implications are.
9     And I think if you look back at some
10  of these documents that have pros and cons and
11  considerations, all bases were touched to the
12  best of our ability.
13  Q   And to the best of your ability, in
14  these meetings, presentations, written
15  submissions, you tried to communicate in as
16  clear a way as you could what are some fairly
17  complicated actuarial concepts?
18     MR. RUMELD: I object to the
19     form.
20  A  Yes.  It -- again --
21  Q  I'll ask the question again.
22  A  Yes.
23  Q  Remember the discussion we were
24  having before about six percent and nine
25  percent?

Page 198

(15:30:48-15:31:40)

1    GREFIG
2  A  Uh-huh.
3  Q  And wear-away?
4  A  Uh-huh.
5  Q  You have to say yes or no for him.
6  A  Yes.
7  Q  Do you think these are easy concepts
8  for non-actuaries to understand?
9  A  Non-actuaries.  Non-actuaries, no.
10  They're not easy to understand.  If we're
11  talking about Tom Kiley, who you said to me
12  before had some prior actuarial experience --
13  Q  Well, what I say isn't evidence.  You
14  say he was good with numbers.
15  A  Yes.
16  Q  You said that, right?
17  A  Yes.
18  Q  You agree with that?
19  A  Yes.
20  Q  So if you could continue.  What about
21  Tom Kiley.  Non-actuaries --
22  A  Non-actuaries, some of these concepts
23  are difficult for them to grasp and retain.
24  Q  But with Tom Kiley, you don't think
25  he had that problem?

Page 199

(15:31:42-15:32:44)

1    GREFIG
2     MR. RUMELD: I object to the
3     form.
4  A  Working with Tom was -- was an
5  easy -- easy -- he's easy to work with.  I don't
6  have any recollection whatsoever of having to
7  struggle during the course of a conversation.
8  Q  With Kiley?
9  A  With Kiley.
10  Q  But you did have meetings on occasion
11  with other people, with or without Kiley
12  present, where some things did appear a struggle
13  for them to understand without further
14  explanations from you?
15     MR. RUMELD: Objection to the
16     form.  Go ahead.
17  A  I have no recollection of that, and
18  maybe that's a good example of why I'm having
19  such difficulty with recalling all of this
20  material.
21     The thing that stands out in my mind,
22  looking back over my career, of a unique
23  situation, the things that were tough, the
24  things where -- the ongoing problems, things
25  didn't get resolved in time, there wasn't any

Page 200

(15:32:48-15:33:36)

1    GREFIG
2  response, and those issues stand out in my mind.
3  I fired two clients during my career.  That
4  sticks out in my mind.
5  Q  Who did you fire?
6  A  I fired a company up in Connecticut,
7  and I fired one down here in Manhattan.
8  Q  Because?
9  A  One was a pain in the butt and was
10  always coming in at the end of -- end of -- you
11  know, we got a change in the law and everybody
12  else is on track, and this guy comes walking in
13  at the last minute, wants to know what everybody
14  else did, so he could do it without having to
15  incur a fee.
16     And I had another client who wanted
17  special treatment the way his fees were put
18  together, so I did it the way he wanted and
19  charged him an extra hundred bucks for doing so.
20  Q   And then fired him?
21  A  Well, I didn't have to show him the
22  door.
23  Q  So --
24  A  He didn't want any more of me.
25  Q  But it does --

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

---

Page 201

(15:33:36-15:34:44)

1    GREFIG
2 A  That stands out in my mind.  Why?
3 Because it's unusual.  It's out of the ordinary.
4 Q  You worked with other in-house
5 administrators, whether the title is literally
6 that or not, for other companies other than
7 Woolworth?
8 A  Yes.  Yes.
9 Q  You had integrated with other plans?
10 A  With people who have similar
11 positions to Tom Kiley, yes.
12 Q  Did those people all have the math
13 skills and understanding that Kiley did?
14 A  No.  No.
15 Q  So Kiley -- Kiley was a pleasure
16 comparatively to work with insofar as he didn't
17 have a struggle with these concepts?
18 A  I didn't have any difficulty working
19 with Kiley, and I'm not sure I want to put a
20 title pleasure on it, because it connotes other
21 things.
22    But you as a professional, clients,
23 where someone came in to you and said, you know,
24 it's -- thus and so happened, you say why am I
25 not surprised.

---

Page 202

(15:34:46-15:36:24)

1    GREFIG
2    And then you got other clients where
3 if somebody came and said the same thing, you
4 would say it's a problem here.  Okay.
5    We never had those types of issues
6 here.  Tom was -- was easy to work with.  He was
7 understanding.  He was responsive.  He --
8 Q  There were no miscommunications in
9 the ordinary course?
10    MR. RUMELD: I object to the
11 form.
12 A  In the ordinary course of business.
13 No miscommunications.  No.
14 Q  And -- but without asking you,
15 because I think this may have been a stumbling
16 block that I would like to get over, to try to
17 recall specific conversations, don't you have a
18 general recollection of being in meetings or on
19 conference calls with groups of people from Foot
20 Locker about the conversion, where it was not
21 just you and Kiley?
22 A  No.  The -- the only meeting that
23 comes to mind at Woolworth has nothing to do --
24 had nothing to do with cash balance plan.
25 Q  Okay.

---

Page 203

(15:36:24-15:37:30)

1    GREFIG
2 A  I'll give you an example of where a
3 meeting did come to mind and dates back longer
4 than this, was with Bill Forcht.
5 Q  Okay.
6 A  And at that point in time -- he was
7 Pat Peck's predecessor.  At that point in time
8 the Woolworth retirement plan owned the
9 Woolworth building.
10    So question came up that was put to
11 me by Bill, what do we have to do if we want to
12 sell this.
13    And I said, well, first thing it has
14 to be an arm's length transaction.  And for some
15 reason he found that response irritated him and
16 he just -- he snapped.
17    Again, that's something that stands
18 out in my mind.  I remember sitting in his
19 office.
20    He was in a chair here (indicating).
21 The attorney was over there (indicating).  I was
22 here.  And it was an honest, straightforward
23 answer.  I said it's got to be an arm's length
24 transaction.  For some reason that -- that
25 sticks into my mind.

---

Page 204

(15:37:30-15:38:28)

1    GREFIG
2 Q  Who was the attorney?
3 A  It was in-house counsel at that time.
4 Q  Who?
5 A  It was a woman.  Forget what her name
6 was.
7 Q  And about what year would this have
8 been?
9 A  Probably late -- late '80s.  Late
10 1980s.
11 Q  He snapped because he didn't want to
12 be told that it had to be arm's length?
13 A  Yes, or something related to that,
14 yes.  I just made his life a little more
15 complicated I guess.
16 Q  And did the transaction go through?
17 A  Not then.  I don't know what happened
18 after.  I don't know.  I don't think it went --
19 anything happened until after I retired.
20    Because I don't -- you know, you
21 referenced Foot Locker, which is what it is
22 today.
23    To me it was always Woolworth, and
24 then it became something else that no one
25 remembers, at least I don't remember.  And then

---

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 205

(15:38:28-15:40:30)

1        GREFIG
2    I guess -- I don't know when it became Foot
3    Locker.
4    Q   Pension equity plan?  Does that ring
5    any bells with you?  Handing you Exhibit 84.
6         (Exhibit 84, fax, was marked
7         for identification, as of this date.)
8    A   Pension equity.  Yes.  It sounds...
9    Q   Does looking at 84 and hearing
10   pension equity plan ring any bells about pension
11   equity plan with you?
12   A   Pension equity plan rings a bell.
13   Q   That's about it?
14   A   That's about it.
15   Q   You do agree that this appears to be
16   a fax from Carol Kanowicz to you?
17   A   Yes.
18   Q   But beyond that there's nothing you
19   can tell us?
20   A   Didn't Woolworth have pension equity
21   plan?  There's stuff from Kwasha Lipton.  Is
22   this -- it's another actuarial firm.
23   Q   Was Quasha in any way at any point in
24   time as far as you were aware a potential
25   competitor to Mercer in offering actuarial

Page 206

(15:40:34-15:41:36)

1        GREFIG
2    consulting services or actuarial services?
3    A   All the firms were.  I mean
4    Woolworth --
5    Q   I don't mean in theory.  I mean in
6    practice.
7    A   You mean were they a threat to me?
8    Q   Whether you ever learned that there
9    was a competing proposal or competing study or
10   conversations being done while you were working
11   on the plan.
12   A   No.  I was not aware of it, but one
13   of the thoughts I had before when we started
14   this conversation about cash balance plan, you
15   know, that time all of the -- I don't know what
16   they do now, but all of the firms were
17   constantly sending out brochures on current
18   subject matters.
19        So Tom Kiley and the crew down there
20   had input other than from Mercer.  But I'm not
21   aware that they had meetings or anything else
22   like this.
23        This is a significant document.  But
24   did they not have a pension equity plan or was
25   this for a new proposal?

Page 207

(15:41:38-15:42:56)

1        GREFIG
2    Q   What do you mean when you say it's a
3    significant document?
4    A   Substantial weight, pages.
5    Q   It has a number of pages to it.
6    A   Yes.
7    Q   Okay.  Do you know what a scrivener's
8    error is?
9    A   Yes, I do.
10   Q   What is a scrivener's error?
11   A   It's when the plan drafter quotes the
12   wrong word or phrase to a plan document, and it
13   comes up with unintended results.
14   Q   Did a scrivener's error make its way
15   into the Woolworth retirement plan, as far as
16   you know?
17   A   Not as far as I know, no.
18   Q   There was a feature of the new plan
19   that limited participants once they terminated
20   who were under age 55 to six months if they
21   wanted to receive their benefit, or if they
22   didn't act within that window they would have to
23   wait until age 55.  Does that ring a bell with
24   you?
25   A   It -- I don't know whether it rings a

Page 208

(15:43:00-15:43:54)

1        GREFIG
2    bell with me.  It was in that -- that e-mail
3    that you showed me, where there was a summary.
4        Wasn't there something in there,
5    stipulation about a plan provision that made
6    terminated vested employees wait?  So yes, it
7    rings a bell, but I think it's in relation to
8    that --
9    Q   The survey that you took of other
10   people?
11   A   Yes.
12   Q   I'm asking about the actual Woolworth
13   plan.
14   A   No.  No.
15   Q   So you wouldn't be able to tell us
16   why that may be in the plan?
17   A   Did I share that e-mail with Tom?
18   Q   I'm mostly not supposed to be telling
19   you things, just asking you questions.  I just
20   want to know --
21   A   Well, I may --
22   Q   -- if I shared it with Tom --
23   A   Then maybe --
24   Q   If you shared it with Tom --
25   A   -- that's the idea.

Page 209

(15:43:54-15:46:56)

GREFIG

2 Q   Other than your speculation, trying
3 to help us out here with speculation about maybe
4 that's where it came from, do you have anything
5 to provide us, other than that connection?
6 A   No.  As to the question being how did
7 that provision get into the Woolworth retirement
8 plan or why is it there?
9      No.  I have to ask myself what
10 purpose would it serve, and that -- again, no
11 recollection of a conversation about that.
12 Q   Please tell me what Exhibit 85 is.
13      (Exhibit 85, cost estimates,
14      was marked for identification, as of
15      this date.)
16 A   These are cost estimates, cash
17 flow -- not cash flow.  Benefit projection.
18 Q   You saw the chart on Page 829?
19 A   Yes.
20 Q   What does that illustrate?
21 A   Looks like it's plotting the benefits
22 that are shown on the first page.
23 Q   And --
24 A   Let me see.  Let me make sure that
25 that -- yeah.  Cash balance plan peaks and then

Page 210

(15:47:00-15:48:44)

GREFIG

2 drops off.  Right.  Because it's a closed
3 population.
4 Q   What do you mean by that?
5 A   Well, it means that the projection
6 was done based upon current active participants,
7 as opposed to a population projection, where you
8 would replace terminations of new -- new
9 employees, I mean, when you do a full benefit --
10 benefit disbursement projection.
11      What's the date on this?  And then it
12 looks like cost alternative for the PEP plan.
13 I'm assuming this is a cost estimate that was
14 prepared by Mercer based upon the Kwasha Lipton
15 plan.
16 Q   You're looking at Page 830, right?
17 A   830.  Right.
18 Q   And on 831?
19 A   Savings.  Oh.  Oh.  Oh.  Okay.  It
20 appears that based on the early retirement
21 assumptions that were used for the Woolworth
22 retirement plan, if in lieu of the subsidized
23 early retirement factors that are shown in the
24 valuation report, the document we were looking
25 at before.

Page 211

(15:48:46-15:50:34)

GREFIG

2 Q   Before the lunch break?
3 A   Yes.  If they put in a true actuarial
4 equivalent reduction, there would be about a $2
5 million savings in certain normal cost.  I was
6 about to call it service cost, but it's normal
7 cost.
8 Q   Just so there's no ambiguity for Ron
9 here, you were saying that the savings would be
10 about $2 million in normal cost?
11 A   Normal cost.  Right.  Yes.
12 Q   And -- but the chart on 829 is based
13 on most people electing a lump sum?
14 A   It doesn't say that.  But...
15 Q   Is that what it says?
16 A   That's what it appears to be.  Right.
17 Q   So it's showing that -- and all of
18 the people that were taking the lump sums are
19 not getting the early retirement subsidy?
20 A   Presumably.
21 Q   And the projection illustrates the
22 magnitude of the long-term savings that the
23 company would enjoy by people not receiving the
24 early retirement subsidy?
25      MR. RUMELD: I object to the

Page 212

(15:50:34-15:51:28)

GREFIG

2 form.
3 A   This thing?
4 Q   Yes.
5 A   This chart?
6 Q   Yes.
7 A   No, no.  When -- people under the
8 current plan benefits projection, what you have
9 are retirees and future retirees who retire and
10 commence an annuity payment that may run for 15,
11 20 or 40 years.  So you get this cumulative
12 effect.  Okay.
13 Q   You just ran your finger over the --
14 I'm sorry.
15 A   Over which one?
16 Q   You ran your finger on --
17 A   The cash balance plan benefits.
18 Q   Yes.  829.  You ran your finger on
19 the sloping wave on the graph, right?
20 A   Right.
21 Q   Those are lump sums?
22 A   Right.  So it's the other one.  It's
23 the other one that has the cumulative effect.
24 Q   So it's the area under the curve that
25 represents the payments from the plan?

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 213

(15:51:32-15:54:14)

1    GREFIG
2  A  Yes.
3  Q  And it's $2 million in savings for
4  years?
5  A  On 830?  Whoops.  No.  Where am I?
6  Where was I?  Oh.  It was folded under.  Yes.
7  The last page on 831.  To the extent that
8  affects normal cost, I would expect that to be
9  ongoing.
10     (Exhibit 86, fax dated 5/16/95,
11     was marked for identification, as of
12     this date.)
13  Q  Showing you 86 from May 16, 1995.
14  This is your handwriting?
15  A  Yes.
16  Q  On all of these pages, right?
17  A  Well, I'm still stuck on the
18  transmittal sheet.  Is there a date on this?
19  Q  Yes.  There's a date on the first
20  page at the fax header, and then on the second
21  page is a handwritten date by yourself of
22  May 16, 1995; is that correct?
23  A  Yes.  Right.
24  Q  So what is that showing?
25  A  I'm thinking about how badly drafted

Page 214

(15:54:20-15:55:24)

1    GREFIG
2  it is.
3  Q  Why is that?  What are you referring
4  to?
5  A  Well, it looks like a comparison of
6  cash balance credit and account growth to the
7  pension equity plan credit and account.
8     But I don't understand why the
9  handwritten note says discounted at eight and a
10  quarter percent, because I don't know where it's
11  being discounted from.
12  Q  Would you look back at 85 for a
13  moment?  The prior exhibit?  That showed the
14  savings from the elimination of the early
15  retirement subsidy?
16  A  Yes.
17  Q  Who are you referring to Woolworth
18  distribution?  Right-hand corner, in your
19  handwriting.
20  A  This isn't --
21  Q  That's not your handwriting?
22  A  No.  This (indicating) is my
23  handwriting.
24  Q  So the handwriting that says "Cash
25  balance and general" is yours?

