F7enosb1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

GEOFFREY OSBERG,

                    Plaintiff,

          v.                              07 CV 1358(KBF)

FOOT LOCKER, INC. et al.,

                    Defendants.

------------------------------------x
                                    New York, N.Y.
                                    July 14, 2015
                                    9:05 a.m.

Before:

                    HON. KATHERINE B. FORREST

                                        District Judge

                         APPEARANCES

GOTTESDIENER LAW FIRM, PLLC
     Attorneys for Plaintiff
BY:  ELI GOTTESDIENER
     ALBERT HUANG
     STEVEN COHEN

PROSKAUER ROSE LLP
     Attorneys for Defendants
BY:  MYRON D. RUMELD
     ROBERT RACHAL
     JOSEPH E. CLARK


ALSO PRESENT:
Jon Int-Hout, Trial Technology Specialist
Randall Carter, Trial Technology Consultant

F7enosb1

1                    (In open court)

2                    (Case called)

3          MR. GOTTESDIENER:  Good morning, your Honor.  Eli

4    Gottesdiener with Steve Cohen, Albert Huang.  I've got

5    Mr. Deutsch and Mr. Osberg with me at counsel table as well.

6          THE COURT:  Good morning all of you.  We have -- let's

7    see.  Mr. Carter?

8          MR. CARTER:  Yes.

9          THE COURT:  Thank you.

10         MR. RUMELD:  Good morning, your Honor.  Myron Rumeld

11   from the Proskauer firm.  I have Robert Rachal and Joe Clark on

12   either side of me.  I would also like to introduce Sheila

13   Clark.  She is the general counsel of Foot Locker.  She is

14   sitting in the first row.  Next to her is Dennis Sheehan.  He

15   is the vice president and deputy general counsel.  I'm sorry.

16   I am standing in your way.

17         THE COURT:  All right.

18         MR. RUMELD:  Immediately behind me is Larry Sher, our

19   expert witness, and I think John Int-Hout who we introduced

20   yesterday.  He's handling the technical issues.

21         THE COURT:  Good morning, everyone.  We are now on

22   trial.  I wanted to give you folks the precise amount of time

23   that you will have so that you can follow it along.

24         We are going to call it 25 hours, which is between 24

25   and 26.  If you do six and a half hours for each of the four

F7enosb1

1    days, it would be 26 hours, but realistically that's not going

2    to quite work out that way, so we will call it 25.  We will

3    keep track of that.

4         Every time you stand up your clock will start to tick.

5    Your clock will stop when you are no longer doing the

6    examination or presenting your opening argument.  We should

7    compare clocks now and again.  You folks can compare with the

8    clerk who will be here.  My clerk will be keeping time.  And if

9    you folks want to make sure that the time that you have

10   reconciles with the time that she has, that would be useful at

11   the conclusion of the day.

12        With that said, Mr. Gottesdiener, would you like to

13   proceed, sir, with your opening statement?

14        MR. GOTTESDIENER:  Yes.  Thank you, your Honor.

15        As your Honor knows, sometimes good people do bad

16   things, things that creep up on them, things that they

17   rationalize to themselves, that they maybe convince themselves

18   aren't so bad but, they know rationally are bad, are wrong.

19        Here it was wrong of Foot Locker to abuse the trust

20   that employees placed in the company, their fiduciary, to tell

21   them the truth about what was happening to their pensions.

22   Employees are entitled to trust.  These employees were entitled

23   to trust the company when it spoke to them about their pension.

24        The company was their fiduciary, owed them the highest

25   duty known to law.  This was not a business relationship.  The

F7enosb1

standard here was much higher.  This is an extract from a
publication that counsel put out, defense counsel, in 1999.

          The employer is a settlor, not a fiduciary when
designing and adopting a plan.  But once it's adopted, the
employer will be a fiduciary regarding the administration of
the plan.  Thus, all of the fiduciary standards, the duties of
loyalty, and the duty of care will apply.

          Of course we know that the fiduciary duty is the
highest duty known to law.  That is the well known Cardozo
standard.  They needed to abide by that standard.  This was not
the mores of the marketplace.  You cannot judge that standard
here, your Honor.

          That's probably one of the hardest things you are
going to have to do in judging this case.  I would not want to
be in your position, because you may find it hard to keep
putting on the mindset of fiduciary/ward relationship, and when
you hear the evidence you are going to be thinking, hmm, is
this crossing the line in the business setting from puffery to
deception?

          We meet that standard hands down, and can show fraud,
traditional fraud.  But we don't have to, because their duty
under *Amara*, under ERISA, under equity was the highest possible
standard.  So they were required, they had an unswerving duty
to communicate with employees about what was happening openly
and honestly.  The duty to fully and accurately disclose and

F7enosb1

explain material information to plan participants is at the
core of the fiduciary's responsibility.

The duty to inform and warn is a constant thread in
the relationship between beneficiary and trustee.  It entails
not only the negative duty not to misinform which,
unfortunately, they did here repeatedly, as we'll get to, but
also the affirmative duty to level with them, to inform them
when they know that silence is going to be harmful.

All the decisions here, the communication decisions
had to be made with an eye single to the interest of the
participants and the beneficiaries, which means for them and
not the company, not the company as well, not the company at
all.

What happened here was the exact opposite.  They
participated, the fiduciaries did, Ms. Peck, the other people
you are going to hear from or about, Ms. Kanowicz, Mr. Kiley,
Ms. Durham, Ms. Peck -- that was the team and that's who knew
what was going on.  They participated knowingly.

The last bullet point there, this is *Varity*, they
participated knowingly and significantly in deceiving people in
order to save money.  They were entitled to cut benefits, but
they needed to come clean and say, This is what we're doing.
We want to use this transition, to use the change to implement
a years' long wear-away when you are going to have to reearn
what you already earned.

F7enosb1

1        They didn't want to bite the bullet and say that to

2   people.  You will hear, it's not disputed, that they were very

3   focused on morale and they knew this would take a big hit to

4   morale.  The standard here is you should have just said it, and

5   now, even if you didn't intend it, because we are in equity, we

6   are in *Amara*, we are in fiduciary land, it doesn't matter that

7   they did not set out to deceive people and obtain this

8   advantage, the advantage of a companywide compensation cut

9   without anybody knowing it, without any possible blowback.

10        They wanted to avoid the risks of a morale hit, and

11   possibly a full backlash, but a morale hit.  They were

12   undergoing restructuring.  But our job is so much easier than

13   has been portrayed, wrongly, by the defense.

14        We briefed this extensively in the proposed findings.

15   We don't have to prove that they set out to deceive.  Equity

16   says if you are a fiduciary and you put out misrepresentations,

17   it doesn't matter.  Once you get a benefit from that, equity is

18   not going to let you keep that.

19        Ms. Peck was a named fiduciary.  She was on the key

20   committee along with Mr. Farah, who you are going to hear from

21   Mr. Hilpert, who also was deposed, Mr. Thomson, who you also

22   apparently read the transcript from.

23        This is not business is business.  You can't

24   rationalize behavior.  Ms. Peck was under pressure apparently

25   from Mr. Farah, who had just come in, new management, to cut

F7enosb1

1    costs without upsetting employees.  That is a nearly impossible

2    task, your Honor.

3        Your Honor may naturally have some sympathy for the

4    position she was in, but she was a fiduciary to these people,

5    and she needed to level with them and not be looking out for

6    the company.  She had some very distorted views, you will hear,

7    of caveat emptor.  First of all, it's not caveat emptor in a

8    fiduciary relationship.  It just isn't.

9        Second of all, her idea of caveat emptor is wrong.

10   You can't with a complete stranger out in the world enter into

11   a transaction when you know the other party is mistaken about

12   something material.  That is fraud, common-law fraud.

13       Foot Locker knew people were going to understand the

14   communications as saying benefits continued growing.  This is

15   Ms. Kanowicz.  They knew people would be and were mistaken.  We

16   will play this in a second.

17       The point, they knew that they were focusing people on

18   a growing account and nothing else, no caveats, not saying

19   anything about, you actually have two benefits, and that is in

20   a way the most basic fraud here, deception.

21       They presented this all as one.  They presented the

22   old benefit as replaced.  It was converted into something new,

23   the account.  There was no prior benefit.  The entirety of it

24   was dumped into the account, and then you move forward.  They

25   knew about what they were giving people.  What else would

F7enosb1

1    people think?

2              (Tape played)

3              MR. GOTTESDIENER:  She said in the midst of that, it

4    could have meant something if they overcame the balance.  She

5    meant the prior accrued benefit.  But they were never told of

6    even that clearly, which is what a fiduciary should have done

7    straight up.  We are going to put you into a horse race.

8    That's what the structure they set up was.  We are going to put

9    the benefit you earned in a barn, close the barn door.  That's

10   horse number one.  You already earned that.

11             We are going to give you a new horse, somewhat of a

12   nag, somewhat an old horse, and we are going to push it

13   backwards from where the horse in the stall is.

14             If you're lucky, you can get up to where you already

15   were at and eventually, maybe someday -- in Mr. Osberg's

16   situation, he left, seven years he still hadn't gotten up to

17   the horse that was in the barn, riding the old nag the account

18   balance that was all that was shown to him, watch the account

19   grow, keep the account.  He never even got to that barn door to

20   start in the horserace.

21             She's referencing the horse race.  She inserted there,

22   she was trying to say, yeah, well, it could have meant

23   something.  Yeah, it could have.  And you could have done your

24   duty as a fiduciary and just laid out this is what we want to

25   do.  We are in trouble as a company.  We want to cut benefits

F7enosb1

1    and this is how we're doing it.

2              It's the opposite of what they did.

3              The law says you can't treat even a stranger that way.

4    Foot Locker, not Mercer, was in charge of the cash balance

5    wear-away design.

6              Their own filings, the HR personnel who designed the

7    plan were aware of the wear-away phenomenon.  There is this

8    suggestion now that it was Mercer that foisted this on to us

9    and we didn't understand it.  That's not what the evidence is

10   going to show.

11             Foot Locker designed this plan.  Mercer just gave them

12   the choice with a cash balance plan.  You will hear from

13   Mr. Deutsch you don't have to have wear-away.  And you

14   certainly don't have to have this unbelievably drastic six nine

15   arbitrage wear-away.

16             Much worse than what happened in *Amara*, baked into the

17   cake, severe wear-away.  That was Foot Locker's design because

18   the sole purpose of this change was to save money and to save

19   money without people noticing.

20             Design meetings -- this is defendant -- typically

21   included Mercer and one on more of the corporate HR employees

22   with the most knowledge of the cash balance design, including

23   the wear-away feature that they embraced.  It was Foot Locker's

24   choice.

25             It was obvious to them right from the start that there

F7enosb1

was going to be a long period of wear-away.  You are going to

hear, your Honor -- you have already gotten the suggestion in

the papers -- that we can't predict the length of the

wear-away.

          Well, that is not the standard.  The standard is they

knew that there was a severe risk in *Amara*.  The focus was the

significant risk of long wear-aways and they have acknowledged

here, because they can't dispute the evidence that they knew

right from the start wear-aways of one to two years, two to

three years and much longer, you are going hear and see in a

second.

          *Amara* holds that it's the risk, the substantial risk

of a significant wear-away that is the issue.  It is a complete

distraction that they couldn't anticipate exactly, but

Mr. Deutsch is going to show they actually did anticipate and

could have anticipated years of wear-away.

          So it's the possibility of wear-away.  This is from

*Amara V*.  So we are entitled to relief once you see that they

knew that there was the risk of substantial wear-away.

          This next slide shows what Foot Locker knew it was

doing to people's benefits, dropping them into this account

into a pension hole.  The initial cash balance account here is

shown.  This is from Mr. Deutsch's report, without this

enhancement that we will talk about.  This is as a percentage

of the ERISA value of their frozen approved benefit on

F7enosb1

1    12/31/95.

2              On the left-hand column you can see the age that

3    people were on 12/31/95, and then on the right the opening

4    balance without the enhancement as a percentage of what they

5    would be paid that day if they left, they said, 1/1/96, OK, pay

6    me.

7              Look at these figures.  Just go right in the middle.

8    I mean everybody under age 50 started out at half, under half

9    of the value.  That essentially under 50 was where Mr. Osberg

10   was.  And people couldn't know, I think as your Honor is

11   appreciating, they had never seen the present value of their

12   future age 65 annuity in a cash form.  People aren't good at

13   that.

14             Even actuaries, if you did a quiz of Mr. Sher or

15   Mr. Deutsch, they would look up for a second, and they would do

16   it in their head.  But present values just don't come

17   intuitively to people, and the story here is that Foot Locker

18   knew that and took advantage of it.

19             This is another chart from Mr. Deutsch's report.  It's

20   very important to understand this is anticipated or expected --

21   actuary speak for this is what they knew was going to occur

22   before anything happened, before history played out and

23   interest rates went this way or that way.

24             Another big distraction, your Honor, and they knew,

25   the evidence is also going to show they knew the risk that the

F7enosb1

interest rates were going to go down and make the wear-away

even worse.  But your Honor saw in one of your Honor's earlier

rulings that six nine arbitrage baked into the cake, the

structural wear-away that wasn't there in *Amara*.  In *Amara* it

really was all dependent on interest rates.

        Here interest rates make it worse, but it is a big

distraction and sideshow that they are going to take you down

that road that it was all caused by interest rates or almost

all caused.

        No.  This was all anticipate based on prevailing rates

then, assuming they were going to be held constant, which is a

fair assumption.  You don't know if they are going to go up or

down.  Assuming rates held constant, what this shows is, this

percentile column and then the number of participants in that

percentile, this shows the shortest wear-away period that

people in that percentile were going to suffer.

        I don't know about you, but Ms. Peck certainly agreed

that freezing somebody's pension, basically everybody agreed,

freezing it even for a period of six months to a year, at that

point, it gets material.

        Maybe a couple months here and there we wouldn't be

here, your Honor, if it was a very short wear-away period.  But

look, we've got -- just take 36 months, three years.  That

means in the 60th percentile there were 8,700 people who they

anticipated had as the shortest wear-away period possible three

F7enosb1

1    years.

2              This was not any surprise that Mr. Osberg had all

3    these years of meaningless pay credits.  We are going to look

4    at this in more detail with Mr. Deutsch.  This chart shows the

5    value of all the pay credits that he was shown and made to

6    believe were adding to his pension.

7              Up at the top, the first row, 1/1/96, his account

8    balance shorts out at $64,000.  The reality, your Honor, is if

9    he had actually left on 1/1/96 -- unbeknownst to him but known

10   to Foot Locker because they had all these calculations, they

11   knew this -- they would have had to pay him $14,000.  Look to

12   the right.  They made him believe, and this is not by omission,

13   the 1/1/96 statements in a way are one of the -- they certainly

14   go in the top ten of the shocking evidence in this case list.

15   The 1/1/96 statements they literally -- sorry -- lie.  They say

16   $6,400, Mr. Osberg, is the amount you would receive if you left

17   today.

18             In a way that more than anything else can help explain

19   why there was no way anybody was ever going to figure this out,

20   because they brainwashed people into believing that was what

21   they had already earned.  But it wasn't.  It was an arbitrary

22   number set up under an additional formula.

23             At the time it was legal to do this.  It was legal to

24   have that horse race.  What it never was legal to do, your

25   Honor, was trick people into thinking there was one benefit and

F7enosb1

1    that the old benefit was replaced or converted and went away

2    and was put in cash in full into the new benefit.  That was the

3    fraud here.

4            Every year his account balance has grown, looks great.

5    Everybody you've read the declarations of and will hear on the

6    witness stand, they are all going to say in their own way, of

7    course -- what else do they probably believe, given what they

8    were shown and the happy news they got?  Not just happy Pat

9    Peck being positive.

10           This isn't about puffery, your Honor.  Puffery in the

11   business world is expected.  Puffery is exaggeration.  These

12   are lies, and these are lies by fiduciaries, showing you a

13   growing account and not grabbing you by the lapels and saying,

14   OK, now just remember that doesn't necessarily do anything for

15   you unless and until it overcomes the value of what you already

16   earned years ago.

17           What he earned years earlier is in the right-hand

18   column that's now in the middle, and those numbers, those were

19   just the present value numbers of the same benefit.  Those

20   number increase, but it's the same benefit, and there's more

21   trickery, including in filings in court, where they suggest

22   even to your Honor that, Oh, that benefit was growing.

23           No, it wasn't.  Mr. Deutsch will explain this.  That

24   wasn't growing.  That's just one less year of discounting

25   because they are that much closer to age 65.  So the change in

F7enosb1

that number is just because he's closer to age 65, so there's
one less year of discounting.  The only other difference is the
interest rate will make changes, sometimes it goes a little up,
sometimes it goes a little down, but there's also a less year
of discounting.

It's the same benefit.  $14,000 at the top, the
$25,000 that he was paid when he left, that was his 12/31/95
benefit, it was the same $14,000.  In essence that was a
nominal number.  That was the same economic value, the same
benefit applying Congress' requirement of the 30-year Treasury.

$25,000, his account.  He never got out of wear-away,
$20,000.  All of those pay credits to the right, the $10,943,
meaningless, useless.  It is important, your Honor, they knew
how material this was to people.

The average person there, $22,000 salary.  They could
not afford, the employees, these kind of cuts, and you will
hear that this is identical, the identical effect is a
temporary plan freeze.  We will go over that in more detail
with Mr. Deutsch.

They knew that freezing employees' pensions was a big
deal.  Here's Ms. Kanowicz admitting to that.

(Tape played)

MR. GOTTESDIENER:  Indeed, it is.  But they knew that
this freeze could be mixed in with all the complexity of the
conversion and nobody would recognize it.

F7enosb1

1          (Tape played)

2          MR. GOTTESDIENER:  Now, your Honor, in their most

3     recent filing they are so on the ropes at this point they knew

4     that their main communications are so completely false and

5     misleading as to the basics of what's going on that now in

6     paragraph 140 of their proposed findings, they come up with a

7     new story, for which there is zero evidence, and doesn't help

8     them anyway.

9          Given the complexities of the plan design and the

10    difficulties that plan participants had in grasping even the

11    most fundamental concepts, such as presenting valuing or the

12    difference between an annuity and a lump sum -- this is what

13    they are saying now, that people had such difficulty with most

14    basic concepts.

15         I just want to pause for a second and remind your

16    Honor how often you were shown complicated formulas with no

17    prose explanation, that they were saying to your Honor, oh, it

18    was so obvious to people that they were not earning benefits.

19         But returning to what they say now, the corporate

20    benefits department reasonably concluded that it was best to

21    limit disclosure -- that is a buzz word for misrepresent, but

22    let's say limit disclosure, limit disclosure in the companywide

23    communications to information that was common for all

24    participants.

25         What they are basically doing is throwing all of their

F7enosb1

1     main communications, the announcement letter, the highlights

2     memo, the SPD under the bus.

3          Because we have shown -- we will show again for trial

4     because we have to do it for the record -- those documents,

5     they are not just misleading, they are false.  They contain

6     false statements, and the omissions are so glaring that they

7     are falsehoods.

8          So they've thrown those under the bus, and they seem

9     to now be relying on these one-offs, that the one-offs are also

10    false and misleading and they are horribly complicated.  As

11    your Honor has seen, even the CFO of F.W. Woolworth, the

12    division that closed, this is the guy, Mr. Steven, who actually

13    advised Mr. Farah that he should go ahead and close that

14    division because they just weren't making a high enough return.

15    This guy received from Mr. Kiley, who was in on this scheme,

16    complicated formulae, and he is a CPA, not an actuary.  So he

17    sees 9 percent, and it says interest rate.  It doesn't say

18    discount rate.  He's trusting and he's busy and he's looking at

19    it and it seems fine.  OK.  Great.

20         That's what they are down to.  And what is so at odds

21    and is how contradictory the defense's positions are, because

22    out of the other side of their mouth they say that they didn't

23    try to disclose the wear-away.

24         In the letter to your Honor in January 5, 2015, they

25    admit they decided not to focus on the wear-away.  So why are

F7enosb1

they putting all these little technical things in the weeds in these documents?  It makes no sense.

Clearly they misled participants into thinking growing accounts must mean a growing benefit.  This is the document that your Honor has now seen so often that she knows it by its PX number already.

We are excited to announce these changes.  They are going to put our company alongside the best retailing companies in providing associates with options for their individual retirement plan.  The other part of the new plan, several changes to the retirement plan.  You are going to have more flexibility and a better ability to monitor your benefits, that third line.

Your Honor, the essence of what happened here is it was impossible to monitor your benefits looking at your account.  Remember back to Mr. Osberg's account.  If you are just looking at your account and they didn't show him anything else, you look at the account, how can you monitor your benefit?  Your real benefit Mr. Deutsch will underscore is that horse locked up in the barn.

That's your benefit.  How can you monitor your benefit from your account, which is an alternative benefit, maybe someday it will do better than that benefit, but for years it didn't, for everybody.  And they knew that.

The next line:  Each plan participate have will have

F7enosb1

1     an individual account to which the company will make a yearly

2     contribution.

3            What was going on when they said that?  They knew the

4     sole purpose of this change was to save money and stop making

5     contributions, or as high contributions as they had to make

6     into the pension plan.

7            Mr. Deutsch will explain the pipe analogy that he uses

8     with clients, sponsors of the plans.  It is a pipe.  You put

9     money in, benefits come out.  You want to stop putting money

10    in, benefits are not going to come out.  It's that simple.

11    That's what they were doing.  They were stopping putting money

12    or very substantially lowering the contributions they had to

13    make, which you will hear about is normal cost.  They wanted to

14    save cash not because they were going to go bankrupt -- that is

15    another fantasy, distracting, untrue story that they tell your

16    Honor.  What they were doing was saying to people, who are --

17    you know, they're average Joes.  They are shoe salesmen.  We

18    are going to give you an account and make a yearly

19    contribution.  Not only do they not tell them it is not a real

20    account, which is not as important as they don't tell them that

21    that contribution is totally conditional in the sense that it

22    is not going to mean anything for Mr. Osberg.

23           All those contributions they made all these years,

24    that is what they are talking about.  So they wanted people to

25    think that was real dollars in their pocket in their account,

F7enosb1

1     but they knew that it wasn't.  They say that contribution will

2     be based on a new formula that will reflect percent of pay and

3     years of service.  They don't say it is a second formula that

4     we have decided to start off at a deficit because we have

5     problems with restructuring.

6             Your Honor is sitting there looking at me saying, How

7     could a company have said that?

8             Well, a company is a business.  Might have thought it

9     couldn't say that.

10            THE COURT:  By the way, just so that the record is

11    clear, I think my face is sort of without reaction.

12            MR. GOTTESDIENER:  Yes, your Honor.  It was

13    rhetorical, purely.

14            So the company is the fiduciary.  They have to totally

15    come clean.  They can't present this thing as new and improved,

16    the greatest thing since sliced bread, because they are a

17    fiduciary, and it wasn't true and they knew that.  It was not a

18    replacement formula.

19            Here's really another kicker.  Participants will be

20    able to see their individual account balance grow each year and

21    know its value.  False.

22            If you look at your account balance, if you are in

23    wear-away, Ms. Peck, they all admitted in their depositions,

24    and they will admit it here, they have to, it has no value.

25    All of that had no value to Mr. Osberg.

F7enosb1

1              In the highlights memo right away in the very first

2     line, after they are told, oh, remember the nice letter that

3     Roger and Dale Hilpert sent you a couple months ago, now let's

4     explain what is going to happen.  Currently your benefit under

5     the plan is expressed as an annual annuity payable at your

6     normal retirement date.  Effective 1/1/96, your benefit will be

7     expressed as an account balance, again in a way that's the most

8     basic falsehood.  Here you have this, now you have that.

9              The "this" goes away.  It is now replaced.  The full

10    value is put into the account.  Don't worry about that old

11    thing anymore.  In fact, we are not even going to show it to

12    you any more sow.  How could people worry about it?  How could

13    people know what's going on?

14             At the very moment they were sending out that

15    communication, they were meeting with Mercer about implementing

16    the conversion.  These people knew this was not a real

17    conversion.  This was not a replacement.  What Jimmy Grefig,

18    the Mercer actuary said to all of the assembled people,

19    Kanowicz, Kiley, Durham, Linda Ine, all the people in Milwaukee

20    who were implementing it -- those were people on the left of

21    that memo -- the current structure for the current plan should

22    remain in place.  The new plan structure should be an add-on.

23             That is exactly what happened in reality, but that is

24    not at all what people were told.  They got two benefits.

25    People were in a horse race, and they were never told that.

F7enosb1

1          Foot Locker has wafted out suggestions, not only were

2     they led around by the nose by Mercer, who knew so much and

3     sold them a bill of goods that Foot Locker didn't understand,

4     but that, you know, counsel was telling them, this was all

5     fine.

6          No, they weren't.  They were advised by outside

7     counsel do not suggest that the cash balance formula replaced

8     the prior annuity benefit.

9          Foot Locker sent counsel the format for that 1/1/96

10    statement that I told your Honor was in the top ten of the

11    falsehoods here.  You see what's crossed out to the left first,

12    where it says, current plan.  And then somebody wrote in,

13    accrued benefits.

14         And then to the right you see how it says also crossed

15    out, amended plan as of January 1, '96.  That's what Foot

16    Locker faxed over to outside ERISA counsel.

17         Outside ERISA counsel said, Wait a minute.  No.  You

18    can't do that.  Accrued benefits, just leave accrued benefits

19    over to this side and just explain that the lump sum is a new

20    distribution option.

21         What you will see, the final format of the plan

22    statement is, again, like the highlights memo, one replaces the

23    other, and you don't even have the old accrued benefit under

24    the amended plan.  Foot Locker ignored that, rejected it, and

25    went with what they wanted to do.

F7enosb1

1            But that wasn't the end of it.

2            Counsel also said there, you can see a little bit more

3    clearly at the top.  You see where it says, amended plan as of

4    1/1/96, that was crossed out.  That was counsel saying, no, no,

5    no, don't do that.

6            Then they also said, Wait a minute.  You cannot say

7    the amount shown in item 6, the account balance, you can't say

8    to Mr. Osberg, who is only given a $64,000 opening account

9    balance when you would have to pay him $14,000 by law, you

10   can't say to him that's the amount that you would expect to

11   receive on termination if you accrue no further benefits.  You

12   can't do that.

13           You have to at least say where counsel wrote in,

14   unless your accrued benefit as of December 31/'95 set forth in

15   5 above is greater on an actuarial equivalent basis.  Counsel

16   is saying, you at least have to put that in, because otherwise,

17   you are making a false statement.  As suggested it still would

18   have been totally inexcusable and not understood by anybody,

19   but at least it would have been not false.

20           They rejected that as well and kept telling people

21   year after year, statement after statement, this is the amount

22   that you would expect to receive if you left the next day.

23           The SPD, shocking really.  This is the summary plan

24   description, how your benefit is determined.

25           The center of gravity of this 22-page document, which

F7enosb1

basically says nothing about what people's benefit really is
for 16,000 people, the whole cash balance formula was
irrelevant.  It meant nothing.

Yet they tell people, and it meant nothing for 16,000
people the first year and then you know, 14,000 people the year
after that, so many people, and yet they said, Your plan
benefit, not just one of the formulas under which you could get
a benefit, the benefit under the plan is based on your account
balance.

False, false, false.

That account balance is made up of your initial
account balance, and what else could it be anybody in the real
world would think, the value of your plan benefit as of
12/31/95, before the plan was amended.  People don't know about
wear-away.

So they would just think obviously I got everything
that I earned, particularly because the company is telling me
that, and then you get the interest and then these additions
called compensation credits.

Obviously, easy for the Department of Labor to say
they engaged in inequitable conduct, and it doesn't, again,
matter that they intended to deceive people.  It is just that
was the result and they got a benefit.  That's why we are
entitled to liability and remedy.  They engaged in inequitable
conduct by issuing SPDs that were at best unclear and at worst

F7enosb1

misleading and otherwise actively encouraged people to think
that they are receiving additional benefits as they perform
their work each day when in reality their accruals were frozen.

        Clearly, they are telling people your benefits are
growing.  They are suggesting continuously growing benefits.
The message conveyed by the SPD as well as the highlights memo,
according to DOL, inexorable benefit growth.

        As a fiduciary, again, they needed to grab them by the
lapels, slap them and say, Hey, we're creating this account for
you.  It is a second formula.  It may not mean anything for you
for years.

        And intent is clear.  Their surveys at the time, Foot
Locker was way off the charts in terms of how aggressive it
was.  This survey shows that 22 out of 24 plans determine the
initial lump sum amounts using the GATT rate, the 30-year
Treasury, or, even more beneficial than the GATT rate.  The
GATT rates are what Cigna did.  Cigna didn't do anything half
as bad as what happened here.  In other words, 92 percent of
these plan conversions, they are not technically correctly
deemed conversions, but changes, the initial lump-sum amount
were equal to the present value of the normal retirement
benefit under the old formula.

        That wasn't the case here.  Mr. Deutsch will explain
present value under the environment of this plan needed to be
done at 6 percent because you were only growing the account up

F7enosb1

1    back to age 65 at 6 percent.  So you had to discount it down at

2    6 percent with no mortality and no 9 percent setting it back.

3    That's the only present value there was.

4              Mr. Sher puts in his report that only 2 percent of

5    plans surveyed created an opening balance that was so low that

6    they used more than a 2 percent spread between the 30-year

7    Treasury and the discount that they used.  Foot Locker was in

8    this 2 percent group.  They used a 3 percent.

9              So they were way, way off the charts, and the evidence

10   you will see is they didn't stumble into this, your Honor.

11   Ms. Peck, Mr. Kiley, Ms. Kanowicz, they knew exactly what was

12   going on.

13             They concede the planners knew that this was going to

14   cause people's pensions to stop growing.  HR personnel notes

15   refer specifically to the wear-away feature and its effect on

16   participant accruals.

17             Look at that last euphemism.  They see its effect on

18   participant accruals.  What is that effect?  To freeze them.

19   To suspend them.  They don't continue to grow.

20             You are going to hear as an excuse, oh, well, we

21   didn't think of this as a freeze of the plan.

22             But you knew that it had the effect of freezing

23   people's benefits.  Freezing the plan is kind of beside the

24   point.  They knew it was a suspension of accruals.  They knew

25   there was no growth.  They expected a long, long wear-away

F7enosb1

1    period.

2            Mr. Kiley you are going to hear is an absolutely

3    fabulous note-taker.  Some of the documents that were not

4    spoliated are his notes.  He testified he is essentially a

5    verbatim note-taker.

6            So he's explaining here -- rather, he's writing down

7    here what Jim Grefig, the Mercer actuary, is saying to him.

8    First-year normal cost.  That's the amount of liability that

9    the plan incurs based on what new benefits people earned in

10   that year, so they were trying to get the normal cost down.  So

11   people would not earn new benefits.  It would translate

12   directly into pushing down the normal cost.

13           Kiley admits they knew it was a one-to-one savings.

14   Wear-away, your Honor, was the point of this change.

15           He is being told by Mercer, after they said they met a

16   couple of months earlier and Mercer said you could do a

17   wear-away, you could do this, you could do that, Foot Locker

18   was like, yep, we're signed up for that.  We like that.

19           Then they went away and they started showing

20   scenarios, and this is one of the multiple exchanges, including

21   with Mr. Maikels, Mr. Grefig, Mr. Cassidy, that Kiley -- who

22   was a math major, who has an MBA, who was almost going to be an

23   actuary, he started taking the actuarial exams.  He was the key

24   interface between Mercer, not exclusively.  Ms. Peck was

25   certainly involved with Mercer directly.  But Kiley was the key

F7enosb1

interface.  He understood all of this stuff very, very well.

He's writing down first year normal cost, which is much, much lower, millions of dollars a year lower, based upon the fact that a person does not earn any additional benefits.

How more stark can you get than that?  We're going to save money because people aren't earning any additional new benefits, and it may take between two and three years to get up to the ongoing cost level.  So they knew -- and this is April '95 -- they knew that there was an anticipated expected wear-away of on average two to three years, and interest rates you are going learn were much higher, 2 percent higher than they were at the time of the change in January '96, when they went down to 6.06.  At this point it's at 8.

What Mercer is saying is exactly what Mr. Deutsch found, which is, the anticipated -- meaning expected -- you don't have to have a crystal ball.  Wear-away at that point in time, with prevailing rates at 8, was already two to three years on average.  Thousands and thousands of people were going to be earning no new benefits for years.  They knew that, and they knew that it was going to get worse if and, as indeed happened, rates fell.  This is counsel conceding they knew that there was going to be a wear-away period of years.

Your Honor, in a way this evidence should make the decision you have to reach in this case easy, because nine months into the wear-away that decimated people's benefits,

F7enosb1

1    Roger Farah wanted more savings and sent around a memo.

2              Ms. Peck moved into action, and Mercer responded with

3    a letter.  This is to Pat Peck.  The letter to Mr. Mercer with

4    Roger's memo attached, that is the memo saying we need to save

5    more money.  Can we do something about the retirement plan

6    again.

7              So Mercer got involved, and what did Mercer say?

8              Under the current plan provisions -- by this time

9    interest rates had fallen -- under the current plan provisions

10   the normal cost is about $4 million for '96, and it's expected

11   to rise to about $10 million by the year 2000.

12             This gets a little tricky, and Mr. Deutsch should help

13   out with this.  The 4,000 is what they had to put in in 96.

14             THE COURT:  4 million.

15             MR. GOTTESDIENER:  4 million.

16             The 10 million is once the wear-away is over.

17             So they are saving, this is rough, $6 million every

18   year until they actually people are actually earning new

19   benefits.  This is all on average.

20             Look at the last sentence.  The increase, which they

21   are referring to the $10 million, is due to short-term savings

22   built into the plan design.  Wear-away was built into the plan

23   design, and those savings are going to wear-away over the next

24   three to four years, which is telling Ms. Peck point blank, now

25   hit the reset button.  You should be anticipating a wear-away

F7enosb1

1    period of four to five years, three to four more years of

2    wear-away.  And when is this?  September of '96.

3              (Continued on next page)

1          And what happened after that?  You're going to hear

2     they put out, your Honor, the SPD after knowing that the

3     wear-away was four to five years.

4          (Tape played)

5          MR. GOTTESDIENER:  And Foot Locker knew not only was

6     that wear-away going to last a long time, but the obvious thing

7     that people would want to know that they were not earning new

8     benefits.  Here is Ms. Peck.

9          (Tape played)

10         MR. GOTTESDIENER:  Yes, exactly right, she would want

11    to know, but she didn't tell people because she had Roger Farah

12    breathing down her neck and she was thinking about other

13    things, not participants.

14         (Tape played)

15         MR. GOTTESDIENER:  They hid the wear-away.  We have

16    seen the communications and we'll go through them again.  I

17    don't want to belabor them.  You're going to hear from the

18    witnesses directly.

19         (Tape played)

20         MR. GOTTESDIENER:  That is an admission that they

21    intentionally withheld this information because they wanted to

22    avoid the natural reaction people would have.  Here is Ms.

23    Kanowicz.

24         (Tape played)

25         MR. GOTTESDIENER:  No ifs, and/or buts, she says,

F7EJOSB2                          Opening - Mr. GOttesdiener

1    squaring the circle.  That is fraud and it is doubly fraud when

2    there are fiduciaries involved.  We don't need the spoliation

3    inference, but we have it because defendants were under an

4    obligation to preserve evidence, yet negligently failed to

5    implement a litigation hold and negligently destroyed documents

6    that were likely relevant to the litigation, a sanction is

7    appropriate.

8            The court agrees the missing documents would have been

9    relevant to our claim and that a reasonable trier of fact could

10   infer the destroyed or unavailable evidence would have been of

11   the nature alleged by the party affected by it, its

12   destruction, and here that is evidence plaintiff alleges we

13   have shown you found that particularly the contemporaneous

14   notes accompanying the design of the plan, including Ms.

15   Kanowicz's notes, the court will recall Ms. Kanowicz had a ton,

16   she had a whole drawer, she said, of notes that were destroyed,

17   and she would have been an even more forthcoming witness if I

18   had those notes to control her.  They would have provided

19   evidence that Foot Locker intentionally concealed the wear-away

20   effect.

21           So in closing, your Honor, I just want to say, as I've

22   said a couple of times, your Honor has a hard job because your

23   Honor has to try to remember that the test here is not out in

24   the outside world and those mores.  The test here is fiduciary,

25   and even if we had to meet the higher standard, we would win

F7EJOSB2                          Opening - Mr. GOttesdiener

1    hands-down because it is fraud.  The Brass case we cite in our

2    submission refers to a famous case of fraud where a woman walks

3    into piano store, common law fraud, no fiduciary relationship,

4    walks into a piano store, the owner of the store has put out a

5    used piano, but it looks new, it's positioned in a way with

6    other pianos that are new, the old are somewhere else, but

7    doesn't lie, doesn't misstate, which we have here, but he

8    doesn't do that.  He just lets her draw her own conclusion.

9        She draws the conclusion that this is a new piano, and

10   they're entering into the transaction, and he learns during the

11   course of the discussions that she is mistaken.  Whether it is

12   his fault, it doesn't matter, whether he intended to do it, at

13   that point in time the loss changes even among strangers, when

14   he knows, because she said something, she said something about

15   new piano, so he knows that she is mistaken.

16       That is fraud.  That is common law fraud.  You cannot

17   take advantage of a known mistake, and as your Honor has

18   recognized, they knew what this was doing to people's benefits

19   and nobody complained?  Hello.  It doesn't take Lassie to

20   figure out that people think their account is growing benefits

21   because nobody is complaining and because they're just reading

22   what these things are saying.  Foot Locker, putting aside

23   fiduciary, knows the participants are mistaken and yet goes

24   ahead with the transaction.

