F7FJOSB1                         Deutsch – direct

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------x

3   GEOFFREY OSBERG,

4                    Plaintiff,

5            v.                                   07 Civ. 1358(KBF)

6   FOOT LOCKER, INC. et al.,

7                    Defendants.

8   ------------------------------------x
                                         New York, N.Y.
9                                        July 15, 2015
                                         9:00 a.m.
10
    Before:
11
                     HON. KATHERINE B. FORREST
12
                                         District Judge
13
                          APPEARANCES
14
    GOTTESDIENER LAW FIRM, PLLC
15       Attorneys for Plaintiff
    BY:  ELI GOTTESDIENER
16       STEVEN COHEN
         ALBERT HUANG
17
    PROSKAUER ROSE LLP
18       Attorneys for Defendants
    BY:  MYRON D. RUMELD
19       ROBERT RACHAL
         JOSEPH E. CLARK
20

21  ALSO PRESENT:
    Jon Int-Hout, Trial Technology Specialist
22  Randall Carter, Trial Technology Consultant

23

24

25

F7FJOSB1                          Deutsch – direct

1            (Trial resumes)

2            (In open court)

3            THE COURT:  Please be seated.  I am sorry about the

4    delay.  I don't like to be late, but I was on a call at 8:30

5    that I couldn't get off of as quickly as I wanted to.

6            I understand that there are a couple of things that

7    people wanted to deal with.  I did get a letter from Proskauer

8    related to the declarations and certain objections that they

9    have, a lot of which are in the nature of what I would call the

10   witnesses opining on the state of mind of others and/or

11   speculating about company motivation and things of that nature.

12           I think the objections are generally well taken.  What

13   I would like to do is to have the plaintiffs respond if they

14   feel it is necessary.  I think it is likely that if you folks

15   look at it, it doesn't actually change the heart of what these

16   folks are saying if these portions are struck, but why don't

17   you folks, why doesn't the plaintiff sort of write me a letter

18   either saying we are going to stand down on the objections as

19   to Campuzano or whatever or we want to take issue and here is

20   our justification for the following.

21           That make sense?

22           MR. GOTTESDIENER:  Yes, your Honor.

23           THE COURT:  So essentially what that is saying is that

24   subject to the court's consideration of any response from the

25   plaintiffs, I would deem the objections to be well taken, but

F7FJOSB1                          Deutsch - direct

```
 1   that is not a formal ruling until I hear from the plaintiffs,

 2   okay?  So that was that.  I know that was one open issue.

 3          What else is open that we should deal with before

 4   Mr. Deutsch goes back on the stand?

 5          MR. RACHAL:  I think we whittled down to we have

 6   objections to one demonstrative.

 7          THE COURT:  Do you want to hand it up?  I don't have

 8   copies of what has not yet been shown.

 9          MR. RACHAL:  Thank your Honor.

10          MR. GOTTESDIENER:  It is 1504?

11          MR. RACHAL:  Yes, 1504.

12          THE COURT:  All right.  The court has been handed

13   something that is marked at the top as PX 1504 which states

14   1996 present value, already earned benefit based on employees'

15   age and it has got a couple of pages.  It is actually a

16   three-page document, yes, three numbered pages with different

17   titles at the top.

18          What this nature of the objection, Mr. Rachal?

19          MR. RACHAL:  We shared some information last night and

20   we'll talk a little bit this morning.  What we understand we

21   wanted to represent is the value of the benefit accrued under

22   the prior plan formula.

23          Our objection is basically an F.R.E. 403 objection

24   that it is inaccurate, misleading because the early retirement

25   subsidy, that bump-up you see on that blue line, can you see
```

F7FJOSB1                        Deutsch - direct

1    how it bumps up, bumps up at age 50.  Under the prior plan

2    formula it doesn't increase until age 55.  That is when you're

3    entitled to retirement subsidy.  It is slightly misleading and

4    looks like you are entitled to more benefits under the prior

5    plan than you actually are.  It is not a disputed plan under

6    the retirement plan, the early retirement subsidy, you don't

7    get that benefit until age 55.  That is the nature of my

8    objection.

9            THE COURT:  What relief do you want?  Do you want to

10   preclude all three pages?  Do you want the court to be aware of

11   that?  Do you want to save it for cross-examination?  Tell me

12   what you want so I can best direct my rulings.

13           MR. RACHAL:  Our request would be either to strike it

14   or just have it adjusted, bumped-over five years with the bump

15   up because we believe it.  We don't dispute the slide other

16   than that issue.  With that, we are fine with the slide.  If

17   they're not going to make that correction, I ask it be

18   precluded.

19           THE COURT:  That is the same point for each of the

20   three pages?

21           MR. RACHAL:  Correct, your Honor.  It carries through

22   on all three pages.

23           THE COURT:  All right.  Mr. Gottesdiener, what is the

24   plaintiff's view as to that application?

25           MR. GOTTESDIENER:  Well, counsel talks about what is

F7FJOSB1                      Deutsch - direct

1    not a disputed fact.  What is not a disputed fact is --

2             THE COURT:  Would you mind speaking into the

3    microphone.

4             (Pause)

5             MR. GOTTESDIENER:  Counsel said what is not a disputed

6    fact or he omits that it is also not a disputed fact is that a

7    participant who has 15 years of service shown on, looking at

8    the first slide, at age 50, where Mr. Deutsch has the bump go

9    up, that person has the right to age-into the early retirement

10   subsidy.  If you're age 50, 15 years of service, which

11   corresponds to the enhancement, you can just do nothing but

12   age.

13            THE COURT:  Your point is that under all of the facts

14   in the record or that will be in the record, some of which are

15   already in the record, this is not, in fact, inaccurate.  You

16   oppose the application?

17            MR. GOTTESDIENER:  Correct.

18            THE COURT:  Mr. Rachal, here is what I will do, which

19   is I have now heard the points, which makes me cautious, and so

20   I will approach these slides with caution and have Mr. Deutsch

21   explain them and have Mr. Sher explain his view, but I think it

22   has been helpful me to put them in context.

23            I am not going to preclude them at this time, although

24   ultimately the evidence on what criteria are required for early

25   retirement, when they become applicable, what rights are earned

F7FJOSB1                    Deutsch - direct

1   and when they're earned, that will be from facts established

2   through the factual record and the opinions of the experts will

3   be upon their view of those facts, but ultimately you'll point

4   me to the facts themselves so I can have something solid to

5   hold onto.  That all makes sense?

6           MR. RACHAL:  It does, your Honor.  Thank you.

7           THE COURT:  Terrific.  That is the resolution of that.

8           Is there anything else we should do right now before

9   we start with Mr. Deutsch back on the stand?

10          Mr. Deutsch, would you please come on back on to the

11  stand, sir.  You remain under oath from yesterday.

12          I should also note I have received an updated color

13  transcript of Kanowicz.  Let me just ask, does this include

14  everybody's designations or is this just the plaintiff's

15  designations?

16          MR. HUANG:  I believe this is ours and their cross.

17          THE COURT:  Fine.  And their cross-designations are

18  contained in their piece?

19          MR. HUANG:  No.  This would be our designations and

20  their cross-designations to our designations.  Their

21  designations and our cross of theirs are --

22          THE COURT:  All right.  All right.  I understand.

23  LAWRENCE DEUTSCH, resumes

24  DIRECT EXAMINATION (Continued)

25  BY MR. GOTTESDIENER:

F7FJOSB1                    Deutsch – direct

1   Q.  Mr. Deutsch, do you have in front of you your reports?

2   A.  Yes.

3   Q.  Yesterday when we left off, you were going through the

4   history that led to the adoption of a formula used --

5          THE COURT:  Could I ask you speak into the mike.  I am

6   sorry.  Maybe I have clogged ears this morning.  Your voice

7   sounds not quite as loud as it usually does.

8          (Pause)

9   BY MR. GOTTESDIENER:

10  Q.  Yesterday we went through the history showing, the history

11  showings what information Foot Locker had about the effect of

12  these formulas on participants' benefits if those formulas were

13  adopted in wear-away.

14          If you would turn to Page 34 of your opening report,

15  on Page 34 you see that you have a chart.  Would you explain

16  what that chart is.

17  A.  Yes.  This shows the breakdown to the extent available from

18  the data of the individual people who terminated by year, and

19  I've broken it into two groups; those whose lump sums were

20  equal to the value of the 12-31-95 benefit and those whose lump

21  sums was in excess of the value of the 12-31-95 benefit.

22          Then next to it it shows for the people who received a

23  lump sum equal to the present value of the 12-31-95 benefit,

24  the value of the pay credits that they received with interest

25  at 6 percent basically to the date of the report, and then next

F7FJOSB1                    Deutsch - direct

1    to that it shows the value of the pay credits with interest for

2    the people who received the higher amounts, received an amount

3    that was in excess of their account balance, but the portion of

4    the pay credit that was not articulated this morning, it is the

5    only, it is the portion of the pay credit that was necessary to

6    get them up to the point of the value of the 12-31-95 accrued

7    benefit.

8              So if you view it that the pay credit was the amount

9    to get them out of wear-away and the amount they received after

10   wear-away, it excludes the amount after wear-away and is only

11   the portion to get them out of wear-away.

12             For the purposes of both columns, the enhancement is

13   treated the same way as a pay credit, I believe I noted that on

14   the page, and then the last column is the sum of those prior

15   two columns.

16   Q.  For context, prior to us breaking yesterday and getting

17   into the history, we went through your analysis of what an

18   actuary would have anticipated the effect of the wear-away

19   would have been.  Here you're showing the effect in real life

20   as it played out?

21   A.  Yes.

22   Q.  Remember yesterday we showed PX-9, the Mercer letter that

23   went to Foot Locker when they were trying to explore whether

24   there was a way to get additional savings, and Ms. Peck

25   received that letter that showed they hadn't anticipated at

F7FJOSB1                        Deutsch - direct

1   that point in time.  They said there was going to be wear-away

2   for another three to four years, and that is in September of

3   '96?

4               THE COURT:  PX-9?

5               MR. GOTTESDIENER:  Yes, ma'am.

6   A.  Yes.

7   BY MR. GOTTESDIENER:

8   Q.  So if we then flip back to your report, that page of your

9   report, Page 34, and look at the first row, what percentage at

10  this point in time, '96, what percentage of people taking lump

11  sums were still in wear-away?

12  A.  Well, out of 2936 people, 2812 were still in wear-away, and

13  doing the math roughly in my head, 124 is a little less than

14  half a percent were not in wear-away, so it is something like

15  99.5 percent were in wear-away.

16  Q.  99.5 percent of the people at that point in time were still

17  in wear-away and they had a projection of years more of

18  wear-away, and this is before the SPD came out in December of

19  '96, yes?

20  A.  For the bulk of people.  There would be a small slice of

21  people terminated in December that would have been after the

22  SPD, but that would be my estimation.

23  Q.  Thank you.  If we could turn now to PX 2, please.

24               By way of background, you did in your reports opine

25  fairly extensively on your view as an actuary as to the

F7FJOSB1                           Deutsch - direct

1    accuracy or not of plan communications?

2    A.   That is my recollection, yes.

3    Q.   Now, this is the letter to participants announcing the

4    change.   In particular, directing your attention to where it

5    says on the 5th paragraph, the other part -- I want to read

6    something and ask you your view whether it is accurate,

7    inaccurate or something else.

8           These changes will provide participants with more

9    flexibility and a better ability to monitor their benefits.

10   Each plan participant will have an individual account, to which

11   the company will make a yearly contribution.

12          Then there is several sentences describing the

13   accounts and how they grew up.   Would you give us your view as

14   to the accuracy or not of those statements?

15   A.   Yes, in my opinion, those statements are inaccurate.

16   Q.   Please explain why.

17   A.   If we start with the second sentence because it is a little

18   easier to deal with that, each participant will have an

19   individual account to which the company will make a yearly

20   contribution, that is not really their benefit.

21          The implication here is the benefit's going to be this

22   account because as long as you're in wear-away, your benefit is

23   unrelated to the account till the account overtakes the value

24   of the prior accrued benefit.   So it implies that the company

25   is contributing to your benefit when it is not.

F7FJOSB1                          Deutsch - direct

1            If we then go back to the first sentence, and it says

2      will provide participants more flexibility, I am not quite sure

3      what that will mean in this context, and a better ability to

4      monitor your benefits.  Well, the accounts are unrelated to

5      their benefits, so they don't allow them to monitor their

6      benefits because they don't tell them what their benefit is.

7      Q.  Let's now take a look at PX 4, the highlights memorandum

8      from November of 1995.

9            Now, this document starts off November 17, highlights

10     of the Woolworth plan as previously announced by Roger Farah

11     and Dale Hippert in their September 15, 1995 letter, Woolworth

12     Corporation will be making changes to the retirement plan as of

13     1-1-96.

14           I'd like to direct your attention to what it says

15     next.  Currently your benefit under the plan is expressed as an

16     annual annuity payable at your normal retirement date.

17     Effective January 1, 1996, your benefit will be expressed as an

18     account balance.  At termination of the employment, you will

19     have the option of taking a lump-sum payment equal to your

20     account balance.

21           Would you give us your view as to the accuracy or not

22     of those statements?

23     A.  Okay.  In my opinion, those statements are incorrect.

24           Starting with the last one again, at termination of

25     employment, provided you are vested, you will have the option

F7FJOSB1                        Deutsch - direct

1    of taking a lump-sum payment equal to your account balance.  I

2    emphasize the word "equal" because the lump-sum payments were

3    not equal to the account balance for people in wear-away.  They

4    were consistently more because otherwise they would have been

5    out of wear-away, and in some instances significantly more.

6           And so that statement that they're equal is wrong and

7    indicates your benefit is your account balance when your

8    benefit is not your account balance.

9           If you go to the prior sentence it says your benefit

10   will be expressed as an account.  Well, the account did not

11   express the benefit because the benefit was the 12-31-95

12   accrued benefit for anybody who was in wear-away and the

13   account didn't express that benefit, it expressed a lower

14   benefit for anybody who was still in wear-away.

15   Q.  Now, if you would look at the statements in the next

16   paragraph under the amended plan, given what you said about the

17   prior paragraph's representation, when it says under the

18   amended plan, your account balance will increase in two ways.

19          Do you agree that that is accurate or inaccurate?

20   A.  That would be inaccurate, in that if it is based on the

21   premise that your benefit is your account; and, therefore, by

22   extension, your benefit is increasing in two ways when, in

23   fact, your benefit is not changing when you're in wear-away.

24   Q.  And the next paragraph says a statement showing your

25   estimated benefits under the amended plan will be mailed to you

F7FJOSB1                      Deutsch - direct

1    during December 1995.  I will ask you about that document in a

2    moment.

3         After that it highlights of the amended plan are as

4    follows.  If I could direct your attention to the -- if you go

5    to the second page, and where it shows benefit payment options.

6    Actually, if you go to the top of the page, benefit formula on

7    the prior page, it says these are highlight of the amended

8    plan.  It doesn't say highlights of the new formula.

9    A.  Yes.

10   Q.  In your view, when it says "benefit formula," is that

11   accurate or inaccurate?

12        MR. RACHAL:  Your Honor, I will have to lodge an

13   objection.

14        THE COURT:  Give me the word.  Leading?

15        MR. RACHAL:  No.  Actually, it is not the leading

16   aspect of it.  It is the beyond the competence, F.R.E. 702,

17   beyond competence, not actual expertise.  The same as we had

18   with Mr. --

19        THE COURT:  Okay.  I'll take it for the weight.

20        If it turns out what he is doing is he is saying

21   something and he doesn't understand the factual basis and he

22   has it wrong, presumably you'll go back on that on cross if he

23   has just got it wrong.

24        He is certainly competent as an expert to speak

25   generally about benefit formulas.  Whether he has this

F7FJOSB1                        Deutsch - direct

1   particular formula right or wrong or this particular version

2   right or wrong will be a separate issue.

3           MR. RACHAL:  Yes.  I am not questioning the competence

4   to testify about benefits, but speaking the meaning of the

5   document.

6           THE COURT:  All right.  That is certainly he is not a

7   representative of the client and everything he is saying is

8   only as an expert, only opinion testimony based upon his

9   expertise.  So his meaning is simply his interpretation, and

10  that's the way the way in which the court will take it.

11          MR. RACHAL:  With that caveat, I don't have an

12  objection.

13          THE COURT:  You may proceed, sir.

14          MR. GOTTESDIENER:  Thank you.  Maybe it would also be

15  helpful to frame the question more directly, and I apologize

16  and I should have done that.

17  BY MR. GOTTESDIENER:

18  Q.  Do you see how it shows benefit formula at the top of the

19  page and underneath it shows pay credits, interest credits,

20  years of credited service, other aspects before it says benefit

21  payment options?  Do you see that?

22  A.  Yes.

23  Q.  Is that the benefit formula, as an actuary reading the plan

24  document, is that the benefit formula under the amended plan?

25  A.  No.  The benefit formula under the amended plan is the

F7FJOSB1                          Deutsch - direct

1   greater of the account balance through this result or the

2   protected accrued benefit.

3   Q.   Thank you.   If you now go down to benefit payment options,

4   I'll see at the bottom of 2, and then at the top of 3, it

5   divides into when your employment terminates prior to early

6   retirement date, age 55, and on Page 3, employment terminates

7   on or after early retirement date, age 55.

8              Do you see that?

9   A.   Yes.

10  Q.   Benefit payment options?

11  A.   Yes.

12  Q.   Do you see where it discusses when it says under both, one

13  of the benefit payment options which they list first is

14  lump-sum payment of your account balance with no reduction for

15  early retirement?

16  A.   Yes, I see that.

17             MR. RACHAL:   Maybe Mr. Gottesdiener didn't mean to

18  lead, but he misstated the document.   It is early payment.

19             THE COURT:   That's right.   That particular one is

20  early payment.   The prior sentence has early retirement as a

21  phrase.   Why don't you reread that, the bullet you're look to

22  go have Mr. Deutsch opine as to.

23             MR. GOTTESDIENER:   Thank your Honor.   Let's take them

24  in order.

25  BY MR. GOTTESDIENER:

F7FJOSB1                        Deutsch - direct

1    Q.  Lump-sum payment, the first one, lump-sum payment of your

2    account balance with no reduction for early payment.  Would you

3    tell me if that is accurate or inaccurate?

4    A.  That is not accurate.

5    Q.  Would you explain why.

6    A.  Because the payment would not be the account balance.  The

7    lump-sum payment would be for anybody who is still in

8    wear-away, the 417 (e) value of the 12-31-95 accrued benefit,

9    so it misstates what the lum sum benefit is.

10   Q.  The statement, you're saying the first part, lump-sum

11   payment of your account balance is wrong?

12   A.  Yes.

13   Q.  It then continues in his wrong statement to say with no

14   reduction for early payment.  What is an actuary, what sense do

15   you make, if any, of --

16          THE COURT:  Put it differently.  So that I am not sure

17   what sense is.  What, in your view, Mr. Deutsch, does the

18   phrase no reduction for early payment mean?

19          THE WITNESS:  Well, generally speaking, in a plan no

20   reduction for early payment would mean you receive the same

21   payment as if you delayed the payment till, for example, age

22   65.  So that means there is no reduction in the payment for the

23   fact the payment precedes normal retirement age, in this case

24   age 65.

25          THE COURT:  How does that understanding of that phrase

1  correspond to your understanding of how the retirement benefits

2  actually worked under the amended plan?

3          THE WITNESS:  Well, with regard to people who are in

4  the --

5  BY MR. GOTTESDIENER:

6  Q.  Wear-away?

7  A.  I am sorry.  People who are in wear-away, their benefit was

8  reduced for payment prior to normal retirement age based on the

9  417 (e) discounts.

10         In some plans, some plans provide what is called a

11  fully subsidized early retirement benefit, where there is no

12  reduction, particularly annuity form for early payment.  Here

13  there is a reduction for early payment.

14  Q.  Let's try it a different way.

15         If there is a lump-sum payment of an account balance,

16  somebody who at that point in time was not in wear-away, can

17  you explain the sense of the additional comment with no

18  reduction for early payment?

19  A.  Well, the parallel would be that if you, if you were not in

20  wear-away, the early payment would have to be a payment prior

21  to normal retirement age, so you would calculate the benefit at

22  normal retirement age, which would be the account projected to

23  age 65.

24         Then they're saying but not reduced for the fact

25  you're receiving it prior to age 65 which would mean you would

F7FJOSB1                          Deutsch - direct

1   be getting the age 65 account balance, not the current age

2   account balance, because otherwise this expression no reduction

3   for early payment is extraneous, it doesn't apply to anything.

4   Q.  So if you could pull together your helpful statements into

5   a conclusion that we can understand, if somebody is actually

6   receiving their account balance as their lump sum, the rest of

7   that sentence, does it -- is it accurate?  Does it fit?

8   A.  No, it doesn't, it doesn't make any sense.

9        The statement, the way the plan is written and the way

10  the plan was administered subject to a 417 (e) minimum

11  requirement, the lump-sum payment was the account balance.  It

12  wasn't the account balance not reduced.  It was simply the

13  account balance.

14  Q.  What you're saying, the first part of the sentence --

15       THE COURT:  Let's not repeat or have you characterize

16  it.  I got what he is saying.

17       MR. GOTTESDIENER:  Thank you.

18  BY MR. GOTTESDIENER:

19  Q.  So the next bullet point that talks about lump-sum payment

20  after early retirement date, lump-sum payment of your account

21  balance with no reduction for early retirement, can you tell us

22  if that under the amended plan is accurate or inaccurate?

23  A.  That's inaccurate for the very same reasons stated, the

24  benefit is not the account balance.  If the person is in

25  wear-away, there is a reduction.  The concept of no reduction

F7FJOSB1                          Deutsch - direct

1    for early payment is a non-sequitur.  When somebody is in

2    wear-away, there is a reduction for early payment.

3    Q.  If you would go, please, to the first page of the

4    highlights memo, at the very bottom, when it states highlights

5    of the amended plan are as follows, there is a paragraph on

6    eligibility, and then there is an entry that says initial

7    account balance.  Your accrued benefit as of December 31, 1995

8    is actuarially converted to an initial account balance.

9           Can you tell us, based on your knowledge of what the

10   amended plan actually provides, whether this is inaccurate or

11   accurate statement?

12   A.  It is inaccurate.  As we discussed yesterday, by saying the

13   initial account balance, the accrued benefit is actuarially

14   converted means the benefit that would derive from the account

15   balance would be the same benefit that would derive from the

16   12-31-95 accrued benefit, and that is not true.

17          We went through yesterday it is significantly

18   understated the benefit from the account balance, significantly

19   understated the benefit it was derived from.  It was not

20   actuarially converted benefit.

21   Q.  If we could look at PX 6, the 1-1-96 statement that the

22   highlights memo told people they would be receiving, the next

23   page, please, this is an example with a participant named Lori

24   Lebrew, and you see on the left-hand side it shows current

25   plan?

F7FJOSB1                              Deutsch - direct

1   A.   Yes.

2   Q.   And then on the right-hand side it shows the amended plan

3   as of January 1, 1996?

4   A.   Yes.

5   Q.   On the right-hand side it quotes -- we'll first talk about

6   the left-hand side.   The current plan, it shows at that point

7   in time it didn't have final compensation for 1995.   You see it

8   shows what your estimated addition to your accrued benefit was

9   in the fourth line?

10  A.   Yes.

11  Q.   And then they total up, so Ms. Lebrew here has an accrued

12  benefit still estimated for the last year of just over

13  $10,000.00?

14  A.   Yes.

15  Q.   So now we go to the right and that is what she would have

16  as of 12-31-95.   The right, where it says amended plan as of

17  January 1, 1996, first of all, is the representation --

18  withdrawn.

19        You see then it says your estimated account balance as

20  of January 1, 1996 for her was $9,000.   Do you see that?

21  A.   Yes.

22  Q.   Under the amended plan, was that her only benefit, the

23  account balance benefit?

24  A.   No.   It had to be the greater of the benefit derived from

25  this $9,000 or that estimate on the other half was correct, but

F7FJOSB1                          Deutsch - direct

1   not less than the benefit derived from that $10,000.00.

2   Q.  Then the statement underneath it, the showing of the

3   opening account balance, do you see it says the amount shown

4   above is what you could expect to receive upon termination of

5   employment or retirement if you accrue no further benefits and

6   elect a lump sum form of payment?

7   A.  Yes.

8   Q.  What did you find as to all participants, 16,000 people as

9   of 1-1-96, the lump sum they would have received, would that

10  have equaled the account balance?

11  A.  No, it would not have.  Well, except for the little slice

12  of people who had an enhancement around age 55.

13  Q.  That little slice of people you're talking about out of

14  16,000 people was how many people?

15  A.  I believe it is less than 1 percent.  I don't remember off

16  the top of my head.

17  Q.  Other than less than 1 percent of the people, your view as

18  to this statement is that it is accurate or inaccurate?

19  A.  It is inaccurate.  If this person had terminated on January

20  1, 1996 and asked for a lump sum benefit, they would have

21  received the benefit that was sizably more than this 9000.

22          Yesterday we saw a chart.  You remember it started at

23  20 percent and went up to 80 percent, and depending on this

24  person's age, that is what percent this number would represent

25  of the number they actually received.

F7FJOSB1                              Deutsch – direct

1          If this person were 65, which is for these purposes

2     the best-case scenario for the plan, they still would have

3     received 20 percent more.  If this person were 30, they would

4     have received over double this amount.

5          MR. GOTTESDIENER:  If we can get up PX 5.  The court's

6     indulgence.

7          (Pause)

8     BY MR. GOTTESDIENER:

9     Q.  Can we get up 1531.  If you look at this screen, 1531

10    corresponds to the printout with the handwritten calculations

11    of Ellen Glickfield of Ms. Lebrew's benefit.

12         MR. GOTTESDIENER:  Is there a way to do the split

13    screen, Randall, and show it?

14         THE COURT:  Do I have 1531?  Do you want me to have

15    1531?  I think my binder ends at 1352.

16         MR. HUANG:  I believe it should be in there, your

17    Honor.  We have it under another cover.

18         THE COURT:  You added it, but not the cover?

19         MR. HUANG:  Yes.

20         THE COURT:  That is fine.

21         MR. GOTTESDIENER:  Do a split screen with the prior.

22         If you could on the left-hand side show her accrued

23    benefit on the current plan, on the left-hand side, yes.

24         With the court's indulgence.

25         (Pause)

F7FJOSB1                         Deutsch - direct

1    BY MR. GOTTESDIENER:

2    Q.   Just linking up these two, you see how on the left-hand

3    side it has the total estimated amount of $10,473.61?

4    A.   Yes.

5    Q.   And on the right-hand side do you see, with my finger

6    pointing, accrued benefit 10,500?

7    A.   Yes, between the two lines.

8    Q.   Between the two lines?

9    A.   Right above the second line, right there.

10   Q.   Right to the left?

11   A.   Yes.

12   Q.   10,000, yes?

13   A.   Yes, I see that.

14   Q.   Now, would it be correct that to the left, the handwriting,

15   yes, if you could highlight all of that -- now, is this

16   showing --

17          THE COURT:  You can't testify, Mr. Gottesdiener, if

18   you know what I mean?  I am trying to go with it a little bit.

19   It will be unusable for you in any sense of a record.

20          What does this mean?

21   BY MR. GOTTESDIENER:

22   Q.   Could you explain what these calculations are showing.

23   A.   Okay.  It would appear that on the part that is

24   yellowed-out at the moment, that is the reproduction of the

25   calculation of the initial account balance based on the

F7FJOSB1                        Deutsch - direct

1   corrected accrued benefit.

2          So if on the left-hand side you switch to the right

3   side of that page, it is the left side of the page, the

4   document on the left, switch to the other half of the page, and

5   you see the estimate was 9059 on a slightly lower accrued

6   benefit, they're updating that to 9121.  You see it says

7   9,129.15 and in little letters CB for cash balance, that is the

8   initial cash balance account on 1-1-96.

9          Now, if we go up to the top where it says accrued

10  benefit, two lines, three lines above that it says term date

11  there, so a moment ago I said if she terminated on January 1,

12  1996.  Well, she actually terminated on January 4th 1996, she

13  terminated three days after the amendment, so there is no time

14  for pay credits or anything else to occur.

15         Then on the right right-hand side where it starts 2-96

16  in the handwriting, and down towards circled 22,000, so this

17  takes the same 10,561.74, multiplies it times the 417 (e)

18  factor of 2.14856, and concludes that the amount she is

19  entitled to is a lump sum is $22,692.53, and you see it says

20  MLS, minimum lump sum, so this is the calculation that she is

21  entitled to a lump sum of 22,000 compared to an initial account

22  balance of $9,129.  So it is well over, double, closing in on

23  two and a half, I can't do the math in my head, and I imagine

24  her age is on here because that would be relevant.  The date of

25  birth is blocked out.  We don't know, we can't tell from this

1    what her age is, but I am guessing she is probably in the 30's.

2              THE COURT:  How can you tell?

3         I take it that you're of the view that PX 1531

4    corresponds with the individual who is referenced in the

5    document we were just looking at.  Let me make sure.  I want

6    the record to be clear that we've got these various pieces.

7         What is on the left, remind me, it is No. 6, PX 6?

8              THE WITNESS:  Yes.

9              THE COURT:  At page FLPL 2842, how are you making that

10   connection?

11             THE WITNESS:  Because Mr. Gottesdiener represented

12   that these were for the same person.

13             THE COURT:  Is there anything in the record that

14   establishes for the court that this is the same person?

15        I see there could be ways in which the social security

16   number is masked.  If it wasn't masked, we could perhaps

17   compare it.  Is there a concession or an agreement from counsel

18   that it is?  I am not trying to be tough about this, but I want

19   to make sure we've got things nailed down.

20             Mr. Rachal?

21             MR. RACHAL:  I think what we could get with

22   plaintiff's counsel and confirm this, the documents were

23   originally masked to protect identities and whatnot.  The

24   participant ID, that is why you see that term used.  Once the

25   class was certified, it was unmasked, and that information was

F7FJOSB1                        Deutsch - direct

1    given to plaintiff's counsel to convert to participant ID and

2    actual participants.

3                THE COURT:  There is a way of doing it?

4                MR. RACHAL:  There is a way to do it.  I am not close

5    enough to do it now.

6                THE COURT:  Mr. Gottesdiener, why don't you folks just

7    make that connection, if you can, and you don't have to do it

8    this moment.  You can just do it at some point soon so that we

9    have that established.

10               You may proceed, sir, otherwise.

11               THE WITNESS:  If I could assist here for one moment.

12               THE COURT:  Yes.

13               THE WITNESS:  We do know because we can divide the

14   initial account balance by the accrued benefit and figure out

15   what the conversion factor is the person on the left and the

16   person on the right are somebody of the same age and roughly

17   the same accrued benefit, so we could conclude, even if it

18   wasn't the same person, that the person on the right would have

19   received a statement that was pretty darn close to the one that

20   is on the left.

21               THE COURT:  All right.  That may be a way of doing it

22   in the alternative.  I want to do something that nails it down.

23   We don't have to spend a lot of time on this.  We need to do

24   something.

25               MR. GOTTESDIENER:  We'll find, we think they actually

F7FJOSB1                        Deutsch - direct

1    have a DX that shows all of this information.

2              THE COURT:  Fine.

3    BY MR. GOTTESDIENER:

4    Q.  Now, we assume, subject to linking it up, this is the same

5    person.  First let me ask you do you see on the two hand

6    calculations where it has using the accrued benefit of

7    $10,000.00 and it is multiplied by a number, two different

8    numbers, one on the left and one on the right?

9    A.  Yes.

10   Q.  That number, what is the, at a high level of generality,

11   what do actuaries call the number that you multiply the accrued

12   benefit by?

13   A.  It goes by a couple of names but, generally speaking,

14   present value factor.

15   Q.  A factor?

16   A.  Yes.

17   Q.  What is a factor?

18             THE COURT:  I know what a factor is.

19   BY MR. GOTTESDIENER:

20   Q.  So you see on the left there is one factor and then on the

21   right there is a different factor?

22   A.  Yes.

23   Q.  So if we see the lump sum that the person would have

24   received had they taken their benefit on 1-1 or 1-4-96 as

25   $22,000, and then we just focus on the left document, the

F7FJOSB1                         Deutsch - direct

1    statement that she received and show on the right the amended
2    plan on the right-hand side, not left, right-hand side, yes, so
3    underneath the representation of the amount of the account
4    balance, the comparison is the 9000 to the 22, your opinion of
5    the statement that that is the amount you would have received
6    is what?
7    A.   It is wrong because I mean at the heart of the matter the
8    9000 is the $10,000.00 accrued benefit discounted at 9 percent,
9    but she is actually entitled to a lump sum based on the
10   $10,000.00, discounted at the 417 (e) rate, which at that point
11   was 6.06 percent.
12        So that is what is causing this 9 percent.  The 6.06
13   percent is what is causing this large disparity.
14   Q.   So if we could now go to PX 5.
15        This is the summary plan description showing Page 1.
16   If we could go to Page 11, please -- actually, why don't we
17   just take half a moment so we're oriented.  Going back to Page
18   1, that was the cover, Page 1 shows an introduction.  Then the
19   next page has a table of contents.  Then the next page, this
20   has a highlight section that goes on for --
21        THE COURT:  The document is in the record.  You don't
22   need to do all of this.
23        MR. GOTTESDIENER:  I was actually trying to make it
24   contextural so there was no suggestion I was --
25        THE COURT:  Leap in.  Leap in.

F7FJOSB1                              Deutsch – direct

1           MR. GOTTESDIENER:  Page 11.

2           MR. RACHAL:  This is the SPD.  We had this early in

3     the case.  The meaning of SPD is for the court.

4           THE COURT:  It is absolutely for the court.  I would

5     never say in a decision, I can assure everyone, I find the

6     statement to be accurate or inaccurate because so and so says

7     so, right?

8           I'll find it to be accurate or inaccurate based upon

9     my assessment and weighing of all of the evidence.  He will

10    probably do all of the same thing right now in terms of his

11    view of accuracy.  I take it as his actuarial review, his

12    review as an expert how he understands the language of the SPD

13    versus how he understands the plan and the facts actually

14    worked.

15          Whether or not that is the same way I view it, TBD,

16    okay?  You may proceed.

17          THE WITNESS:  I have a question.  Can I ask him to

18    give me a copy?

19          THE COURT:  You should have a copy.

20          THE WITNESS:  It is a lot easier to deal with it with

21    a copy in your hand.

22          THE COURT:  Understood.

23          (Pause)

24          MR. GOTTESDIENER:  May I approach?

25          THE COURT:  You may.

F7FJOSB1                         Deutsch - direct

1             THE WITNESS:  Thank you.

2   BY MR. GOTTESDIENER:

3   Q.  Turning to Page 11, please, at the bottom it starts how

4   your retirement benefit is determined.

5   A.  Yes.

6   Q.  Your plan benefit is based on the account balance you

7   accrue, or earn, while a participant?

8   A.  Yes.

9   Q.  In your view, is that an accurate statement?

10  A.  No, it is not an accurate statement.  Anybody who was still

11  in wear-away, it is unrelated to their account balance.

12  A.  I am sorry.  Unrelated to the concept of earned doesn't

13  apply here because if they're still in wear-away, they're not

14  earning anything.  You're not earning anything while a

15  participant if you're in wear-away, and the account balance is

16  moot, it is unrelated to the benefit.

17  Q.  It continues, that account balance is made up of the first

18  bullet point of three bullet points, your initial account

19  balance which is the value of your plan benefit as of December

20  31, 1995, before the plan was amended.  Is that accurate or

21  inaccurate?

22  A.  In my opinion, that is inaccurate for reasons we have

23  covered several times.  The account balance is not the value of

24  the December 31, '95 benefit because it does not reproduce the

25  benefit that it claims to be the equivalent to.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F7FJOSB1                          Deutsch - direct

1          MR. GOTTESDIENER:  The court's indulgence.

2          THE COURT:  All right.

3          (Pause)

4    BY MR. GOTTESDIENER:

5    Q.  On Page 4, please, the summary box, this is under

6    highlights in how your benefit is determined.  This is a

7    summary on Page 4.  Your view of that, please, how your benefit

8    is determined?

9    A.  Well, again this is not how your benefit is determined if

10   you're still in wear-away.  Your benefit is based on your

11   12-31-95 accrued benefit and not based on the account.

12          So it is saying it has credited 6 percent annually.

13   It is not changing.  Compensation is arrived at.  There are no

14   compensation credits.  There are no credits at all.  The

15   benefit is static as long as you're in wear-away.

16   Q.  Page 14, please.  Could you tell us what Page 14 is showing

17   under, starting at the top we're still in how your retirement

18   benefit is determined, the amount of your retirement benefit,

19   can you tell me what this is showing?

