F7gnosb1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------------x

3  GEOFFREY OSBERG,

4              Plaintiff,

5         v.                          07 Civ. 1358(KBF)

6  FOOT LOCKER, INC. et al.,

7              Defendants.

8  ------------------------------------x
                                    New York, N.Y.
9                                   July 16, 2015
                                    9:00 a.m.
10
   Before:
11
                      HON. KATHERINE B. FORREST
12
                                    District Judge
13
                          APPEARANCES
14
   GOTTESDIENER LAW FIRM, PLLC
15      Attorneys for Plaintiff
   BY:  ELI GOTTESDIENER
16      STEVEN COHEN
        ALBERT HUANG
17
   PROSKAUER ROSE LLP
18      Attorneys for Defendants
   BY:  MYRON D. RUMELD
19      ROBERT RACHAL
        JOSEPH E. CLARK
20

21  ALSO PRESENT:
   Jon Int-Hout, Trial Technology Specialist
22  Randall Carter, Trial Technology Consultant

23

24

25

F7gnosb1                      Farah - cross

1           (Trial resumes)

2           (In open court)

3           THE COURT:  I understand we are going to call, or you

4      folks are going to call Mr. Farah now out of order.

5           Is that correct?

6           MR. GOTTESDIENER:  Yes.  Because Mr. Kiley is on the

7      stand.  Yes.

8           THE COURT:  So what we will do is we will interrupt

9      the testimony of Mr. Kiley.  Mr. Gottesdiener, then why don't

10     you go ahead and call Mr. Farah.

11          MR. GOTTESDIENER:  Thank you.

12          Mr. Farah.

13      ROGER NOEL FARAH,

14         called as a witness by the Defendants,

15         having been duly sworn, testified as follows:

16          THE COURT:  Terrific.  Thank you.  Please be seated.

17          It is important that you pull up the chair, adjust it,

18     pull down the microphone so that we can get a clear sound.  We

19     have had some issues with people not speaking clearly into the

20     mic, but I am sure you will.

21          Mr. Gottesdiener, why don't you proceed, sir.

22          MR. GOTTESDIENER:  Thank you, your Honor.

23     CROSS EXAMINATION

24     BY MR. GOTTESDIENER:

25     Q.  Good morning, Mr. Farah.

F7gnosb1                          Farah - cross

1    A.  Good morning.

2    Q.  Just a couple of quick preliminaries.  You and I have never

3    spoken before or been in each other's presence before, right?

4    A.  That's correct.

5    Q.  Have you done anything to prepare for your testimony today?

6    A.  I met with Myron on Monday.

7    Q.  Myron Rumeld, counsel for Foot Locker?

8    A.  Yes.

9    Q.  This past Monday?

10   A.  Yes.

11   Q.  Anything else did you do?

12   A.  I read the testimony from the deposition of Dale Hilpert.

13   Q.  You read Mr. Hilpert's deposition testimony?

14   A.  Yes.

15   Q.  When did you do that, sir?

16   A.  This week.

17   Q.  Before or after you met with Mr. Rumeld?

18   A.  Before.

19   Q.  Did you do anything prior to meeting with Mr. Rumeld other

20   than read the deposition testimony of Mr. Hilpert?

21   A.  No.

22   Q.  Had you ever spoken to Mr. Rumeld or anyone in Mr. Rumeld's

23   firm?

24   A.  No.

25   Q.  When you met with him on Monday?

F7gnosb1                       Farah - cross

1    A.  Yes.

2    Q.  And was anyone else present?

3    A.  My attorney, John Callagy.

4    Q.  Anyone else besides you, Mr. Callagy, and Mr. Rumeld?

5    A.  There was a woman whose name escapes me that was part of

6    the meeting as well.

7    Q.  How long did the meeting last?

8    A.  About an hour.

9    Q.  Did you go through any documents while you were at the

10   meeting?

11   A.  One piece of paper, yes.

12   Q.  One piece of paper?

13   A.  Yes.

14   Q.  Are you sure you didn't look at any other documents during

15   the meeting?

16   A.  I am sure.

17   Q.  How long did the meeting last?

18   A.  About an hour.

19   Q.  How did you obtain a copy of Mr. Hilpert's deposition

20   transcript in this case?

21   A.  My lawyer gave it to me.

22   Q.  Thanks for those questions being answered.  Thank you.

23   That's helpful.

24          I understand that were you the CEO and chairman of the

25   board of Woolworth Corporation between 1994 and 2002?

F7gnosb1                        Farah - cross

1    A.   I started December of '94, and I left being the CEO in '99,

2    and left the board in early 2000.

3    Q.   I would like to show you something that Ms. Peck as

4    president of HR said, docket 333, and I'll ask you if it's

5    accurate or not?

6    A.   Is this screen the same as what's up there?

7    Q.   Yes.

8    A.   OK.

9    Q.   Paragraph 3.

10            Do you see where it says, In late 1994?

11   A.   I see that, yes.

12   Q.   In late 1994 or early 1995, Foot Locker's management

13   announced that, in light of the company's poor financial

14   condition, it was necessary for the company to cut costs,

15   including with respect to retirement benefits.  Members of

16   senior management instructed me to provide -- meaning

17   Ms. Peck -- to provide them with a suitable recommendation.

18            That's correct?

19   A.   I see that, yes.  That's correct.

20            THE COURT:  Let me just make sure that the question

21   and the answer are meeting.  It is not that he's reading it

22   correctly.  It's whether or not you believe that the facts that

23   are stated there are correct to the best of your recollection?

24   A.   I understand that, and I think the facts as they are stated

25   here or the statement that's stated here is correct.

F7gnosb1                        Farah - cross

1          THE COURT:  Terrific.  Thank you.

2          You may proceed, sir.

3     BY MR. GOTTESDIENER:

4     Q.  OK.  So in a nutshell, restated --

5          THE COURT:  You don't need to restate it.  You can

6     just go on.

7          MR. GOTTESDIENER:  OK.

8     BY MR. GOTTESDIENER:

9     Q.  Subsequent to your direction to Ms. Peck to cut costs, you

10    know that ultimately that led to the adoption of an amendment

11    that added a second alternative formula to the pension plan or

12    cash balance formula, right?

13         MR. RUMELD:  Objection.

14         THE COURT:  Hold on one second.  There is an

15    objection.

16         MR. RUMELD:  Yes.  There is a small lack of

17    foundation.  He referred to it as if it was Mr. Farah's

18    instruction.  That's not what this says.

19         THE COURT:  Let me see.

20         In general, don't give the rest of it.  You can just

21    say "foundation" so that we don't have any other issues.  Why

22    don't you restate.

23    BY MR. GOTTESDIENER:

24    Q.  You directed Ms. Peck to find ways to save money with the

25    pension plan, correct?

F7gnosb1                        Farah - cross

1  A.  No I don't recall that I said that to Ms. Peck.  I am sure

2  that at a senior management conversation we discussed cost

3  reduction as an important thing to do, yes.

4          Pat Peck was another level down, so, to your question,

5  I am sure that the head of HR at the time -- who was not Pat

6  Peck, I don't believe -- was probably in a senior management

7  conversation about cost reductions.

8          THE COURT:  Did you ever give an instruction to anyone

9  to reduce costs associated with the pension plan?

10          THE WITNESS:  I don't recall that.  We were in very

11  desperate shape, and I'm sure we discussed cutting costs

12  wherever we could find them.

13          THE COURT:  But you don't recall a specific

14  instruction --

15          THE WITNESS:  No.

16          THE COURT:  -- relating to the pension plan?

17          THE WITNESS:  No.

18          THE COURT:  How about if we expanded it to retirement

19  benefits generally.

20          Do you recall any direction, instruction, to anyone

21  relating to cutting costs in retirement benefits, cutting the

22  company's costs by seeking cost reductions in retirement

23  benefits?

24          THE WITNESS:  No, I don't recall that.  I would say

25  that we had roughly 250,000 retirees and 125,000 active

1    employees, so we did have a two-to-one retiree to active

2    population in a company that was losing money and was in

3    desperate shape.  So under the heading of, you know, is it on

4    the table to be looked at, my guess would be yes.

5             THE COURT:  You may proceed, Mr. Gottesdiener.

6    BY MR. GOTTESDIENER:

7    Q.  So you were trying to find ways to save cash in all areas?

8    A.  Yes.

9    Q.  And retirement benefits wasn't excluded from that?

10   A.  I'm sure it wasn't.

11   Q.  It couldn't be, given what you just said about the

12   desperate financial condition?

13   A.  I'm sure it wasn't.  That's what I said.  I'm sure it

14   wasn't excluded.

15   Q.  I'm sorry?

16   A.  I'm sure it was not excluded.

17   Q.  The CFO of the Woolworth division, Michael Steven, he

18   provided analyses to you as to the financial condition of the

19   Woolworth division, didn't he?

20   A.  I have no idea.

21   Q.  You have no idea?

22   A.  If the division finance chief of one of 35 of the operating

23   divisions provided me with financial information on that

24   division?  Is that your question?

25   Q.  No, it wasn't my question.  Let me back up and ask this.

F7gnosb1                        Farah - cross

1          THE COURT:  Why don't you set up a foundation for

2     Mr. Steven.

3          MR. GOTTESDIENER:  That's what I was going to do.

4          THE COURT:  OK.

5     BY MR. GOTTESDIENER:

6     Q.  You know Michael Steven?

7     A.  I don't know Michael Stevens, no.  We had 125,000

8     employees.  So if your question is did a financial division

9     head provide me with financial information on a division.  I

10    don't know Mr. Stevens and I don't know if that's -- if I had

11    any direct interaction.

12    Q.  OK.  Let me ask you a question without wanting to know what

13    source you may have received this information from.  You do

14    know that a gentleman who was the CFO of F.W. Woolworth

15    division is testifying in this case?

16    A.  I know that, yes.

17    Q.  You do know that?

18    A.  Yes.

19    Q.  And you do know that he says he didn't know what was

20    happening to his pension benefit?

21    A.  I don't know that he's saying that, no.  I don't know him,

22    and I haven't spoken to him.

23    Q.  My question is you do know that he's testifying in this

24    case?

25    A.  Yes.

F7gnosb1                          Farah – cross

```
 1   Q.  And you do know or you were given information in some
 2   content, manner, that gives you an indication that he's not
 3   testifying on behalf of the defense?
 4   A.  I am not sure I understand what your question is.  Can you
 5   repeat that.
 6           THE COURT:  Do you know that there is an employee of,
 7   who was a CFO of the one of the divisions.
 8           THE WITNESS:  Yes.
 9           THE COURT:  Who claims that he was misled in terms of
10   the changes in the pension plan between the plan in effect as
11   of 12/31/95 and that which became in effect as of 1/1/96?
12           THE WITNESS:  That's Mr. Stevens?
13           THE COURT:  Just generally.  Do you know that there is
14   a person like that testifying here?
15           THE WITNESS:  No, I don't know who that is.
16           THE COURT:  Go ahead.  Proceed.
17   BY MR. GOTTESDIENER:
18   Q.  In 1995, you were the chairman, correct?
19   A.  Yes.
20   Q.  You had something called a chairman's group?
21   A.  Yes.
22   Q.  What was the chairman's group?
23   A.  It was the senior leaders of the company that, you know,
24   periodically met on issues.
25   Q.  And who were those people in 1995?
```

F7gnosb1                          Farah - cross

1   A.  I don't really know.  My assumption is it was the business

2   heads and some of the heads of the corporate function, like the

3   CFO and people like that.

4   Q.  You mentioned Mr. Hilpert, and you read his deposition

5   transcript?

6   A.  Right.

7   Q.  So we would include him --

8   A.  Yes.

9   Q.  -- along with you?

10  A.  Yes.

11  Q.  Is there anyone else, either by title or by name, that you

12  can tell us was in the chairman's group in 1995?

13  A.  I'm assuming Andy Hines the CFO at the time was a part of

14  that, but beyond that, I don't remember all the people.

15  Q.  How about Barry Thomson?

16  A.  Perhaps.

17  Q.  It was not a very large group the chairman's group?

18  A.  Correct.

19  Q.  It was a small circle, wasn't it?

20  A.  Correct.

21  Q.  It helped you run the company?

22  A.  Um, I think we used it as a communication exchange and

23  update mechanism and, where appropriate, made decisions, yeah.

24          MR. GOTTESDIENER:  With the Court's indulgence.

25  Q.  Earlier, you pointed out that Ms. Peck was not the head of

F7gnosb1                        Farah - cross

1    HR in 1995.  You did interact with Ms. Peck, didn't you?

2    A.  Yes.

3    Q.  About the retirement plan, right?

4    A.  I don't know.

5    Q.  No idea?

6    A.  No idea.

7    Q.  Would you say that you were a hands-on chairman and CEO?

8    A.  I would say on subjects I had expertise, yes.  On subjects

9    I didn't, I depended on people who were more expert than I was.

10   Q.  But you wanted to understand as much as you could?

11   A.  I always want to know as much as I can, yes.

12   Q.  And if you are in a meeting and matters are being

13   discussed, you are paying attention?

14   A.  I try to pay attention, yes.

15          MR. GOTTESDIENER:  Could we call up please PX 101.

16          May I approach the witness, your Honor.

17          THE COURT:  You may.

18   BY MR. GOTTESDIENER:

19   Q.  PX 101 is a memorandum to you, to Dale Hilpert, three other

20   people, Barry Thompson, who I just asked you about, who you

21   said you didn't know whether or not he was in the chairman's

22   group, Gary Bahler.  Who was Gary Bahler?

23   A.  He was our general counsel.

24   Q.  And Rina Zimmerman.  Who was --

25   A.  I have no idea who she is.

F7gnosb1                          Farah - cross

1   Q.  You see it's from Pat Peck?

2   A.  I do.

3   Q.  And it's not from Patricia Peck.  It's from Pat Peck, and

4   she signs her name?

5   A.  I see that, yes.

6   Q.  And copied, cc, Carol Kanowicz and Tom Kiley?

7   A.  I see that as well.  But I don't know who they are either.

8   Q.  Those are names that in the course of preparing to testify

9   here that you didn't hear at all or you did hear?

10  A.  I don't know who they are.  Is that your question?

11  Q.  That's not my question?

12  A.  OK.

13  Q.  I am asking in the course --

14          MR. RUMELD:  I am going to object.  He's asking --

15          THE COURT:  I will allow him to ask whether or not he

16  has heard their names, and we can back up from there.

17          MR. RUMELD:  OK.  Thank you, your Honor.

18  BY MR. GOTTESDIENER:

19  Q.  Have you heard their names in preparing to testify?

20  A.  No.

21  Q.  The subject line says:  Retirement Plans Meeting- July 20,

22  1995.  And the date of the memo is July 19.

23          And it says:  Attached is your copy of the information

24  that has been prepared regarding changes to our retirement

25  plans.

1          The meeting is scheduled for 2 p.m. on Thursday, July

2    20, in the board room.

3          Do you see that?

4    A.  I do.

5    Q.  You don't have any reason to think that you didn't receive

6    this memorandum and attend this meeting?

7    A.  I have no reason to think that.

8    Q.  Now, if you would --

9          THE COURT:  Let me just ask generally before we get

10   into this, unless you are going to lay a foundation -- are you

11   going to lay a foundation generally, not just for this document

12   but for the witness's familiarity with the changes in the

13   retirement program?

14         MR. GOTTESDIENER:  I was going to lay a foundation by

15   showing him and asking him if it refreshes his recollection or

16   if he has reason to doubt that he was in this meeting and

17   was --

18         THE COURT:  Let me do it a little differently, because

19   I am going to lay a more general foundation.

20         MR. GOTTESDIENER:  Sure.

21         THE COURT:  You testified before, Mr. Farah, that you

22   had not instructed anyone in particular, as a particular

23   instruction that is, to cut costs by virtue of changes in the

24   retirement plan?

25         THE WITNESS:  Right.

F7gnosb1                         Farah - cross

| | |
|---|---|
| 1 | THE COURT:  The question that I want to ask now is |
| 2 | broader than that.  Did you become aware that there was an |
| 3 | effort underway in the 1995 time period to change the |
| 4 | retirement plan or make amendments to the retirement plan? |
| 5 | THE WITNESS:  I'm sure I was. |
| 6 | THE COURT:  All right.  You are aware that there was, |
| 7 | in fact, an amendment to the retirement plan that came into |
| 8 | effect in 1996? |
| 9 | THE WITNESS:  I am. |
| 10 | THE COURT:  So, with that as general background, why |
| 11 | don't you go on ahead now, Mr. Gottesdiener. |
| 12 | MR. GOTTESDIENER:  Thanks. |
| 13 | BY MR. GOTTESDIENER: |
| 14 | Q.  To the extent of her Honor's question, one or two.  Do you |
| 15 | know that the change that came about was an amendment to the |
| 16 | plan that adopted an alternative formula called a cash balance |
| 17 | formula? |
| 18 | A.  I'm not sure what you are asking me.  Am I aware of the |
| 19 | nature of the changes? |
| 20 | Q.  Yes.  Generally that at 30,000-foot level you are aware |
| 21 | that the plan was amended to add a second alternative formula |
| 22 | called a cash balance formula? |
| 23 | A.  I am aware of it because in the last couple of days I have |
| 24 | gotten refreshed.  I would not have remembered 20 years ago, |
| 25 | but generally I am aware the plan was changed. |

```
 1   Q.  But my question is you have no reason to doubt that at the

 2   time you learned in the fall of 1995, that the board adopted an

 3   amendment that added a second alternative formula to the plan?

 4   A.  Correct.

 5            MR. GOTTESDIENER:  If we could call up PX 18?

 6            If I could approach again, your Honor?

 7            THE COURT:  Yes.

 8   A.  Is that in here?

 9   Q.  I am giving you that.

10   A.  OK.

11   Q.  If you could keep this in front of you.

12   A.  All right.

13   Q.  The first document, because the first document you'll see

14   has the cover memo to you July 19.

15            And the second document effectively repeats the

16   content of the first document after the memorandum.  It is a

17   presentation.  And you can look back at the first document if

18   you're interested.  But this one, we have a copy from

19   Mr. Kiley's file, and he has notes on it.

20            THE COURT:  I think that you need to -- just

21   reminiscent of yesterday -- just go ahead and ask the question,

22   but don't introduce the document, ask the question, try to lay

23   a foundation through this witness through this document for

24   your questions.

25            MR. GOTTESDIENER:  Sure.
```

F7gnosb1                          Farah - cross

 1              I just want to let the Court know, the reason I'm

 2    showing, in effect, a new document beyond the memorandum is

 3    there is additional information here that might help in laying

 4    a foundation and refreshing recollection.

 5              THE COURT:  It may or may not.

 6              So you will just go ahead and proceed.  If he has seen

 7    the document with the handwriting or not or whatever you want

 8    to do.

 9    BY MR. GOTTESDIENER:

10    Q.  So starting at the first page, Woolworth Retirement Program

11    Review, July 20, 1995 and it says Benefits Department.

12              Do you see that there?

13    A.  Yes.

14    Q.  So, if we look to the next page, you can see there is a

15    table of contents?

16    A.  Yes.

17    Q.  And the contents tables have objectives, background,

18    recommendations, benefit illustrations, review of defined

19    benefit plan alternatives, benefit illustrations, cash

20    balance --

21              THE COURT:  Mr. Gottesdiener, you don't need to read

22    from the document.

23              Just ask him.

24              MR. GOTTESDIENER:  OK.

25              THE COURT:  We all have it here.

1            MR. GOTTESDIENER:  Thank you, your Honor.

2    BY MR. GOTTESDIENER:

3    Q.  So if you would, please, turn to the page 4390.

4    A.  4390?

5    Q.  Objectives.  That is in the bottom right-hand corner.

6    A.  Could I just read it off the screen?

7    Q.  Yes.  You can do that, too.

8    A.  OK.

9    Q.  It's up to you.  You can look at the screen or hard copy

10   document.

11   A.  OK.

12   Q.  You can also look up on the projection.

13   A.  No.  This is clearer for me.  Thank you.

14   Q.  Looking at the objectives, to decrease company cost, these

15   two other bullet points, does it refresh your recollection that

16   you were in a meeting where there was a discussion presented to

17   you and the other members of the chairman's group how to go

18   about achieving cost savings in the retirement plan?

19   A.  No, it does not.

20   Q.  You don't have any reason to doubt that that was what the

21   purpose of the meeting was?

22   A.  I have no thoughts at all, since I'm reading a page on a

23   screen that's got no context and I don't know who was there,

24   but -- so I'm not sure what you are asking me.

25   Q.  I am asking you, you said the company was in dire financial

F7gnosb1                    Farah - cross

1   straits and needed to save cash, right?

2   A.  Yes, it was.

3   Q.  So retirement benefits weren't off the table.  Do you have

4   any reason to doubt that you became aware through a

5   presentation like this of the ways that were being explored to

6   save money?

7   A.  Does it say I was in this meeting?  I can't tell that from

8   this one piece of paper.

9   Q.  Does it say that?  If you are asking me, I would ask you --

10  A.  I don't recall being in this meeting.  And I don't -- I

11  mean, this is a piece of paper with the notes and three bullet

12  points.

13  Q.  If you look at the page that ends 00, that's page 7.  It

14  will come up on the screen.

15  A.  OK.  I got it.

16  Q.  So under, Recommendations --

17  A.  Yes.

18  Q.  -- the first one says change TWRP to a cash balance plan

19  effective January 1, 1996.

20  A.  What does TWRP mean?

21  Q.  You don't know?

22  A.  No.

23  Q.  The retirement plan, the Woolworth retirement plan.

24  A.  Is that what it's called?  OK.

25  Q.  And do you see there, under the first bullet point, second

1   from the bottom, it says, Reduces future benefit accruals and

2   lowers future costs?

3   A.  I see that, yes.

4   Q.  You don't have any reason to doubt that as chairman and CEO

5   you became aware that there were recommendations to change the

6   plan so it would do that?

7   A.  I have no reason not to believe that, yes.

8   Q.  If we could go to page 9, Bates 4405.

9           THE COURT:  We are still on PX 18, correct?

10          MR. GOTTESDIENER:  Yes, your Honor.

11  BY MR. GOTTESDIENER:

12  Q.  At the top it is entitled Review of Defined Benefit Plan

13  Alternatives.  If you were in a meeting and you were trying to

14  find --

15          THE COURT:  Just ask it affirmatively.  You can't ask

16  him a hypothetical.

17          MR. GOTTESDIENER:  OK.

18  BY MR. GOTTESDIENER:

19  Q.  So you don't have any reason to doubt that in this meeting

20  that you don't have any reason to doubt you attended you were

21  presented with all the alternatives that the benefits

22  department could think of and had analyzed for saving money?

23  A.  You're asking me if I had any reason to doubt I was at the

24  meeting.  I have no knowledge that I was in the meeting or

25  wasn't.  I'm not sure --

1   Q.  I thought we -- do you have any reason to doubt that

2   Ms. Peck's memo sending you a dec. for a meeting the next day

3   resulting in you attending it?  Do you have any reason to doubt

4   you didn't show up?

5   A.  I have no reason to doubt it or know that I did.  Your

6   earlier question asked me whether as chairman and CEO would I

7   be aware of changes planned for the pension, and I said I

8   probably would be aware.  You are now asking me if I have any

9   reason to doubt I attended a meeting 20 years ago.  I have no

10  ability to answer that.

11          MR. GOTTESDIENER:  With the Court's indulgence.

12          PX 24, please.  Can we get that on the screen.

13          May I approach the witness, your Honor?

14          THE COURT:  You may.

15  A.  I just note that here she uses her name Patricia.

16  Q.  Patricia Peck sent you in June of 1997 this dec. entitled

17  401(k) plan review?

18          THE COURT:  Hold on.  You can't testify to that.  You

19  need to lay a foundation for that so that it can be in the

20  record appropriately.

21  BY MR. GOTTESDIENER:

22  Q.  How about we look at briefly PX 9.

23          Can we look at the third page -- there are two or

24  three pages to PX 9 -- here is Roger N. Farah.  This is you.

25  A.  Right.

F7gnosb1                        Farah - cross

1   Q.   The third page of PX 9, you are signing it Roger, and this

2   is a memo that you sent to John Gillespie and John Cannon on

3   September 10, 1996.

4   A.   OK.

5   Q.   Correct?

6   A.   Yes.

7   Q.   What you say is:  I am concerned about the 6 percent

8   interest that we are guaranteeing on the account balances of

9   our pension program.  Could you please work up an analysis that

10  shows how this impacts our program.  Also, please run the

11  numbers at various interest rates which may help us with some

12  of the deficit in the pension plan.

13          You wrote that, didn't you?

14  A.   Yes.

15  Q.   John Gillespie and John Cannon, could you tell her Honor

16  who they were?

17  A.   At that point John Gillespie was the head of human

18  resources, and John Cannon I believe was the treasurer or

19  somewhere in the finance department.

20  Q.   So it would be fair to say that at this point in time you

21  were concerned that any changes that had been made may have

22  still been changes that didn't reduce the company's expense

23  enough?

24  A.   Well, as I read it, I'm concerned about the 6 percent that

25  we're guaranteeing in the account balances.  Could you work up

F7gnosb1                     Farah - cross

1  how it impacts the programs, run numbers at various scenarios,

2  which may help us with the deficit in the pension plan.  That's

3  what it says.

4  Q.  You are just reading back, but what that means is that you

5  know there is a deficit in the pension plan and the plan has to

6  be funded with cash, correct?

7  A.  I understand that, yes.

8  Q.  OK.  So cash has to go in to keep the plan adequately

9  funded, and if there's a deficit there's got to be not just

10 cash going in to cover current benefit accruals but to make up

11 the deficit, right?

12 A.  Well, I know --

13         THE COURT:  Hold on one second.  There is an

14 objection.  Just give me the objection.  I don't want to have

15 any --

16         MR. RUMELD:  The question is vague.

17         THE COURT:  OK.

18         THE WITNESS:  The question is what?

19         THE COURT:  Vague.

20         You may answer if you understand the question.

21 A.  Well, why don't you try it one more time and then I'll

22 answer.

23 Q.  You know that money has to go in on a current basis, normal

24 cost to cover benefits that are being accrued by

25 participants --

F7gnosb1                         Farah - cross

1   A.  I would just pick at your word.  I think assets have to go

2   in, not just cash, right?  That's my understanding.

3   Q.  Whether it's cash or assets, these are things that have to

4   come out of some pocket --

5   A.  Yes.

6   Q.  -- of the company, and they go into the plan?

7   A.  Yes.

8   Q.  And the plan is a trust?

9   A.  Yes.

10  Q.  And you can't get the money out of the plan once it's in

11  the trust, correct?

12  A.  I don't know about a trust, but that sounds about right,

13  yes.

14  Q.  Weren't you a fiduciary to the plan?

15  A.  I am assuming I was.

16          MR. RUMELD:  Objection.

17          THE COURT:  Overruled.

18  BY MR. GOTTESDIENER:

19  Q.  You are assuming you were?  You don't know that you were?

20  A.  No, I don't know that I was.

21          MR. GOTTESDIENER:  Can we get on the screen docket 66,

22  please.

23          THE COURT:  Ladies and gentlemen, you may have seen

24  that there are a number of people who have joined us in the

25  audience.  I understand that these are students from Spain.  I

F7gnosb1                          Farah - cross

1    think that's right.  I'm getting some nods of the head that are

2    yes.  Here to watch a trial.  So, welcome.  That explains who

3    those folks are.

4              Thank you.

5              MR. GOTTESDIENER:  OK.

6              Can we please go to item 11.

7              Your Honor, this is stipulated by the parties, filed

8    with the Court and signed by the Court.  If I could show the

9    witness item 11.  OK.  Thank you.

10   BY MR. GOTTESDIENER:

11   Q.   11A.  Plan administration.

12   A.   Right.

13   Q.   Membership of the retirement administrative committee (RAC)

14   between '95 and 2005.  In 1995, the RAC members were R.N.

15   Farah, Cannon, Hilpert, Hines, Ms. Peck and Mr. Thompson?

16   A.   Right.

17   Q.   That is an admitted stated fact by the defendants in this

18   case.  Can you accept that?

19   A.   Yes.

20   Q.   It also says in '96 that you were on this committee?

21   A.   Yes.

22   Q.   And '97 and '98 and '99 you were also on the committee?

23   A.   Correct.

24   Q.   And one of your responsibilities as a fiduciary was to make

25   sure that the plan was adequately funded?

F7gnosb1                        Farah - cross

1    A.  Yes.

2              MR. RUMELD:  Objection, your Honor.

3              THE COURT:  Sustained.

4              You have to restate the question.

5    BY MR. GOTTESDIENER:

6    Q.  Were you concerned as a fiduciary to the plan --

7              THE COURT:  I think that the issue here is we've got a

8    little bit of ships passing in the night.  You have him on the

9    committee.  You haven't yet got him to say that it that he

10   understands that that meant he was a fiduciary.

11             MR. GOTTESDIENER:  I see.

12             THE COURT:  I don't know that the leap is very far,

13   but I think you need to lay that foundation.  That's the nature

14   of the objection as I understand it.

15             MR. GOTTESDIENER:  OK.  Could we have on the screen PX

16   5.  Go to page 18 of PX 5.  This is the summary plan

17   description for the plan.  If we could blow that up a bit.  The

18   second paragraph.

19   BY MR. GOTTESDIENER:

20   Q.  This is under the whole heading of Administration of the

21   Plan.  The company and the retirement investment committee and

22   retirement administration committee of its board of directors

23   administer the operation of the plan.  RAC on behalf -- no

24   that's RIC, that's the investment -- RAC on behalf of the

25   company is responsible for the general administration of the

F7gnosb1                    Farah - cross

1    plan.  You were aware of that at the time?

2    A.  Well, I couldn't quite quote this the way you're reading it

3    now.  I know we were on the committee, and I knew we were

4    responsible for the health of the plan, yes.

5    Q.  And the administration of the plan?

6    A.  That's what it says.

7    Q.  I'm asking not what it says.  I'm asking what your

8    understanding at the time was.

