F7KJOSB1                        Kiley - cross

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    GEOFFREY OSBERG, On behalf of
     himself and on behalf of all
4    others similarly situated,

5                    Plaintiffs,

6            v.                               07 Civ. 1358 KBF

7    FOOT LOCKER, INC.,

8                    Defendant.

9    ------------------------------x

10                                           July 20, 2015
                                             9:00 a.m.
11

12

13   Before:

14                    HON. KATHERINE B. FORREST,

15                                           District Judge

16

17                           APPEARANCES

18

     GOTTESDIENER LAW FIRM, PLLC
19        Attorneys for plaintiffs
     BY:  ELI GOTTESDIENER, Esq.
20        ALBERT HUANG, Esq.
          STEVEN DANA COHEN, Esq.
21                  Of counsel

22

     PROSKAUER ROSE LLP (NY)
23        Attorneys for defendant
     BY:  JOSEPH EMANUEL CLARK, Esq.
24

25

F7KNOSB1                        Kiley – cross

1              (Trial resumes)

2              (In open court)

3          THE COURT:  Hi.  Good morning, everyone.  Please be

4    seated.  We have got Mr. Kiley on the stand.  Sir, you remain

5    under oath from last week.

6          Mr. Gottesdiener, you may proceed, sir.

7          MR. GOTTESDIENER:  Thank, your Honor.

8    CROSS EXAMINATION (Continued)

9    BY MR. GOTTESDIENER:

10   Q.  Good morning, Mr. Kiley.  Last week we showed you PX 619.

11   If we can put that on the screen for a second.

12          Do you remember we discussed this on Thursday?

13   A.  Yes.

14   Q.  And this shows in effect a horse race over time between the

15   gross and accrued benefit, both as a lump sum and an annuity,

16   compared to the cash balance benefit, both as an account

17   balance, a lump sum and an annuity?

18          MR. RUMELD:  Objection.

19          THE COURT:  Why don't you rephrase it.  I don't even

20   know if you need to characterize it.  If the witness recalls

21   going over the document -- do you recall going over this

22   document?

23          THE WITNESS:  I recall the document.

24          THE COURT:  You can then just proceed.

25   BY MR. GOTTESDIENER:

F7KNOSB1                         Kiley - cross

1    Q.  You recall agreeing what this shows is over time as opposed

2    to a one-time snapshot the progression of the two different

3    benefits compared to each other, correct?

4    A.  When you say "two different benefits," would you clarify

5    that.

6    Q.  Sure.  You know that once the plan was amended effective

7    1-1-96, a participant actually had two benefits or potential

8    benefits under the plan, and the winner was their benefit,

9    correct?

10   A.  No.

11   Q.  No?

12   A.  If the person had accrued benefit to 12-31-95 plus the pay

13   credits and interest credits to date of termination, that is

14   not two different benefits.

15   Q.  Let's go back to the meeting you had with Mercer

16   implementing the amendment, Exhibit 126.  Do you remember those

17   typed notes of the meeting you had with the Mercer people in

18   the and HROC people on November 15th, 1995?

19   A.  I don't remember the name, but I remember the notes.

20   Q.  Do you remember we also went over typed notes, PX 751?

21   A.  Yes.

22   Q.  And the second bullet point we discussed that the current

23   structure for the current plan should remain in place.  Do you

24   see that?

25   A.  Yes.

F7KNOSB1                        Kiley - cross

```
 1              THE COURT:  It is going to be much better if you're
 2      able to show how --
 3              THE WITNESS:  That --
 4              THE COURT:  I want to see, Mr. Gottesdiener -- I know
 5      you're looking at documents there -- is there any way to pull
 6      the podium over?  We need to have you talking into the mike.  I
 7      want to see if there is some way for you to arrange your
 8      materials so you've got them, but can speak into the mike.
 9              Do you want to put your box on that ledge?
10              MR. GOTTESDIENER:  I think I will be able to come to
11      the mike.
12              THE WITNESS:  That is not a reference to two different
13      plans or benefits; that is a reference to the computer
14      programming structure to administer the plans.
15      BY MR. GOTTESDIENER:
16      Q.  Haven't you acknowledged that the structure of the plan
17      after the amendment went into effect was there was a greater of
18      A or B, A being the frozen accrued, or B, the cash balance
19      benefit?
20      A.  The accrued benefit could not be reduced, and the accrued
21      benefit to 12-31-95 could not be reduced, and the benefit at
22      the time of the termination was equal to the accrued benefit
23      plus the interest and pay credits.
24      Q.  I am sorry, Mr. Kiley.  I thought we went over
25      extensively --
```

F7KNOSB1                    Kiley - cross

1    A.  I don't know what you're trying to get at.

2    Q.  I am trying to start my examination, sir.  If you would

3    indulge me for a second.

4            Didn't you acknowledge repeatedly on Thursday that if

5    your pay credits and interest credits in your starting balance

6    that are added to it do not end up exceeding the frozen accrued

7    benefit, that those don't add anything to growing account

8    credits, don't add anything to your frozen accrued benefit,

9    right?

10           MR. RUMELD:  Objection.

11           THE COURT:  Let me allow the witness to answer it.  It

12   sounds like he has an answer.  Was that your testimony on

13   Thursday?

14           THE WITNESS:  I don't recall what I said on Thursday.

15           THE COURT:  Why don't you --

16           THE WITNESS:  I don't recall what I had for lunch

17   yesterday.

18           THE COURT:  -- why don't you come at a different way.

19           Come at it from the language of the SPD or some other

20   way if you want to do it that way.

21   BY MR. GOTTESDIENER:

22   Q.  Sir, I appreciate it is Monday morning and real early.  I

23   wonder if we can start and have you recall that the structure

24   of the plan once the amendment was in effect was that people

25   had two potential benefits, and the winner of those two

F7KNOSB1                         Kiley - cross

1    benefits was their actual benefit that they would be paid when

2    they requested payment?

3    A.  I would not phrase it that way.

4    Q.  Do you disagree with the way that --

5    A.  The person received the accrued benefit as of date of

6    termination.  If the accrued benefit as of 12-31-95 was

7    greater, then that would be the benefit the person received.

8    It is not two different benefits.

9    Q.  Your answer is an acknowledgment if it weren't bigger, the

10   cash balance were bigger, that would be their benefit?

11   A.  If you say so.

12   Q.  I am sorry, sir.  I am trying --

13           THE COURT:  I think you've --

14           THE WITNESS:  Can we move on?

15           THE COURT:  You can't actually get him to move on.  I

16   have to be able to do that.

17           I think you are going to battle.  Why don't we have

18   you move to your next question and let's get ourselves going

19   into a bit of a rhythm.

20           MR. GOTTESDIENER:  I am trying to do that.

21           THE COURT:  I understand, but you guys are having the

22   Monday morning blues, so move into the question and we'll see

23   with a new question, newly-posed, where we go go from there.

24           MR. GOTTESDIENER:  Could I approach to see what

25   exhibits he has in front of him?

F7KNOSB1                        Kiley - cross

1              THE COURT:  Yes.

2              MR. GOTTESDIENER:  I will ask him about an exhibit.

3              THE COURT:  Yes, yes, yes, that is the kind of thing I

4     hoped you guys would organize before we came out here.

5              MR. GOTTESDIENER:  Just double-checking.  (Pause)

6              If you can go back on the screen to 619.  I am just

7     seeing if he has a hard copy of it here.  (Pause)

8              Yes, it is right in front of you.

9     BY MR. GOTTESDIENER:

10    Q.  Do you see that --

11             THE COURT:  Actually, I see 619 in front of you.  I

12    want to make sure we can get your voice.

13    A.  Yes.

14             THE COURT:  The reason for that, Mr. Gottesdiener, I

15    realize that the transcript, if you read it, has got some

16    things that fall off the edge sometimes and I want to make sure

17    we get every word.

18             MR. GOTTESDIENER:  Thank you.

19    BY MR. GOTTESDIENER:

20    Q.  So you see as we discussed on Thursday that this is an

21    illustration of the two competing potential benefits somebody

22    could receive, their frozen accrued or their cash balance.  Is

23    that correct?

24    A.  I don't know.

25             MR. GOTTESDIENER:  The court's indulgence.

1            (Pause)

2   BY MR. GOTTESDIENER:

3   Q.   From Thursday, Page 67 line 25:

4   "Q   Let me try asking it this way.  Even if you don't remember

5   seeing this document, would you agree that at that time, in

6   August of 1995, you understood that you could show the

7   progression of a hypothetical or an actual employee's benefits

8   under the new formula based on this greater of A or B design

9   where you would essentially run a two-horse race, where you

10  showed a cash balance account and then you would show in the

11  right-hand column where it says minimum lump sum, you would

12  show the frozen accrued benefit paid as a lump sum?

13  "A   Yes."

14           You gave that testimony, right?

15  A.   Apparently.

16  Q.   Now, over the weekend we found another version of this

17  document.

18           MR. GOTTESDIENER:  Court's indulgence.  Could I hand a

19  copy to defense counsel, your Honor and the witness?

20           THE COURT:  Yes.

21           MR. GOTTESDIENER:  This is PX 1542.

22  BY MR. GOTTESDIENER:

23  Q.   If you look in the middle of the page, you see a line where

24  it has 50-year old in the cash balance plan?  And you're

25  looking at a hard copy as well as on the monitor?

F7KNOSB1                        Kiley - cross

1    A.   Yes.

2    Q.   That is your handwriting that says no adjustment?

3    A.   No, I don't think so.

4    Q.   You don't think that is your handwriting?

5    A.   No.

6    Q.   Whose handwriting does it look like to you?

7    A.   I don't know.

8    Q.   Does it look like Carol's handwriting?

9    A.   I don't know.

10   Q.   You said on Thursday -- withdrawn.

11            Do you think anybody else --

12            THE COURT:  You can't ask him to speculate, right?

13   BY MR. GOTTESDIENER:

14   Q.   On Thursday you said the only two people in the company who

15   would receive this kind of document from Mercer were you and

16   Carol, correct?

17   A.   Yes.

18   Q.   And on Thursday you acknowledged that there were probably a

19   large number of people that you knew on 1-1-96 were in

20   wear-away, correct?

21   A.   I don't recall saying that if that is what I said.

22   Q.   Putting aside -- withdrawn.

23            You do acknowledge that you knew, as in 1996, 1-1-96,

24   that a large number of people were in wear-away, correct?

25   A.   We didn't use the term, "wear-away."

F7KNOSB1                          Kiley - cross

1    Q.   Okay.  We have been through that before.

2              You knew that those people at that time, their cash

3    balance benefit was a lesser value either as a lump sum or an

4    annuity than their frozen accrued benefit, correct?

5    A.   Yes.

6    Q.   Could we just call that wear-away and agree you may not

7    have used that term frequently because you have already told us

8    that?  Can we have that agreement so we don't each time you

9    say --

10   A.   I think there is negativity associated with that term.

11   Q.   Okay.  How about the term you acknowledged after I read to

12   you your deposition testimony that you did consider it at that

13   time as a suspension of accruals?

14             Can we call it suspension of accruals for the purpose

15   of these questions?

16   A.   I don't agree with that term, either.  Whatever you want to

17   call it.

18   Q.   Do you remember in the context of discussing that there

19   were a large number of people in wear-away as of 1-1-96?  You

20   brought up the enhancement on Thursday?

21   A.   Yes.

22   Q.   And you also recall on Thursday that we saw that

23   notwithstanding the fact that people got that enhancement, that

24   there were a large number of people in those test case

25   scenarios who were shown getting the enhancement who were,

F7KNOSB1                          Kiley - cross

1    nevertheless, suffering from a freeze of their accruals for

2    several years?

3              MR. RUMELD:  Objection.

4              THE COURT:  Sustained.

5    BY MR. GOTTESDIENER:

6    Q.  You do acknowledge that on Thursday you looked at these

7    test case scenarios, right?

8    A.  Yes.

9    Q.  And that you received them at the time?

10   A.  Yes.

11   Q.  And that you paid attention to them?

12   A.  Yes.

13   Q.  And you yourself asked for additional scenarios?

14   A.  Yes.

15   Q.  And that you saw that under those scenarios,

16   notwithstanding people receiving the enhancement, they remained

17   in wear-away for a period of years?

18             MR. RUMELD:  Objection.

19             THE COURT:  Overruled.  I'll allow it.

20   A.  There were people who apparently we looked at examples of

21   whose minimum lump sum benefit was greater than their account

22   balance, yes.

23   BY MR. GOTTESDIENER:

24   Q.  For several years notwithstanding the enhancement, correct?

25   A.  I believe so.

F7KNOSB1                          Kiley - cross

1   Q.  I am just trying to get that foundation with the next

2   question I am trying to ask.

3          So you would acknowledge then that the purpose of the

4   enhancement was not to offset the wear-away effect?

5   A.  The purpose of the enhancement was to build up or increase

6   the initial account balance for all the participants.

7   Q.  We'll talk about that in a moment.  Could you just first

8   answer my question.

9          THE COURT:  I am going to ask you to sort of not do

10  the introductory language, as I asked.

11         MR. GOTTESDIENER:  This is cross-examination.

12         THE COURT:  I understand.  I am asking you and I am

13  instructing you not to do the introductory because that's where

14  we're drawing objections with the characterization.  I see Mr.

15  Rumeld, he stands up, and so just ask the question.

16  BY MR. GOTTESDIENER:

17  Q.  The purpose of the enhancement was not to negate the

18  wear-away effect, yes or no?

19  A.  I would say no.

20  Q.  The purpose of the enhancement was actually two-fold, it

21  was, as you say, to boost the accounts for people who were

22  close to retirement age and it was also to replace the early

23  retirement subsidy?

24  A.  I don't recall that.  It may have been.

25         MR. GOTTESDIENER:  The court's indulgence. (Pause)

F7KNOSB1                          Kiley - cross

1          Can we get PX-94 on the screen, please.  May I
2   approach, your Honor?
3          THE COURT:  Yes.
4          (Pause)
5          MR. GOTTESDIENER:  Does your Honor have a copy of
6   PX-94 already?
7          THE COURT:  Let me check.
8          MR. GOTTESDIENER:  I have an additional copy if the
9   court needs it.
10          THE COURT:  I do not.  Thank you.  The court has been
11   handed PX-94.
12   BY MR. GOTTESDIENER:
13   Q.  Okay.  There are three entries in this e-mail chain.  This
14   is dated August 18, 1997.  The one at the top of the page is
15   response written by you to the message at the bottom of the
16   page and on the next page.  Do you see that generally?
17          We'll go over it in more detail, but do you see that
18   generally?
19   A.  Yes.
20   Q.  So looking at what you're responding to, this is an e-mail
21   from Mr. Grefig that starts with Ellen and then goes on the
22   next page.  Do you see that?
23   A.  Yes.
24   Q.  Going to the second page, Mr. Grefig explains the reason
25   for the enhancement as, "There was concern that participants

F7KNOSB1                          Kiley - cross

1    close to early retirement eligibility at the time of conversion

2    to the cash balance format might have some slippage in their

3    early retirement benefits.  So, a subsidy was added."

4           Do you see that there, right?

5    A.  Yes.

6    Q.  And reading this and hearing this, you agree that you

7    understood Mr. Grefig at the time to be saying that the

8    enhancement was tied to the early retirement subsidy?

9    A.  I don't know.  I don't know that I would interpret the

10   highlighted language that way.

11   Q.  So you doubt that you understood him at the time that he is

12   saying the enhancement was tied to the early retirement

13   subsidy?

14   A.  No.  Just sitting here today, I don't know what it was 20

15   years ago.

16   Q.  How else could you have read it back then?

17   A.  I don't know.

18   Q.  It is fair to say that you can't think of any reason,

19   sitting here now, why back then you would have done anything

20   other than understood him to be saying that the enhancement was

21   tied to the early retirement subsidy?

22   A.  No, I can't say that.  I don't know.  I don't know what my

23   understanding was 20 years ago.

24   Q.  It is still Monday morning, but please listen to this

25   question closely.

F7KNOSB1                         Kiley - cross

```
 1              You don't, sitting here now, currently have any reason
 2     that you can tell us for why you doubt that reading that at the
 3     time, you would have understood him and did understand him to
 4     be saying that the enhancement was tied to the early retirement
 5     subsidy?
 6     A.  I can't say.
 7     Q.  You don't have any reason to point us to to doubt that is
 8     how you would have interpreted it?
 9     A.  I don't know how I would have interpreted it then.
10     Q.  I am sorry.  Let me ask it again.
11              You're acknowledging you can't think of any other way
12     to read that?
13     A.  Not now, but I may have then.  I don't know.  I don't know
14     what was in my mind then.
15     Q.  Very good.  I am asking you, acknowledging you can't think
16     now of any other way to interpret it, I am asking you to just
17     agree that sitting here now, you can't think of any reason that
18     you would not have interpreted it that way as a result of?
19     A.  Again, what's the point of what I am thinking now?  It was
20     what I was thinking then, and I don't know what I was thinking
21     then.
22     Q.  Right.  You can't identify any reason to doubt that you
23     would have understood him to be saying that the enhancement was
24     tied to the early retirement subsidy?
25     A.  I don't know.  I can't answer that.
```

F7KNOSB1                           Kiley - cross

1    Q.  I think we have your answer.

2             Now let's look at your response to Mr. Grefig.  First,

3    where you say I do not completely agree with Jim's explanation,

4    do you see that there?

5    A.  Yes.

6    Q.  So I guess you didn't always agree with Mr. Grefig.  Is

7    that right?

8    A.  Apparently.

9    Q.  Well, you told us on Wednesday that what Jim Grefig said

10   you took as gospel, right?

11   A.  When it pertained to actuarial advice, yes.

12   Q.  The design of the early retirement subsidy replacement,

13   this enhancement, that wasn't your design personally, was it?

14   A.  No.

15   Q.  So this was something that you would have taken as gospel

16   from him, right?

17             MR. RUMELD:  Objection.

18             THE COURT:  Let me read the question.

19             THE WITNESS:  A I would have taken --

20             THE COURT:  Hold on.  Overruled.  You may answer.

21             THE WITNESS:  We would have taken his advice as being

22   correct and accurate.

23   BY MR. GOTTESDIENER:

24   Q.  As gospel?

25   A.  I would prefer not to use the word, "gospel."

F7KNOSB1                         Kiley - cross

1   Q.  You were the one who brought it up on Wednesday, correct?

2   I am talking about Mr. Grefig, right?

3   A.  Yes.

4   Q.  So you are saying in the e-mail that you agreed with Mr.

5   Grefig, but not completely.  Is that fair?

6   A.  That appears to be, yes.

7   Q.  Because you believed that there were two purposes to the

8   enhancement, not just the one that Jim addressed.  Is that

9   fair?

10  A.  Well, the next sentence, "I believe the purpose of the

11  enhancement was to increase the account balances for

12  participants who were relatively close to retirement and whose

13  account balances would not, therefore, have sufficient time to

14  accumulate before retirement," I think that answers the

15  question.

16  Q.  Well, I think what you're saying, if I am hearing you

17  correctly, is you're pointing out that Jim's response is not

18  taking into account the lower rate of accrual under the cash

19  balance formula independent of the lost early retirement

20  subsidy?

21  A.  Well --

22  Q.  Can you answer that yes or no?  Isn't that what you've been

23  saying?

24  A.  I don't know.

25  Q.  When you talk about the build-up of the account, isn't

1    that, in effect, saying there was a lower rate of accrual, as

2    you pointed out repeatedly, compared to the prior formula with

3    the cash balance formula, right?

4    A.  Yes.

5    Q.  So Jim's not taking account of the lower rate of accrual

6    independent of the lost early retirement subsidy is what you're

7    explaining in the entirety of the e-mail, right?

8    A.  Yes.

9    Q.  And the context here was a participant, a lawyer written on

10   behalf of the participant wanting an explanation, do you see in

11   the third paragraph, you say, "I don't think that all of this

12   detail should necessarily be provided to the participant's

13   attorney.  I believe the purpose of the enhancement as stated

14   in the first paragraph above should be sufficient"?

15   A.  Yes.

16   Q.  Now, one of your responsibilities in the 20 years or so

17   that you worked in pension at Woolworth prior to the cash

18   balance amendment was gathering information for participant

19   communications?

20   A.  To some extent, yes.

21   Q.  You know there were two participant-wide communications

22   that went out every year:  One, an annual statement of the plan

23   benefit; and, two, a total compensation statement showing all

24   benefits including the retirement plan benefit?

25   A.  Yes.

F7KNOSB1                        Kiley - cross

1    Q.  And you were responsible for making sure that the people

2    who got those statements to the printer had the information

3    that was required to send those out to folks, right?

4    A.  I wasn't responsible for the comprehensive benefit

5    statement.  I was involved in probably helping to provide some

6    of the data for that, but I wasn't responsible for that.

7    Q.  I didn't ask you if you were responsible for the total

8    statement.  You were responsible for the pension piece,

9    correct?

10   A.  Yes.

11   Q.  In the pension piece in the total comprehensive, total

12   compensation statements, people got a personalized amount that

13   their benefit was at the time stated in the statement, right?

14   A.  I don't recall exactly what it showed, but something like

15   that.

16        MR. GOTTESDIENER:  May I approach the witness, your

17   Honor?

18        THE COURT:  You may.

19        MR. GOTTESDIENER:  I don't know if your Honor has this

20   and I don't know if your Honor would have this exactly in this

21   format.  I will hand up to the court.  This is a compilation of

22   three exhibits, PX 50, 51 and 52.

23        THE COURT:  All right.  Have you shown that to defense

24   counsel?

25        MR. GOTTESDIENER:  I have another copy I can give them

F7KNOSB1                              Kiley - cross

1      if they don't have it.

2                  THE COURT:  I see.  You've just literally taken those

3      three exhibits and stapled them together with green sheets

4      in-between them?

5                  MR. GOTTESDIENER:  Right.

6                  THE COURT:  All right.

7                  MR. GOTTESDIENER:  All of those exhibits were

8      uploaded?

9                  MR. HUANG:  Yes, previously uploaded.

10                 THE COURT:  Speak up.

11                 MR. GOTTESDIENER:  They were previously uploaded on

12     ECF, and defense counsel has those.  I do not have another copy

13     of that compilation, but they have those.  It is just the PXs

14     combined, 50, 51 and 52, for ease of reference.

15                 THE COURT:  All right.

16     BY MR. GOTTESDIENER:

17     Q.  Looking at those, you do recognize -- let's start with

18     number PX 50.  Do you see on the cover this is this gentleman's

19     your 1992 benefit statement?

20     A.  I don't recognize this particular one and I don't know -- I

21     mean I recognize the logo.

22     Q.  Sir, all I am asking is not that you recognize Gary Romig

23     got this statement.  These are the total compensation

24     statements we were just talking about, right?  That is what it

25     looks like?

F7KNOSB1                          Kiley - cross

1    A.  Yes, that is what it looks like.

2    Q.  If we can page through, you see the introduction -- if you

3    can blow that up a bit.

4          This shows the benefits summarized in this statement,

5    shows the current protection you and your family have against

6    financial losses which may result from injury, illness or

7    death.  The retirement benefit section highlights the financial

8    security you are building for the future.

9          Do you see that?

10   A.  Yes.

11   Q.  And it continues, "You will want to compare this statement

12   with those you receive in the future.  It is a measure of your

13   yearly progress."

14          You see that, right?

15   A.  Yes.

16   Q.  And then if we could go to the next page, under cost of

17   your benefits, you know in these total compensation statements

18   the company made a point of saying that the cost of people's

19   benefits shown in this statement -- in Paragraph 2 --

20   represents a significant portion of your total compensation?

21          MR. RUMELD:  Objection.  Your Honor, I just want to --

22   he is showing him a statement from 1992.

23          THE COURT:  That is all right.  If he remembers it, he

24   remembers it.  If he doesn't, then the document is here and it

25   is going to be in evidence.  I don't think there is going to be

F7KNOSB1                         Kiley - cross

1    any problem with publishing it.  Right now I think the question

2    is do you see the words on the page.

3              MR. RUMELD:  I would state an objection to relevance.

4              THE COURT:  I hear the objection.  I am going to see

5    where it is going.  The question was whether or not the witness

6    sees the first sentence that you highlighted here which is

7    again with the cost of your benefits as reflected on Page 3 of

8    PX 50, correct?

9              THE WITNESS:  Yes, I see it.

10   BY MR. GOTTESDIENER:

11   Q.  You know that these statements were made annually to

12   people?

13   A.  Yes.

14   Q.  And, in effect, they stayed the same after the plan was

15   amended?

16   A.  I don't know that.

17   Q.  Then we'll have to look at those.  You know before the

18   amendment that's the way things were stated in these

19   comprehensive statements, right?

20   A.  Yes.

21   Q.  So let's go to the page that shows retirement benefits,

22   health care benefits, survivor retirement benefits.  Do you see

23   that there?

24   A.  Yes.

25   Q.  On the retirement benefits page, the company showed the

F7KNOSB1                              Kiley - cross

1   participant their accrued benefit as of 12-31-the end of the

2   year preceding, correct?

3   A.  Yes.

4   Q.  And then the company did a projection of what the accrued

5   benefit would be if the participant kept working to normal

6   retirement date, right?

7   A.  Yes.

8   Q.  So like in this example, Gary Romig, he had accrued at that

9   point almost $600.00 as his annual benefit starting at age 65

10  if he did nothing else, left the company, didn't work another

11  day for the company, he could start collecting that at age 65,

12  correct?

13  A.  Yes.

14  Q.  And then the company was saying however, if you keep

15  working for us, given the assumptions, your salary increase and

16  you go all the way to your normal retirement date, for him it

17  was January 1, 2007, look, your benefit would be over a

18  thousand dollars?

19  A.  Yes, that was based on present earnings, not with salary

20  increases.

21  Q.  So there was no 4 percent assumption salary increase?  It

22  was just based on present earnings?

23  A.  Yes, that is what I said.

24  Q.  Thank you.

25          Now let me show you the other statements, examples of

F7KNOSB1                          Kiley - cross

1    the other statements that I mentioned, these annual statements

2    that went out to folks.

3              PX 1221 --

4              MR. GOTTESDIENER:  Could I approach, your Honor?

5              THE COURT:  Yes.

6              MR. GOTTESDIENER:  This is another compilation also

7    for Gary Romig, 12-22,-12-22, 12-23, 1991 through 1993, annual

8    plan statements just of the retirement plan benefit of

9    Mr. Romig.

10             THE COURT:  All right.

11   BY MR. GOTTESDIENER:

12   Q.  So these, you recognize these as well, correct?  Not Mr.

13   Romig's, but you recognize these plans?

14   A.  Yes.

15   Q.  On the front, this is a mailer that shows his address.  The

16   next page, so this showed the participant similar to the total

17   compensation statement, the current benefit and their projected

18   benefit.  Is that fair?

19   A.  Yes.

20   Q.  Now, the statement, when the amendment came in 1996, the

21   statement that went out, you were involved in the drafting of

22   the statement that people were going to see under the amended

23   plan, correct?

24   A.  I don't recall, but most likely.

25   Q.  Well, in your declaration, Paragraph 28, you say that you

F7KNOSB1                        Kiley - cross

1    were personally involved in distributing drafts for comments by

2    some professionals, right?

3    A.  If that's what it says.

4              MR. GOTTESDIENER:  Could we get on the screen 625, PX

5    625.

6              MR. GOTTESDIENER:  May I approach, your Honor?

7              THE COURT:  You may.

8              MR. GOTTESDIENER:  I don't know if your Honor has a

9    copy of 625 just in case.

10             THE COURT:  All right.

11   BY MR. GOTTESDIENER:

12   Q.  Do you see this is a memo from you and Carol to Pat Peck

13   and Sheilagh Clarke, subject, estimated retirement plan

14   statement, December 4, 1995?

15   A.  Yes.

16   Q.  It says, "Attached is the latest revised draft mock-up of

17   the 12-31-95 estimated cash balance statement.  Please let us

18   have your final comments by 4:30 today.  We must overnight the

19   mock-up to the printer for receipt tomorrow.  Thank you."

20             Do you see that?

21   A.  Yes.

22   Q.  Your handwriting adds a comment, and your comment is, "No

23   comments per Sheilagh Clarke, 12-4-95, 4:15 pm," right?

24   A.  Yes.

25   Q.  So this refreshes your recollection you were involved in

F7KNOSB1                          Kiley - cross

1    the creation of the amended plan annual retirement statement?
2    A.  Yes.
3              MR. GOTTESDIENER:  If we could get PX-6 on the screen,
4    please.  The second page, please.
5              MR. GOTTESDIENER:  This is the statement that went out
6    for Ms. Lerew.  Let me provide you with a copy, with the
7    court's indulgence.  Let me also provide you with a blank
8    version of that just so we have that because it might come in
9    handy.  PX 43, if we can briefly show that on the screen.  May
10   I approach, your Honor?
11             THE COURT:  Yes.
12             MR. GOTTESDIENER:  These are extra copies for the
13   court if the court can't locate them.
14   BY MR. GOTTESDIENER:
15   Q.  You would agree with PX-43 is the blank version, meaning
16   not filled in with the participant's information of the PX-6
17   that is for Ms. Lerew?
18   A.  Without reading both statements, I can't say for certain,
19   but it appears that way.
20   Q.  On the left it shows the current plan.  By the way, the
21   word "estimated" is used, you recall, because at that time
22   there was not a final compensation known for sure for people
23   for 1995, so there had to be an estimate done?
24   A.  That sounds reasonable.
25   Q.  And then a final version in some cases corrected was sent

1     out a few months later, around March of 1996?

2     A.  I don't recall that.

3     Q.  But that sounds reasonable?

4     A.  Perhaps, yes.

5     Q.  Well, the company wouldn't have just left people with an

6     estimated statement?  They would have given them the actual

7     statement for the year, right?

8     A.  Probably.

9     Q.  On the left it says the current plan, and it shows the

10    accrued benefit under the current plan, the estimated total for

11    December 31, 1995, that is under the old plan formula, the

12    traditional formula, correct?

13    A.  I don't know.

14    Q.  I am sorry.  You don't know what?

15    A.  I don't know if that is under the old formula.

16    Q.  What formula other than the old plan formula could it be

17    for current plan in 1995?

18    A.  That's most likely it.

19    Q.  On the right-hand side it says, "Amended plan as of January

20    1, 1996," right?

21    A.  Yes.

22    Q.  And it only shows an account balance, correct?

23    A.  Yes.

24    Q.  It doesn't show the frozen accrued or any accrued benefit

25    through 12-31-1995 as on the left?

F7KNOSB1                              Kiley - cross

1    A.  Yes.

2    Q.  So it doesn't show that that benefit is still part of your

3    amended plan benefit if it were greater than the account

4    balance?

5             MR. RUMELD:  Objection.

6             THE COURT:  I'll allow it.

7    A.  I don't know.  I didn't read the --

8    Q.  Well, take a moment.

9    A.  -- statement.  (Pause)  It just shows the account balance

10   as of 1-1-96.

11   Q.  So that is the extent of the person's entire entitlement,

12   according to this statement?

13   A.  I don't think so.

14   Q.  Well, if don't think --

15   A.  So there is a lot more.  This is a one-page statement.

16   There is a limit to what you can present to someone on one

17   page.

18   Q.  Okay, but if you would answer my question, according to

19   this one-page statement that represents their benefit, it says

20   their benefit is the account and it doesn't say there is any

21   other possible benefit, does it?

22            MR. RUMELD:  Objection.

23            THE COURT:  Sustained.

24   BY MR. GOTTESDIENER:

25   Q.  It doesn't show any other benefit on the right-hand side of

1   the page other than the account, correct?

2   A.  Correct.

3   Q.  It also makes a statement about the account balance

4   underneath the dollar sign.  It says, "The amount shown above

5   is what you could expect to see upon termination of employment

6   or retirement if you accrue no further benefits and elect a

7   lump sum form of payment," correct?

8   A.  That is what it says, yes.

9   Q.  And for anybody in wear-away, that was not an accurate

10  statement, correct?

11  A.  It is still an accurate statement relative to the account

12  balance.  There is another piece of it.

13  Q.  I am sorry.  It is not an accurate statement that that is

14  the amount they would get?  They would get more?

15  A.  They would get more, not less.

16  Q.  But it doesn't say you will get at least.  It says this is

17  the amount that you would get?

18  A.  It says that you could expect to receive.  It doesn't say

19  you will get.

20  Q.  The statement is the amount shown above is what you could

21  expect to receive?

22  A.  That's what it says.

23  Q.  But, in fact, you knew at the time what people could expect

24  to receive if they asked for their money that day without

25  working any further for the company was a whole lot more than

F7KNOSB1                              Kiley - cross

```
 1    what was shown in their opening balance, correct?
 2                MR. RUMELD:  Objection.
 3                THE COURT:  Hold on.  Sustained.
 4    BY MR. GOTTESDIENER:
 5    Q.  Do you remember on Thursday you testified that the 3
 6    percent spread between the 9 percent discount and the 6 percent
 7    interest crediting rate was pretty dramatic, right?
 8    A.  That's the difference of 3 percent.  That is significant.
 9    Q.  Sir, I am asking you a very specific question.
10                On Thursday you agreed that that was a pretty dramatic
11    spread, yes?
12    A.  I don't know if those were the exact words.
13    Q.  You acknowledge that that would mean that all those people
14    except for some people who by virtue of the enhancement may not
15    have been in that position, they would be in wear-away and
16    receive more than their account balance on that day, correct?
17    A.  Could you repeat that.
18    Q.  You know that anybody who was in wear-away would receive
19    more than what was just shown in their opening account balance
20    statement, correct?
21    A.  Yes.
22    Q.  Thank you.
23                Now, if we could get PX 44 on the screen.
24                MR. GOTTESDIENER:  May I approach, your Honor?
25                THE COURT:  Yes.
```

F7KNOSB1                          Kiley - cross

1              MR. GOTTESDIENER:  Here is an extra copy if the court

2    can't locate it.

