F7lnosb1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------------x

3    GEOFFREY OSBERG,

4                    Plaintiff,

5          v.                                07 Civ. 1358(KBF)

6    FOOT LOCKER, INC. et al.,

7                    Defendants.

8    ------------------------------------x
                                         New York, N.Y.
9                                        July 21, 2015
                                         9:00 a.m.
10
     Before:
11
                         HON. KATHERINE B. FORREST
12
                                         District Judge
13
                              APPEARANCES
14
     GOTTESDIENER LAW FIRM, PLLC
15        Attorneys for Plaintiff
     BY:  ELI GOTTESDIENER
16        STEVEN COHEN
          ALBERT HUANG
17
     PROSKAUER ROSE LLP
18        Attorneys for Defendants
     BY:  MYRON D. RUMELD
19        ROBERT RACHAL
          JOSEPH E. CLARK
20

21   ALSO PRESENT:
     Jon Int-Hout, Trial Technology Specialist
22   Randall Carter, Trial Technology Consultant

23

24

25

F7lnosb1

1          (Trial resumes)

2          (In open court)

3          THE COURT:  Good morning.

4      OK, folks.  We are going to get going with the next

5  witness.  I just want to let you folks know that I have a new

6  criminal case that I have to arraign at 12:30.  I'm sorry.  I

7  have to arraign the criminal case at 1:30.  That is the only

8  time that counsel is I think available.  I had a sentencing

9  scheduled from one to two, which now I have to move back a half

10 hour.  We have to break today for lunch at 12:30 so I can do

11 the sentencing followed by the arraignment.

12         We will be ready to pick up again at 2 o'clock on

13 time.  But it is an earlier break than otherwise I would have

14 had.  So plan for that, if you could.

15         Mr. Gottesdiener, would you like to call your next

16 witness.

17         MR. GOTTESDIENER:  Ms. Ine, your Honor.

18         THE COURT:  Ms. Ine, please.

19         MR. RUMELD:  Your Honor, I apologize, she just stepped

20 out for a moment.

21         THE COURT:  All right.

22  LINDA J. INE,

23      called as a witness by the Defendant,

24      having been duly sworn, testified as follows:

25         THE COURT:  Ms. Ine, please be seated.  It will be

F7lnosb1

```
 1    very important that you pull your chair in and speak directly

 2    into the microphone.

 3              Could people just maybe remove -- there is so much

 4    stuff here now at the witness table.  Maybe all of it should be

 5    taken away, reorganized back there somehow, and then just what

 6    the witness needs up here.  Why don't you folks come and do

 7    that.

 8              MR. RUMELD:  That is what I was about to do, your

 9    Honor.

10              THE COURT:  Terrific.

11              MR. RUMELD:  This is the signed declaration.

12              THE COURT:  We have two binders, four piles, and a

13    partridge in a pear tree.

14              That binder has your declaration in it.

15              The first thing, Ms. Ine, I am going to do is ask you

16    to open up that binder, make sure that that declaration is, in

17    fact, the declaration which you have submitted in this matter

18    as your direct trial testimony.

19              Let me know when you've confirmed that fact.

20              THE WITNESS:  Yes, it is.

21              THE COURT:  Do you swear to the truth of the contents

22    of that declaration?

23              THE WITNESS:  I do.

24              THE COURT:  Thank you.  The Court does accept the

25    declaration of Ms. Ine as her direct testimony, and the witness
```

F7lnosb1                          Ine - cross

1    is turned over for cross-examination.

2              Mr. Gottesdiener, you may proceed, sir.

3    CROSS EXAMINATION

4    BY MR. GOTTESDIENER:

5    Q.  Good morning, Ms. Ine.

6    A.  Good morning.

7    Q.  You were the corporate benefits manager in the Milwaukee

8    Human Resources Operations Center?

9    A.  Correct.

10   Q.  You held that position for how many years, ma'am?

11   A.  Almost 20.

12   Q.  And the period that you were employed by Woolworth, you

13   started what year?

14   A.  1979.

15   Q.  You left in '99?

16   A.  Correct.

17   Q.  The change to the pension plan occurred in the fall of '95

18   and was implemented in '96?

19   A.  Correct.

20   Q.  You were responsible for overseeing the implementation of

21   the plan change?

22   A.  Administratively, yes.

23   Q.  Administratively.  You didn't have any actuarial training

24   yourself, right?

25   A.  Correct.

F7lnosb1                    Ine - cross

```
 1    Q.  You were reasonably good with math, but you hadn't taken
 2    any special courses or gotten any special instruction from
 3    actuaries?
 4    A.  Other than what I would have discussed with the actuary
 5    that was for the company.
 6    Q.  When you did discuss things with the actuary for the
 7    company, it's fair to say that he didn't speak very simply or
 8    clearly to you?
 9    A.  Clearly enough that I could understand.
10    Q.  You thought you could understand what he was saying?
11    A.  I felt, yes, that I did know what he was saying.
12    Q.  You felt that way?
13    A.  Yes.
14    Q.  Didn't you in your deposition say that -- first of all,
15    didn't you call the actuary -- first of all, we are talking
16    about Jim Grefig from Mercer, correct?
17    A.  Correct.
18    Q.  Didn't you say that in meetings that you were in with him
19    that he would go off on mathematical tangents that you could
20    not follow what he was saying?
21    A.  That is true.
22    Q.  You had to know how the mechanics of the calculations would
23    be done, correct?
24    A.  Correct.
25    Q.  And supervise people who would do the mechanics of the
```

F7lnosb1                      Ine - cross

1   calculations, is that fair?

2   A.  Correct.

3   Q.  But you did not yourself understand at the time the cash

4   balance amendment went into effect that its impact was to stop

5   benefit accruals for a period of time, did you?

6   A.  No.

7             MR. GOTTESDIENER:  If we could get on the screen the

8   September '95 announcement letter, PX 2.

9   BY MR. GOTTESDIENER:

10  Q.  Do you remember this announcement letter that went out to

11  all participants where Mr. Farah and Mr. Hilpert explained that

12  they were excited to announce changes to the plan?

13  A.  Yes, I do.

14  Q.  They said that participants would be able to see their

15  individual account balance grow each year and know its value?

16  A.  Correct.

17  Q.  You read that when that came out?

18  A.  Yes, I did.

19  Q.  That was followed by PX 4, the November 1995 highlights

20  memo, and you read that as well when it came out?

21  A.  Yes, I did.

22  Q.  That memo first looped in the letter from Mr. Farah and

23  Mr. Hilpert and said, as previously announced by them, we are

24  going to be making some changes, and you read at the time in

25  the second paragraph, Currently your benefit under the plan is

F7lnosb1                          Ine - cross

1    expressed as an annual annuity payable at your normal

2    retirement date.  Effective January 1, 1996 your benefit will

3    be expressed as an account balance at termination of

4    employment.  Provided you are vested, you will have the option

5    of taking a lump sum payment equal to your account balance.

6              You read that at the time?

7    A.  Yes.

8    Q.  You worked with participants both in the operations center,

9    but participants who were in contact with the operations center

10   on a daily basis, is that fair?

11   A.  Correct.

12   Q.  You came to have what you considered a good understanding

13   of what the average Woolworth participant understood?

14   A.  Could you restate that.

15   Q.  That's fair.  You came to understand what you thought the

16   average participant's capabilities were in terms of

17   understanding complex pension matters?

18   A.  I felt that, yes.

19   Q.  You felt that essentially in order to have a connection

20   with a participant and make them understand something if they

21   had a question, you and your team had to assume that they

22   basically had an eighth-grade level of education?

23   A.  That was a procedural understanding, yes.

24   Q.  That was based on experience with them?

25   A.  Correct.

F7lnosb1                          Ine - cross

1    Q.  A lot of times when participants contacted your center,

2    your team was essentially just on a human level rereading

3    materials that these people actually already had in their

4    possession and speaking to them slowly?

5    A.  Yes, in some cases.

6    Q.  It was your view that a lot of the material that was sent

7    out was legalese?

8    A.  Based on what we felt they understood at an eighth-grade

9    level.

10   Q.  And based on their reaction to the materials?

11   A.  Correct.

12   Q.  You believed that the average participant would take from

13   these announcements, the two we have just been talking about,

14   that they would assume that their benefits were merely changing

15   form and then were picking up where they left off and

16   continuing going forward?

17            MR. RUMELD:  Objection.

18            THE COURT:  Hold on.

19            Overruled, you may answer.

20   A.  I don't know if they assumed that.

21   Q.  Well, you thought that the average participant would expect

22   just what the materials say, that they would assume that it was

23   picking up where it left off and just continuing forward?

24   A.  I think that they saw that there would be a new way of

25   calculating a cash balance account and that they would get

F7lnosb1                    Ine - cross

1    increases over time to the cash balance account.

2            MR. GOTTESDIENER:  Page 130, line 8.

3            THE COURT:  Of Ms. Ine's deposition?

4            MR. GOTTESDIENER:  Yes.

5            THE COURT:  Just so the record is clear.  Otherwise we

6    won't know where we are going.

7            MR. GOTTESDIENER:  The transcript.

8            THE COURT:  All right.

9    BY MR. GOTTESDIENER:

10   "Q.  How do you think the average participant would understand

11   that statement made to them?

12   "A.  I think the average participant would expect just what it

13   says.  I think they would assume that it was picking up where

14   it left off and just continuing forward."

15           You gave that testimony correct?

16   A.  Yes, I did.

17   Q.  Is there anything in the announcement letter that you would

18   think would cause an average participant to think that there

19   was any kind of slowdown in the growth of their retirement

20   benefit?

21   A.  Based on the Roger Farah announcement?

22   Q.  Yes.

23   A.  No.  It said they that they would go to an account balance

24   and that it would grow in value.

25   Q.  So that's how you think the average participant would

F7lnosb1                     Ine - cross

1   interpret it, right?

2   A.  Yes.

3   Q.  And that's how you yourself interpreted it, correct?

4   A.  It was true.  They did go into an account balance, and they

5   did get pay credits, and they did get interest.

6   Q.  Page 131, line 17:

7   "Q.  And there's nothing in here that you would think would

8   cause an average participant and didn't cause you to think that

9   there was any kind of --

10  "A.  No.

11  "Q.  -- slowdown in the growth of your retirement benefit?

12  "A.  Right.  I wouldn't have thought that, no.

13  "Q.  And you didn't think that?

14  "A.  I didn't think that."

15          MR. RUMELD:  Objection.

16  "Q.  You thought that your retirement benefits were growing at

17  least as much as they had been before?

18  "A.  Yes."

19          You gave that testimony, didn't you?

20          MR. RUMELD:  Objection, your Honor.

21          THE COURT:  I will allow it?

22  A.  Yes, that is what I said.

23  Q.  And you were a participant yourself in the plan, correct?

24  A.  Yes, I was.

25  Q.  When you read these letters, the Roger Farah letter and the

F7lnosb1                    Ine - cross

1  highlights memo, you thought this meant that you would be

2  picking up where you left off in the old plan and moving

3  forward and earning a better benefit, didn't you?

4  A.  Based on how they brought the 12/30/95 accrual into a

5  startup number for '96, which was basically converting an

6  annuity that was for the future to something for the present,

7  yes.  I thought it would be equivalent, just in different

8  terms.

9  Q.  So I think I have your answer, but just so there is

10  clarity.  My question was, you thought yourself that you would

11  be picking up where you left off in the old plan and moving

12  forward and earning a better benefit, correct?

13          MR. RUMELD:  Objection.

14          THE COURT:  Overruled.

15  A.  I don't know if it would be better, but I did believe that

16  it would be growing.

17  Q.  Thank you.  I think you will recall -- we've met before?

18  A.  Right.

19  Q.  Three and a half years ago?

20  A.  Right.

21  Q.  I told you in the deposition, when we were almost done with

22  it or towards the end of it, that we had done the math and that

23  it turned out that the cash balance amendment the way it was

24  done most people didn't earn any benefits for many years.

25          Do you remember when I informed you of that?

F7lnosb1                          Ine – cross

1   A.  Yes.

2           MR. RUMELD:  Objection, your Honor.

3           MR. GOTTESDIENER:  That was something --

4           THE COURT:  I will allow it.  He's just trying to

5   short circumstance it.

6           Go ahead.

7   BY MR. GOTTESDIENER:

8   Q.  That was something that you didn't know before I informed

9   you of that fact, correct?

10  A.  I'm sorry.  Can you rephrase that.

11  Q.  I informed you in the deposition that most people didn't

12  earn any benefits for many years, across the whole population,

13  correct?

14  A.  Correct.

15  Q.  I informed you of that in the deposition, right?

16  A.  Correct.

17  Q.  You didn't know that before I informed you of that,

18  correct?

19  A.  That is correct.

20  Q.  I also informed you that we had run the numbers for your

21  benefit and that it turned out that you didn't earn a dollar of

22  new pension benefits for the three years that you worked after

23  the amendment went into effect between 1/1/96 and February

24  1999.

25  A.  Correct.

F7lnosb1                         Ine - cross

 1  Q.  You didn't know that before I informed you of it, correct?

 2            MR. RUMELD:  Objection, your Honor.  He's

 3  mischaracterizing the testimony.

 4            THE COURT:  She can answer.  And if she doesn't agree

 5  with it she will tell us.

 6            You may answer.

 7  A.  I'm sorry?

 8  Q.  You didn't know that you didn't earn any new pension

 9  benefits until I informed you of that fact, correct?

10  A.  I must have been confused at the time because I knew I was

11  getting the lump sum from the old accrual.

12  Q.  You were very surprised when I informed you that you had

13  not earned a dollar of new pension benefits for the three years

14  from the amendment to February '99, correct?

15  A.  I don't remember that.

16  Q.  You were not aware until I told you that you were

17  personally a victim of a pension freeze and you did not earn a

18  single new pension dollar between '96 and '99, correct?

19  A.  I knew before I left because I calculated what I would get.

20  So I knew that I would get a benefit based on the old accrual.

21  And the rules also said that I would never get less than what I

22  had in the 12/30/95 accrual.

23            MR. GOTTESDIENER:  Can we play the clip, transcript

24  page 200, line 21 to transcript page 201, line 3, please.

25            (The following was played:

F7lnosb1                    Ine - cross

```
 1    "Q.  So sitting here now, I take it that you're not aware based

 2    on everything you've said that you actually yourself were a

 3    victim of this freeze and you didn't earn a single new pension

 4    dollar between the conversion and your cashout date in February

 5    of 1999?

 6              "MS. DePIETTO:  Objection.  Form.

 7    "A.  That's true.")

 8    BY MR. GOTTESDIENER:

 9    Q.  You gave that testimony, correct?

10    A.  Yes.

11    Q.  At your deposition in 2012 it was news to you that the

12    account growth that you thought had been pension growth was

13    actually not pension growth, correct?

14    A.  It was pension growth, but --

15    Q.  I'm sorry.  I'm asking a question about 2012.

16    A.  It was pension growth, but it wasn't enough to qualify me

17    for the cash balance amount.  It was -- I received the money

18    based on 12/30/95.

19              MR. GOTTESDIENER:  Page 202 line 8:

20    "Q.  But you said -- you were saying that you thought you

21    were -- that this was all pension growth and it wasn't.

22    "A.  True.

23    "Q.  So this is news to you?

24    "A.  This is true."

25    BY MR. GOTTESDIENER:
```

F7lnosb1                    Ine - cross

1   Q.  You gave that testimony, correct?

2   A.  Yes.

3   Q.  I told you in the deposition that I felt bad that I had to

4   break the news to you, that you shouldn't feel bad because the

5   freeze had been effectively disguised in complicated actuarial

6   concepts, and you agreed, correct?

7   A.  Yes.

8   Q.  As far as you know, no participant knew that their benefit

9   wasn't growing while their account balance was growing,

10  correct?

11          MR. RUMELD:  Objection.

12          THE COURT:  Overruled.

13  A.  Yes.

14  Q.  Meaning you agree?

15  A.  Yes, I do.

16  Q.  You never heard any expressed concern that the conversion

17  was going to mean people's benefits weren't going to grow for a

18  while, correct?

19  A.  I'm sorry.  Can you say that again?

20  Q.  Sure.  It is just a follow-on to the prior question.

21          You didn't hear from anyone that people had figured

22  out or thought or suspected that their benefits were not going

23  to be growing for a time after 1996, correct?

24  A.  No.  Not in the way that you are talking about it.

25  Q.  The defendants in this case have argued that they disclosed

F7lnosb1                        Ine - cross

1    that the opening balance was being calculated using a 9 percent

2    interest rate assumption and that employees would have

3    understood that using a 9 percent interest rate was a bad thing

4    and would have tipped them off that their accounts were worth a

5    lot less than the benefit that they had earned.  Based on your

6    familiarity with what the average Foot Locker participant knew,

7    do you think they would have understood that the use of a 9

8    percent interest rate was a bad thing or a good thing?

9              MR. RUMELD:  Objection.

10             THE COURT:  Sustained.

11             You have to break that down into multiple pieces if

12   you are going to do it.

13   BY MR. GOTTESDIENER:

14   Q.  Your understanding at the time, ma'am, was that the use of

15   the 9 percent was a good thing for participants, wasn't it?

16   A.  I would say that I really didn't know, but --

17             MR. GOTTESDIENER:  Can we play the clip 156, line 12

18   through line 18.

19             (The following was played:

20   "Q.  And your understanding was the use of the 9 percent was a

21   good thing for participants?

22   "A.  Yes.

23   "Q.  And that's how you understood they understood it?

24   "A.  Yes.

25   "Q.  And that was how the Ducks explained it to people?

F7lnosb1                          Ine - cross

1    "A.   Yes.")

2    BY MR. GOTTESDIENER:

3    Q.   The Ducks, just for clarity, those are the folks who worked

4    under you who had more direct contact on a daily basis with the

5    average participant?

6    A.   Correct.

7    Q.   You essentially took orders from the New York office, is

8    that fair?

9    A.   Yes.

10   Q.   They were in control of the way things got communicated to

11   participants, correct?

12   A.   Yes.

13   Q.   They told you how to tell people about the amended plan,

14   right?

15   A.   Essentially, yes.

16   Q.   And the administrator you understood to be the retirement

17   administrative committee --

18   A.   Yes.

19   Q.   -- right?  Yes?

20   A.   Yes.

21   Q.   And your primary contact was Tom Kiley?

22   A.   Correct.

23   Q.   And he was the most knowledgeable about the ins and outs of

24   the pension, is that fair?

25   A.   Correct.

F7lnosb1                          Ine - cross

1   Q.  You also, though, had contact with Pat Peck --

2   A.  Correct.

3   Q.  -- about the amended plan, right?

4   A.  Some, yes.

5   Q.  As well as Carol Kanowicz?

6   A.  Yes.

7   Q.  And you knew and implemented the New York policy of telling

8   active employees who asked to know what they would get if they

9   were going to be paid just to give them the account balance?

10  A.  If --

11  Q.  Not if they actually requested a termination package, but

12  if they just called up and said what would I get paid, you

13  understood the policy that New York directed and you

14  implemented was tell them the account balance?

15          MR. RUMELD:  Objection.

16          THE COURT:  Hold on one second.

17          Why don't you restate, because you've got two

18  questions with a short 'if' at the beginning of an answer and

19  then you went back.

20          Go ahead and restate a question.

21  BY MR. GOTTESDIENER:

22  Q.  The policy from New York was to tell participants the lump

23  sum they would receive if they requested to know that amount

24  was their account balance, correct?

25  A.  I don't remember.

F7lnosb1                          Ine - cross

1              MR. GOTTESDIENER:  Page 164, line 15:

2      "Q.  And the instruction that New York gave you all was to, if

3      anybody was a current participant who asked what's the --

4      what's the amount I'd receive, you would tell them their

5      account balance?"

6              Your answer:  "As a lump sum, correct."

7      BY MR. GOTTESDIENER:

8      Q.  You gave that testimony, right?

9      A.  Yes.

10     Q.  New York did not tell you anything even remotely about the

11     benefit formula that we are using to convert is going to mean

12     that for basically everybody they are not going to earn any new

13     benefits for years, correct?

14     A.  My understanding at the time was that it would take a few

15     years --

16     Q.  I'm sorry.  My question to you is New York did not tell you

17     that that was going to be the impact, they didn't say anything

18     like that even remotely to you that that was the impact of the

19     benefit formula --

20             MR. RUMELD:  Objection, your Honor.  She was

21     responding to a question.

22     Q.  -- is that correct?

23             THE COURT:  Hold on.  Hold on.

24             Do you remember what you were going to say before?

25     You started to say, "My understanding at the time was that it

F7lnosb1                          Ine - cross

1    would take a few years --"

2              THE WITNESS:  Yes.  I was told by the people in the

3    executive office that it would take a few years for the

4    participant to actually get a lump sum based on the cash

5    balance account.

6              THE COURT:  OK.  Why don't you go ahead.

7              She's finished her answer.  Go ahead and pose a new

8    question.

9              MR. GOTTESDIENER:  Absolutely.  Can I have the video,

10   please, page 205, line 2.

11             (The following was played:

12   "Q.  And they didn't tell you anything at all even remotely

13   about the benefit formula that we're using to convert is going

14   to mean for basically everybody they're not going to earn

15   anything for years?

16             "MS. DePIETTO:  Objection, form.

17   "A.  No, that was not pointed out.")

18   BY MR. GOTTESDIENER:

19   Q.  You gave that testimony didn't you?

20   A.  Yes.

21   Q.  Wasn't it true when you gave it?

22   A.  I didn't remember at the time.

23   Q.  Isn't that something pretty dramatic that you would have

24   remembered had this been pointed out to you?

25   A.  I came in to the deposition not really understanding the

F7lnosb1                        Ine – cross

1    types of questions I would be asked.

2    Q.  You came into the deposition after four years of

3    preparation with your lawyers from Foot Locker, correct?

4    A.  Yes.

5              THE COURT:  Let me just ask.  So your testimony today

6    is that you knew that there would be a period of time when

7    employees would not be earning or at least some employees would

8    not be earning additional retirement benefits?

9              THE WITNESS:  Beyond 12/30/95, correct.  But I thought

10   it was just a few years.

11             THE COURT:  Who, if you can recall, provided you with

12   that information?

13             THE WITNESS:  Tom Kiley.

14             THE COURT:  Do you recall approximately when?  Was it

15   shortly after the plan was announced or some later time or some

16   earlier time?

17             THE WITNESS:  It was when we had a group meeting in

18   '95 to discuss the plan.

19             THE COURT:  All right.

20             OK.  You may proceed.

21             MR. GOTTESDIENER:  I would like to play the clip at

22   203, starting at line 13:

23             (The following was played:

24   "Q.  You seem like a very honest person.  If you knew this was

25   going on, would you have disclosed it to people?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F7lnosb1                         Ine - cross

1    "A.  I certainly would have had a discussion with New York as

2    to why it was going on.

3    "Q.  And New York did not tell you that this was going on, did

4    they?

5    "A.  No, no.")

6    BY MR. GOTTESDIENER:

7    Q.  Were you confused at that moment in the deposition?

8    A.  Based on the questions being asked and my recollection at

9    that time I guess I was.

10   Q.  You had 30 days to make changes to your deposition.  You

11   didn't avail yourself of that opportunity, correct?

12   A.  Correct.

13            MR. GOTTESDIENER:  I would like to play 208, line 12.

14            THE COURT:  You have to, before you play it --

15            MR. GOTTESDIENER:  It's the same.  She's saying that

16   she was --

17            THE COURT:  I know.  But I'm saying you have already

18   impeached her with one.  Ask her another question and see

19   whether or not she is going to contradict the testimony before

20   you just play things.

21            MR. GOTTESDIENER:  Sure.

22   BY MR. GOTTESDIENER:

23   Q.  Because in fact you did not have any idea that people's

24   benefits were being frozen, you were not able to ask New York

25   pointed questions like, why didn't you just openly freeze the

F7lnosb1                    Ine - cross

1    pension plan so people would know and perhaps start

2    contributing more to their 401(k) plans, correct?

3              MR. RUMELD:  Objection.

4              THE COURT:  Sustained.  Don't answer it.

5    Q.  If you knew --

6              THE COURT:  Don't do the "if."  Do it differently.

7    You know that.

8              MR. GOTTESDIENER:  Actually, I don't, your Honor, so

9    my confusion is genuine.

10             THE COURT:  I think that that question, if you're

11   reading a question, may have been objectionable in form at the

12   deposition, if that's what you are going back to.

13             MR. GOTTESDIENER:  No.

14             THE COURT:  Go ahead and just pose a question.

15   BY MR. GOTTESDIENER:

16   Q.  What do you think people would have done if they found out

17   that what the company was doing --

18             THE COURT:  You need to word it differently.  You

19   can't word it in terms of this hypothetical.

20             Based upon your experience and knowledge as to

21   reactions that the participant would have to information that

22   you provided, do you think that the lack of additional growth

23   in their accrued balance was important to disclose?

24             THE WITNESS:  Of the cash balance?

25             THE COURT:  Of the accrued balance.

F7lnosb1                        Ine - cross

1            THE WITNESS:  Well, they knew the 12/30/95 was a

2     frozen annuity as far as the cash balance.  The basic thing the

3     employees knew, the participants knew was that they would get

4     the higher of the two, that they would not get less than what

5     they had under the old plan.

6            THE COURT:  All right.  You may proceed.

7     BY MR. GOTTESDIENER:

8     Q.  You just told us earlier, though, that what participants

9     knew was, in terms of their lump sum, they were adding to their

10    lump sum as they continued to work after '96, right?

11    A.  Correct.

12    Q.  So are you saying that there was a difference you think in

13    your mind maybe that the annuity was frozen, but the lump sum

14    continued to grow?

15    A.  The lump sum varied.

16    Q.  In your mind?

17    A.  From year to year.

18    Q.  I'm sorry?

19    A.  The lump sum would vary depending on the interest rates.

20    Q.  But in terms of getting value, added value in exchange for

21    service to the company, you thought that it was growing,

22    correct?

23    A.  The account balance was growing.

24    Q.  I'm sorry.  Not the account balance, the lump sum that

25    somebody would get, the lump sum form of payment was growing in

F7lnosb1                          Ine - cross

1    exchange for work for the company?

2    A.  I could see where a participant would think that.

3    Q.  And you were one of the participants who did think that,

4    correct?

5    A.  I may have said that in the deposition, but I knew that it

6    wasn't growing.

7    Q.  But you thought your own lump sum was growing for three

8    years, didn't you, ma'am?

9              MR. RUMELD:  Objection, your Honor.

10             THE COURT:  Overruled.

11   A.  I didn't really -- I didn't think that.  I knew that in the

12   long run because I was leaving so early in the plan that I

13   would get a lump sum based on '95.

14   Q.  I'm sorry.  You are there --

15             THE COURT:  Hold on.  I really am going to ask you not

16   to do the facial expressions and the --

17             MR. GOTTESDIENER:  Your Honor, this is

18   cross-examination, and I'm genuinely confused.

19             THE COURT:  Hold on.

20             You have my instruction.

21             MR. GOTTESDIENER:  I am trying --

22             THE COURT:  I know.  But I am going to say it's

23   really --

24             MR. GOTTESDIENER:  I really am trying to follow them.

25             THE COURT:  I understand.

F7lnosb1                        Ine - cross

 1              MR. GOTTESDIENER:  I promise you.

 2              THE COURT:  I understand.  So we will just proceed

 3      from here.

 4              MR. GOTTESDIENER:  OK.

 5              THE COURT:  OK.

 6      BY MR. GOTTESDIENER:

 7      Q.  So you are working -- you don't know in '96 that you are

 8      going to leave in '99, right?

 9      A.  That's true.

10      Q.  So your last answer was about knowledge that you had in

11      '99, correct?

12      A.  That's true.

13      Q.  I'm asking you, in '96, and '97 and '98, you did not

14      know -- you saw the clip, you did not know that you were a

15      victim of this freeze.  You thought your benefit was growing

16      during that time, didn't you?

17              MR. RUMELD:  Objection.

18              THE COURT:  Overruled.

19      A.  I guess I didn't think of it as a freeze.

20      Q.  You thought --

21      A.  But you're correct.  I did not earn anything for the years.

22      Q.  I'm sorry.  I am not right now asking you about that fact.

23      That is not a disputed fact.  I'm asking, in your mind, you

24      thought you were getting new lump sum benefit growth in

25      exchange for continued service for the company in '96 and '97.

F7lnosb1                          Ine - cross

1    That's how you were thinking, right?

2              MR. RUMELD:  Objection.

3              THE COURT:  Overruled.

4    A.  I think -- I didn't think of it that way, as the minimum

5    lump sum.  I only thought of things in terms of an annuity or a

6    cash balance account.

7    Q.  You thought the 9 percent was a good thing for you and

8    others, didn't you?

9    A.  Without any other information available at that time, I

10   did.

11   Q.  Outside of the New York office, you probably had more

12   information available to you than any participant in the

13   country, correct?

14   A.  Probably.

15   Q.  Not only was it your understanding that the use of 9

16   percent was a good thing for you, you made sure that the

17   employees under you explained the 9 percent to people as a good

18   thing for them, correct?

19   A.  I don't know if they said it was a good thing, but I do

20   know they explained the 9 percent.

21   Q.  As a good thing?

22   A.  I don't remember.

23             MR. GOTTESDIENER:  Transcript page 156, line 12:

24   "Q.  And your understanding was the use of the 9 percent was a

25   good thing for participants?

F7lnosb1                    Ine - cross

1    "A.  Yes.

2    "Q.  And that's how you understood they -- meaning the

3    participants -- understood it?

4    "A.  Yes.

5    "Q.  And that's how the Ducks explained it to people?

6    "A.  Yes."

7    A.  That's what I said.

8    Q.  And that's true?

9    A.  That's what I thought at the time, yes.

10   Q.  And you were responsible for what the Ducks said to people,

11   correct?

12   A.  Correct.

13          THE COURT:  What did you think the 9 percent referred

14   to in connection with the retirement benefit participants would

15   be eligible for?

16          THE WITNESS:  I understood the 9 percent was a

17   conversion of the annuity to a present value based on what was

18   needed for people, to earn a rate of 9 percent on that account

19   until age 65 to get what they would have gotten as an annuity

20   from 12/30/95.  So it was just a conversion of one thing in the

21   future --

22          THE COURT:  Why did you think 9 percent would have

23   been a good thing versus a lower discount rate?

24          THE WITNESS:  At that time, I didn't understand that a

25   lower discount rate would be better.

F7lnosb1                        Ine – cross

1          THE COURT:  All right.  You may proceed.

2     Q.  You didn't even understand it was a discount rate, the 9

3     percent, right?

4               THE COURT:  At the time?

5               MR. GOTTESDIENER:  Yes.

6     BY MR. GOTTESDIENER:

7     Q.  At the time you thought it of as a factor?

8     A.  I didn't think of it as that, no.  It was always just a

9     present value.

10    Q.  And it was a factor?

11    A.  Correct.

12    Q.  What you thought was, well, they had a 9 percent factor and

13    it used mortality tables, so it really took a look at your age

14    and it projected out what your expected accrued benefit would

15    be at your normal retirement date and then it brought it back

16    in a present value using one of the mortality tables to say

17    this is the amount of money that you would get to receive, what

18    we project at the 9 percent, correct?

19    A.  Correct.

20    Q.  You further understood that amount of money was if you

21    invested, we assume the company assumes that you would get the

22    same amount of money on your own using that lump sum value?

23    A.  Correct.

24    Q.  If you actually knew at the time that the effect of this

25    was very different and it had an impact of freezing benefits

F7lnosb1                      Ine - cross

1   for a time, you would have asked New York, why didn't you just

2   freeze the plan openly, stop it like many companies did and

3   tell people you're frozen, you can cash out or leave it until

4   your retirement age and then just do the 401(k), why do

5   anything else?