Page 215

(15:55:28-15:57:06)

1    GREFIG
2  A  Appears to be my handwriting, yes.
3  Q  And at the bottom right, "Woolworth
4  distribution," these initials and the words
5  "Woolworth distribution", you didn't write that?
6  A  No.  And the note to Tom is not my
7  writing either.
8  Q  That -- it says Jim under it.
9  A  That's Cassidy.  Yes.
10  Q  It says, "Tom, please call me to
11  discuss," right?
12  A  Yes.  It does.  That's not my phone
13  number.
14  Q  If -- if Mercer did this work to
15  analyze these savings, it would have been
16  something that you would have made sure that
17  Mercer communicated to the client?
18  A  Yes.  Supposed to.
19     (Exhibit 87, fax, was marked
20     for identification, as of this date.)
21  Q  87 is a fax from you to Mary Sue
22  Dickinson.  Does that name ring a bell?
23  A  Yes.
24  Q  Who is she?
25  A  She was in the asset planning group.

Page 216

(15:57:10-15:58:48)

1    GREFIG
2  Q  This reads, "May 26, 1995.  Mary Sue,
3  attached is a benefit disbursement projection
4  for the January 1, 1995 active participants
5  under the Woolworth retirement plan, TWRP, and a
6  proposed cash balance formula.
7     "While the incremental cash
8  disbursement is significant during the first few
9  years, the plan is now out of full funding, and
10  new money coming into the plan will cover a
11  substantial portion of additional payments."
12  You see that there, right?
13  A  Yes, yes.
14  Q  You don't doubt that you wrote that
15  and sent that to Mary Sue?
16  A  It sounds like something I would have
17  composed, yes.
18  Q  And the incremental cash disbursement
19  that you call significant during the first few
20  years, that's a reference to your knowledge that
21  under the formula that would be adopted cash
22  balance there would be a lot of lump sums?
23  A  Yes.
24     (Exhibit 88, handwritten notes
25     dated 6/12/95, was marked for

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 217

(15:58:48-16:00:44)

GREFIG

1      GREFIG
2      identification, as of this date.)
3   Q  88 is your June 12, 1995 handwritten
4   notes; isn't that correct?
5   A  That's my handwriting.
6   Q  And this reflects your call with Mr.
7   Kiley, and that you were going to be showing him
8   options involving formulas for the new plan that
9   had tiers; is that correct?
10  A  Yes.  That looks like he's requesting
11  certain illustrations be prepared.
12  Q  That's consistent with what you
13  recall about Mr. Kiley, that he liked to know
14  all the options?
15     MR. RUMELD: I object to the
16     form.
17  A  Uh-huh.
18  Q  You have to say yes or no.
19  A  Yes.  I'm sorry.
20  Q  Showing you 89.
21  A  The three-tier, the eight-tier thing
22  just doesn't -- I mean, just looking at it I'm
23  aghast.  Eight tiers to the benefit formula?
24  Q  Aghast because that would be very
25  complicated?

Page 218

(16:00:44-16:01:54)

GREFIG

1      GREFIG
2   A  Yes.  If I understand it to be -- if
3   I understand it correctly.
4      (Exhibit 89, document, was
5      marked for identification, as of this
6      date.)
7   Q  You do know that that's the formula
8   that Foot Locker, Woolworth adopted?
9   A  No.  I don't.  I don't remember what
10  they adopted.  Are those tiers prospective based
11  on service or age or are they --
12  Q  With all due respect, if you could
13  look at 89, please?
14  A  Yes.
15  Q  89 is a Mercer document that was
16  produced from Mercer files, that at the top says
17  Woolworth Corporation retirement plan
18  comparison.  You see that?
19  A  Yes.
20  Q  Does this refresh your recollection a
21  bit that there were comparisons that were done
22  between proposed cash balance formulas and the
23  plans of other retailers?
24     MR. RUMELD: I object to the
25     form.

Page 219

(16:01:56-16:03:06)

GREFIG

1      GREFIG
2   A  I have a recollection of a comparison
3   having been made to other -- other retailers.
4   Q  Why was that done?
5   A  I don't know.
6   Q  Why would it have been done?
7   A  Why would it have been done?  Because
8   they see themselves in the retailing business,
9   and if nothing else but curiosity would want to
10  know what the competition is offering.
11  Q  But in -- apart from abstract
12  curiosity, why would -- why would Woolworth be
13  interested to know what their competitors are
14  doing --
15     MR. RUMELD: I object to the
16     form.
17  Q  -- in terms of the benefits offered
18  to employees?
19  A  Well, if they perceived those other
20  retailers to be competing for their employees,
21  then they would have an interest in it.
22     But from my recollection of
23  Woolworth, I as the outsider would not have
24  deemed Sears to be a competitor of their own
25  employees.

Page 220

(16:03:08-16:04:16)

GREFIG

1      GREFIG
2   Q  How about some of the others listed?
3   A  I don't know if Federated --
4   Federated is owner of Macy's?  I don't know.  I
5   never walked past a Federated store.
6   Q  But your recollection is that this is
7   one of the factors that you understood from Mr.
8   Kiley and Woolworth to be in the mix of what
9   design was ultimately adopted, was how it would
10  position Woolworth in terms of other retailers
11  for competing in the marketplace for employees?
12     MR. RUMELD: I object to the
13     form.
14  A  I would use the word consideration as
15  opposed to factor.
16  Q  Okay.
17  A  In other words --
18  Q  Is there a difference?
19  A  Yes.  I think a factor -- a factor
20  has more compulsion to it than a consideration.
21  One is awareness, and the other is I got to -- I
22  got to beat this guy or it's -- it's a factor
23  that has to be built into everything that's
24  done, whereas consideration is I wonder what the
25  other guys are doing.

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 221

(16:04:18-16:05:52)

1    GREFIG
2  Q  What is a replacement ratio?
3  A  It's the proportion of the final pay
4  or the final five average pay.  That would be
5  one of the selections, your base.
6      The question is what is a replacement
7  ratio.  A replacement ratio is the ratio of the
8  plan benefit to the final pay of the employee at
9  time of retirement, or the final average pay
10  depending upon the nature of the discussion at
11  hand.
12  Q  And did you do any replacement ratio
13  analyses for Woolworth in connection with the
14  conversion?
15  A  I don't remember.  We may have, but I
16  don't remember.
17      (Exhibit 90, document, was
18      marked for identification, as of this
19      date.)
20  Q  Exhibit 90.
21      MS. WALWORTH: After this
22      document let's take a comfort break,
23      if you don't mind.
24  Q  You see at the bottom right-hand
25  corner it says Mercer FL?

Page 222

(16:05:54-16:07:00)

1    GREFIG
2  A  Yes.
3  Q  That means it was produced from
4  Mercer's files, as opposed to from Foot Locker's
5  files.
6  A  Okay.
7  Q  If you would turn to these inner
8  pages, starting at the third page, 3842?
9  A  Okay.
10  Q  You see the -- someone written in by
11  hand "highly mobile"?
12  A  Yes.
13  Q  Who is that?
14  A  That looks like my writing.
15  Q  Then the next page, your writing is
16  at the bottom insert, the word "future"?
17  A  Yes.
18  Q  And what you're writing here is into
19  a sentence that says, "The assumption used to
20  estimate terminations," and you put in "Future
21  terminations/retirements were from a Woolworth
22  experience analysis study."
23  A  Yes.
24  Q  And what do you mean by that?
25  A  I'm not sure why I'm highlighting it

Page 223

(16:07:08-16:08:16)

1    GREFIG
2  with respect to the document in hand, but the
3  actuarial assumptions for termination and
4  retirement for the Woolworth retirement plan
5  valuations were the result of an experience
6  analysis.
7  Q  When did they do that study?
8  A  I don't recall.  Probably the late
9  '80s.
10  Q  And that was a study that Woolworth
11  did in house?
12  A  No, no.  The actuaries -- the
13  actuaries did it.  They wouldn't have the
14  capacity -- I mean, they had -- they had the
15  ability under direction to do it, but we had
16  systems that can consolidate five or more years
17  or whatever number of years of termination in
18  retirement experience that we had to develop an
19  experience analysis.
20      You need -- you need a number of
21  years of experience to develop these studies.
22  You can't rely on just one year of input.  So...
23  Q  How often should such a study be
24  done?
25  A  If -- if you're running actuarial

Page 224

(16:08:22-16:09:26)

1    GREFIG
2  valuations you have to do it on an annual basis
3  now, I guess under ERISA, and you continually
4  develop actuarial gains or losses from one or
5  more assumptions.  Then it warrants an analysis
6  of the experience.
7      Let's say you've observed this over
8  the past five years.  You should run an analysis
9  of experience over the past five years, and then
10  you need to have a conversation with the client
11  as to whether these observations were a
12  permanent feature of their population, or
13  there's something unusual that's given rise to
14  these variations.
15  Q  So if over the course of, say, five
16  years there are a lot of terminations, you'd
17  have to have a conversation with your client
18  about that?
19  A  Yes.
20  Q  And you don't have any doubt that you
21  did so if there were such large terminations?
22  A  Well, that may have been the
23  reason -- maybe there's another reason too.  May
24  have been a reason why we did the experience
25  analysis.

Page 225

(16:09:28-16:10:44)

1    GREFIG
2    But the other reason experience
3    analysis might have been done is when I came
4    aboard, the plan was a career average plan, as
5    we mentioned before.  There was no projection of
6    benefits.
7       Now FASB came along and dictated the
8    use of the projected unit credit method, and
9    under -- with -- I think we had to use a salary
10   scale.
11      THE WITNESS: Did FASB make use
12   of a salary scale?
13      MR. GOTTESDIENER: He can't
14   answer either.
15   A   What sticks out in my mind is that
16   the way the valuation was run prior to FASB was
17   that it was run without rates of termination,
18   termination rates, because what you're valuing
19   under a career average plan like this, unit
20   credit career average, is you're valuing the
21   accrued benefit and discounting for probability
22   that the employee reaches retirement on those
23   various retirement ages.  Okay.
24      Now, full-blown set of actuarial
25   assumptions would include termination rates, but

Page 226

(16:10:48-16:12:06)

1    GREFIG
2    if you decrement the termination, and then go
3    back and value the vesting benefit, you
4    basically end up close to if not equal to what
5    you have by not using termination rates at all.
6       So when FASB came along and we needed
7    to modify the way that the valuation was being
8    run, we were in need of some experience
9    analysis.
10   Q   When you came on board, did you run
11   it or was it already being run?
12   A   No.  I think I ran it.  I ran it.
13   Q   Okay.
14   A   Again, it's an issue that sticks in
15   my mind, because the actuary, Phil Mauer, who
16   had run it, ran a projected unit credit cost
17   method for FASB and put termination rates in,
18   and you get decidedly different results.
19      So that -- that may be the origin of
20   the experience analysis, which would have put it
21   in the late '80s.
22   Q   Looking at the other pages, do you
23   see more of your handwriting on the document?
24   A   Yes.
25   Q   On the Page 3844, what does that say

Page 227

(16:12:16-16:13:24)

1    GREFIG
2    on the corner?
3    A   The one that's written sideways on
4    the page?  It looks like this one --
5    Q   Yes.
6    A   It says, "Put behind next page."
7    Q   So what you're doing is suggesting to
8    whoever is the suggestee that the page in
9    question be moved behind the next page?
10   A   Right.  Yes.
11   Q   Do you see the next page?  You're
12   asking an interesting question.  You nodded your
13   head, but you didn't say anything.
14   A   I nodded my head.  That's my
15   handwriting.  Convert TWRP to a cash balance
16   plan September 1, 1995.
17   Q   And you circled the words cash
18   balance and you wrote --
19   A   Why.
20   Q   -- why with a question mark.
21   A   Right.
22   Q   And my question was --
23   A   Why?
24   Q   Well, my question was, isn't that an
25   interesting comment or question?

Page 228

(16:13:26-16:15:24)

1    GREFIG
2    A   Yes, especially since we were well
3    into the study in June of '95.
4    Q   So why were you asking why?
5    A   Let me see what else I noted here.
6    Yes.  In fact, the very next page showed a
7    replacement ratio with the -- the next page
8    shows replacement ratio with and without Social
9    Security.
10   Q   What's the relevance of that to what
11   you were just --
12   A   Well, we were talking about -- you
13   asked me before what replacement ratios are and
14   whether we used them, and yet according to this
15   we did.
16      I don't know whether I'm questioning
17   the cash balance or whether I'm questioning
18   September 1st.
19   Q   Well, you didn't circle
20   September 1st.
21   A   I know I didn't, but changing of the
22   plan provision in the middle of the year just
23   complicates everybody's life.
24   Q   You see at the top it says,
25   "Restructuring has reduced the $12.3 million

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 229

(16:15:28-16:16:54)

1    GREFIG
2  normal cost by 20 percent"?
3  A  I don't know what restructuring
4  means.  I don't know whether that means changed
5  to cash balance.
6  Q  Well, cash balance you know just from
7  looking at this, and everything you do know is
8  that there was no change yet.
9      So this is -- restructuring is a
10  reference to something that has occurred, has
11  reduced --
12  A  Has reduced.  Right.
13  Q  Does this refresh your recollection
14  that your restructuring in this context means
15  terminating a lot of employees?
16  A  Oh.  Restructuring the company.
17  Q  Yes.
18  A  Could very well be.
19  Q  Does it refresh your recollection
20  that you were aware of the fact that the company
21  was terminating?
22  A  They were restructuring?
23  Q  And terminating a lot of employees.
24  A  No.
25  Q  So if you turn the next page, what's

Page 230

(16:17:02-16:18:42)

1    GREFIG
2  the word that you have handwritten in there?
3  A  To the extreme right?  At the top of
4  the column?
5  Q  I'm sorry.  Maybe I'm looking at a
6  different -- what's the next Bates number that
7  you have on your document?
8  A  You mean down at the bottom?
9  Q  Yes.  What's the next number?
10  A  3845, goes to 3848.
11  Q  Okay.  On 3848, what does target
12  replacement ratios mean?  That's your
13  handwriting, right?
14  A  Yes.
15  Q  What does target replacement ratio
16  mean?
17  A  Okay.  Because of Social Security,
18  the proportion of pay that's replaced by Social
19  Security benefits varies by pay level.
20      So there was a formulation of
21  replacement ratios by pay level, which I
22  believe -- I believe is shown in the first
23  column.
24      So that the higher -- more
25  highly-paid employee needs less of their

Page 231

(16:18:48-16:19:58)

1    GREFIG
2  pre-retirement pay replaced by other sources of
3  income.
4      And then Social Security amount is
5  shown in the second replacement rate column.
6  That subtracted from the first column gives you
7  what's needed from the employer plan.
8  Q  So back to the question of target.
9  So what does that mean?
10  A  Well, the target is -- the target
11  maybe is -- is -- it covers all the columns.
12  Maybe target shouldn't recover all -- cover all
13  the columns.
14      The first column is the target
15  replacement ratio.  Total age 65 replacement
16  ratio.
17      That's the target that you want to
18  achieve through a combination of Social
19  Security, personal savings and
20  employer-sponsored benefits, plans.
21  Q  And what role did the target
22  replacement ratio play in the design of the cash
23  balance plan?
24  A  I don't know.  I think this was more
25  than likely a reference point.  You know,

Page 232

(16:20:02-16:34:30)

1    GREFIG
2  somewhere along the line a question was where do
3  we stand relative to these ideal replacement
4  ratios.
5      MR. GOTTESDIENER: We want to
6  take a bathroom break.  Not a
7  problem.
8      THE VIDEOGRAPHER: This
9  concludes Tape Number 4.  The time is
10  4:17 p.m.  We're off the record.
11      (Recess taken)
12      THE VIDEOGRAPHER: This begins
13  Tape Number 5.  The time is 4:31 p.m.
14  We're back on the record.
15  CONTINUED DIRECT EXAMINATION BY MR.
16  GOTTESDIENER:
17  Q  Exhibit 92.  Can you tell me what
18  that is?
19      (Exhibit 92, handwritten notes,
20  was marked for identification, as of
21  this date.)
22      MR. GOTTESDIENER: Can I share
23  this one?  I don't have another copy.
24      MS. WALWORTH: Yes.
25  Q  Just without having to read