25       You come to work.  This is your benefit package.  We

1    are not going to tell you, even though we know you're mistaken,

2    we have deleted 10 to 15 percent of it, we have reduced your

3    pay.  Foot Locker knows people are mistaken, they think they're

4    coming to work in part for continually growing benefits.  That

5    is fraud at common law, but we don't have to meet that

6    standard.

7            In equity, fraud is not commonly fraud.  If you're in

8    a court of equity like we are right now and you prove fraud, of

9    course, equity will give relief from that.  But equity in

10   fraud, as we have extensively briefed in our submission, it is

11   not the same thing.  It is simply the equitable idea that if

12   you're a fiduciary and you issue misrepresentations, even

13   innocently, like the piano store owner, and then you learn --

14   withdrawn.

15           You issue misrepresentations, equity says you put out

16   misrepresentations, you have a duty, you breach the duty, and

17   the result is you, the fiduciary, get a benefit vis-a-vis your

18   work, something good happens for you, like here they just

19   avoided the flack of people reacting to a pension freeze.  No

20   question the defendants have never disputed that that is a very

21   substantial benefit that happened.

22           Of course, they say they didn't intend it to happen

23   and, of course, we say they did intend it to happen, but equity

24   says it doesn't matter what their intentions were.  At the

25   start, it doesn't matter.  In the middle, it doesn't matter.

F7EJOSB2                         Opening - Mr. GOttesdiener

1    At the end, it doesn't matter.

2              At the start it is the classic fraud, I'm going to set

3    out to deceive you.  This is outside of equity.  In the middle,

4    it is the piano store owner.  I didn't set out to deceive you,

5    ah, but I learned you are making a mistake, you think the piano

6    is new so you're willing to pay this high price.  I am going to

7    take advantage.  At that point it is also common law fraud.

8              But we're over here, the third slot, which is you

9    don't have to show, we don't have to show any intent at all

10   because treatise upon treatise, including the ones that they

11   cut out the operative sentence, they say it doesn't matter that

12   there is no bad intent because you're a fiduciary, and a

13   fiduciary shouldn't profit from breaches of its duty.  This is

14   not strict liability.  This is not turning ever breach of

15   fiduciary duty case into a reformation case because the

16   difference, as the AMEX case we talked about in April shows, is

17   there was no benefit to the breaching party.

18             In AMEX, they changed this policy and they were still

19   paying out the money, it was just to one person or another.

20   AMEX actually refers to all of the law that I am talking about,

21   and it says it is the resulting benefit that the breacher gets

22   in the fiduciary case from the misrepresentations.  That is it.

23   Equity steps in and says we don't care if you're as pure as the

24   driven snow at the beginning or middle or the end, you should

25   not retain the advantage that you got from those

F7EJOSB2                         Opening – Mr. Rumeld

1    misrepresentations.

2              So in the end we have a very easy burden.  It is clear

3    and convincing.  The standard is not intent to deceive.  It is

4    not fraud.  The facts here are, we believe, intent to deceive

5    and fraud, at least in the middle when they immediately knew.

6    By the time they started issuing these false communications

7    about the growing account, they knew, no complaints, they

8    understood nobody understood what was going on.

9              But the evidence is clear throughout it was the intent

10   of the people, the Pat Peck team to trick people into believing

11   that they were getting something when they weren't, but we do

12   not have to prove that.  The evidence will show that liability

13   should be found for the class and the full remedy we seek

14   should be given to us.  Thank you.

15             THE COURT:  Thank you.  Mr. Rumeld.

16             MR. RUMELD:  Thank you, your Honor.

17             Let me just say preliminarily if your Honor has any

18   questions or comments in the course of my remarks, I am happy

19   to take them and ad lib a little bit if it suits the court.

20             As your Honor knows, this case arises out of a

21   decision by Foot Locker to amend its retirement plan in 1996 to

22   a cash balance formula.  Because of the dire financial

23   predicament facing the company, management had directed every

24   department to come up with cost savings, and retirement

25   benefits were no exception.

1          Let me just say parenthetically, if Mr. Farah gets

2     called Thursday morning as expected, I invite your Honor to ask

3     questions to Mr. Farah about the financial conditions of the

4     company, although there shouldn't be any confusion about that.

5     The cash balance formula coupled with the implementation of the

6     401 (k) plan which happened simultaneously was recommended as a

7     means to address these demands but in a manner that was viewed

8     at the time to be most suited to the employees' needs and their

9     demands.

10          Responsibility for initially coming up with a

11     recommendation that would address these demands fell with Tom

12     Kiley, the manager of benefits planning and design, and he

13     consulted with the plan's long-standing actuaries, the William

14     Mercer Company, which was a very reputable, well known actuary

15     firms in the company.

16          For Kiley, the request to make changes to the plan

17     also presented an opportunity.  As Mr. Kiley's testimony will

18     show -- let me also just say parenthetically, your Honor was

19     shown a lot of video clips just now.  With respect to the clips

20     of the witnesses who are no longer able to appear, they're in

21     evidence.  The other ones I am certainly hoping your Honor will

22     take a fresh listen when these witnesses actually come to the

23     courthouse, and perhaps your Honor will draw a little bit

24     different impression about what these witnesses are trying to

25     say and will represent, but we'll leave that for later.

F7EJOSB2                     Opening – Mr. Rumeld

1          What Mr. Kiley's testimony will show is that he

2     understood from ongoing discussions that he had with his peer

3     groups with other retail employers, that the general trend in

4     the 90's was away from traditional defined benefit plans with

5     offered retirement annuities, some monthly benefit at age 65

6     and in favor of plans that offered participants portable

7     benefits, meaning benefits that they could take with them when

8     they left one job and moved on to another job.

9          Many employees at Woolworth had, in fact, been

10    requesting the opportunity to take their benefits with them in

11    the form of a lump sum.  Although a lump sum option could

12    conceivably have been added to the existing plan formula, a

13    point that is argued by my adversary in the proposed findings

14    if I remember correctly, our expert, Mr. Sher, will explain

15    that that would have been an extremely costly option; and,

16    thus, not an option for Foot Locker at this point in time.

17         Kiley's understanding was that many of Foot Locker's

18    competitors who were looking to install a portable benefit had

19    adopted 401 (k) plans and many also adopted or were considering

20    adopting cash balance plans at that time.

21         Cash balance plans were generally viewed favorably at

22    the time because they they offered this portability of a

23    defined contribution plan, but without the risk of adverse

24    investment returns that a defined contribution plan presents.

25    When you put your money in a 401 (k) plan and the stock market

F7EJOSB2                        Opening – Mr. Rumeld

1    takes a tumble, then your retirement benefits are at risk.

2            As Mr. Sher will explain later, with the cash balance

3    plan, it is still a defined benefit.  The company guarantees

4    the benefit, so on one hand you have a portable benefit like a

5    defined contribution plan, but you also have the advantages of

6    a defined benefit plan.

7            So those are all among the reasons why the talk at

8    that time was the cash balance plan offered some very good

9    features for interested participants.  While the recommendation

10   of a cash balance formula coupled with the 401 (k) plan was

11   made in response to management's request to save costs, and no

12   questions savings costs was clearly management's principal

13   objective, it was also intended to provide the types of

14   benefits that Kiley had been independently looking to implement

15   well before this request was made.

16           This is why Kiley recommended these changes as opposed

17   to various other alternative approaches to saving costs.  Now,

18   Mr. Kiley's recommendations were delivered to his boss,

19   Patricia Peck, the vice president of HR, in early 1995.  She

20   accepted them, and the recommendation was then passed up to

21   senior management in the course of the summer and the fall of

22   1995, and we have some presentation materials still on file

23   that confirm that that was done.

24           THE COURT:  I wasn't sure about the chronology in your

25   findings because it seemed as if Kiley had said that he had

independently come up with these recommendations, but then it

appears that his recommendations were presented in April but

the meeting of the board had happened in January, which seemed

to mean that his recommendations post-dated that.

Over the course of the evidence maybe --

MR. RUMELD:  I intend to come back to that a little

later, but let me say for now I am not sure what your Honor's

talking about in terms of the board meeting in January.

What Mr. Kiley will testify to is that the

recommendation he made was at the very beginning of 1995, in

January.  He then turns over to Mercer, who he had been

consulting with, the job of coming up with a specific design

terms, and then they do, and then in the spring when the terms

are, you know, more fully constituted, that's when there is a

series of meetings with the management group and the investment

group and then the board of directors.  That takes place

somewhere between, off the top of my head May, end of fall, and

the fall of 1995, and the board approves the cash balance

amendment several months later.  I'll come back to that in a

few minutes if that is all right, your Honor.

Now, despite these well-meaning intentions, the class

tries to put this nefarious spin on these amendments.  The

class doesn't dispute the legality of the amendments, nor could

it.  No one is here to say there was anything wrong with

designing a cash balance plan the way we did it.

F7EJOSB2                          Opening - Mr. Rumeld

1          Rather, the class claims that the communications

2    concerning the amendment were faulty and purposefully so.  As

3    we can see from the proposed findings that class submitted, the

4    class contends that Foot Locker misled its participants when it

5    stated that it was converting the pension plan's existing

6    formula to a cash balance formula because, and this part I'll

7    quote, "In reality, Foot Locker added an alternative formula to

8    the plan, a cash balance formula which generated an initial

9    account balance that was significantly smaller than the benefit

10   employees had already earned."

11         Then the class also argues that Foot Locker thereafter

12   hid from its employees the fact that as a result of how their

13   starting balances were calculated, the compensation and

14   interest credits accumulating in their accounts did not

15   represent growth in their pension benefits, or as the class

16   member witnesses are expressing it, that their benefits were,

17   "frozen."

18         Now, before addressing the legal claims, the merits of

19   the legal claims that arise from these assertions, I think it

20   is very important to identify a fundamental misconception that

21   is baked into these allegations.  It is simply wrong to say

22   that the starting balances were less than what participants had

23   earned under the prior plan; and, thus, their benefits were

24   frozen.  That is a misconception that I want to try very hard

25   to remove from this case.

1              Prior to the cash balance conversion, a participant

2      was entitled to an annuity; that is, a stream of payments

3      beginning at age 65 or age 55 for participants who qualified

4      for early retirement annuity.  There was no intention meant to

5      a lump sum at all; and, thus, there were no calculations or

6      determinations of what a participant's benefit might be worth

7      in present dollars using any set of assumptions, 9 percent, 6

8      percent, there was no calculation of a lump sum under the prior

9      plan.

10             The only limited exception was that the plan provided,

11     as I believe the law required, that de-minimus benefits,

12     participants entitled to under $3,500, their money was just

13     cashed out.  For everybody else, you had to wait until

14     retirement age and get a monthly benefit, whatever it was then.

15             THE COURT:  So the annuity was earned, you agree with

16     that?

17             MR. RUMELD:  Annuity was earned.

18             THE COURT:  The conversion of the annuity into a

19     present value lump sum was not earned?

20             MR. RUMELD:  Was not earned.  It didn't exist.  It was

21     just no such benefit at any price.

22             So it is with the new plan formula that the first,

23     that for the first time we create the right to substitute an

24     immediate lump sum for the previously approved benefit.  As the

25     evidence is going to show, this opportunity to take all your

F7EJOSB2                    Opening - Mr. Rumeld

1    pension benefits, because a decision was made not just to do

2    this for the going-forward benefits, but to do it for the

3    accumulated going-backwards benefits that had been earned in

4    the form of an annuity, the opportunity to take all these

5    benefits in the form of a lump sum was really the driver behind

6    the decision to adopt this type of cash formula.

7            This newly credited entitlement to a lump sum was very

8    valuable, first, because consistent with what employees had

9    been asking for, it enabled them to do how they placed with

10   their retirement savings.  I think as your Honor already knows

11   from the papers we submitted, the overwhelming majority of

12   people took these benefits in the form of a lump sum, and it

13   became particularly important when it turned out that thousands

14   of people were let go just within their first year or two after

15   the cash balance conversion.

16           The benefit was also valuable because it provided them

17   an opportunity to cash out at these very favorable interest

18   rates and then to reinvest at a high rate of return, thereby

19   effectively getting much more than what their benefits would

20   otherwise be worth when they were just in the form of an

21   annuity if they waited until age 65.

22           It is not meant to gain an advantage this way because

23   the rate at which they were cashing out was the T-Bill rate,

24   the most conservative rate that there is.  So if you had the

25   opportunity to cash out at T-Bills and then reinvest, that was

F7EJOSB2                         Opening – Mr. Rumeld

1    an opportunity with a great deal of up-side that many of these

2    people seized.  The up-side becomes even bigger if it turns

3    out, as was the case here at the time, that the rates were

4    historically low.

5            So being able to cash out at T-Bill rates was

6    eventually recognized to actually constitute an unwarranted

7    windfall.  As Mr. Sher, our expert, will explain, Congress

8    subsequently amended the Internal Revenue Code to substitute a

9    corporate bond rate for the T-Bill rates as a measure of how to

10   arrive at this lump sum present value.  Those corporate bond

11   rates are typically about a percentage and a half higher than

12   the T-Bill rates.

13           So, you know, even looking at this with the benefit of

14   hindsight, anyone who cashed out in this earlier time period

15   effectively had a one and a half percent jump start on his or

16   her investment opportunity that wouldn't have even been

17   available were it not for the cash balance conversion and would

18   not have been available at that rate were it not for the fact

19   that at that particular period of time, the IRS was using the

20   T-Bill rate it subsequently agreed, that Congress agreed was

21   the wrong rate, it was too conservative.  It was a big

22   opportunity to cash out this way.

23           Just to summarize my point so far, the right to a lump

24   sum value for the pre-'96 accrued benefit was not a preexisting

25   right.  It was a right that was created by this cash balance

1     amendment, the same amendment that the class claims was enacted

2     for all these nefarious reasons, only to suit the interest of

3     the company at the expense of the participants.

4              Now, this newly created lump sum benefit, and this is

5     important as well, the right to that benefit was not triggered

6     when the initial account balance was determined.  It is

7     triggered only when the participant terminates employment and

8     elects the lump sum.  It is only then when the participant

9     leaves that anybody has a right to a lump sum, and there is any

10    statutorily-determined calculation of what that lump sum is

11    worth.

12             THE COURT:  I am going to take advantage and ask you

13    two questions right now.  One is cash balance, is that plan

14    possible without making the prior plan into at least a possible

15    lump sum; in other words, could you, and I think the answer

16    would be yes because some folks kept the annuity aspect of it,

17    or did you need effectively to make the cash balance have a

18    lump sum option?  That is one.  In other words, could you have

19    had cash balance without lump sum in the first place?

20             Then, two, one issue that is important is whether or

21    not in terms of the impact of wear-away, the company which was

22    in financial straights, as you have stated, expected that there

23    would be a number of people laid off, terminated or leave in

24    the near future and, in fact, likely prior to the expiration of

25    some wear-away period, because in that case the point that

F7EJOSB2                          Opening - Mr. Rumeld

1   you're just making right now, which is the issues don't really

2   take hold until you leave, so it is possible you could be out

3   of wear-away for any number of reasons, including interest rate

4   fluctuations and other criteria identified by Mr. Sher in his

5   report.  So those are two questions.

6           MR. RUMELD:  Let me try to take them one at a time and

7   let me also assure the court that you'll get a good chance with

8   Mr. Sher who knows all of this stuff better than I do.

9           I think the simple answer to the first question is

10  yes, it was an option to do the traditional version of an A

11  plus B benefit which really is you continue to get your prior

12  accrued benefit as an annuity, and you start the cash balance

13  account at zero, and then you add payment interest credits as

14  you go.

15          THE COURT:  You're saying A plus B, I hadn't

16  appreciated A plus B could also be an annuity plus B.  I always

17  think of A plus B as lump sum plus B.

18          MR. RUMELD:  Right.  Forgive me, but this can send you

19  down a path that's based on a bit of a misconception because

20  whether you do it the way I just said, which is A is an

21  annuity, or whether you do it where A can also be a lump sum

22  benefit, there is no A benefit on day one because the value --

23  and this is the point of this little slide I'm trying to

24  show -- because the value of the A benefit, if it is left in

25  the form of an annuity, it is annuity.  If the value of the A

F7EJOSB2                        Opening – Mr. Rumeld

1    benefit is a lump sum, that, that accrued benefit is determined

2    when you leave sometime later.

3            There is no day one value of the A benefit.  That is a

4    fiction.  So that's the point.  When we convert, okay, there is

5    no value, dollar value that is predetermined by the IRS as of

6    that date of what the A benefit is worth because that previous

7    benefit was an annuity.  It has a lump sum value if you choose

8    to give a lump sum, but that lump sum value is determined when

9    the participant leaves if he elects the lump sum then.

10           On day one there is no lump sum value of the annuity.

11   If your Honor reads the declarations of a lot of the witnesses,

12   it is built on the impression that I got something less than

13   what I earned on day one, and that's what caused me to

14   experience this freeze.  But, in fact, there is no cash

15   earnings on day one, and that's why the company makes an actual

16   conversion based on the advice it receives from its actuary.

17   That is what generates this situation where you have two

18   benefits going on, because this benefit starts pursuant to an

19   actuarial conversion, not pursuant to what you earned yet, and

20   then sometime later you just compare that accumulation to what

21   you had earned, so to speak, under the prior plan which is

22   determined later because you can only determine that lump sum

23   later.

24           But just to get back to your Honor's first question,

25   which is yes, we could have started everybody at zero, okay,

 1    and just left them with the same annuity they had before.  I

 2    think it is pretty clear that that would have been a much less

 3    popular benefit particularly for those people who were, say,

 4    you know, 40 some years' old, worked for Foot Locker 20 years,

 5    had already accumulated a fairly decent sized retirement

 6    annuity and wanted to get that benefit in the form of a lump

 7    sum.

 8           If they left a few months later, as many did, the only

 9    lump sum they would have gotten was off of the nickels and

10    dimes they had accrued going forward, and for the bulk of their

11    benefit they would have had to wait until age 55 or age 65.

12           So there is this kind of quid pro quo that is going on

13    here.  We make the decision, consistent with what a lot of

14    other plans did at the time, to make the whole benefit into the

15    cash balance plan, to give somebody a right to get the whole

16    benefit in the form of a lump sum.  A by-product is that that

17    is the circumstances that can give rise to the this wear-away

18    effect.

19           Now, in response to your Honor's second question,

20    assuming I still remember it --

21           THE COURT:  Known or projected layoffs?

22           MR. RUMELD:  So forgive me, I don't wish to dodge your

23    Honor's question.  We do know that in the mid-'90s the company

24    was in bad shape.  Certainly the people in management knew it.

25    Stores were closing and stores continued to close throughout

F7EJOSB2                    Opening - Mr. Rumeld

1   '96, okay?  This process of eliminating the Woolworth division

2   had started, but I don't know that already in 1995 they decided

3   to completely close the Woolworth division.

4          So people have anticipated and were people already

5   aware that people were being let go in large numbers?  I think

6   the answer is yes.  I think it is going to be clear from some

7   of the internal e-mails amongst the Wisconsin and New York

8   benefit people, they were already in the process of scheduling

9   meetings for the locations that were going to be shut down, and

10  some of that was already happening certainly by the end of

11  1995.

12         So it is true that for people who were leaving in the

13  short term, you could actually do this math and compare the

14  initial account balance to what you would be entitled to when

15  you left.  In fact, in places like Greenville, we showed your

16  Honor that that information was actually distributed, but for

17  the same reason, for the participants who left in the first

18  year or two, whether voluntarily or involuntarily, I think they

19  generally would have viewed, and some of our witnesses speaking

20  for themselves, speaking for themselves, say they viewed it as

21  a big advantage to get the lump sum even if they were

22  experiencing this wear-away because what wear-away meant for

23  them was there a period of a few months where paying interest

24  credits did not contribute to their benefit because they did

25  get a benefit based on the prior benefit.

F7EJOSB2                    Opening – Mr. Rumeld

1          But their entire benefit they could take in the form

2     of a lump sum, discounted if it was in '96 at 6 percent, a

3     rather low rate and could then invest on their own.  Certainly

4     when we speak to some of our witnesses, you're going to hear

5     this from Ms. –– and Kiley in their declaration already, they

6     understood when they left their credits didn't count towards

7     them, but they were happy to get their benefits in the form of

8     a lump sum.

9          If you left in the short term, yes, if you sat down

10    and thought about it this way, and I want to get back to that

11    point, you could say gee, my credits aren't counting, but it is

12    also true you wouldn't have necessarily perceived this as

13    anything bad because you had this opportunity to grab a lump

14    sum for all the benefits you earned earlier and there was a

15    short period of time in which you're paying interest credits

16    you're not getting the benefit of, so to speak.

17         If you're leaving later, and this gets me back I

18    suppose to my slide, then there are all sorts of things that

19    can happen in the interim, interims of the movement of interest

20    rates.  Now, as Mr. Deutsch has conceded, a mere half percent

21    movement in the IRS rate can cause a 23 percent change in that

22    minimum lump sum benefit.  So every time the year end T–Bill

23    rate went down, the minimum lump sum went up considerably.

24         This meant, of course, the participant was more likely

25    to receive a benefit based on the minimum lump sum if he or she

F7EJOSB2                         Opening - Mr. Rumeld

1     terminated employment and took the lump sum then, but it also

2     meant the amount of money you're getting would be much longer.

3     So, yes, your wear-away WAS longer if the interest rates go

4     down, but you are getting a LOT more money.  No, legally it is

5     not an increase in your accrued benefit, but from the

6     standpoint of the participant, he is getting a lot more cash

7     than if the interest rates hadn't gone down.

8              THE COURT:  Another question.  I Will try to hold

9     questions.  One thing I was thinking about as I read through

10    Mr. Sher's reports again and really focused on them is this

11    interest rate issue.

12             Where in the record, if it is in the record, can you

13    find what corporate management projected as the likely interest

14    rate environment?

15             Putting aside that actuaries may frequently choose to

16    keep the interest rate environment at a static level just to

17    sort of, or pick an average or time, but did management have an

18    interest rate projection, because that seems likely relevant to

19    the point you're making?

20             As I see it, it is difficult or harmful in terms of

21    wear-away.  Wear-away goes on longer potentially based on a lot

22    of other factors.  Interest rates rise.  Wear-away is shorter

23    if interest rates decrease.  I think that seems to be a

24    take-away, right?

25             MR. RUMELD:  Wear-away is longer if interest rates

1    decrease because the minimum lump sum goes up.

2              THE COURT:  Wear-away is the opposite?

3              MR. RUMELD:  Right.

4              THE COURT:  The question is, did management have a

5    projection one way or the other and was their projection

6    consistent with benefit to employee versus lack of benefit in

7    terms of using benefit?  I don't mean benefit in an actuarial

8    sense, but advantageous sense.

9              MR. RUMELD:  I suspect this is one of a million places

10   where we are going to discuss questions with the benefit of

11   hindsight where maybe it seems obvious that question should

12   have been asked and answered.

13             First of all, what your Honor refers to as management,

14   far as we can tell from Mr. Kiley's notes and the other

15   information we have and their testimony, the only people who

16   spoke to Mercer about this whole subject matter was Mr. Kiley,

17   Mrs. Peck and other people below Ms. Peck's level.  Anybody in

18   management above Ms. Peck's level, we don't see any evidence of

19   this discussion happening.

20             In terms of the discussion they had, all we see is

21   what Mercer recommended.  They're the actuaries.  They came up

22   with the plan design.  There is the discussion about the

23   appropriateness of the 9 percent rate.  I have a little bit of

24   a cold.  Excuse me.

25             And they recommend the 9 percent rate.  There is also

F7EJOSB2                    Opening – Mr. Rumeld

1      some discussion about how that rate compares to other things,

2      but I don't think we see Mr. Kiley's notes or any place else

3      some projection by Mercer of this is the direction we can

4      expect rates to move.

5              THE COURT:  I am actually thinking of not Mercer at

6      all, but did the CFO's office, putting aside an individual

7      division, but at corporate level say we project interest rate

8      environment is going to be decreasing with the current

9      environment over the next three to five years, that would be a

10     typical kind of thing that corporate financial folks would do.

11              I just don't recall whether or not it was somewhere in

12     the record because I wasn't focused on that particular question

13     as a proxy for knowledge.  I understand what you're saying,

14     which is even if corporate finance had done that, that may not

15     have gone to Peck and Kiley and those folks.  That may be true,

16     but I am nonetheless still interested because of the potential

17     attribution of the information.  We'll figure that out.

18              MR. RUMELD:  Right.  It is something we can look into.

19     I don't know there is actually evidence in the record.

20              THE COURT:  It may not be in the record.

21              MR. RUMELD:  I certainly don't see any evidence in the

22     record to suggest that there was any flow of information about

23     the future movement of interest rates and whether that could

24     affect this decision about the 9 percent interest rate.  I know

25     my adversary has asked questions about whether Mr. Kiley or

F7EJOSB2                        Opening - Mr. Rumeld

1    Ms. Peck were aware of movement of interest rates in the course

2    of 1995.  I suspect that will surface.  We'll address that

3    issue.

4             I think they'll tell you that Mercer was kind of in

5    charge of the recommendations on the interest rates.  They

6    followed their advice, and Mercer did not at any time suggest

7    to them that, A, we should probably pick a lower interest rate

8    because interest rates are going down.  There is no evidence of

9    that happening.

10            Now, let me just to sort of bring this point home, I

11   want to show your Honor an example of one participant who's

12   referred to as Participant OO4 because everybody has an ID

13   number.  Let me see if I can actually work with this.  (Pause)

14   So this is a participant who left here in 1997, okay?

15            One of the things that happened is between 1996 and

16   1997, there is a change in the interest rates.  At year end

17   1995 the interest rates were 6.06, and that is the rate that is

18   rolled over in a lot of the communications in Greenville about

19   how much you're going to get if you leave, et cetera.

20            By the end of 1996, the rate had gone up to 6 and a

21   half, about, just about half of a percent change.  What you can

22   see here is that half a percent change has a huge impact on

23   what happens to this participant both in terms of what he's

24   going to get, but also in terms of its relationship to his

25   account balance.

F7EJOSB2                    Opening - Mr. Rumeld

1          If you look in the middle, for example, here as of

2     December 31st, 1996, if he had left there, the green line is

3     his frozen accrued benefit.  That is what his benefit, his

4     pre-'96 benefit is worth if he had left then, and you can see

5     it is a little bit higher than his account balance.

6          If he had actually left then, he would have been sort

7     of completely in wear-away because he would have gotten a lump

8     sum benefit, meaning to quote plaintiff's version, that is his

9     accumulated interest and pay credits didn't count.

10          He leaves a few months later, and by the time he

11     leaves, because of the movement in interest rate, that green

12     line goes way down to here.  It increases with time because as

13     Mr. Gottesdiener has said, with age it affects closer to 65,

14     affects the value of the pre-'96 benefit.

15          But all of a sudden it is way lower than the blue line

16     which is his account balance.  By virtue of the fact he leaves

17     in 1997, just one year after the cash balance conversion, he

18     does get his account balance.  He gets this sum, the 132, and

19     what is also interesting to note, it is not only bigger than

20     his pre-'96 benefit, but it is so much bigger that it exceeds

21     the amount of his A plus B benefit, which is this line in the

22     middle, okay?

23          That orangy-yellow line, I guess that is what he would

24     get, that line in the middle would be the full value of his

25     pre-'96 benefit calculated when it should be calculated when he

F7EJOSB2                          Opening – Mr. Rumeld

leaves.  If you take that and add all his paying interest

credits, it would still be a number less than what he got in

his account balance.  This guy who leaves in 1997 actually ends

up ahead of an A plus B benefit.

So he was in wear-away for a period of time in '96,

but it is not relevant because nobody does any calculation for

him in '96 because he is still working, and he leaves in '97.

That is when the numbers matter, and he does better than an A

plus B benefit.

Now, he is not an isolated incident.  The evidence

will show that through 2011 when the actuaries were doing their

numbers, there were close to a thousand people who actually got

their account balance benefit that was bigger than the A plus B

benefit, meaning they already got more than A, the value of

their prior benefit measured in today dollars, plus B, the

total amount of their pay and interest credits.

Yet all of these participants are in the class and

they're all seeking relief in this lawsuit, and they're going

to get a much larger benefit than they already got based on

resetting the starting balances if the court gives the relief

that the plaintiff is demanding.

Now, this all leads to the second point I want to make

about the class' misconception, which is that because of this

wear-away effect, plan benefits should be viewed as "frozen,"

that wear-away means plan freeze.

1          Where the class is characterizing as undisclosed plan

2     freeze was actually a very dynamic process pursuant to which

3     class members for the first time get to take advantage of this

4     opportunity to cash out of their benefits at very favorable

5     rates and thereby effectively increase the value of their

6     previously accrued benefits, an opportunity that, as I said,

7     was exercised by the overwhelming majority of plan

8     participants.

9          I also find it interesting if your Honor reads Ms.

10    Glickfield's declaration, I think she describes she is aware of

11    the pre-'96 benefit calculation because she is one of the

12    people who actually does the benefits and she describes it as

13    an enhancement of the pre-'96 benefit by virtue of the manner

14    in which she calculates.

15         I don't know that I would describe it as an

16    enhancement, but what is really going on is because the IRS

17    tells you how you have to calculate it when you leave, and at

18    this time the IRS says use the T-Bill rates, you just end up

19    with a very large present value number, and in that sense it

20    could be viewed as an enhancement because it is much better

21    than you would get if you used the corporate bond rates or

22    other rates actuaries typically use for present value and

23    Congress later used itself to present present values.  It could

24    be used as a form of enhancement and in that sense maybe we

25    agree with Ms. Glickfield.

F7EJOSB2                        Opening - Mr. Rumeld

1           This was also a process in which the lump sum benefit

2   entitlement based on pre-'96 accruals, even if you were in

3   wear-away at some time, that lump sum, as I showed you, it can

4   go up, it can go down.  You can be in wear-away, you can be out

5   of wear-away.  You can be back in wear-away.  So it has been

6   described with the benefit of hindsight as a plan freeze.  Some

7   of my witnesses have admitted in their testimony it could be

8   looked at with the benefit of hindsight as a plan freeze.  It

9   is really a very dynamic process and where you are you don't

10  know until you end up.

11          As your Honor pointed out, if you were leaving really

12  soon, you could probably end up where you would be.  Certainly

13  if you left in 1996, you already know what interest rate would

14  apply because it is in the year end 1995 rate.  For the reasons

15  I said, those are the people who probably would have preferred

16  the lump sum notwithstanding a loss of a very small amount of

17  credits just for the few months benefit afterwards.

18          With this background, I would like to turn to look at

19  the legal claims that have been asserted.  As your Honor knows,

20  there are two claims for relief.  One is targeted specifically

21  at the summary plan description which was not distributed until

22  several months after the plan went into effect, which is one of

23  the reasons we're suggesting at least for that claim there is a

24  whole bunch of people who had no SPD claim because they never

25  got it and they weren't entitled to it.

F7EJOSB2                         Opening - Mr. Rumeld

         Second, there is a claim for breach of fiduciary which
is directed, shall we say, at the Gestalt of the plan
communications, to see whether we acted prudently.

         We have already explained in our papers based on the
law as well as the documentary evidence why we feel none of
these claims have merit.  The testimony will shed some
additional light on these issues.

         The SPD can take all the information that was
statutorily required both then and now insofar as they contain
an explanation of how the benefits under the new plan formula
was calculated.  A reasonably attentive reader of the SPD would
have known that the initial account balance was determined by
actuarially converting, not replacing, actuarially converting
annuity benefit previously earned using 9 percent and mortality
assumption.

         It said it right in the definition.  There was nothing
misleading about representing that it was an actuarial
conversion, that the starting balance was actuarially
equivalent because as I said, those were the assumptions that
were recommended by the plan's actuary, that he advised were
consistent with an actuarial conversion, and there was no
requirement then to use the interest rate that the IRS mandates
for lump sums because, as I said earlier, you didn't earn that
lump sum yet.

         What is alleged to be missing from the SPD is not the

F7EJOSB2                          Opening - Mr. Rumeld

1    information about how the benefits were paid under the new

2    formula but how these benefits are impacted by the old formula.

3              Consistent with ERISA's anti-cutback rule, which is

4    what entitles you to that old formula now that you're entitled

5    to get it in the form of a lump sum by virtue of the cash

6    balance amendment, so consistent with the anti-cutback rule and

7    what was the prevailing practice at the time, the SPD simply

8    reminded participants that if under the prior formula your

9    accrued benefit was bigger, then you would get the benefit

10   under the prior formula.

11             Now the class complaints, as your Honor know, we

12   needed to go much further and to explain more specifically how

13   the prior formula could be greater and to translate for them

14   that this meant that the credits accumulating in their account

15   balance, therefore, might not count toward their ultimate

16   benefit.

17             In other words, the class contends that the SPD needed

18   to affirmatively put participants on notice of wear-away.  This

19   is another one of the great arguments with benefit of

20   hindsight.  The class can't identify any company with an SPD

21   that did so, and it is really not surprising because, as I

22   said, there is no legal requirement that the SPD talk about the

23   effects or the interrelationship with a prior plan.

24             Years later Congress became concerned about this

25   problem, and Congress addressed this problem by amending the

1    204 age notice.  The notes, the legislative history, the

2    internal memos to Congress show there was a specific discussion

3    about whether to change the SPD, and they decided against it

4    because there was a recognition that the SPD comes out after

5    the amendment, not before, that the SPD describes the new

6    plan's rules, not the old ones, and the more effective way to

7    get this done was with this 204 age notice that needs to be

8    sent in advance of the amendment.

9          After those amendments came into place in 2000, all

10   the Foot Lockers of the world who are designing cash balance

11   plans adjusted the 204 age notices to provide something like

12   what your Honor referred to as a sensitivity analysis,

13   scenarios where you said you know assume the interest rates are

14   here and this is what would happen to you after five years.

15   Those are all regulations that came into place in or about

16   2000, after Congress studied this issue and even then the SPD

17   rules didn't change, and they certainly didn't apply before

18   2000 to make this requirement in any document.

19         This is the problem with trying to litigate a case in

20   hindsight.  This was just not the way people looked at things

21   at the time, and maybe Congress should have put their finger on

22   this years earlier, but they didn't, okay?

23         The other thing to keep in mind, once Congress amends

24   the 204 age, not only does it make rules, but those rules are

25   in effect a safe harbor because then if you follow those

F7EJOSB2                         Opening - Mr. Rumeld

1    instructions and you make projections based on the assumption

2    that the interest rate is going to be the same interest rate

3    that is in effect right now, then you have done your job and

4    nobody will blame you for misleading a participant.

5            Back in 1995 if you actually thought about this and

6    gave some kind of projection, and then it turns out now the

7    interest rates went up and the minimum lump sum went down, some

8    participant would have been suing us, saying we misled them

9    into thinking they would get more than they were going to get.

10   Everybody is navigating without a Congress in the mid-1990's,

11   professionals included.

12           Unlike the SPD claim, the fiduciary breach claim is

13   not limited to an examination of the four corners of this

14   particular document.  Rather it takes into account all of the

15   communications and all the surrounding circumstances for the

16   purposes of evaluating the prudence of what plan fiduciaries

17   were doing in determining what was communicated and how it was

18   communicated.

19           In performing this evaluation, I ask the court to keep

20   in mind that while the class is applying this laser light focus

21   on the communications specifically related to wear-away, at

22   that time the HR department is dealing with a multiplicity of

23   questions and sources of confusion both with respect to the 401

24   (k) plan that is coming out at that time and with respect to

25   this rather complicated cash balance formula involving the

F7EJOSB2                          Opening – Mr. Rumeld

1      conversion of annuity to a lump sum benefit and why are the

2      people down the hall getting better benefits than I am if they

3      worked the same amount of time, not realizing maybe if their

4      number in the starting balance is worth less or if the person

5      down the hall is over 50, he got this benefit enhancement.

6            There is a multiplicity of questions going on and

7      there is clearly lots of confusion.  Your Honor's point about

8      the average employee being a shoe salesman is very well taken.

9      There is a separate question about what is actually the best

10     thing to do when communicating in these company-wide

11     communications with that type of audience.

12           With the benefit of hindsight we can talk about things

13     we could have, should have, would have done differently, but

14     what your Honor needs to consider is what the facts were on the

15     ground at that point in time.  One of the things --

16           THE COURT:  In a couple of minutes we'll take a short

17     break and then we'll come back and I'll resume just so that

18     everybody doesn't have to sit here for too long.

19           Reach your point.

20           MR. RUMELD:  To be honest, I didn't rehearse this.  I

21     didn't know how long my remarks were.

22           THE COURT:  You're not yet at an hour.  We are at

23     11:00 o'clock.

24           MR. RUMELD:  Maybe what I could do is have another two

25     minutes or so, he says confidently.

F7EJOSB2                    Opening – Mr. Rumeld

1              So what the evidence will show is that these various

2     company-wide communications, including the ones the class

3     attacks, the letter from the chairman, the 204 age notice, the

4     SPD, they were all reviewed extensively and edited extensively

5     by a host of people, including the Mercer people, their

6     actuaries, including inside and outside counsel, other

7     management employees, and their collective changes were by and

8     large implemented.

9              Now, Mr. Gottesdiener in his remarks identified one or

10    two places where it looks like the change is recommended and

11    was not implemented.  He also rather conceded the change that

12    was recommended is the same language that appears in the SPD,

13    so according to what anybody would have actually intended it to

14    to have excluded for the purposes of excluding this

15    information.