20   A.  Well, this page doesn't show how your retirement benefit is

21   determined.  It shows how your account is determined.  It shows

22   for this individual your initial account balance growing each

23   year with interest credits and pay credits, but it doesn't show

24   how that would interact with the 12-31-95 accrued benefit for

25   anybody in wear-away.  This is unrelated to anything that is

F7FJOSB1                          Deutsch - direct

1     shown on this page.

2     Q.  Did you actually do a detailed analysis of the participant

3     who is shown on Page 14 in your report?

4     A.  I did an analysis of the potential person who is shown

5     here.  They don't show this individual -- sorry.

6     Q.  It is in your rebuttal report.

7     A.  It is in my opening report.

8             MR. RACHAL:  Your Honor, at some point I object to

9     leading.  He is cutting off his own witness.

10            THE COURT:  I will let the witness finish.  I think we

11    are just trying to get him to the page.

12            MR. GOTTESDIENER:  Yes.

13            THE WITNESS:  Yes.  In the opening report, yes, it is

14    actually the very last page, Page 51.

15    BY MR. GOTTESDIENER:

16    Q.  Starting on Page 50 in B, the example on Page 14 fails to

17    address the impact of wear-away on the participant's benefit?

18    A.  Yes.

19    Q.  Can you explain to us what analysis you performed that is

20    reflected on 50 and 51, sir.

21    A.  Yes.  As we discussed going back to that chart I keep

22    bringing up that goes from 20 percent to 80 percent, the impact

23    of the wear-away would be significantly impacted by this

24    individual's age, but we don't know this individual's age, so I

25    speculated that could have been one of any number of ages.

F7FJOSB1                          Deutsch – direct

1          The SPD should have, if you will, picked one, but so I
2     said well, based on which one they applied, if you go to the
3     next page of the report, we show that for this person their
4     initial account balance would have been $7,000 in all cases
5     because that is the same whether they're 30, 40, 50 or 60.
6          Their conversion factor would be different, but once
7     we know their age, we can say we know the factor used by the
8     plan to create the initial account balance, so we can just
9     divide by that factor to get the accrued benefit that was used
10    to create the initial account balance.
11          (Continued on next page)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

F7fnosb2                        Deutsch - direct

1    Q.  If I could just stop you and link it up to what we saw with

2    Ms. Lerew's calculation.  Is this the same thing that you were

3    talking about?

4    A.  Yes.  So the $10,000 benefit we could figure out once we

5    know that person's age what that benefit would be for this

6    individual.  Once we know their accrued benefit, well, three

7    years later we know that they are going to be three years older

8    than they were on 1/1/96.  So that's the next.  That shows the

9    age on 12/31/98, which is in the example it says this is the

10   account balance on 12/31/98.

11   Q.  You are talking about on page 14?

12   A.  Yes, on page 14.

13   Q.  That shows the account balance developing until the end of

14   1998?

15   A.  Yes.

16   Q.  OK.  That's why you were looking at the person's age as of

17   that date?

18   A.  That is correct.

19   Q.  OK.

20   A.  We would then have to apply some 417(e) factor.  I

21   arbitrary selected the one that actually applied in 1998, which

22   was, as I recall, 5.99 percent.  Perhaps I should have used

23   6.06 percent, you know, there is a debate as to what rate they

24   might have used.  There's not a big difference between sort of

25   using the natural 6 percent in the plan design, the 6.06 from

F7fnosb2                    Deutsch - direct

1   1996 or the 5.99.  They are not going to produce significantly

2   different results in this context.

3            We multiplied that in terms of the 417(e) factor.

4   That produces the minimum lump sum value of the protected

5   accrued benefit.  We would then compare that to the account

6   balance on that date, and they are entitled to the greater of

7   the two.

8            What can be seen is for the participant who is on page

9   14, whether they were 30 years old, 40-year-old, 50-year-old,

10  60-year-old, on 1/1/96, their benefit would still be in

11  wear-away.

12           They would have still received the 417(e) value of the

13  12/31/95 accrued benefit.  So on the SPD when it says, This is

14  how your benefit is determined, that's not how that individual

15  without regard to what age they were, that is not how their

16  benefit was determined.

17           Their benefit was determined by the additional step of

18  saying we have these two competing calculations.  You have to

19  do the second competing calculation of the value of your

20  12/31/95 accrued benefit, and you get the larger of the two.

21  And for that individual the larger of the two would have been

22  the calculation that is not shown.

23  Q.  Just also linking that back up to the calculation for

24  Ms. Lerew, here, if the person was in their 40s, you have the

25  amount that they would have had to receive.  You say ERISA lump

F7fnosb2                          Deutsch - direct

1    sum?

2    A.  Yes.

3    Q.  For that person it was actually $20,000?

4    A.  Yes.

5    Q.  The account balance was only $9,000?

6    A.  Yes.

7            MR. GOTTESDIENER:  Can we go back to Lori Lerew just

8    to link up.  The one after.

9    Q.  Lori was around 42 at the time.  And you see that she has

10   an opening balance of 9,000.  9and 7 are not the same number.

11   But if we then go to the calculation of PX 15 --

12           MR. GOTTESDIENER:  What was that PX number Steven?  PX

13   1531, where it showed that she was entitled actually to a

14   22,000 --

15           THE COURT:  You are devolving into testifying again.

16           MR. GOTTESDIENER:  Sorry.

17           THE COURT:  You know what I mean by the difference,

18   right?

19           MR. GOTTESDIENER:  I do, your Honor.

20           I'm sorry.

21           THE COURT:  All right.  What's the question that you

22   wanted to ask?

23   BY MR. GOTTESDIENER:

24   Q.  Is this consistent with your analysis, seeing these results

25   that the plan reached for Ms. Lerew?

F7fnosb2                        Deutsch - direct

A.   Yes.  Let's go back to the -- I don't know the numbers of
them, the statement that was given, the estimate statement.

          THE COURT:  Let's get some exhibit numbers.

          MR. GOTTESDIENER:  PX 6.

          THE COURT:  Right.  PX 6.

          THE WITNESS:  Yes.  Now go to the second page.

          If we highlight in the upper corner, we can see the
year of her birth.  They have date of birth, but they didn't
block out the year.  She was born sometime in 1956, which to me
would mean on January 1, 1996.  She was somewhere between 39
and 40 years old, so that means her numbers, except for ratio
to the higher accrued benefit should be pretty close to the
kind of impact we saw for a 40-year-old.

          Her accrued benefit here is $10,000.  If we now go to
page 51 from the report, for the person who is 40 years old,
here their approved benefit is $7,000, let's call it $7,500.
So she is about four thirds higher.  She's about 33 percent
higher on her accrued benefit.  So we would expect her lump sum
to be about 30 percent higher, which would be $27,000, not
$22,000.

          But the reason for the difference is that this person,
remember we talked about as they age, they get less of a
discount.  This person is three years older.  So there is an 18
percent difference, ignoring the mortality because it is 6
percent for three years.  That's the reason it's not 22.  It

F7fnosb2                         Deutsch - direct

1    would be 27.  But it is a consistent result.  The two line up.

2               MR. GOTTESDIENER:  Just for the record, your Honor, I

3    want to do the linkup.

4               THE COURT:  Yes.  Please do.

5               MR. GOTTESDIENER:  Randall, could we get up docket

6    351.  This is the declaration of Ellen Glickfield, who did the

7    handwritten calculations, paragraph 33.

8               THE COURT:  This is ECF docket entry 351?

9               MR. GOTTESDIENER:  Yes, ma'am.

10              THE COURT:  All right.

11              MR. CARTER:  Paragraph?

12              MR. GOTTESDIENER:  33.

13              THE COURT:  This was submitted in connection with

14   summary judgment?

15              MR. GOTTESDIENER:  No.  This is --

16              THE COURT:  Part of this?

17              MR. GOTTESDIENER:  This case.

18              This is the direct testimony of Ellen Glickfield.

19              THE COURT:  Glickfield.  I'm sorry.

20              I thought you were saying Whitfield.  She was one of

21   the late additions, right, the late arriving ones.

22              MR. GOTTESDIENER:  Yes.  She was deposed ten days or

23   so ago.

24              THE COURT:  Yes.

25              MR. GOTTESDIENER:  Paragraph 33G she avers and refers

F7fnosb2                          Deutsch - direct

1    to these documents?

2              THE COURT:  Yes.

3              MR. GOTTESDIENER:  This was an estimate that she did

4    for participant Lori Lerew.

5              THE COURT:  Fine.

6              MR. GOTTESDIENER:  She actually --

7              THE COURT:  Got it.

8              So G on page 8 of 10 and 9 of 10.

9              Got it.  Thank you.

10             MR. GOTTESDIENER:  Thank you, your Honor.

11             If we could return to page 14 of the actual SPD.

12             THE COURT:  It will be helpful later on for the

13   record, even though it's continuous, to identify them by their

14   exhibit numbers.  So it's PX 5.

15             MR. GOTTESDIENER:  Yes.  PX 5.  Page 14 of PX 5.

16   BY MR. GOTTESDIENER:

17   Q.  In your opinion -- actually let me ask you a couple more

18   questions.  If you could scroll down and look down on the page,

19   it says that interest credits and compensation credits, do you

20   see there, would continue to be determined as indicated above

21   for each year of service?

22   A.  Yes.

23   Q.  In years when compensation credits are based on less than a

24   full year, the $22,000 is prorated?

25   A.  Yes.

F7fnosb2                          Deutsch - direct

1    Q.   Then it says, The lump sum payable to you is the greater of

2    your account balance or the amount determined under federal law

3    and IRS regulations.

4              Do you see that?

5    A.   Yes.

6    Q.   Do you have a view as to whether the representation --

7              THE COURT:  Can I just do it a little bit differently.

8              MR. GOTTESDIENER:  Sure.

9              THE COURT:  What is your understanding of that

10   sentence?

11             THE WITNESS:  I would think it relates back to a

12   comment on the top of page 12.

13             MR. GOTTESDIENER:  Could you show us page 12.

14             THE WITNESS:  Because there is a parallel in the

15   language.  If we look at the last sentence, just to see the

16   parallel first, it says, The lump sum payable to you is the

17   greater of your account or the amount determined by multiplying

18   the annuity payable to you by factors required by federal raw

19   and IRS regulations.

20             So the parallel of these two sentences to me indicates

21   they are talking about this calculation.

22             This calculation, if we then go to the second

23   sentence, it says, The annuity payable to you is determined in

24   the following manner.  Your account balance is increased by

25   interest credits as described below to your normal retirement

F7fnosb2                         Deutsch - direct

1    date.  The resulting amount is converted to an annuity using

2    factors required by federal law and IRS regulations.

3            That is the calculation of the age 65 accrued benefit

4    we discussed yesterday, where you project the account at the 6

5    percent out to age 65 and convert it to an annuity.  So this is

6    a description of the calculation of the accrued benefit.

7            And at this point in time in cash balance plans, you

8    couldn't pay somebody less than the 417(e) minimum lump sum

9    value of that benefit, and it says here, The lump sum payable

10   to you is the greater of your account balance with the amount

11   determined by multiplying that accrued benefit just

12   described --

13           THE COURT:  Slow down.

14           THE WITNESS:  I'm sorry.

15   A.  -- by multiplying the annuity payable, which I assume would

16   reference the annuity in the same paragraph, by the factors

17   required by federal law and IRS regulations.

18           So this would be a description to me of the minimum

19   lump sum based solely on the cash balance account.

20           And then, as I said, where the question started, the

21   parallel of this language and the language on 14 would appear

22   to tie the two, that 14 is actually referring to this

23   calculation from page 12.

24   Q.  Is that the same minimum lump sum that Lori Lerew received?

25   A.  No.  The amount that she received --

F7fnosb2                    Deutsch - direct

1    Q.   Yes.  I am actually asking conceptually.  The minimum lump

2    sum that you just described to her Honor, did Lori Lerew

3    receive that kind of minimum lump sum?

4    A.   No, she did not.

5    Q.   What kind of minimum lump sum did she receive?

6    A.   What see received was her 12/31/95 accrued benefit

7    multiplied by the 417(e) factors, the required factors.

8    Q.   The SPD is describing a different minimum lump sum up

9    there?

10   A.   Yes.  That is a different minimum lump sum --

11   Q.   This is the top of page 12.  Could you just go back to the

12   bottom of 11 to make sure that we have the context.  The bottom

13   of 11, before we get to the top of 12, is there any discussion

14   there of anything other than the account balance benefit?

15   A.   No, there is not.

16           THE COURT:  I don't mean to -- it's your time.  To the

17   extent that we've got his testimony as to what these things

18   mean and don't mean, all he needs to do is show me the five

19   places where he thinks it's repeated, I can actually read the

20   documents.  I think we've beaten the horse now to a pulp.

21           So I don't need him just to tell me what words are or

22   aren't there after he's done all the work that he's done to

23   sort of describe things.  You may want to cut it short.

24           MR. GOTTESDIENER:  Yes.

25   BY MR. GOTTESDIENER:

F7fnosb2                         Deutsch – direct

1   Q.  So your opinion as to the accuracy of page 14, using the

2   example that they demonstrate, the amount at the top where it

3   says the amount of your retirement benefit, how your retirement

4   benefit is determined, do you have a view as to whether page 14

5   is accurate or inaccurate?

6   A.  Yes.  This is completely inaccurate.  This does not

7   describe for this individual how this individual's benefit

8   would be calculated.

9   Q.  At the bottom of page 12, there is a sentence, if we could

10  look at page 12 in its entirety.

11       We have at the top, How your retirement benefit is

12  determined.  Then it shows initial account balance.  And then,

13  in the middle of the page, it talks about the enhancement.  And

14  then you see, below the discussion of the enhancement, but

15  above the entry that says interest credits, do you see a

16  two-line sentence?

17  A.  Yes.

18  Q.  That sentence states, and there is italics for terms that

19  are defined in the SPD that I would like you to plug in, Your

20  accrued benefit at the time your employment terminates is the

21  greater of the amount determined under the plan as amended on

22  January 1, 1996 or your accrued benefit as of December 31,

23  1995.

24       Do you see that?

25  A.  Yes.

F7fnosb2                         Deutsch - direct

1    Q.  As an actuary, if you take that sentence and then plug in

2    the definitions that they provide in the SPD, could you help us

3    with what your understanding of that sentence is?

4    A.  Yes.  So you would have to go backwards in the SPD to -- I

5    am looking for the page.

6    Q.  The definitions start on page 5 if that is any help.

7    A.  Yes, that is very helpful.  On page 5 there is a definition

8    of accrued benefit.  It says, A participant's accumulated

9    account converted to a single life annuity payable at normal

10   retirement age.

11           When you put that into the language that is on page

12   12, it would read, Your accumulated account balance converted

13   to a single life annuity payable at normal retirement age at

14   the time your employment terminates is the greater of the

15   amount determined under the plan as amended on January 1, 1996,

16   or your accrued benefit as of December 31, 1995.

17           THE WITNESS:  I am going to speculate, your Honor,

18   that that makes no sense to you because it makes no sense to

19   me.

20           THE COURT:  Well, actually, I'll tell you the way I

21   read it.  I read it, on page 12 there is a distinction on one

22   side of the "your accrued benefit," which is whatever that

23   means under the definitions, or "your accrued benefit as of

24   December 31, 1995."

25           So I feel like I can understand something.  Now

F7fnosb2                        Deutsch - direct

1    whether or not it is accurate or not accurate or enough or not

2    enough I think is a different question.

3                Why am I not supposed to understand it?

4                THE WITNESS:  Because what it's saying is your account

5    balance benefit can't be less than -- it is not saying your

6    ultimate benefit can't be less than your account balance

7    benefit or your accrued benefit.  It is saying the benefit

8    derived from your account balance can't be less than the

9    benefit that is your accrued benefit, which would mean, well,

10   your account balance benefit would then have to be larger.  In

11   order to get -- you can't get there.  The equality doesn't

12   work.

13               THE COURT:  I see what you are saying.

14               You are saying it should say in fact, something more

15   along the lines of, "Your benefit is determined in the

16   following manner:"

17               THE WITNESS:  Yes.

18               THE COURT:  And then go into?

19               THE WITNESS:  Yes.

20               THE COURT:  Otherwise, it's saying your accrued

21   benefit is (i) the greater of or (ii), and that is not correct?

22               THE WITNESS:  That's correct.

23               THE COURT:  I understand your point.  Got it.

24   BY MR. GOTTESDIENER:

25   Q.  Now I would like to turn to continuing to look as to what

F7fnosb2                         Deutsch – direct

1   actually happened to people once the plan was implemented.

2              Using Mr. Osberg to help us, if we can get on the

3   screen slide 22.

4              You analyzed the wear-away that Mr. Osberg actually

5   experienced, is that correct?

6   A.  Yes.

7   Q.  Why don't you tell us what this shows.

8              THE COURT:  What number is this so that we can have it

9   clearly in the record.

10             MR. GOTTESDIENER:  The PX number is.

11             THE COURT:  PX 1497.  I think is that right.  It is

12  not right.  That's why it's got to have it in the record.  It's

13  different.

14             MR. CARTER:  It should be 1492.

15             THE COURT:  I don't have that page.  Do you want me to

16  have it?

17             MR. GOTTESDIENER:  Yes.  1492.

18             THE COURT:  All right.  PX 1492.

19             Do you folks have an extra copy?  That would be

20  terrific.

21             MR. GOTTESDIENER:  I have it.

22             THE COURT:  All right.  The Court has received PX

23  1492.

24  BY MR. GOTTESDIENER:

25  Q.  Would you proceed and tell us how this demonstrates the

F7fnosb2                          Deutsch - direct

1    wear-away that he actually experienced?

2    A.   Yes.   This shows as of various points in time, just for

3    convenience January 1 of each year as his actual date of

4    payment, what his account balance was as of that point in time.

5    And it's my understanding that was communicated to Mr. Osberg.

6    And then next to that is what he would have received at that

7    point in time if he took a lump sum, basically terminated

8    employment and took a lump sum at that point in time.

9              Now, the benefit, the account balance benefit is going

10   up because of both pay credits and interest credits, so it's

11   going up due to additional benefits that he's earning in

12   exchange for additional service.

13             The 12/31/95 benefit value goes up and down.   It's

14   changing for two reasons.   One reason is because of the

15   increase in age.   It increases by one less year's interest

16   discount, one year's less mortality discount, but it's also

17   going up and down due to changes in the mandated interest rate

18   for this purpose.

19             So, for example, from 1996 to 1997, the mandated

20   interest rate went from 6.06 to I believe 6.57.   My memory may

21   be wrong on that exact number.   It is in my report.   And the

22   change in the interest rate overcomes the increase due to

23   increased age and mortality, so the lump sum actually goes

24   down.

25             The next year the interest rate goes back down, so the

F7fnosb2                    Deutsch - direct

1   lump sum goes back down.  The interest rate goes up further,

2   the lump sum goes up further and so on.

3           But that is the benefit he was already entitled to as

4   of January 1, 1996 was, If I receive a lump sum payment on that

5   date, that's what I am entitled to.

6           So he is in wear-away in all years because the lump

7   sum he was already entitled to -- I should be more specific and

8   say he was in lump sum wear-away because there's different

9   types of wear-away.  He was in lump sum wear-away because at

10  every point in time his benefit based on no additional service

11  was always larger than his benefit otherwise provided by the

12  plan.

13  Q.  Was he in any other kind of wear-away other than lump sum

14  wear-away?

15  A.  He was in both annuity wear-away -- what I referred to in

16  my report as the annuity wear-away, which is the age 65

17  benefit, and the early retirement subsidy wear-away, so as soon

18  as he got to age 55 his protected benefit at age 65 with the

19  early retirement subsidy was consistently larger than the

20  benefit that would be provided with the cash balance account.

21          MR. GOTTESDIENER:  If we could get on the screen

22  docket 58, please.  Paragraph 47.

23  BY MR. GOTTESDIENER:

24  Q.  I want to ask you your view as to the accuracy or

25  inaccuracy of the statement.  It's in the context of what you

F7fnosb2                        Deutsch - direct

1  just testified to on the right-hand column, those changing

2  numbers as to the 12/31/95 benefit value taken as a lump sum.

3            Paragraph 47, please.

4            In paragraph 47 there is a statement.

5            THE COURT:  Let's hear the objection.

6            MR. RACHAL:  I am not sure.  Now we have

7  Mr. Deutsch --

8            THE COURT:  Give me your word.  Is it similar to what

9  we did yesterday?

10           MR. RACHAL:  Yes.  702, competence, beyond the scope

11 of his expertise, etc., legal conclusions, potentially all of

12 those aspects.

13           THE COURT:  OK.  I will ignore any legal conclusions.

14           Let me just see --

15           MR. GOTTESDIENER:  Can I proffer the question.

16           THE COURT:  Let me just read this for a second.

17           Why don't we ask Mr. Deutsch what he understands the

18 portion of that phrase, the portion of the answer in paragraph

19 47 where it states, "Defendants admit that under the terms,"

20 what that means to him.

21           Why don't we start there.

22           THE WITNESS:  OK.  Well, what they are saying is that

23 they admit under the terms of the plan --

24           THE COURT:  He is saying this as an actuary.  He's not

25 saying this as you guys.

1          MR. RACHAL:  I understand, your Honor.  It's an odd

2     type of thing to testify on.

3          MR. GOTTESDIENER:  If I could --

4          THE COURT:  I don't even need it.  We are just going

5     to continue.  Just go ahead.

6          MR. GOTTESDIENER:  I am trying to simplify.

7          THE COURT:  It's fine.

8          THE WITNESS:  OK.  They are saying it was equivalent

9     to his frozen accrued benefit.  And then it says, as increased

10    to and valued as of December 31.

11         So there's two things.  It is increased and the value.

12         Well, it is valued as of December 31, 2005, but there

13    is no change in the frozen accrued benefit.  It was frozen.

14         So when they say substantially increased, it was not

15    substantially increased.  It was not increased.  It was frozen.

16         THE COURT:  You are saying as an actuarial matter, it

17    wasn't substantially increased.  As a mathematical matter in

18    fact it was substantially increased because the numbers

19    changed?

20         THE WITNESS:  No.  Remember the number is the age 65

21    annuity.

22         THE COURT:  Right.

23         THE WITNESS:  That number did not change.

24         THE COURT:  All right.

25         THE WITNESS:  The value changed, but the number didn't

F7fnosb2                        Deutsch - direct

 1    change.

 2                THE COURT:  I understand your point.  OK.

 3                MR. GOTTESDIENER:  Thank you.

 4                If you can call up on to the screen docket 260,

 5    please.  There is just one more of these, your Honor, just in

 6    this context.

 7                THE COURT:  What are you trying to get at here?

 8                MR. GOTTESDIENER:  I want to ask about --

 9                THE COURT:  If they made misstatements in a letter to

10    me, it doesn't really matter.  It matters to me and to you

11    greatly, but I don't need him to tell me about them.

12                MR. GOTTESDIENER:  What I am trying to do, your Honor,

13    is explain complicated concepts, even though the Court I

14    know --

15                THE COURT:  If I don't have these concepts by now, we

16    are lost.  OK?  We're truly lost, because I spent hours

17    understanding these concepts.

18                So point out what you think the misstatement is here.

19    And let me just see whether or not I need him to opine on it,

20    because we have been over things now repeatedly, the same

21    things.  I am not saying I haven't found it very useful.  I

22    found it very useful.

23                THE WITNESS:  I appreciate that.

24                THE COURT:  It is just that I don't know how much more

25    of it we have to do.

F7fnosb2                          Deutsch - direct

1          Show me what you want to point to here.  I don't want
2     you not to be able to make the point.  I just don't know that
3     we need Mr. Deutsch for it.
4          MR. GOTTESDIENER:  There is a statement on page --
5     with the Court's indulgence.
6          THE COURT:  Yes.
7          MR. GOTTESDIENER:  I had this as a slide.
8          THE COURT:  This is one of the things from your
9     opening where you say they make certain admissions.
10         Is that right?
11         MR. GOTTESDIENER:  It is, your Honor.
12         THE COURT:  So it's going to be as a legal matter.
13         We don't need him.
14         MR. GOTTESDIENER:  I think it's really slightly
15     different.
16         THE COURT:  All right.  Just tell me where in this.
17     Let's go to the page so I can be where you are.
18         MR. GOTTESDIENER:  On page 6 there is a statement as
19     to what Mr. Sher is going to explain at trial.
20         THE COURT:  All right.  Where is that?
21         MR. GOTTESDIENER:  It makes an assertion.
22         THE COURT:  If I need any actuarial interpretation, we
23     can have him testify about it.  Otherwise move on.
24         MR. GOTTESDIENER:  What I am trying to focus on is the
25     statement, to get him to explain why he disagrees with

F7fnosb2                         Deutsch - direct

1    something that was made a big deal about by the defense in

2    their opening.

3              THE COURT:  OK.  So let me just find it.

4              Where is that statement?

5              MR. GOTTESDIENER:  The sentence starts, "As Foot

6    Locker's actuarial expert would explain at trial."

7              THE COURT:  OK.  Footnote No. 4.

8              MR. GOTTESDIENER:  OK.

9              THE COURT:  "There was in fact no benefit freeze" --

10   which is their position-- "because the opportunity to obtain a

11   lump sum constituted a significant benefit enhancement" --

12             That's the portability, right?

13             -- "and because the value of the lump sum increased,

14   in part due to the continued reduction in the IRS rate."

15             So that is the same mathematical point that we just

16   went over, whether it was an increase or not an increase.

17             MR. GOTTESDIENER:  Right.  But could I just ask him?

18             THE COURT:  Yes.

19             MR. GOTTESDIENER:  Do you agree or not and could you

20   explain?

21             THE COURT:  Why?

22             MR. GOTTESDIENER:  Whether there was no --

23             THE COURT:  No.  Let's just say do you agree or not

24   with the statement in footnote No. 4?

25             THE WITNESS:  No, I do not agree with it.

F7fnosb2                          Deutsch - direct

1           THE COURT:  Tell me why.

2           THE WITNESS:  There's two reasons.

3           First of all, as we discussed yesterday, as of January

4    1, 1996, there was a right to the lump sum.  You didn't earn

5    the right to a lump sum at a point after that.  So there was no

6    increase after January 1, 1996, so that part I disagree with.

7           And then the change in the lump sum increased due to

8    increased age and service, the mathematical issue we just

9    talked about and the change in the IRS rates.  But the benefit

10   itself is the age 65 annuity, and that did not change.

11          More importantly, the benefit that he would have

12   received was unimpacted by whether he continued in employment

13   or didn't continue in employment.

14          So the increase had nothing to do with earning

15   additional benefits and that's the basic definition of a

16   freeze.

17          THE COURT:  All right.  That's what we talked about

18   yesterday, which is the right effective of, or possessed.

19          THE WITNESS:  Yes.

20          THE COURT:  The possessed right based upon certain

21   required assumptions that are then used for the calculation.

22          THE WITNESS:  Exactly.

23          THE COURT:  Those are required as of January 1.  If

24   they change they are still going to be required, so there is

25   nothing anybody can do in terms of discretion, subjective

F7fnosb2                    Deutsch - direct

1    changes that could alter that?

2            THE WITNESS:  That is correct.

3            THE COURT:  OK.  I get the point.

4            MR. GOTTESDIENER:  Thank you.

5        We don't have a copy from the defense of Mr. Osberg's

6    actual annual benefit statement so we can't show those like we

7    showed with Ms. Lerew, your Honor.

8            So every year participants got two things.  They got

9    the statement saying what you would get paid if you left that

10   day as a lump sum.

11           THE COURT:  What do you want to do that you need this

12   explanation.

13           MR. GOTTESDIENER:  I'm going to show him, and we don't

14   have those produced, what we do have is Deutsch slide 23 just

15   for context.  They also provided annually people total

16   compensation statements where they listed all their different

17   benefits, including their retirement plan benefits.

18           And that's -- we do have this.

19           THE COURT:  PX 58?

20           MR. GOTTESDIENER:  Yes.

21           THE COURT:  All right.

22           MR. GOTTESDIENER:  This is from 2002.

23           THE COURT:  All right.

24   BY MR. GOTTESDIENER:

25   Q.  Did you examine this in the course of your work on the

F7fnosb2                        Deutsch - direct

1   case?

2   A.  Yes, I did.

3   Q.  Would you tell us --

4           THE COURT:  Did you draw any conclusions based upon

5   your examination of this document in connection with your

6   retention in this matter?

7           THE WITNESS:  Yes.

8           THE COURT:  What were they?

9           THE WITNESS:  The document is inaccurate.

10          THE COURT:  Tell me how.

11          THE WITNESS:  I don't have it in front of me.  If you

12  go to one of the pages that describes his -- further down.

13          This is really weird because it is not in order, but

14  not this page.

15          Not this page.

16          Not this page.

17          This page.

18          THE COURT:  All right.  That's numbered at the bottom

19  FLP17?

20          THE WITNESS:  Yes.  It says, The amount shown in item

21  4 is the amount that you could expect to receive upon

22  termination of employment or retirement if you elect the lump

23  sum form of payment and do not receive future interest credits.

24          And, of course, that's not true, as we keep pointing

25  out.

F7fnosb2                         Deutsch - direct

1            I mean, he several months later received a lump sum of

2    $25,000.  The $18,000 was unrelated to what he would have

3    received had he terminated employment.  This is simply not a

4    true statement.

5            Now -- you look like you're studying.

6            THE COURT:  I guess what I'm doing is, I think the

7    distinction is -- let me let defendants make their own argument

8    in terms of how they are going to draw the distinction.  What

9    you are saying is that because in fact the amount that he could

10   in fact by law expect to receive is not the $18,000, it's the

11   $20,000 --

12           THE WITNESS:  25.

13           THE COURT:  -- this is wrong?

14           THE WITNESS:  Yes.  And it's not even related to the

15   account.

16           THE COURT:  Understood.  I get your point.

17           THE WITNESS:  Derivative of that, if we go back

18   towards the beginning -- I am taking a second to find it.

19   There is a comment in here that says, The benefits described in

20   this statement are a valuable portion of your compensation.

21           It is not this page.

22           Here it is.  The second paragraph:  The cost of your

23   benefits shown in this statement are significant portion of

24   your compensation.

25           So they are saying that the benefit that we just

F7fnosb2                          Deutsch - direct

1    looked at is a significant portion of your compensation.

2          But it isn't any part of his compensation.  There's no

3    actual increase going on that he's receiving value for because

4    he already owns that higher lump sum benefit, so he's not

5    getting an increase, if you will, as part of his compensation

6    because those increases already belong to him.

7          THE COURT:  That is on FLPL 16?

8          THE WITNESS:  Yes.

9          THE COURT:  All right.

10   BY MR. GOTTESDIENER:

11   Q.  Did the number that's shown for his account balance on the

12   page that said the $18,000, did you -- you calculated his

13   account balance.  How does that compare to what you came up

14   with in your --

15   A.  My recollection is I pretty accurately reproduced the

16   account balance calculations.

17   Q.  So if you could just see again PX 1492 that you had in

18   front of you, the wear-away he actually experienced?

19   A.  Yes, I think there is a penny difference.  If I remember --

20   Q.  Actually there is a penny difference it looks like?

21   A.  Yes.

22   Q.  Your calculation is off from theirs by a penny?

23   A.  Yes.

24   Q.  So the amount that you calculated that he would have

25   received if he asked for his benefit was how much?

F7fnosb2                        Deutsch - direct

1    A.   $24,645.30.

2    Q.   Thank you.

3              If we could look through slide 27.  I want to ask you

4    about another look at the impact?

5              THE COURT:  This is PX 1497?

6              MR. GOTTESDIENER:  Yes, your Honor.

7              THE COURT:  All right.

8    BY MR. GOTTESDIENER:

9    Q.   Could you tell us what we're looking at there.

10   A.   Well, what we see here is his account balance growing from

11   year to year, which is what we saw in the previous slide, and

12   the present value, and then effectively how much pay credits

13   with interest he wasn't getting the value of.

14             In his case the calculation is fairly simple because

15   he's still in wear-away, so we don't have to extract the

16   portion post wear-away.

17             So the value lost pay credit is simply his pay credits

18   increased with interest at 6 percent, and then for partial

19   year's interest in the last year, and it shows that he was -- I

20   don't know what the right word would be.  He was told he was

21   getting $10,000 worth of pay credits with interest when in fact

22   all he got was the benefit he already was entitled to.

23             THE COURT:  Just so that I have it clearly in mind,

24   where do I find -- in which of my pieces of the 6 percent

25   interest.  I know it's here someplace.  Where I do find the

F7fnosb2                          Deutsch - direct

1    guaranteed --

2                 THE WITNESS:  That's the SPD.

3                 THE COURT:  So that's PX 5?

4                 THE WITNESS:  I'll get you an exact page in one

5    second.  I believe it's on page 14.

6                 THE COURT:  Not page 5, PX 5.  Page 14?

7                 THE WITNESS:  Page 14 shows the person getting a 6

8    percent interest credit probably in the definition of interest

9    credit.

10                MR. GOTTESDIENER:  Page 12.

11                THE COURT:  Page 12.  All right.

12                Page 12 under interest credits has a reference to, on

13   the last day of each plan year account balances as of the first

14   day of that plan year will be credited with interest at the

15   rate of 6 percent, and that I would take is the annual number?

16                THE WITNESS:  Yes.

17                THE COURT:  Half a percent per month.

18                That in your view means that for the service credits

19   that Mr. Osberg under the SPD would have thought he was

20   receiving that there should have been 6 percent added to that

21   annually?

22                THE WITNESS:  Yes.

23                THE COURT:  I understand the calculation.  Thank you.

24                THE WITNESS:  Yeah.

25                Two additional things just real quickly is the 6

F7fnosb2                        Deutsch - direct

1    percent shows up all over the place, and the technical correct

2    place is the plan document, but this was just the quickest

3    place to find it.

4            The interest, because of -- they say as of the prior

5    year, you don't get any interest in the year you earned the pay

6    credit.  The interest doesn't start until the next year.

7            THE COURT:  Right.  OK.

8            So, for instance, interest for the 1,211 which is for

9    '97, that is going to be attributed at 6 percent in the number,

10   the cumulative number for 1/1/98?

11           THE WITNESS:  Yes.

12           THE COURT:  Got it.  OK.

13   BY MR. GOTTESDIENER:

14   Q.  So if we could look at PX 1498.

15           THE COURT:  I don't have that one.

16           MR. GOTTESDIENER:  I'm going to hand that up, your

17   Honor.  That's slide 28.

18           THE COURT:  All right.  I have been handed PX 1498,

19   which is a two-page document.

20           MR. GOTTESDIENER:  May I approach and give him a copy.

21           THE COURT:  Yes.

22           MR. GOTTESDIENER:  So he has it.

23           THE WITNESS:  Thank you.

24           THE COURT:  Let me just ask whether or not the text

25   portion of 1498 is the opinion of Mr. Deutsch or whether that's

F7fnosb2                        Deutsch - direct

1   lawyer's argument.  If it is, we can just separate the two

2   pages.  There's two pages of 1498.

3            MR. GOTTESDIENER:  This is his prepared --

4            THE COURT:  So he prepared 1498?

5            MR. GOTTESDIENER:  Yes.

6            THE COURT:  All right.  You may proceed, sir.

7   Q.  Can you tell us, you are doing an analysis of, had he not

8   left --

9            THE COURT:  Why don't you ask him what PX 1498 is?

10            THE WITNESS:  OK.

11            THE COURT:  It is just as a technical matter.

12   Otherwise, later on somebody will read this transcript and say

13   it was all him and you just sort of said yes, yes, yes.

14            THE WITNESS:  That part I understood.  I just didn't

15   understand whether he had to repeat.

16            THE COURT:  No.  You go ahead and tell me what this

17   is.

18            THE WITNESS:  OK.

19            So through 1/1/2002 -- that's what we have been

20   looking at before -- this is how his account balance actually

21   grew.

22            Then what I did is I took his compensation from 2001,

23   because 2002 compensation wasn't a full year's compensation,

24   increased it, as it says up at the top, at 4 percent per year

25   and said, Based on additional service and his additional

F7fnosb2                        Deutsch – direct

1    compensation, what would his pay credits continue to be,

2    increasing the account with 6 percent and those projected

3    additional pay credits.  This is then how his account would

4    have continued to grow until January 1, 2006.  That's what in

5    the account balance column.

6              THE COURT:  He would have been in wear-away

7    effectively until the last year?

8              THE WITNESS:  Yes.

9              And so -- because the 37 is more than the 32.  There's

10   this interesting problem that we have been skirting around that

11   was on the top of page 12 of the outline, that if you -- I mean

12   of the SPD, that if you took his account balance and you

13   projected it out to age 65 and then you discounted the 417(e)

14   factors you actually end up in some of the years with a lump

15   sum attributable to the account balance that's actually larger

16   than the account balance solely on the fact that the 417(e)

17   rate has fallen significantly below 6 percent.