9    A.  I didn't have that level of understanding of the nuances of

10   the responsibility that you are asking me about.

11   Q.  Is it a nuance whether or not you are a fiduciary?

12   A.  To me it was, yes.

13   Q.  So in your mind, whenever you did something with respect to

14   the plan, you were thinking of the company and not as a

15   fiduciary?

16   A.  No, that's not true.

17   Q.  OK.  So what is true?  How were you thinking?

18   A.  I was using my best efforts to make sure the plan was as

19   well funded as it could be based on what I inherited when I

20   walked in.

21   Q.  I'm sorry.  Based on what?

22   A.  Based on what I inherited when I walked into the company.

23   Q.  When you were doing that, did you consider yourself at the

24   time in 1995 a fiduciary to the retirement plan?

25   A.  If fiduciary means responsible, yes.  I felt the

F7gnosb1                        Farah - cross

1   responsibility of that, yes.

2   Q.  How about responsible to plan participants?

3   A.  I felt responsible for the plan participants as well.

4   Q.  Did you feel that --

5   A.  Both retired and active are you asking me or just active?

6   Q.  I'm sorry?

7   A.  Both retired and active or just active?

8   Q.  Both, sir.

9   A.  Yes.

10  Q.  Did you consider yourself a fiduciary to them?

11  A.  I felt responsible, yes.

12  Q.  So that means you considered yourself a fiduciary?

13  A.  I'm not sure.  Maybe you could use some clarity on the

14  definition of fiduciary.

15  Q.  You don't have a working definition of it?

16  A.  No.

17  Q.  So, if we could go back to PX 24, that is in front of you

18  as well.  If you want to look at the third page in, under

19  background -- the next page, page 4.  It states, In February

20  1995, Roger N. Farah directed that a review of the company's

21  retirement program be undertaken.  Is that an accurate

22  statement?

23  A.  Yes.

24  Q.  Does this dec. seem to be the kind of document that you

25  received from lower management in this time frame?

F7gnosb1                          Farah - cross

1          THE COURT:  Let's just so that we can be clear later

2     on if he received it.  Is this document a document that you

3     received during this time frame, which is the '95/'96 time

4     frame?

5          THE WITNESS:  I have no idea.  It's one page that says

6     I directed a review of the company's retirement benefits, which

7     I'm sure I did.  What document -- how would I know whether I

8     got this document or not?

9     BY MR. GOTTESDIENER:

10    Q.  But you don't have any reason to doubt that you got

11    documents like this?

12    A.  I got hundreds of documents.  I --

13         THE COURT:  The problem I have is if you want it to be

14    usable, then you won't able to say he got this document by

15    saying "documents like this," because it could be any kind of

16    PowerPoint.  So I just want to make sure our record is clear.

17    BY MR. GOTTESDIENER:

18    Q.  Do you have any reason to doubt that you received this

19    document?

20    A.  I have no idea whether I received this document.

21         THE COURT:  Do you remember participating in a review

22    of the 401(k) plan in or about June of 1997?

23         THE WITNESS:  I don't have a recall, but I would

24    assume I would have been a part of that.

25         THE COURT:  All right.

F7gnosb1                        Farah - cross

1          Would Ms. Peck from time to time make presentations to

2     you at any of these senior management meetings that you

3     attended, including the RAC?

4          THE WITNESS:  Yes, she would.  But the head of HR

5     might more normally make the presentation.

6          THE COURT:  All right.

7          THE WITNESS:  At one point Barry and then later John

8     Gillespie.

9          THE COURT:  All right.

10    BY MR. GOTTESDIENER:

11    Q.  So let's then go back to PX 18, this is the July 20 dec.

12         As CEO you would have been interested to see details

13    as to how much money could be saved under various alternative

14    options, is that correct?

15    A.  I don't know that.  I would say as CEO I would be

16    interested in knowing how much we were going to save across all

17    the various programs.  What level of depth I got into on any

18    one of those initiatives I couldn't sit here 20 years later and

19    say.

20    Q.  So you sent in '96, in September -- shooting forward a year

21    from July '95 and a few months -- this memo to John Gillespie

22    and John Cannon expressing concern about the guaranteed 6

23    percent rate, right?

24         THE COURT:  That's the third page of PX 5?

25         MR. GOTTESDIENER:  9, your Honor.

F7gnosb1                         Farah - cross

```
 1              THE COURT:  9.
 2   A.  I'm sorry.  What's the question?  I did write that note
 3   expressing concern, yes, if that was your question.
 4   Q.  Right.  And how was your concern addressed?
 5   A.  I have no idea.
 6   Q.  No idea?
 7   A.  No idea.
 8   Q.  Did you ever here back?
 9   A.  How would I remember that 20 years later?
10   Q.  Because you were running the company and you were concerned
11   about --
12   A.  I was running a global company in 17 countries with 35
13   operating divisions, and my role and expertise was on
14   merchandise, product, brand building and marketing.
15              So if you're asking me if I remember whether this HR
16   head and the treasurer responded to a memo from 19 years ago, I
17   have no idea what their reply was.
18   Q.  So you are saying you just -- you are drawing a complete
19   blank on anything to do with maybe changing again the formula
20   in the pension plan?
21   A.  I have no idea.
22              THE COURT:  Hold on.  I want to make sure the question
23   and the answer meet.  That is a different question from this.
24   Go ahead and ask that question, but I don't think it belongs
25   with a so in front of it.
```

F7gnosb1                        Farah - cross

1          MR. GOTTESDIENER:  I will withdraw the question and

2     ask another thank you, your Honor.

3     BY MR. GOTTESDIENER:

4     Q.  We were looking at July 20, 1995, the chairman group's

5     meeting.  On August 8, 1995, another meeting was held?

6          MR. GOTTESDIENER:  May I approach the witness?

7          THE COURT:  You may.

8          MR. GOTTESDIENER:  PX 19, please.

9          THE WITNESS:  Thank you.

10         THE COURT:  I just want to caution you,

11    Mr. Gottesdiener, so the record is clear -- I don't mean to

12    give you too hard a time -- you can't introduce by saying and

13    another meeting was held.  You have to establish through the

14    witness or something else whether it was a meeting or a set of

15    written communications or whether there is a stipulation.  That

16    would get us there.

17         MR. GOTTESDIENER:  Can I state that the defense does

18    not object?

19         THE COURT:  You have to ask them.  Do you guys dispute

20    that there was a meeting on August 8, 1995, that related to a

21    review of the retirement program?

22         MR. RUMELD:  I don't dispute that we have

23    documentation of that meeting.

24         THE COURT:  All right.  Fine.  Thank you.  You may

25    proceed, sir.

F7gnosb1                         Farah - cross

1            Do you dispute that Mr. Farah was present at that

2      meeting?

3            THE WITNESS:  How would I know that?

4            THE COURT:  I am not asking you.  I am trying to

5      establish with counsel if they are going to stipulate, since

6      your memory is not --

7            THE WITNESS:  Sorry.

8            THE COURT:  I'm not going to do this a lot.  I'm not

9      going to get all the facts through you, Mr. Rumeld, but just so

10     we can short circuit this.

11           MR. RUMELD:  I don't dispute that the documentation is

12     consistent with his attendance.

13           THE COURT:  Fine.  You may proceed, Mr. Gottesdiener.

14           MR. GOTTESDIENER:  Could I get PX 91 on the screen.

15           Your Honor, should I first ask the defense if they

16     dispute --

17           THE COURT:  No.  I don't want to have a whole bunch of

18     stipulations.  That was just because -- that wouldn't really be

19     the way to do a lot of things.  Why don't you go ahead, and you

20     can lay a foundation for this document in the traditional way.

21     BY MR. GOTTESDIENER:

22     Q.  I'm showing you PX 91.  This appears to be a letter from --

23           THE COURT:  Don't do it that way.  Just ask him

24     whether or not he recognizes this document.

25           You may need to have it in hard copy, because you are

1   showing us a copy.

2            MR. GOTTESDIENER:  May I approach?

3            THE COURT:  You may.

4            THE WITNESS:  Thank you.

5            THE COURT:  Have you had a chance to read it?

6            THE WITNESS:  Do you want me to read this?

7            THE COURT:  No, have you had a chance to review it?

8            THE WITNESS:  No.  I am just looking at it now.  Do

9   you want plea to read it now?

10           THE COURT:  I think Mr. Gottesdiener is going to ask

11  you questions about it.

12           Do you see you are copied on it?

13           THE WITNESS:  Yes, I do.

14           THE COURT:  Do you recall receiving a copy of PX 91 in

15  August of 1995?

16           THE WITNESS:  No I don't, but --

17           THE COURT:  No reason to doubt that you received it?

18           THE WITNESS:  No reason to doubt it.  That is correct.

19           THE COURT:  Mr. Gottesdiener, do you want to ask him

20  about the content?

21           MR. GOTTESDIENER:  Yes, please, your Honor.

22           THE COURT:  All right.  So why don't you go ahead and

23  review that.

24  A.  OK.

25  Q.  So you don't have any reason to doubt that you knew, at

F7gnosb1                        Farah - cross

1    least as of August 22, 1995, that the proposed change to the

2    plan would reduce the formula for future benefit accruals for

3    most associates?

4    A.  That's what it says, yes.

5    Q.  So you don't have any reason to doubt that you knew that at

6    that time?

7    A.  I have no reason to doubt it at that time.

8    Q.  You saw that prior to that it talks about adding a lump sum

9    option?

10   A.  I see that in the letter, yes.

11   Q.  If you knew at that time, given the financial condition

12   that you said the company was in, that there was a

13   recommendation to add an expensive provision to the plan, would

14   that have been important to you?

15            MR. RUMELD:  Objection, your Honor.

16            THE COURT:  Sustained.  You have to rephrase without

17   the if.  With a percipient witness you can't ask an if

18   question, unless you establish a different kind of foundation.

19   Q.  You don't have any reason to doubt that you knew a lump sum

20   provision in addition was being made to allow people who had

21   benefits under the plan to request it in the form of a lump

22   sum, an option they didn't have at that time?

23   A.  I am not sure what you are asking me.

24   Q.  You have no reason to doubt --

25   A.  Right.

F7gnosb1                        Farah - cross

1    Q.   -- reading this letter --

2    A.   Right.

3    Q.   -- you have no reason to doubt that you received it at this

4    time, you were aware that the recommendation was not only to

5    reduce the formula for future benefit accruals, but to also add

6    a provision that allowed people to take a lump sum?

7    A.   OK.   Correct.   I see it here, yes.

8    Q.   You have no reason to doubt you knew that at the time?

9    A.   I have no reason to doubt that at the time.

10   Q.   You have no reason to doubt that you did not believe, have

11   information at that time that that was going to be expensive?

12   A.   I honestly don't recall what I knew at the time.

13   Q.   Well --

14   A.   Whether it was expensive or not.

15   Q.   Well, you were looking to reduce the cost of the plan, not

16   increase it, right?

17   A.   Well, I don't know what the 401(k) was modeled at.   I don't

18   know whether --

19   Q.   I'm sorry.   I am not asking about the 401(k).

20              THE COURT:   Allow each other to finish.

21              Do you want to ask a different question now.

22              MR. GOTTESDIENER:   I don't want to talk about the

23   401(k), because that would be a long discussion.   I want to

24   talk about the pension plan and the paragraph that is

25   addressing the pension plan.

F7gnosb1                          Farah - cross

1    A.  What I'm saying is I see the letter states that there is a

2    choice at termination, you could receive a lump sum or an

3    annuity.  I see that it says we're reducing the formula for

4    future benefit accruals.  I see that it says we're introducing

5    a 401(k), which current and new recruited employees are, you

6    know, excited about.  I see that it says we're merging the

7    Kinney Shoe Corporation Pension for Manufacturing from the

8    Woolworth Retirement Plan, but I'm saying I don't know how all

9    of that adds up into a macro cost to the company based on this

10   memo.  It doesn't say that.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MR. GOTTESDIENER:  Your Honor, what I am trying to get

2      from the witness is to ask the witness in some form, and if I

3      am not doing it correctly, I really apologize, I am trying, I

4      just want to know, given the situation at the time, if he was

5      no reason to doubt there was a provision that was going to add

6      a lump sum, that that would have concerned him if it was going

7      to be costly.

8              THE COURT:  Let's just take it this way.

9              Do you recall whether or not there was discussion as

10     to the cost implications of providing a lump sum option as part

11     of the retirement plan?

12             THE WITNESS:  I don't recall specifically discussion

13     about lump sum.  I recall a total discussion about all of the

14     puts and takes of the retirement changes being a cost

15     reduction.

16             THE COURT:  Do you have any understanding at all as to

17     whether or not offering a lump sum option has cost implications

18     one way or the other?

19             THE WITNESS:  No, I don't.

20             THE COURT:  All right.

21             MR. GOTTESDIENER:  Can I then --

22             THE COURT:  Go ahead and follow up.

23     BY MR. GOTTESDIENER:

24     Q.  But at the time, given your focus on saving money, you

25     would agree that you would have been concerned to know about

1    the expense, if it were considered a potentially expensive

2    thing adding to the plan?

3    A.  I've tried to answer it.  Maybe I am not being clear.  I'll

4    try again.  My interest was in the totality of the moving parts

5    and whether in total the introduction of 401 (k), the change in

6    future benefits, request for lump sum, whether in total that

7    was a cost savings for the company would have been important to

8    me.  That is what I had, you know, knowledge of.

9         The individual moving parts of each of these and the

10   ramifications I don't claim knowledge of that.

11   Q.  But you do claim knowledge that you knew at the time that

12   you believed the total package was an effective way of reducing

13   costs?

14   A.  Yes.

15   Q.  In the letter that you have in front of you, you saw that

16   this was addressed to all the members of the board who were not

17   members of the board who were CC'd along with yourself, right?

18        THE COURT:  PX-91.

19   A.  I do.  Other than me as the chairman, but I was copied,

20   yes.

21   Q.  Do you see how it references the prior document I put in

22   front of you from August, this is a truncated or this is a

23   version of what was before the committee?  Do you see the first

24   sentence?

25   A.  Yes, I see the leading sentence, yes.

F7GJOSB2                              Farah - cross

1    Q.  Now, the board did have a meeting, I don't think it will be

2    disputed, in September.  Board meetings are not held without

3    adequate preparation, right?

4    A.  Correct.

5              MR. GOTTESDIENER:  May I approach, your Honor?

6              THE COURT:  You may.

7    Q.  This is PX 40 now.

8    A.  This is a board presentation, is that what it says?  It

9    doesn't say what it was.

10             MR. GOTTESDIENER:  Well, it is from September 13th,

11   1995.  If I could approach and show the witness another

12   document?

13             THE COURT:  Yes.

14             MR. GOTTESDIENER:  That is PX 37, if we can briefly

15   get that on the screen.  These are minutes.

16             (Pause)

17             MR. GOTTESDIENER:  For the record, the witness is

18   reviewing the minutes.

19             THE WITNESS:  I will wait till you ask me something.

20   Do you want me to read them all first?

21   Q.  Do these look like minutes from September 13th, 1995?

22   A.  Yes.

23   Q.  You received the minutes after they were prepared?

24   A.  Yes.

25   Q.  You are noted as being present at the board meeting,

F7GJOSB2                        Farah - cross

1   correct?

2   A.   Yes.

3   Q.   You don't have any reason to doubt that you were paying

4   attention, when referencing Page 2, the board took up the

5   amendments to the retirement plan and a document that would

6   adopt the 401 (k) plan?

7   A.   Yes.

8   Q.   Do you see there is after the signed page by the secretary,

9   there is Attachment A, Retirement Plan Amendment?

10  A.   One second.  I see it, yes.

11  Q.   If I might ask this question, your Honor:

12           It was typical practice at that time in advance of a

13  board meeting to send board members material like Ms. Peck sent

14  and covered in her letter and then at the board meeting itself

15  have a handout again for the board members?

16           THE COURT:  You mean PX 40?

17           MR. GOTTESDIENER:  Yes.

18  A.   I don't know about this specifically.  It is common

19  practice to send certain materials in advance you want the

20  directors to read and then have those materials at the meeting,

21  yes.

22  Q.   In case they didn't bring their copy with them?

23  A.   Yes.

24  Q.   You see Mr. Thomson who reviewed the objectives of the

25  revised retirement plan?

F7GJOSB2                          Farah - cross

1    A.  I am not sure.  Where I am now on the amendment?

2    Q.  In the minutes?

3    A.  In the minutes.  If that is what it says, I am sure that is

4    what happened, yes.

5    Q.  I am sure you paid attention when he was doing his

6    presentation?

7    A.  Am I sure I paid attention?  20 years later was I paying

8    attention, is that your question?  I don't recall that specific

9    presentation at that time.

10   Q.  Well --

11   A.  I generally paid attention to at the meetings, yes.

12   Q.  It was your practice, right?

13   A.  It is my practice to pay attention, yes.

14   Q.  It was the practice for the board to receive detailed

15   information that would allow the board to exercise its judgment

16   as to whether or not to approve recommendations from

17   management?

18             MR. RUMELD:  Objection.

19             THE COURT:  Overruled.

20   A.  Yes, on various subjects, but not all subjects, but, yes,

21   they did get presentations in advance, in the hopes they would

22   be more prepared to discuss it, yes.

23   BY MR. GOTTESDIENER:

24   Q.  Was the retirement plan an important subject?

25   A.  It was an important subject, but I don't know whether it

 1   was sent in advance.

 2   Q.  Whether it was what?

 3   A.  Sent out in advance.

 4          THE COURT:  Again, we are still talking about PX 40,

 5   am I right?  Whether PX 40 was sent out in advance, that is the

 6   discussion?

 7          MR. GOTTESDIENER:  PX 40 is dated September 13, so

 8   that would have been the document that would have been handed

 9   out for anyone who hadn't brought their copy.

10          THE COURT:  So what are we talking about?  Sent what

11   in advance?

12          MR. GOTTESDIENER:  He brought up sent in advance.  I

13   wasn't asking that.

14          THE WITNESS:  I am sorry.  I misunderstood.

15          THE COURT:  Why don't we have him ask you the

16   question.

17   BY MR. GOTTESDIENER:

18   Q.  So at the time, the retirement plan was important?

19   A.  Yes.

20   Q.  And it was the practice of the board not just to rubber

21   stamp recommendations from management?

22          THE COURT:  Related to the retirement plan?

23          MR. GOTTESDIENER:  Yes.  Thank you.

24   A.  Yes.

25   BY MR. GOTTESDIENER:

1  Q.  So, in order to do the opposite of a rubber stamp, to

2  exercise its judgment, it needed to have some information?

3  A.  Yes.

4  Q.  And you have no reason to doubt that the board received

5  from management some information of some detailed nature that

6  explained why management was recommending this option versus

7  other options that were considered?

8  A.  At the board meeting, yes.

9  Q.  You understood at the board meeting, consistent with what

10  you knew in advance, that the recommendation was to make

11  changes that were going to save the company money?

12  A.  Yes.

13  Q.  It was going to save the company money by reducing the

14  benefit formula under the pension plan?

15  A.  I don't know that specifically.  I know in total, that was

16  the objective.

17  Q.  But you don't have any reason to doubt that you were paying

18  attention to all the presentations that we have seen so far

19  where it shows that for the pension plan, the recommendation is

20  to reduce future benefit accruals and lower future costs that

21  way?

22          MR. RUMELD:  Objection.

23          THE COURT:  Sustained.

24          MR. GOTTESDIENER:  The court's indulgence.

25          (Pause)

1          MR. GOTTESDIENER:  No further questions, your Honor.

2          THE COURT:  Thank you.  Mr. Rumeld, anything from you?

3          MR. RUMELD:  Just one question.  I'll ask it from here

4     if it is okay.

5          THE COURT:  I want your voice to carry.

6     REDIRECT EXAMINATION

7     BY MR. RUMELD:

8     Q.  I think your words were we were in very desperate shape,

9     Mr. Farah.  Would you just explain to the court what you meant

10    by that.

11    A.  Well, I was hired in the middle of December of 1994 after

12    the CEO and CFO were fired for accounting irregularities and

13    the company in fiscal 1994 lost almost $500 million.

14         When I started really in essence on January 1, all of

15    our bank loans were due to expire at the end of January so we

16    had 30 days before we were out of money.

17         After a series of prior restructurings hadn't worked,

18    we were in a very desperate situation for cash and very quickly

19    started getting a cash in and out every night at my desk at

20    5:00 o'clock to make sure we could pay the bills on Friday when

21    checks had to go out.

22         We had the bankers lined up in my office the first

23    week I was on the job saying don't go bankrupt in the next 30

24    days, but we are not going to lend you money, and spent the

25    better part of the month trying to line up alternative

1    financing that gave us enough time to try to turn the company

2    around.

3                Over the course of those first early years, I had to

4    make a lot of tough decisions about businesses to keep,

5    businesses to sell, how to survive until we could come out the

6    back end as a well financed, successful company which it is

7    today.  So those were very dark days.

8    Q.  Did you perceive the company to be at risk of bankruptcy?

9    A.  Yes.

10               MR. RUMELD:  Nothing further.

11               THE COURT:  Mr. Gottesdiener.

12   RECROSS EXAMINATION

13   BY MR. GOTTESDIENER:

14   Q.  Gee, it sounds so dire, why --

15               THE COURT:  Strike that.  Try a different way.

16   Q.  If things were so dark, why didn't you just say to the

17   benefits department shut down the pension plan or freeze it?

18   A.  Why would I say that?

19               MR. GOTTESDIENER:  Could your Honor ask --

20               THE COURT:  I am not going to ask.  You guys ask.  I

21   have been trying to assist, but it it not my job.

22   BY MR. GOTTESDIENER:

23   Q.  It was so dark you were on the verge of bankruptcy -- let

24   me finish.

25   A.  Did I say anything?

F7GJOSB2                          Farah - recross

1   Q.  You were about to talk.

2   A.  You were anticipating my talking.

3           THE COURT:  Stop.  Pose a question without the

4   argumentative piece of it.  Certainly you can ask a

5   factually-based question and the witness will wait for you to

6   ask the question and you will answer.

7   BY MR. GOTTESDIENER:

8   Q.  You just described the company on death's door.  Why didn't

9   you instruct the benefits department to just freeze or shut

10  down the plan?

11          MR. RUMELD:  Objection.

12          THE COURT:  Overruled.  You may answer.

13  A.  What I began to do when I got to the company and understood

14  the current condition first was line up some short term

15  financing so we could pay the bills, and then we engaged the

16  senior management team in looking for ways to cut costs

17  throughout the company.

18          Every opportunity we thought to cut expenses that

19  would not impair our ability to go forward we looked at.  Maybe

20  we didn't --

21  Q.  I am sorry?

22  A.  Let me finish.

23          THE COURT:  Impair his ability to go forward.

24  A.  -- maybe we did look at it at the time.  I don't know, but

25  every subject that we thought was on the table for

F7GJOSB2                           Farah - recross

1    consideration we looked at.

2    BY MR. GOTTESDIENER:

3    Q.  Was it not on the table or was it quickly taken off the

4    table --

5    A.  I don't recall.

6              THE COURT:  You have to let him finish his question.

7              THE WITNESS:  Sorry.

8              THE COURT:  Restate the question.

9    BY MR. GOTTESDIENER:

10   Q.  Was it not on the table or was it quickly taken off the

11   table perhaps because it would kill morale to freeze the

12   pension plan?

13   A.  No.

14   Q.  Morale was irrelevant?

15             THE COURT:  Those are two different questions.  Why

16   don't you re-ask that question.

17   BY MR. GOTTESDIENER:

18   Q.  Was morale irrelevant in the determination of what to do

19   with the pension plan?

20   A.  In the short run, morale was terrible.  We had just lost

21   almost $500 million.  We had just closed 900 stores the year

22   before.  We had 35 operating companies out of 38 losing money.

23   Morale in the company wasn't very good anyway.

24   Q.  So morale would not have -- it would have been the straw

25   that broke the camel's back --

F7GJOSB2                         Farah - recross

A.  No, I am not saying that.  You are putting that word in my

mouth.  I didn't say that.

Q.  You didn't let me finish my question.

            THE COURT:  You guys stop again.  Try it again, okay?

            You need to ask it so it is not a "would" question

because a would definitionally is an if-type question.  Ask a

factual question, and you give an answer, but let each other

finish.

            THE WITNESS:  Okay.

BY MR. GOTTESDIENER:

Q.  What do you think the effect on morale would have been if

there was an announcement of a freeze or shutdown of the

retirement plan, no new benefit accruals?

A.  I have no idea.

Q.  It would not have helped morale, correct?

A.  I have no idea.

Q.  Do you think it might have helped morale?

A.  I didn't say that.  I said I have no idea.

Q.  So if you're so in dire straights and bankruptcy, why, why

wouldn't you just stop the pension plan to save money if morale

was not a consideration?

            MR. RUMELD:  Objection.

            THE COURT:  Sustained.  Here I think is the way that

the question could be asked.  Do you recall, as you sit here

today, giving any consideration to termination of the pension

F7GJOSB2                      Farah - recross

1    plan?

2              THE WITNESS:  No.

3              THE COURT:  As you sit here today, thinking back on

4    the facts as they existed at the time, do you recall whether or

5    not morale played any role, and that is, employee morale played

6    any role in connection with the cost-cutting efforts that the

7    company was undertaking at that time?

8              THE WITNESS:  It did not.

9              THE COURT:  Tell us why, from your point of view.

10             THE WITNESS:  Because we were in survival mode, that

11   if we didn't make changes, whether they were morale-damaging or

12   not, the company would not have survived.  In a bankruptcy

13   proceeding where we could have walked away for thousands of

14   store leases, canceled contracts, the employees would have been

15   hurt in a very bad way.  So our focus was on doing everything

16   we could do to stay out of bankruptcy.

17             MR. GOTTESDIENER:  PX 2, please.

18   Q.  PX 2 is the document you reviewed in preparation for

19   testifying here today, right?

20             MR. RUMELD:  Objection, your Honor.  Beyond the scope

21   of my cross.

22             THE COURT:  I don't know where it is going yet.  I'll

23   allow it.  You may proceed.

24   BY MR. GOTTESDIENER:

25   Q.  That is the document you reviewed in preparing to testify.

1     Is that right?

2     A.  I can't see all of it, but it looks like it, yes.

3     Q.  Is there anything in this letter that tells employees that

4     benefits are being reduced?

5     A.  I can't see all the letter.

6              MR. RUMELD:  I renew my objection.

7              THE COURT:  For that question, the objection is

8     sustained.  There is a way of using this document that is

9     within the scope of the witness's prior answer and within the

10    scope of the redirect, but not that.

11    BY MR. GOTTESDIENER:

12    Q.  Could I ask the witness, sir, if you need take time to

13    review the document, would you review the document and then I'd

14    ask you a question.

15    A.  Okay.

16    Q.  The same question.

17             THE COURT:  That question is not going to work.  Here

18    this problem.  That question is a question you should have

19    asked on direct examination.  Having not asked it on direct

20    examination, you are limited on what is your now cross to the

21    scope of what Mr. Rumeld did.

22             What Mr. Rumeld did is he went into the dire financial

23    straights.  If you want to use the document to talk about dire

24    financial straights or employee morale, all of that is fair

25    game.  Doing now what could have been done first is too late.

1    So you can't do that.  You can do other things.

2              MR. RUMELD:  Just --

3    BY MR. GOTTESDIENER:

4    Q.  Do you see anything in there that talks about the dire

5    financial straights of the company or the fact that the company

6    needs to tighten its belt?

7    A.  I am reading it, if you give me just one second.  Can you

8    move it up the screen a little and get the whole body of the

9    letter a little more.  Thank you.  (Pause)

10             I have read it.  What is your question again?

11   Q.  Do you see anything in there that makes any mention of the

12   company's dire financial situation?

13   A.  No.

14   Q.  Or the need to cut costs?

15   A.  I don't see that in there, in this letter.

16   Q.  Was the intent of this letter to keep morale up?

17             MR. RUMELD:  Objection, your Honor.

18             THE COURT:  Overruled.

19   A.  I don't think it was morale-driven.  I think it was

20   announcing some changes.

21   BY MR. GOTTESDIENER:

22   Q.  And saying you're excited to announce the changes doesn't

23   to you indicate that morale was a consideration, keeping it up?

24   A.  If I could lift the morale of 125,000 people with the word

25   "excited," that would be a good use of the word.  So I would

F7GJOSB2                          Farah - recross

1    say no.

2                THE COURT:  Let me ask whether or not you are aware of

3    any reason for changes being made to the retirement plan as of

4    1-1-96 other than the need to cut costs?

5                THE WITNESS:  No.

6                THE COURT:  So would it be fair to say that your

7    understanding of the changes in the retirement plan were

8    related to the need to cut costs?

9                THE WITNESS:  In totality, plus there was growing

10   demand for a 401 (k) option from our workforce and people we

11   were hiring.

12               THE COURT:  Where did you get that understanding from?

13               THE WITNESS:  Being out in the business world, talking

14   to employees.  People were asking for that as a part of their

15   benefits.

16   BY MR. GOTTESDIENER:

17   Q.  But you don't see anything in there that talks about the

18   need to save money or cut costs?

19   A.  I think I answered that already with a no, I don't.

20               MR. GOTTESDIENER:  Nothing further.

21               THE COURT:  Thank you.  Mr. Rumeld, anything further?

22               MR. RUMELD:  No, your Honor.

23               THE COURT:  Mr. Farah you may step down.

24               (Witness excused)

25               THE COURT:  Let's get Mr. Kiley back out onto the

1    stand.  (Previously sworn)

2     THOMAS J. KILEY, JR.,

3         called as a witness by the Defendant,

4         having been duly sworn, testified as follows:

5              THE COURT:  We are right now in the middle of

6    cross-examination of Mr. Kiley.

7              Do we know if Mr. Kiley's declaration is accessible

8    now?  We have had another witness in-between.  Let's just see

9    if his declaration is still here.  While we are organizing

10   that, Mr. Kiley, I just want to remind you, you remain under

11   oath from yesterday.