3    BY MR. GOTTESDIENER:

4    Q.  PX 44 is a fax received from outside counsel, directed to

5    the attention of Ms. Clarke at Foot Locker in the General

6    Counsel's Office, correct?

7    A.  It appears that way, yes.

8    Q.  And on the page that has the Bates No. 562 -- let me know

9    when you're there.

10   A.  Yes.

11   Q.  So you see where it has under Item 6 -- first of all, you

12   see there is a line drawn through, "Amended plan as of January

13   1, 1996," crossing it out?

14   A.  Yes.

15   Q.  And then to the left of it apparently in its place is the

16   word, "distributions".  Do you see that?

17   A.  Yes.

18   Q.  And you would agree that one thing that the amendment did

19   was provide participants whose benefits were worth more than

20   $3,500 with an additional distribution option?

21   A.  As I recall, that wasn't an option.  That was, I think that

22   was a mandatory lump sum.

23   Q.  I am sorry?

24   A.  I think --

25   Q.  I hear what you're saying.  I think you are

F7KNOSB1                          Kiley - cross

1    misunderstanding me.  I am acknowledging, I am saying over
2    $3,500?
3    A.  Over $3,500.
4    Q.  Over $3,500, before the amendment, you could not receive a
5    lump sum if you wanted to?
6    A.  That's correct.
7    Q.  So a distribution option of a lump sum was added to the
8    plan?
9    A.  Yes, that was one of the goals.
10   Q.  Another thing that we went over on Thursday is why that
11   was.  Another thing that we know is that in addition to that
12   distribution option, there was an additional formula added to
13   the plan as of 1-1-96, the cash balance formula?
14   A.  Yes.
15   Q.  What remained in the plan was the preexisting formula and
16   preexisting benefit under the traditional formula, correct?
17   A.  At the accrued benefit of 2-12-95, yes.
18   Q.  But there was a formula in the plan that said you get the
19   greater of that or the new cash balance formula, whichever is
20   bigger?
21           MR. RUMELD:  Objection.
22   Q.  Correct?
23           THE COURT:  Overruled.
24   A.  At the point of termination, you got the greater of your
25   account balance or the accrued benefit as of 12-31-95.

F7KNOSB1                      Kiley - cross

```
 1  BY MR. GOTTESDIENER:
 2  Q.  And that was your true accrued benefit under the plan, the
 3  greater of those two, correct?
 4  A.  Yes.
 5  Q.  So your amended plan benefit was the greater of those two
 6  benefits and you had a distribution option.
 7          Do you see where, according to the edits, the
 8  statement that you and I were talking about just now, the
 9  amendment shown in the item is the amount you could expect to
10  receive upon termination, do you see that that is being edited
11  in this fax?
12  A.  Yes.
13  Q.  Do you see what it says?
14          It says essentially the same language, but then
15  counsel is adding, comma, you get that amount, the account
16  balance amount, unless your accrued benefit as of December 31,
17  1995, as set forth in Item 5 above -- which is on the left-hand
18  side of the page -- is greater on an actuarial equivalent
19  basis.  Do you see that?
20  A.  Yes.
21  Q.  That text did not make it into any of the annual statements
22  that the company put out, correct?
23  A.  Not the ones you showed me.
24  Q.  You don't know of any?  We can look at each year.  Do you
25  know of anywhere it said --
```

F7KNOSB1                         Kiley - cross

1    A.  I don't recall.

2    Q.  You don't recall that ever being said, right?

3    A.  I don't recall the statements to that detail.

4    Q.  On Thursday you went over a couple of times, you

5    acknowledged the policy was when somebody was not on the

6    threshold of termination and having asked for payment after

7    being terminated and severed or retired from the company, to

8    just show someone their account balance as the present value of

9    their pension benefit, correct?

10   A.  I think --

11   Q.  I am just asking about Thursday.  You acknowledged that,

12   right?

13   A.  Yes.

14   Q.  This is what we're seeing in the statement that went out,

15   not the edits, that is consistent with that policy to just show

16   the account balance, right?

17   A.  It appears to be.

18   Q.  Now, you see there is a question at the top, you see it

19   says, "Why eliminate normal retirement date estimates?"

20          Do you see counsel has asked the question, "Why

21   eliminate normal retirement date estimates?"

22   A.  Yes, I see that.

23               (Continued on next page)

24

25

1    Q.  In fact, the company stopped doing that in these

2    statements, right?

3    A.  Yes.

4    Q.  Do you remember we saw the Romig statements preconversion

5    or preamendment and it showed if you keep working, at normal

6    retirement date this is what your benefit will be?

7    A.  Yes.

8    Q.  What is the answer to counsel's question?  Why eliminate

9    normal retirement date estimates?

10   A.  I don't know.

11   Q.  If the statements had shown normal retirement date, NRD

12   estimates, what would the NRD be for someone on 1/1/96, to keep

13   it simple who didn't get the enhancement?

14            MR. RUMELD:  Objection.

15            THE COURT:  Hold on.

16            Why don't you rephrase.

17   BY MR. GOTTESDIENER:

18   Q.  If the statement showed the NRD estimate, what would it be

19   for someone on 1/1/96?

20            MR. RUMELD:  Objection.

21            THE COURT:  I will allow it, but don't want to go down

22   the road of a bunch of if questions.

23   A.  I don't know.

24   Q.  It would show the 12/31/95 accrued if they are in

25   wear-away, right?

F7knosb2                              Kiley - cross

1    A.  It sounds like it probably would.

2    Q.  It would be in effect just like the test-case scenarios

3    where we saw the static accrued benefit, correct?

4    A.  It sounds like it.

5              MR. RUMELD:  Objection.

6              THE COURT:  Overruled.  Go ahead.

7    BY MR. GOTTESDIENER:

8    Q.  If a year passed and the person were still in wear-away and

9    it's 1997, what would the normal retirement date estimate have

10   been?

11   A.  I don't know.

12   Q.  You do.  It would have also shown the 12/31/95 benefit.  It

13   would have shown the same static benefit, right?

14             MR. RUMELD:  Objection.

15             THE COURT:  Overruled.

16   Q.  Wouldn't it?

17   A.  Apparently.

18   Q.  Let's use Mr. Osberg, the plaintiff in this case, as an

19   example.  His 12/31/95 accrued benefit was $6,000, $6,098.57.

20             It's not disputed that he was in wear-away for seven

21   years until the date that he took his payment in 2002.

22   Wouldn't his estimated NRD for all those years state $6,098.57?

23             MR. RUMELD:  Objection.

24             MR. GOTTESDIENER:  If he's still in wear-away.

25             MR. RUMELD:  Lack of foundation, your Honor.

F7knosb2                         Kiley - cross

1              THE COURT:  I think that the question can be put

2    differently.

3              Let me ask the question this way:

4              If an individual was in wear-away, would their

5    estimated retirement benefit be their lump sum as of 12/31/95?

6              THE WITNESS:  I think it depends on what was

7    determined to show on the statement.  I mean --

8              THE COURT:  I'm sorry.  My question is a little bit

9    different, which is let's for starters get the premise in that,

10   if somebody is in wear-away, then their benefit is the 12/31/95

11   lump sum.

12             Would you agree with that?

13             THE WITNESS:  Yes.  It would be greater, yeah.

14             THE COURT:  So, if a retirement benefit was put on to

15   a sheet of paper and you listed their account balance and you

16   had on the other side their lump sum as of 12/31/95, so long as

17   they are in wear-away what they would actually get would be the

18   12/31/95, right?

19             THE WITNESS:  Yes.

20             THE COURT:  All right.  I think that's enough.

21             THE WITNESS:  The only problem is you don't know what

22   happens to wear-away until after the fact.  You can't project

23   what is going to happen to the GATT interest rates seven years

24   into the future.

25             THE COURT:  I understand.  So it could be fluctuating.

1            THE WITNESS:  Yes.

2            THE COURT:  So therefore it could be dramatically

3    different in some -- or strike that.  It could be fluctuating,

4    is that right?

5            THE WITNESS:  Yes.

6            THE COURT:  All right.  You may proceed.

7    BY MR. GOTTESDIENER:

8    Q.  But that is not true for annuity wear-away.  It would be

9    static, correct?

10           MR. RUMELD:  Objection, your Honor.

11           THE COURT:  He can ask.  I will allow it.

12   A.  I don't recall how the calculation worked.

13   Q.  Mr. Kiley, the accrued benefit of Mr. Osberg at 6,098 --

14           THE COURT:  I don't know that he knows anything about

15   Mr. Osberg.  That's the issue.

16   BY MR. GOTTESDIENER:

17   Q.  Let's look at Ms. Lerew.  You have Ms. Lerew's statement in

18   front of you, No. 6, PX 6.

19           On the left-hand side of the page, No. 5, let's assume

20   this was the final, this shows the estimated.  Let's assume

21   that's the final accrued benefit of Ms. Lerew, $10,473.61.

22   Let's simplify it and call it $10,000.  OK?

23   A.  OK.

24   Q.  That $10,000 that's for annual, starting-at-age-65 payment,

25   correct?

F7knosb2                        Kiley - cross

1    A.   Yes.

2    Q.   You can see her date of birth, partially obscured, but it

3    says 1956 or 1958.

4              Do you see that?

5    A.   Yes.

6    Q.   So she was a good 20 years away from normal retirement date

7    in 1996, right?

8    A.   Yes.

9    Q.   So, if she worked not another day for the company and left

10   her benefit in the plan, at age 65 she would get that $10,000

11   every year, right?

12   A.   Yes.

13   Q.   If she is in wear-away and she remains in wear-away but

14   works for the company year after year after 1996 and the

15   company on these statements kept showing her projected normal

16   retirement date annual annuity benefit, you agree it would have

17   kept showing that $10,000, correct?

18              MR. RUMELD:   Objection.

19              THE COURT:   OK.  I will allow it.  But then I want to

20   move on.

21              MR. GOTTESDIENER:   That's all I have, your Honor.

22              That's all I have been trying to get to.

23   BY MR. GOTTESDIENER:

24   Q.   That is what it would show?

25   A.   I think from year to year on a year-to-year basis -- again,

F7knosb2                          Kiley - cross

1    you can't project -- this doesn't project her benefit into the

2    future.  It shows her benefit as of a point in time.

3    Q.  I'm sorry.  That is exactly what I'm asking, is if you did

4    project it into the future --

5    A.  But this statement didn't.

6    Q.  Well, yes.

7         THE COURT:  Let's just move on.  The math is going to

8    work out as the math works out.

9    BY MR. GOTTESDIENER:

10   Q.  When you prepared benefit calculations, did you and others

11   in your office rely on benefit estimate registers prepared by

12   Mercer?

13   A.  I don't recall exactly.  That rings a bell.

14   Q.  Those benefit estimate registers, does it ring a bell they

15   provided lump sum payments, minimum lump sum payments under the

16   12/31/95 formula that you could grab and insert into a

17   calculation estimate?

18   A.  I'm sure they were quite detailed.  I don't recall what was

19   exactly on them.

20   Q.  Does that sound right, though?  You said they're quite

21   detailed.  One of the details they would have would be the

22   frozen accrued benefit, right?

23   A.  Probably.

24   Q.  And the cash balance account amount right?

25   A.  Right.

F7knosb2                         Kiley - cross

1    Q.  And they would show as of the date the minimum lump sum if

2    it were greater than the cash balance amount.  That's what you

3    would have to put down for the estimate, right?

4    A.  I don't know.  I mean I don't recall.  It sounds plausible.

5    Q.  And this minimum lump sum 12/31/95, we looked at some of

6    your hand calculations on Thursday, that's what you were

7    calculating in those hand calculations like for Mr. Steven,

8    right?

9    A.  Yes.

10   Q.  When you had a register, you would be able to actually just

11   grab it from the register rather than do it by hand, correct?

12   A.  Sounds likely, yes.

13   Q.  As you know, there were a lot of people who were in

14   wear-away when they were paid and who were paid their minimum

15   lump sum, right?

16   A.  Yes.

17   Q.  And it would have been extremely time consuming for you and

18   Carol and anyone else who was capable of doing it of

19   calculating their minimum lump sum by hand?

20   A.  Yes.

21   Q.  So you had Mercer provide that kind of information in a

22   handy register?

23   A.  That sounds reasonable.

24   Q.  That November 15 document where you had the implementation

25   meeting, if you look at that document in front of you, 751, the

F7knosb2                              Kiley - cross

1   typed version, on the second page of the typed version in the

2   middle of the page -- sorry, it is on page 3, I guess.

3              THE COURT:  What is the exhibit number of this?

4              MR. GOTTESDIENER:  This is 751, your Honor.

5              THE COURT:  All right.

6   BY MR. GOTTESDIENER:

7   Q.  In the middle of the page there is a bullet point,

8   Retirement Estimates.

9   A.  Yes.

10  Q.  You wrote -- let's just make sure.  Do you have in front of

11  you also your handwritten version of that so we have no

12  question as to the typed version.  It's PX 126.

13             If you would go to the page on 126 that has the Bates

14  in the corner 2291.

15             Do you see that?

16  A.  I see it on the screen.

17  Q.  Is that sufficient for you?

18  A.  That is fine.

19  Q.  You see it says, Retirement Estimates.  Mercer will produce

20  a register in Social Security number order segregated by 55 and

21  over and under 55 as of 1/1/96.  55 and others will be first.

22  This will contain all of info on Linda's estimate letter plus

23  L.S. -- lump sum, right?

24             MR. RUMELD:  I just want to correct it would first be

25  1/1/97.

F7knosb2                          Kiley - cross

1   BY MR. GOTTESDIENER:

2   Q.  With that correction, L.S. is you writing plus lump sum,

3   right?

4   A.  Yes.

5   Q.  Then register estimates -- retirement estimates, it's one

6   bullet point down, after estimated statements.  Do you see it

7   says, Retirement estimates run the register twice -- once based

8   on 1/1/95 accrued plus age as of 1/1/96 to use now.  Then run

9   again at end of January after '95.

10          Do you see that?

11  A.  After '95 earnings are updated, yes.

12  Q.  Let me show you PX 1287, December 8, 1995.

13          This is a letter from Donna McNamara.  She was with

14  Mercer, right?

15  A.  The name is familiar, but I don't remember.

16  Q.  But you see this is Mercer letterhead?

17  A.  Yes.

18  Q.  Correct?

19  A.  Yes.

20          MR. GOTTESDIENER:  Your Honor, may I approach and give

21  the witness a copy?

22          THE COURT:  You may.

23          MR. GOTTESDIENER:  Here's one for the Court in case

24  the Court needs one.

25          THE COURT:  I've got it.

F7knosb2                          Kiley - cross

 1   BY MR. GOTTESDIENER:

 2   Q.  You're copied on the letter, right?

 3   A.  Yes.

 4   Q.  It is sending a sample of the 1/1/96 benefit statement

 5   register and says that the entire register will be provided to

 6   you on microfiche, right?

 7   A.  Yes.

 8            MR. GOTTESDIENER:  PX 870, please.

 9            May I approach.

10            THE COURT:  You may.

11   BY MR. GOTTESDIENER:

12   Q.  This is a worksheet, a register based worksheet, correct,

13   in your hand?

14   A.  It is in my handwriting, yes.

15   Q.  It says, Worksheet for calculating minimum lump sum based

16   on Mercer benefit register, doesn't it?

17   A.  Yes.

18   Q.  The purpose was to be used when the payment date is after

19   1/1/96, right?

20   A.  Yes.

21   Q.  It shows that the estimated MLS at 1/1/96 is provided as

22   item II from the Mercer register, right?

23   A.  Yes.

24   Q.  So Woolworth sets up calculation worksheets based on the

25   benefit register that says to take the estimated minimum lump

F7knosb2                         Kiley - cross

1    sum from the Mercer register for purposes of the calculation,

2    is that fair?

3    A.  Yes.

4    Q.  So this confirms that Woolworth has the Mercer registers

5    that provide the 1/1/96 MLS by this time?

6    A.  Yes.

7            MR. GOTTESDIENER:  PX 563, please.

8            May I approach, your Honor.

9            THE COURT:  Yes.

10   BY MR. GOTTESDIENER:

11   Q.  This is another invoice directed to you from Mercer for

12   their services, correct?

13   A.  Yes.

14   Q.  One of the entries four bullet points down shows,

15   Completion of estimate register for the months of January

16   through June 1966 -- means '96 -- using updated data.

17           Correct?

18   A.  I see that, yes.

19   Q.  There's also some other estimate registers indicated on the

20   invoice, right?

21   A.  Yes.

22           MR. GOTTESDIENER:  PX 490, please.

23           May I approach?

24           THE COURT:  You may.

25           MR. GOTTESDIENER:  Blow that up just a bit.

F7knosb2                          Kiley - cross

 1  BY MR. GOTTESDIENER:

 2  Q.  This is the estimate register for January 1, '96, through

 3  June 1, '96 that you received from Mercer, correct?

 4  A.  It looks like it, yes.

 5  Q.  And the person's name at the top of the first entry, there

 6  are several entries on this page, right --

 7  A.  Yes.

 8  Q.  -- for different participants?

 9          The names are redacted and Social Security numbers are

10  redacted?

11  A.  Yes.

12  Q.  Do you see that?

13  A.  Yes.

14  Q.  And but the name of Jeffrey Osberg, the named plaintiff in

15  the case, has not been redacted on this copy, right?

16  A.  Yes.

17  Q.  It shows in January the cash bal., cash balance.  That's

18  the opening balance he was given of $6,400?

19  A.  Yes.

20  Q.  You see that it shows that if he asked for his payment that

21  day, his minimum lump sum was actually almost $15,000, $14,914?

22  A.  Yes.

23  Q.  Then it shows that yet again in the next column when it

24  says lump sum payable and it shows the same amount?

25  A.  Yes.

F7knosb2                          Kiley - cross

1    Q.  And then it shows the annuity options he had, correct?

2    A.  Yes.

3    Q.  And you see at the top where it says 12/31/95 accrual,

4    $6,098.57?

5              Do you see that?

6    A.  Yes.

7    Q.  That's the annual benefit starting at age 65 that in effect

8    would compare to Ms. Lerew's $10,000, correct?

9              MR. RUMELD:  Objection.

10             THE COURT:  You can answer.

11   A.  Yes.  That's what it is.

12   Q.  That is what would be static?

13   A.  If he --

14   Q.  Were in wear-away after '96?

15   A.  Or he terminated and didn't accrue any additional benefits.

16   Q.  That is the exact point, which is that wear-away is you

17   keep working, but you don't accrue any additional benefits,

18   right?

19   A.  Yes.

20   Q.  So for the seven years if you showed him his estimated

21   accrued benefit, if he kept working, year after year, it would

22   still show that $6,098.57, right?

23   A.  Yes.

24   Q.  If we look actually at everyone on this page, we don't have

25   their names, but you can see everybody on this page is in

F7knosb2                         Kiley - cross

1    wear-away on 1/1/96, correct?

2    A.  I don't know.

3    Q.  Well, let's look at it.  You can figure it out in a moment

4    with us together.

5            MR. RUMELD:  Objection.

6            THE COURT:  Actually I don't think he needs to do

7    this.  But I think at this point in time it's evident from the

8    page whether they are or are not, so I think we can move on.

9            MR. GOTTESDIENER:  With the Court's indulgence.

10            Can I get PX 189 on the screen, please.

11            May I approach?

12            THE COURT:  You may.

13   BY MR. GOTTESDIENER:

14   Q.  This is from you to a participant whose name we know as

15   Mr. Lyon.  You sent a letter to him.  If you look on the next

16   page that has the Bates number 10381 in the process of doing

17   this letter you noted to Ellen Glickfield, you see how it

18   says -- withdrawn.  Do you see on 10381 --

19   A.  Yes.

20   Q.  -- you have a PS?

21   A.  I see it.

22   Q.  P.S.  I took the estimate from the estimate register in

23   Marion's office?

24   A.  Yes.

25   Q.  Then, if you look at 10386, that is your handwriting again,

F7knosb2                          Kiley – cross

1   right?

2   A.  Yes.

3   Q.  The prior page we just discussed also was your handwriting,

4   right?

5   A.  Yes.

6   Q.  So you see at the bottom right it says, Per Mercer estimate

7   register, page 606?

8   A.  Yes.

9   Q.  So you agree it looks like you're getting the June '96 cash

10  balance minimum lump sum and annuity values from the Mercer

11  register?

12  A.  Yes.

13          MR. GOTTESDIENER:  To save time I'm going to show you

14  together a bunch of different documents.

15          With the Court's indulgence.

16          Maybe we can put them on the screen as I'm grabbing

17  them.

18          The first is PX 459, this is from October of '96.

19          The next is 492, together with 437.

20          The next is going to be 485, from November.

21          The next is going to be 460 from December 1996.

22          The next one is going to be a compilation from 1997,

23  January 22, starting with PX 491.

24          And the last is going to be from February 12 '97, PX

25  493 together with 477.

F7knosb2                         Kiley - cross

1              So if we could return to the first in the series,

2      October '96.  We had just been in July of '96 where you were

3      doing Mr. Lyon using the register in Marion's office.  Now we

4      are in October, 459.

5              THE COURT:  I'm sorry.  One second.

6              Let me just make sure.

7              MR. GOTTESDIENER:  I will supply copies to the Court.

8              THE COURT:  Yes.  I think it's easier.  I'm not sure

9      that I've got -- it looks like you have supplemented over the

10     weekend with maybe some of the things you have taken out

11     previously.

12             MR. GOTTESDIENER:  With the Court's indulgence.

13             THE COURT:  Yes.  It's fine, but I don't think I have

14     those as a result.

15             Thank you.  All right.  I have been handed the

16     exhibits that counsel just previously referenced, and I have PX

17     459 in front of me.

18     BY MR. GOTTESDIENER:

19     Q.  So over this period of time Mercer is continuing to provide

20     you updates of these registers, right?

21     A.  Probably.  It appears that way.

22     Q.  But the company is not providing these MLS lump sum amounts

23     to active employees unless the employee actually says I want to

24     now terminate and leave?

25     A.  I think so.

1   Q.  So, if you look at 459, this is a one-page excerpt for

2   Mr. Osberg, and it has updated data for him as of September 1

3   of '96, including cash balance and minimum lump sum, correct?

4           Do you see his cash balance amount of $7400 and his

5   minimum lump sum of $15,000, rounded?

6   A.  Yes.

7   Q.  And from before, when it was in the 6,000s and 14,000 as to

8   the minimum lump sum, the changes in that number do not reflect

9   additional benefits he earned.  Those are changes due to the

10  two factors we discussed on Thursday.  He's aged a bit and the

11  interest rate in this case would stay the same.  It's because

12  he aged, right?

13  A.  Yes.

14  Q.  Now, the next two exhibits, 492 is a cover, and 437 --

15  well, on the front page, on this cover in hand it says, Final

16  calcs from Mercer.  Do you see that to the right?

17  A.  Yes.

18  Q.  And it has October 28, '96, the print date on the front?

19  A.  Yes.

20  Q.  So this is another example of a register that we have been

21  talking about, correct?

22  A.  Yes.

23  Q.  And on the next page it has the 1/1/96 payment date, right?

24  A.  Yes.

25  Q.  And it shows the cash balance and the minimum lump sum.  It

F7knosb2                        Kiley - cross

1    shows the minimum lump sum is higher for this participant?

2    A.  Yes.

3    Q.  So that $60,000 higher number would not be shown to the

4    active employee, right?  The account balance $55,000 would be

5    shown?

6              MR. RUMELD:  Objection.

7    Q.  Was shown.  If the objection is to using would, it was

8    shown.  The $55,000 was shown?

9              THE COURT:  Why don't you restate the question.

10   BY MR. GOTTESDIENER:

11   Q.  In these statements that went out to people, active

12   employees were told the amount they would receive if they

13   accrued no further benefits was the account balance amount, in

14   this particular case the $55,000, correct?

15   A.  That is what it's showing, yes.

16   Q.  And then 460, in December -- this is November '96 estimate

17   regs.  This has updated data as of November 1, including cash

18   balance and minimum lump sum as of that date, correct?

19   A.  It says November 1 -- it's hard to read, but it looks like

20   it's as of November 1.

21   Q.  You have a print copy in front of you?

22   A.  I can't read the print.

23   Q.  You see in that example the minimum lump sum is effectively

24   twice as large as the account balance, the cash balance as of

25   the date in question, correct?

F7knosb2                           Kiley - cross

1    A.  Yes.

2              THE COURT:  Just to sort of save time, because these

3    are in the record, because the witness has testified that it's

4    likely he received registers updated from time to time, I think

5    these documents now speak for themselves.

6              You can move on.

7              MR. GOTTESDIENER:  OK.  I just want to wrap it up by

8    saying --

9    BY MR. GOTTESDIENER:

10   Q.  Despite the fact you had this information, you were sending

11   out to active people the wrong information as to what they

12   would be paid if they left the next day --

13             MR. RUMELD:  Objection.

14   Q.  -- right?

15             THE COURT:  He can answer it.

16   A.  I don't we were sending the wrong information out.

17   Q.  You agree that you weren't providing the minimum lump sum

18   to active people?

19   A.  If someone requested an estimate of their benefits, we gave

20   them the correct -- we gave them the complete information.

21   Q.  But on Thursday --

22             THE COURT:  You are not going to get him to agree to

23   your ultimate point, I don't think, so that will be for

24   argument.

25   A.  We didn't give out erroneous information.

F7knosb2                          Kiley - cross

1   Q.  You did when you --

2   A.  We did not.

3   Q.  I'm sorry sir.

4   A.  We did not, sir.  I'm sorry, sir.  Don't argue with me.

5           THE COURT:  Hold on.  This is the issue in the case.

6   It is not worth you guys fighting with each other about it.

7           All right.

8           MR. GOTTESDIENER:  How about PX 164.

9   BY MR. GOTTESDIENER:

10  Q.  This is from June of '96, June 18.  This is an e-mail

11  trail, but the one of most relevance is starting at the second

12  page.  There is somebody, Sue Hartman, in Camp Hill,

13  Pennsylvania, who worked in the HR department.

14          Does that name ring a bell?

15  A.  Yes.

16  Q.  She was an HR person at Camp Hill, and she was the

17  interface person on the scene who provided participants with

18  assistance who were interested in getting pension estimates if

19  they were thinking about retiring, right?

20  A.  Yes.

21  Q.  If we look at the e-mail --

22          MR. GOTTESDIENER:  May I approach?

23          THE COURT:  Yes.

24          MR. GOTTESDIENER:  A copy for the Court.

25  BY MR. GOTTESDIENER:

1    Q.   Though it's redacted, this is concerning the request of a

2    gentleman Hank Lombardozzi.  If you start at the back, the

3    bottom e-mail, you see there is an e-mail from Catherine Krause

4    to Sue Hartman?

5    A.   I see that.

6    Q.   And who is Catherine Krause?

7    A.   I don't know.  The name is vaguely familiar, but I don't

8    remember who she was.

9    Q.   Another HR person, correct?

10   A.   Probably.

11   Q.   And Sherry Flesses, you know that name, don't you?

12   A.   Also vaguely.

13   Q.   Another HR person?

14   A.   Probably, in the location.

15   Q.   Who is Wally Sprague?

16   A.   The name is also familiar.  I don't remember who he was.

17   Q.   So, according to these e-mails Hank is asking for an

18   estimate, it's June of '96, and he wants to know what his

19   pension would be if he decides to retire in a year from then,

20   June 1, '97 -- this is on the very last page -- and a year

21   after that, June 1, '98.  Do you see that, the final page?  He

22   would like to see the figures should he decide to retire on the

23   two dates that I just said.

24   A.   OK.

25   Q.   And it goes up the chain, and the e-mail on the first page

F7knosb2                          Kiley - cross

1   under Attached Note, that's from Carol Kanowicz, your

2   colleague.  Do you see that?

3   A.  Yes.

4   Q.  It is to Sue, and it's copying Wally Sprague and Marion

5   Derham?

6   A.  Yes.

7   Q.  Subject retirement estimate.

8           At the top you see that Carol sent it to you and to

9   Pat Peck, right?

10  A.  Yes.

11  Q.  And you don't have any reason to doubt that you received

12  this, correct?

13  A.  Correct.

14  Q.  What Carol says in effect, and we can go through it in

15  detail, is we just can't do these estimates anymore, so he

16  doesn't get an estimate of either of his potential benefits?

17          MR. RUMELD:  Objection.

18          THE COURT:  Sustained.

19  Q.  The e-mail reads:  Sue, In answer to your memo of June 13,

20  '96, please be advised that effective 1/1/96 the Woolworth

21  retirement plan was changed from a traditional pension plan to

22  an account balance plan.  The new plan encompasses many

23  changes.  It is more than just a change in the benefit

24  formula -- it is a new concept.

25          Under the prior plan, a projected benefit could be

F7knosb2                          Kiley - cross

1    reasonably calculated because a participant's accrual was

2    impacted by (a) a definite formula and future W-2 compensation,

3    and (b) a determinable early retirement factor.  Under the new

4    revised plan, a projected benefit would be impacted by (a) an

5    escalating formula based on (i) years of credited service and

6    (ii) W-2 compensation (b) an annual 6 percent simple interest

7    rate and (c) an interest rate each year based on the interest

8    rate for 30-year treasury bills as of December of each prior

9    year.

10             Are you following me so far?

11   A.   Yes.

12   Q.   That is Carol describing in her words the difference

13   between the prior formula that was frozen as of 12/31/95 and

14   the cash balance formula that went into effect 1/1/96 is that

15   fair?

16   A.   Yes.

17   Q.   And we are agreed that the participant is entitled to

18   receive the better of the outcome under either of these two

19   formulas, correct?

20   A.   Yes.

21   Q.   So she continues, As we cannot determine the rate of

22   interest in successive years, it is virtually impossible to

23   produce a projection that has any value.

24             She continues, We currently are seeing a rate swing of

25   over a full point in this year alone.  If the current monthly

F7knosb2                           Kiley - cross

1   rate holds to the end of the year, benefit calculations will be

2   significantly impacted in 1997.

3              Do you see that?

4   A.   Yes.

5   Q.   That is, you understand now and understood then, that is a

6   discussion that has accuracy as to the cash balance annuity

7   benefit because it involved an interest rate, right?

8              MR. RUMELD:  Objection.

9              THE COURT:  Overruled.

10  A.   Repeat the question, please.

11  Q.   This, what she is describing about this, we can't determine

12  the rate of interest in successive years, that is relevant to

13  the determination of the annuity under the cash balance

14  formula, correct?  The annual benefit payable at normal

15  retirement date involves the use of an interest rate, correct?

16  A.   Yes.

17  Q.   And that interest rate under the plan is the better of for

18  the participant 6 percent or the 417(e) rate, correct?

19             MR. RUMELD:  Objection.

20             THE COURT:  Overruled.

21  A.   I don't recall that detail, but --

22  Q.   It sounds right?

23  A.   It sounds right.

24  Q.   So there is a variability.  You need to know exactly, to

25  know the exact cash balance accrued benefit annuity, you need

F7knosb2                          Kiley - cross

1   to know what the interest rate is at the point of calculation,

2   correct?

3   A.  Yes.

4   Q.  Just so it's clear, we are talking about the interest rate

5   that is used once you have accumulated the account balance up

6   to age 65 and you take that accumulated balance and you convert

7   it into an annuity starting at age 65, right?

8            MR. RUMELD:  Objection.

9            THE COURT:  Hold on.  Let me just read.

10           Overruled.  You can come back on some of this on

11  redirect.  I think I understand your point.  All right.

12           So you may answer.

13  A.  Again, I don't recall the details of the calculation, but,

14  yes, this -- it sounds like there was a calculation like that

15  that was done.

16  Q.  Again, we are on the B side of the A or B formula, the cash

17  balance side of the formula, right?

18  A.  Yes.

19  Q.  Now, there was no reason, as in the past, that Hank

20  couldn't get a projection of his A benefit, his frozen 12/31/95

21  benefit, was there?

22  A.  Well, that is not a projection.  That is just the frozen

23  benefit.

24  Q.  Well, remember we talked about the other participants and

25  Mr. Osberg, but that number, in his case $6,000 prior to the

F7knosb2                          Kiley - cross

1   amendment, Mr. Romig, you could show the projected change in

2   the accrued benefit if somebody kept working, right?

3   A.  Yes.

4   Q.  But it would not have changed for Hank if he were in

5   wear-away, correct?

6             MR. RUMELD:  Objection.

7             THE COURT:  Hold on.  Let me just read it.

8             All right.  I will allow him to answer it.  You may

9   answer.