6           MR. RUMELD:  Objection.

7   Q.  That is what you would have said or asked to New York had

8   you known at the time the true impact of a conversion, correct?

9           MR. RUMELD:  Objection.

10          THE COURT:  Sustained.

11          You've got too many pieces embedded in that question.

12          MR. GOTTESDIENER:  What I'm trying to do, I'm sorry,

13  is track an answer that she gave.

14          THE COURT:  I understand.  But if your question at the

15  deposition was ill formed, I can't fix it now for you.  If you

16  can, break it down and then combine it.

17  BY MR. GOTTESDIENER:

18  Q.  You would have questioned New York had you known the true

19  impact of the conversion, correct?

20          MR. RUMELD:  Objection.

21          THE COURT:  Overruled.

22  A.  Yes.  I would have called and asked.

23  Q.  And --

24          THE COURT:  Hold on one second.  Let me just say that

25  there's case law on if questions with witnesses who have

F7lnosb1                          Ine – cross

1    extensive experience in factual areas and I looked at that

2    recently.  So that is the basis for my ruling, which may come

3    up again with this particular witness.

4              You may proceed.

5    BY MR. GOTTESDIENER:

6    Q.  You would have asked them why not just openly tell people

7    the pension is frozen and for your retirement you need to use

8    the 401(k)?

9    A.  I don't know if I would have asked that particular

10   question.  I would have basically asked why didn't they use a

11   lower interest rate.

12   Q.  Based on your frequent interactions with New York at the

13   time -- withdrawn.  You did have frequent interactions with the

14   folks in the New York office?

15   A.  Correct.

16   Q.  In particular, Mr. Kiley and Ms. Kanowicz?

17   A.  Correct.  And Marion Derham more than Carol Kanowicz.

18   Q.  But Kiley more than Marion Derham?

19   A.  Correct.

20   Q.  Based on your interactions with them, don't you conclude

21   that they intentionally failed to inform you that the whole

22   population was going to have their benefits frozen effectively

23   for several years?

24             MR. RUMELD:  Objection.

25             THE COURT:  Hold on one second.

F7lnosb1                          Ine - cross

1                 Let me just read this.  If you are asking about what

2        she's concluding today, then I sustain the objection.

3                 If you are asking something else, then you can

4        rephrase.

5        BY MR. GOTTESDIENER:

6        Q.  When I informed you of this in 2012, you concluded that

7        they intentionally failed to inform you of this, correct?

8        A.  I said that in the deposition?

9        Q.  That's my question to you.

10       A.  I don't believe they did things intentionally.  I mean,

11       they told me what they could based on the questions I asked.

12       They never withheld information to my knowledge.

13       Q.  They certainly didn't tell you that there was essentially a

14       companywide benefit freeze for a period of years, right?

15                 MR. RUMELD:  Objection.

16                 THE COURT:  I think we have been over this.

17                 MR. GOTTESDIENER:  I agree, your Honor.

18                 THE COURT:  Do you want to ask the question, or are

19       you going to ask a different question?

20                 Let me sustain the objection.  You can go on.

21       BY MR. GOTTESDIENER:

22       Q.  You yourself equated account growth with lump sump growth,

23       correct?

24       A.  At the time.

25       Q.  At the time.

F7lnosb1                          Ine - redirect

1   A.  At the time I probably would have.

2          MR. GOTTESDIENER:  No further questions.

3          THE COURT:  All right.  Thank you.  Mr. Rumeld.

4          MR. RUMELD:  Is it all right if I just move this back

5   so I am a little closer to Mr. Clark?

6          THE COURT:  Yes.

7          MR. RUMELD:  Thank you, your Honor.

8   REDIRECT EXAMINATION

9   BY MR. RUMELD:

10  Q.  Ms. Ine, you left Foot Locker or Woolworth in 1999?

11  A.  Correct.

12  Q.  Since then, what have you been doing?

13  A.  After that I went to a new employer and retired from them

14  in 2009.

15  Q.  What did you do for that new employer?

16  A.  I was their benefits manager.

17  Q.  And what specifically did you do as a benefits manager?

18         THE COURT:  For the new employer?

19         MR. RUMELD:  Yes.

20  A.  I'm sorry.  What was the --

21  Q.  As a benefits manager, what were your responsibilities?

22  A.  I had similar functions as I did when I was with Woolworth,

23  except that I didn't have to deal with stock purchase.  I

24  didn't have a pension plan.  We only had a 401(k) plan.

25  Q.  Since leaving Foot Locker, have you had any

F7lnosb1                          Ine - redirect

1    responsibilities in connection with cash balance plans?

2    A.   No.

3    Q.   In any context?

4    A.   No.

5    Q.   Now, when you left Foot Locker, you elected the lump sum

6    option, is that right?

7    A.   Correct.

8    Q.   How did you feel about your pension benefits at the time?

9    A.   At the time, I was happy to get what I did in a lump sum

10   since it's something that I wouldn't have had available to me,

11   as I wasn't of retirement age at the time I left.

12   Q.   Were you aware at the time you took these benefits that you

13   had not accrued any new benefits since the end of 1995?

14   A.   Yes.

15   Q.   Did that come as a surprise to you when you left?

16   A.   No.

17   Q.   Why is that?

18   A.   Because I did see what was -- I was able to determine my

19   lump sum value before I left, so I knew that I hadn't accrued

20   enough under the cash balance to match what I would have gotten

21   under the 12/30/95 frozen accrued benefit.

22   Q.   At the time you were being deposed by Mr. Gottesdiener a

23   couple of years ago, did you understand that then as well?

24   A.   Yes.

25   Q.   In fact, you also testified in between the questions that

F7lnosb1                              Ine - redirect

1    Mr. Gottesdiener showed you before, "I saw what was happening

2    in my particular case.  I could see that I was going to get

3    what I had in the accrued benefit at the point that I made the

4    decision I was going to leave.

5           Do you remember giving that testimony?

6    A.  Yes.

7    Q.  What did you mean by that?

8    A.  I mean that I calculated it myself to determine what

9    benefit would be available.

10   Q.  Right.  When you said that I was going to get what I had in

11   the accrued benefit, what did you mean by that?

12   A.  The 12/30/95 frozen benefit.

13   Q.  Right.  So in your mind accrued benefit meant the benefit

14   accrued under the prior plan?

15          MR. GOTTESDIENER:  Objection.

16          THE COURT:  Overruled.

17   A.  Can you restate that?

18   Q.  When you referred to the accrued benefit, what were you

19   referring to?

20   A.  12/30/95.

21   Q.  OK.  Thank you.

22          THE COURT:  Let me ask.  You referred in a couple of

23   answers to when you calculated your benefit you understood.

24          THE WITNESS:  Yes.

25          THE COURT:  Prior to the time that you calculated your

F7lnosb1                          Ine - redirect

1    benefit, did you understand that your accrued benefit under the

2    old plan would not be increasing with time?

3              THE WITNESS:  Well, the 12/30/95 was a frozen benefit.

4    In order to come up with an amount of an annuity in the new

5    plan, at the time that you were going to get a benefit, they

6    would take the cash balance and apply factors to turn it into

7    an accrual, and the higher of the two accruals between the cash

8    balance and the frozen amount for 12/30/95, the higher one was

9    selected for calculating the minimum lump sum.

10             THE COURT:  I understand that point.  I just want to

11   see whether or not you meant anything in particular when you

12   tied your prior testimony to the statement "when I calculated."

13             So I'm trying to figure out, is there a distinction in

14   your mind between what you understood at the time you

15   calculated your own benefit, or did you have that same

16   understanding prior to any calculations you may have performed

17   for yourself?

18             THE WITNESS:  I expected, based on the comment from

19   Tom Kiley, that it would take a few years, that my short time

20   in the cash balance plan would not result in a minimum lump sum

21   from the cash balance account.

22             THE COURT:  All right.  You may proceed.

23             (Continued on next page)

24

25

F7LJOSB2                          Ine - redirect

 1   Q.  Ms. Ine, back in 1999, did you feel there was anything

 2   unique about your experience relative to the other

 3   participants?

 4   A.  No.

 5   Q.  So back in '99, was it your understanding that there may

 6   have been other participants who would get a benefit based on

 7   the pre-'96 accrual?

 8   A.  Yes.

 9   Q.  What about before 1999, was it your expectation before '99

10   as well that that would be the case?

11   A.  Yes.

12   Q.  I want to show you what has not been previously identified

13   as Defendant's Exhibit 149.

14             MR. RUMELD:  May I approach, your Honor?

15             THE COURT:  You may.

16             (Pause)

17   BY MR. RUMELD:

18   Q.  Now, you testified a little earlier about attending a

19   meeting with Mr. Grefig where you received an explanation of

20   how the cash balance plan worked?

21   A.  Yes, yes.

22   Q.  From reviewing these notes, are you able to tell whether

23   these are notes of that meeting?

24   A.  Yes, they are familiar to me.

25   Q.  In what way are they familiar?

F7LJOSB2                          Ine - redirect

1   A.  I remember these handwritten notes.  They were provided at

2   the meeting -- right after the meeting, I should say.

3   Q.  Were these notes actually given to you?

4   A.  Yes.

5   Q.  You see the people referred to at the top there?

6   A.  Yes.

7   Q.  Do you remember attending a meeting with those folks?

8   A.  Yes.

9           THE COURT:  Is this also a PX that we have used

10  before?

11          MR. GOTTESDIENER:  Yes, your Honor, it is.  It is 126.

12          THE COURT:  Thank you.  All right.

13  BY MR. RUMELD:

14  Q.  Do you remember, for example, looking at the bottom

15  bulleted point on the first point, being told beginning 1-1-96

16  we will use the GATT interest rate for 30-year Treasury bills

17  in effect on 12-31 or for each year for determining the minimum

18  lump sum for the subsequent year?

19  A.  Yes.

20  Q.  That is what was told you back at the time?

21  A.  Yes.

22  Q.  If you look at the next page, there is a reference to

23  calculation of minimum lump sum.  Do you see that?

24  A.  Yes.

25  Q.  And then in Item 2, it specifically refers to the 12-31-95

F7LJOSB2                          Ine - redirect

1    accrued benefit.  Do you see that?

2    A.  Yes.

3    Q.  And then there is kind of a formula for how to go about

4    doing that, right?

5    A.  Correct.

6    Q.  So is it your recollection, then, that at this meeting, at

7    this first meeting that you attended, you received an

8    explanation about the need to compare the account balance to a

9    minimum lump sum that was calculated based on the pre-'96

10   accrued benefit?

11   A.  Yes.

12   Q.  Now, you had a team of people that you worked with --

13   A.  Yes.

14   Q.  -- in Wisconsin.  What were their responsibilities?

15   A.  There were two teams involved.  One of the teams was

16   responsible for taking all the incoming phone calls and they

17   would answer questions that were more general.  Anything that

18   was beyond generalities, they would pass to the second team

19   that was exclusively responsible for calculating pension

20   benefits.

21   Q.  So the second team that was responsible for calculating

22   pension benefits, how did they know how to do that?

23   A.  They received instructions from New York, prepared

24   instructions on calculations.  We had information in the

25   beginning and then as questions arose, we would have to go back

F7LJOSB2                         Ine - redirect

1    to New York to ask for further explanations on how to perform

2    calculations based on a question we received from a

3    participant.

4    Q.  Was it your understanding that the people responsible for

5    doing these calculations understood how you use the greater or

6    both analysis?

7    A.  Yes.

8    Q.  There was no way you could get to somebody's benefits if

9    they performed that calculation?

10            MR. GOTTESDIENER:  Objection.

11   A.  Correct.

12            THE COURT:  Let me ask, because I want to see whether

13   there is a distinction between participants who may have asked

14   generally without giving a termination date, or indicating any

15   plans to terminate, that they wanted to understand what their

16   retirement benefit was worth and whether or not the efforts

17   undertaken with respect to that group was different from those

18   individuals who indicated an actual plan to terminate and

19   perhaps even give a date.  That is sort of the point of my

20   question.

21            Let me ask a discrete couple of questions to try to

22   get at that point, which is do you know whether there was a

23   practice for the individuals who worked for you to give both

24   the calculation for a participant relating to their cash

25   account balance as well as a calculation related to their

F7LJOSB2                        Ine - redirect

1    accrued minimum lump sum as of 12-31-95 when any participant

2    asked for the value of their retirement benefit?  Do you

3    understand the question?

4              THE WITNESS:  Yes, I do.  In the beginning we limited,

5    because we did not have automation, we limited the questions to

6    only people who were of retirement age.

7              As the system went into production, then we could

8    handle questions when these persons were going to retire or

9    terminate or for whatever reasons wanted to have an estimate.

10             THE COURT:  Let's just take the people who just for

11   whatever reason wanted to have an estimate and they're not

12   retiring or is indicating they're retiring and not indicating

13   they're terminating.  That is the group, all right?

14             THE WITNESS:  All right.

15             THE COURT:  Do you know whether or not the individuals

16   who were working for you would calculate both the accrued lump

17   sum and the cash account balance and give the participants

18   both?  Do you know whether or not they did that?

19             THE WITNESS:  They would calculate both, but they

20   didn't necessarily give the fact that they determined two

21   different annuities to come up with what the minimum lump sum

22   would be.  The estimate would go out and they would say the

23   accrued benefit amount and what the minimum lump sum was.

24             If somebody came back and said they wanted to know

25   exactly how this was done, then we would do a correspondence

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F7LJOSB2                          Ine - redirect

 1   with them that showed specifically how all these calculations

 2   took place, and that the higher of the two accruals was used to

 3   calculate the minimum lump sum.

 4           THE COURT:  All right.  Thank you.

 5   BY MR. RUMELD:

 6   Q.  Let me just follow up on this in a couple of ways.

 7           There were a lot of calls that came into Wisconsin, is

 8   that right?  You talked about that?

 9   A.  Yes, in the beginning, yes.

10   Q.  In your experience, were the majority of people who called

11   or asked questions in any form, in your experience, were they

12   people who were nearing their termination date or just people

13   who were working?

14   A.  I think that there were more people in general.  They

15   weren't going to necessarily retire.  They just had questions

16   about the numbers that -- well, I shouldn't say that because

17   they got a pension statement.  In the beginning the calls were

18   just related to understanding of the plan.

19           Later when statements went out, we got more specific

20   questions from people as to how the numbers were calculated,

21   and they were compared with other employees and would get

22   questions arising from those comparisons.

23   Q.  If I put aside the few weeks after the cash balance plan

24   went into effect, in your experience, did participants pay much

25   attention to their benefits before they were leaving?

F7LJOSB2                      Ine - redirect

1    A.  In the old plan, they really, they capped statements, but

2    they really didn't pay attention.  They received a number of

3    what the accrued benefit was, but they didn't really ask

4    questions until they actually terminated.

5         In the cash balance account, it was I think people

6    were -- because they obtained money immediately, they would ask

7    more questions immediately as they saw numbers come through on

8    estimates.

9    Q.  If they could take money immediately if they were leaving?

10   A.  Yes, or retiring, yes.

11   Q.  Is that when they would ask the questions, if they were

12   thinking about leaving or retiring?

13   A.  In the cash balance account, they might have asked -- they

14   would have probably asked more questions when they -- they did

15   ask more questions when they saw a pension statement,

16   especially because they would see it then, so they could see

17   the prior year's pension statement and compare it with the

18   current year.

19        MR. RUMELD:  I want to show you Defendant's Exhibit

20   108.  May I approach?

21        THE COURT:  Yes.

22        MR. HUANG:  PX 163.

23        THE COURT:  All right.

24   BY MR. RUMELD:

25   Q.  I think for the purposes of my questions, you only need to

F7LJOSB2                          Ine - redirect

1    look at the first half of that first page.

2    A.  (Pause)

3    Q.  Okay?

4    A.  Yes.

5    Q.  Does this e-mail look familiar to you?

6    A.  I don't remember it.

7    Q.  Is there any reason to think that you didn't send this note

8    out in April of 1996?

9    A.  No.

10   Q.  Who were the people to whom the e-mail was addressed?

11   A.  It's all of the people in the team that calculates pension

12   benefits and the manager and supervisor of the department.

13   Q.  Who would that be?

14   A.  Ann Wade and Jen Valenti.  Ann was the manager, Ann Wade

15   was the supervisor, and Sue Willis was the manager of health

16   and welfare benefits, but she did some assisting with pension

17   when we were -- at this point we were backed up because we

18   didn't have a system.

19   Q.  If you will read with me, do you see the paragraph that

20   begins you will need to complete the lump sum worksheet?

21   A.  Yes.

22   Q.  What was the lump sum worksheet?

23   A.  It was a form that had been created that would help the

24   staff who actually did the calculations go through the various

25   steps that they needed to take in order to come up with the

1    accrued benefit to use when calculating the lump sum amount.

2    Q.  If you look a couple of sentences later, it says the figure

3    on the Mercer report for the minimum lump sum is as of 1-1-96.

4    Do you see that?

5    A.  Yes.

6    Q.  Why is that the case?

7    A.  In the beginning, Mercer gave us a report of all of the

8    cash balance calculations, so we would have to go to the Mercer

9    books to find the 1-96 for the individual.

10   Q.  And, generally speaking, how did the 1-1-96 minimum lump

11   sum compare to the amount of the cash balance account at that

12   time?

13   A.  At this time they were paying based on the old plan.

14   Q.  Why was that the case?

15   A.  Because the minimum -- the annuity of the old plan was

16   higher than the annuity that was calculated for the cash

17   balance account.

18   Q.  If the annuity is higher under the old plan, what does that

19   mean for the minimum lump sum?

20   A.  It means that the minimum lump sum would be calculated on

21   the higher of the two because the old plan would be calculated

22   on the old plan accrual.

23   Q.  Do you have any reason to believe that the people you were

24   communicating with here did not understand that?

25   A.  No.

F7LJOSB2                    Ine - redirect

1  Q.  Do you have any reason to believe that if participants

2  asked about how their benefits were being calculated, this

3  wouldn't have been explained to them?

4  A.  No.

5  Q.  If you look a little further, it says in the second

6  paragraph, if you find that the cash balance is greater than

7  the MLS, or minimum lump sum, you will have to let me know.  We

8  will need to do something different and NY0 -- I take it that

9  is the New York office -- has not prepared a worksheet yet for

10 that scenario.

11       Do you see that?

12 A.  Yes.

13 Q.  How was it that there wasn't a worksheet available at this

14 time for the purposes of calculating if the benefit of the cash

15 balance account was bigger than the minimum lump sum?

16 A.  I think since this is April of '96, most of the

17 calculations would be made from the old accrual since it was

18 higher than the cash balance accrual.

19 Q.  Everyone in your group understood at this time that by

20 virtue of the way the calculations worked, a participant was

21 going to get a benefit based on the pre-'96 benefit rather than

22 the amount of the cash balance account?

23       MR. GOTTESDIENER:  Objection.

24 A.  Correct.

25       THE COURT:  Sustained.  The answer is struck.  Why

F7LJOSB2                     Ine - redirect

1    don't you go, if you want to -- you shouldn't probably lead as

2    much.

3              MR. RUMELD:  I'll work on it.

4              THE COURT:  All right.

5    BY MR. RUMELD:

6    Q.  What was your understanding at this time as to the

7    likelihood that a participant leaving in the first few months

8    of '96 would receive a benefit based on the pre-'96 accrual?

9    A.  My understanding was that most people probably would get

10   the minimum lump sum based on the old plan accrued.

11   Q.  What was your understanding as to what your staff

12   understood?

13   A.  They understood the same thing.

14   Q.  What was your understanding at the time about how long that

15   would continue that participants would more likely receive a

16   benefit based on the minimum lump sum?

17   A.  Based on the conversation that I had with Tom Kiley, with

18   it being a few years, and I thought perhaps three years.

19   Q.  Perhaps three years?

20              And what about your staff, do you think they

21   understood that as well?

22   A.  I don't think I ever told them how long it might last.

23   Q.  So they just knew how to do the calculation?

24   A.  Right.

25   Q.  Now, did you understand at the time the relationship

F7LJOSB2                          Ine - redirect

1   between getting paid the minimum lump sum benefit based on the

2   prior accrual and whether accrued benefits were being earned

3   under the new plan?

4           MR. GOTTESDIENER:  Objection.

5   A.  Can you say that in a different way.

6   BY MR. RUMELD:

7   Q.  Did you have an understanding as to whether a participant

8   who received a benefit based on the pre-'96 accruals had

9   accrued any new benefits under the new plan?

10  A.  I am sorry.  Did the team?

11  Q.  I am asking what you understood.

12  A.  Oh, I would have expected that the majority would have gone

13  with the old plan accrual.

14  Q.  My question is, what does that mean in terms of whether a

15  participant accrues any new benefits under the new plan?

16  A.  It means that the amount of the cash balance, when it

17  converted to an annuity, was less than the old plan.

18  Q.  Okay.  At the time did you think of this as a frozen

19  benefit?

20  A.  The only frozen benefit that I ever thought of was the

21  12-30-95 frozen benefit.

22  Q.  Is the answer to my question no, that the fact that a

23  participant was receiving a minimum lump sum based on the prior

24  benefit did not translate into your mind as a plan freeze?

25  A.  Not, not at that point, no.

F7LJOSB2                          Ine - redirect

1   Q.  It was only when you were being deposed, that was the first

2   time you started to think about it that way?

3           MR. GOTTESDIENER:  Objection.

4           THE COURT:  Overruled.

5   BY MR. RUMELD:

6   Q.  Before your deposition, had you ever thought about this

7   greater of both calculations as being synonymous with a plan

8   freeze?

9   A.  I never thought that.

10  Q.  Before your deposition, did you ever think about the

11  greater of both calculations being synonymous with a

12  participant accumulating credits that didn't count?

13  A.  At the time I didn't think that.

14  Q.  At any time before your deposition?

15  A.  I know what I said during the deposition, but as I

16  indicated, I really didn't think that.

17          MR. RUMELD:  Let's look at exhibit, Defendant's

18  Exhibit 95.  May I approach?

19          THE COURT:  Yes.

20  BY MR. RUMELD:

21  Q.  Do you recognize this type of document?

22  A.  Yes, I do.

23  Q.  Would you tell the court what it is.

24  A.  This is what a participant would receive when they asked

25  for an estimated, an estimate of their benefits.

F7LJOSB2                         Ine - redirect

1   Q.  What about a participant who was planning to leave

2   employment?

3   A.  The same.

4   Q.  He or she would also receive a form like this?

5   A.  Yes, yes.

6   Q.  This particular form says it was prepared by Marion Derham.

7   Do you see that?

8   A.  Yes.

9   Q.  Do you know whether estimates like these were prepared by

10  people in your group in Wisconsin?

11  A.  Wisconsin did them, too.

12  Q.  Would you say there were a lot of these prepared?

13  A.  Yes.

14  Q.  Because, in fact, a lot of participants were leaving

15  between 1996 and 1999?

16  A.  Correct, correct.

17  Q.  Now, you see that towards the top there is a benefit

18  payment date, January 1st, 2000?

19  A.  Yes.

20  Q.  What does that date correspond to?

21  A.  That is the date that the benefit will go into effect.  So

22  all of the calculations, looking at years and person's age, et

23  cetera, are based off of January 1, 2000.

24  Q.  And the next line, the estimated annual accrued benefit as

25  of benefit payment date, what is that?

F7LJOSB2                        Ine - redirect

1    A.   That is the higher of the calculation of the cash balance

2    annuity versus the old plan annuity.

3    Q.   By the "cash balance annuity," what do you mean by that?

4    A.   It would take the cash balance which was a present value

5    and apply factors to turn it into an accrual, and it would come

6    back with an accrual number that was calculated based on the

7    cash balance at the time.

8    Q.   So this figure here would be whichever of those two

9    annuities was greater?

10   A.   Yes.

11   Q.   If the greater annuity was the pre-'96 annuity, how would

12   it compare to the 12-31-95 annuity reflected on the statement a

13   participant received in 1996?

14   A.   I am sorry.  Prepared when?

15   Q.   Do you remember in 1996 there were benefit statements that

16   went out to all the participants?

17   A.   Yes.

18   Q.   Did those statements include the accrued benefit through

19   the end of 1995?

20   A.   Yes.

21   Q.   So how would that figure for the accrued benefit through

22   the end of '95 compare to this figure if the 1995 accrued

23   benefit was greater than the cash balance accrued benefit?

24   A.   It was greater, it would show the 12-30-95 value.

25   Q.   So it would be the same amount as in the prior statement?

F7LJOSB2                         Ine - redirect

 1   A.  Correct.

 2   Q.  Now, if you look in the middle of the page there is a

 3   paragraph that begins the lump-sum payment, do you see that?

 4   A.  Yes.

 5   Q.  I'll just read that and then ask you for your understanding

 6   of that.

 7        "The lump-sum payment indicated above represents the

 8   greater of your account balance or a minimum lump sum.  The

 9   minimum lump sum is determined by multiplying your annual

10   accrued benefit by a factor that is based on the mortality

11   table and interest rate in effect on your benefit payment

12   date."

13        Do you see that?

14   A.  Yes.

15   Q.  Could you explain to me the second sentence?  How is that

16   calculation performed?

17   A.  Well, first of all, what it is talking about here is the

18   annual accrued benefit.  It doesn't indicate whether it is

19   talking about -- that there are two.

20        What this is saying, what is really happening is we're

21   calculating the cash balance accrual by using factors to bring

22   it to the value, equal -- not equal in value, but apples and

23   apples, both looking at annuities which is then whichever is

24   higher is the one that will be used to calculate the minimum

25   lump sum.

F7LJOSB2                        Ine - redirect

1  Q.  The annual accrued benefit referred to in this sentence,

2  how does it compare to the estimated annual accrued benefit on

3  the top of the page?

4  A.  Well, it is basically the same thing as what is on the top

5  of the page.  It is only talking about that particular accrued

6  benefit.

7  Q.  So the minimum lump sum is calculated off of that figure at

8  the top of the page?

9  A.  Yes.

10  Q.  The figure at the top of the page is the greater of the two

11  accrued benefits?

12  A.  Yes.

13          THE COURT:  And the factor based on the mortality

14  table and interest rate, where is that on this page?

15          Is that the GATT factor or is that something else that

16  is not reflected here?

17          THE WITNESS:  It is the factor that we need to use

18  based on the T-Bills, but I don't believe it is on this

19  worksheet.

20          THE COURT:  So the minimum lump sum interest rate,

21  that is 5.06 reflected there?

22          THE WITNESS:  I don't see it, no.

23          THE COURT:  It is actually underneath the -- if you

24  follow down at the top of the page it has benefit payment date

25  and the fourth line down --

F7LJOSB2                          Ine - redirect

1          THE WITNESS:  You're right, yes, that would have been

2     the rate that was used to come up with with the minimum lump

3     sum value.

4          THE COURT:  You may proceed.

5          MR. RUMELD:  Thank your Honor.

6     BY MR. RUMELD:

7     Q.  Could you look at Defendant's Exhibit 122 which is attached

8     to your declaration.

9          MR. RUMELD:  I believe it is also Plaintiff's Exhibit

10    930 and 931.

11         THE COURT:  Let me see if it is in here.  If it is in

12    here, then I will use this one.  It is not, so I'll take it

13    from you.

14         (Pause)

15         THE COURT:  DX-122 is PX-930?

16         MR. RUMELD:  I think it is a combination of 930 and

17    931.

18         THE COURT:  All right.  Thank you.

19    BY MR. RUMELD:

20    Q.  Now, there are several e-mails here, Ms. Ine, and I

21    apologize for the copy, but that is the best we can do.

22         You appear to be copied on several of these e-mails.

23    Could you look at the one all the way at the bottom which is

24    from Marion Derham.  It says during a conference call Carol and

25    I had with Don on May 2, 1997.  Who was Don?

F7LJOSB2                      Ine - redirect

1   A.  Don was the benefits manager at that time.

2   Q.  At that time?  He came in a little later?

3   A.  Yes.

4   Q.  And he was in your group?

5   A.  He was in the Milwaukee office.

6   Q.  What was his last name?

7   A.  Kappel.

8   Q.  "During the conference call, Carol and I had with Don on

9   May 2, 1997, Don indicated that HROC was getting inquiries from

10  participants requesting an explanation as to how their benefit

11  was calculated.  If I remember correctly, Don mentioned two

12  specific types of questions.  Why is my accrued benefit the

13  same as it was on my last estimate statement?  Why is the lump

14  sum on the current estimate lower than the lump sum on my

15  estimate I received last year?"

16          Do you see that?

17  A.  Yes.

18  Q.  Are you able to answer those two questions?

19  A.  Yes.

20  Q.  So go ahead, one at a time.

21  A.  Why is my accrued benefit the same as it was on the last

22  statement?

23          That is saying it is using the 12-30-95 accrued

24  benefit in the calculation instead of the cash balance accrued

25  benefit.

F7LJOSB2                         Ine - redirect

1          Why is the lump sum lower than the lump sum on the

2    estimate that they got last year?

3          And that is because the interest rate went up on the

4    30-year T-Bill, and so as a result, the interest goes up, the

5    minimum lump sum goes down.

6    Q.  Now, what you just said about the interest rate, is that

7    something you understood back in 1996, 1997, 1998?

8    A.  I knew the interest rate would be based on the annual

9    figure.  I had no idea what the figures would be.

10   Q.  Right, but the concept of the minimum lump sum going down

11   if the interest rate being higher, is that something you

12   understood then?

13   A.  Not at that time, but as we went along, and this is 1997,

14   so at the time of Don's note, I knew.

15   Q.  What was the purpose of Don communicating this to the folks

16   in New York?

17   A.  Any pension calculation even before the cash balance

18   account, all communication was prepared by New York, or if we

19   prepared it, it would have to be sent to them and approved

20   before we could issue it.

21   Q.  So this is an effort on his part to learn how to respond to

22   these questions?

23   A.  Yes.

24   Q.  Do you have any reason to think that the New York office

25   didn't cooperate in providing the response?

F7LJOSB2                          Ine - redirect

1    A.  I have no reason to think that.

2    Q.  In fact, would you look at Exhibit 79 to your declaration.

3    A.  Yes, yes.

4              MR. RUMELD:  Your Honor, would you like a copy?

5              THE COURT:  Have we used this before?

6              MR. RUMELD:  I don't think so.

7              THE COURT:  All right.  Then your loose copies are

8    easier than your --

9              MR. RUMELD:  Right.  I get it and I apologize.

10             THE COURT:  That is fine.

11   BY MR. RUMELD:

12   Q.  Could you tell me, Ms. Ine, what this document is.

13   A.  This is an example of when we get an approved text from New

14   York, we would create model letters that were used to respond

15   to participants.  So this is a letter that was sent to someone

16   with questions and was given the information that they're

17   asking for.

18   Q.  So is this a form letter?

19   A.  Yes.

20   Q.  So, in other words, this was provided by New York to

21   Wisconsin?

22   A.  Yes.

23   Q.  And then Wisconsin is expected to make use of this form?

24   A.  Yes.

25   Q.  Can you tell whether this letter is responsive to one or

1    both of the questions we just looked at?

2    A.  Yes, it does answer both questions.

3    Q.  So, for example, it says towards the bottom of that first

4    page, "Although your accrued benefit will not change, the

5    interest rate as explained previously does change.  Since the

6    interest rate in 1997 is higher than the interest rate in 1996,

7    the amount your money can earn is greater.  Therefore, the

8    factors decrease as the interest rate increases to achieve the

9    same accrued benefit at normal retirement date.  This results

10   in lower lump sums when interest rates increase."

11   A.  Yes.

12   Q.  Did you understand this was an explanation provided at the

13   time to participants who were come make about their --

14   A.  Yes.

15   Q.  Let me finish the question.  Who were complaining about

16   their benefits going down, so to speak?