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 233

(16:34:32-16:36:00)

1  GREFIG
2  everything in this, can you say that these are
3  your handwritten notes?
4  A  Yes.  Yes.
5  Q  Okay.  Great.  So they appear to be
6  dated 4/21/95, and consist of four handwritten
7  pages, and then attached are provisions of --
8  I'm sorry.  Are portions of valuation for the
9  plan?
10 A  Yes.
11 Q  And at the back end there's some
12 information about the 401(k) plan with some of
13 your handwriting on the final three pages of the
14 exhibit?
15 A  Yes.
16 Q  So this is -- if you look at the
17 second page, you have a cash balance example?
18 A  Okay.
19 Q  Can you walk us through what you're
20 doing there?
21 A  We have a $3,000 accrued benefit.
22 Q  That's under the old plan formula,
23 correct?
24 A  Presumably.  Right.  Because it's an
25 annuity benefit, because to the right of taking

Page 234

(16:36:04-16:37:18)

1  GREFIG
2  the 3,000 times the nine percent annuity to get
3  a present value of 6,510.
4  Q  You're in the second page.  That's
5  2485, right?
6  A  Yes.
7  Q  And when you said present value of
8  accrued is $3,000, and then are you -- were you
9  referring to multiplying it by 2.1698?
10 A  Yes.
11 Q  And there's an arrow pointing to that
12 from nine percent annuity?
13 A  That's nine percent annuity.
14 Q  And the age of the participant is age
15 55, right?
16 A  Yes.
17 Q  And what you're doing here is -- what
18 calculation are you performing?
19 A  Well, we're taking two and half
20 percent of pay to get a pay credit of $500.
21 Q  Could you just -- you're moving too
22 fast for me.  I'm not an actuary.
23     Could you just -- what are you doing
24 on that line present value of accrued?  I want
25 to understand.  3,000 -- you're multiplying it

Page 235

(16:37:20-16:38:32)

1  GREFIG
2  by something.
3  A  I multiplied that 2.1698 is a nine
4  percent annuity deferred to age 65, I guess.
5  Q  Well, I'm still looking for really a
6  dumb-down explanation.
7     You have above accrued benefit is
8  $3,000.  Then you are trying to determine on the
9  participant's 55th birthday what is the present
10 value of that age 55 benefit?
11 A  Yes.
12 Q  What I'm trying to get here is you're
13 taking the annuity of 3,000 and you're
14 multiplying it by some factor?
15 A  Yes.
16 Q  What -- where did you look to get
17 that factor?
18 A  Probably the valuation assumptions,
19 exclusive of termination rates.  In other words
20 it's simply any interest discount and a discount
21 for mortality.
22 Q  What do you mean, a discount for
23 mortality?
24 A  Well, you've discounted for the
25 probability that the employee will survive to

Page 236

(16:38:36-16:39:50)

1  GREFIG
2  retirement age.
3  Q  And that was something that you were
4  doing to determine what?
5  A  Starting account balance.
6  Q  And when it says nine percent
7  annuity, you mean you're taking the annuity and
8  you're reducing it to a present value, using a
9  nine percent interest rate and mortality?
10 A  Correct.
11 Q  And you're arriving at an opening
12 cash balance of $6,509?
13 A  Correct.
14 Q  Okay.  Then what is immediately below
15 the 6,500?  Let's just round it.  $6,500 figure.
16 What is that in hand?
17 A  That .6?
18 Q  Yes.  On --
19 A  .6.
20 Q  .6.  And there's also -- to the left
21 of it there's a sign, isn't there?
22 A  Divide by.
23 Q  Okay.  And you're taking .6 and
24 you're doing what with it?
25 A  I'm dividing it into 6,509.

Page 237

(16:39:56-16:41:46)

1  GREFIG
2  Q  And you're arriving at what?
3  A  10,849.
4  Q  And what is that?
5  A  Based upon what else I'm reading on
6  this page, that would be the starting account
7  balance for this theoretical employee.
8  Q  But what is -- what step is being
9  performed with the .6?
10  A  At the bottom it says, "To provide a
11  boost for those 50 and older with 15 years of
12  service, the initial balance is divided by
13  one" -- I'll read it and then explain it.  "One
14  minus four percent times the number of years
15  between age 65 and current age, where age is not
16  less than 55."
17  So in this instance the employee is
18  age 55.  That's ten years until age 65 times
19  four percent is 40 percent.  One minus
20  40 percent gives me 60 percent or .6.
21  Q  Okay.  Where does all this come from
22  to provide a boost?
23  A  I don't know where it came from, but
24  the four percent -- what was the plan's early
25  retirement reduction factors?  Was four percent?

Page 238

(16:41:48-16:43:04)

1  GREFIG
2  Q  Four percent.
3  A  That's probably where the four
4  percent came from.
5  Q  If you were 55 and had 15 years of
6  service, it was six percent if you didn't have
7  15 years.  Is that a --
8  A  Here we have 15 years -- yes.  Based
9  upon what we were discussing before.  Right.
10  Q  So does that refresh your
11  recollection that this boost was in some way
12  based on the prior plan early retirement
13  subsidy?
14  MR. RUMELD: I object to the
15  form.
16  A  It may have been.
17  Q  Okay.  Well, what else -- what else
18  are we seeing here, that this participant is
19  moving forward in time and has stayed with
20  Woolworth through the conversion and it's
21  earning -- withdrawn.
22  Is -- does -- pay credits being added
23  to the participant's account balance?
24  A  Right.  Down -- down -- down at the
25  bottom where there's that horizontal line,

Page 239

(16:43:08-16:45:46)

1  GREFIG
2  starting off at 10,849, which is the account
3  balance determined above, that balance was
4  brought forward at five percent interest and a
5  $500 pay credit was added to that balance to
6  give 11,891 at the end of the year.
7  And that was brought forward at five
8  percent and another pay credit added, just
9  starting the bootstrapping process of bringing
10  that account balance forward.
11  Q  If you turn to the next page.
12  A  The top of the page on the left
13  headed by cash balance appears to be a run-out
14  through 1/1/2000 of the calculations that were
15  started on the preceding page.
16  Notice 10,849 grows to 11,891 a year,
17  later to 12,986 a year later.  So that's -- that
18  cash balance is being incremented by both
19  interest and by additional pay credits.
20  Q  Okay.  But is the participant's
21  benefit actually growing?
22  MR. RUMELD: I object to the
23  form.
24  A  Bringing it forward at five percent.
25  It -- I don't know?  I'd need a table of annuity

Page 240

(16:45:50-16:47:20)

1  GREFIG
2  factors to convert these cash balance amounts
3  that are shown on the second page, you know, the
4  10,000, 11,000, 16,000.
5  Q  But if you look at the bottom here,
6  where it says the minimum annuity --
7  A  $1,800.
8  Q  Yes.  That went out over the cash
9  balance annuity, doesn't it?
10  A  Why do you say that?
11  Q  Because the cash balance annuity is
12  only $1,500.
13  A  That's at 55.
14  Q  Yes.
15  A  Well, okay.  So the -- doesn't look
16  right.  16 -- I think that is a misstatement
17  there.  I think that's a mistake.
18  Q  The only mistake is that the
19  participant's age is 55 at the time the assumed
20  benefit commences.
21  On the top of the second page he's 50
22  at the start of the addition of the pay credits.
23  Right?
24  A  Okay.
25  Q  Now, with that correction, what we

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 241

(16:47:24-16:48:50)

1    GREFIG
2    see here is what we were talking about earlier,
3    that the effect of the use of the nine percent
4    to start the participant off, notwithstanding
5    the boost that this participant received, still
6    didn't help him.  So --
7    A  With the minimum annuity.
8    Q  You agree with me?
9    A  That's what it appears to say.
10    MR. RUMELD: I object to form.
11    Q  You agree that you had to have known
12    and communicated to Foot Locker that this would
13    be the effect on their employees if they went
14    ahead with the design that was one of the
15    options on the table?
16    MR. RUMELD: I object to the
17    form.
18    A  That appears to be the case, yes.
19    Q  So the net effect for that employee
20    was that he worked for five years and earned
21    zero new pension benefits?
22    A  He earned no new annuity benefits.
23    That's correct.
24    Q  Now, you're about to point to --
25    A  The cash balance he now has available

Page 242

(16:48:52-16:50:20)

1    GREFIG
2    to him.  So he had no cash balance available to
3    him before, and an annuity of $1,800 per year,
4    and now he's got an annuity of $1,800 per year
5    and $16,600 in the bank.
6    Q  If I'm understanding what you're
7    saying is that this participant is able to
8    access in a lump sum form his pension benefit?
9    A  Right.  He has access to $16,600 in
10    his account balance --
11    Q  And --
12    A  -- which he did not have before the
13    change.
14    Q  But you're aware that there's no need
15    to convert a defined benefit plan to a cash
16    balance defined benefit plan to give people a
17    lump sum option?
18    A  That's correct.
19    Q  And did Foot Locker consider just
20    offering people a lump sum option without
21    converting the plan to a cash balance plan?
22    A  I don't know.  I don't remember.  And
23    it doesn't seem to show up in any of the summary
24    material that we looked at earlier today, so I
25    don't know whether the straight-out lump sum was

Page 243

(16:50:26-16:51:40)

1    GREFIG
2    considered as an option under --
3    Q  But it would have been one that you
4    made available to Foot Locker?
5    MR. RUMELD: Objection to form.
6    A  Something that could have been
7    considered, yes.
8    Q  Given a choice between a lump sum of
9    16,609 and $1,800 a year for the rest of your
10    life from age 55, which is better?
11    MR. RUMELD: I object to the
12    form.
13    A  I -- I can't -- can't make that kind
14    of evaluation.  Depends upon the employer.
15    Depends upon prior practices in order to --
16    Q  Well, if a friend asked you for
17    advice.
18    A  Well, then I would ask him about a
19    number of other contingencies involved here.
20    Has the employer ever provided COLAs under the
21    plan.
22    So there may be advantages to leaving
23    my lump sum in there and taking it in the form
24    of an annuity, as one example.
25    And that not having been involved in

Page 244

(16:51:42-16:52:34)

1    GREFIG
2    this for 13 years, I'm sure that there are other
3    pros and -- that go along with having the
4    annuity.
5    Q  But let's say -- don't assume that --
6    that the friend could count on a COLA.  What's
7    the answer?
8    MR. RUMELD: I object to the
9    form.
10    A  I'd take the annuity.
11    Q  Why?
12    A  Well, you got -- as I said, there are
13    probably a number of other advantages to leaving
14    your money in the plan, even if the employer
15    hasn't provided a COLA to date.  You've got a
16    PBGC guarantee of your accrued benefit.
17    Q  Isn't the annuity worth more?
18    A  Is the annuity worth more?
19    Q  Yes.
20    A  Than what?
21    Q  Then taking a lump sum.
22    A  No.  It's about the same actually.
23    Annuity at 65 --
24    Q  At 55.
25    A  Oh.  At 55.

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

---

Page 245

(16:52:36-16:53:36)

1    GREFIG
2  Q   Talking about the early retirement
3  subsidy.
4  A   So he's going to take an $1,800
5  annuity?  Rule of thumb, maybe it's worth
6  $18,000.
7  Q   So you agree that the early
8  retirement subsidized annuity is more valuable
9  than lump sum?
10       MR. RUMELD: I object to form.
11 A   Somewhere in there, in the same
12 ballpark, but --
13 Q   But more valuable to the participant?
14       MR. RUMELD: I object to the
15       form.
16 A   Under these circumstances, maybe.
17 But again, that -- that needs to be valued
18 adequately with, you know, economic assumptions
19 and annuity conversions and so forth.
20       But on a ballpark basis, they're --
21 they have equivalent value at this point in
22 time.
23 Q   Now you're changing your answer, or
24 are you sticking with your answer that --
25 A   I'm sticking with my answer, that,

---

Page 246

(16:53:38-16:54:50)

1    GREFIG
2  you know --
3  Q   Take the annuity.
4       MR. RUMELD: I object to the
5       form.
6  A   This needs to be finalized, but as it
7  stands now, with the guesstimate as to the
8  annuity value at 55 versus 16,600, the value of
9  the annuity is about the same as the value of
10 the cash balance.
11 Q   Well, you see here that there's -- in
12 your notes that there's a -- you mention
13 yourself, the GATT.  You're writing down GATT
14 mortality and interest, and it's assumed to be
15 eight percent?  Page 3?
16 A   Yes.  I see that.
17 Q   So why are you assuming it to be
18 eight percent?
19 A   Because probably what it was at some
20 point in time during the study.
21 Q   And you agree that during the study
22 you would have been monitoring as the study
23 progressed the movement of the GATT rate?
24 A   Oh.  Had to.  Yes.
25 Q   You'd have to.  And you agree that

---

Page 247

(16:54:56-16:55:54)

1    GREFIG
2  the GATT rate during 1995 fell steadily, to the
3  point where the conversion when it occurred
4  using the December rate used a rate of
5  6.06 percent?
6  A   That was the GATT rate.
7  Q   And my question is, at the time you
8  and the people you were working with communally
9  on the conversion project were aware that the
10 GATT rate was steadily falling?
11       MR. RUMELD: I object to the
12       form.
13 A   I -- I don't know.  I don't.
14 Q   Well, you do agree you're not taking
15 back your answer about a moment ago, where you
16 said that you would have necessarily been
17 watching the movement of the GATT rate?
18       MR. RUMELD: I object to the
19       form.
20 A   Yes.
21 Q   You're saying you don't remember?
22 A   As a byproduct, but it was not -- it
23 was not -- I don't recall discussions about
24 interest rate trends in terms of what was
25 happening during that year.

---

Page 248

(16:55:56-16:57:00)

1    GREFIG
2  Q   But you think that the eight percent
3  here is reflecting the prevailing GATT rate?
4  A   Of the realities at that point in
5  time, it's probably where the eight percent came
6  from.
7  Q   And you agree that mathematically
8  that as that rate fell, the wear-away affect
9  would get larger and larger if you were to use a
10 nine percent interest rate, and you were looking
11 at a participant taking a lump sum sometime
12 after the conversion?
13 A   If the lump sum would continue to
14 grow in value, yes.
15 Q   I don't understand your answer.
16 A   The $1,800 is worth more at six
17 percent than it is at eight percent.  So as the
18 GATT rate fell and we were forced to use the
19 GATT rate for lump sum calculations, the
20 employee's lump sum benefit increases.
21 Q   Okay.  The $1,800 is the early
22 retirement subsidized annuity?
23 A   Annuity.  Right.
24 Q   That's not what the participant was
25 receiving the present value of.

---

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 249

(16:57:04-16:58:18)

1    GREFIG
2  A   That's what he would get the present
3  value of if a lump sum was paid from the plan
4  under GATT rates.  It would be --
5  Q   It would be using his $3,000, not
6  his -- not the $1,800.
7  A   If they paid it out at the age 65
8  accrued benefits you're correct.  It would be
9  the $3,000 paid out at 65, but at six percent
10  that has a greater value than it does at eight
11  percent.
12  Q   And the lump sum is -- showed in the
13  middle of the third page towards -- three
14  quarters of the way down, you're showing the use
15  of the GATT rate to present value the deferred
16  annuity.
17  A   Right.
18  Q   So it's not of the 18.  It's of the
19  3,000.
20  A   It would be of the 3,000.  Right.
21  Q   And what I'm asking about is --
22  A   In other words, what you're saying,
23  before the lump sum -- electing a lump sum under
24  a defined benefit plan, any defined benefit
25  plan, the employer is not obligated to include

Page 250

(16:58:20-16:59:22)

1    GREFIG
2  early retirement subsidies in the lump sum, the
3  lump sum out at age 65 accrued benefit.  Right.
4  Q   So you'd see here -- if you go back
5  to the prior page, you see how the 3,000 is
6  being reduced to a present value using a nine
7  percent and mortality and you end up with
8  $6,500?
9  A   Yes.
10  Q   And then on the following page,
11  you're taking the $3,000 and you're paying it
12  out?
13  A   Lump-summing it.
14  Q   You're lump-summing it, but using the
15  legally-required rate which is capped at eight
16  percent?
17  A   Yes.
18  Q   And that that $11,000 is a whole lot
19  more than the $6,500 without that boost?
20      MR. RUMELD: I object to the
21      form.
22  A   Right.  His entitlement.  Correct.
23  His entitlement.
24  Q   But you're starting people off --
25  even the person who got the boost is getting

Page 251

(16:59:26-17:00:32)

1    GREFIG
2  less on the day of the conversion, right?  His
3  cash balance account is less than --
4  A   No.  His entitlement is not less.
5  That's the starting balance -- starting balance
6  under the cash balance plan.
7  Q   That's exactly what I'm asking about.
8  A   His entitlement is almost $12,000,
9  and that doesn't change.
10  Q   But my point, sir, is that he's not
11  earning anything new.
12  A   Oh.  With the additional pay credits
13  you mean.
14  Q   It's -- these additions -- if this
15  person -- let's take the same example, but not
16  add the boost on the second page, where you
17  boosted him up to $10,000.
18  A   Yes.
19  Q   Say my client, Jeffrey Osberg, who
20  didn't get the enhancement, if his opening
21  balance is $6,500, but if he left the next day
22  he would have to be paid 11,000.
23  A   Correct.
24  Q   That phenomenon is what communally
25  was referred to as a wear-away.