16             We'll get back to that in the course of this case and

17    in my closing because I will be able to show you the document

18    that was edited was changed wholesale from the one we ended up

19    with.  There is no way to trace one change to another or to

20    explain why certain changes were made.  We don't attribute any

21    intent to not accepting those changes.

22             If you look at the changes to the SPD and 204 age

23    notice, for example, or the president's letter, you'll see

24    there are notes of the changes that were never recommended by

25    all these professionals, and by and large all the changes were

F7EJOSB2                          Opening – Mr. Rumeld

1   taken wholesale because the client listened to their advisers.

2          But notwithstanding all these sources of input, the

3   evidence will also show that no one ever suggested that there

4   was a need to specifically communicate what Mr. Gottesdiener

5   has said now was surely communicated, that as a result of the

6   amendment, for a period of time a participant's pay and

7   interest credits might not be counted towards their final

8   benefit or that even though the dollar amount of their benefit

9   may increase, there may not be no increase for the legally

10  defined accrued benefit.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          So we can ask now, could you have done this?  Should

2     you have done this?

3          I don't know the answer to that.  I only know that

4     people in good faith consulted with all their professionals,

5     and back in the 1990s no one thought it was necessary to put in

6     more language than that sentence that appeared in this summary

7     plan description.

8          I think this would be a good time for me to pause if

9     we need to pause.  I would just say that sometime later I want

10    to go back to trying to explain to your Honor why it would be

11    that people wouldn't necessarily look at it the way we are

12    looking at it today.

13         THE COURT:  All right.  Thank you.  Let's take about a

14    ten-minute break and come back and resume.

15         Thank you.

16         (Recess)

17         THE COURT:  Mr. Rumeld, you may proceed, sir.

18         MR. RUMELD:  Thank you, your Honor.

19         I think what I would like to do is spend a minute or

20    two more on the fiduciary breach claim itself, and then proceed

21    to talk about reformation a little bit.

22         We know from the opening remarks and the proposed

23    findings that the class is going to contend, among other

24    things, that we acted imprudently because some of the

25    communications, including those benefit statements, which also

F7enosb3                          Opening - Mr. Rumeld

1    appear to have been drafted by Mercer, stated or implied that a

2    participant would expect to receive what was in the cash

3    balance account and nothing else.  That is what

4    Mr. Gottesdiener said was just not right, was a lie.

5           Interestingly, what that really means is it was

6    imprudent because we misled class members by failing to tell

7    them that they might actually receive more than they were

8    expecting instead of less but that is the claim.

9           Some of the witnesses are going to testify to having

10   been pleasantly surprised when it turned out that they got more

11   than they were expecting because they were looking at the cash

12   balance account.  But the evidence will show that there was an

13   understandable reason for just telling people the cash balance

14   account before they left, because one of these, the evidence

15   will show, was that there were these e-mails in 1997 amongst

16   the human resources people, and they specifically show that

17   they were accumulating questions and complaints from people who

18   wanted to know why they were suddenly getting less than they

19   were told the previous year that they were getting.

20          So there were reasons contemporaneously why a decision

21   might have been made to say let's tell people what is certain.

22   Let's tell them that you can expect to get this, and if it

23   turns out that you get something bigger, you get something

24   bigger.  If you are leaving tomorrow, we give you the minimum

25   lump-sum calculation.  You can see that you are getting

F7enosb3                         Opening – Mr. Rumeld

1    something bigger.  But if you are leaving only a few years from

2    now and somebody wants some kind of projection, there was an

3    understandable reason why HR might have pushed back from doing

4    that, because it was dangerous.

5           Now, one last point on the fiduciary breach claim --

6    sorry, I lied, I had three points -- to prove a fiduciary

7    breach claim there is an also an independent element of the

8    claim to prove detrimental reliance.

9           Your Honor allowed the class to be certified with

10   respect to this claim because there was circumstantial evidence

11   from which your Honor could infer detrimental reliance.  I

12   would ask your Honor to consider, now that we are going to hear

13   the evidence and hear the witnesses, that there is no class

14   showing of detrimental reliance.

15          Everybody liked their job, would have kept their job,

16   would not have done anything differently in their lives based

17   on a greater understanding of this wear-away phenomenon.  There

18   is no evidence to suspect that.  At best a lot of people left

19   their jobs for companies that had no defined benefit

20   arrangements at all.

21          The notion that somebody would say, Gee, if my credits

22   aren't going to count, I should leave my job and go somewhere

23   else, that is all speculation and really can't be corroborated

24   by the evidence we have now coming out of the witnesses'

25   mouths.  At best we have speculation that people would have

F7enosb3                        Opening – Mr. Rumeld

1    complained because they would have been unhappy.

2              Based on the financial condition of the company, there

3    is no reason to think that that would have changed anything

4    either.  In fact, your Honor already rejected the claim that

5    was based on the argument that the company would have amended

6    its plan somehow and given more generous benefits because

7    people complained.

8              So there really is no detrimental reliance in this

9    case.  There is no detrimental reliance on a classwide basis.

10   That is an independent problem with the fiduciary breach claim

11   that I will come back to again in my closing I suppose.

12             Even if there was a basis to debate what we did and

13   why we did it, as your Honor already recognized earlier this

14   week and when we had oral argument, there is this need to show

15   fraud or inequitable conduct to be entitle to a reformation

16   remedy.

17             For purposes of this morning I am going to pass over

18   some of the other things that we think the plaintiffs need to

19   prove, including classwide misunderstanding based on your

20   Honor's remarks yesterday.  I know how she feels about

21   classwide misunderstanding.  I am simply going to say, invite

22   the Court to continue to listen to the evidence, because I

23   actually think there are a couple of people who will testify

24   who sure sound like they had an understanding, at least one

25   very similar to whatever understanding we are considered to

1    have had at the time.

2              THE COURT:  You don't even have to invite me to listen

3    to the evidence.  I will certainly listen to the evidence on

4    both sides.

5              MR. RUMELD:  Right.

6              That is just my polite way of saying I am not going to

7    beat a dead horse right now.  I think there is a much more

8    relevant issue that your Honor already identified, which is,

9    can the plaintiff prove, can the class prove by clear and

10   convincing evidence -- which everybody has conceded -- the

11   elements of a claim for fraud or inequitable conduct.

12             And the evidence will show that they can't, that

13   plaintiffs can't.  In judging the evidence, I want to again

14   urge the Court to separate out the information that was

15   contemporaneously available to Foot Locker and what we know

16   now.  This is at least -- I think one back.

17             OK.  So, your Honor asked about what the projections

18   of the interest rate were by management at the time.  I

19   couldn't answer it because I don't know that there is evidence.

20   But if you were looking at this at the time, and I know there

21   is a lot of squiggly lines on here, the fact is in the 15-year

22   period preceding the cash balance conversion, the average T.Bo.

23   rates were over 9 percent.  It is hard to conceive of that now,

24   but that's what they were then.

25             Even if you look at the ten-year period preceding the

F7enosb3                    Opening – Mr. Rumeld

1    cash balance conversion, they were at 7.9, which is actually

2    slightly above the rate that was in effect as of December 1994

3    when the plan was being designed.

4           So while the 9 percent rate would have looked a little

5    higher than the ten-year average, it wouldn't have looked

6    higher than the 15-year average.  Nobody was reasonably looking

7    at a 3 percent spread, if they were taking any relevant history

8    into account at the time.  That is how something would have

9    looked then.

10          As I said, I think was more Mercer's business than

11   Mr. Kiley's business or Ms. Peck's business, but that's one way

12   to say, well, what is a good number to convert it.

13          The other good way was to consider the plan's

14   investment rate of return, and we will talk about the plan's

15   investment rate of return and the assumed rate of return was 9

16   percent, that's what the plan thought it was going to be.  That

17   number had not changed in 1995.

18          So, as I mentioned before, we also know now that the 6

19   percent rate, which is what generates this big spread that my

20   adversary talks about between the rate we choose and the rates

21   that were in effect, that that rate actually was one that was

22   soon going to be grandfathered, because Congress decided that

23   the rate should be a point and a half higher based on the

24   corporate bond rates.

25          So, please, when judging conduct, just let's keep in

F7enosb3                         Opening - Mr. Rumeld

1    mind the lens that was available rather than the lens that we

2    have now.

3              What is the theory of fraud or inequitable conduct?

4              The theory is that we designed the plan, we designed

5    this cash balance plan amendment specifically with wear-away in

6    mind, because we wanted to slash costs by means of a plan

7    freeze and without letting the employees know that this was

8    going on.

9              So, according to the class, to avoid negative

10   publicity and morale issues that would have resulted from a

11   straight freeze, we set out to accomplish the same thing by

12   implementing a cash balance plan.  This was the raison d'etre

13   of the cash balance plan.  Then we implemented the scheme by

14   purposely keeping everybody in the dark about wear-away and

15   specifically that the pay and the interest credits weren't

16   going to count.  That's the theory.

17             THE COURT:  I am just going to ask you actually, to

18   slow down a little bit, because even though I am following you,

19   I am having to sort of look over to make sure that I have taken

20   it in, so I want to be sure to get every word.

21             MR. RUMELD:  I am admittedly feeling a little rushed

22   because my helpers told my I had taken 45 minutes before the

23   break.  If your Honor has patience I do as well.

24             So that is the theory of fraud, that we designed the

25   plan -- Mr. Gottesdiener just said this a few minutes ago.

F7enosb3                        Opening - Mr. Rumeld

1    This was the reason we designed the plan.  We designed with

2    wear-away on the brain.  That's why we wanted this plan.  He's

3    also said, there's also this kind of watered down inequitable

4    conduct theory.  OK.

5           That seems to be, you know, doesn't require any intent

6    at all.  I don't think that is the correct version of the law.

7    I think we can return to this again at the conclusion of the

8    case if your Honor would like, but I think it's pretty clear

9    when the cases on inequitable conduct are read, it may be

10   something other than fraud, but there has to be some volitional

11   intent to take advantage of people.

12          I think that's what your Honor is going to find in

13   reviewing the cases.  But, that having been said, we think the

14   evidence is going to debunk both the theory that we designed

15   the plan with this in mind and the theory that we acted to take

16   advantage of people through our choices of what we communicated

17   or didn't communicate.

18          Now, just preliminarily, I think it's worth noting

19   that there is always this certain ambiguity in the class's

20   papers as to who actually perpetrated the fraud.  I think,

21   based on this morning's remarks, I am supposed to assume that

22   it was Ms. Peck and Mr. Kiley.

23          There is no evidence to suggest that anybody above

24   Ms. Peck's level was actually presented with this wear-away

25   information, let alone that they designed the plan with that

1    intent in mind.

2            I think it's helpful to just pause for a minute and

3    consider how absurd it would be for Ms. Peck and Mr. Kiley to

4    purposefully conceal from their own management an issue like

5    this, if at the time they thought it was very important.

6            THE COURT:  But Ms. Peck was on the RAC?  Right.

7            MR. RUMELD:  She reported to it.

8            THE COURT:  She reported to it.  So she was present.

9    I guess she's shown as an attendee at meetings.

10           MR. RUMELD:  Yes.  I think that's the case.

11           She was a vice president.  I don't mean to suggest she

12   didn't have a position of importance.  She was the head of HR,

13   she was a vice president.

14           Somebody in Ms. Peck's position doesn't pull the wool

15   over her own boss.  Where's the end game?  Ms. Peck and

16   Mr. Kiley were amongst the people who were most severely

17   affected by wear-away in the sense that their circumstances

18   were such that they ended up with a long period of wear-away.

19           Where's the end game where these people were to

20   purposefully conceal from their own management?  What really is

21   part of the evidence of is that they were not thinking of this

22   the way my adversary is accusing them of at this time.  If they

23   thought it was important, we would see evidence of this in the

24   slide presentation that they gave to management.

25           So why was the cash balance plan chosen?

1          Next slide.

2          Here were the reasons, as I said at the beginning, and

3     the witnesses will testify, the contemporaneous documentation

4     will show it was recommended to effect cost savings in a way

5     that was suitable for the participants needs and for the

6     purpose of achieving the objective of plan benefits that were

7     suitable to the participants.

8          The key feature was the lump-sum option and the 401(k)

9     plan, which they were able to institute at the same time with a

10    modest matching contribution from management.

11         So the package of the two was viewed to be the best

12    way to save costs at one time and to do something that was

13    consistent with the needs of the employees as the other.

14         And, yes, the 401(k) plan was important, because it

15    was important to encourage employees to contribute to their own

16    retirement savings.  It was definitely an awareness that,

17    because of the change in the formula, on a long-term basis

18    benefits from the defined benefit arrangement would go down,

19    and it is a good idea to have employees contribute to a 401(k)

20    plan.

21         So the new plan design was not chosen merely because

22    it appeared to be attractive to participants, which is the

23    class' contention.  Rather, and Mr. Kiley will testify to this,

24    it had futures in his mind that were attractive.  This wasn't

25    just an issue of appearance when people refer to it, it appears

F7enosb3                      Opening - Mr. Rumeld

attractive.  It appears attractive because it has things that

participants want, namely, the lump-sum feature.

          So there were substantive features of this plan that

drove the decision to adopt this type of formula, and this

wasn't just some kind of charade or appearance.

          The countervailing theory, that we designed this plan

with wear-away on the mind, with a plan freeze in mind, and

that this was going to be a surreptitious freeze is really

concocted on the basis of a single document that's lifted

completely out of context.

          OK.  So, amongst some of the draft presentation

materials are a list of alternatives with pros and cons.  Just

to clarify, you know it's already in Mr. Kiley's declaration,

the other alternatives are listed as things that Mr. Kiley and

his group had considered and had rejected.

          By the time we are presenting to management, the

recommendation is the cash balance plan.  By early 1995, the

recommendation is the cash balance plan.  This is really just a

retrospective presentation of other alternatives that could

have been presented.  That's the testimony.

          The class's theory is based on the fact that, for

whatever reason, in this particular document the option of

freezing temporarily lists as a con that it could be bad for

morale, loss of associate morale, and confidence and negative

publicity.  Those words don't appear next to cash balance

F7enosb3                          Opening – Mr. Rumeld

1    design, so my adversary gets it in his head from that that this

2    means that we purposefully chose the cash balance design

3    because that was the same thing.  It was a freeze without that

4    consequence.

5            So, first of all, if you look at this document more

6    carefully, it's really not internally consistent.  Maybe it was

7    just a not-so-well-written draft.  So you can see, for example,

8    next to -- the next click.  OK.

9            So here are some other options.  It is a little hard

10   to see.  Terminating the current plan or freezing with an

11   intent to terminate.

12           Those are pretty dire things to do that you would

13   think would generate bad morale.  Clearly terminating is worse

14   than freezing.  Yet for whatever reason it doesn't identify

15   that as one of the cons.  20 years later I can't exactly

16   explain what the drafter of this draft document that was never

17   shown to management had in mind, but it doesn't seem all that

18   logical.

19           Any doubts about this are probably dispelled by a

20   subsequent draft of the presentation materials, which also has

21   a listing of the consequences.  You will see here that under

22   cash balance plan, for the formulas that result in some loss of

23   benefits, meaning some savings to the cost of the company, it

24   does say negative publicity and loss of morale are

25   consequences.

F7enosb3                         Opening - Mr. Rumeld

1          The only one that doesn't have as a consequence loss

2     of morale is the formula they wouldn't have chosen because

3     there was no reduction in the value of the formula and it

4     wouldn't have achieved any savings.

5          THE COURT:  Isn't this a different presentation than

6     the one we were just looking at?

7          MR. RUMELD:  It is a subsequent draft.  There were

8     multiple drafts of presentation materials that one can

9     speculate reflected internal thinking about why the choices

10    were made that were made.

11         I acknowledge it is a form of circumstantial evidence

12    that is in the records, but this one suggests that any change

13    that would reduce benefits, and the new cash balance formula we

14    are not debating that did reduce benefits, even without the

15    wear-away factor, that any change that would reduce benefits

16    could generate poor morale and negative publicity.

17         By the way, Ms. Kanowicz my adversary has shown

18    various snippets of her testimony.  Your Honor hasn't seen yet,

19    she also testifies about the fact that it was bad morale when

20    she went to these presentations.  She did make it clear to

21    people that their benefits were worsening in terms of the

22    going-forward formula without necessarily focusing specifically

23    on wear-away.  The general sense was benefits were being made

24    worse.  It wasn't concealed, and a lot of people complained

25    about it.

1          So there was neither a --

2          THE COURT:  Not complained about the cash balance

3     plan, but complained about, as I understood it, sort of a

4     constellation of things that were occurring at the same time

5     relatively speaking.

6          MR. RUMELD:  Well, that is a fair question, because

7     there are a lot of things going on, including lots of people

8     are being let go, which also causes one to wonder whether they

9     would have been so single minded and focused on the morale

10    implications of a plan change being done, because management

11    says the company is on the verge of bankruptcy when so many

12    people are being let go.

13          I think it tends to show why the theory that we would

14    have concocted this plan design just to conceal something that

15    would be bad for morale doesn't really add up.

16          I think a fair take of Ms. Kanowicz's testimony is

17    that with respect to the cash balance plan itself, there was a

18    perception that retirement benefits were going down, the

19    formula was worse than the one before -- and it was, it

20    depended on who you were, younger people are impacted less than

21    older people -- and that people reacted negatively to that.

22    That was her testimony.

23          She also, in fairness, and I'll get back to this

24    point, there doesn't seem to be any evidence that in these

25    conversations people specifically spoke about wear-away.  But

F7enosb3                         Opening – Mr. Rumeld

1    the notion that the end game was let everybody think that the

2    plan changes were all hunky dory terrific, regardless of what

3    the president's letter said, she said she was very explicit

4    with people and she explained to people that this was something

5    that, you know, they were going to have to adjust to, and this

6    was awkward news, and she didn't conceal things for the sake of

7    preserving associate morale, not Ms. Kanowicz that's for sure.

8           Let's also look at the sequence of events.  This is

9    what we talked about before.

10          What the evidence is going to show is that Pat Peck

11   went to Tom Kiley, asked him for his recommendation.  He came

12   back with his recommendation for cash balance plan by about

13   January of 1995.

14          Then responsibility for the specific design that would

15   generate sufficient cost savings to sell this to management,

16   that fell logically with Mercer.

17          We will hear, incidentally, from Mr. Kiley that while

18   it is very nice that everybody says he is a math whiz and stuff

19   like, that he is not an actuary.  He's not capable of designing

20   a cash balance plan by himself.  He was aware of some of the

21   positive features of the cash balance plan, but he wouldn't

22   have been able to calculate what the cost savings were.  Those

23   were all things that were left to Mercer.  So it was Mercer who

24   comes up with a plan design that includes a wear-away effect.

25          The evidence will show that the first meeting with

F7enosb3                        Opening - Mr. Rumeld

1   Mercer during which Mercer educates Kiley and Pat Peck about

2   various terms of the plan, including the wear-away effect, this

3   cause of the so called freeze, did not occur until February.

4           So the cash balance plan is already the plan on the

5   table that Kiley is recommending before there is any discussion

6   about wear-away.  That's the sequence of events.  So the notion

7   that we said, Let's go do a cash balance plan because we want

8   to have wear-away, it just doesn't add up, your Honor.

9           Finally, and perhaps most importantly, although the

10  effect this wear-away effect was explained to Peck and Kiley,

11  Mr. Gottesdiener is right, Mr. Kiley takes detailed notes, and

12  we can see some of the things that were discussed there.  No

13  one perceived wear-away as particularly significant relative to

14  the other aspects of the plan at the time.

15          From their perspective the principal cost savings were

16  built into the design.  There is a fundamental change in the

17  design.  Under the old plan we get an annuity based on years of

18  service multiplied by earnings, by average earnings, and here

19  there is a certain amount contributed based on compensation.

20  And the design works out to generate cost savings not for a

21  year, not for two years, but forever, on a long-term basis.

22  They are going to testify that, yes, they were told about

23  wear-away, but they did not view this as a key driver of the

24  plan.

25          And it needs to be kept in mind that whatever

1   information they had about wear-away was what Mercer told them.

2   Mercer told them the 9 percent interest rate was appropriate.

3   Mercer never told them that wear-away was increasing because of

4   the movement of interest rates.   There is no evidence of any

5   discussion about the movement of interest rates.

6          Mr. Gottesdiener has identified a couple of letters

7   that were generated in response to a request from the president

8   to save more costs.   There is no indication that anybody

9   connected that to wear away or said, gee, maybe wear-away is

10  going to be longer.   There's really --

11         THE COURT:   Hold on.   PX 9 is confusing in that regard

12  in terms of what you are saying.   They seem to be in conflict.

13         MR. RUMELD:   Just if you can remind me what PX 9.

14         THE COURT:   PX 9 is the September 12, 1996 Mercer

15  document which says that under the current plan the normal cost

16  is $4 million --

17         MR. RUMELD:   Yes.

18         THE COURT:   -- expected to rise.

19         And then it says that there are short-term savings

20  built into the plan design which wear away over the next three

21  to four years.

22         MR. RUMELD:   Right.   It uses the word wear away in

23  that context.   I agree with your Honor that Mercer was probably

24  referring to the cost savings associated with what we call

25  wear-away.   But there really is no indication that this

F7enosb3                         Opening – Mr. Rumeld

document that was passed through Pat Peck caused her to have
some rethink about this issue or even whether she connected
these dots.

          I think we have to be careful not to attribute to Pat
Peck some contemporaneous deep understanding about these moving
parts.  The sequence of events there appears to be that
Mr. Farah was still looking for more savings.  Mercer was
tasked with trying to come up with an additional ways to save
benefits, save costs in this plan, which would certainly
suggest that any participant complaints would not have led to a
more generous plan, and there were some options considered that
appeared not to have been implemented.

          So, yes, with the benefit of hindsight that is
probably something they were referring to.  But the fact that
this document in some way passed through Pat Peck is no
indication that there was some discussion or, gee, guys maybe
we should have a different interest rate.  What are we going to
do about this?

          there is no continuity to that isolated letter.  This
is the whole point, that we are all looking at this with this
laser-like focus that people woke up in the morning and were
thinking about wear-away as opposed to all the other things
that are going on in their lives while the company was fighting
bankruptcy.

          From Pat Peck and Tom Kiley's perspective and

F7enosb3                        Opening – Mr. Rumeld

1    everybody else's perspective at the time, the company was

2    providing a new plan formula with many new features, including

3    this valuable lump sum.  The fact that participants could

4    receive a benefit based on the prior formula, if that benefit

5    turned out to be larger didn't translate for them then into a

6    plan freeze.

7            Each of these witnesses that we have seen clips from

8    also said at these same depositions that they just never looked

9    at it that way.

10           We may look at it that way now if we choose to.  I

11   don't think it is appropriate to look at this as a plan freeze,

12   but I guess it is why Mr. Gottesdiener is making that point,

13   but no one looked at it that way at the time.

14           As your Honor pointed out, in order to be a fraud

15   claim, the participants have to lie, and truthful

16   communications tend to debunk a fraud claim.

17           So let's look at what was actually communicated to

18   participants.

19           The class' theory is based on essentially these three

20   documents:  The initial announcement letter, the November

21   memorandum, which is the 204(h) notice, and the SPD.

22           As we discussed before, they were also hung up about

23   the benefit statement.  But there were numerous other

24   communications to many people on individual and group bases.

25           Next slide.

F7enosb3                    Opening - Mr. Rumeld

1          So the additional communications include group

2     meetings at large locations attended by hundreds of people at a

3     time, written and verbal responses to the many telephone

4     inquiries received both in Wisconsin and New York, Linda Ine,

5     the head of the group in Wisconsin, testified that there were

6     as many as a thousand calls a week at her office.

7          She had several people working just on receiving these

8     calls at the call-in center.  Then there were the benefit

9     calculation sheets that were sent to employees in response to

10    their requests.  And then there were the benefit estimates that

11    were made either upon request or for everybody shortly before

12    they were terminated.  Each of these documents had much more

13    information concerning the calculation of benefits, including

14    the minimum lump sum, than what was in those companywide

15    communications.

16         Now, we already went through some examples with your

17    Honor the last time we were here at the oral argument, so I

18    don't want to overdo this now, but I would like to just look at

19    one document both because I think it's so explicit, but also --

20    next slide -- but also because it went to one of the class

21    members that we are going to hear from today.

22         So, if we look at this slide, on the cover page you

23    have this very detailed discussion about exactly what's

24    happening.  This is the material that was sent to Mr. Steven in

25    response to his request for a benefit estimate.

F7enosb3                    Opening - Mr. Rumeld

1          So he gets told, and this is a guy who, as the other

2     side has said, has a fairly substantial degree of at least

3     claimed sophistication, who says how the initial account

4     balances were calculated using a 9 percent rate.

5          It says that the minimum lump sum is based on this

6     much lower rate because it's based on the 6.06 percent rate,

7     and it also alerts him that we cannot anticipate what this will

8     be.  That's precisely why Mr. Kiley, who responds to this

9     letter, says, I am not going to tell you the minimum lump sum

10    as of May '97 when you want it.  I can only tell you at the end

11    of the year, because this is a number that is going to change.

12         Then attached to this cover letter is this calculation

13    sheet.  What you can see here is it really tells you

14    everything.  It starts with the accrued benefit as of 12/31/95.

15    That's his annuity, $32,000.  That's the so-called frozen

16    benefit.

17         It shows him that the initial account balance is

18    calculated based on that, and the previous page just told him

19    that was calculated at 9 percent.  Then we see additions to the

20    initial account balance in the course of 1996, those are the

21    pay and the compensation and the interest credits.  So he goes

22    from 140 to 150 something, right?  151.

23         And then it tells him that his minimum lump sum is

24    going to be $224,000, $70,000 more than this one, and it

25    specifically tells him how that minimum lump sum is calculated

F7enosb3                          Opening – Mr. Rumeld

off of the frozen 12/31/95 benefit using the 6 percent rate

that was explained on the previous page was the rate that was

in effect as of the end of the year.

          Then it goes one further and it tells him what he

could expect his account balance will be in May, when he asked.

As I said before, it doesn't tell him what the minimum lump sum

will be then because we don't know it, but it's pretty

reasonable to assume that, unless this $224,000 rate goes way

down, he's not going to get the 159, he is going to get

something over 200.  And all of these pay and interest credits

that are adding to his account balance aren't going to count

because he's going to get his minimum lump sum.

          Every piece of information relevant to seeing the

plaintiff's claim that they are paying the interest credits are

not going to count to their benefit is on this piece of paper

and in the cover letter that came with it.

          Now, Mr. Steven is going to testify.  It says in his

declaration that nevertheless he didn't understand it that way.

He didn't understand that his starting balance was

"discounted," that that 9 percent was some kind of discount.

          I already explained at the beginning of my remarks

that it is not a discount because he's not entitled to have the

starting balance calculated a certain way.  He got told how his

starting balance was calculated.  He got told how his account

balance was calculated, and he got told how his minimum lump

F7enosb3                    Opening - Mr. Rumeld

sum was calculated.  But nevertheless he did not connect the

dots and say, well, this means I had a frozen benefit.

I am not here to call him a liar.  I do think there is

a real question whether participants like Mr. Steven were on

notice of their claim for statute of limitations purposes, but

I think the real point is we are all sitting here today trying

to ascribe some nefarious intent to my clients, and the

information he had is exactly the information my clients had,

that there were two formulas.  You calculate the benefit under

one formula, you calculate the benefit under the other formula,

and you see which one is bigger.

That's what is going on here.  That's what all the

people who did the calculation sheets were doing when they were

figuring out these benefits, and somehow it wasn't equated with

a plan freeze.  It just did not click that way at that time,

and for the reasons I said, maybe it should never have clicked

that way because there were lots of positive things going on,

including Mr. Stevens' ability to take away $224,000 that he

never would have been able to take way had we not done this

amendment.

So these are the things I would ask your Honor to

consider when she's trying to evaluate whether we were engaged

in fraud or inequitable conduct.  Mr. Steven had the same

information we did.  If he didn't think this was a plan freeze

when he got this letter, why is everybody saying we concealed a

F7enosb3                          Opening – Mr. Rumeld

1   plan freeze?  Nobody looked at it that way.

2            Just a word or two on relief.  In the event that the

3   Court does find there is liability and does find that

4   reformation relief is appropriate, we will have a discussion

5   with Mr. Sher about the appropriate ways to calculate relief.

6            There is one important thing I want to communicate

7   here.  As we said in our papers reformation relief has to be

8   geared towards what the misunderstanding was.

9            These participants say, I thought I was getting the

10  benefit of my pay and interest credits.  I thought that they

11  were adding to my benefit.

12           That means they thought they were getting an A–plus–B

13  benefit.  They were getting whatever their prior, pre-'96

14  benefit was worth and whatever their paying interest credits

15  were worth on top of that.

16           For the reasons I explained, the prior benefit's worth

17  is measured when they leave based on the interest rate at that

18  time.  So if your Honor wants to award an A–plus–B remedy to

19  fix this problem, if she thinks there is a problem, then that's

20  what the remedy should be, the present value of the A benefit,

21  measured as of the legally appropriate time, when the

22  participant leaves, and then add the paying interest credits so

23  that everybody, just like that participant 0004 can say I got

24  the benefit of these credits that I worked for.  But what is

25  not appropriate relief is to just reset the starting balance

F7enosb3                         Opening – Mr. Rumeld

1    based on the 6 percent interest rate, which is what my

2    adversaries want to do, because there is no entitlement to a

3    starting balance pursuant to a particular interest rate.

4            There is no one actuarially equivalent starting

5    balance.  To do it that way, which Mr. Sher will show, will

6    create this huge windfall for all these participants who

7    started with a benefit enhancement because the benefit

8    enhancement already shrunk or eliminated the wear-away that

9    they experienced.

10           The people with the benefit enhancements largely did

11   not experience this problem of paid interest credits not

12   counting.  So if we measure this as of the time they leave, and

13   we say how much is their A benefit worth, how much is their B

14   benefit worth, what does that add up to, and let's compare to

15   it what they got, that's a way to take care of the problem if

16   your Honor thinks it is a problem that they didn't get the full

17   measure of their pay and interest credits.  If you reset it at

18   the beginning, then you're really adding on top of what the

19   enhancement already largely took care of.

20           I know this is all a little bit dense.  I think

21   Mr. Sher will spend some time with it, because even though for

22   the reasons we have said we don't think there should be any

23   liability, we don't think there is any fraud or concealment

24   here.  We don't think there is any inequitable conduct here.

25   But if your Honor should feel otherwise, please, please, let's

F7enosb3                        Maxam - direct

1   just keep the relief limited to what the plaintiffs say the

2   misunderstanding was.

3              With that, I will say thank you.

4              THE COURT:  Thank you.

5              Mr. Gottesdiener, would you like to call your first

6   witness, please.

7              MR. GOTTESDIENER:  Yes, your Honor, thank you.

8              I call to the stand Dr. Maxam.

9    CLARK MAXAM,

10        called as a witness by the Plaintiffs,

11        having been duly sworn, testified as follows:

12             THE COURT:  Dr. Maxam, please be seated, sir.

13             It will be important for you to adjust that chair to

14   be close to the mic and adjust the mic however you need to in

15   order to speak clearly and directly into the mic so folks can

16   hear you.  It is a balancing act between getting close, but not

17   too close.

18             THE COURT:  All right.  Mr. Gottesdiener.

19             MR. GOTTESDIENER:  May I approach the witness, your

20   Honor?

21             THE COURT:  You may.

22   DIRECT EXAMINATION

23   BY MR. GOTTESDIENER:

24   Q.  Dr. Maxam, is that your rebuttal report that you gave in

25   this case with some redactions?

F7enosb3                          Maxam - cross

1   A.  Yes, it is.

2            MR. GOTTESDIENER:  Your Honor, my understanding is --

3            THE COURT:  Yes.  What we will do is the Court will

4   accept as Dr. Maxam's direct testimony his rebuttal report,

5   which is included in the pretrial order at Exhibit 14, and the

6   witness is turns over for cross-examination.

7   CROSS EXAMINATION

8   BY MR. RACHAL:

9   Q.  Before I start my first line of questions, I wanted to

10  recall two agreed facts.  Then I had some questions relating to

11  this those agreed facts.

12           MR. RACHAL:  Would you pull up agreed fact No. 5.

13  Paragraph 5.

14           THE COURT:  All right.  Remind me where the agreed

15  facts are.  I have read them.

16           MR. RACHAL:  The stipulated facts.

17           THE COURT:  The stipulated facts.  Which tab?

18           MR. RACHAL:  It was in --

19           THE COURT:  I've got it.  It is tab 1 of binder 1.

20           MR. RACHAL:  Yes.

21           THE COURT:  You are focused on fact 5?

22           MR. RACHAL:  Yes.

23           THE COURT:  All right.

24           MR. RACHAL:  If you can pull that up.  OK.

25           Agreed fact 5, it says, In its 1995 annual report

F7enosb3                              Maxam - cross

Woolworth Corporation reported that its earnings were not

adequate to cover fixed charges by $233 million in 1995, $798

million in 1993, and $83 million in 1991.

            Then if you would pull up stipulated fact 6.

            Thank you.

            And for stipulated and agreed fact 6 it's:  Woolworth

corporation reported a $164 million loss for 1995.

Q.  Dr. Maxam, is it correct that you were aware that Foot

Locker had lost substantial sums, about $500 million, in the

1991 to 1995 time period?

A.  Yes, I was aware.  I considered those losses to be

irrelevant to the analysis I was doing.

Q.  Correct.  But you were aware that they had those

substantial losses in this time frame, correct?

A.  Yes, I was aware.

Q.  All right.  Assuming other major factors, competitors,

economic conditions, remained the same, if a company is losing

substantial sums of money, is it correct that it needs to

change its operations or it will likely go out of business?

A.  I would say losing substantial amounts of money means they

need to do something, and they were in the midst of a

restructuring, yes.

Q.  You would agree that Foot Locker's substantial losses

enhanced Foot Locker's need to save cash and cut expenses by

the end of 1995?

F7enosb3                          Maxam - cross

1    A.   Yes.

2    Q.   I want to call attention to agreed fact 10.  I think it's

3    undisputed by our agreed facts:  By 1995 Woolworth Corporation

4    eliminated the general merchandise businesses and focused

5    instead on specialty retail of athletic footwear and apparel.

6            That was basically the Woolworth stores were closed

7    and they were focused mostly on the Foot Locker stores.  Is it

8    correct that Foot Locker was attempting a significant

9    restructuring of its business by 1996?

10   A.   They were attempting a restructuring, yes.

11   Q.   Assuming that Foot Locker was restructuring its business

12   because of losses and competitive pressures, would you agree

13   that there was a substantial risk the restructuring may not

14   work out?

15   A.   I would say that any time there is a restructuring there's

16   some risk.  But as my report states, what I based my view on,

17   on the likelihood or the chance or the probability of a

18   bankruptcy event in the case of Foot Locker, I didn't think

19   that that restructuring was being viewed by the marketplace as

20   being a significant risk because the marketplace had decided

21   during this period of time to make significant investments in

22   Foot Locker via the form of debt.  Specifically, Foot Locker

23   was able to issue five- to seven-year bonds in the amount of

24   $300 million, give or take, and they were also able to secure a

25   one and a half billion dollar line of credit from 37 banks.

F7enosb3                          Maxam - cross

1   Q.  Was it correct, Dr. Maxam, that because of these large

2   losses, by early 1995 Foot Locker needed this substantial new

3   financing to avoid a potential liquidity and financing crisis?

4   A.  I don't know that they had a substantial liquidity and

5   financing crisis.  Again, I based my opinion on the fact that

6   the market looked at this.  What was appropriate to look at was

7   how participants were viewing Foot Locker at the time, and bond

8   market participants and banks looked at Foot Locker and decided

9   to extend them a significant amount of credit.

10          THE COURT:  I am going to ask you to move up a little

11  bit, a little bit closer to the mic.

12          THE WITNESS:  Sure.

13          THE COURT:  And we'll find that sweet spot.  You may

14  proceed.

15          MR. RACHAL:  Thank you, your Honor.

16  BY MR. RACHAL:

17  Q.  Dr. Maxam, do you have the documents that were cited in

18  your report as exhibits?  Do you have that with you?

19  A.  No.

20          MR. RACHAL:  May I approach, your Honor?

21          THE COURT:  You may.

22          MR. RACHAL:  All right.

23  BY MR. RACHAL:

24  Q.  What I'm referring to, it was filed in the record docket

25  349-2.  It was index of documents cited in Dr. Maxam's report,

F7enosb3                          Maxam – cross

1    if you would pull up page 35 of 55.

2              I am going read that, and then I am going to reask my

3    question to you.  Let me back up a second, Dr. Maxam.

4              These were documents that you reviewed in preparing

5    your report, correct?

6    A.  Yes.

7    Q.  All right.  In this document here, it is a revolving credit

8    agreement update to the board of directors in March of 1995,

9    correct?  That is your understanding?

10   A.  That's what it says, yes.

11   Q.  All right.

12             So it says:  The board of directors was advised in

13   January 1995 that, as a result of a further decline in

14   earnings, estimated at 36 cents per share, the company needed

15   to develop a contingency program to avoid a potential

16   liquidity/financing crisis.

17             Do you have any basis to believe that's not accurate,

18   Dr. Maxam?

19   A.  No.

20             (Continued on next page)

21

22

23

24

25

F7EJOSB4                          Maxam - cross

1    Q.  In fact, this new financing was done to buy time for the

2    restructuring, is that correct, Dr. Maxam?