18             So you are projecting forward at 6, you are

19   discounting back at say 5, and so he would have actually

20   received a $39,000 lump sum attributable to the account on

21   1/1/2006.  So, even though his account is less than the value

22   of the 12/31/95 accrued benefit, the lump sum attributable to

23   the account is now more.

24             THE COURT:  I understand.

25   BY MR. GOTTESDIENER:

F7fnosb2                          Deutsch - direct

1    Q.  Now, on the second slide you are discussing a separate

2    additional point, is that right?

3                THE COURT:  So that we don't end up with a hearsay

4    issue, why don't you just tell me what your opinion is or view

5    is or any additional explanation you feel you need to add.

6                THE WITNESS:  Well, what this is describing is that

7    even when we get to 2006, the wear-away is not washed away.  So

8    he's got all of these pay credits that he would have received

9    that he still didn't get any value for.

10               So he didn't actually get any value for the additional

11   accruals until the accruals that occur after 2006, actually

12   sometime in 2005.  That's the point at which he's actually

13   accruing.

14               So those prior pay credits, he basically permanently

15   loses the value of them.  So even if he gets a payment in

16   excess of the value of his 12/31/95 accrued benefit, he's still

17   permanently lost any return for those pay credits until he was

18   out of wear-away.

19               THE COURT:  So, to put it differently, he comes out of

20   wear-away --

21               THE WITNESS:  Yes.

22               THE COURT:  -- but everything that led him up to

23   wear-away effectively is off in the ether?

24               THE WITNESS:  Right.

25               Because he had already earned that part of his benefit

F7fnosb2                         Deutsch – direct

1    before the plan was changed.

2              THE COURT:  I understand the point.  OK.

3              MR. GOTTESDIENER:  If you can get on the screen PX

4    1499.

5              If I could hand up a copy?

6              THE COURT:  Yes.

7    BY MR. GOTTESDIENER:

8    Q.  If you could tell us what that is, sir.

9    A.  OK.  So when a participant actually terminates from a plan,

10   they have to elect to receive their benefit and elect what form

11   to receive their benefit in.  We euphemistically refer to them

12   as the benefit election form.

13             So this is the form on which he was electing that he

14   wanted to receive his benefit in October 2002 in the form of a

15   lump sum.

16             THE COURT:  That's PX 75, the underlying document.

17             THE WITNESS:  The underlying document that you can't

18   really see.

19             Then what we have is the highlighted part that says,

20   his account balance is $20,000, and if we ignore the other

21   stuff, his lump sum payable is $25,000.

22             THE COURT:  Right.  I see that.

23   BY MR. GOTTESDIENER:

24   Q.  Did you have a view as to the accuracy of the benefit

25   election form he was given?

F7fnosb2                         Deutsch - direct

1   A.  Well, there's some stuff that's hidden that we can't see.

2   But the account balance is correct.

3            The lump sum is correct.

4            But this comment here that says, Based on the

5   information shown above, that's not correct.  When you look at

6   the information shown above --

7            MR. GOTTESDIENER:  Why don't we get up PX 70.

8            THE COURT:  Yes.

9   A.  His lump sum of $25,000, as we have discussed, is based on

10  his 12/31/95 accrued benefit, but there's no mention of his

11  12/31/95 accrued benefit on the form.

12           So when it says it's based on the above, the answer

13  is, no, it's not based on the above.  It's based on something

14  that is not on this form.

15           MR. GOTTESDIENER:  Slide 28, PX 1498.

16           THE COURT:  That's the one we went over before?

17           MR. GOTTESDIENER:  Yes.

18           THE COURT:  You want us to pull that back out again?

19           MR. GOTTESDIENER:  With the Court's indulgence.

20           PX 1500, slide 30.

21           Can I approach?

22           THE COURT:  Yes.

23  BY MR. GOTTESDIENER:

24  Q.  Did you attend Mr. Sher's deposition?

25           THE COURT:  We don't need this as a PX in evidence,

F7fnosb2                        Deutsch - direct

1    right?  So you can give that to him only because he's been

2    talking about the Sher statement, but we'll use this as a

3    demonstrative.

4               OK?

5               MR. GOTTESDIENER:  Yes.  I'm sorry.

6               THE COURT:  Did you attend Mr. Sher's deposition?

7               THE WITNESS:  Yes, I did.

8               THE COURT:  All right.

9    BY MR. GOTTESDIENER:

10   Q.  And before I ask anything more about that specifically, you

11   examined the SPD and discussed it and showed what it was saying

12   was the lump sum under the plan.

13              Do you have a view as to whether it would have been

14   reasonable -- what a participant in Mr. Osberg's position could

15   have reasonably concluded was the explanation for why his

16   payment was $25,000 --

17              THE COURT:  I've got that point.  We don't need him

18   to -- we just went over that, and I'll draw the conclusion.

19              MR. GOTTESDIENER:  OK.

20              If we get up PX 1479.

21   BY MR. GOTTESDIENER:

22   Q.  We saw this before.  You developed this chart based on an

23   analysis of Mr. Osberg?

24   A.  Yes.  This is similar to what Mr. Osberg --

25              THE COURT:  Do you want the Court to have that chart?

F7fnosb2                              Deutsch – direct

 1              MR. GOTTESDIENER:  I do, your Honor.

 2              MR. HUANG:  Your Honor, I believe it's in the binder

 3     already.

 4              THE COURT:  It's in the binder?

 5              MR. HUANG:  I believe so.

 6              THE COURT:  All right.

 7              MR. GOTTESDIENER:  I have another one for the Court.

 8              THE COURT:  That's all right.  I will pull it out.

 9              MR. GOTTESDIENER:  This actually consists of three

10     slides.  May I hand him my copy so he has it?

11              THE COURT:  All right.

12     BY MR. GOTTESDIENER:

13     Q.  Can you tell us what this shows.

14     A.  Well, the blue line shows prior to 1/1/96 roughly how much

15     Mr. Osberg was accruing each year.

16              The orange line shows the accumulations.

17              These are because -- the benefit is the age 65 annuity

18     benefit.  This is the accumulation of that age 65 annuity

19     benefit.  And we see it increasing each year until 1996.

20              And then it flatlines.  It stops increasing because

21     that formula is discontinued as of January 1, 1996.

22              I guess you could notice that the line is just a hair

23     above $6,000, and that's where his accrued benefit was.

24              MR. GOTTESDIENER:  Your Honor, would this be a good

25     point to take the midmorning break.

F7fnosb2                         Deutsch – direct

1                THE COURT:  Sure.  Let's take our midmorning break.

2      We'll return in about 10 or 12 minutes.  Thank you.

3                MR. GOTTESDIENER:  Thank you, your Honor.

4                (Recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F7FJOSB3                           Deutsch - direct

1          THE COURT:  Let's all be seat seated.  All right, Mr.

2     Gottesdiener, you may proceed, sir.

3          MR. GOTTESDIENER:  Thank your Honor.

4          Your Honor, there was an issue in the exchange of

5     letters the night before last.  Does your Honor want us to

6     describe the value of Mr. Osberg's early retirement benefit

7     compared to his cash balance benefit when he turned age 55?

8          THE COURT:  If you want to, you can go ahead and do

9     that.  I am not sure what I am going to do with that

10    information just now, but I don't want to take up the time

11    right now to go back-and-forth discussing that.

12         If there is something you want Mr. Deutsch to talk

13    about, go ahead and do that.

14    BY MR. GOTTESDIENER:

15    Q.  If we could call up PX 107.  This is Mr. Sher's rebuttal

16    report, Page 10, paragraphs 37 through 39.

17         Can you describe what Mr. Sher is discussing there and

18    whether you think that Mr. Sher's method is correct with

19    respect to the value of Mr. Osberg's early retirement benefits

20    compared to his cash balance benefit when he turned age 55?

21    A.  Well, he's describing the difference between the benefit

22    with the early retirement subsidy and the benefit without the

23    early retirement subsidy and concluding if the early retirement

24    subsidy is only worth $7.20 per month to Mr. Osberg, that his

25    analysis is wrong.

F7FJOSB3                              Deutsch - direct

1          He misinterprets the plan to begin with.  He does the

2     calculations inconsistent with how the plan was actually

3     administered and ends up comparing the wrong benefit to the

4     wrong benefit.  Well, one of the benefits is right, but one of

5     the benefits is wrong.

6          He points out, correctly, that as of 2009, the lump

7     sum would have been 47,700 as a rough number, and his accrued

8     benefit is 6098.57, but then he says that lump sum would be

9     converted under the 1996 plan terms using a 6 percent interest

10    rate to a monthly annuity starting at age 55 up 297.73.  There

11    is no such plan provision.

12         The plan document says that when you take a benefit

13    after age 55, but before age 65, you receive the better of the

14    cash balance account divided by this number, or the benefit in

15    Appendix B which then is the 6098 with the early retirement

16    subsidy.  So there is no provision that says you calculate the

17    lump sum and convert it into an annuity dividing it by a 6

18    percent factor.

19         Now, I checked, and the people who retired after age

20    55, and before age 65.  Not one person was benefit was

21    calculated in this manner.  If this were correctly calculated

22    benefits, you end up with effectively an infinite loop which I

23    will describe in a second where the benefits would become

24    infinite.

25         Consider a guy who is already at age 65.  The 417 (e)

F7FJOSB3                         Deutsch - direct

rates at that point in time, let's say, produce a lump sum

factor to convert the annuity into lump sum at a factor of 11.

The person's annuity benefit, just to do the math easy, is a

thousand dollars a year, pretty small, but let's assume that is

the benefit at age 65, and at the 6 percent factor is 10, so

their lump sum would be the thousand dollars times the 11.

         They would then say but their annuity is that $11,000

divided by 10, so their annuity would be 1100.  Well, if their

annuity at age 65 is 1100, then that's the benefit you have to

multiply times 11 to get their lump sum because that is the age

65 benefit payable to annuity under the plan.

         Now you would take that number and multiply it by 11,

get 12,100, and divide that because that would be your lump sum

and divide that by 10 and say now their annuity benefit is

$1200 a month, and I would go on through that loop forever

until it swallowed the economy.

         It isn't a logical way to calculate the benefit.  It

doesn't make sense and it is not consistent with how the plan

was administered for people who retired after age 55.  It is

not what is in the plan document.

         What you would end up with is comparing the cash

balance benefit converted to an annuity to the early retirement

benefit.  Well, the early retirement benefit he has calculated

here correctly at 304.93.  I agree with that number.  Then he

has a footnote, and if we follow the footnote, he says the

F7FJOSB3                         Deutsch - direct

1    annuity derives from the cash balance account is lower than

2    both of these accounts.  It is not just lower than both these

3    these amounts, it is half lower, significantly lower.

4            In my opening report which he is rebutting,

5    Mr. Osberg, I don't refer to Mr. Osberg in my report, I refer

6    to people in general, the people in general were receiving

7    significantly longer wear-away periods because of the value of

8    the early retirement subsidy was so large.  So what you would

9    be comparing is their cash balance benefit to the early

10   retirement benefit.  There is a substantial benefit, over 2 to

11   1, for Mr. Osberg, as I recall.

12           Even if his analysis were correct, what we would be

13   saying is he was already entitled to this like a lump sum, but

14   he would already be entitled to the 297.73, so basically he is

15   still in early retirement wear-away and at best all we are

16   doing is arguing by how much.

17           The bottom line is this analysis is just inconsistent

18   with the plan provisions.

19   Q.  Now we are going to show somebody a little different who

20   got the enhancements and who elected an annuity, Ms. Cardona.

21           Ada Cardona, we saw a slide earlier, PX 1485, that

22   showed her opening account balance increased by the

23   enhancements, PX 1501.

24           THE COURT:  Hold on.  Are you going to do something

25   with multiple ones?

F7FJOSB3                          Deutsch - direct

1           MR. GOTTESDIENER:  I was just going to remind everyone

2      that PX 1485 you showed us earlier yesterday how --

3           THE COURT:  All right.  PX 1485.  You don't have to

4      comment on it.

5           MR. GOTTESDIENER:  Now 1501.

6           THE COURT:  And 1501.

7      BY MR. GOTTESDIENER:

8      Q.  You showed the impact of the wear-away, the actual

9      wear-away she experienced, if you could explain that to her

10     Honor.

11     A.  Yes.

12          THE COURT:  And I need 1501.

13          MR. RACHAL:  Your Honor, I just wanted to -- I want to

14     renew my objection that there is no class claim in the case

15     related to the early retirement subsidy.

16          THE COURT:  I understand.  I understand your point.

17          The issue potentially impacts other things, but I

18     understand your point.

19          MR. RACHAL:  Thank you.

20          THE COURT:  You may proceed.

21          MR. GOTTESDIENER:  May I approach?

22          THE COURT:  Yes.

23          MR. GOTTESDIENER:  1501 has four different slides.

24     BY MR. GOTTESDIENER:

25     Q.  Right now I will ask you about the first slide.  We'll talk

F7FJOSB3                          Deutsch - direct

1    about the other slides as we progress.  Would you tell us what

2    you show in 1501.

3    A.  Yes.  So we start with an account balance plus enhancement.

4    There is 55,192 is the 55,192 from yesterday that -- whatever.

5    That is the number from the bottom of that other slide.  Then

6    it shows this increasing to 1197 based on the pay he actually

7    received increasing to November '97.  The 65,000 is what her

8    account balance was when she actually retired.

9              THE COURT:  Slow down.

10             THE WITNESS:  Okay.  Under the plan terms, for

11   converting cash balance account into annuity, we divide it by

12   the median factor and we end up with 379, 438, 488 as the

13   benefit she could have received from the cash balance account.

14             This number is going up rather rapidly.  The reason

15   why it is going up rather rapidly, it does not go up through

16   increases in the account enhancement but it goes up because she

17   is older; and, therefore, the cost of purchasing annuity for

18   the rest of her life is going down.  It also goes up in '97

19   because the 417 (e) rates went up.  There is a discount in cost

20   to providing those future benefits.

21             In comparison, the protected accrued benefit which is

22   actually static as a benefit starts at 541, goes to 69, goes to

23   593, and the reason that is going up is the same way is that

24   the lump sums go up because there is less periods of discount.

25   She has one less year of that 4 percent per year reduction for

F7FJOSB3                        Deutsch – direct

1   payment prior to 65.  So it is going up because she has less

2   and less reduction.

3          Ultimately, she retired, her benefit is the 59376,

4   which is well above the 488, which is the cash balance benefit.

5   So she was clearly in wear-away when she took this early

6   retirement benefit.

7   Q.  So the changes in the annuity under the cash balance, the

8   alternative formula shown in the middle, those changes you

9   described why the cash balance account would produce different

10  amounts going up, you said, rather rapidly.

11         On the right-hand side, the difference in the numbers

12  there, you said that is static as a benefit.  Why are those

13  numbers changing?

14  A.  They're changing because of basically her increase in age

15  causing less of an early retirement reduction, less years on

16  the 4 percent.  So to put this in the same terms as the lump

17  sum, had she terminated on 1-1-96 and, in fact, if she

18  terminated on 12-31-95, she was entitled to retire on November

19  1, 1997 and get that 59376.  She, unlike the issue of saying

20  well, we didn't have a lump sum so adding a lump sum was an

21  additional benefit that we gave people on January 1, '96, that

22  is irrelevant for her.

23         Her benefit that she actually got, she got, she didn't

24  need the plan amendment.  She was entitled to that before they

25  amended the plan.

F7FJOSB3                       Deutsch - direct

1   Q.   In the next slide you did an analysis of what?

2   A.   Ms. Cardona is advanced age in comparison to Mr. Osberg.

3   The reason this slide stops in 2002 is because she turned 65 in

4   2002.  So early retirement now doesn't exist any more.  She has

5   postponed her retirement, which is a different issue.  This

6   shows how much her account balance would have gone up had she

7   continued in employment and received additional credits and

8   interest rates the same way we did for Mr. Osberg.

9            There is a little glitch here, I should point out, and

10  that is like with Mr. Osberg, I used her prior year's

11  compensation rather than using a partial year's compensation.

12  Her partial year compensation in 1997 was significantly larger

13  than her 1996 compensation.  It shows a sort of odd glitch, but

14  I am assuming that is because in conjunction with her

15  retirement, she got, for example, unused vacation pay or

16  something.  If she continued employment, she wouldn't have

17  gotten that big bump in her salary.  That would have been

18  sometime down the line.

19            That is ignored in this calculation.

20            THE COURT:  That is ignored, meaning the bump is

21  ignored?

22            THE WITNESS:  I used her '96 compensation and

23  projected it forward, not the '97, which partial year

24  compensation which included that bump.

25            The cash balance immediate annuity is calculated the

F7FJOSB3                        Deutsch - direct

1    same way.  That is the benefit she would have been entitled to

2    under the cash balance plan.  The frozen benefit on the prior

3    slide shows the benefit she was entitled to before the plan was

4    amended, and as can be seen as of January 1, 2002, she still is

5    entitled to a larger benefit under the protected prior plan

6    benefit than she is entitled to under the cash balance plan

7    benefit even with her getting the enhancement.

8              THE COURT:  All right.  I understand what you're

9    saying.

10   BY MR. GOTTESDIENER:

11   Q.  The 30,000 foot view, what was the effect of the effect on

12   Ms. Cardona?

13   A.  Basically it froze her out.  The benefit is in '96, never

14   changed.

15   Q.  Now, you have an opinion, don't you, as to how benefits

16   should be recalculated in the event of prerequisites are found

17   by her Honor with no wear-away and giving people the benefits

18   that were promised in the plan materials.

19             Is that right?

20   A.  Yes.

21   Q.  Could you tell us, starting with using Mr. Osberg, starting

22   off with PX 1503.

23             THE COURT:  Do you want to hand me a copy?  Thanks.

24             (Pause)

25             THE COURT:  Let me be clear.  Is PX 1503 how you

F7FJOSB3                        Deutsch - direct

1    believe Mr. Osberg's benefits should be calculated?

2                THE WITNESS:  Yes.

3                THE COURT:  Why don't you explain 1503 to us.

4                THE WITNESS:  1503, instead of using the 9 percent

5    with mortality, that the initial account balance would have

6    been established with the 6 percent and no mortality.

7                So his initial account balance is calculated using

8    that calculation which would produce a method of 164664 as his

9    initial account balance.  That account balance, if you

10   projected it forward to age 65 at 6 percent interest, and

11   converted it under the worst-case scenario of the 6 percent

12   conversion rate at age 65, would have produced his protected

13   accrued benefits of the accrued benefit at age 65 after

14   conversion would in all cases been either equal to or larger

15   than what his 12-31-95 accrued benefit was.

16               I show next to that, we saw this column before, what

17   his present value lump sum would have been.  The reason the

18   present value lump sum is less than -- is caused by two

19   factors.  One is that the 1-1-96 calculation would be at 6

20   percent versus 6.09 percent.  There is a small difference due

21   to the difference in the interest rate.

22               It is that the calculation of the minimum lump sum is

23   calculated using mortality, but as we discussed yesterday, you

24   use mortality in the account balance and you end up

25   understating the benefit ultimately.  That is why the account

F7FJOSB3                        Deutsch – direct

balance is slightly more than the minimum lump sum in 1996.
You see in every single year year, the account balance value is
actually larger than the value of the protected 12-31-95
benefit.

        Now, we discussed this before that if you projected it
out to age 65, to get his age 65 benefit, at 6 percent, you
then discount it back in 2002 because of the lower interest
rates in 2002, he actually would be entitled to a slightly
larger lump sum attributable to the cash balance account than
the actual amount of his cash balance account, and that is the
36,639 we see.

        If he had this $35,000 account balance on October 1,
2002, the calculation of the associated benefit lump sum added
to that would have been 36,639.  That number is relevant for
the next paragraph.

        The reason it is relevant in the next paragraph, if
you take the difference between the 636, not the 35, but the
36, the benefit he would be paid and the 25,000, we get a
difference of 10,943.88.  There was a slide, I don't remember
the slide number, but there was a slide that showed the value
of his pay credits increased with interest, and the total of
the value of the pay credits increased with interest is that
exact same so 10,943.88.
Q.  That is 1497?
A.  You're asking me?  I don't know.

F7FJOSB3                        Deutsch – direct

1            THE COURT:  I know what he is talking about, 1497.

2            THE WITNESS:  So basically the difference between the

3    benefit that we would say calculated using the corrected

4    initial account balance and using the benefit to age 65,

5    minimum lump sum is described on the top of Page 12, during

6    those two calculations, we end up the difference between his

7    now corrected lump sum and the lump sum he was actually paid,

8    it lines up nicely as the value of the pay credits with

9    interest that he didn't receive.

10   BY MR. GOTTESDIENER:

11   Q.  Did Mr. Sher give an opinion as to whether, using a 6

12   percent no PRMD opening balance method is equivalent with A

13   plus B with no wear-away?

14   A.  Yes.

15           THE COURT:  That is present value mortality discount?

16   What is --

17           THE WITNESS:  Pre-retirement mortality discount.  It

18   is sometimes referred to that as PRMD.

19   BY MR. GOTTESDIENER:

20   Q.  I will hand up 1502, PX 1502.  Can you tell us what he said

21   about that.

22   A.  Well, actually to give a little history for just a moment,

23   I suggested in my opening report that if you did this, it would

24   eliminate wear-away on the age 65 annuity and on the lump sum

25   annuity.

F7FJOSB3                         Deutsch - direct

1    Q.  You did this?  Just to make sure the record is clear, did

2    what?

3    A.  I described this method of using 6 percent as the opening

4    account balance to eliminate the wear-away factor, eliminate

5    the lump sum wear-away effect and age 65 annuity wear-away

6    effect.

7            In Mr. Sher's rebuttal report, he indicated I was

8    wrong, it would not eliminate the wear-away effect, but after

9    his deposition, as noted in this quote here, he issued an

10   amended report -- there are a lot of amended reports in this

11   case -- he issued an amended report and he says in Paragraph

12   85, Footnote 19, basically says as I just said, that it didn't

13   eliminate the wear-away effect, but after reviewing and taking

14   into account the special provisions of Foot Locker plan, I

15   don't know, it would just take into account the provisions of

16   the Foot Locker plan, I concluded the footnote is incorrect and

17   hereby deleted.  He ultimately agreed it would eliminate the

18   wear-away.

19           THE COURT:  That is in Paragraph 8 of the supplemental

20   report of Mr. Sher, right?

21           THE WITNESS:  No.  This says 5 of 8 --

22           THE COURT:  It is Paragraph 8 refers in the

23   supplemental report to Paragraph 85, which is a reference to

24   the rebuttal report.

25           THE WITNESS:  Okay.  I will have to take your word for

F7FJOSB3                    Deutsch - direct

1    it, your Honor, because it is covered up by the yellow piece.

2              THE COURT:  Understood.

3    BY MR. GOTTESDIENER:

4    Q.  Now, going back to Ms. Cardona, in terms of the other

5    elements as to your opinion as to the enhancement, why that is

6    needed to make people whole, could you put up PX 1501 again.

7              MR. GOTTESDIENER:  Your Honor already has that set of

8    slides.  We looked at the first two.  This will be the third

9    slide.

10   BY MR. GOTTESDIENER:

11   Q.  Mr. Deutsch, could you explain why, in your opinion, the

12   enhancement needs to remain.

13   A.  Yes.  If we corrected the account balance for somebody such

14   as Ms. Cardona, then what would happen is because the initial

15   account balance would not reflect any of the value of the early

16   retirement subsidy, she still ends up in wear-away because of

17   the cash balance account.  While it reproduces the age 65

18   benefit properly, it doesn't reproduce the subsidized early

19   retirement benefit properly.

20             So what this is showing is -- this is not the slide we

21   want.

22   Q.  The third slide.

23   A.  This is the fourth slide.  This is the slide -- back.  This

24   slide.  What this shows is that if we did the initial account

25   balance without the enhancement, this is how her account would

F7FJOSB3                          Deutsch - direct

1    have grown.  This is the resulting cash balance immediate

2    annuity.  As you can see, it is less than what the already

3    earned as of 12-31-95 accrued benefit was, and so she still

4    would have been in wear-away if all we do is recreate her

5    opening account balance at 6 percent, but we don't give her an

6    enhancement.

7              So then we go to the next slide and we add on the

8    enhancement, then what happens is that her benefit is also

9    increased due to additional pay credits.  It doesn't line up

10   perhaps as nicely as one might like, but it does line up

11   nicely, and we see her benefits go up by $140, 130 some

12   dollars, 142, I guess, dollars, due to the additional benefits

13   earned in '96 and '97.

14   Q.  So what happens if you don't do the enhancement?  If you

15   remove the enhancement?

16   A.  If you remove the enhancement, you leave her in wear-away.

17   Q.  You did a chart that shows another way of looking at this,

18   1504 that we talked about before?

19             MR. GOTTESDIENER:  May I hand that up to your Honor?

20             THE COURT:  Yes.

21             MR. RACHAL:  Just note my objection, your Honor.

22             THE COURT:  On 1504?

23             MR. RACHAL:  Yes.

24             THE COURT:  Was that one of the ones we discussed

25   yesterday?

1          MR. RACHAL:  No.  That was the one this morning, the

2     slide over five years.

3          THE COURT:  The bump at 50?

4          MR. RACHAL:  Yes.

5          THE COURT:  All right.

6          MR. RACHAL:  Thank you.

7     BY MR. GOTTESDIENER:

8     Q.  So can you tell us what you're showing there and along the

9     way I guess address the bump at 50.

10    A.  Yes.  So if we divide this graph into the below 50 part and

11    the above 50 part, the below 50 part is this is what the

12    initial account balance would have been if we just used the 6

13    percent discount rate.

14         So this is the present value of the age 65 benefit at

15    6 percent.  Now, this chart assumes we have a person with at

16    least 15 years of service.  As we discussed before, I think,

17    once somebody has 15 years of service, it doesn't matter how

18    old they are, they've earned the right that when they get to

19    age 55, they can get the early retirement benefit.

20         So they can terminate the day after they achieve 15

21    years of service, then be 40 years' old, they have earned the

22    right at 15 years in the future, they're going to get the

23    subsidized early retirement benefit at age 55.  We are talking

24    pre-amendment, of course.

25    Q.  In the pension world, is that known as aging-into?

F7FJOSB3                       Deutsch - direct

A.   Yes, sometimes it is referred to when you have a future

right like that, you age into the benefit, so currently you're

40, you have to wait until you're 55 to get the benefit.  All

you have to do is get older.  You don't have to continue to

work.

          Starting at age 50, because that is kind of where the

plan drew the line, that is why I drew the line at 50, this is

the value for these people of the benefit they would get if

they ultimately elected the early retirement benefit at the

later of the current age or age 55.

          So from 50 to 55, it is the value of the benefit you

get at 55.  After 55, it is the value of the benefit they would

receive if they took the benefit immediately.

          THE COURT:  So the entitlement attaches at 50, in your

view, per the plan, but you can't actually do anything with it

until 55?

          THE WITNESS:  That's correct.

          THE COURT:  All right.  That is the difference between

the 50 and 55.

          THE WITNESS:  I was going to say technically if you

were 40, and you had 15 years of service, you already have the

entitlement, so that the above-the-bump line, you actually

should continue down, but when they decided well, who are we

going to address this issue with, they said well, we'll address

it for people who are 50, with 15 years of service, so I lined

F7FJOSB3                          Deutsch - direct

1    it up with their decision to address it only for the people who

2    were 50 years' old.

3             Technically, it applies all the way down.  Of course,

4    someone who is 20 doesn't have 15 years of service.

5             THE COURT:  In your view -- this is an exemplar --

6    this is an example of what you're putting together, assuming

7    various things, 15 years of service, 50 years' old?

8             THE WITNESS:  Yes.

9             THE COURT:  You will be able to address this with

10   Mr. Sher.  Go ahead.

11            MR. RACHAL:  My objection is when he was speaking to

12   Foot Locker's state of mind.  Part of his answer, he said this

13   is why they did it.  That is very much a disputed fact.  That

14   is why they did the enhancement.

15            THE COURT:  I assume nobody can speak to anybody

16   else's state of mind.  I understand.

17            MR. RACHAL:  Thank your Honor.

18   BY MR. GOTTESDIENER:

19   Q.  Could you then look at the last slide and explain what

20   you're graphically demonstrating here.

21   A.  The orange line is the value of the benefit at age 65,

22   discounted at 6 percent.  So this is, if you will, the value of

23   the benefit without the early retirement subsidy.

24            At the ages we are not showing the value, in other

25   words, the pre-50 ages, the orange line and the blue line line

F7FJOSB3                        Deutsch - direct

1    up, which is why you can't see the blue line, they're on top of

2    each other, they're exactly the same.

3             Once we say we are going to start reflecting the value

4    of the early retirement subsidy, if we don't do something to

5    cover that gap, then we'll see the same kind of wear-away that

6    was illustrated earlier for Ms. Cardona that the corrected --

7    using the term loosely -- the corrected cash balance account is

8    still going to fall short for these people of addressing the

9    early retirement subsidy.

10   Q.   Could we try to -- I know it is inexact, but could you try

11   to identify, we have a laser pointer, where Ms. Cardona, the

12   various numbers --

13            MR. GOTTESDIENER:  May I approach, your Honor?

14            THE COURT:  Yes.

15   BY MR. GOTTESDIENER:

16   Q.   -- where she would be still in wear-away or wear-away

17   points and the remedy that you're proposing at 6 percent with

18   the enhancement.

19   A.   In 1996, okay, I don't have a steady enough hand, she was

20   roughly around here.  She is 58 and 9 months, if I recall, that

21   was her age.  She has got this gap here between the benefits.

22            Then when she ultimately retired, she was just past

23   60, which is about here.  Her protected accrued benefit kind of

24   falls right in-between the blue line and the orange line.  The

25   orange line doesn't get her up high enough.  The blue line

F7FJOSB3                          Deutsch – direct

1    would actually be a little higher than her protected benefit

2    because, as she gets closer to 65, she has less and less value

3    to the early retirement subsidy, but it is not going to be off

4    by 30 percent because the difference in the ages are small.

5    She retired in the next year.  That is where she would fall on

6    the chart.

7    Q.  Could we just line those up with numbers at the orange line

8    where she would still be in wear-away, according to your

9    calculation, she is entitled to the 56093?

10   A.  I am flipping charts here.  Her number, her specific number

11   is, if she was on the orange line, she would have gotten 59376

12   ultimately.  On the blue line, she would have jumped up to the

13   7 -- I am sorry -- the orange line would put her at the 560.

14   That was on the fourth page of that 4 page prior.

15            THE COURT:  Of PX 1501?

16            THE WITNESS:  1501, right.

17   BY MR. GOTTESDIENER:

18   Q.  The orange line is the correction at 6 percent, but without

19   enhancement?

20   A.  She would have been at 56093.

21   Q.  That is still in wear-away?

22   A.  Still in wear-away because her protected level would be

23   above that line at 59376.

24   Q.  That is all she is receiving today?

25   A.  That is all she is receiving today.  If we put her at the

F7FJOSB3                        Deutsch - direct

1   blue line, she would be at 73599.

2   Q.  Under your remedy, she would go from today receiving

3   monthly 560 to 735?

4   A.  Yes.

5           MR. GOTTESDIENER:  That is all I have for Mr. Deutsch.

6           THE COURT:  All right.  Mr. Rachal.

7           You'll take every note that you've got with you that

8   is part of the open book exam back with you.

9           THE WITNESS:  The ones handed as an exhibit stay?

10          THE COURT:  We'll see what they need.  Did you mark on

11  them?

12          THE WITNESS:  No, I didn't mark on them.

13          THE COURT:  Leave them here.

14          THE WITNESS:  There is a pile.

15          THE COURT:  Don't worry about the pile.

16          THE WITNESS:  I have to separate them.

17          THE COURT:  Unless nobody cares.  They may not need

18  them.  Are you going to need him to leave here for Mr. Sher,

19  those exhibits to which he has referred?  Or will you be able

20  to reconstruct that yourself?  We'll separate them, that is

21  fine.

22          MR. RACHAL:  Yes.  We are trying --

23          THE COURT:  That is fine, we'll separate them.

24          THE WITNESS:  I am not sure, some of my notes look

25  just like the exhibits.

F7FJOSB3                          Deutsch j- cross

 1              THE COURT:  Your counsel will figure that out.

 2              What you guys need to do, the issue is, here is the

 3      point, on the witness stand if the defense wants to have a

 4      grouping of those documents to which Mr. Deutsch has referred

 5      in his testimony for Mr. Sher, you folks need to confer and

 6      assemble that grouping, which I am sure you can do.  It is

 7      really mostly the demonstratives, frankly, and the PXs  we have

 8      looked at.  That is what we are talking about.  It is the group

 9      of demonstratives.  You may proceed.

10      CROSS-EXAMINATION

11      BY MR. RACHAL:

12      Q.  Mr. Deutsch, good morning first.

13      A.  Good morning.

14      Q.  Mr. Deutsch, is it correct that based on your review of the

15      documents, do you believe Foot Locker's board was approving a

16      plan conversion without wear-away?

17      A.  I am sorry.  I was going to a different part of my memory.

18              MR. GOTTESDIENER:  Note my objection on relevance.

19              THE COURT:  No.  I will allow it.  Can you turn your

20      mike UP so it is closer to you.  You're asking whether or not

21      he believes that the plan as approved was a plan without

22      wear-away?

23              MR. RACHAL:  The board's, yes, the board thought it

24      was approaching a plan without wear-away.  Based on

25      Mr. Deutsch's review --

F7FJOSB3                    Deutsch j- cross

1           THE COURT:  You objected to all kinds of state of

2   mind, right?  You don't want to ask him what they thought.  I

3   will ignore all state of mind.

4           Do you have any information which indicates whether or

5   not the board understood that wear-away was part of the plan?

6           THE WITNESS:  Not what they understood, no.

7           THE COURT:  That gets to the same point.

8           MR. RACHAL:  Exactly correct.  Thank you.  A better

9   question.

10  BY MR. RACHAL:

11  Q.  PX 1484 --

12  A.  What?

13  Q.  -- PX 1484, the plan term on the initial account balance,

14  do you have it, Mr. Deutsch?

15  A.  No.  I will read this.

16          THE COURT:  I will look at my copy in my book, okay?

17          So it is PX, it is referring to PX 38 because I don't

18  actually have that particular document you have on the screen.

19  That is just a demonstrative of PX 38.  I have it.  It is at

20  Bates numbered Page 58-587-703.  You may proceed.

21  BY MR. RACHAL:

22  Q.  It is the plan term on the initial account balance?

23  A.  Yes.

24  Q.  Is it correct, Mr. Deutsch, if a participant completed an

25  hour of service on or after January 1st, 1996, he became

F7FJOSB3                           Deutsch j- cross

1    eligible for the initial account balance?

2    A.   That is what it says, yes.

3    Q.   You don't have any reason to dispute that, what the plan

4    term meant?

5    A.   No, I don't have any reason to dispute that.

6    Q.   If that same participant were at least 50, with 15 years of

7    service, does he also receive the enhancement to that initial

8    account balance, correct?

9    A.   That is not a hundred percent correct, but that is what it

10   says.

11   Q.   Why is it not a hundred percent correct?

12   A.   Once you are 65, you wouldn't receive it.

13   Q.   With the qualification -- well, wait.  I don't think that

14   is correct.

15   A.   Yeah, because the factor would be 1, so there is no

16   enhancement.

17   Q.   I understand the correction, Mr. Deutsch.

18            For a participant who is at least, would have at least

19   15 years of service and was age 50, but less than 65 at the

20   time of the conversion, he or she was eligible for this

21   enhancement at the same time he or she was eligible for the

22   initial account balance, correct?

23   A.   At the same time?

24   Q.   Yes.

25   A.   Yes.

F7FJOSB3                          Deutsch j- cross

1                THE COURT:  So the record is clear for later, the

2     Bates numbered -- I am still trying to locate this document.

3                MR. RACHAL:  I have the source as Plaintiff's Exhibit

4     38, Foot Locker 0SB OOO587 to 703, and I think this is at pages

5     606 to 07.  It is the plan provision, I think it is 1.23 on the

6     initial account.

7                THE COURT:  I see.  Okay, because of the way it was

8     put on there, I had the same issue yesterday.  It is actually

9     carried over to the next page here on this demonstrative.  It

10    appeared on the single page.  It is fine.  I am with you.

11    You're correct.

12    BY MR. RACHAL:

13    Q.  In form, the enhancement was one time increased to the

14    opening balance for the qualified participant, correct,

15    Mr. Deutsch?

16    A.  I am sorry?  Yes, that sounds correct.

17                THE COURT:  I am sorry.  In form -- I want to make

18    sure I understood.

19                (Pause)

20                THE COURT:  Got it.  Yes, you may proceed.

21                THE WITNESS:  I took me a second to process.  That is

22    why I delayed, yes.