12             THE WITNESS:  Yes.

13             THE COURT:  I want to thank you for your indulgence

14   this morning, as we took another witness out of order due to

15   scheduling issues, so I appreciate that.

16             THE WITNESS:  You're welcome.

17             THE COURT:  As soon as we get that back in front of

18   you, then Mr. Gottesdiener will proceed.

19             MR. GOTTESDIENER:  The court's indulgence.

20             THE COURT:  Yes.

21             (Pause)

22   CROSS EXAMINATION (Continued)

23   BY MR. GOTTESDIENER:

24   Q.  If we can get back on the screen PX 21.  Mr. Kiley, you

25   have that exhibit in front of you?

F7GJOSB2                        Kiley - cross

1    A.  Yes.

2    Q.  Again you should feel free to look at any of the screens or

3    the exhibit, the monitor.  These are your February 2, 1995

4    handwritten notes.  One thing we didn't mention yesterday, your

5    declaration attaches a lot of documents.  Is that right?

6    A.  That's correct.

7    Q.  And one of the documents it actually attaches are these

8    notes?

9    A.  That's correct.

10   Q.  So you're fairly familiar with them?

11   A.  Yes.

12   Q.  Would you call up PX 552.  If we could blow that up.

13          Do you remember yesterday we talked about how you were

14   the interface with Mr. Grefig from Mercer, including for

15   receiving bills?

16   A.  Yes.

17   Q.  Do you see this is a bill that he sent you, "Dear Tom,"

18   March 31, 1995?

19   A.  Yes.

20   Q.  It was the practice to send bills obviously after the

21   services were rendered, right?

22   A.  Yes.

23   Q.  Do you see how it says, "Enclosed is our invoice with

24   respect to the Woolworth retirement plan for the period January

25   1, 1995 to February 28, 1995"?

F7GJOSB2                          Kiley - cross

1    A.   Yes.

2    Q.   These notes that we have been talking about are within that

3    period, February 2, right?

4    A.   Correct.

5    Q.   Do you see how he says in the next sentence:

6              "Time spent preparing for and attending the cost

7    reduction strategy meeting (approximately $9,600.00) has not

8    been charged to you"?

9    A.   Yes.

10   Q.   So back to the notes, you don't have any reason to doubt we

11   are talking about the same cost-reduction strategy meeting he

12   is referencing?

13   A.   No.

14   Q.   At this meeting Ms. Peck was present as well, right?

15   A.   I don't recall.

16   Q.   In the deposition you gave where I asked you questions,

17   didn't we look at these notes and also look at Ms. Peck's

18   notes?

19   A.   Yes.

20   Q.   So now it refreshes your recollection, hearing that, that

21   that was in your deposition, and we looked at those together,

22   now refreshes your recollection she was present?

23   A.   Not really.

24              MR. GOTTESDIENER:  The court's indulgence.

25              (Pause)

F7GJOSB2                          Kiley - cross

1   BY MR. GOTTESDIENER:

2   Q.  Let me ask this:  You don't have any reason to think that

3   Ms. Peck was not present?

4   A.  She may or may not have been.

5   Q.  Okay.  The notes where we left off were showing that -- you

6   don't have any reason to doubt that the discussion in the

7   middle of the page under Example 2 was replicating the current

8   plan as a cash balance plan and showing what the pay credits

9   would be at the current level versus what the pay credit would

10  be at a 20 percent reduction from the current plan level?

11            MR. RUMELD:  Objection.

12            THE COURT:  Overruled.

13  A.  I can't say that I don't have any doubt it appears that way

14  in some of the type of not necessarily cash balance plan

15  represented here.  It could have just been a general, you know,

16  overview of what the reductions might be.

17  BY MR. GOTTESDIENER:

18  Q.  But you don't doubt that these above percentages he was

19  telling you, that the above percentages replicate the current

20  plan as a pay credit?

21  A.  Yes.

22  Q.  And you don't have any reason to doubt the discussion was

23  of potentially adopting a cash balance plan?

24  A.  Yes.

25  Q.  So you knew at the time and know now that just adopting a

1    cash balance plan in that formula doesn't magically save costs?

2           You actually have to reduce the level of benefits to

3    save costs?

4    A.  Yes.

5    Q.  What he was illustrating there was one of the potential

6    ways to save costs from the current plan using a cash balance

7    formula?

8    A.  It would appear that way.

9    Q.  And what he is doing here is showing you and the assembled

10   other folks from Woolworth the options, as the sponsor you had

11   for doing that, he was presenting options, you guys were the

12   decision-makers?

13   A.  Yes.

14   Q.  Now, if we then go to the second page of the notes, and on

15   the second page you see in the middle of the page --

16   A.  Yes.

17   Q.  -- in the example that we've got Mr. Grefig providing you

18   all an example of wear-away.  Is that right?

19   A.  Yes.  I don't think we even had that term yet presented to

20   us, but, yes, it appears that way.

21   Q.  If I understand your answer, what you mean is that term did

22   get used, but you didn't see that term used in the notes that

23   you took on February 2nd?

24   A.  I don't think so.

25   Q.  I am not suggesting you're wrong.

F7GJOSB2                         Kiley - cross

1          What I am getting at is you just mean that it is

2     illustrating what you came to know was labeled wear-away?

3     A.   Yes.

4     Q.   And that in subsequent meetings, that was the term that was

5     used?

6     A.   Once or twice.  It wasn't used very often.

7     Q.   But you do know it was used and it appears in your notes

8     and other people's notes?

9     A.   Yes.

10    Q.   So here what you see is --

11          MR. GOTTESDIENER:  The court's indulgence.

12          (Pause)

13    BY MR. GOTTESDIENER:

14    Q.   Over the example, you see how what he is suggesting is

15    shown in the example, and he says -- Randall if you can go

16    above, just one above -- yes, there -- so he is saying you

17    could, we could, your notes say, convert existing balances at 9

18    percent?

19          MR. RUMELD:  Objection, your Honor.

20          MR. GOTTESDIENER:  Reading what you wrote --

21          THE COURT:  Hold on.  (Pause)

22          Why don't you restate the question because I am not

23    sure exactly if he finished the question or not to understand

24    whether it was objectionable.  You may proceed.

25    BY MR. GOTTESDIENER:

Kiley - cross

1    Q.  What your notes say is:

2              "We could convert existing balances at 9 for existing

3    employees, but if they term, they'd be cashed out at 7.83

4    percent," right?

5    A.  Yes.

6    Q.  And that's consistent with he was giving you guys options,

7    it was your decision whether or not to do that?

8              MR. RUMELD:  Objection.

9              THE COURT:  Overruled.

10   A.  He was giving us options, but I don't think we ever had an

11   option of converting at 9 percent.

12   BY MR. GOTTESDIENER:

13   Q.  But you knew from your discussions with Mercer and your own

14   investigation that that was a choice that the sponsor made in

15   terms of what conversion terms to use?

16   A.  Yes, certainly it was a choice, but it was one that was

17   strongly guided by the actuary.

18   Q.  Strongly what?

19   A.  Strongly guided by the actuary.

20   Q.  Because the actuary knew from you guys that the objective

21   was to save money?

22   A.  He knew the objective was to save money.  We did not have

23   the technical expertise to determine, you know, the assumptions

24   used to establish the initial account balance.  He had that.

25   Q.  Let's break down what you just said in two parts.

1              First, you understood what the impact was of using a

2    higher rate versus a lower rate on opening account balances,

3    right?

4    A.  Yes.

5    Q.  Second, the purpose of use of 9 percent was to save cash,

6    right?

7    A.  The purpose, one of the purposes of the conversion to a

8    cash balance plan was to save, to save the company money.  That

9    was why we were even engaged in the exercise.  9 percent, there

10   were other reasons for the usage of 9 percent.

11   Q.  You used 9 percent because it saved cash?

12   A.  We used 9 percent because that was the actuary interest

13   assumption and it was the going or approximate rate of return

14   of the plan assets at that point in time.

15   Q.  You testified at your deposition, page 169, question line

16   11:

17   "Q   Before lunch we were talking about how, you know, how you

18   know that 9 percent wasn't really picked because it was the

19   rate of return on plan assets, that was assumed, but you said

20   you didn't remember why.  But now looking at these, you're

21   refreshed that it was to generate cash savings?

22   "A   Yes."

23              You gave that testimony, didn't you?

24   A.  Apparently, I did.

25   Q.  I just asked was it true?

F7GJOSB2                              Kiley - cross

1           MR. RUMELD:  Your Honor --

2           THE COURT:  I will allow that in that context because

3    it was just a question to which he answered.

4           MR. RUMELD:  I did object to that question.  I just

5    want to point out that was a question I objected to.

6           THE COURT:  All right.  That is fine.  It doesn't

7    change the adequacy of the prior question that Mr. Gottesdiener

8    asked.  You may proceed, sir.

9    BY MR. GOTTESDIENER:

10   Q.  I asked that you that question and you gave that answer,

11   right?

12   A.  Yes.

13   Q.  You were under oath at the time, right?

14   A.  Yes.

15   Q.  And you were prepared by Mr. Rumeld before you attended

16   that deposition, weren't you, your lawyer?  You met with him?

17   A.  To some extent.

18   Q.  And we had already spent the morning together, and I was

19   asking you after lunch this question, looking at the documents

20   we looked together, you were refreshed that the purpose was to

21   generate cash savings, and you answered yes, right?

22   A.  Yes, obviously.

23   Q.  Did you ever ask about using a rate other than 9 percent?

24   A.  No, I don't recall.

25   Q.  You don't recall asking or --

F7GJOSB2                              Kiley - cross

1    A.  I don't recall asking.

2    Q.  What would the effect have been to use a rate lower than 9

3    percent on opening balances?

4    A.  Obviously, it would have generated higher initial account

5    balances.

6    Q.  And obviously also it would have generated less savings due

7    to wear-away, right?

8    A.  The goal was not to generate savings to the wear-away; the

9    goal was to generate savings due to a change in plan design.

10   Q.  Okay, but part of the plan design was a wear-away

11   transition period between the old formula and the added new

12   formula?

13   A.  But that was not something that was consciously built into

14   the plan.  That was a consequence of the plan design.

15   Q.  I am sorry.  I don't understand.

16        It was not consciously built into the plan?  It was a

17   consequence of plan design?

18   A.  Correct.

19   Q.  So could I just ask, isn't that one and the same thing?

20   Isn't plan design building in a change to the plan?

21   A.  Not necessarily.  The plan design was to change to a cash

22   balance plan with all the advantages that that offered and to

23   reduce future accruals.

24   Q.  The objective was to save money?

25   A.  That was the overall primarily objective, yes.

F7GJOSB2                              Kiley - cross

1    Q.  It wasn't to raise costs, right?

2    A.  Of course not.

3    Q.  You knew that using a wear-away feature was an option?

4    A.  No, I did not.

5    Q.  Your testimony is that a cash balance plan, there is only

6    one kind of cash balance plan?

7    A.  No.  There are many kinds of cash balance plans.

8    Q.  You could have designed this plan to not have a wear-away,

9    correct?

10   A.  But again it wasn't designed to --

11   Q.  Well --

12          THE COURT:  Let's go back.  You were being good about

13   not cutting the witness off.  Why don't you go back and re-ask

14   the question.

15   BY MR. GOTTESDIENER:

16   Q.  You knew you could have a cash balance plan without

17   wear-away, right?

18   A.  I don't think wear-away was very much on our minds at that

19   point in time.

20   Q.  I am sorry, sir, that is not answering my question.

21          You knew at the time that you did not have to have the

22   plan have a wear-away?

23   A.  I would have to say it wasn't our focus.  I would say no.

24   Q.  Separate from your focus, you investigated cash balance

25   plans and you got good advice from Mr. Grefig, right?

F7GJOSB2                          Kiley - cross

1   A.   Yes.

2   Q.   Can we get that example back on the screen.

3            While it is coming up on the screen, you're looking at

4   the hard copy?

5   A.   Yes.

6   Q.   Do you see the example shows the account value at a

7   thousand dollars and the term value is $1250, and you write

8   below:

9            "If we add a hundred dollars due to interest and pay

10  credits bringing the value up to $1100, but upon termination we

11  will still pay out $1250," right?

12  A.   Yes.

13  Q.   You understood at that time that would mean the interest

14  and pay credits added to that person's account wouldn't mean

15  anything for benefit growth, correct?

16  A.   I wouldn't put it in those terms, but I think what we

17  understood was that there was an IRS requirement that we had to

18  use a minimum calculation in the event of a cash-out and that

19  would produce a higher cash-out.

20  Q.   You understood that what Mr. Grefig was saying, and you

21  were writing down verbatim, that we could convert existing

22  balances at 9 percent, but they'd have to be cashed out at 7.83

23  percent, but that if you converted at 7.83 percent, and they

24  cashed out at 7.83 percent, that the hundred dollar additions

25  to those persons' accounts would mean something to their actual

F7GJOSB2                              Kiley - cross

1    benefit, correct?

2                MR. RUMELD:  Objection.

3                THE COURT:  Overruled.

4    A.  Well, compared to 7.83 and then had a cash-out at 7.83, it

5    would probably be indifferent.  It would probably be the same.

6    Q.  I am sorry.  What would happen would be, you knew that

7    those pay credits and interest credits would actually add

8    value, would add benefit to the participant, correct?

9    A.  Well, they did add value, as far as adding value.

10   Q.  I am sorry?

11   A.  We started adding value.

12   Q.  You saw this as saving money for the company?

13   A.  The goal of the project was to save money for the company.

14   Q.  Thank you.  If you go later in the notes, on Page 3, you

15   see --

16               THE COURT:  Just so the record is clear, it is PX 21

17   that we're still on?

18               MR. GOTTESDIENER:  Yes, your Honor.

19   BY MR. GOTTESDIENER:

20   Q.  Do you see that Mr. Grefig is saying the design,

21   "encourages lump sums"?

22   A.  Yes.

23   Q.  And this is in the context of discussing the early

24   retirement subsidy, correct?

25               Do you see where it says retirees and pay status would

1    not be affected?  TV's, that means "terminated vesteds," right?

2    A.  Yes.

3    Q.  TV's ideally would all be cashed out --

4            MR. RUMELD:  Objection.

5    Q.  -- is that what it says?

6    A.  Yes.

7            THE COURT:  I'll allow it.

8            MR. RUMELD:  I don't want to keep getting up, so if I

9    could just get a clarification.  I thought I understood from

10   your Honor's instructions yesterday that Mr. Gottesdiener

11   wasn't supposed to ask these questions this way.

12           THE COURT:  Well, that particular question was do you

13   see where it says would not be affected.  That means terminated

14   vesteds, right?

15           If it doesn't mean that in terms of the words, this is

16   different.  It is slightly different, I understand, that he can

17   say that.  Then he asked if in terms of the second question,

18   which was that's what the words said.  So I think it was

19   acceptable.

20           Mr. Gottesdiener, just so you're clear, you have got

21   two versions.  You have got one which is did the words say

22   that, and then there is a separate issue as to what the words

23   mean, all right?  The answer you have got is really do the

24   words say that.

25   BY MR. GOTTESDIENER:

1  Q.  In the third paragraph, the words say the early retirement

2  reduction, i.e., 4 percent per year will go away, right?

3  A.  Yes.

4  Q.  You knew at the time that the early retirement subsidy in

5  the plan was very valuable?

6  A.  It was, yes, it was a generous reduction for early

7  retirement.

8  Q.  And it was expensive?

9  A.  Yes.  I don't remember how expensive, but, yes.

10  Q.  Well, isn't it kind of a one-to-one?

11          It was generous, which means from the company's point

12  of view, it was expensive?

13  A.  It was more generous than the actuarial equivalent.

14  Q.  It was more expensive than the actuarial equivalent?

15  A.  Yes.

16  Q.  If people took lump sums under the way the plan was written

17  and the law allowed, they would forfeit that generous subsidy,

18  which could only be taken if they took it in annuity form,

19  correct?

20  A.  I think so.  I don't remember all the details of the plan

21  design.

22  Q.  I am sorry.  This is something we went over in your

23  deposition, wasn't it?

24  A.  I don't recall.

25  Q.  Okay.  Well, Page 229, on 229 -- withdrawn -- on 231,

1    question on Line 4:

2    "Q   So there is no disclosure of this valuable early

3    retirement subsidy, correct?"

4            And that is referring to the SPD.

5    "A   Yes.

6    "Q   Which is only available if people elect an annuity?

7    "A   Yes.

8    "Q   And you agree that the change to cash balance was in part

9    to encourage people to take lump sums?

10   "A   Yes."

11           You gave that testimony, didn't you?

12   A.  Yes.

13   Q.  You learned in the course of working with Mercer that

14   everybody, more or less, given the option to take a lump sum,

15   takes a lump sum, right?

16   A.  Yes, that was one of the goals that we were trying to

17   achieve, a lump-sum option for participants.

18   Q.  And save the company a lot of money by having people

19   forfeit the early retirement subsidy?

20           MR. RUMELD:  Objection.

21   A.  That was just one aspect.

22   Q.  You agree it was one aspect of cost savings, right?

23   A.  Yes.

24   Q.  And another aspect was to reduce the benefit formula going

25   forward once somebody got out of wear-away, right?

F7GJOSB2                          Kiley - cross

1             The formula was lower?

2    A.   The formula was lower after the date of conversion.

3    Q.   The formula -- well, if somebody is in wear-away, doesn't

4    the formula mean nothing for them until they get out of

5    wear-away?

6    A.   We didn't view it that way.

7    Q.   I am not asking how you viewed it right now.  Isn't that a

8    fact?

9    A.   That was not the way we were looking at it at the time we

10   did the conversion.

11   Q.   Didn't you know at the time that someone who was in

12   wear-away gets no value or benefit whatsoever of this other

13   formula?

14   A.   No, that is not the way we were looking at it.

15   Q.   You keep saying, sir, look at it.  I am simply asking

16   didn't you know at the time?

17   A.   It wasn't a primary focus.

18             MR. RUMELD:  Objection.

19             THE COURT:  I will allow it.  He is asking did he know

20   at the time.  If he did or not know, they are having ships

21   passing in the night, but I understand the point.

22   BY MR. GOTTESDIENER:

23   Q.   Did you know it at the time?

24   A.   If we knew it, it wasn't a major focus.  It wasn't built

25   into the plan, and it wasn't -- we considered the participants

F7GJOSB2                      Kiley - cross

1   would still be accruing benefits because of the pay credits and

2   interest credits that they would be receiving.

3   Q.  First you were not answering and again you said --

4           THE COURT:  You don't need to -- just ask a new

5   question.  You don't need to comment on the prior answer.  Ask

6   a new question.

7   BY MR. GOTTESDIENER:

8   Q.  The same question, did you know it at the time?

9           THE COURT:  I have lost now what the "know it" it is.

10  Restate the whole thing.

11  BY MR. GOTTESDIENER:

12  Q.  If they're still in wear-away, they would get no value or

13  added benefit from this new formula?

14  A.  I can't say that I knew it at the time.

15  Q.  You knew at this time the benefit they would receive would

16  not reflect any benefit larger than they were entitled to under

17  the 12-31-95 formula, correct?

18  A.  That was all dependent upon the GATT and interest rates.

19          THE COURT:  Did you know -- let me ask this way.

20          Did you know that there was some likelihood that there

21  would be certain participants in the plan whose benefit as they

22  ultimately received it would be that in existence as of

23  12-31-95 and not more?  Did you know that at the time?

24          THE WITNESS:  I think we knew that in some cases the

25  lump-sum payment would be higher.

F7GJOSB2                              Kiley - cross

```
 1              THE COURT:  That means you knew that at the time there

 2    was some likelihood that certain participants would not be

 3    receiving or were not likely to receive an amount greater than

 4    the lump sum in existence as of 12-31-95, correct?

 5              THE WITNESS:  Yes, correct.

 6              THE COURT:  When I say "in existence," I mean by

 7    virtue of the conversion to the plan?

 8              THE WITNESS:  Yes.

 9              THE COURT:  And all the changes that occurred

10    contemporaneous with that, all right?

11              THE WITNESS:  Yes.

12              THE COURT:  You may proceed.

13    BY MR. GOTTESDIENER:

14    Q.  Isn't that exactly what her Honor is describing what is

15    shown on the notes in that example that we just went through,

16    the hundred dollar addition doesn't mean anything for that

17    person, right?

18    A.  Yes.

19    Q.  And you knew that at the time, right?

20    A.  Ah --

21    Q.  I am not asking what your focus was.  You knew that at the

22    time?

23    A.  We had the example.

24    Q.  You knew it wouldn't add any value, right?

25    A.  Again, we didn't look at it as not adding any value.
```

F7GJOSB2                              Kiley - cross

```
 1              We looked at it as an IRS requirement that we had to
 2     perform a calculation when a person's benefit was being
 3     determined when they terminated, and if that produced the
 4     higher benefit, then that is what they received.
 5              THE COURT:  In five minutes we'll take our mid-morning
 6     break.
 7              (Pause)
 8     BY MR. GOTTESDIENER:
 9     Q.  You also knew at the time that the wear-away would be
10     longer if the GATT rate fell?
11     A.  At this point in time I don't think we knew that.  I think
12     we subsequently were informed of that by Mercer.
13     Q.  At what point in time?
14              Before the plan was fully designed you were aware that
15     when the GATT rate fell, the wear-away would be worse, right?
16     A.  Yes, but we had no crystal ball to know what the GATT rates
17     would be.
18     Q.  You certainly knew that there was a dramatic spread between
19     the 9 percent discount rate and the 6 percent interest
20     crediting rate, right?
21              MR. RUMELD:  Objection.
22              THE COURT:  Hold on.  Overruled.  You may answer.
23              THE WITNESS:  Yes.
24     BY MR. GOTTESDIENER:
25     Q.  And that would mean that people subjected to that would be
```

F7GJOSB2                          Kiley - cross

1    getting, if they cashed out at that time when the GATT rate was

2    right at 6, they would be getting a whole lot more than what

3    was just shown in their opening account balance, right?

4    A.  In some cases, yes.

5    Q.  I am sorry?

6           Page 140 Line 22:

7    "Q   And that would mean that those people would be getting a

8    whole lot more than what was just shown in their opening

9    account balance?"

10          141 Line 2:

11   "A   Yes."

12          Right?

13   A.  Yes.  At the time, though, I had forgotten about the

14   enhancement for age 50 and 15 years of service participants

15   which increased it, significantly increased their starting

16   account balances.

17   Q.  Okay.  We'll come back to this enhancement, but because you

18   brought this up for a moment, you know out of 16,000 people is

19   a relatively small number of people who got that enhancement,

20   correct?

21          MR. RUMELD:  Objection.

22          THE COURT:  Overruled.

23   A.  I don't know the exact number, but I thought it was a

24   significant number.

25   Q.  Okay, but if the number were around 2,000 out of 16,000,

F7GJOSB2                          Kiley - cross

1   you would agree there were a lot of people who didn't get the

2   enhancement?

3   A.   There were a lot of people who didn't get it, I am sure,

4   but I suspect it may have been more than 2,000 just because of

5   demographics.

6   Q.   You know that in a lot of cases just because somebody got

7   the enhancement didn't mean that they were out of wear-away

8   when the plan started on 1-1-96, right?

9   A.   Every case was different.

10  Q.   Let's look at some cases together.

11              THE COURT:   Let's not have the -- don't do the

12  introductions to it.   Just ask the questions.   Let's take our

13  mid-morning break and we'll come back in about 10 or 12

14  minutes.   Thank you.

15              (Recess)

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

F7gnosb3                         Kiley - cross

1            THE COURT:  I apologize for that lengthier break than

2     normal.  Let's go ahead and continue.  Mr. Gottesdiener.

3            MR. GOTTESDIENER:  Thank you, your Honor.

4            PX 215, please.

5     Q.  In March, March 15, 1995, you received a fax from Jim

6     Grefig.  Do you see there on the screen.  Let me get you a

7     copy.  If you will please indulge me.

8            MR. GOTTESDIENER:  May I approach?

9            THE COURT:  You may.

10    BY MR. GOTTESDIENER:

11    Q.  You received this from Mr. Grefig on March 15, 1995?

12    A.  I see that.

13    Q.  And what he is showing in this fax, this is about a month

14    or so after the cost reduction strategy meeting, on the first

15    page he's comparing the cost of continuing the plan as it is

16    versus having a cash balance plan, is that right?

17    A.  Yes.

18    Q.  And you see in the middle line it says normal cost?

19    A.  Yes.

20            THE COURT:  What page are you on in terms of the line?

21            MR. GOTTESDIENER:  9876 is the Bates.

22            THE COURT:  All right.  76.

23    BY MR. GOTTESDIENER:

24    Q.  You see in the middle of the page it shows accrued

25    liabilities for actives, right?

F7gnosb3                          Kiley - cross

1    A.  Yes.

2    Q.  And you knew then and you know now that that's the number

3    that the plan is already on the hook for, right?

4    A.  Yes.

5    Q.  And the normal cost is the cost to the plan of paying for

6    benefits that people are accruing in that year?

7    A.  Correct.

8    Q.  Then it shows the normal cost after the first year.  Do you

9    see that?

10   A.  Yes.

11   Q.  He was showing you that the normal cost for the plan as it

12   was right then was $12.3 million, but if you went to cash

13   balance, it would drop in that first year down to $5.6 million?

14   A.  Yes.

15   Q.  So that would be savings of approximately $6 million?

16   A.  Yes.

17   Q.  And then eventually the normal cost after the first year

18   would go back up, but it would still be less than the current

19   plan.  The $8.5 million was still substantially less than the

20   current plan, correct?

21   A.  Correct.

22   Q.  If we go to the next page, along with this showing, he's

23   showing Woolworth test case scenarios, if you flipped to the

24   document, you will see there is actually one, two, three of

25   them?

1    A.  Yes.

2    Q.  Those were sent because you wanted to know the impact on

3    benefit growth for different demographics?

4    A.  It would appear that way, yes.

5    Q.  If we just look for a moment at the first one, this is

6    somebody who is age 35, five years of service, salary $25,000.

7         Do you see that there?

8    A.  Yes.

9         MR. RUMELD:  Your Honor, I am just going to renew the

10   objection I made before.

11        THE COURT:  All right.  Let me just read the question.

12        The actual question to which the witness just gave an

13   answer is:  "If we just look for a moment at the first one,

14   this is somebody who is age 35, five years of service, salary

15   $25,000.  Do you see that there?"

16        So there's two points in that question, just so we are

17   clear analytically as to how to separate that.

18        One is the factual point of whether or not this is in

19   fact somebody age 35, five years of service, salary $25,000;

20   or, separately, whether or not those certain words appear on

21   the page.  The answer, however, was only yes.

22        So it's really just in terms of interpreting what the

23   words are on the page as opposed to anything else.  It is just

24   something that the Court itself could do.

25        MR. RUMELD:  OK.  I am concerned, your Honor, because

F7gnosb3                    Kiley - cross

1    I don't think it's clear from Mr. Gottesdiener's questions

2    whether he's calling for Mr. Kiley's recollection or just

3    reading what the words say.

4            THE COURT:  Well, Mr. Kiley should just be, presumably

5    he understands that if you are able to, in reviewing the

6    document you know what it means, and even if you can't recall

7    the day that you saw it, which is not required, but you know

8    what it means and it's familiar to you, then you can testify to

9    it.

10           But if you don't and you are seeing it and you are

11   right now having to, really almost for the first time,

12   interpret it, that we don't want.  You should tell us that you

13   just only know what is on the page.

14           With that in mind, Mr. Gottesdiener, you can go ahead

15   and ask questions.  I don't want you today, applying your today

16   expertise, to look back and come up with what something meant.

17   But presumably you knew what it meant at the time, and the

18   question is do you recall what that meant.

19           Mr. Gottesdiener, you can go ahead.

20           MR. GOTTESDIENER:  Thank you.

21   BY MR. GOTTESDIENER:

22   Q.  So you did know at the time that these were designed to

23   show the impact on benefits under proposed formulas on

24   different demographics?

25   A.  I can't really say.  In response to the her Honor's

F7gnosb3                          Kiley – cross

1    question or statement, I don't really recall this document.

2    Obviously it was faxed to me from Jim Grefig.

3              THE COURT:  Let me ask you some other foundational

4    questions.

5              Do you recall, in connection with the potential

6    changes to the retirement plan, that you received from time to

7    time Woolworth test case scenarios where certain employee

8    information was provided and then calculations were done to

9    give you a sense as to what it a proposed plan adjustment might

10   result in?

11             THE WITNESS:  Yes.

12             THE COURT:  Do you recall that?

13             THE WITNESS:  Not specific cases, but I am certain

14   that would have been part of the process, yes.

15             THE COURT:  All right.

16             So, when you are looking at these documents, I take it

17   that you don't recall the particular document, but is it the

18   case that this document that you are looking at, which is PX

19   215, is consistent with the type of document you would have

20   seen at the time or that you saw at the time?

21             THE WITNESS:  Yes.

22             THE COURT:  All right.  You understand, don't you, how

23   to read this document?

24             THE WITNESS:  Well, it is almost as though I'm reading

25   it for the first time.  It is not a document that I reviewed.

F7gnosb3                          Kiley - cross

1            THE COURT:  So is it the case that you are saying --

2     let me put it differently.  Do you recall receiving any

3     documents from Mr. Grefig relating to Woolworth test scenarios

4     or test case scenarios which you couldn't even begin to

5     understand?

6            THE WITNESS:  No.

7            THE COURT:  And do you recall that, generally

8     speaking, when Mr. Grefig would send you materials relating to

9     potential changes in the retirement plan that you would

10    familiarize yourself with those materials?

11           THE WITNESS:  Yes.

12           THE COURT:  And if you had questions about the

13    materials, would you ask Mr. Grefig to explain it to you?

14           THE WITNESS:  Yes.

15           THE COURT:  So at the time that you were reviewing

16    these materials, you would have had a pretty good working

17    understanding as to what they meant?