10  BY MR. GOTTESDIENER:

11  Q.  If he were in wear-away, that benefit, the A, wouldn't have

12  changed, correct?

13  A.  Correct.

14  Q.  And that could have been given to him and he could have

15  been told we can't do the B part, right?

16  A.  Correct.

17  Q.  You agree with Carol's next statement, don't you, From a

18  human resource standpoint, giving out information that is

19  inaccurate is misleading, and may cause participants to make

20  decisions which they otherwise would not make.  Since those

21  decisions would be financial in nature, you can see the harm

22  that might be done.

23            You agree with Carol's statement, don't you?

24  A.  Yes.

25  Q.  So if Hank thought that by continuing to work he was

F7knosb2                          Kiley - cross

1   increasing his pension and it turns out that he was going to be

2   in wear-away no matter how much longer he worked, couldn't that

3   have, giving him information that he can't get a projection,

4   couldn't that have harmed him?

5           MR. RUMELD:  Objection.

6           THE COURT:  Sustained.  We don't need him to go there.

7   All right.  Just move on.

8           MR. GOTTESDIENER:  Understood, your Honor.

9           With the Court's indulgence.

10          Can we get back on the screen PX 188.

11  BY MR. GOTTESDIENER:

12  Q.  We looked at this briefly on Thursday, Mr. Kiley.  This is

13  a letter that you sent to Donald Dill, January 31, 1996.

14          THE COURT:  We are going to be taking a break in about

15  five minutes.

16  BY MR. GOTTESDIENER:

17  Q.  Do you remember we went over this, where on January 31, '96

18  you sent Mr. Dill, this participant, a copy of the announcement

19  letter with the Farah/Hilpert letter of September 13, '95 and

20  the highlights memo from November 17, '95?

21  A.  Yes.

22  Q.  And you are effectively using those documents before the

23  SPD comes out as kind of an interim summary plan description?

24          MR. RUMELD:  Objection.

25          THE COURT:  Hold on.

F7knosb2                        Kiley - cross

1          We are not going to take it in the legal sense of

2     word.  Why don't you restate the question.

3     BY MR. GOTTESDIENER:

4     Q.  As a practical matter, you didn't have the SPD --

5     withdrawn.  You know that there is something called a summary

6     of material modifications?

7     A.  Yes.

8     Q.  And you issued those not in connection with this, a change

9     to the plan, but in the 20 years before you issued summary of

10    material modifications at Woolworth, right?

11    A.  Yes.

12    Q.  In effect they operate, not the legal conclusion, but just

13    as a practical matter as an interim SPD, right?

14              MR. RUMELD:  Objection, your Honor.

15              THE COURT:  Hold on.

16          Why don't you just restate the question.  I am not

17    going to be able to understand what you are trying to get at

18    from this question.  Why don't you restate it.

19    Q.  So you understood as a practical --

20              THE COURT:  Let's take off the so.

21              MR. GOTTESDIENER:  I'm sorry.

22    BY MR. GOTTESDIENER:

23    Q.  You understood as a practical matter as a benefits

24    professional that participants were entitled to understand the

25    basic operation of their pension plan?

F7knosb2                          Kiley - cross

1    A.  Yes.

2    Q.  And the bible for communicating the basics to the

3    participant was in the summary plan description, the SPD?

4    A.  Yes.

5    Q.  The amended plan went into effect on January 1, '96, but

6    you know that there was no SPD that had yet been written and

7    issued to participants as of January 31, '96, correct?

8    A.  Yes.

9    Q.  So when a participant wanted to know what was up with the

10   basics of the amended plan and requested information in the

11   form of a letter such as you got from this participant, it was

12   appropriate to provide them with an interim description of the

13   plan as amended, a summary of material modifications?

14            MR. RUMELD:  Objection, your Honor.

15            THE COURT:  Hold on.

16            Sustained.

17   Q.  It was appropriate to provide them with --

18            THE COURT:  The problem is that the question as

19   phrased is asking what was in the mind of the participant.  So

20   you have to redo the question.

21            MR. GOTTESDIENER:  I'm sorry.  The participant --

22            THE COURT:  That's what you've got.

23            MR. GOTTESDIENER:  I didn't mean to do that.  I just

24   meant to ask --

25            THE COURT:  Just pose another question.

F7knosb2                          Kiley - cross

1          MR. GOTTESDIENER:  I am sorry.

2     BY MR. GOTTESDIENER:

3     Q.  If the participant says I would like information about

4     how --

5          THE COURT:  Let's just avoid the ifs.  You can

6     certainly approach it directly.  But you don't need to do the

7     ifs.  It's just going to get us into trouble.

8          MR. GOTTESDIENER:  Sure, your Honor.

9          THE COURT:  Let me say this so that everybody is

10    clear.  There are certain times when an if question is

11    reasonable, but it's only when it's deeply embedded in a series

12    of questions where there's already a factual predicate.  In

13    this context, there is not, so I can't allow it because there

14    is no reasonable extrapolation to that.  I say that just for

15    the record because of the prior objections that I did not

16    sustain.  You may proceed.

17    BY MR. GOTTESDIENER:

18    Q.  You don't remember Mr. Dill's specific request, correct?

19    A.  No.

20    Q.  If the participant is asking for information --

21         THE COURT:  No.  No ifs.  That's what I just said.

22    BY MR. GOTTESDIENER:

23    Q.  Why would you send a participant a copy of both the

24    announcement letter and the highlights memo in January of ''96?

25    A.  Most likely that was all I had at that point in time to

F7knosb2                          Kiley - cross

1   provide to him.

2   Q.  Right.  But I'm asking why did you provide that?

3   A.  I don't know.  It probably would have been -- had to do

4   with the nature of his request.

5   Q.  OK.  So those two documents together you thought at the

6   time you sent it out provided a fair and accurate summary of

7   the changes to the amended plan?

8   A.  I don't know if I thought that.  I probably thought that

9   was the only information we had at that point in time that was

10  written and passed all the vetting and could be, you know,

11  appropriately provided to participants.

12  Q.  As a description of the plan as amended --

13  A.  Yes.

14  Q.  -- 1/1/96?

15  A.  Yes.

16          MR. GOTTESDIENER:  Is this a good time to break?

17          THE COURT:  Yes.  Let's take our midmorning break

18  right now.  I am going to ask the witness to step down and go

19  ahead and take a break.  I just want to talk about some

20  housekeeping for the first minute or two of our break.

21          (Witness not present)

22          THE COURT:  How much do you have left with this

23  witness, Mr. Gottesdiener?

24          I am anxious to move on.

25          MR. GOTTESDIENER:  Not much, your Honor.

F7knosb2                              Kiley - cross

1          THE COURT:  Like how much?  Half an hour?  Before

2     lunch?

3          MR. GOTTESDIENER:  Definitely before lunch.

4          THE COURT:  All right.  So we'll go until will lunch.

5     That's what I wanted to know.  How much cross-examination do

6     you folks think you have got or redirect?

7          MR. RUMELD:  I believe about an hour and a half.

8          THE COURT:  All right.

9          MR. RUMELD:  Somewhere around there.

10         THE COURT:  What's after that, Mr. Gottesdiener?

11         MR. GOTTESDIENER:  I have a brief witness who is an

12    out-of-town witness who has got to leave today, and then

13    Ms. Peck.

14         MR. RUMELD:  Your Honor, we talked about doing Ms.

15    Peck after Mr. Kiley she's been sitting in the hallway since 9

16    o'clock this morning.

17         MR. GOTTESDIENER:  We also very specifically -- I read

18    the transcript -- I said that I had this witness --

19         THE COURT:  Hold on.  It sounds like what we are going

20    to do, we're going to get through this other witness who is in

21    from out of town we are going to get to Ms. Peck.  You folks

22    can work it out.

23         It sounds like both human beings are being

24    inconvenienced.  We want to get to both of them get them back

25    to other parts of their lives.  We will make that happen as

F7knosb2                        Kiley - cross

1      quickly as we can.  Let's be very efficient.

2              I want to remind you that while the time has not been

3      used, it's not as if we're running short on time at this point,

4      we are on Monday of what's an eight-day trial, so we're today

5      four days in.  We've got next Monday as well, but I want you to

6      factor this in as well with your for your planning purposes.

7              OK.  We will have to talk about it if we're going to

8      somehow end up running into issues with the defense case.  We

9      won't.  You guys will be able to put on your case.  I want to

10     make sure we do four days and four days.  That's what I had

11     been thinking.

12             Some of the witnesses are encompassed within the

13     plaintiff's case, so it is not quite like that, but I still

14     want us to end with everybody having their say and putting on

15     the case they need to put on by the end of the day next Monday.

16     So if we are going to run into problems with that I need to

17     have that surfaced.

18             OK.  Just so we all think about it.

19             All right.  Let's take a break.

20             (Recess)

21

22

23

24

25

F7KJOSB3                          Kiley - cross

1          THE COURT:  Let's all be seated.  All right, Mr.

2     Gottesdiener, you may proceed, sir.

3     BY MR. GOTTESDIENER:

4     Q.  May we have PX-903 on the screen, please.  This is a

5     February 1, 96 letter that you wrote.

6          MR. GOTTESDIENER:  Does your Honor have a copy?

7          THE COURT:  I do not.

8          MR. GOTTESDIENER:  May I approach?

9          THE COURT:  You may.

10    BY MR. GOTTESDIENER:

11    Q.  Now this is to Ms. Beaver, Carlene Beaver.  Do you know

12    Ms. Beaver?

13    A.  No.

14    Q.  She apparently worked at Camp Hill.  You say, "This is in

15    response to your request concerning your retirement benefits."

16          Then you say, "I wish to assure you that the amounts

17    indicated on your estimated retirement plan statement as of

18    January 1, 1996 (1-1-96 statement) are correct."

19          Then you say, "The amount shown in Item 5 on the

20    left-hand side of the statement under the heading current plan

21    is your estimated annual accrued benefit payable at age 65

22    under the prior plan formula.  This amount, for comparison

23    purposes, should be equal to or greater than the amount shown

24    in Item 3 on your December -- prior year's, December 31, '93

25    statement."

1          Do you see that?

2     A.   Yes.

3     Q.   So what you're telling her is you could see the growth from

4     one year to the next, right?

5     A.   Right.

6     Q.   Then you say, "Your estimated account balance, which is

7     shown on the upper right-hand side of the 11-1-96 statement is

8     your initial account balance under the plan as amended on

9     January 1, 1996.  This account balance is the actuarial

10    equivalent lump sum value of your accrued benefit as of

11    12-31-95.  This is the amount that you may have expected to

12    receive in a single lump-sum payment of you terminated your

13    employment on January 1, 1996."

14         Do you see that?

15    A.   Yes.

16    Q.   You're saying that on February 1, '96, so what you're

17    saying is a month earlier, that amount is what you would have

18    received as your lump sum if you asked for it on 1-1-96, right?

19    A.   May have expected to receive, yes.

20    Q.   You understood that the average participant would have

21    understood you to be saying that is the amount that they would

22    get on 1-1-96, correct?

23    A.   I don't know.  I don't know what I understood at that point

24    in time.

25    Q.   You don't know what?

F7KJOSB3                          Kiley - cross

1    A.  I don't know what I understood at that point in time.

2    Q.  You can't say that you were thinking of the average

3    participant when you wrote that letter?

4    A.  I don't know.

5    Q.  Then you tell her to refer to the highlights memo that you

6    enclose for more information about the revised plan.  Is that

7    right?

8    A.  Yes.

9    Q.  May we just see Page 2.  Then you enclose a summary plan

10   description as of February 1, '96.  That must have been for the

11   prior plan, correct?

12   A.  I don't know for certain.  Probably.

13          MR. GOTTESDIENER:  Why don't we just resolve this

14   issue that keeps coming up with another document, PX 59 from

15   December 24,199.  May I approach?

16          THE COURT:  You may.

17          MR. GOTTESDIENER:  Do you want an extra copy?

18          THE COURT:  No.  I am all set.  Thank you.

19   BY MR. GOTTESDIENER:

20   Q.  So this is a letter that you write, do you see on the

21   second page you sign and say a revised summary plan, do you see

22   on the second page, the middle paragraph?

23   A.  Yes.

24   Q.  "A revised summary plan description reflecting the plan as

25   amended January 1, '96 is currently being printed.  In its

F7KJOSB3                        Kiley - cross

1    place I have enclosed the SPD covering the plan in effect as of

2    December 31, 1995 and a letter to participants which describes

3    the January 1, 1996 plan amendments."

4    A.  I see that, yes.

5    Q.  So this tells you two things, doesn't it:  First, it

6    refreshes your recollection that the formal -- withdrawn --

7    that the SPD for the amended plan was not available prior to

8    sometime in December of '96?

9    A.  Yes.

10   Q.  And it also tells you in this case that you were providing

11   as information about the amended plan in addition to your

12   letter the Farah and Hippert letter from September 15th?

13   A.  Yes.

14   Q.  Now back to the prior exhibit, please, so back to the

15   second page there, so you're refreshed that you didn't have an

16   amended plan SPD in February, so this must have been a

17   reference to the old plan SPD, right?

18   A.  This is over a month later, so it was possible it was an

19   updated summary plan description, but probably not likely.

20   Q.  I am sorry?

21        If you don't have the amended --

22   A.  Wasn't that in the letter as of December 1995?

23   Q.  The SPD?

24   A.  '96, okay, yes, okay, yes.

25   Q.  We know this is not the amended plan SPD, this is the old

F7KJOSB3                           Kiley - cross

1    plan SPD?

2    A.   Right.

3    Q.   You have been speaking to the participant about her old

4    plan benefit in the prior page where you said you can see the

5    progress in your accrued benefit by comparing the '93 as of '93

6    with the as of '94, correct?

7              MR. RUMELD:  Objection.

8              MR. GOTTESDIENER:  Withdrawn.

9    BY MR. GOTTESDIENER:

10   Q.   Could you go to the first page, please.

11             Remember you were saying to her that this amount for

12   comparison purposes should be equal to or greater than the

13   amount shown in Item 3 in your December 31, '93 personal

14   retirement plan statement?

15   A.   Yes.

16   Q.   What you were talking about there was the change in her old

17   plan accrued benefit prior to the amendment, what she earned in

18   the interim?

19   A.   Yes.

20   Q.   Let's put up 186.  This is a letter you sent out the same

21   day to a different participant, copying Ms. Kanowicz and Ms.

22   Derham.  186 is to a Michael Collins, and --

23             MR. GOTTESDIENER:  Does the court have a copy of this?

24             THE COURT:  I do not.

25             (Pause)

1          MR. GOTTESDIENER:  I am not handing a hard copy of

2    that, your Honor, that you could use.  904 was also sent the

3    same day.  Can I approach and gave your Honor a copy of that?

4          THE COURT:  Yes.  Thank you.

5          (Pause)

6          MR. GOTTESDIENER:  I understand what happened here,

7    your Honor.  If we can go back to 186.  186 is a letter to a

8    participant.  Do you see that?  May I approach?

9          THE COURT:  Yes.

10         MR. GOTTESDIENER:  That is actually two letters.  The

11   first one is from March and the second one in the exhibit is

12   from February.  My apologies.  We have the February 1 on the

13   screen.

14   BY MR. GOTTESDIENER:

15   Q.  This is from Mr. Collins, and it is also the same day as we

16   just saw that you wrote Ms. Beaver, and again you're writing to

17   say, you say you assure them that the amounts on the statement

18   are correct.  Do you see that?

19   A.  Yes.

20   Q.  Do you remember on Thursday we talked about the gentleman

21   Mike Steven who was in the excess plan?

22   A.  Yes.

23   Q.  Who you gave information to in October of '96, do you

24   remember that?

25   A.  Yes.

F7KJOSB3                         Kiley - cross

1   Q.  Over the weekend did you happen to remember Mr. Steven?

2   A.  No.

3   Q.  I am sorry?

4   A.  No, I did not.

5   Q.  Let's look at Exhibit 329.  You gave not just one estimate

6   to Mr. Steven, you gave one in January, did you not?

7   A.  I don't remember.

8              MR. GOTTESDIENER:  May I approach?

9              THE COURT:  You may.

10             MR. GOTTESDIENER:  329.

11  BY MR. GOTTESDIENER:

12  Q.  Do you see that you sent him a memo, and there is a second

13  page that was produced along with the memo.  You told him, "We

14  have calculated your estimated retirement benefits as you

15  requested.  For illustration purposes, a retirement date of

16  July 1, 96 was used."

17             And this is from the vantage point of January, January

18  19th shortly after the plan went into effect.  The estimates

19  include amounts payable from both the Woolworth retirement plan

20  and the full payment plan, right?

21  A.  Yes.

22  Q.  You had some responsibilities with respect to the full

23  plan, full payment plan, right?

24  A.  Yes.

25  Q.  You know there was really only about 20 people who were in

F7KJOSB3                          Kiley - cross

1    the full payment plan, correct?

2    A.  I don't remember the number, but there weren't that many.

3    Q.  Just top executives, correct?

4    A.  For the most part.

5    Q.  You provide estimates, you give the termination date,

6    retirement date, June 30, July 1, and then you write,

7    "Estimated earnings through June 30, '96, $82,000."

8            Do you see that?

9    A.  Yes.

10   Q.  And then you provide the spouse benefit if he elects an

11   annuity and asks for a 50 percent qualified joint survivor?

12   A.  Yes.

13   Q.  You say that is half of the stated amount.  Then you say

14   the lump-sum payment, 217,000, right?

15   A.  Yes.

16   Q.  And then you show two different annuities, the single life

17   annuity at 23,000 and the 50 percent qualified joint survivor

18   annuity, 21,000, correct?

19   A.  Yes.

20   Q.  Then you say, "If you have any questions after reviewing

21   these estimates, please let me know.  I apologize for the delay

22   in responding to your request."

23            Do you see that apology?

24   A.  Yes.

25   Q.  Let me show you Exhibit 404.  This is an October 31, 1995

F7KJOSB3                          Kiley - cross

1   calculation for Mr. Steven.  Did I say 404?  I am sorry.  405.

2             MR. GOTTESDIENER:  May I approach?

3             THE COURT:  Yes.

4             MR. GOTTESDIENER:  We'll talk about 404 in a moment.

5   BY MR. GOTTESDIENER:

6   Q.  405 is a calculation for Mr. Steven from October of 1995.

7   Do you see that it has in the bottom-left-hand, B E N, Ben,

8   underscore calc dot Excel?

9   A.  Yes.

10  Q.  In the middle it has the date of October 31, '95?

11  A.  Yes.

12  Q.  Is this a calculation that you did or Mercer did for you?

13  A.  I don't recall.

14  Q.  It is something that you could have done or Mercer could

15  have done for you?

16  A.  Yes, or someone else in the benefits department could have

17  done it.

18  Q.  By just plugging in the values?

19  A.  Yes.

20  Q.  So it wouldn't have taken any special understanding to

21  arrive at these figures, just plug in the values in the boxes?

22            MR. RUMELD:  Objection.

23            THE COURT:  Overruled.

24  A.  I don't know that I'd say that.  I think it probably would

25  have required some understanding.

F7KJOSB3                          Kiley - cross

1   BY MR. GOTTESDIENER:

2   Q.  Let me then back up.

3        There were some calculations that could be done by

4   somebody who was just trained to plug in numbers and wouldn't

5   necessarily understand the different calculations.  Is that

6   fair?

7   A.  Probably, yes.

8   Q.  But there are other calculations such as this calculation

9   where you would have to have some understanding of what you

10  were doing in order to perform it.  Is that fair?

11  A.  That is fair.

12  Q.  In the benefits department the people who had that level,

13  the second kind of level, who would produce this calculation

14  for Mr. Steven, that would have been yourself and Carol?

15  A.  And Marion.

16  Q.  And Marion?

17  A.  Yes.

18  Q.  But no one else as far as you remember?

19  A.  I am not sure if Ellen Glickfield would have had that

20  ability.

21  Q.  She may have?

22  A.  She may have.

23  Q.  Anyone else you can think of?

24  A.  Not that I can think of.

25  Q.  But definitely you, Marion and Carol could do this?

F7KJOSB3                          Kiley - cross

1    A.  Yes.

2              THE COURT:  Let me be sure we have PX-405 clearly

3    noted.  It has on the bottom FLOSB 010430, correct?

4              MR. GOTTESDIENER:  The version I have of 405, your

5    Honor?

6              THE COURT:  The one we were just looking at, 404.

7              MR. GOTTESDIENER:  Could you scroll to the bottom, the

8    one on the screen which is 405.

9              THE COURT:  I was wondering about that.  What you

10   handed me is -- mine at the bottom says 010430.  Do you have a

11   different one?

12             MR. GOTTESDIENER:  Yes.  Do you have PX-405 on the

13   top?

14             THE COURT:  I was writing on the top of it, "PX-405."

15             MR. GOTTESDIENER:  Then I handed your Honor a working

16   copy we had.  I am sorry.

17             THE COURT:  That is all right.

18             MR. GOTTESDIENER:  Perfect!

19             THE COURT:  I have now been handed PX-405.  All right.

20             (Pause)

21   BY MR. GOTTESDIENER:

22   Q.  Before we look at this a little closer, do you remember I

23   culled up 404, which is a compilation -- withdrawn.

24             It is not a compilation.  It is a collection of many

25   documents about Mr. Steven.  I'll provide a hard copy for the

F7KJOSB3                         Kiley - cross

1    witness in a moment.  While we are finding that, when you --

2    you were pretty good, in addition to being a note-taker, you

3    were a pretty good record-keeper.  Is that fair?

4    A.  It is fair.

5    Q.  You liked to keep everything close to you, not send it off

6    to off-site storage?

7    A.  Yes.

8    Q.  And when you did calculations or estimates for people, you

9    would generally keep your work together for that person.  Is

10   that fair?

11   A.  Yes.

12   Q.  So let me show you 404.  This was produced to us by the

13   defendants just like this in one package.  Do you see the last

14   page of that package, 404?  Do you see the last page has that

15   Bates number that I believe was the one her Honor had.  Do you

16   see how that is the same document except for it's got Mr.

17   Steven's name and date of birth redacted and it has got a

18   different Bates number --

19   A.  Yes.

20   Q.  -- than 405?

21          THE COURT:  What is the question?

22          MR. GOTTESDIENER:  I am asking him if it is the same

23   document.

24          THE WITNESS:  It appears to be, yes.

25          MR. GOTTESDIENER:  Thank you.

F7KJOSB3                         Kiley - cross

1   BY MR. GOTTESDIENER:

2   Q.  So let's look at it a little closer in terms of what it's

3   showing.  It's determining that the lump sum of his frozen

4   accrued benefit as of 12-31-95, based on his estimated earnings

5   through the end of the year, is how much?

6   A.  I don't know.

7   Q.  You don't know?  Okay.

8        How about looking at where it says estimated minimum

9   lump sum value 12-31-95 about halfway between -- halfway and

10  two-thirds down the page?

11  A.  Okay.

12  Q.  You agree that is what, that $196,000 is what his lump sum

13  would be on that date of his frozen accrued benefit?

14  A.  That's what is shown on this sheet.

15  Q.  Yes, but you agree with that?

16  A.  I don't know if I agree with that calculation.  That is

17  what it appears to be.

18  Q.  That is all I am asking you.

19       According to this calculation, his estimated earnings

20  for the end of the year, we are standing on October 31, so we

21  don't know, at the end of the year he has a frozen accrued

22  benefit when the amended plan goes into effect, correct?

23  A.  Yes.

24  Q.  And it shows, do you see how it shows at the top, the 5th

25  line accrued benefit in December 31, 1994, it shows it is

F7KJOSB3                              Kiley - cross

1    $29,000?

2    A.  Yes.

3    Q.  And then it estimates his earnings through the year and

4    that he adds $2,300 to his benefit?  That is his accrual for

5    the year '95 estimated?

6    A.  Yes.

7    Q.  And that means he ends up with a $31,000, starting at age

8    65, annual payment until he dies, right?

9    A.  Yes.

10   Q.  That is his single life annuity, correct?

11   A.  Yes.

12   Q.  Then it shows his age on that date.  He is not 65.  He is

13   57 --

14   A.  Right.

15   Q.  -- and some change, almost 58, correct?

16   A.  Yes.

17   Q.  So he has about a little over seven years to normal

18   retirement age, right?

19   A.  Yes.

20   Q.  And then it shows three things:  The deferred annuity

21   values at 9 percent, that is showing factors used to determine

22   his opening account balance at 9 percent plus mortality,

23   correct?

24   A.  It appears that way.

25   Q.  And then the next one is the deferred annuity values at 6.5

F7KJOSB3                        Kiley - cross

1   percent, correct?

2   A.   Yes.

3   Q.   And 6.5 percent, we saw on Thursday how in November Jim

4   Grefig was using a 6.5 GATT rate because the rate had fallen in

5   the discussions with you and others from HROC?

6            MR. RUMELD:  Objection.

7            THE COURT:  If he recalls?

8   BY MR. GOTTESDIENER:

9   Q.   On Thursday do you remember that document where -- we saw

10  it also today, but we didn't focus on that, with the typed

11  notes?

12  A.   Yes.

13  Q.   It says 6.5, so here we're in October, so we're at 6.5,

14  this would be the cash-out, the minimum lump sum.

15  A.   Okay.

16  Q.   You agree?

17  A.   Yes.

18  Q.   So the factors are shown for that.  Then it has early

19  retirement factor.  Do you see that there?

20  A.   Yes.

21  Q.   And that shows that he is not at that point in time

22  eligible because it is just using a factor of 1?

23  A.   Right.

24  Q.   Then it says estimated qualified plan cash balance, and by

25  the way, just the qualified reference is because he actually

F7KJOSB3                          Kiley - cross

1    has a benefit under the nonqualified full payment excess plan

2    for the executives?

3    A.  Okay.

4    Q.  You agree, right?

5    A.  Yes.

6    Q.  That is why it says, "qualified"?

7    A.  Yes.

8    Q.  We don't see that in other calculations, right?

9    A.  Right.

10   Q.  It says $139,600, that is his opening cash balance account,

11   correct, as of 1-1-06 given all this information we have gone

12   through, correct?

13   A.  It looks that way, yes.

14   Q.  If we simplify, say he has an opening balance of 140,000,

15   and, however, he would have to be paid basically 200,000, 196,

16   over $50,000 more, right?

17   A.  Yes.

18   Q.  So at this point in time, assuming the GATT rate stays

19   around 6.5, he is in wear-away by in order of over $50,000,

20   correct?

21   A.  Yes.  Again I wouldn't state it that way, but yes.

22   Q.  And on the first document that we looked at, you apologized

23   for the delay getting back to him, you in January gave him

24   PX-329, where you told him that the July 1, '96 lump-sum

25   payment -- would you get up PX-329 -- by January 1, '96, you

F7KJOSB3                         Kiley - cross

1    know the GATT rate has fallen to 6.06, right?

2    A.  Yes.

3    Q.  And so he, instead of at 6.5, the calculation yielded him a

4    minimum lump sum of 196.  At 6.06, and with some aging for six

5    months because you're doing the calculation as of July '96,

6    correct?

7    A.  Yes.

8    Q.  So the interest rate has changed and he's aged, so those

9    two variables, those two variables caused the change in the

10   different lump sum amounts, correct?

11   A.  Yes.

12   Q.  So approximately let's just call it for ease $17,000 or

13   $20,000 because one is 196 and this is 217, okay?

14   A.  Okay.

15   Q.  So when you sent him this, you know from these calculations

16   that he's looking at a long wear-away of $50,000, but you don't

17   tell him anything like that when you give him his estimated

18   benefits, do you?

19            MR. RUMELD:  Objection.

20            THE COURT:  Hold on.  I'll allow it.

21   A.  I don't think I had a crystal ball to tell me if he was

22   going to have a long wear-away or not.

23   BY MR. GOTTESDIENER:

24   Q.  You don't even put his account balance on this, do you, his

25   account balance of $140,000, do you?

F7KJOSB3                         Kiley - cross

1    A.  No, I don't see it there.

2    Q.  But you put on there that you're estimating these numbers?

3         These numbers you're giving him include his earnings

4    through June 30th of '96, correct?

5    A.  Well, his earnings are stated in the memo.

6    Q.  Right, but that is what I just asked.  You're showing him

7    that, in effect, that is relevant to your calculation, aren't

8    you?

9    A.  Perhaps.

10   Q.  You agree if he is in wear-away and remains in wear-away,

11   his earnings for that half of the year are irrelevant to his

12   ultimate benefit, correct?

13   A.  His lump sum would have been higher, his minimum lump sum.

14   Q.  Sir, his earnings after 1996, after '95, during '96, if he

15   is in wear-away as of 1-1-96 and remains in wear-away as of

16   payment, his earnings in 1996 do not contribute to his benefit

17   at all, do they?

18   A.  They don't contribute to the payment of his lump sum

19   benefit.

20   Q.  And it wouldn't have contributed to the payment of his

21   annuity benefit, either, would they?

22   A.  I don't know.

23   Q.  You don't know?  You think that they wouldn't contribute to

24   the lump sum?

25   A.  How am I, sitting here today, going to be able to calculate

F7KJOSB3                          Kiley - cross

1   his benefit?

2   Q.  I am not asking you about calculations.  Isn't it a very

3   simple principal --

4   A.  I don't know that this is simple.

5          MR. GOTTESDIENER:  Could I get on the screen PX 7,

6   please.

7          (Principle).

8

9   Q.  Do you remember we saw earlier the total compensation

10  statements prior to the amendment, in the years prior to 1996?

11  A.  Yes.

12         MR. GOTTESDIENER:  The court's indulgence.  Does the

13  court have a copy of that?

14         THE COURT:  I do.  PX-7, yes.

15  BY MR. GOTTESDIENER:

16  Q.  If we look through this, go to the first page, do you see

17  the introduction?

18  A.  Yes.

19  Q.  This is substantially unchanged from the pre-amendment

20  where it tells you the retirement benefits section highlights

21  the financial security you are building for the future?

22  A.  Yes.

23  Q.  And it also says you will want to compare this statement,

24  in the third paragraph, with those you receive in the future.

25  It is a measure of your yearly progress.  That is the same

F7KJOSB3                          Kiley - cross

1    statement made before the amendment, right?

2    A.  Okay.

3    Q.  If you go in a page, please.

4            THE COURT:  The Bates number, so we have it clearly?

5    BY MR. GOTTESDIENER:

6    Q.  FLPL3009 shows the cost of your benefits.  Do you see that.

7    A.  Yes.

8    Q.  That also has before, as before, makes the assertion the

9    cost of your benefits shown in this statement represents a

10   significant portion of your total compensation?

11   A.  Yes.

12   Q.  That is unchanged from prior to the amendment, right?

13   A.  I believe so, yes.

14   Q.  If you go in, please, to the retirement benefits section,

15   you see there on the Bates page FLPL3011, it doesn't say

16   anything about any other benefit or benefit possibility other

17   than the account balance.  Do you see that?

18   A.  Yes.

19   Q.  Let's get up 646.  This is from August 15th, 1996.

20           (Off-the-record discussion)

21           MR. GOTTESDIENER:  May I approach, your Honor?

22           THE COURT:  Yes.  I have been handed PX-646.

23   BY MR. GOTTESDIENER:

24   Q.  Do you see this has handwriting on it?

25   A.  Yes.

F7KJOSB3                          Kiley - cross

1   Q.  On the second page is your handwriting?

2   A.  No.

3   Q.  Yes, if you look on --

4   A.  That is my handwriting.

5   Q.  That is your handwriting, isn't it?

6   A.  Yes.

7   Q.  So what you're doing here is marking up the text of the '96

8   total compensation statement we just saw to update it to 1997?

9   A.  Okay.

10  Q.  It makes sense, right?

11  A.  Yes.

12          MR. GOTTESDIENER:  Then could we see PX 53.

13  BY MR. GOTTESDIENER:

14  Q.  You worked on making sure these total compensation

15  statements contain individualized information for the

16  participant, fair?

17  A.  I wasn't responsible for working on these statements.  I

18  commented to some degree on them, but someone else was

19  responsible for them.

20  Q.  But as to the retirement plan benefit information, you were

21  the one who had to pull that information together, make sure

22  that it got to the people who were getting it to the printer,

23  right?

24  A.  No.

25  Q.  No?  Who was Rita Welz?

F7KJOSB3                          Kiley - cross

1   A.   Rita Welz was Carol's, Carol Kanowicz's manager.

2   Q.   She was an assistant vice president under pension, right?

3   A.   Right.

4   Q.   You didn't have the title of assistant vice president?

5   A.   No, I didn't.

6   Q.   You and her were effectively lateral colleagues?

7   A.   I think with the title, I'm not quite lateral, no.

8   Q.   So she was a little bit higher than you in the hierarchy?

9   A.   Yes.

10  Q.   Did you answer to her?

11  A.   No.

12  Q.   Did you ever work with her?

13  A.   Oh, yes.

14  Q.   She was focused on medical benefits, right?

15  A.   She was not just medical, she was focused on group

16  insurance and group insurance benefits and communications.

17  Q.   But she supervised Carol?

18          She did not on a day-to-day basis have involvement

19  with pension?

20  A.   She didn't have much involvement with pension, no.

21  Q.   The information regarding those kind of benefits that she

22  did have involvement with, she was responsible for overseeing

23  that that data got into these total compensation statements on

24  an individualized basis for participants, fair?