17   A.  Yes.

18            MR. RUMELD:  Now, if you could take a look at

19   Defendant's Exhibit 49, which is attached to your declaration

20   as well,?  Your Honor, I can hand this one up as well.

21            THE COURT:  All right.

22   BY MR. RUMELD:

23   Q.  Now, the redacted box at the time and the reference to the

24   number underneath, that is just our effort to redact personal

25   information about a particular participant.  Do you see that?

F7LJOSB2                        Ine - redirect

1   A.  Yes.

2   Q.  Would you agree with me that this letter is based on the

3   form letter we just looked at before?

4   A.  Yes.

5   Q.  The person signing the letter is whom?

6   A.  Don Kappel.

7   Q.  Is there any reason not to believe that Mr. Kappel used

8   that form letter to respond to the participants you said made

9   these inquiries?

10  A.  There is no reason to believe we would not use this.

11  Q.  Now, earlier you testified about your concern that some of

12  the company-wide communications used legalese.  Do you remember

13  that testimony?

14  A.  Yes.

15  Q.  Would the word "participant," viewed by you, be legalese?

16  A.  Yes.

17  Q.  And why is that?

18  A.  Employees that worked at the store didn't, if it had said

19  employees which they would understand.  A participant means

20  somebody who is in the plan.  It is not the type of verbiage an

21  employee usually uses.  They think of themselves as employees

22  versus a participant.

23  Q.  Now, you were also questioned about your testimony

24  concerning the 9 percent interest rate?

25  A.  Yes.

F7LJOSB2                          Ine - redirect

1    Q.  I think you said that at the time you thought the 9 percent

2    interest rate was good?

3    A.  Yes.

4    Q.  What did you mean by that?

5    A.  I meant that I thought it was a good rate to use at that

6    time.

7    Q.  What was the function of the 9 percent interest rate, as

8    you understood it?

9    A.  It was to take the accrued benefit as of 12-30-95 and turn

10   it into a present value for starting up the cash balance

11   account.

12   Q.  At the time did you think that 9 percent was an appropriate

13   figure to use to make that conversion?

14   A.  I didn't have anything to compare it to, so yes.

15   Q.  You assumed that was a correct way to convert the annuity

16   to a lump sum?

17   A.  Yes.

18   Q.  And am I correct that if the plan was to offer the

19   previously accrued benefit in the form of a lump sum, there had

20   to be some conversion process?

21           MR. GOTTESDIENER:  Objection.  Objection.

22           THE COURT:  Hold on.  Overruled.  You may answer.

23           THE WITNESS:  Can you say that again.

24   BY MR. RUMELD:

25   Q.  Did you understand at the time --

F7LJOSB2                          Ine - redirect

 1              MR. RUMELD:  I'll rephrase the question, your Honor.

 2    Q.  You testified that you were happy that you were able to get

 3    your benefit in the form of a lump sum?

 4    A.  Yes.

 5    Q.  The benefit you received in the form of a lump sum, did

 6    that correspond only to your work post-'96 or also your work

 7    pre-'96?

 8    A.  Only my work pre-'96.

 9    Q.  It was the lump sum equivalent of what you had earned

10    before '96?

11    A.  Correct.

12    Q.  Were it not for the cash balance amending, how would you

13    have received that portion of your benefit?

14    A.  I wouldn't have received anything.  It would have just

15    stayed as an accrued benefit until I became 55 or older.

16    Q.  Right.  You would have received an annuity sometime in the

17    future?

18    A.  Right.

19    Q.  Am I correct then that converting that annuity into a

20    starting balance was the process that enables you to take your

21    benefit in the form of a lump sum?

22    A.  Yes.

23    Q.  Sitting here now, do you know one way or the other whether

24    there is anything, whether there was anything that was wrong

25    using the 9 percent?

F7LJOSB2                         Ine - redirect

1   A.  With hindsight, it is probably part of the reason why it is

2   going so long before the cash balance annuity actually is more

3   than the pre-'96 annuity.

4   Q.  When you say going so long, relative to what?

5   A.  Relative to understanding the participant that is being

6   used for this case.  My understanding is that he was there

7   seven years and he still got the 12-30-95 benefit.

8   Q.  At your deposition you testified about being surprised

9   about certain things Mr. Gottesdiener was representing to you.

10          Can you distinguish between what was not a surprise

11  because you already knew it and what was a surprise to you

12  based on what Mr. Gottesdiener was telling you?

13          MR. GOTTESDIENER:  Objection.

14          THE COURT:  Overruled.  You may answer.

15  A.  My surprise was that it continued beyond three years.

16  BY MR. RUMELD:

17  Q.  What is the "it"?

18  A.  Well, that the old formula was still being used for the

19  lump sum calculation.

20  Q.  So am I correct then that if you had been told that for

21  three years after the cash balance amendment, lots of

22  participants had received a benefit that was based on their

23  pre-'96 accruals, that would not have surprised you?

24          Should I try again?

25  A.  Yes.

F7LJOSB2                         Ine - redirect

1   Q.  In your case --

2   A.  Yes.

3   Q.  -- you left in 1995?

4   A.  Correct.

5   Q.  Were you surprised your benefit was based on your

6   pre-1995-'96 accruals?

7   A.  No.

8   Q.  As of that time, would it have surprised you that lots of

9   other people were receiving a benefit based on their pre-1996

10  accruals?

11  A.  No.

12  Q.  So when you went to your deposition, that fact wasn't news

13  to you?

14  A.  Correct.

15          MR. GOTTESDIENER:  Objection.

16          THE COURT:  Overruled.

17  BY MR. RUMELD:

18  Q.  So what was news to you was just that people like

19  Mr. Osberg who left several years later was also getting a

20  benefit based on pre-'96 accrual?

21          MR. GOTTESDIENER:  Your Honor, I am sorry.

22          THE COURT:  I'll allow it.

23          MR. GOTTESDIENER:  None of this was discussed at her

24  deposition.

25          THE COURT:  That is okay.  It is within the scope of

F7LJOSB2                       Ine - redirect

1    her deposition.  Frankly, the surprise versus not surprise we

2    have beaten on both sides.  I will allow this last question.

3    You may answer.  Do you have it in mind or do you want it

4    restated?

5              THE WITNESS:  Restate.

6    BY MR. RUMELD:

7    Q.  I am trying to understand what was it that you found

8    surprising when you reviewed --

9    A.  That it went longer than a few years, a few years.

10   Q.  Were you also surprised when you were told that no one was

11   earning anything?

12   A.  From the sense of the cash balance account, yes.

13   Q.  When you got your benefit in 1999, did you view it as if

14   you hadn't earned anything?

15   A.  I didn't because I wanted some settlement.  It was

16   something I wouldn't have gotten under the old plan.  I wanted

17   to have control of the money by investing it myself.

18   Q.  Did you view it in 1999 as if your benefit had been frozen?

19   A.  I didn't, no.

20             THE COURT:  All right.  Thank you.

21             Mr. Gottesdiener.  Let me tell people I am now going

22   to be making notes directly into my computer, and so that will

23   be what you see me doing.  If you see me typing, that is what I

24   am doing, not looking at e-mail or anything else, just so

25   nobody is concerned for lack of attention.

F7LJOSB2                        Ine - recross

1              MR. GOTTESDIENER:  The court's indulgence.

2              THE COURT:  Yes.

3     RECROSS EXAMINATION

4     BY MR. GOTTESDIENER:

5     Q.  While I am setting up here, Ms. Ine, let me ask you a

6     couple of questions about the deposition itself.

7              You were accompanied by two lawyers to the deposition,

8     correct?

9     A.  Correct.

10    Q.  As you told us already, you prepared with them for four

11    hours before the deposition, correct?

12    A.  Correct.

13    Q.  In addition, during the deposition we took breaks, right?

14    A.  Correct.

15    Q.  And you had the opportunity to speak with them on breaks

16    during the deposition, correct?

17    A.  Yes.

18    Q.  After I finished questioning you, they asked you questions

19    at the deposition, correct?

20    A.  Correct.

21    Q.  And nothing that you're now saying in response to

22    Mr. Rumeld's questions was elicited from you after I finished

23    questioning you, correct?

24             MR. RUMELD:  Objection, your Honor.

25             THE COURT:  Overruled.

F7LJOSB2                          Ine - recross

1     A.  Correct.

2           MR. GOTTESDIENER:  If we could get on the screen DX-95

3     that Foot Locker's lawyer showed you and if we could blow that

4     up a bit.  If you scroll down.

5     BY MR. GOTTESDIENER:

6     Q.  Do you see where it says, "The lump-sum payment indicated

7     above represents the greater of your account balance or a

8     minimum lump sum."  Do you see that?

9     A.  Yes.

10    Q.  Then it says, "The minimum lump sum is determined by

11    multiplying your annual accrued benefit by a factor that is

12    based on the mortality table and interest rate in effect on

13    your benefit payment date," correct?

14    A.  Yes, yes.

15    Q.  Your focus was on the application of factors?

16    A.  Yes.

17    Q.  You really didn't have an understanding as to where those

18    factors exactly came from.  Is that fair?

19    A.  I am not sure what you're asking.  I knew they came from an

20    actuary.

21    Q.  Okay, you knew they came from an actuary.

22          The actuary caused you to have the belief that the use

23    of the 9 percent factor to start off the initial account

24    balance was that it was a projection.  Is that correct?

25    A.  Yes.

1  Q.  In response to counsel's questions, you said that it was a

2  present value but, in fact, your belief was that it was a

3  projection of the amount that you would ultimately get if that

4  amount were reinvested and earning a 9 percent rate of return

5  before being discounted to present value, correct?

6          MR. RUMELD:  Objection.

7          THE COURT:  Hold on.  I'll allow it.

8  A.  Correct.

9  BY MR. GOTTESDIENER:

10  Q.  And you thought that federal law governed the creation of

11  the opening account balance, correct?

12  A.  Correct.

13  Q.  So the minimum lump sum -- actually, let's turn to your

14  declaration and see what you say in your declaration about the

15  minimum lump sum.

16          Paragraph 8 of your declaration, you say, "During my

17  deposition, I was confused as to how the minimum lump sum was

18  calculated."

19          Do you see that?

20  A.  Yes.

21  Q.  There is a minimum lump sum that we talked about at the

22  deposition that is derived from the cash balance annuity,

23  correct?

24  A.  Yes.

25  Q.  And that minimum lump sum is derived from the cash balance

1      annuity, is described in the summary plan description?

2      A.  Yes.

3      Q.  Correct?

4                 MR. RUMELD:  Objection.

5                 THE COURT:  Overruled.

6      BY MR. GOTTESDIENER:

7      Q.  And the summary plan description explains that there are

8      times when the participant will get more than their account

9      balance, correct?

10     A.  I believe so.

11     Q.  Your testimony in your deposition was that you understand

12     the minimum lump sum to be the same minimum lump sum that is

13     described in the summary plan description that is based not on

14     the 12-31-95 frozen accrued, but the cash balance annuity,

15     correct?

16     A.  Could you restate that, please.

17     Q.  In the deposition when we talked about this minimum lump

18     sum, you ascribed it to the cash balance annuity and the

19     minimum lump sum described in the SPD, correct?

20     A.  If that is what I said in the deposition, then yes.

21                THE COURT:  I think he is asking you if you recall

22     saying that.  Don't agree with him unless you recall.

23                THE WITNESS:  I don't, I don't recall saying that.

24     BY MR. GOTTESDIENER:

25     Q.  Here is one way without taking out the deposition, which we

F7LJOSB2                          Ine - recross

1   can do, that you know that is the case because it is in your

2   declaration, isn't it?

3         You say in Paragraph 8, do you see where it says, "I

4   realize now that both concepts."  You say, "I realize now that

5   both concepts were incorporated into the minimum lump sum

6   calculation," right?

7   A.  Right.  I think at the time that we had the deposition, I

8   was thinking the cash balance calculation to an accrued benefit

9   was a calculation for lump sum.  That is already mixed up that

10  there were two minimum sum calculations.

11        THE COURT:  Go ahead.

12        MR. GOTTESDIENER:  Please, your Honor.

13        THE COURT:  Is it the case that under both the cash

14  balance plan as well as under the prior plan, it is possible

15  that a participant can receive a lump sum?

16        MR. GOTTESDIENER:  More than the account, do you mean,

17  your Honor?

18        THE COURT:  I am sorry?

19        MR. GOTTESDIENER:  Do you mean more than the account

20  balance?

21        THE COURT:  No.  It is just they couldn't receive a

22  lump sum.  It is possible a participant could receive a lump

23  sum under either?

24        THE WITNESS:  Yes.

25        THE COURT:  As a theoretical matter, putting aside the

F7LJOSB2                          Ine – recross

1     greater of?

2              THE WITNESS:  Correct.

3              THE COURT:  Is Paragraph 8 an attempt to say that you

4     were confusing the calculation of a lump sum that might be

5     possible under the cash balance plan?

6              THE WITNESS:  Yes.

7              THE COURT:  With the minimum lump sum as that term is

8     used under the prior plan, the greater of minimum lump sum?

9              THE WITNESS:  Correct.

10             THE COURT:  I see.  Okay.

11    BY MR. GOTTESDIENER:

12    Q.  So we're agreed that there are two minimum lump sums, one

13    under the cash balance benefit if that is the winner and then

14    the other under the frozen 12–31–95 accrued benefit if that's

15    the winner.  Is that fair?

16    A.  Technically, yes.

17    Q.  I am sorry.  What is the technically part?

18    A.  We really compared the accrual instead of going through the

19    process of creating two minimum lump sums.

20    Q.  Right.  Let me see if I can restate what you just said.

21             The way it was done is you compared which was the

22    winning annuity?

23    A.  Correct.

24    Q.  Because whatever the winning annuity was, that was also

25    going to be the winning lump sum?

F7LJOSB2                          Ine - recross

1   A.  Correct.

2   Q.  Okay.  But my question was, you acknowledge that there were

3   two distinct minimum lump sums, correct?

4   A.  Correct.

5   Q.  Because there were these two distinct formulas that a

6   person had as of 1-1-96?

7   A.  Correct.

8   Q.  It couldn't be the actual winning accrued benefit once the

9   comparison was done?

10  A.  Correct.

11  Q.  Now, in your way of thinking of things at the time --

12          THE COURT:  At the time of the deposition or back in

13  '96?

14          MR. GOTTESDIENER:  Back in the '96 to '99 time-frame.

15  BY MR. GOTTESDIENER:

16  Q.  Actually, one question I did want to ask, her Honor was

17  asking you questions that touched on potentially the question:

18          When you left, you had to calculate your benefit to

19  understand that you actually had no accruals, correct?

20  A.  Correct.

21  Q.  You didn't know that before you actually did the

22  calculation.  Is that fair?

23  A.  Not that I didn't have an accrual as much as there wasn't

24  an accrual, but it was less than the old plan.

25  Q.  You didn't earn any new benefits --

F7LJOSB2                          Ine - recross

1   A.  Correct.

2   Q.  -- is what you discovered only after you actually did the

3   calculation in 1999; is that fair?

4   A.  Yes.

5   Q.  You agree the average participants wouldn't have been able

6   to do what you did?

7   A.  That is true.

8   Q.  Back in your thought process, '96, '97, '98, '99, before

9   you do your calculation, you think that federal law, you think

10  first the initial account balance is done in a way that is

11  favorable to participants using a 9 percent projection,

12  correct?

13  A.  Correct.

14          MR. RUMELD:  Objection.

15          THE COURT:  Hold on.  Sustained.  You need to re-ask.

16  The answer is struck.

17  BY MR. GOTTESDIENER:

18  Q.  You believed that the initial account balance was created

19  using a 9 percent factor that projected to age 65?

20          MR. RUMELD:  Objection.

21          THE COURT:  Overruled.  She has actually already

22  answered this question.

23  A.  Yes.

24  Q.  It is a foundational question.

25  A.  Yes.

F7LJOSB2                         Ine - recross

1   Q.  You also, before it was brought back to a present value --

2   A.  Correct.

3   Q.  -- you also believed at the time that federal law required

4   the calculation to be done in that way, correct?

5   A.  Correct, except for the law didn't require 9 percent.  That

6   was what the company selected.

7   Q.  No, but I am asking at the time you thought federal law

8   governed the way it was done?

9   A.  Yes.

10  Q.  And you thought the company was just following federal law

11  when it did that, correct?

12          MR. RUMELD:  Objection.

13          THE COURT:  Overruled.

14  A.  Yes.

15          THE COURT:  You can ask another question, but we are

16  going to take a mid-morning break in a question or two.

17          MR. GOTTESDIENER:  This is a good time.

18          THE COURT:  Let's take our mid-morning break and we'll

19  return in 10 minutes.  I want to remind people I need to break

20  at 12:30 to take the criminal matter.

21          (Recess)

22          (Continued on next page)

23

24

25

F7lnosh3                        Ine - recross

 1              THE COURT:  Mr. Gottesdiener, you may proceed, sir.

 2              MR. GOTTESDIENER:  Thank you, your Honor.

 3    BY MR. GOTTESDIENER:

 4    Q.  In your deposition do you remember we spent a little time

 5    on an e-mail that is PX 47.  We will get it on the screen.

 6              MR. GOTTESDIENER:  Can I approach the witness, your

 7    Honor?

 8              THE COURT:  You may.

 9              MR. GOTTESDIENER:  Does your Honor need another copy?

10              THE COURT:  No.

11    BY MR. GOTTESDIENER:

12    Q.  This is an e-mail.  The subject is present value, and it is

13    a two-part e-mail.  In the middle is the one that we started

14    with talking about.  It was a question, Marion sent an e-mail

15    to Ellen Glickfield.

16              You know who Ellen is, right?

17    A.  Yes, I do.

18    Q.  She was a clerk under Marion?

19    A.  Yes.

20    Q.  And Marion is explaining, this is soon after the

21    conversion, how to talk to people who are asking, if they would

22    like to know what they are going to get paid, that is what you

23    should tell people, right?  That's what this e-mail concerns?

24    A.  Yes.

25              THE COURT:  Let me just see.  You need to go back and

F7lnosh3                          Ine - recross

1    establish a foundation with this witness.

2              You may have used it.

3    BY MR. GOTTESDIENER:

4    Q.  We talked about this e-mail in your deposition.

5              THE COURT:  Have you seen this e-mail before your

6    deposition that you can recall?

7              THE WITNESS:  I don't believe so, no.

8              I don't remember it.

9              THE COURT:  Then you can ask her questions in terms of

10   whether this is consistent with certain things, but not what

11   the actual e-mail means.

12             MR. GOTTESDIENER:  OK.

13   BY MR. GOTTESDIENER:

14   Q.  This is consistent, the instruction to give to the account

15   balance to active participants who want to know what they will

16   be paid, that was consistent with the instructions that you had

17   from New York and what you all did when somebody asked that

18   question who was still active?

19             THE COURT:  Correct?

20             MR. GOTTESDIENER:  Right, yes.

21   Q.  Correct?

22   A.  In the beginning, because everything was manual, in

23   Milwaukee we were not answering any questions for anybody that

24   was not 50 years old.

25   Q.  Right.

1    A.  We couldn't.

2    Q.  Sure.  But after that period of time, that didn't persist

3    forever?

4    A.  No.

5    Q.  You then had to field those kinds of questions, right?

6    A.  And then we did.

7    Q.  And you did.  This was consistent with what you did.  You

8    told people, you communicated to people who were active their

9    benefit is the account balance.  That's what they would get

10   paid.  Correct?

11   A.  I don't remember that.

12            MR. GOTTESDIENER:  Page 168.

13            If you could blow up here at the bottom, line 19 so

14   the witness can see clearly.

15   BY MR. GOTTESDIENER:

16   Q.  Exhibit 32 was the same thing that you have in front of

17   you, PX 47.  I started asking you --

18            MR. GOTTESDIENER:  I am going to try to short circuit

19   this, your Honor, because it goes on for a few pages.  First I

20   am just going to be asking, refreshing recollection that I

21   showed this to the witness and we discussed it.

22            So I am saying around the conversion, February 5,

23   there was this e-mail sent by one of the musketeers.  Let me

24   back up because I don't know if the Court has heard that.

25   Q.  There was a term used for Tom, Marion and Carol, and that

F7lnosh3                         Ine - recross

1    was the Three Musketeers, right?

2    A.  Yes.

3    Q.  So you remember that in the deposition I went through this

     e-mail with you?

5    A.  Now that you are showing me, yes.

6         MR. GOTTESDIENER:  OK.  If you could just show the

7    next page of the deposition, just so we can see how that

8    evolved and just walk through.  We don't have to repeat

9    everything.

10        If you could continue to scroll down.

11        I asked a question on line 11.  I said:  So what I

12   want to do is just read this with you and ask you to confirm if

13   this is a correct understanding of what you guys did, what your

14   protocol called for communicating.

15   BY MR. GOTTESDIENER:

16   Q.  This refreshes your recollection that I walked through the

17   e-mail with you like that?

18   A.  Yes, now that I see it.

19   Q.  OK.  And then on the next page.  Then, after reading the

20   e-mail, at line 15 I asked:  "And first of all, is that your

21   understanding of what you guys communicated to people at the

22   time?"

23        And you answered:  "Yes."

24        Does that refresh your recollection that you gave that

25   testimony?

F7lnosh3                              Ine - recross

1              MR. RUMELD:  Objection, your Honor.  That is what she

2     says at the time.  That was her testimony.

3              THE COURT:  I will allow it.

4     A.  At the time, meaning at the beginning of the plan year, as

5     I indicated.

6     Q.  OK.  That's fine.

7     A.  OK.

8     Q.  But I am just asking, then there was, I said at the bottom,

9     you'll notice, and you can look at it now directly, the e-mail

10    itself, that Marion is asking Carol and Tom --

11             Who were in effect their superiors, right?

12    A.  Correct.

13    Q.  -- if she understood their conversation correctly, if my

14    understanding of our conversation is not correct or if you want

15    different information provided to the participant, please let

16    me and Ellen know immediately.

17             Right?

18    A.  Yes.

19             MR. GOTTESDIENER:  And then if you would turn to the

20    next transcript page.  We are now on transcript 171.  Now go to

21    the middle of the page.  Scroll down a little bit more.

22    BY MR. GOTTESDIENER:

23    Q.  OK.  And then I am asking at the bottom, "But this is

24    completely consistent with what" --

25             And you started to answer, "Yes"

F7lnosh3                    Ine - recross

1              "-- you recall being told to people?

2      "A.  Yes."

3              Here's where I'm trying to arrive:

4      "Q.  And the way you understood the benefit worked?"

5              And you answered:  "Yes."

6              MR. RUMELD:  Objection.

7              THE COURT:  I think right now she's just being asked

8      to confirm that this all occurred during the deposition.

9              I have to say --

10             MR. GOTTESDIENER:  That's right.

11             THE COURT:  -- I do think that it's sufficiently

12     opaque that I am not sure I know what is going on right now.

13             MR. GOTTESDIENER:  Right.  I am going to try to

14     connect up.

15             THE COURT:  All right.

16             MR. GOTTESDIENER:  I just --

17             THE COURT:  All right.

18             Do you see that you testified to this?

19             THE WITNESS:  Yes.

20             THE COURT:  OK.

21     BY MR. GOTTESDIENER:

22     Q.  At the deposition -- this is not a trick question, this is

23     just foundational -- you said then that this is e-mail was

24     consistent with your understanding of the way the benefit under

25     the amended plan worked, right?

F7lnosh3                          Ine - recross

1   A.  Yes.

2   Q.  Now, coming forward, looking at the e-mail, you see it

3   says, If the request is from an active associate, provide the

4   account balance.  Correct?

5   A.  Yes.

6   Q.  Now, what I want to review with you is your belief at the

7   time was that was the appropriate information to give a

8   participant, because the conversion, as you understood it, took

9   the 12/31/95 benefit and it did some kind of conversion and it

10  started you off exactly where you left off, correct?

11  A.  Correct.

12  Q.  So now there was only one real benefit under the plan, and

13  that was your account balance benefit, correct?

14  A.  Correct.

15  Q.  Your account balance benefit moved forward, and it was real

16  additions to a real benefit that you were getting in exchange

17  for working for the company, right?

18  A.  Correct.

19  Q.  As the Farah letter and the highlights memo explained, it

20  replaced the prior benefit, and it moved forward in exchange

21  for work giving you additional pension, correct?

22  A.  Under the cash balance plan, correct.

23  Q.  Under the amended plan, 1/1/96, that was your understanding

24  of the way the benefit worked, right?

25  A.  Correct.

F7lnosh3                     Ine - recross

1    Q.  That's one of the reasons --

2             MR. GOTTESDIENER:  And I will link this up, your

3    Honor.

4    Q.  That's one of the reasons you didn't think of this as a

5    freeze, right?

6    A.  Correct.  I never thought of it as a freeze.

7    Q.  OK.  We're almost there.  There's a few more steps to this.

8             So what you understood, was, however, that there was a

9    federal law requirement -- remember, we started, I started my

10   examination here after Mr. Rumeld questioned you with one of

11   the documents that you were shown by Mr. Rumeld, it was DX 95?

12   A.  OK.  The estimate, yes.

13   Q.  Do you remember we paused for this digression to get to

14   this point where it says the minimum lump sum is determined by

15   multiplying your annual accrued benefit by a factor, right?

16   A.  Correct.

17   Q.  And you understood, your focus was on these factors?

18   A.  Yes.

19            MR. GOTTESDIENER:   Now, if we could get on the screen

20   a demonstrative exhibit that we just put together, which is

21   1543.

22   BY MR. GOTTESDIENER:

23   Q.  I want to talk to you to see if I understand what your

24   understanding was at the time, that the cash balance account as

25   we have been discussing, that was the benefit, but at

F7lnosh3                    Ine - recross

1    termination there had to be this greater-of calculation done?

2    A.   Correct.

3    Q.   And the greater-of calculation done was, it was this MLS

4    the 12/31/95 benefit times a factor, right?

5    A.   This is as of termination?

6    Q.   Yes.

7    A.   Employee termination or retirement?

8    Q.   Yeah.  Or an estimate if they wanted an estimate?

9    A.   As I did --

10   Q.   You would do?

11   A.   As I indicated before, we would look at the annuity, not

12   the minimum lump sum.

13   Q.   Understood.  But this is in effect the way you would

14   understand the --

15   A.   Yes.

16   Q.   It's consistent?

17   A.   Yes.

18   Q.   And it's consistent with that explanation in DX 95?

19   A.   Yes.

20   Q.   What you are looking at is it's just times this factor.

21            MR. GOTTESDIENER:  If I could move to the next screen.

22   Q.   Do you remember we discussed that in the SPD it explains

23   that there are times when you would end up with your benefit

24   was your account and you would get your account as a lump sum,

25   but there would be kind of luck-of-the-draw times where, based

F7lnosh3                              Ine - recross

```
 1   on where interest rates were under federal law, you would have
 2   to get more than the account?
 3            Do you remember that?
 4   A.  I --
 5            MR. RUMELD:  Objection.
 6            THE COURT:  Hold on.  Before you answer, let me just
 7   read this question.
 8            Why don't you rephrase.
 9            MR. GOTTESDIENER:  Sure.
10   BY MR. GOTTESDIENER:
11   Q.  In the deposition and earlier today we discussed how in the
12   summary plan description there is a disclosure that there are
13   times when you would actually get more than your account
14   balance based on a federal law calculation requirement.
15   A.  Correct.
16   Q.  And in the deposition I started using, and you agreed with
17   it and we used it as a shorthand, that it was a kind of a
18   luck-of-the-draw calculation as far as you thought of it
19   because it depended on where interest rates were whether or not
20   under that calculation you would do better than the account
21   balance?
22            MR. RUMELD:  Objection.
23   Q.  Do you recall that?
24            THE COURT:  I don't know if "luck of the draw" was
25   used in the deposition, and therefore you're incorporating --
```

F7lnosh3                              Ine - recross

1              MR. GOTTESDIENER:  It was.  That was my question.

2              THE COURT:  It was?

3              MR. GOTTESDIENER:  Yes.

4              THE COURT:  Luck of the draw was a phrase you already

5    used in representing that?

6              MR. GOTTESDIENER:  Yes.

7              THE COURT:  I want to make sure.  Otherwise it would

8    be an objectionable question.

9              I will allow it.

10             MR. RUMELD:  The question was objectionable then and

11   it's certainly objectionable now.

12             THE COURT:  She adopted it.  He's represented that she

13   adopted it in her answer.

14             Is that right?

15             MR. GOTTESDIENER:  Yes.

16             THE COURT:  Was there an objection to form at the

17   time?

18             MR. RUMELD:  We would have to look back.

19             THE COURT:  Let me see.

20             If there's no objection to form, then it's waived.

21             MR. GOTTESDIENER:  But it's still --

22             THE COURT:  No.  Let me just see if there is an

23   objection to form.  It's just the phrase "luck of the draw."

24   You can do it without that.  You can say variable.

25             MR. GOTTESDIENER:  OK.

F7lnosh3                          Ine - recross

<table>
<tr><td>1</td><td>THE COURT:  And that would I think clear up the issue</td></tr>
<tr><td>2</td><td>here.</td></tr>
</table>

1    THE COURT:  And that would I think clear up the issue

2    here.

3    MR. GOTTESDIENER:  I will try it that way then.

4    BY MR. GOTTESDIENER:

5    Q.  So you do agree that in the SPD you knew at the time that

6    it did explain that under federal law there were times that you

7    would get more than the account number?

8    A.  Correct.

9    Q.  So let's look at this second slide, and you tell me if I'm

10   understanding the way you understood the benefit worked.

11        The account was the benefit under the plan, and it was

12   the 12/31/95.  You see where I have 12/31/95?

13   A.  Yes.

14   Q.  You started with that full value, right?

15   A.  Yes.

16   Q.  You understood that you got the full value of that in

17   effect put into your account to start?

18        MR. RUMELD:  Objection.

19        THE COURT:  I will allow it.  She can answer it if

20   that's consistent with her understanding.

21   A.  Yes.  The starting cash balance, yes.

22   Q.  And it was also you said in the deposition you also used

23   the term equal value, correct?

24   A.  Yes.

25   Q.  So we start with the full value, equal value of what you

F7lnosh3                    Ine - recross

1    already earned and under the only benefit under the plan, you

2    add as time goes on enhancement if you're eligible for that,

3    plus C, compensation credits, plus I, interest credits.

4    Correct?

5    A.  Correct.

6    Q.  The calculation that you would have to do, however, to see

7    if somebody would get their growing benefit or somebody else

8    would be, you would then have to check -- whether you started

9    by doing it with the annuity or not, you would then have to

10   check whether the MLS was greater, right?

11   A.  Greater than what?

12   Q.  Greater than the growing account benefit.

13   A.  Yes.

14   Q.  What you knew was that it was multiplied by a factor that

15   was required by federal law?

16   A.  Correct.

17   Q.  Just like you thought the initial account balance was

18   governed by federal law and the use of a factor, right?

19              MR. RUMELD:  Objection.

20              THE COURT:  Overruled.

21              You may answer.

22   A.  Yes.

23   Q.  What you believed at the time, and I'm not sure -- I'm not

24   asking you what you believe right now, if you believe what you

25   believed then, that's fine.  If you believe something

F7lnosh3                          Ine - recross

1    different, that's not in the question.

2            At the time you thought that there was this federal

3    law requirement that you use some calculation, that you took

4    the old benefit and you multiplied it by this factor, and maybe

5    it would vault over the value of the account balance benefit,

6    and that's what the person was entitled to as a matter of

7    federal law, right?

8    A.  Correct.

9            MR. RUMELD:  Objection.

10           THE COURT:  Overruled.

11   Q.  That's why you didn't think of any of this as a freeze,

12   correct?