Page 252

(17:00:34-17:01:08)

1  A   Oh.
2      MR. RUMELD: I object to the
3      form.
4  Q   Right?
5  A   Okay.
6  Q   You agree?
7      MR. RUMELD: I object to the
8      form.
9  Q   You agree that during the time that
10  conversion was being planned and discussed, that
11  you communicated this phenomenon to Foot Locker
12  very clearly, right?
13      MR. RUMELD: I object to the
14      form.
15  A   Yes.
16  Q   And it was discussed as -- one of the
17  ways it was discussed was it was called
18  wear-away?
19      MR. RUMELD: I object to the
20      form.
21  A   Okay.
22  Q   You agree?
23  A   I understand what you're saying to
24  me.

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

---

Page 253

(17:01:08-17:01:52)

GREFIG

1   GREFIG
2   Q   But I'm not hearing an answer.
3   A   Now I understand what you mean by
4   wear-away.  And it's likely that the term may
5   have been used, yes.
6   Q   And it refreshes your recollection,
7   now that we've been through this a bit, that
8   this was something that was clearly by you
9   communicated to the people at Foot Locker --
10      MR. RUMELD: Objection to the
11      form.
12  Q   -- so they could make their own
13  decision, if that's the way they wanted the plan
14  designed?
15      MR. RUMELD: I object to the
16      form.
17  A   Yes.
18  Q   You were just doing your job?
19      MR. RUMELD: I object to the
20      form.
21  A   Yes.  Yes.  It's one of the ways that
22  the --
23  Q   One of the ways it could have been
24  designed, but remember at the very beginning you
25  gave Mr. Kiley options of using a much lower

---

Page 254

(17:01:58-17:02:38)

GREFIG

1   GREFIG
2   interest rate to create a larger opening
3   balance.  Remember that?
4   A   No, but likely --
5   Q   You don't remember that we talked
6   about it at the beginning of the deposition?
7   A   Likely -- well, we talked about where
8   the nine percent came from.
9   Q   Well, we talked about that, but I
10  also showed you a document that you sent him
11  where you created that draft commentary on --
12  A   Okay.
13  Q   Do you remember that now?
14      MR. RUMELD: I object to the
15      form.
16  A   It's a long time ago.  Not 17 years.
17  Q   No, no.  I'm talking about earlier in
18  today's deposition.  But how is your health?
19  A   I appreciate that.
20  Q   How is your health, sir?
21  A   How is my health?
22  Q   Yes.  Because I understand that you
23  may not be the best of health.
24  A   I'm -- I have prostate cancer that
25  has metastasized in the body.  They don't know

---

Page 255

(17:02:40-17:03:56)

GREFIG

1   GREFIG
2   where it is, because no tumors have formed yet,
3   but they have me on medication that lowers my
4   testosterone level, which makes me somewhat of a
5   dishrag at times.
6       They continue to monitor my PSA
7   levels, and every time it varies they give me
8   another shot to knock down the testosterone, but
9   they say eventually that -- that treatment, the
10  cancer tissue learns how to grow, even in a
11  testosterone-free environment, and we got to
12  kick it up to chemo or some other approach.
13      My father had -- it's -- they put him
14  in a nursing home last week.  He's got -- he had
15  prostate cancer surgery 30 years ago, and they
16  just discovered conglomeration of prostate and
17  bladder cancer cells in his hip, so he's going
18  under radiation therapy.  Must be in the genes.
19  Q   Sorry to hear that.
20  A   Then they sent me for radiation
21  treatment and screwed up my guts.  So don't ever
22  miss a physical, an annual physical.
23  Q   93.
24      (Exhibit 93, fax, was marked
25      for identification, as of this date.)

---

Page 256

(17:03:56-17:05:42)

GREFIG

1   GREFIG
2   Q   Let me ask you if this is a fax that
3   you and Mr. Cassidy received from Tom Kiley with
4   another version of the document entitled
5   Woolworth retirement program review.
6   A   This first page, second -- seems to
7   be under objectives.  It was another bullet
8   point put in here that I don't remember from the
9   prior documents, sharing of responsibility for
10  retirement savings with associates.
11  Q   So that's been added in?
12  A   It -- I believe so, based on -- I
13  don't -- I don't recall from a few hours ago.  I
14  haven't seen that in the first objectives.
15  Q   So that's a kind of a euphemistic way
16  of making employees fund their own retirements?
17      MR. RUMELD: Objection to the
18      form.
19  A   Contribute toward it.  I wouldn't say
20  fund their own, but certainly contribute toward
21  it.
22  Q   Well, you agree that -- now that
23  you've seen these documents and we've spoken for
24  these hours, that you knew at the time that
25  Woolworth was attempting to lower its costs --

---

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 257

(17:05:46-17:06:42)

1    GREFIG
2    MR. RUMELD: Objection to the
3    form.
4  Q  -- for the retirement plan?
5  A  Based upon comments that I see in
6    here, yes.  That was a stated objective.
7  Q  And -- so now you're remembering that
8    as well?
9  A  No.  I'm acknowledging that there's
10   documents here that stated as one of their
11   objectives.
12      I do not recall -- have no memory of
13   ever having conducted a conversation with
14   anybody at Woolworth about cost reduction one
15   way or other being an element of this analysis.
16      Undoubtedly, based upon the documents
17   that you're showing me, it was.  But does it
18   come out -- forward in my mind as part of the
19   conversation?  No.  Because I don't recall
20   conversation.
21  Q  I'm not asking about specific
22   conversation.
23      I'm asking about did you know as a
24   general matter, the residue of all of the
25   contacts you have, are you not now remembering

Page 258

(17:06:46-17:07:52)

1    GREFIG
2    that this was an objective on the conversion?
3  A  No.
4  Q  But you're just -- but -- withdrawn.
5    You're not doubting that it was?
6  A  Oh, no, no.
7  Q  Now, is this your handwriting on that
8    page with the objectives?
9  A  Yes.
10  Q  And you're writing, "Younger, more
11   mobile"?
12  A  Yes.
13  Q  Then you're drawing an arrow, and you
14   say, "Therefore more terminated vesteds and
15   inactive"?
16  A  In, I-N, inactives.  More terminated
17   vested employees.  In other words --
18  Q  "Therefore more TVs," and then is
19   that -- is that I-N or E-E?
20  A  No.  I-N.
21  Q  Okay.  "More TVs in inactives"?
22  A  Right.
23  Q  I understand.  And then on these
24   other pages, are these your handwritten notes,
25   drawings, insertions of numbers and percentages?

Page 259

(17:07:56-17:09:10)

1    GREFIG
2  A  2792.  Yes.  That's my handwriting.
3    2791 might very well be my handwriting.  93,
4    yes.  That's my handwriting.
5  Q  And what you're writing in, there's a
6    recommendation about implementing the 401(k)
7    plan.
8      What you're writing is "Strengthening
9    our retirement program."  Your contribution
10   there is "versus competition"?
11  A  Competition.  Yes.
12  Q  Now, does that help bring about that
13   you were involved in promoting the company's
14   objective of positioning itself vis-a-vis
15   competitors?
16  A  No.  I wasn't promoting the company's
17   objectives.  The company got to make its own
18   decision.
19      What's happening here is -- as you
20   look at it is that I was sent a document to
21   review, and as I'm going through it, it becomes
22   apparent that as a result of conversations that
23   I had with the client, that what they were doing
24   relative to the competition was important to
25   them.

Page 260

(17:09:10-17:11:14)

1    GREFIG
2    So when I see a statement that says
3    strengthens our retirement program, it -- it is
4    just hanging out there.
5      What do you mean it strengthens the
6    retirement program?  Well, it strengthens it
7    relative to the competition.
8      So I'm basically just regurgitating
9    some of the objectives that the client had
10   identified.
11  Q  Okay.  And the next page is -- also
12   has your handwritten notes?
13  A  They appear to be my handwriting,
14   yes.
15  Q  And then in the other pages if you
16   could just flip through.  You see other
17   handwriting?
18  A  Yes.  2797, that's my handwriting,
19   but I don't know what it means.  And that --
20   that's 6 -- it looks like 6.5, but I don't know
21   if that's -- I don't know if the 6.5 is another
22   plan cost.
23      Here it is.  Two pages earlier, 2795,
24   Page 2795, estimated plan cost of 6.5.  So
25   that's where the 6.5 came from.  Yes.  That's

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 261

(17:11:34-17:13:18)

1    GREFIG
2  where the 6.5 came from.
3  Q   If you turn to career average pay
4  plan -- sorry.  Career average plan highlights?
5  A   This is further back in the document?
6  Q   It would be 28.
7  A   28.  I got -- I have 03 -- 01 as a
8  plan highlights.
9  Q   You see how it has your handwriting?
10  You're asking post GATT?
11  A   Right.
12  Q   So GATT you're aware at the time is
13  not just about international trade?
14  A   Well, yeah.  We learned that from one
15  of your documents.
16  Q   Okay.  94.
17      (Exhibit 94, notes, was marked
18      for identification, as of this date.)
19  Q   These are also your handwritten
20  notes, sir; isn't that correct?
21  A   No.  This is a mixture.
22  Q   Okay.  The top is you have written in
23  the darker color "Woolworth cash balance"?
24  A   That appears to be my writing, and
25  And "Please call" appears to be me, but the

Page 262

(17:13:20-17:15:04)

1    GREFIG
2  other -- other notations are not.
3  Q   Okay.  And --
4  A   This appears to be an estimate of
5  proportion of terminations and retirees who
6  elect lump sums.
7  Q   And in what years?
8  A   1994, 1995.  The 19 -- I don't know
9  where this comes from.  We didn't have lump sum
10  options in the plan in '94 or '95.
11  Q   So that was term vesteds -- I'm
12  sorry.  That was de minimis lump sums, right?
13  A   No.  De minimis lump sum is
14  mandatory, isn't it?  This says elect lump sums.
15  So there must have been some provision where the
16  participant could choose to take it.  This may
17  come from another plan.  I don't know.
18  Q   In any event, the -- that handwriting
19  in the middle is not yours?
20  A   None of this is mine.  This
21  (indicating) is and this (indicating) is.
22  Q   Okay.  Now, what -- showing you 95.
23      (Exhibit 95, document dated
24      7/95, was marked for identification,
25      as of this date.)

Page 263

(17:15:04-17:17:06)

1    GREFIG
2  Q   A July 1995 document sent to you by
3  Tom Kiley.
4      What you see going on here is that
5  there's a continuously evolving presentation
6  that appears to be being readied for
7  decision-makers; is that fair?
8  A   That's what it appears to be, yes.
9  Q   And what you're seeing is consistent
10  with whatever faint recollection you have of
11  events, that there was a fair bit of back and
12  forth between you and Tom Kiley in this regard?
13  A   Yes.
14  Q   And on Page 2749, I would ask you if
15  you recognize your handwriting there.
16  A   Yes.  That's my handwriting.
17  Q   And what does it say at the very top
18  before -- before the word annual?
19  A   It says "Design we are proposing."
20  Q   Okay.  And --
21  A   Which didn't mean -- did not mean
22  Mercer.  I'm speaking in Tom Kiley's voice here,
23  reviewing one of his documents.
24  Q   You're assisting him in making his
25  recommendation?

Page 264

(17:17:06-17:18:42)

1    GREFIG
2  A   Yes.
3  Q   Exhibit 96.
4      (Exhibit 96, notes, was marked
5      for identification, as of this date.)
6  Q   These notes came from Mercer's files.
7  You can see from the Bates stamp at the right
8  corner, but do you recognize that handwriting?
9  A   That's my handwriting.
10  Q   Okay.  So tell me if I'm interpreting
11  correctly.
12      You have 8/95 draft at the right, and
13  I'm going to read into the record and you tell
14  me where I'm wrong.  "Preface.  Remove a DB
15  plan.  It is a DB plan."
16  A   Right.
17  Q   "3, always get interest.  Why 501 has
18  wording"?
19  A   That looks likes H-R-S.  It looks
20  like short for hours.  501 hours.
21  Q   Okay.  Why -- I see.  Okay.  "Why
22  500 hours -- 501 hours wording."
23  A   The numbers on the left are in
24  reference to this document that we just looked
25  at?

Page 265

(17:18:44-17:20:00)

1    GREFIG
2  Q   You're asking me, and I wish I could
3  tell you.  The date on this just says 8/95.
4  So --
5  A   It's after the date on this.  But
6  that's -- it's a long time between them.
7  Q   There is at least from what we
8  received --
9  A   Yes.  It's not -- I'm not referencing
10  the same document.
11  Q   You're referencing a different
12  version?
13  A   It appears to be a different one
14  because there's no -- no cross-reference here.
15  Okay.
16  Q   Well, just -- while you brought that
17  up, let me ask you if 97 -- I think I only have
18  one copy of this.
19      (Exhibit 97, document, was
20      marked for identification, as of this
21      date.)
22  Q   97 is yet another version, but with
23  handwriting that's not yours, but that perhaps
24  you might recognize.
25  A   I don't recognize the handwriting on

Page 266

(17:20:38-17:21:54)

1    GREFIG
2  this.
3  Q   Let's go back to the prior exhibit,
4  the handwritten notes.
5  A   Right.  96?
6  Q   Yes.  So under the "Always gets
7  interest," there's you putting down 4, and it
8  says "Will need to calculate an accrued benefit
9  at times other than term or retirement, e.g.
10  responding to a participant's request."
11  A   Correct.
12  Q   "Review" --
13  A   "Application of comp limit."
14  Q   And that's the 415 limit?
15  A   No.
16  Q   That's --
17  A   415 is a benefit limit.  There's
18  another --
19  Q   That's the 401(a)17 limit, not the
20  415 limit?
21  A   Correct.
22  Q   Then at the right you have
23  "Conversion to account balance divided by."  Is
24  that early retirement factor, ERF?
25  A   Yes.  Remember before we had one

Page 267

(17:22:02-17:23:14)

1    GREFIG
2  minus four percent times years?  The four
3  percent times year would have been the
4  reduction.
5      So one minus that amount gives you
6  early retirement factor, so that's what that is.
7  Conversion to account balance.  Divide by the
8  ERF, early retirement factor.
9  Q   Then you have "Interest credit on 1/1
10  balance.  Two, no date of distribution.  TVs who
11  leave balance in plan."  Right now I'm just
12  asking to translate your handwriting.
13  A   Oh.
14  Q   Did I read that --
15  A   Yes.  You read that correctly.  Yes.
16  Q   Then it says "QDRO actuarial value
17  review requirements"?
18  A   Yes.  That's what it says.
19  Q   Then it has "QPRSA plus accrual
20  benefit discussed with Carol"?
21  A   Yes.  That's what that says.
22  Q   And you would take that as reference
23  of a discussion you had with Carol Kanowicz?
24  A   Yes.  Over the qualified
25  pre-retirement survivor annuity.  Isn't this --

Page 268

(17:23:16-17:24:20)

1    GREFIG
2  you know, this appears to me to be a review of a
3  plan document.
4  Q   And does that --
5  A   But that's -- August of '95?
6  Q   Does that become confirmed in your
7  mind when you see that it says 8/95 draft?
8  A   I'm guessing that is a plan document.
9  Q   Okay.
10  A   I mean, we're looking at all of these
11  things put together.  I'm just saying that given
12  the nature of my comments here, they appear to
13  be more along the lines of comments that I would
14  make about a plan document than it would about a
15  presentation.
16  Q   Understood.  So then if you look
17  down, does it then say next to 32, "Do we want
18  to continue this?  Doesn't seem to allow for
19  offset of accrued.  See Page 55, 5.06."
20  A   Got to be a plan document, because
21  the presentations aren't numbered that way.
22  Q   Sir, my narrow question is did I read
23  that --
24  A   Yes, you read it correctly.
25  Q   Thank you.  So then it says Page 24,

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 269

(17:24:24-17:25:30)

GREFIG

1    GREFIG
2    "Uses comp over 200,000 for pre '89 years."
3 A  That's what it says.  Yes.
4 Q  And then the next page it says, "Can
5  we pay the spouse the lump sum of the cash
6  balance or the 50 percent annuity at the
7  spouse's election."
8 A  Okay.  That's what it says.
9 Q  Then 39 has your initials next to it,
10  right?
11 A  Yes.
12 Q  And then it seems to say "Also TV
13  notes"?
14 A  Yes.
15 Q  So that would be terminated vesteds?
16 A  Vesteds, right.
17 Q  And what do you think the reference
18  to JJG there --
19 A  JJG.
20 Q  What do you think that means, that
21  you put that there?
22 A  I may have owed them something else.
23 Q  Okay.  And if you look at the very
24  bottom, you see where you have JJG again?
25 A  Yes.