3    A.  I know they did obtain a new financing from a consortium of

4    banks, so I know that they achieved this new financing from a

5    consortium of banks and issued a bond into the marketplace and

6    that this information was known to those people who lent the

7    money.

8    Q.  And according to this, is it correct that the board of

9    directors was doing this because they were losing money and

10   they needed this financing, otherwise they would face a

11   liquidity crisis, is that correct, Dr. Maxam?

12   A.  That is what this said.

13   Q.  In effect, this new financing was buying them time so they

14   could attempt to restructure, is that correct, Dr. Maxam?

15   A.  All I know, they did obtain the financing and the people

16   who gave them the financing knew this information and did so

17   willingly.

18   Q.  I am now going to call attention to further down, pull up

19   the highlights, I take this is your point, Dr. Maxam, the new

20   revolving credit agreement sends a message to mark the company

21   with financial support.  This helps stabilize the stock price.

22          You agree with that, correct, Dr. Maxam?

23   A.  I think it was a strong signal that they were able to

24   obtain this financing, that these banks and lenders had faith

25   in Foot Locker to repay their debts.

F7EJOSB4                        Maxam – cross

1   Q.   There was also going to buy time to develop a new strategic

2   direction and start to improve operating results, correct, Dr.

3   Maxam?

4   A.   That is what it says there.

5   Q.   Do you have any basis to disagree with that?

6   A.   No.

7   Q.   Thank you.

8        I am going to shift focus to the other topic you were

9   opining on regarding Mr. Sher's calculations using estimations

10  of the 30 year treasury rate, what was shown in the opening

11  statement.  You know the estimate of the 15-year liquidity?

12  A.   Yes, sure.

13  Q.   You were aware at the time that Foot Locker cash balance

14  conversion, the 417 (e) rate was --

15  A.   Yes.

16  Q.   I can restate the question.

17       THE COURT:  Why don't you do that.  Remember the Court

18  Reporter isn't necessarily familiar with all of think legal

19  nuances and terminology that you all have been living with for

20  eight years.

21       MR. RACHAL:  417 (e) will be referred to here a lot of

22  times.

23  BY MR. RACHAL:

24  Q.   You were aware at the time of the Foot Locker cash balance

25  conversion, the 417 (e) rate was based on a 30-year Treasury

F7EJOSB4                          Maxam – cross

1   rate?

2   A.  Yes.

3   Q.  Were you aware that the 30-year Treasury rate was first

4   published in February 1977?

5   A.  Was first published?

6   Q.  Yes.  Actually, I think it first came into being February

7   1977?

8   A.  I know that there are long term bond rates going back much

9   further than that.

10  Q.  I am talking about the 30-year Treasury rate, Dr. Maxam.

11         Were you aware when they first started using the

12  30-year treasure rate?

13  A.  I don't recall, no.

14  Q.  You have no basis to dispute it was, in fact, in February

15  1977?

16  A.  I am not sure what you mean by first published?

17  Q.  The first years, first issued the 30-year Treasury bond?

18  A.  I don't believe that is true.  I believe there were 30-year

19  treasury bonds prior to that period.  I don't know about

20  collected data.

21  Q.  Did you know when they first started issuing the 30-year

22  Treasury bonds?

23  A.  Not from memory, no.

24  Q.  Did you calculate the average from when they first starting

25  issues the 30-year Treasury bonds, whenever that was, to just

1  before the cash balance conversion?

2  A.  I computed some averages, yes.

3  Q.  I saw you computed a different average, not the 30-year

4  Treasury average.  Did you compute the 30-year -- let me back

5  up, Dr. Maxam.

6          Is it correct you don't know when they first starting

7  issuing the 30-year Treasury bond?

8  A.  I don't recall at this time.

9  Q.  It is correct you never calculated what those averages

10  would be for when they first issued, started issuing the

11  30-year Treasury bond to 1995?

12  A.  I calculated averages based on long term government bonds

13  from a reliable source, and the long term government bond

14  yields should be very, very highly correlated to any 30-year

15  Treasury bond rate.

16  Q.  You didn't calculate the 30-year Treasury bond rate,

17  correct, Dr. Maxam?

18  A.  Not going back to 1926, no.

19          THE COURT:  Going back at all?

20          Did you calculate it going back at all?

21          I am looking at Page 12 numbered at the bottom of your

22  report, so we're specific and I am looking in particular at --

23          THE WITNESS:  Right.

24          THE COURT:  Hold on.  Let me finish the question.

25          The most important thing in this case, apart from the

F7EJOSB4                        Maxam - cross

1    fact of the testimony, is the record which reflects the actual

2    testimony, so I want to make sure down the road I can remember

3    the question I had even though we are on probably the same

4    wavelength right now.  That is why I slow you down.  That is

5    why I stated out.

6              In your report the Ibbotson long term government, long

7    term 1926 to 1995 period was 5.15 percent, significantly lower

8    than the 30-year Treasury rates in 1995, and the 6.06 percent

9    rate effective as of January 1, '96.  So the question is, did

10   you do any kind of averaging at all looking backwards for any

11   period of time, whether it is 10 years or 7 years or 5 years at

12   that 30-year Treasury rate?  And if you did not, was there any

13   particular reason why you did not?

14             THE WITNESS:  I don't recall specifically computing

15   the exact 30-year constant maturity treasury yield over that

16   period of time.

17             One of the reasons I did not was because, as some of

18   us recall, the period of time from 19, let's say, '77 to

19   through the 80s and 90s, there was a period of extremely high

20   interest rates.  In fact, the highest interest rates we have

21   ever seen.  In 1984 or so there was a 14 percent 30-year

22   Treasury bond issued, which again by today's rates seems almost

23   unfathomable, but that is what it was.  I view that period of

24   time as kind of an aberrant, outlying period of time relevant

25   to the history of interest rates in the United States and

F7EJOSB4                          Maxam - cross

1    really the world.

2            So I viewed that as kind of a biased period of time.

3    My intention was to get beyond that biased period of time.  I

4    included it in my analysis, inclusion of the Ibbotson rate, but

5    I did not specifically compute exactly the 30-year Treasury

6    bond yield averages over that period of time.

7            The Ibbotson is very, very highly correlated with that

8    rate.  I would guess it is correlated to the point of 96, 97

9    percent, so very very close matched 30-year Treasury rate.

10           THE COURT:  You don't know if it is correlated to the

11   longitudinal analysis of the 30-year Treasury rate?

12           It ought to be if it is highly correlated on an annual

13   basis, but I guess the question is in terms of your last

14   statement, if you're making an assertion the 5.15 percent is

15   equivalent to the 6.06, and that there is going to be a

16   regression to the mean, is there anything to suggest that the

17   5.15 is the correct mean against which to compare the 6.06?

18           Do you see?

19           THE WITNESS:  I see exactly what you're saying.  I

20   would say the answer is it is the best information we have.

21   That would put a high degree of confidence in the fact that it

22   is a rate that has meaning in the regard that we're looking at

23   right here right now in this case.

24           THE COURT:  All right.  You may proceed.

25   BY MR. RACHAL:

F7EJOSB4                         Maxam - cross

1   Q.  This actually short-circuited a few of the questions.

2           You agree from the 1970's to at least up until the

3   early 1990's there was a period of high inflation and high

4   interest rates?

5   A.  Yes, I would.

6   Q.  Dr. Maxam, you agree that in determining what long term

7   interest rates would be, one key component is the expected

8   inflation rate?

9   A.  Yes.

10  Q.  You would agree that at least through the 1990's, at least

11  early 1990's to mid-1990's, it was still a bit of battle going

12  on as whether or not the fed was going to be able to tamp down

13  inflation expectation?

14  A.  I would say certainly through the 80's, yes.

15  Q.  When you talk about regression to the mean, you have to

16  define what is driving the mean, correct, Dr. Maxam?

17  A.  I am not sure what you mean by driving the mean.

18  Q.  I'll break it down a step or two.

19          If one of the key drivers of the long term interest

20  rates is the inflation rate, what is going to return it to the

21  mean is what is going to be the long term inflation rate,

22  correct, or expected inflation rates is more precise?

23  A.  I would say there is a theoretical understanding that an

24  interest rate consists of some components, one of which is the

25  inflation rate.  That is a future expected inflation rate over

F7EJOSB4                         Maxam - cross

1    a long period of time, and that on a theoretical basis that is

2    the way interest rates are formed.  In practice, it may not

3    necessarily be the case.

4    Q.  You had mentioned about in hindsight it is hard to fathom

5    interest rates in the 10, 12, 14 percent for Treasury bills,

6    correct, Dr. Maxam?

7    A.  Yes.

8    Q.  You agree you can't judge economic decisions with

9    hindsight; you have to judge it based on information you had

10   when they were made?

11   A.  Yes, very much so.

12            THE COURT:  I still want to try to figure out whether

13   or not there is any way to prove up the accuracy of your

14   statement about the correlation between the Ibbotson long term

15   government yield and the 30-year Treasury.

16            I am wondering whether or not you have in some of the

17   materials that are in the record that are handy, so I can pull

18   the 30-year treasury yield myself, whether or not you have

19   handy the Ibbotson government bond, long term government bond

20   yield?  Is there a spreadsheet someplace that's got that?

21            THE WITNESS:  I believe it should have been.

22            THE COURT:  Is there a spreadsheet that has got that

23   attached some place?

24            MR. GOTTESDIENER:  A spreadsheet that has Ibbotson

25   attached?

F7EJOSB4                        Maxam - cross

1                THE COURT:  The year-by-year it Ibbotson rates.  You
2        think about it and let us know.  I can do.
3                THE WITNESS:  I can provide that.
4                THE COURT:  I don't want you to provide me.  I will
5        look at what the public record is.  You may proceed, sir.
6                MR. RACHAL:  I might be ready to tender the witness.
7                (Pause)
8                MR. RACHAL:  Is it alright if I confer with counsel?
9                THE COURT:  Yes.
10               (Off-the-record discussion)
11               THE COURT:  While you're conferring, what I am trying
12       to do, I want to do a year-by-year comparison with Ibbotson
13       long term to 30-year treasury to see whether or not the period
14       we have the data for the treasury there is, in fact, a
15       correlation.  If there is, that is some inference that the
16       Ibbotson long term does correspond.  If not, then it will be
17       thrown off by virtue of this period of time we have just been
18       talking about.  That is the purpose of the exercise.  If you
19       folks don't have it, it is publicly available.
20               MR. RACHAL:  I know in expert discovery I do not
21       recall that being part of the expert discovery.  That is these
22       I can tell you.  The Ibbotson we didn't contest.  He actually
23       calculated the Ibbotson bond rate, whether or not it calculated
24       with the 30-year Treasury rate.
25               THE COURT:  I am only interested in the 30-year

F7EJOSB4                          Maxam - recross

1    Treasury.

2              MR. RACHAL:  I tender the witness.

3              THE COURT:  Mr. Gottesdiener.

4    RECROSS EXAMINATION

5    BY MR. GOTTESDIENER:

6    Q.  Dr. Maxam, based on your analysis and points raised by

7    defense counsel at your deposition and here today, is it your

8    opinion that Foot Locker was close or on the edge of bankruptcy

9    in 1995?

10   A.  I don't believe they were they because I don't believe

11   anyone would extend credit, significant credit and long term

12   credit to a company that was on the verge of bankruptcy.

13             The bond markets lent them over $300 million for a

14   5-to-7-year period.  Certainly anyone who was buying those

15   bonds believed Foot Locker was an ongoing concern and was able

16   to make those interest rates and repay the principal over that

17   period of time.

18             There were 37 banks that looked at Foot Locker and

19   agreed to participate in one and a half million dollars of

20   revolving credit facility for them.  Again, no one would look

21   at a company they thought were on the verge of not being able

22   to pay them and decide to go ahead and lend them money.  They

23   just wouldn't do it.

24             THE COURT:  Can I ask you a question about that.  I

25   don't want to use Greece as an example because people are

F7EJOSB4                          Maxam - recross

1    lending them all kinds of money potentially.  They certainly

2    have a high likelihood of bankruptcy with the new potential

3    bailout.  Isn't it true if the asset values were sufficiently

4    high, even if they didn't have an ongoing payment stream, there

5    would be a lending facility available that could be obtained

6    through liquidation?

7               THE WITNESS:  I suppose that is to some degree true.

8               If we have learned any lessons from the last 15 years

9    or so, banks don't make money when they have to go collect on a

10   loan via asset liquidation, seizing of assets.  It is a loss

11   scenario for them no matter what happens.

12              THE COURT:  Thank you.

13   BY MR. GOTTESDIENER:

14   Q.  You did your analysis in 2012?

15   A.  Correct.

16   Q.  At the time you did your analysis, I am assuming you did

17   not have available to you the declaration of Michael Steven,

18   the former CFO of the F.W. Woolworth Division?

19   A.  No, I did not.

20   Q.  Have you recently reviewed his declaration?

21   A.  Yes, I just received that very recently.  I did review it.

22   Q.  Does he talk about in his opinion and provide bases for his

23   opinion whether or not Foot Locker was close to bankruptcy in

24   1995?

25   A.  He does, and he states that bankruptcy was -- I am

F7EJOSB4                          Maxam - recross

1   paraphrasing, but bankruptcy was never an issue, never a

2   consideration as far as he was concerned.

3   Q.  The information, in addition to his conclusion, the

4   information that he identifies that forms the basis for his

5   conclusion in his declaration, is that consistent with the

6   information that you used in forming the basis of your opinion?

7   A.  I would say yes.

8   Q.  Is there anything in his declaration that is inconsistent

9   with your understanding?

10  A.  Not that I saw, no.

11          MR. GOTTESDIENER:  No further questions.

12          THE COURT:  Thank you.

13          MR. RACHAL:  No further questions.

14          THE COURT:  You may step down.

15          (Witness excused)

16          THE COURT:  Mr. Gottesdiener, would you like to call

17  the plaintiff's next witness.

18          MR. RACHAL:  I have a question on the reports of

19  Mr. Deutsch.  I have some objections to certain parts of it.

20          THE COURT:  I see that in your letter this morning and

21  the exchange.  I think that while I understand it will take

22  time out of your cross-examination, the issues relating to some

23  of what, for instance, he testified to -- for instance, early

24  retirement -- does come up again with Sher, which makes sense,

25  right, but separately from him relying on Eaton, so there is

F7EJOSB4                         Maxam - recross

1    places where I am not really ready to cut him off entirely.

2              The portability I think is one of the other issues

3    which seems to come up in other places.  Am I right about that?

4    So she is talking about the value certain people would

5    attribute to -- I am taking this not having read her report,

6    but having read descriptions of her report, the other folks'

7    report, that issue seems to be still live in terms of other

8    pieces of information.  What I was going to suggest, you just

9    go through this.  If it later becomes absolutely clear that

10   you've wasted a lot of time and you want the time back, we'll

11   talk about that later.

12             MR. RACHAL:  The only real main issue I have is with

13   the early retirement subsidy issues.  There was a subclass

14   originally certified or he sought to certified, a subclass.  In

15   the first round of class where that subclass was dropped, the

16   issues related to it were dropped, we had --

17             THE COURT:  Let me tell you why I think early

18   retirement, looking at Paragraph 63 of Mr. Sher's report, his

19   first declaration, it is DX 12, which is at 15 A, and that one,

20   in Paragraph 63, he is talking about the ways in which

21   different things affected different folks, and completely apart

22   from Niden, he talks about early retirement.  I understand your

23   point in terms of the class, but I still am interested in

24   whether and the extent to which there are variances like that.

25             It is worth you going ahead and cross-examining.

F7EJOSB4                          Deutsch – cross

1           MR. RACHAL:  There were certain demonstratives that

2    were exchanged last night.  We have objections to certain of

3    them.  I don't know if now is the appropriate time or when

4    they're introduced.

5           THE COURT:  Wait and see when they're introduced

6    because we might be able to take it up at the beginning of the

7    lunch break if we have time.  We don't take up much trial time.

8    If they're introduced and we need to go to them right away, we

9    can do that.

10   LAWRENCE DEUTSCH,

11        called as a witness by the Plaintiffs,

12        having been duly sworn, testified as follows:

13   DIRECT EXAMINATION

14   BY MR. GOTTESDIENER:

15          THE COURT:  Mr. Deutsch, I will ask you to speak

16   slowly, clearly and into the mike, close by but not too close.

17          THE WITNESS:  I will try.

18          THE COURT:  You have done it before?

19          THE WITNESS:  Quickly.

20          THE COURT:  Slow down or I won't follow you.  All of

21   this I get, but I need to think about it as we go.  It is

22   important that I hear it clearly.  Mr. Gottesdiener, you may

23   proceed sir.

24   BY MR. GOTTESDIENER:

25   Q.  First, Mr. Deutsch, I would like to show you --

1           MR. GOTTESDIENER:  May I approach, your Honor?

2           THE COURT:  You may.

3   Q.  -- Exhibit 13 A and Exhibit 13 B.  Is 13 A your opening

4   report and 13 B your rebuttal report in this case, modified to

5   make certain corrections, and in the rebuttal, to delete

6   material no longer relevant to responding to Dr. Niden?

7   A.  Yes.

8   Q.  The opening report, 13 A, that we'll sometimes call it the

9   May 22, 2012 report, that has been altered to fix math errors

10  identified in your supplemental report, June 23rd, 2015, and in

11  your deposition that occurred on June 28th, 2012?

12  A.  Yes.

13  Q.  I gave the supplemental report as June 23rd, 2015.  It is

14  June 23rd, 2012.  Is that right?

15  A.  Yes.  That is my recollection, yes.

16          MR. GOTTESDIENER:  We had an agreement, your Honor,

17  with both sides, both sides' experts could have their notes in

18  front of them.

19  BY MR. GOTTESDIENER:

20  Q.  Mr. Deutsch, do you want your machine?

21  A.  No.  Just the paper notes.

22  Q.  The paper notes?

23  A.  Yes.

24  Q.  Do you have them?

25  A.  I forgot to bring them up.  They're on the table.

F7EJOSB4                          Deutsch – cross

1          THE COURT:  While those are being obtained, let me ask

2     you, Mr. Deutsch, do you swear to the contents of what has been

3     put in front of you as Exhibits 13 A and 13 B to the joint

4     pretrial order, which are those declarations, that those

5     contents are true an correct?

6          THE WITNESS:  Yes.

7          THE COURT:  The court will take, then, those as his

8     direct testimony subject to the objections that have been

9     lodged by the defendants, and I will sort through those in due

10    course.

11         MR. RACHAL:  Both parties have agreed that respective

12    experts can testify on notes and we are not going to ask for

13    the notes.

14         THE COURT:  All right.  There is a stand-down on the

15    notes.  He can refresh his recollection without needing to turn

16    them over to counsel upon request.  All right.  That is fine

17    with the court.  Open book exam.

18         MR. GOTTESDIENER:  Yes.

19    BY MR. GOTTESDIENER:

20    Q.  Mr. Deutsch, as you know, this case is about the impact of

21    the plan change effective 1-1-96 and how it was communicated to

22    plaintiffs.  Plaintiffs argue, misleadingly, to give the court

23    context for what we say were misleading communications.  I'd

24    like to walk through the mechanics of the transition from the

25    old formula to the additional new formula and the impact it had

F7EJOSB4                    Deutsch - cross

1    on benefits.  To do that, I would like to start briefly with

2    the old plan and then move forward from there.

3           For ease of reference, I'll refer to the amendment

4    adopted by the sponsor in 1995 and effective 1-1-96 as simply

5    the amendment or the 1996 amendment.  Is that okay?

6    A.  Yes.

7    Q.  Prior to the amendment, can you tell her Honor how was the

8    benefit under the plan determined?

9    A.  Well, in generic terms, the plan is what was referred to as

10   a career average pay plan.  What that meant is that each year

11   the benefit under the plan was equal to the benefit earned the

12   year before plus a percentage of that year's compensation.

13   That is a reference to what is sometimes referred to as final

14   average pay plans where you earn a percentage of the ultimate

15   pay rather than each year's pay.

16          The percentage level was roughly one and a quarter,

17   one and a half percent pay.  The plan did something called

18   integrating the social security, where they provided a higher

19   level of benefit to people, over in this case I believe it was

20   $10,800 a year in recognition of the fact they were effectively

21   funding the social security system.  So that is referred to as

22   an integration, which is integration with social security.

23          The plan only allowed benefits to actually be paid

24   when somebody reached age 55 and generally speaking somewhere

25   between 55 and 65 unless somebody continued employment in which

1    case they would get increases in benefit due to the delay after

2    65.  And when they received the benefit, it had to be paid as

3    an annuity.

4    Q.  Let's try to simplify this and ask.  The annual amount

5    payable at age 65, what was that called?

6    A.  The primary benefit at age 65 under the plan which is the

7    benefit in the form of a life-only annuity is generally

8    referred to as accrued benefit.

9           It is defined as accrued benefit in the plan document

10   and in the laws I deal with as an enrolled actuary.  I don't

11   refer to things by ERISA reference, but their code references.

12   The Revenue Code 411-87 defines accrued benefit as benefit

13   payment as an annuity at retirement age, in this case age 65.

14   That is the accrued benefit, apparently a building block of the

15   plan.

16   Q.  Can we give some numbers to this.

17          If somebody after five years has earned the right to

18   benefit at age 65 of a thousand dollars a year, how does the

19   benefit grow after that?

20   A.  Well, each year the benefit would grow due to additional

21   service, so if somebody was earning, say, $30,000 a year, they

22   would accrue one and a half percent roughly of that, so it

23   would be roughly, if you had a year, they would earn another

24   $45.00 payable as benefit annually at age 65.  I think I

25   shifted a decimal point there, it is probably $450.00 a year

they're earning, not $45.00.

Q.  I think it will help if you put the mike right in front of
your mouth.

A.  I will try.

Q.  So their accrued benefit is growing each year based on a
percentage of their pay?

A.  Yes.

Q.  And you said something about they don't have to pay it
until age 65, they can retire early at age 55 and start
benefits then?

A.  Yes, they can start the benefit as early as age 55.

Q.  Can you explain how that worked under the plan to her
Honor.

A.  Yes.  Assuming the individual is going to be receiving a
benefit just payable over their life, the benefit payable at
age 55 would be reduced for payment prior to age 65, and the
reduction depended upon the number of years of service the
individual had as of the point the benefit commenced.

        If they had less than 15 years of service, the benefit
was reduced by 6 percent per year.  If they had 15 or more
years of service, it was reduced 4 percent per year.  At age
55, if you have the individual that we were just talking about
had a benefit of a thousand dollars a year payable at age 65, a
reduction of 6 percent per year would be a 10-year reduction,
60 percent reduction, leaving 40 percent of the benefit, so the

F7EJOSB4                    Deutsch – cross

benefit payable at 55 would be $400 a year.

          If they had 15 years of service, the reduction is 4

percent per year for 10 years, that is 40 percent, that leaves

at 60 percent, so their benefit payable at 55 would be $600.00

a year.

Q.  So let's put that again in terms of if we had somebody with

an average pay of $30,000 who was there 20 years, was that a

typical person at that time?

A.  I remember seeing statistics, the average pay was 22,000,

so that was a little higher, but pretty much close to average.

I don't remember the average service.

Q.  So under this formula, the annual pension payable was about

25 percent of pay or $7,500 a year?

A.  Yes, it was a bit of a quirk due to salary increases, but

basically that is roughly what I recall.

Q.  In oversimplified terms, if the accrued benefit is a

thousand dollars, and you have a participant who works, say,

eight years, elected to retire and start benefits at age 55,

tell us again the thousand dollar benefit would be reduced by 6

percent?

A.  Yes, it would be reduced by 6 percent because they had less

than 15 years, so they would end up with 40 percent of that

thousand dollar benefit or $400.

Q.  So it would be reduced by 6 percent a year for 10 years?

A.  For 10 years.

F7EJOSB4                          Deutsch – cross

1    Q.  So that would result in an age 55 benefit of $400?

2    A.  Yes.

3    Q.  Now, the 15 year, if you had 15 years, you got a better

4    deal?

5    A.  Yes.

6    Q.  Is that right?  Would you explain that?

7    A.  Yes.

8    Q.  In terms of the same thousand dollars?

9    A.  Yes.  So the reduction at that point would be only be 4

10   percent per year, so the $400 that was previously calculated as

11   I described earlier would jump to $600.00 because there is only

12   a 4 percent per year reduction.  So it is a 40 percent

13   reduction.  The benefit payable itself would go from $400 to

14   $600.00, which is a 15 percent jump in the benefit because

15   somebody has over 15 years of service.

16   Q.  Does ERISA, the code call this something special?

17   A.  Yes, this is generally referred to as an early retirement

18   subsidy.  There is a regulation that defines what an early

19   retirement subsidy is, and basically if it is more valuable

20   than the benefit determined under actuarial factors, then the

21   benefit is considered subsidized.

22   Q.  This, you think, is a benefit would be considered

23   subsidized?

24   A.  The benefit payable for people over 15 years of service was

25   definitely subsidized.

F7EJOSB4                        Deutsch – cross

1   Q.  Did you say about 15 percent more?

2   A.  If you give me one second.  I would say more than 50

3   percent more because the benefit with only the 6 percent

4   reduction, depending on what interest rate you thought was the

5   interest rate for determining the actual calculation which I

6   covered in my report, may or may not be viewed as subsidized.

7          So it was 9 percent would be considered subsidized.

8   At 6 percent it was about even.  If you consider the 6 percent

9   reduction as being non-subsidized, the one with more than 15

10  years is clearly at 50 percent subsidy.

11  Q.  Was there any other way a participant could receive his or

12  her benefit before age 55 or 65 under the prior plan

13  pre-amendment?

14  A.  Yes.  If the individual when they terminated, the value of

15  their benefit determined under the 417 (e) assumptions was less

16  than what is referred to as the de minimis amount which at that

17  time was $3,500, then the plan would pay a lump sum benefit to

18  that individual.

19         Actually, there was no choice in the matter.  The

20  benefit was paid as a lump sum whether they elected it or not,

21  but they would receive a lump sum basically as soon as they

22  terminated.

23  Q.  So the rule kicked in if the lump sum value of the benefit

24  was less than $3,500?

25  A.  3500 at the time.  That amount subsequently increased to

F7EJOSB4                          Deutsch - cross

1    5,000.

2    Q.   How was that measured, the rate that was used to do that

3    calculation?

4    A.   That was done using the same 417 (e) rates that had been

5    talked about here repeatedly.  I don't recall off the top of my

6    head, but I believe they're already using the 30-year Treasury

7    rate, but they may have been still been using the PBGC rates

8    which was more generous.  There was a change in the law

9    changing the underlying interest rate for 417 (e) calculations.

10           The amended plan went directly to the 30-year Treasury

11   rate, but I don't remember whether that had been adopted.

12   Q.   The 30-year Treasury rate, when it comes to lump sums, is

13   the plan allowed to pick any rate that it wants or is it

14   somehow regulated?

15   A.   Yes.  Well, there is -- the lump sum benefit cannot be less

16   than the amount determined under the rates prescribed by law,

17   which is, generally speaking, the 30-year Treasury rate in the

18   period of time we are talking about, but they are allowed to

19   pay more if they choose to.  They can give more a more generous

20   rate, but can't give a less generous rate.

21   Q.   As far as you know as an actuary, what brought about

22   Congress setting a limit as to how high an interest rate a

23   company could use in cashing people out?

24   A.   Well, my recollection is that at one point there was a

25   lawsuit where the plan was cashing out lump sums at a rate --

F7EJOSB4                         Deutsch – cross

okay -- I believe it was American Airlines or pilots of

American Airlines, and they were cashing them out at a rate of

9 to 10 percent, and the pilots sued and said that rate was too

high an interest rate.

        The pilots won, and subsequent to that it is generally

recognized that is what generated the existence of 417 (e), and

Congress said there has to be a limit as to the minimum lump

sum that can be paid, or to put it differently, the maximum

interest rate that can be used.

        Additionally, they set it at the -- I used the term

PPG earlier.  PPG, Pension Benefit Guaranty Corporation, which

effectively is a federally run insurance company that

guarantees pension benefits.  So they were setting the rate.

Subsequently, that rate was amended to the 30-year Treasury

rate.

Q.  In this context, could you tell us what does the actuarial

equivalent lump sum value mean?

A.  Generally speaking, the term actuarially equivalent lump

sum would be the lump sum value of cash you need today, so then

when it grew based on your assumptions, generally speaking,

interest to some future point in time, that it would reproduce

the benefit that it is the actuarial equivalent to.

        So, for example, if you had a benefit payment at age

65 of a thousand dollars a year, the lump sum equivalent value

would be the amount of money you need today, so if you grew up

1   the assumptions you're using, it would grow into enough money

2   to fund that thousand dollars a month benefit at age 65.

3   Q.  When the 30-year Treasury rate was the rate that Congress

4   said must be used, was there an assumption that Congress was

5   necessarily making as so what an employee who got paid a lump

6   sum would on average yield in the market with that money?

7   A.  So, in essence, Congress dictated that when you say well,

8   it would grow with interest, the mandated interest rate that

9   you had to assume it would grow at would be the 30-year

10  Treasury rate.  So the presumption would be the participant

11  would invest the money at the 30-year Treasury rate.

12  Q.  Was it relevant if the participant thought they could do

13  better than the 30-year Treasury or wanted to get their hands

14  on their money early?

15  A.  No, it is not relevant.  The law doesn't say subject to the

16  participant thinking they could do better.  Because of doing

17  work like this, I read a bunch of court decisions.  There is a

18  court decision pretty landmark on this issue, Berger v. Xerox,

19  and Judge Posner makes the comment that even if the participant

20  thought it was a good deal to get a smaller amount of money, it

21  is a sale that Congress prohibited.  So he points out you can't

22  use a more generous rate.

23          MR. RACHAL:  Objection.  I have let Mr. Deutsch go on

24  a pretty good bit.  He is starting to move over to giving

25  opinions of law.

F7EJOSB4                        Deutsch - cross

1          THE COURT:  That case was cited in your proposed

2     conclusions of law, and I think you had a block quote from it.

3     So I will only pay attention to what I think about the law,

4     although I will make sure that I read all the cases which you

5     folks and experts seem focused on.  I understand the point, but

6     we'll let him continue.

7     BY MR. GOTTESDIENER:

8     Q.  Now, you were present for the opening statement, both

9     sides, and defense counsel talked about there is this amendment

10    that creates people getting a lump sum?

11    A.  Yes.

12    Q.  Did people on any sizeable basis get lump sums prior to the

13    amendment?

14    A.  By a "sizeable basis," you mean head count or dollar

15    amount?

16          By dollar amount, there were a lot of people who were

17    getting the de minimis lump sum.  After the amendment to the

18    plan?

19    Q.  Before the amendment, how about by head count?

20    A.  I don't have a statistics before the amendment.  Only after

21    the amendment.

22    Q.  Do you think the rate would change substantially?

23    A.  I would not think it would change substantially, no.

24    Q.  Why don't you then tell us after the amendment?

25    A.  After the amendment, this is actually cited, and I don't

F7EJOSB4                        Deutsch - cross

1    remember off the top of my head, it is cited in my rebuttal

2    report, but it is somewhere around 40 percent of the people who

3    are receiving payments were receiving the de minimis lump sum.

4    Q.   40 percent, 4-0?

5    A.   I don't remember the exact number, but it was substantial.

6    Q.   4-0, 40 percent of the people receiving any form of

7    distribution for the plan were receiving it in the form of a

8    lump sum?

9    A.   Yes.

10   Q.   So?

11   A.   A de minimis lump sum.

12   Q.   De minimis lump sum, so assuming the rate was generally the

13   same, those people would have received lump sums without any

14   amendment to the plan?

15   A.   Yes, a very large percentage of the people would have

16   received the lump sum independent of the amendment of the plan.

17          THE COURT:  Do you have any idea how long, given

18   average salaries, one would have to work to accrue any benefit

19   that would nonetheless fall within the de minimis?

20          What I am wondering, in effect, is whether or not

21   these people that we are talking about, the 40 percent would be

22   impacted by the change of plan in any event because

23   definitionally they're relatively short-term employees, if you

24   will?

25          They're at least not long, employees with particularly

F7EJOSB4                    Deutsch - cross

1   long employment with the company, and so a couple of years?  Is

2   it some number of months?

3            THE WITNESS:  Well, prior to the amendment, that is

4   hard to say precisely because it is very dependent on age.  If

5   somebody is 30 years' old, their lump sum equivalent to their

6   age 65 benefit is going to be, I don't know, 10 percent of that

7   same benefit attributable to the same service for somebody who,

8   say, is 60 years' old.

9            After the amendment, since that dollar amount is not

10  impacted by age, but on the service, you can say well, if a

11  person is earning $20,000 a year and they're getting a

12  contribution of, say, 1 percent of pay, that means their

13  contribution would be about $200.00.  So with the interest, it

14  is 10 years.  It is more than 10 years.

15           THE COURT:  Got it.  Thank you.

16  BY MR. GOTTESDIENER:

17  Q.  Now, was there anything that would have stopped Foot Locker

18  from expanding the lump sum rule so that it was an option for

19  anyone leaving the plan even if the value of their benefit was

20  more than $3,500?

21  A.  No.  It was not uncommon, in my experience, for plans to

22  have a lump sum provision which were not cash balance plans.

23           In Mr. Sher's opening report, he attached a survey of

24  cash balance plans, and as I recall in that survey, it

25  highlighted at 27 percent I think was the number of the plans

F7EJOSB4                     Deutsch – cross

1   in the survey had a lump sum provision prior to being changed

2   to a cash balance plan.

3   Q.  So they could have just crossed out the $3,500 restriction?

4   A.  Or increased it, yes.  For example, I remember a plan once

5   that had a $25,000 line.

6   Q.  This could have been a stand-alone change?

7   A.  Yes.

8   Q.  Would it have saved any money?

9   A.  That is an interesting question.  I remember seeing notes

10  from a November 15th, 1995 meeting where this issue was raised.

11  It was Mr. Kiley's notes and this issue was raised that --

12  Q.  Could I just interrupt you and ask, are you referring to

13  February 2nd or November 15th?

14  A.  I am pretty sure it was November 15th.  I could be wrong.

15  Q.  Was it after the plan design had been decided or before?

16  A.  I believe it was -- you're right, it was before.  It must

17  have been before November 15th.

18  Q.  I am sorry about that.  Whenever the notes were.  We'll

19  look at the notes.

20  A.  That in Mr. Kiley's notes they indicate that at 7.83

21  percent, they would be saving money when people took lump sums,

22  and there is even an indication they were thinking of extending

23  the lump sum option to people who have already terminated, but

24  they're still entitled to a benefit, referred to as terminated

25  vested.  In the notes, they referred to as TV's.

F7EJOSB4                          Deutsch – cross

1   Q.  Can we call up PX 21, please, and tell us if that is the

2   set of notes you're talking about?

3   A.  It would be on the next page.  Yes, this is the notes.  I

4   believe these are the notes.

5   Q.  If we go to the third page --

6   A.  There we go.  It says TV's ideally would all be cashed out.

7   Q.  So at the top does it seem to say retirees in pay status

8   would not be affected?

9   A.  Right.

10  Q.  TV's terminated vesteds?

11  A.  Yes.

12  Q.  Ideally would all be cashed out?

13  A.  Yes.  So they're hoping even at 7.83 percent, that all

14  these people who were terminated vesteds will elect to take a

15  lump sum because that would be a good thing for Foot Locker.

16  Q.  Would it be a good thing for Foot Locker if people who were

17  terminated vesteds took a lump sum if the rate was at 7.83

18  percent?

19  A.  Well, he gets into that in the third paragraph.  The early

20  retirement reduction --

21  Q.  Let's slow down.  The early retirement reduction, we're now

22  on the third paragraph.  The notes say, i.e., 4 percent/year?

23  A.  Yes.

24  Q.  Is that the subsidized early retirement reduction you told

25  us about earlier?

F7EJOSB4                          Deutsch - cross

A.   Yes.

Q.   The notes say the earlier retirement reduction, i.e., 4

percent per year, will go away because this is taken into

account in the interest rate used.  There is an inherent

savings in doing this.

          Can you explain what you think that means in this

context?

A.   Yes.  So an individual is entitled to this heavily

subsidized benefit at age 55.  If you're terminated vested and

you already have the 15 years of service, logically your

benefit at age 55 is worth way more than your benefit at 65.

You're going to optimize your position and take your benefit as

early as you remember to do it.  The only reason to delay is

because you forgot.

          The cost to Foot Locker of paying this heavily

subsidized benefit at age 55 is substantial.  In my report I

point out it is the equivalent of roughly a 1 percent interest

rate.  There is a graph in my opening report that shows the

value of early retirement percent.  It is valued at 1 percent.

If you're cashing them out at 7.83, but costing you the

equivalent of 1, you're getting a really good deal, you're

discounting people substantially.

          Across the people, already some people at 10, some

people at 15, there will be some people who would have taken it

at 55.  Some people would have taken it at 60, but this early

F7EJOSB4                          Deutsch - cross

retirement benefit is a very expensive feature to the plan.
When you pay the lump sum, it does not include the value of
that feature.  The law is clear on that point.

          Effectively they were buying, paying people the lump
sum, they were buying them out of this expensive early
retirement annuity benefit.

Q.  Do you see more evidence of that in the notes where it says
in the prior paragraph, do you see forms of payment?

A.  Yes.

Q.  Including normal forms can be the same as now.  "The plan
design, however, encourages lump sums."?

A.  Yes.

Q.  So, now, is there anything, you know, in the ultimate
enactment of the amendment when they said the lump sum is now
available?