23    BY MR. RACHAL:

24    Q.  As far as you know, Mr. Deutsch, this is how the

25    enhancement was described to the qualified participant as one

F7FJOSB3                    Deutsch j– cross

1    time increased to their opening balance?

2    A.   Essentially, yes.

3    Q.   Is it correct there were no communications to participants,

4    at least that you're aware of that called this enhancement pay

5    credits?

6    A.   No, they did not call them pay credits.

7    Q.   Is it correct that you do not recall ever seeing an SPD,

8    summary plan description, describing wear–away?

9    A.   That is correct.

10   Q.   Is it correct, Mr. Deutsch, that you have limited

11   experience on advising large employers, those who have more

12   than 10,000 lives in the plans on actuarial issues advising not

13   in litigation, but as an actuary?

14   A.   Well, everybody has limited experience.  I have limited

15   experience on that, yes.

16   Q.   You say everyone?

17   A.   Nobody has worked universally.

18   Q.   I am sorry?

19   A.   Everybody's experience is limited to their experience.  By

20   definition, everybody's experience is limited.

21            THE COURT:  Go ahead.

22   BY MR. RACHAL:

23   Q.   How many large plans –– and that is plans for more than

24   10,000 lives –– have you advised on as an actuary?

25   A.   In any capacity, I would say I don't know.  Half a dozen at

1    least.

2    Q.  How many plans have you advised on regarding large plans,

3    regarding cash balance conversions?

4    A.  None.

5    Q.  How many large plans have you advised on on plan

6    communication issues?

7    A.  Probably hundreds.  I don't know.

8    Q.  Large plans you have advised on?

9    A.  I am sorry.  I didn't realize you were caveating large

10   plans?

11   Q.  Yes.

12   A.  Large plans, a very small number.

13   Q.  Would one be correct?

14   A.  I know of at least one off the top of my head.  It is

15   possible there is more than one.

16   Q.  Thank you.

17          After the conversion, the cash balance plan expressed

18   the benefit to participants in the form of a lump sum, correct?

19   A.  Yes, they did.  Excuse me.  No, they didn't.  They

20   expressed it in the form of account, not a lump sum.

21   Q.  After the conversion, the cash balance plan expressed the

22   benefit as an account balance, correct?

23   A.  Yes, yes.

24   Q.  They could take that benefit as a lump sum or they could

25   elect to take it as an annuity?

F7FJOSB3                          Deutsch j- cross

1              They could take it as an annuity or elect to take it

2      as an account balance, correct?

3      A.   Except in certain instances, the lump sum, ignoring the

4      wear-away, which I assume you want to ignore the wear-away

5      issues for your comment, in certain instances ignoring the

6      wear-away issue, that --

7      Q.   That was called the whipsaw issue you talked about earlier

8      on where it rose more than it discounts back?

9      A.   I didn't call it a whipsaw.  It is sometimes referred to as

10     a whipsaw, yes.

11     Q.   The issue you talked about the plan's interest rate is 6

12     percent at 417 (e), but you have applied to the benefit when

13     you calculating it to age 65, but the 417 (e) discount rate is

14     less than 6 percent, the discount will be less than it grows,

15     is that correct, Mr. Deutsch?

16     A.   Well --

17     Q.   Simplyfing it?

18     A.   Simplified, because that is not exactly correct.  The

19     interest rate would have to be below about five and a half

20     depending on the individual's age, that generic concept.

21     Q.   That creates a situation in which the account balance could

22     be a little -- excuse me -- setting aside any issue of

23     wear-away, would there be a benefit based on account balance

24     could be a little larger than the account balance as of the

25     issue we talked about, generically called whipsaw?

F7FJOSB3                    Deutsch j- cross

A.  I disagree with your comment a little.  There are actually

people in the plan who do not receive -- didn't receive the

benefit that is attributable to the 12-3-95 benefit who were

paid a lump sum over double their account balance in 2009 in

particular.  So a little is not universal.

Q.  Whatever the amount is, this is a benefit they got under

the plan, and that feature that caused, that had the 6 percent

interest crediting rate combined with the 417 (e) that caused

the benefit they got under the term of the plan with legal

requirements would be larger than their account balance?

A.  Obviously, there are more issues to it than that, but

generically it is the disparity between the 417 (e) discount

rate and the plan interest rate of 6 percent.

Q.  That could cause them to get a larger benefit, not a

smaller benefit than their account balance?

A.  Based on how the plan is written, that's correct.

Q.  Is it correct more than 90 percent of class members who

made distribution elections have elected the lump sum form of

benefit?

A.  No, that is not correct.

Q.  Excluding cash-outs and those are the ones who aren't

making elections to pay their lump sum benefit, I think I

understand it is under 3500, is it correct more than 90 percent

of the class members who made distribution elections elected to

form benefit elected lump sums?

F7FJOSB3                        Deutsch j- cross

```
 1   A.  I don't believe that is the correct number, no.
 2             THE COURT:  Did you say yesterday like 97 to 99
 3   percent elected lump sum?
 4             THE WITNESS:  No.  Received lump sums.
 5             THE COURT:  Received?
 6             THE WITNESS:  Yes.  There is an important distinction.
 7             THE COURT:  That is the automatic lump sum that you
 8   get if you get the de minimis?
 9             THE WITNESS:  Yes, because there were so many people
10   who got the de minimis, when you cull the people who got de
11   minimis out of the percent of people who elected lump sums
12   declined significantly.
13             In my opening report I mistakenly said it was 90-some
14   percent, but in my rebuttal report I corrected that and said
15   when you remove the de minimis people, the percentage drops,
16   and I represented -- so a person terminates.
17             THE COURT:  I get it.  The denominator is different.
18   If you look at denominator of the entire class, it will be
19   different than those making elections?
20             THE WITNESS:  Right.  He is asking a slightly
21   different question than what I put in my report.
22             When you terminate, you have, if you will, effectively
23   3 options:  Take the annuity; take the lump sum; or choose to
24   continue to wait.  If you only count the people who you elect
25   lump sums, I remember the number is 72 percent of the people
```

F7FJOSB3                          Deutsch j- cross

1    were faced with a choice.

2          The question was if you take those people out of the

3    calculation and only compare lump sum versus annuity, and I

4    don't remember what that percentage is.

5    BY MR. RACHAL:

6    Q.  I am going to go and seek because I am not sure if we have

7    disagreement, Mr. Deutsch, for a terminology.

8          What I am talking about is, I do want you to factor

9    out people who have, were forced out, factor out people who

10   have not made a decision yet.  They haven't commenced their

11   benefit, haven't made a decision on the form of benefit they're

12   electing.

13         For people who have elected a form of benefit, is it

14   correct that more than 90 percent of those people had elected

15   the lump sum form of benefit?

16   A.  I don't remember that.

17   Q.  Go ahead, if you would, and call up Deutsch 57, Deutsch

18   deposition 57, Line 3 to Line 13 first.

19         It might not be totally clear.  The preface was on the

20   lump sums.  Then if you go ahead and go to 59, 8 to 17.

21         (Pause)

22         Does that refresh your recollection, Mr. Deutsch?

23   A.  Yes, so the 72 percent is the 72 percent that was in the

24   prior clip that I was remembering, and then at the deposition I

25   was remembering it was roughly 90 percent of the -- if you

1    remove the people who had deferred their decision, it was

2    roughly 90 percent who elected lump sums versus annuities.

3    Q.  And the converse of that would be something less than 10

4    percent would have elected annuities for those who made benefit

5    election?

6    A.  If it was above 90 percent.

7    Q.  If it was at 90 percent --

8    A.  If it was a little bit below, it would be a little bit

9    above, but I don't remember that number specifically.

10   Q.  Is it correct, Mr. Deutsch, the prior plan offered on an

11   annuity commencing at age 65 or reduced at age 55, again

12   setting aside the cash-outs?

13   A.  Setting aside the cash-outs, that is not completely true.

14   It is close.

15   Q.  Go ahead and tell --

16   A.  You can take your benefit after age 65.

17   Q.  My question was they could elect a benefit -- let me stay

18   the question.  Under the prior plan, setting aside cash-outs,

19   the earliest sum you could commence a benefit was at age 55,

20   correct?

21   A.  That is correct.

22   Q.  The benefit form was in the form of annuity at age 55,

23   correct?

24   A.  If you took it at 55, that would be correct.

25   Q.  Is it correct that other than the cash-outs, the prior plan

1   did not offer lump sums as a benefit option?

2   A.   I seem to recall this weird provision that dealt with death

3   benefits, but that is not really participant elections.   On

4   participant elections, that's correct.

5   Q.   See if we can have agreement on terminology.   What I am

6   going to refer to as the protected, protected lump sum is the

7   benefit once the lump sums are offered, which the plan did, the

8   lump sum value of the annuity accrued to conversion under the

9   plan that is protected by 417 (e) and some other provisions of

10   the code, so the protected lump sum benefit is the lump sum

11   value of I think you call it the frozen annuity.

12          Do we have agreement on that terminology?

13   A.   Let me make sure I understand.   When Mr. Osberg took his

14   benefit in 2002, he received what you're going to call the

15   protected lump sum?

16   Q.   Correct.

17   A.   All right.

18   Q.   That is the terminology.   That is what I mean when I say

19   protected lump sum.

20   A.   Okay.

21   Q.   The expected wear-away for the protected lump sum benefit

22   was difficult to predict, wasn't it, Mr. Deutsch?

23   A.   "Difficult" is a relative term.   It was predictable and it

24   could be predicted within certain reasonable tolerances.

25   Q.   To convert to age 65 annuity accrued to the time of the

F7FJOSB3                          Deutsch j- cross

1    plan conversion to December 31, 1995, into the protected lump

2    sum benefit, corrected, you used the mortality assumptions

3    required by the Internal Revenue Code 417 (e)?

4    A.   I didn't understand the context.  When did I do that?  The

5    answer is sometimes I did.  I am not sure of the context.

6    Q.   The context would be after the plan conversion?

7    A.   Are you talking about how the plan would do it or how I did

8    it in the report?

9    Q.   No.  I am talking about the legal requirement.

10   A.   Okay.

11             THE COURT:  Why don't you restate it because you did

12   say you used the mortality assumptions and so I think it is --

13   are you talking --

14             MR. RACHAL:  I understand that.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

F7fnosb4                         Deutsch - cross

1   Q.  To convert in, the age 65 annuity accrued to the plan

2   conversion, to December 31, 1995, into the protected lump sum

3   benefit, is it correct that the law requires you to use the

4   Internal Revenue Code 417(e) assumptions?

5   A.  Yes.

6   Q.  To calculate this protected lump sum, you use the 417(e)

7   rate in place when the participant elects the distribution of

8   the lump sum benefit, not the rate in place when the plan is

9   converted, correct?

10  A.  Again when you are saying you, you mean the plan, and the

11  answer would be yes.

12  Q.  OK.  Thank you.

13          Because you have to use the 417(e) rate in effect when

14  the participant terminates, not at plan conversion, is it

15  correct that makes it more difficult to estimate the expected

16  lump sum wear-away because the 417(e) rate fluctuates from year

17  to year?

18          THE COURT:  I'm sorry.  Let's back up to the prior

19  question.

20          MR. RACHAL:  I'm sorry.

21  A.  I think I misunderstood the question.  You said when they

22  terminate.  You use the 417(e) rate when they terminate.

23  Q.  I said because --

24  A.  No.  The prior question.

25          You said you use the 417(e) rate when they terminate.

F7fnosb4                          Deutsch - cross

1    That's not the 417(e) rate you use.  You use the 417(e) rate

2    when the benefit is paid.

3    Q.  You are correct.

4    A.  Not when they terminate.  I wanted to correct that answer.

5    Now, if we go to this answer --

6    Q.  Ah.

7    A.  -- the question has to say --

8    Q.  Just so the record is clear, the 417(e) rate that you had

9    to use to calculate the protected lump sum is a rate in place

10   when the participant not only terminates but also elects the

11   lump sum form of benefit?

12   A.  When they terminate is not relevant.  It's when the benefit

13   is paid -- not when they elect.  It's when it is paid that's

14   relevant.

15   Q.  Am I correct that, setting aside those who are over 70 and

16   a half, that a participant is not going to be able to elect the

17   lump sum benefit until after they terminate?

18   A.  In this plan, that is, as far as I know, correct.

19   Q.  Other than those who are over 70 and a half, you cannot --

20   the 417(e) rate used to calculate the protected lump sum is

21   determined once they terminate and elect the lump sum benefit,

22   correct?

23          THE COURT:  I'm sorry.  I've gotten confused as to

24   which plan we are talking about.  We are talking about the

25   1/1/95 and prior plan?  The 12/31/95?

F7fnosb4                        Deutsch - cross

1             MR. RACHAL:  Sorry, your Honor.

2             THE COURT:  The amended plan?

3             MR. RACHAL:  The amended plan, yes.

4             THE COURT:  Got it.

5             MR. RACHAL:  This is all under the amended plan.  The

6    prior plan didn't offer the lump sum benefit.

7             THE COURT:  Right.  OK.

8    A.  So, other than over 70 and a half people, you wouldn't know

9    the 417(e) rate until after the person terminated because it

10   would be as of a date after their termination date.

11   Q.  OK.  The fact that the 417(e) rate is not fixed until

12   someone is actually getting paid their benefit makes it more

13   difficult to estimate the expected lump sum wear-away.

14            Is that correct, Mr. Deutsch?

15   A.  Only to a limited degree.  If you are looking at the 417(e)

16   rate rising, then that is a correct statement.

17            But if you are looking at the 417(e) declining, once

18   the 417(e) rate declines below five and a half percent, then

19   what happens is that the lump sum value of the cash balance

20   account, that what you call whipsaw, starts increasing the lump

21   sum value of the account at the same time it's increasing the

22   lump sum value of the protected benefit and the two are going

23   up at the same rate.

24            So the difference between the two as a percentage

25   remains constant, and so you come out of the lump sum wear-away

F7fnosb4                          Deutsch - cross

1    once the interest rate is below five and a half percent at the

2    same point in time you come out of the age 65 annuity

3    wear-away.  That is unrelated to the 417(e) rate, if the 417(e)

4    rate is below 6 percent.

5              So the point is there's, it is slightly age dependent

6    because of the mortality, but once you fall below five and a

7    half, it is a discernible period.

8    Q.  This is your sworn-in report, page 16, the difficult to

9    estimate part.  I think it's Exhibit 13A, if I recall.

10             MR. GOTTESDIENER:  I object if there is the suggestion

11   by the sworn-in thing that there's any inconsistency.

12             THE COURT:  I understand.  If it is, it is.

13             All right.  He did swear to his report.  There's no

14   doubt about that, right?

15             MR. GOTTESDIENER:  Right.

16             THE COURT:  OK.

17             MR. GOTTESDIENER:  What I'm saying what he's pointing

18   to is not inconsistent with what he is saying.

19             MR. RACHAL:  I just want the answer to that question.

20             THE COURT:  All right.

21             We'll figure it out.

22             MR. RACHAL:  I'm getting to --

23             THE COURT:  I don't even need to talk about it.  Just

24   go ahead and ask the question.

25             MR. RACHAL:  OK.  Thank you, your Honor.

F7fnosb4                          Deutsch - cross

1   Q.   Is it correct that you testified that, because of having to

2   use the 417(e) rate when somebody commenced their benefit, took

3   the lump sum benefit, that that makes it more difficult to

4   estimate the expected lump sum wear-away because the 417(e)

5   rate fluctuates from year to year?  You still stand behind that

6   testimony?

7   A.   Yes, it does make it more difficult.  But there is a limit

8   to the difficulty was my point.

9          MR. RACHAL:  All right.  If you would pull up the

10  difficult to predict, section.

11         I'm sorry.  Difficult to predict.

12  BY MR. RACHAL:

13  Q.   Is it correct that you testified, Mr. Deutsch, that the

14  fluctuation in the 417(e) rates means that the lump sum value

15  of the future year of even a frozen accrued benefit can be

16  difficult to predict?

17  A.   Yes.

18  Q.   You still stand behind that testimony?

19  A.   Yes.

20  Q.   If, for example, the 417(e) rate rises, the lump sum value

21  of that benefit may go down, correct?

22  A.   That is correct.

23         MR. RACHAL:  Pull up PX 1492.

24         If you would, highlight -- yes.  Thank you.

25  Q.   So this is your calculation of what I've called the

F7fnosb4                           Deutsch – cross

1   predicted lump sum benefit, the far right column.  That column

2   is 12/31/95 benefit value.

3           Correct, Mr. Deutsch?

4   A.  That's correct.

5   Q.  For Mr. Osberg that value went down about 25 percent

6   between 1999 and 2000, correct?

7   A.  Yes, it looks like about 25 percent.

8   Q.  As a dollar value it went from $23,432 to $17,605.

9           Correct, Mr. Deutsch?

10  A.  That is correct.

11  Q.  Is it correct that this volatility in the value of the

12  protected lump sum benefit can be even greater for younger

13  employees -- and I'm going on to give you an example and see if

14  you agree -- that a half a percent drop in the 417(e) rate from

15  6 percent to five and a half percent can cause a 23 percent

16  increase in the lump sum benefit due a 30-year-old?

17  A.  Yes.  So what's going on here, is that the promise under

18  the plan could be viewed -- I think I discussed this

19  yesterday -- could be viewed as a promise of a payment years in

20  the future.  So the guy is -- did you say 30 or 35?  I forget.

21  Q.  30.

22  A.  30.  So his payment is not just 35 years in the future

23  because that's the age 65 payment, but it's 35 years, 36 years,

24  37 years, because it's each year after he retires and compound

25  interest, that's the nature of compound interest.  If you

F7fnosb4                          Deutsch - cross

compound even small interest rate changes over an extended

period of time, while the ultimate amount is not changing, the

current value of it could fluctuate significantly due to small

changes in the interest rate.

Q.   So, to use an example -- use Mr. Osberg here -- if he was

10 years younger, the amount of that change would, on the

12/31/95 benefit, between 1999 and 2000 would be even larger

because of the compounding interest issue you just flagged?

A.   Yes, the fluctuation would be larger.

Q.   Is it correct that prior to 1985 there was no 417(e) rate,

and instead the rate to convert an annuity to a lump sum

benefit simply had to be reasonable?

A.   You are talking about in the law?

Q.   Well, you are an actuary.  You understand the actuarial

practice prior to 417(e).

A.   I'm sorry.  I'm trying to find the context of your

question.

Q.   Sure, Mr. Deutsch.  Yes.  I guess the way I'm putting it --

as an actuary your understanding -- I understand the law is the

law.  But your understanding of the practice, or the legal

requirements, your understanding prior to 1985, is -- let me

back up to even before.  Is it correct that prior to 1985,

there was no 417(e) requirements?

A.   That is roughly my recollection.  That sometime around 1985

was --

F7fnosb4                          Deutsch - cross

1   Q.  So if you're converting an annuity into a lump sum prior to

2   around 1985, is it correct that the actuarial assumption simply

3   had to be "reasonable"?

4   A.  No.  That's not completely correct.  They had to be stated

5   in the plan.

6   Q.  And if the plan stated assumptions, they had to be

7   reasonable?  I don't know if it was individually or in the

8   aggregate.

9   A.  I don't think the regulation is that precise.  But since

10  there's really only two assumptions in the aggregate, it really

11  doesn't have much influence here, but I believe that's the

12  guideline at the time, reasonable.

13  Q.  All right.  Is it correct that everyone in the amended plan

14  was entitled to receive at least their initial account balance

15  plus the paid interest credits added to that account balance?

16  A.  I am not sure I completely understand the question.  Are

17  you saying that the lump sum in no event could be less than the

18  account balance?

19  Q.  Correct.

20  A.  That's my understanding of the plan, yes.

21  Q.  Is it correct that a participant may receive more than that

22  account balance -- you just mentioned one example was

23  whipsaw -- but never less?  Your understanding of the terms of

24  the plan?

25  A.  Well, it can't just be any random amount.  The plan defined

F7fnosb4                    Deutsch – cross

1    what the amount would be, and in certain instances that would

2    be an amount that was more than the account balance.

3    Q.  But never less?

4    A.  But it did say nobody could receive less than the account

5    balance.

6    Q.  All right.  The next topic I want to ask about is the

7    causes of wear-away for annuities versus what causes wear-away

8    for lump sums.  For myself it was not an easy issue to first

9    understand.  On wear-away, would you agree that wear-away

10   exists to the extent the new cash balance account benefit is

11   less than the sum of -- I'm including in new cash balance,

12   whatever you pay in interest, credits accrued after that -- is

13   less than the sum of the protected prior accrued benefit, plus

14   the benefits accrued after that amendment date?

15   A.  I would not describe wear-away like that, but I think --

16   not because we disagree with each other.  I just think that is

17   a poor way to describe it.

18   Q.  You describe it.

19   A.  What I would describe it as is what the benefit would have

20   grown to without regard to the protection of the prior accrued

21   benefit.  The increase from the amendment date to that date is,

22   if you will, the postamendment increase.  And the actual

23   increase is the actual increase, or the difference between the

24   two is the amount of the wear-away.

25   Q.  Let me state it a little differently, Mr. Deutsch.  Under

F7fnosb4                      Deutsch - cross

1   the notion of an A plus B benefit that we have talked about, if
2   your A benefit is -- let's keep it simple right now and just
3   talk about lump sums -- the value of your protected lump sum
4   whenever you terminate and take a distribution, and the B
5   benefit is the value of your pay credits and interest credits
6   accrued under that, is that what you would call an A plus B
7   plan, or an A plus B benefit?
8   A.  We are ignoring where the enhancement fails in that.  But
9   for somebody who didn't get an enhancement then, yes, I would
10  call that an A plus B benefit.  That's not the only way to do
11  it.  But that would be a way to do an A plus B benefit.
12  Q.  Under the A plus B benefit that you just described, is it
13  correct that the person would not have wear-away?
14  A.  In an A plus B benefit that's done correctly they would not
15  have wear-away.
16  Q.  I understand we disagree about where the enhancement fits,
17  but I want to be sure we are correct on the terminology.
18          Is it correct that wear-away on lump sums is caused
19  principally the difference between the 417(e) rate at the date
20  of distribution versus the discount rate used to determine the
21  opening account balance?
22  A.  Until the rate falls below five and a half percent, I would
23  agree with that.
24  Q.  And below five and a half percent this plan has a feature
25  that protects participants and provides a larger benefit from

F7fnosb4                        Deutsch - cross

1   the whipsaw feature, is that correct?

2   A.  Yes, if I understood the question correctly.

3   Q.  Is it correct that wear-away -- excuse me.  I'm asking the

4   wrong question.  I should probably remove my glasses.

5        Is it correct that wear-away for annuities is caused

6   principally by the difference between the plan's interest

7   crediting rate -- here it was 6 percent -- and the discount

8   rate used to determine the opening balance, which was 9

9   percent?

10  A.  Yes.

11       THE COURT:  So it's the 6 percent versus the 6.06

12  percent as of 1/1/96?

13       THE WITNESS:  Well, this is oversimplified because

14  there's more to it than that, because passage of time has an

15  impact on this when you are looking at the lump sum.

16       And, of course, the 417(e) rate has a minor impact in

17  converting the cash balance account into the annuity when the

18  rate is above 6 percent.

19       But in the lump sum it's the difference effectively --

20  on 1/1/96, the wear-away on 1/1/96, not on a dater date is the

21  difference between the 9 percent and the 6.06, whereas the

22  annuity it's the difference between the 9 percent and the 6.

23       THE COURT:  The 9 percent and the 6 percent?

24       THE WITNESS:  Yes.

25       THE COURT:  Right.

F7fnosb4                          Deutsch - cross

1          So the 9 percent is the same on both sides, whether it

2     is a lump sum or annuity.

3          THE WITNESS:  Yes.

4          THE COURT:  The difference is the 6.06 for lump sum,

5     which is the 417(e), versus the 6 percent, which is a rate set

6     in the plan?

7          THE WITNESS:  Yes.

8          THE COURT:  OK.  Got it.

9     BY MR. RACHAL:

10    Q.  That leads to the follow-up question, which is the 6.06

11    percent just happens to be the spot rate, 417(e) rate at the

12    date of conversion, correct?

13    A.  Yes.

14    Q.  So if someone terminated three years later and the 417(e)

15    rate was -- lets take Mr. Osberg.  Mr. Osberg I think

16    terminated seven years later.  The 417(e) rate was 5.48 percent

17    I think.

18          It's correct that his lump sum benefit is being

19    calculated, his protected lump sum benefit is being calculated

20    using 5.48 percent, not 6.06 percent?

21    A.  That is correct.

22    Q.  That would go to the converse?  When the 417(e) rate went

23    up to 6.55 percent in 1997, the protected lump sum benefit

24    would be calculated using that 6.55 percent rate, correct?

25    A.  That is correct.

F7fnosb4                    Deutsch - cross

1    Q.  So, for the wear-away -- for the protected lump sum, that

2    wear-away isn't fixed, if it exists, until someone terminates

3    and takes their benefit distribution as a lump sum, correct?

4    A.  Well, that is not completely correct, but it is close to

5    correct.  The problem lies in what happens over the passage of

6    time, but generically the amount of the lump sum wear-away you

7    won't know until you know the amount of the lump sum, and

8    therefore you won't know until the 417(e) rate is fixed.

9    Q.  To convert the age 65 annuity accrued to December 31, 1995,

10   to plan conversion, into the protected lump sum benefit -- I

11   think we've covered this, sorry, but just bear with me for a

12   second -- is it correct that you use not just the interest

13   rate, but also the mortality assumption provided by 417(e)?

14   A.  OK.  I lost the front of the question.  So --

15   Q.  All right.  When you are converting the, excuse me, the

16   protected -- or we'll call it your term -- frozen annuity into

17   the protected lump sum benefit at date of conversion, 417(e)

18   has mortality assumptions if you use it to do that, correct,

19   that it permits you to use?

20   A.  I would debate the issue of permits, but that is not at

21   issue here, so that is the way the plan was doing it.

22   Q.  When I say permitted to use under 417(e), to convert an

23   annuity payable in the future into a lump sum payable today

24   there are two discounts that are applied, correct?

25   A.  Again, as I said, I would dispute that issue, but that is

F7fnosb4                    Deutsch - cross

1    not at issue here, so that's the way the plan did it.

2    Q.  Right.

3    A.  I knew what you meant.  I don't necessarily agree with it.

4    Q.  Right.  I just want to make sure for the judge's purposes

5    we understand this is what also the law permits.

6    A.  I would dispute that, but that is not an issue in the case.

7            THE COURT:  I think you are disagreeing as to whether

8    it is at issue in the case.

9            I think, as I understand the point, what counsel is

10   getting at is that 417(e) builds in as part of its formula as

11   to what a participant would be entitled to a, if you are going

12   to take their benefit and convert it, you use both a discount

13   rate and a mortality assumption.

14           THE WITNESS:  Yes.

15           in *Berger v. Xerox*, Xerox argued that that's how it

16   should be done, and the Court said, no, that's not how it

17   should be done.  So it's not that 417(e) requires that

18   mortality discount.  In that particular case the court

19   disagreed.

20           What I am saying is we are not disputing in the 417(e)

21   calculation -- at least not to my knowledge, I don't want to

22   speak for plaintiff's counsel.  But to my knowledge plaintiffs

23   are not disputing the use of mortality for that discount for

24   417(e).  But I do dispute that the law says you are always

25   allowed to use it.

F7fnosb4                           Deutsch – cross

1            As I said there's this court case that said they were

2      not allowed to use it.

3            THE COURT:  All right.  I understand the point.

4            MR. RACHAL:  OK.

5      BY MR. RACHAL:

6      Q.  Agree that when Foot Locker converted the prior annuity to

7      the initial account balance that Foot Locker used the mortality

8      tables specified under the Internal Revenue Service's guidance?

9      A.  So, the calculation of the initial account balance used the

10     417(e) mortality table?

11     Q.  Yes.

12     A.  The answer is yes.  That's my understanding, and I was able

13     to reproduce those calculations.

14     Q.  It's correct that the IRS mortality table used for 417(e)

15     converts future annuity payments into a lump sum payable today,

16     is that correct?

17     A.  That's -- that's kind of a non sequitur.  That's what they

18     are being used for.  That's not what they do.  All they do is

19     predict the probability of death at a particular age.

20     Q.  With that qualification, the 417(e) tables gives you a

21     discount, mortality discount to apply to the converted annuity

22     payable in the future to a lump sum payable today?

23     A.  Well, with the caveat about whether it applies between now

24     and 65, that is effectively what it does, yes.

25     Q.  All right.  So that is my follow-up.

F7fnosb4                          Deutsch - cross

1   A.  It is used in that calculation I guess would be a better

2   way to say it.

3   Q.  I'm sorry?

4   A.  It's is used in that calculation, but it's not the sole

5   thing in the calculation.

6   Q.  All right.  Is it correct that the IRS mortality table used

7   for 417(e) does not draw a distinction between pre- and

8   postretirement mortality?

9   A.  It's simply a probability of death.

10  Q.  But it is --

11  A.  There is no retirement in the table.  There is no -- it's a

12  non sequitur.

13  Q.  So is it correct that it does not attempt to draw a

14  distinction between pre- and postretirement mortality, the IRS

15  417(e) mortality table?

16  A.  It's not --

17          THE COURT:  Is your question does retirement impact

18  mortality or is it something different?

19          MR. RACHAL:  No, it's that the table itself that's

20  used under 417(e) published by the IRS does not draw a

21  distinction between whether it's applied to preretirement

22  mortality or postretirement mortality.

23          THE COURT:  Right.  It's just a matter --

24          MR. RACHAL:  Years.

25          THE COURT:  -- if you are 45 how likely are you to

F7fnosb4                          Deutsch - cross

1    live to 100, irrespective of what activities you may be

2    undertaking during that time?

3              Is that what you mean?

4              MR. RACHAL:  Yes.

5              THE WITNESS:  Well, the table is the probability of

6    death at each age.

7              THE COURT:  Irrespective of activity?

8              THE WITNESS:  It doesn't address any other issues.

9              THE COURT:  So retirement is irrelevant to the table,

10   is that right?

11             THE WITNESS:  Yeah.  The table doesn't talk about how

12   it's applied.

13             THE COURT:  Got it.  I understand.

14             MR. RACHAL:  All right.

15   BY MR. RACHAL:

16   Q.  If the 417(e) rate would have been 8 percent at the time of

17   the plan conversion, would you agree that creating an opening

18   balance using an 8 percent discount rate would have created an

19   actuarially equivalent opening balance?

20   A.  I'm trying to process that question.  I think the answer is

21   no.  I would not agree with that.

22   Q.  Why not?

23   A.  So the plan rate is still 6 percent.

24             The 417(e) rate is 8 percent.  So you would use 8

25   percent to create the opening account balance, and the opening

F7fnosb4                    Deutsch - cross

1    account balance when projected to age 65 would fail to

2    reproduce the benefit that it was supposed to be equivalent to,

3    and, therefore it wouldn't be equivalent to that benefit, so it

4    would not be an equivalent -- that opening balance would not be

5    equivalent to the benefit it was supposed to be representing.

6    Q.   If the interest crediting rate -- we'll use the assumptions

7    you talked about -- is 6 percent, and the 417(e) rate is 8

8    percent at the date of conversion, creating an opening balance

9    using the 6 percent rate will create a lump sum benefit

10   immediately after the conversion substantially larger than the

11   protected lump sum benefit under 417(e), correct?

12   A.   Well, we have the word "substantial" in there, which is age

13   dependent.  So it would be larger depending upon -- substantial

14   would depend upon the person's age.  At 30, clearly

15   substantial; but at 65, you know, maybe it's not so

16   substantial.

17          That's because the benefit is not less than the

18   account balance, and the account balance at that point would be

19   more than the minimum lump sum.

20   Q.   I think earlier you talked about when the plan was

21   converted it created a right to a lump sum, they had that right

22   to lump sum from day one after the conversion, correct?

23   A.   As the judge said, they possessed it from January 1, 1996.

24   Q.   Correct.  So if, using again my hypothetical, the plan's

25   interest crediting rate is -- excuse me.  You are saying the

F7fnosb4                         Deutsch - cross

1    plan's interest crediting rate is 6 percent.  You say you must

2    use that rate to set the opening account balance.  In fact, the

3    417(e) rate is 8 percent.  On day one, if they leave and take

4    their lump sum benefit, they are going to walk out with a

5    benefit -- let's use somebody 30 -- that's substantially larger

6    than their protected lump sum benefit.  Their account balance

7    is going to be, under that scenario, substantially larger than

8    their protected lump sum been benefit.

9    A.  At age 30 it would be.  But let's play this out.  Let's

10   take and create the opening being balance and say the 417(e)

11   rates are static, 8 percent.  They never change.

12       You create the opening account balance at 8 percent --

13   excuse me, at 6 percent.  You credit the account balance at 6

14   percent, and the guy waits until he's 65 to take his benefit.

15       At 65, the account balance is only going to be

16   different from the 417(e) lump sump by the ratio of the

17   conversion rate at 65 at 8 percent to 6 percent, which is I am

18   going to guess 20 percent, probably in that neighborhood.

19       And so this would only be a 20 percent difference at

20   age 65, so it depends on when the guy ultimately takes his

21   benefit.

22       If he does, in fact, take his benefit when he's 30,

23   then you are going to have this 2 percent interest arbitrage

24   operating for 35 years to age 65, and that's going to be a

25   substantial difference.

F7fnosb4                          Deutsch – cross

1   Q.  I think we've discussed it earlier, but it is correct each

2   participant under the plan after the conversion had possessed

3   the right to take that lump sum benefit any point after the

4   conversion, provided they terminated, those who were not over

5   70 I think?  They had that right to take the benefit and go,

6   take it with them, portable, correct?

7   A.  If they took it within six months of termination.

8   Q.  With that qualification, correct?  Otherwise, they would

9   have to wait until age 55 to --

10  A.  That sounds --

11  Q.  -- elect the benefit?

12  A.  -- like my recollection of the plan, yes.

13  Q.  Would you say that, using the 417(e) rate in effect at the

14  date of conversion would create actuarial equivalence?

15  A.  Well, technically, no, but in this case, because the two

16  rates were so close to each other, the variance would have been

17  small.

18  Q.  I am not trying to rely on the difference between 6 and

19  6.06 percent.  I am saying whatever -- just so we're clear on

20  my question, whatever the 417(e) rate was at date of

21  conversion, if that was used to create the initial account

22  balance, would you consider that to be actuarially equivalent

23  or not?

24  A.  In this context, no.  The actuarial equivalent is the

25  account balance when it grows back to the benefit at age 65

F7fnosb4                          Deutsch - cross

1   produces the benefit it's replacing.

2           So, for example, if you created the opening account

3   balances using 5 percent, you have now overstated the value.

4           MR. RACHAL:  John, would you pull up, I think it's his

5   opening report, page 3.

6   Q.  The highlighted part, this is from your sworn-in report:

7   The actuarial equivalent lump sum value of an accrued benefit

8   could be reasonably calculated by using one of two alternative

9   assumptions about the lump sum.  One, the lump sum would be

10  immediately cashed out and invested by the participant.  Under

11  scenario one, because ERISA requires a plan to use an assumed

12  rate of interest published by the IRS 417(e) applicable

13  interest rate that was 6 percent at the time of the conversion

14  to determine a lump sum present value, that same rate would be

15  used for this purpose.

16          Do you still agree with your testimony in that?

17  A.  Yes.  I believe this was in the context of communication,

18  not in the context of what the plan should have done to create

19  an actuarially equivalent benefit.

20          When they were communicating the value in the

21  communication, what they were saying to the participant was

22  this was the value of your already accrued benefit.  If you

23  were saying that to a participant, then there would be two

24  options.  One is that is the value if you took it as a lump

25  sum, and the other is that's the value if you leave it in the

F7fnosb4                        Deutsch - cross

1    plan.

2              And the value if you look it in a lump sum would have

3    to be what you would get as a lump sum.  That's what it is

4    saying here.

5    Q.  If I understand then your qualification or clarification,

6    in your view the only way you can have an actuarial equivalent

7    lump sum benefit at plan conversion is to use the plan's

8    interest crediting rate no matter what that rate is?

9    A.  I'm sorry.  Let me change your terminology there for a

10   second.

11   Q.  Sure.  Go ahead?

12   A.  It's not an actuarial equivalent lump sum benefit at

13   conversion we are talking about.  It is an initial account

14   balance we are talking about.

15   Q.  With that qualification --

16   A.  OK.

17   Q.  -- to create the initial account balance --

18   A.  In other words, for the initial account balance to be

19   equivalent to the benefit it's replacing, it has to produce the

20   same benefit, which means you are in a closed box, and the

21   closed box is a fixed 6 percent return.