18           THE WITNESS:  Yes.

19           THE COURT:  All right.  You may proceed.

20    BY MR. GOTTESDIENER:

21    Q.  So when you look at the two formulas that are proposed to

22    the right of the career average formula, one is age indexed and

23    service based.

24           THE COURT:  Here is one issue for you folks to

25    consider.  If this witness isn't going to understand or

F7gnosb3                          Kiley - cross

1    remember right now these, and we are going to run into this as

2    a repeated issue, this witness is never going to be able to

3    contradict -- and I'm telling this to defense counsel as

4    well -- the plaintiff's view.

5            The question is whether or not you can do certain

6    things globally and for you to consider that as a possibility.

7    Because he -- well -- you can go ahead.  But I don't know if

8    the exercise is that worthy in terms of the way in which you

9    are proceeding, but I understand the points you want to make.

10   You can use your time how you see it.

11           MR. GOTTESDIENER:  Maybe at some point it would be, at

12   another break maybe we could have a discussion outside the

13   witness.

14           THE COURT:  Let's do that right now because as you can

15   see I'm getting frustrated with the nature of the questions.

16   It's better that we just deal with this right now.

17           Mr. Kiley, would you step out for just a moment?

18           THE WITNESS:  Yes.

19           THE COURT:  Thank you.

20           (Witness not present)

21           MR. RUMELD:  Who's going first?

22           THE COURT:  All right.  So Mr. Kiley has now left the

23   room.  This gives us an opportunity to flesh out, flush out

24   both of those are used, how we should best proceed here.

25           I find it, frankly, I will tell you remarkable that

F7gnosb3                       Kiley - cross

the witness is unable to talk about these documents.  I mean
let's just put that on the table so that you all understand
where I'm coming from, which is I don't expect that he will
remember certain meetings.  But the idea that these charts are
on the page and he now says he doesn't know how to interpret
them, given how smart he obviously is, and he looks really
uncomfortable and when he's just being asked other questions he
seems to be forthright and wants to give answers, it just
doesn't ring with me.

          I am not suggesting that he has a specific
recollection.  Clearly he does not have a specific
recollection.  I understand that.  But these are the kinds of
documents generically he would have seen.  He would know how to
look at things with arrows saying if your age is above this and
below that and, you know, it's calculated with 15 years of
service and X, he would now how to interpret that.  Whether he
understands the specific result of a specific scenario is not
the question.

          So part of my frustration is the exercise, which is
unduly complicated for what ought to be straightforward.  In my
view the defendants' case is the defendants' case.  Your theory
is your theory.  The plaintiff's theory is their theory.

          The theories are relatively straightforward.  I
frankly have enough information on these documents right now
that I don't really need a lot more from Mr. Kiley.  I am not

1     saying to make an ultimate decision.  I mean in terms of

2     understanding what the company was doing.  Whether or not

3     legally that results in certain relief or not is to be

4     determined.

5          But in the event that there is going to be a witness

6     coming forward who is suddenly going to come up with something

7     else, I'm hesitant to cut off Mr. Gottesdiener.  This is my

8     dilemma.

9          I understand that this witness looks like he's seeing

10    this type of document almost for the very first time, though my

11    questioning was designed to get underneath that.  So I don't

12    really want us to sort of poke and prod too much along these

13    lines.

14         Now, I have made my record.  Why don't you both have

15    an opportunity to say your piece on these issues.  Let me have

16    Mr. Rumeld go first, because it's the objection that I think

17    has drawn this out.

18         Mr. Rumeld.

19         MR. RUMELD:  Well, I have to confess, I am a little

20    bit concerned about your Honor's take about how Mr. Kiley's

21    responded.  He did leave Foot Locker in 2000 and he hasn't been

22    doing exactly the same kind of work.

23         But I am just making that observation.

24         THE COURT:  I understand.  I understand.  Again, this

25    is not -- having seen many, many, many witnesses testify,

F7gnosb3                          Kiley - cross

always about events in the past, right?  That's what I do.

About events in the past.  There is a difference, a very

important difference between a specific recollection and being

able to give testimony about the kinds of documents and

understanding, does he understand this type of document and his

answer is basically no.

         So that's the problem I have.  So there's nobody then

who can testify as to the document.  That leads to an issue.

         MR. RUMELD:  OK.  So let me try and address that

point, and maybe this is a good way out of this dilemma.

         The fact is, first of all, this type of document, just

so we're clear, there are some versions of this document that

were shared with Mr. Kiley.

         We don't know how much they were read, but they were

sent to him, and that's evidence and I understand that.  There

were many, many more documents on the exhibit list that may

have been internal to Mercer or Mercer may have shared, you

know, looked at it on its own.  We tried to bring in

Mr. Maikels' testimony, and he was involved in doing that on a

very frequent basis.

         Mr. Gottesdiener has already questioned his expert,

and your Honor let him, in terms of his interpretation of this

document.  And we will probably do the same with Mr. Sher now

that that door has been opened.

         I would certainly suggest that, rather than try to

1    have Mr. Kiley interpret documents that he says he doesn't

2    remember well, if at all, or have the experts interpret them

3    for your Honor, we're better off leaving this with the experts

4    because all we are doing is interpreting these documents after

5    the fact.

6          THE COURT:  I don't disagree with that.  That is a

7    question really I would leave to Mr. Gottesdiener ultimately,

8    which is why I want to raise it, and have him make the tactical

9    choice.  Because there are tactical reasons, as we all

10   understand as trial folks, why one could want to poke and prod

11   Mr. Kiley, to undermine his credibility, to make him slip up.

12         If he does remember more than he's saying, there might

13   be a slip now and again, and that could be useful.  I frankly

14   don't how much of that right now I need.  But I also think it

15   is important that the record be what you folks want it to be.

16         So, if I had my druthers, I would go with what you are

17   saying, Mr. Rumeld, but I am not going to order that because

18   it's Mr. Gottesdiener's as plaintiff his burden, and ultimately

19   you know you each have to choose what kind of record you want

20   to make.

21         MR. RUMELD:  So two more sort of contradictory points

22   on that.

23         To the extent that these scenarios are showing a

24   person who's getting the same accrued benefit two or three or

25   four years in a row, I don't think your Honor is going to have

1    much trouble concluding on her own that the point there is to

2    show the benefit isn't increasing.  The person is in wear-away.

3         THE COURT:  I think I get the point of these documents

4    in spades.  I think they are clear on their face.  I think with

5    a custodian of records and Mr. Deutsch and Mr. Sher it would be

6    obvious.  I think the points that are coming now -- I said my

7    points.

8         MR. RUMELD:  Here's the point that contradicts that,

9    and this is why I would suggest that your Honor should hear

10   from the experts and not from the fact witnesses.  Because

11   while your Honor may be incredulous that he can't interpret

12   this document at all, the fact of the matter is that, unless

13   you actually can intuit the specific accrual formula that may

14   be under that example, this may or may not be a statement of

15   how much wear-away is going to be experienced over --

16        THE COURT:  Here's the problem.  You have a witness.

17   You have to have somebody exercising their fiduciary duty.

18   Let's not put too fine a point on it.  OK.

19        There is a fiduciary duty owed.  If you are telling me

20   that there is not going to be any witness who understood that

21   they had a fiduciary duty and understood what they were doing,

22   that is a very big problem.  I mean, is he going to say he

23   didn't understand that?  Because he can't just rely on Mercer.

24   He then had an obligation to learn it if he recommended and

25   worked with Ms. Peck to come up with a plan that he didn't

F7gnosb3                         Kiley - cross

1   understand.

2          MR. RUMELD:  With respect, I think it's perfectly

3   appropriate for a fiduciary to rely on actuaries, who know

4   their business better than they do.

5          THE COURT:  They have to understand what they are

6   being told, though.  They can't just defer.  You can't offload

7   your fiduciary responsibility like that.

8          MR. RUMELD:  His declaration states his understanding

9   of wear-away as explained to him by Mr. Grefig.  That doesn't

10  mean that he had to personally be involved in the underlying

11  calculations by which --

12         THE COURT:  I agree with that.  I don't think he had

13  to do the math.  I don't think he had to design the formula.

14  One of that.  I'm not holding him responsible for any of that.

15         What I am suggesting is he has to have understood,

16  somebody, it doesn't have to be him, somebody has to have

17  understood this.  Peck says, he was the guy.  The guy is going

18  belly up.

19         All right?

20         MR. RUMELD:  Understood.

21         THE COURT:  And so belly up is not so great with the

22  leading fact witness in the case.

23         MR. RUMELD:  Well, I don't agree he's the leading fact

24  witness, but that is your Honor's --

25         THE COURT:  Who is the leading fact witness?

F7gnosb3                     Kiley - cross

1          MR. RUMELD:  I don't know that there is a leading fact

2     witness.  It depends on what Mr. Gottesdiener's theory of the

3     case is of the day.

4          THE COURT:  I don't mean that.  I want to hear from

5     your leading fact witness.  Who is going to tell your story

6     that you were a fiduciary carrying out your responsibilities.

7          MR. RUMELD:  It is a combination of Mr. Kiley and

8     Ms. Peck.  I agree with that those are our witnesses, but the

9     burden is not on us, your Honor --

10         THE COURT:  I understand.

11         MR. RUMELD:  -- in trying to prove a case of fraud

12    here.

13         THE COURT:  But in terms of your defense, your defense

14    is that you adequately carried out your fiduciary

15    responsibility.

16         MR. RUMELD:  Right.  His job is to explain his

17    recollection of what purposes he had in mind when he designed

18    this plan and the extent to which Mercer alerting him to this

19    wear-away issue impacted those decisions.

20         THE COURT:  I understand.

21         What I am saying is there is an issue if the person

22    who is supposed to have understood the plan best from the

23    company's perspective can't tell the company's story.

24         I am not talking about details and nuances from 20

25    years ago.  I totally get that.  But the idea that he would say

F7gnosb3                        Kiley - cross

1     that he can't even look at a document and it's -- I am not

2     talking about whether or not a particular document says a

3     particular thing.  It's generically speaking, does he

4     understand how these documents operated.  These were the kinds

5     of scenarios we would get, generally speaking, these are the

6     kinds of things that would be portrayed, I don't remember this

7     one.  Sometimes we would run things with different assumptions.

8              MR. RUMELD:  I think in response to your Honor's

9     question, he said that he probably got scenarios to look at it.

10             THE COURT:  He did.  But then he said he was just

11    looking at this for the first time, and couldn't give anybody

12    any sense of the document.

13             MR. RUMELD:  Yes.  I can't go --

14             THE COURT:  All right.  I understand that.

15             Now, Mr. Gottesdiener, what are you going to do with

16    this guy to like save us all?  I am not saying that you have to

17    end.  You have your time.  You have your 25 hours.

18             What is your plan?

19             MR. GOTTESDIENER:  My hope is not to waste the Court's

20    time.  On the other hand, I think --

21             THE COURT:  Your plan is to continue?  OK.

22             MR. GOTTESDIENER:  Because on appeal.

23             THE COURT:  I understand.

24             MR. GOTTESDIENER:  In theory --

25             THE COURT:  I understand.  That's fine.  You can make

1    your choices.  Let me just tell you that what you need to do is

2    you need to ask appropriately formed questions or I am going to

3    just keep on interrupting you.  That doesn't help anybody.

4          So your record on appeal is worthless unless you ask

5    appropriately formed questions.  You cannot testify.  You have

6    to ask questions in a particular form.

7          I don't want to frustrate you with me.  I don't want

8    to suggest you don't know what you are doing, but sometimes the

9    lead-ins are long and complicated and bury two things in them.

10   You need to break everything down and do what you need to do,

11   but do them really factually based.

12         MR. GOTTESDIENER:  I will do that, your Honor.  Just

13   so the record is clear, I don't think -- we do not have to

14   prove fraud.  However, in theory, on appeal, there could be a

15   ruling that we would have to prove fraud.  So I need to keep

16   going, and your Honor doesn't know other things that he's said.

17   So I don't believe his story now that he doesn't remember,

18   because we took his deposition and there's plenty of things

19   that he remembered.

20         THE COURT:  You will make the record you deem

21   appropriate.  As I've said, you've got the time that you've

22   got, and you will do what you will do.  I have --

23         MR. GOTTESDIENER:  Could I just take a minute to

24   regroup?

25         THE COURT:  Yes.  Do you want me to take a break?

F7gnosb3                              Kiley - cross

1              MR. GOTTESDIENER:  Very short.

2              THE COURT:  Let's take like three or four minutes.

3    Get Mr. Kiley, if you could, back to the stand.

4              MR. GOTTESDIENER:  Thank you, your Honor.

5              (Recess)

6              THE COURT:  Mr. Gottesdiener, you may proceed.

7              MR. GOTTESDIENER:  Thank you, your Honor.

8    BY MR. GOTTESDIENER:

9    Q.  Sometimes after you got materials from Mercer via fax, you

10   would then have phone calls with the actuaries at Mercer, is

11   that right?

12   A.  Yes.

13             MR. GOTTESDIENER:  May I approach the witness, your

14   Honor?

15             THE COURT:  Yes.

16             MR. GOTTESDIENER:  If I could get on the screen also

17   PX 129.

18   BY MR. GOTTESDIENER:

19   Q.  This is your notes, is it not, dated March 15, the same

20   date as the fax that you just looked at?

21   A.  Yes.

22   Q.  Am I correct that at the top you show the participants to

23   the call?

24             THE COURT:  I'm sorry.  What PX is this again?

25             MR. GOTTESDIENER:  129.

F7gnosb3                        Kiley – cross

1              THE COURT:  Thank you.

2   A.  Yes.

3   Q.  In the middle of the page, directing your attention there,

4   during this call, you and the Mercer actuaries discuss the fax

5   that was PX 215, correct?

6   A.  I'm sorry.

7   Q.  You guys discussed the fax that you received from Mercer

8   earlier that day?

9   A.  It would appear that way, yes.

10  Q.  In the middle of the page, you see they are explaining to

11  you that the $5.625 million is a onetime normal cost?

12             Do you see that there?

13  A.  Yes.

14  Q.  And they said to you and you wrote down, This is because of

15  GATT, which requires a minimum interest of 8 percent.  We

16  calculate at 9 percent.  So in first year we get credit for a

17  wear-away.

18  A.  Yes.

19  Q.  And you understood at the time that the savings that are

20  reflected in the prior exhibit was a result of wear-away,

21  correct?

22  A.  Yes.  But I don't think that was where all the savings

23  would come from.

24  Q.  There were additional savings above wear-away savings

25  because you were getting rid of the early retirement subsidy?

F7gnosb3                              Kiley - cross

1    A.  Yes.

2    Q.  And further additional savings because you were dropping

3    the rate of benefit accrual for people once they got out of

4    wear-away, correct?

5    A.  Yes.

6    Q.  But --

7    A.  Well, just to clarify that.  Not once they got out of

8    wear-away.  The reduction of future accruals was from the date

9    of the conversion on forward.

10   Q.  Can you reduce somebody's rate of future accruals to zero?

11   A.  Yes.

12   Q.  Is that equivalent to a freeze?

13   A.  It -- and even if -- this was not considered a freeze, and

14   even Mercer indicated that.  I had that notation in the prior

15   notes that we looked at, PX 21.

16   Q.  It was considered at the time not a freeze, but a

17   suspension of accruals, wasn't it?

18   A.  I don't think so.  I don't think that's the way we looked

19   at it.

20   Q.  Page 208.  Your testimony, line 23 --

21            THE COURT:  This is now the deposition?

22            MR. GOTTESDIENER:  Yes, ma'am.

23            THE COURT:  So let me just have the question in mind

24   because I want to see what you are going to be trying to

25   impeach him with.  Can you read back have the court reporter

1    read back the prior --

2                MR. GOTTESDIENER:  Could I just tell the Court.

3                THE COURT:  -- counsel's question and answer.  Let me

4    just hear it.  I want to hear the precise words.

5                MR. GOTTESDIENER:  Sure.

6                (Record read)

7                THE COURT:  OK.  So what's the "it" in that question?

8    It was considered not a freeze.  Just so that we're clear, what

9    do you think the "it" was in your question?

10               MR. GOTTESDIENER:  In my question.

11               THE COURT:  You said, "It was considered at the time

12   not a freeze but a suspension of accruals, wasn't it?"

13               MR. GOTTESDIENER:  The wear-away.  The impact.

14               THE COURT:  So the impact of wear-away was not

15   considered a freeze.  OK.

16               MR. GOTTESDIENER:  Then I said suspension of accruals.

17               THE COURT:  I understand.  I wanted to make sure we

18   have the record clear on what the it was.  Now you may proceed.

19   BY MR. GOTTESDIENER:

20   Q.  Page 208, line 23, you testified:

21   "A.  It -- it wasn't -- not in the way we considered a freeze

22   to be a freeze, but it was, yes, a suspension of accruals for a

23   period of time because that's how the cost savings was

24   achieved."

25               You gave that testimony, right?

1    A.  Yes.

2    Q.  Now, in the conversation that you had about the fax that

3    you received, they then told you, if you look at the notes

4    again under where you discussed the getting credit for

5    wear-away, they discussed the formulas that they were

6    reflecting in the test-case scenario, is that right?

7    A.  Yes.

8    Q.  At the time you understood what they were talking about?

9    A.  I believe I did.  I don't recall.

10   Q.  I'm sorry?  When you say you don't recall --

11   A.  I don't specifically recall this document, you know, so I

12   don't recall specifically what my understanding would have

13   been.

14   Q.  Right.  But I'm not asking about your specific recall.  I'm

15   asking, you understood what these gentlemen were explaining to

16   you at the time; even if you can't remember it now, you know

17   that you got what they were saying?

18   A.  Yes.

19   Q.  Thank you.  In terms of suspension of accruals, while we

20   are still on that same previous document that's being discussed

21   in the notes, PX 215, you understood at the time that the

22   test-case scenarios for the formulas that they were running

23   showed for three years the person's accrued benefit staying

24   static?

25   A.  Most likely.

F7gnosb3                        Kiley - cross

1   Q.  Most likely.  You understood what was being displayed as

2   under both formulas, that person's benefits were suspended

3   accrual-wise and static?

4   A.  Yes.

5   Q.  Then after the call you received another fax?

6           MR. GOTTESDIENER:  If we could call up 214.

7   Q.  This is a fax from Chris Maikels from Mercer.

8           MR. GOTTESDIENER:  May I approach, your Honor?

9           THE COURT:  Yes.

10  BY MR. GOTTESDIENER:

11  Q.  The first fax, 215, has a fax header that indicates that it

12  was sent at 3:19 p.m.  It has military time, 1519.

13          This fax, if you look at the cover page, indicates

14  that it was sent from Mercer at 6:45 p.m.

15          Do you see that there, where Mr. Maikels appears to

16  have written in his name and date?

17  A.  Yes.

18  Q.  OK.  There is a message that he sends.  The message is on

19  the fax cover.

20          THE COURT:  What document are you on right now?

21          MR. GOTTESDIENER:  I am on 214.

22          THE COURT:  I don't have a fax cover.  Where is there

23  a fax cover?

24          MR. GOTTESDIENER:  I am not seeing that on the screen

25  obviously.  I'm sorry.  It seems to be 252.

1              Could I approach?

2              THE COURT:  Yes.

3              MR. GOTTESDIENER:  I gave the witness a document, but

4    it didn't have the PX number on it.

5    BY MR. GOTTESDIENER:

6    Q.  Do you see that there, Mr. Kiley?

7    A.  Yes.

8    Q.  That is PX 252, the same document I previously handed you,

9    but it has the PX on it.

10   A.  Yes, I see it.

11   Q.  Now that is on the screen, and we see that Maikels is

12   indicating he's sending the fax at 6:45.  Do you see where it

13   says message?

14   A.  Yes.

15   Q.  Tom, here are the additional nine scenarios you requested.

16   If you have any questions, etc.

17              Chris.

18              Do you see that there?

19   A.  Yes.

20   Q.  Do you have any reason to doubt that at the time you were

21   sufficiently engaged in this project that you not only

22   understood the previous scenarios, but you wanted nine

23   additional scenarios?

24   A.  No.

25   Q.  So if we could just very quickly move through the nine

F7gnosb3                          Kiley - cross

1     scenarios.

2              Do you have any reason to doubt that, once you

3     received the nine scenarios, you were able to see that under

4     basically all the scenarios shown that demographically the

5     people who were depicted were in wear-away for a period of

6     years?

7     A.  But -- yes, but it appears to be different periods of time

8     for different examples.

9     Q.  So, for example, if we look at the person who is on Bates

10    page 9886, if you could turn several pages in.  In the

11    right-hand corner it says FLOSB 009886.

12    A.  Yes.

13    Q.  So you see that this person is age 50 and they have 25

14    years of service?

15    A.  Yes.

16    Q.  You brought up yourself in response to one of my questions

17    the enhancement, right?

18    A.  Yes.

19    Q.  Would this person qualify for the enhancement?

20    A.  I believe so, yes.

21    Q.  And what's the impact benefit-wise on the benefit growth of

22    this individual from the change to either one of the two cash

23    balance formulas shown to the right of the career average

24    formula?

25    A.  In this example, the accrued benefit didn't increase until

F7gnosb3                          Kiley – cross

1    age 53.

2    Q.  So this was a three-year wear-away for that person?

3    A.  Yes.

4                (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F7GJOSB4                          Kiley - cross

1   Q.  And you would have seen and understood that at that time,

2   right?

3   A.  Yes.

4           MR. GOTTESDIENER:  So then if we could call up PX 214.

5           May I approach, your Honor?

6           THE COURT:  You may.

7   BY MR. GOTTESDIENER:

8   Q.  Is 214 a series of test case scenarios with your

9   handwriting on most of the pages?

10  A.  Yes.

11  Q.  Would this indicate to you that you were taking

12  contemporaneous, verbatim notes while discussing this with one

13  of the actuaries from Mercer over the telephone or in person?

14  A.  Most likely.

15  Q.  Can you see, flipping through the scenarios, that in all of

16  these cases that the persons who were demographically depicted

17  are in wear-away from a period of two to three years?

18  A.  (Pause)  Would you repeat the question.

19  Q.  Flipping through these, which it appears you have now done,

20  wouldn't you have seen and understood at the time that these

21  scenarios were showing that people were in wear-away for two to

22  three years?

23  A.  Perhaps.

24  Q.  I am sorry?

25  A.  Perhaps.

F7GJOSB4                         Kiley - cross

1  Q.  Perhaps?  Is there something you're seeing that causes you

2  to doubt?

3  A.  Well, I am looking at it.  This is like -- I know I saw

4  this 20 years ago, but it is like I am looking at it for the

5  first time so I don't really have time to study it here.

6  Q.  Is there something beyond looking at the accrued benefit to

7  the left under the career average, let's just take somebody who

8  is entitled to the enhancement.  Let's look at Page 2386.  Let

9  me know when you've got there.

10 A.  Yes.

11 Q.  So you can see that this is somebody who is entitled to the

12 enhancement at age 50, 20 years of service, their salary is

13 $50,000?

14 A.  Yes.

15 Q.  And then did you understand at the time -- and can you see

16 now as well -- the age 50 person depicted there with the career

17 average formula, they got an accrued benefit of 12-31-95 of

18 $8,820.00?

19 A.  Yes.

20 Q.  You see that continuing across to the right under age-based

21 cash balance and age-based integrated cash balance?

22 A.  Yes.

23 Q.  So then you see under both of those columns, that number

24 stays static, right?

25 A.  Yes.

F7GJOSB4                          Kiley - cross

1    Q.  And you understood at the time that that was a

2    representation that that person's true accrued benefit was

3    under the original plan formula and that they had no accrued

4    benefit under the cash balance formula?

5    A.  Again it is like I am looking at this document for the

6    first time.  I can't say what I for certain understood at that

7    point in time.  It appears to be the case, yes.

8              THE COURT:  Let me just ask you a question about Bates

9    numbered Page 2383.  This is just to have you interpret your

10   handwriting.

11             First, is it your handwriting on Bates numbered Page

12   2383 of PX 214?

13             THE WITNESS:  Yes, that is.

14             THE COURT:  Why don't you read those two lines into

15   the record slowly.

16             THE WITNESS:  "Replacement ratio is similar to the

17   $20,000 person.  This person is more hurt than the $20,000

18   person under the age-based plan."

19             THE COURT:  Thank you.  You may proceed, Mr.

20   Gottesdiener.

21   BY MR. GOTTESDIENER:

22   Q.  On the first page would you agree that underneath the

23   scenario on the third line, that it starts off by saying

24   $1,080.00 per year for a 35-year old?

25             Do you see that there?

1   A.  Yes.

2   Q.  And looking at the actual scenario, does that look like it

3   is depicting somebody who is 35 years' old?

4   A.  Yes.

5   Q.  And someone who starts out with an accrued benefit of

6   $1,080.00?

7   A.  Yes.

8   Q.  So you continue, do you not, writing, that 1080 per year

9   for a 35-year old would be $630.00 on a cash balance basis at 9

10  percent.  If termed during the year, they would be entitled to

11  $890.00 (at 8 percent due to GATT).

12         That is what that says, right?

13  A.  Yes.

14  Q.  You don't have any reason to doubt that at the time you

15  understood from Mercer that if that person termed during the

16  year, the GATT rate was at 8 percent, that that person would

17  have still been in wear-away and not earned anything during

18  that year, correct?

19  A.  I don't know.  Probably.

20         THE COURT:  What else could it mean?

21         THE WITNESS:  Well, again he is using the term

22  wear-away.  I don't think that was a term we really used.  I

23  think we viewed it differently.  I think we viewed it as the

24  accrued benefit, being under federal law you can't reduce the

25  accrued benefit.  So we had to do an exercise because of IRS

1    regulations for GATT, but the accrued benefit, benefit payable

2    would be the higher of the accrued benefit or the benefit

3    termed under GATT.

4    BY MR. GOTTESDIENER:

5    Q.  What about the person who didn't want a lump sum and just

6    you elected the annuity, and putting aside the early retirement

7    subsidy, isn't it showing and weren't you aware at the time,

8    unrelated to the movement of GATT rates, that the people who

9    are having the depicted static benefit, they're suffering from

10   a suspension of benefit accruals for all those years?

11              THE COURT:  Hold on.  Let me read the question.  I

12   think you've got two things embedded in that question.

13              Why don't you restate.

14   BY MR. GOTTESDIENER:

15   Q.  You know the way people could receive benefits was not

16   limited to --

17   A.  Correct.

18   Q.  You know there were different kinds of wear-away or

19   suspension accrues.  I won't use the word "wear-away" in this

20   question.  You know there were different ways that people could

21   take a distribution, right?

22   A.  Yes.

23   Q.  And depending on the way they took the distribution, they

24   might or may not have suffered a suspension of benefit

25   accruals?

1  A.  I can't say that I definitely knew that.  Probably.

2  Q.  You testified at your deposition that you understood the

3  difference between annuity wear-away and lump sum wear-away,

4  right?

5  A.  I don't recall that.

6  Q.  Didn't you look at your deposition in preparation for your

7  testimony here today?

8  A.  I looked at my declaration.  I didn't look at the

9  deposition that much.

10  Q.  That much, but you did look at it?

11  A.  To be honest, no.

12  Q.  You didn't look at it at all?

13  A.  No.

14  Q.  Did you meet with counsel?

15  A.  Yes.

16  Q.  You didn't write the declaration and put together all those

17  exhibits, right?

18  A.  No.

19  Q.  Did you make any changes to the declaration?

20  A.  Yes.

21  Q.  You did?  What did you change?

22          MR. RUMELD:  Your Honor, I think that is privileged.

23          THE COURT:  Hold on.  Let me think about it.

24          I think there are certain aspects of it you can ask.

25  He shouldn't talk about what the words were that he struck

F7GJOSB4                        Kiley - cross

1    because those words are definitionally counsel's words.

2            If you want to ask him how many changes he made and to

3    which paragraphs, you can do that, but I wouldn't get into the

4    wording changes.  So I don't know where it gets you.

5            I understand that the process for all declarations is,

6    generally speaking, that counsel works with the witnesses to

7    write them.  If there is a witness who didn't write or didn't

8    approve a declaration, that would be important.

9            MR. GOTTESDIENER:  So why don't we look at another

10   document, PX 298.  May I approach?

11           THE COURT:  Yes.

12   BY MR. GOTTESDIENER:

13   Q.  This is a fax from Jim to you, dated April 7th, at 3:10 in

14   the afternoon.  Do you see that there?

15   A.  Yes, I do.

16   Q.  If we look at the first page together, do you see it is

17   entitled, "Woolworth Corporation-Cash Balance Study"?

18   A.  Yes.

19   Q.  And it says, "liability comparison-1-1-94 data and

20   liabilities"?

21   A.  Yes.

22   Q.  Do you see how it has got current plan all the way to the

23   right, the column all the way to the right, do you see that

24   there?

25   A.  Yes, I do.

F7GJOSB4                          Kiley - cross

1   Q.  And then do you see how it has got 4 other columns, the

2   first one being age based, integrated age based, integrated

3   age-based at a different level and service based?

4   A.  Yes.

5   Q.  You understood the difference between those kinds of cash

6   balance formulas at the time, didn't you?

7   A.  Most likely.

8   Q.  May I try it this way.

9        Could you do your job if you didn't understand the

10  difference between the kinds of cash balance formulas that they

11  were shown?

12  A.  No.  I am sorry.  I had some understanding of them, yes.

13  Q.  Just some?

14  A.  I can't say to what extent.  I wasn't an expert in cash

15  balance plans.  Mercer was.  They were guiding us.  I am sure

16  we had different formulas and that is what they're representing

17  here.

18       THE COURT:  Let me ask it this way.

19       There was a time when Woolworth adopted the amended

20  plan.  Is that right?

21       THE WITNESS:  Yes.

22       THE COURT:  And there was plan documentation which

23  included an SPD.  Do you recall that?

24       THE WITNESS:  Yes.

25       THE COURT:  Did you review the plan documentation

1    associated with the change of plan?