25  A.   Yes.

F7KJOSB3                          Kiley - cross

1    Q.  And you at the same level were not maybe doing the work,
2    but you were responsible and oversaw the people who did that
3    for the pension?
4    A.  No, I did not.
5    Q.  Who, if you weren't the one who did it --
6    A.  Carol and Marion did.  Again, this comprehensive statement
7    I had very little to do with.  They had Rita and her group had
8    done this before we -- we originally at one point were
9    separated.  The issue was the Kenney benefits manager who got
10   her department and my department merged.
11            She had been doing the comprehensive statement before
12   that and she continued to do it and she was, it was her
13   responsibility.  I had very little input in it.  Carol and
14   Marion would have provided the pension information for that
15   statement.
16   Q.  And so if the information was wrong, if it all went out
17   wrong, are you saying you weren't the one who was ultimately
18   responsible for it being right?
19            MR. RUMELD:  Objection.
20            THE COURT:  I will allow it.  Overruled.
21   A.  I am sorry.  Rita was the one who was ultimately
22   responsible for the statement.  I would have had input on some
23   of it, but she was the one who was ultimately responsible.
24   BY MR. GOTTESDIENER:
25   Q.  Okay.  So if it went out wrong, you would have had no

F7KJOSB3                         Kiley - cross

1   responsibility there?

2   A.  I wouldn't say I would have had no responsibility, but I

3   wouldn't have had the last word.

4   Q.  The annual statements, you did have responsibility for the

5   annual statements that were just about the pension plan?

6   A.  Yes.

7           MR. GOTTESDIENER:  Could we get on the screen PX-647,

8   please.  This is a fax.  May I approach, your Honor?

9           THE COURT:  You may.

10           MR. GOTTESDIENER:  Here is an extra copy if the court

11   needs one.

12   BY MR. GOTTESDIENER:

13   Q.  647, April 4, '97, this is a fax from you, Carol and Marion

14   to Linda Ine at HROC?

15   A.  Yes.

16   Q.  Do you see that?

17   Q.  Who is Linda Ine?

18   A.  She was the supervisor of the operation in Milwaukee.

19   Q.  The message is, "Linda, here is a draft of the pension

20   statement.  We don't expect the data elements to change.

21   However, the language is subject to revision."

22           Do you see that?

23   A.  Yes.

24   Q.  If you look at the first page, you can see how some

25   somebody has crossed out the 6 in 1996 and written in a 7?

F7KJOSB3                           Kiley - cross

1    A.  Okay.

2    Q.  You see that, right?

3    A.  Yes.

4    Q.  If you look down under the box on the left-hand side where

5    it shows the pay credits or compensation credits, do you see

6    how, do you see how it still makes the representation that the

7    amount shown in Item 4, which above states total account

8    balance as of the end of the year, is the amount you could

9    expect to receive upon termination of employment or retirement

10   if you elect the lump sum form of payment?

11   A.  Yes, I see it.

12   Q.  It further represents the lump sum form of payment provides

13   you with a single payment which represents the actuarial

14   accrued value of your accrued benefit, right?

15   A.  Yes.

16   Q.  You told us on Thursday that actuarial equivalence means

17   equal, right?

18   A.  Yes.

19   Q.  And that if you discount it at 9 and had interest crediting

20   rate of 6, that that was not equal, correct?

21            MR. RUMELD:   Objection.

22   A.  That is what you said.

23   Q.  I am sorry?

24   A.  That is what you said.

25   Q.  And you agreed?

F7KJOSB3                         Kiley - cross

1    A.  I don't think I agreed with that.

2            THE COURT:  I think the record will be whatever it is

3    going to be.

4            MR. GOTTESDIENER:  Can't I impeach him with his direct

5    statement?

6            THE COURT:  Not from Thursday, just because the record

7    is what it is.  That is actually testimony in the record, so it

8    is evidence as opposed to impeachment purposes.  It comes in

9    for impeachment purposes, not as evidence.

10   BY MR. GOTTESDIENER:

11   Q.  You don't see anywhere in the document, take the time to

12   look, there where there was information or information, where

13   it says by actuarial equivalent value means we discount at 9

14   with mortality?

15   A.  No, I see that.

16           MR. GOTTESDIENER:  Could we get PX-61 and then 62 on

17   the screen.  May I approach, your Honor?

18           THE COURT:  You may.  I've got both of those.

19           MR. GOTTESDIENER:  Okay.

20   BY MR. GOTTESDIENER:

21   Q.  These are annual statements for '97 and '98?

22   A.  Okay.

23   Q.  You agree with that?

24   A.  Yes.

25   Q.  PX-61 happens to be the annual statement of one of the

F7KJOSB3                        Kiley - cross

1    class members who has testified here, Ralph Campuzano, and then

2    62 -- that is for 1997 -- 62 is 1998.

3          Can you see that the language remains the same with

4    the account balance is represented as the amount that the

5    participant could receive if they asked for their payment right

6    away?

7    A.  Yes.

8          MR. GOTTESDIENER:  If we could get 56, PX 56 on the

9    screen.  Just to finish this off, this is the total

10   compensation statement going back to the statements that are

11   the combined benefits that people have.

12         May I approach?

13         THE COURT:  You may.

14         MR. GOTTESDIENER:  Does your Honor have 56?

15         THE COURT:  I do.

16   BY MR. GOTTESDIENER:

17   Q.  If we could go into the retirement benefits section, and

18   you see again just like the retirement plan statements, it says

19   the amount shown in Item 4, which is the account balance, is

20   the amount you could expect to see upon termination or

21   retirement if you elect a lump sum form of payment?

22   A.  Yes.

23   Q.  There is nothing in there about any other benefit that the

24   participant is or may be entitled to, correct?

25   A.  Correct.

F7KJOSB3                          Kiley - cross

1   Q.  Mr. Kiley, you agree that suspending a participant's

2   accruals from additional new benefits under the plan for a

3   period of time was material?

4              MR. RUMELD:  Objection, your Honor.

5              THE COURT:  Sustained.  If you're going to go there,

6   you have to back up and lay a different kind of foundation.

7   BY MR. GOTTESDIENER:

8   Q.  Do you agree that the pension benefit under the plan that

9   people could earn prior to the amendment was an important

10  benefit for the participants?

11  A.  Yes.

12  Q.  Do you agree that suspending the earning of additional

13  benefits under the retirement plan for participants for a

14  period of time was material to the participants?

15  A.  No.

16  Q.  Page 185 Line 4 through 8.

17             THE COURT:  This is a --

18             MR. GOTTESDIENER:  Deposition.

19             THE COURT:  The witness's deposition?  All right.

20             MR. GOTTESDIENER:

21  "Q  Because it was material?

22  "A  Yes.

23  "Q  To freeze people's benefits for any period of time?

24  "A  Yes.

25  "Q  So it is definitely material to freeze them for periods of

F7KJOSB3                        Kiley - cross

1   years, correct?

2   "A   Yes."

3              MR. RUMELD:  Objection, your Honor.

4              THE COURT:  I will allow it.

5   BY MR. GOTTESDIENER:

6   Q.  You gave that testimony under oath, didn't you?

7   A.  Yes.  This was my deposition.  Apparently, I did.

8   Q.  You understood at the time that if people learned that

9   their benefit accruals had been suspended for a period of time,

10  that they'd have a strong reaction to that, correct?

11  A.  Yes.

12  Q.  When you communicated with participants and assisted others

13  at the company with the communications that were sent out to

14  participants, you were not attempting to comply with ERISA's

15  fiduciary standards as you understood them when you were doing

16  so, correct?

17             MR. RUMELD:  Objection.

18             THE COURT:  Sustained.

19             MR. GOTTESDIENER:  Your Honor --

20             THE COURT:  You have to --

21             MR. GOTTESDIENER:  May I approach?

22             THE COURT:  No.  This is 101.  You have to ask it

23  differently.  Circle back around and ask it differently..

24             (Continued on next page)

25

F7knosb4                         Kiley - cross

1    Q.  You had an understanding of the requirements of ERISA as to

2    the communication with participants, didn't you?

3    A.  Yes.

4    Q.  You understood that participants were owed a fiduciary

5    duty, didn't you?

6    A.  I understood the ERISA requirements for communications,

7    yes.

8    Q.  You understood that participants were entitled to a

9    fiduciary communicating with them who was complying with

10   ERISA's fiduciary standards, correct?

11            MR. RUMELD:  Objection.

12            THE COURT:  I will allow it as phrased.  You may

13   answer.  It is your understanding.  I understand you are not a

14   lawyer, but what you understood.

15   A.  No, I didn't understand that fiduciary had to communicate

16   with participants.

17   Q.  So you didn't think that participants were entitled to a

18   fiduciary standard of conduct with respect to the

19   communications they received?

20            MR. RUMELD:  Objection.

21            THE COURT:  Sustained.

22   Q.  You just said that you --

23            THE COURT:  No.  He didn't --

24            MR. GOTTESDIENER:  I am trying to understand his

25   answers, your Honor.

1          THE COURT:  I understand.  These questions are

2     important questions.  I understand where they fit in your case.

3     You have to ask them very carefully.  So be very precise about

4     your form of question here.

5     BY MR. GOTTESDIENER:

6     Q.  You just testified, I didn't understand that the fiduciary

7     had to communicate with participants.  Is that what you just

8     said?

9     A.  Yes.

10    Q.  Can you explain what you mean by that?

11    A.  I was not a fiduciary.  I was acting on behalf of the

12    company and the retirement committee to provide information to

13    participants.  We provided them with all of the information

14    they requested to the best of our ability.

15    Q.  Let's just focus on the roles.  You said the company and

16    the committee.  You understood they were fiduciaries?

17    A.  Yes.

18    Q.  When communicating with participants about the plan.

19    A.  They were fiduciaries with regard to making financial

20    decisions regarding the plan.

21    Q.  And the decisions as to how to explain the plan and how to

22    not to explain the plan to people, right?

23    A.  Yes.

24    Q.  So you were acting on behalf of those fiduciaries as you

25    just said, the company and the committee, right?

F7knosb4                        Kiley - cross

1    A.  Yes.

2    Q.  My question is, when you were so acting on their behalf,

3    you did not think that you on their behalf had to comply with

4    ERISA's fiduciary standards, did you?

5              MR. RUMELD:  Objection.

6              THE COURT:  I will allow it.

7    A.  There was not -- it was not something I thought of.

8    Q.  I'm sorry.

9    A.  But when we were drafting communications to participants,

10   we were certainly aware of the ERISA requirements for

11   communications.  When I answered or responded to a participant

12   on a one-on-one basis, my approach was to provide them with as

13   much information as I could.

14   Q.  Page 301, line 10.

15             THE COURT:  This is of his deposition?

16             MR. GOTTESDIENER:  Yes.

17   BY MR. GOTTESDIENER:

18   "Q. All of the one-off letters that you sent that defense

19   counsel showed you" -- this is in questioning at your

20   deposition" -- showed you when he started questioning you, did

21   you view those letters as subject to ERISA standards?

22   "A. You mean now or when I wrote them?

23   "Q. Then.

24   "A. I don't know that I -- I really thought about that.  I

25   think my intent with those letters was to answer the -- the

F7knosb4                          Kiley - cross

1    questions to provide them with, you know, as much understanding

2    as -- as possible.

3    "Q. Right.  But did you think at the time you were acting on

4    behalf of Woolworth as the plan sponsor or on behalf of the

5    plan as a fiduciary?

6    "A. I don't think I was a fiduciary, but I think I was acting

7    on the part of the human resources person trying to assist the

8    participant in understanding their -- their benefits."

9              MR. RUMELD:  Objection.  It's improper impeachment.

10             THE COURT:  The Court agrees.  In terms of the prior

11   question, it is not impeachment because he actually said

12   essentially the same thing here.

13             MR. GOTTESDIENER:  OK.  Your Honor --

14             THE COURT:  Why don't you pose a question and then we

15   will proceed.

16             MR. GOTTESDIENER:  OK.

17   BY MR. GOTTESDIENER:

18   Q.  Did you not give the following testimony?

19             THE COURT:  Ask him a question, let's get it clean,

20   and then impeach him with something that is inconsistent.

21   BY MR. GOTTESDIENER:

22   Q.  You didn't think when were you acting that you on behalf of

23   the company or the committee had to comply with ERISA's

24   fiduciary standards, did you?

25   A.  I don't think that's something that I was focusing on when

F7knosb4                          Kiley - cross

1    I was responding to that.

2    Q.  You didn't see yourself acting on behalf of a fiduciary or

3    yourself acting as a fiduciary when you sent those, did you?

4              MR. RUMELD:  Objection.

5              THE COURT:  Overruled.

6    A.  No.

7    Q.  You agree you didn't see yourself as a fiduciary or acting

8    on behalf of a fiduciary when you sent those letters, correct?

9    A.  Correct.

10   Q.  You didn't get any legal advice from anyone on the

11   communications you sent out, did you?

12             MR. RUMELD:  Objection.

13             THE COURT:  Overruled.  You can answer that yes or no.

14   A.  I don't think so.  There may have been some times when I

15   ran some of those letters by legal.  I don't know.  I don't

16   recall.

17   Q.  Do you remember on Thursday we saw that in a July meeting

18   there was a Rina Zimmerman, a lawyer that was copied on one of

19   those decs for the presentation to Farah and Hilpert.  Do you

20   remember Rina Zimmerman, that name?

21   A.  Yes.

22   Q.  You didn't consider her an ERISA attorney, did you?

23   A.  No, I did not.

24   Q.  Mercer made a proposal to Foot Locker to do the

25   communications for the rollout of the new plan, and Foot Locker

F7knosb4                          Kiley - cross

1    turned Mercer down on that, correct?

2    A.  I don't recall that.  In reviewing some of the documents I

3    think I saw that, yes.

4    Q.  So Foot Locker didn't use Mercer for participant

5    communications, correct?

6               MR. RUMELD:  Objection.

7               THE COURT:  So far as you are aware of, you may

8    answer.

9    A.  As far as I am aware of, no.

10              MR. GOTTESDIENER:  No further questions at this time,

11   your Honor.

12              THE COURT:  All right.  Thank you.  Mr. Rumeld.

13              Mr. Rumeld, there is a lot of paper up here in front

14   of the witness.  I don't know if one of your colleagues or you

15   want to come and just try to organize it.  We can proceed

16   however you see fit.  I don't know that there will be speedy

17   access to precise exhibits.

18              MR. RUMELD:  Right.

19              Let me suggest, Mr. Kiley, I should have remembered

20   this from your deposition, can you just take all the loose

21   pieces of paper and put them on the side in a pile.

22              My intention, your Honor, is that if I question

23   Mr. Kiley on an exhibit that is attached to his declaration, I

24   am going to include the defendant's exhibit so that he can find

25   it in his notebook.

F7knosb4                        Kiley - cross

1           THE COURT:  That is going to be hard for me.  If it's
2   the same document, I need a cross-reference.  Will you folks
3   have a cross-reference?
4           MR. RUMELD:  Your Honor has all the defendant's
5   exhibits that were attached to his notebook.
6           THE COURT:  I have no doubt.  The two of you,
7   Mr. Gottesdiener and Mr. Rumeld, are these going to be the same
8   documents that Mr. Gottesdiener was just using?
9           MR. RUMELD:  Sometimes they are, sometimes they are
10  not.
11          THE COURT:  OK.
12          MR. RUMELD:  Frankly, your Honor, it is not fair to us
13  that Mr. Gottesdiener chose to examine this witness, who
14  submitted all of those exhibits, and to use his version --
15          THE COURT:  I don't think there is any problem with
16  the fact that the numbering is different.  The content of the
17  documents is what we are seeking to understand.
18          MR. RUMELD:  Right.
19          THE COURT:  We don't have to make this complicated.
20  Can somebody just say out loud when we get to one of the
21  documents that's in both parties' piles what the
22  cross-reference is so I am able to turn to the copy I may have
23  marked up.
24          MR. RUMELD:  I will try to do that.
25          THE COURT:  That is all I want.

1           MR. RUMELD:  If I am introducing an exhibit that is

2     not attached to his declaration, I will use the plaintiff's

3     exhibit, but, in any event, if not, I will hand up --

4           THE COURT:  Anything that are Mr. Gottesdiener hasn't

5     gone over, I have your exhibits here.

6           MR. RUMELD:  Right.

7           THE COURT:  I am going to use the ones that I was just

8     handling for the last couple of days first.

9           MR. GOTTESDIENER:  I just want to correct the record.

10    Numbers of documents that I showed him they do not attach --

11          THE COURT:  I understand.  I am not worried about

12    that.

13          MR. GOTTESDIENER:  -- so that's not accurate.

14          THE COURT:  You may proceed, Mr. Rumeld.

15          MR. RUMELD:  For purposes of the witness, your Honor,

16    it's easiest if he refers to the exhibits in his declaration.

17          THE COURT:  We are now days past the beginning of his

18    testimony, so we will just take it from here.  I think he's got

19    some there, and he can refer back to them or you can put the

20    new ones in front of him.  We'll just get going.

21          MR. RUMELD:  Thank you, your Honor.

22    REDIRECT EXAMINATION

23    BY MR. RUMELD:

24    Q.  Mr. Kiley, when were you last employed for Foot Locker or

25    one of its affiliates?

F7knosb4                        Kiley - redirect

1    A.  January 2000.

2    Q.  And since then what have you been doing?

3    A.  I worked for another company.

4    Q.  What was the name of that another company?

5    A.  It was -- it actually changed names a few times.  But it

6    was basically ALM Media.

7    Q.  What did you do for them?

8    A.  I was the -- I worked in the human resources department and

9    I was responsible for all of the benefits.

10   Q.  What responsibilities did you have with respect to pension

11   benefits?

12   A.  Well, I was responsible for administering the pension

13   plans.  They had two frozen pension plans, which were frozen

14   before I came on the scene.

15   Q.  Were those pension plans cash balance plans?

16   A.  No, they were not.

17   Q.  Have you done any work on cash balance plans since leaving

18   Foot Locker?

19   A.  No, I have not.

20   Q.  And are you still working for ALM?

21   A.  No.  I stopped working for them at the end of April of this

22   year.

23   Q.  This year?

24   A.  This year, yes.

25   Q.  So you worked for ALM between about 2000 and the beginning

1    of this year?

2    A.  Yes.

3    Q.  And during that entire period of time, you had nothing to

4    do with cash balance plans?

5    A.  That's correct.

6    Q.  Do you have a specific recollection of when you and the

7    others in your group came up with the recommendation to amend

8    the plan to a cash balance formula and to adopt the 401(k)

9    plan?

10   A.  No, I don't.

11   Q.  Could you look at Defendant's Exhibit 289, which is

12   attached to your declaration, and I don't think this one was

13   shown before?

14            MR. HUANG:  Your Honor, that would be PX 109.

15            THE COURT:  Thank you.

16   A.  OK.

17   Q.  Could you just look through them, please.

18            Do you recognize these materials at all?

19   A.  Yes.

20   Q.  What do you recall about these materials?

21   A.  This was a comprehensive compilation of all of the cost

22   reduction items that were being looked at.

23   Q.  The cover page is a fax cover page from you to Mercer, is

24   that right?

25   A.  Yes.

F7knosb4                          Kiley - redirect

1   Q.  Is there any reason to think that you didn't work on these

2   materials if you were faxing them to Mercer?

3   A.  No, I am sure I worked on them, but I didn't produce all of

4   that information.

5   Q.  Could you just generally describe the division of labor

6   between you and Mercer in preparing materials like this?

7   A.  Well, Mercer had the expertise for both not only -- they

8   were our consultant not just for the pension plan but for all

9   of the benefits, and they would have had the expertise to, you

10  know, produce exhibits such as these.

11  Q.  Could you look at the page with the Bates numbers ending

12  2106.

13  A.  OK.

14  Q.  You see there there's a series of recommendations?

15  A.  Yes.

16  Q.  And the fifth recommendation is, Convert TWRP to cash

17  balance plan equivalent to 1 percent career average plan.

18          Do you see that?

19  A.  Yes.

20  Q.  What do you understand that recommendation to be?

21  A.  To convert the existing career average defined benefit plan

22  to a cash balance plan with a cash balance formula equivalent

23  to a 1 percent career average plan.

24  Q.  Is there any reason you can think of why you would be

25  sending this document to Mercer if you were not agreeing with

F7knosb4                          Kiley - redirect

1   that recommendation at the time?

2                MR. GOTTESDIENER:  Objection.

3                THE COURT:  I will allow it.  Overruled.

4                MR. GOTTESDIENER:  Is he going to be --

5                THE COURT:  I will allow it.

6                MR. GOTTESDIENER:  I just have a general question.

7                THE COURT:  I am not allowing colloquy.  Remember

8   that's what Mr. Rumeld had to live with as well.

9                Go ahead.  Proceed.

10               MR. RUMELD:  Do you want to read -- I'm sorry I can't

11  ask that question.

12  BY MR. RUMELD:

13  Q.  Do you have the question in mind, sir.

14  A.  I think so.  The fax was directed to Steve Patterman.  He

15  was the group insurance consultant.  So it was possible this

16  was being sent to him to not -- not necessarily to have

17  anything to do with the pension side of it, but with the, you

18  know, the group insurance aspects of this.

19  Q.  Right.  With respect to these recommendations, would these

20  recommendations be a reflection of your thought process at the

21  time?

22               MR. GOTTESDIENER:  Objection.

23               THE COURT:  Why don't you ask him in terms of were.

24  BY MR. RUMELD:

25  Q.  Do these recommendations reflect your thought process at

1     the time?

2     A.   Regarding the pension plan?

3     Q.   Yes.

4     A.   Probably.

5     Q.   Could you turn to DX 143.

6              MR. RUMELD:   This is, your Honor, PX 21.

7              THE COURT:   Thank you.

8     A.   Yes.

9     Q.   These are the notes we looked at earlier in your testimony?

10    A.   Yes.

11    Q.   And there are notes of a meeting in February with the

12    Mercer people?

13    A.   I believe so.

14    Q.   OK.  Do these notes discuss any alternative plan formula

15    other than the cash balance formula?

16    A.   No, I don't believe they do.

17    Q.   Just so you understand, if you would like, you can look at

18    the version attached to your notebook as well.

19    A.   OK.  No.

20    Q.   Sitting here now, do you have any reason to believe that

21    any other formula was discussed during this meeting?

22             THE COURT:   Other than a cash balance formula?

23             MR. RUMELD:   Correct.

24    A.   Other than a cash balance, no, I do not.

25    Q.   It would be reflected in your notes if there were such a

1  discussion, is that right?

2  A.  Yes.

3  Q.  Could you turn to the third page of your notes.  That's

4  2345 on the version attached to your declaration.

5  A.  OK.

6  Q.  Can you read the bottom paragraph for us.

7  A.  Target 7/1/95 to implement cash balance, possibly 7/1/95 or

8  1/1/96 for 401(k).  If it is 1/1/96, we could announce that the

9  K plan is coming.

10 Q.  So target 7/1/95 to implement cash balance.  That meant

11 that as of this -- what did that mean to you?

12 A.  That that was the date of conversion from the career

13 average cash balance plan that we were considering at that

14 time.

15 Q.  So as of this meeting in February, you were actually

16 considering rolling out the cash balance plan effective July 1,

17 1995?

18        MR. GOTTESDIENER:  Objection.

19        THE COURT:  Sustained.  You can't lead him, but you

20 can ask the question in a different way.

21        MR. RUMELD:  I understand, your Honor.

22 BY MR. RUMELD:

23 Q.  So what was the expectation as of this time?

24 A.  That we would make a conversion to the cash balance plan as

25 of July 1, 1995.

1    Q.   Now, what does this lead you to conclude about the status

2    of the cash balance amendment versus any other alternatives

3    that you might have been considering?

4    A.   That it was at this point in time decided that the cash

5    balance was the approach that would be taken.

6    Q.   Could you look at Defendant's Exhibit 140.

7              MR. RUMELD:   That one I have to hand up.

8              May I approach, your Honor?

9              THE COURT:   Yes.

10             MR. HUANG:   Your Honor, this is PX 84.

11             THE COURT:   Thank you.

12   BY MR. RUMELD:

13   Q.   Do you recognize the handwriting?

14   A.   No, I don't.

15   Q.   So you don't know whose notes those are?

16   A.   No.

17   Q.   Those do appear to be notes of the same meeting, though?

18   A.   It's hard to read the date.  I'm not sure if it's the same

19   date or not.

20   Q.   It says 2/2.

21   A.   It says 2/2.  OK.

22   Q.   OK.  Do you recognize the names appearing under there,

23   Andrea, Rina, Mark, Tom, Carol, Carol?

24   A.   Yes.  I'm trying to -- I'm trying to remember Mark.  I

25   think he was a Mercer person.

F7knosb4                          Kiley – redirect

1   Q.   Who are the other people?

2   A.   Andrea would have been outside legal counsel, I believe,

3   Rina was in house counsel, Tom is me, Carol is Carol Kanowicz,

4   and I am not sure who the other Carol would be.

5   Q.   Do you remember participating in a meeting in early 1995

6   with Andrea and Rina and Mark and Carol?

7   A.   I don't have a specific recollection of it.

8   Q.   OK.  Does the fact that outside counsel attended a meeting

9   like this tell you anything as to the status of the cash

10  balance amendment?

11  A.   That would probably be an indication that, you know, that's

12  the path we were going down.

13  Q.   Could you take a look at Defendant's Exhibit 141.  That is

14  attached to your declaration.

15          MR. RUMELD:  That is PX 129, your Honor.

16          THE COURT:  Thank you.

17  BY MR. RUMELD:

18  Q.   Those notes are familiar to you?

19  A.   Yes.

20  Q.   That's your handwriting, right?

21  A.   Yes, it is.

22  Q.   Do these notes refer to the cash balance plan amendment?

23  A.   Yes.

24  Q.   Do these notes refer to any other proposals?

25  A.   I don't believe so.  No, they don't.

F7knosb4                          Kiley - redirect

1    Q.  Could you look now at Defendant's Exhibit 172.

2              MR. HUANG:  This would be PX 620.

3              It is not in our binders yet.

4              THE COURT:  I will use the defense.

5              All right.

6    BY MR. RUMELD:

7    Q.  Mr. Kiley, did you have a chance to read this exhibit?

8    A.  Yes.

9    Q.  It is an e-mail from you to Ms. Kanowicz, Ms. Derham, and

10   Eileen Hendrickson.

11   A.  Yes.

12   Q.  Do you know why those people would have received this

13   e-mail?

14   A.  Because they were involved with the pension plan.

15   Q.  And specifically with respect to amending the pension plan,

16   did they have any responsibilities?

17   A.  Not necessarily for amending, but certainly I probably

18   would have wanted to have -- wanted them to be aware of what

19   was being discussed and to also have input in it.

20   Q.  Besides yourself, who had input in coming up with the

21   recommendation of the plan amendment?

22   A.  Besides myself, mostly Carol and Marion on this, who are

23   mentioned on this e-mail, and also, of course, Mercer.

24   Q.  The second sentence refers to Jim.  I take it that's either

25   Jim Grefig or Jim Cassidy.  Do you know who?

F7knosb4                        Kiley - redirect

1    A.  I don't.  My sense is it's probably Grefig.

2    Q.  From reading this e-mail, do you have any reason to doubt

3    that as of this point in time in late March you were still

4    looking at possibly amending the plan as early as July?

5    A.  I'm sorry.  Could you --

6    Q.  From looking at this e-mail, do you have any reason to

7    doubt that in late March you were still thinking about amending

8    the plan as early as July?

9    A.  No, I don't.

10   Q.  Given that Mr. Grefig is working on amending the plan as

11   early as July, what does this tell you about any feedback you

12   received from Pat Peck about the amendment?

13   A.  At this point in time I probably would have had a sort of

14   directional feedback from Pat that this was the way we should

15   be going.

16           THE COURT:  I just want to make sure that the witness

17   does not speculate.  I want to get your best view.  We want to

18   get your best view, but don't speculate.  Just so that we are

19   sure that when you are giving an answer it's your view as to

20   what actually occurred.

21           MR. RUMELD:  Maybe I can ask it this way, your Honor.

22   BY MR. RUMELD:

23   Q.  Would it have been your practice, Mr. Kiley, to have

24   Mr. Grefig working on amendments to go into effect in less than

25   four months if you didn't have Ms. Peck's approval?

F7knosb4                      Kiley - redirect

1   A.   No, it would not.

2   Q.   Now, Mr. Kiley, were you involved in drafting the various

3   presentation materials that were used for purposes of

4   communicating your group's recommendations to senior

5   management?

6   A.   Yes.

7   Q.   What was your objective when you were drafting those

8   materials?

9   A.   Well, one, to respond to the, you know, request I had been

10  given, to come up with proposals that would meet the company's

11  cost-saving goals, and, you know, provide ongoing benefits for

12  employees.

13  Q.   If there was something about the plan that was important,

14  would you have intended to include it?

15  A.   Yes.

16  Q.   Did you have any motivation to exclude any information that

17  you at the time considered to be important?

18  A.   No.

19  Q.   Would you take a look at Defendant's Exhibit 38.

20          MR. RUMELD:   This is PX 10, your Honor.

21          THE COURT:   Thank you.

22  BY MR. RUMELD:

23  Q.   Do you have it in front of you?

24  A.   Yes.

25  Q.   If you could turn to the third page.  That's the page that

F7knosb4                         Kiley - redirect

1    has the pros and the cons.  Do you see that?

2    A.  Yes.

3    Q.  I think you looked at that earlier with Mr. Gottesdiener.

4    A.  Yes.

5    Q.  Now, the title to that page is The Woolworth Retirement

6    Plan, Cash Balance/401(k) Plan.

7         Do you see that?

8    A.  Yes, I do.

9    Q.  What does that tell you if, that's the title of the page?

10   A.  That at this point in time it's already been decided that

11   we're going to convert to a cash balance plan and to implement

12   the 401(k).

13   Q.  What is the purpose of listing these other alternatives?

14   A.  I think it was to show that we didn't just blindly come up

15   with a cash balance plan and the 401(k) plan by themselves,

16   that we did our homework and we vetted out other alternatives.

17   Q.  If you turn the page, the next page refers to strategy.  Do

18   you see that?

19   A.  Yes.

20   Q.  What is meant there by strategy?

21   A.  I think that these are the steps that, in order to convert

22   to a cash balance plan and to implement the 401(k), these were

23   the steps we needed to undertake.

24   Q.  So these were your recommendations about what to do, is

25   that right?

1   A.  Yes.

2   Q.  If you could look a page earlier, before the pros and cons.

3           MR. RUMELD:  The second page, John?

4   A.  Yes.

5           MR. RUMELD:  Could we make that a little larger.

6   Q.  There is a statement there of objectives.  Do you see that?

7   A.  Yes.

8   Q.  The first objective is to decrease long-term company cost.

9           Do you see that?

10  A.  Yes.

11          MR. GOTTESDIENER:  I'm sorry, your Honor.  He said it

12  says objectives.  It doesn't say objectives.

13          THE COURT:  All right.  The document will ultimately

14  speak for itself, but that is noted.

15          MR. RUMELD:  I stand corrected.

16          Thank you, Mr. Gottesdiener.

17  BY MR. RUMELD:

18  Q.  Under objective it says to decrease long-term company cost.

19          Do you see that?

20  A.  Yes.

21  Q.  Was that your understanding of one of the objectives at the

22  time?

23  A.  Yes.

24  Q.  OK.  It doesn't refer to short-term company cost, does it?

25  A.  No, it does not.

1   Q.  At the time did you have an objective in mind to decrease

2   short-term company costs?

3   A.  I don't think so.  I don't really recall, but I don't think

4   so.

5   Q.  Could you look at Defendant's Exhibit 249.

6           MR. RUMELD:  This is PX 227, your Honor.

7           THE COURT:  All right.  Thank you.

8   BY MR. GOTTESDIENER:

9   Q.  If you turn to the third page here you also have a listing

10  of objectives, and this time I think it's in plural.  In this

11  case, just to keep our bearings here, if you turn back to the

12  first page, this refers to it being a draft as of June 16.

13          Do you see that?

14  A.  Yes.

15  Q.  So, going back to the page with the objectives, in this

16  instance the first objective is to decrease long-term company

17  cost by an estimated 20 percent per year.

18          Do you see that?

19  A.  Yes.

20  Q.  Do you have any recollection as to there being a targeted

21  20 percent reduction in long-term cost?

22  A.  I believe that was the target we were given, yes.

23          THE COURT:  What kind of horizon is long term in your

24  view?

25          THE WITNESS:  In my view I would say anything beyond a

F7knosb4                         Kiley - redirect

1   year or two is probably long term.

2            THE COURT:  All right.

3   BY MR. RUMELD:

4   Q.  Did you have an understanding, Mr. Kiley, as to how that

5   objective of long-term cost reduction was going to be obtained,

6   or achieved?

7   A.  Well, it had to be achieved through a reduction of benefits

8   in the future.

9   Q.  What do you mean when you say that?

10  A.  Well, all of the benefits were being looked at, not just

11  the retirement plan.  So there had to be cost savings

12  generated.  Without getting into details on other benefits, for

13  the most part you needed to reduce benefits going forward to

14  reduce costs.