13   A.  Correct.

14   Q.  Because you were --

15           THE COURT:  Wait.  Do you want to have an answer after

16   the word correct.  You said correct.  Now you're asking a new

17   question.

18           MR. GOTTESDIENER:  She said correct.

19           THE COURT:  You said correct?

20           THE WITNESS:  Yes.

21           THE COURT:  I'm sorry.  I thought that was you saying

22   it.  OK.  Let me just make sure.  And the court reporter got it

23   correctly.

24           OK.  Thank you.  You may proceed.  It was going

25   quickly.  If you could slow it down a little bit.

F7lnosh3                          Ine - recross

1    BY MR. GOTTESDIENER:

2    Q.  So, in the end this is all, while complicated, it's all

3    kind of simple insofar as the account was the benefit, this MLS

4    where people ended up getting more was an additional federal

5    mystery calculation that sometimes just gave people a gift of

6    even more, even though it was based on the old benefit?

7            Correct?

8            MR. RUMELD:  Objection.

9            THE COURT:  Sustained.

10   Q.  You thought that what this MLS calculation was doing was

11   boosting the 12/31/95 benefit in some cases when somebody got

12   that over what people were earning under the account balance

13   benefit, correct?

14           MR. RUMELD:  Objection.

15           THE COURT:  Overruled.

16   A.  Yes.

17           MR. GOTTESDIENER:  No further questions.

18           THE COURT:  Thank you.

19           Just so it's clear, this is going to be the last round

20   we are doing with this witness.  All right.

21           So make it short and tight, but I don't want to have

22   this be like an endless cycle.

23           MR. RUMELD:  All right.  I have the same objective.

24   Five minutes.

25           THE COURT:  Terrific.

F7lnosh3                          Ine – redirect

1              MR. RUMELD:  I just think I need to --

2              THE COURT:  I'm not precluding you from doing that.

3    It's really meant for Mr. Gottesdiener that it's not going to

4    be an endless round robin.

5    REDIRECT EXAMINATION

6    BY MR. RUMELD:

7    Q.  When a participant terminates employment and asks for a

8    minimum lump sum, there is a calculation that has to be made,

9    correct?

10   A.   Correct.

11   Q.  And for purposes of performing the minimum lump sum

12   calculation, how is that done?

13             THE COURT:  Let's just make sure.

14             Do you want it as her understanding?

15             Let me ask this prefatory question.  Is your

16   understanding as to how the minimum lump sum is calculated

17   different today from how it was back in the '96/'97/'98 time

18   frame, or do you believe your view to be the same?

19             THE WITNESS:  They are the same.

20             THE COURT:  All right.  You may proceed, sir.

21             MR. RUMELD:  OK.

22   BY MR. RUMELD:

23   Q.   If I understand your declaration and your testimony, you

24   derived that minimum lump sum from the accrued benefit, is that

25   right?

F7lnosh3                          Ine - redirect

1    A.  Correct.

2            THE COURT:  I'm going to ask you not to lead because

3    of this line of questioning.

4            MR. RUMELD:  OK.

5            THE COURT:  I understand that --

6            MR. RUMELD:  I'm trying to meet my five-minute

7    commitment.

8            THE COURT:  You can do more than five minutes.  I just

9    don't want you to lead.

10           MR. RUMELD:  OK.

11   BY MR. RUMELD:

12   Q.  So tell us again how did you arrive at that minimum lump

13   sum that's calculated when the participant leaves employment?

14   A.  The accrued benefit for the cash balance account is

15   calculated, and that is compared to the accrued benefit as of

16   12/30/95, whichever is higher is what is used to calculate the

17   minimum lump sum.

18   Q.  So the accrued benefit from before '95, that's -- in what

19   form is that?  Is it an annuity or lump sum?  I'm sorry.  From

20   before '96.

21   A.  Oh, before '96 it was an annuity.

22   Q.  So that one is already in the form of an annuity?

23   A.  Correct.

24   Q.  The cash balance account you changed to an annuity to

25   compare it to the old benefit, is that right?

F7lnosh3                          Ine - redirect

1    A.  Made it apples and apples, correct.

2    Q.  Right.  And to make it apples to apples --

3              THE COURT:  Don't lead this part.

4              MR. RUMELD:  OK.

5    BY MR. RUMELD:

6    Q.  How do you go about making it apples to apples?

7    A.  You take the cash balance account and convert it from a

8    present value to a future value.

9    Q.  Right.

10   A.  Based on the person's age and mortality tables and then

11   it's brought back -- it's turned into a projection of an

12   annuity.

13   Q.  OK.  For purposes of doing that math, the factors that are

14   used for that, are they governed by federal law?

15             MR. GOTTESDIENER:  Objection.

16             THE COURT:  Sustained.  Ask it in a nonleading -- ask

17   it a little bit differently.

18   Q.  Is it your understanding --

19             THE COURT:  Where did the factors come from?

20             MR. RUMELD:  OK.

21   BY MR. RUMELD:

22   Q.  You mentioned a mortality assumption?

23   A.  Yes.

24   Q.  Where does that come from?

25   A.  We have tables that were provided.

F7lnosh3                        Ine - redirect

1   Q.  OK.

2   A.  To use looking at the person's age.

3   Q.  And --

4   A.  And to the normal retirement date.

5   Q.  Do you know whether those assumptions are legally required?

6   A.  Yes, they are.

7   Q.  Are there other factors that you apply to take that cash

8   balance account and move it into a age 65 annuity?

9   A.  Not that I can think of right now.

10  Q.  Then you said you compare the two annuities?

11  A.  Correct.

12  Q.  And one of those two annuities is larger?

13  A.  Correct.

14  Q.  Then what do you do to the larger annuity to calculate the

15  minimum lump sum?

16  A.  Then we take the larger annuity, and we use the rate for

17  the T bills in that year and use that to calculate a minimum

18  lump sum.

19  Q.  The use of those T bills, did you have an understanding as

20  to whether that was legally required?

21  A.  That would be what?

22  Q.  Legally required.

23  A.  Yes.

24  Q.  Using those treasury bill rate, that was a legal

25  requirement?

F7lnosh3                          Ine - redirect

1    A.  That's how I understood it.

2    Q.  And that's how you understood it back then?

3    A.  Yes.

4    Q.  Now let's put that calculation aside and talk about the

5    calculation of the initial account balance.  How was that done?

6    A.  That's taking the annuity and using a 9 percent factor.

7              THE COURT:  The winning annuity.

8              THE WITNESS:  I'm sorry.  The 12/30/95 annuity.  And

9    using a 9 percent factor which the company elected to use to

10   calculate a start cash balance.

11   Q.  So in your response you said the company elected to use the

12   9 percent --

13   A.  Yes.

14   Q.  -- factor.  What did you mean by that?

15   A.  It's my understanding that the federal requirements were

16   less than the 9 percent factor.

17   Q.  So was it your understanding that the use of the 9 percent

18   factor was legally required?

19   A.  No.

20   Q.  That was just something the company chose?

21   A.  Yes.

22   Q.  And you understood that at the time?

23   A.  Yes.

24             MR. GOTTESDIENER:  Objection.

25             THE COURT:  Overruled.

F7lnosh3                          Ine - redirect

1    Q.  So is it fair to say that you understood at the time --

2              THE COURT:  Don't do it's fair to say with your own

3    witness.  The reason for that is, it may be perfectly fair, but

4    I don't want him to lead you.  I want to hear your testimony

5    directly.  So he'll ask you a nonleading question.

6              MR. RUMELD:  OK.  Let me try it this way.

7    BY MR. RUMELD:

8    Q.  At the time what was your understanding as to the

9    relationship between the rate that the company chose to use for

10   purposes of calculating the initial lump sum, the initial

11   account balance, excuse me, and the rate that was legally

12   required for purposes of calculating the minimum lump sum?

13             MR. GOTTESDIENER:  Objection.

14             THE COURT:  I will allow it.  You may answer.

15   A.  It was my understanding that that was the rate that the

16   actuaries felt we would get if we took the lump sum or if we --

17   yes, if we took the money, the cash balance account, and took

18   it ourselves and went out and invested it that we could get at

19   least 9 percent.

20   Q.  Just so we're clear, which rate are you referring to now,

21   the 9 percent?

22   A.  Yes.

23   Q.  In response to Mr. Gottesdiener's questioning you said that

24   your understanding at the time was that the cash balance

25   account was the only benefit you could get under the plan?

F7lnosh3                          Ine - redirect

1              MR. GOTTESDIENER:  Objection.

2              THE COURT:  Hold on.

3              Sustained.

4   BY MR. RUMELD:

5   Q.  What was the relevance of the benefit under the prior plan

6   when you were calculating a participant's benefit?

7   A.  It was made clear that the benefit under the cash balance

8   account would never be less than what you could get under the

9   old plan.

10  Q.  So did you view what you could get under the old plan as a

11  benefit under the new plan, or just a benefit under the old

12  plan that needed to be compared to the benefit under the new

13  plan?

14             MR. GOTTESDIENER:  Objection.

15             THE COURT:  I will allow it.

16  A.  To me it was a comparison that made sure that the

17  participant did not get less than what they were entitled to

18  under the old plan.

19  Q.  Do you still have in front of you Defendant's Exhibit 95,

20  which was that estimate that we looked at a little while ago?

21             Do you have that?

22  A.  Yes.

23  Q.  Could we look at Defendant's Exhibit 37, which is the

24  summary plan description.

25             MR. RUMELD:  I need another copy.  Can I hand a copy

F7lnosh3                    Ine - redirect

 1   up, your Honor.

 2              THE COURT:  Yes.  I've got one.

 3              MR. RUMELD:  I was sure you did.

 4              THE COURT:  But if you want to give the witness one.

 5   BY MR. RUMELD:

 6   Q.  Could you turn to page 12 of the SPD.

 7   A.  Yes.

 8   Q.  I should ask first, do you recognize this document?

 9   A.  Yes.

10   Q.  Do you want to tell the Court what it is.

11   A.  The summary plan description that describes the benefit

12   program.

13   Q.  Which benefit program specifically?

14   A.  The 1996 plan, the cash balance.

15   Q.  You see in the end of the first paragraph at page 12 it

16   says, The lump sum payable to you is the greater than your

17   account balance or the amount determined by multiplying the

18   annuity payable to you by factors required by federal law and

19   IRS regulations?

20   A.  Yes.

21   Q.  How does your understanding of that sentence compare to

22   your understanding of the second sentence of that middle

23   paragraph that we read before:  The minimum lump sum is

24   determined by multiplying your annual accrued benefit by a

25   factor that is based on the mortality table and interest rate

F7lnosh3                          Ine - redirect

1    in effect on your benefit payment date?

2              THE COURT:  This is DX 95?

3              MR. RUMELD:  Correct.  Thank you.

4    A.  They are both saying that it is a calculation using the

5    annual accrued benefits.  It isn't -- well, the SPD says if

6    it's greater than your account balance or multiplying the

7    annuity payable.

8              It adds a little more information than the estimate,

9    which is talking about just multiplying your annual accrued

10   benefit by a factor.  It doesn't indicate that -- which, you

11   know, it's the higher of the two.

12             MR. RUMELD:  OK.  Thank you.

13             I have nothing further.

14             THE COURT:  Thank you.  Mr. Gottesdiener, one

15   question.

16   RECROSS EXAMINATION

17   BY MR. GOTTESDIENER:

18   Q.  When you were being asked by Mr. Rumeld about the initial

19   account balance and your understanding of the 9 percent, you

20   said something that I think needs to be highlighted.

21             You said federal requirements were less than 9 percent

22   was your understanding, correct?

23   A.  Yes.

24   Q.  What you meant by that was the company was doing a favor?

25   It did not have to go as high as 9, which was favorable, it was

F7lnosh3                          Ine - redirect

1   required to use what the federal government set as some lower

2   number, correct?

3   A.  Correct.

4                THE COURT:  All right.  Thank you.

5                OK.  You can step down, Ms. Ine.

6                THE WITNESS:  Should I take this with me?

7                THE COURT:  You can just leave everything there.

8                THE WITNESS:  OK.

9                THE COURT:  Be careful stepping off the witness stand.

10               (Witness excused)

11               THE COURT:  All right.  Mr. Gottesdiener, your next

12   witness, please, sir.

13               MR. GOTTESDIENER:  Yes, your Honor.

14               Mr. Schaeffer is a class member.

15               THE COURT:  All right.  Mr. Schaeffer, please.

16               MR. GOTTESDIENER:  We are calling him because he can't

17   be here any other day.

18               THE COURT:  We're going to get to Ms. Peck as well?

19               MR. GOTTESDIENER:  Yes.

20               THE COURT:  All right.  Let's get to Mr. Schaeffer.

21   Hopefully if he's here we can proceed.  He's here so I won't

22   say any more.  All right.

23     RICHARD SCHAEFFER,

24        called as a witness by the Plaintiffs,

25        having been duly sworn, testified as follows:

F7lnosh3                          Schaeffer – cross

1            THE COURT:  Mr. Shaver, please be seated, sir.  It

2   will be important for just to pull your chair up to the

3   microphone and adjust the microphone so you can speak into it

4   clearly.

5            Sometimes you have to find that sweet spot.  You want

6   to be close but not too close.

7            All right.  You may proceed.

8            MR. CLARK:  Good morning, Mr. Schaeffer.

9            THE WITNESS:  Good morning.

10            THE COURT:  We have his declaration.

11            Mr. Schaeffer, why don't you look through this

12   declaration and confirm for me, if you would, please, sir, that

13   that is in fact the declaration of yourself and that you expect

14   it would be your direct trial testimony in this matter?

15            THE WITNESS:  Yes, this is it.

16            THE COURT:  All right.

17            Do you swear to the truth of the contents of that

18   declaration.

19            THE WITNESS:  Yes.

20            THE COURT:  All right.

21            The Court does accept the declaration of Mr. Schaeffer

22   as his direct trial testimony, and the witness is turned over

23   to Mr. Clark for cross-examination.

24   CROSS EXAMINATION

25   BY MR. CLARK:

F7lnosh3                          Schaeffer - cross

1    Q.  Mr. Schaeffer, you worked for Woolworth in the Mid-Atlantic

2    distribution center, is that correct?

3    A.  Correct.

4    Q.  That was in Denver, PA.?

5    A.  Yes.

6    Q.  That plant closed in 1997?

7    A.  Yes.

8    Q.  Before the distribution center closed, you hadn't

9    considered leaving Woolworth, correct?

10   A.  No.

11   Q.  And after it closed, it took you about six months to find

12   another job?

13   A.  Yes.

14   Q.  And you went to work for Elixir Industries?

15   A.  Yes.

16   Q.  And when you went to work for Elixir you took a pay cut,

17   right?

18   A.  Yes.

19   Q.  About $4 an hour?

20   A.  Close to that.

21   Q.  Do you still work at Elixir today?

22   A.  Yes.

23   Q.  Elixir does not offer a pension plan, does it?

24   A.  No, it does not.

25   Q.  Just a 401(k)?

F7lnosh3                         Schaeffer - cross

1    A.  Yes.

2    Q.  Do you recall in 1995 and 1996 the Woolworth pension plan

3    underwent a conversion?

4    A.  Yes.

5    Q.  At the time of the conversion retirement wasn't something

6    you were really focused on --

7    A.  Not at the time, no.

8    Q.  -- right?

9             MR. CLARK:  May I approach, your Honor?

10            THE COURT:  You may.

11   Q.  I'm showing you what's been marked as DX 20.

12            THE COURT:  All right.  Also PX 2.

13            MR. HUANG:  That's correct.

14            THE COURT:  I am just cross-referencing.  We have two

15   different numbers for the same document.

16            You may proceed, Mr. Clark.

17   BY MR. CLARK:

18   Q.  We looked at that document during your deposition, correct?

19   A.  Correct.

20   Q.  And you testified that you didn't remember receiving this

21   document, right?

22   A.  I don't remember this document, no.

23   Q.  Do you recall anyone ever mentioning it to you at the time

24   of the conversion?

25   A.  In 1995?

F7lnosh3                          Schaeffer – cross

1   Q.  Yes.

2   A.  I don't recall it, no.

3           MR. CLARK:  May I approach, your Honor?

4           THE COURT:  You may.

5           MR. CLARK:  This is DX 29.  I think it's PX 4.

6           THE COURT:  All right.

7   BY MR. CLARK:

8   Q.  Have you had a chance to look at DX 29?

9   A.  I remember this one, yes.

10  Q.  We also looked at this document during your deposition,

11  right?

12  A.  Correct.

13  Q.  And you recall receiving this document?

14  A.  I do this one, yes.

15  Q.  You remember reviewing it?

16  A.  Yes.

17  Q.  If you could take a look at the bottom of the first page.

18  There is a definition there for the term initial account

19  balance.

20          Do you see that?

21  A.  Yes.

22  Q.  I am just going to read the definition.

23          Initial account balance:  Your accrued benefit as of

24  December 31, 1995 is actuarially converted to an initial

25  account balance.

F7lnosh3                              Schaeffer – cross

1              You understood at the time of the conversion that

2       there were a number of steps that needed to be taken to

3       actuarially convert something, right?

4       A.  Yes.

5       Q.  You understood that these steps involved an application of

6       some factor and the mortality rate from which you would get a

7       figure, right?

8       A.  Yes.

9       Q.  Also at the time you wouldn't have known or understood the

10      term actuarial convert to mean equal, right?

11      A.  Probably not at the time.

12              MR. CLARK:  May I approach?

13              THE COURT:  You may.

14              MR. CLARK:  I'm handing the witness DX 37.

15              I believe you have a copy, your Honor.

16              THE COURT:  All right.

17              (Continued on next page)

18

19

20

21

22

23

24

25

F7LJOSB4                    Schaeffer - redirect

1    Q.  Do you recognize that document?

2    A.  I do recognize it, yes.

3    Q.  And again we also reviewed this document during your

4    deposition?

5    A.  Correct.

6    Q.  This is the sort of document that upon receiving it, you

7    would have glanced through it, right?

8    A.  I would have looked at it, yes.

9    Q.  You don't recall focusing more specifically on this summary

10   plan description simply because it followed the cash balance

11   conversion, right?

12   A.  I am not sure what you mean.

13   Q.  If you look to the very back page of the SPD, so you see a

14   date on the bottom right?

15   A.  Yes.

16   Q.  What is the date?

17   A.  September 30th, 1996.

18   Q.  And the plan was converted on January 1st, 1996 back to

19   January 1, 1996?

20   A.  Yes.

21   Q.  You don't recall focusing more specifically on this SPD as

22   opposed to others simply because how close to the time of the

23   conversion it was released?

24   A.  Right.

25   Q.  If you could turn to Page 6 of the SPD.  The page within

1    the section of the definitional terms, do you see the term,

2    "Initial Account Balance" --

3    A.  Yes.

4    Q.  -- around the middle of the page?

5          You don't actually remember reading the definition of

6    that term at the time that you converted, right?

7    A.  I don't remember, no.

8    Q.  If you could turn to Page 14 -- actually, start with Page

9    13, please.  So we're within the section, "How Your Retirement

10   Benefit is Determined"?

11   A.  Yes.

12   Q.  And this page appears to be describing compensation

13   credits, right?  Do you see that?

14   A.  Yes.

15   Q.  In essence, this is describing how credits will be added to

16   your account, your account balance will be increased by credits

17   that are a portion of the compensation you earned, right?

18   A.  Yes.

19   Q.  Did you have an understanding at the time that that is how

20   your account balance would increase?

21   A.  Yes.

22   Q.  So, in essence, increases to your cash balance account were

23   based in part on your salary?

24   A.  Correct.

25   Q.  Because of this, this was the sort of thing that employees

1    generally really wouldn't discuss, right?

2    A.  Right.

3    Q.  Because I believe you testified that employees generally

4    didn't discuss their pension benefits because those were based

5    on their wage and salary, right?

6    A.  Yes.  There is a difference there.  The warehouse people,

7    of which I was a part of for many years, all earned the same

8    money so they knew what others were making.  When I moved up to

9    the rebuying area, there it was totally different.  There it

10   was not discussed.  So yes and no.

11   Q.  So in the position you were at at the time of the

12   conversion, were you in the rebuying area at the time of the

13   conversion?

14   A.  Yes.

15   Q.  At that point in time the employees you worked with

16   generally didn't discuss their pension benefits because it was

17   based on their salary?

18   A.  Correct.

19   Q.  In Paragraph 9 of your declaration, you referred to a

20   letter that Marion Derham sent you?

21   A.  Yes.

22   Q.  This is PX-390.  Do you have a copy of it?

23   A.  Yes.

24           MR. CLARK:  Your Honor, would you like a copy?

25           THE COURT:  That might be easier, yes.

F7LJOSB4                              Schaeffer - redirect

1           (Pause)

2    BY MR. CLARK:

3    Q.  Do you recognize this document?

4    A.  Yes.

5    Q.  Now, in your declaration you characterized that September

6    11th letter.  Just for clarity, if you turn to the second page

7    of the document, do you see it is dated September 2nd, 1997?

8    A.  Yes.

9    Q.  Actually the cover page, the first page of the document, do

10   you see that's a note from somebody to Marion Derham, to Carol?

11          MR. GOTTESDIENER:  Objection.

12   A.  Yes.

13          THE COURT:  Overruled.

14   BY MR. CLARK:

15   Q.  It says, "Carol, attached for your reference is a copy of

16   the" -- redacted -- "letter I referred to in my 0V note to

17   Don."  Do you see that?

18   A.  Yes.

19   Q.  Do you know who Don is?

20   A.  No idea.

21   Q.  If you look at the first paragraph of the letter --

22          THE COURT:  Could I just ask, is this letter -- I

23   haven't gone back to look, Mr. Schaeffer -- is this a letter

24   you received?

25          THE WITNESS:  Yes.

1          THE COURT:  So you believe that the September 2nd,

2    1997 letter was addressed to you personally?

3          THE WITNESS:  Yes, I do.

4          THE COURT:  Thank you.  You may proceed.

5    BY MR. CLARK:

6    Q.  If you look at the first paragraph of the letter, it says,

7    "As requested during our July 28, 1997 telephone conversation,

8    the attach sheets provide you and Denise with a breakdown of

9    the calculation done to arrive at your account balance as of

10   January 1, 1997 under the Woolworth retirement plan."

11         Do you see that?

12   A.  Yes.

13   Q.  And Denise is Mrs. Schaeffer?

14   A.  Yes.

15   Q.  Do you recall what your specific request was to

16   Mrs. Derham?

17   A.  Not specifically, no.

18   Q.  Do you have any reason to doubt that you requested a

19   calculation of your account balance as of January 1, 1997?

20   A.  Knowing me, I probably just wanted to know the figure that

21   I might be receiving or will be receiving when both my wife and

22   I were let go.

23         THE COURT:  Does that mean that you were just asking

24   for your retirement benefit generally?

25         THE WITNESS:  Generally, yes.

F7LJOSB4                          Schaeffer – redirect

1          THE COURT:  So you don't recall whether or not you

2     focused on any particular way of defining that retirement

3     benefit?

4          THE WITNESS:  No.

5          THE COURT:  All right.

6          THE WITNESS:  We were both losing our jobs.  I wanted

7     to know if I needed money to fall back on, what I would have

8     available.

9          THE COURT:  Thank you.

10          THE WITNESS:  That is the way I am.

11     BY MR. CLARK:

12     Q.  You said you wanted to know if had money to fall back on?

13     A.  Yes.

14     Q.  Had this letter contained an estimate that was inaccurately

15     high, how would you have reacted to that?

16          MR. GOTTESDIENER:  Objection.

17          THE COURT:  Sustained.

18     BY MR. CLARK:

19     Q.  In your declaration, at Paragraphs 6 through 7, you say

20     that you were led to believe that your benefit was your account

21     balance and that it would keep growing.

22          Am I summarizing that fairly?

23     A.  Yes.

24          MR. GOTTESDIENER:  Objection.

25          THE COURT:  Hold on.  I'll allow it.

1           THE COURT:  You can go to your next question.  Thank

2   you.

3   BY MR. CLARK:

4   Q.  In your deposition you testified that you believed there

5   was -- I believe there was deception in the way that the

6   account balances were calculated because --

7           MR. GOTTESDIENER:  Can we get a page and line, please.

8           MR. CLARK:  Sure, 38, 1 through 9, of Mr. Schaffer's

9   deposition.

10          MR. GOTTESDIENER:  Objection.

11          THE COURT:  Well, I think that the better way of

12  approaching it, before we get to the deposition, ask him a

13  question and see if he contradicts himself.  If he does, you

14  can impeach him with the deposition.  Otherwise, you may not

15  need to get there.  These are technical things, Mr. Schaeffer.

16          You worry about whatever question comes to you, you

17  answer it truthfully and honestly.

18  BY MR. CLARK:

19  Q.  You believe that you were deceived into thinking that a 9

20  percent interest rate used to calculate your initial account

21  balance was actually interest that you were going to earn on

22  your cash balance account, right?

23  A.  Yes.

24  Q.  But you don't actually remember the definition of initial

25  account balance in the summary plan description, right?

F7LJOSB4                        Schaeffer - redirect

1    A.   Back at that time, no, I don't remember.

2    Q.   In fact, it was this letter from Ms. Derham, PX-390, that

3    was the first time you ever recall seeing anything about the 9

4    percent rate, right?

5    A.   I don't know.  I don't know when the first time was I saw

6    it.

7    Q.   If you could turn to the page with -- Page 4, Bates number

8    FLOSB OO7603.  Look at the bottom right of PX-390, the letter

9    from --

10   A.   Which page?

11   Q.   The one ending 7603.

12   A.   Okay.

13   Q.   Could you read the first sentence starting with on the last

14   day.

15   A.   (Pause)

16   Q.   "On the last day of each plan year, account balances, as of

17   the first day of that plan year, are credited with interest at

18   the rate of 6 percent (half percent per month)."

19        Would you have read that at the time, that sentence?

20   A.   I would have read it, yes.

21   Q.   If you look further down, do you see there is a calculation

22   of adding credits to your account balance?

23   A.   Yes.

24   Q.   Do you see the line for interest credits?

25   A.   Yes.

F7LJOSB4                    Schaeffer – redirect

1   Q.  Would you tell me what the interest rate there is.

2   A.  6 percent.

3   Q.  Is there anything on this page that says 9 percent?

4   A.  Not on this page, no.

5   Q.  But you still thought that your account balance was growing

6   at an interest rate, being credited with 9 percent interest,

7   right?

8   A.  At this time probably not because it said 6 percent.

9   Q.  So after reading this letter, you understood that your

10  account balance was actually growing with 6 percent interest

11  credits, is that what you're saying?

12  A.  In 1996, yes.

13  Q.  When you left Woolworth, you elected a lump sum, right?

14  A.  Correct.

15  Q.  And you thought being able to do so was a good idea by the

16  company, right?

17  A.  Yes.

18  Q.  You also thought the 401 (k) plan was a good idea?

19  A.  Yes.

20  Q.  You participated in the 401 (k) plan, right?

21  A.  Correct.

22          MR. CLARK:  I have no further questions.

23          THE COURT:  Thank you.  Mr. Gottesdiener.

24          MR. GOTTESDIENER:  Thank your Honor.

25  RECROSS EXAMINATION

F7LJOSB4                          Schaeffer - recross

1              MR. GOTTESDIENER:  Could I get PX-390 on the screen.

2     That is the Marion Derham letter.  The second page, please, if

3     you could blow that up at the fourth paragraph, "to convert."

4     BY MR. GOTTESDIENER:

5     Q.  First of all, you were looking for not, I'm assuming, four

6     pages of complicated actuarial discussion of benefits?  You

7     wanted to know how much you were going to be paid because you

8     were losing your job?

9              MR. CLARK:  Objection.

10             THE COURT:  Sustained.  You need to rephrase.

11    BY MR. GOTTESDIENER:

12    Q.  When you received this letter, what was your focus in

13    reviewing the letter?

14    A.  I'm probably thinking I went to the last page to see what

15    the figure was and then went over it.

16    Q.  Do you think you understood everything in this letter when

17    you read it?

18    A.  Everything, no.

19    Q.  Were you trying to understand it?

20    A.  Yes.

21    Q.  When you looked at the first page, you testified that at

22    some point you thought that the 9 percent was what you were

23    being credited.  Do you see on the first page in that paragraph

24    that I asked Randall there to highlight, do you see where it

25    says, "The actuarial equivalent, the term actuarial equivalent

F7LJOSB4                        Schaeffer - recross

1    lump sum for present value means what the benefit payable to

2    you at age 65 is worth today"?

3    A.  Yes, I see that.

4    Q.  Did you read that sentence at the time?

5    A.  I'm sure I did.

6    Q.  Did you have any understanding from reading that sentence

7    and the rest of the letter different from what you say in your

8    declaration, that you believed that you had been given full

9    value at the point of conversion for what you had earned to

10   date?

11   A.  I thought I had.

12   Q.  Did the letter make you suspicious in any way, in any way

13   in September 1997 that something other than that had happened?

14   A.  No.

15   Q.  You have a friend Gregg Stauffer.  Is that right?

16   A.  Yes.

17   Q.  He was in essentially your situation as well, worked with

18   you?

19   A.  Yes.

20   Q.  And he lost his job as well?

21   A.  Correct.

22   Q.  Let me have on the screen PX 1234.

23          MR. GOTTESDIENER:  May I approach the witness, your

24   Honor?

25          THE COURT:  You may.

F7LJOSB4                        Schaeffer – recross

1          MR. GOTTESDIENER:  This is for the court in case the

2     court doesn't have it yet.

3     BY MR. GOTTESDIENER:

4     Q.  Your deposition occurred recently, right?

5     A.  About a month ago.

6     Q.  When you came to New York, you took time off from work to

7     come to New York to be deposed, also to be a witness in this

8     case today, correct?

9     A.  Correct.

10    Q.  And you brought with you some documents that Gregg gave you

11    just before you got on the train.  Is that fair?

12    A.  Yes.

13    Q.  This PX-1234, this is a reproduction of what it is that you

14    gave me.  Is that fair?

15    A.  Yes.

16    Q.  You didn't have a copy of this benefits transition

17    information kit in your own possession, but did you receive

18    something like this?

19    A.  I'm sure I did.

20    Q.  When you received it, would you have reviewed it?

21    A.  Yes.

22    Q.  Now, if you look at FLPL 3106, do you see where it

23    describes your retirement plan?

24    A.  Yes.

25    Q.  And where it states, "If you are vested in the retirement

F7LJOSB4                          Schaeffer - recross

1  plan, your account balance as of January 1, 1997 is shown on

2  your personal benefits form in this kit.  The final benefit

3  amount payable will be determined as of your actual date of

4  termination."

5          Do you see that?

6  A.  Yes.

7  Q.  Was that consistent with your understanding as to what the

8  benefit was under the plan, your account balance?

9  A.  Yes.

10 Q.  If you look at FLPL 3109, do you see the company's there

11 saying your vested account balance as of January 1, 1997 is in

12 Gregg's case $6,000 and change?

13 A.  Yes.

14 Q.  Is this consistent with the information that you believe

15 you were given at the time you were informed the plan was

16 closing?

17 A.  Yes.

18 Q.  For yourself?

19 A.  Yes, I believe so.

20         MR. CLARK:  Objection.

21         THE COURT:  Let me just say that is it your best

22 recollection, Mr. Schaeffer, that the sentence up to but not

23 including the amount was the same in the materials you

24 received, but that this amount refers to your friend?

25         THE WITNESS:  This amount refers to him, yes.  Mine

F7LJOSB4                          Schaeffer - recross

1    was similar to this, but mine would have had my information on

2    it.

3              THE COURT:  I'll allow it.

4              MR. CLARK:  The objection is this is beyond the scope.

5              THE COURT:  It is not.  It is fairly within the scope

6    because the scope related to what he received and what he

7    thought he was going to receive.  The document wasn't used, but

8    the topic was certainly covered, so I'll allow it.