Page 270

(17:25:30-17:26:32)

1    GREFIG
2 Q  And it says, "JJG shipped articles,"
3  and then it lists some numbers?
4 A  Yes.
5 Q  And that means that you -- in all
6  likelihood it means that you had made comments
7  and sent them off?
8 A  That's -- yes.  That's what it
9  appears to be.
10 Q  Then the rest of it seems to be
11  straightforward.
12     We've got "Q 50 percent J and S
13  qualified joint survivor annuity" underneath
14  the --
15 A  Yes.
16 Q  -- "417(e) rate."
17 A  That's a mathematical term.  The V
18  with the line through it means for all.
19 Q  For all terms?
20 A  Terms.
21 Q  And then it looks like "Regulatory
22  language.  Do we need now.  Yes.  Pre 1/1/96
23  accrued"?
24 A  Uh-huh.  Yes.
25 Q  But then there's an X through it?

Page 271

(17:26:36-17:27:50)

1    GREFIG
2 A  Probably means that we don't need it
3  now, so I crossed it out --
4 Q  Then --
5 A  -- or someone decided that.
6 Q  Then "Participant notifies," question
7  mark?
8 A  Yes.  That's what it says.
9 Q  Then "Do we need 507," question mark.
10  "Yes."  It looks -- does that look like
11  "disability benefit"?
12 A  Correct.  Yes.
13 Q  Then "ERFs JJG to review procedures"?
14 A  Yes.
15 Q  Then "ER benefit factors apply to
16  12/31/95 accrued, and convert CB for CB piece."
17  As in cash balance?
18 A  Cash balance.  CB.
19 Q  Did I -- does that look like you're
20  saying convert CB for CB piece?
21 A  Yes.  Correct.
22 Q  What does that mean?
23 A  I don't know.
24 Q  Okay.
25 A  I don't know.

Page 272

(17:27:58-17:29:32)

1    GREFIG
2 Q  Do you know what the formula is
3  you're working on at the last page concerns?
4  I'm not --
5 A  It looks like ".02 times (P minus S
6  minus 5)".
7 Q  I'm not asking you to read it.  I'm
8  just asking if looking at it you know what
9  you're doing there.
10 A  No.
11 Q  Could I have the exhibit back,
12  please?  Thank you.
13     (Exhibit 98, fax dated 8/14/95,
14     was marked for identification, as of
15     this date.)
16 Q  98 is an August 14, '95 e-mail -- I'm
17  sorry.  Fax from you.
18     Initially I guess it looks like it
19  was addressed to Rina Zimmerman?
20 A  Yes.
21 Q  And that's crossed out, and is that
22  your handwriting, "Tom Kiley"?
23 A  It may be.
24 Q  Okay.  Or somebody else who might
25  have assisted you sending this?

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 273

(17:29:32-17:30:28)

GREFIG
1
2  A   Yes.
3  Q   But you signed the fax cover sheet?
4  A   That's my name.  Right.
5  Q   And it's -- did you type out fax
6  cover sheets yourself?
7  A   If push came to shove, I was capable
8  of doing that, yes.
9  Q   Okay.  It's addressed to Rina.  It
10  says Rina.
11  A   Yes.
12  Q   Who's Rina I believe
13  A   Rina I believe was in-house counsel.
14  Q   And what interaction with her did you
15  have other than this fax as regards to the
16  conversion?
17  A   I don't remember her interaction.
18  Remember, I told you before about Bill Forcht
19  and how he was sitting here (indicating) and the
20  attorney was sitting there (indicating).
21  Q   I remember that very well.
22  A   That's the attorney I was
23  referencing.  She was in-house counsel.
24  Q   So she was present for --
25  A   During that conversation.  Yes.

Page 274

(17:30:30-17:31:26)

GREFIG
1
2  Q   So this was the female attorney?
3  A   Correct.  Yes.
4  Q   And how did she react to his
5  snapping?
6  A   Well, she was a subordinate counsel.
7  We all kind of chilled out and shook it off.
8  Q   Okay.
9  A   I mean, I followed up with his
10  comment.  I didn't ignore him.  But...
11  Q   You followed up with it?
12  A   Well, I responded to him.
13  Q   By telling --
14  A   Look, I'm sorry.  That's what you
15  have to do, but you did ask me the question.
16  Q   And did he calm down after that?
17  A   Yes.  He chilled out a little bit.
18  Q   A little bit?
19  A   Well, it -- it didn't carry on.
20  Let's put it that way.  We moved on to other
21  subjects and other conversation.  It wasn't like
22  it was --
23  Q   All right.  So you're saying here,
24  "Rina, the following two definitions are needed
25  for actuarial equivalent in the cash balance

Page 275

(17:31:30-17:33:06)

GREFIG
1
2  plan.  We need to talk about what optional form
3  of benefit will be provided."
4  And then you're providing here these
5  two definitions.  And you see how you're
6  providing for the conversion at nine percent and
7  applicable mortality?
8  A   Yes.
9  Q   And then you're giving a definition
10  for converting the account balance to an
11  annuity?
12  A   Right.
13  Q   And you end by saying, "I've also
14  sent this to Tom so we can discuss open issues."
15  Right?
16  A   Right.  Yes.
17  Q   So this further confirms your belief
18  that you were providing comments and input on
19  the drafting of the plan document?
20  A   It appears so, yes.
21  Q   And does reading this jog your memory
22  about anything at all?
23  A   No.  It's kind of procedural.
24  (Exhibit 99, handwritten notes
25  dated 8/15/95, was marked for

Page 276

(17:33:08-17:34:32)

GREFIG
1
2  identification, as of this date.)
3  Q   99 are your handwritten notes dated
4  August 15, '95, are they not?
5  A   Yes.  This is my handwriting.
6  Q   Okay.  Maybe we could just quickly go
7  through and you just confirm for me that I'm
8  reading correctly.
9  At the top, "Cash-outs.  Pre '85 use
10  age 1/1/85.  Pre '85 rate and test against
11  3,500."
12  A   Yes.  That's what it says.
13  Q   "All others use age at term," meaning
14  termination, "and appropriate interest rates age
15  to nearest month"?
16  A   Yes.
17  Q   Then it says, "204(h) after adoption
18  and 15 days before effective date."
19  A   Yes.
20  Q   "Cash balance."  There's a dollar
21  sign.  Then it has "1,000 -- 1,000/month"?
22  A   Correct.
23  Q   And "$81,000," and then June is
24  crossed out, and then it says May, and then it
25  looks like it's 5,000?  Is that "5,000," then

Ellen Grauer Court Reporting Co. LLC

Page 277

(17:34:44-17:35:46)

1    GREFIG
2    "greater than 1,000 hours"?
3    A  Less than.  Less than.
4    Q  "Less than 1,000 hours and no break
5    in service.  No."
6    A  Correct.  That's what it says.
7    Q  "Compensation credit based on
8    completed years of credited" -- CS is
9    credited --
10   A  Credited service.
11   Q  And -- I'm sorry.  "At 1/1 of year."
12   A  Yes.
13   Q  Then "Interest credits" -- looks like
14   "half a percent"?
15   A  Correct.
16   Q  And "June"?
17   A  No.  "Per month."
18   Q  "Per month.  Per month.  Simple
19   interest as at beginning of year"?
20   A  "On."
21   Q  "On beginning of year account
22   balance"?
23   A  Correct.
24   Q  Okay.  "Compensation credit accrues
25   throughout year but is credited to the account

Page 278

(17:35:48-17:37:14)

1    GREFIG
2    at 12/31"?
3    A  Correct.
4    Q  "TV."  That means terminated vesteds.
5    "Who defer give greater of annuity giving
6    interest at term or interest at retirement"?
7    A  Correct.
8    Q  What does that mean?
9    A  I don't know what this means within
10   the context of what's being done, but it
11   suggests that the interest rate at the date of
12   termination -- the greater of the interest rate
13   at date of termination or at retirement will be
14   used for whatever calculation is being addressed
15   here.
16   Q  And the next page says, "Tape fields.
17   We get valuation tape."  Is that right?
18   A  Yes.
19   Q  Then it says, "We keep 12/31/95
20   approved benefit.  Calculate 12/31/95 initial
21   cash balance"?
22   A  Correct.
23   Q  Then "Monthly at compensation credit
24   interest credit"?
25   A  Correct.

Page 279

(17:37:14-17:38:48)

1    GREFIG
2    Q  What are those -- I'm sorry.  What is
3    valuation tape that you're referencing?
4    A  We used to get a tape from Woolworth
5    that contained all of the participant records,
6    compensation, records for the year, date of
7    birth, date of employment, perhaps Social
8    Security number, other -- an employee number,
9    but that's what we referred to as the valuation
10   tape.
11   Q  And that was for the purposes of?
12   A  The valuation.
13   Q  At the bottom of the page it says,
14   "Illustration."  Then it appears to have
15   someone's name there?
16   A  Linda Ine.
17   Q  Who is that?
18   A  My recollection is that Linda Ine
19   worked at Camp Hill, Pennsylvania.  She may have
20   been the source to which Woolworth New York went
21   to get the valuation tapes cut.
22   Q  And what is Camp Hill, Pennsylvania
23   to Woolworth?
24   A  Camp Hill to me was like the cloud.
25   They -- they were involved in -- they didn't

Page 280

(17:38:52-17:39:54)

1    GREFIG
2    have -- that's where their computers were, I
3    guess is the way to express it.
4        They were an administrative center, I
5    believe.  That's not -- I wouldn't take that as
6    fact, but that was the impression I had from
7    working with Woolworth.
8    Q  Did you have any dealings with Linda
9    Ine?
10   A  No, not other than however she got
11   involved with what's going on here, or if there
12   was an issue about data tapes, and one of my
13   staff would probably be dealing with her.
14   Q  Do you remember speaking with her
15   ever?  Not necessarily the content, just --
16   A  Yes.  I mean, Linda Ine was not, you
17   know, someone in the wilderness.  I had phone
18   conversations with her.
19   Q  And what would the subject matter
20   have been?
21   A  I don't know specifically.  More than
22   likely it had to do with valuation tapes,
23   because that's the only time I have a
24   recollection that her name ever came up.
25   Q  Were you ever in a meeting with her?

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 281

(17:39:56-17:41:34)
1    GREFIG
2  A  I don't remember.
3  Q  Would you ever have occasion to
4   explain the way the conversion worked to her?
5  A  No.  No.  Not that -- not that I
6   recall.
7  Q  How about Marion Derham?
8  A  Marion was an assistant to Tom and/or
9   Carol Kanowicz.
10 Q  And did you have any interaction with
11  her?
12 A  Not on an ongoing basis.  What sticks
13  in my mind, again under unusual circumstances, I
14  found out that she lived five miles north of me
15  in Ossining, when I was living in Ossining at
16  the time, so we commuted on the same railroad,
17  not -- didn't take the same train.
18    MS. WALWORTH: I want to ask
19    you for scheduling purposes what you
20    anticipate?
21    MR. GOTTESDIENER:
22    Continuing -- you want to take a
23    break?
24    MS. WALWORTH: No.  I mean, do
25    you have any idea how much more time?

Page 282

(17:41:36-17:52:46)
1    GREFIG
2    MR. GOTTESDIENER: Can we
3    discuss this off the record?
4    MS. WALWORTH: Sure.  Of
5    course.
6    MR. GOTTESDIENER: Does anybody
7    need a break now?
8    MS. WALWORTH: We're off the
9    record.
10    MR. GOTTESDIENER: We're off
11    the record?  Okay.  Let's go off the
12    record.
13    THE VIDEOGRAPHER: This
14    concludes Tape Number 5.  The time is
15    5:39 p.m.  We're off the record.
16    (Discussion off the record)
17    THE VIDEOGRAPHER: This begins
18    Tape Number 6.  The time is 5:49 p.m.
19    We're back on the record.
20 CONTINUED DIRECT EXAMINATION BY MR.
21 GOTTESDIENER:
22 Q  Remember before lunch we were talking
23  about your assumptions that everybody was going
24  to be taking annuities and the large number of
25  terminations, and how your assumptions didn't

Page 283

(17:52:50-17:54:14)
1    GREFIG
2  change based upon what you were seeing occur.
3  Do you recall that?
4  A  Yes.
5    MR. RUMELD: Objection to form.
6  Q  There was some issue about how all
7  the numbers lined up.  Showing you and I'm
8  marking as Exhibit 100.
9    (Exhibit 100, extract of 1998
10    valuation, was marked for
11    identification, as of this date.)
12 Q  This is an extract of the 1998
13  valuation.
14    And looking at Page 34, the second
15  page, you see that there were 4,164 people who
16  terminated during 1997 who were cashed out?
17 A  Yes.
18 Q  Another 594 who were previously
19  terminated who took lump sums?
20 A  Yes.
21 Q  And you see at the top it has actives
22  at the beginning of the year 19,551?
23 A  Yes.
24 Q  And so of those people at the
25  beginning of the year, about 20 to 25 percent of

Page 284

(17:54:18-17:55:18)
1    GREFIG
2  them took lump sums?
3    MR. RUMELD: I object to the
4    form.
5  A  Okay.
6  Q  And did you -- did you discuss the
7  anticipation of people taking lump sums with
8  Woolworth during the design process?
9  A  I don't remember, but that piece of
10  paper you showed me before, where I read off the
11  termination rates, I said that this didn't apply
12  to Woolworth, it must have been another plan.
13  So yes.  There must have been some conversation
14  about utilization of lump sums.
15 Q  Because?
16 A  Because I had a piece of information
17  that dealt with that issue.
18 Q  But why would it be important to
19  discuss that with the sponsor?
20    MR. RUMELD: I object to the
21    form.
22 A  Well, I just think this warrants
23  discussion.
24 Q  Because?
25 A  To demonstrate that you're -- from an

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 285

(17:55:22-17:56:44)