          Were there certain restrictions that were placed on
the availability of the lump sum from which you would infer
that they were actually really trying to encourage people to
take lump sums for this purpose, to save money?

A.  Yes.  So they installed the provision in the plan design
that said in order to receive a lump sum, assuming you're below
age 55, you must elect to take the lump sum within six months
of your date of termination.

          While I am not a salesman by trade, one of the things
they talk about doing when you're a salesman is creating an

F7EJOSB4                        Deutsch - cross

1    urgency, that is what forces a sale, do it now before it is

2    gone.  So by saying you have an option only to do it with the

3    next six-month window, that would encourage people to make the

4    election rather than delay.

5            If we contrast that for a second to a plan where they

6    didn't have a six-month window, which is more common, where you

7    could take it at any time, an individual terminates when

8    they're 40.  Let's say the value of their benefit is

9    $10,000.00.  That is effectively like having money in a savings

10   account.  You could argue about good rate of return, bad rate

11   of return, but it is money sitting in an account.

12           If you hit some emergency, like you want to pay for

13   your kids' college, if you could get the money whenever you

14   want, you could tap it at age 55 and use it for some purpose

15   you couldn't necessarily see when you're age 40.  If you only

16   have a six-month window and you're concerned about maybe in a

17   couple of years I want that money, your only choice is to take

18   it now, where you lose the ability to take it in 10 years.

19           There was this misconception also in the world that

20   well, if Foot Locker went bankrupt or Woolworth went bankrupt

21   and my pension money was still there, I'd lose it.  Well, that

22   is what the Pension Guaranty Corporation is about.  You don't

23   lose it.  That doesn't change the fact that people's mentality

24   was that they might.

25           MR. RACHAL:  I have to object.  This is speculation

1    about people's state of mind.  It has gone way beyond actuarial

2    expertise.

3              THE COURT:  Based upon your experience, review and

4    literature, why don't you tie your answers to those kinds of

5    things?

6              THE WITNESS:  I have had conversations with

7    individuals in the plans who said -- I remember one

8    specifically where he said I lost my pension because my prior

9    employment went bankrupt.  No, you didn't.  This is an issue

10   that I have seen it literature and I have had conversations

11   with people.

12             THE COURT:  All right.  Mr. Gottesdiener.

13   BY MR. GOTTESDIENER:

14   Q.  So we actually started by asking well, you know, could Foot

15   Locker have just amended the plan to allow the lump sum option,

16   and we looked at how encouraging people to take lump sums saved

17   them a lot of money.

18             You may have heard in opening statement that counsel

19   said well, this just was not practical because it actually

20   would have cost Foot Locker a lot of money.  Can you tell us

21   about the assumptions that were being used at the time for the

22   number of people taking lump sums versus annuities once they

23   amended the plan.

24   A.  Well, when they amended the plan in 1996 -- let me back up

25   one second.  In 1995 they assumed that basically all people

F7EJOSB4                          Deutsch – cross

1    other than the de minimis lump sum people would take annuities.

2              When they amended the plan, they continued to assume

3    for funding purposes -- in other words, for the purpose of

4    determining the legally required minimum amount of money going

5    into the plan -- that a percent of the people will take annuity

6    benefits.  They did not change the assumption.

7              If you assume that everybody is going to take an

8    annuity, the funding cost, how much money they would have had

9    to put in the plan in 1996, would not have been impacted by

10   adding a lump sum provision because their assumption for

11   determining the cost of the plan was nobody was going to take

12   advantage of that lump sum.

13   BY MR. GOTTESDIENER:

14   Q.  So it says that the lump sum is encouraged under this

15   design, but then when it came to reporting assumptions, the

16   assumptions that were reported was nobody was going to take

17   lump sums?

18   A.  Yes.

19   Q.  The parties here do not disagree that the company wanted to

20   change the plan to save money.  I think you've heard that.

21             Could we just review, generally speaking, a sponsor in

22   the position of Foot Locker in 1995.  What are the ways that a

23   sponsor like that could have saved money in terms of the plan,

24   and maybe you can start with the pipe analogy that I mentioned

25   before.

F7EJOSB4                          Deutsch – cross

A.   Yes.   The contributions going into the plan are funding

venues.   That could be viewed in a certain way like a pipe.

You push money in one end and benefits come out the other end.

        If you push more money in the front end, that means

you can afford to pay more benefits after that.   If you want to

decrease the amount of money going in the front end without

running into trouble, the only way to do that is to lower the

benefits coming out the other end because otherwise you're not

going to have enough money to pay for that.

        The money in the plan is also growing with interest,

so there is an addition in the pipe where it is both money

going in the plan plus interest on that money that went into

the plan, but the only way to not put more money in the plan is

to decrease the amount of benefits coming out the other end.

Q.   Were you going to say something?

A.   When you're funding the plan, there is what we refer to as

minimum funding requirements, which is the legally mandated

minimum contribution.   Assuming the plan is, if you will,

evenly funded so it is not ahead on funding or behind on the

funding, the contribution generically is made up of two pieces.

One is the funding of the difference between the already earned

liability and the assets, referred to as the unfunded

liability.

        The other piece is the normal cost, that is this

year's attribution of cost.   The funding method used by the

F7EJOSB4                         Deutsch - cross

1    plan both before and after the amendment was a method referred

2    to as the unit credit funding method.  Under the unit credit

3    funding method, the liability is set as the value of the

4    benefits earned to date, and the normal cost is set as the

5    value of benefits earned during the year.

6         Well, the benefits earned to date is a fixed number.

7    You can't reduce it because it is legally protected.  So the

8    only place where there is room to lower the cost is in the

9    normal cost.  The normal cost is tied directly to the benefits

10   earned in that individual year.  So to reduce the normal cost,

11   reduce the benefits.

12        THE COURT:  How is what is earned to date determined?

13        In other words, what are the assumptions underlying

14   what is earned to date and is there any, for instance, any

15   interest rate assumption built into that?

16        THE WITNESS:  Well, that has two parts to it.  The

17   first is the benefit itself.  The second is how the benefit is

18   valued.

19        The benefit itself is determined under the terms of

20   the plan, that based upon the service worked to date, this is

21   your benefit which is the accrued benefit we talked about

22   earlier.  This is your accrued benefit, and that accrued

23   benefit is basically the benefit we would be valuing for the

24   liability.

25        Now, at that point in time as far as the interest rate

F7EJOSB4                          Deutsch - cross

1   is concerned, the actuary had pretty much free rein to take the

2   assumption he felt was his best estimate.

3                THE COURT:  You could determine whether you had a

4   fully funded liability based upon what kind of range of

5   interest rates?

6                THE WITNESS:  Well, it was supposed to be the

7   actuary's best estimate of the future anticipated rate of

8   return on plan assets.

9                THE COURT:  Do you know what that number was for the

10  plan prior to the conversion?

11               THE WITNESS:  Yes, it was 9 percent.

12               THE COURT:  It was 9 percent?

13               THE WITNESS:  Yes.

14               THE COURT:  All right.

15  BY MR. GOTTESDIENER:

16  Q.  What you were talking about, this pipe analogy, did that

17  show up in the PX-9, the document that her Honor asked defense

18  counsel about during his opening statement, this letter from

19  Mercer that went to Pat Peck that was in response to

20  Mr. Farah's interest in seeing if they could save more money

21  from the plan?

22  A.  Yes.  If the opening of the first -- excuse me -- second

23  paragraph below the bullet points, as a way of background, the

24  only way in which significant cash savings can be realized is

25  in the future accrual of benefits, i.e., the normal cost.

F7EJOSB4                          Deutsch - cross

1    Q.  Is that what you were talking about where the only area in

2    which significant cash savings can be realized is in the future

3    accrual of benefits?

4              The normal cost, that means you can't cut back on what

5    people have already earned, you can only stop having new

6    benefits coming out of the pipe if you want to save cash?

7    A.  Yes.

8              THE COURT:  I will ask, people are interested in time.

9    Just I can hear as much as possible Mr. Deutsch?  Can you not

10   lead as much?

11             MR. GOTTESDIENER:  Sure.

12   BY MR. GOTTESDIENER:

13   Q.  Can you find for her Honor, is there any other place they

14   discuss what you were saying in the letter?

15   A.  So in the next paragraph they say the 6 percent increase

16   may be changed in order to effect a decrease in normal cost.

17             What this would cause is let's say somebody has a pay

18   credit of a thousand dollars and they have 20 years to

19   retirement because they're age 45.  So the benefit we are

20   funding for, assuming they're going to stay until age 65, is

21   that thousand dollars increased with interest at 6 percent for

22   20 years, and that thousand dollars with all those interest

23   accumulations creates a bigger benefit at the end that is

24   coming out of the pipe, so to speak.

25             If we lower the 6 percent to 5 percent, that means it

F7EJOSB4                          Deutsch - cross

1    is going to grow at a slower rate, so the same pay credit would

2    ultimately result in a smaller benefit; and, therefore, we save

3    money.

4              THE COURT:  Maybe now is a good time to break for

5    lunch.

6              MR. GOTTESDIENER:  Sure, your Honor.

7              THE COURT:  Let's all come back at 2:00 o'clock and

8    we'll resume.  Mr. Deutsch would be back on the stand at 2:00.

9              (Luncheon recess)

10             (Continued on next page)

1                A F T E R N O O N    S E S S I O N

2                          (2:00 p.m.)

3            THE COURT:  Mr. Gottesdiener, you may proceed, sir.

4            MR. GOTTESDIENER:  Thank you, your Honor.

5   BY MR. GOTTESDIENER:

6   Q.  Before lunch, Mr. Deutsch, we were on PX 9.  I believe you

7   were talking about how a drop in the interest crediting rate

8   from 6 percent to 5 percent would be one way of Foot Locker

9   saving on normal costs.

10           Do you remember that?

11  A.  Yes.

12  Q.  Looking at -- what paragraph were we on?  Was that the

13  third paragraph?

14  A.  That was the second from the last paragraph.  That one.

15  Q.  OK.  Was there a discussion about the effect that this

16  would have on the wear-away?  Maybe that is in the next

17  paragraph.  The next paragraph.

18  A.  In the next paragraph, they give a third alternative.

19           The third alternative is to simply directly reduce the

20  pay credits, thereby lowering the benefits being earned each

21  year.  And by lowering the benefits, since less benefits are

22  coming out at the end, they don't have to put as much money in.

23           They then note that this pay credit is directly linked

24  to the normal cost because the pay credit directly affects the

25  benefit being earned, which in turn affects the amount of money

F7enosb5                        Deutsch - direct

1    required to fund that benefit being earned.

2               They go on to say the annual savings in the year 2000

3    would be about 5 million.  In addition, the wear-away period

4    would be extended a little further resulting from additional --

5    resulting in additional short-term savings.

6               What they are saying there is that during the

7    wear-away period, for those people who were in wear-away, they

8    are actually earning no additional benefit.  They don't earn

9    additional benefits until the benefit under the new formula

10   catches up with the benefit they already earned.

11              So if you are earning benefits at a slower rate, it is

12   going to take longer before the new benefit catches up.  So the

13   resulting costs for those individuals who are still in

14   wear-away would be zero, though those people would be reflected

15   with a lower initial cost, and the reduction in cost

16   attributable to the wear-away would then extend for a longer

17   period of time.

18   Q.  If I understand, lowering the formula, Mercer is saying we

19   could extend the wear-away and save more short-term cash?

20   A.  Yes.

21   Q.  But did they say why that might not be feasible practically

22   speaking?

23   A.  Well, I assume maybe on the next page they mention why it

24   would not be feasible.

25   Q.  In the prior paragraph of the first page, do you see there

F7enosb5                          Deutsch - direct

1   is a discussion about downside?

2           Could you explain that.

3   A.   It says, Because ERISA protected benefits of -- such a

4   change is I assume what they meant -- such a change would

5   require a complete redesign of the plan, resulting in

6   burdensome administration.

7           What would happen, for example -- this is a little

8   technical so bear with me for a moment.  They have different

9   pay credit rates for different periods of service, and they go

10  up from one group to another.

11          When you take those pay credits and convert them into

12  the ultimate benefit payable at age 65 for an individual, he

13  can't earn more money in a later year by more than 130 percent

14  than he's earning in an earlier year.

15          It is not that the pay credits can't go up.  It is

16  that the associated benefit at age 65 can't go up.  As I

17  discussed in my opening report, they designed those pay credits

18  so that they were level, but if they went to 5 percent it would

19  fail that.

20          So that would mean that the whole design of the pay

21  credits wouldn't work at 5 percent.  It would fall apart.

22  Because it would fail this other rule that is not really at

23  issue at all in this case, but it would cause that to be a

24  problem, and so they would have to completely redesign the pay

25  credit scale.

F7enosb5                          Deutsch - direct

1              So it wouldn't be just a matter of changing the

2       interest rate.  It would be more complicated than that.

3       Q.  Where else in the letter do they talk about short-term

4       savings?

5       A.  So, if we go up to the second paragraph, they mention this

6       wear-away creating a short-term normal cost savings.  When we

7       say here under the current plan provisions the normal cost is

8       about $4 million for 1996 and is expected to rise to $10

9       million by the year 2000, that's caused again by the people who

10      were earning no additional benefits, have no costs until they

11      start earning additional benefits.

12             And so, if you will, there is about $6 million worth

13      of benefits that people would eventually be earning but are not

14      yet because they are still in wear-away.  So it says the

15      increase is due to short-term savings built into the plan

16      design which wear away over the next three to four years.

17             So I would say what they are saying is that they

18      designed the plan to create this wear-away that was part of the

19      design of the plan, and at this point they are expecting that

20      wear-away to have a significant impact on the cost for three to

21      four years.

22      Q.  Would that mean that benefits wouldn't grow for three or

23      four years?

24      A.  For those people, on average, they would expect the

25      benefits wouldn't grow for three or four years, because once

F7enosb5                         Deutsch - direct

1   they start growing the person starts having a normal cost

2   again.

3   Q.  Just so we are clear, I said in opening expectation,

4   anticipation.

5          Am I correct that those are used interchangeably by

6   you actuaries to talk about what you expect, kind of all things

7   staying the same, would happen in the future?

8   A.  You are talking about the 10 million expected rise?

9   Q.  I am actually just talking about words.  Do you actuaries

10  talk that way in terms of what would be expected or

11  anticipated --

12  A.  Right.

13  Q.  -- in the future, is that all things staying about the

14  same --

15  A.  Yes.  A comment like this would necessarily, unless it was

16  caveated, to be based on the presumption that everything else

17  not commented on in the paragraph remains constant.

18  Q.  Without jumping forward other than just this one question,

19  is the anticipated wear-away that Mercer reports here from that

20  vantage point, how does that compare to the anticipated or

21  expected wear-away that you analyzed from around that vantage

22  point?

23  A.  In my opening report, I did an analysis of the anticipated

24  wear-away period based on an annuity, because they are doing

25  these calculations assuming everybody gets an annuity, as we

F7enosb5                         Deutsch - direct

1    mentioned earlier.

2             The wear-away based on the age 65 annuity, and I

3    believe in my report I indicated that I calculated the average

4    expected wear-away would be about three and a half years, which

5    would be in synch with three to four years.

6             So that's roughly the same number I would have come up

7    with.

8    Q.  I think we're done with this for now.  We were talking

9    about ways that a sponsor, such as Foot Locker but not

10   necessarily Foot Locker, other ways that a sponsor might save

11   money in the short term by changing the plan.

12            Could you speak generically about how a sponsor that

13   wanted to save money could change a defined benefit plan that

14   they had?

15   A.  Yes.  The most extreme situation would be to stop all

16   future benefit accruals, so you only have to pay the benefits

17   that are already earned, but you don't, if you will, dig the

18   hole deeper.  Therefore, you leave it at the liability you are

19   legally obligated to, so that would be a freeze.

20            They could have attempted and they did consider a plan

21   termination where you basically shut the plan down and pay it

22   off.  But in order to pay it off, you have to have enough cash

23   to actually cover the benefits, and they didn't have enough

24   cash to cover the benefits.

25            But in a lot of plans where they are either

F7enosb5                         Deutsch - direct

sufficiently funded or close to it, they cut costs by simply

just terminating the plan and paying everybody off.

         They could have simply lowered the formula, so the

formula we talked about earlier was somewhere between one and a

quarter and one and a half percent of pay.  They could have

reduced it to say three-quarters of a percent a pay to 1

percent a pay and reduced it by half a percent a year.  That

would have had a savings, if it was a 25 percent reduction, it

would have a 25 percent savings.

Q.  If they did any of these things, terminate the plan,

temporarily freeze it, freeze it with an intent to terminate or

reduce the formula, would that be something that they would

have to communicate to the participant?

A.  Yes.  So, there's been discussions about the 204(h) notice.

         The 204(h) notice is a notice that you have to put

participants, if you will, on alert that there's been a

reduction in future benefits.  The requirements of the notice

have changed over time, but they would have had to inform

participants and the SPD similarly would have said, well, now

your benefit formula is simply the benefit earned as of 1/1/96

or 12/31/95.

         So the SPD, and there would have been a notice, would

have made clear to people or at least hopefully made clear to

people that their benefits accrual ceased or the rate was

reduced.

F7enosb5                          Deutsch - direct

1    Q.  That would be something very visible that would be out

2    there for folks.  That would be not good.  Could the sponsor

3    couple that with --

4             THE COURT:  Hold on.

5             So that question is about to, it's got sort of an

6    argumentative, sort of statement in the front of it, and then

7    we have a comment and now we have a question.

8             So just go for the question.

9    BY MR. GOTTESDIENER:

10   Q.  So if the sponsor wanted to offset a plan change of the

11   kind that you just described, would something that participants

12   might consider a positive like a lump sum option --

13   A.  Yes.

14   Q.  -- would that be possible with these different changes you

15   just mentioned?

16            MR. RACHAL:  Objection, your Honor.

17            THE COURT:  Give me one more word.

18            MR. RACHAL:  State of mind.  It's speculation.

19            THE COURT:  I will allow it on his experience.

20            Putting it aside the positive lump sum and whether

21   it's positive or negative, let's just say were these -- why

22   don't you rephrase the question.  You can do the question, but

23   why don't you rephrase it slightly.

24            MR. GOTTESDIENER:  Thanks.

25   BY MR. GOTTESDIENER:

F7enosb5                         Deutsch – direct

1   Q.  Terminate the plan, freeze with intent to terminate,

2   temporary freeze, reduce the formula, four different kinds of

3   changes.

4            Could a sponsor couple those, one or more of those

5   changes with the addition of a lump-sum option for the

6   participant?

7   A.  Well, let me take all of them except for the plan

8   termination for a moment.

9            All three of those, there's no correlation between

10  freezing benefits and adding a lump-sum option.  So you could

11  add a lump-sum option at the same time you are freezing

12  benefits.

13           You could add a lump-sum option at the same time you

14  are lowering the benefit formula.  You could have a lump-sum

15  option in conjunction with a temporary freeze.

16           A termination is a little different.  In a termination

17  you have to basically pay off the benefits.

18           There's two options to pay off the benefits.  One

19  option is you go to an insurance company, you buy an insurance

20  policy that will pay the same benefit that the person would

21  have received had you not terminated the plan, but simply

22  frozen it.  The other option is you would add a lump-sum option

23  and paid people a lump sum.

24           The problem in this circumstance is the issue that we

25  were discussing earlier, and that is the cost of the early

F7enosb5                          Deutsch - direct

1   retirement subsidy.

2              In my experience, if you have a plan with a subsidized

3   early retirement benefit and you go to an insurance company and

4   say, I want to buy a policy that covers, among other things,

5   this early retirement subsidy, they are going to assume that

6   everybody gets the early retirement subsidy and it's going to

7   be very expensive.

8              If you could avoid that by offering a lump sum and

9   hoping that people are going to take a lump sum, then that's a

10  way to save money.  I see that used where the plan will simply

11  say, OK, we're going to allow everybody to take a lump sum so

12  that we can be done with it.

13             Generically there have been some studies, the American

14  Academy of Actuaries did a study that the 417(e) cost, that

15  lump sum is pretty close to what it would cost to buy from an

16  insurance company the annuity.  So there isn't a significant

17  savings or cost if the only benefit's the age 65 benefit.

18             So it is not uncommon that you might introduce a

19  lump-sum option in the termination either to not end up having

20  to fund the early retirement subsidy or just because it really

21  isn't going to cost that much more or that much less.

22  Q.  Let's move to cash balance formulas.

23             An amendment could be adopted to add a cash balance

24  formula.

25             What is a cash balance plan?  Could you just give us

F7enosb5                         Deutsch - direct

1   some mechanics of how a cash balance plan works.

2   A.   Well, generically a cash balance plan is generally a

3   reference to a plan in which the benefit is determined by

4   reference to a notional account.

5          So the key operative part of the formula in a cash

6   balance plan is the notional account.  The notional account

7   grows each year through a combination of an interest credit and

8   a pay credit.

9          So basically an account would be set up, and every

10  year you say you get an increase in account because you worked

11  some amount that may or may not be tied to pay, and in addition

12  to you get an increase in the amount due to interest, which may

13  be at a fixed rate or a variable rate.  It's always --

14         MR. GOTTESDIENER:  Can we see, Randall, if you

15  wouldn't mind putting up on the screen Deutsch 3.

16  A.   It is generally referred to as a notional or a hypothetical

17  account, because the benefit is not actually the account.  The

18  benefit is determined based on the account and in certain

19  circumstances the benefit may be larger than the account or

20  different from the account.

21         MR. RACHAL:  Your Honor, this is one of the exhibits I

22  had an objection to.

23         THE COURT:  All right.  And I forgot to tee them up at

24  the lunch break.  What is the issue here?

25         MR. RACHAL:  It is not in the report, so we didn't

F7enosb5                        Deutsch - direct

1   have Rule 26 disclosures.  A lot of this stuff has kind of

2   grown out of the report, but more precisely here it creates a

3   participant that can't exist because he's doing that by

4   overstating the comp credits by -- he has a person starting out

5   at zero at year 1, which means --

6               THE COURT:  So you have --

7               MR. RACHAL:  Can I --

8               THE COURT:  I hear you.

9               Without going through all of that, because it sounds

10  like you may want to save some of that for cross-examination, I

11  am not going to take this in as evidence right now.

12              I don't even have it in a hard copy.  Why don't we

13  hear where it goes, because it sounds like what you can do is

14  your points can go to the weight of the document and whether it

15  should be given any weight at all.

16              MR. RACHAL:  Thank you, your Honor.

17              MR. GOTTESDIENER:  Could I hand it up?

18              THE COURT:  You could hand it up.  I don't know if you

19  are offering it as a demonstrative.

20              MR. GOTTESDIENER:  Can I lay a foundation?

21              THE COURT:  Yes.

22  BY MR. GOTTESDIENER:

23  Q.  Could you explain what this is and how you developed it.

24  A.  First, my screen is not working.

25  Q.  Your screen is not working?

F7enosb5                        Deutsch – direct

1              THE COURT:  It not on the screen yet.

2              THE WITNESS:  It is not on the screen.

3    Q.  I will hand you a copy.  This is PX 1475.

4    A.  OK.  While he's working on that, this was intended as a

5    generic example of how an account in a cash balance plan would

6    work, not how the Foot Locker plan worked.

7              So this was not intended to represent a person in Foot

8    Locker, but rather a hypothetical person in the hypothetical

9    plan.

10             MR. RACHAL:  Your Honor, with that, I withdraw my

11   objection.

12             THE COURT:  All right.

13             So, for instance, the fact that an account balance on

14   January 1, 1996, is zero, that's not a statement that there's

15   anybody in the Foot Locker plan who had zero?

16             THE WITNESS:  No.  Well, let me say that definitely

17   there are people in the Foot Locker plan who have zero.  They

18   are just not in the class.

19             THE COURT:  I see.  Because they wouldn't have had one

20   hour of service.

21             THE WITNESS:  Right.

22             As was pointed out also, they would have started at a

23   lower pay rate than what's illustrated here.

24             THE COURT:  All right.

25             THE WITNESS:  I thought starting at the lower pay

F7enosb5                          Deutsch - direct

rate, I modeled it after the Foot Locker plan, but it's not

intended to represent the Foot Locker plan.

THE COURT:  OK.

THE WITNESS:  I thought using a lower pay rate didn't

really properly illustrate how the cash balance plan would

grow, because the numbers are so small in the first few years.

So what would happen is the person's benefit -- on

each January 1 they have a benefit, then it would grow with

interest.  Here we are using 6 percent interest.

And then, based on their pay and some formula, it

would have a resulting pay credit, which is the compensation

credit we are using here, and when you add the three together,

the beginning balance, the interest credit, the pay credit, you

end up with the ending balance for that year, which then

becomes the beginning balance at the beginning of the next

year.

So generically this is how a hypothetical account

would grow in a cash balance plan.

Q.  Now, a plan that has a formula that is a cash balance

formula, but it previously had another formula, could you tell

us about the different ways that a plan that has a traditional

formula can transition away from a traditional formula to the

cash balance formula?

A.  Yes.  There is a number of different ways they could do

that.

F7enosb5                        Deutsch - direct

1            One is they could leave the old plan -- this was

2      mentioned earlier today I think -- you could leave the old plan

3      as is, just stop future accruals, start a cash balance plan

4      with a zero account, and then have the benefit ultimately be

5      the sum of these two, for our purposes, independently

6      calculated benefits.

7            You could create an opening account balance that was

8      intended to replace the existing benefit or you could create an

9      opening account balance that was somehow otherwise determined.

10     I have seen plans where the opening account balances have what

11     are called transition credits, where they give a boost in the

12     opening balance to reflect potential negative impacts from a

13     change to a cash balance plan.

14           Sometimes what they do is they run both formulas going

15     forward where the old formulas run as a lower level.  So

16     instead of freezing the old formula in those contexts, the old

17     formula is referred to generically as the grandfather formula,

18     I guess the politically correct way is the grandparent formula,

19     the grandfather formula.

20           Most of the times they freeze that benefit formula and

21     it stops future accruals, but sometimes they continue that

22     plan, but at a lower formula level.  So you still have two

23     independent formulas, and the participant gets the better of

24     these two formulas, but you have reduced one of the formulas.

25           In one plan I saw, they continued the full formula at

F7enosb5                          Deutsch - direct

1   full force, but only if you agreed to fund part of it yourself,

2   in other words, if the employee made contributions to the plan

3   then they got to keep the old formula completely in place as if

4   the plan had never amended and gotten the better of that or the

5   cash balance.

6          There is a number of ways that you can transition

7   between the two formulas.  I'm including creating an opening

8   account balance and different ways to create the opening

9   account balances.

10  Q.  In your view, how many ways could you do a real conversion

11  from a prior formula to a cash balance formula?

12  A.  In my opinion, in order to be a true conversion, that would

13  mean that the benefit after the conversion could in no event be

14  less than the benefit prior to the conversion.

15         So in order for the benefit after the conversion to be

16  at least as large as the benefit prior to the conversion,

17  there's two basic ways to do that.  One is you keep the old

18  formula in place, and add the cash balance formula basically

19  starting from zero usually, or you create an opening account

20  balance such that it is a guaranteed to be at least as large as

21  the old benefit when the person ultimately reaches normal

22  retirement age.

23         THE COURT:  So let's pause on that, because it's that

24  moment and how that is done that seems to be the real issue

25  here.

F7enosb5                         Deutsch - direct

1            THE WITNESS:  Yes.

2            THE COURT:  Which is that the question is.  One

3    question -- and there are many questions -- is whether or not

4    that calculation of the account balance could properly be done

5    with an assumption of a discount rate that is equivalent to the

6    expected rate of return on investments.

7            THE WITNESS:  Yes.

8            THE COURT:  And could it be?

9            THE WITNESS:  Well, it theoretically could be, but

10   only if the interest crediting rate, the amount that we are

11   showing here that the account is growing at --

12           THE COURT:  Yes.

13           THE WITNESS:  -- is also related to that number.

14           So, for example, if you discounted it at 9 percent, if

15   you credited it back at the same 9 percent you would ultimately

16   end up with the same benefit.

17           If you discount it with 9 percent and mortality, you

18   would have to -- the inverse of mortality is called

19   survivorship.  You would have to increase it at 9 percent and

20   survivorship to get back to the same benefit that you started

21   with.

22           So if the expected increasing rate matched up with the

23   discount rate, you could do that.  But that's, of course, not

24   what we have here.  But you could theoretically accomplish

25   that.

F7enosb5                          Deutsch - direct

1          THE COURT:  If you did apples to apples on both sides,

2     then it's possible, but you need to have the assumptions on

3     both sides equivalent.

4          THE WITNESS:  Technically they are not assumptions,

5     they are plan provisions.  But, yes, you would need the plan

6     provision for the discount to be equivalent for the plan

7     provision for the growth.

8          THE COURT:  All right.

9     BY MR. GOTTESDIENER:

10    Q.  I am hearing you saying there are two ways.

11         One would be, as her Honor identified earlier, the A

12    part stays as an annuity?

13    A.  Yes.

14    Q.  And then the B starts from zero like this?

15    A.  Yeah.  If you were going to do that, you would normally

16    start at zero.  I suppose technically you would start at more.

17    Q.  The other way you could get A plus B in a real conversion

18    would be as you just described?

19    A.  Yes.

20    Q.  And in an opening balance A-plus-B conversion, as you just

21    described, what would you do about the early retirement

22    subsidy?

23    A.  That is -- a problem with that type of conversion is that,

24    because you are targeting the benefit at normal retirement age,

25    the fact that the early retirement benefit wouldn't be

F7enosb5                          Deutsch - direct

reflected in that calculation, you would lose part of the value

of the early retirement benefit.

          So, there would be ways -- there are ways where what

you could do, for example, under the current rules, what you

would do is you would simply calculate the amount the person

lost on the early retirement benefit and bump it up.  So

effectively maintaining what he would have gotten had you stuck

with the A as an annuity if you will.

          But you could try and make it up by jumping people's

account balance to the extent that you feel they lost value in

the early retirement benefit.  So you would give them a bump up

for the lost early retirement benefit, if you will.

Q.  In a plan that doesn't follow either one of these, A plus

Bs, it does an A or B --

A.  Yes.

Q.  -- what is that?  What kind of transition is that?

A.  Well, when we say A or B, I mean this has been discussed in

a lot of the papers, but I want to reiterate that's the

wear-away when it's the greater of A or B.  So what would

happen is you would get the better of the two formulas.

Q.  Is that a conversion in your opinion?

A.  It's not a conversion because the old benefit hasn't gone

away.  It's still there.

Q.  How is the B part of the formula, the second benefit --

          THE COURT:  Can I pause there for a second.

F7enosb5                          Deutsch – direct

1          MR. GOTTESDIENER:  Sure.

2          THE COURT:  Does that fact that it's not a conversion

3    have any implication or implications for whether or not you

4    would need to use the same plan terms, what I was calling

5    assumptions, to come up with what A was worth versus the

6    opening account balance?

7          In other words, when we were talking about the

8    conversion a moment ago, we were saying if you are going to do

9    a conversion, you need to sort of use similar plan terms on

10   both sides.

11         THE WITNESS:  Well --

12         THE COURT:  Here if you are going to do one and have

13   that be separate from the other, so A and B are not converting,

14   they're changing --

15         THE WITNESS:  Yes.

16         THE COURT:  -- under those circumstances in your

17   experience, can the assumptions or the plan terms be different?

18         THE WITNESS:  Well, let me divide that into two

19   periods of time, because the law changed.

20         There's pre-PPA and there's post-PPA.  I don't think

21   we care about post-PPA.  Pre-PPA the answer is there were no

22   rules, so they could do whatever they want.  So they could

23   have -- as long as both of the formulas otherwise complied with

24   the rules, for example, the minimum lump sum calculated under

25   417(e) -- excuse me, under -- let me try that again.

F7enosb5                          Deutsch – direct

1         The 417(e) minimum lump sum of the A benefit and the

2    417(e) lump sum on the B benefit or both calculated, then you

3    are complying the rules.

4         But other than constraints of law, there are no

5    restrictions at all.  So they theoretically could have said

6    we're going to start a cash balance plan from ground zero, and

7    you basically are stuck with your, whatever, frozen or depleted

8    formula A benefit until that cash balance plan that's started

9    all over again caught up.  That is theoretically allowable at

10   that point in time.

11             THE COURT:  All right.  That's what happened here?

12             THE WITNESS:  No, that is not what happened here.

13   They were more generous than starting it at zero.

14             THE COURT:  Not starting at zero, they used two

15   different assumptions, sets of assumptions?

16             THE WITNESS:  Yes.  There was a disconnect, yes.

17             THE COURT:  All right.  You can proceed.

18   BY MR. GOTTESDIENER:

19   Q.  If you can look at No. 5.  What was the most common method

20   at the time to base the initial account balance on?

21   A.  Maybe if No. 5 can come up.  OK.

22   Q.  Can you tell us what No. 5 is?

23   A.  No. 5 is the survey that Mr. Sher attached to his opening

24   report.  Based on this survey, it talks about what the most

25   common opening account balances were.  And -- well, this talks

1    about -- this particular page talks about the interest rate

2    used to establish the opening account balance, and it says only

3    2 percent of the plans use a spread that was more than 2

4    percent above the 30-year treasury rate, which is the 417(e)

5    rate.  The two are synonymous at this point in time.  So only 2

6    percent of the plans that were surveyed used more than the 2

7    percent spread.

8           Here on the plan effective date of course, the

9    interest rate is 6 -- the 417(e) rate is 6.06.  The rate used

10   to establish the plan is 9 percent, so we are at a 3 percent

11   spread.  So that's clearly outside of what was the norm at the

12   time based on this survey.

13   Q.  Turn the page.  There's one more page.

14   A.  So further down in there it says, In the survey, the

15   converted plans, 22 out of the 24 plans determined the initial

16   lump sum amount using GATT rates or a rate even more beneficial

17   to participants than the GATT rate.  In other words, in 92

18   percent of these plan conversions, participants' initial lump

19   sum amounts were equal to the present value of their normal

20   retirement benefits under the old benefit formula, because if

21   you converted it to the 417(e) rate, you converted the account

22   balance that equaled the lump sum you would have been required

23   to pay.

24          So, 92 percent of the plans, which was clearly the

25   majority, established the opening account balances as not less

F7enosb5                    Deutsch – direct

1    than the lump sums.

2    Q.   What effect would that have?  Would it still create the

3    possibility of a wear-away, a risk of a wear-away?

4    A.   Of course, depending upon the plan terms there potentially

5    could be a risk of wear-away.  For example, if you coupled that

6    with a proper interest crediting rate and so on, you could

7    eliminate risk wear-away.

8    Q.   Just for illustrative purposes, I don't think you ever said

9    anything about this, the *Amara* case?

10   A.   Yes.

11   Q.   Do you know generically what caused the wear-away that was

12   at issue in that case?

13   A.   As I recall, one of the primary issues was the use of the

14   period of mortality, and the other was that the interest rate

15   was slightly less than the interest crediting rate, but I may

16   be wrong, but the mortality sticks out in my mind.

17   Q.   OK.  I think it might be helpful to get No. 6 up and get

18   from you, Mr. Deutsch, a definition of wear-away.

19   A.   Well, is No. 6 up.  OK.

20          So you have two competing formulas.  And wear-away is

21   when the first formula has stopped, so it's not going up.  But

22   the second formula, if you will, is the primary operative

23   formula under the plan.  But because you can't provide a

24   benefit that's less than the protected benefit, the actual

25   benefit from the plan is not going up due to additional

F7enosb5                        Deutsch - direct

1   service.

2           So wear-away refers to wearing away the difference

3   between the benefit that was already earned and the benefit

4   determined under the new formula without regard to the fact

5   that that already-earned benefit is protected.

6           Another way to view this, which I think is a little

7   easier to deal with sometimes, is if a participant terminated

8   at a particular point in time and said I'm going to take my

9   benefit off in the future, but I have no additional service,

10  that is the benefit that is protected.

11          If you said the difference between that and what they

12  actually get, that increase is what they earned.  And you say,

13  well, under the formula, that's the operative formula, so, for

14  example, in this case, the cash balance formula, if it weren't

15  for the wear-away, what is the benefit you would have earned

16  during that period of time?

17          And if the two of those don't line up, there's some

18  level of wear-away, and the difference between those two is the

19  impact of the wear-away.  That's how much less you -- it's how

20  much less you got because you had already earned part of your

21  benefit before the plan changed.

22          MR. GOTTESDIENER:  Your Honor, would you like a copy

23  of this?

24          THE COURT:  No.  I think that I'm OK.

25          MR. GOTTESDIENER:  OK.

F7enosb5                              Deutsch – direct

 1            THE COURT:  You can give me whatever you would like,

 2    but I don't particularly need it.

 3    BY MR. GOTTESDIENER:

 4    Q.  How would you calculate the participant's benefit under an

 5    A-or-B plan, a plan that has a wear-away?

 6    A.  Well, what you would do is you would independently

 7    calculate the benefit under formula A and the benefit under

 8    formula B and then the participant gets the greater of those

 9    two.

10            MR. GOTTESDIENER:  If we could call up Deutsch 4.

11    Q.  Again, not rushing too much ahead to this plan -- actually

12    why don't we cancel that slide.

13            Does moving to a -- let me ask, I'm sorry.  In opening

14    statement you heard counsel say that when the plan was amended

15    and they added this lump-sum option, and he said you only earn

16    the right to the lump sum at the point that it is paid.