22   Q.  If the return were based on 3 percent, the interest

23   crediting rate were 3 percent, you would say that you would

24   have to create that initial account balance using the 3 percent

25   interest crediting rate no matter what the 417(e) rate was?

F7fnosb4                        Deutsch - cross

1    A.  I'm sorry.  When you say you would have to --

2    Q.  Well, to create your view of actuarial equivalents.

3    A.  You didn't say that in your question.

4    Q.  I'm sorry.  Correct.

5    A.  Because you could use different rates.  Just in order to

6    produce an equivalent benefit, yes, if you were using 3 percent

7    as the interest crediting rate, you should have to use 3

8    percent for the discount.

9            If we take it to the extreme, and you said let's say

10   we are not going to give any interest credits at all, well,

11   then that number should be what the number at 65 would be,

12   because it's never going to change.  So, in order for the

13   initial account balance to be equivalent to the benefit it was

14   replacing, it would have to be that benefit at 65 because there

15   would be no interest credits.

16   Q.  Was there any legal requirement that required a plan to use

17   your version of actuarial equivalence to create the initial

18   account balance?

19   A.  No, that's why I corrected your prior question was, because

20   if it was generally do you have to use -- the answer is

21   generally at that point in time -- the rules, of course,

22   changed, but at that point in time, you could do whatever you

23   wanted to do create the opening account balance.  I don't

24   believe that point is disputed.

25   Q.  I note the distinction you are drawing is based on the

F7fnosb4                          Deutsch - cross

1    Pension Protection Act that I think went into effect -- was it

2    2006?  Is that correct?

3    A.  Uh --

4    Q.  That imposed limitations on how you created the opening

5    balance --

6    A.  For conversions that occurred after -- I forget what it

7    is -- august something, 2006.

8    Q.  Did the Pension --

9    A.  I would have to --

10   Q.  Protection Act require your version of actuarial

11   equivalence to create -- let me restate the question.

12          Did the Pension Protection Act in setting the -- if

13   you use an opening balance, did it require the plan to use the

14   interest credit rate that it offered?

15   A.  Well, actually, I would say that's not -- when you get --

16   when the rubber meets the road, you actually have to maintain

17   two balances.  One is the initial balance that gets interest

18   only, and the other is another balance that generically would

19   start at zero.

20          The one that you are going to have with an initial

21   balance, well, you are not restricted to that.  When you get to

22   the other end and you go to pay the benefit, you then have to

23   calculate that as, as was described, you know, where you

24   maintain the prior benefit as if the plan had never been

25   amended, that you would have to go back and say, well, you

F7fnosb4                          Deutsch - cross

1    can't get less than that.

2              So if you failed, if you created it at 8, you would

3    then end up on the back end having to up it up to what it would

4    have been had you created it with 6.  So you would have gotten

5    nowhere by using a lower interest rate.  But it is a different

6    construct because it effectively requires two balances, not

7    one.

8    Q.  Did the Pension Protection Act require in a plan

9    conversion, if you used an opening balance, that you had to

10   offer at least -- you had to create the opening balance using

11   at least the plan's interest crediting rate, whatever that was?

12   A.  I thought we just went through that question.  The answer

13   is no, but that's the effect when you get to the back end.

14   Q.  We have had a good bit of discussion here about the early

15   retirement subsidy earlier in your testimony.

16             Is it correct that during the expert discovery phase,

17   during your deposition that you testified that you thought

18   Mr. Sher's calculation that resulted in early retirement

19   subsidy being worth $7 more a month to Mr. Osberg if he had

20   waited seven years and commenced his benefit as an annuity at

21   age 55 is correct.  Is it correct that is what you testified to

22   curing your deposition?

23   A.  I reread that testimony recently, and I expected additional

24   questions, and I misunderstood the question going in.

25             And in retrospect I think I was referring to his

F7fnosb4                         Deutsch - cross

1    calculation as the forty-seven seven hundred.  That is an

2    equivalent benefit, not that that's what the terms of the plan

3    provided.

4    Q.  I'm not understanding you.  Qualify that please.

5    A.  In other words, the entire discussion of that in the

6    transcript is like ten lines.  There were no additional

7    questions after that.  I didn't understand the breadth of the

8    question that you were asking that in retrospect it looks like

9    you were asking, so I misunderstood the question when I gave

10   the answer.

11   Q.  And what is the difference you now have, or at least the

12   clarifying, with Mr. Sher regarding his calculation that the

13   early retirement subsidy would have been worth only $7 more a

14   month to Mr. Osberg?

15   A.  Well, in rereviewing this I am not sure of the context of

16   the $7.

17        There's two benefits in the plan.  One is the benefit

18   of the early retirement subsidy.  And that benefit is the 304

19   in his report.

20        And the other benefit is the cash balance benefit,

21   which is like $130.  It's not in his report, but I seem to

22   recall that that number is about $130.

23        And Mr. Sher shows us a $297 benefit and says there is

24   a $7 difference.

25        That $297, first of all, is based on the 12/31/95

F7fnosb4                              Deutsch - cross

1    accrued benefit, not on the cash balance benefit, and it's not

2    provided for anywhere in the plan.  It's not the way the plan

3    was being administered.

4           And, as I described towards the end of

5    Mr. Gottesdiener's examination, if that were in fact a

6    provision of the plan, anybody who at age 65 took the benefit

7    when the 417(e) was to any extent below 6 percent would end up

8    with an infinite benefit level, and that's, of course, absurd.

9    So not only is it not what the plan says; it wouldn't even make

10   sense for the plan to say that.

11          MR. RACHAL:  Your Honor, can I take about five

12   minutes.

13          THE COURT:  Sure.

14          MR. RACHAL:  Are we going to take a lunch?

15          THE COURT:  Do you want to take a break now?  Do you

16   want to break right now?

17          MR. RACHAL:  If we could, your Honor.

18          THE COURT:  All right.

19          Let's take an early lunch break.  Can we come back as

20   10 minutes of two as a result?  Would that be all right?

21          MR. RACHAL:  That's fine by me.

22          MR. GOTTESDIENER:  Can I ask how long he anticipates

23   taking?

24          THE COURT:  Why don't you confer after we break and

25   you folks figure out what we've got going on this afternoon so

F7fnosb4                         Deutsch – cross

1    we can line people up.

2            MR. RACHAL:  I can definitely let you know by 5 after.

3            THE COURT:  One of the issues I think -- so I will sit

4    down for just a moment -- is whether or not they are going to

5    line up or want to line up Kiley, so that affects both of you

6    and you both have an interest in it.

7            MR. RACHAL:  I can figure it out in the next --

8            THE COURT:  Couple of minutes?

9            MR. RACHAL:  Terrific.

10           THE COURT:  Why don't you talk before you both go off

11   to lunch, and then you will be able to give people a heads-up

12   to get here or not.

13           MR. GOTTESDIENER:  Thank you.

14           THE COURT:  We'll take our lunch break, and we'll come

15   back at 1:50.

16           MR. RACHAL:  Thank you, your Honor.

17           (Luncheon recess)

18

19

20

21

22

23

24

25

F7FJOSB5                              Deutsch – cross

```
 1              AFTERNOON SESSION

 2              1:50 pm

 3              (Trial resumes)

 4              (In open court)

 5              THE COURT:  Let's all be seated.

 6              Mr. Gottesdiener, you may proceed, sir -- I am sorry,

 7    Mr. Rachal.  Mr. Rachal.

 8              MR. RACHAL:  It will be pretty short, your Honor.

 9              I just had one housekeeping note for clarification.  I

10    have conferred with Mr. Gottesdiener.  We are agreeable it is

11    okay for counsel to confer with expert witnesses during breaks

12    but not fact witnesses.  Is that okay with the court?

13              THE COURT:  That is fine with the court if it is okay

14    between counsel.

15              MR. RACHAL:  It is, your Honor.

16              MR. GOTTESDIENER:  Yes.

17              THE COURT:  All right.

18    LAWRENCE DEUTSCH, resumes

19    CROSS-EXAMINATION (Continued)

20    BY MR. RACHAL:

21    Q.  Mr. Deutsch, are you aware of the GAO study on cash balance

22    plans, implication of conversion of cash balance plans I think

23    it was around September of 2000?

24    A.  It sounds familiar, but I can't recall off the top of my

25    head.
```

F7FJOSB5                          Deutsch - redirect

1   Q.  Were you aware of whether the GAO study included its plan

2   of conversions plans that had wear-away?

3   A.  Again I only have a vague recollection but I do believe it

4   was mentioned in the study.

5   Q.  Did the GAO study, if you remember, distinguish when they

6   talk about plan conversions between plans that had wear-away

7   and plans without wear-away?

8   A.  Well, if it was mentioned in the study, it would have had

9   to have been, but again I don't remember any details of the

10  study.

11          MR. RACHAL:  That is all.

12          THE COURT:  Thank you.  Mr. Gottesdiener, anything

13  further from you?

14          MR. GOTTESDIENER:  Briefly, your Honor, yes.

15  REDIRECT EXAMINATION

16  BY MR. GOTTESDIENER:

17  Q.  You were asked during cross-examination about whether the

18  enhancement was called a pay credit.  Do you remember that?

19  A.  Yes.

20  Q.  Functionally in the operation of the account, was there a

21  difference?  What was the difference between the enhancement

22  and the pay credit?

23  A.  Well, both the enhancement and the pay credit were promised

24  additions to the account.  It is just the enhancement was one

25  time addition to the account from a select group of people

F7FJOSB5                        Deutsch - redirect

1    whereas the pay credit was an ongoing addition to the account

2    that applied to basically everybody.

3    Q.  So they're both promised additions to the initial account,

4    so in an A plus B, is the enhancement part of A or part of B?

5    A.  It might be clearly part of B.  It is part of the additions

6    after, so if you were establishing an A plus B, the A would be

7    the benefit established to replace the existing benefit, and

8    the B would be additional benefits and the enhancement would be

9    an additional benefit on top of what was originally established

10   that stood in for the prior benefit.

11   Q.  And the A then, that's what is done at 6 percent?

12   A.  The A is what we are suggesting, I am suggesting should be

13   done at 6 percent.

14   Q.  Without the enhancement, would an opening account of equal

15   value to the 12-31-95 accrued benefit fairly replace the prior

16   benefit?

17   A.  No, it would not.  As we saw before with Ms. Cardona, if

18   you fail to give an additional benefit, the people who take an

19   early retirement benefit are going to have this hole where

20   they're back in the wear-away problem.

21        So there is basically two reasons I would think that

22   you need to keep the enhancement.  The first is, is that in

23   order to keep the promised early retirement subsidy on the

24   prior benefit, you need to give something to bring that accruel

25   account balance up to a sufficient point to replace the subsidy

F7FJOSB5                         Deutsch - redirect

1    that is being lost.

2         The other reason you would potentially need to keep

3    the enhancement is that basically this is something that was

4    promised to people, that you have two people sitting

5    side-by-side and, for example, one of them is 55 with 14 years

6    of service and the other one is 55 with 15 years of service and

7    they promised to give a bigger benefit to the person with 15

8    years of service.  So if you drop the enhancement, that bigger

9    benefit disappears.

10        Similarly, between someone who is 50 with 15 years of

11   service and someone who is 55 with 14 years of service, they

12   promised as big a benefit to these older, long-service

13   employees the same way they promised to longer pay credits to

14   longer-service employees, they promised enhance to

15   longer-service employees.

16   Q.  On cross you were asked about a proper actuarial equivalent

17   to open balance, and you indicated that using the 714 (e) would

18   not be a proper opening balance.

19        If the 714 (e) rate is as of 1-1-96, 6.06, how far off

20   would the opening account balance be in that situation?

21   A.  Yeah, I don't know whether we can call it -- call up the

22   exhibit we were looking at with Mr. Osberg, I don't remember

23   the exhibit number, that showed what the 417 (e) value is

24   compared to the 6 percent value, my recollection is his opening

25   account balance would be about 16,000 using 6 percent, about

F7FJOSB5                       Deutsch - redirect

1    14,000 using the 714 (e) to establish the opening balance and

2    the reason for the difference is a combination of the

3    difference between 6 percent and 6.06 percent, so it is .06

4    percent compounded for 25 years.  While compounding bills

5    things up, that doesn't create a lot of difference when it is

6    only .06 percent.

7           The bigger difference is the mortality.  The mortality

8    in the table being used here primarily doesn't start till 55.

9    55 to 65, it is about 11 percent.  Below 55, not a lot of

10   anticipated death, so you wouldn't see that difference growing

11   much at younger ages.  It would be pretty stable that

12   difference between the 14,000 and the 16,000.

13   Q.   The roughly constant --

14   A.   It would be roughly I guess 10 to 15 percent difference.

15   Q.   You were asked on cross about the difficulty of predicting

16   the wear-away period because of changing 417 (e) rates and you

17   mentioned once the 417 (e) rate hit 5.5 percent, this

18   prediction problem or difficulty goes away.  Could you explain

19   that or explain it again.

20   A.   Yes.  First of all, let me correct you.  I should have said

21   6 percent.  It is not 5.5 percent.  What is happening is in the

22   calculations, there is two steps in the calculation where there

23   is a test of which benefit is greater than the other.

24   Generically, like in the expert reports and a lot of briefs

25   they talk about a comparison of the account balance to lump

1    sum.  That is not really been in practice what is going on.

2               What happens first is that you take the current

3    account balance and you project it to age 65 and convert it to

4    an annuity, and that produces the cash balance age 65 benefit.

5               You then compare that to the frozen age 65 benefit,

6    and whichever one of those is larger, that is the age 65

7    benefit.  You then calculate the 417 (e) lump sum value off of

8    that winning age 65 benefit, and that is the minimum lump sum

9    and compare it to the account balance, and whichever one of

10   those is winning, that is the ultimate benefit.

11              So when you're calculating the benefit at age 65 that

12   is attributable to the cash balance account, the projection

13   from now until age 65 is at fixed 6 percent.  The 417 (e) rate

14   doesn't come into play.  When you convert it into an annuity,

15   the 417 (e) rate only comes into play in the conversion factor,

16   but since the plan says if the interest rate is below 6

17   percent, you use 6 percent.  The 417 (e) rate is no longer

18   impacting that age 65 benefit.

19              What happens is that, which is why this is 5 and a

20   half versus 6 percent question is, when you discount it back,

21   you have the effect of discounting it back at 5 and a half, so

22   you don't get what Mr. Rachal referred to as the whipsaw

23   effect.

24              The question as which one is the winning benefit at

25   age 65 happens at the point that the 417 (e) rate becomes 6

F7FJOSB5                    Deutsch - redirect

```
 1    percent.  So once the cash balance account becomes the winning
 2    benefit, you still can have a lump sum that is larger than the
 3    account balance like what we saw for Mr. Osberg, but that's not
 4    due to wear-away, that is due to whipsaw.
 5            The wear-away is which one is the winning benefit at
 6    age 65 and you can predict that at any rate 6 percent or lower
 7    because once the interest rate is at 6 percent, that is a done
 8    deal.  So whichever one is winning, you can predict that and
 9    know and say well, you know, once the interest rate is below,
10    depending on your point of view, 5 and a half or 6 percent, I
11    know exactly where this person is going to be out of wear-away.
12            I am only concerned if the interest rate goes up.  If
13    the interest rate goes down below 5 and a half, and almost all
14    the years here are below 5 and a half, we know when it is.
15    Every year where the rate is below 5 and a half, the wear-away
16    period is constant.  That is from person-to-person, I mean.
17    Q.  Just to keep real clear, the two different minimum lump
18    sums in cross-examination you were asked about whipsaw, am I to
19    understand from your direct testimony that is --
20            THE COURT:  Ask him what it is.
21    Q.  -- could you tell us, based on the testimony so far, what
22    are the two different minimum lump sums in this case?
23    A.  So there is the -- well, I am sorry.  I am not sure which
24    two minimums you're talking about.  Whipsaw versus account
25    balance?
```

F7FJOSB5                        Deutsch - redirect

1   Q.  No.  Two minimum lump sums, the MLSs that have been

2   discussed to far?

3   A.  There is two benefits.  One benefit is the protected

4   benefit, and that creates a minimum lump sum based on the 417

5   (e) value of that protected benefit.

6   Q.  That is as of 12-31-95?

7   A.  That accrued benefit as of 12-31-95.

8           The other minimum lump sum is the one we referenced as

9   the one described on the top of Page 12, which is Mr. Rachal

10  referred to as the whipsaw calculation, and there what you do,

11  you calculate the age 65 benefit that is attributable to

12  account balance, and you take the account balance projected to

13  age 65 at the plan's fixed 6 percent rate, convert it into an

14  annuity using the better of the then 417 (e) rate or 6 percent

15  because that is the plan duration.  That produces the age 65

16  benefit.  Then you would multiply that times the 417 (e) factor

17  which would discount it at whatever the current 417 (e) rate is

18  and mortality.

19          At the point at which the 417 (e) rate falls far

20  enough below 6 percent, as I keep referencing roughly 5 and a

21  half, that number actually becomes larger than the account

22  balance and the concept of the minimum lump sum value of the

23  account balance actually exceeding the account balance has been

24  dubbed whipsaw and that is a reference to your projecting it in

25  one direction up at 6 and back at below 6, and so that creates

F7FJOSB5                         Deutsch - redirect

1    this thing dubbed whipsaw.

2    Q.  Does the SPD contain any direct reference to the 12-31-95

3    minimum lump-sum payment?

4    A.  Not to my recollection.

5    Q.  You mentioned that there is the cash balance minimum lump

6    sum is referenced on Page 12.

7    A.  Yes.

8    Q.  In page, on Page 14 where we started looking at that

9    example, what minimum lump sum is referenced on Page 14?

10   A.  I have to refresh my memory what is on Page 14.  Sorry.

11   Q.  That is under the example of the growing account balance

12   that you analyzed in your report.

13   A.  Okay.  At Page 14 it doesn't actually -- it says what the

14   minimum lump sum is, and it uses the same language on Page 12.

15   So it would by extension to me, meaning the lump sum on Page

16   12, so it would be the whipsaw.

17   Q.  So the cash balance minimum lump sum?

18   A.  The cash balance minimum lump sum.

19   Q.  You were asked questions about large plans, the size of

20   plans, 10,000, a hundred thousand lives.  The rules regarding

21   employee communications, 417 (e), protection of the accrued

22   benefit, wear-away, do they change based on --

23            THE COURT:  You are not going to ask him for a legal

24   conclusion, right?

25            MR. GOTTESDIENER:  No.  In practice.

F7FJOSB5                          Deutsch j- recross

1      THE COURT:  No.  Ask it that way as opposed to the

2  rules.

3  BY MR. GOTTESDIENER:

4  Q.  You have worked on some large plans and smaller plans,

5  correct?

6  A.  Yes.

7  Q.  Do the rules that or practices in the required things you

8  have to follow and actuaries have to follow, do they change

9  based on the size of the plan?

10  A.  As of the point in time involved here, the rules did not

11  differ based on the size of the plan.  There are some minor

12  tweaks, about 500 people.  The rules are basically the same

13  without regard to the size of the plan.  Rules for SPD are the

14  same, rules for minimum lump sum are the same.  Rules for how

15  you calculate benefit are the same.  Basic rules are identical

16  without regard to the size of the plan.

17      MR. GOTTESDIENER:  That is all I have.

18      THE COURT:  Mr. Rachal.

19  RECROSS EXAMINATION

20  BY MR. RACHAL:

21  Q.  For the pay credit, Mr. Deutsch, isn't it correct that you

22  had to work to be entitled to a pay credit?

23  A.  Yes.

24  Q.  That, by definition -- not by definition -- by name of the

25  benefit, it is a pay credit, it is tied to your work

F7FJOSB5                           Deutsch j- recross

1   post-conversion, correct?

2   A.  Yes.

3   Q.  Is it correct from what we talked about earlier, the

4   enhancement you were entitled to from the plan conversion once

5   you had at least one hour of service would be acquired initial

6   account balance, you also acquired the possession of the right

7   to the enhancement upon the plan conversion?

8   A.  Yes, if you only had to work one hour.

9   Q.  In early retirement subsidy, is it correct that under the

10  prior plan, to commence that benefit you had to be age 55?

11  A.  Yes.

12  Q.  If you didn't commence that benefit at age 55, the value of

13  that subsidy would go down; in other words -- well, let me try

14  to ask a better question.

15          If you had an early retirement subsidy, if you didn't

16  commence benefits until age 65, did you get any value from that

17  early retirement subsidy?

18  A.  Value has to be in this context compared to something.  I

19  would assume you mean value in comparison to benefit payment at

20  age 65.

21          Generically, they say you don't get any value from an

22  early retirement subsidy if you wait until normal retirement

23  age to take your benefit because it is not early retirement any

24  more.

25  Q.  Perhaps wearing away the concept, you wear-away the value

F7FJOSB5                          Deutsch j- recross

1    of early retirement subsidy when you approach age 65 unless we

2    leave and take that benefit?

3    A.  Wear-away, I am not sure I would use wear-away in that

4    context.

5            THE COURT:  The size of the value to the participant

6    decreases as they near retirement age.  Would you agree or

7    disagree?

8            THE WITNESS:  I agree with that.

9            THE COURT:  All right.

10   BY MR. RACHAL:

11   Q.  And the feature you were talking about, about how the

12   account balance is projected forward to age 65, converted to

13   annuity and winning feature, winning benefit is then calculated

14   417 (e), is it correct that that plan feature protected

15   participants and protected participants in the sense provided a

16   larger benefit than they otherwise would have been entitled to

17   if the rates dropped below 6 percent?

18   A.  Okay.  I was with you until you said if the rates dropped

19   below 6 percent.

20   Q.  Yes.  417 (e) rates dropped dropped below 6 percent?

21   A.  You're saying, though, that the -- I must have

22   misunderstood your question.  I think what you're saying is the

23   retention of the protected accrued benefit --

24   Q.  Sorry.

25   A.  I misunderstood your question.

F7FJOSB5                          Deutsch j- recross

1   Q.  You did.  That is all right.  I am trying to think of the

2   best way to frame the question so it's clear.

3           The plan features you were talking about earlier, that

4   included the whipsaw feature or included whipsaws, I should

5   say, provided participants -- let's take away wear-away.

6           Assume somebody is out of wear-away, keep it simple.

7   The plan features you talked about that required this

8   calculation, if the interest rates fell below 6 percent, it

9   provided participants a larger benefit than their initial

10  account balance?

11  A.  If you were doing it on January 1, 1996?

12  Q.  I don't think it matters.

13  A.  Well, then, when you said initial account balance --

14  Q.  Keep it simple.  Do it as of 1-1-96, yes?

15  A.  If we lived in a different world --

16  Q.  To keep it simple still, let's say it is 1-1-96 and 417 (e)

17  rate is 4 percent.  Would that, this plan feature that requires

18  this conversion that you talked about earlier, result in the

19  participant getting a larger benefit?

20  A.  You realize that in the world that guy would have gotten

21  protected benefit.

22  Q.  Right.

23  A.  So the whipsaw would have been the losing benefit and it

24  wouldn't have mattered so it doesn't give him a larger benefit.

25  Q.  Let's strike the question.  That is not a good one.

F7FJOSB5                              Deutsch j– recross

1            If I understand what your testimony was earlier, it is

2       that if rates dropped below 6 percent under the plan features

3       that the plan provided the post-conversion plan provided, there

4       was a calculation done that, that did result in the benefit if

5       the rates were below the 417 (e) rate was below 6 percent, that

6       resulted in the benefit due under the terms of the converted

7       plan being larger than the initial account balance?

8            THE COURT:  I have to understand this question.

9            THE WITNESS:  I am glad you said that because I didn't

10      understand it.

11           THE COURT:  Could you rephrase that.  Part of the

12      issue is your voice goes up and down, and so I get lulled into

13      the cadence of your voice a little bit.  I have to reread it.

14           Restate it.

15      BY MR. RACHAL:

16      Q.  I think we have agreement on this, but that is what I am

17      trying to find out on this point, which is that talking about

18      the benefit provided by the converted plan, that if the 417 (e)

19      rate drops below 6 percent, this plan feature will result in

20      the benefit provided by the converted plan being larger than

21      the account balance?  That could be any point in time, initial

22      account balance plus interest credits?

23      A.  I still didn't you understand it.  The whipsaw kicks in 6

24      percent.

25      Q.  That is one aspect?

F7FJOSB5                          Deutsch j- recross

1   A.   The whipsaw kicks in at 5 and a half.

2   Q.   That results in the participants getting a larger benefit

3   if it applies?

4   A.   Assuming the person is out of wear-away, then the whipsaw

5   effect would effectively result in a lump sum benefit larger

6   than the account balance.

7   Q.   If someone isn't in wear-away, this whipsaw feature would

8   lessen the effect of the wear-away, correct?

9   A.   That would be the effect of it.  I guess it depends on how

10  you define, "effect."  The way I define effect, it would lessen

11  the effect.

12  Q.   I meant in a practical sense it would be smaller dollars,

13  smaller period, or depending on which way you looked at it?

14  A.   I am sorry.  As the interest rate went down -- that sounds

15  like the exact opposite of where we started this conversation.

16       You're saying the interest rate went down, it would

17  shorten the wear-away period?

18  Q.   Let's take someone who had a very small initial account

19  balance to start with.

20  A.   Okay.

21  Q.   So that the wear-away period would be small because there

22  is a small initial account balance.  The plan feature your

23  talking about whipsaw feature effect, is it correct that if it

24  kicks in, the interest rates fall below five and a half

25  percent, that would increase the benefit they have under the

F7FJOSB5                           Deutsch j- recross

1  converted plan which would lessen any wear-away effect they had

2  as compared to the protected benefit?

3  A.  No.  The ratio of the two would remain constant.  So I

4  suppose as an absolute dollar amount, it is actually going up

5  because the lump sums are going up, but the ratio of the two is

6  based on the benefit at age 65 because that age 65 benefit, the

7  whipsaw effect is going to take the age 65 benefit on the cash

8  balance account and multiply it times the same 417 (e) factor

9  that the 12-31-95 benefit is being multiplied by, so the

10  comparison, the ratio of the lump sums is exactly the same as

11  the ratio of the age 65 annuities because they're both being

12  multiplied times the same factor.

13        If you write this out as a formula -- people say I do

14  too much math -- if you write it as a formula and say, we'll

15  call it C for cash balance benefit and F for frozen benefit,

16  the lump sum of the cash balance benefit is C times, and let's

17  call it -- I don't know, A for actuarially equivalent factor.

18  C times A is the whipsaw and F times A is the protected lump

19  sum, what you call the protected lump sum.

20        If you said well, what is C-A divided by F-A, well the

21  two A's cancel out and it just becomes the ratio of the lump

22  sums this ratio of the age 65 annuities.

23  Q.  I think -- so is it correct you're -- what you're saying,

24  Mr. Deutsch, both because the decline in the 417 (e) rate

25  increases the value of the protected lump sum, the decline in

F7FJOSB5                         Deutsch j- recross

1    the 417 (e) rate increases the value of the benefit provided,

2    the account balance benefit?

3    A.   Right.

4    Q.   They're moving in tandem?

5    A.   Yes, they're moving at the same percentage.

6    Q.   That's the only way they're going to move because this

7    feature only kicks in if the rates fall below 6 percent is up.

8    Is that correct?

9    A.   Well, if the- --

10             (Multiple voices)?

11   A.   -- if the 417 (e) rate goes further down, the value of both

12   of them is going to go up.

13             MR. RACHAL:  No further questions.

14             THE COURT:  Thank you.  Mr. Gottesdiener, you're all

15   set?

16             MR. GOTTESDIENER:  Yes.

17             THE COURT:  You may step down, sir.

18             (Witness excused)

19             THE COURT:  Mr. Gottesdiener, would you like to call

20   your next witness.

21             MR. GOTTESDIENER:  Mr. Osberg.

22    GEOFFREY OSBERG,

23        called as a witness by the Plaintiff,

24        having been duly sworn, testified as follows:

25             THE COURT:  You have heard us talking about how

F7FJOSB5                          Deutsch j- recross

1    important it is to pull up your chair, adjust the microphone,

2    speak clearly and directly into the mike and make sure you keep

3    your voice up.

4              THE WITNESS:  Okay.

5              THE COURT:  And we have a copy of Mr. Osberg's

6    declaration, clean copy?

7              MR. GOTTESDIENER:  Yes.  I am just wondering, the

8    court's indulgence, because of shortness of time, we weren't

9    able to write the letter that responded to their identification

10   of objections.

11             THE COURT:  I'll take that not -- I don't need that

12   before his testimony.  Just give me a copy of that, I will

13   grapple with it.  Mr. Rumeld?

14             MR. GOTTESDIENER:  The only question, to finish the

15   thought if you wouldn't mind, your Honor?

16             THE COURT:  Yes.

17             MR. GOTTESDIENER:  So in his case, there is a couple

18   of paragraphs, and if the court -- I am assuming he won't ask

19   about paragraphs he wants to have come out.

20             THE COURT:  He might.  My intention, depending on the

21   nature of your response -- let me see them again, which ones

22   are causing the concern here.  I will tell you right now

23   whether --

24             MR. GOTTESDIENER:  We think there is not this --

25             THE COURT:  All right.

1                MR. GOTTESDIENER:  There is an element of --

2                THE COURT:  Here is the point.  There is a sentence

3     which is having served as a manager overseeing several

4     employees at any given time, Paragraph 23 of Mr. Osberg's

5     declaration, I believe that it is impossible that other Foot

6     Locker employees would have accepted such blatant mistreatment

7     by the company.

8                He, in his view, there would have been a huge uproar.

9     He can't testify as to the state of mind per se, but there is

10    probably a way to ask the question that would be as a manager

11    what were the kinds of issues that were brought to your

12    attention, in fact.

13               I won't go into hypotheticals.  I will draw what

14    conclusions I'll draw whether or not this is the type of issue

15    which was typically brought to his attention.  He shouldn't say

16    that it is impossible that other employees would have accepted.

17               Nor do you need this, Mr. Gottesdiener, right?  He

18    doesn't need to testify for every single employee.  That is not

19    a burden he bears.

20               MR. GOTTESDIENER:  I agree, your Honor.  I do want to

21    say that if the defense -- there is an issue as to --

22               THE COURT:  You should both, assume, cut this short so

23    we don't have a long colloquy about this.  You should both

24    assume this is in here.  Then Mr. Rumeld can cross-examine to

25    his heart's content how if there is any basis at all for this,

F7FJOSB5                          Deutsch j- recross

1    what his basis is, and like that.

2            MR. GOTTESDIENER:  That sounds fine.

3            THE COURT:  I just don't think this is where -- I am

4    not going to be quoting that Mr. Osberg said that it would have

5    been impossible for any other employees to have, any employees

6    or there would have been a huge uproar.  I can draw that as an

7    inferential conclusion or not.  I wouldn't cite his declaration

8    for that point.

9            MR. GOTTESDIENER:  Just to also deal with the fact

10   that there are going to be other --

11           THE COURT:  It is the same point really.

12           MR. GOTTESDIENER:  Could I make a record because I

13   haven't actually said our view is it is admissible under 701,

14   that he, in his case and the other witnesses, they provide in

15   their declarations, they provide evidence that they hold the

16   opinion that they do based on their experience and interaction

17   with other people at Foot Locker that it is helpful to

18   determine how and whether Foot Locker employees would have

19   responded negatively had the benefit freeze been communicated,

20   whether the company might have ultimately had to do something

21   different or still go ahead with the change, and his opinion is

22   and other witnesses' opinions are not based on scientific,

23   technical other or specialized knowledge under Rule 702.  That

24   is essentially my proffer --

25           THE COURT:  I hear you.

F7FJOSB5                          Deutsch j- recross

1            MR. GOTTESDIENER:  -- why it is admissible.

2            THE COURT:  Let's not take too much time on it.  Mr.

3    Rumeld -- now that you have made your record, he has to be able

4    to respond.

5            MR. RUMELD:  I just feel the need to make my record

6    here.  I understand your Honor's instruction and Mr.

7    Gottesdiener was, I had in mind exactly what he had in mind

8    because my cross questions are influenced by whether this

9    witness purports to be testifying.  It is our position and will

10   be our position that these types of comments are really idle

11   speculation that the court should not consider.

12           I do think there is going to be an issue for the court

13   when the evidence closes whether the plaintiff has proven what

14   they seem to be treating as an element of their claim for their

15   theory of inequitable conduct.

16           THE COURT:  That raises the relevance of this if this

17   is going to be a key aspect of that proof.

18           Here is my view, which is I understand 701.  I think

19   that in order for any fact witness to be able to provide

20   701-type testimony, they have to have a sufficient basis for

21   that.  That includes not only position, but it also includes

22   additional foundation which is not yet in the record.  It can

23   be.  It depends on how it would get there.  But in all events,

24   one cannot use 701 to opine about aspects that would otherwise

25   be precluded.

1          For instance, you can't have somebody who knows

2     another individual really, really well by virtue of sitting in

3     the same cubicle, testify about that individual's state of

4     mind.  Based on my experience, I know that John would have

5     gotten really upset at that.  And I know that, here is my

6     rational, reasoned basis.  So you have to be careful.  There is

7     a line that is drawn between appropriate 701 and inappropriate

8     701 when it comes to the issue of state of mind.

9          That is different and separate from I understand based

10    upon my experience, employee moral is an issue that ever

11    manager faces, issues that were brought to me as a factual

12    matter that affected employee moral were issues surrounding

13    compensation.  They were always a hot topic.

14         Now, that kind of thing, and decreases in

15    compensation, if an individual based upon factual information

16    experienced a decrease in compensation, in his actual

17    experience affected one or more employees moral, he is probably

18    got a factual basis for that.  I think some of the same points

19    could be made the same way.  That is my view.  I want to see

20    how this plays out, but I told you I think you folks can get to

21    some of the points without this.  Then we'll see where it goes

22    from there.

23         With that said, I am not going to strike this right

24    now because there is too much going on right now to make that

25    kind of ruling at this point, but I will -- because I think you

F7FJOSB5                         Deutsch j- recross

1    are going to have time, I think it is not going to unduly

2    lengthen the cross-examination.  With that said, why don't you

3    give Mr. Osberg a copy of his declaration and let me get it

4    authenticated and we'll then proceed.

5              Mr. Osberg, is this the declaration you submitted as

6    your direct testimony in this matter?

7              THE WITNESS:  Yes.

8              THE COURT:  Is it true and correct, sir?

9              THE WITNESS:  Yes.

10             THE COURT:  Do you swear to the truth of the contents

11   of that declaration?

12             THE WITNESS:  I do.

13             THE COURT:  The court does take as Mr. Osberg's direct

14   testimony the declaration he submitted for the purposes of

15   trial.  That is contained at Exhibit 11 A in the joint pretrial

16   order, and that declaration is taken in subject to the court's

17   ultimate resolution of the objections that have been made

18   pursuant to the discussion of the objections lodged by letter

19   today.  The witness is turned over for cross-examination, Mr.

20   Rumeld.

21             MR. RUMELD:  Your Honor, I just want to go over

22   procedurally, we'll have a number of witnesses with the same

23   issue.  It was our understanding that the witness would be

24   handed his declaration with the exhibits that he refers to in

25   his declaration.

1              THE COURT:  I believe they were.

2              MR. RUMELD:  I am sorry if I missed it.

3              THE COURT:  He has now got a copy of his declaration

4     and the exhibits in front of him.

5              MR. RUMELD:  I can do it either way, but my plan was

6     going to be just to let the witness refer to the exhibits in

7     front of him.  However, if it is an exhibit that is not in his

8     declaration, I can hand those up or we can just look on the

9     screen.  If it is better to hand them up, I will do both.

10             THE COURT:  Whatever makes Mr. Osberg more

11    comfortable.  If he would like to have a paper copy in front of

12    him, we'll take it step-by-step and where you go and what

13    Mr. Osberg would find easier to refer to.

14             MR. RUMELD:  If, your Honor and Mr. Osberg won't take

15    it the wrong way, I will move the lectern back.

16             THE COURT:  Fine.

17    CROSS-EXAMINATION

18    BY MR. RUMELD:

19    Q.  Good afternoon, Mr. Osberg.

20             When you left Foot Locker, you did not think the

21    prospects for further promotion there were very good.  Am I

22    correct?

23    A.  Yeah, you can say I would say that, yeah.

24    Q.  It is a little hard to hear you.

25    A.  I am sorry.  Yeah, that was the situation at the time.

F7FJOSB5                          Osberg - cross

1    Q.  Right.  The next promotion would have been to district

2    manager, is that right, for you?

3    A.  Yes.

4    Q.  And you didn't think it was likely that that was going to

5    happen, right?

6    A.  No, at the time not.

7    Q.  Before you left Foot Locker, you were making over $40,000 a

8    year.  Is that correct?