2              THE WITNESS:  Yes, I am sure I did.

3              THE COURT:  Would you have understood the amendments

4    that were being made to the plan and the -- let's start with

5    that.

6              THE WITNESS:  Yes.

7              THE COURT:  Did you make any recommendations to

8    management ultimately about amendments to the plan?

9              THE WITNESS:  Yes.

10             THE COURT:  At the time that you made that

11   recommendation, what did you think of -- how would you describe

12   your understanding of the plan including the fundamentals of

13   its design that you were recommending to management?

14             THE WITNESS:  As far as my understanding of it?

15             THE COURT:  As far as your personal understanding?

16             THE WITNESS:  I believe I understood them if I

17   recommended them.

18             THE COURT:  You may proceed.

19   BY MR. GOTTESDIENER:

20   Q.  This page here is showing the different costs, different

21   normal costs using different assumptions as to how people were

22   going to take their benefit.  Is that correct?

23   A.  I think so.

24   Q.  Do you remember we looked earlier at one of the documents

25   that they prepared and sent you that showed accrued liability,

F7GJOSB4                         Kiley - cross

1    first year normal cost and ongoing normal cost.  Do you

2    remember that?

3    A.  Yes, yes.

4    Q.  At that time when you were answering, you said that you

5    knew what that meant at the time?

6    A.  Yes.

7    Q.  So you can see they're showing the same concepts, what the

8    plan is on the hook for?  You remember I used that analogy and

9    you said you understood that at the time?  That is the accrued

10   liability?

11   A.  Yes.

12   Q.  And that the first year normal cost was different than the

13   ongoing normal cost?

14   A.  Yes.

15   Q.  And they both reflected the amount of benefits people were

16   accruing during that year that the plan needed to have funded

17   assets for?

18   A.  Yes.

19   Q.  At the time you would have understood that they were

20   displaying that it was going to cost the company a lot less to

21   report an assumption that everyone was going to take annuities

22   versus everyone was going to take lump sums?

23             MR. RUMELD:  Objection to the form.

24             THE COURT:  Hold on.  Why don't you restate the

25   question.

F7GJOSB4                          Kiley - cross

1   Q.  You knew at the time --

2            THE COURT:  Why don't you separate the two.  Ask it

3   apart from this document.  That is a good place to start.

4   BY MR. GOTTESDIENER:

5   Q.  You knew at the time that it was advantageous from a cost

6   standpoint for the company to use an assumption that everybody

7   took an annuity versus everybody took a lump sum?

8   A.  I don't recall knowing that.  I may have.

9   Q.  That is the kind of thing you would have known at the time

10  in order to do your job, though?

11  A.  Probably.

12           THE COURT:  Let me just ask.  I want to make sure we

13  are not losing something in translation of the question.

14           Is it the case, in your view, that based on your

15  knowledge and what you were doing at Woolworth, that there is a

16  difference in cost between annuity versus lump sum elections,

17  it would cost the company something different if an employee

18  took an annuity versus a lump sum?

19           THE WITNESS:  Actuarially, no.  It should be the same.

20           THE COURT:  All right.  So you can go back over that

21  if you want.

22  BY MR. GOTTESDIENER:

23  Q.  This document shows other scenarios at the back of it in

24  addition to these cost, these cost differences, right?

25  A.  Yes.

1    Q.  So looking at those scenarios, if you would indulge me for

2    a moment and look at a couple of these on Bates 2452.  Are you

3    on that page, sir?

4    A.  Yes.

5    Q.  You see that is another person who actually happens to be a

6    50-year old with 20 years of service who would be entitled to

7    the enhancement.  Do you see that?

8    A.  Yes.

9    Q.  And under these four different formulas, this person is in

10   wear-away for, depending on the formula, four or five years?

11   A.  It is a little blurry.

12   Q.  Did I give you a copy?  Can you look at the one that is in

13   hard copy and see --

14            THE COURT:  Which exhibit are you on?

15            MR. GOTTESDIENER:  298.

16            THE COURT:  PX 298?

17            THE WITNESS:  The last page?

18            MR. GOTTESDIENER:  2452, the Bates No. 2452.

19            THE WITNESS:  The page numbers -- I got it.  Okay.

20            (Pause)

21   BY MR. GOTTESDIENER:

22   Q.  Are you able to make it out now, sir?

23   A.  Yes.

24   Q.  Do you have the question in mind, whether that showed --

25            THE COURT:  Why don't you restate the question.

1    Q.  -- whether that showed for this person wear-aways of either

2    for or five years?

3    A.  Yes.

4    Q.  If you go back to the first page with the 100 percent lump

5    sums versus 100 percent annuities, if I understood your answer

6    to her Honor's question, you say that there was no cost

7    difference between taking a lump sum and taking an annuity,

8    according to the company's point of view?

9              MR. RUMELD:  Objection.

10             THE COURT:  Sustained.  The Q and A we had dealt with

11   the topic, but it was worded slightly different, to be fair.

12             Why don't you ask the question you would like to ask

13   and get an answer so we have it all in one place.

14   BY MR. GOTTESDIENER:

15   Q.  Did you understand at the time how costs were reported by

16   the plan?

17   A.  Yes.

18   Q.  Did you understand at the time that there were different

19   costs or the same costs for using assumptions as to whether or

20   not somebody took a lump sum or an annuity?

21   A.  No.

22             THE COURT:  No, you didn't understand; or no, there

23   wasn't a difference in cost?

24             THE WITNESS:  There wasn't a difference in cost

25   because the lump sum should be the actuarial equivalent of the

F7GJOSB4                          Kiley - cross

1    annuity.

2              THE COURT:  Do you think of actuarial equivalency as

3    equal to?

4              THE WITNESS:  Yes.

5              THE COURT:  All right.

6    BY MR. GOTTESDIENER:

7    Q.  If the lump sum grows at 6, but it starts out at a discount

8    of 9, that would not be actuarially equivalent, correct?

9    A.  The account balance grew at 6.

10   Q.  Right, but if it started off with an accrued benefit

11   discounted at 9, and you just grew it back at 6, that is not

12   actuarially equivalent, right?

13             MR. RUMELD:  Objection.

14             THE COURT:  Overruled.

15   A.  Correct.

16   BY MR. GOTTESDIENER:

17   Q.  In terms of the normal costs, don't you see here -- getting

18   back to the cost to the plan -- don't you see here that there

19   are two very different numbers for the assumption of lump sums,

20   $3.76 million, and for annuities, it is only 1.15 and change

21   million dollars.  Do you see that?

22   A.  Yes.

23   Q.  You don't have any reason to doubt that at the time you

24   would have noticed that?

25   A.  That's correct.

F7GJOSB4                          Kiley - cross

1   Q.  Let me show you PX 8.  I am sorry.  PX 192.  My apologies.

2            MR. GOTTESDIENER:  May I approach?

3            THE COURT:  Yes.

4   BY MR. GOTTESDIENER:

5   Q.  Is this more handwritten notes by you, these dated April

6   20th, 1995?

7   A.  Yes.

8   Q.  And these notes are actually attached to your declaration,

9   right?

10  A.  Yes.

11  Q.  And so you would have reviewed these notes before coming

12  here today?

13  A.  Yes.

14  Q.  Let me also show you -- I think I can do it more

15  efficiently by also showing you another document that is going

16  to be PX 8.

17           MR. GOTTESDIENER:  May I approach?

18           THE COURT:  Yes.

19  BY MR. GOTTESDIENER:

20  Q.  Also handwritten documents from -- notes, sorry -- from 10

21  days earlier, April 10th.  Would you agree those are your

22  notes?

23  A.  Yes.

24  Q.  And that they're dated April 10th?

25  A.  Yes.

F7GJOSB4                          Kiley - cross

1   Q.  So we go to Page 2 of your notes --

2              THE COURT:  PX 8?

3              MR. GOTTESDIENER:  PX 8, yes.

4   BY MR. GOTTESDIENER:

5   Q.  Could you read the first three lines.

6   A.  "Based on an a national survey that Jim Grefig conducted,

7   under 55 100 percent take lump sums, over 55 90 percent take

8   lump sums."

9   Q.  So you don't have any reason to doubt that at the time you

10  were aware that the anticipated distribution of benefits was

11  going to be via lump sums essentially by a hundred percent of

12  the people, right?

13  A.  I wouldn't say a hundred percent of the people, but by the

14  majority of the people, yes.  That was actually one of the

15  goals we converted to a cash balance plan to afford the

16  participants the ability to take lump sums.

17  Q.  Because when people were encouraged to take lump sums, they

18  took them, right?

19  A.  Well, not just encouraged.  That was something that they

20  desired.

21  Q.  Right, but the company desired it.  We went over earlier

22  because that was a way of getting the expense out of the

23  earlier retirement subsidy?

24             MR. RUMELD:  Objection.

25             THE COURT:  Sustained.  Rephrase.

1   BY MR. GOTTESDIENER:

2   Q.  You agree that the design was to encourage lump sums?

3   A.  Yes.

4   Q.  And it was to use, one of the ways you testified it was

5   going to save the company money, this new design, was when

6   people took lump sums?

7            MR. RUMELD:  Objection.

8   Q.  There was an inherent savings in that Mr. Grefig explained

9   to you right?

10            THE COURT:  Sustained.  You need to rephrase it.

11            Don't embed some of his prior testimony so we don't

12   end up with confusion.  Ask the question and he will answer it.

13   BY MR. GOTTESDIENER:

14   Q.  You agreed earlier and you agree now --

15            THE COURT:  Just ask what he agrees now.

16   Q.  -- you agree that one of the ways the company saved money

17   with this new design was by the early retirement subsidy going

18   away?

19   A.  Yes.

20   Q.  And it went away in part when people who had the right to

21   the early retirement subsidy, instead of electing it, chose to

22   take a lump sum?

23   A.  Yes.

24   Q.  And in the lump sum, under the way the plan was

25   administered, there was no reflection of the value of the early

F7GJOSB4                              Kiley - cross

1    retirement subsidy?

2    A.  I believe that's the case.

3    Q.  So if we go down on the same page, looking again at your

4    notes, do you see where the second to last paragraph starts

5    first year normal cost?

6    A.  Yes.

7    Q.  You wrote first year normal cost is based upon the fact

8    that a person does not earn any additional benefits.  Do you

9    see that?

10   A.  Yes.

11   Q.  So you don't have any reason to doubt that you understood

12   at the time from Mercer that those millions of dollars we have

13   been seeing that are saved in the first year normal cost

14   estimate is based upon the fact that people's benefits are

15   suspended accrual wise?

16   A.  Would you please repeat.

17   Q.  You were aware at the time that the savings, the normal

18   cost savings that were reflected in those charts, the first

19   year normal cost, was based upon the fact that a person didn't

20   earn any additional benefits?

21   A.  No, not completely.

22   Q.  Not completely?

23       Is that because you're saying there were additional

24   savings because of the rate of benefit accrual going down?

25   A.  Yes.

F7GJOSB4                          Kiley - cross

1   Q.  Your notes continue.  It may take between two and three
2   years to get up to the ongoing cost level.
3   A.  Yes.
4   Q.  You understood at the time Mercer was telling you that on
5   average, people were going to be not earning any additional new
6   benefits between two and three years?
7              MR. RUMELD:  Objection.
8              THE COURT:  Overruled.  You may answer.
9              THE WITNESS:  Again I don't think that it was viewed
10  as no one earning additional benefits.  We viewed this earning
11  at reduced level.
12  BY MR. GOTTESDIENER:
13  Q.  You said in a reduced level of additional benefits include
14  a level at zero?
15  A.  It could, yes, sure.
16  Q.  Now, if you thought something different than what is
17  written on the page, would you have asked for clarification?
18  A.  Yes.
19  Q.  What I am not understanding is, are you saying that Mr.
20  Grefig --
21             THE COURT:  Why don't you just strike the first part
22  and just ask the question.
23  Q.  -- are you saying that Mr. Grefig said the first year
24  normal cost is based on the fact that a person does not earn
25  any additional benefits and some people earn a lower level of

F7GJOSB4                        Kiley - cross

1   benefits?

2   A.  Yes, I think so.

3   Q.  I thought you told us yesterday that you didn't filter out

4   or change when you took notes, you were writing down verbatim?

5   A.  That is true.

6   Q.  But here you think you departed from that practice?

7   A.  No.  I think I continued with that practice.

8   Q.  You understood at the time that -- you're now April 10th,

9   we are talking about April 10th -- you understood that the

10  interest rate at that time, the GATT rate was still close to 7

11  and a half percent?  You knew that if the rate dropped, that

12  the wear-away of two to three years on average was going to be

13  longer, didn't you?

14  A.  Had I focused on that, I probably would have known that,

15  yes.

16          THE COURT:  Do you recall whether you had a view one

17  way or the other as to the direction of interest rates in

18  approximately this time-frame?

19          THE WITNESS:  We were in an environment of high

20  interest rates, maybe just coming out of that.  So, no, I

21  didn't have any prediction as to what future interest rates

22  might be.

23          THE COURT:  All right.  You may proceed.

24  BY MR. GOTTESDIENER:

25  Q.  But you did know -- because I don't think, respectfully, I

F7GJOSB4                          Kiley - cross

```
 1   got an answer to my question -- you did know that the wear-away
 2   would be longer if interest rates dropped?
 3   A.  Yes, probably.
 4            THE COURT:  By the way, he did answer the question
 5   with a, "yes."  He said, "Had I focused on that, I probably
 6   would have known that, yes."
 7            So you had got an answer.
 8            MR. GOTTESDIENER:  Respectfully, he said, "focus."
 9            THE COURT:  If you want to ask him a different
10   question, but don't make it seem as if he didn't answer because
11   it sounded to me like a similar answer.  I may not sound that
12   way to you, but that is why it is good not to start off with
13   the embedded assumptions.
14   BY MR. GOTTESDIENER:
15   Q.  You have in front of you already PX 192, your notes from
16   April 20th?
17   A.  Yes.
18   Q.  Now, would you agree that on the first page, you're
19   detailing a calculation of a 50-year old person who after five
20   years is still in wear-away?
21   A.  It looks like someone who is earning interest and pay
22   credits.
23   Q.  When you say they're earning interest and pay credits, you
24   mean their account balance is going up?
25   A.  Yes.
```

F7GJOSB4                         Kiley - cross

```
 1   Q.  But when you walk through the calculation, at the bottom of
 2   the page also it goes on to the top of the second page, if you
 3   will reference that, we discussed this at your deposition, this
 4   document, didn't we?
 5   A.  I don't recall.
 6   Q.  Okay.  Why don't you look at the document and tell me, in
 7   addition to seeing the account balance going up for five years,
 8   don't you see that ultimately this participant is receiving the
 9   early retirement subsidy with no increase in value attributable
10   to those increases to his account?
11           You need to go to the top of the next page to see --
12           THE COURT:  Hold on.  You have too much on the
13   question.  You were just on the edge where you stopped.  Now
14   the top of the next page is too much.  Ask him piecemeal.
15   BY MR. GOTTESDIENER:
16   Q.  Do you see the guy has an accrued benefit of $3,000 at the
17   top --
18   A.  Yes.
19   Q.  -- of the calculation examined, right?
20   A.  Yes.
21   Q.  You see here he is somebody who is entitled to the
22   enhancement, right?
23   A.  Yes.
24   Q.  And the multiplication that is being done against the
25   $3,000, what is that, 2.1698?
```

F7GJOSB4                           Kiley - cross

1   A.  I am not sure.  That is probably the single premium to

2   determine the initial account balance.

3   Q.  It is the 9 percent factor?

4   A.  Yeah, that is what I am saying.

5   Q.  So the 9 percent factor yields an opening account balance

6   before the enhancement of $6,510.00?

7   A.  Right.

8   Q.  And then there is a division of .6, that you recognize as

9   the enhancement?

10  A.  Yes.

11  Q.  And then the gentleman ends up with an opening balance of

12  $10,850.00.  Is that right?

13  A.  Yes.

14  Q.  So then you go through the calculation, and the opening

15  balance goes from $10,850.00 to the $13,850.00 at age 55 with

16  interest.  Do you see that?

17  A.  Yes.

18  Q.  Then it shows the account generating, it breaks off a

19  little bit, but the annuity benefit that is generated

20  ultimately is 15,000, looks like, $36?

21  A.  $1,536.00, that is probably per month.

22  Q.  I am sorry.  1536?

23  A.  Right.

24  Q.  And then to the right you see the 3,000 accrued benefit,

25  you are starting the calculation to compare the cash balance

F7GJOSB4                        Kiley - cross

1   annuity that was generated, the $1500.  Now you're going back

2   and seeing if they still have a bigger benefit under the frozen

3   accrued, right?

4   A.  Right.

5   Q.  So if we then go to the top of the next page, right, you're

6   taking, you see the .368 actuary ERF, the early retirement

7   factor?

8   A.  Yes.

9   Q.  You are seeing the accrued benefit times .6 equals $1800,

10  that is the minimum annuity?

11  A.  Yes.

12  Q.  That is the prior plan protected benefit that that

13  gentleman is going to receive, right?

14  A.  Right.

15  Q.  Because it is bigger than the $1500 generated from the cash

16  balance formula even though he got the enhancement and he got

17  five years of a growing account, right?

18  A.  Yes.

19  Q.  So it is fair to say that you could not have failed to see

20  the effect of the proposed conversion on someone in that

21  demographic at that time.  Is that fair?

22          MR. RUMELD:  Objection.

23          THE COURT:  Sustained.  Rephrase.

24  BY MR. GOTTESDIENER:

25  Q.  You saw at that time, did you not, the effect of the

F7GJOSB4                          Kiley - cross

1    proposed conversion on that individual?

2            MR. RUMELD:  Objection.

3            THE COURT:  Overruled.

4    A.  As indicated in these notes, yes.

5    Q.  Now, at some point --

6            THE COURT:  Could I just ask a question on these notes

7    that is separate from what you're asking.

8            Could you turn to -- I am now on PX 192, all right --

9    to page Bates number at the bottom 10629, and let me just

10   actually ask, even apart from this document because we may not

11   need the document for this, do you recall that one of the

12   scenarios that you reviewed in connection with possible

13   amendments to the plan included termination of the plan?

14           THE WITNESS:  Yes.

15           THE COURT:  Did a scenario that involved termination

16   of the plan require the company to put cash into the plan to

17   fully fund the existing obligations as of date of termination?

18           THE WITNESS:  Yes, I clearly said that.

19           THE COURT:  So do you have a recollection as you sit

20   here today as to whether or not termination of the plan as of

21   the end of 1995 would have, in fact, required the infusion of

22   cash into the plan?

23           THE WITNESS:  Yes, I believe so.

24           THE COURT:  If you look on page 10629, do you see

25   where it says in the middle, "Plan Design Alternatives"?

F7GJOSB4                           Kiley - cross

1              THE WITNESS:  Yes, yes.

2              THE COURT:  And then it says -- is it in your

3     handwriting?  Tell me if I am not reading it correctly.  ACC.L,

4     I take as account or accrued liability?

5              THE WITNESS:  Accrued liabilty.

6              THE COURT:  Then underneath that UNF, does that stand

7     for unfunded?

8              THE WITNESS:  Yes.

9              THE COURT:  Would I be correct that the accrued

10    liability for a 9 percent return on assets was 561475OOO?

11             THE WITNESS:  Yes.

12             THE COURT:  And unfunded liability of 61,350,400?

13             THE WITNESS:  Yes.

14             THE COURT:  Which would have required a $61 million

15    infusion of cash if the plan had been terminated at that time.

16             Is that about right?

17             THE WITNESS:  Yes.

18             THE COURT:  If I follow the other scenarios across at

19    8 percent and 7 percent, that would similarly give me an

20    indication as to the amount that would need to be infused into

21    the plan to fully fund it.  Is that right?

22             THE WITNESS:  Yes.

23             THE COURT:  Thank you.  You may proceed.

24    BY MR. GOTTESDIENER:

25    Q.  Just directing you to your notes there, do you see you have

F7GJOSB4                          Kiley - cross

1    two different bullet points?

2    A.  Yes.

3    Q.  One says terminate the plan?

4    A.  Yes.

5    Q.  And that then has $132 million immediately funded, this

6    could build to $200 million due to immediate company

7    administrative --

8    A.  INS is probably insurance.

9    Q.  Insurance?

10   A.  Yes.

11   Q.  Insurance company administrative cost and profit?

12   A.  Yes.

13   Q.  So when you were answering her Honor about what would have

14   to be done if the plan were terminated, that is in distinction

15   to the second bullet point where you were discussing with her

16   those numbers, that was a separate option, freezing the plan,

17   not terminating it, right?

18   A.  Yes.

19        MR. GOTTESDIENER:  So if I'm understanding your Honor

20   the last conversation, respectfully, your Honor I think didn't

21   see the, "Freeze the plan"?

22        THE COURT:  No.  I understood.  Let me just ask it

23   this way in case there is any lack of clarity.

24        Would termination of the plan have required infusions

25   of cash indicated on that page of PX 219, assuming for the

F7GJOSB4                          Kiley - cross

1    moment that the numbers as reflected there were accurate in

2    terms of accrued liability and unfunded liability at those

3    indicated interest rate scenarios?

4                THE WITNESS:  Yes.

5                THE COURT:  Whether it is freeze the plan or terminate

6    the plan, those numbers would be accurate?

7                THE WITNESS:  Yes.

8                THE COURT:  You may proceed.

9    BY MR. GOTTESDIENER:

10   Q.  If the plan did not have an unfunded liability, let's

11   assume the unfunded liability went away, if you terminated the

12   plan -- withdrawn.

13               If you just froze the plan, it would not have required

14   the infusion of any money?

15   A.  Probably just interest on the accrued liability.

16   Q.  So there would be no normal cost at all?

17   A.  If the plan was frozen, there would be no future normal

18   cost.

19   Q.  So you all were looking at a wide range of alternatives for

20   saving money, right?

21   A.  Yes.

22   Q.  One was terminate the plan, and that would have really

23   required coming out of pocket immediately with a lot of money,

24   right?

25   A.  Yes.

1  Q.  Freezing the plan, that would have required coming out of

2  pocket, but that was in order to take care of a past unfunded

3  liability, right?

4  A.  Yes.

5  Q.  It would not have required on an ongoing basis more cash

6  going in?

7  A.  For normal costs, correct.

8  Q.  You also looked at just dropping the rate of benefit

9  accrual on the current formula, right?

10 A.  Yes.

11 Q.  You could have done that and saved a lot of money?

12 A.  Yes.

13 Q.  But that would have been very visible, right?

14 A.  Well, that would not have given the participants the

15 ability to take lump sums when they terminated, which was one

16 of our goals.

17 Q.  There was nothing preventing the plan from staying just the

18 way it was in terms of the way the formula was written,

19 dropping the rate of benefit accrual like, for example, in the

20 example you saw with Mr. Grefig on 2-2-95, and adding the lump

21 sum as an option, right?

22 A.  Yes, but that is usually an expensive way to do it.

23 Q.  Well, it is not expensive if you make an assumption that a

24 hundred percent of the people are going to take annuities,

25 right?

F7GJOSB4                          Kiley - cross

```
 1   A.  If you assume everyone would take annuities and not take
 2   lump sums.
 3   Q.  It costs nothing, right?
 4   A.  Yes.
 5   Q.  Why wouldn't there have been a way to reduce the formula,
 6   keep the formula the same formula structure and just add a lump
 7   sum feature, but just drop the rate of benefit accrual and
 8   report a hundred percent annuity distribution?
 9              MR. RUMELD:  Objection.
10              THE COURT:  Sustained.  You can't ask a hypothetical,
11   but you can ask him a question based upon facts.
12   BY MR. GOTTESDIENER:
13   Q.  There would have been no cost to the lump sum based on the
14   way -- withdrawn -- you know that what then was done was 100
15   percent annuities were assumed despite the information that
16   people could be expected to take lump sums a hundred percent of
17   the time?
18              MR. RUMELD:  Objection.
19              THE COURT:  He can answer.  Overruled.
20   A.  No, I don't know that.
21   BY MR. GOTTESDIENER:
22   Q.  You don't know that?
23   A.  No.
24              THE COURT:  Are you aware of projections one way or
25   the other as to the expected likelihood of a lump sum election
```

F7GJOSB4                          Kiley - cross

 1  following the plan amendments?

 2            THE WITNESS:  Yes.

 3            THE COURT:  What, generally speaking, do you recall

 4  about those projections.

 5            THE WITNESS:  I think if a lump sum was available,

 6  then it would have been a very popular option and a lot of

 7  participants would have taken it.

 8            THE COURT:  In terms of how costs were being projected

 9  with respect to the plan amendments, do you know whether or not

10  those cost projections took the statement about that you've

11  just made about the assumption of a very popular lump sum

12  election into account or whether they differed?

13            THE WITNESS:  They probably took the assumption of

14  lump sums into account, yes.

15            THE COURT:  All right.  All right.  We are going to

16  break in either now or in about five minutes for lunch.

17            MR. GOTTESDIENER:  Now would be good, your Honor.  I

18  would like to do a number of documents all at once.  It might

19  be more efficient to --

20            THE COURT:  Let's take our lunch break now.  We'll

21  come back at 2:00 o'clock.  Is there anything that anybody

22  needs to raise right now?  I'll see you folks at 2:00.

23            (Luncheon recess)

24            (Continued on next page)

25

```
 1                    A F T E R N O O N    S E S S I O N

 2                          (2:00 p.m.)

 3              THE COURT:  All right.  Mr. Gottesdiener, you may

 4     proceed, sir.

 5              MR. GOTTESDIENER:  Thank you, your Honor.

 6              May I approach the witness?

 7              THE COURT:  Yes.

 8     BY MR. GOTTESDIENER:

 9     Q.  PX 715 and PX 86 are the two documents that I just handed

10     you, Mr. Kiley.  I would like to start with PX 715.  This is a

11     one-page fax cover sheet.  Do you see your handwriting there?

12     A.  Yes.

13     Q.  This fax cover is directed to Jim Grefig and Jim Cassidy?

14     A.  Yes.

15     Q.  You see the date is April 28?

16     A.  Yes.

17     Q.  And the message down below says:  Attached is the

18     presentation for Monday.  If you have any comments, please let

19     us know ASAP Monday morning.  See you around 10:30 Monday.

20     A.  Yes.

21     Q.  That is what it says, right?

22     A.  Yes.

23     Q.  You know that you provided top management of the company

24     with presentations summarizing the design team's

25     recommendations to top management for what to do to save money
```

F7hnosb5                          Kiley - cross

1   with respect to the pension plan, correct?

2   A.  Yes.

3           THE COURT:  Do you know who the recipients were inside

4   the company of the presentation at PX 715?

5           THE WITNESS:  I don't recall.

6           THE COURT:  All right.

7   BY MR. GOTTESDIENER:

8   Q.  In fact, you do recall though that you and Ms. Peck made a

9   presentation to Roger Farah, correct?

10  A.  No, I don't actually.  I am not sure I was in that

11  presentation or not.

12  Q.  Well, you were in presentations with Mr. Farah, correct?

13  A.  I don't recall.

14  Q.  Well, were you often in the presence of Mr. Farah?

15  A.  No.

16  Q.  When you were in Mr. Farah's presence, there was a

17  presentation going on about the change to the pension plan,

18  right?

19  A.  There may have been.

20  Q.  There may have been?  What else would you have been in his

21  presence --

22  A.  It could have been a meeting, you know, in which something

23  else was being discussed.

24  Q.  Like what?

25  A.  I have no idea.  I can't remember.

F7hnosb5                          Kiley - cross

1   Q.  So you have no reason to believe, though, that it wasn't a

2   presentation to him and others about this change to the pension

3   plan, right?

4   A.  Yes.

5   Q.  Meaning you agree?  You have no reason to think we are not

6   talking about you being in his presence during the presentation

7   of the design team's recommendations, correct?

8   A.  Please repeat that.

9   Q.  You have no reason to doubt that at the time that you were

10  in his presence and something was being discussed, it was these

11  potential changes to this retirement plan, correct?

12  A.  It is likely if I had met with him at this time that it

13  probably is what was being discussed.

14  Q.  OK.  PX 86 is a draft, if you look in the left-hand corner,

15  you say -- it says draft, 4/28/95.

16  A.  Yes.

17  Q.  That's the same day as the fax, the first page of 715?

18  A.  Yes.

19  Q.  At your deposition we talked about PX 86.  Do you remember

20  that?

21  A.  No.

22  Q.  Look at PX 86 and tell me, this does look like the kind of

23  presentations that you created in connection with making

24  recommendations to change the pension plan, correct?

25  A.  Yes.

F7hnosb5                          Kiley - cross

1    Q.  You have no reason to doubt that this was a presentation

2    that you created?

3    A.  Yes.  That I probably pulled together.  I don't think I

4    created everything in this presentation.

5    Q.  But it was your presentation?

6    A.  Yes.

7    Q.  And the fax cover reflects that you are asking for any

8    comments that Mercer has on your presentation, right?

9    A.  Yes.

10   Q.  And you can see that it says, See you around 10:30, Monday.

11   April 28, 1995 turns out to have been a Friday.  May 1, 1995,

12   there's another document that I want to show you --

13            THE COURT:  We are running into another issue again.

14   I think you were just talking about the fax cover page of PX

15   715.

16            MR. GOTTESDIENER:  Yes.

17            THE COURT:  You said, Turns out April 28 was a Friday,

18   and then you started to talk about I thought May 1 was going to

19   be a Monday, but then you sort of did a comma and we are going

20   to go into another document.

21            MR. GOTTESDIENER:  I just want to put that one in

22   front of him.

23            THE COURT:  I know.  All I am saying is your question

24   has several different pieces in it.  So let's strike the

25   question and then just go to a clean question.

1          MR. GOTTESDIENER:  With the Court's indulgence.

2     BY MR. GOTTESDIENER:

3     Q.  Looking at the one that is in front of you, before we get

4     to May 1, the April 28 document?

5          THE COURT:  That's PX 715, the fax?

6          MR. GOTTESDIENER:  PX 86 is actually the presentation.

7          715 is the fax cover sheet.  They are separated.