15  Q.  For the pension plan, how specifically were these cost

16  savings supposed to be achieved?

17  A.  I'm sorry.  I'm not following the question.

18  Q.  For the pension plan, what about the pension plan amendment

19  that you were recommending was supposed to achieve long-term

20  cost savings?

21  A.  A reduction of future accruals.

22  Q.  What specifically do you mean when you say a reduction of

23  future accruals?

24  A.  That the formula going forward from the date of amendment

25  would generate lower pension benefits.

F7knosb4                        Kiley - redirect

 1   Q.   By the formula, what do you mean?

 2   A.   The formula for accrual of benefits.

 3   Q.   So in the case of a cash balance plan what would go into

 4   that formula?

 5   A.   In the case of a cash balance plan, the pay credits that

 6   were generated by the formula going forward would not be as

 7   great as the formula that existed prior to the date of the

 8   amendment.

 9   Q.   Under that career average plan?

10   A.   Under the -- right.

11   Q.   Am I correct that this document, DX 249, has a fax label on

12   the top?

13   A.   Yes.

14   Q.   Can you tell who's faxing to whom here?

15   A.   Mercer is at the bottom.  I think --

16   Q.   Mercer's reference on the bottom just means that it

17   produced this document.  I'm trying to understand -- it refers

18   to Woolworth in the fax label on the top.

19          Do you see that?

20   A.   I think, if I remember right, 212-553 was a Woolworth

21   number.

22   Q.   So is this something that Woolworth is faxing to Mercer or

23   Mercer is faxing to Woolworth?

24   A.   It looks like probably Woolworth faxing to Mercer.

25   Q.   So then would this be a document that you and your people

1   had worked on?

2            MR. GOTTESDIENER:  Objection.

3            THE COURT:  Sustained.

4            You have to rephrase.

5   BY MR. RUMELD:

6   Q.  Do you think that you worked on this document?

7   A.  Yes.

8   Q.  And before this document was sent to Mercer, do you think

9   you reviewed the materials on the page ending 3844?

10           I think it's the fifth page that says review of

11  defined benefit plan alternatives?

12           MR. GOTTESDIENER:  Objection.

13           THE COURT:  Let me just see what the -- I will allow

14  it.

15  A.  Yes.

16  Q.  So did you in fact contribute to the information that's

17  contained on that page?

18  A.  Most likely.

19  Q.  Would you most likely be in agreement with the references

20  to negative publicity and loss of morale with respect to two of

21  the cash balance plan formulas that are listed there?

22  A.  Yes.

23  Q.  Could you look at Defendant's Exhibit 38, please.

24           Strike that.  That's OK.

25           Let's forget that.

F7knosb4                        Kiley - redirect

1            Could you look at Defendant's Exhibit 143.

2            MR. RUMELD:  That is PX 21.

3            You looked at this a few minutes ago.

4   A.  OK.

5   Q.  If you look on the first page about five lines down, it

6   refers to 20 percent reduction.

7            Do you see that?

8            To the right down, down, down?

9   A.  Yes.  Yes, I do.

10  Q.  I'm waiting for it to be highlighted.

11           What does that mean?

12  A.  I think that's a reference to a formula that would produce

13  a 20 percent cost reduction.

14  Q.  And a formula under what plan?

15  A.  Cash balance.

16  Q.  How is the 20 percent reduction being achieved?

17  A.  Through reducing future accruals.

18  Q.  How is the reduction in the future accruals being achieved?

19  A.  Through the lower formal after the date of amendment.

20  Q.  That's what you were testifying to a few minutes ago, is

21  that right?

22  A.  Yes.

23  Q.  Now could you look at Defendant's Exhibit 199.  I think

24  this one your Honor doesn't have yet.

25           THE COURT:  All right.

F7knosb4                                    Kiley - redirect

1                MR. HUANG:  It should be PX 17.

2                MR. RUMELD:  Thank you.

3                THE COURT:  All right.

4                MR. RUMELD:  May I approach?

5                THE COURT:  Yes.

6                MR. RUMELD:  Thank you.

7    BY MR. RUMELD:

8    Q.   This is another draft of the presentation materials?

9    A.   Yes.

10   Q.   Looking at the first page, this one is dated June 30.  Do

11   you see that?

12   A.   Yes.

13   Q.   Now, if you turn the page to the objectives.

14   A.   Yes.

15   Q.   OK.  In this instance, the objectives are -- the first

16   objective is listed to decrease company cost.

17           Do you see that?

18   A.   Yes.

19   Q.   It doesn't refer to long-term costs?

20   A.   Correct.

21   Q.   Do you know how that change came about?

22   A.   No, I don't recall.

23   Q.   These presentation materials that were being drafted, were

24   they generally shared with Mercer?

25   A.   Yes.

F7knosb4                          Kiley - redirect

1   Q.  So is it fair to conclude that Mercer contributed to the

2   final document?

3   A.  Yes.

4   Q.  Does the fact that this objective changed alter your

5   recollection that when you were recommending the cash balance

6   amendment you had long-term cost savings in mind rather than

7   short-term cost savings?

8            MR. GOTTESDIENER:  Objection.

9            THE COURT:  Sustained.

10  A.  No, it doesn't.

11           THE COURT:  I sustained the objection.

12           MR. RUMELD:  She sustained the objection.  My bad.

13           THE COURT:  He needs to ask it differently.

14  BY MR. RUMELD:

15  Q.  Is it still your recollection that when you were

16  recommending the cash balance plan you were thinking of

17  long-term cost savings?

18  A.  Yes.

19  Q.  And you were thinking of achieving those savings through

20  the changes in the going-forward formula?

21  A.  Yes.

22  Q.  Could you look at Defendant's Exhibit 41, please.

23           MR. HUANG:  That is PX 101.

24           THE COURT:  All right.

25  Q.  This is the version of the presentation that actually went

F7knosb4                          Kiley - redirect

1    to senior management?

2    A.  I believe so, yes.

3    Q.  You believe so from the cover page, is that right?

4    A.  Yes.

5            THE COURT:  I'm still trying to get to it.

6            MR. RUMELD:  I'm sorry.

7            MR. HUANG:  It should be in both binders.

8            I do believe it's in both binders, and we did it

9    previously.

10           THE COURT:  OK.

11           MR. RUMELD:  I'm recalling that as well.

12           THE COURT:  You did not previously?

13           MR. HUANG:  I believe we did use it.

14           THE COURT:  You did.

15           MR. RUMELD:  Sorry for the confusion, your Honor.

16           MR. HUANG:  It's PX 101.

17           MR. RUMELD:  Unfortunately in our case we don't know

18   what exhibits we are going to use.

19           THE COURT:  I do understand.  PX 101.

20           OK.  Hold on one second.

21           I'm there.  Thank you very much for your patience.

22   BY MR. RUMELD:

23   Q.  I think when you looked at this before, you observed that

24   some of your notes were on this copy, is that right?

25   A.  Yes.

F7knosb4                        Kiley - redirect

1   Q.  From looking at this document, are you able to tell whether

2   those notes were meant for you or meant for Ms. Peck?

3   A.  Not really.  I would think they were probably meant for me.

4   Q.  You think they were meant for you?

5   A.  Yes.

6   Q.  But is it possible that Ms. Peck made this presentation

7   based on your notes?

8   A.  Yes.

9   Q.  Is it possible that you actually didn't attend this

10  meeting?

11  A.  Yes.

12  Q.  You are just not sure one way or the other?

13  A.  I am just not sure.

14  Q.  You see after the table of contents there is a listing of

15  objectives there?

16  A.  Yes.

17  Q.  One of the objectives is to decrease company cost.  Do you

18  see that?

19  A.  Yes.

20  Q.  Another objective is to develop a retirement program that

21  would be appropriate for our changing workforce.

22          Do you see that?

23  A.  Yes.

24  Q.  What was meant by that?

25  A.  I think that's a reference to 401(k) for one thing and also

1   to enable participants to be able to take a lump sum payment

2   when they retired.

3   Q.  What was changing about the workforce?

4   A.  It was very mobile, and we had to a higher turnover.

5   Q.  So was this second objective one of your objectives when

6   you recommended the plan changes?

7   A.  I don't recall.  It might have been.

8   Q.  What about the third objective?  What's your understanding

9   of that objective?

10  A.  I think that it is probably a reflection of the shifting of

11  retirement income to the, for employees to have more

12  responsibility for their own retirement income.

13  Q.  Why was that an objective?

14  A.  I think that actually the entire pension world was going in

15  that direction.  That was probably towards the beginning of it.

16  It had probably started a little bit before then, but there was

17  a shift to do, a shift away from defined benefit plans to

18  defined contribution plans.

19  Q.  Right.  From the company's perspective, how was that shift

20  affecting the company's costs?

21  A.  That would help to reduce the company's costs going

22  forward.

23  Q.  In other words, the company was going to spend less money

24  on pension benefits and therefore participants had to

25  contribute some of their own?

F7knosb4                        Kiley - redirect

1    A.  Yes.

2    Q.  Is that what is being conveyed here?

3    A.  I think so.

4    Q.  Did you have that objective in mind when you were making

5    your recommendations?

6    A.  Yes.

7    Q.  How did that objective impact the recommendation of the

8    401(k) plan?

9    A.  Well, the 401(k) plan gave employees the opportunity to

10   save for retirement.

11   Q.  So it gave them the opportunity to contribute their portion

12   to their retirement savings?

13   A.  Yes.

14           MR. GOTTESDIENER:  Objection.

15           THE COURT:  Sustained.

16           What we are going to try to do is the same thing with

17   Mr. Gottesdiener, not to restate his testimony.

18           MR. RUMELD:  OK, your Honor.  I will move on.

19   BY MR. RUMELD:

20   Q.  Could you look at -- I need to hand you Defendant's Exhibit

21   8.

22           MR. RUMELD:  May I approach?

23           THE COURT:  Yes.  We are going to end and break for

24   lunch in a few minutes.

25           MR. RUMELD:  I can do this exhibit in a moment.

F7knosb4                        Kiley - redirect

1              THE COURT:  All right.  Yes.  Terrific.

2     BY MR. RUMELD:

3     Q.  Do you recognize Defendant's Exhibit 8?

4     A.  Yes.

5              THE COURT:  Is it PX 5, the same thing?

6              MR. RUMELD:  I don't think so.

7              THE COURT:  Is this the SPD we have been referring to,

8     or is this an earlier one?

9              MR. RUMELD:  I will ask the witness.

10             MR. GOTTESDIENER:  We objected to this, your Honor, as

11    not relevant.

12             THE COURT:  All right.

13             Well, I find it useful to see how things proceed.  I'm

14    not going to rely upon anything that is irrelevant in my

15    decision, but I will allow it on the assumption that you are

16    going to connect it up.

17             Go ahead.

18             MR. RUMELD:  I am going to try, your Honor.

19    BY MR. RUMELD:

20    Q.  Do you recognize this document Mr. Kiley?

21    A.  Yes.

22    Q.  Could you tell the Court what it is.

23    A.  It is a summary plan description of the Woolworth 401(k)

24    plan.

25    Q.  Could you turn to the second page, or I guess the first

                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

F7knosb4                          Kiley - redirect

 1  page where the introduction is.

 2  A.  Yes.

 3  Q.  Did you assist in any way in the preparation of this

 4  document?

 5  A.  I probably did.  I don't have the specific recollection,

 6  but most likely.

 7  Q.  Would it have been part of your responsibilities to

 8  contribute towards a summary plan description of the pension

 9  benefits?

10  A.  Yes.

11  Q.  In the second paragraph of the introduction there, it says,

12  Achieving a financially comfortable requirement --

13          THE COURT:  I think -- actually, why don't you try it

14  again.

15          MR. RUMELD:  Yes.  I said it wrong.

16  Q.  Achieving a financially comfortable retirement is a goal

17  that requires careful planning and a consistent effort.

18  Financial security during retirement may require a combined

19  income from as many as three sources.  A company provided

20  pension plan, Social Security retirement benefits, and personal

21  savings.

22          Do you see that?

23  A.  Yes.

24  Q.  How does that statement compare to the objectives that you

25  had identified for management in your presentation materials?

F7knosb4                          Kiley - redirect

1    A.  I think it's consistent with the objectives.

2    Q.  How so?

3    A.  Because it still provides, it still includes the provision

4    of a company pension plan, but also adds a vehicle for

5    employees to save.

6            MR. RUMELD:  This is as good a stopping point as any,

7    your Honor.

8            THE COURT:  All right.  Ladies and gentlemen, we will

9    take our lunch break now and we'll pick up again right at 2

10   o'clock.  Thank you.

11           (Luncheon recess)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              AFTERNOON SESSION

2              2:00 pm

3              (Trial resumes)

4              (In open court)

5    THOMAS J. KILEY, Jr., resumes

6    REDIRECT EXAMINATION (Continued)

7    BY MR. RUMELD:

8              THE COURT:  Let's all be seated.  Mr. Rumeld, you may

9    proceed, sir.

10             MR. RUMELD:  Thank you, your Honor.

11   BY MR. RUMELD:

12   Q.  Mr. Kiley, at Paragraph 8 of your declaration, you say that

13   Mercer was responsible for recommending the specific design of

14   the cash balance plan.

15             Did you have a role as well with respect to the design

16   of the plan?

17   A.  Well, I was the main contact with Mercer and, yes, I did

18   have a role with it.  On day-to-day I provided the technical

19   expertise.  I was aware of cash balance plan.

20             I was by no means an expert in them, but I did some

21   research on them and I had also belonged to a group of retail

22   benefits, retail benefits managers, and some of them had

23   considered or may have actually converted to cash balance plans

24   and some of them had also implemented 401 (k) plans.  So I was

25   able to gain some information from them.

F7KJOSB5                        Kiley - redirect

1    Q.  Did you converse with Mercer about features of the plan

2    terms?

3    A.  Yes.

4    Q.  Did you need to approve each of those terms each if Mercer

5    was recommending them?

6            MR. GOTTESDIENER:  Objection.  There was a lack of

7    foundation about this.

8            THE COURT:  Overruled.  You may proceed.

9    A.  I vetted out different plan terms with Mercer and

10   eventually composed the final to management.

11   BY MR. RUMELD:

12   Q.  Okay.  With respect to the plan terms, what role did cost

13   considerations play?

14   A.  Well, that was the primary driver.

15   Q.  What was Mercer's role and what was your role with respect

16   to the cost consideration?

17   A.  Well, basically I told them what the goal was, that the

18   company was looking to achieve in terms of cost reduction, and

19   Mercer then developed formulas or designs that would

20   potentially meet those goals.

21   Q.  What was some of the specific terms of the plan that you

22   discussed with Mercer.

23   A.  Well, we were also interested in having a lump sum, a lump

24   sum option for participants.  That was feedback that we had

25   gotten from participants, that was something they wanted, so we

F7KJOSB5                           Kiley - redirect

1    were interested in having that part of the plan design as well.

2    Q.  Okay.  Am I correct that one of the plan terms was the

3    initial account balance?

4    A.  Yes.

5    Q.  How was that term arrived at?

6    A.  I'm not sure exactly how.  I am sure it came from Mercer.

7    Q.  What do you mean, it came from Mercer?

8    A.  Well, Mercer, you know, I knew we needed to establish a

9    starting account balance, so Mercer lent their expertise to

10   help us do that.

11   Q.  You mean how it should be calculated?

12   A.  Yes.

13   Q.  When you say you knew there needed to be an initial account

14   balance, why was that the case?

15   A.  Well, because we wanted participants to be able to take

16   their benefit in a lump sum if they so cheese.

17           The trouble was when they terminated and not have two

18   distinct plans, one where they had to take the prior benefit in

19   an annuity and could only take the future benefit in a lump

20   sum, we wanted them to be able to take the entire benefit in a

21   lump sum if that is what they wanted.

22   Q.  Could you look again at Defendant's Exhibit 143, please.

23   These are your notes from February 2nd.

24           THE COURT:  Can you remind me of the cross-references,

25   21?

F7KJOSB5                          Kiley - redirect

1             MR. RUMELD:  21.

2             THE COURT:  Thank you.

3   BY MR. RUMELD:

4   Q.  If you could look at the second page there where it says in

5   the second paragraph as of 1-1-95, 7.83 percent is the interest

6   rate we must use for core valuing liabilities at 9 percent.

7             Did I read that correctly?

8   A.  Yes.

9   Q.  Then it says we could convert existing balance at 9 percent

10  for existing -- is that employees?

11  A.  Yes.

12  Q.  But if they term, they would be cashed out at 7.83 percent.

13  Did I read that correctly?

14  A.  Correct.

15  Q.  What is your understanding of that?

16  A.  That the initial account balance would be created using a 9

17  percent interest rate to convert the accrued benefit, but there

18  was an IRS requirement that when someone terminated, they had

19  to be cashed out at a certain proscribed interest rate.

20  Q.  Who was speaking here?

21  A.  Mercer was speaking here.  I took it from notes verbatim.

22  Q.  What is your understanding as to who was coming up with

23  this 9 percent rate?

24  A.  Mercer, probably Jim Grefig.

25  Q.  Could you look now at DX 141 --

F7KJOSB5                          Kiley - redirect

1                THE COURT:  Let me ask, did Mercer provide advice that

2     you're aware of relating to investments of assets of Foot

3     Locker?  Were they financial advisers as well?

4                THE WITNESS:  No, they weren't.

5                THE COURT:  Do you know whether or not Jim Grefig was

6     aware of the investment experience, the return on assets that

7     Foot Locker had obtained?

8                THE WITNESS:  Yes.

9                THE COURT:  How were you aware that he had information

10    on that topic?

11               THE WITNESS:  Well, we would provide him with

12    information every year on the results of an annual statement

13    from the trustee for the plan which had probably most of the

14    information.

15               THE COURT:  Do you recall having any conversations

16    with him at all related to the 9 percent?

17               THE WITNESS:  Not too much.  I think from the outset,

18    you know, that was what they suggested would be the appropriate

19    interest rate to do the conversion, and I don't think we ever

20    questioned that.

21               THE COURT:  Did they ever express the basis of that

22    number?

23               THE WITNESS:  I think there were a couple of reasons.

24    One was 9 percent was the actuarial interest rate.

25               THE COURT:  What I want to do, I want to separate for

F7KJOSB5                           Kiley - redirect

1    a moment that which you may have assumed was the basis for the

2    9 percent and whether or not there were any communications from

3    you, to you from Mercer as to why they chose the 9 percent,

4    which you testified that they gave you and you folks accepted?

5              THE WITNESS:  I think there may have been some, you

6    know, statements made by them in some means, but I don't think

7    they, to my knowledge, I don't know that they gave us anything

8    formally to substantiate the 9 percent.

9              THE COURT:  All right.  If there were statements at

10   meetings, would they be contained in the verbatim handwritten

11   notes that you took?

12             THE WITNESS:  Yes.

13             THE COURT:  You may proceed.

14             MR. RUMELD:  Thank your Honor.  I will remove a few

15   questions in light of yours.

16             MR. RUMELD:  Could we look at Defendant's Exhibit 146,

17   please.  Exhibit 146.

18             MR. HUANG:  PX 22.

19             THE COURT:  22?  Thank you.

20   BY MR. RUMELD:

21   Q.  If you look at the first sentence there, it says 9 percent

22   is -- maybe you can read it.  These are your notes, right?

23   A.  Yes.  9 percent is probably the typical earnings rate in a

24   K plan, so 7 percent is conservative.

25   Q.  What is your understanding of that first sentence, that 9

F7KJOSB5                          Kiley - redirect

1  percent is probably the typical earnings rate in a K plan?

2  A.  That most 401 (k) plans at that point in time were earning

3  somewhere in the aggregate of approximately 9 percent.

4  Q.  What is your understanding why Mr. Grefig is telling you

5  this -- strike that.

6           Who was this coming from, this information?

7  A.  Probably Jim Grefig.

8  Q.  Why is he telling you this?

9  A.  It would seem that he's substantiating the use of the 9

10 percent rate.

11 Q.  In fact, in the next sentence it says currently discount

12 liability of 9 percent.  Do you see that?

13 A.  Yes.

14 Q.  Sitting here now, you don't see any reason why those two

15 thoughts aren't timed together?

16           MR. GOTTESDIENER:  Objection.

17           THE COURT:  Sustained.  Why don't you rephrase.

18 BY MR. RUMELD:

19 Q.  Do you think there is a connection between the reference to

20 the earnings rate in the K plan and the reference to the

21 discount rate in the next sentence?

22 A.  No.  I think they were independent, but they were similar

23 rates and helped to, you know, confirm the use of the 9

24 percent.

25 Q.  Use of the 9 percent for what purpose?

F7KJOSB5                         Kiley - redirect

1    A.  For establishing the initial account balances.

2    Q.  Do you recall Mr. Grefig ever recommending that Foot Locker

3    or Woolworth use any other rate other than 9 percent to

4    establish the initial account balances?

5    A.  No, I don't think he ever did.

6              THE COURT:  Let me ask you a question that is sort of

7    related but a little bit different.

8              Do you recall when you made the determination that the

9    plan would not be amended as of July 1995?

10             THE WITNESS:  No.

11             THE COURT:  Do you recall why a decision was made not

12   to amend the plan in the middle of the year?

13             THE WITNESS:  I would --

14             THE COURT:  I want to make sure, don't guess, but give

15   me your best recollection.  I don't need perfect recollection,

16   but I want to be able to rely on what you're saying.

17             THE WITNESS:  To my best recollection, there was so

18   much involved in doing this conversion, we ran out of time to

19   be able to do it as of July 1.

20             THE COURT:  Do you know if there was an expectation

21   that the GATT interest rate would decline in year, by year-end

22   '95, year commencement 1996?

23             THE WITNESS:  I don't think we were focused on that at

24   that point in time, so I don't think there was -- I don't think

25   it was in our -- I don't think it was in our consciousness to,

1    you know, know that the GATT rate might have been declining.

2              THE COURT:  So let me ask, if you could, to look just

3    under the place that Mr. Rumeld had focused on before, Bates

4    22, 2532, currently discount liabilities at 9 percent with

5    GATT, we must use a rate around 7 and a half to 8 percent.

6    Cash balance -- am I reading correctly so far?

7              THE WITNESS:  Yes.

8              THE COURT:  Cash balances are converted?

9              THE WITNESS:  Yes.

10             THE COURT:  At 9 percent.  I am focused on the next

11   sentence.  If someone termed this year, which would be 1995, we

12   would have to cash out at 8 percent, which is a higher number.

13             Do you see that?

14             THE WITNESS:  Yes.

15             THE COURT:  Do you recall what that relates to?

16             THE WITNESS:  The IRS requirement for a cash-outs.

17             THE COURT:  Would be the GATT rate, the 8 percent?

18             THE WITNESS:  Yes.

19             THE COURT:  If somebody cashed out at 8 percent, they

20   would end up with a higher cash-out lump-sum payment.  Is that

21   right?

22             THE WITNESS:  Yes.

23             THE COURT:  You may proceed.

24             MR. RUMELD:  Higher than at 9 percent.

25             THE COURT:  Higher than 9 percent, but -- well, no, it

F7KJOSB5                         Kiley - redirect

1   is higher than -- they would end up higher than 7.5 percent,

2   right?

3            MR. RUMELD:  If the interest rate is --

4            THE COURT:  Let's ask the witness, right?

5            If the interest rate goes up, their payment goes down

6   because we are talking about the GATT rate now, not talking

7   about the discount rate.  We are talking about the GATT rate.

8            Am I right?

9            THE WITNESS:  Yes.

10           THE COURT:  If the GATT rate decreases, then the

11  payment lump sum to the participant decreases.  Am I right?

12           THE WITNESS:  No.

13           THE COURT:  The GATT rate decreases?

14           THE WITNESS:  Yeah, the payment, the lump-sum payment

15  is higher.

16           THE COURT:  The lump-sum payment is higher?

17           THE WITNESS:  Yes.

18           THE COURT:  If the GATT rate goes down to 75 percent,

19  75 percent, that is what I am trying to get at, then the

20  company pays more than it would if the GATT rate were 8

21  percent.  Is that right?

22           THE WITNESS:  Correct.

23           THE COURT:  Got it, yes.

24  BY MR. RUMELD:

25  Q.  I want to follow up on one of your questions, DX 38, which

F7KJOSB5                          Kiley - redirect

1   is Plaintiff's Exhibit 10.  This presentation material is dated

2   May 1.  Do you see that?

3   A.  Yes.

4   Q.  Would you turn to the strategy page which is I think the

5   fourth page in.

6   A.  Okay.

7   Q.  Okay.  So I just wanted to point out here it says in the

8   second bullet, to convert TWRP to a cash balance plan as of

9   9-1-95.  Do you see that?

10  A.  Yes.

11  Q.  You don't have any reason to doubt, do you, Mr. Kiley, that

12  at least as of May, you had already pushed back the expected

13  date of the cash balance plan?

14  A.  No, I don't.

15  Q.  It was pushed back to September, not to January 1 as of

16  this time?

17  A.  Right.

18  Q.  Thank you.  Would you turn to -- I want to show you

19  Defendant's Exhibit 159.  I think it is attached to your

20  declaration as well.

21        THE COURT:  I am still cycling through on a couple of

22  things.  Let me interrupt you before we get to the new

23  document.

24        Do you know whether, as part of the work that you did

25  in connection with this plan-change process, you looked at the

F7KJOSB5                          Kiley - redirect

1    number of expected terminations based upon known closures, et

2    cetera, et cetera, and came up with an amount that was likely

3    to be the lump sums that you have to pay?

4              THE WITNESS:  I don't recall doing that.

5              THE COURT:  All right.  Thank you.  You may proceed.

6    BY MR. RUMELD:

7    Q.  Let me ask you a first question first, Mr. Kiley.

8              What was your understanding at the time of the

9    relationship between the initial account balance and the prior

10   benefit?

11   A.  Because 9 percent was the actuarial interest rate

12   assumption, the rate at which the liabilities were being

13   valued, we considered the initial account balance to be an

14   actuarial equivalent.

15   Q.  Did you receive advice from Mercer about that?

16             MR. GOTTESDIENER:  Objection.

17             THE COURT:  Let's hold on.  I'll allow it.  You may

18   proceed.

19   A.  I believe so, yes.

20   BY MR. RUMELD:

21   Q.  It was their advice that the two were actuarially --

22             MR. GOTTESDIENER:  Objection.

23             THE COURT:  If it is advice, then it is overruled.

24   You may answer.

25   A.  Yes, I believe we did, yes.

F7KJOSB5                          Kiley - redirect

BY MR. RUMELD:

Q.  Would you look now on Defendant's Exhibit 159.  This is a

memo that appears to be sent to you because Rita Zimmerman's

name is crossed out and your name is substituted.  Do you see

that?

A.  Yes.

Q.  What is your understanding here of what Mr. Grefig is

communicating to you.

A.  Well, I think he is saying that in the writing of the plan

document, there were certain definitions that had to be

included, and one of them was accrued benefit.

        I guess the other one was the methodology for

converting a participant's account, cash account balance to a

life annuity.

Q.  And he introduces those two definitions by saying these are

two definitions that are needed for actuarial equivalent in the

cash balance plan.  Do you see that?

A.  Yes.

Q.  And the first definition is the definition of the initial

account balance?

A.  Yes.

        THE COURT:  Was the calculation of the minimum

lump-sum payment done on an actuarial basis at all?

        THE WITNESS:  Well, it used mortality tables and

interest rate.

F7KJOSB5                          Kiley - redirect

1              THE COURT:  Are those the two primary characteristics

2     that make the cash balance, that comprise the cash balance as

3     well?

4              THE WITNESS:  You mean the initial account balance?

5              THE COURT:  Yes.

6              THE WITNESS:  Yes.

7              THE COURT:  So both the initial account balance and

8     the minimum lump sum use a form of mortality.  Is that right?

9              THE WITNESS:  Correct.

10             THE COURT:  And they both use a form of discount rate.

11    Is that right?

12             THE WITNESS:  Yes.

13             THE COURT:  So they're both actuarial calculations.

14    Is that right?

15             THE WITNESS:  Yes, yes.

16             THE COURT:  You may proceed.

17    BY MR. RUMELD:

18    Q.  Let me follow up on that question.

19             As of that time, did you perceive there to be anything

20    wrong with the fact that the assumptions used to calculate the

21    initial account balance were different than the assumptions

22    used to calculate the minimum lump sum?

23    A.  No.

24    Q.  What determined the assumptions that were used to calculate

25    the minimum lump sum?

F7KJOSB5                          Kiley - redirect

1    A.   The IRS requirements which required a certain mortality

2    table and certain interest rate.

3    Q.   At the time in your discussions with Mercer, were you ever

4    of the impression that those statutory requirements for

5    determining the minimum lump sum needed to apply for the

6    purposes of the initial account balance?

7    A.   No.

8    Q.   Now, am I correct that another term of the plan was the

9    compensation credits?

10   A.   Yes.

11   Q.   Do you recall any of the discussions about how you arrived

12   at the terms for the compensation credits?

13   A.   Not specifically.

14   Q.   Do you remember what some of the alternatives were?

15   A.   I know we looked at a number of different formulas and ways

16   of doing it.

17   Q.   Such as?

18   A.   Having it be an aged-base formula or service-based formula.

19           I saw a note, I didn't remember this, but I saw a note

20   that I had asked Mercer for a formula that would combine the

21   two, but they indicated that would probably be a complex

22   formula.

23   Q.   So one formula that was considered was an age-based

24   formula?

25   A.   Yes.

F7KJOSB5                          Kiley - redirect

1    Q.  What did that mean?

2    A.  I think it was a formula where the pay credit would change,

3    probably increase as the person aged.

4    Q.  And a service-based formula?

5    A.  Where the pay credits would increase as service increased.

6    Q.  Did I understand your testimony that you also looked into

7    the possibility of a combination of the two?

8    A.  Yes.

9    Q.  Could you look at Defendant's Exhibit 38 again.  That was

10   the May 1, 1995 slide deck.

11          MR. HUANG:  PX-10.

12          MR. RUMELD:  Thank you.

13   BY MR. RUMELD:

14   Q.  I want to direct you to the, I think it is the 5th or 6th

15   page entitled, "Comparison plan."  It is on Page 5461.

16          Do you see on the top, on the right, there is a

17   formula for counting the credits.  Do you see that?

18   A.  Yes.

19   Q.  Could you explain this formula as you understand it.

20   A.  The formula would apply 1 percent of up to the first 10,800

21   of pay for service up to 10 years of service.  Then it would

22   increase to 1 and a half percent of the balance of pay for

23   service from 11 to 20 years.

24   Q.  Let me ask you, are the figures on the left side supposed

25   to be under the new plan or the old plan?

1  A.  I think that's the new plan.

2  Q.  What are the figures on the right where it says percent of

3  pay?

4  A.  I think that's, I think that's a pay-based formula rather

5  than a service-based formula.

6  Q.  Do you know whether any of these terms were actually

7  implemented?

8  A.  I don't know.

9  Q.  Could you look at Defendant's Exhibit 37, which is the

10  summary plan description.  Look at Page 13.  Does that look

11  familiar to you, sir?

12  A.  Not really.

13  Q.  If it is in the SPD, could you agree that this was the

14  formula eventually adopted?

15  A.  Yes.

16  Q.  What kind of formula is it?

17  A.  It is a pay-based formula.  It is actually pay and

18  service-based.

19  Q.  What causes you to say it is pay-based?

20  A.  Because there is a percentage for all pay and then an

21  additional percentage for pay above a certain level.

22  Q.  For more years of service, the percentage of pay increases.

23  Is that right?

24  A.  Yes.

25  Q.  The percentage of pay for any given end of service, the

F7KJOSB5                          Kiley - redirect

1   percentage of pay increases over 22,000 -- I am sorry --

2   decreases over 22,000.  Is that right?

3   A.  Repeat that last part again.

4   Q.  For any specific band of service, so 6 but not less than 11

5   years, for example, there is a percentage of pay for

6   compensation up to 22,000 and another percentage of

7   compensation for pay over 22,000?

8   A.  The way I would read that is percentage of all

9   compensation.  So it includes total compensation, even

10  compensation over 22,000.  That is the 1.5.  Then there is an

11  additional .75 percent for pay over 22,000.

12  Q.  Right.  I stand corrected.  I am sorry, Mr. Kiley.

13          Now, were there also discussions about how to

14  calculate the interest rates?

15  A.  There may have been.  I have a vague -- I think it was

16  always proposed that it be 6 percent -- I have a vague

17  recollection of someone questioning that that might be too

18  high.  It was decided to keep the 6 percent.

19  Q.  You remember it was 6 percent?

20  A.  Yes.

21  Q.  You participated in discussions as to whether it would be 6

22  percent or some other percent?

23  A.  Yeah.  I don't think there were too many discussions on it.

24          I think again it was something that came from Mercer

25  and they suggested that was an appropriate rate to use.

F7KJOSB5                          Kiley - redirect

1    Q.  So let's look back at Defendant's Exhibit 143, which are

2    your notes from February 10 -- February 2.  Excuse me.

3           Do you see there it refers to the interest credit as 5

4    percent?  Do you see that two-thirds down the page?