9              We do, Mr. Gottesdiener, have to end at 12:30.  I will

10   end up giving Mr. Clark some additional time, so if you want to

11   get this witness off the stand before 2:00, you need to tie it

12   up soon.

13             MR. GOTTESDIENER:  Yes.

14   BY MR. GOTTESDIENER:

15   Q.  So the answer to the last question is "correct," or you

16   don't have it in mind any more?

17   A.  Yes, I received something like this with my personal

18   information on it.

19   Q.  Just to speed things along, your personal information, if I

20   direct your attention to PX-390, your number would have been

21   almost the same as his?

22             If you look at Page 3, would you agree that the

23   initial -- I am sorry -- not Page 3 -- the Page 4, yours was a

24   little higher than his?

25   A.  Correct.

F7LJOSB4                          Schaeffer - recross

1    Q.   7800?

2    A.   Right.

3    Q.   And that's what you thought at the time was your benefit

4    under the plan?

5    A.   Yes.

6    Q.   Did you think you had any other benefit or there was any

7    other basis for you being paid something?

8    A.   No.

9             MR. GOTTESDIENER:   The court's indulgence.

10            (Pause)

11   BY MR. GOTTESDIENER:

12   Q.   What was the bottom line, if there was one, that you got

13   out of reading the Derham letter which she sent you?

14   A.   The bottom line, the dollar figure that I would be getting.

15   Q.   Was there a dollar figure that she gave you?

16   A.   Not that I would be getting after we were let go in August

17   or September, no, that would be coming later.

18   Q.   Was it your understanding that this calculation would

19   increase your account balance?

20   A.   Yes.

21   Q.   But it could be less than your account balance?

22   A.   Correct.

23   Q.   Your declaration says that you remember being very confused

24   by all the interest rates mentioned in the communications, and

25   you point out that Ms. Derham's letter referenced three

F7LJOSB4                          Schaeffer - redirect

1    different rates, 9 percent, 6.55 and 6 percent?

2    A.  Yes.

3    Q.  Did you think the 9 percent rate was a good, a bad or an

4    indifferent rate for the purposes of your benefit?

5    A.  I thought it was a good rate.

6              MR. GOTTESDIENER:  No further questions.

7              THE COURT:  Thank you.  Mr. Clark.

8    REDIRECT EXAMINATION

9    BY MR. CLARK:

10   Q.  Mr. Schaeffer, I think you testified that when reviewing

11   PX-390, your practice would have been to look at the last page

12   and get the bottom line and take it from there?

13   A.  Yes.

14   Q.  Could you turn to the last page of the document -- rather

15   the page ending 7604.

16   A.  Okay.

17   Q.  I don't know if your copy has a separate calculation or

18   7604 is the very last page?

19   A.  It is that one.

20   Q.  That is the last page of the document, right?

21   A.  Yes.

22   Q.  Does it tell you your bottom-line benefit?

23   A.  No.

24   Q.  It actually says the lump sum payable at termination of

25   employment is the greater of the account balance or a minimum

F7LJOSB4                        Schaeffer - redirect

```
 1    lump sum, right?
 2    A.  Yes.
 3    Q.  Would you have read that at the time?
 4    A.  I would have, yes.
 5    Q.  Do you recall what your understanding was of that at the
 6    time?
 7    A.  I would probably have thought I was getting at least $7800
 8    plus, you know, the half year more that I worked, so it would
 9    have been at least that much.
10             MR. CLARK:  May I approach?
11             THE COURT:  You may.
12             MR. CLARK:  This is DX-363.
13             THE COURT:  All right.
14             (Off-the-record discussion)
15             THE COURT:  It has to be on the record.  You are
16    saying this was produced in unredacted form?
17             MR. CLARK:  It was produced in unredacted form during
18    the discovery that went on in June, but they will be redacted
19    for the purposes of filing with the court.
20             THE COURT:  Before we finalize the exhibits, the
21    social security number in particular will be redacted.
22             Thank you.
23    BY MR. CLARK:
24    Q.  Do you recognize this document, Mr. Schaeffer?
25    A.  Yes.
```

F7LJOSB4                          Schaeffer - redirect

1   Q.  Would you explain what it is.

2   A.  It is Union Central was the insurance company, the

3   investment firm that I turned my money over to from the

4   Woolworth plan.

5   Q.  If you look at the bottom, there is an X next to the

6   lump-sum payment option?

7   A.  Yes.

8   Q.  Is that the lump-sum benefit that you received from

9   Woolworth, the $14,245.00?

10  A.  Yes.

11  Q.  That's $5,200 more than the account balance on PX-390,

12  right?

13  A.  Yes.

14  Q.  Do you recall what your reaction was at the time?

15  A.  I was quiet.  Why wouldn't you want to get more?

16  Q.  Do you recall having any understanding as to why you were

17  receiving that much more than your account balance?

18  A.  The letter said it could be more or less depending on the

19  interest rate and the federal law, calculations and everything,

20  so it ended up being more.

21  Q.  The last page of the letter says the minimum lump sum is

22  affected by age, interest rate and mortality table, right?

23  A.  Yes.

24  Q.  So was it your understanding you were receiving the minimum

25  lump sum?

F7LJOSB4

1   A.   Yes.

2              THE COURT:  All set?

3              MR. CLARK:  Yes.

4              THE COURT:  Thank you.  You may step down, sir.

5              (Witness excused)

6              THE COURT:  All right, ladies and gentlemen, let's

7    break for lunch.  The next witness, is that going to be Ms.

8    Peck?

9              MR. GOTTESDIENER:  Yes.

10             THE COURT:  We'll start with Ms. Peck at 2:00 o'clock.

11             What is the current estimate for her testimony, Mr.

12   Gottesdiener, in terms of what you're going to be doing first?

13             Two hours?

14             MR. GOTTESDIENER:  That would be great if we could --

15             THE COURT:  You have deposed this witness.  So give me

16   a sense as to what you think it is likely to be.  Are we likely

17   to get her off the stand today?

18             MR. GOTTESDIENER:  I think we could.  Like I said

19   yesterday, I also deposed Mr. Kiley, and I couldn't have

20   predicted what happened.

21             THE COURT:  I want to make sure I have a sense as to

22   what is going to be happening next.  Today is Tuesday.  Who is

23   coming after Ms. Peck?

24             MR. GOTTESDIENER:  For plaintiffs, some of it depends

25   on what Ms. Peck says.

F7LJOSB4

| | |
|---|---|
| 1 | THE COURT:  I understand.  Tell me right now your |
| 2 | current expectation. |
| 3 | MR. GOTTESDIENER:  We have Ellen Glickfield.  The |
| 4 | court has heard about her, and we have Mike Steven. |
| 5 | THE COURT:  Yes. |
| 6 | MR. GOTTESDIENER:  And there are two other potential |
| 7 | witnesses that are in the nature of defense witnesses. |
| 8 | THE COURT:  And that is who? |
| 9 | MR. GOTTESDIENER:  Ms. Derham and Ms. Rattner. |
| 10 | THE COURT:  They are?  Just remind me, are they on |
| 11 | your pretrial order?  Are they listed? |
| 12 | MR. GOTTESDIENER:  Yes. |
| 13 | MR. RUMELD:  Just to clarify, Ms. Derham is listed as |
| 14 | plaintiff's witness and a defense witness.  Mr. Gottesdiener |
| 15 | agreed to produce her, so we didn't subpoena her separately |
| 16 | because we have no control over Ms. Derham. |
| 17 | THE COURT:  All right. |
| 18 | MR. RUMELD:  Ms. Rattner is listed on |
| 19 | Mr. Gottesdiener's list, not on mine, and I am waiting to hear |
| 20 | from Mr. Gottesdiener. |
| 21 | MR. GOTTESDIENER:  There was one other class member I |
| 22 | forgot I was reminded of, Ms. Hartman.  So we have three class |
| 23 | member witnesses, all of whom I don't think are going to take |
| 24 | very long. |
| 25 | THE COURT:  All right. |

F7LJOSB4

1          MR. GOTTESDIENER:  Those two other witnesses, I don't

2     know that --

3          THE COURT:  That sounds like -- what I am trying to do

4     is get a sense of when we're going to get to Mr. Sher, and that

5     is going to be the longest single witness left after Ms. Peck.

6          Is that fair?

7          MR. GOTTESDIENER:  The longest single witness, yes, I

8     think that is right.  I just want to make clear, we have

9     multiple objections to his reports.

10          THE COURT:  Anything that you folks have filed, I

11     have.  If you filed multiple objections to his report, I won't

12     think about it right now because I have another matter right

13     now.  We will deal with that, I told you, in due course.  I

14     want to remind everybody we will end the end of the day Monday.

15     You folks, if you respectively run out of time, give me a

16     heads-up so I can cut somebody off.

17          MR. RUMELD:  Is the understanding still, your Honor,

18     25 hours a side?

19          THE COURT:  It is, but we need to end by the end of

20     the day Monday.  It depends.  If we have to end by the end of

21     the day Monday and still have time, we have to adjourn and come

22     back.  That is not preferable.  I have another Bench trial

23     starting Tuesday.

24          MR. RUMELD:  I want to know whether your Honor is

25     going to limit Mr. Gottesdiener.

F7LJOSB4

1              THE COURT:  This is why I am trying to give you guys a

2      heads-up.  If we are not going to end the end of day Monday, I

3      want you to let me know because I made them truncate things

4      like I didn't feel like we need to go through any further.  I

5      want to have that opportunity to do that so we can get over the

6      finish line on Monday, but I need to get a heads-up from you

7      folks.  We'll come back at 2:00 o'clock.  You need to clear off

8      things and push them all away.

9              (Luncheon recess)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F7lnosb5                              Peck - cross

1                      A F T E R N O O N   S E S S I O N

2                              (2:08 p.m.)

3              THE COURT:  Mr. Gottesdiener, would you like to call

4    your next witness, please.

5              MR. GOTTESDIENER:  Yes, your Honor, Ms. Peck.

6    PATRICIA A. PECK,

7         called as a witness by the Defendants,

8         having been duly sworn, testified as follows:

9              THE COURT:  Ms. Peck, please be seated.  It's going to

10   be very important for you to pull that chair forward so that

11   you can speak clearly and directly into the mic.

12             Are these things things that can be removed?

13             MR. RUMELD:  I will do so, your Honor.  I'm sorry we

14   didn't have a chance before the break.

15             THE COURT:  That is OK because I had another matter in

16   the room, so we weren't able to get to the witness stand.

17             We will clean things up there for you Ms. Peck.

18             THE WITNESS:  Thank you.

19             THE COURT:  Being placed in front of the witness is a

20   binder which, if you open the cover of that binder, Ms. Peck,

21   it should contain a declaration.  The first thing I want you to

22   do is confirm for me that the declaration is, in fact, your

23   declaration that you intend to be your trial testimony in this

24   matter, your direct testimony in this matter.

25             THE WITNESS:  Yes.  This is mine.

F7lnosb5                          Peck – cross

1        THE COURT:  Do you swear to the truth of the contents

2   of that declaration?

3        THE WITNESS:  I do.

4        THE COURT:  All right.  Thank you.  The Court does

5   accept the declaration of Ms. Peck as her direct trial

6   testimony, and the witness is turned over for

7   cross-examination.

8        Mr. Gottesdiener, you may proceed, sir.

9   CROSS EXAMINATION

10  BY MR. GOTTESDIENER:

11  Q.  Good afternoon, Ms. Peck.

12  A.  Good afternoon.

13  Q.  If we could spend a couple of minutes on some background.

14       First, you were vice president of human resources from

15  1992 at Woolworth then it changed to Venator and Foot Locker

16  until recently?

17  A.  Correct.

18  Q.  In that capacity you were head of the entire human

19  resources department?

20  A.  Yes.

21  Q.  And you were an officer -- you stopped working recently?

22  A.  Yes, in February.

23  Q.  February of this year?

24  A.  Yes.

25  Q.  You were an officer until February of this year at the same

F7lnosb5                              Peck - cross

1    level as the general counsel, is that correct?

2    A.  Yes.

3    Q.  You --

4    A.  No.  That's not true.  The general counsel is a senior vice

5    president, and I was a vice president.  But we were officers.

6    Q.  You were both officers?

7    A.  Yes.

8    Q.  It may not be of any consequence.  If you just indulge me.

9            Was there some point in time where you were at the

10   same level as the general counsel?

11   A.  No.

12   Q.  Back in the time frame 1995, 1996, the general counsel was

13   Mr. Bahler?

14   A.  Right.

15   Q.  You both reported to the same individual, is that correct?

16   A.  Correct.  I don't remember if Gary was a senior vice

17   president at that time.

18   Q.  If he weren't, then you would have been on the same level

19   with Gary?

20   A.  Right.

21   Q.  In your deposition, let me just read this and tell me if

22   this refreshes your recollection, the bottom of 286, line 25:

23   "Q.  And you and Gary Bahler were in terms of your --

24   "A.  Colleagues.

25   "Q.  -- in terms of your status, were you both at the top of

```
 1    your departments?
 2    "A.  That's correct.
 3    "Q.  Was he an officer at that time?
 4    "A.  I believe he was, yes.
 5    "Q.  And you were an officer?
 6    "A.  I was.
 7    "Q.  And you were effectively at the same hierarchical level?
 8    "A.  Yes."
 9         Does that refresh your recollection that you and he
10    were at the same level at least at that time?
11    A.  OK.  Yes.
12    Q.  It's not necessarily a big point.  I just wanted to clarify
13    that.
14         You both reported you just confirmed to the same
15    person, and that was Barry Thomson?
16    A.  Yes.
17    Q.  And Mr. Thomson was chief administrative officer?
18    A.  Yes.
19    Q.  He was very senior in the company?
20    A.  Yes.
21    Q.  He was part of the exclusive chairman's group?
22    A.  Yes.
23    Q.  Now, in addition to your role as head of HR, you served on
24    the retirement administrative committee, correct?
25    A.  I don't think I was a member of the committee, but I was
```

F7lnosb5                          Peck - cross

1   present at their meetings.

2   Q.  Did you serve the role of -- when you say you were present

3   at their meetings, what do you mean by that?

4   A.  If there was a retirement administrative committee, or RAC,

5   meeting, I was there.

6          THE COURT:  Were you a voting member of the committee?

7          THE WITNESS:  No.

8          THE COURT:  All right.

9   BY MR. GOTTESDIENER:

10  Q.  Let me see if looking at docket 66 might help you explain

11  for us what your role was.

12         This is a document that is an admission by the

13  defendants as to certain facts, and what we're looking at is --

14         MR. GOTTESDIENER:  Randall do you have opening slide 4

15  and 5 by any chance?

16  Q.  What he's getting to is the retirement administrative

17  committee.  While he's locating this, you understood it was the

18  formal administrator of the retirement plan?

19  A.  Yes.

20  Q.  So what he's located here is this document in this form.

21         MR. GOTTESDIENER:  Then if we have the second -- yes,

22  so we can blow that up.

23  Q.  This is an admission by the defendants, or a stipulation.

24  It is an agreement by the parties in the case as to certain

25  facts.  What they state is plan administration, the membership

F7lnosb5                          Peck - cross

```
 1   of this committee between 1995 and 2005, and it states that the
 2   RAC members were Mr. Farah, Mr. Cannon, Dale Hilpert,
 3   Mr. Hines, and you and Barry Thompson.
 4   A.  Yes.
 5   Q.  So when you say yes, I really want your testimony, not just
 6   your agreement.
 7           Does this refresh your recollection or help you tell
 8   us that you actually were a member -- I mean, they are stating
 9   that there.  Is that what you believe to be the case?
10   A.  Where did this come from?
11   Q.  From --
12           THE COURT:  Hold on just one second.  I just want to
13   make sure the witness understands that the piece at the top
14   that blue piece --
15           THE WITNESS:  Yes.
16           THE COURT:  -- that is argument from lawyers.
17           it may be a true fact or not, but that's put on the
18   page.
19           THE WITNESS:  OK.
20           THE COURT:  What they've done below that is they are
21   excerpting a statement.  OK?
22           THE WITNESS:  OK.
23           THE COURT:  So it's from what's called -- I think it's
24   called a joint stipulation.
25           Is that what it is called?
```

F7lnosb5                          Peck - cross

1              MR. GOTTESDIENER:  Yes, your Honor.

2              If you could show 11A.  It may help to see that it is

3      a statement made as to several years.

4      BY MR. GOTTESDIENER:

5      Q.  So this is the actual document that is up on the screen?

6      A.  Yes.

7      Q.  You see it says 11A the membership from '95 to 2000.

8              What it shows is that in '95 you are on the committee,

9      and then for reasons that we are not sure of, it says, in other

10     years it says Farah, Gillespie, Hilpert, and Hines.  But

11     Thomson and you are not on the committee at that point in time.

12             Do you see that?

13     A.  Yes.

14     Q.  Can you help us with that.  I don't think you and I spoke

15     about this in your deposition in detail.

16     A.  Right.  Well, John Gillespie came in as the senior vice

17     president of HR, and once he came in then that's who I reported

18     to, no longer reporting to Barry Thompson.

19     Q.  OK.

20     A.  OK.

21     Q.  But you continued to attend the meetings of the RAC?

22     A.  I do believe I did, yes.

23     Q.  You know obviously something about what this case is about,

24     the change to the retirement plan and how it was or not -- how

25     it was or was not communicated to people.

F7lnosb5                          Peck - cross

1    A.  Uh-huh.

2    Q.  You were the head of the team that was responsible for

3    coming up with a recommendation about a plan change, and then

4    responsible for the way it was communicated to participants, is

5    that correct?

6    A.  Yes.

7    Q.  So, because this is kind of important, we are going to walk

8    through that together, and you'll have an opportunity to

9    explain what your responsibilities were in practice and why you

10   did what you did.

11            MR. GOTTESDIENER:  So if we could get on the screen

12   Ms. Peck's declaration.

13   Q.  Ms. Peck, you can turn to that.

14            THE COURT:  You don't go to the declaration until she

15   has an inconsistent statement.  Otherwise it's just hearsay.

16            MR. GOTTESDIENER:  It is her declaration.

17            THE COURT:  Declaration, not the deposition.  Sorry.

18   BY MR. GOTTESDIENER:

19   Q.  Your declaration, your direct testimony, paragraph 3?

20   A.  Uh-huh.

21   Q.  So, starting at the beginning when this project started,

22   you discussed this in your declaration.  First, to cap it all

23   off, you would agree that the goal of the change was to cut

24   costs?

25   A.  One of the goals.

F7lnosb5                          Peck - cross

1  Q.  Well, let's look at what you say here in your declaration.

2          You say:  In late 1994, or early 1995, Foot Locker's

3  management announced that, in light of the company's poor

4  financial condition it was necessary for the company to cut

5  costs, including with respect to retirement benefits.  Members

6  of senior management instructed me to provide them with a

7  suitable recommendation.

8          That is true, right?

9  A.  That is true.

10  Q.  By senior management, you mean all the way to the top,

11  including CEO, Roger Farah?

12  A.  Yes.

13  Q.  Are you aware, while I'm locating a document, that

14  Mr. Farah has testified in this case?

15  A.  Yes.

16  Q.  PX 24 --

17          MR. GOTTESDIENER:  May I approach the witness, your

18  Honor?

19          THE COURT:  Yes.

20          MR. GOTTESDIENER:  Does your Honor need a copy of

21  this?

22          THE COURT:  No.

23  BY MR. GOTTESDIENER:

24  Q.  Here's a copy for you.  You can look on the monitor, you

25  can look at the hard copy, you can look on that.  You have all

F7lnosb5                          Peck - cross

1   those choices.

2   A.  OK.  Thank you.

3   Q.  This is a deck that bears your name.  Do you see that

4   401(k) Plan Review on the front cover first?  It is after that

5   cover page.  Do you see there June 10, 1997?

6   A.  Just a minute, please.

7   Q.  Sure.  Take your time.

8   A.  No.

9   Q.  I'm sorry?

10  A.  No.  I don't have it.  Where is it?

11  Q.  What is confusing is this cover page just shows that it was

12  filed in court.

13  A.  OK.

14  Q.  On the back, because we tried not to kill too many trees,

15  we have it double sided?

16  A.  I got it, OK.

17  Q.  Do you see that this is your deck from June of '97?

18  A.  I see that.

19  Q.  401(k) Plan Review is the title?

20  A.  Yes.

21  Q.  Thumbing through it, can you see that this is a

22  presentation that you made to senior management?

23  A.  Yes.

24  Q.  That would have included Mr. Farah?

25  A.  It should have, yes.

F7lnosb5                          Peck - cross

1    Q.  You see on the page that says, Background?

2    A.  Yes.

3    Q.  It states, In February 1995 Roger N. Farah directed that a

4    review of the company's retirement program be undertaken.

5    A.  Yes.

6    Q.  And then there is a bullet point, and it says, A task force

7    consisting of four corporate benefits department associates was

8    established.

9    A.  Yes.

10   Q.  The task force consisted of Tom Kiley, Carol Kanowicz,

11   Marion Derham -- and the fourth person?

12   A.  Would have been me.

13   Q.  Do you see underneath here you state that in May the

14   concept of converting the company's defined benefit pension

15   plan was presented -- I'm skipping some words -- was presented

16   to the CFO, CIO, general counsel, and secretary-treasurer, vice

17   president of taxation, and controller?

18   A.  Yes.

19   Q.  You have no reason to doubt that the statements that you

20   made in this deck are true?

21   A.  Right, yes.

22   Q.  Right.  It's sometimes confusing, the negative.  I am just

23   saying you have no reason to think that any of those statements

24   are inaccurate.

25          Thank you.

F7lnosb5                        Peck - cross

1       So in your declaration, going back to paragraph 3 of

2  your statement to her Honor as your direct testimony, you say

3  they instructed me.

4       So it's fair to say that this was your responsibility?

5  A.  They instructed me as the head of department.

6  Q.  Members of senior management instructed me to provide them

7  with a suitable recommendation?

8  A.  Yes.  That's right.

9  Q.  So it was your responsibility as you understood it?

10 A.  Yes.

11 Q.  And you were in charge of the project, assembled the team

12 we just mentioned, and you were reporting to Thomson, who you

13 understood would then take matters up the line to Mr. Farah and

14 ultimately the board?

15 A.  Yes.

16 Q.  You were the one who made the decisions about what went up

17 the line?

18 A.  With the committee, yes.

19 Q.  With which committee?

20 A.  The group that we were working -- that was working.

21 Q.  The task force?

22 A.  Right.  Uh-huh.

23 Q.  OK.  But you were ultimately the one who decided?

24 A.  Yes.

25 Q.  And is it fair that you were to take and did take all of

F7lnosb5                              Peck - cross

1    the task force, the core team members' work and perhaps relying

2    on their judgment, winnow down the options for presentation to

3    Thomson?

4    A.  Yes.

5    Q.  You understood at the time when you were going through this

6    process that the company needed to save a lot of money?

7    A.  The company needed to save money, yes.

8    Q.  The edict came from Mr. Farah and Mr. Hilpert to see what

9    could be done without unduly upsetting employees to cut

10   benefits?

11            MR. RUMELD:  Objection.

12            THE COURT:  Hold on.

13            Sustained.

14   BY MR. GOTTESDIENER:

15   Q.  I asked you about you needed, you understood there was the

16   need to cut -- withdrawn.  The edicts came to cut expenses from

17   Roger and Dale, correct?

18   A.  Yes.  But I actually got it from Barry as my supervisor.

19   Q.  Barry was person who informed you that Roger and Dale had

20   directed him to have you cut what you could and come up with a

21   recommendation?

22   A.  That's correct.

23   Q.  You understood this was a big item for top management?

24   A.  Yes.

25   Q.  It was a big item because it had to do with benefits that

F7lnosb5                          Peck - cross

1   affected everyone?

2   A.  Yes.

3   Q.  Because of that, you understood that's why they would all

4   be involved in it?

5   A.  I don't think those two things necessarily go together.

6   Q.  Again, it may not be that big of a point, but I want to ask

7   you, in speaking with me in your deposition, page 155, line 18,

8   I asked you:

9   "Q.  So why the three of them at this time?

10  A.  Right.  Because -- because -- well, certainly Barry as my

11  boss.  And then, you know, the -- the edict to cut expenses

12  came from Roger and Dale so -- and this is a big item having to

13  do with benefits that affects everyone.

14          "So that's why they -- and it ultimately has to go to

15  the -- to the board, so that's why they would all be involved

16  in it."

17          So now --

18  A.  And that's the statement, yes.

19  Q.  You gave that testimony, right?

20  A.  Right.

21  Q.  So you see that you were drawing that connection between

22  those?

23  A.  Right.

24  Q.  Right?

25  A.  Yes.

F7lnosb5                              Peck - cross

1   Q.   Thank you.  So the first step was, after the task force was

2   assembled, you saw the job to work collaboratively with Mercer?

3   A.   Yes.

4   Q.   And Mercer was the company's longtime actuarial firm?

5   A.   Correct.

6   Q.   To come up with a proposal that would work for the company?

7   A.   Right.

8   Q.   This was not to be some kind of prepackaged off-the-shelf

9   Mercer design; it was something that was right for the company

10  in the situation?

11  A.   Right.

12  Q.   Looking again at paragraph 3 of your declaration:  Because

13  I -- meaning you -- did not have any specialized training in

14  employee benefits or finance, I asked Thomas Kiley, who was

15  then serving as manager of benefits planning and design, to

16  work with the corporate benefits department and Mercer, the

17  actuary, in providing me with the recommendation for

18  management.

19  A.   Yes.

20  Q.   That's accurate, right?

21  A.   Yes.

22  Q.   So you turned to Kiley because he has the necessary pension

23  expertise?

24  A.   Right.

25  Q.   He's somebody who understood the ins and outs of pension

F7lnosb5                              Peck - cross

1     plans?

2     A.   Yes.

3     Q.   You wanted to know what you would be getting into?  You

4     were not content to just say, Here, Mercer, do this and Mercer

5     would say, trust us, this is what you should do.

6             Correct?

7     A.   Correct.

8     Q.   And Tom you would agree was very bright, knew his pension

9     field very well, would communicate with an actuary succinctly,

10    and understood what the actuaries would be presenting to him?

11            MR. RUMELD:  Objection.

12            THE COURT:  Let me just read this.  Hold on.

13            Sustained.

14    BY MR. GOTTESDIENER:

15    Q.   Tom was very bright, correct?

16    A.   Yes.

17    Q.   Tom knew his pension field very well, right?

18    A.   Yes.

19    Q.   Tom could communicate with an actuary succinctly?

20    A.   Yes.

21    Q.   And Tom understood, as far as you knew, what the actuaries

22    would be presenting to him?

23    A.   Yes.

24            MR. RUMELD:  Objection.

25            THE COURT:  Overruled.

F7lnosb5                          Peck − cross

1    Q.  You can answer.

2    A.  Yes.

3    Q.  So, again, looking at paragraph 3 of your declaration, you

4    say in the next sentence there, After lengthy internal

5    deliberations, and based on advice received from James Grefig

6    of Mercer, Kiley recommended that the plan be converted from a

7    traditional career average pay defined benefit plan to a cash

8    balance plan, and that this change occur simultaneously with

9    the institution of a 401(k) plan with corporate matching

10   contributions.

11          Is that correct?

12   A.  Yes.

13   Q.  So I take it from what we just talked about with Barry and

14   top management you mean that Kiley recommends to you, you

15   satisfy yourself the recommendation makes sense, and then you

16   run it up the line in a big picture way, and it then moves

17   forward from there?

18   A.  I run it up the line, yes.

19   Q.  You would agree that because there were lengthy internal

20   deliberations, there was nothing preordained in January or

21   February about what kind of changes to the plan you were going

22   to have?

23          MR. RUMELD:  Objection.

24          THE COURT:  Overruled.

25   A.  Would you repeat that question, please.

1    Q.   Sure.   I think it's very understandable.   You say that

2    after lengthy internal deliberations --

3    A.   Right.

4    Q.   -- Kiley came up with this recommendation.   I'm just asking

5    you, prior to the lengthy internal deliberations, there was

6    nothing preordained in terms of what the plan was going to look

7    like after it changed if the recommendation were followed?

8    A.   That's right.   There was nothing preordained.

9    Q.   In fact, as late as May of '95 -- I am reminding you about

10   that deck that you have in front of you from '97 that talks

11   about on page 3, that hard copy you have in front of you, if

12   you want to refresh your recollection?

13   A.   Right.

14   Q.   You mentioned as a second step in the deck on page 3 that

15   there was a presentation to senior management in May of '95.

16        Do you want to just take a look at that again.

17        Page 3.

18   A.   I have it.   OK.

19   Q.   Right.   I want to ask you that in fact as late as May that

20   the point in time there was nothing preordained?   I'll ask it

21   another way.

22        It would be fair to say that it was still, in May you

23   were still in a fact finding mode at that point in time?

24        MR. RUMELD:   Objection.

25        THE COURT:   Sustained.

F7lnosb5                          Peck - cross

 1                Why don't you rephrase that.

 2                MR. GOTTESDIENER:  Poorly asked.

 3   BY MR. GOTTESDIENER:

 4   Q.  Prior to May there still was nothing preordained in terms

 5   of the recommendation that you were going to make to senior

 6   management?

 7                MR. RUMELD:  Objection.

 8                THE COURT:  Overruled.

 9   A.  That's right.

10                THE COURT:  Does that mean the same thing as you

11   hadn't yet decided what to recommend?

12                THE WITNESS:  Yes.

13                THE COURT:  Thank you.

14                THE WITNESS:  Thank you.

15   Q.  Sorry for all the lawyerisms.  How about let's look at

16   February 2, 1995.  You say in your declaration paragraph 6 that

17   in early '95 you participated in at least one meeting during

18   which possible changes were being discussed.

19                Do you see that there in paragraph 6?

20   A.  I do.

21   Q.  Do you have that binder in front of you that was put in

22   front of you?

23   A.  Yes.

24   Q.  Let me give you our copy.  You can also look at the binder.

25                MR. GOTTESDIENER:  May I approach, your Honor?

F7lnosb5                              Peck - cross

1          THE COURT:  You may.

2     BY MR. GOTTESDIENER:

3     Q.  This is PX 84.  PX is plaintiff, DX is defendant.  Many

4     documents are exhibits of both sides.  This is one of them.  PX

5     84 you would agree are your handwritten notes?

6     A.  I agree.

7     Q.  And you have looked at these notes probably more than you

8     would have liked to on many occasions prior to today in the

9     past few years, is that right?

10    A.  Yes.

11    Q.  This is a meeting at which, according to your declaration,

12    you came to learn that there was an aspect of the proposed

13    design that would have the effect of suspending the accrual of

14    new benefits for employees for a period of time, is that

15    correct?

16    A.  Yes.

17    Q.  If you look at page 2, you can see at the top of the page

18    where you write, example 7.83 percent and 9 percent?

19    A.  Yes.

20    Q.  You drew a bar graph, right?

21    A.  Yes.

22    Q.  And you were there illustrating the wear-away effect in

23    that circumstance, if there was a conversion using 9 percent as

24    a discount rate applied to the 12/31 benefit, but somebody

25    cashed out at 7.83 percent, a GATT rate?

F7lnosb5                         Peck - cross

1   A.  Yes.

2   Q.  In this meeting by the way, there were Mercer people, there

3   was Tom Kiley.  Who is it that was giving this example?  Can

4   you be sure?

5   A.  I believe it was Jim Grefig.  This was part of what he was

6   telling us about, yes.

7   Q.  Certainly Jim Grefig you would agree did talk to you about

8   wear-away.  You have that recollection, right?