1    GREFIG
2  actuarial standpoint that you're paying
3  attention to changes in the population.
4    And again, as I had mentioned
5  earlier, the issue is not so much the current
6  level of terminations, but whether or not that's
7  expected to be a regular part of the plan
8  demographics, has your business changed to the
9  point where you expect that higher level of
10  termination year in and year out.
11    I mean, there was in the -- in the
12  presentations that we looked at, there is talk
13  about a modern work force, more mobile.
14    Remember the piece that we looked at
15  where my arrow pointed down, therefore more TVs.
16  So that warrants discussion with the client, is
17  it abnormal, are you going through a period of
18  time, or is this going to become a permanent
19  part of your -- your work force turnover.
20  Q  Well, the client is -- you're also
21  seeing that there's 6,500 other terminations
22  during the year, right?  Above cash-outs?
23  A  6,000 -- right.  Between vested
24  terminations and -- yes.  Right.
25  Q  So essentially half of the active

Page 286

(17:56:48-17:57:50)

1    GREFIG
2  participants are leaving that year?
3  A  In that year, right.
4  Q  So you must have discussed this, the
5  decline in the number of participants with
6  Woolworth?
7    MR. RUMELD: I object to the
8    form.
9  A  Probably, yes.
10  Q  And considering that they were adding
11  a lump sum option, were they hoping for a high
12  level of lump sums?
13    MR. RUMELD: I object to the
14    form.
15  A  I wouldn't think so.  Lump sums are
16  far more expensive to the plan.
17  Q  Why add the lump sum option?
18    MR. RUMELD: I object to the
19    form.
20  A  Because that's part of the plan
21  design that there were examining.
22  Q  But why add that plan design feature?
23  A  Because they thought they had a more
24  mobile work force and that this would -- this
25  would aid them in providing benefits to that

Page 287

(17:57:54-17:58:40)

1    GREFIG
2  work force, that they terminate employment.
3  They move on to other employment.  They could
4  roll these lump sums over.
5  Q  Well, they could --
6  A  Now you've got -- and you don't have
7  to pay PBGC premiums for terminated vested
8  employees who have vested out of the plan.
9  Q  But they had a cash balance plan
10  without offering a lump sum option.
11  A  That's true.
12  Q  So why wasn't that done?
13    MR. RUMELD: I object to the
14    form.
15  A  Cash balance plan without a lump sum
16  option?  A cash balance plan?
17  Q  You just said that's true.
18  A  Well --
19  Q  Are you doubting your answer?
20  A  Yes.  I doubt myself.  Yes.
21  Q  There was -- this was -- came up in
22  your survey earlier of your cash balance
23  network.
24  A  Yeah.
25  Q  Of course you can have a plan that

Page 288

(17:58:42-17:59:46)

1    GREFIG
2  doesn't offer lump sums, right?  There's no
3  requirement to offer a lump sum?
4  A  No.
5  Q  Nothing about a cash balance plan
6  that --
7  A  Not that I recall.  Not that I
8  recall.
9  Q  So you did an analysis we saw earlier
10  on the cost savings of early retirement subsidy
11  if Woolworth went to a cash balance plan and
12  adding a lump sum feature, right?
13  A  No.  Backtrack on that.  Cost savings
14  if they went to a cash balance plan?
15  Q  Yes.
16  A  And did what?
17  Q  And had the lump sum feature, where
18  people were taking lump sums, and therefore not
19  obtaining the early retirement subsidy annuity.
20  A  We looked at something that looked at
21  the cost of the early retirement subsidy in the
22  DB plan, but I don't recall showing a reduction
23  in cost by allowing a lump sum, because a lump
24  sum is going to go out at a much lower interest
25  rate than the investment return assumption rate,

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 289

(17:59:50-18:00:52)

GREFIG

1    GREFIG
2    so it has to generate an actuarial -- lump sum
3    has to generate an actuarial loss.
4    Q   Remember we looked at that bell
5    curve?
6    A   That was benefit disbursement.
7    Q   But you said that -- you did
8    acknowledge those are lump sums?
9    A   Correct.
10   Q   And you acknowledged at the end of
11   the document there was a $2 million savings.
12       MR. RUMELD: I object to the
13       form.
14   A   No. I think the $2 million -- dollar
15   savings was to remove -- I'm sorry. The
16   $2 million savings was to remove the early
17   retirement subsidy from the existing DB plan.
18       And the fact that that bell-shaped
19   curve, which shows the lump sums far in excess
20   of the benefit disbursements that trickle along
21   the bottom of the curve, is one illustration
22   that lump sums are far more expensive to the
23   plan than are annuity payments, because you're
24   taking out a greater sum of money in a shorter
25   period of time, so you lose the benefit of the

Page 290

(18:00:56-18:01:56)

1    GREFIG
2    interest discount.
3    Q   Was there an assumption made by
4    yourself during the planning process as to where
5    the GATT rate, PBGC, whatever applicable
6    interest rate was for discounting, where that
7    was going to go?
8       MR. RUMELD: I object to the
9       form.
10   A   For valuation purposes?
11   Q   For design purposes.
12   A   Well, it's one indication of it in
13   here where the GATT rate was pegged at eight
14   percent, but that was mid to early year, and you
15   made the comment before that by the end of the
16   year that rate had tanked.
17       So I think we were just being
18   responsive to the current -- the rate that
19   existed at that time, the time the illustration
20   was put together.
21   Q   When you were say we are being
22   responsive, what do you mean?
23   A   Acknowledging the fact that the GATT
24   rate was changing.
25   Q   I'm asking acknowledging in the

Page 291

(18:01:58-18:02:56)

1    GREFIG
2    design or acknowledging in that one --
3    A   In that one -- that one --
4    Q   -- set of handwritten notes.
5    A   One set of illustrations.
6    Q   And my question was, was the cost of
7    providing lump sums a consideration in the
8    design of the new plan?
9    A   I would say only to the extent they
10   considered it a more modern plan. But...
11   Q   No. Cost.
12   A   I don't know whether it was a
13   consideration or an awareness. They're
14   certainly aware that lump sums cost money.
15   Q   You said that -- you actually said
16   that --
17   A   Are more costly than annuity
18   payments.
19   Q   Well, that does somewhat depend on
20   where interest rates are.
21       MR. RUMELD: I object to the
22       form.
23   A   During the actuarial valuation
24   methods and assumptions that we used, lump sums
25   generate an actuarial loss to the plan.

Page 292

(18:02:58-18:04:02)

1    GREFIG
2    Q   Did you -- you must have quantified
3    that.
4    A   I don't recall. Unless it's in one
5    of those prior illustrations that we looked at,
6    but I don't remember that.
7    Q   Well, didn't you have to quantify
8    that?
9    A   Yes. I'm saying I don't recall it,
10   but in all likelihood that was one of the things
11   that we discussed, among all of the other
12   considerations involved in a cash balance plan.
13   Q   But you don't -- I mean, where would
14   we find that?
15   A   The cost of the lump sum?
16   Q   Yes. The actuarial loss you're
17   saying you quantified.
18   A   Was there a set of calculations along
19   with that graph that showed the bell curve on
20   it, the bell curve, and then the squiggly line
21   on the bottom? Were there calculations stapled
22   to that?
23   Q   If it's not there, where would it be?
24   A   Some other piece of paper. Some
25   other analysis.

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 293

(18:04:06-18:05:36)

GREFIG

1    GREFIG
2  Q  The lump sum is cheaper than the
3  subsidized early retirement annuity though,
4  right?
5    MR. RUMELD: I object to the
6  form.
7  A  The lump sum is cheaper than the
8  subsidized early retirement benefit, only
9  because the subsidy is not captured in the lump
10  sum payment.
11    In other words, if someone takes a
12  lump sum of early retirement, the lump sum is
13  based upon the accrued benefit, which is payable
14  at normal retirement age and doesn't capture the
15  subsidy, so the lump sum is going to be less
16  expensive on an ongoing basis, less expensive
17  than --
18  Q  Than the early retirement subsidy?
19  A  Right.
20  Q  And you obviously communicated that
21  to Mr. Kiley and the people at Woolworth?
22    MR. RUMELD: I object to the
23  form.
24  A  In all probability, yes, but I don't
25  recall discussion on that issue.

Page 294

(18:05:38-18:06:16)

1    GREFIG
2  Q  But -- I mean, this was a major
3  feature of the plan to add a lump sum, and you
4  do agree with that?
5  A  Uh-huh.
6  Q  You have to say yes or no.
7  A  Yes. I'm sorry. Yes.
8  Q  You learned months earlier that when
9  people were offered lump sums in your survey,
10  people took lump sums?
11    MR. RUMELD: Objection to the
12  form.
13  A  Yes.
14  Q  You learned that too, right?
15  A  Yes.
16  Q  And you communicated that to
17  Woolworth, right?
18    MR. RUMELD: I object to the
19  form.
20  A  Yes.
21  Q  Okay. So the -- and you knew that --
22  withdrawn.
23    And you knew and communicated in your
24  discussions with Woolworth that if people took
25  the lump sum they would not get the subsidy in

Page 295

(18:06:20-18:07:28)

1    GREFIG
2  the early retirement subsidy, right?
3    MR. RUMELD: I object to the
4  form.
5  A  Yeah, because, you know, this whole
6  issue that we're talking about, that the --
7  calculate that the accrued benefit by definition
8  doesn't -- does not include early retirement
9  subsidies obviously would have been discussed.
10  Q  And given these numbers that we're
11  seeing about the number of these cash-outs,
12  wouldn't this necessarily have the greatest
13  concern about the accuracy of the assumption
14  that you made of the hundred percent annuities?
15    MR. RUMELD: I object to the
16  form.
17  A  It would have raised -- it would have
18  raised awareness of a need to look further at
19  the actuarial assumptions.
20    But to modify your assumption after
21  one year's experience, given what you've
22  indicated to me was going on with restructuring
23  that you pointed out in one of the document,
24  restructuring must have been of the company,
25  doesn't make -- we revise the assumption to

Page 296

(18:07:30-18:08:36)

1    GREFIG
2  reflect that the resulting assumptions are no
3  more accurate than the assumptions I had
4  previously.
5  Q  So that's --
6  A  Because we don't know what -- we need
7  a period of time of stability and a period of
8  time where we can accumulate the data, so that
9  it -- the -- data over that period of time
10  is more reflective of the company's true
11  operations.
12  Q  Well, if there were a new plan and
13  you knew what you knew about the likelihood of
14  people taking up to a hundred percent lump sums,
15  would you have included an assumption that said
16  there's a hundred percent assumption that they
17  take annuities?
18    MR. RUMELD: I object to the
19  form.
20  A  If it was a new plan.
21  Q  Cash balance plan starting from
22  scratch, lump sum option, annuity option. And
23  you knew what you knew from the investigation
24  you took.
25    You would have included a lump sum

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 297

(18:08:40-18:09:30)

1    GREFIG
2  assumption, wouldn't you?
3      MR. RUMELD: I object to the
4    form.
5  A   There's a likelihood that it would
6  have included an assumption about lump sums, but
7  again --
8  Q   How is this different then than --
9  you know, when this is a new provision and it's
10  a converted plan?
11  A   Maybe because there's other turmoil
12  going on at the company.
13  Q   What do you mean by that?
14  A   Well, the document that we looked at
15  that referenced restructuring and cost of a plan
16  after restructuring, apparently they terminated
17  some divisions, and you just pointed out to me
18  that they had a significant reduction in the
19  work force.
20  Q   But that would just make it all the
21  more important to include a lump sum assumption.
22  A   No.  And on what basis do you select
23  that assumption?
24  Q   Based on experience that you've --
25  A   One year's experience?

Page 298

(18:09:30-18:10:28)

1    GREFIG
2  Q   Okay.  So then what about two years'
3  experience?
4      MR. RUMELD: Objection to form.
5  A   Three years' experience.  Now,
6  depending upon what happened after two years, I
7  might push to introduce an assumption, three
8  years' experience, watching what's going on,
9  seeing that there's any stability coming from
10  the demographics from one year to the next.
11  Then we start to talk about introducing a lump
12  sum option assumption.  Now --
13  Q   I'm sorry.  I'm just not following,
14  because you said that --
15  A   Do you have the -- you had the 1/1/99
16  valuation report, didn't you?
17  Q   Yes.  But I'm asking a question,
18  which is you knew from your investigations
19  before the plan was put into operation that the
20  likelihood was of a hundred percent lump sums.
21  A   No.
22      MR. RUMELD: I object to the
23    form.
24  A   Not a likelihood of a hundred percent
25  of lump sum.

Page 299

(18:10:28-18:11:16)

1    GREFIG
2  Q   You understood there was a high
3  likelihood --
4  A   It was a likelihood --
5      MS. WALWORTH: I would ask that
6    you please let each other finish.
7      Thank you.
8  Q   You expected -- we have your
9  testimony in response to several different
10  questions.
11      You expected a high number of lump
12  sums even before the plan went into operation;
13  isn't that correct?
14      MR. RUMELD: I object to the
15    form.
16  A   I don't -- I don't recall testifying
17  to that.  No.
18  Q   How about you knew that there was --
19  based on what you've seen, that there was a
20  likelihood of a high number of lump sums.
21  A   Correct.
22  Q   And then there was plan experience.
23  A   Correct.
24  Q   That confirmed that assumption?
25  A   That expectation, right.

Page 300

(18:11:18-18:12:30)

1    GREFIG
2  Q   And that was already confirmed in the
3  first year, and it was reconfirmed in the second
4  year?
5      MR. RUMELD: I object to the
6    form.
7  A   Was it in the second year?  I
8  don't -- I don't recall that we had two years of
9  experience of significant population declines.
10      We had that one year that you were
11  addressing, where there was a 50 percent
12  reduction of population.  I don't know how many
13  years running.
14  Q   But you have multiple years where
15  we've seen that there's a high number of
16  terminations?
17  A   Yes.  We saw that one year.  That's
18  true.
19  Q   And how many years experience do you
20  need?
21      MR. RUMELD: Objection to form.
22  A   I would wait three years or more.
23  Q   The bottom line was that after
24  significant terminations in every year from '94
25  through '97, four years, that that was a

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 301

(18:12:34-18:13:28)

1    GREFIG
2    significant number of years?
3         MR. RUMELD: I object to the
4    form.
5    A  But '94 and '95 there weren't any
6    lump sums paid.
7    Q  There were significant terminations?
8    A  Okay.  Significant terminations.
9    Okay.
10   Q  You saw that there were significant
11   terminations, and you knew or expected
12   significant lump sums of people who terminated?
13   A  Uh-huh.
14   Q  So at what point do you reconsider
15   your assumptions?
16        MR. RUMELD: I object to form.
17   A  After I've had a few more years of
18   observing what's happening with the work force,
19   and determining whether or not these are
20   abnormal events that are going to occur in a
21   short period of time, or whether they are truly
22   going to become characteristics of the plan
23   demographics.
24   Q  But --
25   A  Now, if these terminations are the

Page 302

(18:13:30-18:14:44)

1    GREFIG
2    result of restructuring, and I walk in with an
3    assumption that we've got a hundred percent lump
4    sum election, that assumption is no more valid
5    than no assumption at all.  The presence of an
6    assumption doesn't make it right.
7    Q  You discussed your assumptions with
8    Mr. Kiley?
9         MR. RUMELD: I object to the
10   form.
11   A  I would have expected that I would
12   have, yes.
13   Q  And you understood that the company
14   at the time was undergoing some significant
15   financial difficulty?
16   A  Based upon the information, yes.  I
17   guess I was aware of that.
18   Q  And that the company was a
19   publicly-traded company?
20   A  Yes.
21   Q  And that there were issues regarding
22   the way the company's books were accounting for
23   liabilities?
24   A  Now we're on to a different subset of
25   assumptions.