17            Do you remember hearing that?

18    A.  Yes.

19    Q.  Do you have an opinion as to the accuracy of that?

20    A.  Yes.  That doesn't comport at all to my understanding of

21    the rules.

22            If we pick on Mr. Osberg for a second and we say they

23    had this six-month provision that I talked about earlier that

24    you have to take your lump sum in six months of termination, we

25    ignore that for a second and we say, if he had terminated on

1    January 1, 1996, the day the amendment was effective, what is

2    the benefit he ultimately would have received in October 2002

3    as a lump sum?

4            Then we compare that to the benefit he earned, that he

5    received because he stayed in employment.  Those two benefits

6    are the same.

7            So he didn't earn the right to the 2002 lump sum any

8    point after January 1, 2006.  It was earned on January --

9    excuse me, on 1996.  I said 2006.

10           On January 1, 1996.  He already had the right to the

11   lump sum in 2002.  We didn't know the exact amount because we

12   didn't know the interest rates that were going to be in effect

13   in 2002, but we knew that, based on whatever interest rate that

14   was in effect 2002, he had a right to that lump sum.  He had

15   already earned it.  It's not something he earned when he

16   terminated.  It's not something he earned due to additional

17   service.  He already earned it.

18           The rules are --

19           THE COURT:  He earned it by virtue of the plan change?

20           THE WITNESS:  He earned it by virtue of two things:

21   His service prior to that date under the plan terms in effect

22   at the point he stopped employment.

23           The plan terms -- so he wouldn't have had that right

24   to a lump sum had the plan not changed on January 1, 1996.

25           THE COURT:  He would not have?

F7enosb5                          Deutsch -- direct

1          THE WITNESS:  He would not have, because it wasn't

2     under the plan terms at the point he terminated.  They could

3     have extended it, as we mentioned earlier, to vested terminated

4     employees, but ignoring that, they didn't have to.  In effect,

5     I don't even know whether they did.  But once they put that in

6     the plan, he earned the right of it all the way until he took

7     his benefit.  He had the right to the lump sum.

8          THE COURT:  I guess the word earned wouldn't even be

9     necessary.  He possessed.

10         THE WITNESS:  He possessed.  That is a much better

11    word.  I like that word.

12         THE COURT:  The right?

13         THE WITNESS:  Yes.  They didn't work together.  They

14    gave it to him, but he didn't work for it.

15         THE COURT:  So the only question was what interest

16    rate was going to be applicable to come up with a number

17    certain?

18         THE WITNESS:  Right.

19         I know somebody might object to me citing court cases

20    but, there is a similar reference to this in *Berger* about not

21    knowing what is going to happen in the future about estimation,

22    what could have estimated it.  And our estimate might have been

23    wrong, but it is not an unknowable guess.  We could have

24    reasonably speculated what the number would be.

25         THE COURT:  Right.  OK.  Yes.

F7enosb5                          Deutsch - direct

1   BY MR. GOTTESDIENER:

2   Q.  So on 1/1/96, Mr. Osberg earned, received, or possessed the

3   right to get the lump sum.  It was not some right that he only

4   got in 2006?

5   A.  That's my understanding of the rules, yes.

6   Q.  And the number that he would have received on 1/1/96, in

7   opening statement we saw one of these charts, that we'll look

8   with you on your calculations at again.  But roughly about

9   $14,000 would have been the amount of the lump sum that he

10  would have received, had he on the day that he possessed the

11  right to take a lump sum, would have had to have been paid, is

12  that right?

13          THE COURT:  Hold on one second.  We have an objection.

14  Yes.

15          MR. RACHAL:  Yes.  Just leading.

16          THE COURT:  I agree.

17          MR. GOTTESDIENER:  It's from --

18          THE COURT:  I know.  It's packaging the entire answer

19  and then just getting a yes.

20          MR. GOTTESDIENER:  All right.

21          THE COURT:  I understand where you're going, and I

22  know it is a time savings issue.  Why don't you pose it more

23  open ended.

24          MR. GOTTESDIENER:  All right.

25  BY MR. GOTTESDIENER:

F7enosb5                          Deutsch - direct

1   Q.  So was the amount of the lump sum that Mr. Osberg would

2   receive on 1/1/96 and the one that he received years later,

3   when he actually elected it, was that the same number?

4   A.  No it was not.

5   Q.  Was it the same or a different benefit?

6            THE COURT:  Why don't we say what's the relationship

7   between the number that he, the relationship between the right

8   that he possessed as of January 1, '96, and what he in fact

9   received as a date of termination.

10            Is that what you are getting at?

11            MR. GOTTESDIENER:  More or less, your Honor.

12   A.  Is it possible to put that chart back up?  Or --

13   Q.  Sure.

14   A.  While we are figuring that out, so each year when he goes

15   from one year to the next the number changes for two reasons.

16            THE COURT:  This is actuarial tables changing?

17            THE WITNESS:  Yes.  One is -- sorry.  One is that the

18   interest rate is changing, and the other is he's a year older.

19   Not just a year older, but he is a year older and he's alive

20   because they're using a mortality discount.  So he survived.

21            THE COURT:  You only age if you're alive.

22            THE WITNESS:  Not in the actuarial world.

23            THE COURT:  You guys have dead folks that are hanging

24   around?  I didn't know.

25            THE WITNESS:  They talk about the benefit you would

F7enosb5                          Deutsch - direct

1   have gotten had you survived, for example.

2         It's the combination of those two.  The passage of

3   time gives him one less year of interest discount.  The

4   survival gives him one year less of mortality discount.

5         And then the interest rate change, well, if it goes

6   up, the discounted value goes down.

7         If it goes down, the discounted value goes up.

8         The question is, what is really going on?

9         What's really going on is that he has a benefit of

10  about $6,000 -- there we go.

11        He has a benefit, which is not shown on this.  He's

12  got a benefit way off down in 2000 -- it's pretty easy to

13  remember he was born in the same year I was.  In 2019 he's got

14  a right to a benefit of about $6,000 a year.

15        That is a fixed obligation.  What it really is, is

16  $6,000 in 2019 and then $6,000 in 2020, $6,000 in 2021 -- each

17  one of them based on the probability of survival to that point

18  in time.  But it is a fixed number.

19        THE COURT:  Are the mortality assumptions fixed in

20  time?  Not fixed in time.  I know they vary year to year.  But

21  do they change?

22        Let me put it differently.  It strikes me that there

23  is a defined number as of January 1, 1996 as to which there is

24  a right.

25        THE WITNESS:  Yes.

F7enosb5                          Deutsch - direct

1            THE COURT:  That right is impacted by the interest

2     rates, which are fluctuating?

3            THE WITNESS:  Yes.

4            THE COURT:  And the actuarial table.

5            THE WITNESS:  The mortality table?

6            THE COURT:  The mortality table.

7            THE WITNESS:  Yes.

8            THE COURT:  That number, if you told me what the

9     interest rate and mortality table was for any particular year,

10    based upon what I knew as of January 1, 1996, I could calculate

11    that number to a certainty?

12           THE WITNESS:  Any age.

13           THE COURT:  Any age.  I get that.

14           THE WITNESS:  OK.

15           THE COURT:  I think actually we can even move beyond

16    that unless you want to continue on.

17           THE WITNESS:  There was something else I wanted to

18    explain.

19           That is that the impact of the change in the interest

20    rate is like the change in the market value of a bond that

21    promises a lump sum in the future.

22           When you are lowering the interest rate, the market

23    value of the bond goes up, but the actual bond doesn't change.

24    It's the value that's changing.  That's the value you are

25    seeing here.

F7enosb5                          Deutsch - direct

 1              THE COURT:  All right.

 2     BY MR. GOTTESDIENER:

 3     Q.  Does moving to a cash balance plan always save money?

 4     A.  No.  Generically there is not a correlation between the

 5     two.

 6     Q.  Could you explain.

 7     A.  Yes.  If in conjunction with changing to a cash balance

 8     plan you also increase the formula, then you wouldn't save

 9     money.  It would actually cost you money.  It's a benefit

10     improvement.  There's now more benefits coming on out of the

11     pipe, so there has to be more money going in.

12              If in conjunction with a conversion to a cash balance

13     plan you are lowering benefits in one way or another, then you

14     have less benefits coming out the other end, so there is a cost

15     savings.

16              So it could be in conjunction with a benefit increase.

17     It could be in conjunction with a benefit decrease.

18     Q.  If you move to a cash balance plan with an A or a B versus

19     a true conversion, a plus B?

20     A.  You still could have an A or B conversion, saving money.

21     But generically if you weren't saving money when you went from

22     A to a B, it kind of says, well, that means the new benefit is

23     always bigger than the old benefit so there's no A benefit

24     left.

25              THE COURT:  You could have an equivalent value and it

F7enosb5                          Deutsch - direct

1   could be offset by employee morale benefits and things of that

2   nature, sort of intangibles?

3              THE WITNESS:  Yes.  But as actuaries we don't deal in

4   those numbers.

5              THE COURT:  All right.

6   Q.  How does wear-away, if an individual is in wear-away, how

7   does that differ from a temporary freeze?

8   A.  Well, a temporary freeze would simply be no additional

9   accruals for some period of time, and then additional accruals.

10  And that's the exact definition of wear-away, no additional

11  accruals for some period of time and then additional accruals.

12  So it is effectively synonymous with a temporary freeze.

13  Q.  Could you take a look at the slide on the screen.

14             PX --

15             THE COURT:  Hold on.  We have an objection.

16             MR. RACHAL:  Your Honor, again, this is one I've never

17  seen before.  I don't know the assumptions.  It seems to be

18  saying if it's frozen, it's frozen.

19             I didn't see any of this in expert discovery or

20  anything that even looked like it in expert discovery.  It is

21  not tied to his report.  So I have never been able to test or

22  review or analyze this.

23             That's one reason.

24             The other one is I'm just -- I can't tell you if it's

25  any good, accurate, or maybe it's just a pretty picture.

F7enosb5                          Deutsch – direct

1           THE COURT:  Did you get this last night?

2           MR. RACHAL:  Yes.

3           THE COURT:  All right.  So the objection ultimately

4    is, because the accuracy you can deal with on cross, is that it

5    wait as not disclosed in any of the reports or as part of

6    expert discovery?

7           MR. RACHAL:  Right.

8           If it would have been, I could have tested it and

9    found out the assumptions underlying and everything else.

10   Again, that's the main problem.  It is not growing out of the

11   report and something that I can tie to and say, oh, well, I see

12   that is just a graphic representation.  I don't know.  I can't

13   tell.

14          THE COURT:  Why don't you tell me, Mr. Gottesdiener,

15   if it wasn't disclosed during discovery, why are we using it

16   now?

17          MR. GOTTESDIENER:  This is what his whole report is

18   about.  If I could ask a foundational question.

19   BY MR. GOTTESDIENER:

20   Q.  Did you create this chart?

21   A.  Yes.

22          THE COURT:  Obviously, his whole report is about

23   wear-away -- not just wear-away but also the plan and all of

24   these bits.

25          The question is whether or not the bits and pieces

F7enosb5                          Deutsch - direct

 1    that underlie this chart are in there.

 2    BY MR. GOTTESDIENER:

 3    Q.  Could I just ask, this is just, Mr. Osberg's benefit isn't

 4    it.

 5    A.  It is an approximation of his benefit.

 6    Q.  And it's all disclosed?  You analyze his benefit

 7    extensively in your report, yes?

 8    A.  Yes.

 9    Q.  And do you say, in your report did you give an opinion as

10    to whether there is a difference between a temporary freeze and

11    wear-away in your report?

12    A.  My recollection is I say they're basically the same.

13              THE COURT:  I think we're like ships passing in the

14    night here.

15              MR. GOTTESDIENER:  Sorry.

16              THE COURT:  Which is, it is not whether or not he

17    talks about these concepts in his report, because obviously he

18    has.

19              It is whether or not -- typically, as you know,

20    counsel would normally have fair notice of all of the exhibits

21    that you are going to use with an expert witness, and you don't

22    spring on them a new exhibit, even if it's within the same

23    topical area.

24              That's the issue.

25              With that said, what I'm going to ask right now is --

F7enosb5                        Deutsch - direct

1    you can go ahead and examine on it, but tomorrow morning, you

2    folks ought to alert me before we even start to any problems

3    like this, and in the future people should not -- except I will

4    allow Mr. Sher now to rebut these new documents, because he's

5    going to need to, or if he wants to, but we'll try to head

6    these off if we can.

7              I understand your point, but I also understand that

8    essentially what the plaintiff is saying is that the

9    information was there and disclosed and it's just a different

10   way of presenting the same information as to which the expert

11   has opined.

12             MR. RACHAL:  Thank you, your Honor.

13             THE COURT:  But we won't surprise each other anymore.

14             Go ahead.

15             MR. GOTTESDIENER:  Yes.

16             This slide consists of three parts.

17             Randall, if you could just flip through one, two, and

18   three and then back up so that Mr. Deutsch and the Court can

19   see the three of them.  Yes.  If you go back to the first.

20   BY MR. GOTTESDIENER:

21   Q.  Could you just tell us, Mr. Deutsch, what we're looking at

22   on the first slide.

23   A.  Yes.  What this is showing is that as a rough estimate,

24   Mr. Osberg was accruing a couple hundred dollars a month.

25   That's this blue line.

F7enosb5                          Deutsch - direct

1              And if the plan was frozen on 12/31/95, the amount of

2      benefit he would have accrued each year would drop to zero,

3      because that is the definition of a freeze.

4              The cumulative accrued benefit, which is the orange

5      line, is basically, under the design of the plan it is a

6      summation of the area under the blue line, and then it stops

7      going up when the plan is frozen.  It flatlines.

8      Q.  Then the next slide?

9      A.  We go to the next slide.  We then overlay the cash balance

10     plan.

11             So the cash balance plan obviously didn't exist before

12     1996, so it jumps up from zero, because that's when it comes

13     into existence and it starts out with an initial account

14     balance, which, as I show in my report, is well below -- the

15     benefit purchased by that account balance is well below the

16     benefit he already accrued.

17             And then it goes up.  As his account balance goes up,

18     the associated accrued benefit goes up until we get to 2002,

19     and he isn't out of wear-away because the gray line here hasn't

20     yet crossed the orange line.

21             It's only once the gray line, the benefit under the

22     new formula starts to get bigger than the flatline old formula

23     that we get out of wear-away, and he wasn't there yet.

24     Q.  What's the last slide showing now.

25     A.  The last slide just basically shows that this is -- it

F7enosb5                        Deutsch - direct

1    basically shows these side by side, that that's what's going on

2    here -- is that the benefit was basically frozen.

3            There is no difference between the freeze, if you

4    will, the higher of the orange and the gray is the orange line,

5    so whether they froze the plan or they did a temporary freeze,

6    they did a wear-away, the benefit is the same.

7            THE COURT:  Would you call it an effective freeze?

8            THE WITNESS:  Until the point he's at a wear-away, it

9    is an effective freeze.

10           THE COURT:  So you don't use to use the word temporary

11   since it is not a plan term, but it effectively amounts to the

12   same thing?

13           THE WITNESS:  Yes.

14           THE COURT:  All right.  You may proceed.

15   Q.  So going to the design here.  This was an A-or-B plan.

16           Can you tell us how your discussion of the initial

17   account balance in the last half hour or so contrasting the A

18   plus B versus the A or B initial account balance actually

19   applied in this design?

20   A.  Well, in this design, they took the previously earned

21   benefit, the 12/31/95 frozen accrued benefit, and they

22   multiplied it times a factor.  So there was a relationship

23   between the initial account balance and the 12/31/95 accrued

24   benefit, but that factor for all practical purposes was a

25   random factor in that it was completely unrelated to how the

F7enosb5                              Deutsch - direct

1    benefit subsequently would grow after it was converted into the

2    initial balance.

3              So it doesn't actually create the benefit, it's

4    replacing, because there's no relationship between the two.

5    Q.  Specifically, what was the design, the specific design?

6    A.  The specific design was they took the initial -- they took

7    the frozen accrued benefit and they multiplied it times a

8    discount factor based on 9 percent preretirement mortality at

9    the 417(e) -- at the time 417(e) mandated rate, and that was

10   the initial account balance.

11   Q.  And the rest of the design, how did the benefit grow?

12   A.  The benefit then grew as a flat 6 percent per year, if we

13   are talking about at age 65, until age 65, at which point it

14   would be converted at an interest rate -- excuse me, at a

15   conversion factor that's based on the then current 417(e)

16   mortality table, and the better of the then-current 417(e) rate

17   or 6 percent.

18             So if the 417(e) rate fell below 6 percent, it was

19   converted at 6 percent.  If it was above 6 percent, you got the

20   benefit that was higher than 6 percent in the conversion at age

21   65.  That's the only place the 417(e) rate showed up in the

22   calculation of the age 65 benefit.

23   Q.  Let me slow you down and back up a lit, because the, quote,

24   growth that you were just talking about, that was in the nature

25   of the interest, is that fair?

F7enosb5                          Deutsch - direct

1    A.  Yes.  It's account growth, not benefit growth.

2    Q.  OK.  Let's say there was no other competing formula that

3    yields a higher benefit.

4         Where in the development of cash balance account

5    benefit is there growth after the account was instituted?

6    A.  Well there's growth in two respects.  One is the interest

7    rate, and the other is the pay credit.

8         So just like you talked about earlier, an a generic

9    cash balance plan it grows from those two things.  But the

10   interest credit, the right to the interest credits all the way

11   out to age 65 and technically potentially beyond, that right

12   exists when you get the pay credit, not as it's, if you will,

13   pegged to your account.  So while it's growth in the account it

14   is not actually growth of the benefit because you already own

15   it.

16              THE COURT:  So the pay credit comes with the interest

17   credit?

18              THE WITNESS:  Well, they both are pegged each year.

19              THE COURT:  And they come at the same time?

20              THE WITNESS:  Absent the year of termination, they

21   come at the same time.  So at the end of each year, you would

22   get credited with one year's interest credit on the balance at

23   the beginning of the year, and then you would get credited with

24   the pay credits that you earned during the year and they would

25   then be posted to your account on December 31 of each year.

F7enosb5                              Deutsch - direct

1   Q.  Let me try it that way, because her Honor was I think

2   getting at the interest that is posted in future years.  Is

3   that earned in the future years, or is it earned at some other

4   time?

5   A.  So the interest credit is earned in conjunction with when

6   the account is earned.  So let's say in 1996 somebody got a pay

7   credit of $100.

8          At that point they earned the right to the next year's

9   interest credit and the next year's and the next year's, all

10  the way up.  All of those are part of the benefit that they

11  just earned all the way out to 65.

12  Q.  And was there any other element in the design -- we went

13  over the creation of the initial balance, the pay or

14  compensation credit scale, the interest for some people.  Was

15  there something else?

16  A.  Yes.  In addition, for a group of older long service

17  employees, which they defined as people between age 50 and 65

18  as the age requirement and at least 15 years of service on

19  January 1, 1996, they provided an enhancement to the benefit.

20  And the formula for the enhancement was you --

21  Q.  Excuse me.  Let me ask you.

22          You said an enhancement to the benefit.  To what

23  benefit?

24  A.  The initial account balance.

25  Q.  OK.  Does that distinction make a difference?

F7enosb5                          Deutsch - direct

1   A.  Not really because the benefit at 65 would be the

2   initial -- before the enhancement would be the initial account

3   balance with interest to 65, and the benefit attributable to

4   the enhancement would be the enhancement -- the balance before

5   the enhancement times the increase for the enhancement, the

6   increase with interest to 65 and then you have to excuse me

7   because I was a math major in school.  I guess it's the -- I

8   always get it mixed up -- associated or community property of

9   arithmetic -- that is, A times B times C is the same as A times

10  C times B.

11          So if you simply to reverse the order and say we are

12  going to increase the account to 65 with interest, and you

13  multiply the enhancement factor, you get the same age 65

14  benefit as if you were to increase it with the enhancement

15  factor and increase it at age 65, the benefit at 65.  It

16  doesn't matter which order you do the enhancement in, you get

17  the same age 65 benefit.  That was a difficult description of a

18  simple question.

19          (Continued on next page)

20

21

22

23

24

25

F7EJOSB6                        Deutsch - cross

1   Q.  So what is the formula?

2          Is there any assumption that the formula is making by

3   using 9 percent?

4   A.  Well, if you were going to assume that 9 percent actually

5   produced the actuarial equivalent of the benefit we discussed

6   earlier, it means the benefit, the account is going to grow at

7   9 percent to get back to the benefit it started with.

8          In order to get back with the actuarial equivalent of

9   the prior accrued benefit, the interest growth would have to be

10  at 9 percent.  You have got that earlier.

11         So in order for it to be a valid actuarial equivalent,

12  it only works if it is growing at 9 percent.  Otherwise, what

13  you end up with, it is an actuarial equivalent because it used

14  something like looks like an actuarial formula.  I would argue

15  I can make two numbers like the actuarial equivalent --

16         THE COURT:  It was the historical number that had been

17  used for the same calculation, right?

18         THE WITNESS:  No, there is was no historical

19  calculation.

20         THE COURT:  I thought the estimated rate of return on

21  the particular investment was 9 percent?

22         THE WITNESS:  Yes, but the interest crediting rate in

23  the plan, there was no interest crediting rate prior to the

24  cash balance plan so there was no historic interest crediting

25  rate.

F7EJOSB6                          Deutsch - cross

1           If what they had done -- and I have seen plans that

2    have done this -- if they said well, what we are going to do is

3    we are going to credit your account with the same rate of

4    return as credited on the assets, then you could argue well,

5    then, the assumed rate of return on assets would be 9 percent,

6    but then the actual crediting of the accounts would have

7    averaged way higher than 6 percent.  There is no historic

8    equivalent of the interest crediting rate.  It doesn't exist.

9    BY MR. GOTTESDIENER:

10   Q.  Once the plan was amended, if they kept the same assumed

11   rate of return on plan investments, did that renown to the

12   benefit of the accounts of people who had cash balance

13   accounts?

14   A.  No, there is no relationship between the two.

15          How an actuary chooses or whoever chooses to value the

16   benefits from the plan doesn't change the benefits from the

17   plan.  You can't change plan benefits by how you outside of the

18   plan decide to value them.

19   Q.  On Pages 2 and 3 of your opening report you discuss that

20   there are only two possible ways to think about the present

21   value of an employee's benefit.  Could you tell us about those

22   two ways.

23   A.  Yes.  So if we take this concept, you say well, what was

24   the value of the accrued benefit, the value has to be

25   reflecting the expected return on that present value as it

F7EJOSB6                          Deutsch - cross

1    grows in the future.

2              There is two possible ways you could do that.  One is

3    the account stays in the plan.  The other is the account is

4    paid.  If the account stays in the plan, the plan terms say the

5    account will grow at 6 percent.  So the growth is at 6 percent,

6    so the discount has to be at 6 percent because the two have to

7    line up in order to get back to where you started.

8              If, on the other hand, the money is paid out of the

9    plan, then what you have to do is make an assumption well, what

10   rate of return would you assume that a participant would get if

11   they invested the money?

12             This is the exact same question that is asked when you

13   pay somebody a lump sum and you calculate the lump sum that

14   they they're entitled to.  You say well, what is the rate of

15   return that would assume the purchaser would get and it is the

16   417 (e) mandated lump sum.

17             So viewing it as what the participant would get, it

18   would seem to me you have to use the 417 (e) rate, which are

19   the effective rate was 6.06 or alternatively the plan rate

20   which was 6, so they're pretty much the same.

21   Q.  Now, this is just a bit of a sidebar, but while we are on

22   the 417 rate, what do you think of Mr. Sher's suggestion that 9

23   percent at this time was akin to the historical 30-year

24   treasury rate?

25   A.  Well, Dr. Maxam obviously discussed that in his testimony

F7EJOSB6                       Deutsch - cross

1    about using long-term averages.  He is basing it on a 15-year

2    average, the 9 percent.

3    Q.  "He," meaning Mr. Sher?

4    A.  Mr. Sher.

5    Q.  What do you think of using that period of time?

6    A.  Well, I think it is an inappropriate period of time.  The

7    problem we have is that the 30-year treasury rate didn't exist

8    until 1977.  Long-term rates did exist prior to that.

9           So you can't simply say well, I am going to average

10   just the ones that I have to project into the future and say I

11   have no information at all as to what that rate might have

12   been.

13          So you would pick a proxy, and a proxy might be, for

14   example, the 20-year rate which goes back to the 60's or other

15   long-term rates.  There is studies comparing what the 20-year

16   rate and 30-year rate would produce, and they line up pretty

17   closely.

18          There is an Internal Revenue Service notice, 96-8, and

19   in the notice towards the end it says we performed a historical

20   analysis of a comparison of different treasury rates, and we

21   think the average difference between those two rates is, and as

22   I recall, the difference between 20 and 30 is zero.

23   Q.  So how would --

24          MR. RACHAL:  Excuse me.  Maybe I am missing it, but I

25   don't think Mr. Deutsch opined on any of this in his expert

F7EJOSB6                          Deutsch - cross

1    reports on this issue about the bond rates.  This is all, once

2    again, stuff I am getting hit with.

3            THE COURT:  Don't have him testify on Mr. Maxam's area

4    because we covered that already.

5            MR. GOTTESDIENER:  Okay.

6            THE COURT:  You can move on.  I don't think there is

7    any need to go back through that, although I would note that

8    Ibbotson, by the way, it is a subscription only.  I can't

9    actually access the numbers, FYI.

10           MR. GOTTESDIENER:  Okay.

11   BY MR. GOTTESDIENER:

12   Q.  Now, the use of pre-retirement mortality discount in this A

13   or B formula in Footnote 4, I believe, in your report, you say

14   that the use of mortality prior to age 65 here just made the

15   problem worse.  Can you explain that.

16   A.  Yes.  Let's assume for a moment that they discounted at 6

17   percent with pre-retirement mortality, but the benefit is

18   growing at 6 percent without pre-retirement mortality.

19           We then have the same thing as using a different

20   interest rate.  You are discounting at a rate that is above 6

21   percent because you're including the mortality discount, but

22   you're not crediting the benefit back out with survivorship.  I

23   have seen plans that do credit with survivorship.  It is

24   extremely rare, in my opinion, but they do exist.

25           Since it is not crediting back to survivorship, when

F7EJOSB6                          Deutsch - cross

1    it gets to age 65, it is going to fall short by the, if you

2    will, probability portion of him that wouldn't have survived.

3    Q.  So isn't it still accurate to describe what they did here

4    as an actuarial equivalent of the A benefits?  It was an

5    actuarial calculation?

6    A.  Well, I think in my opinion, the term "actuarial

7    equivalence" means more than it used an actuarial formula.

8            So inherently an actuarial equivalent is the word

9    equivalent.  It is the two words, actuarial equivalent.  It is

10   actuarial.  For example, it includes mortality calculations and

11   it is equivalent.  It has the same value.  To have the same

12   value means the interest rate you're discounting that lines up

13   with your expected interest growth during the period you're

14   discounting for.

15           That isn't the case here.  So if we look at what we

16   have here, a 35-year old has accrued benefit of $10,000.00.  We

17   discount it using 9 percent and we get for this 35-year old at

18   9 percent $6,000 is a lump sum.

19           What we can grow that back under the plan terms at 6

20   percent per year, we convert it back into an annuity.  The

21   annuity is only $3,500 when you started at 10,000.  It is only

22   35 percent of the benefit.  It is not equal value because it is

23   only 35 percent.  Equal would be a hundred percent.

24           So in my mind, it fails the equivalent part of

25   actuarial equivalent because it is not equivalent.

F7EJOSB6                         Deutsch - cross

1             MR. GOTTESDIENER:  If you could put on the screen

2    Deutsch 10, please.  This this SPD and go to Page 10.

3    BY MR. GOTTESDIENER:

4    Q.  Mr. Deutsch, while he is getting there, I wanted to ask you

5    because you talked about present value could be looked at in

6    two different ways.

7             On Page 10 of the SPD, the defendants use the term

8    actuarial equivalent lump sum.  What do you read that as

9    saying?

10   A.  That it is the dollar amount today that is the equivalent

11   value of your accrued benefit.

12            MR. RACHAL:  Objection.  I don't think this is --

13            (Inaudible)

14            MR. RACHAL:  Objection; improper expert testimony.

15            THE COURT:  All right.  I understand your point, but

16   I'll allow him to give his interpretation.  Ultimately it will

17   be up to the court.  How with his expertise he would read and

18   interpret certain language would be important information.

19   BY MR. GOTTESDIENER:

20   Q.  So that means what?

21   A.  How do you say, if a friend of mine handed me this SPD and

22   said what does this clause mean, I would say they have some

23   assumptions, no more putative than 417 (e), and they're taking

24   the value of your benefit, your benefit payable on retirement,

25   calculating the value using the assumptions the plan dictates

F7EJOSB6                          Deutsch - cross

1    for lump sums and that is how your lump sum is calculated.

2    Q.  Now, you look at the foreseeability of the impact of the

3    way they did this transition.  In a general way you mentioned

4    this somewhat before, but I want to go through some of the

5    slides that reproduce charts in your report.

6            Stepping back, what was the foreseeable result of this

7    design, in your opinion?

8    A.  Well, it is best if you divide it into three potential

9    benefits to do the analysis.  One is the benefit payable at age

10   65 which is the core benefit in the plan because that, as I

11   mentioned earlier, by definition, accrued benefit is the

12   benefit tables on the annuity at on retirement.

13           That would be one way to look at it.  One is the

14   benefit payable in annuity prior to that, between 55 and 65,

15   and the third way to look at it is through the lump sum.

16   Q.  Before you go into the details of it, could we get on the

17   screen No. 11.  I want to know if your conclusion is similar or

18   different from the statements made by the defendants admitting

19   the foreseeability of the wear-away.

20           THE COURT:  Hold on.

21           MR. RACHAL:  Objection.  He is now going to opine on

22   the meaning of our statements?

23           MR. GOTTESDIENER:  No.  The question was does he agree

24   or disagree with what the defendants said about foreseeability

25   of the wear-away.

1              THE COURT:  I haven't read it.  Let me take a look at

2    this.  You're going to ask his does he agree or disagree with

3    the statement in the answer?

4              MR. GOTTESDIENER:  Yes.

5              THE COURT:  All right.

6              (Pause)

7              THE COURT:  I will allow it.  We're talking about the

8    answer Paragraphs 44 to 45 and 56, and the question is do you

9    agree or disagree with the first statement.  Defendants admit

10   that.

11             THE WITNESS:  The first statement says in light of the

12   manner in which the starting value in the cash balance was --

13             THE COURT:  Whenever people read, it gets really fast

14   because you read as if you're reading.  I don't think you need

15   to read it.  If you do, you have to read it slowly.

16             THE WITNESS:  I have to read it to myself.

17             (Pause)

18   BY MR. GOTTESDIENER:

19   Q.  Could I ask, the statement in sum, see if you agree --

20             THE COURT:  Don't, don't characterize it.

21             MR. GOTTESDIENER:  I am trying to save time, but I

22   understand.

23             (Pause)

24             THE WITNESS:  The first sentence I absolutely agree

25   with.  It was foreseeable that the benefit that is the annuity

F7EJOSB6                         Deutsch - cross

1    benefit we are talking about, to the best I can tell, to age 65

2    would be in wear-away.

3              From the best I can agree with, the second sentence

4    looks like it is an extension of the first sentence.  It was

5    foreseeable that there would be lump sums higher than the cash

6    balance account.  That was also foreseeable.  So I would agree

7    with that.

8              MR. RACHAL:  Your Honor --

9              THE COURT:  Yes?

10             MR. RACHAL:  -- again we were hit with these last

11   night.  He is opining on on our answer.

12             THE COURT:  He is just telling whether or not separate

13   and apart -- it is an admission.

14             MR. RACHAL:  Correct.  I am not sure it is accurate

15   because of the ellipses.

16             THE COURT:  Pull it out.  You can cross-examine him on

17   it.

18   BY MR. GOTTESDIENER:

19   Q.  Do you have an opinion?  Do you agree --

20             THE COURT:  He has given his opinion.

21             MR. GOTTESDIENER:  There is one part.

22             THE COURT:  Let me have the court reporter read it

23   back where we were so far.

24             (Record read)

25   BY MR. GOTTESDIENER:

F7EJOSB6                    Deutsch - cross

1   Q.  Do you agree with their exception about the enhancement?

2   A.  Okay.

3   Q.  Do you agree?

4   A.  The exception, no, I do not completely agree with the

5   second part.

6          With regard to people who were taking lump sums, there

7   is a small segment of people where this is debatably true, but

8   for people taking annuities, this is not true.  It was

9   foreseeable that people taking annuities who received

10  enhancement, all of them would be in wear-away.

11  Q.  Now let's then walk through your opinions as to

12  foreseeability in detail.  Put on the screen, please, Deutsch

13  12.  This chart from your report is the initial account balance

14  without the enhancement as of 12-31-95.

15  A.  So what this --

16  Q.  What does this show?

17  A.  What this chart shows is a comparison of the initial

18  account balance to the lump sum the participant would have

19  received on January 1, 1996 if they effectively terminated on

20  that date and elected a lump sum.

21         So it is showing an initial account balance as a

22  percentage of the lump sum they were entitled to and it is

23  eventually age-sensitive.  At age 65, the balance would have

24  been at 81 percent of the lump sum.  But at age 20, it would

25  have been only 21 percent.  As you can see on the graph nice

F7EJOSB6                    Deutsch - cross

1   and smoothly it is geometrically progression, pretty close to

2   geometric progression increases from age 20 up to age 65.

3   Q.  So what was expected or anticipatable based on this

4   information?

5   A.  It would be anticipated basically anybody who did not

6   receive an enhancement at best a lump sum would have been 80

7   percent of their account balance -- excuse me.  I said that

8   upside down.  Their initial account balance would have been at

9   80 percent of the lump sum they would receive.

10  Q.  As to the enhancement, we briefly looked at the

11  enhancement.  Could you pull up SPD Page 12, Deutsch 13.

12          You mentioned it before, but if you would just explain

13  it a bit to her Honor.  With specificity as to the --

14  A.  So the enhancement formula took the account without the

15  enhancement and it divided it by a factor.  The factor was the

16  number of months prior to age 65 at a third of a percent per

17  month which is equivalent to 4 percent per year but to a

18  maximum of 10 years.  If you were under 55, you get the same

19  factors as if you were 55.

20          The factor lines up exactly with the earlier reduction

21  you were talking about earlier, so it basically divides by what

22  the early retirement factor reduction would have been.  So, for

23  example, we talk about a guy with a thousand dollar benefit

24  would have ended up with a $600.00 benefit at age 55.  Well,

25  that is a 60 percent of his benefit.  So that person would be

F7EJOSB6                    Deutsch - cross

1    divided by .6, which is equivalent to giving a two-thirds

2    increase in his benefit and multiplying it, if you will, times

3    1.66.  So when they divide here by .6, they're giving him a 66

4    percent bump in his account due to the enhancement.

5    Q.  Could you show Deutsch 14, please.  Can you tell us what

6    Deutsch 14 is.

7    A.  This would appear to be the -- it is hard to tell because

8    it is on top of things.  It appears to be the plan definition

9    of the initial account balance.

10   Q.  Does it reflect the enhancement in there?

11   A.  Yes, the second sentence starts with respect to participant

12   who attained Page 50, with 15 years of service, and describes

13   the formula I hopefully just stated.

14   Q.  Now, if you'd call up, please, Deutsch 15 and tell us if

15   this is a calculation of a participant's account with the

16   enhancement.  Explain it.

17   A.  This is the calculation of Ms. Cardona's opening account

18   balance that was increased by the enhancement.  So the first

19   step is to calculate the initial account balance.

20           So her 12-31-1995 accrued benefit was this $8,000

21   number that you see here.  Based on her age of 58 years 9

22   months on January 1st, 1996, basically you look up on a table

23   that produced these 9 percent discount factors, and with the

24   mortality, what the factor is and the factor is 4.7813.

25           You multiply to an initial account balance without

1    enhancement was $41,000.  Then because she satisfied the age 50

2    with 15 years of service requirement because, as I recall, I

3    don't think it is here, but she had about 35 years of service,

4    and as I just said, she was 58 years' old and over 58, and with

5    15 years of service, she is entitled to the enhancement.

6         Because she was age 58 and 9 months that is 75 months,

7    six years and three months, 75 months.  You multiply that times

8    one-third, that would be 25 percent.  You subtract it from a

9    hundred percent in the formula, that coincidentally gives us 75

10   percent.  That is more than 76, then the other set one would

11   have been less, so it is just a coincidence.

12        And then you would take her $41,000 number, divide it

13   by this 75 percent, and get an initial account balance for her

14   of $55,000.

15   Q.  Now, without the enhancement, does the calculation of the

16   opening balance capture the value of the earlier retirement

17   subsidy we talked about earlier?

18   A.  No, it does not.

19        THE COURT:  Can you just go back to the prior slide

20   for one moment.  I want to get the citation for it.  PX 38.

21   There is another page cite.  PX 38, the Woolworth retirement

22   plan.

23        MR. GOTTESDIENER:  It is Section 1.23.

24        THE COURT:  Bates number Page 606.  Thank you.  You

25   can go ahead.

F7EJOSB6                          Deutsch - cross

1    BY MR. GOTTESDIENER:

2    Q.  Was it typical for plans around this time to do something

3    similar for folks who were entitled to the early retirement

4    subsidy?

5    A.  As I said earlier, it was not uncommon for plans to have

6    some form of transition credit which in certain instances could

7    have replaced the value of an early retirement subsidy that

8    could be the value of the transition credit, multiple reasons,

9    but that could be one.