9    A.  Yes.

10   Q.  That was in addition to bonus?

11   A.  That would include a bonus.

12   Q.  Including bonus?

13   A.  Yes.

14   Q.  There were occasions when you complained about your bonus?

15   A.  Yeah.  They made a switch in how they calculated that.

16   Q.  Generally when you complained to the district manager about

17   bonuses, you didn't get a favorable response.  Is that right?

18   A.  Well, he didn't tell me they were going to change it, no,

19   but I don't know what he did after that.

20   Q.  If you complained about your bonus, you bonus wasn't

21   increased, was it?

22   A.  No, it wasn't.

23   Q.  After you left Foot Locker, you went to work for a company

24   called Game Crazy.  Is that right?

25   A.  Yes.

F7FJOSB5                          Osberg – cross

1    Q.  Your starting salary there was $38,000?

2    A.  Yes.

3    Q.  Less than you were making at Foot Locker?

4    A.  Right.

5    Q.  And there was no bonus there?

6    A.  No, there wasn't.

7    Q.  And no pension benefits, either, right?

8    A.  No, as it turned out, no.

9    Q.  And the health benefits at Game Crazy you would say were

10   comparable to the health benefits gout at Foot Locker?

11   A.  Yeah, they were very similar.

12   Q.  After Game Crazy, you worked for Mega Health & Life.  Is

13   that right?

14   A.  Yes.

15   Q.  You were an insurance producer or insurance salesman?

16   A.  Yes.

17   Q.  That was just for six to nine months.  Is that right?

18   A.  Yeah.

19   Q.  Since 2007, you've been working for Carson Perry?

20   A.  Correct.

21   Q.  Is that the name of the company?

22   A.  Carson Perry Scott, yes.

23   Q.  Thank you.

24          As of 2011, you were making about $26,000 there?

25   A.  Yes.

F7FJOSB5                          Osberg - cross

1   Q.  Prior to 2011, you had been making about the same amount of

2   money?

3   A.  Prior to 2011?  Well there was a time I wasn't working,

4   but --

5   Q.  I am trying to establish you were making less money at

6   Carson than you had been making at Foot Locker?

7   A.  Right, yes.

8   Q.  Now, when you left Foot Locker, you elected to take a lump

9   sum benefit.  Is that right?

10  A.  Yes.

11  Q.  You made that election because you thought you could get a

12  better return on your investments than you could by leaving the

13  money in the plan and waiting for an annuity?

14  A.  Yeah.

15  Q.  Under the prior plan formula, you remember, right, there

16  was a change to the plan, to the cash balance formula?

17  A.  Right.

18  Q.  Under the prior formula, you could not take a lump sum.

19  You remember that?

20  A.  Yes.

21  Q.  You could only take an annuity when you reached retirement

22  age?

23  A.  Right.

24  Q.  Or age 55?

25  A.  Yeah.  I thought it was 65.

F7FJOSB5                           Osberg - cross

1   Q.  Now, when you received your lump sum, you saw that the

2   amount that was being paid to you was about $5,000.00 greater

3   than what was in your account balance.  Is that right?

4   A.  Yes.

5   Q.  You didn't make any inquiries at the time as to why that

6   was the case?

7   A.  No, I didn't.

8   Q.  Now, you first learned about the cash balance amendment

9   when you received a letter from the CEO, Mr. Farah.  Is that

10  right?

11  A.  Yes.

12  Q.  And that letter would be Exhibit 2 to your declaration?  Is

13  that the letter?

14  A.  Yeah.

15  Q.  This letter also told you about the new 401 (k) plan.  Is

16  that right?

17  A.  Yes.

18  Q.  That is when you first learned about the 401 (k) plan as

19  well?

20  A.  Yes.

21  Q.  As far as you remember, everybody liked the 401 (k) plan.

22  Is that right?

23  A.  Yeah, there was a lot of --

24  Q.  I am sorry?

25  A.  -- there was a lot of people that were excited about that.

F7FJOSB5                              Osberg – cross

1    Q.  You were as well, right?

2    A.  Yes.

3    Q.  You, in fact, availed yourself of the 401 (k) plan?

4    A.  Yes, I did.

5    Q.  You took payroll deductions and contributed that into the

6    plan?

7    A.  Ah-huh.

8    Q.  Just yes?

9    A.  Yes.

10   Q.  We went over that at your deposition?

11   A.  We did.

12   Q.  There were also matching contributions for some of your

13   deductions as well?

14   A.  Yes.

15   Q.  You had about $20,000 in the 401 (k) plan when you left.

16   Is that right?

17   A.  That sounds about right.

18   Q.  Now, in your declaration, could you take a look at PX 4

19   which is attached to your declaration.  It is also on the

20   screen if that becomes easier for you.

21   A.  I need to see it in paper.

22   Q.  Okay, whichever works for you.

23        So that's that November 1995 memo.  In your

24   declaration, you say that you remember receiving this memo.  Is

25   that right?

F7FJOSB5                          Osberg – cross

1    A.  Yes.

2    Q.  And on the third page there is a reference to minimum

3    benefit.  Do you see that?

4    A.  Oh, okay, yes.

5    Q.  There is some help with visual aids, too.  We are looking

6    at the same thing where it says in bold, "minimum benefit"?

7    A.  Right.

8    Q.  So specifically it says your accrued benefit as of December

9    31st, 1995 will not be reduced result of plan revisions.  I

10   read that correctly, right?

11   A.  Yes.

12   Q.  Now, your testimony is that this reference that your

13   accrued benefit as of December 31st, 1995 was not going to be

14   reduced, that that statement actually reinforced your

15   understanding that your account was starting with what you had

16   before.  Is that right?

17   A.  Yeah.  They just switched it.

18   Q.  In your declaration, you also state that after reading this

19   document, you understood that the account balance was your

20   benefit and that the old annuity benefit from the prior plan

21   would no longer be relevant, right?

22   A.  Right.

23   Q.  Those are the words in your declaration, would no longer be

24   relevant?

25   A.  Yes.

F7FJOSB5                          Osberg - cross

1   Q.  Let me hand you what has been marked as Defendant's Exhibit

2   37, which is the summary plan description.

3            THE COURT:  So the SPD is also in evidence as PX 5?

4            MR. RUMELD:  I guess that's right.

5            THE COURT:  I want to make sure.  I will refer to it

6   as PX 5.

7            MR. RUMELD:  I am sorry for the confusion.  For my

8   purposes, it was a little easier to distinguish the exhibits

9   attached to the declaration.

10            THE COURT:  That is fine.

11            MR. RUMELD:  May I approach?

12            THE COURT:  Yes.

13            (Pause)

14   BY MR. RUMELD:

15   Q.  So you agree with me this is the summary plan description

16   for the benefit plan?

17   A.  Yes.

18   Q.  This is a document you read when you first received it back

19   in 1996.  Is that right?

20   A.  Yes.

21   Q.  Could you turn to Page 12.  You see the sentence

22   immediately above the bold interest credits towards the bottom?

23   A.  Yes.

24   Q.  It says there your accrued benefit at the time of your

25   employment terminates is the greater of the amount determined

F7FJOSB5                          Osberg - cross

1    under the plan as amended on January 1, 1996 or your accrued

2    benefit as of December 31, 1995.

3              Do you see that?

4    A.  Yes.

5    Q.  Would you agree that the accrued benefit as of December

6    31st, 1995 must still have been relevant for something, right?

7    A.  Well, I guess.  I always thought they were the same.

8    Q.  Right, but it says one could be bigger than the other.

9    Isn't that what it says?

10   A.  Yes.

11   Q.  You remember reading this sentence when you received the

12   SPD.  Is that right?

13   A.  Yes.

14   Q.  But you don't recall reading it any time after you first

15   received it?

16   A.  Probably not.

17             THE COURT:  What did you think this sentence meant?

18             THE WITNESS:  I am not really sure what it meant, to

19   tell you the truth.

20             THE COURT:  Did you have any understanding of the

21   phrase, "accrued benefit"?

22             THE WITNESS:  I believe I did, yes.

23             THE COURT:  What did you think "accrued benefit"

24   meant?

25             THE WITNESS:  That is what I built up from when the

F7FJOSB5                    Osberg - cross

1   benefits started, the benefits started growing, that is built

2   up, that is what you accrued.

3           THE COURT:  All right.  Did you, if you recall or if

4   you don't recall specifically, then tell me if you remember

5   what your general practice would have been, would you have gone

6   back to the definitions when you read this document which has

7   been marked as PX 5?  Was that a practice you had?  You see how

8   accrued benefit is italicized there?

9           THE WITNESS:  Yeah.  I probably would not have.

10          THE COURT:  You probably would not have?

11          THE WITNESS:  No.

12          THE COURT:  Okay.  All right.  You don't recall, I

13  take it, as you sit here today, whether you did or not?

14          THE WITNESS:  No, I do not.

15          THE COURT:  You may proceed.

16          MR. RUMELD:  Thank you, your Honor.

17  BY MR. RUMELD:

18  Q.  Just so I'm clear, when you left Foot Locker and you

19  received your benefit election form, do you remember you got a

20  form to fill out?

21  A.  Yes.

22  Q.  It was on that form that it showed you the minimum lump sum

23  benefit?

24  A.  It showed the lump sum benefit.

25  Q.  Right, and that was when you saw that your lump sum benefit

F7FJOSB5                          Osberg - cross

1    was a few thousand dollars higher than your account balance?

2    A.   Correct.

3    Q.   At that time you didn't go back to check this summary plan

4    description to see what it said about the calculation of your

5    benefits?

6    A.   No, I did not.

7              THE COURT:  May I please ask, hijack it one more time.

8              MR. RUMELD:  Sure.

9              THE COURT:  Turn, if you would, to Page 6 of that

10   document.  We are talking now still about PX 5, all right?

11             Do you see where it says initial account balance

12   there?

13             THE WITNESS:  Yes.

14             THE COURT:  What did you understand that to mean, if

15   you had an understanding, back at the time that you reviewed

16   this document?

17             THE WITNESS:  Well, my understanding was under the old

18   plan they took what I had earned and moved it into a new plan

19   and they just labeled it cash, the cash balance account.

20             THE COURT:  That is what you thought your initial

21   account balance was?

22             THE WITNESS:  Yes.

23             THE COURT:  You may proceed.

24   BY MR. RUMELD:

25   Q.   Since your Honor asked that question, let me just ask you,

F7FJOSB5                    Osberg – cross

1    Mr. Osberg, do you actually remember reading that definition?

2    A.  Not this definition, no.

3    Q.  So you are merely trying to interpret it right now.  Isn't

4    that right?

5    A.  Well, I answered that question using another item that I

6    remember where they said that that is what they were going to

7    do, they were going to transfer from the old, the old plan into

8    the new plan.

9    Q.  So you had an understanding about how it was going to work,

10   but that understanding wasn't based on this plan.  Is that fair

11   to say?

12   A.  Yeah.

13           MR. RUMELD:  May I approach?

14           THE COURT:  Yes.

15   BY MR. RUMELD:

16   Q.  I am going to hand you another exhibit, Defendant's Exhibit

17   54.

18           THE COURT:  What is that document so I can see if it

19   has a cross-reference to the PXs.

20           MR. RUMELD:  I don't think it does.

21           THE COURT:  It is just PX 54.

22           MR. RUMELD:  I think you have that.

23           THE COURT:  I do.  I will just take that from my

24   binder.

25   BY MR. RUMELD:

F7FJOSB5                              Osberg - cross

1    Q.  Mr. Osberg, you previously testified that you remember

2    receiving this document as well.  Is that right?

3    A.  Yes.

4    Q.  This document also contains an explanation of the initial

5    account balance in the third paragraph there.  Do you see that?

6    A.  The third paragraph?

7    Q.  Right.

8    A.  Okay.

9    Q.  Do you see where it says in the second sentence --

10   A.  Yes.

11   Q.  -- your initial account balance is the actuarial equivalent

12   lump sum or present value of your accrued benefit as of

13   December 31, 1995.

14   A.  Okay.

15   Q.  There is a description of the initial account balance here?

16   A.  Right.

17   Q.  You would have gotten it in this communication as well?

18   A.  Yes.

19   Q.  In your declaration, you say that you believed the company

20   would have changed course in response to employee backlash or

21   if people understood the cash balance plan better.  Is that

22   right?

23   A.  Yes.

24   Q.  You don't recall any instances, do you, where management

25   ever made a change in the terms or conditions of employment

F7FJOSB5                         Osberg - cross

1  because they perceived there to be bad moral?

2  A.  Well, there was one instance where I believe the managers

3  on the East Coast got together or actually I think they sued

4  Foot Locker because they weren't paid overtime for not

5  supervising over 40 hours.  I believethat was a labor law

6  issue.  So at that point they did get together and change

7  course.  Later the law required to manage 40 hours a week.

8  Q.  So that change was made in response to a lawsuit?

9  A.  Yes.

10 Q.  Not just in response to their morale?

11 A.  Not just, but there was bad morale.

12 Q.  Right.  At your deposition you didn't remember any

13 instances where bad morale provoked a change in management's

14 practices.  Is that right?

15 A.  Not specifically, no.

16 Q.  Now, you became involved in this lawsuit because you

17 received a letter from your lawyers.  Is that right?

18 A.  Right.

19 Q.  You didn't know them before you got the letter.  Is that

20 right?

21 A.  No.

22          MR. RUMELD:  May I approach?

23          THE COURT:  You may.  You are showing him what has

24 been marked as?

25          MR. RUMELD:  PX 177.

F7FJOSB5                          Osberg - cross

1            THE COURT:  177, all right.

2   BY MR. RUMELD:

3   Q.  Now there are a few documents compiled here together,

4   Mr. Osberg.  Am I correct that the first letter on the top is

5   the initial letter that you received from the Gottesdiener law

6   firm that invited you to become a client?

7   A.  Yes.

8            THE COURT:  Is this going to be document you're going

9   to want in evidence because it is not in my binder.  I go to

10  179.

11           MR. RUMELD:  I have it in evidence and yes, we can

12  give you an extra copy.

13           THE COURT:  Terrific.  You can give it to me later.

14  My binder skips one.

15           MR. CLARK:  That is one of the ones we would have slid

16  in.

17           THE COURT:  You slid it in?

18           MR. CLARK:  We did not slide it in because it wasn't

19  in evidence.

20           THE COURT:  Got it.

21           MR. RUMELD:  Right, because so far --

22           THE COURT:  Okay.

23           MR. RUMELD:  -- we'll take care of that.

24  BY MR. RUMELD:

25  Q.  So this is the letter that you initially received,

F7FJOSB5                          Osberg - cross

1   Mr. Osberg?

2   A.  Yes.

3   Q.  At the time you received this letter, you were looking for

4   work.  Is that right?

5   A.  Right.

6   Q.  And your resume was on the internet?

7   A.  Yes.

8   Q.  That's how Mr. Gottesdiener's firm located you?

9   A.  Yes.

10  Q.  And sometime thereafter, if you flip through to the 5th

11  page, I believe there is a letter agreement, dated November

12  22nd, 2006.  Do you see that?

13  A.  Right.

14  Q.  Is this an agreement that you eventually signed?

15  A.  Yes.

16  Q.  Among other things, in Paragraph 11 of the agreement, it

17  states that you might qualify for a special incentive or bonus

18  payment if you participate in the lawsuit?

19  A.  Yes.

20  Q.  Am I correct your lawyers actually first filed a different

21  lawsuit on your behalf in Illinois?

22  A.  Yes.

23  Q.  And that lawsuit pertained to a different kind of claim.

24  Is that right?

25  A.  Right.

F7FJOSB5                          Cardona - direct

1   Q.  And that lawsuit was then dismissed?

2   A.  Yes.

3   Q.  And then this one was brought instead?

4   A.  Yes.

5            MR. RUMELD:  That is all I have.

6            THE COURT:  Do you have anything?

7            MR. GOTTESDIENER:  No questions.

8            THE COURT:  Mr. Osberg, you may step down.

9            (Witness excused)

10           MR. GOTTESDIENER:  Ms. Cardona.

11           THE COURT:  Ms. Cardona, please come to the stand.

12   ADA CARDONA,

13       called as a witness by the Plaintiff,

14       having been duly sworn, testified as follows:

15   DIRECT EXAMINATION

16           THE COURT:  Ms. Cardona, please be seated.  It is

17   important that you pull your chair forward and that you adjust

18   that microphone so that it can get a clear and direct sound

19   from you when you speak so that we can hear it all across the

20   courtroom, all right?  You may proceed.

21   BY MR. GOTTESDIENER:

22   Q.  Ms. Cardona, this is your declaration and this is a

23   document referred to in your declaration.  The judge is going

24   to ask you a couple of questions.

25           THE COURT:  Ms. Cardona, do you want to hand me that

F7FJOSB5                          Cardona - cross

1    declaration just for a moment and I will confirm it is what we

2    have been handed.  Take a look at that declaration, would you,

3    and just tell me whether or not that is the declaration that

4    you submitted in this case?

5              THE WITNESS:  Yes.

6              THE COURT:  Are its contents true and accurate?

7              THE WITNESS:  Yes.

8              THE COURT:  Do you swear to the truth?

9              THE WITNESS:  Yes.

10             THE COURT:  Thank you.  The witness is then turned

11   over for cross-examination because the court will accept as her

12   direct testimony the trial declaration she has submitted in

13   this matter.  Mr. Rumeld.

14   CROSS-EXAMINATION

15   BY MR. RUMELD:

16   Q.  Good afternoon, Ms. Cardona.

17             You worked at Woolworth for 40 years.  Is that right?

18   A.  Yes.

19   Q.  You left the company in 1997?

20   A.  Repeat that again.

21   Q.  You left Woolworth in 1997.  Is that right?

22   A.  Yes.

23   Q.  Yes?

24   A.  Yes.

25   Q.  You left because the store closed.  Is that right?

F7FJOSB5                          Cardona - cross

1   A.  Yes.

2   Q.  At the time the entire Woolworth division was closing.  Is

3   that right?

4   A.  Yes.

5   Q.  It was widely known that Woolworth stores were closing

6   down.  Isn't that right?

7   A.  Yes.

8   Q.  In fact, the national media was at your store before it

9   closed talking about the expected closing of your store, right?

10  A.  Yes.

11  Q.  You enjoyed working at Woolworth, didn't you?

12  A.  Yes.

13  Q.  Before your employment was terminated, you had never

14  considered leaving Woolworth.  Is that right?

15  A.  Right.

16  Q.  If Woolworth had not closed, you would not have been

17  looking for new employment.  Is that fair to say?

18  A.  Yes.

19  Q.  At Woolworth, you were an hourly employee?

20  A.  Yes.

21  Q.  Your wages were 9.80 an hour.  Do I have that right?

22  A.  Yes.

23  Q.  Your last year at Woolworth, you made over $20,000.  Is

24  that right?

25  A.  Yes.

F7FJOSB5                           Cardona - cross

```
 1              THE COURT:  Pause for one second.  What was your
 2   hourly rate in your very last year, your 40th year of
 3   employment?
 4              THE WITNESS:  $9.80.
 5              THE COURT:  An hour?
 6              THE WITNESS:  Yes, an hour.
 7              THE COURT:  You may proceed.
 8   BY MR. RUMELD:
 9   Q.  Now, you were able to make that much money because you
10   regularly did some overtime.  Is that right?
11   A.  Yes.
12   Q.  Now, you testified in your declaration that you worked
13   overtime to help increase the amount of your pension?
14   A.  Correct.
15   Q.  Didn't you also work overtime to generate more income for
16   yourself?
17   A.  Yes.
18   Q.  Now, after the store closed, you went to work for J.C.
19   Penney?
20   A.  Yes.
21   Q.  And your hourly wage at J.C. Penney was only $6.75.  Is
22   that correct?
23   A.  Yes.
24   Q.  Your yearly earnings were less, right, 9,000 to 17,000,
25   about?
```

F7FJOSB5                              Cardona - cross

1    A.   Yes.

2    Q.   Now, you recall receiving information about the changes to

3    the pension plan back in 1995 and 1996, correct?

4    A.   Yes.

5    Q.   At the time you didn't really give much thought to the

6    information you received.  Is that fair?

7    A.   Repeat that again.

8    Q.   At the time, back in 1995 and 1996, you got this

9    information about the changes, but you didn't give much thought

10   to it.  Is that right?

11   A.   I did receive the documents.  I saw they're still on the

12   retirement, the retirement was right there.

13   Q.   Right, but you remember at your deposition you said you

14   didn't really -- strike that.

15           You have Exhibit 2 with your declaration there?

16           THE COURT:  Do you have that in the materials that he

17   handed you before?  Yes, inside -- not that.  PX 2, was that

18   handed to you?  Not that one.  Is it underneath 11 B right

19   there?  No.  She has 160.  She has PX 160 right here.  Hand me

20   that pile right next to you and let me flip through it.  I

21   think we have got --

22           (Pause)

23           THE COURT:  -- lots of PX 4s.

24           MR. RUMELD:  I can hand up another copy.

25           THE COURT:  I have it right here, here is PX 2, all

F7FJOSB5                         Cardona - cross

1    right, and then the other ones are going to be probably in this

2    pile some place.

3    BY MR. RUMELD:

4    Q.  This announcement letter that is one of the pieces of

5    information that you received about the plan changes.  Is that

6    right?

7    A.  Yes.

8    Q.  Am I also right that you testified that you didn't really

9    give much thought to this letter when it came?

10   A.  I didn't give it much thought.  I read it and I just

11   thought the pension was still there, and that was it, you know?

12          The pension was still, I was still going to get the

13   pension.

14   Q.  Other than that, you didn't have any reaction to the

15   letter?

16   A.  I don't recall.

17   Q.  Do you have PX 4 with you?

18          THE COURT:  That is in this pile here.  You folks

19   can -- here we go.  That is PX 4.  You might at some point

20   organize them for the next witness so we have them all in

21   order.

22          MR. RUMELD:  Okay.  I apologize, your Honor.

23          THE COURT:  That is okay.  They probably are in in

24   order, but now they've gotten --

25          MR. RUMELD:  Our understanding was that if the

F7FJOSB5                          Cardona - cross

1    declaration referred to specific exhibits, they would be --

2              THE COURT:  In the pile right behind it?

3              MR. RUMELD:  That is why I thought it would be easy

4    for the witness to refer to the exhibits that she had already

5    identified.

6              THE COURT:  And she was handed PX 160, but not the

7    others.  We'll just take it one-by-one.  PX 4.

8              MR. RUMELD:  I have very few questions on each of

9    these exhibits.  I hate to bog the court down.

10   BY MR. RUMELD:

11   Q.  Is there another document you received about the plan

12   changes?

13   A.  Yes.

14   Q.  You don't remember discussing this document with anybody at

15   the time.  Is that correct?

16   A.  No.

17   Q.  Am I also correct that at the bottom of the first page of

18   that document there is a specific reference to an initial

19   account balance.  Do you see that?

20   A.  I see it.

21   Q.  And specifically it says your accrued benefit as of

22   December 31st, 1995 is actuarially converted to an initial

23   account balance.  Did I read that correctly?  Is that what it

24   says?

25   A.  Yes.

F7FJOSB5                              Cardona – cross

1   Q.  At the time you did not know what the term "actuarially

2   converted" meant.  Is that right?

3   A.  Yes.

4   Q.  Yes, meaning it is correct that you didn't know?

5   A.  I did not know.

6   Q.  Thank you.

7               (Continued on next page)

F7fnosb6                        Cardona - cross

1    Q.  At the time you didn't give any thought to what that phrase

2    meant.  Is that also true?

3    A.  Yes.

4    Q.  The last witness was shown Defendant's Exhibit 37 so I

5    think it's there.

6            THE COURT:  I am going to hand the witness what is PX

7    5 which also happens to be DX 37.  It is the SPD.

8            MR. RUMELD:  That's fine.  Thank you, your Honor.

9    Q.  Do you recognize that as the summary plan description?

10   A.  Yes.

11   Q.  We talked about this document at your deposition.  Do you

12   remember that?

13   A.  Yes.

14   Q.  Could you turn to page 6 of that document.  You see that in

15   the middle of the page it refers to initial account balance?

16   A.  Page 6 you said?

17   Q.  Yes.  You can also see it up there.

18   A.  Initial account balance.

19   Q.  You see that?

20   A.  Yes.

21   Q.  You don't recall ever reading anything about how the

22   initial account balance was determined, is that right?

23   A.  Yes.

24           MR. RUMELD:  May I approach?

25           THE COURT:  Yes.

F7fnosb6                          Cardona - cross

1              MR. RUMELD:  I am handing up 311.  I think your Honor

2      has it.

3              THE COURT:  I have it in my binder.

4      BY MR. RUMELD:

5      Q.  Am I right, Ms. Cardona, that you received a document

6      resembling Exhibit 311 every year while you were employed at

7      Woolworth?

8      A.  Yes.

9      Q.  In fact, in your declaration you say that these statements

10     showed you that your benefit was growing, is that right?

11     A.  Yes.

12     Q.  But you didn't actually pay attention to the words in the

13     document, right?

14     A.  Right.

15     Q.  You just looked at the numbers?

16     A.  I just took the numbers.

17             THE COURT:  Can you hold on one second while I get

18     311.

19             MR. RUMELD:  I'm sorry.

20             THE COURT:  It takes a little bit of doing.

21             MR. RUMELD:  I think we need to come up with a better

22     system.

23             THE COURT:  It does contain everything, but it's not

24     particularly -- I am going to take my copy of 311 out of this

25     thing.

F7fnosb6                          Cardona - cross

1              You may proceed, sir.

2              MR. RUMELD:  I just asked my last question about 311.

3              THE COURT:  All right.

4    BY MR. RUMELD:

5    Q.  Ms. Cardona, in your declaration you say that you were a

6    victim of a benefit freeze, is that right?

7    A.  Yes.

8    Q.  And it was a surprise to you, it was a big surprise for you

9    to learn after you met with your lawyers that you weren't

10   getting any credits towards your pension in 1996 and 1997, is

11   that right?

12   A.  Yes.

13   Q.  You also testified earlier that you didn't actually know

14   what compensation and interest credits were, isn't that right?

15   A.  Yes.

16   Q.  Now, in 2003, a few years after you left Foot Locker, you

17   called up and asked the company to review your pension

18   calculation, is that right?

19   A.  Yes.

20   Q.  Now, Plaintiff's Exhibit 160, do you have that near you?

21   A.  Yes.

22   Q.  You do.  OK.  Plaintiff's Exhibit 160, that's the document

23   you received in response to your request --

24   A.  Yes.

25   Q.  -- to review your pension calculation, is that right?

F7fnosb6                          Cardona - cross

1   A.  Yes.

2   Q.  You were really just interested in knowing whether your

3   benefit had been calculated correctly, right?

4   A.  Yes.

5   Q.  But this document actually gave you much more.  It showed

6   you how the benefit was calculated, is that right?

7   A.  It showed me that they redid it again.  They went over the

8   figures, and I got the same amount.

9   Q.  Right.  You did not understand all of these calculations

10  and explanations, is that fair to say?

11  A.  Yes.

12  Q.  But you didn't ask for any explanations, because you just

13  wanted to satisfy yourself that the bottom line was consistent

14  with the amount you were getting?

15  A.  Yes.

16  Q.  But you were aware that there was a number you could call

17  if you had any questions about these calculations?

18  A.  Yes.

19  Q.  In fact, that's how you would have gotten this information

20  in the first place, because you had made such a call?

21  A.  Yes.

22  Q.  Did you in fact get confirmation that the pension you were

23  receiving was consistent with the calculations?

24  A.  Repeat that again.

25  Q.  After you got this letter, this document, am I correct that

F7fnosb6                         Cardona - cross

1    you were satisfied that your pension had been calculated

2    correctly?

3    A.   According to what I received, I accepted the numbers there,

4    my final amount.

5    Q.   And the amount that you were getting was $593.76 a month,

6    is that right?

7    A.   Yes.

8    Q.   That's the number at the end of the third page there, is

9    that right?

10   A.   Yes.

11   Q.   So, if you look on that third page, do you see that there

12   is a reference to your benefit as of December 31, 1995?

13   A.   Yes.

14   Q.   In the paragraph above, do you see there is a box with the

15   numbers where they arrive at the $593 benefit?

16   A.   Yes.

17   Q.   Above that box there's two paragraphs, and the second

18   paragraph says, As reflected on page 1, your monthly accrued

19   benefit as of December 31, 1995 was $721.46.

20         Do you see that?

21   A.   Yes.

22   Q.   Then that number, $721.46, is what is referred to in the

23   first box as the monthly accrued benefit.

24         Do you see that?

25   A.   Yes.

F7fnosb6                          Cardona - cross

1   Q.  Then there is a reduction to take into account the fact

2   that you took your benefit before you reached age 65, is that

3   right?

4   A.  Yes.  That was the amount, December 31, 1995.

5   Q.  Right.  It's from that number that they came up with the

6   $593.76 figure that you received, is that right?

7   A.  Yes.

8   Q.  Now, if you look at the previous page, there are a lot of

9   other figures on this page, right?

10  A.  Yes.

11  Q.  Now, you can see, for example, in the first group of

12  figures there is a reference to an initial account balance as

13  of 1/1/96.  Do you see that, $41,394.325?

14  A.  That's the one that I did not understand.

15  Q.  That is what it says, right?

16  A.  Yes.

17  Q.  It says initial account balance.  Then, going a little

18  further down you have an enhanced initial account balance?

19  A.  Yes.

20  Q.  Right.  Do you remember that you received an enhanced

21  initial account balance?

22  A.  Repeat that again.

23  Q.  Did you remember that you received, that your initial

24  account balance was enhanced?  Do you remember ever knowing

25  that?

F7fnosb6                          Cardona – cross

1    A.  Yes.

2    Q.  Do you remember knowing why you received an enhancement of

3    your initial account balance?

4    A.  Well, it says there you have to be 50 years or older and 15

5    years in the company and you got the enhanced balance.

6    Q.  And you were in that group?

7    A.  Yes, I was in that category there.

8    Q.  Thank you.  OK.  Then, if you look towards the bottom,

9    there's another one of those boxes.

10          MR. RUMELD:  John, blow it up a little bit.

11   Q.  What you have there is a statement of what your account

12   balance is first as of December 31, 1996, and then as of

13   December 31, 1997.  Do you see that?

14   A.  Yes.

15   Q.  So, as of December 31, 1997, right after you left, your

16   account balance was about $65,000.

17          Do you see that?

18   A.  65, yes.

19   Q.  And the paragraph underneath, you didn't take your money in

20   a lump sum, right, you elected to get a monthly annuity

21   instead?

22   A.  Yes.

23   Q.  So in the paragraph underneath, it says, In order to

24   determine your accrued benefit under the plan as amended on

25   January 1, 1996, your account balance was projected to normal

1   retirement date and then converted back to an annuity.  The

2   result of this calculation provided for a monthly single life

3   annuity of $477.58.

4           Do you see that?

5   A.  Yes, I see it.

6   Q.  Now, the pension you received was larger than $477.58,

7   correct?

8   A.  Yes.

9   Q.  So you didn't get the pension calculated this way off of

10  your account balance, you got the pension that was calculated

11  off of that $721 figure, is that right?

12  A.  Yes.  From the 1995.

13  Q.  Right.  It was based on the 1995 figure.

14  A.  But I could never understand that bottom part.  I never

15  could understand that 477.  I couldn't understand those

16  figures.

17          MR. RUMELD:  Thank you.

18          I have no further questions.

19          THE COURT:  Mr. Gottesdiener, anything from you?

20          MR. GOTTESDIENER:  Just briefly.

21  REDIRECT EXAMINATION

22  BY MR. GOTTESDIENER:

23  Q.  Ms. Cardona, do you remember you were at the deposition

24  where Mr. Rumeld asked you a lot of questions?

25  A.  Yes.

```
1    Q.  I just want to ask you if you gave this testimony in
2    response to one of his questions, page 70, line 22:
3    "Q. And what do you remember about that change?
4    "A. I didn't give it much thought, because like I said" -- and
5    then there were two interruptions by the lawyers, and then you
6    continue on page 71, line 6:  "Oh, about the change, that there
7    was going to be a new change.  They're going to give us more
8    things added to us, more benefits, 401(k) plan added to us if
9    we added more money to it.  All that."
10          Did you give that testimony at your deposition?
11   A.  Yes.
12          MR. GOTTESDIENER:  No further questions.
13          THE COURT:  All right.  Thank you.
14          Thank you, Ms. Cardona you may step down.  You are all
15   done.
16          THE WITNESS:  OK.
17          THE COURT:  Just be careful stepping off the stand
18   there.
19          (Witness excused)
20          THE COURT:  Mr. Gottesdiener, would you like to call
21   your next witness, please.
22          MR. GOTTESDIENER:  Yes, your Honor.
23          Mr. Russell Howard to the stand.
24          THE COURT:  All right.  Mr. Howard, please.
25          Now, Ms. Cardona can stay in courtroom if she wants to
```

f7fnosb6                          Howard - direct

1    after she's testified.  It's up to her.

2              But the witness exclusion only applies prior to their

3    testimony, of course.

4              Up this way, Mr. Howard.

5      RUSSELL HOWARD,

6          called as a witness by the Plaintiff,

7          having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MR. GOTTESDIENER:

10             THE COURT:  Mr. Howard, please be seated.  It will be

11   very important for you to pull that chair right up to the mic

12   and for you to speak clearly and directly into the mic.  I'm

13   going to hand you a pile of some additional documents just in

14   case you need them at some point.  I don't know if you will or

15   not.

16             Mr. Gottesdiener, do you have his declaration.

17             MR. GOTTESDIENER:  Yes, I think we have a full set of

18   exhibits as well.

19             May I approach?

20             THE COURT:  You can take the ones that are on the

21   stand perhaps back so we don't get confused then.

22   Mr. Gottesdiener is handing the witness his declaration and the

23   exhibits that are referenced therein.

24             Am I correct?

25             MR. GOTTESDIENER:  That's correct, your Honor.

1           THE COURT:  All right.

2           Mr. Howard, would you please take a look at this

3    declaration here and tell me whether that is in fact the

4    declaration that you intend to submit as your direct testimony

5    in this matter.

6           THE WITNESS:  Yes, this is.

7           THE COURT:  Do you swear to the truth of the contents

8    in that declaration?

9           THE WITNESS:  I do.

10          THE COURT:  All right.

11          Well, the Court does take as Mr. Howard's direct

12   testimony his trial declaration in this matter which was set

13   forth at Exhibit 11E of the joint pretrial order and the

14   witness is turned over for cross-examination.

15          MR. RUMELD:  Thank you, your Honor.

16   CROSS EXAMINATION

17   BY MR. RUMELD:

18   Q.  Good afternoon, Mr. Howard.

19   A.  Good afternoon, sir.

20   Q.  So I need to ask you this question first.

21          In paragraph 2 of your declaration it says you are

22   taking time off work in order to testify at this trial.

23   A.  Yes, sir.

24   Q.  It does say that.  I just wanted to understand, because at

25   your deposition I thought you testified that you retired.  Was

f7fnosb6                          Howard - cross

1   I mistaken?

2   A.  No, I said I retired in October.

3   Q.  Are you working now?

4   A.  I am currently working now part-time, yes.

5   Q.  Let's go back to Woolworth, which I know is a while ago.

6        You were happy working for Woolworth, is that right?

7   A.  Very much so.

8   Q.  You viewed Woolworth as a family atmosphere?

9   A.  Yes.

10  Q.  And before 2003, when you left, you hadn't considered

11  leaving the company, is that right?

12  A.  That's correct.

13  Q.  And you only left because you got a better offer in 2003?

14  A.  Correct, sir.

15  Q.  And you went to Foot Action, is that right?

16  A.  Yes.

17  Q.  Am I correct that Foot Action did not offer a pension plan?

18  A.  That's correct.

19  Q.  After Foot Action you went to work for Macy's?

20  A.  Correct.

21  Q.  And Macy's also didn't offer a pension plan?

22  A.  Correct.

23  Q.  And after Macy's you went to work for Toys "R" Us I guess

24  until October?  I thought that was it for you, but until

25  October you worked for Toys "R" Us?

1   A.   That's correct.

2   Q.   And Toys "R" Us didn't give you pension benefits either, is

3   that right?

4   A.   Yes.  That's correct.

5   Q.   You have Plaintiff's Exhibit 71 in front of you, I hope?

6   A.   I do.

7   Q.   That would be the benefit election form that you received

8   at the time that you left Foot Locker?

9   A.   Yes, that's correct.

10  Q.   Am I correct that this is the form that alerted you to the

11  fact that you could take your benefits in the form of a lump

12  sum?

13  A.   Yes.

14  Q.   Before receiving this form, you were not aware that this

15  cash balance formula allowed you to take the lump sum, is that

16  right?

17  A.   I was aware that there was a lump sum, but I was more

18  focused on the growth of my retirement growing, and that's

19  really what I was focused on when I was reading through the

20  documents earlier.