8     That's the way they were produced.

9          THE COURT:  All right.  I've got a presentation also

10    in PX 715 that bears the date at the bottom May 1.  And then I

11    have -- also, on the front cover page, the April 28 cover page,

12    PX 86 I have as a draft 4/28.  Do you want PX 86?  What do you

13    want to focus on.

14         MR. GOTTESDIENER:  I want to focus on PX 86.  That has

15    also the date, the draft 4/28.

16         THE COURT:  All right.

17    BY MR. GOTTESDIENER:

18    Q.  So this document, if you would look at the first page in,

19    do you see the objectives on the page that is Bates 5474, the

20    objective to decrease long-term company cost, to promote

21    sharing of responsibility for retirement savings with

22    associates?

23    A.  Yes.

24    Q.  That second bullet point is really just the same way of

25    saying something similar to decreasing cost to the company.

1    Promoting sharing of responsibility just means they need to

2    foot more of the bill than they were before?

3    A.  Yes.  I think it's also a lead-in to the 401(k) plan, which

4    was proposed as well.

5    Q.  If you look on page 5475, review of plan alternatives,

6    there is a list of alternatives, there's pros, cons, estimated

7    cost in millions of dollars.

8             Do you see that?

9    A.  Yes.

10   Q.  The first one is terminate the current plan.  You see the

11   estimated cost at $200 million?

12   A.  Yes.

13   Q.  This is similar information to the notes that you took and

14   her Honor was asking you about before the lunch break, right?

15   A.  Correct.

16   Q.  And then, freeze with intent to terminate, freeze

17   temporarily.  You see on the pros of all of these first three,

18   decreases future company cost for the first two, and then

19   freeze temporarily, decreases annual cost during freeze?

20   A.  Yes.

21   Q.  That corresponds to the normal cost.  There's no normal

22   cost anymore as we discussed before lunch, right?

23   A.  Correct.

24   Q.  And then in the middle where it has cons, it says, for

25   terminating the current plan, competitively disadvantageous,

F7hnosb5                          Kiley - cross

1  negative publicity.

2          The same thing for the next, freeze with intent to

3  terminate, freeze temporarily, permanent loss of retirement

4  benefits, loss of associate morale and "cofidence" -- you see

5  that is circled?  That there is a typo?

6  A.  Yes.

7  Q.  You intended to write "confidence" but it says "cofidence"?

8  A.  Yes.

9  Q.  And then negative publicity?

10 A.  Yes.

11 Q.  The next alternative that you all considered was change

12 current plan formula to 1 percent of W-2 compensation, right?

13 A.  Yes.

14          MR. RUMELD:  I object to the question.

15          THE COURT:  Sustained.  Why don't you rephrase.

16 BY MR. GOTTESDIENER:

17 Q.  The design team did consider the alternative of keeping the

18 current plan, but reducing the rate of benefit accrual,

19 correct?

20 A.  Correct.

21 Q.  The fact that that was considered is reflected in this

22 fourth entry here, correct?

23 A.  Yes.

24 Q.  The pros of that was a decreased future company cost and

25 there was minimal plan changes, right?

F7hnosb5                         Kiley - cross

1   A.   Yes.

2   Q.   Now, the cons were the same cons as freezing temporarily,

3   permanent loss of retirement benefits, loss of associate morale

4   and "cofidence," also a typo, and negative publicity, correct?

5   A.   Yes.

6   Q.   The last entry is, Convert to cash balance plan.   The pros

7   of that is decreased future company cost, and it says

8   attractive features, contemporary plan design?

9   A.   Yes.

10  Q.   And on the cons, it only lists permanent loss of retirement

11  benefits.

12        It does not list as a con loss of associate morale and

13  "cofidence" or negative publicity, does it?

14  A.   No, it doesn't.

15  Q.   On 5479 you see current plan cost, comparison of plans,

16  estimated plan cost under cash balance plan in the middle of

17  the page?

18  A.   Yes.

19  Q.   First it has the formulas and then the cost currently and

20  then the estimated cost.  You see the normal cost of the

21  current plan at 9.8 and the normal cost in the first year of

22  the cash balance plan at 3.4, correct?

23  A.   Correct.

24  Q.   And then the ongoing cost after we are out of the wear-away

25  period is still less than the normal cost for the current plan,

F7hnosb5                          Kiley - cross

1   correct?

2   A.  Yes.

3           MR. GOTTESDIENER:  With the Court's indulgence.

4           On Monday, May 1 -- if we could call up PX 632.

5   Q.  PX 632 is the final version of the presentation that you

6   made, is that correct?

7   A.  I don't recall, but it appears that way.

8   Q.  If you look on Bates ending 68, the next page --

9           MR. GOTTESDIENER:  If we could zoom in on that,

10  please.

11  Q.  Do you remember we looked on the Friday's document, the

12  April 28 draft, we saw those two objectives.  Now, here you

13  have written in, in hand -- this is your handwriting, isn't it?

14  A.  Yes.

15  Q.  You have written something in hand.  Could you read that

16  for us?

17  A.  In January we were charged with the responsibility to

18  decrease ongoing company cost.

19  Q.  You did make presentations of the recommendations to folks

20  in the company who were higher than you, correct?

21  A.  Yes.

22  Q.  It is consistent with your practice before making a

23  presentation on the PowerPoint or the dec., the slides, to

24  write notes to yourself to prepare to speak to the people to

25  whom you are making the presentation?

F7hnosb5                              Kiley - cross

1    A.  Yes.

2    Q.  If we can flip to the next page.  Do you see here we have

3    more or less Friday's version of the review of plan

4    alternatives.  Do you see the structure of it is the same,

5    where there's the alternatives to the left, the pros the cons

6    and the cost?

7    A.  Yes.

8               THE COURT:  Why don't we just be clear.

9               For Friday's version you are referring to the PX 86 or

10   the fax version, which is PX 719.

11              MR. GOTTESDIENER:  I'm referring to PX 86.

12              THE COURT:  715.

13              MR. GOTTESDIENER:  The draft.

14              THE COURT:  Not PX 715.

15              MR. GOTTESDIENER:  Except for the fax cover sheet,

16   that's correct.

17              THE COURT:  All right.

18   BY MR. GOTTESDIENER:

19   Q.  This shows there's been some changes between this document,

20   this page, and the draft from April 28 that I would like to ask

21   you if you agree that we can see those changes.

22              First of all, on the first row do you see that you or

23   someone has inserted, Current plan unchanged as a new

24   alternative vis-a-vis Friday's version?

25   A.  Yes.

F7hnosb5                        Kiley - cross

1    Q.  So here the pros are maintains current level of benefits,

2    associate comfort level.  And then the cons are, not portable,

3    traditional style plan, past service update overdue.

4            Do you see that?

5    A.  Yes.

6    Q.  What does the reference to past service update overdue

7    mean?

8    A.  It was the practice -- I think actually they only did it

9    maybe once or twice, to on occasion increase benefits for

10   accrued service.

11   Q.  Because this plan was not a particularly rich plan, was it?

12   A.  That's correct.

13   Q.  And the company competitively was not really offering the

14   level of benefits that its competitors were, without a 401(k)

15   and a pension plan it wasn't particularly rich, right?

16   A.  That's probably true, yeah.

17           MR. RUMELD:  Objection.

18           THE COURT:  I will allow it.

19   Q.  We have that row added.  That's one change that you made.

20   By the way, this is your presentation, you don't have any

21   reason to doubt that you are the one that put it into final

22   form, right?

23   A.  Correct.

24   Q.  So you make that change, that addition.  Now if we look at

25   the cons in freezing temporarily, do you see that entry?

F7hnosb5                    Kiley - cross

1   Freeze temporarily and then the cons?

2   A.  Yes.

3   Q.  And then changing the current plan formula, going lower

4   than what it is, the content of those entries are the same

5   except something's changed.  You fixed the typos.  It doesn't

6   say "cofidence" twice anymore, right?

7   A.  Right.

8   Q.  It says "confidence," right?

9   A.  Right.

10  Q.  So the change in the first row and the fixing of the

11  typographical errors in the cons in the two rows immediately

12  above convert to cash balance plan shows you that you were

13  paying close attention to this slide, right?

14  A.  Yes.

15  Q.  You still left off of the cons of convert to cash balance

16  that there would be a loss of associate morale and confidence

17  and negative publicity, correct?

18  A.  Yes.

19          THE COURT:  Was one of these alternatives more favored

20  than the others at the time that you made this presentation as

21  reflected in PX 632?

22          THE WITNESS:  I can't say for certain.  I suspect it

23  probably was.

24          THE COURT:  Do you know whether or not as of the, I

25  guess we are talking about the springtime --

F7hnosb5                        Kiley - cross

 1             THE WITNESS:  Right.

 2             THE COURT:  -- of 1995, whether the cash balance plan

 3    was the leading potential alternative to the then-current

 4    retirement plan?

 5             THE WITNESS:  I don't -- again, I don't know for

 6    certain, but I believe it probably was.

 7             THE COURT:  All right.

 8             You may proceed, Mr. Gottesdiener?

 9             MR. GOTTESDIENER:  May I approach, your Honor?

10             THE COURT:  Yes.

11             The only reason I say that is -- not the only reason,

12    but at the top of the page in PX 632 it says, it's entitled,

13    "Cash Balance/401(k) Plan."

14             Do you see that?

15             THE WITNESS:  Yes.

16             THE COURT:  Does that assist you in confirming that

17    cash balance was likely a leading alternative at that time, or

18    does it not assist you in that way?

19             THE WITNESS:  I think it was probably the leading

20    alternative, yes.

21             THE COURT:  All right.

22             You may proceed, Mr. Gottesdiener.

23    BY MR. GOTTESDIENER:

24    Q.  So when it says permanent loss of retirement benefits for

25    cash balance, why would there be no loss of morale and

F7hnosb5                        Kiley - cross

1    confidence if there's also a cut in benefits there?

2                MR. RUMELD:  Objection.

3                THE COURT:  Rephrase it.  You can ask the question.

4                Just take out the "would."

5    BY MR. GOTTESDIENER:

6    Q.  Why didn't you put in no loss of morale for the cash

7    balance plan, despite putting in that it is a permanent loss of

8    retirement benefits?

9    A.  I don't know.

10   Q.  Is it because employees would not realize that they had

11   lost benefits?

12   A.  I don't think so.  I think that employees, no matter what

13   we did to the plan, they would know, under the environment that

14   was in place at the time, any change was not going to be an

15   increase in benefits.  It's possible, because it did have some

16   attractive features that they were interested in having, but

17   I'm speculating.  I can't put myself in my shoes 20 years ago.

18   Q.  Well, you know that you didn't leave those two things off

19   by mistake, right?  You put permanent loss of retirement

20   benefits, but you know that you didn't leave the loss of

21   associate morale and confidence and negative publicity as cons.

22   You didn't leave those off of the cash balance conversion

23   alternative by mistake, correct?

24   A.  I couldn't be certain.

25                MR. GOTTESDIENER:  May I approach, your Honor?

F7hnosb5                        Kiley - cross

1          THE COURT:  Yes.

2          Do you recall any communications relating to the

3    conversion to a cash balance plan in which the -- strike that.

4          Go ahead and proceed, Mr. Gottesdiener.

5    BY MR. GOTTESDIENER:

6    Q.  I don't know if this was what the Court was getting at, but

7    people were not told you are not going to earn any new benefits

8    for a time, correct, in that way?

9    A.  Not in those words.

10   Q.  And they weren't told that directly in any other kinds of

11   words, right?

12   A.  I think the communications -- there were a lot of

13   communications, and there were actually communications with

14   individuals after the plan was changed in which, yes, they were

15   told that.

16   Q.  They were told your benefit was frozen?

17   A.  This were given examples which clearly showed that in some

18   cases.

19   Q.  Clearly showed that to somebody who has actuarial skill

20   like yourself?

21   A.  No.  Someone who asked the question.

22   Q.  Someone who asked the question?

23          You nodded.  You have to say yes or no.

24   A.  Someone who asked the question, yes.

25   Q.  You agree that none of the mass communications that went

F7hnosb5                          Kiley - cross

1    out companywide said we are freezing your pension, you are not

2    going to earn any benefits for a time?

3    A.  I wouldn't say none.  I think there was at least one that I

4    reviewed recently to the Green Mill distribution center that

5    clearly indicated that.

6    Q.  When you say indicated, you don't mean it stated that; you

7    mean somebody in your opinion could have figured it out --

8    A.  Yes.

9    Q.  -- right?

10           That's all you mean by indicated, correct?

11   A.  The information was included in there.  It wasn't written

12   in the words that you indicated.

13           THE COURT:  All right.  Since my question was

14   different, and I don't want the record to reflect that it was

15   the same, let me just ask it.

16           Do you recall any discussions as to whether the

17   inclusion of an employee 401(k) plan would offset any morale

18   hit resulting from the conversion to the cash balance plan?

19           THE WITNESS:  I don't recall any discussions about the

20   401(k) in regard to improving morale.

21           THE COURT:  All right.  That was my question.

22           Thank you.  You may proceed.

23   BY MR. GOTTESDIENER:

24   Q.  Just on the 401(k), if I might, you did spend quite a bit

25   of time studying how much someone would under certain

F7hnosb5                          Kiley - cross

1   assumptions have to put away in a 401(k) plan to make up for

2   the permanent loss of benefits represented by moving to the

3   cash balance, right?

4   A.  We did look at that, yes.

5   Q.  You looked at that extensively with Mercer's help, right?

6   A.  Yes.

7   Q.  In order for somebody to protect themselves against a

8   suspension of benefit accruals on the DB pension side by taking

9   current compensation and putting it away in the 401(k) plan on

10  that side, the DC, defined contribution, side, they would first

11  have to have been informed that they were permanently losing

12  benefits on the defined benefit side, correct?

13  A.  Yes.

14  Q.  So you studied how somebody could make up for the cut, but

15  you didn't say to people in introducing the 401(k) plan, Here

16  is how can you make up for the reduction in the defined benefit

17  plan, correct?

18  A.  Correct.

19  Q.  The document I just put in front of you, PX 227, if you

20  flip through it, this is a document that does not have -- it

21  has handwriting, but it is not your handwriting, correct?

22  A.  Correct.

23  Q.  This does not look to you like one of your presentations,

24  does it?

25  A.  No, I don't think so.

F7hnosb5                        Kiley - cross

1   Q.  And you are confirmed in that view by seeing that in the

2   stamp in the right-hand column side at the bottom it says

3   Mercer FL, and a bunch of numbers.  This is a Mercer document,

4   right?

5              MR. RUMELD:  Objection, your Honor.

6   A.  Yes.

7              THE COURT:  Hold on one second.

8              OK.  You need to lay a foundation for whether or not

9   he's able to tell, separate and apart from the Bates number,

10  whether it's a Mercer document.  I don't want there to be an

11  assumption that he's only saying it is a Mercer document

12  because of the Bates number, and it is a Bates number that he

13  knows really nothing about how it got there.

14             Why don't you circle back through this.  It may be

15  fine, but I want to make sure that we haven't inadvertently

16  done something we weren't supposed to do.

17             What is the PX number on this?

18             MR. GOTTESDIENER:  The PX is.

19             THE COURT:  227?

20             MR. GOTTESDIENER:  227.

21             THE COURT:  All right.

22  BY MR. GOTTESDIENER:

23  Q.  You do agree, before I got to it, that it is a Mercer

24  document, that this does not look like one of your documents,

25  correct?  You said that already?

F7hnosb5                        Kiley - cross

1    A.  Yes, I did.

2    Q.  You were the only one at Foot Locker who would have created

3    something comparable to this kind of presentation, right?

4    A.  Probably.

5           MR. GOTTESDIENER:  With the Court's indulgence.

6    Q.  Looking back at the May 1 document --

7           THE COURT:  Actually hold on.  For 227, did you add

8    this into my binder?  Is this an add-on.

9           MR. HUANG:  Not yet.

10          THE COURT:   Let me have 227 because I don't have it

11   in my binder.

12          MR. GOTTESDIENER:  Here.

13          THE COURT:  Thank you.

14          Now you may proceed, Mr. Gottesdiener.

15   BY MR. GOTTESDIENER:

16   Q.  Looking back at PX 632, the May 1 final version of the

17   document where you wrote in your handwritten presentation

18   notes.  We were on the first page.  Then we looked at the

19   second page.

20          If we could go to the Bates number 2472.  Do you see

21   there's your handwriting in the upper right-hand corner there?

22   A.  Yes.

23   Q.  And what you wrote there was --

24          THE COURT:  Why don't you just have him read it.  Way

25   gives us the best view of his handwriting.

1              MR. GOTTESDIENER:  OK.

2    A.  We looked at many variations of CB, cash balance, formulas.

3    We chose this formula because of the level of savings it

4    provides and because it is service based, which is appropriate

5    based on the emerging demographics of our company, i.e.,

6    younger and more mobile.  $22,000 is the average covered comp

7    of the Woolworth's retirement plan participants.

8    Q.  So, in fact, you did, before making this recommendation,

9    look at many variations of cash balance formulas?

10   A.  Yes.

11   Q.  And you did choose this formula because of the level of

12   savings it provides and because the service based -- those two

13   reasons, it?

14             MR. RUMELD:  Objection.

15             THE COURT:  If you're just having him restate what he

16   just said.

17             MR. GOTTESDIENER:  No, I'm asking isn't this a fact.

18             THE COURT:  OK.

19             MR. GOTTESDIENER:  He's remembering things.

20             THE COURT:  That is fine.  Let's do it apart from the

21   document.  Go ahead and reask the questions.

22             So, apart from this document.

23   BY MR. GOTTESDIENER:

24   Q.  Does this help your refresh your recollection?

25             THE COURT:  Here's the point.

F7hnosb5                          Kiley - cross

1                MR. GOTTESDIENER:  OK.

2                THE COURT:  The point is he said this is his

3      handwriting.  He's read it into the record.  I don't think

4      there is any reason to doubt what the words on the page mean.

5                If you want him simply to restate what he said in his

6      handwriting, that's one things.  But the handwriting says what

7      it says.  In other words, it says, We chose this formula

8      because, so there's no need right now ask him again did you

9      choose this formula because.

10               MR. GOTTESDIENER:  Could I ask then --

11               THE COURT:  Just ask him a question.  Ask him whatever

12     you want.  I'll tell you if I think it's objectionable.

13     BY MR. GOTTESDIENER:

14     Q.  If you wrote it in this presentation in handwritten form to

15     give to upper management, it would have been something that you

16     believed was true at the time, correct?

17               MR. RUMELD:  Objection, your Honor.

18               THE COURT:  Overruled.  Let me actually ask it this

19     way.  Do you see the handwriting here on this page?

20               THE WITNESS:  Yes.

21               THE COURT:  PX 632.  Was it your practice if you were

22     making a presentation to make notes to yourself prior to making

23     a presentation on your copy of the document?

24               THE WITNESS:  Yes.

25               THE COURT:  Is it reasonable to assume that these

F7hnosb5                          Kiley – cross

1   handwritten notes of yours are indications to yourself as to

2   things that you were likely to have said to management or

3   something else?

4            THE WITNESS:  They are points that I would –– if –– if

5   it was –– depending on how the conversation was going, these

6   are things that I would have probably said to management, yes.

7            THE COURT:  All right.  So it was at least prepared?

8            THE WITNESS:  Yes.

9            THE COURT:  Whether or not it was delivered is a

10  different question?

11           THE WITNESS:  Right.

12           THE COURT:  OK.

13           When you made such notes to yourself that you were

14  prepared to deliver to management, such as that reflected in PX

15  632, did you attempt to be truthful and accurate?

16           THE WITNESS:  Yes.

17           THE COURT:  All right.

18           Now you may proceed.

19           MR. GOTTESDIENER:  Thank you.  May I approach, your

20  Honor?

21           THE COURT:  Yes.

22  BY MR. GOTTESDIENER:

23  Q.  We were talking about May 1.  Now we are on July 20.  I'm

24  handing you PX 101.  That is a similar looking presentation

25  with the date after the initial cover page of July 20, 1995.

F7hnosb5                          Kiley - cross

1              Do you see that?

2    A.   Yes.

3    Q.   Going back to the cover memo, does this refresh your

4    recollection, seeing this cover memo from Pat Peck where you're

5    copied along with Carol Kanowicz, that you were present for the

6    presentation of these recommendations to the top management of

7    the company, including Mr. Farah?

8    A.   Not necessarily.

9    Q.   But, again, you don't have any reason to think that you

10   were in Mr. Farah's presence other than for a presentation to

11   him and others as to the design team's recommendations

12   regarding changing the pension plan?

13   A.   That's probably true, but it doesn't necessarily mean I was

14   at this meeting.  I was cced on this memo.  It wasn't addressed

15   to myself and Carol.

16   Q.   OK.  Well, Pat understood the accrual suspension effect

17   that the conversion had on participants' benefits, correct?

18              MR. RUMELD:  Objection.

19              THE COURT:  Sustained.  You have to rephrase.

20   Q.   From meetings and discussions with Pat, you know that she

21   was aware of the wear-away effect, correct?

22   A.   I don't know that for certain.

23   Q.   You didn't testify that you knew that for certain in your

24   deposition?

25   A.   I don't know.

F7hnosb5                         Kiley - cross

1  Q.  OK.  How about --

2            MR. GOTTESDIENER:  With the Court's indulgence.

3  Q.  How about thinking of it this way:  I mean, wasn't it part

4  of your job to make sure that she understood something as basic

5  as that?

6  A.  Again --

7            MR. RUMELD:  Objection.

8            THE COURT:  Sustained.

9            You have to rephrase.

10           MR. RUMELD:  Sorry to be late.

11 BY MR. GOTTESDIENER:

12 Q.  Page 176, line 19.  I'll go a little higher for context.

13           Line 9:

14 "Q.  In the middle of the first page, it says currently

15 discount liability at 9 percent.  With GATT, we must use a rate

16 around 7.5 percent to 8 percent.  Cash balances -- actually,

17 maybe you can help out.  It seems to say cash balance --

18 "A.  Cash balances are converted at 9 percent.  If someone

19 termed this year, we would have to cash out at 8 percent, which

20 is a higher number.

21 "Q.  And the -- now, Pat knew about this both because of her

22 attendance at the meetings and because she was a micromanager

23 and you explained all this to her, right?

24 "A.  Yes."

25           You gave that testimony, correct?

F7hnosb5                              Kiley - cross

1   A.  Yes.

2              MR. GOTTESDIENER:  With the Court's indulgence.  Page

3   198 --

4              THE COURT:  As a technical matter you have to actually

5   ask him the question with which he then provides you with a

6   different answer and then you would impeach him.  Otherwise,

7   it's just hearsay.

8              MR. GOTTESDIENER:  I am impeaching him.  He says he

9   doesn't know that he told her.

10             THE COURT:  That's not what you are saying.  You asked

11  a question that was objectionable because it used the word

12  "basic."  So it was a sustained objection as to form.

13  Q.  You know that Pat knew about the wear-away effect because

14  you explained it to her, right?

15             MR. RUMELD:  Objection.

16             THE COURT:  Overruled.

17  A.  Um --

18             THE COURT:  Put it this way, did you explain to

19  Ms. Peck the wear-away impact of the cash balance plan, whether

20  you called it wear-away or called it something else, that

21  concept?

22             THE WITNESS:  I can't -- I don't recall specifically

23  having a discussion about that concept.

24             THE COURT:  All right.  Let me ask it this way:  Did

25  you perceive it as a responsibility of yours to insure that

F7hnosb5                          Kiley - cross

1    Ms. Peck understood the fundamentals as to how the retirement

2    plan changes would work?

3              THE WITNESS:  Yes.

4              THE COURT:  And you have now been refreshed a fair

5    amount between your deposition and your testimony here today

6    with respect to the existence of some amount of wear-away for

7    certain employees as between the old plan and the new plan, is

8    that right?

9              THE WITNESS:  Yes.

10             THE COURT:  Do you believe that you would have told

11   Ms. Peck about that, or do you just not have any view at all

12   because you just don't recall?

13             THE WITNESS:  I don't really recall.

14             THE COURT:  OK.  Did you view wear-away, however you

15   conceptualized it, but that mathematical effect as important

16   when you were involved in the design of the new plan?

17             THE WITNESS:  No, I don't believe we did.

18             THE COURT:  All right.

19             You may proceed, Mr. Gottesdiener.

20   BY MR. GOTTESDIENER:

21   Q.  You have no doubt that you and she discussed that if you

22   went ahead with this proposed conversion formula that that

23   would mean a period of no pension growth, correct?

24   A.  No, I can't say I have no doubt.

25             MR. GOTTESDIENER:  Now I'm going to impeach him,

F7hnosb5                          Kiley - cross

1    please.

2    Q.  Page 198, line 20 --

3           THE COURT:  It better start with "no doubt."  Does

4    this start with "No doubt"?  Does it have that in there.

5           MR. GOTTESDIENER:  "She was in that meeting," line 20.

6           THE COURT:  All right.  You may proceed.

7    BY MR. GOTTESDIENER:

8    "Q.  She was in that meeting and you have no doubt that you and

9    she discussed that this would mean a period of no pension

10   growth?

11   "A.  Yes.

12   "Q.  -- right?  No doubt --

13   "A.  Yes.

14   "Q.  -- about that, correct?  Correct?

15   "A.  Correct.

16   "Q.  So whether you used the word temporary pension freeze,

17   still the concept was discussed, and you knew from your

18   dealings with her that she did not want that message going out

19   companywide, correct?

20   "A.  I -- I think she want -- she didn't want to send out a

21   negative message.  She wanted to send out a positive message."

22           You gave that testimony under oath, didn't you?

23   A.  Yes.

24           MR. RUMELD:  So --

25   Q.  You have in front of you --

F7hnosb5                              Kiley - cross

1            THE COURT:  Hold on one second.  We have an objection

2    here.

3            MR. RUMELD:  I'm trying to see how to frame it.

4            THE COURT:  Can you just give me a word.

5            MR. RUMELD:  He went too far in the testimony.

6            THE COURT:  That's OK.  I understand the point.

7            I will allow it.

8            MR. GOTTESDIENER:  So we have up PX 101.

9    BY MR. GOTTESDIENER:

10   Q.  You saw this cover memo and then this is --

11           MR. GOTTESDIENER:  With the Court's indulgence.

12           If you would turn to the next page, please.

13           THE COURT:  So it's page, Bates numbered page?

14           MR. GOTTESDIENER:  4387.

15           THE COURT:  All right.

16           MR. GOTTESDIENER:  With the Court's indulgence.

17   BY MR. GOTTESDIENER:

18   Q.  If we look through this, start paging through, you'll

19   see -- keep going one page at a time -- there on the objectives

20   page do you see your handwriting?

21   A.  Yes.

22   Q.  And this is consistent with you making the presentation to

23   Mr. Farah and others, or you writing things out for Ms. Peck to

24   use for her guidance in her doing the presentation?

25   A.  Yes.

F7hnosb5                          Kiley - cross

1    Q.  Sitting here now, you can't remember whether it was you or

2    her or some combination of the two of you explaining the

3    details of the recommendation, is that fair?

4    A.  That's fair.

5    Q.  So what you wrote here is somewhat faint:  Our primary

6    objective to decrease cash flow.  Is that right?

7    A.  Correct.

8    Q.  If you go to Bates 10, 11 -- 4410, 4411.  Do you have the

9    hard copy in front of you?

10   A.  Yes, I have to look at that.

11   Q.  It's easier to do it this way.  The hard copy shows fairly

12   extensive handwritten notes by you looking to explain, it would

13   appear, would you agree, to someone who's trying to absorb a

14   lot of information where the cost savings actually is viewed

15   from the vantage point of with or without the 401(k) plan?

16   A.  Yes.

17   Q.  And you are writing that the cash savings for '96, without

18   the 401(k) plan is $6 million and in 1997 is $8.7 million,

19   correct?

20   A.  I don't see the 8.7.

21   Q.  You don't see it?

22   A.  Yes.

23   Q.  Now you see it?

24   A.  Yes, I see it.  Yes.

25              THE COURT:  Can you read your handwriting down there

F7hnosb5                          Kiley - cross

1   at the bottom of Bates numbered page 441 that begins with "two

2   different"?

3              THE WITNESS:  Two different actuarial cost methods are

4   used, contribution, unit credit --

5              THE COURT:  Something?

6              THE WITNESS:  -- something projected unit credit.

7              THE COURT:  And then?

8              THE WITNESS:  Account effect.

9              THE COURT:  Accounting effect?

10              THE WITNESS:  Accounting effect, yes, in smoothed

11   unit.  I think that's unit.

12              THE COURT:  Is it smoothed out?

13              THE WITNESS:  Oh, yes, sorry.  Yes, you can read my

14   handwriting better than me.  Yes.  Accounting effect is

15   smoothed out.  Contributions are not.

16   BY MR. GOTTESDIENER:

17   Q.  So, looking at these handwritten notes of yours, you

18   certainly would agree that at the time you had pretty good

19   command of the implications of these changes, is that fair?

20   A.  Yes.

21   Q.  Those savings, you understood that the wear-away effect was

22   going to cause those savings on normal cost, correct?

23   A.  Again, not completely.

24   Q.  But you are not denying that at least a significant portion

25   of the savings on normal cost was because of the wear-away

F7hnosb5                              Kiley - cross

1    effect, right, persons not earning additional benefits?

2    A.  Yes.

3    Q.  All other things being equal, that is a dollar-for-dollar

4    savings for the company, correct?

5    A.  I don't know.

6    Q.  Page 167, line 23:

7    "Q.  Because you're going to save on normal cost?

8    "A.  Yes.

9    "Q.  And all other things being equal, that's a

10   dollar-for-dollar savings for the company, right?

11   "A.  Yes."

12            You gave that testimony didn't you?

13   A.  Yes.

14            MR. GOTTESDIENER:  If I could get on the screen, with

15   the Court's indulgence, PX 619.

16            May I approach?

17            THE COURT:  Yes.

18   BY MR. GOTTESDIENER:

19   Q.  This says Woolworth Corporation cash balance plan

20   illustration.