5    A.  Yes.

6    Q.  If I look at your notes from March, DX 141 --

7           MR. HUANG:  PX-21, your Honor.

8           THE COURT:  The March?

9           MR. CLARK:  March is PX-129.

10   BY MR. RUMELD:

11   Q.  If you look on the second page, the second line, it says

12   we're crediting 5 percent.  Do you see that?

13   A.  Yes.

14   Q.  Would you agree with me at least during this period of time

15   you folks were contemplating a 5 percent interest credit rate?

16   A.  Yes.

17   Q.  You just don't remember --

18   A.  No.

19   Q.  -- what happened to that?

20   A.  No.

21           THE COURT:  Do you have any understanding as to what

22   the phrase excerpted right there on the screen means, we're

23   crediting 5 percent, but we have an 8 percent GATT?  What is

24   the relationship of those two?

25           THE WITNESS:  I am not sure what the relationship is,

F7KJOSB5                              Kiley - redirect

```
 1    but I think it is a reference to the GATT interest rate
 2    requiring 8 percent.  But GATT, you know, any discussions we
 3    had at this point, to my recollection, was in reference to
 4    calculating the minimum lump-sum payment.
 5              THE COURT:  Why would there be any need to -- I am
 6    wondering what is the word, "but."  It looks like there is some
 7    relationship being drawn out there.  We're crediting 5 percent,
 8    but -- am I reading that word correctly?
 9              THE WITNESS:  Yes, yes.
10              THE COURT:  We have an 8 percent GATT.  Why would one
11    be relevant to the other is if one is for the initial account
12    balance and the other is for the accrued benefit.
13              THE WITNESS:  The 5 percent at this point in time was
14    being considered to be interest on the account balance.
15              THE COURT:  On the accrued?
16              THE WITNESS:  Yeah, yes.
17              THE COURT:  As the lump sum would go up at 5 percent
18    or 6 percent is what it became per year, per anum?
19              THE WITNESS:  The interest credit came to 6 percent
20    per year, yeah.
21              THE COURT:  The interest credit is relevant to the
22    cash balance account, right?
23              THE WITNESS:  Yes.
24              THE COURT:  Not to the 12-31-95 lump sum calculation.
25    Is that right?
```

F7KJOSB5                          Kiley - redirect

1            THE WITNESS:  Correct, correct.

2            THE COURT:  The 12-31-95 payment, one uses the GATT

3    rate for the interest rate, right?

4            THE WITNESS:  To calculate the lump-sum payment, yes.

5            THE COURT:  Right.  So here it says we're crediting 5

6    percent.  That's not the GATT rate, right?  Because the GATT

7    rate now is either 8 percent or 7.83?

8            THE WITNESS:  Right.

9            THE COURT:  Or it goes down to 6.06?

10           THE WITNESS:  Right.

11           THE COURT:  It seems there is a distinction or some

12   relationship between the initial account balance and 5 percent

13   which is the annual credit, and an 8 percent GATT.

14           THE WITNESS:  There does, but I don't recall.

15           THE COURT:  Okay.  All right.

16   BY MR. RUMELD:

17   Q.  So from the participant's standpoint, if the interest

18   credit rate is higher, is that better or worse for the

19   participant?

20           THE COURT:  The interest credit rate?

21           Let's assume, do two hypotheticals, but let's have one

22   of them be if the participant is in wear-away for calendar year

23   1996 and they terminate 12-1-97, are they better off with an

24   interest rate at 5 percent and a GATT rate at 8 percent, or

25   does it make no difference?

1          THE WITNESS:  It may not make any difference.  In the

2     end they're better off with a higher interest rate for

3     crediting interest on the account balance.

4          THE COURT:  On the initial account balance?

5          THE WITNESS:  Right.

6          THE COURT:  What I understand, let me just tell you,

7     Mr. Kiley, see if I understand it correctly, the initial

8     account balance and the interest credits that go into the

9     initial account balance and -- I shouldn't say the initial

10    balance, but the cash balance, let's assume for the moment that

11    a cash balance is calculated as $10,000.00 as of January 1,

12    '96.  Are you with me?

13         THE WITNESS:  Yes.

14         THE COURT:  At the end of the year there would be an

15    interest rate applied which is being considered here in this

16    document, your notes of March '95, which is PX-129 as 5 percent

17    but eventually ends up at 6 percent.  Am I right?

18         THE WITNESS:  Yes.

19         THE COURT:  That is the interest credit, right?

20         THE WITNESS:  Yes.

21         THE COURT:  But that number has nothing to do at all

22    with the accrued balance, which then becomes the lump sum if it

23    is the greater of.  Am I right?  It is sort of apples and

24    oranges, two separate things going on?

25         THE WITNESS:  They're separate, yes.

F7KJOSB5                        Kiley - redirect

1           THE COURT:  All right.  I at least know what I was

2    aiming at, but I may have done something different from where

3    you were aiming.

4           MR. RUMELD:  We'll keep going and we'll see.

5    BY MR. RUMELD:

6    Q.  Mr. Kiley, you previously testified that the term wear-away

7    was not used very frequently.  Is that correct?

8    A.  That is correct.

9    Q.  So I am going to ask you to do what I think the court and

10   Mr. Gottesdiener asked you to do.  For the purposes of my

11   questioning, let me ask a question first.

12          You do have a recollection of what was discussed in

13   the February meeting about the impact of starting with a 9

14   percent interest rate if the GATT rate was lower?

15   A.  Yes.

16   Q.  So for the purposes of my questioning today in these

17   proceedings, to make them easier, I am going to refer to that

18   as wear-away as well, okay?

19   A.  Okay.

20   Q.  Could you tell me first in your own words as to how you

21   understood wear-away.

22   A.  Again I don't think we focused on wear-away per se too

23   much.  I think what we focused on was that the person's account

24   balance would accumulate with pay credits and interest credits,

25   but then if someone decided to take a lump sum when they

F7KJOSB5                    Kiley - redirect

1   terminated or retired, we would have to do a calculation based

2   upon the GATT rates, and that could produce a higher rate.

3            I don't think we were focusing on that too much as

4   wear-away.

5   Q.  You did understand that if that minimum lump sum turned out

6   to be higher, then for that participant he did not accrue new

7   benefits during that period of time.  Is that correct?

8   A.  Yes.

9   Q.  Now, did you at the time equate wear-away with a pension

10  plan freeze?

11  A.  No.

12  Q.  Why not?

13  A.  We just didn't consider it a freeze.  We considered any

14  effect from wear-away to be temporary.  We did consider the

15  possibility of a plan freeze, but we didn't obviously go in

16  that direction.

17  Q.  Now, what did you know at the time about how long the

18  anticipated period of wear-away would be?

19  A.  Well, initially I think we thought it would be a year or

20  so.  Then I think subsequently Mercer, you know, suggested it

21  might be longer than that.

22  Q.  How much longer?

23  A.  Two to three years, as I remember.

24  Q.  Could we look again at Exhibit 141, which those are the

25  March notes.

F7KJOSB5                          Kiley - redirect

1              MR. HUANG:  PX-129.

2    BY MR. RUMELD:

3    Q.  So right there in the middle, it says, doesn't it, so in

4    first year we get credit for a wear-away.  Do you see that?

5    A.  Yes.

6    Q.  And how do you understand that sentence?

7    A.  How do I understand it now or how did I understand it then?

8    Q.  How did you understand it then?

9    A.  I don't know.  I can't be certain.  Again I am taking these

10   notes, this is what we were saying in the meeting.  At that

11   point we may have questioned what does wear-away mean, but I

12   don't know that for certain.

13   Q.  It doesn't say in the first three years we credit for

14   wear-aways?

15   A.  Right.

16   Q.  By "credit," what does that mean?

17   A.  I would imagine that refers to a reduction in -- let me

18   step back.  I am not sure really what the word "credit" would

19   mean there.  I am not sure if that is really a misnomer.

20   Q.  Did you understand that there was a relationship between

21   wear-away and the plan's cost?

22   A.  I don't think we were focusing on that, no.

23   Q.  You don't remember having that understanding?

24   A.  No.

25   Q.  Let's look at 142, which is DX 8.  These are your notes

F7KJOSB5                        Kiley - redirect

1    from April.  Is that right?

2    A.   Yes.

3    Q.   So if you look on the second page towards the bottom, the

4    second to the last paragraph, do you want to read that for the

5    court?

6    A.   "First year normal cost is based upon the fact that a

7    person may not earn any additional benefits.  It may take

8    between two and three years to get up to the ongoing cost

9    level."

10   Q.   Would you agree with me, Mr. Kiley, at least Mr. Grefig is

11   explaining this is drawing a connection between the normal cost

12   and the wear-away period?

13   A.   Yes.

14   Q.   When it says it may take two to three years to get up to

15   the ongoing cost level, what does that mean?

16   A.   I know there was a normal cost.  We were trying to achieve

17   a savings, so we wanted to have a lower normal cost.

18            So I think that is the period of time before we get

19   back up to the level of normal cost that there was prior to the

20   plan change.

21   Q.   If you're up to the ongoing cost level, are you still in a

22   period of wear-away?

23   A.   Probably not.

24   Q.   So the statement that it may take between two and three

25   years to get up to the ongoing cost level means what with

F7KJOSB5                         Kiley - redirect

1   respect to wear-away?

2   A.  That it would last probably less than three years.

3   Q.  And then it would be over?

4   A.  Yes.

5           THE COURT:  Are you going to ask about the last

6   paragraph on PX-8, on that second page?  And if not --

7           MR. RUMELD:  I wasn't going to.

8           THE COURT:  -- I want to get your understanding as to

9   what this language means.  Can you read what you can from that

10  last paragraph in your handwriting on Bates numbered Page 2305

11  of PX-8.

12          THE WITNESS:  "The normal cost would also have added

13  to it an amortization of the unfunded.  This would be about

14  700,000 per year for 30 years.  This is under the 100 percent a

15  month sums.  It would be about, I don't know what that looks

16  like, 500,000 under annuities probably.

17          THE COURT:  What does that mean to you?

18          THE WITNESS:  Amortization of the unfunded refers to

19  the unfunded liability, and that would be amortized over a

20  30-year period.

21          I guess we'd have some flexibility probably in how to

22  amortize that, and it might have, depended upon what was

23  assumed in terms of lump sums or annuities.

24          THE COURT:  So is it the case that on top of the

25  normal cost, there would be a payment that was made to

1    effectively pay off the unfunded liability over a period of 30

2    years?

3              THE WITNESS:  Yes.

4              THE COURT:  And that payment was projected to be

5    approximately $700,000?

6              THE WITNESS:  Probably between 500,000 and $700,000.

7              THE COURT:  Do you know if that payment was the same

8    level, approximately, as was being paid on the unfunded

9    liability prior to the plan change?

10             In other words, is that just a constant number that

11   was unaffected between the prior plan and the amended plan, or

12   did it change, if you can recall?

13             THE WITNESS:  I don't recall exactly.  It probably

14   changed, but I don't recall.

15             THE COURT:  What would be the factors which would have

16   been the reason for a change?  And do you think it would have

17   been higher or lower?

18             THE WITNESS:  I think it had a change at this point in

19   time because we had a plan amendment.

20             THE COURT:  The plan amendment would increase the

21   payments for unfunded liability or decrease?

22             THE WITNESS:  Increase.

23             THE COURT:  It would increase because it would

24   accelerate them, or why?

25             THE WITNESS:  I am not sure.  I think there was, I

F7KJOSB5                              Kiley - redirect

1  think there was a requirement in probably under ERISA that you

2  had to re-amortize the unfunded if you did a plan amendment.

3              THE COURT:  All right.  Thank you.

4  BY MR. RUMELD:

5  Q.  Could we take a look at PX 215, please.  This is PX, so I

6  don't have to do a translation for your Honor.

7              This appears to be coming from Mr. Grefig to you on

8  March 15th, 1995.  Do you see that?

9  A.  Yes.

10 Q.  Could you turn to the next page, please.  It refers to a

11 comparison of the career average plan versus initial cash

12 balance runs.  Do you see that?

13 A.  Yes.

14 Q.  What is the career average plan?

15 A.  That was the plan in effect prior to 1-1-96.

16 Q.  Underneath there there is a comparison of costs and

17 liabilities.  Do you see that?

18 A.  Yes.

19 Q.  If you look at the normal cost, it says in the second line

20 under the career average plan, the normal cost is about $12.3

21 million.  Do you see that?

22 A.  Yes.

23 Q.  For the cash balance, it is only $5.6 million.  Do you see

24 that?

25 A.  Yes.

F7KJOSB5                         Kiley - redirect

Q.  And then it says normal cost after first year, $8.5

million, approximately, for the cash balance plan.  Do you see

that?

A.  Yes.

Q.  How do you understand the distinction between the normal

cost in the first year and the second year?  I am sorry.  Yes,

in the first year and thereafter?

A.  Well, in the first year it is lower than it was previously

because of the reduction of future accruals.  As time goes on,

pay increases, normal costs would increase.

Q.  But even for after first year, it lists the normal cost as

being 8.5 million as compared to the normal cost under the

accrued average plans being 12.3 million.  Do you see that?

A.  Yes.

Q.  Even after the first year, it continues to be lower?

A.  Yes.

Q.  Agreed?

A.  Yes.

Q.  What is that attributable to?

A.  Reduction in future accruals.

Q.  How would you understand the difference between the normal

cost in the first year and after the first year?

A.  There is just a larger reduction in normal cost obviously

in the first year.  Then probably having to do with the formula

and, you know, increases in compensation as time goes on.

F7KJOSB5                         Kiley - redirect

1   Q.  Isn't that reduction in the first year also due to that

2   wear-away?

3   A.  Looking back kind of now, yes.

4   Q.  You're just not sure you understood that at the time?

5   A.  Correct.

6           MR. GOTTESDIENER:  Objection.

7           THE COURT:  Overruled.

8   BY MR. RUMELD:

9   Q.  But you would agree that the notes that we read a few

10  minutes ago seemed to communicate that there is a cost

11  reduction associated with the period of wear-away?

12  A.  Yes.

13  Q.  Now, in calculating the lump sum, you need to know what the

14  IRS rate is.  Is that correct?

15  A.  Yes.

16  Q.  When is the IRS rate determined?

17  A.  I believe it is in December.

18  Q.  And then that rate for December, for how long is it in

19  effect?

20  A.  The entire subsequent year.

21  Q.  So throughout 1995, what would be the IRS rate that would

22  determine the minimum lump sum?

23  A.  Throughout '95?

24  Q.  Right?

25  A.  The December 1994 GATT rate.

F7KJOSB5                          Kiley - redirect

1  Q.  So when the plan was contemplated, when you folks were

2  contemplating a plan amendment effective June or September,

3  1995, what would be the rate that would be applying to anybody

4  who left shortly after the plan amendment?

5  A.  The December '94 GATT rate.

6  Q.  That rate was what, do you remember?

7  A.  I believe it was 7.83.

8  Q.  Now, could you look at Defendant's Exhibit 189 or PX-619.

9  We can just look at 619, that is fine, you don't have to go

10 through a lot of trouble.

11          This was the exhibit you looked at before with Mr.

12 Gottesdiener.  Do you remember that?

13 A.  Yes.

14 Q.  If you look at the bottom of the page, this appears to be

15 dated August 31, 1995.  Do you see that?

16 A.  Yes.

17 Q.  If you look at that box on the right, on the bottom

18 paragraph, it says the cash balance annuity is determined by

19 dividing the cash balance account by an immediate annuity at 8

20 percent.  Again the 8 percent will vary with prevailing rates.

21 What do you understand that to mean?

22 A.  That that is our reference to the GATT rate.

23 Q.  So as of the end of August, Mercer is still making

24 projections using an 8 percent rate?

25 A.  Yes, it appears that way.

F7KJOSB5                         Kiley - redirect

1          THE COURT:  Do you understand the 8 percent to be the

2     7.87 just rounded up?

3          THE WITNESS:  Yes.

4     BY MR. RUMELD:

5     Q.  Now, could we look at PX-214, which is one of the exhibits

6     that was shown to you.

7          Now, Mr. Kiley, you had some difficulty remembering

8     whether you had actually seen these documents.  Is that right?

9     A.  Yes.

10    Q.  Do you remember, though, that you had discussions about

11    various scenarios, looking at different terms and formulas?

12    A.  Yes.

13    Q.  Now, if I look at the middle box there, okay, on the top,

14    it says age index.  Do you see that?

15    A.  Yes.

16    Q.  What does that mean?

17    A.  I am not sure.

18    Q.  Do you know whether it is referring to the type of formula

19    that is going to be used?

20    A.  Most likely.

21    Q.  Underneath that box it says age-based cash balance, right?

22    A.  Yes.

23    Q.  And did the company implement an age-based cash balance?

24    A.  I think it implemented a combination of age and pay rates.

25    Q.  Right, age and service-based?

F7KJOSB5                          Kiley - redirect

1    A.  Age and service, sorry, yes.

2    Q.  Wasn't it service and pay, not service and age?

3    A.  Yes.

4    Q.  Do you remember that now?

5    A.  Yes.

6    Q.  I didn't mean to confuse you.

7    A.  That is okay.

8    Q.  To the left of that, career average, that is a reference to

9    what?

10   A.  The prior plan.

11   Q.  That is just showing what the accruals would be if you kept

12   the old plan?

13   A.  Yes.

14   Q.  And the middle one is showing what would be if we adopted,

15   if Foot Locker adopted an age based cash balance plan which it

16   did not adopt, right?

17   A.  Correct.

18   Q.  On the right there is a reference to integrated cash

19   balance?

20   A.  Yes.

21   Q.  Above that there is a box showing what the terms of that

22   integrated cash balance basis would be.  Do you see that?

23   A.  Yes.

24   Q.  It has various grade points for ages.  Is that right?

25   A.  Yes.

F7KJOSB5                        Kiley - redirect

1    Q.   Was that formula adopted?

2    A.   I don't know if this exact one, but I think one similar to

3    this was.

4    Q.   Well, didn't you agree with me a minute ago that we did not

5    index it based on age?

6    A.   Ah!

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F7knosb6                         Kiley - redirect

1    Q.  You agree that this formula would provide different

2    compensation credits based on someone's age?

3    A.  Yes.

4    Q.  OK.  And the formula that Foot Locker adopted, did it

5    provide for different credits --

6    A.  No.

7    Q.  -- based on someone's age?

8    A.  No, it was service based.

9    Q.  Let's look now at PX 215.  If we could turn here to the

10   third page.

11              On the left side you have again the career average.

12              Do you see that?

13   A.  Yes.

14   Q.  That is the existing plan?

15   A.  Yes.

16   Q.  In the middle we have age indexed, do you see that?

17   A.  Yes.

18   Q.  That is a plan that was not adopted?

19   A.  Right.

20   Q.  And on the right it refers to service based, right?

21   A.  Yes.

22   Q.  Are you able to tell whether the formula for the years of

23   service are the same as what was in the final plan that was

24   adopted?

25   A.  No.

F7knosb6                        Kiley - redirect

1   Q.  So here you see that there is service up to ten years, ten

2   to twenty, twenty to thirty?

3   A.  Yes.

4   Q.  Can we look back at the SPD, which is Defendant's Exhibit

5   37.  If we turn back to page 13 --

6           MR. RUMELD:  Can we go to page 13, John.

7   Q.  Would you agree with me that this formula is different in

8   terms of the brackets for years of service?

9   A.  Yes.

10  Q.  Turning back to Exhibit 215, if I look at the top left,

11  where it says Woolworth test case scenario, do you understand

12  what that first box on the top left is?

13  A.  It is just -- it's the demographics and details for a

14  hypothetical person.

15  Q.  It is taking a hypothetical person and then applying the

16  various formulas for that person's demographics?

17  A.  Yes.

18  Q.  Do you see that on earnings on account it says 5 percent?

19  A.  Yes.

20  Q.  What does that mean?

21  A.  That's the interest on the account balance.

22  Q.  So it assumes a 5 percent interest credit rating for this

23  exercise?

24  A.  Yes.

25  Q.  And the interest rate that was ultimately used?

1    A.  6 percent.

2    Q.  Let's look now at Plaintiff's Exhibit 252, please.  I guess

3    we can look at the second page.  Looking at the top left again,

4    where the demographics are, this projection also has earnings

5    on account of 5 percent rather than 6 percent, is that right?

6    A.  That's correct.

7    Q.  This also looks at an age-based example?

8    A.  Yes.

9    Q.  Which is not the one that was used by Foot Locker at the

10   end?

11   A.  Right.

12   Q.  And the service-based formula on the right, is that formula

13   the one that was adopted?

14   A.  That type of formula.  I don't know if those percentages --

15   I don't think those were the exact percentages.

16   Q.  Those were the ones like in the previous exhibit, right?

17   A.  Right.

18   Q.  Ten to twenty years?

19   A.  Yes.

20   Q.  So that one wasn't adopted either, am I right?

21   A.  Correct.

22   Q.  Let's look at one more.  Plaintiff's Exhibit 298.  If you

23   could turn to the fourth page.  If we look at the demographics,

24   it refers to the interest credits as being 5 percent in this

25   example?

F7knosb6                          Kiley – redirect

1   A.  Correct.

2   Q.  Not 6 percent?

3   A.  Correct.

4   Q.  The formula that's used in the next column, that's age

5   indexed, am I right?

6   A.  Yes.

7   Q.  Which is not the formula that Foot Locker used?

8   A.  Correct.

9   Q.  And the next formula is integrated.  That includes age as

10  well, right?

11  A.  Yes.

12  Q.  You didn't use age?

13  A.  No.

14  Q.  The next formula also uses age, am I right?

15  A.  Yes.

16  Q.  And the last formula, that's a service-based formula, but

17  again with the ten-year brackets.

18          Do you see that?

19  A.  Yes.

20  Q.  None of these formulas were used by Foot Locker either?

21  A.  No.

22  Q.  So is it fair to say that all of the projections, that all

23  of these various exhibits that were shown to you were based on

24  formulas that ultimately were not adopted?

25  A.  Yes.

1              THE COURT:  Let me ask, on that same exhibit,

2     different question, PX 298.

3              On the page that we were just looking at, which has

4     Bates numbers at the bottom of 2452 -- it's actually at the

5     top, but putting that aside -- the fourth scenario, I guess the

6     third new scenario over it says integrated basis and it has a

7     break point 22,000.

8              Do you see that?

9              THE WITNESS:  Yes.

10             THE COURT:  At the very top?

11             THE WITNESS:  Yes.

12             THE COURT:  In PX 5, which is the SPD, it turns out

13    that the compensation credits are reflected on the page that

14    Mr. Rumeld had pointed you to before as, in part, a certain

15    amount representative of all compensation and a certain amount

16    for percent of compensation over 22,000.

17             THE WITNESS:  Yes.

18             THE COURT:  Do you recall that?

19             THE WITNESS:  Yes.

20             THE COURT:  Do you know why the $22,000 break point

21    was chosen generally speaking?

22             THE WITNESS:  Not exactly, but it was customary to use

23    approximately what -- in designing formulas with break points,

24    to use whatever the maximum pay base for Social Security may

25    have been at the time.  So I would have to look back and see

F7knosb6                        Kiley - redirect

1   what it was then.  That may have been, it may have been 22,000

2   or something close to 22,000.

3           THE COURT:  All right.  Thanks.

4   BY MR. RUMELD:

5   Q.  Now, you earlier were questioned about the discrepancy

6   between the 9 percent interest rate that was used to calculate

7   initial account balance and the 6 percent interest credit rate.

8           Do you remember that?

9   A.  Yes.

10  Q.  You were asked a question as to whether for someone taking

11  an annuity, whether the initial account balance would be --

12  strike that.

13          You remember being asked whether there would be a lack

14  of actuarial equivalents for a person who was taking an annuity

15  if the initial account balance was calculated at 9 percent and

16  the interest credit was 6 percent?

17          MR. GOTTESDIENER:  Objection.

18          THE COURT:  Well, I will allow him to answer it.

19          The question that this is based on will speak for

20  itself in terms of the record, but I will allow this question.

21  A.  Yes, I think so.

22  Q.  Well, at the time the cash balance amendment was being

23  considered, was there much thought given to participants who

24  took an annuity as opposed to a lump sum?

25          MR. GOTTESDIENER:  Objection.

F7knosb6                         Kiley - redirect

1            THE COURT:  Overruled.

2   A.  I wouldn't say not much thought.  There was probably some

3   thought, but I think it was probably expected that most

4   participants would take lump sums.

5   Q.  Do you remember ever being part of a discussion where the

6   manner in which the starting balances were calculated was

7   questioned with respect to people who wound up taking an

8   annuity?

9   A.  No.

10  Q.  Under the prior plan, there was an early retirement

11  benefit, is that right?

12  A.  Yes.

13  Q.  Are you familiar with the term subsidized early retirement

14  benefit?

15  A.  Yes.

16  Q.  What does that mean?

17  A.  It means that it's more generous than would be provided by

18  an actuarial equivalent early retirement benefit.

19  Q.  More generous how?

20  A.  The reduction due to early retirement would be less than an

21  actuarial equivalent reduction.

22  Q.  Under the new cash balance formula, was there a subsidized

23  early retirement benefit?

24  A.  No, that was eliminated.

25  Q.  It was eliminated.  OK.  Were there other provisions in the

F7knosb6                          Kiley - redirect

1    plan that addressed the needs of older participants?

2              MR. GOTTESDIENER:  Objection.

3              THE COURT:  I will allow it.

4              You can go back on it on recross in a limited way.

5    A.  Yes.  There was an enhancement for employees age 50 with 15

6    years of service.

7    Q.  To whom did the early retirement enhancement apply under

8    the prior plan?

9    A.  To employees eligible for early retirement.

10   Q.  What did you need to be, to be eligible for early

11   retirement?

12   A.  Age 55.

13   Q.  55.  Could we look again at DX 163 and the Plaintiff's

14   Exhibit -- I'm sorry I don't have it handy.  94.  Thank you.

15             Do you remember looking at this exhibit before,

16   Mr. Kiley?

17   A.  Yes.

18   Q.  Could you explain the difference between Mr. Grefig's point

19   of view and yours about the enhancement?

20   A.  I would have to look back at his again.  I don't remember.

21   Q.  What was your understanding of the reason for the

22   enhancement?

23   A.  Because the account balance formula didn't necessarily

24   credit, you know, as much as perhaps, you know, everyone would

25   have liked to see credited for older participants, so there was

F7knosb6                          Kiley - redirect

1  an enhancement that was built in.

2  Q.  So was the new plan perceived as being disadvantageous to

3  the older participants?

4          MR. GOTTESDIENER:  Objection.

5          THE COURT:  Sustained.

6          You have to rephrase.

7  BY MR. RUMELD:

8  Q.  Why was the enhancement available only to participants age

9  50 or over with 15 years of service?

10 A.  Because I think cash balance plans were, younger employees

11 were more, received better benefits under cash balance plans

12 than older employees did.

13 Q.  Better or better relative to the prior plan?

14         MR. GOTTESDIENER:  Objection.

15         THE COURT:  Hold on let me just read this.

16         I'm still looking for PX 94.  I can't find my copy of

17 it.  Let me look at the question.

18         MR. RUMELD:  I can give you 163, which is the same

19 document.

20         THE COURT:  Yes.  That would be terrific.

21         THE COURT:  You may answer if you recall the question.

22         THE WITNESS:  Yes.

23 A.  Not relative to the prior plan, but just in terms of how

24 cash balance plans operate.

25 Q.  Now, based on the way your e-mail is written here, are you

F7knosb6                        Kiley - redirect

1    having a disagreement with Mr. Grefig about the reason for the

2    enhancement?

3    A.   I don't think it was a big disagreement, but it might have

4    been a slight disagreement.  My focus was on, you know,

5    increasing benefits for the older participants.

6    Q.   So did you have an opinion then independent of Mr. Grefig's

7    on this issue?

8    A.   To some degree.

9    Q.   Administratively, what was involved in handling the

10   wear-away issue?

11   A.   I am not following you.

12   Q.   Well, you understood that there was a comparison that had

13   to be done between the benefit that was generated by the cash

14   balance formula and the benefit under the prior plan?

15   A.   Yes.

16   Q.   Is that fair?

17   A.   Yes.

18   Q.   So mechanically how was that done?

19   A.   Well, we had to calculate the benefit under the prior --

20   the accrued benefit to the date of the -- to 12/31/95 under the

21   prior plan and compare that with the crude benefit under the

22   cash balance plan.

23            MR. RUMELD:  May I approach, your Honor?

24            THE COURT:  Yes.

25   Q.   I'm showing to show you, Mr. Kiley, what's previously been

F7knosb6                          Kiley - redirect

1     marked as Defendant's Exhibit 124.

2              MR. RUMELD:  And I'll hand a copy up.

3              THE COURT:  All right.

4     BY MR. RUMELD:

5     Q.  Maybe you could just take a moment to flip through this

6     document and then I'll try to ask you particular questions.

7              Mr. Kiley, can I ask you some questions, and then if

8     you want to look at it in some more detail, you let me know?

9     A.  OK.

10    Q.  Do you know what this is?

11    A.  I don't recall it.  But it looks like it might be coming

12    from HROC as, you know, a detailed description of how they

13    would program the calculations.

14    Q.  HROC refers to what?

15    A.  Human Resources Operations Center in Milwaukee.

16    Q.  On the bottom there is a box indicating that this went to

17    you and then another box indicating it went from you to

18    Mr. Grefig, is that right?

19    A.  Yes.

20    Q.  Who did it come to you from?  Are you able to read that

21    name?

22    A.  The first name looks likes a Houston.  I can't read the

23    last name.

24    Q.  It doesn't look like a name that is familiar to you right

25    now?

1    A.  No.

2    Q.  But you don't have any reason to believe you didn't receive

3    this document, do you?

4    A.  No.

5    Q.  In fact, in the background materials at the front it says,

6    William Mercer presented a booklet containing most of the

7    calculations required for the Woolworth pension system.  We

8    have taken those descriptions and examples and have coded them

9    into a series of in-house programs to perform these on an

10   ongoing basis.

11          Do you see that?

12   A.  Yes.

13   Q.  And then it says, We have taken these programs and turned

14   them back into words and examples for review and approval.  We

15   have tried to explain every detail, no matter how small.

16          Do you see that?

17   A.  Yes.

18   Q.  Whether or not you remember this document, is what I just

19   read to you consistent with your recollection of how this

20   worked?

21   A.  You mean as far as Milwaukee or HROC running the

22   calculations?

23   Q.  You do remember that?

24   A.  Yes.

25   Q.  And do you remember that they were provided with

1    information on all the details on how to do that?

2    A.  Yes.

3    Q.  Were you familiar with those details as well?

4    A.  I may have been.  But, you know, I don't recall this

5    document.

6    Q.  If you look on the next page, it has the first of several

7    steps in how to perform the calculations.

8            Do you see that?

9    A.  Yes.

10   Q.  And the first step is what?

11   A.  This is on page 2?

12   Q.  Yes.

13   A.  The 1/1/96 cash balance, determination of the 1/1/96 cash

14   balance.

15   Q.  So that is an explanation as to how to calculate the

16   initial account balance, is that right?

17   A.  Yes.

18   Q.  And step two, on page 4 of 15?

19   A.  That's to take the cash balance and bring it forward with

20   pay credits and interest credits.

21   Q.  So that's the means by which you calculate the current

22   account balance, is that right?

23   A.  Yes.

24   Q.  If you turn a few pages to page 10 of 15.  It references

25   step three, accrued benefit.

1          Do you see that?

2     A.  Yes.

3     Q.  How is the accrued benefit calculated?

4     A.  It says it's the greater of two values, the 12/31/95 frozen

5     or this formula.

6     Q.  And without getting into the details, what is that second

7     formula doing?

8     A.  It appears to be taking the account balance and converting

9     it to an annuity.

10    Q.  So this is a comparison of two annuity benefits, is that

11    right?

12    A.  Yes.

13    Q.  And one annuity benefit is the frozen 12/31/95 annuity?

14    A.  Yes.

15    Q.  And the other one is the annuity generated by the cash

16    balance account?

17    A.  Yes.

18    Q.  And the instruction is to take the greater of the two?

19    A.  Yes.

20    Q.  Now, could you turn to page 11, where it refers to step

21    four, which is the minimum lump sum.  Do you see that?

22    A.  Yes.

23    Q.  How is the minimum lump sum calculated?

24    A.  It's the accrued benefit calculated previously divided by

25    the GATT factor.

1  Q.  So what is the reference to the accrued benefit there?

2  A.  The accrued benefit would be the greater of the frozen

3  accrued or the accrued benefit under the account balance.

4  Q.  Right.  So there's two different accrued benefit

5  calculations, you determine which one is bigger, and then you

6  determine the minimum lump sum from that accrued benefit, is

7  that right?

8  A.  Yes.

9  Q.  Now, could you turn back to the summary plan description,

10  which was Defendant's Exhibit 37 or Plaintiff's Exhibit --

11          MR. HUANG:  I believe it would be PX 5.

12          MR. RUMELD:  That would be my guess.

13  BY MR. RUMELD:

14  Q.  Let me just first ask you, Mr. Kiley, is that step-by-step

15  process that you just read.  Is that consistent with your

16  recollection of how the formula worked?

17  A.  Yes, I think so.

18  Q.  I realize that you are having some trouble --

19  A.  Yes, the details are -- it's a long time.

20  Q.  You don't see anything there that's inconsistent with how

21  you thought this worked?