9   A.  We never referred to it as wear-away at that point no.

10  Q.  At some point you did?

11  A.  Much, much later.

12  Q.  And when you say much, much later, you mean a year or so

13  into the implementation of the new plan?

14  A.  I don't exactly remember when, but it was certainly not at

15  this time we weren't calling it wear-away.

16  Q.  But I'm just trying to get a range.  Some period of time

17  within a year or two of the implementation of the plan, in that

18  general time frame?

19  A.  I don't -- yes, I guess so.

20  Q.  OK.

21  A.  I don't recall exactly when, but that seems reasonable.

22  Q.  It was around the time when you -- I don't want to get too

23  far ahead of things, but it was around the time when you

24  understood that this effect, this suspension of new accruals,

25  was lasting longer than you would -- or previously was going to

F7lnosb5                              Peck - cross

1    last, is that fair?

2              MR. RUMELD:  Objection.

3              THE COURT:  Yes.  Hold on.

4              All right.  Sustained.

5              The question is unclear.

6    BY MR. GOTTESDIENER:

7    Q.  All I'm trying to do is get a sense from you what was the

8    circumstance under which you started hearing it and you started

9    referring to it as wear-away?

10   A.  I don't remember the exact circumstance.

11   Q.  Just to finish, the general circumstance was that it was

12   something that you understood was impacting a significant

13   number of people?

14   A.  Yes.

15   Q.  So this was during the time it was still going on, after

16   the conversion, correct?

17   A.  After.

18   Q.  The impact?

19   A.  After what?

20   Q.  The conversion, the amendment.

21   A.  After the amendment.

22             THE COURT:  Let's take the question I think a lit bit

23   differently.

24             I Think what Mr. Gottesdiener is trying to get at is,

25   when you first started using the phrase wear-away in connection

F7lnosb5                          Peck - cross

1    with the suspension of accruals, was it before the amendment

2    went into effect or after?

3            THE WITNESS:  I believe it was after.

4            THE COURT:  Do you recall whether it was relatively

5    soon after the amendment went into effect, or can you estimate

6    the period of time when you started using that phrase?

7            THE WITNESS:  Yeah.  It wasn't relatively soon.

8            THE COURT:  It was not relatively soon?

9            THE WITNESS:  It was not relatively soon.

10           THE COURT:  Do you have any estimate at all?  Would it

11   have been within two years or three years?  Or some other

12   period of time?

13           If you don't recall, you don't recall.

14           THE WITNESS:  I don't recall.

15           THE COURT:  Do you recall the circumstances under

16   which you started using that phrase?

17           THE WITNESS:  No, definitely not.

18           THE COURT:  All right.  Mr. Gottesdiener, you may

19   proceed.

20           MR. GOTTESDIENER:  Thank you, your Honor.

21   BY MR. GOTTESDIENER:

22   Q.  You'll let us know.  In the course of seeing some more

23   documents, maybe it will come back to you, and I will ask you

24   again the same question.

25           However, one thing that you do know is that you --

F7lnosb5                              Peck - cross

1    first of all, can we agree even though it wasn't called

2    wear-away at the time it still is wear-away, so is it OK if we

3    refer to it as wear-away?

4    A.   That's fine.  But, as you said, it was not part of our

5    vocabulary.

6    Q.   On February 2, 1995, right?

7    A.   Right.

8    Q.   So one thing we were not exactly finished with, you said

9    Grefig the reason we went down that road, Grefig you think was

10   talking with you all at this meeting?

11   A.   Yes, he did.

12   Q.   And explaining wear-away?

13   A.   Without labeling it that, yes.

14   Q.   That's the graph that you're drawing; that illustrates

15   wear-away, right?

16   A.   Yes.

17           THE COURT:  Which graph is this?

18           MR. GOTTESDIENER:  This is on page 2 of PX 84.

19           THE COURT:  All right.

20           MR. GOTTESDIENER:  This is the example that we went

21   through with Mr. Kiley.

22           THE COURT:  All right.

23           MR. GOTTESDIENER:  I won't take the Court's time to go

24   through the example now.

25           THE COURT:  I just want to have the record clean.

F7lnosb5                              Peck - cross

1             MR. GOTTESDIENER:  Maybe I should now that it's popped

2     up here.  I think the Court has it.

3             THE COURT:  Really just for the record I wanted to

4     make sure we had it on page 2.

5             MR. GOTTESDIENER:  Thank you.

6             I am just mindful of the time.

7             THE COURT:  OK.

8     BY MR. GOTTESDIENER:

9     Q.  In your deposition -- memory can play tricks, so just let

10    us know if this helps.  I think in your deposition you thought

11    that maybe it was Mark Brandes or Tom Kiley or maybe both of

12    them who were giving you that example of wear-away.  Do you

13    remember saying that?

14    A.  I don't remember saying it.  But what I was saying was that

15    I didn't remember which of them actually made that example.

16    Q.  OK.  Now I'm asking because in your deposition -- and I

17    could read it to you, direct you to page 203 of it, to show it

18    to you.

19            On page 203, 204 when you were talking about this

20    discussion, you didn't mention Grefig, so I'm just wondering

21    are you now remembering that it was Jim?

22    A.  Well, he was the actuary.  So it's quite possible that it

23    was him, right.

24    Q.  But it is also possible that, as you said in your

25    deposition, that it, maybe it was Kiley or Mark Brandes from

F7lnosb5                          Peck - cross

1   Mercer?

2   A.   Right.  It could have been Mark, uh-huh.

3   Q.   You also said it could have been Kiley?

4   A.   Could have been, sure.

5   Q.   So you understood from this presentation and your

6   discussions that -- you understood wear-away at that time,

7   right?

8   A.   We were not referring to it as wear-away.

9   Q.   Right.  I'm asking, don't you agree that the phenomenon is

10  the phenomenon, and can we just have an agreement that I hear

11  what you are saying?

12  A.   Yes.

13  Q.   And I accept what you are saying.  But can we refer to as

14  wear-away?

15         Because it is that phenomenon, even if you didn't call

16  it that on February 2.  Do you agree?

17  A.   OK.

18  Q.   OK.  So you had a good grasp of wear-away after these

19  discussions, is that fair?

20         MR. RUMELD:  Objection.

21  A.   I --

22         THE COURT:  Overruled.

23  Q.   I'm sorry.  Your answer?

24         THE COURT:  You may answer.

25  A.   I don't -- I would not call it a good grasp, no, I

F7lnosb5                         Peck - cross

1    wouldn't.

2    Q.  OK.

3    A.  Not after one meeting.

4    Q.  Well, how about this.  Soon thereafter -- that's why I kind

5    of asked the question, your discussions with the task force

6    this meeting and discussions that may have followed, you came

7    not long thereafter to have a good grasp of wear-away?

8    A.  Right.

9    Q.  And you came to understand that the wear-away -- first of

10   all, it was something that was an option.  It was not something

11   that was necessary to using a cash balance formula?

12             MR. RUMELD:  Objection.

13             THE COURT:  Overruled.

14   A.  Would you ask the question again, please.

15   Q.  Sure.  Maybe I can use your notes to help.  If you look at

16   your notes on page 2 at the bottom?

17   A.  Uh-huh.

18             THE COURT:  PX 84.

19   Q.  Do you see where it says --

20             MR. GOTTESDIENER:  The prior page, Randall.  7347 is

21   the Bates number.

22   Q.  Towards the very bottom, do you see where it says, Convert

23   current approved benefit.

24             Do you see those words?

25   A.  Yes.

F7lnosb5                          Peck - cross

1  Q.  And then it kind of cuts off at the end of that sentence.

2  Then it says, May convert at 9 percent.  But if they term. we

3  must value at 7.83 percent.

4        Do you see that?

5  A.  I see it.

6  Q.  You understood that you may convert at 9 percent; you may

7  convert at some other interest rate?

8  A.  OK.

9  Q.  You understood that?

10 A.  Yes.

11 Q.  And you understood that there could be cash balance plans

12 that didn't have wear-away, right?  They could convert it at

13 7.83, for example?

14 A.  Right.

15        MR. GOTTESDIENER:  OK.

16        THE COURT:  Hold on.

17        I just want to make sure she is not just agreeing with

18 what you are saying, but actually agrees with the concept.

19        MR. GOTTESDIENER:  Sure.

20        THE COURT:  I want you to be very careful just to make

21 sure that was your understanding at the time.  I'm not trying

22 to say it wasn't.

23        THE WITNESS:  That's OK.

24        THE COURT:  But I just want to make sure.  Was it your

25 understanding at the time that the company had some discretion

F7lnosb5                         Peck - cross

1   to choose what rate it wanted to discount, and that it could

2   discount at 9 percent or discount, at some other rate, and it

3   could, if it wanted, make the discount rate the same rate as

4   the GATT rate?

5            THE WITNESS:  Yes, I understood that.

6            THE COURT:  OK.  Thank you.  You may proceed,

7   Mr. Gottesdiener.

8   BY MR. GOTTESDIENER:

9   Q.  You also understood that under the design that was

10  ultimately adopted, wear-away was built into the conversion?

11           MR. RUMELD:  Objection.

12           THE COURT:  Overruled.

13  A.  Because of the difference in the interest rates, yes.  I

14  understood that.

15  Q.  In addition to this GATT rate, where somebody cashes out,

16  there is another interest rate or in this point an interest

17  crediting rate that was important that you understood was

18  fundamental to the wear-away, right, the 6 percent interest

19  crediting rate?

20  A.  I know the 6 percent that you are talking about, but --

21  Q.  You knew that if you were to take somebody's already

22  accrued benefit up to 12/31/95 and apply a 9 percent discount

23  rate to it to reduce it to what looks like a cash amount, an

24  opening account balance, but then in the cash balance formula

25  you move people forward going back to age 65 only at a

F7lnosb5                              Peck - cross

1    guaranteed rate of 6 percent that it's that differential

2    between the 6 and the 9 that locks in mathematically the

3    wear-away period?

4    A.  Yes.  I knew that.

5    Q.  You had to know what you told us just now that you knew in

6    order to do your job in this context, correct?

7    A.  Yes.

8    Q.  You came to know that it was wear-away that was going to be

9    causing the drop in the normal cost that was going to save the

10   company the cash it needed to save?

11   A.  We didn't think about it as wear-away, but, yes, we knew.

12   Q.  The anticipated normal cost savings that Mercer described

13   for you from the conversion, they were based you understood

14   directly on the fact that because of the conversion, the way it

15   was structured, a person wouldn't earn any additional benefits

16   for a period of time after the conversion?

17            MR. RUMELD:  Objection.

18            THE COURT:  Overruled.

19   A.  Yes.

20   Q.  That was, even if you didn't use the word on February 2,

21   that was the wear-away period, correct?

22   A.  Uh-huh, yes.

23   Q.  The period during which a person didn't earn any additional

24   benefits, correct?

25   A.  Yes.

F7lnosb5                        Peck - cross

1   Q.  Now, you came to learn initially in the spring that this

2   wear-away period was expected to last one or two years, is that

3   correct?

4   A.  I was thinking it was -- I thought I had two to three

5   years, but --

6   Q.  I was going to get to that next.

7           By April you understood that it was anticipated to be

8   lasting two to three years, is that right?

9   A.  Yes.

10  Q.  And you also came to learn that that GATT rate, which was

11  the actual cashout rate if somebody left the plan --

12  A.  Uh-huh.

13  Q.  -- if that dropped further than where it was at the time

14  Mercer gave these estimated wear-away periods that that would

15  worsen or lengthen the wear-away period?

16  A.  I knew that it would worsen it, yes.

17              (Continued on next page)

18

19

20

21

22

23

24

25

1   Q.  And you understood that during that period of time

2   someone's account balance going up really would not have meant

3   anything to them if they were still in the wear-away.  Is that

4   correct?

5   A.  That's correct.

6   Q.  So during that period of time, that growth to the account

7   doesn't end up meaning anything because it doesn't actually add

8   to their pension, correct?

9   A.  That's correct.

10  Q.  Now, one of the options that was considered to save money

11  was a freeze of the plan itself.  Do you recall that?

12  A.  Yes.

13  Q.  You understood that wear-away had the same effect as a

14  benefit freeze, a freeze of the plan itself, correct?

15  A.  No, that is not correct.

16  Q.  Well, you agree that you all were contemplating a pension

17  freeze, meaning a freeze of the entire plan?

18          MR. RUMELD:  Objection.

19          MR. GOTTESDIENER:  Let me ask it another way because

20  of the way that came out.

21          THE COURT:  Yes.

22  BY MR. GOTTESDIENER:

23  Q.  It was something that was considered as a possibility to be

24  looked at to understand what the savings would be and the

25  implications to do an open freeze of the pension money?

F7LJOSB6                          Peck - cross

1   A.  Yes, it was.

2   Q.  And the participants, if there were such an open, total

3   freeze of the plan, the participants would not earn any new

4   benefits during that time, correct?

5           MR. RUMELD:  Objection.

6           THE COURT:  Overruled.

7   A.  Correct.

8   BY MR. GOTTESDIENER:

9   Q.  And you understood that at the time when you were at least

10  exploring understanding the implications of an actual open

11  pension freeze of the entire plan?

12  A.  Correct.

13  Q.  So you knew at the time that the effect of the wear-away

14  was no different as a practical matter from the employee's

15  point of view than a pension freeze, right?

16  A.  No, we didn't equate the two.

17  Q.  Well, I'm not exactly asking if you equated them, but you

18  recognized that there was not from the employee's point of view

19  any difference in that situation?

20  A.  As we look back on it now, we realize that, but that was

21  not what we saw when we were looking at the possibility of

22  doing a pension freeze.

23  Q.  Well, what you saw when you were looking at the possibility

24  of adopting a cash balance formula that had a built in

25  wear-away, the effect on people's benefits would be they would

1  not earn any new benefits for a period of time, correct?

2  A.  Only for a short period of time was our understanding.

3  Q.  That was your understanding, a short period of time, two to

4  three years, you're calling that a short period of time?

5  A.  Yes.

6  Q.  Well, so pension is part of people's total compensation,

7  right?

8  A.  That's correct.

9  Q.  If you turn back to that 401 (k) presentation you made to

10 Mr. Farah and other senior managers, you'll see that you note

11 in there on Page 6, still in the background, the Bates number

12 is 3954, do you see that?

13 A.  Yes.

14 Q.  The average salary for participants, the employees, was

15 about $22,000.  Am I right?

16 A.  Ah-huh.

17 Q.  So the company paid people not just salary, but salary and

18 benefits, right?  The total compensation that an employee

19 earned was their salary plus their benefits, right?

20 A.  Yes.

21 Q.  And pension was one of the benefits at least up until this

22 amendment that was part of people's total compensation?

23 A.  Yes.

24 Q.  So they stopped when they're in wear-away, and you're

25 stopping any new pension benefits, your total compensation, all

F7LJOSB6                         Peck - cross

1   other things being equal, is being cut?

2   A.   Okay.

3   Q.   You agree?

4   A.   Yes, I agree with the mathematics, yes, ah-huh.

5   Q.   You brought in a water bottle.  Do you want to have a drink

6   of water?

7   A.   It is not going to help.  (Pause)

8   Q.   But you have water?

9   A.   I do.  Thank you.

10  Q.   Let us know if you need anything else.

11          What you were describing as a two to three year

12  wear-away period, I think you said that that was a short period

13  of time, you thought of that as a short period of time?

14  A.   Yes.

15  Q.   You later -- we'll come back to it -- you later learned

16  that it was going to be even longer than two to three years,

17  right?

18  A.   Yes.

19  Q.   If you were working for a company, and the company decided

20  to freeze your benefit maybe even for a short period of time,

21  would you want to know about that?

22          MR. RUMELD:  Objection.

23          THE COURT:  Rephrase.

24  BY MR. GOTTESDIENER:

25  Q.   If you were still employed and your employer --

F7LJOSB6                          Peck - cross

1        THE COURT:  Rephrase it from there.

2    Q.  -- would you want to know if your employer was freezing

3    your pension even for a short period of time?

4    A.  I, Pat Peck, would want to know, but that doesn't mean that

5    everybody would.

6    Q.  Am I understanding you to be saying that you, Pat Peck,

7    would want to know because you paid attention to those kinds of

8    things?

9    A.  Yes.

10   Q.  Whereas, from your understanding and experience as head of

11   HR, you didn't think that the employees at Woolworth, except

12   for those right on the cusp of retiring, paid much attention to

13   their retirement?

14       MR. RUMELD:  Objection.

15       THE COURT:  Sustained.

16       THE WITNESS:  Well --

17       THE COURT:  Hold on.  Let him rephrase the question.

18       MR. GOTTESDIENER:  I'm actually trying to understand

19   your last answer.

20   BY MR. GOTTESDIENER:

21   Q.  What is it about you?

22       You would want to know if the company was freezing

23   your benefit, your pension benefit?

24       THE COURT:  She can't see in the mind of others.  You

25   have to word it differently.  She can't understand why somebody

F7LJOSB6                              Peck - cross

1    else would or would not find it to be the same as for her, nor

2    do you need to go any further with this.  I think it is worth

3    moving on.

4              MR. GOTTESDIENER:  Could I ask one more question, your

5    Honor?

6              THE COURT:  You can ask and we'll see if it is all

7    right.

8    BY MR. GOTTESDIENER:

9    Q.  So you would want to know if your benefit had been frozen

10   even for a short period of time, right?

11             THE COURT:  She answered that.

12             MR. GOTTESDIENER:  That is just a predicate?

13             THE COURT:  You don't need to have a predicate.

14             Go on.

15   BY MR. GOTTESDIENER:

16   Q.  Your answer would be the same, you would definitely want to

17   know about it if it were for a long period of time?

18   A.  Yes, I would want to know if it was for a long period of

19   time.

20   Q.  So you'd want to know even if it were a short period of

21   time, you would definitely want to know if they were freezing

22   your benefit for a long period of time?

23   A.  Yes.

24   Q.  Now, in the Fall of 1996 -- before I ask that question, you

25   knew that the wear-away affected everybody, adversely affected

1  everybody?

2  A.  No, because of the enhancement that we gave to people that

3  were over 50 and had 15 years of service.

4  Q.  Let me try it this way.

5      Without getting into all the details of that, those

6  people, all of those people still suffered a period of

7  wear-away.  Would you agree?

8  A.  I don't know the answer.

9  Q.  In your deposition, Page 230, I asked this question and you

10 gave this answer.  I asked at Line 2:

11 "Q   You understand that you yourself experienced wear-away?

12 "A   All of us did, yes."

13     You gave that testimony, right?

14 A.  I did.

15 Q.  You knew that the use of the 9 percent discount rate to

16 create opening balances, that that meant for everybody across

17 the board, that their opening balance was less than the pension

18 that they had actually earned up to 12-31-95 --

19     MR. RUMELD:  Objection.

20 Q.  -- correct?

21     THE COURT:  Hold on.

22     THE COURT:  Overruled.  You you may answer.

23 A.  Would you ask it again, please.

24     MR. GOTTESDIENER:  Sure.

25 BY MR. GOTTESDIENER:

F7LJOSB6                          Peck - cross

1    Q.  You knew that you were being given an opening balance that

2    was significantly less than the pension that you had actually

3    earned up to 12-31-95, correct?

4    A.  Yes.

5    Q.  And you knew that basically that was true across the board

6    for everybody in the company?

7    A.  I am not so sure it was everybody now.

8    Q.  Basically everybody?

9    A.  Basically.

10   Q.  Basically, yes?

11           MR. RUMELD:  Objection, your Honor.

12           THE COURT:  Hold on.  I am trying to get the witness's

13   answer.  Did you agree it was basically everybody?

14           THE WITNESS:  Well, not everybody.

15           THE COURT:  But not everybody?

16           THE WITNESS:  But not everybody.

17           THE COURT:  All right.

18   BY MR. GOTTESDIENER:

19   Q.  But basically everybody?

20           THE COURT:  I think we have her testimony.  You can go

21   on.

22           MR. GOTTESDIENER:  I agree, your Honor.

23   BY MR. GOTTESDIENER:

24   Q.  Just so the record is clear, you knew that the other

25   members of the task force had at least as good an understanding

F7LJOSB6                              Peck – cross

1   of the wear-away as you do?  Probably better is what you were

2   about to say?

3   A.  Yeah, probably better.

4   Q.  Certainly Tom and Carol?

5   A.  Right.

6   Q.  Is that fair?

7   A.  Ah-huh.

8   Q.  You have to say yes or no for the court reporter.

9   A.  I am sorry.  Yes.

10  Q.  Mary, she was lower down, she was underneath Carol, right?

11  A.  Correct.

12  Q.  Now, in September of '96 you came to learn that the

13  wear-away period was anticipated to last a lot longer than you

14  had previously learned.  Is that fair?

15          MR. RUMELD:  Objection.

16          THE COURT:  Overruled.

17  A.  I believe it was four to five years.

18  BY MR. GOTTESDIENER:

19  Q.  You came to learn that in September of 1996.  Is that

20  right?  That is what you're saying?

21  A.  Yes.

22  Q.  And the way you learned that was through a letter that

23  Mercer sent to the company, explaining that the wear-away was

24  now slated to last three to four years presumably from the date

25  of the letter in September, so now a total of four to five

F7LJOSB6                          Peck – cross

1    years.  Is that fair?

2    A.  That's fair.

3    Q.  In that letter that explained -- why don't we just get that

4    up on the board, PX-9, this is the Mercer letter you were

5    referring to.  Is that right?

6    A.  Yes.

7    Q.  You have seen that recently several times?

8    A.  Yes.

9    Q.  In that letter you'll recall that they were reporting that

10   the normal cost for the pension plan was going to stay at $4

11   million, eventually when the wear-away ended increasing up to

12   $10 million.  Is that right?

13   A.  Yes.

14   Q.  You needed to know how long this period was lasting so you

15   could inform senior management from a fully informed

16   perspective as to what your recommendation for a design was

17   going to be?

18   A.  Yes.

19   Q.  You wouldn't have recommended a design that you didn't

20   fully understand.  Is that fair?

21   A.  That's fair, yes.

22   Q.  If I understand your testimony, you actually did inform

23   senior management, through Barry Thomson at least, of the

24   wear-away that was built into the plan design?

25   A.  Yes, we told Barry, ah-huh.

F7LJOSB6                          Peck - cross

1    Q.  When you say you told Barry, you may recall from the

2    deposition this wasn't some casual mention that you think he

3    could have missed, this was something that you made sure that

4    he understood.  Is that fair?

5    A.  Yes.

6    Q.  And you considered Barry to be very, very bright?

7    A.  Very bright, yes.

8    Q.  You affirmatively told him that everybody was going to be

9    impacted by a benefit no growth stall for a period of years,

10   right?  You may have used different words, but you got that

11   concept across to him?

12   A.  The concept, yes.

13             MR. RUMELD:  Objection.

14             THE COURT:  Overruled.

15   BY MR. GOTTESDIENER:

16   Q.  You didn't get a blank stare when you told him that?  In

17   your opinion, from what you observed, he got it?  He understood

18   it?

19   A.  Yes, I think he understood it.

20             THE COURT:  Do you remember whether you conveyed this

21   information to Mr. Thomson at a meeting or in some other form?

22             THE WITNESS:  It would have been at a meeting.

23             THE COURT:  Do you know approximately how long you

24   spent with him on this topic?

25             THE WITNESS:  No, I don't recall.  I am sorry.

F7LJOSB6                              Peck - cross

1              THE COURT:  When you say that it was your perception

2     that he understood the concept that we have been referring to

3     as wear-away, what's that based on?

4              THE WITNESS:  It's based on if he didn't understand

5     it, he would have kept asking me, asking me more and more

6     questions.

7              THE COURT:  Was it your experience with Mr. Thomson

8     that if he didn't understand something, he would probe further

9     for additional information from you?

10             THE WITNESS:  Yes.

11             THE COURT:  All right.  Thank you.  May proceed, Mr.

12    Gottesdiener.

13    BY MR. GOTTESDIENER:

14    Q.  Moving forward to May of '95, back into the actual design

15    process, there was a meeting on May 1st with top management,

16    and if I could approach, your Honor, to give Ms. Peck what is

17    PX-10.  This was an exhibit in your deposition we talked about.

18             MR. GOTTESDIENER:  Your Honor I think has a copy of

19    that already.

20             THE COURT:  Yes.

21    BY MR. GOTTESDIENER:

22    Q.  This is a May 1st dec, and if you care to refer to the '97

23    dec that has been a useful source of confirmatory information,

24    this was where you said the concept of converting and using

25    this formula with the wear-away was presented to the CFO, the

1  CIO.  Do you remember that at the bottom of Page 4 of the '97

2  dec?

3           MR. RUMELD:  Objection.

4           THE COURT:  Hold on.

5           MR. GOTTESDIENER:  I can rephrase it.

6           THE COURT:  Please.

7           MR. GOTTESDIENER:  I am trying to help the witness see

8  the timeline here.

9  BY MR. GOTTESDIENER:

10 Q.  In the '97 dec you mentioned in May 95 there was a formal

11 presentation to upper management.  You agree that is what that

12 is referencing?

13 A.  Ah-huh.

14 Q.  I am just helping you see what I put in front of you is a

15 May 1, '95 presentation.  You have no reason to think that it's

16 not one and the same presentation, correct?

17 A.  Right.

18 Q.  And you see that the version that I put in front of you has

19 your handwriting on it?

20 A.  Yes.

21 Q.  Let me also show you a copy that's PX-632 that has

22 Mr. Kiley's handwriting on it.

23           MR. GOTTESDIENER:  May I approach?

24           THE COURT:  Yes.

25           MR. GOTTESDIENER:  Your Honor, if you want an extra

F7LJOSB6                          Peck - cross

 1    copy, there's one.

 2    BY MR. GOTTESDIENER:

 3    Q.  Could you just confirm that is Mr. Kiley's handwriting that

 4    you recognize?

 5    A.  Yes, it is.

 6    Q.  And you're looking at the first page that has the single

 7    objective to decrease long term company cost, to promote the

 8    sharing of responsibility for retirement savings with

 9    associates.  He wrote above that, do you see that?

10    A.  Yes.

11    Q.  What he wrote you can read is in January we were charged

12    with the responsibility to decrease ongoing company cost.  Do

13    you see that there?

14    A.  I do.

15    Q.  And that's accurate, right, both the objective and what he

16    wrote in his handwriting, correct?

17    A.  Yes.

18    Q.  There is nothing on this page and nothing in what Mr. Kiley

19    wrote there about improving the plan to make employees happy,

20    right?

21    A.  Right.

22    Q.  Nothing about lump sums, correct?

23    A.  Not on that page, no.

24    Q.  You understood the task at hand from Barry, conveying the

25    edict, as you called it, from Roger and Dale, which was to cut

F7LJOSB6                          Peck - cross

1    costs, not improve the plan to make it more pleasing to

2    participants, right?

3    A.   Right.

4    Q.   So these presentations in your declaration, Paragraph 8,

5    you say that Kiley prepared the presentations.  You say that he

6    had assistance from Mercer, but it was Kiley who was the main

7    person presenting this information creating these decs.  Is

8    that fair?

9    A.   I think Carol had something to do with it also in the

10   routine.

11   Q.   I am not trying to be nitpicky, but in Paragraph 8 of your

12   declaration, you say to assist you in these discussions, we

13   used presentation materials that were prepared by Mr. Kiley,

14   with assistance from Mercer.

15   A.   Ah-huh, but that doesn't mean that Carol didn't have any

16   input into it.

17   Q.   That is fair.

18          So you, in your opinion, Carol knew what she was doing

19   pension-wise?  She was sophisticated?

20   A.   Well, not as much as Tom, but, yes.

21   Q.   Okay.  So if you had to blue pencil this, would you now say

22   that we used presentation materials that were prepared by

23   Mr. Kiley, with assistance from Carol Kanowicz and Mercer?  Is

24   that more accurate?

25   A.   Okay, yes, I think so.

F7LJOSB6                              Peck - cross

1     THE COURT:  In about five minutes we'll take our

2     mid-afternoon break, all right?

3     BY MR. GOTTESDIENER:

4     Q.  While we have Mr. Kiley's dec, the one he wrote on handy,

5     would you turn to it, it should be the last page of that

6     Exhibit PX-632, it has got the Bates number 2472 on it.  Do you

7     see where it says comparison of plans?

8     A.  Yes.

9     Q.  And there may be a staple in the way in the page where you

10    can -- or you can look up on the monitor, but do you see that

11    he wrote in, "We looked at many variations of cash balance

12    formulas"?

13    A.  Yes, I see it.

14    Q.  Is that true?

15    A.  Probably.  I am sure that the committee looked at a number

16    of things, yes.

17    Q.  The committee in this case, you're referring to the task

18    force, not the retirement --

19    A.  Yes, the task force.

20    Q.  Is it true what he writes in the next line, "We chose this

21    formula because of the level of savings it provides and because

22    it is service-based which is appropriate based on the emerging

23    demographics of our company, i.e., younger and more mobile"?

24    A.  Yes.

25    Q.  So that is true, too?  Is that right?

F7LJOSB6                          Peck - cross

1   A.  Why would he write it if he wasn't?

2   Q.  I am sorry about these questions.  These are legal

3   questions.

4           THE COURT:  Let me make sure the witness understands

5   what the question is intended to do.

6           Do you believe that it is a correct statement that the

7   formula that's reflected in PX-632 as the recommended formula

8   was chosen because of the level of cost savings it provided and

9   because it is service-based, which was appropriate based on the

10  emerging demographics of the company?

11          THE WITNESS:  Yes.

12          THE COURT:  Thank you.  You you may proceed, Mr.

13  Gottesdiener.

14  BY MR. GOTTESDIENER:

15  Q.  There is nothing there about lump sums, we chose this

16  formula because of lump sums?  You agree, right?

17  A.  It is not there, right, but it was discussed, many, many

18  times.

19  Q.  Lump sums?

20  A.  Yes, because it was part of what we were attempting to do

21  was to make this attractive to the participants, and the way

22  that would be is if they could take a lump sum, then they don't

23  have to wait until their retirement age.

24  Q.  Well, that offering of a lump sum, now that you've brought

25  that up, was attractive to the company?

F7LJOSB6                          Peck - cross

1   A.   And to the associates.

2   Q.   Right.  Let me ask you about the attractiveness of the lump

3   sum to the company.  That was the way you understood the

4   company was going to get even more savings, correct?

5   A.   I wouldn't say even more.  They were going to get savings

6   because of the things that having people out of the plan, the

7   benefits of having fewer people in the plan.

8   Q.   The reason that was an especial benefit to get people out

9   of the plan was because there was a very expensive early

10  retirement subsidy?

11  A.   Yes.

12  Q.   That you knew about?

13  A.   Yes.

14  Q.   And you knew that that was expensive to Woolworth, right?

15  A.   Yes.

16  Q.   And that was something you you learned with lots of numbers

17  through Mercer and Tom Kiley in the course of the review?

18  A.   Ah-huh.

19  Q.   Yes?

20  A.   Yes.

21  Q.   And one of the objectives of going in this direction was to

22  eliminate the early retirement subsidy?

23  A.   Yes.

24  Q.   And you mentioned that enhancement?  Do you remember that

25  was brought up?

F7LJOSB6                          Peck - cross

1    A.  The enhancement, right.

2    Q.  The enhancement was effectively to replace the early

3    retirement subsidy for people who were close to retirement age?

4    A.  50 years plus 15 years of service, right.

5    Q.  So it is yes, essentially the enhancement was to replace

6    the early retirement subsidy that was going away?

7    A.  Yes.

8            THE COURT:  All right.  I think it is now a good time

9    to take break.

10           MR. GOTTESDIENER:  Could I finish one or two questions

11   and then I will be done?

12           THE COURT:  Yes.

13   BY MR. GOTTESDIENER:

14   Q.  And you understood and the company understood that the more

15   people who took lump sums, the less people who would be

16   receiving this early retirement subsidy because it had to be

17   elected in the form of an annuity?