Page 303

(18:14:44-18:15:56)

1    GREFIG
2    Q  I'm not finished with my question.
3    But you were aware of all that at the time?
4    A  Yes.
5    Q  And the people at Foot Locker --
6    sorry.  Woolworth.  Withdrawn.
7    The information that you had, you
8    don't have any reason to believe that we've been
9    discussing here about what your expectations
10   were, you don't have any reason to believe that
11   you kept that to yourself and didn't communicate
12   that to Foot Locker?
13   A  No.  I have no expectations.
14   Remember, we're talking about the funding
15   valuation here.
16   Amortization of gains and losses
17   under -- under ERISA back then, I think they
18   had -- they had a five-year amortization.
19   Q  Exhibit 101 is your e-mail to Jim
20   Cassidy.
21        (Exhibit 101, e-mail, was
22        marked for identification, as of this
23        date.)
24   Q  As well as some other folks, in which
25   you say, September 15, 1995, "I talked to Marion

Page 304

(18:16:02-18:17:08)

1    GREFIG
2    Derham at Woolworth this morning.
3    "I told her we could deliver a
4    statement tape by the end of the month or the
5    first week in October.  That leaves them with
6    six weeks until the middle of November.
7    "I reminded her that I was making
8    this commitment without knowledge what their
9    statement would contain, but with the knowledge
10   that there was a finite amount of information to
11   be prepared, projected benefits, optional forms.
12   "In addition -- in addition to the
13   usual projected benefits under the current plan
14   formula and the CB formula" -- that means cash
15   balance formula.
16   A  Right.
17   Q  -- "we are to calculate the amount
18   that needs to be deferred into the K plan" --
19   and that's a reference to the new 401(k) plan?
20   A  I -- yes.
21   Q  -- "by those over age 50 in order for
22   them to have total income from both plans equal
23   to what the current formula produces.  Note,
24   this ignores the fact that the current formula
25   is inadequate."  You wrote that, right?

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 305

(18:17:12-18:18:14)

1    GREFIG
2  A   Yes.
3  Q   What did you mean by the current
4  formula is inadequate?
5  A   The -- we looked at those replacement
6  ratios before.
7  Q   If you could just testify without --
8  A   What do I mean?  The benefit -- that
9  the benefit form -- the current benefit formula
10  doesn't produce target replacement ratios.
11  Q   Even prior to the change to cash
12  balance?
13  A   Correct.
14  Q   Which you understood you testified
15  long ago deposition-wise was going to reduce the
16  rate of benefit accrual in the future?
17  A   Right.
18      MR. RUMELD: I object to the
19  form.
20  Q   And you made sure, because you were
21  doing your job, to communicate very clearly to
22  Tom Kiley and people at Woolworth that according
23  to those replacement ratios, that the current
24  formula was already inadequate?
25      MR. RUMELD: I object to the

Page 306

(18:18:14-18:20:06)

1    GREFIG
2  form.
3  A   Yes.  Probably.  Yes.  Probably.
4  Q   Do you have any doubt?  Any reason to
5  doubt?
6  A   No.
7  Q   102.
8      (Exhibit 102, fax dated
9      10/13/95, was marked for
10     identification, as of this date.)
11  Q   Is your fax to Tom Kiley, October 13,
12  1995, stating "Here is a summary of the age 65
13  benefits under the career average plan and the
14  cash balance plan with and without salary
15  projection."  Is that correct?
16  A   Yes.
17  Q   And what is it that you mean by that?
18  A   Okay.  We've taken real or
19  hypothetical people with the stated age of
20  service, the stated salary scale, and calculated
21  the age 65 annuity under the current plan, and
22  then expressed it as a percent of final pay, and
23  calculated the age 65 annuity under the cash
24  balance plan and expressed it as a percent of
25  final pay.

Page 307

(18:20:20-18:22:26)

1    GREFIG
2      And then this appears -- we're
3  showing the cash balance at 65 and expressing
4  that as a multiple of pay at 65.  Is that right?
5  Right.
6      So cash balance as shown on the cash
7  balance column is -- is expressed as a multiple
8  of cash balance, as a multiple of pay as the pay
9  at 65.  Then according to the cover memo -- I
10  don't know what the final column is.
11  Q   Exhibit 103.
12      (Exhibit 103, handwritten notes
13      dated 12/1/95, was marked for
14      identification, as of this date.)
15  Q   These are also handwritten notes that
16  you made, dated December 1, 1995; is that
17  correct?
18  A   Yes.
19  Q   Those presentations that we went
20  through, where there were a number of back and
21  forths -- I'll take that.
22      You understood that those
23  presentations were fielding ultimately to be
24  presented to the board of directors of
25  Woolworth?

Page 308

(18:22:26-18:23:54)

1    GREFIG
2      MR. RUMELD: I object to the
3  form.
4  A   They would be presented up the line.
5  I don't know that -- the board of directors
6  makes that decision probably, but that --
7  usually in a company there's a benefits
8  committee.
9      And I don't know whether Woolworth
10  had one, so maybe this was being prepared for
11  the board.  Maybe it was being prepared for
12  another group of people.
13  Q   Based on what we've seen so far,
14  you're pretty clear now that at the time the
15  design was being considered and finalized, that
16  you understood and communicated to Woolworth
17  that there was this wear-away effect, that could
18  mean for a number of participants that there
19  would be a period of years during which they
20  would actually never lose anything, but they
21  would not add new benefits to their accrued
22  benefit?
23      MR. RUMELD: I object to the
24  form.
25  A   No new annuity benefits, yes.

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 309

(18:23:58-18:25:12)

1    GREFIG
2  Q   And depending on where interest rates
3  were, for many participants that could also mean
4  no lump sum new benefits either?
5      MR. RUMELD: I object to the
6      form.
7  A   That's true -- that is a true
8  possibility, but the risk is the opposite risk.
9  I mean, you're sitting with a nine percent
10 vested return assumption.
11 Q   But the participant didn't have a
12 nine percent shot.  The participant was capped
13 at six with the interest --
14 A   In terms of interest credit, right.
15 Q   So it was always going to have to dig
16 out of that hole.
17     MR. RUMELD: Objection to the
18     form.
19 A   But the more likely result was that
20 there would be additional accruals under the
21 plan in terms of lump sums, because interest
22 rates were first of all lower than nine percent
23 when we made the conversion, and as you pointed
24 out before were trending lower.
25     So in terms of the participant's

Page 310

(18:25:14-18:25:54)

1    GREFIG
2  entitlements, trending interest rates were going
3  to give them a much larger lump sum.  But the
4  nine percent --
5  Q   I have to stop you there and ask you,
6  that larger lump sum is not a growth in their
7  benefit.
8      MR. RUMELD: I object to the
9      form.
10 Q   It's just a nominal change in the
11 amount in the frozen accrued, correct?
12     MR. RUMELD: Objection to form.
13 Q   Could you answer that yes or no?  Am
14 I right or wrong?
15     MR. RUMELD: I object to the
16     form.
17 A   Restate your --
18 Q   This drop in interest rates you're
19 talking about during this period of wear-away
20 created by the use of the nine percent may
21 increase the nominal value of their frozen
22 accrued but --
23 A   Right.
24 Q   -- it's just nominal, right?
25     MR. RUMELD: I object to the

Page 311

(18:25:56-18:26:56)

1    GREFIG
2    form.
3  Q   It's not increasing because they are
4  earning new benefits?
5  A   They're not earning new annuity
6  benefits, but they do have a larger lump sum
7  distribution entitlement.
8  Q   But it's not a growth benefit-wise if
9  they quit.
10 A   It's not -- we agreed to this before.
11 It's not an annuity growth.
12 Q   Sir --
13 A   But you're asking -- you asked me --
14 the original question you asked me was with the
15 risk of no growth whatsoever in a cash balance
16 amount because of the trend in interest rates.
17     And I'm saying the trend in interest
18 rates is more likely to produce a larger lump
19 sum than a smaller one.
20 Q   What I'm just trying to get you to
21 focus on is, if the participant quit the next
22 day and let his frozen accrued sit there and
23 interest rates fell, his pay-out from the frozen
24 accrued would be larger, but not because he
25 earned more money, more pension money.  It would

Page 312

(18:27:00-18:27:44)

1    GREFIG
2  just have been because interest rates fell.
3  A   Right.
4      MR. RUMELD: Objection to the
5      form.
6  Q   What I would like to get you back to
7  is the question of you understood at the time,
8  based on the math, the inexorable math, that
9  there were also people who were going to go for
10 potentially long periods of time where they
11 would also have a lump sum wear-away because --
12 A   No.
13 Q   No.  You didn't understand that?
14 A   No.
15 Q   No idea?
16 A   No.
17 Q   So all the notes, where people were
18 taking notes and meetings where you're
19 describing lump sum wear-away, you didn't
20 understand that at the time?
21     MR. RUMELD: I object to the
22     form.
23 A   Where -- where is the lump sum
24 wear-away?
25 Q   How about that $3,000 person example,

GEOFFREY OSBERG VS.
FOOT LOCKER, INC.

JAMES GREFIG
March 27, 2012

Page 313

(18:27:50-18:28:54)

1    GREFIG
2  who ended up having all that wear-away, where
3  they got the $1,800.  They didn't earn a dime.
4  You agreed --
5  A  They didn't --
6  Q  Let me finish my question.  You
7  agreed they didn't earn a dime in their benefit
8  if they took the annuity, correct?
9  A  They didn't earn a dime in their
10  annuity benefit.  That's correct.
11  Q  Take that same participant and knock
12  them back a few years of age, so they don't get
13  the enhancement.  Remember they started off
14  about $6,500?
15  A  Yes.
16  Q  Well, that person would have worked
17  all those additional years, and would not have
18  been up to the $11,000 that his frozen accrued
19  was.  Do you remember that?
20  A  I have vague recollections of the
21  calculation we looked at before.  I have to look
22  at it again to -- to confirm your comment.
23  Q  But you don't deny that whatever you
24  knew at the time, when you were in better
25  health, younger and working at this on a

Page 314

(18:28:56-18:29:44)

1    GREFIG
2  day-to-day basis, that you communicated this to
3  Mr. Kiley and the people at Woolworth?
4    MR. RUMELD: I object to the
5  form.
6  A  Yes.  Based upon all the
7  documentation that we've been looking at today
8  these are -- these are -- were considerations
9  that were discussed.
10  Q  And you --
11  A  Issues that were discussed.
12  Q  But I'm asking, you, not the document.
13  I'm asking, you made sure that you clearly and
14  fairly communicated this to Mr. Kiley and
15  Woolworth, so they understood the consequence
16  for their employees?
17    MR. RUMELD: I object to the
18  form.
19  A  Yes.  I think so.  I think that shows
20  in the work and the analysis that we did.
21  Q  And the kind of thing you would have
22  made sure that you did personally?
23  A  Uh-huh.
24    MR. RUMELD: I object to the
25  form.

Page 315

(18:29:44-18:30:42)

1    GREFIG
2  A  Yes.
3  Q  Did anybody ever ask you, hey, do we
4  have to tell employees that they may not be
5  earning any benefits for a period of time?
6  A  No.  I have no recollection at all of
7  that.
8  Q  Wouldn't you think people should have
9  been told that?
10    MR. RUMELD: I object to the
11  form.
12  Q  Maybe they were, but I'm just asking.
13  Don't you think people should have known that?
14    MR. RUMELD: I object to the
15  form.
16  A  Yes, but what makes you believe they
17  weren't?
18  Q  What makes you believe that they
19  were?
20  A  That they -- what makes me believe
21  that they might have is that -- one thing that
22  we haven't even discussed or might have
23  happened -- we're looking at a lot of documents.
24    Were employee meetings held at the
25  time this conversion took place?  Did Kiley and

Page 316

(18:30:46-18:31:46)

1    GREFIG
2  crew go out to the stores and the distribution
3  centers and have employee meetings?  And --
4  Q  I want to ask you a question.  I'm
5  not asking if anybody -- withdrawn.
6    I want to ask you a question.  I'm
7  not asking you to tell me anything that anybody
8  said to you.
9    But do you have an understanding why
10  Foot Locker and Mercer have a joint defense
11  agreement, where I can't find out what Mr.
12  Rumeld talked --
13  A  Why they have a --
14  Q  Yes.  Do you have an understanding?
15  A  No, I do not.
16  Q  Were you curious about that?
17  A  Not really.
18  Q  Did Mercer -- Mercer is -- you're not
19  paying for the services of the lawyer who is
20  sitting across the table from you, are you?
21  A  No.
22  Q  You know she doesn't work at Mercer?
23  A  Correct.
24  Q  She works for an outside law firm
25  that sends bills to Mercer, and so Mercer has to

Page 317

(18:31:50-18:32:36)

1    GREFIG
2  pay her?  You understand that?
3  A  Yes.
4  Q  So Mercer is effectively paying her
5  for you so you don't have to pay; is that right?
6  A  Well, I don't know going that far.
7  She's representing me.
8  Q  You think she's doing it for nothing?
9  A  No.  Mercer has retained her to
10  represent me, as a former employee.
11  Q  And you think they're doing that
12  purely out of the goodness of their heart?
13    MR. RUMELD: I object to the
14  form.
15  Q  Just what do you think?  I'm not
16  asking what anybody told you.
17    MS. WALWORTH: Do you have a
18  basis for --
19    MR. GOTTESDIENER: Excuse me.
20    MS. WALWORTH: I'm going to --
21  I'm going to object and assert the
22  attorney-client --
23    MR. GOTTESDIENER: You're going
24  to tell him not to answer that
25  question?

Page 318

(18:32:36-18:33:02)

1    GREFIG
2    MS. WALWORTH: Let me finish.
3    MR. GOTTESDIENER: Do it or
4  not.  I don't have time.
5    MS. WALWORTH: Let me finish.
6  Q  Sir, I'm withdrawing the question.
7    MS. WALWORTH: I'm going to
8  instruct --
9    MR. GOTTESDIENER: I'm not --
10    MS. WALWORTH: Question
11  withdrawn.
12  Q  Do you think they're doing it out of
13  the goodness of their heart?
14    MR. RUMELD: I object to the
15  form.
16    MS. WALWORTH: Objection.
17  Don't say anything counsel has said
18  to you.
19  Q  Answer the question.
20    MS. WALWORTH: If you have
21  anything to say other than that you
22  may.
23    THE WITNESS: Other than what?
24    MS. WALWORTH: Whatever counsel
25  told you.

Page 319

(18:33:02-18:34:10)

1    GREFIG
2  Q  Do you think Mercer is doing it
3  selflessly out of the goodness of its heart?
4  A  I think they're doing it as the
5  normal course of business.
6  Q  And in the course of business, so
7  Mercer doesn't have any exposure?
8    MR. RUMELD: I object to the
9  form.
10  A  No, no.  No, no.
11  Q  It's employee relations?
12  A  Employee relations.
13  Q  Are they giving you any other
14  compensation, any -- deferring any expenses or
15  anything in connection with this?
16  A  (Indicating)
17  Q  No?  Your answer is no?
18  A  No.
19  Q  And with respect to -- withdrawn.
20    The -- the -- going back to the
21  question of the board of directors, I mean, you
22  did understand that the plan had to be approved
23  and amended formally in order to put this in
24  place?
25  A  Yes.