10   Q.  How many people here got the enhancement?

11   A.  I don't have an exact count because we don't have

12   sufficient data to know the exact answers on these, but it is

13   roughly 2,000 people out of the 16,000 people have received the

14   enhancement, in my estimate.

15   Q.  That would be around what percent?

16   A.  2 divided by 16 is 1/8th, that is about 12 percent.

17   Q.  What would have been the expected impact on the expected

18   wear-away, if you can call up Deutsch 18, of participants who

19   got the enhancement, even with the enhancement?

20   A.  That is not what is on this chart.

21   Q.  Foot Locker expected wear-away even for participants

22   receiving the enhancement?

23   A.  The chart is without enhancement.  That is with

24   enhancement.  What this chart is showing is that the purplish

25   section, the higher of the two, they're both purple, but the

F7EJOSB6                          Deutsch – cross

1    higher of the one, frozen accrued benefit shows what the

2    benefit would be if the person elected early retirement benefit

3    on January 1, 1996, or if they were under age 55, waited until

4    they're 55th birthday and then took the early retirement

5    benefit.

6              For the people below 55, we get a flat line of $600.00

7    because that is the hundred dollars we calculated earlier at

8    age 55, and then it slowly increases up to a thousand dollars.

9    When they reach 65, they're unimpacted by the early retirement

10   because they're not actually retiring early any more and they

11   get the full thousand dollars.

12             If you take the benefit purchased by the initial

13   account balance, that is the lower section, and you can see it

14   starts out at only 400 instead of 600.  While it boosts people

15   up to potentially compensate for the loss of the early

16   retirement subsidy, it is piggybacked on top of a benefit that

17   is already falling short, so that is corollary damage, if you

18   will, also falls short.

19             So if, if the initial balance had properly replaced

20   the initial benefit, then the way they calculated the

21   enhancement, it would have identically replaced the early

22   retirement benefit a person would have gotten on 1-1-96.

23   Because the initial balance didn't replace it, this has the

24   same percentage shortfall.

25   Q.  If we call up the Deutsch report itself, and Mr. Deutsch,

F7EJOSB6                          Deutsch – cross

1    while he is doing that, can you turn to Page 11 and 12, more

2    particularly Page 12 because there is another chart there.

3            THE COURT:  We'll take a break at 3:30, so you can

4    plan for a few minutes away.

5    BY MR. GOTTESDIENER:

6    Q.  On Page 12, if you could focus on that chart, can you tell

7    us what that chart comparison of frozen accrued to the 1-1-96

8    cash balance accrued benefit with enhancement is showing?

9    A.  Yes, this is showing if the individual were to wait until

10   age 65 to receive their benefit and then took their benefit as

11   an annuity at age 65, that's the lower number, so that is this

12   thing that looks like it has a peak to it.

13           The upper one is what their benefit at age 65 would

14   be.  So this is based on a person who has a $1,000 accrued

15   benefit, so the protected benefit is by definition a thousand

16   dollars at age 65, so that is why you have a flat line there.

17           The people who are younger than 55, they get a lower

18   number than the ones at 55 because they have a bigger interest

19   discount so they get hit harder by the conversion of the

20   earlier chart with geometric progression with the 20 years and

21   65 with 80 percent.  They're getting the effect.  That is why

22   it is going down.

23           The reason it is going down on the other side, they

24   get less of an enhancement, they get less benefit out of the

25   enhancement.  Everyone is waiting till 65, but because they

F7EJOSB6                        Deutsch - cross

1    have less years prior to 65 on 1-1-96, they get a smaller

2    enhancement increase, so that is why this is this peak in the

3    middle.  55 is the place to be on the enhancement.

4    Q.  In the opening statement there was displayed a calculation

5    of a participant with zeroes and the No. 4, and counsel made

6    the statement that this person was not unique.  Do you have an

7    opinion about the accuracy of that?

8    A.  Yes.  This is a participant with pin number like 00004.

9    This individual was paid in 1997.  They were near this 55 sweet

10   spot where they were optimizing the enhancement, and so they

11   actually received a lump sum that was larger than the value of

12   their accrued benefit.

13         Now, first of all, the question is how many of them

14   were there?  So you counted.  There is 200 people like this.

15   It is a very rare instance.  Because it requires two things,

16   payment in '97 when the interest rate was the highest in any

17   year, payment soon after the conversion or change, I am sorry,

18   the change to the plan, and so as you get further from '96,

19   that becomes less and less likely.  The third thing is the

20   enhancement.

21         So it is not a lot of people.  There is only 2,000

22   people to start with that received the enhancement.  A lot of

23   them are not in this 55 zone and a lot of them weren't paid in

24   '97.  When you narrow it down, you end up with only about 200

25   people.

F7EJOSB6                         Deutsch - cross

Q.   So looking at the three different types of wear-away, now
getting more detailed as to what in your opinion Foot Locker
could and should have anticipated overall, let's assume that
interest rates held constant, how long would it take for a
participant's account balance to catch up?  What was the
expectation and anticipation?

A.   Assuming future accruals, you have a chart in the report, I
assume that is what is going up, it would take, depending on
how much past service somebody had, it would take between zero
and could take as long as twelve years for some people.  On
average, it was around three years.  I assumed you would bring
the chart up.

Q.   Yes.  What I was getting at, the question about how long a
participant's account would take to catch up, is that one
question or more than one question?

A.   Well, there are several factors that influence it.  I
misunderstood the question, several factors that influence how
long somebody's in wear-away.

        The first factor is how short of the lump sum the
initial account is.  That is influenced by their age on 1-1-96.
Again, that is that chart showing from 20 to 65, going from 20
percent to 80 percent.  How much do I have to catch up, that is
the first problem.

        The second problem is how quickly am I catching up?
That is influenced not by your age, but by your service because

F7EJOSB6                         Deutsch - cross

1   the higher your service, the higher your pay credit rate.  So a

2   person with 20 years of service is earning benefits at a faster

3   pace than a similarly-aged person with only one year of

4   service.  So service is another factor.

5           Then, of course, the year of payment is going to be

6   another factor, and the period of time actually since 1996 has

7   a small influence on it, but it is primarily three factors.

8   Q.  Let's look at Deutsch 19, starting with lump sum wear-away.

9           Based on the data available to Foot Locker, you show

10  in your report that they could have anticipated the following

11  periods of wear-away.  Could you explain the breakdown of 5

12  percent of participants, who would have been expected to have a

13  lump sum period of wear-away?

14  A.  Yes.  This is assuming the 417 rates neither went up or

15  down, they remained constant.  What we see is that there are a

16  few people who have less than a year, a few.  10 percent of the

17  people are less than 8 months.  Another 10 percent of the

18  people are between 8 months and 14 months.  So we have 20

19  people who are just a year or less.

20          THE COURT:  Let me just say that I see Deutsch 19,

21  that is the number of your slide.  It is at Page 33 in the

22  report.  All right.  So the record is clear and I can get back

23  to it.

24          THE WITNESS:  On the other side we look at and we go

25  is 1400 people who have a period of 86 months, which is over 7

1    years.  So we've got as many people at 7 years as we have who

2    are less than 8 months.  If we pick three years just because it

3    is a nicest I point to look at, three years is half the group,

4    half the group would be having a wear-away period of at least

5    three years.

6              THE COURT:  Shall we take our mid- afternoon break

7    now.  Ladies and gentlemen, let's just take our break.  We'll

8    take another break of similar length as this morning and

9    return.

10             (Recess)

11             THE COURT:  Let's all be seated.  Mr. Gottesdiener,

12   you may proceed, sir.

13             MR. GOTTESDIENER:  Thank your Honor.

14             MR. GOTTESDIENER:  If we can show Deutsch 20.  We were

15   just on lump sum wear-away, the anticipated lump sum wear-away

16   would have been an analysis of that, what you would have found

17   at the time.

18   BY MR. GOTTESDIENER:

19   Q.  Now, annuity wear-away, can you tell us what this chart

20   shows?  This seems to correspond to Page 30 of your report.

21   A.  What this shows is a similar analysis, but the analysis is

22   of the benefit payable as an annuity at age 65 rather than the

23   lump sum, and we have a slightly long longer wear-away period,

24   for example, 8 months, the 90th percentile.  It is 11 now.

25   Q.  How about the average overall?

F7EJOSB6                    Deutsch - cross

1   A.   The average is 3.98, so it is about four years on average.

2   The prior one on the lump sum, I don't think I mentioned, it

3   was three and a half, roughly.

4   Q.   An average lump sum wear-away of three and a half and here

5   annuity wear-away of --

6   A.   About 4, a lot longer, yes.

7   Q.   You were talking about the percentiles?

8   A.   For example, 50 percent percentile which was three years

9   now, a little more than three and a half years.

10  Q.   How many people would be anticipated to suffer that period

11  of wear-away?

12  A.   It is about, about 7300 people would be anticipated to be

13  in their wear-away period of over three and a half years.

14  Q.   That is okay.

15          Can we see Deutsch 21, the early retirement wear-away

16  you would have anticipated.

17  A.   Because the value of the early retirement benefit, because

18  of the value of the subsidy is more valuable than either of the

19  other two benefits, the wear-away period is going to be longer.

20  Q.   What is the average wear-away period was anticipatable for

21  people in this category?

22  A.   So the average goes from 4 to almost 5, just under 4 to

23  just under 5.  It is almost a whole year longer.  It originally

24  was 8 months and 11 months, is now at 15 months.

25          The middle was originally at three years is now

F7EJOSB6                       Deutsch - cross

1    pushing six years.  One of the things to understand about this

2    chart, though, is there are people excluded from this chart

3    because if you are already over 65, it is a moot point.  There

4    are slightly less people in the population itself.

5    Q.  So you've examined the documentary evidence that explains

6    how the company came to have this specific design formula.  Is

7    that right?

8    A.  That is correct.

9    Q.  We previously looked at PX 21, if we can get that back on

10   the screen.  These are Mr. Kiley's notes.  We looked at part of

11   them from February 2, 1995.

12           I would like to show you this document and a few other

13   documents to help the court understand how this specific

14   formula came to be adopted in the Fall of '95 starting here now

15   in February of '95.

16           On the first page, is there anything you would like to

17   tell us about what you see on the first page?  Just to back up,

18   the evidence is undisputed, will show these are notes and

19   Mr. Kiley testified about this was one of the meetings at which

20   Mr. Grefig and other people from Mercer and Foot Locker were

21   present at which Mr. Kiley took notes February 2, 1995.

22           Go ahead, sir.

23   A.  As I say, when you convert to a cash balance plan or

24   alternatively adopt a cash balance plan, there is the opening

25   account balance and there is the ongoing pay credits.  So this

F7EJOSB6                    Deutsch – cross

1    is this chart here which says Example 2, and he is talking

2    about the pay credit rate.

3            As the conversion turned out, for most people the pay

4    credit rates were lower than they were prior to the conversion.

5    What he is saying is we can create pay credit rates that

6    reproduce the current formula.

7    Q.  The yellow that Randall highlighted there, the yellow

8    column, what does that say?

9    A.  It says current plan pay credit.

10   Q.  And then to the right, what does it say?

11   A.  20 percent reduction from current plan.

12   Q.  You were saying?

13   A.  With what he is saying here, the one and a quarter, six and

14   a quarter, 10 percent, if those were --

15           THE COURT:  Hold on a second.

16           MR. RACHAL:  Again he is crossing over, saying what

17   someone is saying and somebody is meaning.

18           THE COURT:  Sustained.  You don't need to go into all

19   of that.  Sustained.

20           What he can't do, what you can't do is just talk about

21   what Mr. Kiley meant just because Mr. Kiley needs to talk about

22   what he meant.  What would be perfectly appropriate for the

23   witness to give an opinion and say is that based on documents

24   you reviewed in the case and point us to those documents he

25   reviewed.  He shouldn't just march through Mr. Kiley's

F7EJOSB6                        Deutsch - cross

1      documents and be the person who assembles the factual record

2      based upon all of the Foot Locker documents because they will

3      speak for themselves or not, or there will be a witness who

4      will speak to them clearly.

5              I don't want him interpreting what Mr. Kiley meant.  I

6      don't know if Mr. Kiley, he said a moment ago Mr. Kiley is

7      saying that.  Is Mr. Kiley the one saying that or is he sitting

8      at a meeting where this was being said to him?  I don't know

9      the answer.  I don't want there -- I don't know that he knows

10     the answer.

11             So let's not have him do that.  He can say based upon

12     his view, he interpreted, took away the following points in

13     terms of the chronology of the plan being created and that was

14     based upon the following information.  Again I don't want and I

15     don't need him to be a factual chronology of the documentation.

16             MR. GOTTESDIENER:  I understand what your Honor is

17     saying.  I understand completely.  What I would like to do,

18     though, is have, when there are numbers displayed and formulae,

19     have him as an actuary just help us understand what that is

20     showing.

21             THE COURT:  If he knows, right?  I don't know if he

22     has a basis.  Let me just ask you, have you read Mr. Kiley's

23     deposition or did you attend it?

24             THE WITNESS:  I did not attend it.  I have seen

25     portions of it.

1          THE COURT:  Did he talk about PX-21?

2          THE WITNESS:  I don't specifically remember one way or

3     the other.

4          THE COURT:  I don't know he can talk about what he

5     understands.  All he would be saying is these numbers look to

6     me to be X, which I understand.  Here is what we can do.

7     They're going to be in the record, right?  You're suggesting

8     they're not going to be objected to?

9          MR. GOTTESDIENER:  Yes.

10         THE COURT:  You can point me to them and I can then

11    look at them and see what you want, if you want to publish

12    certain notes to the jury.  Ultimately Mr. Kiley is coming,

13    right?

14         MR. GOTTESDIENER:  Yes, your Honor.

15         THE COURT:  He can talk about what he meant.

16         MR. GOTTESDIENER:  Okay.  Could I ask, could I move to

17    a different example as maybe to show the court the kind of

18    thing that I think the court would allow me to do with

19    Mr. Deutsch.

20         THE COURT:  You can certainly say if this were

21    referring to X, Y or Z, and do it as a hypothetical.  What you

22    can't do is act as if it is the thing you hope it is.

23         MR. GOTTESDIENER:  I absolutely understand.

24         THE COURT:  Mr. Kiley will make the connection.  It

25    will be subject to that connection.  You may proceed.

F7EJOSB6                         Deutsch – cross

BY MR. GOTTESDIENER:

Q.  If you could go to the second page.  In the middle of the

second page, if you highlight where it says E X, Randall, right

there, yes.

          Could you just tell us as an actuary what does this

appear, this E X example, what does this appear to be showing?

A.  It appears to be showing an illustration of wear-away.  It

shows for an individual that his initial account balance would

be a thousand dollars at 9 percent, but if he terminated and

the 417 rate was -- who would get lump sum of 12.   The account

balance would understate his lump sum by $1,250.00.

          If we add to it a hundred to interest and pay credit

its so as the account is growing at a hundred dollars a year,

it would take two and a half years of interest before this

person was out of wear-away.

Q.  In the prior paragraph above, do you see where it says as

of the -- yes -- do you see that where it says we could convert

existing balances at 9 for existing employees, but if they

term, they would be cashed out at 7.83 percent?

          As an actuary, could you tell us what you think that

means?

A.  Yes, it basically sounds like a description of the

calculation we just saw, that we were creating the accounts at

9 percent, and 417 (e) is going to require us to pay the lump

sum using a lower rate of 7.83 percent.  So they would be

F7EJOSB6                         Deutsch – cross

1    getting, if you will, a different present value calculation on

2    payout than was used to calculate the initial balance.

3    Q.   If we could see Deutsch 95 for a moment.  Can you tell us

4    what we're seeing in Deutsch 95.

5    A.   This looks like it is the same thing.  It is saying that

6    the 417 (e) rate is 1-1-95.  Actually, that is the '95 rate,

7    more appropriately described as.

8            So what would happen is if they created initial

9    account balances at 9 percent, but if people terminated, they

10   would be paid at the 417 (e) rate at -- and repeats an example

11   of -- a wear-away where the minimum lump sum would exceed the

12   account balance of two and a half years ignoring interest.

13           THE COURT:  Hold on one second.  My PX 553 -- let me

14   ask you, what is the PX that is the document which you have

15   highlighted on this?

16           One issue is that I don't have every page you're

17   looking at.  I want the record to be able to be -- I want to be

18   able to get back to these pages eventually.  What I am doing, I

19   am cross-referencing the PX numbers to certain things.

20           What is the PX number of that?  Is it the same PX

21   number?  Is it still PX-21.

22           MR. HUANG:  Yes.

23           THE COURT:  What page?

24           MR. HUANG:  2 --

25           THE COURT:  You were talking about Deutsch 95.  I

F7EJOSB6                        Deutsch - cross

1  don't have it.  I don't have any reference for --

2          MR. GOTTESDIENER:  Your Honor, those are for Randall

3  to call up.

4          THE COURT:  We'll connect them to things so that I've

5  got them.  2343, terrific.  That is on PX-21.  Then you have a

6  cross-reference to 553, which is something different.

7          MR. GOTTESDIENER:  That is the Mercer invoice.

8          MR. RACHAL:  Your Honor, if I understand, these notes

9  are fro the same meeting.  You saw the same text.

10          THE COURT:  Right.

11          MR. RACHAL:  I think they're the same meeting.

12          THE COURT:  That is what it sounds like.  Now I

13  understand where we are.

14  BY MR. GOTTESDIENER:

15  Q.  Just a rough fact back-of-the-envelope calculation, how

16  long would the wear-away for someone in this example last?

17  A.  If, in fact, this person had an account balance of a

18  thousand dollars, that means he has $60.00 of the hundred

19  dollars would be the interest credit because it says interest

20  plus pay credit is a hundred dollars.  That means $40 is the

21  pay credit if $60.00 is the interest credit.  He if needs to

22  make up $250.00 of ground at $40 a year, that is six years.

23          (Continued on next page)

24

25

F7enosb7                    Deutsch - direct

1                THE COURT:  I have also figured this out.

2                You guys have retyped.

3                MR. GOTTESDIENER:  Yes.

4                THE COURT:  That's what is going on here.  It is not

5      actually 2343.  It's 2344.  It is exactly what we were looking

6      at before, only retyped.

7                I thought we were looking at the same language,

8      slightly different, because it is a little clearer here in two

9      different places, which may or may not have some degree of

10     emphasis.  But, in fact, it's the same language in 2344.

11               All right.

12               MR. GOTTESDIENER:  The next slide to show is PX 215.

13     This is dated March 15, 1995.  This is a fax from Mr. Grefig at

14     Mercer to Kiley.

15               Currently on the screen is the first page of this

16     five-page document.  And if you go to the next page, after the

17     fax cover, and if you could kind of blow that up please, so

18     that it's more visible.

19     BY MR. GOTTESDIENER:

20     Q.  You were talking about normal costs earlier.  Can you tell

21     us what this shows to you as an actuary, what is this is

22     displaying, Mercer to Foot Locker?

23     A.  Well, the first quadrant of those four is representing the

24     current career average pay plan.

25               So the anticipation at this point is, absent any

F7enosb7                         Deutsch – direct

1    change, the cost will be $12 million.

2    Q.  12 million in normal cost?

3    A.  In normal cost, yes.

4    Q.  OK.

5    A.  The one next to it says that says cash balance says that

6    the normal cost is five million six, but the normal cost after

7    the first year is eight million five, which to me, knowing the

8    facts of the case, indicates that the expectation in this

9    calculation that there was going to be a reduction down to 5

10   million due the wear-away, but once they are out of the

11   wear-away, it is going to rise to $8 million.

12   Q.  The next page, please.

13             THE COURT:  Does it mean out of --

14             MR. RACHAL:  Objection, your Honor.

15             THE COURT:  Yes.

16             MR. RACHAL:  This is inconsistent with what he swore

17   in his trial --

18             THE COURT:  You will be able to do that on

19   cross-examination.

20             MR. RACHAL:  OK.

21             It is not linking up to the reports that were

22   submitted and what he had in the report.

23             That is fine, your Honor.  I will address it later.

24             THE COURT:  You are saying that the $8 million, so

25   it's like a 3 million or three one increase between the cost

F7enosb7                         Deutsch - direct

1     under cash balance, normal cost, and after first year?

2              THE WITNESS:  Yes.  I think it's two million nine.

3              THE COURT:  Two nine.  Sorry.  It is the other way

4     around.

5              Could it be due to both wear-away and the requirement

6     of a certain number of lump sum payments?  In other words --

7              THE WITNESS:  No.  Because the anticipation in their

8     funding assumptions were that people who were not going to take

9     lump sums were going to take annuities.  These are based on the

10    funding assumptions which have that annuity assumption in it.

11             THE COURT:  All right.

12    BY MR. GOTTESDIENER:

13    Q.  This would show savings of how much between the career

14    average and going with the wear-away cash balance?

15    A.  About 2 million -- excuse me.  Yes.  Two million nine in

16    the first year.  2.9.

17    Q.  So from the career average of 12 --

18    A.  I'm sorry.  I misunderstood the question.  From the career

19    average of 12 it's, I guess, six seven roughly, $6.7 million.

20             MR. GOTTESDIENER:  OK.  The next page of this fax,

21    please.  Could you blow that up a bit.

22    BY MR. GOTTESDIENER:

23    Q.  There are -- you see in the upper left-hand corner where it

24    says, Woolworth test case scenario?

25    A.  Yes.

F7enosb7                           Deutsch - direct

1              MR. GOTTESDIENER:  You can reduce that a bit.  There

2     is an additional page or two of these test case scenarios.

3     Could you show us, Randall.

4     BY MR. GOTTESDIENER:

5     Q.  So we have three different test case scenarios.  Could you

6     tell us what these appear to be showing.

7     A.  Well --

8     Q.  We may need to have it blown up just a bit so it's a little

9     more visible.

10             MR. RACHAL:  Your Honor, I am going raise, I guess, a

11    foundation objection.  I can approach or explain.

12             THE COURT:  What is your foundation objection?

13             MR. RACHAL:  This --

14             THE COURT:  Just try to make it concise.

15             MR. RACHAL:  I will.

16             THE COURT:  Let me just ask you, does this have who do

17    with how Mr. Kylie would explain these documents as being

18    different?

19             MR. RACHAL:  No.  It has to do with whether this

20    document even made it over to Foot Locker.  I don't think it

21    connects up.

22             In other words, there were some notes that Mr. Kiley

23    had that were obviously his notes.  Mercer did a lot of

24    calculations.

25             THE COURT:  Doesn't this have an FL Bates number on

F7enosb7                        Deutsch - direct

1    it?  Doesn't that mean it was a Foot Locker document?

2              MR. RACHAL:  I think that means it was produced by

3    Foot Locker, not that it went over to Foot Locker.

4              THE COURT:  I will tell you what.  I am going to allow

5    it for the moment only because it's got a Foot Locker's Bates

6    number on it.  If there is something particular about Bates

7    numberses where they are not Foot Locker documents, let me

8    know.  We will continue for now.

9              MR. RACHAL:  It was a slightly different point.  I

10   don't know that the document was shared with Foot Locker so

11   that they ever considered it.  It is their state of mind.

12             THE COURT:  I assume what you are going to do with a

13   bunch of these is have Mr. Kiley get up here and say whatever

14   he is going to say about them or not.  And he will either say

15   they didn't mean what Mr. Deutsch said they mean or they were

16   my own and I never shared them with anybody, so nobody could

17   have known this information, or whatever he is going to say.

18             Mr. Deutsch as an actuary can interpret them.  Whether

19   that is anything that Foot Locker management, if you will, was

20   thinking is something that can be connected up later.

21             MR. RACHAL:  Thank you, your Honor.

22             THE COURT:  All right.

23   BY MR. GOTTESDIENER:

24   Q.  If you could show us, these were showing three different

25   scenarios.  If you could just flip through the three.

1           The first one is somebody who was age 35 with five

2    years of service.

3    A.   Yes.

4    Q.   Then the next two pages, that is somebody who is 50 with 15

5    years?

6    A.   Yes.

7    Q.   That would be somebody who would be entitled to the

8    enhancement, is that right?

9    A.   Yes.

10   Q.   And the last one is 50 years old and 25 years of service,

11   correct?

12   A.   Yes.

13   Q.   It may be easier -- so can you tell us what this document

14   shows, if we could then zoom out of it.

15           THE COURT:  It is Bates numbered page at bottom 9879,

16   right?  That's where you are?

17           MR. GOTTESDIENER:  9879.  That's right.

18   BY MR. GOTTESDIENER:

19   Q.   What does this show?

20   A.   What this would show, for example, for this individual,

21   there is three competing plan designs illustrated here.

22           The first one is entitled career average, the next one

23   is entitled age based cash balance, and the third one is

24   entitled service based cash balance.

25           The career average is the current plan.  So they are

F7enosb7                    Deutsch - direct

1    using that as a baseline for comparison.  And they are saying,

2    based on the assumptions they are using here that he has a

3    $25,000 salary, that his prior average salary over the last 25

4    years was $16,000, so they can determine the accrued benefit on

5    the initial date, that his salary is going up 5 percent per

6    year, and that the interest crediting rate is 5 percent.  It

7    mentions the 401(k), but -- yes, that's illustrated here, that

8    he's getting a 7 percent return on the 401(k) plan.  This is

9    the progression of his accrued benefit from the amendment date

10   up until age 65.

11   Q.  So that would be the rows starting in the middle at page

12   50?

13   A.  Yes.  So it shows every year until 60 and then jumps to 65.

14   Q.  OK.  So what is this showing on the left is the career

15   average?

16   A.  Right.

17   Q.  In the middle is the age based cash balance formula?

18   A.  Right.

19   Q.  And then the service based.

20         What are the results in terms of the benefits this

21   person would earn during the first three years after the

22   amendment?

23   A.  Well, what you would notice is in the accrued benefit

24   column, in the age-based cash balance that the 4650 is repeated

25   for three years.

```
 1    Q.  What does that mean?

 2    A.  That means his accrued benefit is stuck at 4650.  It's not

 3    going up.  It's at the prior protected benefit.

 4    Q.  So it's in wear-away?

 5    A.  Exactly.

 6    Q.  On the service based, do you see he's in wear-away?

 7    A.  Yes, you have the same phenomenon in the service based.

 8    Q.  These are three-year wear-aways.  How does this formula

 9    compare to the one that Foot Locker actually adopted?

10    A.  Obviously they didn't adopt the age based.  They went with

11    the service based.  So that one is not really relevant.

12    Q.  I am talking in terms, you explained to her Honor before

13    that a richer formula would get you out of wear-away sooner?

14    A.  Yes.

15    Q.  A poorer formula would stick you in wear-away longer?

16    A.  Yes.

17    Q.  How does this formula compare to the formula they adopted?

18    A.  Yes.  This is actually a much higher formula than the one

19    that they adopted.

20    Q.  So if the one they adopted were put into this format, what

21    effect would that have on the wear-away?

22    A.  It would extend the wear-away.

23             THE COURT:  That's based on what?

24             THE WITNESS:  If we -- I am looking at what I have.

25    If you look in -- the SPD is probably the quickest way to see
```

F7enosb7                          Deutsch - direct

1    it.   There is a schedule that shows the contribution rates.   So

2    the numbers here are larger than the numbers in that schedule.

3    Q.   So if we go now to the same day, there is Kiley notes of a

4    call.   This is PX 129.   On page 2 -- sorry, I think it is on

5    page 1.   On page 1 --

6             MR. GOTTESDIENER:   May I approach the witness, your

7    Honor?

8             THE COURT:   You may.

9    BY MR. GOTTESDIENER:

10   Q.   Do you see anything relevant to wear-away written on page

11   1, in the middle of the page?

12   A.   Yes.   There is a paragraph.   It starts with the 5625.

13   Q.   Yes.   The $5.625 million?

14   A.   It says this is a onetime normal cost, and it says it is

15   because we get a credit for wear-away.

16   Q.   So at the bottom it says we calculated 9, so in first year

17   we get a credit for a wear-away?

18   A.   Yes.

19   Q.   Let's look at also the same day, PX 252.

20            MR. GOTTESDIENER:   May I approach, your Honor?

21            THE COURT:   You may.

22            I am going to use my binder so I don't need it.

23            Thank you.

24   BY MR. GOTTESDIENER:

25   Q.   252 on the front, from Chris Maikels to Thomas Kiley:   Tom,

F7enosb7                         Deutsch - direct

1    here are the additional nine scenarios you requested.  If you

2    have any questions, etc.

3            So what do we see on these additional nine scenarios?

4    A.  These are similar to the ones we just looked at.

5            So, for the example, the one that is up there now, it

6    shows again in the first three years the 1230 doesn't increase,

7    indicating that this person is in wear-away for three years.

8    Q.  Just flipping through the pages, we've got the next page,

9    there is a scenario of a 50-year-old with 25 years of service,

10   and that person --

11   A.  They have the same thing.  The benefit doesn't go up until

12   the fourth year.

13   Q.  So that is a three-year wear-away that's being illustrated?

14   A.  Yes.

15   Q.  These are different scenarios --

16           THE COURT:  What is accounting for the differences

17   here?  Not in terms of obviously the document and what

18   Mr. Kiley may say.  But in terms of your view as to the tests

19   that are being run here, what is fluctuating?

20           THE WITNESS:  What is fluctuating between the

21   different ones, for example, in this group of nine is the

22   age -- if you can flip back to the first one.  It's the age,

23   service and comp, so they're like different people.

24           THE COURT:  I see.

25           THE WITNESS:  The first one is 35 years old, five

F7enosb7                          Deutsch – direct

1    service, $25,000.

2             And if we go to the next one, it's 50 years old, 25

3    and 25,000.

4             So it's those three things that are changing.

5             THE COURT:  I see.

6             THE WITNESS:  I believe they set it up so that the

7    salary and the earnings rate on the account can change, but I

8    think they held them constant on all nine of them.

9             THE COURT:  All right.

10            Thank you.

11            MR. GOTTESDIENER:  May I approach, your Honor?

12            THE COURT:  You may.

13            MR. GOTTESDIENER:  PX 214, your Honor.

14   BY MR. GOTTESDIENER:

15   Q.  This is 214.  This has handwriting on it.  It will be

16   linked up to Mr. Kiley, but show her Honor, if you would, under

17   the numbers, there is three lines of handwriting.

18            If you could just blow up the line that says -- yes,

19   the third line.  That says 1080 per year for a 35-year-old

20   would be $630 on a cash balance basis at 9 percent.  If term.

21   during the year, they would be entitled to $890 at 8 percent

22   due to GATT.

23            Could you tell us what that means to you as an

24   actuary?

25   A.  Yes.

F7enosb7                          Deutsch – direct

1          So the example that is higher up on the page shows

2     this guy's initial accrued benefit is 1080.  What it's saying

3     is the initial account balance for this person would be $630.

4     But when we go to pay them their lump sum, they are going to

5     get $890 as the 417(e) minimum lump sum, which means their

6     account balance is going to be 260, a sizeable chunk short of

7     their minimum lump sum.

8          MR. RACHAL:  Your Honor?

9          THE COURT:  Yes.

10          MR. RACHAL:  Brief objection.

11          It's gone on for a bit.  Maybe I am misremembering and

12     he can point me to where this is in the expert report, but I

13     don't ever remember this type of narrative analysis of the

14     documents in the case in his expert report, so I've never had a

15     chance to cross-examine him on them on them or anything else.

16          MR. GOTTESDIENER:  Your Honor, all of these

17     documents --

18          THE COURT:  Hold on.

19          MR. GOTTESDIENER:  Sorry.

20          THE COURT:  I don't want to have colloquy right now on

21     it.

22          I hear your point.  This has been repeated all day.

23     It's really unfortunate in terms of the fact that things are

24     being raised for the first time.  That kind of thing typically

25     is taken care of during all the expert discovery.

F7enosb7                          Deutsch – direct

1              You've got Mr. Kiley coming, right?  So you will be

2       able to have Mr. Kiley do what he's going to do.  In the

3       meantime what he's doing is he's pointing the Court to

4       documents which apparently demonstrate wear-away in terms of a

5       variety of runs.  It is fine.

6              MR. RUMELD:  Your Honor, I just want the Court to be

7       fully informed about what I think is going to happen here.

8              Your Honor already read portions of Mr. Maikel's

9       report, and I think he remembered very little about these

10      documents, even though he was involved with them.  Mr. Kiley is

11      not going to remember anything.  I just want to point out, we

12      have a lot of expert testimony on documents for which there is

13      no underlying witness who can actually testify to what is going

14      on.

15             THE COURT:  Then Mr. Sher.

16             MR. GOTTESDIENER:  I disagree.

17             THE COURT:  It doesn't matter.  You disagree.  That's

18      why we are here.  What I don't want to do is devolve into

19      argument.

20             Mr. Sher can say that these documents can mean any

21      variety of things.  He has no idea as an actuary what these, in

22      fact, mean.  They can mean the following kinds of scenarios.

23             In fact, for all he knows it may be that these relate

24      to scenarios for plans that were never adopted.  It may relate

25      to one of the ones that were on whatever May notes and

F7enosb7                         Deutsch - direct

1    presentations.

2              What's good for the goose is good for the gander.  I

3    will then weigh their expertise, their credibility etc., etc.

4    and listen to Mr. Kiley or anybody else.

5              MR. RUMELD:  I just didn't want to leave the Court

6    with some false expectation about Mr. Kiley.

7              THE COURT:  That Mr. Kiley is going to come in, guns

8    ablaze remembering everything.

9              It's too bad.  He's got all these carefully written

10   notes with pretty good handwriting.

11             MR. GOTTESDIENER:  And he acknowledges receiving them.

12             THE COURT:  We're beyond that.

13             MR. GOTTESDIENER:  That's fine.

14             Could I just make a statement because this is very

15   surprising that they are claiming surprise.

16             THE COURT:  They are claiming surprise because

17   typically during trial I have to say it is true the expert's

18   get on the stand particularly, when it's the second witness,

19   and testify as to what is in the report and what is attached to

20   the report and what documents are referenced.

21             MR. GOTTESDIENER:  That is all these documents are.

22             THE COURT:  Fine.

23             All you have to say is --

24             MR. GOTTESDIENER:  They are --

25             THE COURT:  Don't argue with me, sir.

F7enosb7                          Deutsch – direct

1          MR. GOTTESDIENER:  I'm sorry.  I just want --

2          THE COURT:  All you have to say is, Mr. Rachal, in

3     fact in his report it was a document attached as one of the

4     documents he reviewed.  Mr. Rachal may have chosen not to

5     examine him on it.  That was their choice.  That is all I need

6     to hear.  Then I am done with the objection frankly.  That

7     would help.

8          MR. GOTTESDIENER:  I should have said that earlier.

9     It's my fault.

10         THE COURT:  If these were things he referenced in his

11    report and/or relied upon in his report and that was full

12    disclosed, so be it.  And people chose to do what they chose

13    do.

14         Good for the goose, good for the gander is still good

15    for goose and good for gander.  All right.

16         MR. GOTTESDIENER:  The next document -- PX -- actually

17    let me finish with this.

18    BY MR. GOTTESDIENER:

19    Q.  The wear-aways that are explained in the other scenarios

20    here.  Would you --

21         THE COURT:  Just so that we are clear, we are back on

22    214.

23    BY MR. GOTTESDIENER:

24    Q.  214, just flipping through the different scenarios, these

25    all appear to be wear-aways lasting three years or so.

F7enosb7                        Deutsch - direct

 1   A.  Yes.

 2   Q.  So, for example, the last two pages show somebody who is

 3   age 50, 20 years of service, and that person has a $150,000

 4   salary, and the prior one is 50-year-old with 20 years of

 5   service at a $50,000 salary.  And that person above, those

 6   people are suffering from three-year wear-aways?

 7   A.  Yes.

 8   Q.  The next document is April 7, and that is PX 298.

 9            This is a fax from Mr. Grefig of Mercer to Mr. Kiley.

10            MR. GOTTESDIENER:  May I approach, your Honor?

11            THE COURT:  Yes.

12   Q.  If you could tell us, looking first at the first page, this

13   seems to be -- the first page in.

14            MR. GOTTESDIENER:  If we could expand that a little.

15   BY MR. GOTTESDIENER:

16   Q.  This seems to be a little different than we have seen

17   before.  It's got liability comparison, 1/1/94 data and

18   liabilities, cash balance study at the top.

19            On the left-hand corner there is 100 percent lump

20   sums, and then it shows accrued liability, the first year

21   normal cost, ongoing normal cost.  And then it has 100 percent

22   annuities with those same entries.

23            Can you tell us as an actuary what that is displaying?

24            THE COURT:  Where are you seeing the 100 percent

25   annuity.

1           THE WITNESS:  It's --

2           THE COURT:  I'm sorry.  Got it.  Thank you.

3    A.  OK.  This would relate to the benefit form election.  So

4    they are currently assuming 100 percent annuity.  By currently

5    I mean in 1995.

6    Q.  But for the purposes of the cash balance study, what is

7    this displaying?

8    A.  What this is doing is this is saying what would happen if

9    we switched to 100 percent lump sum assumption versus sticking

10   with a hundred percent annuity assumption.

11   Q.  What does it show in terms much how much more money can be

12   saved if you used one assumption versus another?

13   A.  In the wear-away, which would be the first year, it's

14   showing, for example, if they went to the age-based formula

15   that it would be -- the normal cost would be cut in half for

16   the first year and then there would be, without doing the math

17   in my head, about a 20 percent reduction by using the 100

18   percent annuity assumption.