21  Q.   Because do you remember that when we were together for your

22  deposition you said you didn't know at all that you could get a

23  lump sum?

24  A.   I do remember saying that.

25  Q.   It refreshed your recollection?

1   A.  Reading through the document, I knew it was there, but I

2   was more focused on how my retirement fund was growing, and

3   that's where I was paying attention.

4   Q.  You did elect the lump sum, is that right?

5   A.  That's correct, sir.

6   Q.  You did so because you found the lump sum option to be

7   financially more attractive to you than the annuity option?

8   A.  Yes, sir.

9   Q.  It was also, from the perspective of your family, the more

10  responsible thing to do?

11  A.  Correct.

12  Q.  So it's fair to say you were happy about the lump sum

13  option?

14  A.  I was, yes, sir.

15  Q.  While you were at Woolworth, you received various other

16  documents that described the pension plan, is that right?

17  A.  Yes.

18  Q.  And your general practice was simply to get the gist of

19  these documents?

20  A.  Yes.  I would read through them, yes.

21  Q.  You would skim them, right?

22  A.  I would read through them and skim certain areas, yes.

23  Q.  OK.  And you skimmed certain areas, and there might be some

24  areas that you wouldn't look at, at all?

25  A.  I would have looked through it, to your phrase, skimmed

1   them would be the correct term, yes.

2   Q.  You were aware at the time that if you had questions about

3   your pension benefits you could call this call-in center?

4   A.  Yes, sure.

5   Q.  But you never contacted them?

6   A.  No, sir.

7   Q.  You really didn't have retirement on your mind while you

8   were working at Woolworth, is that fair?

9   A.  That is a very fair statement.

10  Q.  Now, could you take a look at PX 2, which should also be

11  attached to your declaration.

12  A.  Yes, sir.

13  Q.  And that is a letter that you do recall receiving back in

14  1995?

15  A.  I do.

16  Q.  That's the letter from which you first learned about the

17  new cash balance formula, is that correct?

18  A.  Introducing the plan, yes.

19  Q.  When you got this letter, you didn't have much of a

20  reaction to it, is that right?

21  A.  No, not really.  No.

22  Q.  Your focus was on the fact that it offered a new 401(k)

23  plan, is that right?

24  A.  Yes, that's correct.

25  Q.  Could you take a look at Plaintiff's Exhibit 4, which is

f7fnosb6                         Howard - cross

1    also I think attached to your declaration.

2    A.  Yes, sir.

3    Q.  This is a document you also received back in 1995, is that

4    right?

5    A.  Yes.

6    Q.  At the bottom of the first page, you see where it refers to

7    the initial account balance?

8    A.  Yes.

9    Q.  Am I correct that that type of description is not the sort

10   of thing that you would have reviewed carefully?

11   A.  Most likely, yes.

12   Q.  Would the same be true for the reference to the minimum

13   benefit that appears on the third page of the document?

14   A.  Yes.

15   Q.  You weren't reviewing these documents on that level of

16   detail at the time?

17   A.  Correct.

18             THE COURT:  Would you have read the language, or would

19   you have skipped over that section all together?

20             THE WITNESS:  No, I would have read through it, but I

21   am not sure that I would have, at the time I would have really

22   given it a lot of deep thought.

23             THE COURT:  All right.

24             MR. RUMELD:  I would like to show the witness the

25   summary plan description and I can hand him up DX37?

f7fnosb6                    Howard - cross

1          THE COURT:  Yes.  Let me just ask one more question.

2          MR. RUMELD:  Sure.

3          THE COURT:  Let me ask, as you sit here right now, do

4    you recall actually having an understanding of that term at the

5    time?

6          THE WITNESS:  Not in detail, your Honor, no.

7          THE COURT:  If you read language like "initial account

8    balance" there at the bottom of PX 4, in terms of your general

9    practice, would you have satisfied yourself that you understood

10   it before you moved on in the document, or would you be really

11   focused on something else, getting a general sense of the

12   document or something else?

13         THE WITNESS:  As I've said in my declaration, when I

14   read through these, I kind of got the gist of what they were

15   telling me.  I understood, you know, this was available, but

16   beyond that I really didn't give it a lot of thought.

17         Again retirement was pretty far out, and I was more

18   focused on my family at the time.

19         THE COURT:  You may proceed, sir.

20         MR. RUMELD:  I can hand up DX 37.

21         THE COURT:  It is also PX 5.

22         MR. RUMELD:  Yes.

23         THE COURT:  Either one.  Do you have PX 5?

24         MR. RUMELD:  I don't think it is attached to his

25   declaration.

f7fnosb6                         Howard - cross

1          THE WITNESS:  It is not here, your Honor.

2          THE COURT:  All right.  It may be easier for you to

3    hand him a copy.

4    BY MR. RUMELD:

5    Q.  Here you go.

6    A.  Thank you, sir.

7    Q.  This is another one of those documents you would have

8    gotten the gist of, right?

9    A.  That's correct, sir.

10   Q.  This one is considerably longer than the other one, so you

11   might have really just been skimming through it?  Is that fair?

12   A.  That is a fair statement.  I would have read through the

13   beginning part of it and then read through the rest to get an

14   understanding, a gist of what they were trying to tell us, and

15   again not really focusing on details so much because retirement

16   was pretty far away in my mind.

17   Q.  Getting the gist would not have included paying attention

18   to the definitions section of this document, is that right?

19   A.  I think that's a fair statement.

20   Q.  So if there is a definition of initial account balance that

21   appears on page 6, you wouldn't have paid any attention to

22   that?

23   A.  I would have looked at it and gone by it without thinking

24   of it in too much detail I'm sure at the time.

25   Q.  Before your deposition, which was a couple of weeks ago I

1   guess, but before your deposition, you you really had no idea

2   how the initial account balances were calculated, isn't that

3   right?

4   A.   That's correct.

5   Q.   If you could turn to pages 11 and 12, there is a section on

6   how your retirement benefit is determined, starting on the

7   bottom of page 11 and continuing on to page 12.

8          Do you see that?

9   A.   I see the bottom, how retirement is determined, yes.

10  Q.   You would not have focused on that either back in 1996 or

11  so?

12  A.   Probably not.

13  Q.   In paragraph 5 of your declaration you say that you thought

14  that your account accruals cost the company real dollars to

15  provide those benefits.  Do you remember putting that in your

16  declaration?

17  A.   I see that, yes.

18  Q.   Let me ask one collateral question.

19          Is it safe to assume that somebody prepared this

20  declaration for you?

21  A.   I worked with my lawyers in preparing it, yes, and read

22  through it and approved basically what we had said, yes.

23  Q.   It was drafted for you?

24  A.   Yes, along with my approval.

25  Q.   Getting back to that paragraph 5, you wouldn't know, would

f7nosb6                        Howard - redirect

1    you, whether there is any added cost factor associated with

2    providing you a lump sum as opposed to just annuity option?

3    A.  Could you rephrase that again, please.

4    Q.  You don't know, do you, whether it cost the company more

5    money to give you a lump sum option?

6    A.  Just from conversations with my lawyers.

7    Q.  Before that, you wouldn't know one way or the other?

8    A.  I would not have known one way or the other.

9            MR. RUMELD:  I have nothing further.  Thank you.

10           THE COURT:  Thank you.

11           Mr. Gottesdiener is there anything from you.

12           MR. GOTTESDIENER:  Just very generally.

13   REDIRECT EXAMINATION

14   BY MR. GOTTESDIENER:

15   Q.  Mr. Howard, what did you think, having read through the

16   materials, getting the gist, skimming, what was your impression

17   of what was happening to the pension that you had learned all

18   the way through 1995 starting in 1996?

19   A.  Well, initially I thought that they had converted one to

20   the other, and that was kind of where my cash balance was.

21   That was my understanding at the time.  And then since this has

22   come about and discussing it, I think I've come to realize that

23   there was calculations that were done that were not adding

24   benefits after '96 to my pension.

25   Q.  Did you have any inkling, suspicion of that at all through

f7nosb6                      Howard - redirect

1  all the years after '96 that you stayed at Woolworth/Foot

2  Locker?

3  A.  Not at all.  I never gave it a thought.  I just looked at

4  the growth year to year, saw that it was growing and that was

5  it, yeah.

6  Q.  What else could you think?

7  A.  Yes.

8         MR. GOTTESDIENER:  No further questions.

9         THE COURT:  Thank you.

10        Mr. Rumeld, anything?

11        MR. RUMELD:  No.

12        THE COURT:  All right.  You may step down, sir.

13        THE WITNESS:  Thank you, your Honor.

14        (Witness excused)

15        THE COURT:  Let's take our midafternoon break, and

16 when we come back we'll go on to our next witness.

17        Have you folks you worked out who else is lined up for

18 the afternoon?  It seems like we are making some good progress

19 here.

20        MR. GOTTESDIENER:  Yes, your Honor, if we are breaking

21 now for ten minutes --

22        THE COURT:  Yes.

23        MR. GOTTESDIENER:  -- that would bring us to about

24 3:40.

25        THE COURT:  Yes.

1          MR. GOTTESDIENER:  We have two, we have Ms. Welz and

2     Mr. Campuzano.  I don't know how long you would estimate.

3          MR. RUMELD:  I don't think it will be much different

4     than what you have heard.  Mr. Kiley, we arranged for him to be

5     here.  So frankly now that he's here --

6          THE COURT:  All right.  Terrific.

7          MR. RUMELD:  -- that is even better.

8          THE COURT:  It sounds like then we are going to be

9     good for the afternoon.

10          MR. RUMELD:  We will be good.  Unfortunately I think

11     Mr. Kiley may have to come back tomorrow, unless we do him

12     fast.

13          MR. GOTTESDIENER:  We will definitely need to do that.

14     I was wondering, it might be an opportune time after these two

15     witnesses to talk about, because we would like to move in some

16     of the deposition designations.

17          THE COURT:  It sounds like we have Mr. Kiley lined up.

18     So we would start with Mr. Kiley.  If he's in situ so to speak,

19     we will start with him, and we will proceed from there.

20          MR. GOTTESDIENER:  Very good.

21          THE COURT:  In terms of the depositions, that which

22     you have submitted as part of the joint pretrial order, that's

23     what I'm taking in subject to the objections that we've

24     already -- so we don't need to do any logistics around that.

25     Before the record is closed I will make sure it's crystal clear

f7nosb6                        Welz - direct

 1  what is on the record.

 2             MR. GOTTESDIENER:  Thank you, your Honor.

 3             MR. RUMELD:  Thank you, your Honor.

 4             THE COURT:  Let's take a ten-minute break.

 5             (Recess)

 6             THE COURT:  Mr. Gottesdiener, would you like to call

 7  your next witness, please.

 8             MR. GOTTESDIENER:  Ms. Welz.

 9             THE COURT:  Ms. Welz to the stand.

10   RITA WELZ,

11      called as a witness by the Plaintiff,

12      having been duly sworn, testified as follows:

13  DIRECT EXAMINATION

14  BY MR. GOTTESDIENER:

15             THE COURT:  Ms. Welz, please be seated.  It will be

16  important for you to be able to pull up the chair and adjust

17  that microphone down to a level where you can speak into it

18  directly and clearly.

19             We are going to get a copy of your declaration.  This

20  is one of those that was added afterwards.  Do you folks have

21  an extra copy that I can have as well?  I mean, I have it

22  upstairs.

23             MR. GOTTESDIENER:  Yes.  One for you, one for the

24  Court.  There are a number of exhibits, with the Court's

25  indulgence.

f7nosb6                      Welz - cross

1            There's a bunch.  Let me just take a moment.

2            Some of the exhibits are familiar to your Honor, some

3      less so.

4            MR. GOTTESDIENER:  Here you have a full set of

5      exhibits, and your Honor has a full set of exhibits now.

6            THE COURT:  The witness has been handed a set of

7      exhibits referred to in her declaration.  Have you also been

8      handed your declaration?

9            THE WITNESS:  Yes, I have.

10           THE COURT:  All right.  Could you look through that

11     and tell me whether or not that is in fact the declaration

12     which you submitted in this matter and if you swear to the

13     truth of its contents.

14           THE WITNESS:  Yes, it is.

15           THE COURT:  The Court then does accept the declaration

16     of Ms. Welz as her direct testimony and the witness is turned

17     over for cross-examination.  Mr. Rumeld.

18           MR. RUMELD:  Thank you.

19     CROSS EXAMINATION

20     BY MR. RUMELD:

21     Q.  Hello again, Ms. Welz?

22     A.  Hello.

23     Q.  In your declaration in paragraph 15 you seem to express

24     some surprise that Pat Peck or Carol Kanowicz or Marion Derham

25     did not let you know about wear-away, is that right?

f7nosb6                          Welz - cross

1   A.  That's true.

2   Q.  But you yourself had no direct involvement in the cash

3   balance amendment, is that right?

4   A.  That's true.

5   Q.  Even though you were the manager of benefits administration

6   you didn't have any inside track on information pertaining to

7   that amendment, is that true?

8   A.  Correct.

9   Q.  In fact, other than the fact that Carol Kanowicz reported

10  to you and Marion reported to Carol, you really had no

11  responsibilities pertaining to pension benefits in the 1990s,

12  isn't that right?

13  A.  Yes.

14  Q.  They were responsible, among other things, for preparing

15  pension estimates?

16  A.  Yes.

17  Q.  But you didn't supervise those activities?

18  A.  No.

19  Q.  And you also didn't play a role in preparing the pension

20  plan summary plan descriptions, right?

21  A.  Yes.

22  Q.  You were focused on the welfare benefits --

23  A.  Yes.

24  Q.  -- but not the pension benefits?

25          It was your understanding, though, that the summary

f7nosb6                         Welz - cross

1   plan descriptions were written by consultants, is that right?

2   A.  That's what I think, yes.

3   Q.  Including Mercer?

4   A.  Right.

5   Q.  When it came to the pension plan summary plan descriptions,

6   it was your understanding that the legal department typically

7   got involved?

8   A.  I think so, yes.

9   Q.  Right.  Because the pension stuff tended to be more legal

10  than the welfare stuff, is that correct?

11  A.  Yes.

12  Q.  There were these one- or two-page pension statements that

13  came out once a year?

14  A.  Yes.

15  Q.  But you didn't have a role with respect to those either, is

16  that right?

17  A.  No.

18  Q.  Let me show you what we have designated as Defendant's 404.

19          MR. RUMELD:  This is one of the exhibits we haven't

20  put in yet, your Honor.

21          THE COURT:  All right.

22  Q.  Here you go.  This is a document you do recognize, right?

23  A.  Yes.

24  Q.  You did have a role in preparing at least parts of these

25  personal benefit statements, is that right?

1    A.   The benefits portion, yes.

2    Q.   The benefits portion meaning the welfare benefits portion?

3    A.   Yes.

4    Q.   Because if I am talking about pension benefits, you don't

5    have a role in preparing those portions?

6    A.   Correct.

7    Q.   So, for example, on page 6 and 7, there is information

8    concerning the Venator Group retirement plan and the 401(k)

9    plan.

10            Do you see that?

11   A.   Yes.

12   Q.   You would have nothing to do with the information on those

13   pages, is that right?

14   A.   That's right.

15   Q.   If I turn back to page 2.  There is a figure corresponding

16   to the company's estimated annual cost for all the benefits, is

17   that right?

18   A.   Yes.

19            THE COURT:  Can I just ask one quick question.

20            MR. RUMELD:  Sure.

21            THE COURT:  I think you said, Ms. Welz, that this

22   document, DX 404, is your benefit statement for 1998.

23            Is that right?

24            THE WITNESS:  Not mine personally.

25            THE COURT:  Not yours personally, but it is just a

f7nosb6                          Welz - cross

1   benefit statement for 1998.

2              THE WITNESS:  Yes.

3              MR. RUMELD:  My apologies for not making that clear.

4   I really was just picking one as an example.

5              THE COURT:    Fine.  You may proceed, sir.

6   BY MR. RUMELD:

7   Q.  So on page 2 there is a figure that corresponds to the

8   estimated annual cost for this particular employee's benefits,

9   is that right?

10  A.  Yes.

11  Q.  And that figure your understanding is a composite of costs

12  that are attributed to various types of benefits, is that

13  right?

14  A.  Yes.

15  Q.  And insofar as the cost of pension benefits would

16  contribute to this figure, you didn't have any role in

17  determining what that number was?

18  A.  That's correct.

19  Q.  So you don't know whether or how that was done?

20  A.  Right.

21  Q.  With respect to the welfare benefits, for example, medical

22  benefits, disability benefits, those would be things you were

23  more familiar with, is that right?

24  A.  Yes.

25  Q.  And those benefits, the medical benefits, were self-insured

f7nosb6                          Welz - cross

1    by the company?

2    A.  Yes.

3    Q.  Meaning there was no outside carrier who paid for coverage?

4    The benefits were paid by the company?

5    A.  Yes.

6    Q.  For purposes of determining the cost of medical benefits

7    that contributed to this figure, there was a cost assigned

8    based on the annual premium?

9    A.  Yes.  We developed a premium, we called it a shadow

10   premium, yes.

11   Q.  Right.  Shadow because it's really just for internal

12   purposes?

13   A.  Right.

14   Q.  It's not like anybody is writing a check to some other

15   carrier?

16   A.  Correct.

17   Q.  So the costs that were reflected here for any particular

18   medical plan that an employee might have chosen, the cost would

19   be the same for every employee who was in that plan?

20   A.  Except for family versus single coverage.

21   Q.  Right.

22   A.  Yes.

23   Q.  Thank you for that clarification.

24   A.  Yes.

25   Q.  What I'm getting at here is somebody who had more medical

1   needs than somebody else, you wouldn't make a distinction in

2   terms of how you assigned the costs?

3   A.  No.

4   Q.  It was just one flat figure based on the premium that was

5   assigned?

6   A.  Correct.

7   Q.  These personal benefit statements, as far as you recall,

8   the information contained on here was essentially the same for

9   a long period of time, is that right?  The format of the

10  information that was generally conveyed in this form remained

11  the same?

12          THE COURT:  Let me just make sure, because it is two

13  different questions.  One is the content of the information,

14  the second is the format.

15          Which do you want?  Which one?

16  BY MR. RUMELD:

17  Q.  I understand the numbers changed every year?

18  A.  Right.

19  Q.  But the type of information that was conveyed in this form

20  generally remained the same?

21  A.  Yes.

22  Q.  You don't remember there ever being like a change in the

23  presentation of this information that came about at some time?

24  A.  Well, this particular statement is for a senior corporate

25  management group.  When that was added, the statement would

f7nosb6                          Welz - cross

1   have changed to add them --

2   Q.   Right.

3   A.   -- on their statement personally.

4   Q.   Right.  So I probably took a bad example here, and I

5   apologize.  But, generally speaking, a regular employee, the

6   statements kind of looked the same every year?

7   A.   Yes.

8   Q.   And that's going back quite a while?

9   A.   Yes.

10  Q.   Back into the 1980s even?

11  A.   Yes.

12  Q.   Now, as the manager of benefits administration, you were

13  aware of the activities of the human resources operation center

14  in Wisconsin?

15  A.   Yes.

16  Q.   I hope I got the name right.

17  A.   Yeah.

18  Q.   It's referred to as HROC?

19  A.   Yes.

20  Q.   Among the things that HROC handled was this call-in center?

21  Do you remember that?

22  A.   Yes.

23  Q.   Am I correct that your recollection is that as many as 20

24  to 30 people worked continuously, daytime hours, but worked at

25  the same time at the call-in center?

f7nosb6                          Welz – cross

1    A.  Yes.

2    Q.  You also were involved in organizing visits to particular

3    work sites to provide information about benefits?

4    A.  Yes.

5    Q.  Generally speaking, if a particular location was closed

6    down, there would automatically be a visit from some of the

7    people in your group to the work site, is that right?

8    A.  Automatically?

9    Q.  Well, if a work site was closing down, you would send

10   people over there?

11   A.  Yes.

12   Q.  For purposes of providing information about pension

13   benefits Carol Kanowicz or Marion Derham or Tom Kiley would be

14   among the people who were sent over?

15   A.  Yes.

16   Q.  And their role would be to provide some explanations about

17   people's pension benefits?

18   A.  Yes.

19              (Continued on next page)

20

21

22

23

24

25

F7FJOSB7                        Welz - cross

1   Q.   Now, among the locations that you're recalling that closed

2   down were Camp Hill, right?

3   A.   Camp Hill Distribution Center, yes.

4   Q.   Greenville?

5   A.   Yes.

6   Q.   There was another one in Arizona I think you remembered?

7   A.   Yes.

8   Q.   Can I assume there were others that you just don't remember

9   the names?

10  A.   Yes.

11  Q.   Was that you remember any more today?

12  A.   I don't remember any more.  Distribution centers that were

13  no longer needed as we were closing operations.

14  Q.   Right.  There were quite a few of those in the 1990's that

15  closed down.  Is that right?

16  A.   There were several, yes.

17  Q.   Now, in addition to the meetings that were conducted at

18  locations that were closing, there were also meetings that were

19  conducted at locations that weren't closing.

20          Isn't that right?

21  A.   Yes.

22  Q.   The general practice was that if the HR people at a

23  particular location asked you to have some of your people come

24  and explain the benefits, you would send some people to do

25  that?

1    A.  Yes.

2    Q.  Now, I understand that with respect to the pension plan

3    amendments, that was other people's responsibilities, but with

4    respect to health benefits, you were more directly involved.

5         Is that right?

6    A.  Yes.

7    Q.  In the 1990's you were involved in making changes that were

8    designed to at least reduce the escalating cost of health

9    benefits.  Is that fair?

10   A.  Yes.

11   Q.  One of the changes you made was making HMOs available as

12   one of the plan choices for participants?

13   A.  Yes.

14   Q.  And without going into all of the details, if a participant

15   decided, if an employee decided to participate in an HMO as

16   opposed to some of the other arrangements, they may have less

17   out-of-pocket costs, but they would be more restricted in terms

18   of what doctors they visited?

19   A.  Yes.

20   Q.  So that those HMO's were offered because in the aggregate,

21   the company was going to save costs, that was one of the

22   reasons for doing this, right?

23   A.  That was our hope, yes.

24   Q.  You would also agree with me from the perspective of the

25   employees, there were many employees who preferred the HMOs?

F7FJOSB7                          Welz - cross

1   A.   There were many employees who preferred the PP0 as well.

2   Q.   Right.   Some preferred the HMO and some preferred the PPOs?

3   A.   Right.

4   Q.   For a lot of people, this was a net gain to add the HMO

5   options?

6   A.   In many places, yes.

7   Q.   Even though from the standpoint of the company, it was also

8   a net gain because they were saving costs?

9   A.   Yes.

10  Q.   Could you take a look at Plaintiff's Exhibit 2 which I

11  think is attached.

12  A.   Attached to this?

13  Q.   I hope so.

14  A.   (Pause)

15  Q.   Do you have some exhibits attached to your declaration?

16  A.   Yes.

17  Q.   So I think one of the exhibits attached to your declaration

18  is Plaintiff's Exhibit 2.   It is the letter from Mr. Farah and

19  Mr. Hippert.   Do you have that in front of you now?   It is the

20  same one on the screen here.

21            You remember receiving --

22            THE COURT:   See if she has the right documents first.

23            MR. RUMELD:   I am sorry.   My apologies.

24  A.   Yes.

25  BY MR. RUMELD:

F7FJOSB7                          Welz - cross

1   Q.  So you do remember receiving this letter back in 1995?

2   A.  Yes, I do.

3   Q.  Your reaction to the letter was that you were happy, right?

4   A.  Yes.

5   Q.  And you were happy because the letter talked about the 401

6   (k) plan?

7   A.  Yes, personally happy.

8   Q.  Personally happy, right.

9        You were also personally happy about there being now a

10  lump sum option for the defined benefit plan?

11  A.  Yes.

12  Q.  And when you left in 2000, you, in fact, chose the lump sum

13  option.  Is that right?

14  A.  Yes.

15  Q.  I think you actually said you thought it was great, the

16  lump sum option?

17  A.  Yes.

18        THE COURT:  Let me ask you about this document.  You

19  testified that you read this document that we have been

20  referring to which is PX 2.  Is that right?

21        THE WITNESS:  Yes.

22        THE COURT:  When you read something such as PX 2, did

23  you read it thoroughly?  Would you have read this kind of

24  document thoroughly or would you have glanced through it?

25        Describe your process.

F7FJOSB7                              Welz - cross

```
 1              THE WITNESS:  I think thoroughly because it was
 2     important.  It was the first notification of this situation.
 3              THE COURT:  All right.  Did you pay more attention to
 4     benefits information because of your job or was it your
 5     practice to read everything thoroughly in your area, or did you
 6     do that with everything that you came across?
 7              THE WITNESS:  With benefits, I probably read it more
 8     closely.  I am a reader so I probably read other documents with
 9     equal interest.
10              THE COURT:  When you talk in your declaration about
11     reading all the communications, you really mean you read all
12     the communications?
13              THE WITNESS:  Yes.
14              THE COURT:  You may proceed.
15     BY MR. RUMELD:
16     Q.  Just on that subject, you also understood when you got a
17     letter like this, that this wasn't the last piece of
18     information you were going to get --
19     A.  Yes.
20     Q.  -- describing new benefits, right?
21     A.  Yes, because it says in there more is coming.
22     Q.  It says more is coming and this was really just a basic
23     initial description?
24     A.  Yes.
25     Q.  If you really wanted to know the details about your
```

F7FJOSB7                          Welz - cross

1   benefits, you would wait for more was coming?

2   A.  Yes.

3   Q.  The summary plan description?

4   A.  Yes.

5   Q.  Now, you mentioned a moment ago that you elected the lump

6   sum when you left in 2000.  Your reason for electing it was

7   because you wanted to invest the money yourself?

8   A.  Yes.

9   Q.  And that is what you did, right?

10  A.  Yes.

11  Q.  You thought you could do better by investing by yourself?

12  A.  Yes.

13  Q.  In fact, you went to an investment company, if I remember

14  correctly?

15  A.  Right.

16  Q.  The more, the better.

17          Now, you said a minute ago that you were a reader, so

18  I take it when the summary plan description came out describing

19  cash balance benefits, you read that as well?

20  A.  Yes.

21  Q.  That would be Plaintiff's Exhibit 5 which hopefully is also

22  attached?

23  A.  Yes.

24          MR. RUMELD:  May I approach, your Honor?

25          THE COURT:  You may.

F7FJOSB7                          Welz - cross

1          MR. RUMELD:  I am going to hand up Defendant's Exhibit

2     403, and I will give your Honor a copy as well.

3          THE COURT:  All right.

4          (Pause)

5     BY MR. RUMELD:

6     Q.  Now, let me first ask, when you received the summary plan

7     description, you didn't ask any particular questions of other

8     people in the pension group about the summary plan description.

9          Is that right?

10    A.  That's correct.

11    Q.  Because at the time you thought you understood it?

12    A.  Right.

13    Q.  Now, what I --

14         THE COURT:  Are you going to leave the SPD or continue

15    to weave it?

16         MR. RUMELD:  I will come back to it in a minute if

17    that is all right.

18    BY MR. RUMELD:

19    Q.  Let's first look at Defendant's Exhibit 403.  This was a

20    document we looked at at your deposition also.  Is that right?

21    A.  Yes.

22         THE COURT:  Can I just ask that -- sorry, Mr.

23    Rumeld -- if we are going to use this, can you folks give me a

24    copy with the masked social security number so that we don't

25    have her social security number there because it will end up

F7FJOSB7                          Welz - cross

1   being part of the public docket.

2           MR. RUMELD:  We can do that.  I apologize.

3           THE COURT:  That is all right.  It won't see the light

4   of day.

5           MR. RUMELD:  We started with a whole lot of documents

6   redacted.  Then we had actual witnesses, we unredacted some

7   things.  Yes, we'll take care of that.

8   BY MR. RUMELD:

9   Q.  This is the application form that you received when you

10  left the company?

11  A.  I don't remember it, but it looks like what I should have

12  received.

13  Q.  Right.  You see that it has a lump sum figure of

14  approximately $80,000?

15  A.  Yes.

16  Q.  And that figure is a couple of thousands greater than what

17  is listed as the account balance of approximately $78,000?

18  A.  Yes.

19  Q.  Is that consistent with your recollection?

20  A.  The only thing I can think is there was interest or

21  something on the lump sum number.

22  Q.  Right.  Okay.  I asked a poor question.  Let me just break

23  it down.

24          Do you remember seeing that the lump sum was bigger

25  than your account balance?  Do you remember seeing that at the

1    time?

2    A.   No.

3    Q.   You didn't focus on it one way or the other?

4    A.   No.

5    Q.   Whatever assumptions you are making as why it was bigger,

6    you are really making it after-the-fact?

7    A.   Yes.

8    Q.   Let's go back to 1996 when the plan started.  You did have

9    an understanding that there was an initial account balance.  Is

10   that correct?

11   A.   Yes.

12   Q.   And you did have an understanding that the initial account

13   balance was somehow based on the pre-1996 benefit that was

14   earned under the prior plan formula?

15   A.   Yes.

16   Q.   And the benefit under the prior plan formula was in the

17   form of an annuity, you knew that?

18   A.   Yes.

19   Q.   Meaning a monthly payment that retirement or early

20   retirement date?

21   A.   Yes.

22   Q.   You did not understand back in 1996 how the initial account

23   balance was calculated?

24   A.   No.

25   Q.   But you did understand that there had to be some process

F7FJOSB7                           Welz - cross

1    pursuant to which the annuity was converted to a lump sum?

2    A.  Yes.

3    Q.  You just didn't know the details about how that was done?

4    A.  Correct.

5    Q.  Now, from reading the summary plan description, you also

6    knew that the conversion was performed using the 9 percent

7    interest rate, correct?

8    A.  Yes.

9    Q.  That was an assumption, that was one of the actuarial

10   assumptions used to make the conversion?

11   A.  Yes.

12          THE COURT:  Did you understand that the 9 percent was

13   being used as a discount rate?

14          Did you understand the difference between discount

15   rate and interest rate?

16          THE WITNESS:  No.

17          THE COURT:  What did you think the term "actuarial"

18   meant?

19          THE WITNESS:  That it was some sort of a process to

20   change an annuity over to a lump sum.

21          THE COURT:  All right.  You may proceed.

22   BY MR. RUMELD:

23   Q.  Could you turn to Page 12 of the summary plan description.

24   A.  Yes.

25   Q.  Now, if you look immediately above the words, "interest

F7FJOSB7                          Welz – cross

1   credits" towards the bottom of that page?

2   A.  Yes.

3   Q.  There is a sentence that begins, "Your accrued benefit," do

4   you see that?

5   A.  Yes.

6   Q.  I'll just read it so we're all on the same page here.

7           "Your accrued benefit at the time your employment

8   terminates is the greater of the amount determined under the

9   plan as amended on January 1st, 1996, or your accrued benefit

10  as of December 31st, 1995."

11          Do you see that?

12  A.  Yes.

13  Q.  Now, at your deposition you didn't remember having read

14  this provision.  Is that right?

15  A.  No, yes, that's correct.

16  Q.  You agreed with me that one reason why the accrued benefit

17  as of December 31st, 1995, under the old plan, one reason why

18  it could be greater was if you weren't getting any accruals

19  under the new plan.  Is that right?

20  A.  Yes.

21  Q.  Now that is what you believe happened to you?

22  A.  Yes.

23  Q.  You also agree with me that this sentence could have

24  alerted you to the fact that the accruals under the old plan

25  could be bigger than your accruals under the new plan?

F7FJOSB7                          Welz - redirect

1    A.  My interpretation would have had something to do with

2    working without being paid, unpaid leave or something.  There

3    was not an immediate reaction at, oh, this is why this is

4    different.

5    Q.  Right.  You didn't think of it that way then, but you do

6    agree with me that this could have alerted you to the idea, for

7    whatever reason, accruals under the older plan could be worth

8    more than the accruals under the new plan.  That is what it

9    says, right?

10   A.  That is what it says, but I never got that.

11        MR. RUMELD:  I have nothing further.

12        THE COURT:  Thank you.

13   REDIRECT EXAMINATION

14   BY MR. GOTTESDIENER:

15   Q.  When you say you never got that, that message didn't come

16   through to you?

17   A.  Correct.

18   Q.  You mentioned statements changed after 1995 with regard to

19   pension.  In what way did the statements that you got, the

20   annual statements change, if you recall?  Maybe I misheard.

21        Did you have any suspicion at the time based on the

22   materials you received that you were not accruing new pension

23   dollars from 1-1-96 forward?

24   A.  No.

25   Q.  Was this a total surprise to you?

F7FJOSB7

1    A.  Yes.

2              MR. GOTTESDIENER:  No further questions.

3              THE COURT:  You may step down.

4              MR. RUMELD:  Before we call the next witness, I just

5    wanted to raise one issue.

6              THE COURT:  Do you need this witness on the stand.

7              (Witness excused)

8              THE COURT:  What is it, Mr. Rumeld, you would like to

9    raise?

10             MR. RUMELD:  I wanted to alert the court, because your

11   Honor has used the term discount rate a couple of times in

12   questioning the witnesses, and I kind of understand why your

13   Honor's using it.  I just want --

14             THE COURT:  Correct me if I am wrong.

15             MR. RUMELD:  -- I want to raise the point that

16   depending on who I am questioning, I think there are witnesses

17   here who think that discount means something like a reduction

18   from what somebody is entitled to.  That is certainly not our

19   position for reasons that we have heard plenty of in the last

20   couple of days.

21             We view this to be a conversion pursuant to an

22   appropriate interest rate recommended by the actuary.  It may

23   have been a higher interest rate than the 417 (e) mandated, but

24   it doesn't mean that it is discounted.  Some people think of

25   discounted meaning if I am getting something now versus in the

F7FJOSB7

1    future.

2              THE COURT:  I am thinking really of the technical term

3    of getting the present value of something and using a discount

4    rate to get yourself there, and you can use any number of

5    discount rates.  What I was interested in, frankly, was whether

6    or not this -- because 9 percent is functioning as a discount

7    rate, am I correct?

8              MR. RUMELD:  The way your Honor defined it, I agree.

9              THE COURT:  I want to tell you where I was coming

10   from.  I was curious whether or not somebody who was a benefits

11   manager who understood there was a 9 percent interest rate

12   which you asked her there, whether she understood that was

13   being used as a discount rate, and if she doesn't understand it

14   because she doesn't understand the word or because she didn't

15   understand because she was thinking of a retail discount or

16   something like that, in some other totally different concept,

17   that would have been fine.

18             If she didn't understand it, it is useful for me to

19   understand she didn't understand it.

20             MR. RUMELD:  I believe there are people who do

21   understand that it is less whether it is today's dollars versus

22   the future, was a separate set of people who now have the

23   impression the conversion gave them something less than they

24   were entitled to.

25             THE COURT:  I think the question is -- two questions.

F7FJOSB7

```
 1   One is certainly entitlement and the other is conversion.

 2   There are many questions, but those are among them.

 3              MR. RUMELD:  I wanted to make that clear.

 4              THE COURT:  Yes.  Mr. Gottesdiener, would you like to

 5   call your next witness, please?

 6              MR. GOTTESDIENER:  Yes, your Honor.  Thank you.  Ralph

 7   Campuzano.

 8    RALPH CAMPUZANO,

 9         called as a witness by the Plaintiff,

10         having been duly sworn, testified as follows:

11              THE COURT:  Mr. Campuzano, please be seated, sir.

12              It will be important for you to pull that chair right

13   up to the mike and to adjust that microphone so you can speak

14   clearly and directly into it.  Imagine you want people in the

15   back of the room to hear you.  You don't want to yell, but you

16   want to keep your voice up.

17              THE WITNESS:  All right.

18              THE COURT:  You may proceed, Mr. Gottesdiener, to hand

19   the witness his declaration.

20              MR. GOTTESDIENER:  Thank your Honor.

21   DIRECT EXAMINATION

22   BY MR. GOTTESDIENER:

23   Q.  This is your declaration and the exhibits referenced --

24              THE COURT:  Mr. Campuzano, I want to make sure you

25   look through that declaration and please tell me whether that,
```

F7FJOSB7                          Campuzano - cross

1   in fact, is your declaration that you intend to offer as your

2   direct trial testimony in this matter?

3              THE WITNESS:  Yes.

4              THE COURT:  Can you confirm for me that the

5   information you put into that declaration is true and correct?

6              THE WITNESS:  Yes.

7              THE COURT:  The court does accept the trial

8   declaration of Mr. Campuzano as his direct trial testimony, and

9   the witness is turned over for cross-examination.

10  CROSS-EXAMINATION

11  BY MR. RUMELD:

12  Q.  Mr. Campuzano, isn't it true that approximately three

13  months before you left your employment with Woolworth, you were

14  asked to leave?