21            Do you see that it has a narrative discussion on the

22   first two pages that starts, The cash balance account is

23   created by multiplying?

24   A.  Yes.

25            THE COURT:  For at least my benefit, I need you to lay

F7hnosb5                          Kiley - cross

1    some foundation with this witness for the document.

2              MR. GOTTESDIENER:  I was just about to attempt to that

3    do, your Honor.

4    BY MR. GOTTESDIENER:

5    Q.  You see in the right-hand corner it says cash bal. excel of

6    the --

7    A.  Yes.

8    Q.  The bottom of the page, you see that.  You see the date of

9    8/31/95?

10   A.  Yes.

11   Q.  Is this a document that you would have received from

12   Mercer?

13   A.  Yes, probably.

14   Q.  It is a document you've seen before, correct?

15   A.  No.

16   Q.  Are you sure you haven't seen it before or you just don't

17   remember seeing it?

18   A.  I don't remember seeing it.

19             THE COURT:  Do you remember seeing documents in this

20   format, or is this a new format for you?

21             THE WITNESS:  I don't remember seeing them in this

22   format.

23             THE COURT:  OK.  All right.

24   BY MR. GOTTESDIENER:

25   Q.  Let me try asking it this way:  Even if you don't remember

F7hnosb5                         Kiley - cross

1    seeing this document, would you agree that at the time, in

2    August of 1995, you understood that you could show the

3    progression of a hypothetical or an actual employee's benefits

4    under the new formula based on this greater of A or B design

5    where you would essentially run a two-horse race, where you

6    would show the cash balance account and then you would show, in

7    the right-hand column where it says minimum lump sum, you would

8    show the frozen accrued benefit paid as a lump sum?

9    A.  Yes.

10                   (Continued on next page)

F7GJOSB6                        Kiley - cross

1          THE COURT:  And do you recall from time to time,

2     putting aside even this document, but looking at information in

3     connection with the possible new plan that did that comparison

4     which looked at the cash balance account and also the minimum

5     lump sum on the same page or within the same document?

6          THE WITNESS:  I don't recall.

7          THE COURT:  All right.  So then your prior testimony

8     was based on the fact you believe it could have been done,

9     there could have been such a side-by-side comparison or you saw

10    it done?

11         THE WITNESS:  There could have been.

12         THE COURT:  Right now, as you sit here today, you

13    don't recall one way or the other whether you saw it?

14         THE WITNESS:  That's correct.

15         THE COURT:  For my benefit, folks, tell me whose file

16    did this come out of?  I see it is a Foot Locker document.

17         Whose source file is this?

18         MR. GOTTESDIENER:  Beyond Foot Locker at this point in

19    time, I am not sure we know.

20         THE COURT:  This was produced from some sort of

21    general files.  Is that right?

22         MR. RUMELD:  I am not sure I can answer that right

23    now, your Honor.

24         THE COURT:  All right.  All right.  I don't know if

25    you have it electronically and have metadata.  There wouldn't

F7GJOSB6                          Kiley - cross

1    be any metadata given its age.

2            MR. RUMELD:  1990's.

3    BY MR. GOTTESDIENER:

4    Q.  The only person at Foot Locker or Woolworth at this time

5    who would be the recipient of this kind of document would be

6    yourself?

7    A.  I wouldn't say the only one.

8    Q.  There is Carol Kanowicz maybe?

9    A.  Yes.

10   Q.  Other than you and Carol, one or both of you would receive

11   this document from Mercer, right?

12   A.  Yes.

13   Q.  And you told your Honor you don't remember that this kind

14   of comparison could have been done, but you currently, sitting

15   here, don't remember whether any such comparison was done for

16   people.  Is that right?

17   A.  That's right.

18   Q.  In fact, you testified in your deposition, though, you did

19   not do a comparison between the old and the new.  Isn't that

20   right?

21   A.  I don't recall.

22   Q.  You don't recall giving that testimony?

23   A.  No.

24   Q.  You do agree that it could have been easily explained to

25   people that their benefits were not going to be growing as a

F7GJOSB6                        Kiley - cross

1    result of the change for a period of time, right?

2    A.  I have trouble with the "easily" part.  I don't think this

3    was an easy concept to explain.

4    Q.  But you do agree that it was material to freeze or -- I am

5    sorry -- stop the accruals of a participant's pension benefits,

6    right?

7               MR. RUMELD:  Objection.

8               THE COURT:  Sustained.  You have to rephrase.

9    BY MR. GOTTESDIENER:

10   Q.  Do you agree that it is material to a participant to know

11   that their accruals had been frozen?

12              MR. RUMELD:  Objection.

13              THE COURT:  Sustained.

14   BY MR. GOTTESDIENER:

15   Q.  Do you think the average participant would draw the

16   conclusion --

17              THE COURT:  You can't ask him about the state of mind

18   about something else.  There is a way of getting at that

19   question.

20              MR. GOTTESDIENER:  Withdrawn.

21   BY MR. GOTTESDIENER:

22   Q.  You involved in participant communications, correct?

23   A.  To some extent.  I wasn't the primary author or primarily

24   responsible for that.

25   Q.  But you did communicate with participants?

1    A.  Yes, on an individual basis, yes.

2    Q.  Wasn't it your job to have an understanding of what you

3    thought the average person would or would not be able to

4    understand about the change that you were describing to them?

5    A.  To some extent, I think I did.

6    Q.  To some extent you think you did, you had an understanding

7    of what the average person would understand?

8    A.  Yes.

9    Q.  Do you agree that you thought at the time that the average

10   person participant would draw the conclusion that as they

11   watched their accounts grow, that they were also watching their

12   benefits grow?

13   A.  Yes.

14   Q.  You never disabused anybody of that idea, told them you

15   can't make the assumption that your growing account equals a

16   growing benefit, right?

17            MR. RUMELD:  Objection.

18            THE COURT:  Sustained.  Rephrase.

19   BY MR. GOTTESDIENER:

20   Q.  You never told anybody that the growth in their account did

21   not equal or necessarily equal growth in their benefit?

22   A.  We did.

23   Q.  You said that in words to people?

24   A.  I don't recall saying that in words to people.  I didn't

25   have that much opportunity to do one-on-ones with people, but I

F7GJOSB6                          Kiley - cross

1    did in written communications with letters that I wrote, yes.

2    Q.  We'll look at some of those letters and maybe you can tell

3    me where that is.

4           MR. GOTTESDIENER:  Court's indulgence.

5           (Pause)

6           MR. GOTTESDIENER:  Could we get on the screen 751,

7    please, and also PX 126, which is the written version, I

8    believe you'll agree when I show them to you of 751.

9           May I approach the witness, your Honor?

10           THE COURT:  You may.

11   BY MR. GOTTESDIENER:

12   Q.  I am going to hand you both of these documents.  PX 126 is

13   your handwriting, correct?

14   A.  Yes.

15   Q.  While you have very nice handwriting, the typewritten notes

16   might be easier for us to follow, but just if you could lay

17   them side-by-side.

18           First, you would agree, looking at your handwritten

19   notes, that you have put the date of November 15th, '95 next to

20   meeting with HROC, and that is Human Resources Operation Center

21   in Milwaukee?

22   A.  Yes.

23   Q.  And Mercer?

24   A.  Yes.

25   Q.  And do you see in the middle column you wrote Jim Greifg,

F7GJOSB6                         Kiley - cross

1  Jim Cassidy.  Those are two Mercer actuaries, correct?

2  A.  Yes.

3  Q.  On the right-hand side it says Carol Kanowicz, Marion

4  Derham, and you put yourself last, Tom Kiley?

5  A.  Yes.

6  Q.  If we look at the typed version, it appears to be

7  identical?

8  A.  Yes.

9  Q.  If you look at the second bullet point down, handwritten or

10  typed, they say the same thing -- first of all, let me back up.

11          In terms of the dates, you understand that we're now

12  in November, and the board of directors has met September 13,

13  then September 15, the announcement is made by Mr. Farah and

14  Mr. Hippert there are going to be these changes they're excited

15  about coming?

16          MR. RUMELD:  Objection.

17  Q.  You know what letter I am tacking about, correct?

18  A.  Yes?

19          THE COURT:  Overruled.

20  Q.  You know that came out on September 15th, 1995?

21  A.  Yes.

22  Q.  You also know there was a highlights memo that was sent out

23  that was referred to in that letter that was sent out November

24  17th, 1995, correct?

25  A.  I don't recall that.

1  Q.  The highlights memo you don't recall or you don't recall

2  the date exactly?

3  A.  I don't recall the highlights memo.

4  Q.  (Pause) PX 4, that looks familiar to you, PX 4?

5  A.  Yes.

6  Q.  You see the date, that is November 17th?

7  A.  17th, yes.

8  Q.  It would be fair to say that during this period of time you

9  all are gearing up to implement the plan change effective

10  1-1-96, fair?

11  A.  Fair.

12  Q.  And the operations center is, as its name describes, a

13  place where this kind of stuff is operationally implemented,

14  correct?

15  A.  Correct.

16  Q.  You have no reason to doubt that you were present at a

17  meeting in Milwaukee with the folks there with Mercer to

18  discuss how to implement the coming changes?

19  A.  Correct.

20  Q.  So the second bullet point says, "The current structure to

21  the current plan should remain in place.  The new plan

22  structure should be an add-on."

23       Do you see that?

24  A.  Yes.

25  Q.  You understood and agreed at that time that that was the

F7GJOSB6                          Kiley - cross

1   way the plan operated once it was amended to include a cash

2   balance formula, correct?

3   A.  Well --

4           MR. RUMELD:  Objection.

5           THE COURT:  Overruled.

6   A.  -- I think that was a reference to the programming,

7   computer programming that needed to be put into place.

8   Q.  Well, the computer programming needs to reflect the terms

9   of the plan, doesn't it?

10  A.  Yes.

11  Q.  So back to my original question, you agree that and

12  understood at the time that this was the accurate way to

13  describe the plan change, the current plan would remain in

14  place and this new plan structure would be an add-on, correct?

15  A.  I don't know about describing this.  It was a way to

16  structure the administration of the plan.

17  Q.  You know the plan was then administered according to that

18  structure, right?

19          MR. RUMELD:  Objection.

20          THE COURT:  Overruled.

21  A.  I believe it was.  I don't know.  I can't recall for

22  certain.

23  Q.  Well, you --

24          THE COURT:  Was there anybody at this meeting who had

25  oversight of the computer systems involved in plan

F7GJOSB6                          Kiley - cross

1    administration?

2            THE WITNESS:  That is a good question.  Not in the

3    sense of, you know, from an IT perspective.  From the sense of

4    perhaps reviewing, you know, some of the output, yes, that

5    would probably have been Carol and Marion and myself.

6            THE COURT:  All right.  You may proceed.

7    BY MR. GOTTESDIENER:

8    Q.  Putting aside the way it was communicated to participants,

9    you agree that the plan was administered properly according to

10   the structure described in the second bullet point?

11   A.  I believe so, yes.

12   Q.  Now, if you look at the bottom of the page --

13           MR. GOTTESDIENER:  Court's indulgence.

14           (Pause)

15   BY MR. GOTTESDIENER:

16   Q.  Why don't we look at your handwritten version, so that

17   would be the second page that corresponds to the first page of

18   the typed version.

19           Do you see at the top of the second page you wrote

20   bullet point calculation of minimum lump sum?

21   A.  Yes.

22   Q.  It would be fair to say --

23           THE COURT:  I am sorry.  Did you give the exhibit

24   number of the handwritten notes?  Which ones are we on, PX 126?

25           MR. GOTTESDIENER:  126, yes.

F7GJOSB6                          Kiley - cross

1             THE COURT:  All right.

2    BY MR. GOTTESDIENER:

3    Q.  126 is the handwritten and 751 is the typed version.

4             So 126, the second page of 126 at the top has a bullet

5    point and it says, "Calculation of minimum lump sum," and it

6    would be fair to say while there are a number of people who you

7    have listed in attendance, that it would only be an actuary who

8    would be talking to people with such terms as 1.06 raised to

9    the 65th power minus X, fair?

10   A.  Fair.

11   Q.  So after that formula is given, we then have an example,

12   you're writing down a person age 64?

13   A.  Yes.

14   Q.  Now, it starts off person aged 64, $9400 account balance,

15   do you see that?

16   A.  Yes.

17   Q.  Under that, previously we've seen the GATT rate in prior

18   notes at 8 percent.  Here you wrote down GATT, six and a half

19   percent interest rate, right?

20   A.  Yes.

21   Q.  That is an indication to you, is it not, that you knew at

22   that time or were told by Mercer that the GATT rate was

23   approximately six and a half percent at that time?

24   A.  Well, Mercer is in the meeting and I was taking the notes,

25   so they probably said that.

F7GJOSB6                              Kiley - cross

1   Q.  I forgot, excuse me, but I think you did say earlier that

2   you understood at the time that when the GATT rate fell, the

3   wear-away would be worse, correct?

4   A.  Yes.  Can I just add to that.  Worse, worse in terms of

5   perhaps being a longer duration of time, but providing a higher

6   payout.

7   Q.  But that higher payout was just a nominally higher payout,

8   it was the same benefit that people had already earned as of

9   12-31-95, wasn't it?

10              MR. RUMELD:  Objection.

11              THE COURT:  Overruled.

12  A.  I don't know about nominally, but, yes, it was based upon

13  the accrued benefit as of 12-31-95.

14  Q.  And the dollar amount that changed, if the person was the

15  same age, the dollar amount change was a reflection of the

16  changed economic environment reflected by the interest rate

17  that was required to be used, correct?

18  A.  Yes.

19  Q.  So a higher dollar amount in a different interest rate

20  environment would correspond under the calculation to the same

21  dollar amount that you're referring to as in effect lower than

22  the amount that they got when the rate went down?

23              MR. RUMELD:  Objection.

24  Q.  Correct?

25              THE COURT:  Overruled.

F7GJOSB6                          Kiley - cross

1   A.  Could you please repeat that.

2   Q.  If the GATT rate goes down --

3            THE COURT:  The question is, did you understand the

4   following during this period of time.

5   BY MR. GOTTESDIENER:

6   Q.  That the money that people got, the higher amount of money

7   that people got economically was really no different if you

8   were looking at the changed interest rate environment?  It was

9   an adjustment given the changed interest rate environment,

10  correct?

11           MR. RUMELD:  Objection.

12           THE COURT:  Hold on.  What was your understanding at

13  the time as to the impact on the amount of benefit that a

14  participant would receive of the GATT rate?

15           THE WITNESS:  That the GATT rate would impact the

16  minimum lump sum payable.

17           THE COURT:  And if the GATT rates decreased, what

18  impact did that have on the minimum lump sum a participant

19  would receive?

20           THE WITNESS:  It would be higher.

21           THE COURT:  If the GATT rate decreased, what impact

22  would that have on the account balance, the cash balance?

23           THE WITNESS:  It wouldn't have an impact on the

24  account balance.

25           THE COURT:  Pick up from where you want to go.

F7GJOSB6                          Kiley - cross

BY MR. GOTTESDIENER:

Q.  The benefit was years in the future.  The future amount is
constant, correct?

A.  I am not following you.

Q.  The change in the number of the payout did not reflect
additional benefits earned after 12-31-95, correct?

A.  Correct.

          MR. GOTTESDIENER:  The court's indulgence.

          (Pause)

BY MR. GOTTESDIENER:

Q.  You agree out of $16,000 people out of 1-1-96, except for a
very tiny number of people who got the enhancement, everybody
was in wear-away as of 1-1-96, correct?

A.  I don't know if I necessarily agree with that.

Q.  But you don't dispute it?

A.  There is probably a large number of people in wear-away
yes.

Q.  A large number, as in close to all 16,000 people?

A.  I couldn't say that.

          MR. GOTTESDIENER:  The court's indulgence.

          (Pause)

BY MR. GOTTESDIENER:

Q.  You don't dispute that in 1996, that 99 percent of the
people paid were in wear-away, do you?

A.  I don't know that for a fact.

F7GJOSB6                          Kiley - cross

1    Q.  But you don't dispute it?

2    A.  I couldn't dispute it because I don't know what the number

3    actually was.

4    Q.  But a large number of people, you will agree, were in

5    wear-away in 1996, correct?

6    A.  Yes.

7              THE COURT:  In five minutes we are going to take our

8    mid-afternoon break.

9              MR. GOTTESDIENER:  Could you put on the screen,

10   please, and may I approach, PX 188.

11             THE COURT:  All right.

12   BY MR. GOTTESDIENER:

13   Q.  You referred earlier to one-on-one communications that you

14   had with people?

15   A.  Yes.

16   Q.  This is an example of one?

17   A.  Yes, it looks like it.

18   Q.  Now, the date is January 31, 1996.  You're aware that the

19   SPD for the amended plan was not issued until approximately

20   December of 1996, correct?

21   A.  No, I didn't call when it was issued.

22   Q.  I am sorry?

23   A.  I don't recall when it was issued.

24   Q.  You know that the SPD didn't come out for quite some time

25   in 1996, fair?

1   A.   That seems likely, yes.

2   Q.   There were times that when people contacted you or the

3   company and requested information because you couldn't give

4   them the first parts of 1996 until whenever it was in 1996, you

5   are saying you don't remember when the SPD issued, you gave

6   them something that described the plan as amended once we got

7   around the corner of 1-1-96, right?

8   A.   Yes.

9   Q.   And here it shows the participant's name is redacted and

10  dear -- redacted.  Do you say you say this is in response to

11  your letter which we received on January 11, 1996, concerning

12  the retirement plan.

13          Then the next paragraph shows you were enclosing to

14  describe the amended plan both Mr. Farah and Mr. Hippert's

15  letter, dated September 15th, and that highlights memo that we

16  called on the screen that you then recognized November 17,

17  1995, fair?

18  A.   Fair.

19  Q.   Now let's look, you're answering questions.

20          We do not have, just so you know and the court knows

21  and the defense I assume will agree, we do not have the letter

22  to which you're responding so we only have what you're saying

23  in response.

24          If you look along --

25          THE COURT:  Is that right?  Do you know whether or not

F7GJOSB6                        Kiley - cross

1    there is a copy of the letter in existence?

2              THE WITNESS:  I don't recall.

3              THE COURT:  Do you remember who you were writing to

4    here?

5              THE WITNESS:  No.

6              THE COURT:  Now you may proceed.

7    BY MR. GOTTESDIENER:

8    Q.  So I will answer your questions in the order that you asked

9    them, you said.

10             First you wrote as indicated in previous

11   correspondence which is enclosed -- and we don't have that --

12   the company is not terminating the retirement plan.  The plan

13   has, however, been revised as indicated in the aforementioned

14   previous correspondence.  Do you see that so far?

15   A.  Yes.

16   Q.  Then again we don't have the question that prompted your

17   answer or information, but then you say the account balance is

18   not frozen.  It will grow by being credited with interest and

19   pay credits.  For further information, please see the corporate

20   benefits department letter dated November 17, 1995.

21             Right?

22   A.  Yes.

23   Q.  If you go to the second page, down by the bottom, you're

24   discussing the changes to the plan, and then you say, the

25   second to last paragraph, the initial account balance was

F7GJOSB6                          Kiley - cross

1    arrived at by multiplying the accrued benefit as of December

2    31, 1995 by an actuarial factor based on interest and

3    mortality.  It represents the actuarial equivalent lump sum

4    value of your December 31, 1995 accrued benefit.

5              Right?

6    A.  Yes.

7    Q.  You wrote that to this participant?

8    A.  Yes.

9    Q.  That was not correct, was it?

10   A.  Well, at the time my understanding was it was correct, yes.

11   Q.  You told us earlier that if you discount at 9, and grow the

12   benefit back up at only 6, that is not equal and that is not

13   actuarial equivalence because it won't match, correct?

14             MR. RUMELD:  Objection.

15             THE COURT:  Overruled.

16   A.  We are talking here about the initial account balance as of

17   1-1-96, not what happened subsequent to it.

18   Q.  Exactly.

19             THE COURT:  You have to cut off the argument on the

20   front of it.  Just ask the question.

21   BY MR. GOTTESDIENER:

22   Q.  Yes, we are talking about the initial account balance.

23   You're representing that it represents the actuarial equivalent

24   lump sum value of that participant's December 31, 1995 accrued

25   benefit, aren't you?

1    A.  Yes.

2    Q.  And that was false, wasn't it?

3          MR. RUMELD:  Objection.

4          THE COURT:  I understand.  What I am pausing, the

5    biggest issue I have is the voice infliction because it leads a

6    different interpretation to the words than how it would appear

7    on the transcript.  I am going to pause here, take up some time

8    as I talk, and ask Mr. Gottesdiener now to redact the question

9    without the argumentative piece and just the flat question, I

10   think, can be asked.

11         MR. RUMELD:  For the record, I would still object to

12   the question.

13         THE COURT:  That is fine.  I would overrule the

14   objection.

15   BY MR. GOTTESDIENER:

16   Q.  You agree that the statement is not correct?

17   A.  At the time that I wrote it, I believed it was correct.  In

18   hindsight, it may not have been correct.

19         THE COURT:  Why?

20         THE WITNESS:  Because of the reasons Mr. Gottesdiener

21   explained.

22         THE COURT:  Explain it to me in your words.

23         THE WITNESS:  Well, his explanation was that we

24   converted at 9 --

25         THE COURT:  Don't give me his explanation.  Give me

1    your explanation.

2              THE WITNESS:  My explanation I think would still be

3    that the initial account balance as of 1-1 was correct.  What

4    happened subsequent to that, you know, is another issue.

5              MR. GOTTESDIENER:  Your Honor --

6              THE COURT:  Hold on.

7              MR. GOTTESDIENER:  -- I wanted to say something to

8    your Honor.  I don't believe --

9              THE COURT:  You don't need to say anything to him.

10             MR. GOTTESDIENER:  I think he was agreeing with my

11   explanation, and your Honor --

12             THE COURT:  No, no.  There is a confusion between the

13   question and the answer, and so it is important -- it is not a

14   deposition -- it is important that we get clarity on what the

15   testimony is.

16             So tell me, do you believe, as you sit here today, do

17   you believe that the initial account balance was truly

18   actuarially equivalent to the accrued benefit?

19             THE WITNESS:  Yes.

20             THE COURT:  All right.  Let's take our mid-afternoon

21   break.  Then we'll come back in about 10 or 12 minutes.  Thank

22   you.

23             (Recess).

24             THE COURT:  Let's all be seated.  Before we continue,

25   one housekeeping matter.  I will need to leave at 4:30 today,

F7GJOSB6                          Kiley - cross

1    unfortunately.  So we'll have 45 minutes today and then pick up

2    on Monday since we are not going to have Friday as trial day,

3    as you folks know.

4             Who is in line for the witnesses for Monday?  I assume

5    Mr. Kiley will still be on the stand.  Somebody will be

6    examining him, but who is after that, just the next couple?

7             MR. GOTTESDIENER:  Ms. Peck.  I don't know if she will

8    be next, but she in all likelihood she will be next.

9             THE COURT:  All right.

10            MR. RUMELD:  Can I just inquire of Mr. Gottesdiener,

11   do you intend to call her before Ms. Derham at this point?  The

12   answer is yes?

13            MR. GOTTESDIENER:  Yes.

14            MR. RUMELD:  I need to arrange for who is coming when.

15            THE COURT:  So Ms. Peck and will she take between

16   Mr. Kiley's redirect and Ms. Peck, will that take most of

17   Monday, do you folks expect?  You guys know approximately how

18   much time you need to be.

19            MR. GOTTESDIENER:  If we don't -- if we need to fill

20   up the time, we would still have a class member and --

21            THE COURT:  You can get ahold of those folks and get

22   them here?

23            MR. GOTTESDIENER:  Yes.

24            THE COURT:  Fine.  You folks will work out then if

25   there are any alterations so that anybody who the defendant

F7GJOSB6                         Kiley - cross

 1    needs to arrange to be here will be here, but I will assume

 2    that you have got the calendar for Monday covered.

 3               MR. GOTTESDIENER:  Yes.

 4               THE COURT:  And we start Monday morning at 9:00.

 5               MR. RUMELD:  If I may, it is still my intention to

 6    leave the same intentions for Ms. Ine coming from Wisconsin.

 7               THE COURT:  Unless you folks believe there is

 8    something that comes up that requires that to be changed.

 9               Why don't you confer on that.  Now that we will have

10    had three full days of trial, you will have a sense as to how

11    much more you've got, whether there are alterations in terms of

12    who you want to call, et cetera, et cetera.  If you can confer

13    tomorrow on that and make sure there are no significant changes

14    that would require you folks to make different scheduling

15    choices, all right?

16               MR. RUMELD:  Yes.

17               THE COURT:  If you run into problems, let me know.

18    Then I will get everybody on the phone tomorrow.

19               MR. RUMELD:  Thank you.

20               THE COURT:  Thank you.  All right, Mr. Gottesdiener,

21    you may proceed, sir.

22               MR. GOTTESDIENER:  Thank your Honor.

23               PX 47, please.  May I approach?

24               THE COURT:  Yes.

25    BY MR. GOTTESDIENER:

F7GJOSB6                          Kiley - cross

1    Q.  I am showing you an e-mail that you're copied on, two

2    e-mails you're copied on.  The first one is February 5th, 1996.

3            Do you see where it is from Marion to Ellen

4    Glickfield, copy Carol and you, and the subject is present

5    value?

6    A.  Yes.

7    Q.  Who is Ellen Glickfield?

8    A.  She was a pension clerk who worked in the -- reported to

9    Marion, who reported to Carol.

10   Q.  The subject is present value and it is written by Marion.

11   It is to Ellen, her clerk, and it is copying you and Carol.

12           I just want to, before I read this, show you that you

13   at the bottom and Carol, it says do you see at the bottom,

14   Carol and Tom, "If my understanding of our conversation is not

15   correct, or if you want different information provided to the

16   participant, please let me and Ellen know immediately."

17           Do you see that?

18   A.  Yes.

19   Q.  Now, Marion would look to you and Carol for advice as to

20   how to communicate the amended plan to participants.  Is that

21   fair?

22   A.  That is fair.

23   Q.  Do you remember being copied on this e-mail and then the

24   subsequent e-mail?

25   A.  Not specifically, no.

F7GJOSB6                          Kiley - cross

1    Q.   You don't have any doubt that you read it when it came to

2    you?

3    A.   That's correct.

4    Q.   The question on the table seems to be subject present

5    value, Marion states, "Historically, we have received requests

6    for the present value of a participant's pension benefit.

7    Requests under the 1-1-96 revised plan should be responded to

8    as follows.  If the request is from an active associate,

9    provide the account balance."

10            Do you see that?

11   A.   Yes.

12   Q.   Now, that is not the right thing to provide the associate

13   who is asking for the present value of their pension benefit,

14   is it?

15   A.   Well, from the perspective of probably what the participant

16   was asking, it may have been.

17   Q.   The participant is asking for the present value of their

18   pension benefit?

19   A.   We discussed previously that to know what present value

20   means, we need to be an actuary, and the participants weren't

21   actuaries.

22   Q.   They want to know the amount they are going to get paid

23   after you do the calculation, right?

24   A.   Yes.

25   Q.   And almost everybody, you agree, is in wear-away at the

F7GJOSB6                           Kiley - cross

```
 1   beginning of 1996, right?
 2                MR. RUMELD:  Objection.
 3   Q.  Or lots of people are in wear-away in 1996, correct?
 4   A.  Possibly more.
 5   Q.  So giving the account balance is not giving the right
 6   information, is it?
 7   A.  It all depends on what they were asking.  If they were
 8   asking for a calculation, if they wanted to terminate, it would
 9   be different.  If they wanted to know what their current value
10   of their account was, it may be appropriate to give them the
11   account balance.
12   Q.  I am sorry.  You're looking at the same e-mail where it
13   says present value of the pension benefit?
14   A.  Yes.  I am interpreting present value.
15                THE COURT:  Take away the argument part.  He is
16   obviously looking at the same e-mail, right.  Just ask a
17   question.
18   BY MR. GOTTESDIENER:
19   Q.  The account balance is not the present value?
20   A.  Yes, but participants didn't know that and probably
21   wouldn't understand that, probably wouldn't understand it.
22   Q.  Exactly!
23                When you were copied on this --
24                THE COURT:  You need to take away the argument.
25                MR. GOTTESDIENER:  I am sorry, your Honor.
```

F7GJOSB6                         Kiley - cross

1    BY MR. GOTTESDIENER:

2    Q.   The participants wouldn't know that unless you told them,

3    correct?  Withdrawn.  I will ask a different question.

4            The question is not coming we received requests for

5    the account balance, correct?

6    A.   That is not the way it is worded.

7    Q.   So if it is active person wants to know the present value

8    of their pension benefit, they're going to be given the account

9    balance.  The e-mail continues and at the bottom as we said,

10   Carol and Tom, "You guys are being asked, you know, if her

11   understanding of your conversation with her is wrong, let her

12   know."

13           Then the next e-mail at the top is from Carol, and

14   you're copied on this again.  Do you see that?

15   A.   Yes.

16   Q.   So Carol responds, and she affirms what Marion said, but

17   she adds per your note, I would add -- meaning to say to the

18   participant -- that the account balance will increase by 6

19   percent per year until disbursement.

20           Do you see that?

21   A.   Yes.

22   Q.   You agree that for somebody in wear-away, the increases in

23   their account balance, 6 percent per year until disbursement,

24   if they're in wear-away and they stay in wear-away until

25   they're cashed out, those increases do not increase their

F7GJOSB6                          Kiley - cross

1    benefit at all?

2    A.  Yes.

3    Q.  And you did not speak up?

4              MR. RUMELD:  Objection.

5    A.  I don't know if I had a --

6              MR. RUMELD:  Objection.

7              THE COURT:  Overruled.

8    A.  -- I don't know if I had a conversation with her.

9    BY MR. GOTTESDIENER:

10   Q.  You do agree this was the operating instructions that were

11   followed at the time company-wide when an active participant

12   asked for the present value or asked for what they would be

13   paid if they left and asked for a distribution, they were told

14   the account balance?