22  A.  No.

23  Q.  If you look at page 12 of the summary plan description --

24          MR. RUMELD:  Can we go to page 12.

25  Q.  If you look at the sentence above interest credits on the

F7knosb6                        Kiley - redirect

bottom there, it says, Your accrued benefit at the time your

employment terminates is the greater of the amount determined

under the plan as amended on January 1, 1996, or your accrued

benefit as of December 31, 1995.

          Do you see that?

A.  Yes.

Q.  How does that sentence compare to what you just read about

step 3 of the process?

A.  I think it is consistent with it.

Q.  Consistent with taking the two accrued benefits and seeing

which is bigger, is that right?

A.  Yes.

Q.  If you look towards the top of that page, right above where

it says, Initial account balance.  It's the last sentence.

A.  The lump sum payable to you is the greater of your account

balance or the amount determined by multiplying the annuity

payable to you by factors required by federal law and IRS

regulations.

Q.  How does that sentence compare to what you read in the

instruction manual with step four with respect to calculating

the minimum lump sum?

A.  I think it is consistent with it as well.

Q.  OK.  Thank you.

          Now, Mr. Kiley, I think it was last Thursday her Honor

asked you whether wear-away was important to you and you said

1     no.

2              Do you remember that?

3     A.   Yes.

4     Q.   Why did you say no?

5     A.   Because it was not something that we focused on, and it was

6     a term that I wasn't generally familiar with until, you know,

7     somewhere during this project, and it was not a term that was

8     discussed a lot during the project.  So I had to say it wasn't,

9     you know, of particular importance to us.

10    Q.   Is it fair to say that it was important in the sense that

11    Mercer explained it to you?

12    A.   They explained it, but they didn't -- there wasn't a lot of

13    emphasis placed on it by Mercer.

14    Q.   Right.  But they did take the time to explain it to you?

15    A.   Yes.

16    Q.   And you took the time to understand it at the time?

17    A.   Yes.

18    Q.   Was it also important in the sense that the folks in HROC

19    had to learn how to do all of these calculations?

20    A.   Yes.

21    Q.   In that sense it was important, wasn't it?

22    A.   Yes.

23    Q.   In fact, judging from that manual you just read from, would

24    you agree that a lot of time and effort went into figuring out

25    how to do that greater-of-both calculation?

F7knosb6                         Kiley - redirect

1    A.   Yes.

2    Q.   Now, was it important from the perspective of the

3    objectives that you were seeking when you recommended the cash

4    balance plan?

5    A.   No.

6    Q.   Why not?

7    A.   I think it wasn't even part of the equation.  We were

8    focused on, you know, cost saving and achieving that through

9    converting the plan to a cash balance plan with lower future

10   accruals and also giving the employees some options they didn't

11   have previously.

12   Q.   From the perspective of communicating information to

13   management, those presentation materials, was it important from

14   that perspective?

15   A.   Mercer never included it in the presentations they gave us,

16   so we -- you know, if they had included it, it would have been

17   in the, or emphasized it in -- it would have been in the

18   presentations to management.

19   Q.   So the fact that it's not in those presentation materials

20   leads you to conclude that, at least at that time, you didn't

21   consider it important?

22            MR. GOTTESDIENER:  Objection.

23            THE COURT:  Sustained.

24   BY MR. RUMELD:

25   Q.   In your mind when you were preparing the presentation

F7knosb6                        Kiley - redirect

1    materials, did you set out to include anything that you thought

2    was important?

3    A.  Yes.

4    Q.  Did you see anything in those presentation materials that

5    specifically referred to wear-away?

6    A.  No.

7    Q.  Now, from the perspective of what needed to be communicated

8    to plan participants, did you consider wear-away to be

9    important at the time?

10   A.  I don't think so.

11   Q.  Why not?

12   A.  Again, it wasn't, you know, it was -- the fact that we had

13   to do those on greater-of calculations was a requirement by IRS

14   regulations.  It wasn't part of the plan design.

15   Q.  Did you have responsibilities with respect to the writing

16   of the summary plan description in the 204(h) notice?

17   A.  I probably had some responsibilities as far as reviewing

18   what was written.  I don't know about, you know, writing it

19   initially.

20   Q.  Did you have any responsibility in terms of soliciting

21   comments from others?

22   A.  Yes.

23   Q.  Could you tell me about that.

24   A.  Well, I think I did solicit comments from quite a few

25   others, including inside, outside counsel, consultants, and,

1    you know, and other people, probably in the human resources

2    department and in the company.  So, you know, I think there

3    were a lot of people who were asked to comment and did provide

4    comments.

5    Q.  Why was it necessary to involve inside and outside counsel?

6    A.  Well, I think inside counsel wasn't -- they didn't have the

7    expertise in pension plans or ERISA, so we needed outside

8    counsel, outside counsel's assistance with those things.

9    Q.  Why did you need the assistance of counsel at all?

10   A.  Because there were a lot of laws and regulations as to what

11   needed to be included, and we wanted to make sure that, you

12   know, everything that was supposed to be included was included.

13   Q.  Did you consider yourself to be an expert on what those

14   legal requirements were?

15   A.  No.

16            THE COURT:  We are going to take a midafternoon break

17   at a convenient breaking spot.  Now is fine?

18            MR. RUMELD:  This is fine.

19            THE COURT:  Let's take a ten-minute break and we'll

20   come back and go to 5.  Thank you.

21            Actually, before we go, let me just ask you folks

22   whether or not you can, each side, send me an electronic

23   version in Word form of two things:  The proposed findings of

24   fact and conclusions of law, and then separately, I want from

25   somebody the stipulated facts.  So I need electronic versions

1    in Word form.

2              Thanks.

3              (Recess)

4              THE COURT:  Mr. Gottesdiener.

5              MR. GOTTESDIENER:  Yes, I have a matter.

6              On Friday we made sure that Doris Albright was

7    available in case we had time on Friday because of your Honor's

8    desire to keep moving.

9              She had to stay the weekend.  She is from South

10   Carolina.  She is here now.  And what I would request is,

11   Mr. Rumeld said he still has more for Mr. Kiley, that we after

12   he's finished that we get Ms. Albright on, who I am going to

13   have only two questions for, and Mr. Rumeld will only have a

14   few questions for.

15             THE COURT:  We have got a declaration from her.

16             Right?

17             MR. GOTTESDIENER:  Yes.

18             THE COURT:  She will be turned over directly to cross.

19             MR. GOTTESDIENER:  Yes.

20             THE COURT:  How long do you think you will have with

21   Ms. Albright?

22             MR. RUMELD:  I think just ten minutes, your Honor.

23             THE COURT:  Let's do this.  We will put Ms. Albright

24   on the stand by 20 of 5, even if we have to interrupt somebody

25   else, but we will get her on so we can get her on and get her

1   off, and she will then end at 5:00, based upon what you have

2   both have said.  We have her declaration, and then, Mr. Rumeld,

3   you have ten minutes.  Is that fair?

4           We could put her on right now.  I don't want to

5   truncate you with her, but I want to make sure she can go home.

6           MR. RUMELD:  I just feel bad for Mr. Kiley, who's been

7   here a few days already.

8           THE COURT:  All right.  We are trying to balance

9   things.  It is a longer witness, and there's going to be I

10  think redirect after this.

11          So if you are done soon -- and I am not suggesting you

12  should be because there was a very long cross-examination of

13  this witness -- but if you were, then Mr. Gottesdiener could do

14  a very short recross and we could get Ms. Albright on.

15          If that's not going to work because you've got more

16  and he's going to have some, then let's just plan that, we'll

17  somehow get her out of here day.

18          MR. RUMELD:  I'm hoping to complete my questioning

19  within a half hour.

20          MR. GOTTESDIENER:  Your Honor, my suggestion would be

21  that because we took a break that it would be an appropriate

22  time to put her on now, so there's no --

23          THE COURT:  I don't think we have to do it right now.

24          MR. GOTTESDIENER:  That is fine.

25          THE COURT:  If he's going finish in half an hour, I am

F7knosb6                         Kiley - redirect

1   going to let him go ahead.  At this point I would think your

2   recross is going to be very limited, so it will be ten minutes

3   or something like that.  If you are done, Mr. Rumeld, in half

4   an hour, that is, at 20 after, then that would mean

5   Mr. Gottesdiener could be until 4:30 and we could get

6   Ms. Albright going.  Something along those lines.

7            Let's give it a go.  Let's see how it goes.

8            You can go ahead and proceed, sir.

9            MR. RUMELD:  All right.

10  BY MR. RUMELD:

11  Q.  Let me show you Exhibit DX 27, which is attached to your

12  declaration.

13  Q.  The handwriting on the first page is your handwriting?

14  A.  Yes, it is.

15  Q.  You are requesting Mr. Grefig for his comments, is that

16  right?

17  A.  Yes.

18  Q.  What document is this that you are requesting comments for?

19  A.  It is the plan highlights document.

20  Q.  That November highlights memo, right?

21  A.  Yes.

22  Q.  There is handwriting in this document, if you flip the

23  pages.  It is more on the second version of this document.  Do

24  you see that?

25  A.  Yes.

1   Q.  Whose handwriting is that?

2   A.  I don't know.

3   Q.  It is not yours?

4   A.  No.

5   Q.  Do you know if they're Mr. Grefig's?

6   A.  Could be.

7   Q.  But you are not sure?

8   A.  I am not sure.

9   Q.  Independently of Mr. Grefig's comments or anybody else's

10  comments, did you feel it was part of your responsibility to

11  communicate any misgivings or changes to this document that you

12  thought should be made?

13  A.  Yes.

14  Q.  Let's look at Defendant's Exhibit 33, also attached to your

15  declaration.

16  A.  Yes.

17  Q.  It says on the first page, Janet and Jim's comments.

18          Do you see?

19  A.  Yes.

20  Q.  Is that your handwriting?

21  A.  Yes.

22  Q.  And who is Janet?

23  A.  I don't recall.

24  Q.  Jim would be Mr. Grefig?

25  A.  Yes.

F7knosb6                        Kiley - redirect

1    Q.  Do you know if Janet worked with Mr. Grefig?

2    A.  I would assume so.

3    Q.  But you are not sure?

4    A.  I am not sure.

5    Q.  There's various handwritings in the course of this

6    document.

7             Do you see that?

8    A.  Yes.

9    Q.  Is that your handwriting or somebody else's?

10   A.  It's mine.

11   Q.  It's yours?

12   A.  Yes.

13   Q.  Are these your changes or someone else's changes?

14   A.  These are probably the changes that they gave me that I

15   wrote in.  I am guessing they would have given them to me over

16   the phone.

17            THE COURT:  Don't guess.  Just tell us what your

18   practice was.

19            THE WITNESS:  It would depend -- I mean, it wouldn't

20   necessarily always be the same thing.  Ideally I would send the

21   document to them and get it back with their comments on it, but

22   if there was a time constraint, I may have had to call them and

23   take their comments over the phone.

24   BY MR. RUMELD:

25   Q.  The same question as before, independently of Mercer's

F7knosb6                          Kiley - redirect

1    comments or counsel's comments or anybody else's comments,

2    would you view as part of your responsibilities to communicate

3    any additional changes that you felt needed to be made?

4    A.   Yes.

5    Q.   And was your understanding of your responsibilities with

6    respect to these communications impacted in any way by whether

7    you perceived yourself to be acting in a fiduciary role or not?

8    A.   No.

9    Q.   What about with respect to the letters that you wrote to

10   participants?  Was the fact that you did or you didn't perceive

11   yourself to be a fiduciary relevant to you in deciding how to

12   respond to the participants?

13   A.   No, I don't think that was a factor.

14   Q.   What was generally your objective when you were responding

15   to participant questions?

16   A.   To answer their questions and provide them with as much

17   information as possible, so hopefully they would have a better

18   understanding of their benefits.

19           MR. RUMELD:  May I approach, your Honor?

20           THE COURT:  Yes.

21   BY MR. RUMELD:

22   Q.   I'm handing you Defendant's Exhibit 162.

23           MR. RUMELD:  And yours.

24           THE COURT:  Thank you.

25           MR. RUMELD:  I don't want to breach protocol here.

F7knosb6                          Kiley – redirect

1          THE COURT:  Right.

2     BY MR. RUMELD:

3     Q.  I am only going to question you, Mr. Kiley, on the first

4     page of this document.

5          MR. RUMELD:  Your Honor, we submitted this exhibit as

6     three pages, but I notice that the second page is not

7     consecutively numbered with the first page.  I am just going

8     question the witness on the first page.

9          THE COURT:  All right.  Should we just separate them,

10    because you only really need the first page in evidence.

11         MR. RUMELD:  That would be OK, two.

12         THE COURT:  We are going to separate off the first

13    page of DX 162, so DX 162 is now a single-page document bearing

14    the Bates number FLOSB 007004.

15         MR. RUMELD:  OK.

16    BY MR. RUMELD:

17    Q.  Do you remember someone named Carl Larouche?

18    A.  No.

19    Q.  Do you any reason to believe that Carl Larouche didn't work

20    for Mercer if you received a letter from him on Mercer

21    letterhead?

22    A.  No.

23    Q.  Do you have any recollection of Mercer preparing benefit

24    statements for Foot Locker or Woolworth?

25    A.  No.

F7knosb6                          Kiley - redirect

1   Q.  Do you have any reason to believe that you did not in fact

2   receive sample copies of the benefit statements for the Phoenix

3   employees as this letter indicates?

4   A.  No.

5   Q.  Could you take a look at Defendant's Exhibit 122, which is

6   attached to your declaration.

7        Do you have that in front of you?

8   A.  Yes.

9        THE COURT:  Is this the version of the document that

10  we saw earlier today or is this something different?

11       MR. RUMELD:  It's something different.

12       THE COURT:  It's different, OK.

13       MR. RUMELD:  I do intend to come to that.

14  BY MR. RUMELD:

15  Q.  Mr. Kiley, this is a string of e-mails, am I right?

16  A.  Yes.

17  Q.  The first one is the most recent, and the older ones are on

18  the bottom, is that right?

19  A.  Yes.

20  Q.  Let's turn to the bottom of the third page.  I'm sorry,

21  let's turn to the third page.

22       Do you see there, there is an e-mail from Marion

23  Derham to you and Carol Kanowicz?

24  A.  Yes.

25  Q.  And copied to Don Kappel?

F7knosb6                          Kiley – redirect

1    A.   Yes.

2    Q.   Do you see that?

3    A.   Yes.

4    Q.   Who is Don Kappel?  Do you remember him?

5    A.   Not well, but he was in the Milwaukee HROC operation.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F7KJOSB7                          Kiley - redirect

1    Q.  And what was his job, do you know?

2    A.  I think he did pension capital issues.

3    Q.  So the e-mail says Tommy -- if you can read it with me,

4    sorry, but the print is so poor.  During the conference call,

5    Carol and I had with Don on 5-2-1997, Don indicated that HROC

6    is getting inquiries from participants requesting an

7    explanation how their benefit was calculated.

8         If I remember correctly, Don mentioned two specific

9    types of questions.  Why is my accrued benefit the same as it

10   was on my last statement?  Why is the lump sum on a current

11   estimate lower than the lump sum on an estimate I received last

12   year?  Do you see that?

13   A.  Yes.

14   Q.  Do you have any recollection of having this discussion?

15   A.  No.

16   Q.  Now, if you look at the bottom of the first page, there is

17   an e-mail from Mr. Kappel to Ms. Derham, copied to Ms. Ine and

18   Stacey Steiniger.  Do you know who she was?

19   A.  No.

20   Q.  And, subsequently, that e-mail chain is passed up to you.

21   Am I right?

22   A.  Yes.

23   Q.  So the e-mail on the bottom says I have a particular

24   person, and the name is left blank, who was rather irate and

25   demanded an answer to her questions in writing.  Her main

1    concern was that she did not understand why her lump sum went

2    down when the interest rate went up.  I put together a letter

3    that attempts to explain this situation.  I would appreciate it

4    if you could review it and let me know if it is okay to send

5    out.  Do you see that?

6    A.  Yes.

7    Q.  Do you understand how this woman could have had a lump sum

8    that went down when the interest rate went up?

9              MR. GOTTESDIENER:  Objection.

10             THE COURT:  I'll allow it.

11   A.  It sounds like a minimum lump sum calculation.

12   BY MR. RUMELD:

13   Q.  Meaning what?

14   A.  Meaning that it was based on the GATT rate and the change

15   in GATT rate caused the lump sum to --

16   Q.  So this person actually received two minimum lump sum

17   calculations.  Is that right?

18   A.  It sounds like that, yes.

19   Q.  And the first one yielded a lower minimum lump sum than the

20   second?

21   A.  It sounds like the second --

22   Q.  The first yielded a higher minimum lump sum than the

23   second?

24   A.  Yes.

25   Q.  That is why the participants was irate?

1   A.  Yes.

2            THE COURT:  Let me just ask you about this.  Are you

3   going to ask another question on this document or were you

4   going to leave the document?

5            MR. RUMELD:  I was going to leave the document.

6            THE COURT:  If you go back to the page the highlight

7   was on, Bates numbers Page 10485 at the top, do you see that

8   the date here is 5-6-97 or something like that, 5-zero some

9   number 97?

10            THE WITNESS:  Right.

11            THE COURT:  At that point would participants have

12   received two statements of benefits at that point in the year

13   with the amended plan?  Would they receive one in '96 and one

14   in '97?

15            THE WITNESS:  Probably.

16            THE COURT:  The current estimate on this page, do you

17   know if that refers to the current estimate of a lump sum of

18   the minimum lump sum based on the accrued benefit or the

19   current estimate of the lump sum based on an account balance, a

20   cash account balance?  Do you know?

21            THE WITNESS:  The cash account balance wouldn't

22   decrease, so it sounds like the minimum lump sum is based upon

23   the GATT interest rate.

24            THE COURT:  I thought you folks didn't provide the

25   minimum lump sums to participants, that when the statements

1    went out, they went out without the minimum lump-sum payment?

2              It went out with only a cash account balance?

3              THE WITNESS:  It did, but we don't have what generated

4    this question.  It is possible she requested an estimate one

5    year, then an estimate the next year, and then compared the

6    two.

7              THE COURT:  Then I also thought we saw documents that

8    indicated that you folks didn't do calculations of minimum lump

9    sums because you couldn't know for sure what the amount was

10   until there was a termination date?

11             THE WITNESS:  When we were projecting a termination

12   date into the future, that's correct.  If someone was

13   interested in a current year termination date, then we

14   calculated the minimum lump sum.

15             THE COURT:  So the way in which DX-122, Bates number

16   Page 1485 would be referring to a minimum lump sum based upon

17   an accrued account balance would be if this requesting

18   participant, if you will, the individual who is asking for the

19   information had twice indicated that she was terminated?

20             THE WITNESS:  Yes.  Well, yes.  She may not have

21   actually indicated she was terminating, but we responded to

22   everyone's request for estimates, you know, whether they were

23   terminating or not.

24             So it is possible she requested -- you know, we had a

25   process to request multiple, if someone would submit multiple

F7KJOSB7                         Kiley - redirect

1    requests.

2               THE COURT:  I want to make sure that I am putting

3    everything together correctly.

4               I thought that essentially the accrued balance and the

5    minimum lump sum calculated from that was something which

6    generally wasn't being sent to participants on an ongoing

7    basis?

8               It was sent when they either, I suppose, specifically

9    asked for it -- and we haven't seen any indications of that

10   yet -- or when they were going to possibly leave and they

11   wanted to know what their benefits would be, like Mr. Steven?

12              THE WITNESS:  Yes.  If someone said I am thinking of

13   leaving and I would like to get an estimate of my benefits as

14   of July 1, '96, and then the person didn't leave, and then the

15   next year they said I'm thinking of leaving, I would like to

16   get an estimate of my benefit as of July 1, '97, that is

17   certainly possible.

18              THE COURT:  As you sit here today, you're thinking

19   about Bates numbered Page 10485 as what is within the realm of

20   possible.  You don't actually recall what this document is

21   about, do you?

22              THE WITNESS:  No, I don't.

23              THE COURT:  All right.

24   BY MR. RUMELD:

25   Q.  Just to follow up on that, in Mr. Steven's case, you

1   remember Mr. Steven we discussed this morning?

2   A.  Yes.

3   Q.  He did ask for an estimate twice, didn't he?

4   A.  Yeah, based upon what we saw this morning, it looked that

5   way.

6   Q.  His minimum lump sum changed because it straddled two

7   different years.  Is that right?

8   A.  Yes, correct.

9   Q.  And could you look at Defendant's Exhibit 96 which is

10  attached to your declaration, I believe.  I am just asking you

11  to look at this exhibit for one purpose, Mr. Kiley.  Can you

12  tell from this estimate what the GATT rate is that is

13  applicable to 1997?

14  A.  Well, towards the top it says minimum lump sum interest

15  rate for 1997, 6.55.

16  Q.  Right.  So that would have been the interest rate as of

17  year end 1996.  Is that right?

18  A.  Yes.

19  Q.  Do you remember how that compares to what the interest rate

20  was as of 1-1-96?

21  A.  6.55 is higher than the GATT interest rate as of 1-1-96.

22  Q.  Do you remember what the rate was in 1-1-96?

23  A.  6.066..

24  Q.  The interest rate went up between 1996 and 1997?

25  A.  Right.

F7KJOSB7                          Kiley - redirect

1  Q.  A participant complaining in 1997 about the lump sum going

2  down could be complaining because between 1996 and 1997, the

3  interest rates went up.  Is that right?

4  A.  That's right.

5  Q.  When you did Mr. Steven's handwritten calculation that Mr.

6  Gottesdiener reviewed with you, you actually projected at a 7

7  percent interest rate.  Is that right?

8            THE COURT:  What are those documents again, the one

9  you're referring to?

10            MR. RUMELD:  PX-405.

11            THE COURT:  Thank you.

12            MR. RUMELD:  I am trying to short-circuit this.

13  BY MR. RUMELD:

14  Q.  I am just trying to understand, Mr. Kiley, would I be

15  correct that the rate you used for that calculation turned out

16  to be higher than the GATT rate in 1996?

17  A.  Yes.

18            MR. RUMELD:  Mr. Gottesdiener thinks I have the wrong

19  exhibits.

20            THE COURT:  I am looking at a document which bears a

21  Bates number at the bottom 405, 25216, different from 404 which

22  is the one that's got the multiple pages.

23            MR. GOTTESDIENER:  Your Honor, I could just clarify

24  really quickly?

25            THE COURT:  Tell me what the document is.

F7KJOSB7                      Kiley - redirect

1              MR. RUMELD:  404.

2              MR. GOTTESDIENER:  The one he was asking about doing

3     the 7 percent, that is what I asked about on Thursday, and that

4     is in the packet of 404.  The one I asked about today is 405,

5     has an interest rate of 6.5.  That was done in 1995.

6              THE COURT:  We have 405 up there I think on the screen

7     on the left.  Is that right?

8              MR. HUANG:  Yes.

9     BY MR. RUMELD:

10    Q.  I should have asked you about 404.  That was the one you

11    used the 7 percent calculation.  Is that right?

12    A.  I believe so, yes.

13             THE COURT:  Hold one second.  I want to get this.

14             What I am looking at is 405, and I am looking at

15    different exhibits, and it may change between documents.  I

16    don't know.  I haven't focused on this point before.  In PX-405

17    and in a number of documents, the phrase "lump sum value" is

18    referred to as a term of art almost as the minimum lump sum

19    value which is the accrued benefit?

20             THE WITNESS:  Minimum.

21             THE COURT:  Right.

22             THE WITNESS:  Well, the minimum lump sum, it would be

23    the minimum lump sum.

24             THE COURT:  All right.  Right.  Let me not distract

25    you folks any more.  Go ahead, Mr. Rumeld.

F7KJOSB7                          Kiley - redirect

1              (Off-the-record discussion)

2    BY MR. RUMELD:

3    Q.  Do you remember this document, Mr. Kiley, you looked at

4    before?

5    A.  Yes.

6    Q.  What is it?

7    A.  It is a pension statement.

8    Q.  It is a pension statement for under the old plan.  Is that

9    right?

10   A.  Yes.

11   Q.  Could you flip to the first page, please.  It is hard for

12   me to see.  Can you make the right side a little bigger, future

13   benefits.

14              So it says on the top your estimated annual benefits

15   at your normal retirement age, do you see that, sir?

16   A.  Yes.

17   Q.  What is the normal retirement date?

18   A.  The end of the month following the 65th birthday.

19   Q.  So a statement going to a participant who is 45 years' old

20   under the old plan would estimate the annual benefits 20 years

21   into the future.  Is that right?

22   A.  Yes.

23   Q.  If the same type of statement was prepared under the cash

24   balance plan for a 45-year-old participant, it would also be

25   projecting what the benefit would be 20 years into the future?

F7KJOSB7                          Kiley - redirect

1    A.  Yes.

2    Q.  If wear-away was expected to last, say, even five or six or

3    seven years, would the projected benefit 20 years into the

4    future be the 12-31-95 benefit?

5    A.  Well, if it lasted five years, it would be greater than

6    the -- the accrued benefit 20 years in the future would then

7    presumably be higher than the 212-31-95.

8    Q.  What would it be based on?

9    A.  The interest credits over the 20-year period divided by a

10   factor which is based upon the GATT interest rate which no one

11   has a crystal ball to know what it would be 20 years in the

12   future.

13   Q.  Right.  But if wear-away was used over 20 years into the

14   future, whatever that projected benefit would be, it would be

15   based on the account balance?

16   A.  Yes.

17   Q.  Let's look at PX-164, please.

18          Do you need that in front of you or are you able to

19   read that?

20   A.  I can read it on the screen.

21   Q.  That is the e-mail we looked at before.  Is that correct?

22          Do you remember looking at this this morning?

23   A.  Yes.

24   Q.  Now, you see on the third paragraph where Carol Kanowicz

25   writes, "As we cannot determine the rate of interest in

1    successive years, it is virtually impossible to produce a

2    projection that has any value."

3           Do you see that?

4    A.  Yes.

5    Q.  Could you tell me, sir, what your understanding is of what

6    she is saying here.

7    A.  Well, those are her words, but I think she is saying

8    because we don't know what the interest rate would be in the

9    future, we can't really make a determination as to what the

10   value would be.

11   Q.  For the purposes of determining what the value would be, is

12   she talking about for the purposes of a lump sum benefit or

13   annuity, or both?

14   A.  Probably both.

15          MR. GOTTESDIENER:  Objection.

16          THE COURT:  Sustained.  The answer is stricken.  You

17   can re-ask the question.

18   BY MR. RUMELD:

19   Q.  What type of benefit is she referring to when she says we

20   can't project what the benefit would be?

21          MR. GOTTESDIENER:  Objection.

22          THE COURT:  Sustained.  You can ask what is her

23   understanding of what she was saying as opposed to what she was

24   saying.

25          MR. RUMELD:  Let me ask it the way your Honor

1    suggested.

2    BY MR. RUMELD:

3    Q.  What's your understanding as to the type of benefit that

4    could not be projected in advance?

5    A.  Well, I think this person may have been asking for the

6    accrued benefit, so that would be what I think she probably was

7    referring to.

8    Q.  Would the problem -- speaking for yourself, Mr. Kiley --

9    would the problem be the same whether you're projecting a lump

10   sum benefit or an annuity benefit?

11   A.  Yes.

12              (Off-the-record discussion)

13   BY MR. RUMELD:

14   Q.  Could we look back at PX-188, please.  This is the letter

15   you looked at before as well.

16              Now, Mr. Kiley, in the fourth paragraph there it says,

17   "As indicated in previous correspondence, which is enclosed,

18   the company is not terminating the retirement plan.  The plan

19   has, however, been revised as indicated in the aforementioned

20   previous correspondence."

21              Do you see that?

22   A.  Yes.

23   Q.  What is your understanding as to why they're making that

24   comment?

25   A.  It sounds as though the person wrote a previous letter to

F7KJOSB7                              Kiley - redirect

1    which I responded, and then the person seems to have written a

2    second letter asking the same or similar question.

3    Q.  Is the question related to whether the plan was

4    terminating, right?

5    A.  Yes.

6              MR. GOTTESDIENER:  Objection.

7              THE COURT:  Overruled.

8    BY MR. RUMELD:

9    Q.  So was your decision about what information to provide to

10   this participant influenced by what the question was?

11   A.  Yes.

12   Q.  Was that generally your practice, that the information you

13   provided in these letters depended on what was being asked of

14   you?

15   A.  Yes.

16   Q.  Mr. Kiley, you have been here for a few days.  Is there

17   anything you would like to tell the court?

18   A.  I guess what I would like to say is that we were faced with

19   a very difficult situation, and I think we really ended up with

20   a win-win situation.  We were able to retain the defined

21   benefit plan, modified to include provisions that we knew

22   participants wanted, reduce company costs, meet their cost

23   goals and add a 401 (k).

24             My understanding is they still have the time benefit

25   plan today and they have the 401 (k) plan today, and we're in

F7KJOSB7                          Kiley - redirect

1    an environment where defined benefit plans are basically

2    dinosaurs and most companies are eliminating or have eliminated

3    it their defined benefit plans and they're just solely going

4    forth with a 401 (k) or something similar.

5              So I think we did the best, you know, the best

6    possible under very trying, difficult circumstances.

7    Q.   Looking at it just from your personal perspective,

8    Mr. Kiley, you experienced wear-away, didn't you?

9    A.   Yes, I did.

10   Q.   In fact, from an accrued benefit standpoint, you didn't

11   accrue any more benefits between 1996 and when you left in

12   2000.  Is that right?

13   A.   That's correct, and I just missed the enhancement as well.

14   Q.   How did you feel about how the plan changes impacted you?

15   A.   Well, I was happy to receive a lump-sum payment.

16   Q.   If you could do it all over again, even knowing now you

17   experienced wear-away for that entire period of time, would you

18   have done anything differently for yourself?

19   A.   No.

20             MR. RUMELD:  I have nothing further.

21             THE COURT:  Mr. Gottesdiener, do you have additional

22   questions?

23             MR. GOTTESDIENER:  I do.

24             THE COURT:  See if we can keep it relatively narrow

25   and get Mr. Kiley off the stand.

F7KJOSB7                    Kiley - recross

1    RECROSS EXAMINATION

2    BY MR. GOTTESDIENER:

3    Q.  So if I understand correctly, based on what you told the

4    Court in response to your lawyer's questions, you're saying

5    that you'd been thinking about a cash balance plan for a while

6    because you thought it would be an improvement that employees

7    would like before you learned there was any need to cut costs?

8    A.  As a benefits person, I always try to be aware of what was

9    taking place in the industry.

10   Q.  Would you just try to -- because of time constraints, could

11   you direct yourself to my question, which is if I'm

12   understanding what you're saying now is that you had in mind

13   doing a cash balance plan anyway, before you learned anything

14   about cost-cutting that had to be done.  Is that correct?

15   A.  Yes.

16   Q.  So when Roger Farah put out the word that he needed cost

17   savings, in essence you thought great, this is the way that

18   you're going to get the cash balance plan you've been wanting

19   because, by happenstance, a cash balance plan also saved money,

20   right?

21   A.  Yes.

22   Q.  In other words, your testimony is that you had been wanting

23   to do a cash balance conversion because you thought it would

24   modernize the plan and you sort of lucked out when you

25   discovered it also saved money?

1            MR. RUMELD:  Objection.

2    A.  I don't think I would put it that way.

3    Q.  You would agree that you are saying to the court that you

4    were already wanting to do this conversion, had no idea that

5    cash balance was going to save money, but then you found out

6    from Mercer that it would, correct?

7            MR. RUMELD:  Objection.

8            THE COURT:  Overruled.

9    A.  No.  I was interested in a cash balance concept because of

10   the features that it afforded participants.  As a benefits

11   person, I never wanted to reduce future accruals.

12   Q.  I don't think you heard my question well.

13           THE COURT:  Hold on, hold on, hold on.  I just want

14   to --

15           MR. GOTTESDIENER:  I'll withdraw the question and keep

16   going to save time.

17           THE COURT:  I want to make sure we don't have the

18   introductions.

19   BY MR. GOTTESDIENER:

20   Q.  You originally agreed with me that you'd already decided

21   you wanted to do a cash balance plan, and you would agree with

22   me that is stated directly in your declaration before there was

23   any word about cost-cutting, correct?

24           MR. RUMELD:  Objection.

25           THE COURT:  Hold on.  All right.  Sustained.  Take out

F7KJOSB7                          Kiley - recross

1   the, "you originally agreed with me" part because his testimony

2   is what it is.

3            MR. GOTTESDIENER:  I think we have it.  He previously

4   said it.  Can we put PX-109 on the board.

5   BY MR. GOTTESDIENER:

6   Q.  This is this Putterman document that counsel showed you in

7   examining you, January 27, 1995.  This is you sending to Mercer

8   a document that for all kinds of benefits as well as the

9   retirement plan benefits, lists cost-cutting options, correct?

10  A.  Yes.

11  Q.  There is nothing in this document that lists plan changes

12  that employees would like to see, correct?