18   A.  Can you ask that question again, please.

19   Q.  Sure.  The early retirement subsidy, to get the benefit of

20   it the way the plan was administered, if there was a lump sum

21   taken, the subsidy was not included in the calculation of the

22   lump sum, it was only included in the annuity?

23   A.  Right, right.

24   Q.  So you understood that the more people who took lump sums,

25   the less people would be receiving the early retirement

1    subsidy?

2    A.  Right.

3    Q.  And so it was the strategy also to save money to get people

4    to take lump sums rather than take the early retirement subsidy

5    annuity?

6              MR. RUMELD:  Objection.

7              THE COURT:  You can answer it.  Overruled.

8    A.  I don't know that it was a strategy, but it was a result

9    of, you know, what we did, yes.

10   BY MR. GOTTESDIENER:

11   Q.  Page 329, this is the last question, your Honor, 329 line

12   19:

13   "Q   So it was the strategy also to save money to get people to

14   take lump sums rather than take the early retirement subsidy

15   annuity?

16   "A   Yes."

17             You gave that testimony, right?

18   A.  Yes, I did.

19             MR. GOTTESDIENER:  Thank you.

20             THE COURT:  Let's take our mid-afternoon break, folks,

21   and come back in 10 or 12 minutes.

22             (Recess)

23             THE COURT:  Let's all be seated.  Mr. Gottesdiener,

24   you may proceed.

25             MR. GOTTESDIENER:  Thank you.

F7LJOSB6                        Peck - cross

1    BY MR. GOTTESDIENER:

2    Q.  Ms. Peck, the May 1 decs that you have in front of you, the

3    one you wrote on and Mr. Kiley wrote on, who made the

4    presentation?  Was it you or Mr. Kiley or some combination of

5    the both, if you remember?

6    A.  It was probably a combination, but I don't remember

7    exactly.

8    Q.  If you turn to the page that has review of plan

9    alternatives on it, that's just a couple of pages in, you can

10   use the PX-10.

11   A.  Yes.

12   Q.  So all these alternatives, they show, starting off with

13   leaving the current plan unchanged, do you see that there?

14   A.  Yes.

15   Q.  Then there's other alternatives listed below.

16          Why don't we just review them quickly so we can talk

17   about them quickly.  There is leaving the current plan

18   unchanged and then there is a column that has pros and cons and

19   the estimated cost of doing that, correct?

20   A.  Yes.

21   Q.  And then underneath, the other alternatives, they show

22   terminate the current plan, freeze with intent to terminate,

23   freeze temporarily, change the current plan formula, reduce it

24   to 1 percent of W-2 compensation, and then the last is convert

25   to the cash balance plan with the formula that, as Mr. Kiley

Peck – cross

1   noted, was the one that saved the most money?

2   A.  Ah-huh.

3   Q.  Right, those are the alternatives?

4           And the pros and cons are discussed, all of them

5   except for termination, they all cut costs, right?

6   A.  Yes.

7   Q.  As compared to the 26.1.  Is that right?

8   A.  Yes.

9   Q.  Do you see that?

10  A.  Yes, I see it.

11  Q.  Now, the one that saved the most money if it were chosen

12  was the temporary freeze.  Is that right?  Do you see how that

13  estimated cost drops to 16 million per year?

14  A.  Yes, I see it.

15  Q.  Now, the cons that are listed in doing that, permanent loss

16  of retirement benefits, loss of associate morale and

17  confidence, negative publicity.

18          Do you agree that that is what was explained to senior

19  management?

20  A.  Yes, I do.

21  Q.  Now, why would a temporary freeze, why would that cause a

22  morale problem?

23          THE COURT:  Let's put it more permanently.

24          What was your understanding as to why the temporary

25  freeze, as reflected on this page, was viewed as having the

F7LJOSB6                          Peck - cross

1    disadvantage of having a loss of associate morale and negative

2    publicity?

3              THE WITNESS:  Why was it viewed that way?

4              THE COURT:  Yes.

5              THE WITNESS:  I think because of the first part of

6    that column that says a permanent loss of retirement benefits.

7    That would definitely be a negative.

8              Also at this time we were thinking about the fact that

9    we were turning over a lot of people, so we would be hiring new

10   people and we didn't want to tell them that -- we didn't want

11   to have to tell them that we didn't have a pension plan, our

12   pension plan was frozen.

13             THE COURT:  Thank you.

14             THE WITNESS:  You're welcome.

15   BY MR. GOTTESDIENER:

16   Q.  You would agree that telling current employees that the

17   company is temporarily freezing benefits because the company's

18   in tough shape would really be a morale killer?

19   A.  Yes, I agree.

20   Q.  And at the time there was a lot in the newspapers and

21   industry publications about companies freezing pension plans in

22   1995, and in 1995 it was not put in a very positive light,

23   correct?

24   A.  I agree.

25             MR. RUMELD:  Objection.

1    THE COURT:  Overruled.

2    BY MR. GOTTESDIENER:

3    Q.  You were concerned that that route, going that route,

4    vendors, your customers, they could decide that they didn't

5    want to patronize a store that would do that to people, freeze

6    their benefit, correct?

7    A.  That's correct.

8    Q.  And the negative publicity, you agree, the reference in the

9    cons there also was referring, thinking about somebody who was

10   at J.C. Penney, for example, who might otherwise be thinking

11   about joining Woolworth, that would be negative for recruiting

12   those new employees, as you mentioned to her Honor, correct?

13   A.  Yes.

14   Q.  Do you remember in the deposition we actually spent some

15   time talking about some of these HR concepts in your

16   experience, and I was asking well, what about the option of

17   doing a temporary freeze of current employees' benefits so you

18   could still recruit new people, still tell them that they could

19   earn a pension?  Do you remember we discussed that?

20   A.  Yes, I do.

21   Q.  Not to put too fine a point on it, you in effect told me

22   that that was crazy, right?

23   A.  I did.

24   Q.  Does it refresh your recollection, I said if you told

25   people that we were freezing your pension, that that would -- I

F7LJOSB6                          Peck - cross

1    am sorry -- Page 190 line 5 --

2            THE COURT:  You need to, before you can impeach her,

3    you have got to get testimony that is inconsistent.

4            MR. GOTTESDIENER:  I am actually not impeaching but

5    refreshing recollection.

6            THE COURT:  She hasn't had a recollection in terms of

7    the last question, right?

8            MR. GOTTESDIENER:  You're absolutely right.

9    BY MR. GOTTESDIENER:

10   Q.  You remembered that I brought up that possibility, and you

11   looked at me like I was crazy, and then you explained why that

12   that would just be a non-starter.  Is that fair?

13           MR. RUMELD:  Objection.

14           THE COURT:  Overruled.

15   A.  Yes, that is fair.

16   Q.  What you told me was that if you told people who were

17   currently at the company that you're freezing their benefits

18   because the company is going through a rough patch, but you

19   were telling people who you're trying to recruit you had a

20   pension, that they would have a pension, in your words, you

21   said that would be a kick in the face?

22   A.  To the people who were already employed, yes.

23   Q.  And that even if they felt that they were job-locked and

24   they had no place to go, that would be a kick in the face and

25   the result would be that morale would plummet?

F7LJOSB6                          Peck - cross

1    A.  I agree with that.

2    Q.  That was just not an acceptable option?

3    A.  Right.

4    Q.  Now, under the next alternative, change the current plan

5    formula to 1 percent of W-2 compensation, it also has the same

6    cons.  You understood the formula without getting too

7    technical, the formula was on a blended rate, to simplify it,

8    it was 1.5 percent.  Is that fair?

9    A.  Ah-huh.

10   Q.  And this option was looking to dropping it down to 1

11   percent?

12   A.  Yes.

13   Q.  So that would not have saved as much money as the freeze,

14   the temporary freeze, but it would have saved some money.

15          That was rejected or deemed not desirable.  Using the

16   same cons, wouldn't there be a permanent loss of retirement

17   benefits, but there would also be a loss of associate morale

18   and confidence and negative publicity.  Is that right?

19   A.  That is what it says, sir.

20   Q.  And you agreed with that because if you're reducing the

21   formula across the plan, and you're still leaving the plan in

22   place, it is not something that would be missed by people,

23   they'd have to be told flat-out now the formula is reduced.  Is

24   that fair?

25   A.  Yes, it is fair.

F7LJOSB6                         Peck - cross

1    Q.  By the way, you understood this lump sum was something

2    that -- withdrawn.

3        You know that people already who had small amounts who

4    left the company before the conversion, that there were

5    actually quite a lot of people who got cash-out lump sums?

6    A.  Yes.

7    Q.  You knew it was an option for the company to simply expand

8    the definition of those people and allow a larger number of

9    people to receive their benefit in the form of a lump sum just

10   through an amendment?

11   A.  You mean more than, if they had more than 3500?

12   Q.  Yes, they would have an option as opposed to something that

13   was forced upon them?  A lump sum option could have been

14   delivered through the existing plan, you agree with that?  You

15   understood that?

16   A.  Yes.

17   Q.  So you could have coupled a decrease in the formula with

18   the lump sum option?

19   A.  That's one thing we could have done, sure.

20   Q.  Now, under the cash balance alternative, you see that it

21   has the permanent loss of retirement benefits, right?

22   A.  I see it.

23   Q.  The wear-away freeze was going to mean for a period of

24   years people were not going to be earning anything, correct?

25            MR. RUMELD:  Objection.

F7LJOSB6                          Peck - cross

1           THE COURT:  Overruled.

2    BY MR. GOTTESDIENER:

3    Q.  The permanent loss of retirement benefits is a reference to

4    the wear-away freeze, correct?

5    A.  Right.

6    Q.  But there is no reference there to loss of associate morale

7    and confidence or negative publicity for that alternative?  You

8    see that, right?

9    A.  I see that.

10   Q.  So you do agree that the effect of the wear-away was a

11   freeze, just by another name, right?  It is the same as a

12   temporary freeze, the option that is above, correct?

13   A.  Yes.

14   Q.  So that says there is going to be a loss of associate

15   morale and confidence and negative publicity because that also

16   would be something that would be not easily missed?  It would

17   have to be something that would be announced, correct?

18   A.  Right.

19   Q.  So the reason why loss of associate morale and confidence

20   or negative publicity is not in the cons column for cash

21   balance is because you understood, and your team understood,

22   that the difference would be from the temporary freeze, that

23   with the conversion and its complexity, people would recognize

24   the temporary wear-away freeze as a freeze?

25           MR. RUMELD:  Objection.

F7LJOSB6                          Peck - cross

1    Q.   Correct?

2                THE COURT:   Overruled.   She can answer.

3    A.   Can you repeat that, please.

4    BY MR. GOTTESDIENER:

5    Q.   Sure.   The only difference was that with the conversion and

6    its complexity --

7    A.   Right.

8    Q.   -- people would recognize the temporary wear-away freeze as

9    a freeze?

10   A.   That's correct because we didn't think of it as a freeze.

11   Q.   I understand, but my question is focused on why the cons of

12   loss of associate morale and confidence are not there, negative

13   publicity is not there?

14   A.   Right.

15   Q.   The reason is that with the conversion versus the old plan,

16   just temporarily freezing it, the employees would have known

17   that the old plan being temporarily frozen under that option up

18   there, but with the cash balance wear-away freeze, that was

19   going to be mixed in with all of the conversion complication.

20                Is that fair?

21                MR. RUMELD:   Objection.

22                THE COURT:   Overruled.

23   A.   It could, yes, that is fair.

24   Q.   That is how you all perceived it at the time?   I am not

25   asking a new question.   I want the record to be clear, that's

F7LJOSB6                          Peck - cross

 1   why -- that is how you all made a distinction between those two

 2   kinds of freezes?

 3              MR. RUMELD:  Objection.

 4              THE COURT:  Sustained.

 5   BY MR. GOTTESDIENER:

 6   Q.  That's the only difference between those two kinds of

 7   freezes?

 8   A.  We did not think of the conversion to the lump sums as a

 9   freeze.  This was a good thing that people could get their

10   money, which they couldn't have done before, so we didn't think

11   of it as a freeze.

12   Q.  The freeze temporarily option up there in the middle --

13   A.  I see it.

14   Q.  -- you could have added a lump, you could have frozen the

15   plan temporarily and said to people listen, we're freezing the

16   plan temporarily for a few years, we hope to be able to restart

17   it, but in the interim, January 1, '96 we are going to give you

18   the right to take your benefit as a lump sum?  That could have

19   been done, right?

20   A.  As we look at it now, yes, that could have been done.

21              (Continued on next page)

22

23

24

25

F7lnosb7                         Peck - cross

1   Q.  And you already told us it could have been done with

2   reducing the rate of the existing plan, just expanding the lump

3   sum option to all participants, right?

4   A.  Yes.  We can sit here and design another whole plan the way

5   this is going.

6   Q.  What I am asking about is how you all designed and decided

7   on this plan.  What I am asking, wasn't it significant to you,

8   you have told us already that it was unacceptable, morale would

9   plummet, if you announced a temporary freeze of the whole plan,

10  correct?

11  A.  Yes.  I think just using the word freeze would have

12  frightened people.

13  Q.  OK.  But if a softer or gentler word than freeze -- how

14  about for this middle option, Dear Participants, we have to

15  suspend accruals for a period of time because the company is in

16  a rough patch, so we are going to suspend new benefit accruals

17  for a period of time?

18          MR. RUMELD:  Objection.

19  Q.  You could have done that, right?

20          MR. RUMELD:  Objection.

21          THE COURT:  Sustained.  You need to reask it.

22  BY MR. GOTTESDIENER:

23  Q.  The temporary freeze, the middle option --

24  A.  Yes.

25  Q.  I'm sorry?

1   A.  I just said yes.

2   Q.  OK.  I'm sorry.  I thought you were going to say something.

3           That was deemed unacceptable, correct?

4   A.  Right.

5   Q.  Because of the morale hit?

6   A.  Because of the freeze.  We were not planning to freeze our

7   plan, and we did not communicate that we were freezing our

8   plan.

9   Q.  Right.  I'm sorry if I'm losing your following what I'm

10  asking.  I am now asking about the temporary freeze option, not

11  the cash balance.

12  A.  I understand.

13  Q.  OK.  The reason that temporary freeze option was

14  unacceptable, or one of the principal reasons was because it

15  would have been a morale killer you told us already, right?

16  A.  Yes.

17  Q.  And that still would have been the same even if you went to

18  people and said, Listen, let's all band together.  We're going

19  through this rough patch.  We promise we'll keep it as brief as

20  possible.  I asked you those questions in the deposition and

21  you said, No way, we just would not ever say that.  We had

22  stores to run and --

23  A.  Right.

24  Q.  -- a business to operate, is that right?

25  A.  That's right.

1        MR. RUMELD:  Objection.

2        THE COURT:  Overruled.

3        Was that an objection?  Was it an objection?

4        MR. RUMELD:  Yes.

5        THE COURT:  It is hard because your voice for the

6   objections is dropping.  I know that you don't want to

7   interrupt, but I just want to make sure that if I make a ruling

8   I'm making a ruling in response to something.

9        MR. RUMELD:  I will keep my voice up, your Honor.

10       Sorry.

11       THE COURT:  OK.

12  BY MR. GOTTESDIENER:

13  Q.  You didn't tell --

14       MR. GOTTESDIENER:  I got the answer, right?

15  BY MR. GOTTESDIENER:

16  Q.  The way you all operated was you didn't tell the whole

17  company that you were in dire straits?

18  A.  Correct.

19  Q.  That's not the way you ever operated?

20  A.  Not HR, no.  I mean --

21  Q.  Well, you are not aware of anyone else --

22  A.  Certainly when facilities were closed, then they didn't use

23  the word -- they didn't use the words dire straits, but they

24  would have mentioned financial hardships.

25  Q.  Now, after this May meeting, we have a July presentation to

F7lnosb7                          Peck – cross

1    the chairman's group?

2    A.  OK.

3    Q.  Do you remember that?

4    A.  Uh-huh.

5    Q.  So this happens July 19.  That is PX 101.  We looked at

6    this together in your deposition.  There is a cover memo, July

7    19, and a July 20 deck.

8            MR. GOTTESDIENER:  With the Court's indulgence.

9    Q.  I just want to make sure you have a hard copy in front of

10   you, in case that's handy.

11           MR. GOTTESDIENER:  May I approach, your Honor?

12           THE COURT:  Yes.

13   BY MR. GOTTESDIENER:

14   Q.  This is PX 101.

15   A.  OK.  Thank you.

16   Q.  You see that has your signature, Pat, on the front?

17   A.  Correct.

18   Q.  It's directed to Roger, Dale, Barry, Gary Bahler.  That's

19   the general counsel you mentioned earlier?

20   A.  Yes.

21   Q.  And Rina Zimmerman?

22   A.  Right.

23   Q.  And she is a --

24   A.  Benefits attorney who was employed by Foot Locker,

25   Woolworth.

F7lnosb7                          Peck - cross

1   Q.  And it's copied to Carol and Tom, right?

2   A.  Right.

3   Q.  It says, Attached is your copy of the information that's

4   been prepared regarding changes to our retirement plans, and

5   you mention the meeting scheduled for the following day.

6          This copy is attached to the memo -- if you just flip

7   through it, you can see this has a lot of Mr. Kiley's

8   handwriting?

9   A.  Yes.

10  Q.  Can you tell us whether you or he or you and he made the

11  presentation?

12  A.  Well, given that this has all of his notes on it and not

13  mine, I would say that he made the presentation, but I don't

14  remember exactly.  But that's the logical, you know, output of

15  him making all the notes and not me.

16         THE COURT:  Let me ask you, in terms of typical

17  practice, was it typical for you to receive from Mr. Kiley

18  materials which might be in PowerPoint form but have his

19  handwritten notes on it for the purpose of allowing you to make

20  a presentation that included his notes?  In other words --

21         THE WITNESS:  I know --

22         THE COURT:  -- did he mark up the power point for you?

23         THE WITNESS:  I understand what you're asking me.

24         I wouldn't say it was typical.  I would say that he

25  would give me the presentation, and then we would sit and

F7lnosb7                        Peck - cross

1   discuss it and go through it and then I would make my own notes

2   on it.

3          THE COURT:  I see.

4          THE WITNESS:  Yes.

5          THE COURT:  OK.  Thank you.

6          THE WITNESS:  You're welcome.

7   BY MR. GOTTESDIENER:

8   Q.  So, without speculating, this seems to be more consistent

9   with him doing the presentation than with you?

10  A.  Right, yes.

11  Q.  And this is a pretty detailed document, including a lot of

12  financial information.  I think you would agree, if you would

13  turn to pages the Bates numbered pages 10-11, that would be

14  4410, 4411, where it has estimated costs, cash balance?

15  A.  Uh-huh.

16  Q.  And it shows the cost in a pension sense, and it's got both

17  contributions and FAS87 reporting expense?

18  A.  Yes.

19  Q.  You see that he's detailed in the notes savings with and

20  without the 401(k) plan?

21  A.  Yes.

22  Q.  A general question, in the savings here that are listed,

23  while they may add up for a few years, the company was a

24  multibillion dollar corporation, right?

25  A.  Yes.

F7lnosb7                          Peck - cross

1    Q.  With annual sales in the billions of dollars, right?

2    A.  Yes.

3    Q.  You did tell us that this was a big item for Roger and Dale

4    because it affected all participants, all employees?

5    A.  Yes.

6    Q.  This seems to suggest a high level of involvement by Roger.

7    A.  Uh-huh, yes.

8    Q.  Is that how you remember it?

9    A.  Yes, I do.

10   Q.  And was he generally a hands-on kind of CEO?

11   A.  Through -- well, he was hands on, but it was through his --

12   through Dale and Barry, not that he would directly come to me

13   on a regular basis.

14   Q.  So, outside of these meetings, that's how you would

15   interact with him?  It would be through Barry and Dale?

16   A.  Right.

17   Q.  And they were themselves detail oriented?

18   A.  Yes.

19   Q.  Interested in a lot of the numbers?

20   A.  Yes.

21   Q.  And in the meetings themselves, when you were in meetings

22   with Roger as well as Dale and Barry, are all these notes

23   consistent with the way the meetings would be conducted, that

24   Roger would want to know the details?

25   A.  Yes.

F7lnosb7                              Peck - cross

1         MR. GOTTESDIENER:  With the Court's indulgence.

2    Q.  Looking at these pages, you can see savings listed on Bates

3    004400, the recommendations page.

4         If you see under the first bullet point, it explains

5    the proposed changes, and at the second to bottom inset dash

6    you see it says, Reduces future benefit accruals and lowers

7    future costs.

8    A.  Yes.

9    Q.  And then the next page has, benefit illustrations –

10   retailers, meaning competitors.

11        Do you see that?

12   A.  Yes.

13   Q.  And then after that, when it shows review of defined

14   benefit plan alternatives.

15        MR. GOTTESDIENER:  Next page, please.

16   Q.  Do you see it looks at the alternatives we looked at in the

17   last one, but it actually has a lot of expanded alternatives.

18   It's still looking at at least considering what the impact

19   would be of these changes of no change, terminate plan, freeze

20   plan with intent to terminate, freeze plan temporarily.  But

21   then do you see under E, F, G, H, and I, that there seems to be

22   expanded consideration of –– I was the one we looked at before

23   in terms of keeping the same plan structure, but lowering the

24   right of accrual.  E, F, G, H, you would agree these are

25   permutations on that that are being analyzed?

1          MR. RUMELD:  Objection.

2          THE COURT:  Hold on one second.

3          Sustained.

4          MR. GOTTESDIENER:  I'll ask it another way.

5    BY MR. GOTTESDIENER:

6    Q.  This page is comparable to the page we looked at from the

7    May deck but it seems to have more detail, is that fair?

8    A.  Yes.

9    Q.  Is that consistent with your recollection and knowledge of

10   the kinds of presentations that Roger Farah and Dale Hilpert

11   wanted when they were needing to make big-item decisions?

12   A.  Yes.

13   Q.  Then after that it shows, benefit illustrations – cash

14   balance and benefit illustrations for cash balance option L,

15   which I don't think there is a dispute between the parties is

16   the one that was ultimately enacted.

17          After this page do you see that it shows benefit

18   illustrations actually using examples of people and showing the

19   impact of the change on their benefits?

20   A.  What page are you on?

21   Q.  I am on page 4408.  If you look at the screen for a moment,

22   it will help you get oriented.  It is the hard copy.

23   A.  OK.

24   Q.  It's kind of a spreadsheet of --

25   A.  Right.

F7lnosb7                        Peck - cross

1    Q.  It's all surrounded by Mr. Kiley's handwriting.  But look,

2    if you would, just take the first example, somebody who is age

3    47.

4            Do you see that?

5    A.  Yes.

6    Q.  That person has 19 years of service and it gives their pay,

7    it gives the current plan benefit, the cash balance retirement

8    benefit, the cash balance lump sum, the cash balance as a

9    multiple of pay.

10           Do you see in the last columns or the second-to-last

11   columns it has replacement ratios?

12   A.  Yes.

13   Q.  You recognize that from your days doing that as that's the

14   percentage of someone's compensation that the plan, once they

15   retire, is replacing through pension, right?

16   A.  OK, yes.

17           THE COURT:  I want to make sure when you say OK that

18   you are not just agreeing with the statement but you actually

19   believe it to be true.

20           THE WITNESS:  I do.  I believe it to be true.

21           THE COURT:  OK.

22   BY MR. GOTTESDIENER:

23   Q.  Let's just take this gentleman.

24           Do you see -- I'm sorry.  I shouldn't have said that.

25   This person.  This person at age 55 under the current plan, the

F7lnosb7                         Peck - cross

```
 1   replacement ratio if they retire at that point in time, current
 2   plan they're getting a 10 percent replacement ratio.  Do you
 3   see that, when that person is at age 55?  Can you find the --
 4   A.  I have the 55.
 5   Q.  And then if you go over --
 6   A.  OK.
 7   Q.  I am not talking about the second entry.  I am talking
 8   about the entry for the person who is currently age 47, the
 9   first person.
10   A.  I see.  OK.  Yes.  I'm there.
11   Q.  Then you go all the way over.
12   A.  Uh-huh.
13   Q.  What do you find is the current plan replacement ratio?
14   A.  10 percent.
15   Q.  And then what do you find that you all were telling Roger
16   was going to be the replacement ratio if you went to cash
17   balance?
18   A.  5 percent.
19   Q.  So it's half?
20   A.  Yes.
21   Q.  So fair to say -- let's just look quickly at age 60.  Do
22   you see age 60.  It's 16 percent.
23          What is it under cash balance?
24   A.  8 percent.
25   Q.  So you don't have any doubt that Roger knew clearly that
```

F7lnosb7                          Peck - cross

1   going with cash balance was cutting benefits?

2   A.  Well, I can't answer for him.  I don't know how he thought

3   about it.  But I mean I know what the numbers say.

4   Q.  You know that when you were in meetings with him he paid

5   attention?

6   A.  Yes, he did.

7   Q.  He was clearly downloaded on the fact that this proposal

8   was going to cut benefits?  You can't get inside his head, but

9   you know that he was clearly shown and told this was cutting

10  benefits, fair?

11  A.  Yes.

12  Q.  So after the chairman's group meets --

13  A.  But this isn't the whole picture.  This is just the pension

14  part of it.

15  Q.  You are talking about adding the 401(k)?

16  A.  Right.

17  Q.  You agree that the company at that time was not competitive

18  with its other retailers insofar as the pension plan was not a

19  rich pension plan and you had no 401(k) plan?

20  A.  Yes.

21  Q.  And you agree that essentially the 401(k) plan, whatever

22  was going to go on, was a must that you had to have?

23  A.  Yes.

24  Q.  Competitively you needed it one way or another?

25  A.  Yes.

F7lnosb7                              Peck - cross

1    Q.  So after the chairman's group you would agree gives the

2    thumbs up to then presenting this to the retirement investment

3    committee of the board and ultimately the board, that is what

4    happened, that versions of this presentation were then in

5    August made to the retirement investment committee and then in

6    September to the full board?

7    A.  Uh-huh, yes.

8    Q.  OK.  So let me just show you very quickly PX 19.

9             MR. GOTTESDIENER:  May I approach, your Honor?

10            THE COURT:  Yes.

11            MR. GOTTESDIENER:  So this is August 8.

12            Your Honor has a copy?

13            THE COURT:  I do.

14            THE WITNESS:  Thank you.

15   BY MR. GOTTESDIENER:

16   Q.  So, if you would just thumb through that, I think you will

17   agree that this is a variation with your handwriting of the

18   same presentation that was made to the chairman's group.

19   A.  Yes.

20   Q.  And if you would just look briefly, it includes the same

21   explanation that it is cutting benefits and it's showing dollar

22   savings?

23   A.  Yes.

24   Q.  And you see that the presentation -- let me show you the

25   minutes that accompanied these.

F7lnosb7                            Peck - cross

1              MR. GOTTESDIENER:  May I approach?

2              THE COURT:  Yes.

3    BY MR. GOTTESDIENER:

4    Q.  PX 147, ma'am, are minutes of the retirement investment

5    committee meeting?

6    A.  Uh-huh.

7    Q.  If you would just confirm that at the meeting you were

8    present but it appears that it was Barry who actually did the

9    presentation?

10   A.  I can confirm that.

11   Q.  And then you sent a memo to the board after this, the

12   entire board, on August 22, that is PX 91 that I will show you,

13   in anticipation of a September 13 board meeting.

14             Does that sound right to you?

15   A.  Yes.

16             THE COURT:  PX?

17             MR. GOTTESDIENER:  PX 91 is the memo to the board, and

18   PX 40 is the presentation to the board.

19             There's one more PX, PX 37, which is the minutes of

20   the board's meeting on September 13.

21             THE COURT:  Sorry.  Is it PX 91?  PX?

22             MR. GOTTESDIENER:  40 and PX 37.

23             THE COURT:  All right.  Thank you.

24             MR. GOTTESDIENER:  May I approach, your Honor?

25             THE COURT:  Yes.

F7lnosb7                              Peck – cross

1          MR. GOTTESDIENER:  With the Court's indulgence.

2     BY MR. GOTTESDIENER:

3     Q.  This August 22 document is a memo that you sent that covers

4     a deck.  It's sent to all of the board members.  It's

5     effectively mailed to their homes or their work?

6     A.  Right.

7     Q.  And it's for them to read in anticipation of the meeting

8     the following month, is that fair?

9     A.  That's fair.

10    Q.  At the actual meeting there is another copy for them if

11    they didn't happen to bring theirs, right?

12    A.  Right.

13    Q.  You are enclosing, as you say, an abbreviated form of the

14    presentation --

15    A.  Uh-huh.

16    Q.  -- made to the members of the retirement investment

17    committee on August 8.  That was the one that Barry made,

18    correct?

19    A.  Right.

20    Q.  Then Barry also made the actual presentation to the board

21    as far as you are aware, showing you PX 37 and PX 40, on

22    September 13, is that correct?

23    A.  Yes.  According to the minutes, that's correct.

24    Q.  I'm sorry?

25    A.  According to the minutes that's correct.

F7lnosb7                          Peck - cross

1    Q.  You were not present?

2    A.  No, not in the board meeting.

3    Q.  You see that the deck is effectively the same deck, and it

4    shows the benefit reductions, the savings, and the statement

5    that this is going to save money for the company, is that

6    correct?

7    A.  Yes.

8    Q.  Thank you.

9         It would be fair to say that you liked to put as much

10   as possible a positive spin on news going out to employees

11   about their pay, their benefits?

12   A.  Sure.

13   Q.  In this case, you knew there needed to be an announcement

14   of the changes that were coming, right?

15   A.  Yes.

16   Q.  In fact, there was an announcement that went out just two

17   days after the board adopted these recommendations in the form

18   of a binding amendment that was then implemented in January and

19   was formalized later, but the real approval point was on

20   September 13, correct?

21   A.  Yes.

22   Q.  And two days later an announcement was made about changes

23   to the pension plan and the addition of the 401(k) plan,

24   correct?

25   A.  I don't think I have that letter in front of me.

F7lnosb7                         Peck - cross

1    Q.  I am about to give it to you.

2    A.  OK.  If you say it was two days later.

3    Q.  You see that the board meeting is September 13?

4    A.  I do.

5    Q.  If we can put on the screen real quick so you can see the

6    date PX 2.

7        MR. GOTTESDIENER:  If you could just blow up the top

8    there.

9    Q.  This is the announcement letter?

10   A.  OK.

11   Q.  Do you agree with that?  It looks familiar?

12   A.  Yes.

13   Q.  At the bottom --

14       MR. GOTTESDIENER:  If you would just scroll for her

15   benefit.

16   Q.  There's Roger signing and Dale signing?

17   A.  Right.  OK.

18   Q.  It's from the both of them?

19   A.  Uh-huh.

20   Q.  I understand the 401(k) was something that was a positive.

21   It may have been much delayed and something that needed to be

22   done, but the changes to the pension plan I understand there is

23   a lump sum option, but you knew that benefits were going to be

24   reduced under the pension plan, right?

25   A.  Yes.

F7lnosb7                              Peck - cross

1    Q.  You knew by that time there was also going to be this

2    transition period that you hoped wasn't going to last too many

3    years, but you did know it was by that time already it was

4    going to last a period of years, right?

5              MR. GOTTESDIENER:  Objection.

6              THE COURT:  Hold on so that I can read it.

7              Sustained.  You've got to rephrase that.

8    BY MR. GOTTESDIENER:

9    Q.  You knew in September of '95 that there was anticipated to

10   be a two- to three-year on average wear-away period?

11   A.  Yes.

12   Q.  During which people would not earn any new benefits, right?

13   A.  Well, right.  They wouldn't earn new benefits, but they may

14   get more than their cash balance.