Page 320

(18:34:10-18:35:34)

1    GREFIG
2  Q  So in -- do you remember being
3  present for any presentations that were made to
4  anybody such as Pat Peck, once these
5  presentations had gotten further along during
6  the summer of 1995?
7  A  Presentations to Pat Peck.  No.  I
8  don't remember any presentations made to Pat
9  Peck.
10  Q  How about --
11  A  I think our involvement was with --
12  with Tom and the development of these
13  presentations.
14    But I don't recall being present at
15  any presentations or was I called into any
16  presentations as the -- you know, as the
17  consultant.  I have no recollection of that
18  whatsoever.
19  Q  Showing you Exhibit 104.
20    (Exhibit 104, fax, was marked
21  for identification, as of this date.)
22  Q  This is from September 1996, after
23  the plan went into effect.
24    This is a fax from Tom to you and Jim
25  Cassidy, saying "Attachment is a revised version

Page 321

(18:35:36-18:37:04)

1    GREFIG
2  of a presentation based on our conversations
3  today, but does not contain comments from Pat.
4  Please let me know if you have any further
5  comments."  Is that correct?
6  A   That's what it says, yes.
7  Q   And if you look at the attachment,
8  you see that it says "The Woolworth retirement
9  plan, review of plan options for additional cost
10  savings"?
11  A   Yes.
12  Q   And what can you tell me about the
13  review of the plan to see if there could be
14  additional cost savings yielded?
15  A   It says that the recommendations were
16  approved by the chairman group in July 1995, the
17  board of directors in September 1995.
18  Q   I'm not asking you to read from it,
19  sir.
20      What else can you tell me, if
21  anything, about what you know about the attempt
22  to find additional cost savings after the plan
23  went into effect.
24  A   After the plan went into effect.
25  Q   Yes.  The date of that is the fall of

Page 322

(18:37:08-18:38:52)

1    GREFIG
2  1996.
3      Do you have any information to give
4  us on that score?
5  A   No.
6  Q   Exhibit 105.
7      (Exhibit 105, final plan
8      document, was marked for
9      identification, as of this date.)
10  Q   A copy of the final plan document.
11  You received a copy of this once it was
12  finalized for purposes of the work you performed
13  in connection with the plan; isn't that correct?
14  A   Well, I -- I take it as a statement,
15  telling me this is.
16  Q   I'm making it a question.  You did
17  receive a copy of the plan document once it was
18  finalized?
19  A   It appears so, yes.
20  Q   Exhibit 106.
21      (Exhibit 106, document, was
22      marked for identification, as of this
23      date.)
24  Q   Is a multi-page exhibit that begins
25  with a memo from Roger Farah, discussing his

Page 323

(18:39:00-18:40:06)

1    GREFIG
2  concern about the guaranteed six percent
3  interest on account balances.
4      And it then has as a second and third
5  page, if you would turn please, a letter that
6  was signed by Jim Cassidy, and below his
7  signature it says JC, and then there's two
8  colons and then your initials appear there.
9  A   Right.
10  Q   And then there's ERE.  Who is that,
11  your secretary?
12  A   Secretary.  Right.
13  Q   Your secretary?
14  A   No.
15  Q   And it's copied to Pat Peck; do you
16  see that?
17  A   Yes.
18  Q   And this, as you told us, this would
19  not have been something that Jim Cassidy
20  associate would have sent to the manager of
21  corporate finance at Woolworth without you
22  specifically approving it?
23  A   They might -- see, my letters at the
24  bottom of the letter indicate that I
25  peer-reviewed this document.

Page 324

(18:40:08-18:42:24)

1    GREFIG
2  Q   Does this refresh your recollection
3  about Foot Locker continuing after the
4  conversion to see how it might save more money
5  on pension benefits?
6  A   No.  I don't remember any of this.
7  Q   107 is a version of the document we
8  looked at a couple of exhibits ago.
9      (Exhibit 107, document, was
10      marked for identification, as of this
11      date.)
12  Q   Where it -- Tom Kiley is sending you
13  and Jim Cassidy a further draft of review of
14  plan options for additional cost savings; isn't
15  that correct?
16  A   Yes.
17  Q   And Tom tells you, "Please let me
18  have your comments as soon as possible.  Let me
19  know if there are any changes I should make
20  before Monday morning's meeting."  Is that
21  right?
22  A   Yes.
23  Q   Does -- if you look in three pages
24  the document show your handwriting, Page 3?
25  A   2994?

Page 325

(18:42:26-18:44:02)

1    GREFIG
2  Q   Yes.
3  A   Page 3.  Okay.
4  Q   Is that your handwriting?
5  A   Yes.
6  Q   And then the following page also your
7  handwriting?
8  A   Yes.
9  Q   And the following page as well?  That
10  would be 2996?
11  A   Yes.  That's my handwriting.
12  Q   Who is Evan Shapiro?
13  A   He was an actuarial technician in
14  Stamford.
15  Q   Who is Robert Clark?
16  A   I don't know.  Name doesn't even ring
17  a bell.
18  Q   Exhibit 108.
19      (Exhibit 108, document, was
20      marked for identification, as of this
21      date.)
22  Q   If you would take a look at this
23  second page, and tell me if that's your
24  handwriting.
25  A   Yes, it is.

Page 326

(18:44:02-18:45:56)

1    GREFIG
2  Q   Does it appear to you that this is --
3  at the top it says employee contributions?
4  A   Yes.
5  Q   And is this a listing of names
6  underneath Pete, Rita, Evan, Carol, Tom?
7  A   Yes.
8  Q   Who's after Tom?
9  A   Marion.
10  Q   Then Bob.  And then --
11  A   It looks like Houston, H-O-U-S-T-O-N.
12  Q   And from your note-taking practices
13  and the context, does it appear to you that this
14  was a meeting that you had with those folks, and
15  you were in attendance and took notes?
16  A   It appears so.
17  Q   Can you look briefly at the
18  presentation that follows, entitled cash balance
19  conversion, October 17, 1996, and tell me if you
20  know who generated that document?
21  A   Well, the note on the bottom of the
22  page says Mercer.  You obtained this -- that
23  means you obtained this from Mercer files,
24  right?  Isn't that what that means?
25  Q   When you say note --

Page 327

(18:45:58-18:47:40)

1    GREFIG
2  A   Well --
3  Q   For the record, it's called a Bates
4  stamp.
5  A   Bates stamp.  Okay.
6  Q   It means that it was produced from
7  Mercer's files.
8  A   Files.
9  Q   But beyond that, is there anything
10  that you see there in the notes, in the
11  presentation, in the handwriting that's on the
12  presentation that allows you to tell us anything
13  about who may have generated that document?
14  A   The handwriting is mine.
15  Q   If you look at Page 3791.
16  A   Okay.
17  Q   Can you see that there?
18  A   Yes.
19  Q   You would agree that this is
20  illustrating a lump sum wear-away we were
21  discussing before; isn't that right?
22  A   The MN I presume is a minimum -- a
23  minimum benefit lump sum calculation.  Okay.
24  Which is greater than the cash balance
25  conversion.  Okay.

Page 328

(18:47:42-18:48:30)

1    GREFIG
2  Q   So you agree with me, right?
3  A   We end up two different values.
4  Q   It illustrates the lump sum wear-away
5  we were discussing earlier, right?
6      MR. RUMELD: I object to form.
7  A   It illustrates the difference in the
8  cash balance versus the minimum distribution at
9  the time of conversion, yes.
10  Q   It illustrates that that person
11  worked for a time and actually earned no new
12  benefit?
13  A   No new annuity benefit, yes.
14  Q   No lump sum benefit either, right?
15      MR. RUMELD: Objection to the
16      form.
17  A   No, because a year later the minimum
18  benefit value of 2,201 is going to increase
19  because they're one year closer to retirement
20  age.
21  Q   But that is not a function of earning
22  anything.  That's just aging.
23  A   That's correct.
24  Q   You agree with that, correct?
25  A   Yes.

Page 329

(18:48:30-18:49:10)

GREFIG

1    Q   So it does illustrate lump sum
2    wear-away.  It doesn't --
3       MR. RUMELD: I object to the
4       form.
5    Q   They're not earning anything.
6       MR. RUMELD: I object to the
7       form.
8    A   They're not earning an annuity
9    benefit.
10   Q   They're not earning a lump sum
11   benefit other than by aging, which is not
12   earning anything.
13   A   Well, we could -- you know, that's --
14   we could argue about that.
15   Q   What is the possible argument about
16   that, sir?
17      MR. RUMELD: I object to the
18      form.
19   A   The -- does the employee --
20   Q   I withdraw the question.  I withdraw
21   the question.  109.
22      (Exhibit 109, sensitivity
23      analysis, was marked for
24      identification, as of this date.)

Page 330

(18:49:10-18:50:38)

GREFIG

1    Q   Is a sensitivity analysis document
2    that Tom Kiley faxed you on October 31, 1996,
3    correct?
4    A   Correct.  The -- getting back to
5    the -- if I may, to 108, the question that you
6    asked me, who generated this?
7    Q   Do you know --
8    A   You asked me who Robert Clark was,
9    and I don't know who Robert Clark is, but it
10   would appear to me that he's consulting
11   maintenance international.  He may have been
12   retained by Woolworth to generate this document.
13   Q   Okay.  Other than that --
14   A   Other than that...
15   Q   Other than that.  Exhibit 110 is from
16   you to Tom Kiley.
17      (Exhibit 110, document, was
18      marked for identification, as of this
19      date.)
20   Q   This one here, sir.  Can you tell me
21   what you're sending Mr. Kiley on November 1,
22   1996?
23   A   These are the immediate and deferred
24   GATT annuities at 6.06 and 9 percent.  And I

Page 331

(18:50:50-18:51:50)

GREFIG

1    don't recall GATT -- whether GATT dictated a
2    mortality table.
3       I gather from some of the other
4    documents we looked at that it was reference to
5    GATT interest and mortality.  So this is
6    probably based upon a GATT mortality.
7    Q   You were sending that to him then
8    why?
9    A   Sending that to him.
10   Q   Why?
11   A   He probably asked for it.
12   Q   Exhibit 111.
13      (Exhibit 111, document dated
14      11/21/96, was marked for
15      identification, as of this date.)
16   Q   Is dated November 21, 1996.  And it's
17   to Janet from Jim.  That came out of Mercer's
18   files, and appears to have your handwritten
19   graph and circle on the front page.
20   A   Yes.
21   Q   And you're the Jim who's referred to
22   here, right?
23      MR. RUMELD: Objection to the
24      form.

Page 332

(18:51:50-18:54:32)

GREFIG

1    A   Let me read this.  Given the nature
2    of the text, I would conclude that I am the Jim
3    at the end of this memo, yes.
4    Q   Who's Janet?
5    A   Janet is in-house counsel of Mercer.
6    Q   Exhibit 112.
7       (Exhibit 112, document, was
8       marked for identification, as of this
9       date.)
10   Q   Can you tell me what that is?  It's
11   entitled calculations, dot, dot, background, and
12   it has a date at the top with a fax header of
13   January 10, 1997, with post-it notes that -- at
14   least one of them seems to be directed to you
15   from Tom Kiley.
16   A   There's that Houston name again or
17   Houston name.
18   Q   Right.  But I'm asking what is the
19   document, not -- not about more.  Could I try it
20   this way?
21   A   A piece of this rings a bell.  For
22   valuation purposes, when we got -- you asked
23   before about a valuation tape.
24      When we got evaluation tape from

Page 333

(18:54:34-18:56:02)

GREFIG

1  GREFIG
2  Woolworth, when they ran their systems to
3  prepare that tape, they had to reassemble all of
4  the accrued -- all of the benefit accruals from
5  the day the employee was employed up until the
6  end of the prior plan year, and they did that
7  every year that they ran a tape.
8      So where it says date -- every time a
9  calculation, estimated or actual, is run, the
10 calculation must start back at time zero and
11 calculate every step going forward.  That I
12 remember.  That was --
13 Q  Did Mercer write an administrator's
14 manual for Foot Locker, Woolworth to administer
15 the cash balance plan, do the calculations in
16 house?
17 A  I don't think so.  I mean, the
18 proposal we looked at earlier, even though --
19 still not sure whether it's administrative.  I
20 don't recall any manual being prepared for
21 Woolworth.
22     MR. GOTTESDIENER: Thank you
23 for your testimony.  I'm out of time.
24 A  And this -- I don't know what it is.
25 I mean, as I say, this in here or what the rest

Page 334

(18:56:06-18:57:50)

1  GREFIG
2  of it is.  I don't know, other than another
3  summary by somebody.
4      MR. RUMELD: Mr. Grefig, if you
5  could hang in there, I just have one
6  or two questions.
7      CROSS-EXAMINATION BY MR. RUMELD:
8  Q  The precise date of your retirement
9  was when?
10 A  The last day of August 1998.
11 Q  And the last valuation report for
12 Foot Locker or Woolworth could have been
13 involved with would be what, for which year?
14 A  Practically speaking I would have
15 expected it to be 1/1/98, but I thought I saw a
16 document here that had a signature from Doug
17 Tinney for the '98 valuation.  You know, it
18 all -- it all -- that's '99.
19 Q  Which exhibit are you looking?
20 A  This happens to be '99, but if we
21 look at the actuarial report for 1998 we could
22 verify whether that was done while I was still
23 employed.  I don't seem to have the 1998 report.
24 Q  You know you didn't review the one
25 from 1/1/99?

Page 335

(18:57:52-18:59:24)

1  GREFIG
2  A  Well, the 1/1/99 one is the one that
3  has Doug Tinney's signature on that.  Let me
4  just confirm that.
5      I'm sorry.  Ray Feeney.  The 1/1/99
6  report was signed by Ray Feeney, who was a New
7  York office employee.
8  Q  And if you were still responsible for
9  this report, would you have signed it?
10 A  For the '99 report?
11 Q  Yes.
12 A  I haven't had an opportunity to
13 review what was in there.  I haven't looked at
14 the actuarial assumptions.  So without having an
15 opportunity to review at least these
16 assumptions.
17 Q  You wouldn't have been working on it
18 after you retired, right?
19 A  No, no.
20 Q  You testified a little earlier that
21 Mr. Kiley was good at math?
22 A  (Indicating)
23 Q  He wasn't able to do cost projections
24 by himself, was he?
25     MR. GOTTESDIENER: Objection.

Page 336

(18:59:26-19:00:28)

1  GREFIG
2  THE WITNESS: Who said that?
3  MR. GOTTESDIENER: I said that.
4  THE WITNESS: Oh.
5  A  He -- he would be able to do some
6  cost projections, but not actuarial cost
7  projections.  Benefit illustrations, but not
8  cost projections.  No.
9  Q  So if there were cost projections in
10 the documentation, they would have been prepared
11 by you or someone at Mercer?
12     MR. GOTTESDIENER: Objection.
13 A  Yes.
14     MR. RUMELD: I have nothing
15 further.  Thank you.
16     MS. WALWORTH: All done?  This
17 deposition is concluded.
18 THE VIDEOGRAPHER: This
19 concludes Tape Number 6, also
20 concludes today's deposition.
21 The time is 6:57 p.m.  We're
22 off the record.  Total time for the
23 Plaintiffs is seven hours and for the
24 Defendant is three minutes.
25

Page 337

```
 1      A C K N O W L E D G E M E N T
 2
 3   STATE OF            )
 4      :ss
 5   COUNTY OF           )
 6
 7   I, JAMES GREFIG, hereby certify that I have
 8   read the transcript of my testimony taken under
 9   oath in my deposition of March 27, 2012; that
10   the transcript is a true, complete and correct
11   record of my testimony, and that the answers on
12   the record as given by me are true and correct.
13
14   _____
15      JAMES GREFIG
16
17   Signed and subscribed to before me
18   this _____ day of _____, 2012
19
20   _____
21   Notary Public, State of _____
22
23
24
25
```

Page 338

```
 1           C E R T I F I C A T E
 2
 3   STATE OF NEW YORK )
 4                      :ss
 5   COUNTY OF NEW YORK)
 6
 7           I, RONALD A. MARX, a Notary Public
 8   within and for the State of New York, do hereby
 9   certify:
10           That JAMES GREFIG, the witness whose
11   deposition is hereinbefore set forth, was duly
12   sworn by me and that such deposition is a true
13   record of the testimony given by such witness.
14           I further certify that I am not
15   related to any of the parties to this action by
16   blood or marriage; and that I am in no way
17   interested in the outcome of this matter.
18           IN WITNESS WHEREOF, I have hereunto
19   set my hand this 30th day of March, 2012.
20
21
22
23   _____
24   RONALD A. MARX
25
```

Page 339

```
 1              ***ERRATA***
 2       ELLEN GRAUER COURT REPORTING  CO. LLC
 3         126 East 56th Street, Fifth Floor
 3            New York, New York 10022
               212-750-6434
 4
 5   NAME OF CASE:  Osberg vs. Foot Locker
     DATE OF DEPOSITION:  March 27, 2012
 6   NAME OF WITNESS:  James Grefig
 7   PAGE  LINE  FROM        TO         REASON
 8   ___|___|_____|_____|_____
 9   ___|___|_____|_____|_____
10   ___|___|_____|_____|_____
11   ___|___|_____|_____|_____
12   ___|___|_____|_____|_____
13   ___|___|_____|_____|_____
14   ___|___|_____|_____|_____
15   ___|___|_____|_____|_____
16   ___|___|_____|_____|_____
17   ___|___|_____|_____|_____
18   ___|___|_____|_____|_____
19   ___|___|_____|_____|_____
20   ___|___|_____|_____|_____
21            _____
22   Subscribed and sworn before me
23   this_____day of _____, 20__.
24   _____  _____
25   (Notary Public)     My Commission Expires:
```