19          In other words, the calculation of the required

20   minimum contribution would be reduced by assuming people take

21   annuities versus lump sums.

22          THE COURT:  I'm sorry.

23          Can you go over that again.  I am not sure I

24   understand what this document, at least what your perception is

25   as to this document.

F7enosb7                          Deutsch - direct

1             THE WITNESS:  OK.

2             I think, because of what was in Mr. Sher's rebuttal

3    report, I should explain it a little differently.  There's the

4    real cost of the plan.  And then there's the, if you will,

5    funding cost of the plan, which tries to allocate that real

6    cost to individual years.

7             The real cost of the plan is how much is ultimately

8    paid as benefits minus the interest on the money.  And that's

9    unimpacted by how much money is actually required to be put in

10   each year.  It is what it is.

11            But the law requires them to put in a minimum amount

12   each year to fund the benefits that are being promised by the

13   plan.  That's referred to as the minimum required contribution.

14            And the minimum required contribution -- I've

15   discussed this earlier -- is made up of various pieces, but

16   primarily the normal cost and the unfunded liability payment,

17   the amortization payment, which is a constant.  They can't

18   lower that number but they can lower the normal cost number.

19            What this is saying is, for purposes of determining

20   how much money we have to contribute to the plan under the law,

21   are we going to be showing a million five as that piece of the

22   calculation?  Are we going to be showing three million seven

23   for that piece of calculation?

24            What this is saying is, if we assume that people are

25   going to take lump sums, then it's going to be three million

F7enosb7                      Deutsch - direct

1     seven.

2              But if we assume people are going to take annuities,

3     it will be a million five.  So there's going to be a two

4     million plus dollar reduction by simply assuming people take

5     annuities.

6              What really happens is people did what they did.  This

7     is just an assumption about what they are going to do.  So it

8     doesn't affect the ultimate playout of the plan.  It just

9     affects allocating the costs to individual years and, most

10    importantly, 1996.

11             THE COURT:  Right.  OK.

12             So if they went with 100 percent annuities, they are

13    able to project a lower cost base?

14             THE WITNESS:  Yes.  Exactly.

15             THE COURT:  All right.  Got it.

16             You may proceed.

17    BY MR. GOTTESDIENER:

18    Q.  Just on that point did you see in the documentary record

19    that is all referenced in your report evidence that Foot Locker

20    was given projections as to how many people were going to take

21    lump sums versus annuities?

22    A.  There was a study done by Mr. Grefig where he e-mailed

23    other people and said, When you introduce a lump sum

24    assumption, what is the incidence, how often do people take

25    lump sums?

F7enosb7                          Deutsch - direct

1              And he then communicated that it would -- for people

2      below 55 a hundred percent of the people would take lump sums.

3      People above 55, 90 percent of the people would likely take

4      lump sums.

5              So, based on that, it would be effectively everybody

6      was going to take lump sums.  It would be well above 90

7      percent.  One chunk would be 100 and one chunk would be 90

8      most.  Most people would be in the 100 percent group.

9              THE COURT:  Hold on.  We have an objection.

10             MR. RACHAL:  It is the same objection about giving

11     narrative testimony.

12             THE COURT:  All right.  Got it.

13             You can have a standing objection to his testimony on

14     this.  So Mr. Sher will do what he is going to do.

15             MR. RACHAL:  All right.

16             THE COURT:  I hear you.  But now that I know that

17     Mr. Kiley is not going to have any factual knowledge, I need to

18     figure out something about the documents.

19             MR. RACHAL:  Fair enough.

20             THE COURT:  Mr. Sher can contradict and throw it all

21     into a massive confusion or not.

22     BY MR. GOTTESDIENER:

23     Q.  If you can turn to the scenarios that are in this same

24     document.  On the last two pages you should be able to see

25     there is another test case scenario for someone who is entitled

F7enosb7                          Deutsch – direct

1    to the enhancement, age 50 with 20 years of service.

2              Do you see that their accrued benefit here is frozen

3    for four years?

4    A.  Yes.  Under the age based cash balance plan.

5    Q.  And --

6    A.  And the other ones which I can't see on the screen.  One

7    two, three, four, five --

8    Q.  Actually, if you were --

9    A.  The last one actually has five years.

10   Q.  So the last column shows a five-year wear-away and the

11   earlier columns show -- well, the first column on age based --

12   this scenario has more different plans than the others.  We

13   have career average, then we have five-year wear-away,

14   four-year wear-away, four-year and five-year, is that accurate?

15   A.  Yes.

16   Q.  And then on the next page,it look like similar outcomes?

17   This is somebody who is 35 with five years of service?

18   A.  Yes.  Similar outcome.

19             MR. GOTTESDIENER:  If you would show us PX 8, please.

20             If I could approach the witness, your Honor?

21             THE COURT:  Yes.

22   Q.  April 10, '95, Kiley notes.

23             Directing your attention to page 2, paragraph 1.  If

24   you could read that and tell us if that is something that you

25   were referring to earlier.

1    A.  Yes.  This is exactly what I was referring to earlier,

2    where he is saying that, based on a national survey that Jim

3    Grefig conducted -- and I saw the e-mail trails with him asking

4    people about it -- under 55, 100 percent of the people would

5    take lump sums and over 55, 90 percent of the people would take

6    lump sums.

7    Q.  If you would look down to the sixth paragraph.  The first

8    year normal cost.

9         Do you see where it says that?

10   A.  Yes.

11   Q.  First-year normal cost is based upon the fact that a person

12   does not earn any additional benefits?  It may take between two

13   and three years to get up to the ongoing cost level?

14   A.  Yes.

15   Q.  As an actuary and someone who analyzed the expected

16   wear-away in this plan, is that consistent with your

17   understanding of what was expected then?

18   A.  Yes.  So for the people who are in wear-away, they would

19   reflect no normal cost until they were out of wear-away.  So if

20   there was an anticipation in two to three years to be out of

21   wear-away, since the normal cost is based on the benefit earned

22   in those years, those people would have no normal cost, and it

23   would depress the total normal cost of the plan.

24   Q.  Because they were earning no new benefits?

25   A.  Because they were earning no new benefits.

F7enosb7                          Deutsch - direct

1              MR. GOTTESDIENER:  PX 192, please.

2              These are notes of another meeting.

3              May I approach, your Honor?

4              THE COURT:  Yes.

5   BY MR. GOTTESDIENER:

6   Q.  Ten days later, April '95, by Mr. Kiley.

7              On the first page, at the middle of the page, starting

8   calculation example, and then carrying over to the top of the

9   next page, did you analyze the calculation example?

10  A.  Yes, I did.

11  Q.  And did you reproduce the results that are reflected on the

12  page?

13  A.  Yes, I did.

14  Q.  And what is this calculation example showing?

15  A.  Well, it shows -- it's broke --

16  Q.  In general before the details.

17  A.  In general what this shows is the determination of this

18  individual's benefit payable at age 55 based on the cash

19  balance account where they received an enhancement.  Then it

20  shows the associated annuity benefit at age 55.  That would be

21  the protected early retirement benefit.  He concludes on the

22  bottom of this page that the -- or I believe it is on the

23  bottom of this page, that the benefit that's protected after

24  five years is still larger than the benefit attributable to the

25  account balance.  It is a little hard to see it there, but it

F7enosb7                          Deutsch - direct

1   is there.

2              So -- give me one second.

3              So here he's showing, at the very bottom of the page

4   where it starts to cut off, the 16,612 is the anticipated

5   account balance.  He divides that by the age 55 factor to

6   convert that into an annuity and has that the cash balance

7   annuity is 1536.

8              And then on the top of the next page, he shows that

9   the $3,000, which is the protected accrued benefit, times the

10  age 55 early retirement factor, reduction factor of .6, which

11  we have talked about before, that's the 4 percent per year

12  reduction, produces a benefit of 1800.

13             And since 1800 is more than 1536, this person's

14  benefit after five years as an annuity at age 55 is still

15  larger as the protected benefit, so this person is still in

16  wear-away if they took an early retirement benefit at age 55.

17             I should note he makes that comment here.  He says,

18  Will be the minimum annuity.  So he reaches that conclusion.

19  Q.  Let me show you PX 86.

20             MR. GOTTESDIENER:  Can I approach, your Honor?

21             THE COURT:  Yes.

22             MR. GOTTESDIENER:  This is a draft debt presentation

23  to top management that we will link up and is already admitted

24  by defendants.  April 28.

25  BY MR. GOTTESDIENER:

F7enosb7                        Deutsch – direct

1    Q.  If you would turn to the back.  Do you see Bates No. 5499?

2    A.  Yes.

3    Q.  What is that displaying?

4    A.  This is displaying first year normal cost and ongoing

5    normal cost under two competing sets of assumptions, and it

6    looks like five separate potential plan designs.

7    Q.  And it's showing the amount of money that can be saved by

8    reporting 100 percent annuities versus 100 percent of lump

9    sums?

10   A.  Yes.  If you contrast the numbers on the top and the bottom

11   half of the page, the difference would be the savings by

12   assuming a hundred percent annuities versus a hundred percent

13   lump sums.

14   Q.  If you go to earlier in the document on Bates 5479 where it

15   has a comparison of plans, the current plan versus the proposed

16   cash balance plan, do you see at the bottom half of the page

17   there is a comparison of the normal cost under the current plan

18   versus under the cash balance plan in the first year showing a

19   savings of $6.4 million?

20   A.  Yes.

21   Q.  Just for her Honor's context, you saw in the documents

22   earlier that the normal cost was at 12 million.  Now it's

23   shaved down about 20 percent for the current plan.

24        Could you explain from your review of the documents

25   what that appears to be a result of?

F7enosb7                    Deutsch – direct

1   A.  Yes.  At some point in the process they discovered that

2   there had been about 20 percent terminations -- I believe they

3   said because of plant closings but I am not sure -- but 20

4   percent terminations during 1995.

5           So there was an expectation that there would only be

6   80 percent of the people would still be there at the end of the

7   year.  So it's basically 12 percent times 80 percent -- I mean

8   12 million times 80 percent.

9   Q.  And that 20 percent reduction also carries over to the

10  normal cost?

11  A.  Yes.

12          MR. GOTTESDIENER:  PX 632.  This is the final version

13  dated a few days later, Monday, May 1.

14          May I approach?

15          THE COURT:  Yes.

16  BY MR. GOTTESDIENER:

17  Q.  On page 1, do you see there's typewritten objective, and

18  above it appears again to be Mr. Kiley's handwriting.  In

19  January we were charged with the responsibility to decrease

20  ongoing company cost.

21  A.  Yes.

22  Q.  And the objective, there are two bullet points there:  To

23  decrease long-term company cost, review plan alternatives.  To

24  promote the sharing of responsibility for retirement savings

25  with associates.  Do you see that?

F7enosb7                        Deutsch – direct

1   A.  Yes.

2   Q.  As an actuary, are those any different, those two bullet

3   points?

4   A.  Only extremely subtly.

5           Basically to promote sharing of responsibility for

6   retirement savings with associates is a euphemism for having

7   the employees pay for the retirement benefits instead of having

8   the company pay for them.  So it is an alternative way for the

9   company to lower their costs.

10  Q.  If you turn to the last page, which is 2472, in the upper

11  right-hand corner, it appears that Mr. Kiley has written:  We

12  looked at many variations of CB formulas, we chose this formula

13  because of the level of savings it provides and because it is

14  service-based, which is appropriate based on the emerging

15  demographics of our company, i.e., younger and more mobile.

16  $22,000 is the average covered compensation of plan

17  participants.

18          Do you see that there?

19  A.  Yes.

20  Q.  Could you explain, a service-based formula for a young

21  mobile workforce, would that be more expensive or less

22  expensive than otherwise?

23  A.  Well, it depends on the benefit level, of course.  The

24  benefit level they selected it was less expensive, but if they

25  picked a higher benefit level, it could have been more

F7enosb7                          Deutsch – direct

1    expensive.

2    Q.  If you are targeting a workforce that's young and more

3    mobile, could you tell her Honor, at the time what did somebody

4    have to do to even get a vested benefit under the plan?

5    A.  My recollection is at the time you had to work five years

6    with at least a thousand hours per year before you were

7    actually entitled to any benefit at all.

8            So if you went to work for Foot Locker for three years

9    and left, you get nothing, because you are not vested.  Even

10   though you've earned a benefit, you don't earn the right to

11   receive it.  That's the vesting.  So you have to have at least

12   five years before you even get a benefit.

13   Q.  The next document is PX 193.

14   A.  Let me add quickly that's in the SPD, so if my memory is

15   right, it could be checked in the SPD.

16           MR. GOTTESDIENER:  May I approach?

17           THE COURT:  Yes.

18   BY MR. GOTTESDIENER:

19   Q.  PX 193, Kiley notes now from August 15.  Directing your

20   attention to -- well, you see at the top handwritten you list

21   participants, including Jim Grefig at the top, cash balance,

22   401(k) plan, design issues?

23   A.  Yes.

24   Q.  And on the second page do you see what would appear to be

25   yet another example given of someone starting out with an

F7enosb7                    Deutsch - direct

1   accrued benefit under the plan and then suffering a period of

2   wear-away?

3   A.  Yes.  In this example it is a little annoying because they

4   repeat the same numbers meaning different things.  But he has a

5   $12,000 accrued benefit, which generates an initial account

6   balance of $12,000.  So those two numbers theoretically are

7   only coincidentally the same.  And they are in the right

8   ballpark that it would be the same at age 45, but they are not

9   quite right.

10          He terminates a year later and the value at 8 percent

11  of his minimum distribution he has at $18,000.  So that means

12  his account balance with $12,000 would have gone up at one

13  year's interest.  So it would have gone up to $18,000.

14          And then he says he has a minimum annuity, dividing it

15  by a factor of one and a half, of $8,000.

16          MR. GOTTESDIENER:  619.

17          May I approach, your Honor?

18          THE COURT:  Yes.

19  BY MR. GOTTESDIENER:

20  Q.  This is a document that we haven't seen the likes of

21  before.  I think you would agree -- would you take a look at

22  619.

23  A.  Yes.

24  Q.  This is entitled, Woolworth Corporation Cash Balance Plan

25  Illustration.

F7enosb7                        Deutsch - direct

1   A.   Yes.

2   Q.   There's three pages.  The first page has one person

3   reflected.  And on the second page it's effectively the same

4   person with the enhancement versus on the first page without

5   the enhancement?

6   A.   That appears to be the case, yes.

7   Q.   And then the last page are a table of factors?

8   A.   That's actually two more pages that are pages of factors.

9   Q.   Tell us what that is illustrating.

10  A.   That's illustrating for this individual, they were

11  originally hired in 1935 -- excuse me, 1935 -- at age 35, and

12  this shows their benefit growing each year until they are 50

13  when the plan is amended.

14  Q.   That is on effectively it's row 15, service 15?

15  A.   Yes.

16  Q.   Age 50?

17  A.   Yes.

18  Q.   So that's then when the plan amendment hits?

19  A.   OK.  They have accrued a benefit under the old plan.

20  Q.   Let's make sure we have this for the record.  It shows the

21  accrued benefit at that point in time as $4,193?

22  A.   Yes.

23  Q.   And that's starting at age 65 for the rest of that person's

24  life?

25  A.   That's their frozen accrued benefit, yes.

F7enosb7                          Deutsch – direct

1    Q.  And then in the next column it has the cash balance

2    account, and that's the starting opening balance calculated

3    using 9 percent?

4    A.  Yes.

5    Q.  And then there are pay credits showing in the next two

6    tables, with interest credits, and that's building the account.

7    Is that right?

8    A.  That's building the account.

9           Those four columns together, the account, the pay

10   credit and the interest.  I think they have one too many

11   columns there.

12   Q.  It's interesting that it shows -- what's the next column

13   that it shows there?

14   A.  It says minimum lump sum.  That is the 417(e) minimum lump

15   sum value that they anticipated that this person would be

16   entitled to if they terminated at that point in time based on

17   the 8 percent table they have two pages later.

18   Q.  So that was under a GATT rate of 8 percent at that time in

19   August of '95?

20   A.  Yes.

21   Q.  And so that number is more than $2,000 higher than the cash

22   balance account that the person was started with?

23   A.  Yes.

24   Q.  And then how long is this person shown in wear-away?

25          Actually, as you answer that, the next two columns,

F7enosb7                           Deutsch - direct

1   they show a cash balance annuity?

2   A.   Yes.

3   Q.   And then a minimum annuity?

4   A.   Yes.

5   Q.   Could you explain that.

6   A.   So the cash balance annuity was determined by taking the

7   cash balance account and dividing it by an immediate annuity

8   factor at 8 percent and converting it into an immediate

9   annuity, which is in line with the ultimate plan provision,

10  that you take the account balance and divide it by an immediate

11  annuity factor at the then current 417(e) rate.

12       That is what the person would be entitled to as an

13  annuity if they converted their benefit into an annuity at that

14  age.  The minimum annuity is the benefit payable from the prior

15  plan.

16       Now, there's no entrance between 50 and 54 because

17  under the prior plan you weren't entitled to a benefit between

18  50 and 54.

19       I don't know if we will get to this, but there is a

20  technical problem with not providing an annuity.  But it is not

21  provided.  That's why it's blank.  Then they start with

22  providing the .6 reduction at age 55 applied to the 4193, and

23  then the .6 factor gets higher and higher as they get closer to

24  age 65 until ultimately it is a 1 at age 65 and the person is

25  entitled to 4193.

F7enosb7                           Deutsch - direct

```
 1              That last column is the early retirement benefit based
 2     on the protected benefit.
 3     Q.   How long is this person being shown in wear-away?
 4     A.   Based on the lump sum, they are in wear-away initially and
 5     then -- and then one, two, three, four, four and a portion of a
 6     year it would look like.
 7     Q.   And annuity wear-away?
 8     A.   I'm sorry.  Five and a portion of a year.
 9              The annuity wear-away, of course, we can't see it
10     until the guy is at 55, but he is in wear-away all the way out
11     until it looks like age 61.  So that's 11 years.
12     Q.   And they have a projection of the minimum lump sum that the
13     person was entitled to 1/1/96, 1/1/97 and so on.  Is that
14     right?
15     A.   Yes.
16     Q.   So somebody could see how that compared to their account
17     balance?
18     A.   Yes.
19     Q.   And then on the next page, this takes the same person
20     effectively and gives them the enhancement?
21     A.   Yes.
22              THE COURT:  Could I just pause for a moment.
23              MR. GOTTESDIENER:  Sure.
24              THE COURT:  I just want to make sure that I understand
25     the testimony on one column.
```

F7enosb7                            Deutsch - direct

1              OK.  So, Mr. Deutsch, you have testified that in terms

2    of wear-away the way you would interpret this document is that

3    for the minimum -- if you look at minimum lump sum and you

4    compare that to the cash balance account, they would be in

5    wear-away for a period I think you said four years?

6              THE WITNESS:  I think I said five.  I said four and

7    then I corrected it I think.

8              THE COURT:  Does it start at age 50?

9              THE WITNESS:  It starts at age 50.  That's when the

10   plan is converted.

11             THE COURT:  Doesn't it go down to age 56?

12             THE WITNESS:  At 56, yes.  So that's six years.

13             THE COURT:  Six years, right?

14             THE WITNESS:  Six years.

15             THE COURT:  That's what I thought.

16             OK.  You may proceed.

17             THE WITNESS:  I am looking at the screen.

18             THE COURT:  I wanted to make sure I was interpreting

19   the document as you were testifying.

20             THE WITNESS:  Yes.

21             THE COURT:  All right.

22   BY MR. GOTTESDIENER:

23   Q.  So the next page with the enhancement given.  What's the

24   basic outcome for that person?

25   A.  Well, on a lump sum basis, the new benefit is always

F7enosb7                          Deutsch - direct

1   better.  So we are comparing, for example, in the first year

2   the $15,000 account balance to the $11,000 minimum lump sum,

3   but on an early retirement basis at 55 when they're first

4   eligible for the early retirement subsidy, the protected early

5   retirement benefit is still larger than the new benefit and

6   continues to be until, for this person somewhere after they

7   turn 57.  So, of course, 57 is seven years out, eight years

8   out.  It's the eighth year.

9   Q.  Do you see in the, the box that explains the two

10  illustrations, do you see in the second paragraph, the

11  paragraph that starts the minimum lump sum is determined by

12  multiplying?

13  A.  Yes.

14            THE COURT:  I'm sorry.  Before we go on to the next

15  one --

16            MR. GOTTESDIENER:  Yes.

17            THE COURT:  -- I want to make sure I understand the

18  last one.

19            Can you just go back to the last page we were looking

20  at, which is Bates numbered page at the bottom 2301.

21            What is your interpretation as to why, even at age 50

22  based upon the calculation they are never in wear-away?

23            So even at 50 when they start, so that's before,

24  right, the early retirement benefit?  Or no.  I see.  It's 50

25  plus 15 years, so they meet the enhancement.

F7enosb7                          Deutsch – direct

1          THE WITNESS:  They meet the enhancement.

2          THE COURT:  Formula.  Got it.

3          Because they meet the enhancement formula, the

4    calculation on page 2301 shows no wear-away --

5          THE WITNESS:  Yes.

6          THE COURT:  -- for that particular profile?

7          THE WITNESS:  This is actually the same person, just

8    one is with enhancement and one is without.

9          THE COURT:  I see.  OK.

10   BY MR. GOTTESDIENER:

11   Q.  The person is not in lump sum wear-away, but that's using

12   the assumption of an 8 percent GATT rate?

13   A.  Yes.

14   Q.  It says in the second paragraph that that can go up or

15   down, doesn't it?  It says, Note that this rate will change

16   with prevailing interest rates?

17   A.  Yes.

18   Q.  So that person is in annuity wear-away?

19   A.  For a period of years, yes.

20   Q.  How many years did you say?

21   A.  Because they have blanks, the first five years they don't

22   indicate it, but after the fifth year they are in wear-away for

23   another three.

24   Q.  Now, on November 15 --

25          MR. GOTTESDIENER:  If I could get on the screen 751,

F7enosb7                         Deutsch – direct

1    please.  November 15, there is Kiley notes that were typed of

2    an implementation meeting with Mercer.  If you could blow those

3    up a bit.

4    BY MR. GOTTESDIENER:

5    Q.  Do you see at the top it has the participants, including in

6    the middle Mr. Grefig and Mr. Cassidy from Mercer?

7    A.  Yes.

8    Q.  In the second bullet point, do you see it says, The current

9    structure for the current plan should remain in place?  The new

10   plan structure should be an add on?

11   A.  Yes.

12   Q.  What does that mean to you?

13   A.  Well, that means that when people terminate, they are going

14   to have to calculate the benefit under the old plan and the new

15   plan because the old plan formula is still an operative benefit

16   formula.  Even though they are not accruing benefits, the

17   formula itself is still operative.

18   Q.  But the current structure for the current plan, that stays

19   in place and then there is an add on?

20   A.  Yes.

21   Q.  So would that be consistent with your discussion about this

22   was not a conversion?

23   A.  Yes.

24   Q.  If you look at the bottom of the page, the very bottom, do

25   you see the bullet point at the top says, Calculation of

F7enosb7                          Deutsch - direct

1    minimum lump sum.  And then it has, ex. person age 64.

2              Do you see that example?

3    A.  Yes.

4    Q.  Person age 64?

5    A.  Yes.

6    Q.  Do you see how it says $9400 account balance?

7              Then what is this showing here?

8    A.  It's saying, if you do the math really rough, if you work

9    it backwards, if you have a $10,000 account balance, 6 percent

10   interest would be $600.  So they are saying the interest credit

11   is roughly $600.

12             So you take $9400, add the $600 interest credit, and

13   you are up to $10,000 the next year.

14             THE COURT:  Is this an OK place to stop.

15             MR. GOTTESDIENER:  I have two questions.  If we can

16   finish the document.

17   BY MR. GOTTESDIENER:

18   Q.  Do you see where it says GATT, 6 and a half percent

19   interest rate?

20   A.  Yes.

21   Q.  Earlier, all through this we have been seeing 8 percent

22   assumed for GATT, is that right?

23   A.  Yes.

24   Q.  November of 1995, where approximately was the GATT rate at?

25   A.  6.5 something.

F7enosb7                          Deutsch - direct

1    Q.  Do you see how it says -- they do a calculation.  Why don't

2    you just tell us what the rest of that shows.  10,000 --

3    A.  What it does is it calculates what this person's annuity

4    benefit would be attributable to the 10,000.  It does a

5    straight life annuity by dividing it by the factor at six and a

6    half percent and says you compare it to the prior accrued

7    benefit to get the actual accrued benefit, which I don't

8    believe they show in the accrued benefit here.

9    Q.  It says, it concludes that if the prior accrued benefit,

10   whichever is the winning benefit -- do you see the last three

11   words?

12   A.  Yes.

13   Q.  And that becomes the person's accrued benefit?

14   A.  Yes.

15        MR. GOTTESDIENER:  No further questions on this

16   document.

17        THE COURT:  Ladies and gentlemen, let's break for this

18   afternoon.

19        You can step down.

20        I have one housekeeping matter that I want to cover

21   and see if we have anything else that we want to cover.

22        THE WITNESS:  I'm sorry.

23        Do I leave the exhibits here?

24        THE COURT:  You can leave it there, and you will pick

25   up tomorrow.  You can come back and it will all look like you

F7enosb7                         Deutsch - direct

1    left it.

2             You don't have to sit there.  You can actually go back

3    to your other seat if you are more comfortable.

4             THE COURT:  We will start at 9.  Joe is here usually,

5    in and out, getting everything set up and ready.

6             If you have things to raise beforehand -- actually, we

7    won't have a court reporter -- let Joe know and we'll take them

8    up first thing at 9.

9             Otherwise, we are going to get Mr. Deutsch back on the

10   stand and start right at 9 with the witness.  In the

11   alternative, we will deal with some housekeeping matters so

12   that we can be pretty smooth.

13            Are there any demonstratives that you folks plan on

14   giving to the defendants tonight?

15            MR. GOTTESDIENER:  They have all of them.

16            THE COURT:  They have everything.

17            Are there other objections, Mr. Rachal, that you think

18   you will have on the remaining demonstratives?

19            MR. RACHAL:  Yes, if they're all being used.  Some of

20   them haven't been used.  Some of them actually got explained

21   away.  Our objection was resolved by the explanation.

22            THE COURT:  Why don't you folks confer on them.

23   That's the way I normally would handle it, which is, whatever

24   the demonstratives are, that way we can head off at the pass.

25   If they are just relating to documents that Mr. Deutsch saw, we

F7enosb7                          Deutsch - direct

1    will just sort of pass by them.

2           If there's some group of them that you think contain

3    similar issues to those today, then you can just make one

4    statement for the record tomorrow to preserve your objection.

5           Then that would prevent us from having to start and

6    stop.  I want to make sure everybody gets their objections on

7    the record.  If there's something that's different than what we

8    have been dealing with, I do want to know about it so we can

9    address that specifically.

10          Let me just say that I wanted to put a little more

11   fully on the record why I am allowing Mr. Deutsch to testify as

12   to the documents.

13          He is clearly an expert in this area.  What I need is

14   the best view as to what the paper trail means.  That can

15   come -- obviously one always hopes to get firsthand knowledge

16   from the author of the document or participant in a meeting.

17   Here I think that, both because of just the passage of time and

18   perhaps memories that get a little worse over time just by

19   virtue of being human, that may not be possible.

20          And so the hoped for result isn't something that we

21   can actually expect here.  On many of the documents they are

22   either typewritten and look to be the type of documents that

23   are maintained in the ordinary course and/or with Kiley there's

24   been a representation that he will be saying that his

25   recordkeeping habit was to be a big note-taker and try to be --

F7enosb7                          Deutsch - direct

1   I think accurate I think is what Mr. Gottesdiener had said.

2            So that put together leads me to believe that the

3   words are not necessarily shorthanded so much that somebody

4   who's looking at familiar terms cannot interpret them.

5            In fact, let me put it more affirmatively.  The words

6   appear to be of the type that somebody within a particular area

7   of expertise would at least have a view as to their meaning.

8            That doesn't mean it's the right meaning.  That is why

9   I would certainly allow Mr. Sher -- Dr. Sher?  I don't know if

10  it is Dr. or Mr.  I was just reading about you again today the

11  *Amara* case.  I went back and read the 2014 opinion.

12           You can also testify to the same thing.  If you have a

13  different view or want to focus on different pieces and you

14  have reviewed these documents during the course of your

15  preparation in terms of the same standard we have been using

16  with Mr. Deutsch, then that would be also free game.

17           Then what I will do, as I said before, I will try to

18  determine based upon expertise of the witnesses whether the

19  language really does look like it's unclear, how in the world

20  could anybody interpret what this language means because nobody

21  really can know, and how sensible it all seems.

22           I'll draw some conclusions.  I don't know what

23  conclusions I will draw.  That's the basis as to why I am

24  allowing this witness to testify as to what certain documents

25  mean.

F7enosb7                         Deutsch – direct

1          Does anybody want to say anything else in that

2     respect, with respect to that point?

3          MR. RACHAL:  No, your Honor.

4          THE COURT:  Anything else anybody else wants to raise

5     before we break for the evening?

6          MR. RUMELD:  I wanted to discuss the schedule for

7     tomorrow.  It does sounds like we have a little more time with

8     Mr. Deutsch.  I think where I last left it with

9     Mr. Gottesdiener was to tell Mr. Kiley to expect to testify

10    Thursday, not tomorrow.

11         I just want to be a little careful here because I

12    don't know what he plans with respect to the other witnesses.

13    I have mentioned to Mr. Gottesdiener, I don't expect.

14         THE COURT:  After Mr. Deutsch you had said yesterday,

15    Mr. Gottesdiener, that it would be Mr. Osberg.

16         Is that still the plan?

17         MR. GOTTESDIENER:  It is still the plan, yes.

18         THE COURT:  Mr. Kiley is the individual coming from --

19    I forgot.  Was he Wisconsin or was he Princeton?

20         MR. RUMELD:  No.

21         MR. GOTTESDIENER:  He's local.

22         MR. RUMELD:  He's Staten Island.  I would prefer to

23    not make him come twice if we can avoid carrying over two days.

24         THE COURT:  Would he be the next witness after

25    Mr. Osberg?

F7enosb7                        Deutsch - direct

1              MR. GOTTESDIENER:  No, I don't think so.

2              I think we would have other witnesses on Wednesday.

3              THE COURT:  Who else?  Let's get the order for

4      tomorrow?

5              MR. GOTTESDIENER:  We are still checking with a number

6      of our witnesses because we have class member witnesses and

7      some of these former --

8              THE COURT:  Tell me who the possibilities are.

9              MR. GOTTESDIENER:  The possibilities are --

10             THE COURT:  In the order that you would hope to call

11     them.

12             MR. GOTTESDIENER:  Mr. Osberg, then Ms. Cardona, and I

13     believe then Ms. Welz, whose declaration the Court got the

14     other day.  And then --

15             MR. HUANG:  Russ Howard.

16             MR. GOTTESDIENER:  Russ Howard.

17             THE COURT:  Who's most likely in flux of those three?

18     Are they all in flux.  Are there some who are more likely to be

19     able to show up tomorrow.

20             MR. GOTTESDIENER:  We think that if we can't get one

21     of them, there are other people who would be able to substitute

22     we think.

23             THE COURT:  Who would be after Mr. Osberg?  I just

24     don't any mystery about it.

25             MR. GOTTESDIENER:  Ms. Cardona is absolutely.

F7enosb7                          Deutsch – direct

1           THE COURT:  After Mr. Osberg?

2           MR. GOTTESDIENER:  She came in from out of town and

3   she's here.

4           THE COURT:  OK.  Then after that.

5           MR. GOTTESDIENER:  Ms. Welz.

6           THE COURT:  And Mr. Howard?

7           MR. GOTTESDIENER:  And Mr. Howard.

8           THE COURT:  Who would be a possibility as a sub for

9   one of those two?

10          MR. GOTTESDIENER:  Mr. Campuzano, Ralph Campuzano.

11          THE COURT:  Those are the people who I and the defense

12  counsel can expect are the folks for cross-examination next?

13          MR. GOTTESDIENER:  Yes.

14          THE COURT:  OK.

15          In terms of Mr. Deutsch, how long approximately do you

16  have left, Mr. Gottesdiener, and then how long, Mr. Rachal, do

17  you think you are going to take?

18          MR. GOTTESDIENER:  I certainly have more.  I would

19  say -- if I could look at my notes.  It certainly would be more

20  than an hour.  I would hope not --

21          THE COURT:  Before lunch you think you might finish?

22          MR. GOTTESDIENER:  I would think so, your Honor, yes.

23          THE COURT:  So a couple of hours in the morning.

24          One or more hours in the morning -- is it Rachal or

25  Rachal?

F7enosb7                         Deutsch - direct

1          MR. RUMELD:  Rachal.

2          THE COURT:  I've got it wrong in both pronunciations

3   Mr. Rachal.

4          MR. RACHAL:  Two to three hours.  I think it's

5   probably going to be more like two, but it could go as long as

6   three.

7          THE COURT:  That is fine.

8          That suggests to me that we'll get to Mr. Osberg.  Is

9   he going to be a relatively short witness, a long witness,

10  medium witness?

11         MR. RUMELD:  Just so there's no misunderstanding,

12  these witnesses that Mr. Gottesdiener mentioned, your Honor

13  already received their direct testimony.

14         THE COURT:  Yes.

15         MR. RUMELD:  I have already advised Mr. Gottesdiener I

16  think a lot of these cross-examinations will go very quickly.

17  That's why we could go through several witnesses in a hurry.

18         THE COURT:  Let's just give a couple of scenarios.

19  Let me get a couple of sensitivity analyses.

20         If we get done with Deutsch -- let's just say that

21  Mr. Gottesdiener is done tomorrow at 11, we take a short break,

22  and let's say that you and Mr. Rachal -- I don't know why I

23  have these issues, whenever I ask for a pronunciation it only

24  gets worse -- that you will then, say you might go as long as

25  2:30 or 3, something like that, you can do whatever you are

F7enosb7                          Deutsch - direct

1  going to do.  I am trying to play out some scenarios so that

2  people can plan in terms of numbers of people who have to be

3  here.

4           Mr. Osberg goes on, you are cross-examining,

5  Mr. Rumeld, first and there will be any redirect.

6           Are these like 20-minute witnesses?

7           MR. RUMELD:  I will be surprised if they take much

8  longer than that.  They could take less.

9           THE COURT:  So we could get through three or four of

10  them tomorrow afternoon, and people will be prepared for that.

11           MR. RUMELD:  I am going to tell Mr. Kiley that he's

12  not due here until Thursday.

13           THE COURT:  You can fill up the day, Mr. Gottesdiener,

14  without Mr. Kiley.  Your folks, you can line them up and bring

15  them.

16           MR. GOTTESDIENER:  Sounds like it.  Certainly the

17  folks that I mentioned.

18           THE COURT:  Cardona, Wells, Howard, Campuzano.

19           You folks should communicate in the morning, because

20  you will have a better sense as to whether the plan is

21  changing.

22           Let's say you have no redirect or you have limited

23  redirect and that there is limited cross, because their story

24  is what that story is I assume is part of the issue.

25           MR. RUMELD:  Right.

F7enosb7                           Deutsch - direct

1           THE COURT:  20, 40, 60, we could be done with

2    Campuzano and have some time left in I think the most

3    optimistic scenario.

4           Mr. Rachal, right?

5           MR. RACHAL:  Yes.

6           THE COURT:  New Rochelle is how I'm remembering.

7           If he is done by 2:30 and that's the time frame, we

8    would be done with Campuzano?

9           MR. RUMELD:  Yes.  Like I said --

10          MR. GOTTESDIENER:  That raises if we are at 4:30 do

11   we --

12          THE COURT:  Remember I said yesterday at 4:30 we call

13   our next witness.

14          MR. GOTTESDIENER:  Right.

15          THE COURT:  So you guys communicate.

16          MR. GOTTESDIENER:  OK.

17          THE COURT:  At 4:30 we will call Mr. Kiley, we will

18   get him on the stand, and we'll start him.

19          MR. GOTTESDIENER:  OK.

20          THE COURT:  And if you want to negotiate something

21   else, you guys negotiate it.  But from my perspective, I would

22   like to call witnesses through the day.

23          If we are at 10 of 5, I am not going to make anybody

24   call.  You folks can communicate in terms of when the last bus

25   leaves Staten Island.

F7enosb7                              Deutsch – direct

1              MR. RUMELD:  Is there any reason why Mr. Gottesdiener

2     can't continue to put his witnesses on so I don't have to make

3     Mr. Kiley come in the afternoon?

4              THE COURT:  Why don't you guys talk about this.

5     Confer as to who else there might be.  It certainly sounds

6     reasonable, if he's got somebody who's local, that sounds like

7     it should happen.

8              I don't want to get down into the weeds on this, and I

9     don't want to have to order it unless I really need to.

10             OK.

11             MR. RUMELD:  Thank you, your Honor.

12             THE COURT:  All right.  Folks, I'll see you in the

13    morning.  Let Joe know if you've got things to raise so I know

14    what to prepare for.  Thanks.

15             (Adjourned to Wednesday, July 15, 2015 at 9:00 a.m.)

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                   Page

CLARK MAXAM

Direct By Mr. Gottesdiener . . . . . . . . . . .91

Cross By Mr. Rachal  . . . . . . . . . . . . .92

Recross By Mr. Gottesdiener  . . . . . . . . 106

LAWRENCE DEUTSCH

Cross By Mr. Gottesdiener  . . . . . . . . . 110