15  A.  Say that again.

16  Q.  Were you asked to leave your employment -- I am sorry.  Not

17  with Woolworth.  Were you asked to leave your employment at

18  Kenny?

19  A.  Yes.

20  Q.  You were?

21             You had a performance review during which you were

22  told that you were not meeting expectations.  Is that correct?

23  A.  Yes.

24  Q.  Even though in Paragraph 1, I believe it was of your

25  declaration, you talk about the business at your location

F7FJOSB7                        Campuzano – cross

1   winding down, the reason you left is because you were let go?

2   A.  Yes.

3   Q.  Now, before you were asked to leave, you enjoyed working

4   for the company.  Isn't that right?

5   A.  Yes.

6   Q.  You thought it was a fun company to work for?

7   A.  Yeah.

8   Q.  If you had not been asked to leave, you would have

9   continued working there as long as it remained open?

10  A.  Yes.

11  Q.  After leaving Kenny, you got a job at a sales company at a

12  company called Alec.  Is that right?

13  A.  Correct.

14  Q.  Alec did not work for pension benefits.  Is that right?

15  A.  Correct.

16  Q.  After Alec, you then worked for a few years at a company

17  called Mitzi?

18  A.  Yes.

19  Q.  A handbag company?

20          THE COURT:  Is that, in fact, the handbag company?

21          THE WITNESS:  Yes.

22  BY MR. RUMELD:

23  Q.  Isn't it true that the only type of retirement benefit you

24  received at Mitzi was a 401 (k) plan?

25  A.  Yes.

F7FJOSB7                    Campuzano - cross

1   Q.  There was no defined benefit plan?

2   A.  Just a 401 (k).

3   Q.  After Mitzi, you then worked for nine years for a toy

4   company called Horizon Group.  Is that right?

5   A.  Yes.

6   Q.  The only retirement group that Horizon Group offered was

7   also a 401 (k) plan.  Is that right?

8   A.  Yes.

9   Q.  You retired in 2012 from Horizon?

10  A.  Yes.

11  Q.  So after leaving Kenny, none of the employers you worked

12  for afterwards offered you a traditional pension plan.  Is that

13  right?

14  A.  No.

15  Q.  I just couldn't hear you.

16  A.  No.

17  Q.  When you left Kenny, you knew that you had a choice to

18  either receive a lump sum benefit when you terminated your

19  employment or to leave the money in the plan and receive a

20  monthly annuity at your retirement.  Is that right?

21  A.  Yes.

22  Q.  Now, you chose to take a lump sum benefit from the plan

23  when you were terminated.  Is that right?

24  A.  Correct.

25  Q.  You were happy with that option, right?

F7FJOSB7                          Campuzano – cross

1    A.  Yes.

2    Q.  Now, you were happy with that option because you thought

3    you could make more money with your financial advisor investing

4    it for you than if you left it in the plan.  Is that fair?

5    A.  Yeah.

6    Q.  You rolled the money into an IRA?

7    A.  Yes.

8    Q.  Then you left it to your financial advisor to handle the

9    investments at that point?

10   A.  Yes.

11   Q.  Now, when you left, the lump sum benefit was approximately

12   $26,000.  Is that right?

13   A.  Yes.

14   Q.  That is about 1998?

15   A.  Yeah.

16   Q.  Your IRA account now has about $80,000 in it.  Is that

17   right?

18   A.  Yeah, I estimate that.

19   Q.  Now, the year before you elected a lump sum, you received a

20   benefit statement.  Do you remember that?

21   A.  Yes.

22   Q.  Could you, I think you have next to your declaration, PX

23   61.  See if you can find that.

24   A.  (Pause)  61, you said?

25   Q.  Yes.

1    A.  (Pause)  Is it on the screen?

2              THE COURT:  Do you folks have a copy of that for the

3    witness?

4    BY MR. RUMELD:

5    Q.  You can take this one.  PX 61 is the statement that you

6    received in 1997?

7    A.  Correct.

8    Q.  It shows your account balance was about $13,000 as of that

9    time.  Is that right?

10   A.  Yes.

11   Q.  Or roughly half the lump sum benefit that you received the

12   next year?

13   A.  Yes.

14   Q.  Right, because you got about $26,000?

15   A.  Correct.

16   Q.  Now, am I correct that you testified that you would have

17   expected your account balance to increase by about $3,000

18   between 1997 and 1998?

19   A.  Yes.

20   Q.  So that would have taken your account balance up to about

21   $16,000?

22   A.  That would be correct.

23   Q.  Right.  The rest, then, and you were asked about how to

24   account for the rest of the increase, and you said you assumed

25   it was due to the fact that the lump sum calculation includes

F7FJOSB7                          Campuzano - cross

1   some kind of sweetener.  Is that right?

2   A.  Yes.

3   Q.  There was some kind of calculation that sweetened the lump

4   sum, that was your understanding?

5   A.  My understanding was that there is something with the

6   pension plan that gave me that thought.

7   Q.  You did understand that there was something that gave you

8   more than your account balance when you took your lump sum?

9   A.  Yeah, that was obvious.

10  Q.  Do you have Plaintiff's Exhibit 4 there?

11  A.  Yes.

12  Q.  Now, you testified in your declaration that this is a

13  document that you received, correct?

14  A.  Yes.

15  Q.  You understood from receiving this memo that the company

16  would be taking the monthly benefit you had already earned and

17  simply converting it into a cash balance account?

18  A.  Yes.

19  Q.  That is Paragraph 9 of your declaration.  I am just making

20  sure that is still your testimony.

21       But, in fact, what the memo says, if you look at the

22  bottom of the first page, it says your accrued benefit as of

23  December 31st, 1995 is actuarially converted to an initial

24  account balance.  Do you see that?

25  A.  Yes, I do.

F7FJOSB7                         Campuzano – cross

1  Q.  Now, you also received the summary plan description, that's

2  Plaintiff's Exhibit 5.  Do you have that with you?

3         THE COURT:  Are you going to come back to PX 4 or are

4  you done with PX 4?

5         MR. RUMELD:  If it was 4, yes, I am done with it.

6         THE COURT:  Did you have any understanding,

7  Mr. Campuzano, as to what the phrase "actuarially converted"

8  meant?

9         THE WITNESS:  No.

10        THE COURT:  All right.

11        THE WITNESS:  I still don't.

12        THE COURT:  And you still don't?

13        THE WITNESS:  Yes.

14 BY MR. RUMELD:

15 Q.  In your declaration, isn't your understanding, isn't it

16 your testimony that what you recall understanding is that the

17 account balance was based on some kind of IRS rulings?

18 A.  The phrase or said that something had been done and at the

19 end, it said per the IRS.  To me, it was change had been made,

20 but it was within, you know, the IRS.

21 Q.  But if I look at Page 6 of the SPD --

22        THE COURT:  PX 5?

23        MR. RUMELD:  PX 5, and there is a definition there of

24 of initial account balance.

25 BY MR. RUMELD:

F7FJOSB7                        Campuzano - cross

1    Q.  It similarly says that the initial account balance is equal
2    to the actuary equivalent lump sum value.  Do you see that?
3    A.  Yes.
4    Q.  Both of these documents talk about some actuarially
5    equivalence, right?
6    A.  Yes.
7    Q.  But you reviewed these documents, and you had no idea what
8    actuarially equivalent meant?
9    A.  That is true.
10   Q.  You understood that if there was something in these
11   documents that you didn't understand, you could ask the human
12   resources operations center to explain it to you, right?
13   A.  Yes.
14   Q.  In fact, you had the phone number, right, of SPD if you
15   wanted to call?
16   A.  Correct.
17   Q.  You also knew you could be provided a letter if you want
18   to?
19   A.  Yes.
20   Q.  These are all things you could have done, but you didn't do
21   even though you didn't understand this term?
22   A.  I didn't see, honestly, a reason for it.  Nothing was being
23   told to me that was indicative I should be looking for
24   something.
25   Q.  Okay.  Now, you also received an annual benefits statement.

F7FJOSB7                    Campuzano - cross

```
 1   Is that right?  I think you have Exhibit PX 53 attached to your
 2   declaration.
 3   A.  Yes.
 4   Q.  Now, this PX 53 is the statement that you received.  Is
 5   that right?
 6   A.  Correct.
 7   Q.  This one specifically for you, and on Page 2, there are a
 8   couple of figures there, and it refers to the company's
 9   estimated annual cost for your benefit was $12,758.00.  Do you
10   see that?
11   A.  Yes.
12   Q.  In your declaration you state that you assumed that your
13   pension benefits contributed to this figure.  Is that right?
14   A.  I was under the impression, yes.
15   Q.  Am I correct that the statement nowhere -- strike that.
16         Am I correct this $12,000 figure, that is a number for
17   all of your benefits, right?
18   A.  Yes.
19   Q.  You don't actually have anything in here that tells you
20   what costs are being attributed specifically to pension
21   benefits?
22   A.  No, I don't think so.
23   Q.  You wouldn't know, would you, whether the costs associated
24   with your pension benefits might increase if you took a lump
25   sum benefit?
```

F7FJOSB7

1    A.  Say that again.

2    Q.  Would you know if the costs, if the costs for paying your

3    pension benefits would increase if you took a lump sum benefit?

4    A.  I don't know.

5            THE COURT:  Did you say, "I don't know"?

6            THE WITNESS:  I don't know.

7            THE COURT:  I want to make sure that you speak into

8    the mike so that the court reporter can hear you and take it

9    down.

10           MR. RUMELD:  The good news is I am done.

11           THE COURT:  Mr. Gottesdiener, anything from you, sir?

12           MR. GOTTESDIENER:  No, your Honor.

13           THE COURT:  Mr. Campuzano, you may step down.  You are

14   excused.

15           (Witness excused)

16           THE COURT:  Mr. Gottesdiener, would you like to call

17   your next witness, please.

18           MR. GOTTESDIENER:  That would be Mr. Kiley.

19           THE COURT:  Mr. Kiley, please.  Let's just discuss the

20   logistics of this.  We'll discuss it when Mr. Rumeld gets back

21   in here.  This is the choreography since the declaration is

22   going to come in as his direct, but it is out of order

23   effectively, right?

24           MR. GOTTESDIENER:  Yes.

25           (Pause)

F7FJOSB7

1          THE COURT:  The reason for that.  So everybody is

2     clear because the declaration as I understand it is being

3     proffered by the defendant, so it would normally be direct

4     testimony in the defense case, but we are going to have it here

5     in the plaintiff's case, which is fine.

6          While the witness is getting up here on the stand, let

7     me ask you, Mr. Rumeld, the declaration, my intention is simply

8     to do what I have done with respect to Mr. Kiley.  Is that

9     acceptable to you as well?

10          MR. RUMELD:  Yes.

11          THE COURT:  All right.  Terrific.  I say that because

12     you were out of the room when I was saying this.  Just because,

13     obviously, it is his direct testimony offered by the defendant,

14     but we are taking him in the plaintiff's case.

15     THOMAS J. KILEY, JR.,

16          called as a witness by the Defendant,

17          having been duly sworn, testified as follows:

18          THE COURT:  Mr. Kiley, please be seated, sir.

19          Now, it will be very important for you to pull that

20     chair up and for you to adjust that microphone so you can speak

21     clearly and directly into it.  You can imagine the folks in the

22     back rows will be able to hear you as well as I can.

23          MR. RUMELD:  These two notebooks constitute Mr.

24     Kiley's declaration and exhibits attached to them.  There is

25     two because it was a little easier to work.

F7FJOSB7                          Kiley - cross

1              THE COURT:  Mr. Kiley, I am going to ask you to take a

2    look at the declaration that has been handed to you, and we'll

3    start by having you confirm for me that that is, in fact, your

4    declaration that you intend to offer as your direct trial

5    testimony in this case?

6              THE WITNESS:  Yes.

7              THE COURT:  Do you swear to the truth of the contents?

8              THE WITNESS:  Yes, I do.

9              THE COURT:  The court then does accept the declaration

10   of Mr. Kiley as his direct testimony, and the witness is turned

11   over for cross-examination, and there will be redirect

12   following that.  You may proceed.

13   CROSS-EXAMINATION

14   BY MR. GOTTESDIENER:

15   Q.  Good afternoon, Mr. Kiley.

16   A.  Good afternoon.

17   Q.  If we can call Docket 333 up on the screen.  Paragraph 3,

18   sentence 1 and 2, this is the declaration of Ms. Peck,

19   Mr. Kiley, and I want to read something to you and ask you if

20   it is accurate and ask you a couple of questions, okay?

21              All right?  Paragraph 3, she states:

22              "In late 1994 or early 1995, Foot Locker's management

23   announced that, in light of the company's poor financial

24   condition, it was necessary for the company to cut costs,

25   including with respect to retirement benefits.  Members of

F7FJOSB7                        Kiley - cross

1   senior management instructed me to provide them with a suitable

2   recommendation."

3            Is that your understanding of the facts at the time?

4   A.  Yes, it is.

5   Q.  So management asked Ms. Peck to cut costs, and you

6   understood that management had so directed Ms. Peck.  Is that

7   right?

8   A.  That's correct.

9   Q.  And an instruction to cut costs, an instruction to cut

10  pension costs, that was an instruction to cut benefits, right?

11  A.  Yes.

12  Q.  Because the only way to cut costs in pension benefits is to

13  cut benefits?

14  A.  Yes, I agree.

15  Q.  Then it continues, "because I" -- again, Ms. Peck -- "did

16  not have any specialized training in employee benefits or

17  finance, I asked Thomas Kiley, who was then serving as manager

18  of benefits planning and design, to work with the corporate

19  benefits department and William M.  Mercer, Incorporated,

20  Mercer, the actuary to the Woolworth retirement plan, in

21  providing me with a recommendation for management."

22  A.  Correct.

23  Q.  That is accurate, correct?

24  A.  Yes.

25  Q.  So she turns to you because you have the necessary pension

F7FJOSB7                          Kiley - cross

1  expertise?

2  A.  Well, I was in a position to do what she was looking to do.

3  Q.  Well, you just said what she said was accurate.

4          You had specialized training in employee benefits

5  and/or finance?

6  A.  I had experience in employee benefits, yes.  My training

7  was really, you know, learned over the course of my career.

8  Q.  You had pension expertise from 20 years doing it, didn't

9  you?

10  A.  I had knowledge, yeah, I had some expertise.  Not as much

11  as Mercer, obviously.

12  Q.  You were a math major in college?

13  A.  Correct.

14  Q.  After college you, worked at Marsh & McClennan, doing

15  pension actuarial evaluations?

16  A.  Yes.

17  Q.  You took actuarial exams?

18  A.  Yes, but I didn't pass them.

19  Q.  But you took them?

20  A.  Yes.

21  Q.  You went to Woolworth and started working in 1974?

22  A.  Correct.

23  Q.  The same year ERISA was enacted?

24  A.  Yes.

25  Q.  And you worked there continuously, and then in 1987 you got

F7FJOSB7                        Kiley - cross

1    an MBA degree?

2    A.  That's correct.

3    Q.  Ms. Peck, if Ms. Peck said --

4              MR. GOTTESDIENER:  The court's indulgence?

5              THE COURT:  Try to word it in terms of your thinking

6    of the question not in terms of a hypothetical.

7    BY MR. GOTTESDIENER:

8    Q.  Let me ask you if you agree with this statement factually

9    or you disagree, tell me.

10             "Tom was very bright, knew his pension field very

11   well, could communicate with an actuary succinctly, understood

12   what was being presented"?

13   A.  For the most part, yes.

14   Q.  For the most part, you agree with that?

15   A.  Yes.

16   Q.  Anything in there you disagree with?

17   A.  Well, I didn't -- I could certainly communicate with the

18   actuaries and the consultants, but I didn't have the depth of

19   knowledge that the actuaries had, obviously.  So I wouldn't

20   necessarily understand everything that they would say to me,

21   but I would understand most of it.

22             THE COURT:  Let me ask you, was there anybody you were

23   aware of at Woolworth or any part of Woolworth that had more

24   expertise than you did in the pension area at this period of

25   time, '95, 1995?

F7FJOSB7                        Kiley - cross

1          THE WITNESS:  No, not that I was aware of.

2          THE COURT:  You may proceed.

3   BY MR. GOTTESDIENER:

4   Q.  And also factually let me ask you if you agree or disagree

5   with these statements of Ms. Kanowicz.  By the way, let me ask

6   before that, in your declaration you watched the videotape of

7   Ms. Kanowicz testifying in this case when she was deposed three

8   years ago, in 2012.  Is that correct?

9   A.  Parts of it.

10  Q.  Only parts of it?

11  A.  Yes.

12  Q.  Were those parts of it selected for you or did you select

13  them yourself?

14  A.  They were selected for me.

15  Q.  How many parts would you approximate were selected for you?

16  A.  Maybe three or four.

17  Q.  And you watched three or four of them?

18  A.  Yes.

19  Q.  Did you talk to Ms. Kanowicz before, during or after her

20  deposition about her deposition?

21  A.  No.

22  Q.  And yet in your declaration you make statements as to what

23  Ms. Kanowicz meant when she gave certain testimony based on

24  your watching three or four sections of the deposition that

25  were selected for you.  Is that right?

F7FJOSB7                          Kiley - cross

1    A.  Yes.

2    Q.  You were not inside her head, though, when you made those

3    statements?

4    A.  Of course not.

5    Q.  You made those statements solely based on your personal

6    interpretation of what it is that you think she meant, hearing

7    and watching the deposition?

8    A.  That's correct, and also knowing what her position was at

9    the time with Woolworth.

10              THE COURT:  Please describe her position compared to

11   yours.

12              THE WITNESS:  She was the benefits manager, and Marion

13   reported to her, and Marion and Carol were responsible for

14   doing most of the pension calculations.

15              THE COURT:  Just so the record is clear, in that

16   answer Carol is Ms. Kanowicz?

17              THE WITNESS:  Yes, that's correct.

18              THE COURT:  What is Marion's last name?

19              THE WITNESS:  Derham, D E R H A M.

20              THE COURT:  How would you compare to their role in the

21   hierarchy of the company?

22              THE WITNESS:  They were responsible for more of the

23   day-to-day administering of the plan, and I was more

24   responsible for the overall plan design.

25              THE COURT:  Were you lateral to them or --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F7FJOSB7                              Kiley - cross

1              THE WITNESS:  I was probably lateral to Carol.

2              THE COURT:  You may proceed.

3    BY MR. GOTTESDIENER:

4    Q.  Just to finish that off, your Honor, you were above Marion?

5    A.  Yes, although she didn't report to me.

6    Q.  You were below Pat?

7    A.  Yes.

8    Q.  Ms. Peck?

9    A.  Correct.

10   Q.  Getting back to Ms. Kanowicz, I am not going to ask you

11   what is inside her head when she is saying things.  I am going

12   to ask you, like I did with respect to the statements that Ms.

13   Peck made about you, whether or not you agree, disagree with

14   these statements.

15              In her deposition which is about to be in evidence as

16   Page 49, she is asked:

17   "Q  Now, my understanding is Tom had a math degree and actually

18   did some actuarial work?

19   "A  Oh, Tom was smart as a whip, smarter than me.

20   "Q  With numbers?

21   "A  Absolutely.

22   "Q  And you're pretty good with numbers?

23   "A  Yes, I was.  Math was my forte in school.

24   "Q  And when you say school?

25   "A  I loved algebra made got a hundred on the algebra regents.

F7FJOSB7                          Kiley - cross

1    "Q  So he --

2    "A.  So he --

3    "Q  He --

4    "A  He was excellent.

5         Would you agree with Ms. Kanowicz's assessment of you

6    vis-a-vis her in terms of your knowledge of math?

7         THE COURT:  There is a lot embedded in those

8    statements, that is, I think not just about math, there are a

9    couple of other statements smart as a whip I think was in there

10   as well.  Let's do it this way.

11        Is there anything in what Mr. Gottesdiener just read

12   with which you disagree?

13        THE WITNESS:  It is extremely complimentary.  It is

14   probably overstated.  I don't know that I was smart as a whip.

15   I think I was reasonably intelligent and had some training and

16   experience, but I was certainly not a genius.

17   BY MR. GOTTESDIENER:

18   Q.  Now, if we could still look at Ms. Peck's declaration.

19        She turns to you, you have the necessary pension

20   expertise, and she says -- that second page, Paragraph 3, do

21   you see where it starts on the second line after, after lengthy

22   internal deliberations, and based on advice received from James

23   Grefig of Mercer, Kiley recommended that the plan be converted

24   from a traditional career average pay defined benefit plan to a

25   cash balance plan, and that this change occur simultaneously

F7FJOSB7                         Kiley - cross

 1    with the institution of a 401 (k) plan with corporate matching

 2    contributions.

 3            Do you agree or disagree with that factual statement?

 4    A.  I agree.

 5    Q.  So after these lengthy internal deliberations, after input

 6    you received from Mercer, you recommend a cash balance

 7    conversion to Ms. Peck?

 8    A.  Yes.

 9            MR. GOTTESDIENER:  Could we show PX 21, please.

10            THE COURT:  When did you start taking such extensive

11    notes?

12            THE WITNESS:  I started doing that in college.  I

13    found that if I took -- and I would take notes verbatim, you

14    know, of exactly what the professors said.  I found that if I

15    did that, then I would go back and read them later on.  Writing

16    what they said helped me remember.

17            THE COURT:  Was your ability to handwrite pretty

18    quick?

19            THE WITNESS:  It was pretty quick, yeah.  Obviously, I

20    didn't have great handwriting.

21            THE COURT:  You were not taking it down from memory,

22    but you were taking down pretty simultaneously?

23            THE WITNESS:  Pretty simultaneously, as they said.

24            THE COURT:  You may proceed, sir.

25    BY MR. GOTTESDIENER:

F7FJOSB7                          Kiley - cross

1    Q.  If the person who was talking said something that was just

2    obvious to you or something you already knew, you still wrote

3    it down?

4    A.  Yes.

5              MR. GOTTESDIENER:  So let's look at PX 21.  PX 21

6    reflects your handwritten notes.  If I could approach and give

7    him a copy of it so he has it, your Honor?

8              THE COURT:  Yes.

9              (Pause)

10   BY MR. GOTTESDIENER:

11   Q.  Mr. Kiley, you're welcome to look at both the hard copy

12   document as well as the projected.

13   A.  Okay.

14   Q.  Actually, also you have it on your screen in front of you.

15   A.  Yes.

16             THE COURT:  We are going to continue until 5:00

17   o'clock, but then we are going to end today's session promptly

18   at 5:00.

19             MR. GOTTESDIENER:  Thank your Honor.

20   BY MR. GOTTESDIENER:

21   Q.  So these are notes that you took in a cash balance plan

22   meeting on February 2nd, 1995.  Is that correct?

23   A.  That's correct.

24   Q.  And this was a meeting that Mr. Grefig billed and actually

25   billed gratis as a cost reduction strategy meeting.  Is that

F7FJOSB7                         Kiley - cross

1    right?

2              MR. RUMELD:  Objection.

3              THE COURT:  Let me ask him to rephrase the question

4    because I don't understand it.

5              MR. GOTTESDIENER:  We withdraw it as stated this way.

6    BY MR. GOTTESDIENER:

7    Q.  Mr. Grefig was your primary interface at Mercer.  Is that

8    fair?

9    A.  That is fair.

10   Q.  He sent you all bills that you received from Mercer to

11   Woolworth?

12   A.  Yes.

13   Q.  He sent invoices distinct for different projects?

14   A.  Yes.

15             THE COURT:  These are invoices for Mercer's time and

16   services provided?

17             THE WITNESS:  Correct.

18             THE COURT:  What was Mr. Grefig's position at about

19   this time or at this time?

20             THE WITNESS:  He was a senior actuary.

21             THE COURT:  He was fairly high up at Mercer?

22             THE WITNESS:  Yes.

23             THE COURT:  All right.  What did you think of his

24   competence?

25             THE WITNESS:  Oh, excellent.  If Jim said something,

F7FJOSB7                        Kiley - cross

1    we just took it as Gospel.

2              THE COURT:  Did you have occasion over the years to

3    have your confidence in his accuracy confirmed?

4              THE WITNESS:  Yes, by other people that I spoke to at

5    Mercer even years later, in the course of doing something else,

6    I ran into someone who was a colleague of Jim's, and we

7    commiserated about him, and he made a similar comment about how

8    highly thought of he was.

9              THE COURT:  When you say "commiserated," is that

10   because Mr. Grefig passed away?

11             THE WITNESS:  No.

12             THE COURT:  I am not saying he did.  I just don't know

13   what the commiseration was.

14             THE WITNESS:  No, it was someone else in a subsequent

15   meeting I had that I encountered I had that worked with Jim

16   back in Mercer somewhere back in the 90's, I suppose.

17             THE COURT:  Commiserating wasn't anything having to do

18   with his demise?

19             THE WITNESS:  No.

20             MR. GOTTESDIENER:  He is very will.

21             THE WITNESS:  Sorry.

22             THE COURT:  Let's go on.

23   BY MR. GOTTESDIENER:

24   Q.  Did you know that?

25   A.  No, I didn't know that.  I am sorry to hear that.

F7FJOSB7                          Kiley - cross

1           THE COURT:  I don't want to upset or unsettle the

2     witness while he on is on the stand.

3           THE WITNESS:  I kept in touch with him for some time,

4     but then we lost contact.

5           THE COURT:  All right.

6           THE COURT:  We all wish him well.

7           MR. GOTTESDIENER:  Sorry?

8           THE COURT:  I am sure that --

9           THE WITNESS:  Yes, absolutely.

10          THE COURT:  -- you wish him well.

11    BY MR. GOTTESDIENER:

12    Q.  So these are notes that you took, and if I could direct

13    your attention at the top, you see where we have, it says

14    example, EX 1, and then EX 2 underneath?

15    A.  Yes.

16    Q.  And if you go down to the middle of the page -- actually,

17    two-thirds down, do you see where you wrote the above

18    percentages replicate the current plan?  Do you see that line

19    above where you wrote, "Note"?

20    A.  Yes.

21    Q.  So the above percentages replicate the current plan.  The

22    Example 2 --

23          THE COURT:  Let me just ask as a preliminary question.

24          Do you recall what PX 21 reflects notes of, whether it

25    was a meeting or a phone call or thoughts that you were

F7FJOSB7                          Kiley - cross

1    personally having?

2              THE WITNESS:  No, I don't recall.

3              THE COURT:  All right.  So other than just seeing --

4    and this, I take it, is PX 21 is, in fact, your handwriting.

5    Is that right?

6              THE WITNESS:  Yes, it is.

7              THE COURT:  Other than just seeing the words on the

8    page, you do recall, as you sit here, to what particular

9    meeting or conference call or event you were referring?

10             THE WITNESS:  No, I don't.

11             THE COURT:  All right.  You may proceed.

12   BY MR. GOTTESDIENER:

13   Q.  But you have looked at these notes in the past few months

14   and in the past three years, and you were aware there was a

15   meeting, and other people have notes of this meeting, that

16   there was such a meeting, right?

17   A.  Yes.

18   Q.  Now, we were talking about the above percentages

19   replicating the current plan, and Example 2, do you see in the

20   middle column where you wrote current plan, pay credit?

21   A.  Yes.

22   Q.  And what that is reflecting is Mr. Grefig explaining that

23   you could state the accrual that was offered under the current

24   plan as a pay credit in a cash balance formula?

25   A.  Okay.

F7FJOSB7                          Kiley - cross

1              THE COURT:  The question is, is that, in fact, what

2      this refers to?

3              It does have embedded in it Mr. Grefig providing this

4      information.  Start there, do you recall whether this is

5      Mr. Grefig providing the information or something else?

6              THE WITNESS:  I don't recall.  I believe it probably

7      was, but I don't really recall.

8              THE COURT:  So let's take this belief, and I want to

9      get a sense as to how likely you think that belief is and what

10     it is based on?

11             THE WITNESS:  Well, he was my contact at Mercer.  He

12     was my actuary consultant, and he was the person I would have

13     gone to for this type of information.

14             THE COURT:  So the type of information reflected in PX

15     21 was of the type that Mr. Grefig would have provided to you

16     in this time-frame relating to the potential change in plan.

17             Is that correct?

18             THE WITNESS:  That's correct.

19             THE COURT:  That is the basis for your belief that

20     this may reflect -- you're not certain -- communication with

21     Mr. Grefig?

22             THE WITNESS:  That's correct.

23             THE COURT:  With that, you may proceed, sir.

24     BY MR. GOTTESDIENER:

25     Q.  So you see also to the right, it says 20 percent reduction

1    from current plan.  Now, putting the middle column with the

2    right column, do you see that in all likelihood what he was

3    doing was explaining, and you were writing down verbatim, how

4    the current plan could be restated as a pay credit accrual in a

5    cash balance formula, and that if 20 percent reduction in

6    benefits and costs were sought, this is what it would look

7    like.  Currently we have at --

8              THE COURT:  You have got way too much in that long

9    question.  I was waiting to have you put like a period

10   someplace.  Why don't you take it in pieces and see whether or

11   not he agrees with you.  Mr. Rumeld, you stood up?

12             MR. RUMELD:  I have a feeling we are going to be in

13   for this a lot.  I want to be really careful because Mr. Kiley

14   already said he doesn't really remember.

15             THE COURT:  We'll do it, rather than having a lot of

16   colloquy, take it piece-by-piece.  What we are interested in,

17   Mr. Kiley, is your view as to what your words meant.  If you

18   don't recall, you don't recall and you should say that.

19             If you recall, you should say that.  You're not to

20   agree with counsel unless you agree with counsel.  We are here

21   to get your view, all right?

22             With that, Mr. Gottesdiener, why don't you go ahead

23   and proceed.

24             MR. GOTTESDIENER:  Your Honor, I would suggest there

25   is a middle ground, which is how I question a witness like

F7FJOSB7                          Kiley - cross

1   Mr. Kiley and himself in this case before, which is if he

2   doesn't have an actual memory, but these are his notes, and we

3   submit these are business records and he is taking down

4   verbatim, as was his practice, and he may be rusty --

5              THE COURT:  What he can say is what do these words

6   mean and in terms of what he remembers from that period of

7   time.  He can't sit here and just act as an expert for

8   something.

9              MR. GOTTESDIENER:  Oh, no.

10             THE COURT:  If he has a recollection, I am happy to

11  have him give it.  Why don't you step down for today.  Let's

12  take this up.  We have to end at 5:00.  I suspect it will take

13  all of our remaining three minutes, all right?  You can go

14  ahead and step down, but we are going to need to have you

15  tomorrow.

16             MR. GOTTESDIENER:  Your Honor --

17             THE COURT:  We start at 9:00.

18             MR. GOTTESDIENER:  -- the parties have agreed, once

19  the witness is on the stand, not to speak with anyone.  Would

20  the court respectfully admonish --

21             THE COURT:  You are not to speak with anybody about

22  the subject of their testimony, but logistics of getting here

23  and what time and all of that, you can speak with counsel

24  about, all right?

25             THE WITNESS:  Okay.

F7FJOSB7                          Kiley - cross

1        THE COURT:  Nobody should be saying to you, by the

2   way, your answer for this should be that.  You got that?

3        THE WITNESS:  I got it.

4        THE COURT:  I want to use this last two minutes for

5   this.  What are you trying to do?

6        MR. GOTTESDIENER:  I should have probably just said it

7   right away.  All I am asking is logically --

8        THE COURT:  I don't want logically.

9        If I can read the words on the page, he can read the

10  words on the page.  I don't want him to be deducing.  You can

11  do the same thing, but you are going to have an evidentiary

12  issue, I promise you, as you proceed if you -- well, consistent

13  do the -- I do see that.  Don't do the eye business, whatever?

14       The issue with him, if he doesn't recall, he doesn't

15  recall.  He can redo the words.  You can say okay, what does

16  that mean to you?  What did that mean to you?

17       MR. GOTTESDIENER:  If I had a moment, I want to try to

18  do it this way.  So I say could you see that?  You say this.

19  Here is this column.  It says current plan.  You are writing

20  this down verbatim.  Doesn't it make sense that in all

21  probability --

22       THE COURT:  Let me tell you how you can do it.

23       If you want an evidentiary correct way of doing it, do

24  you have any reason to believe that does not mean X.  Then

25  you're fine.  What you're suggesting is asking him to speculate

F7FJOSB7                         Kiley - cross

1    within a realm of probability.  It is okay for practice, but

2    not for difficult particular questions.

3                   MR. GOTTESDIENER:  I will ask that way.

4                   THE COURT:  Ask him whether or not he has any reason

5    to believe he is not referring to this concept or any

6    information that suggests otherwise.  It is what it is.  That

7    is only leaves us with the circumstantial evidence of that, but

8    the defense counsel is welcome to try their hand at their own

9    interpretation if there is any difference.  I don't really know

10   if there will be.

11                  MR. GOTTESDIENER:  That is all I was getting at.

12                  THE COURT:  I want to make sure that our evidentiary

13   record is for the facts, not something where everyone is ever

14   going to have to revisit.  Whatever else happens here, this

15   evidence record ought to be closed.  I don't want to have

16   things where people say you have to go back and develop the

17   record on a particular point.

18                  MR. RUMELD:  I want to talk about the schedule for

19   tomorrow morning.  I know that arrangements we made for Mr.

20   Farah to be here at 9:00.  He has a rigid schedule.  Is it okay

21   with everybody if we do Mr. Farah, who my understanding is it

22   isn't going to take that long and return with Mr. Kiley?

23                  THE COURT:  It is fine with me.

24                  MR. GOTTESDIENER:  Yes, absolutely.  He will be here

25   at 9:00?

F7FJOSB7                          Kiley - cross

1          MR. RUMELD:  That is what I was told.

2          MR. GOTTESDIENER:  Do you know how long your

3     examination will be?

4          MR. RUMELD:  It is kind of based on yours.  If yours

5     isn't long, I don't expect mine to be long.

6          THE COURT:  Where is Mr. Mr. Farah declaration?

7          MR. RUMELD:  There isn't one.  He was called by Mr.

8     Gottesdiener and not by the defense.

9          THE COURT:  How long do you think you're going to

10    take?

11         MR. GOTTESDIENER:  I never met the man and I don't

12    know.  At least -- well, 20 minutes to a half hour.

13         THE COURT:  Fine.  I am not going to hold you to it.

14    I want to get a sense whether you're thinking half a day or

15    just a bit?

16         MR. GOTTESDIENER:  No.

17         THE COURT:  We will come back tomorrow morning and

18    start with Mr. Farah if he is here and ready to go.  Then we'll

19    go back to Mr. Kiley.  Somebody will inform Mr. Kiley why he

20    understands he might not be called first, but he would be

21    called by 10:00 am.

22         MR. RUMELD:  We'll try to, given traffic issues, make

23    sure he is hereby 9:00.

24         THE COURT:  Is there anything else you folks would

25    like to raise?

F7FJOSB7                          Kiley - cross

1          MR. GOTTESDIENER:  Not at the moment.

2          THE COURT:  Let me ask, is there anything you wanted

3     to say about the manner in which I have instructed Mr.

4     Gottesdiener in which he may proceed?

5          MR. RUMELD:  No.  I don't want to be too joking about

6     this, but I was waiting for your Honor to send a bill because I

7     thought you gave very good advice.  No, thank you.

8          THE COURT:  You pay with the tax dollars.  We're

9     adjourned.

10          (Court adjourned until Thursday, July 16, 2015, at

11     9:00 o'clock am)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2     Examination of:                          Page

 3     Direct By Mr. Gottesdiener . . . . . . . . . . 263

 4     Cross By Mr. Rachal  . . . . . . . . . . . . . 348

 5     Redirect By Mr. Gottesdiener . . . . . . . . . 390

 6     Recross By Mr. Rachal  . . . . . . . . . . . . 398

 7     GEOFFREY OSBERG

 8     Cross By Mr. Rumeld  . . . . . . . . . . . . . 412

 9     ADA CARDONA

10     Direct The Court . . . . . . . . . . . . . . . 428

11     Cross By Mr. Rumeld  . . . . . . . . . . . . . 429

12     Redirect By Mr. Gottesdiener . . . . . . . . . 443

13      RUSSELL HOWARD

14     Direct By Mr. Gottesdiener . . . . . . . . . . 445

15     Cross By Mr. Rumeld  . . . . . . . . . . . . . 446

16     Redirect By Mr. Gottesdiener . . . . . . . . . 455

17     RITA WELZ

18     Direct By Mr. Gottesdiener . . . . . . . . . . 458

19     Cross By Mr. Rumeld  . . . . . . . . . . . . . 459

20     Redirect By Mr. Gottesdiener . . . . . . . . . 479

21     RALPH CAMPUZANO

22     Cross By Mr. Rumeld  . . . . . . . . . . . . . 483

23     THOMAS J. KILEY

24     Cross By Mr. Gottesdiener  . . . . . . . . . . 494

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300