15             MR. RUMELD:  Objection.

16   Q.  Right?

17             THE COURT:  Hold on a second.

18             (Pause)

19             THE COURT:  You have two things embedded in the

20   question.  Why don't you ask them just separately.

21   BY MR. GOTTESDIENER:

22   Q.  The practice, you know, was to tell active participants

23   that they would be paid a lump sum equal to their account

24   balance even if they were in wear-away, correct?

25   A.  Yes.

F7GJOSB6                          Kiley - cross

1    Q.  Thank you.

2    A.  That is not the complete answer, though, because there are

3    examples of communications where the account balance was given,

4    and if a particular date was indicated, the minimum lump sum

5    benefit was also given.

6    Q.  So the participant was going to be given accurate

7    information if they were about to be paid, but if they're an

8    active participant and they have no right to be paid, they

9    would be given the account balance, correct?

10   A.  Correct.

11   Q.  Now, do you know -- withdrawn -- Carol Baer from Camp Hill,

12   does that ring a bell?

13   A.  Yes, it rings a bell, yes.

14   Q.  She was in the HR department at Camp Hill, correct?

15   A.  Yes.

16            MR. GOTTESDIENER:  Could we put on the screen PX 209

17   and could I approach, your Honor?

18            THE COURT:  Yes.

19   BY MR. GOTTESDIENER:

20   Q.  This e-mail is the day after I believe the last e-mail that

21   we just saw.  This is February 6th, 1996.  The prior one was

22   February 2nd, and this is from Carol Kanowicz to Carol Baer,

23   copying you and Marion, and the subject is initial cash balance

24   accounts.  Do you see that?

25   A.  Yes.

1   Q.  I think we can skip the first part that seems to be talking

2   about certain participants whose names are redacted.

3           If you look to the very last paragraph, do you see

4   where it says the hardest thing?

5   A.  Yes.

6   Q.  The hardest thing for participants to understand is that

7   the 12-31-95 accrual is their benefit collectible and age 65.

8   The account balance is the present value, collectible today.

9           Do you see that?

10  A.  Yes.

11          THE COURT:  I am sorry.  One second.  This is PX 209?

12          MR. GOTTESDIENER:  Yes.

13          THE COURT:  Do you have a copy of that for me?  It is

14  not in my book.

15          MR. GOTTESDIENER:  I am sorry.  Yes.

16  BY MR. GOTTESDIENER:

17  Q.  We are looking at the last paragraph, "The hardest thing

18  for participants to understand is that the 12-31-95 accrual is

19  their benefit collectible at age 65.  The account balance is

20  the present value, collectible today," right?

21  A.  Yes.

22  Q.  That is what it says?

23          And that is wrong, isn't it?  For anybody in

24  wear-away, that is just not correct, is it?

25  A.  If they're in wear-away.

F7GJOSB6                          Kiley - cross

1   Q.  And you didn't speak up and correct Carol Kanowicz so Carol

2   Baer was not giving out incorrect information to participants,

3   did you?

4   A.  I can't say --

5              THE COURT:  Hold on.  Hold on.  There is an objection.

6              MR. RUMELD:  Your Honor --

7              THE COURT:  It is sustained.  You have to rephrase the

8   question.

9              MR. RUMELD:  It is not just a question of rephrasing.

10  There is no foundation.

11             THE COURT:  It is a question of rephrasing, and he can

12  either lay a foundation or not.  We are on the same page.

13  Don't say any more.  You may proceed.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

F7hnosb7                          Kiley - cross

1   Q.  You don't have any reason to doubt that you received this

2   e-mail, correct?

3   A.  Correct.

4   Q.  And you don't have any reason to doubt that you did not

5   speak up or respond --

6           THE COURT:  You can't use the word "speak up."  You

7   can phrase it differently.  Otherwise we are going to run into

8   a repeated loop.  I allowed you to do it once before, but I

9   probably could have cut it off then, too.  But we will cut it

10  off now.

11  BY MR. GOTTESDIENER:

12  Q.  You don't have any reason to think that you actually

13  responded and corrected Carol Kanowicz's mistake, do you?

14  A.  I don't know.

15  Q.  But you don't have any reason to think that you did because

16  you told us earlier that you agreed that it was the company

17  policy to tell active associates who could not terminate and

18  retain their benefit at that time that the present value of

19  their pension benefit was their account balance?

20  A.  Yes.

21  Q.  Now, you know who Michael Steven is, right?

22  A.  No.

23  Q.  You don't know who Mike Steven is?

24  A.  I don't recall.

25  Q.  The CFO of the Woolworth division?

 1   A.  No, I don't recall.

 2          MR. GOTTESDIENER:  Can I approach, your Honor.

 3          THE COURT:  You may.

 4          MR. GOTTESDIENER:  PX 330, can we please get it on the

 5   screen.

 6   BY MR. GOTTESDIENER:

 7   Q.  This is a memo from Tom Kiley to Mike Steven?  Do you see

 8   that?

 9   A.  Yes.

10   Q.  This is a document that you attach and discuss in your

11   declaration, isn't it?

12   A.  I don't recall.

13   Q.  This is one of the documents that you said earlier in

14   response to some of my questions indicated that a participant

15   was in a benefit freeze?

16          MR. RUMELD:  Objection.

17          THE COURT:  Well, let's do it this way, because I

18   don't think any of us has a perfect recollection as to how

19   wording was done for particular questions.  So the record will

20   speak for itself in terms of past testimony.

21          Why don't you ask him whatever the question is for

22   right now.

23   BY MR. GOTTESDIENER:

24   Q.  When you referred earlier in response to questions I was

25   asking you about did you ever tell people, state to people that

1    they were in a benefit freeze or they were not earning any new

2    benefits, do you agree that words were not so directly stated,

3    but you did say that calculations and explanations were given

4    from which they could figure it out?  It was indicated?

5              MR. RUMELD:  Objection.

6              THE COURT:  Sustained.

7              You have to break it down.  You've got lots of

8    different things embedded in the question.  Just ask him what

9    you want to ask him about this document.

10   BY MR. GOTTESDIENER:

11   Q.  You were earlier referring to documents like the one in

12   front of you when you responded to me by saying, Oh, no, we

13   provided information that indicated that people were not

14   earning benefits, is that fair?

15   A.  That's fair.

16   Q.  You see from this that you are saying, We have calculated

17   your estimated retirement benefits as you requested.  The

18   estimates on the attached worksheet include amounts payable

19   from both the Woolworth Retirement Plan and the Woolworth

20   Corporation Excess Cash Balance Plan.

21             Do you see that?

22   A.  Yes.

23   Q.  You know that there was a very small number of people who

24   were in the excess cash balance plan, right?

25   A.  Yes.

F7hnosb7                          Kiley - cross

Q.  And it's basically the top people in the company, right?

A.  Yes.

Q.  By the way, you say you didn't know whether or not you

discussed this in your declaration.  Please turn to paragraph

33 of your declaration and tell me if you are not in fact

talking about this document.

         THE COURT:  It might be helpful to just put DX 55 in

front of witness so that he can see.

         MR. GOTTESDIENER:  I don't have all the copies of DXs.

This is the same document as the PX.

         THE COURT:  I'm saying since the reference in graver

33 is to DX 55, it would be very easy for him to see DX 55, go

through it and say what it is as opposed to right now trying to

remember.

BY MR. GOTTESDIENER:

Q.  Mr. Kiley, if you look just at paragraph 33, I think you

will be able to match up, you discuss this and you can see that

the numbers match?

         THE COURT:  Do we have a copy of DX 55.

         MR. RUMELD:  Yes.

         THE COURT:  Can you hand me a copy of DX 55.  I will

take a look at it.  I have no reason to doubt that it's not the

same, but I just want to see that it's the same.  It's an easy

exercise to do.

         All right.

F7hnosb7                          Kiley - cross

1              MR. RUMELD:  Your Honor, for small clarification, our

2       exhibit is redacted has the names redacted.  The PX version

3       does not.

4              THE COURT:  The the Court has been handed DX 55, the

5       Court is going to hand it to the witness.  You can confirm that

6       PX 330 is the same as DX 55 or not, as you deem appropriate.

7       BY MR. GOTTESDIENER:

8       Q.  So in your declaration, this is in paragraph 33.  In your

9       view this is putting a participant on notice that their

10      benefits are not growing, is that correct?

11      A.  Yes.

12      Q.  You are not aware of any more direct statement that you or

13      anyone at the company made to any participant that their

14      benefits were not growing other than providing calculations and

15      explanations like this?

16              MR. RUMELD:  Objection.

17              THE COURT:  Hold on.

18              THE COURT:  Overruled.  You may answer.

19              THE WITNESS:  Repeat the question, please.

20              THE COURT:  The court reporter can read it back.

21              (Record read)

22      A.  That's correct.

23              MR. GOTTESDIENER:  With the Court's indulgence.

24              Can we get on the screen PX 404.

25      BY MR. GOTTESDIENER:

F7hnosb7                        Kiley - cross

1    Q.  PX 404 is your handwriting, is it not?

2    A.  Yes.

3              MR. GOTTESDIENER:  May I approach, your Honor?

4              THE COURT:  Do you folks have a copy of PX 404.

5              MR. GOTTESDIENER:  Yes, I do, your Honor.

6    BY MR. GOTTESDIENER:

7    Q.  Just so it's clear we are talking about the same person,

8    could you tell me if the DX version of the document that is on

9    your binder in front of you, DX 55, Mr. Kiley, if you could

10   just look at that.  Yes.  Do you have it there?

11   A.  Yes.

12   Q.  The participant's ID number is 4537, is it not?

13   A.  Yes.

14   Q.  So you would agree that a participant who was in the excess

15   cash balance plan was one of a very rare number of people high

16   up in the company whose sophistication was probably pretty high

17   as to financial matters, is that fair?

18              MR. RUMELD:  Objection.

19              THE COURT:  Overruled.  He can answer, his perception.

20   A.  Not all of them, but if he was the CFO he would have had

21   the financial understanding, yes.

22   Q.  OK.  But you knew if somebody is in the excess plan they

23   are not the average participant?

24   A.  Correct.

25   Q.  They would probably be pretty highly educated vis-a-vis the

F7hnosb7                          Kiley - cross

1     average participant?

2     A.   Probably.

3     Q.   OK.  So you would agree looking at the document that you

4     sent that this participant, if you turn the page and look at

5     Mr. Steven's date of birth, do you find that?  He's born in

6     1938?

7               THE COURT:   Which one are we looking at now?

8               MR. GOTTESDIENER:   PX 330.

9               THE COURT:   I was on PX 404.

10              So we are back on 330.  All right.  So PX 330.

11              MR. GOTTESDIENER:   Yes.

12    A.   Yes, that indicates '38 as his date of birth.

13    Q.   So his age at that time is -- well, the request is for --

14              MR. GOTTESDIENER:   Can we call up the unredacted

15    version, PX 407, please.  This is 404, but just the unredacted.

16    BY MR. GOTTESDIENER:

17    Q.   Do you see how you wrote down Mike Steven?

18    A.   Yes.

19    Q.   Still hearing this name doesn't ring any bell?

20    A.   Sorry, no.

21    Q.   OK.  So he's requesting, according to your cover memo, you

22    see where it says, Since we cannot anticipate what this rate

23    will be, we have shown your estimated account balance as of

24    5/1/97?

25              Do you see that?

F7hnosb7                          Kiley - cross

1   A.  Yes.

2              THE COURT:  PX 330?

3              MR. GOTTESDIENER:  This is on 330, yes.

4              THE COURT:  All right.

5              MR. GOTTESDIENER:  On the written narrative portion.

6   BY MR. GOTTESDIENER:

7   Q.  Then you can see from the calculations that are on 330, the

8   second page, you can see what you're aiming at is a retirement

9   date of May 1, 1997?

10  A.  Yes.

11  Q.  To make sure we are clear on the date, because the typed

12  document for some reason doesn't have a date on it, PX 404 that

13  is in front of you, you see that you wrote in hand October 22,

14  1996?

15  A.  Yes.

16  Q.  So this participant in effect came to you, wrote you and

17  requested to know, I'm in October of 1996, I want to know what

18  my pension is going to be if I retire May 1, 1997, right?

19  A.  Yes.

20  Q.  You said that you've calculated his estimated benefits, and

21  you point him to the worksheet.  Then you give a statement

22  about initial balances.  Then you say minimum lump sums are

23  based on what you say in that sentence they're based on.  Then

24  you say the interest rate for the minimum lump sum will change

25  for terminations of employment and retirements in 1997 based on

F7hnosb7                          Kiley - cross

1    the interest rate for 30-year treasury bills in effect on

2    January 1, 1997, right?

3    A.  Yes.

4    Q.  You're noting in the prior sentence that for '96 the

5    interest rate or discount rate is 6.06, but you don't know what

6    it will be for '97 when this gentleman wants to know what his

7    pension will be?

8    A.  Yes.

9    Q.  Then you say, Since we cannot anticipate what this rate

10   will be, we have shown your estimated account balance as of

11   5/1/97 and have not calculated an estimated minimum lump sum

12   payment as of that date.

13            Is that right?

14   A.  Yes.

15   Q.  Well, that wasn't exactly correct that you had not

16   calculated an estimated minimum lump sum payment, isn't that

17   correct, that you can see from PX 404?

18   A.  PX 404 shows the calculation at 6.06.

19   Q.  You are still studying the document or are you done

20   studying it?

21            THE COURT:  He just answered.

22   A.  No.

23   Q.  That's your answer?

24   A.  Yes.

25            MR. GOTTESDIENER:  Could the court reporter read back

F7hnosb7                          Kiley - cross

1   my question, please.

2              THE COURT:  You have to actually go through me for

3   that.

4              MR. GOTTESDIENER:  I'm sorry.

5              THE COURT:  It's OK.

6              MR. GOTTESDIENER:  I'll ask --

7              THE COURT:  We can ask him, but the court reporter

8   will only do it if I ask.  You can read back --

9              MR. GOTTESDIENER:  Your Honor --

10             THE COURT:  You want to withdraw it?

11             MR. GOTTESDIENER:  Yes.  At this point I think it's

12  easier.

13             THE COURT:  All right.

14  BY MR. GOTTESDIENER:

15  Q.  Respectfully, sir, you're saying that it's calculated at

16  6.06.  Could you direct me to why it is that you think that?

17             What line?

18  A.  Well, the second line, the first line, 9 percent deferred

19  at age 58 and a half.  The second line is 6.06 percent deferred

20  at age -- I'm sorry, not a half, 10/12.  That indicates the

21  factor.

22  Q.  As you are looking at it, isn't this actually showing you

23  that what you did here was you went to the factor table that

24  Mercer provided you, you knew that you were looking at

25  calculating retirement for this gentleman at 58 and 10 months,

F7hnosb7                        Kiley - cross

1    that he would be at that age, so you looked up the factor for 9

2    percent so you could calculate his opening balance?  Is that

3    fair?  You then obtained the factor of 4.8?

4    A.  Yes.

5    Q.  And then you looked up the factor on the table at 6.06 for

6    the gentleman at that same age and you got 7.02 and change,

7    correct?

8    A.  Right.

9    Q.  Is that correct?

10   A.  Yes.

11   Q.  And that would be using the GATT rate.  And then beneath

12   that you put a delta sign, correct?

13   A.  Yes.

14   Q.  And so you calculated or just subtracted so you got the

15   difference between those two factors, 2.2 and change, correct?

16   A.  Yes.

17   Q.  Then what you did is, because the spread between the two

18   interest rates was 3 and you wanted to know what his minimum

19   lump sum would be if the GATT rate was at 7, you divided by

20   three and you got .735.  Then you took that result and you

21   subtracted it from the 6.06, yielding 6.2.

22           Are you with me so far?

23           MR. RUMELD:  Objection.

24           THE COURT:  Overruled.

25   A.  Yes.

F7hnosb7                         Kiley - cross

1   Q.  So you are trying to figure out what it would be at 7.  You

2   then take that factor -- you are essentially doing a

3   modification of the factors Mercer gave you to do an estimate

4   of the factor that you would use for a 7 percent GATT rate, and

5   then you multiply it by his accrued benefit for $32,000,

6   correct?

7   A.  Yes.

8   Q.  Just so everyone is following, if you look at the typed

9   document, PX 330, we see over there that the accrued benefit of

10  this gentleman as of 12/31/95 is $32,000.  Do you see that --

11  A.  Yes.

12  Q.  -- on the worksheet?

13  A.  Yes.

14  Q.  It is your contention more or less in your declaration,

15  paragraph 33, that the worksheet shows this participant, this

16  participant who is in the excess plan, Mr. Steven, it shows he

17  is in wear-away, right?

18  A.  Yes.

19  Q.  And you say in your declaration -- so it was clear to you

20  that he was in wear-away, because it's your contention in your

21  declaration, paragraph 33, that he could have figured that out

22  from the calculation worksheet.  Fair enough?

23  A.  Again, the term wear-away, I don't think was a term --

24  Q.  OK.  Let's look at what you say in 33.  We'll use your

25  terminology.

F7hnosb7                          Kiley – cross

1   A.  OK.

2   Q.  Which is you say he could have figured out that the

3   additions to his account weren't doing anything for his

4   benefit.  Is that fair summary?

5   A.  Yes.

6   Q.  So you certainly knew that if you are saying that he could

7   have figured that out, right?

8   A.  Yes.

9   Q.  OK.  So you know that these additions to the account of a

10  guy who's asking, I am looking at maybe retiring in May of '97,

11  he wants to know what his pension is going to be, you know that

12  future additions are not going to count for him for quite some

13  time, looking at the actual calculations, right?

14  A.  Yes.

15  Q.  The reason you're answering yes is you calculate his

16  estimated account balance through May 1, '97, he's only at

17  $159,000.  Whereas at the end of '96, if he took his lump sum

18  then using the 6.06 rate, his payment would be $224,000.

19          Quite a gap, right?

20  A.  Yes.

21  Q.  So you know pretty much it would be very, very unusual if

22  there was any set of circumstances under which further work for

23  the company would yield this guy any additional benefit?

24          MR. RUMELD:  Objection.

25          THE COURT:  Sustained.  You can rephrase.

1           MR. GOTTESDIENER:  We will try it this way.

2    BY MR. GOTTESDIENER:

3    Q.  You know the rate at which the account balance grows,

4    correct?

5    A.  Yes.

6    Q.  And you knew that there was a very slim chance that his

7    account balance would grow large enough to be larger than his

8    minimum lump sum, absent a very wild change in the GATT rate,

9    correct?

10          MR. RUMELD:  Objection.

11          THE COURT:  Overruled.  We will strike the word

12   "wild."

13   Q.  A very substantial, aberrant change, a very big swing in

14   the GATT rate?

15          THE COURT:  With that modification, you can answer.

16   A.  No, I don't think we knew that.

17   Q.  So he's at 160 and his minimum lump sum is at 224?

18   A.  Right.

19   Q.  So you think he could get out of wear-away?

20   A.  It depends upon what his retirement date actually turned

21   out to be and what the GATT rates were.

22   Q.  That's what we have been talking about.  He's asking about

23   retirement in May of the following year, which isn't that long

24   off.

25   A.  This was an estimated retirement date from what I can see.

1    It's possible he -- a lot of people asked about what if I

2    retire early, as of whatever date, and they asked for

3    information.  That didn't mean they were going to retire at

4    that date.

5    Q.  Right.  You are doing a calculation as if.  So as if he

6    were to retire on that date, if you were to look at the growth

7    in his account from 1/1/96 to -- 1/1/96 he starts out at

8    $140,000.  Do you agree?

9    A.  Yes.

10   Q.  And his account balance grows by $14,000?

11   A.  Right.

12   Q.  So it would be fair to say that his account balance from

13   1996, 12/31, to May 1997, it's not going to grow by more than a

14   few thousand dollars, correct?

15   A.  Probably.

16   Q.  But that number is known, sir.  I mean there's his

17   compensation and there's 6 percent interest, and that doesn't

18   fluctuate, right?

19   A.  Right.

20         THE COURT:  Let me just ask so we have it clearly on

21   the record.

22         On PX 404, in the handwritten notes, it states the

23   number below the calculation, one of the calculations we have

24   been looking at, 224,817.02.

25         That same number is reflected on PX 330 as the minimum

1    lump sum as of 12/31/96.

2              Do you see that?

3              THE WITNESS:  Yes.

4              THE COURT:  If you go back to PX 404, it subtracts the

5    201,270.36 that is up above.  Do you see that?

6              THE WITNESS:  Yes.

7              THE COURT:  And the delta is 23,546.66.

8              Do you see that?

9              THE WITNESS:  Yes.

10             THE COURT:  What is the relationship between those two

11   numbers.  What does the 224 and represent and what does the 201

12   represent just in terms of the calculation?

13             THE WITNESS:  The 224 is the minimum lump sum benefit

14   as of 12/31/96.  I think the 201 was my attempt to do an

15   approximation of what it might be perhaps.

16   BY MR. GOTTESDIENER:

17   Q.  You think that because we walked through how you were using

18   an estimate using the factor table to get at 7 percent as a

19   GATT rate, correct?

20   A.  Yes.

21   Q.  If we could put on the screen the month-by-month changes in

22   the GATT rate in 1996.  You are doing this calculation --

23             THE COURT:  Let me just see.

24             Is this in the record someplace?

25             MR. GOTTESDIENER:  It is a PX --

F7hnosb7                          Kiley - cross

1            THE COURT:  Just give me the number.

2            MR. GOTTESDIENER:  With the Court's indulgence.

3            THE COURT:  Yes.

4            MR. GOTTESDIENER:  It's PX 1541.

5            THE COURT:  All right.  Do you have a copy of that?

6            MR. GOTTESDIENER:  No.  We don't have a copy of it

7  right now.

8            THE COURT:  All right.

9  BY MR. GOTTESDIENER:

10  Q.  Do you remember you were asked earlier, and at this point

11  I'm not sure whether it was myself or her Honor, at some point

12  you were telling us that historically, I believe you said at

13  this time, in 1995, you had been coming off of a period of high

14  interest rates, and it looked like the direction was in the

15  opposite direction generally, but you couldn't predict, right?

16            MR. RUMELD:  Objection.

17            THE COURT:  Sustained.  We run into issues with the

18  characterization.  I specifically remember his answer being

19  different from that.

20            I think one of the questions is, at the time that you

21  prepared the handwritten notes at PX 404, were you anticipating

22  a rise in interest rates as between that and what was

23  previously assumed to be the operative interest or the

24  operative GATT rate when the plan was first amended?

25            THE WITNESS:  I can't say for certain what I was

F7hnosb7                          Kiley - cross

1    thinking at that time, but it appears that it was.

2              THE COURT:  It appears that 404 reflects a higher

3    assumed GATT rate, is that right?

4              THE WITNESS:  Yes.

5              THE COURT:  So whatever a projection might have

6    resulted in as of 1/1/96 for Mr. Steven, it would be different

7    under PX 404 in terms of his accrued benefit because of a

8    potentially higher GATT rate, is that right?

9              THE WITNESS:  That's correct.

10             THE COURT:  That is what I had wanted to ask.

11             I'm sorry.  You can go back, Mr. Gottesdiener.

12   BY MR. GOTTESDIENER:

13   Q.  I'm just wondering, looking at the chart where you see the

14   September rate, where it says 7.03 --

15   A.  Yes.

16   Q.  -- looking at that and looking at the calculations you were

17   doing where you were trying to do an estimate at 7, does it

18   refresh your recollection that around that time you were aware

19   that the GATT rate was trending in that neighborhood?

20   A.  No, it doesn't.  I'm sorry.

21   Q.  OK.  But it certainly is consistent --

22   A.  Yes.

23   Q.  -- with the calculation that you were attempting to

24   perform --

25   A.  Yes.

F7hnosb7                          Kiley – cross

1   Q.   -- for Mr. Steven, right?

2   A.   Yes.

3              THE COURT:   You have about three minutes left.

4   BY MR. GOTTESDIENER:

5   Q.   What happens here is you went through the trouble -- was

6   this a typical calculation you did or not a typical calculation

7   you did?

8              MR. RUMELD:   Objection.

9              THE COURT:   "This" being the PX 404?

10             MR. GOTTESDIENER:   Yes.

11  BY MR. GOTTESDIENER:

12  Q.   Where you were taking factors and adjusting to look at a

13  minimum lump sum at different interest rates?

14  A.   I don't think that was typical, no.

15  Q.   You would agree again, based on the small number of people

16  who were in the excess plan, that was not the typical

17  participant, right?

18  A.   Correct.

19  Q.   So you do the calculation and show that in 1996, if you

20  took his benefit in 1996, he would be favored if the interest

21  rate stayed at 7, he would be favored by a 6 percent interest

22  rate that he was still entitled to receive for months yet still

23  in 1996, correct?

24             MR. RUMELD:   Objection.

25             THE COURT:   Sustained.

F7hnosb7                              Kiley - cross

1    BY MR. GOTTESDIENER:

2    Q.   You did the calculation at 6 percent and the result is

3    $224,000, right?

4    A.   Yes.

5    Q.   And he would have been entitled to that if he asked for his

6    benefit immediately in October, November, and December,

7    correct?

8    A.   Yes.

9    Q.   But if he waited and the interest rate that was prevailing

10   or the interest rate that prevailed was 7 percent, and he

11   didn't take it until sometime in 1997, he would suffer a drop

12   of his payment by the $23,000 that you show on that page,

13   correct?

14   A.   Yes.

15   Q.   But you didn't tell him that, did you?

16   A.   Apparently not.

17   Q.   In fact, you told him that you have not calculated an

18   estimated minimum lump sum payment as of that date, but indeed

19   you had, correct?

20          MR. RUMELD:   Objection.

21          THE COURT:   Sustained.  I'm sorry.  Overruled.  I have

22   a separate question.  You may answer that.

23   BY MR. GOTTESDIENER:

24   Q.   You had in fact done a calculation of that minimum lump sum

25   as of 1997 for him, correct?

F7hnosb7                          Kiley - cross

A.  Yes.  But my estimate was really, you know, an estimate of
what the factor would be.  It was not -- it was not with
knowledge of what the factor would be.  So I wasn't even
certain if the factor I calculated was correct, so --

          THE COURT:  Let me just ask -- go ahead.

          MR. GOTTESDIENER:  No, your Honor, go ahead.

          THE COURT:  I have just put mine away.  So if we go to
the typewritten version that we were looking at before of the
letter to Mr. Steven, that's DX 55.

          THE WITNESS:  Yes.

          THE COURT:  So there it says on that page that you had
not yet calculated the estimated lump sum.  But if you turn the
page, there is in fact an estimated lump sum.

          Was that second page included with the first page in
terms of the correspondence sent to Mr. Steven?

          THE WITNESS:  I would expect that it probably was.

          THE COURT:  What did you mean in the first page when
you talk about not having yet calculated the estimated lump
sum?

          THE WITNESS:  As of 5/1/97.

          THE COURT:  As of 5/1/97?

          THE WITNESS:  Right.

          THE COURT:  All right.

BY MR. GOTTESDIENER:

Q.  Just to tie that up, the 5/1/97 note is on your handwritten

1    calculation.  That would be the $201,000, correct?

2    A.  Yes.  But that was really -- I wasn't certain if that was

3    the correct factor.  You know, I did basically a ballpark

4    estimate of what the factor would be.

5    Q.  Right.  And you knew at the time there was a lot of layoffs

6    and people were retiring?

7    A.  Yes.

8    Q.  And when people come and they ask you to do a calculation,

9    they're looking to you for information and advice as to what

10   they should do, right?

11              MR. RUMELD:  Objection.

12              THE COURT:  The only objection --

13              MR. GOTTESDIENER:  We are looking for information.

14              THE COURT:  Right.

15              The only issue I have is the tone of voice, which adds

16   an element of argumentation to it, but why don't you go ahead

17   and ask the question.

18              Let's have the court reporter read it back.  That will

19   be neutral.

20              (Record read)

21              THE COURT:  The question is, was that your

22   understanding?

23   A.  Yes.

24   Q.  You didn't tell this guy --

25              THE COURT:  We're done with this guy.  I think we have

1    been there with this guy.  We have been through every

2    variation.  You can come back to it on Monday.  It's 4:30.

3              THE COURT:  We will conclude for this afternoon.  We

4    will pick up Monday at 9 a.m. with Mr. Kiley.

5              Mr Kiley, I know you get to think about this all

6    weekend and we'll see you back on Monday morning at 9.

7              MR. GOTTESDIENER:  Can your Honor just admonish the

8    witness again.

9              THE COURT:  The same instruction applies.  I think he

10   understands.  Everybody should understand that for all

11   witnesses once a witness is sworn -- I think you have reached a

12   different arrangement with the experts, but as to percipient

13   witnesses, for all witnesses once they have been sworn they

14   cannot talk about the content, the substance of their testimony

15   with counsel.

16             All right.  Thanks.  We are adjourned.

17             I will see you folks Monday morning.

18             MR. GOTTESDIENER:  Thank you, your Honor.

19             THE COURT:  Yes.  I have a full calendar tomorrow

20   starting very early.  Can you folks move everything down on the

21   tables.  I need to have the portion on my left, all of that

22   cleared down to at least here.  Your materials will be safe,

23   but I will have a bunch of folks.  The reason it has to be

24   there is because I'm going to have a bunch of criminal matters

25   where the marshals will want to sit right behind where

F7hnosb7                          Kiley – cross

1    Mr. Rumeld is sitting.

2              All right.

3              (Adjourned to Monday, July 20, 2015 at 9:00 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2    Examination of:                            Page

3    ROGER NOEL FARAH

4    Cross By Mr. Gottesdiener  . . . . . . . . . 517

5    Redirect By Mr. Rumeld . . . . . . . . . . . 560

6    Recross By Mr. Gottesdiener  . . . . . . . . 561

7    THOMAS J. KILEY

8    Cross By Mr. Gottesdiener  . . . . . . . . . 569

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25