13  A.  I don't know.

14  Q.  We looked at it together.  Let's look at it.

15           Do you think -- do you have a copy?  Let me hand you a

16  copy of the PX --

17           MR. GOTTESDIENER:  May I approach?

18           THE COURT:  You may.

19  BY MR. GOTTESDIENER:

20  Q.  It is PX-109.  Show me in there, sir, if it shows anything

21  about listing out making the plan better for employees.

22  A.  I don't know if this version has the objectives.

23  Q.  Well, look on Mercer FL2106 that has all of the

24  recommendations.  Do you remember you looked at that with your

25  lawyer?

F7KJOSB7                         Kiley - recross

1    A.  Yes.

2    Q.  You said that it was your recommendation, you were in

3    agreement with the recommendation that said go with cash

4    balance, the redesigned plan appears attractive to associates

5    while reducing costs and benefit levels, correct?

6    A.  Yes.

7    Q.  And then when we looked with you on Thursday and when you

8    looked with your lawyer for the past several hours at all of

9    these notes, starting with the February 2nd meeting, did you

10   see in any of those notes any discussion of making the plan

11   better, improving the plan for participants?

12   A.  No.  That is not to say we didn't have those discussions.

13   Q.  Well, you took verbatim, contemporaneous notes, correct?

14   A.  Yes.

15   Q.  Let's put up PX-21 again, your notes of the February 2nd

16   meeting.

17           THE COURT:  I think you can argue with him, but I hear

18   the point and I can read the note.  I think they'll speak for

19   themselves.  I understand your point.

20           MR. GOTTESDIENER:  Thanks.  I will move quickly, but

21   if I could just -- there is something I want to develop with

22   it.

23           THE COURT:  You're going to ask him -- go ahead.

24           MR. GOTTESDIENER:  I appreciate it, your Honor, I do.

25   I am mindful of the clock.

F7KJOSB7                          Kiley - recross

1    BY MR. GOTTESDIENER:

2    Q.  So remember this meeting?

3         This meeting was billed as a cost reduction strategy

4    meeting, correct?

5    A.  Yes.

6    Q.  Nothing about improve the plan for employees meeting,

7    right?  Withdrawn.  I have your answer.

8         With respect to the other notes, when we saw the March

9    notes and April notes, all those notes were talking about

10   dollar savings, correct?

11   A.  Yes.

12   Q.  The same with the May 1st dec, if we could get PX-10 on the

13   screen, and if we can turn to -- this is the top management

14   meeting dec May 1st -- if we can turn to the next page, do you

15   see the objective?  It has one objective, and it is to save

16   money, correct?

17   A.  There are two objectives on there.  One is to save money,

18   yes.

19   Q.  The second one I thought you explained is essentially the

20   same thing as the first, to promote sharing of responsibility

21   for retirement savings with associates, you told us effectively

22   means they need to help pick up the tab for their own

23   retirement, right?

24   A.  In part.  I think there is also a reference to adding a 401

25   (k), which I had been trying to do for years.

F7KJOSB7                              Kiley - recross

1    Q.  The 401 (k) requires them to take money out of their

2    current salary in order to fund their own retirement, correct?

3    A.  That is the way 401 (k)s work, correct.

4    Q.  Thank you, sir.

5            So you, if I understand what you're saying is, you

6    then learned through documents, like the Putterman document and

7    the meeting with Mercer on February 2nd and then in April, the

8    March meetings, you learned one of the reasons why this cash

9    balance plan that was being suggested would save money was

10   because of wear-away.  Is that right?

11   A.  That was and something else, yes.

12   Q.  That was what you learned?  That is not just in the notes,

13   you then learned that the way it cut costs largely was through

14   wear-away?

15   A.  No.

16           MR. RUMELD:  Objection.

17   Q.  You learned you could cut --

18           THE COURT:  Hold on.  Overruled.  You can ask.

19   BY MR. GOTTESDIENER:

20   Q.  You learned that one of the ways to cut costs was through

21   wear-away, correct?

22   A.  One of the ways, but that wasn't the primary way.

23   Q.  But, in fact, you told us -- and there was virtually no

24   discussion of this with your lawyer on redirect -- another way

25   we saw in the notes, and you agreed, was by encouraging lump

F7KJOSB7                          Kiley - recross

1    sums, the plan flushed out the early retirement subsidy?

2              MR. RUMELD:  Objection.

3              THE COURT:  Sustained.

4    BY MR. GOTTESDIENER:

5    Q.  The plan saved a lot of money, you agree, because people

6    took lump sums, thereby not getting the early retirement

7    subsidy?

8    A.  Yes.

9    Q.  And agreed that was an expensive right that people had,

10   correct?

11   A.  Yes.

12   Q.  If I am understanding, you're saying to the judge you

13   initially picked cash balance because you thought it was all

14   roses for employees, but then you found out that it was

15   actually going to freeze benefits for two to three years --

16             THE COURT:  Now, we could just let you finish.  There

17   are several objectionable things in that question.

18             MR. GOTTESDIENER:  I'll try again it.

19             THE COURT:  Try it again.

20             (Continued on next page)

21

22

23

24

25

1          MR. GOTTESDIENER:  But I am trying to sum up, your

2     Honor?

3          THE COURT:  I know.  But you don't need to sum up.

4     You can sum up to me.  Let's not do the roses business and

5     stuff like that.  That just gets us into a little cycle.

6     BY MR. GOTTESDIENER:

7     Q.  You admit that you learned that wear-away was going to

8     freeze people's benefits for two to three years, correct?

9     A.  I wouldn't use the word freeze.

10          MR. RUMELD:  Objection.

11     BY MR. GOTTESDIENER:

12     Q.  You understood, and you just did it on cross-examination,

13     and redirect examination, you agreed that people were not going

14     to earn new benefits for a period of years, right?

15     A.  Yes.

16     Q.  If I am understanding, you thought that it was sort of OK

17     to ignore that information and then proceed as if your first

18     impression of cash balance plans was correct?

19          MR. RUMELD:  Objection.

20          THE COURT:  Well, it's really in the nature of

21     argument.

22          MR. GOTTESDIENER:  I am asking to try to understand

23     his testimony.

24          THE COURT:  Don't argue with me.

25          MR. GOTTESDIENER:  I'm sorry.

F7knosb8                          Kiley - recross

1          THE COURT:  I am responding to the objection, which is

2     sustained.  Rephrase.  Argumentative.

3     BY MR. GOTTESDIENER:

4     Q.  Isn't it your explanation to the Court that you were well

5     meaning in deciding to go with cash balance, then it's almost

6     coincidental that you found out that it could save money,

7     right?

8     A.  Yes.

9          MR. GOTTESDIENER:  Can we put up PX 9.

10    Q.  You learned in September that Mercer, you know that Roger

11    Farah in September was looking for additional cost savings, and

12    was looking at dropping the interest crediting rate from 6

13    down, right?

14         MR. RUMELD:  Objection.  No foundation.

15    Q.  I am asking you, did you learn about this.

16         THE COURT:  Hold on.

17         All right.  Rephrase.

18    Q.  You learned later in 1996, once the plan was implemented,

19    you did learn that Mercer increased its estimate for how long

20    the wear-away was going to last, correct?

21    A.  Yes.

22    Q.  So you learned by the fall of 1996 that the wear-away was

23    going to last for four to five years, according to their

24    estimate, correct?

25         MR. RUMELD:  Objection.

1          THE COURT:  Overruled.

2     A.  I don't recall that.

3     Q.  But you learned that it was going to be longer than the two

4     to three years, right?

5     A.  I don't know.  I don't recall that.

6     Q.  But you did learn that it was going to be longer, correct?

7     A.  Perhaps, yes.

8     Q.  That was before the SPD got issued, correct?

9     A.  I don't remember when the SPD was issued, but --

10    Q.  We went through it before, and we showed you the letter

11    where it was only issued in December of '96.

12          Do you remember --

13    A.  Yes.

14    Q.  -- you told us about that?

15    A.  Yes.

16    Q.  You just told your lawyer on redirect examination you would

17    have said something if you thought something needed to be

18    said --

19          MR. RUMELD:  Objection.

20    Q.  -- in reviewing the SPD, isn't that right?

21          MR. RUMELD:  Objection.

22          THE COURT:  Hold on.  Overruled.

23          You may answer.

24    Q.  Right?

25    A.  Yes.

1                MR. GOTTESDIENER:  OK.  Can we put up real quick PX 5,

2       the SPD.

3                If we look at PX 5 -- turn to page 4, please.  Can we

4       get that box up.

5       BY MR. GOTTESDIENER:

6       Q.  Do you see it says how -- this is the highlights page.  It

7       says, the second box, just the second box, How your retirement

8       benefit is determined.  Account balances are credited,

9       compensation credits, and interest credits.

10               That was not true for anybody who was in wear-away for

11      the next three to four years, correct?

12      A.  I wouldn't say that's not true.

13      Q.  Sir, you earlier agreed that if they are in wear-away that

14      is not going to influence their benefits, correct?

15               MR. RUMELD:  Objection.  It's argumentative.

16               THE COURT:  Well, I will allow one or two more.

17               MR. GOTTESDIENER:  I just want that one.

18               That is all I need.

19      BY MR. GOTTESDIENER:

20      Q.  I just want you to agree that this would not have anything

21      to do with their benefit.

22      A.  No, I don't agree.

23      Q.  For three or four years, if you are in wear-away, the

24      account balance benefit was irrelevant to that person?

25      A.  It is not irrelevant.

1   Q.  If they were in wear-away is the premise of my question,

2   sir.  It ends up being irrelevant to their benefit, correct, if

3   they get the frozen accrued benefit?

4   A.  But nobody knows that until after the benefit is

5   calculated.

6   Q.  But the premise of my question is they stay in wear-away

7   and they leave and request a benefit three or four years later.

8   They only get their frozen accrued benefit?

9            MR. RUMELD:  Objection.

10           THE COURT:  Overruled.

11  Q.  Do you know that --

12           THE COURT:  Hold on.  When you ask a question you

13  can't just keep adding to it.

14           MR. GOTTESDIENER:  I was stating what the premise.

15  He's not --

16           THE WITNESS:  That is just one example that you are

17  saying.

18           MR. GOTTESDIENER:  OK.

19           THE COURT:  We need to end this.  You are not going to

20  get the ultimate argument.

21           MR. GOTTESDIENER:  I have one more line.  It will go

22  very fast.

23           THE COURT:  You have exactly one and a half minutes,

24  but don't speak too quickly.

25           MR. GOTTESDIENER:  Please put up PX 10.

F7knosb8                          Kiley - recross

1          This is the May 1 dec. that we saw earlier.  If you go

2     to the page with the options the recommendations.

3          OK.  Yes, right here.

4     BY MR. GOTTESDIENER:

5     Q.  Now, you say if no change was made, current plan unchanged,

6     $26.1 million.

7          Do you see that?  That's the cost, you agree, if the

8     plan was unchanged, correct?

9     A.  Yes.

10    Q.  The objective you told us was a 20 percent savings of

11    costs, right?

12    A.  Yes.

13    Q.  And 20 percent of that, it's approximately $5.2 million,

14    correct?

15    A.  Yes.

16    Q.  So that means that the target was a cost of $26.1 million

17    minus 5.2, or about $20.9 million, correct?

18    A.  Yes.

19    Q.  Now look at the cash balance plan that was adopted.  You

20    see that it shows a range of cost.  It is not one number.  It

21    is a range that starts from 19 million that goes to 24 million,

22    correct?

23    A.  Yes.

24    Q.  And the low end of the range, sir, you agree was the cost

25    reflecting the full force of the wear-away, right?

1              MR. RUMELD:  Objection.

2              THE COURT:  Overruled.

3    A.  Perhaps based on what we know now, but not based on what we

4    knew then.

5    Q.  So the answer is yes, that 19 was reflecting the full force

6    of the wear-away?

7    A.  Looking back on it 20 years later.

8    Q.  Looking at it then, we looked at the documents from

9    February and March that show the normal cost at $12 million and

10   then the first year it plummeted by about $5 million.

11             Do you remember looking at those numbers?

12   A.  Yes.

13             MR. RUMELD:  Objection, your Honor.

14             MR. GOTTESDIENER:  So we have -- excuse me.

15             THE COURT:  You have to be careful with your

16   characterization.  I know you're trying to speed it along, but

17   we run into problems because everybody believes their own

18   wording is very important.

19             MR. GOTTESDIENER:  I understand.

20             But the witness agreed and there was a late objection.

21             THE COURT:  Right.

22             MR. GOTTESDIENER:  The witness was fine with the

23   question.

24             THE COURT:  That doesn't matter if the witness is

25   fine.  If there is an objection, I still have to or should at

F7knosb8                        Kiley - recross

1    least rule on the objection, which I am going to sustain.

2              So ask your question again.

3    BY MR. GOTTESDIENER:

4    Q.  The first year cost was lower, you agree, because of

5    wear-away?

6    A.  Partially.

7    Q.  You reviewed all of this with your lawyer in redirect and

8    we went over it in cross-examination, that a significant

9    portion of the first year normal cost savings was due to

10   wear-away, correct?

11   A.  Yes.

12   Q.  Isn't it a fact, sir, that the 20 percent targeted

13   reduction could not be achieved just using the number at the

14   high end of the range, the $24 million?

15   A.  Yes.

16   Q.  Meaning you agree with me?

17   A.  No.

18   Q.  OK.

19   A.  The cost savings could have been achieved by a different

20   formula.

21   Q.  I'm sorry.

22             THE COURT:  I think that we are done with this.

23             MR. GOTTESDIENER:  OK.  As long as your Honor sees the

24   point.

25             THE COURT:  I understand the point.  I understood it

F7knosb8                        Kiley - recross

1   before we went down this road.  We need to end right now.

2           Do you have one last question or no more questions?

3           MR. GOTTESDIENER:  The question was just at 19 you --

4           THE COURT:  How many millions of dollars there between

5   19 and 26 million dollars.

6           THE WITNESS:  19 and 24, 5 million.

7           THE COURT:  Thank you.

8           That is all you need.  Thank you.  Right?  You wanted

9   20 percent?

10          MR. GOTTESDIENER:  He couldn't get --

11          THE COURT:  I am saying that would have done it.  OK.

12          Let's end.  Do you have one last question, Mr. Rumeld,

13  or we are going to have Ms. Albright come out here?

14          MR. RUMELD:  I think under the circumstances I rest,

15  your Honor.

16          THE COURT:  Terrific.  You can step down, Mr. Kiley.

17          (Witness excused)

18          THE COURT:   Let's get Ms. Albright out here.

19          MR. GOTTESDIENER:  Where is she?

20          THE COURT:  We are going to take her declaration as

21  her direct testimony.  Then, Mr. Rumeld, leave five minutes at

22  the end for Mr. Gottesdiener, but we have to end at 5.

23          You said ten minutes originally, so you've got about

24  ten.  He's got five.  Like that.

25   DORIS ALBRIGHT,

F7knosb8                        Kiley - recross

1          called as a witness by the Plaintiff,

2          having been duly sworn, testified as follows:

3              THE COURT:  All right.  Ms. Albright, please be seated

4    here.  It is going to be very important that you pull your

5    chair up so you can speak directly into the mic and that will

6    carry your voice all across the room.

7              THE WITNESS:  OK.

8              THE COURT:  All right?

9              THE WITNESS:  OK.

10             THE COURT:  Has anybody handed Ms. Albright her

11   declaration?

12             MR. GOTTESDIENER:  Yes, your Honor.

13             THE COURT:  Ms. Albright is that in fact your

14   declaration which you intend to be your direct trial testimony

15   in this matter?

16             THE WITNESS:  Yes, your Honor.

17             THE COURT:  Do you swear to the truth of the contents

18   of that declaration?

19             THE WITNESS:  Yes, I do.

20             THE COURT:  All right.  The Court does accept the

21   declaration of Ms. Albright as her direct testimony, and the

22   witness is turned over for cross-examination.

23             Thank you.

24             MR. RUMELD:  Your Honor, just to save a little time

25   could I hand up to your Honor a notebook that holds the

F7knosb8                         Albright - cross

1    exhibits that I am going to question her on.

2            THE COURT:  Yes.  Thank you.

3    CROSS EXAMINATION

4    BY MR. RUMELD:

5    Q.  Good afternoon, Ms. Albright.

6            You enjoyed working at Woolworth, is that right?

7    A.  Yes.

8    Q.  During your 22 years there, you never considered leaving

9    because you loved your job, is that right?

10   A.  That's correct.

11   Q.  The Greenville distribution center where you worked closed

12   in 1996, correct?

13   A.  Correct.

14   Q.  Your position was terminated then in July, is that right?

15   A.  Yes.  That's correct.

16   Q.  After you left Woolworth, you went to work for Hatfield

17   Brothers, is that correct?

18   A.  Hatfield Builders.

19   Q.  Hatfield Builders.  Excuse me.

20   A.  Yes.

21   Q.  Hatfield did not offer a pension plan, did it?

22   A.  No.

23   Q.  Just a simple IRA?

24   A.  Correct.

25   Q.  You worked for Hatfield 15 years, is that right?

F7knosb8                        Albright - cross

1    A.  Yes, that's correct.

2    Q.  Could you look at Plaintiff's Exhibit 341, which I think is

3    attached to your declaration.

4            Do you have that?

5    A.  What number did you say again?  I'm sorry.

6    Q.  341.

7    A.  341.

8            THE COURT:  Do you mean PX 341 or DX?

9            MR. RUMELD:  PX.

10           THE COURT:  All right.

11           You can change that on the screen there.

12           MR. RUMELD:  Sorry, your Honor.

13   BY MR. RUMELD:

14   Q.  Do you have it, Ms. Albright?

15   A.  Not yet.  I'm sorry.

16           THE COURT:  Why don't you just take my binder.

17           THE WITNESS:  I think actually I'm there.  I have it.

18   Thank you.

19   BY MR. RUMELD:

20   Q.  I just wanted to ask, did you receive that at some time

21   before you left?

22   A.  Yes.

23   Q.  When you left the company, you decided to keep your pension

24   in the plan, is that right?

25   A.  That is correct.

F7knosb8                          Albright - cross

1    Q.  And eventually you took it out sometime later?

2    A.  Yes.

3    Q.  In June of 2011?

4    A.  Yes.

5    Q.  When you did take your money out, you took it in the form

6    of a lump sum?

7    A.  Correct.

8    Q.  You chose a lump sum instead of an annuity because if you

9    elected an annuity you would only be receiving pension payments

10   until you and your husband passed away, is that right?

11   A.  That's correct.

12   Q.  And you wanted to make sure that there was money there for

13   your children after you passed away?

14   A.  Yes.  That's correct.

15   Q.  So you were happy, were you not, that you had the option to

16   take your benefit as a lump sum?

17   A.  Yes.

18   Q.  Now, in your declaration you say that you noticed that the

19   lump sum was larger than your account balance?

20   A.  Yes.

21   Q.  Do you remember that?

22   A.  Yes.

23   Q.  And you thought that the difference between the lump sum

24   and your account balance was because Woolworth was required to

25   give you some sort of buyout because you were taking your money

F7knosb8                     Albright - cross

1    out rather than leaving it in the plan until age 65?

2    A.  Yes.

3    Q.  Now, back in 1996, you received an estimate which also

4    showed that your benefit would be larger than your account

5    balance.  Do you remember that?

6    A.  Yes.

7    Q.  Do you have PX -- that was the exhibit we looked at, PX

8    341?

9    A.  Yes.

10   Q.  Am I correct that you thought back then that the difference

11   was also because you would be getting some kind of bump-up

12   because you were taking the money out early?

13   A.  Yes.

14   Q.  Am I correct it doesn't actually say that anywhere in the

15   materials that were given to you that that's the reason why the

16   lump sum was bigger?

17   A.  No, it does not say that.

18   Q.  Now, by virtue of taking the money out early, you were able

19   to invest it, is that right?

20   A.  Yes.

21   Q.  So, even though it wasn't earning money in the plan

22   anymore, it was earning money for you?

23   A.  Yes.

24   Q.  And it made even more money than it would have earned in

25   the plan?

F7knosb8                          Albright - cross

1    A.   Possibly.

2    Q.   Now, in your declaration, you also make reference to an

3    estimated pension statement that you received a little earlier,

4    that's Exhibit 340?

5            Do you see that?

6    A.   Yes, I see that.

7    Q.   Now, according to that estimate, your annual benefit is

8    $5658.26 as of December 31, 1995.

9            Do you see that?

10   A.   Yes.

11   Q.   That was your annuity under the old plan?

12   A.   Yes.

13   Q.   If you look back at Exhibit 341, if you look at page 5 of

14   5?

15   A.   Yes.

16   Q.   You see there that you have an estimated accrued benefit as

17   of June 1, 1996?

18   A.   Yes.

19   Q.   It's the same $5600?

20   A.   Yes.

21   Q.   Did you ever stop and think about how those two numbers

22   could be the same six months later?

23   A.   No, sir.

24   Q.   At the time of the cash balance conversion, you were an

25   administrative manager at the Greenville distribution center,

1    is that right?

2    A.  Yes, sir.

3    Q.  After the cash balance conversion some associates

4    approached you because they were questioning their account

5    balances, is that right?

6    A.  Yes.

7    Q.  Some of the people were complaining or questioning because

8    they were of similar ages and service of others, but their

9    benefits were different?

10   A.  Yes, sir.

11   Q.  People thought that this disparity was the result of some

12   sort of incorrect counting of their years of service?

13   A.  Yes.

14   Q.  So then you reached out to Marion Derham in New York to

15   provide additional information responsive to these questions?

16   A.  Yes.

17   Q.  Could you look at Exhibit 162, which I think is also

18   attached to your declaration.

19   A.  Yes.

20   Q.  The bottom is your e-mail to Ms. Derham, is that right?

21   A.  Yes.  That's correct.

22   Q.  That's where you are asking for some more information?

23   A.  Yes.

24   Q.  You say that associates requested to see in print the

25   formula which was used to calculate their figures that are on

F7knosb8                    Albright - cross

1   their pension statements, right?

2   A.  Yes.

3   Q.  They also wanted to see their salaries and years that are

4   used in the calculations so that they can be sure that it was

5   calculated correctly?

6   A.  Yes.

7   Q.  Then you received PX 339 in response?

8   A.  Yes.

9   Q.  That was that cover memo with the summary for Greenville

10  associates and then those examples, is that right?

11  A.  Yes.

12  Q.  Would you agree that this memo and the summary was

13  responsive to the first of the two questions that you had

14  asked?

15  A.  Yes.

16  Q.  And the second question you followed up with her

17  subsequently to get some more information about the years of

18  service?

19  A.  Yes.

20  Q.  Now, if you look at 339, would you look at example III,

21  please.

22          Do you have that in front of you?

23  A.  Yes, sir.

24  Q.  This is the example that you said you had actually paid

25  some attention to because it resembled your situation?

F7knosb8                          Albright - cross

1   A.  Yes.

2   Q.  It shows a minimum lump sum of $13,210, but an initial

3   account balance of $5411.

4            Do you see that?

5   A.  Yes.

6   Q.  In your declaration you say that you thought that this

7   discrepancy was due to federal rules, and again that the rules

8   required an increase due to the fact that this is what you get

9   if you take your money out earlier, is that right?

10  A.  Yes.

11  Q.  If you turn back to the first page of the memo, it says, if

12  you look to the second to the last paragraph, federal law

13  requires that when a lump sum is paid it cannot be less than a

14  minimum lump sum determined by using the interest rate for

15  30-year treasury bills.

16           Do you see that?

17  A.  I do.

18  Q.  The next sentence says, For lump sums that are paid during

19  1996 we must use the rate for December 1995, which was 6.06

20  percent.

21           Do you see that as well?

22  A.  Yes.

23  Q.  It doesn't say anything about increasing the benefit on

24  account of taking it out early, am I right?

25  A.  I don't see that there.

F7knosb8                          Albright - redirect

1    Q.  Now if you turn back to that example III.

2    A.  Yes.

3    Q.  Do you see that it says that the minimum lump sum is

4    calculated using the accrued benefit as of 12/31/1995?

5           Do you see that?

6    A.  Yes.

7    Q.  Accrued benefit (12/31/1995)?

8    A.  Yes.

9    Q.  And you will see that item 2?

10          MR. GOTTESDIENER:  Your Honor, you said I got five

11   minutes.

12          MR. RUMELD:  I will rest right there, your Honor.

13          Thank you.

14          THE COURT:  All right.  Thank you.

15          Mr. Gottesdiener, you may proceed, sir.

16   REDIRECT EXAMINATION

17   BY MR. GOTTESDIENER:

18   Q.  The document that you got from Marion, did it answer the

19   questions that you needed answered for the other people at

20   Greenville?

21   A.  Not completely.

22          THE COURT:  This is PX 99?

23          MR. GOTTESDIENER:  That is the Greenville summary that

24   we have been looking at?

25          THE COURT:  All right.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F7knosb8                    Albright - redirect

1    BY MR. GOTTESDIENER:

2    Q.  I want to go back and ask you about when you got that

3    estimate that showed $13,000.

4            Could you look at PX 352.

5    A.  OK.

6    Q.  If we could blow up on the screen the bottom where there's

7    the handwriting.

8    A.  Yes.

9    Q.  Is that your handwriting?

10   A.  It is.

11   Q.  Does that reflect you trying to understand why it is the

12   estimate was coming in at $13,000, but the plan statement said

13   you would only have an entitlement to about $5,000?

14   A.  Yes.  That's correct.

15   Q.  The people who were concerned about the determination of

16   their accounts, did anybody say anything about having a

17   suspicion that their benefits had been frozen or understated in

18   value?

19   A.  No, sir.

20   Q.  Did you yourself, reading the Greenville summary and

21   looking at the examples, come to the conclusion that your

22   benefit had stopped growing at 1/1/96?

23   A.  No, sir.

24   Q.  And you continued working into 1996, and you actually

25   helped close the Greenville plant, is that right?

F7knosb8                          Albright - redirect

1     A.   That is correct.

2     Q.   Did you think during that time you were continuing to earn

3     pension benefits?

4     A.   I believed that I was, yes.

5     Q.   You elected to neither take an annuity nor a lump sum when

6     you separated from service; you left your benefit in the plan

7     for quite some time?

8     A.   Yes.

9     Q.   Did you believe that your benefit was growing at the rate

10    of 6 percent a year?

11    A.   Yes.

12    Q.   So is it true that you were shocked to learn that the plan

13    statements that were telling you that you had received $5,000

14    if you left on January 1, '96 were false because you had

15    actually been entitled to $13,000?

16    A.   Yes.

17              MR. RUMELD:  Objection.

18              THE COURT:  Overruled.

19              MR. GOTTESDIENER:  With the Court's indulgence.

20    BY MR. GOTTESDIENER:

21    Q.   And you received another communication from the plan in

22    July '97 that you talk about in paragraph 27 of your

23    declaration that you say showed you that 20 years in the

24    future -- that letter showed you what your benefit would be

25    both as an annuity and as a lump sum 20 years in the future, is

F7knosb8                        Albright - recross

1   that right?

2   A.  Yes.

3   Q.  And it looked to you like a reasonable number, $28,000?

4   A.  Yes.

5   Q.  The Greenville summary, that narrative that Marion sent,

6   did you understand everything that was in there?

7   A.  No, sir.  I didn't understand everything, but I just

8   trusted the company that I worked for so faithfully for so many

9   years that they were doing the right thing.

10  Q.  You were the HR person for the entire plant, weren't you?

11  A.  Yes.  That's correct.

12         MR. GOTTESDIENER:  Thank you for your testimony,

13  ma'am.

14         THE WITNESS:  OK.

15         MR. RUMELD:  One more question.

16         THE COURT:  All right.

17         MR. RUMELD:  I will ask it from here if that's OK.

18         THE COURT:  All right.

19  RECROSS EXAMINATION

20  BY MR. RUMELD:

21  Q.  Am I correct you never asked anybody for an explanation as

22  to that discrepancy between the minimum lump sum and the

23  account balance?

24  A.  You're correct.

25         MR. RUMELD:  Thank you.

F7knosb8                         Albright - recross

1              THE COURT:  Thank you, Ms. Albright.

2              THE WITNESS:  Thank you.

3              THE COURT:  You may step down.  Just be careful

4    stepping off the witness stand there.

5              THE WITNESS:  Thank you.

6              (Witness excused)

7              THE COURT:  All right.  Ladies and gentlemen, let's

8    talk about what the plan is for tomorrow.

9              Are we going to start with Ms. Peck?

10             MR. RUMELD:  Well, we need to follow with Ms. Ine now

11   because she is the one who is flying in this evening.  If it is

12   OK with Mr. Gottesdiener and the Court, I am going to tell

13   Ms. Peck to come in a little later if we can get an estimate

14   for Ms. Ine.

15             THE COURT:  Who is it?  Ms. Ine?

16             MR. RUMELD:  Yes Linda Ine.

17             THE COURT:  How long do we think she is going to be at

18   this point?  Her declaration is going to be taken as her direct

19   testimony.  She will be turned over for cross-examination, and

20   what are we thinking?

21             MR. GOTTESDIENER:  An hour I would hope, but some of

22   it depends on how responsive she is to the questions.

23             THE COURT:  Well, you deposed her, so you have a

24   sense.

25             MR. GOTTESDIENER:  I also deposed Mr. Kiley as well.

1                  THE COURT:  All right.

2                  So you folks should judge based upon how things are

3     progressing and at the midmorning break what you no need to do

4     in terms of Ms. Peck.  I would assume she should be here late

5     morning or midmorning to start.

6                  MR. RUMELD:  We will do that, your Honor.  We will

7     assume that we are going with Ms. Peck right after Ms. Ine.

8                  THE COURT:  So Ms. Ine and then to Ms. Peck.

9                  MR. GOTTESDIENER:  I may have issues with -- I still

10    have class members to call, and we were going to call some of

11    them, at least one other today we were hoping.  So I may need

12    to insert between Ms. Ine --

13                 THE COURT:  You guys will talk about that.

14                 I think that the next accommodation fairly speaking

15    should be Ms. Peck because she's been out there and on deck,

16    and we talked about doing her today, but because your witness

17    had been here already, Ms. Albright, we took Ms. Albright and

18    crunched things.

19                 I think we should take Ms. Peck, get her on, get her

20    off the stand, do that efficiently, and get your folks

21    accommodated as well.  You folks chat about it.

22                 But it doesn't strike me as unreasonable if Ms. Ine is

23    only going to be an hour with you, Mr. Gottesdiener, something

24    less than that from the proffering party, you are into Ms. Peck

25    before lunch I would hope.

1          If you folks want to agree on taking somebody out of

2     order later in the afternoon, that's fine with me.  But

3     otherwise, we would just plow on through.  OK.

4          MR. GOTTESDIENER:  Your Honor, we have the video of

5     Ms. Kanowicz that we wanted to submit tonight.

6          THE COURT:  Have you folks agreed that is an accurate

7     compilation?

8          MR. GOTTESDIENER:  Yes.

9          THE COURT:  It's everybody's pieces, right?

10         MR. GOTTESDIENER:  Yes.

11         MR. RUMELD:  Yes.

12         THE COURT:  Is there anybody else that I am waiting

13    for the video of?

14         MR. GOTTESDIENER:  At the moment not from us.

15         MR. RUMELD:  We plan to submit complete versions of

16    Thomson and Flesses as well.

17         THE COURT:  OK.

18         MR. RUMELD:  Based on our understanding of what your

19    Honor wants.

20         THE COURT:  All right.  Why don't you hand that to my

21    deputy.  I am being handed a drive with the deposition of

22    Ms. Kanowicz on it, the videotape version of it.

23         The Court has received that.

24         OK.  Anything else that we should go over right now?

25         MR. GOTTESDIENER:  No, your Honor.

F7knosb8                          Albright - recross

1          THE COURT:  When do we get to Mr. Sher?

2          MR. RUMELD:  Your Honor, he is our witness.

3          THE COURT:  Yes.

4          MR. RUMELD:  I think we get to Mr. Sher when

5   Mr. Gottesdiener closes his case.

6          THE COURT:  How much longer do we think you've got,

7   Gottesdiener's case, how many more days?  I know about

8   tomorrow, Ine, Peck, whoever else.

9          MR. RUMELD:  And Ms. Derham.

10         THE COURT:  So that's like Tuesday-ish.

11         So maybe Tuesday sometime?

12         MR. RUMELD:  That is tomorrow, your Honor.

13         THE COURT:  Wednesday.

14         MR. GOTTESDIENER:  I can't guess how long Ms. Peck is

15  going to take, but I would hope on Wednesday for sure.

16         THE COURT:  OK.  I will be hoping similarly.

17         OK.  Folks.  Thanks.  We will see you in the morning.

18         MR. GOTTESDIENER:  Thank you, your Honor.

19         (Adjourned to Tuesday, July 21, 2015 at 9 o'clock

20  a.m.)

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

INDEX OF EXAMINATION

Examination of:                                    Page

Cross By Mr. Gottesdiener  . . . . . . . . . . 735

Redirect By Mr. Rumeld . . . . . . . . . . . 837

Redirect By Mr. Rumeld . . . . . . . . . . . 865

Recross By Mr. Gottesdiener  . . . . . . . . 943

DORIS ALBRIGHT

Cross By Mr. Rumeld  . . . . . . . . . . . . 960

Redirect By Mr. Gottesdiener . . . . . . . . 968

Recross By Mr. Rumeld  . . . . . . . . . . . 971