15   Q.  But they would not get more than they would already be

16   entitled to based on their accrual up to 12/31/95?

17   A.  12/31/95.

18   Q.  Right?

19   A.  Right, uh-huh.

20   Q.  So you knew that the suspension of accruals of new benefits

21   was anticipated last two to three years, right?

22   A.  Yes.

23   Q.  And you knew also that once people got out of wear-away,

24   you also understood that the rate of benefit accrual for people

25   who were actually out of wear-away was going to be lower than

1   it was under the prior plan?

2   A.  Yes, I do believe we talked about that, uh-huh.

3   Q.  And it's fair to say that as to those pieces of information

    that you had, given your druthers to put a positive spin on

5   things, you didn't want to tell employees bad news?

6           MR. RUMELD:  Objection.

7           THE COURT:  Sustained.

8   Q.  You didn't want to tell employees bad news about the

9   changes to the plan?

10          THE COURT:  Well, I think you need to word that

11  differently.  Sustained.

12  BY MR. GOTTESDIENER:

13  Q.  You were involved in fashioning the announcement letter

14  that went out, correct?

15  A.  Yes.  That's correct.

16  Q.  You didn't want there to be any bad news communicated in

17  that announcement letter?

18          MR. RUMELD:  Objection.

19          THE COURT:  Overruled.

20  A.  This is a good news letter, and that's how we saw it.  So

21  that's what is in here.

22  Q.  So you wanted a good news letter going out?

23  A.  Roger and Dale wanted a good news letter going out.

24  Q.  OK.  You did, too, though, right?

25  A.  Yes, of course, I did, too, as the HR person.

F7lnosb7                          Peck - cross

1   Q.  So you made a decision to leave out the bad news that we

2   were just talking about?

3              MR. RUMELD:  Objection.

4              THE COURT:  Overruled.

5   A.  Well, it wasn't in the draft that I gave Roger and Dale,

6   that's correct, or Barry, uh-huh.

7   Q.  So it's correct that you made a decision to just leave that

8   part out of it, correct?

9   A.  Yes.  That's right.

10  Q.  The letter as it went out when it talked about the change

11  to the pension plan you agree that in the letter --

12             MR. GOTTESDIENER:  If we could blow up where it says,

13  The other part of the new retirement benefit program.

14  BY MR. GOTTESDIENER:

15  Q.  It says:  The other part of the new retirement benefit

16  program provides several changes to the Woolworth retirement

17  plan.  These changes will provide participants with more

18  flexibility and a better ability to monitor their benefits.

19             It then says:  Each plan participant will have an

20  individual account to which the company will make a yearly

21  contribution.  That contribution will be based on a new formula

22  that will reflect percent of pay and years of service.

23  Participants will be able to see their individual account

24  balance grow each year and know its value.

25             Do you see that there, ma'am?

1   A.  I do.

2   Q.  You knew at the time that letter went out that that was a

3   false statement for anyone in wear-away at least?

4   A.  For anyone in wear-away.

5   Q.  And you knew that everyone was essentially going to be in

6   wear-away 1/1/96, right?

7   A.  You think there were some exceptions.

8   Q.  Some exceptions.  Of about 16,000 people, other than the

9   exceptions, basically everyone was going to be in wear-away.

10  You agree with that, right?

11  A.  Basically.

12  Q.  So you agree that it is a false statement for somebody in

13  wear-away that they are going to be able to know the value of

14  their account if they are in wear-away?  Let me withdraw it and

15  ask it this way.  You know that there is no value to the

16  account when you are in wear-away, right?

17  A.  Right.

18  Q.  And you can't obviously know the value if you are in

19  wear-away without being flat out told you are in wear-away,

20  right?

21  A.  Yes.  You're right.

22  Q.  So if you are not out of wear-away, the account has no

23  value, correct?

24  A.  Well, the value is in the 12/31/95 accrual.  So that if

25  somebody left, if that was more than what was in the cash

F7lnosb7                         Peck - cross

1   balance plan, they would get that.

2   Q.  Right.  So the account would have no value.  It would have

3   meant nothing to them?

4   A.  Well, that account would -- right.  You're right.

5   Q.  So you agree --

6   A.  But the pension benefit, there still would be a pension

7   benefit.

8   Q.  Yes.  That was the pension benefit people had already

9   earned as of 12/31/95.  That's what you mean, right?

10  A.  Correct, uh-huh.

11  Q.  So you agree it is a false statement for someone who would

12  be looking at their account balance watching it grow, they

13  would not be able to know its value if they're still in

14  wear-away?

15  A.  If they're still in wear-away, that's true.

16  Q.  You were involved in the drafting I think you just

17  mentioned before, you said they wanted good news going out,

18  Roger and Dale, correct?

19  A.  That this was a good news letter, right.

20  Q.  But, as the HR person, you were the point person that they

21  were relying on to get out this good news letter?

22  A.  Right.

23  Q.  As you told us, you made an affirmative decision to leave

24  out the bad parts, correct?

25  A.  Yes.  Because they weren't necessarily -- they didn't apply

F7lnosb7                          Peck - cross

1    to everybody.  I mean we talked about this already.

2    Q.  You mean --

3    A.  There were exceptions.

4    Q.  So you left out the bad parts because out of 16,000 people

5    there were some small number of people who were not in

6    wear-away?

7    A.  Correct.

8    Q.  In discovery -- that's the process before trial where the

9    parties exchange documents -- we got some drafts of the letter.

10   A.  OK.

11   Q.  Including what the defendants have agreed is a draft that

12   has your handwriting on it?

13   A.  OK.

14   Q.  That's consistent with your memory, that you were involved

15   in the actual drafting of the letter?

16   A.  OK.

17   Q.  Like her Honor said, I don't want you just saying OK if you

18   are just agreeing with me.

19          Is that consistent with your memory that you got out

20   your pen and made comments?

21   A.  It -- yes.  Yes.

22   Q.  OK.  I will show this to you with leave from the Court.

23          MR. GOTTESDIENER:  May I approach?

24          THE COURT:  Yes.

25          MR. GOTTESDIENER:  PX 25.

F7lnosb7                          Peck - cross

1   BY MR. GOTTESDIENER:

2   Q.  Let me show you PX 25 and ask you if you recognize your

3   handwriting on that document?

4   A.  I do.

5   Q.  So, if you go down to the third paragraph, in the third

6   paragraph or two-thirds of the way down do you see the sentence

7   that starts, Participants will be able?  If you look up where

8   Randall is coloring it in yellow.

9   A.  OK.

10  Q.  Do you see that sentence?

11  A.  Right.

12  Q.  That's the sentence that you agreed was a false statement

13  for anyone that is in wear-away?

14  A.  In wear-away, yes.

15  Q.  You see to the left of it you wrote, Good, with an arrow?

16  A.  Right.  I see it.

17  Q.  Thank you.  After this letter went out on September 15,

18  this letter mentioned that there would be more information

19  coming.

20  A.  Uh-huh.

21  Q.  And the next communication that went out was this

22  highlights memo in November.  Do you recall that?  PX 4?

23          MR. GOTTESDIENER:  Put that on the screen, please.

24  Q.  You remember this November memo, right?

25  A.  I will have to refresh my mind.

F7lnosb7                         Peck - cross

1    Q.  Sure.

2    A.  Because I don't remember it offhand.

3    Q.  Is it coming back to you?

4    A.  OK.  Yes.

5    Q.  Maybe what would be helpful to make a final link is if you

6    look at your declaration, because you actually discuss it in

7    several parts of your declaration.

8    A.  Uh-huh.

9    Q.  In paragraph 16, you say you played a direct role in

10   connection with certain companywide communications.

11   A.  Uh-huh.

12   Q.  And you first list the September announcement letter and

13   then second you list that memo, the memorandum distributed in

14   November of '95.

15            Do you see that you say that in your declaration?

16   A.  Yes.

17   Q.  And then you also discuss, in paragraph 19 you talk about

18   how it was reviewed and edited by other people?

19   A.  Right.  Uh-huh.

20   Q.  So, going back to the actual memo, PX 4, that is on the

21   screen, that three-page memo, do you now remember that this was

22   the memo that you are referring to in your declaration that was

23   the next companywide communication that went out about the plan

24   changes?

25   A.  I don't remember that this was the next one, but it seems

F7lnosb7                          Peck - cross

1   logical since November is shortly after September.

2   Q.  So you remember the memo; you are just not sure that there

3   wasn't something in between?

4   A.  Exactly.

5   Q.  So let's just talk about this memo.

6   A.  Uh-huh.

7   Q.  You see how it says, it starts off, As previously announced

8   by Roger and Dale in their September 15 letter --

9   A.  Yeah.  Right.

10  Q.  -- the company is going to make changes?

11  A.  Right.

12  Q.  Now, you agree that also when it came time to edit this and

13  get this out that you still, you made an affirmative decision

14  to leave out the bad part of the change?

15  A.  This mirrors the other memo, yes, uh-huh.

16  Q.  So that is a yes, you made an affirmative decision to leave

17  out the bad part?

18  A.  Right.

19          MR. RUMELD:  Objection.

20          THE COURT:  Overruled.

21  BY MR. GOTTESDIENER:

22  Q.  So you agree that wear-away is not in there, not any part

23  of it, correct?

24  A.  Correct.

25  Q.  You agree the statement in the second paragraph, where it

F7lnosb7                          Peck - cross

1   says, At termination of employment, provided your vested, you

2   will have the option of taking a lump sum payment equal to your

3   account balance, is a false statement for anyone who is in

4   wear-away?

5   A.  For anyone who is in wear-away, yes.

6   Q.  It is a false statement for anyone in wear-away because the

7   lump sum payment for everybody who is in wear-away is going to

8   be a payment in excess of their account balance and not tied at

9   all to their cash balance benefit?

10  A.  If they are in wear-away, yes.

11  Q.  Now, the next communication that went out was referenced --

12          MR. GOTTESDIENER:  Actually, if you would just put

13  back on the screen for a moment PX 4.  PX 4 references that

14  there will be a plan statement on the first page.  Scrolling

15  down a little bit more.

16  BY MR. GOTTESDIENER:

17  Q.  Do you see where it says, right there, A statement showing

18  your estimated benefits under the amended plan will be mailed

19  to you during December 1995?

20  A.  Yes.

21  Q.  And that refreshes your recollection that the next

22  companywide communication about the amended plan was the

23  statement referred to in this memo?

24  A.  Would you reask the question again, please.

25  Q.  Yes.  I'm sorry.

1      This says you are going to get a statement of your

2   estimated benefits under the amended plan, right?

3   A.  That's what it says, yes.

4   Q.  And you know that what happened next was such a statement

5   was prepared and mailed out to people?

6   A.  Uh-huh.

7   Q.  Correct?

8   A.  Yes.

9   Q.  And the reason it was estimated was because you didn't have

10  all their compensation for the year?

11  A.  Right.

12  Q.  You wanted to get people a statement close to 1/1/96, but

13  typically in prior years you didn't get that out until around

14  March because that's when you definitely had everybody's

15  definite compensation, right?

16  A.  Right.

17  Q.  But in this case you wanted to get --

18  A.  Get it out --

19  Q.  -- because it was an amended plan you wanted to get that

20  out around 1/1/96, correct?

21  A.  Yes.

22  Q.  Then you followed that up with a statement that was the

23  actual plan statement in approximately March of '96, correct?

24  A.  Yes.

25  Q.  And the statement that went out, you were involved in

F7lnosb7                              Peck - cross

1   supervising the production of that statement, is that right?

2   A.  Yes.

3   Q.  And you had input into the content of that statement,

4   right?

5   A.  Yes.

6         MR. GOTTESDIENER:  If we could put on the screen PX 6.

7         Actually could we use PX 23 -- no.  The blank version

8   was Deposition Exhibit 23.

9         MR. HUANG:  It's PX 43.

10         MR. GOTTESDIENER:  PX 43.  Can we see if that's right.

11   Excellent.

12   BY MR. GOTTESDIENER:

13   Q.  PX 43, at the top you see how it says estimated retirement

14   plan statement as of January 1, 1996?

15   A.  Yes.

16   Q.  So you recognize this as the statement that did in fact go

17   out around the end of '95, early '96, right?

18   A.  Yes.  OK.

19   Q.  If you look on the left-hand side, it shows current plan

20   and it shows their accrued benefit through 12/31/1995, correct?

21   A.  Yes.

22   Q.  And then on the right-hand side it shows amended plan as of

23   January 1, 1996.

24   A.  OK.  Uh-huh.

25   Q.  You see that the only thing that it shows as the benefit

F7lnosb7                          Peck - cross

1    under the amended plan is the account balance?

2    A.  You're asking me the account balance, yes.

3    Q.  So it doesn't carry over from the current plan, the '95

4    plan on the left-hand side, it doesn't say on the right-hand

5    side, well, you have this greater of, you have an account

6    balance, but you also have your accrued benefit as of 12/31/95,

7    right?

8    A.  Yes.

9    Q.  It doesn't show that as the benefit under the amended plan,

10   does it?  On right-hand side it doesn't, correct?

11   A.  Correct.

12   Q.  So if you look further at -- where it says your estimated

13   account balance as of 1/1/96, it has a dollar sign?

14   A.  Right.

15   Q.  And you know that because of the 9 percent rate used and

16   that disconnect between the interest crediting rate and the

17   GATT rate, if somebody was going to actually be paid on 1/1/96,

18   putting aside some small number of people, basically for 16,000

19   people, the account balance would not be the payment that they

20   would receive if they asked for a lump sum on 1/1/96, correct?

21   A.  That's possible, right --

22   Q.  Well --

23   A.  -- that they would get the 12/31/95.

24   Q.  They would get the --

25   A.  The greater of the two.

F7lnosb7                          Peck - cross

1    Q.  And you know that for basically everybody they would get --

2    A.  12/31/95.

3    Q.  -- the 12/31/95 lump sum, correct?

4    A.  Right.

5    Q.  You also know that for many people that the account balance

6    was given this 9 percent rate that was used to discount plus

7    mortality, in many cases the account balance was half of the

8    actual lump sum that they would have received had they asked

9    for a payment on 1/1/96?

10   A.  What's the question?

11   Q.  The question is, you knew at the time not only was the

12   account balance not the payment that they would receive as

13   their lump sum, but that the account balance was very

14   frequently very significantly reduced from the amount that they

15   would have received had they asked for their money that day?

16   A.  OK.  But --

17   Q.  Do you --

18   A.  I don't know what you are asking me there.

19   Q.  You agree with my question, the assertion in my question?

20        THE COURT:  No.  Let's do it differently.  You need to

21   do it differently.

22        MR. GOTTESDIENER:  She just wants to know the

23   relevance of it.

24        THE COURT:  Right.  I'm not going to have you put the

25   relevance as the assertion in your question because it becomes

F7lnosb7                        Peck - cross

1    confused.  So --

2            MR. GOTTESDIENER:  I wasn't going tell her the

3    relevance I.  Was going to ask her if she agreed.

4            THE COURT:  Sustained.

5    BY MR. GOTTESDIENER:

6    Q.  You knew that the impact -- at the beginning of my

7    examination you agreed that you knew the impact of using a 9

8    percent discount rate when the GATT rate was significantly

9    lower than that, right?

10   A.  Yes.

11   Q.  So knew that the opening balance of people that would be

12   shown on their statement was in many cases half or even in many

13   cases even less than half of what they were actually entitled

14   to if they asked for their money that day, right?

15   A.  OK.  Yes, yes.

16   Q.  The statement underneath that dollar sign says, The amount

17   shown above is what you could expect to receive upon

18   termination of employment or retirement if you accrue no

19   further benefits and elect a lump sum form of payment.  Right?

20   A.  Yes.  That's what it says.

21   Q.  And you knew at the time for everybody who was in wear-away

22   that that was a false statement?

23   A.  For everybody in wear-away, yes.

24   Q.  You knew that at the time it went out, correct?

25   A.  I don't recall that I knew it at the time.  But I know

F7lnosb7                        Peck - cross

1   that's -- I know it's true.

2   Q.  I'm sorry.

3   A.  I don't know that I knew it when the statement went out,

4   but I certainly know it to be true.

5           THE COURT:  Is that because you don't recall one way

6   or the other what you knew at the time?

7           THE WITNESS:  Yeah.

8           THE COURT:  OK.

9           THE WITNESS:  Back, you know, 20 years ago.

10  BY MR. GOTTESDIENER:

11  Q.  But you know we did discuss this in the deposition?

12          Do you recall that?

13  A.  Yes.

14  Q.  And you know that I asked you if you knew that that was

15  false.  Let me withdraw the question and ask it this way.

16          You had that information at the time that the account

17  balance was not the entitlement if somebody asked for their

18  money the next day, the same day, correct?

19  A.  Yes.

20  Q.  And you were aware that outside counsel proposed edits to

21  this statement that would have made the statement at least not

22  a false statement, correct?

23  A.  I didn't know then that they -- because the outside counsel

24  communicated with our benefits attorney most of the time.

25          THE COURT:  Who was that?

F7lnosb7                                Peck - cross

1          THE WITNESS:  Our benefits attorney was Rina Zimmerman

2     and outside counsel was Proskauer.

3          THE COURT:  All right.  I think we should end there

4     for today.  It's 5 o'clock.

5          Let's pick up tomorrow at 9 a.m., and we will

6     continue.

7          Is there any housekeeping that people want to raise

8     with me?  So we'll get the witness off the stand and then take

9     that up.

10         MR. GOTTESDIENER:  I don't think it's necessary, but

11    just a precaution about the admonishment.

12         THE COURT:  Well, yeah.  I think counsel certainly

13    understands that, but I will tell the witness just for your

14    benefit, since you are probably not a professional trial

15    witness.

16         THE WITNESS:  Right.

17         THE COURT:  Once you're sworn in under oath, you can't

18    talk with the lawyers who represent anyone in this case, the

19    parties in this case, or any lawyer about this case, about the

20    content of your testimony.  If it's about things like what time

21    should you be here and should you wait in the hallway before

22    you come in, obviously you can ask somebody that, but not about

23    the questions and answers.

24         THE WITNESS:  OK.

25         THE COURT:  All right.  Thank you.

1           THE WITNESS:  Thank you.

2           THE COURT:  You can go ahead and step down and let me

3    just see if there's things to take up.

4           MR. RUMELD:  I do want to discuss some of the

5    scheduling issues with your Honor.

6           THE COURT:  Let's do that.  That's exactly what I

7    wanted to find out.  So we'll let --

8           THE WITNESS:  Do I just leave this here?

9           THE COURT:  Leave it all here.  You'll pick up where

10   you've left off tomorrow morning.

11          THE WITNESS:  OK.

12          THE COURT:  All right.

13          So let's discuss some of those logistics.  In

14   particular, we will start with, tomorrow is Wednesday.  Let's

15   talk about the schedule for tomorrow.

16          I think that the witness should go outside.  He'll

17   join you if you want to know about scheduling things tomorrow.

18          OK.  Just because we are going to talk about some

19   other witnesses as well.

20          THE COURT:  OK.  So who is after Ms. Peck?  Let's

21   start there until she's out of the room.

22          MR. GOTTESDIENER:  I think at this point because we

23   want to not take up the Court's time unnecessarily, we can and

24   we will also -- withdrawn.

25          We can we had three class members we were going to

F7lnosb7                          Peck - cross

1   call.  One is really an HR person, Ellen Glickfield.  So we do

2   want to call her.  She could be put on after Peck or Mike

3   Steven, who also is the former CFO, but --

4             THE COURT:  You may not need Hartman?

5             MR. GOTTESDIENER:  Right.

6             THE COURT:  It's possible that Hartman will be carved

7   off, and in any event she would be the third of those three.

8             MR. GOTTESDIENER:  She would be quick, but I guess we

9   are thinking it could save time.

10            THE COURT:  That's fine with me.

11            Are you going to have any opposition to that?

12            Had you relied upon that Mr. Rumeld, where you want to

13   call Ms. Hartman?

14            MR. RUMELD:  Well, it was his witness, not mine, but I

15   think then he needs to withdraw the declaration.

16            THE COURT:  Obviously the declaration would be

17   withdrawn because the declaration is direct testimony.  She's

18   either going to be here for cross or we just take out the

19   direct testimony.  It wouldn't be accepted.  We haven't moved

20   it into evidence.

21            MR. GOTTESDIENER:  We would have no problem with that.

22            THE COURT:  All right.

23            Are you ready to strike her right now, or do you want

24   to wait?

25            MR. GOTTESDIENER:  I would prefer to confirm it in the

F7lnosb7                              Peck - cross

1    morning.

2              THE COURT:  All right.  In the event that

3    Mr. Gottesdiener drops Ms. Hartman, Mr. Rumeld, at this point

4    in time do you have any reason why you would call her in your

5    case separately?

6              MR. RUMELD:  I think, given the procedural posture in

7    which this arose, I don't really think I have that discretion.

8              THE COURT:  What I want to avoid is, if you are going

9    to make an application for that, then I need to know so I can

10   get a ruling on that.

11             MR. GOTTESDIENER:  I can have her here.  I don't want

12   to make a speech on this, but there is something I need to say

13   that is in their papers which is an improper missing witness

14   argument.

15             They make the argument --

16             THE COURT:  Don't even -- we will address that at some

17   other time, not right now.  They make the argument that there's

18   lots of class members --

19             MR. GOTTESDIENER:  He's implying the argument right

20   now, your Honor.

21             THE COURT:  All right.  Then let him make it.  If he

22   wants to make the application that he would like to call

23   Hartman then he'll make the application.  Let's hear what it

24   is.

25             Is there an application to call Hartman?

F7lnosb7                         Peck - cross

 1              MR. RUMELD:  No, your Honor.

 2              THE COURT:  OK.  So Hartman then tomorrow morning

 3      you'll let me know if she is struck.

 4              MR. GOTTESDIENER:  Subject to confirmation, right.

 5              THE COURT:  If she's struck, the defense is not asking

 6      themselves separately to call her.

 7              If the plaintiffs choose not to call her, then that's

 8      the plaintiff's decision.  OK?

 9              MR. GOTTESDIENER:  Yes.

10              THE COURT:  That is separate from any arguments which

11      the defense might make about any number of things.  They are

12      not waiving any arguments I think.  Just so we are clear, I am

13      not making any determinations about any arguments anybody is

14      making.  You guys think about it.  You guys talk about it.

15      This is not a discussion it want to have here.

16              MR. GOTTESDIENER:  I understand.

17              THE COURT:  I am saying this because of the facial

18      expressions.

19              Who is after Ms. Peck, and how much more time do you

20      have with Ms. Peck?  We had originally thought she would only

21      be two hours.  She's now been a full three.

22              MR. GOTTESDIENER:  Yes.

23              THE COURT:  I have to say she is extremely forthcoming

24      with you.  So I would have thought that you would be able to

25      tie this up, because this is not a witness who's been resisting

F7lnosb7                              Peck - cross

1    examination.

2              MR. GOTTESDIENER:  I agree, your Honor.  But I haven't

3    wanted to go too fast, but, yes, I think I can finish in an

4    hour.

5              THE COURT:  All right.

6              So an hour more with Ms. Peck in the morning, and then

7    how much, Mr. Rumeld, how much do you think you have going to

8    have with her at this point?

9              MR. RUMELD:  I think a couple of hours.

10             THE COURT:  OK.  So Ms. Peck will be the morning-ish,

11   in that range.

12             Is that about right?

13             MR. RUMELD:  I think so.

14             THE COURT:  Until about 12:45 or 1 when we break for

15   lunch, which you ought to shoot to try to have her done.  I am

16   not going to cut you folks off at this point.

17             MR. RUMELD:  I hope so.

18             THE COURT:  Then after that, it will be either

19   Ms. Glickfield or Mr. Steven, is that right?

20             MR. GOTTESDIENER:  Correct, your Honor.

21             THE COURT:  OK.

22             MR. RUMELD:  I wanted to hear from Mr. Gottesdiener

23   what his intentions were with my partner, Ms. Ratner, because

24   we had originally talked about her going first thing in the

25   morning tomorrow, and she has some scheduling issues as well.

F7lnosb7                          Peck - cross

 1              THE COURT:  You guys talked about that?

 2              MR. RUMELD:  Mr. Gottesdiener was indicating he might

 3   not call her, and I don't know what his intentions are.

 4              THE COURT:  Are you still thinking of not calling her?

 5              MR. GOTTESDIENER:  Yes, I'm thinking of not calling

 6   her.  I am also thinking of not calling Marion Derham.

 7              THE COURT:  All right.

 8              MR. GOTTESDIENER:  She is under subpoena, and we can

 9   make sure she comes if he wants to call her.

10              THE COURT:  All right.

11              MR. RUMELD:  Just so we are clear, Ms. Ratner was not

12   one of my witnesses.  But I really would like to know today

13   what to tell her about tomorrow.

14              THE COURT:  You folks confer about that.  Are you

15   ready to say right now whether you are going to call her or

16   not?

17              MR. GOTTESDIENER:  I don't think we are going to call

18   her.

19              THE COURT:  You are not going to call her.  The

20   plaintiffs are not going to call Ms. Ratner.

21              Are you going to call Ms. Ratner?

22              MR. RUMELD:  I did not list her as a witness.

23              THE COURT:  All right.  So Ms. Ratner is off.

24              MR. RUMELD:  Ms. Derham is a witness on my list.  I do

25   intend to call her, and Mr. Gottesdiener undertook to take care

F7lnosb7                              Peck – cross

1   of subpoenaing her since she is a class member and we thought

2   that was the appropriate way to proceed.

3          Whether or not Mr. Gottesdiener is planning to call

4   her, as of this time I think we still need her as a witness for

5   our case.

6          THE COURT:  All right.  Let's see.

7          Live witnesses who the class intends to call.  I'm

8   looking for the -- all right.

9          So you folks work out the logistics.  Is there going

10  to be any problem with the logistics of getting Ms. Derham

11  here?

12         MR. GOTTESDIENER:  No.

13         THE COURT:  Are you planning, Mr. Gottesdiener, on

14  subpoenaing Ms. Derham.

15         MR. GOTTESDIENER:  She's under subpoena, your Honor.

16         THE COURT:  All right.

17         MR. GOTTESDIENER:  She is not a witness that we have

18  any control over.

19         THE COURT:  My point is somebody has subpoenaed her.

20         MR. GOTTESDIENER:  We subpoenaed her, and as long

21  as -- he should just tell me when he wants her here to call

22  her.

23         THE COURT:  You guys work that out then.

24         MR. RUMELD:  OK.

25         THE COURT:  It sounds like she's under subpoena.

F7lnosb7                              Peck - cross

1          MR. RUMELD:  I would just request again for

2     clarification, your Honor, I know your Honor has mentioned

3     about finishing by Monday.

4          THE COURT:  Yes.  How much time do you need with

5     Mr. Sher?

6          MR. RUMELD:  I am not clear what the current count is

7     about the hours.

8          THE COURT:  What I had suggested was that you folks

9     confer with each other and with Joe or my clerk about the

10    timing on a periodic basis so you can all keep track of it.  I

11    said that the first day.

12         MR. RUMELD:  Right.  My understanding was that there

13    was a 25-hour limit.

14         THE COURT:  There is.

15         MR. RUMELD:  Whether we were --

16         THE COURT:  There is or we are going -- we will end on

17    Monday.  That's why I want you folks -- let's put it this way.

18    Let's level set.

19         How much time do you need, Mr. Rumeld, for Mr. Sher?

20         MR. RUMELD:  I think Mr. Sher's direct will take more

21    than half a day and less than a full day.  I think your Honor

22    can tell that's Mr. Rachal's bailiwick, not mine.  The point

23    I'm trying to make is, I think if Mr. Sher goes on Thursday --

24         THE COURT:  He needs to go on Thursday.

25         MR. RUMELD:  We will be done by Monday.

F7lnosb7                              Peck - cross

 1              THE COURT:  I understand.

 2              MR. RUMELD:  If your Honor is intending to adhere to

 3      the 25-hour limit, I thought I heard yesterday that he was up

 4      to 16 hours in the morning yesterday.  Maybe I misunderstood.

 5              THE COURT:  The total I think for all the parties was

 6      earlier this week was 16 hours.  Am I right?

 7              THE LAW CLERK:  I don't know about earlier this week.

 8              THE COURT:  I will talk to you about that in a little

 9      bit.

10              MR. RUMELD:  I just think that there's been a lot

11      plaintiff's examination.

12              THE COURT:  I understand.

13              That is exactly why I said earlier today if we are

14      going to run into issues where people don't think we can get

15      done by Monday I need to surface, because a lot of witnesses

16      are overlapping, so it is hard for me personally to judge how

17      much you folks are going to have with the same witnesses

18              MR. RUMELD:  Right.

19              THE COURT:  You are in the best position to know if

20      you are likely to run out of time.  If there's unfairness, we

21      will adjourn and come back in September.  I would rather not do

22      that.  That's why I'm saying I want to finish this on Monday.

23              That requires I think, Mr. Gottesdiener, you end

24      tomorrow at the end of the day.

25              MR. GOTTESDIENER:  We can end before the end of the

F7lnosb7                         Peck - cross

1    day.

2              THE COURT:  All right.  Terrific.

3              MR. GOTTESDIENER:  We do --

4              THE COURT:  That way Sher can go on.

5              MR. RUMELD:  I need to finish Ms. Derham, and

6    Mr. Gottesdiener needs to finish his cross of Ms. Derham.

7              THE COURT:  It's really, Mr. Gottesdiener, you and

8    your time because you have had more time than Mr. Rumeld.

9              If you guys want a decision before November, you are

10   going to need to end it Monday.  Otherwise we are going to have

11   to pick up in September because I have another trial right

12   behind you and then I've got all kinds of criminal things after

13   that.  I have a potential four-week trial actually in September

14   I should say that I learned about this morning.

15             So I either have a two-week trial or a four-week

16   trial, one of the two.  They both seem to be going.

17             Bear this in mind.

18             MR. GOTTESDIENER:  We've already bore it in mind.

19             THE COURT:  I am not going to cut off Mr. Rumeld if

20   there's unfairness in it.  I am going to let him put on his

21   case.  So we're trying to balance things.

22             MR. GOTTESDIENER:  There's also, we may need to move

23   into evidence a lot of documents.

24             THE COURT:  We can do that on paper.

25             MR. GOTTESDIENER:  Fine.

F7lnosb7                         Peck – cross

1          THE COURT:  I am not worried about the logistics

2     because we have all got a pretty good sense as to what's been

3     shown.  OK?

4          MR. GOTTESDIENER:  OK.

5          THE COURT:  I am only concerned about live testimony.

6          OK, folks.  So let's pick up tomorrow morning at 9

7     a.m. and see where we are at the end of the day.  We will know

8     a lot more by the end of day, but let's try to keep it short on

9     the plaintiff's side.

10         Thank you.

11         MR. GOTTESDIENER:  Thank you.

12         (Adjourned to Wednesday, July 22, 2015, at 9 o'clock

13    a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1    INDEX OF EXAMINATION

2    Examination of:                              Page

3    LINDA J. INE

4    Cross By Mr. Gottesdiener  . . . . . . . . . . 980

5    Redirect By Mr. Rumeld . . . . . . . . . . . .1009

6    Recross By Mr. Gottesdiener  . . . . . . . . .1041

7    Redirect By Mr. Rumeld . . . . . . . . . . . .1065

8    Recross By Mr. Gottesdiener  . . . . . . . . .1073

9     RICHARD SCHAEFFER

10   Cross By Mr. Clark . . . . . . . . . . . . . .1075

11   Recross Mr. Gottesdiener . . . . . . . . . . .1089

12   Redirect By Mr. Clark  . . . . . . . . . . . .1095

13   PATRICIA A. PECK

14   Cross By Mr. Gottesdiener  . . . . . . . . . .1103