F7MJOSB1                        Peck – cross

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   GEOFFREY OSBERG, On behalf of
     himself and on behalf of all
 4   others similarly situated,

 5               Plaintiffs,

 6        v.                               07 Civ. 1358 KBF

 7   FOOT LOCKER, INC.,

 8               Defendant.

 9   ------------------------------x

10                                    July 22, 2015
                                      9:00 a.m.
11

12

13   Before:

14                 HON. KATHERINE B. FORREST,

15                                         District Judge

16

17                      APPEARANCES

18

19   GOTTESDIENER LAW FIRM, PLLC
          Attorneys for plaintiffs
20   BY:  ELI GOTTESDIENER, Esq.
          ALBERT HUANG, Esq.
21        STEVEN DANA COHEN, Esq.
                    Of counsel
22

23   PROSKAUER ROSE LLP (NY)
          Attorneys for defendant
24   BY:  JOSEPH EMANUEL CLARK, Esq.

25
```

F7MJOSB1                        Peck - cross

1                (Trial resumes)

2                (In open court; case called)

3                THE COURT:  Please be seated, everyone.  Good morning.

4        Yesterday my clerk had indicated that at the time she

5     came out and told whoever was still here about the time, but I

6     think, Mr. Gottesdiener, you're the one who is closest, it is

7     not surprising, since you're leading the charge as plaintiff,

8     but you've got about five hours and what?

9                THE LAW CLERK:  Five hours and 45 minutes.

10               THE COURT:  Five hours and 45 minutes left in total.

11       I say that because that includes any cross-examination

12    you'll be doing of Mr. Sher as well as the additional

13    examination of your witnesses.  Just bear that in mind.  I

14    think for defendants, what do they have?

15               THE LAW CLERK:  I think about eight hours or so, 16

16    hours left.

17               THE COURT:  16 hours left for the defense.  It is as

18    you would expect at this point, it is sort of flipped.

19               MR. RUMELD:  One clarification.  The 25 hours is

20    inclusive of the closing?

21               THE COURT:  It is.  I don't know that we'll need

22    closing arguments.  We can do it on papers or we can do it

23    orally, as you folks like.  I am not expecting a lot of

24    additional briefing, but we'll see where you are.  If you want

25    to reserve some time, you can have some time for pulling things

F7MJOSB1                       Peck - cross

1  together.  If it turns out everybody runs out of time, but they

2  do think they would like to pull things together, we can do it

3  in some reasonable briefing.

4           MR. RUMELD:  Right.  I would just request perhaps we

5  split tomorrow, we just know what we are doing over the

6  weekend.

7           THE COURT:  Let's do that.  Let's see where we are

8  tomorrow.  Mr. Gottesdiener, then, you have your sense of time.

9           Ms. Peck, you remain under oath from yesterday.

10          THE WITNESS:  Okay.

11          THE COURT:  You may proceed.

12  PATRICIA A. PECK, resumes

13  CROSS-EXAMINATION (Continued)

14  BY MR. GOTTESDIENER:

15  Q.  Good morning.

16  A.  Good morning.

17  Q.  We broke when I was asking you questions about one of the

18  communications that went out January 1, 1996 estimated plan

19  statement.  Do you recall that?

20  A.  Yes.

21  Q.  Before going back into the actual communications, I just

22  want to ask you in terms of setting up the context, making

23  clear the context in which all of this is occurring, would it

24  be fair to say that this period of time, 1995, was a period

25  during which you were under pressure?

F7MJOSB1                        Peck - cross

1  A.  Yes.

2  Q.  You were under pressure from top management to cut costs?

3  A.  Yes.

4  Q.  Top management had actually turned over, there was any

5  management in place?

6  A.  That's correct.

7  Q.  Mr. Farah and his team?

8  A.  Right.

9  Q.  If I understand, there was somewhat of a culture change at

10  Woolworth when he and his team came in.  Is that fair?

11  A.  That's fair.

12  Q.  Previously a lot of senior managers actually came from his

13  stores?

14  A.  That's correct.

15  Q.  And Mr. Farah and his team were a different breed?

16  A.  Yes.

17  Q.  And people who didn't fit in with the new culture sometimes

18  found that they didn't have a job any more?

19  A.  That's correct.

20  Q.  Not to put too fine a point on it, you wanted to keep your

21  job?

22  A.  Sure.

23  Q.  And you wanted to fit in with the new culture?

24  A.  Yes.

25  Q.  It would be fair to say that the edict for costs being cut,

F7MJOSB1                        Peck - cross

1    you perceived it as never-ending?

2    A.  I wouldn't say never-ending, but there were a lot of them,

3    yes.

4    Q.  From the Farah team?

5    A.  Yes.

6    Q.  And that didn't help your stress level, I would imagine?

7    A.  Right.

8    Q.  I think you termed it nonstop.  Does that sound right?

9    A.  It seemed like it at the time, yes.

10   Q.  As an HR person, is it fair to say that when you're being

11   given these from on high tasks of cutting costs -- first of

12   all, when it comes to pensions, the only way to cut costs is to

13   cut benefits, right?

14   A.  Yes.

15   Q.  You were in a somewhat near impossible position of cutting

16   benefits but without upsetting employee's?

17   A.  Yes.

18   Q.  When you do anything, you do have to consider how employees

19   are going to react?

20   A.  Yes.

21   Q.  That's one of the reasons why it was your personal practice

22   to put a positive spin on whatever communication you sent out?

23   A.  Yes.

24   Q.  Now, with respect to the highlights memo, yesterday after

25   we broke I went back and looked at my notes, and I just want to

F7MJOSB1                          Peck - cross

1    clarify the highlights memo, I believe, is PX-4.

2              You agreed that it was a false statement that you get

3    your account balance as your lump sum for anyone who was in

4    wear-away.  Do you remember we reviewed that yesterday?

5    A.  Yes.

6    Q.  I just wanted to make sure the record was clear that it was

7    known by you and the rest of the members of the team at the

8    time that communication went out, that participants who were in

9    wear-away would not be getting their account balance, they

10   would be getting a payment larger than their account balance?

11   A.  Yes.

12   Q.  With respect to the 1-1-96 statement, that is -- the blank

13   version was depo Exhibit 43, PX-43.  When we got close to

14   breaking, I think I asked you about the statement on the

15   right-hand side that said under account balance, the amount

16   above is the amount you get paid if you ask for your lump sum

17   on that day.  Do you recall those questions?

18   A.  Yes.

19   Q.  You said, you agreed it was a false statement, but then

20   when I asked well, you knew at the time that people would be

21   getting more than their account balance, everybody who was not

22   in the group of enhancement people who got more than other

23   people and maybe conceivably got out of wear-away, everybody

24   else you agreed you knew at the time would be getting more than

25   their account balance?

F7MJOSB1                          Peck - cross

1          MR. RUMELD:  Objection.

2          THE COURT:  Hold on.  Let me just take a look at it.

3          (Pause)

4          THE COURT:  I will allow it in terms of -- let's put

5    it this way.  The record will reflect what the witness's

6    testimony was yesterday.

7          If you hear anything in that question that doesn't

8    strike you as accurate, you should tell counsel.  Otherwise,

9    you can go ahead and answer it.

10          THE WITNESS:  Okay.

11          MR. GOTTESDIENER:  Let me try it another way.

12    BY MR. GOTTESDIENER:

13    Q.  You knew at the point of conversion the amendment 1-1-96,

14    as long as you were using a 9 percent discount rate and the

15    GATT rating was less than 9 percent, you knew that that person

16    was going to be entitled to a payment that was more than their

17    account balance?

18    A.  Yes.

19    Q.  You knew that at the time this statement went out to

20    people, correct?

21    A.  Yes.

22    Q.  You knew that that was not a correct statement of the facts

23    for anybody who was in wear-away, correct?

24    A.  Right.

25    Q.  Now, we also talked about the edits that were proposed by

F7MJOSB1                          Peck - cross

1    outside counsel to that statement before it went out.  Do you

2    remember when we were talking yesterday afternoon, that is

3    where we were at?

4    A.  Yes.

5    Q.  You were involved in the process of the generation of that

6    statement to folks, correct?

7    A.  I didn't write the statement, but I probably read the

8    statement before it was sent out.

9    Q.  Are you saying that you were not aware that outside counsel

10   had raised questions about the statement?

11   A.  I don't recall that outside counsel raised questions about

12   the statement, no.

13          MR. GOTTESDIENER:  Could you put on the screen PX 44.

14          I think we saw that yesterday and turn to a couple of

15   pages in.

16   BY MR. GOTTESDIENER:

17   Q.  You were aware at the time that this statement went out,

18   were you not, that counsel had suggest that instead of saying

19   the account balance is the amount that you would be paid in a

20   lump sum if you left the same day, that it would be stated

21   unless your accrued benefit as of December 31, '95 as set forth

22   in 5 above is greater on an actuarially equivalent basis?

23          MR. RUMELD:  Objection.

24          THE COURT:  Hold on.  Let me just read this.

25          (Pause)

F7MJOSB1                          Peck - cross

1              THE COURT:  Sustained.

2      BY MR. GOTTESDIENER:

3      Q.  Well, you knew that counsel was involved, both inside and

4      outside counsel, in looking at this statement.  Is that fair?

5      A.  That's fair.

6      Q.  How did you know that?

7      A.  I don't know.  I mean we were all working together, so I

8      don't know.

9      Q.  Inside counsel was Ms. Clarke, who has been sitting in the

10     courtroom, correct?

11     A.  Yes, and Rita Zimmerman.

12     Q.  You were aware at least as a general matter that outside

13     counsel had made comments on the statement?

14     A.  Yes.

15     Q.  That was in the November time-frame as the statement was

16     being developed.  Is that fair?

17     A.  Yes.

18     Q.  And then on December 4, if you would cull up PX-625 --

19              MR. GOTTESDIENER:  May I approach, your Honor?

20              THE COURT:  You may.

21              THE WITNESS:  Thank you.

22     BY MR. GOTTESDIENER:

23     Q.  You received this memo that was directed to you and Ms.

24     Clarke from Tom Kiley and Carol Kanowicz about the plan

25     statement, correct?

F7MJOSB1                          Peck - cross

1            THE COURT:  Is this 625?

2            MR. GOTTESDIENER:  Yes.  Do you have a copy?  I have

3   an extra, your Honor.

4            (Pause)

5            THE COURT:  All right.  Go ahead.

6   BY MR. GOTTESDIENER:

7   Q.  You received that, ma'am?

8   A.  Yes.

9   Q.  Do you see how Kiley's asking for any final comments,

10  please let us have your final comments, and then you see that

11  he states, "No comments per Sheilagh Clarke"?

12  A.  Yes.

13  Q.  You don't have any reason to doubt that you were involved

14  in determining that there were no comments that you were going

15  to provide you and Sheilagh back to Tom and Carol to make any

16  changes to the statements?

17           MR. RUMELD:  Objection.

18           THE COURT:  Hold on.

19           MR. GOTTESDIENER:  I'll ask it again.

20           THE COURT:  Yes.

21  BY MR. GOTTESDIENER:

22  Q.  You have no reason to believe that you were not consulted

23  by Sheilagh before Sheilagh communicated to Tom, "no comments"?

24  A.  No, that's not how it worked.  I mean if we had comments,

25  we would independently give our comments back to Tom, not that

F7MJOSB1                         Peck - cross

1    Sheilagh had to consult with me.

2    Q.  Okay.  I guess I was just suggesting that perhaps that

3    reflected Sheilagh's communication to Tom that she had checked

4    with you and the two of you did not have any comments.  Is it

5    possible that that occurred?

6           THE COURT:  Don't have her speculate.  Don't

7    speculate.  Why don't you ask it more affirmatively.

8           If you know what Ms. Clarke was writing here and what

9    she intended to indicate, then you can testify as to that.  If

10   you don't, don't get.

11          THE WITNESS:  Okay.

12          MR. GOTTESDIENER:  Just so the record is clear, that

13   is Mr. Kiley writing, "no comments per Sheilagh Clarke."

14          THE COURT:  I understand.  It requires the assumptions

15   about two different people:  One, about what Ms. Clarke was

16   conveying; and, two, what Mr. Kiley was conveying about what

17   Ms. Clarke was conveying.  The witness would be able to

18   interpret both in order to adequately answer your question.

19          MR. GOTTESDIENER:  Let me try it this way.

20   BY MR. GOTTESDIENER:

21   Q.  Would it have been your practice to sometimes communicate

22   to the team through someone else who was a trusted member of

23   the Woolworth Corporation?

24   A.  Not a practice, but it happens, yes.

25   Q.  You don't have any reason to believe that you did not give

F7MJOSB1                          Peck - cross

1    a final review yourself to the statement and conclude it was

2    okay to send it out in the form that it was in?

3              Do you want me to ask it again?

4    A.  Yes.

5    Q.  Because you don't have an actual recollection, I'm

6    assuming, of this moment in time, correct?

7    A.  Right.

8    Q.  I am just asking, you don't have any reason to doubt that

9    you actually did review the statement before it finally was

10   printed and sent out and gave your approval?

11   A.  I don't have any reason to doubt it, right.

12   Q.  And one reason you don't have any reason to doubt it is

13   that it was necessary to get your approval before that

14   statement went out?

15   A.  Yes.

16   Q.  And that's because, as we discussed yesterday, you were the

17   person responsible for the communication of the change to

18   participants?

19   A.  Yes.

20   Q.  And the actual plan statement went out in March, and we

21   discussed that, March '96, approximately, once the actual

22   earnings came in?

23   A.  Yes.

24   Q.  And you know that that assertion that you agreed was false

25   about this is the amount you get paid if you left this day for

F7MJOSB1                          Peck - cross

1   anybody in wear-away, that was false, you know that stayed in

2   there?  It was not altered?

3   A.  Okay, yes.

4   Q.  In fact, you know that that statement was made

5   year-after-year to participants?

6           They were shown the account balance and even if the

7   payment they would have received that day was unrelated to

8   their account balance and more than it, they were still told

9   that's the Lump sum they would receive?

10          MR. RUMELD:  Objection.

11          THE COURT:  Hold on.  Don't answer yet.  I'll just

12  read the question.

13          (Pause)

14          THE COURT:  You have two questions there, so I'll

15  sustain the objection.  Please break it up.

16  BY MR. GOTTESDIENER:

17  Q.  You know the plan statement effectively remained the same

18  with respect to telling people the account balance is the

19  amount that they will receive if they asked for a payment that

20  day?

21  A.  Yes.

22  Q.  So in '97 and '98, '99 and so forth and so on, this

23  statement continued to be made to people the same as in the '96

24  statement.  Is that correct?

25  A.  I haven't reviewed those statements.  I don't recall

F7MJOSB1                         Peck - cross

1   exactly.

2   Q.  You don't have any reason to doubt that that assertion

3   changed, do you, that this is the amount you would get if you

4   leave today?

5          THE COURT:  I don't think you mean that question to

6   come out that way.  I think you mean the opposite.

7   BY MR. GOTTESDIENER:

8   Q.  As far as you're aware, the statement was not changed from

9   the statement in '96?

10  A.  As far as I'm aware, that's correct.

11  Q.  You know that the same statement was made in '96 in the

12  total compensation statements?

13  A.  Yes.

14  Q.  Those booklets that had a number of different benefits?

15  A.  Yes.

16  Q.  Including the retirement benefit?

17  A.  Yes.

18  Q.  The next communication that I would like to speak to you

19  about is the summary plan description --

20  A.  Okay.

21  Q.  -- that went out in late December of 1996.  Does that sound

22  right?

23  A.  No.  No, I don't think it went out until March.

24  Q.  The summary plan description now?

25  A.  I understand.  I don't think it went out in December.

F7MJOSB1                         Peck – cross

1    Q.  I am sorry?

2    A.  December of '96, you said?

3    Q.  Right.  Not '95?  That is why you were saying March?

4    A.  No.

5    Q.  Could we put it on the screen, that is PX-5, and I will

6    show you a document that might refresh your recollection it

7    didn't go out until December?

8    A.  Do you have the back cover because that is where the date

9    is?

10   Q.  On the back cover, yes, I do.  On the back cover it says,

11   it has a date of September 30, 1996.

12   A.  Okay.

13   Q.  But the defendants agree that it did not go out on

14   September 30, 1996.  If you could get on the screen PX-59, and

15   this is just to refresh your recollection, ma'am.

16           MR. GOTTESDIENER:  May I approach, your Honor?

17           THE COURT:  You may.

18   BY MR. GOTTESDIENER:

19   Q.  This was a letter that Mr. Kiley wrote that we actually

20   discussed with him when he testified.  If you look at the date

21   of his letter, December 24, 1996 on the front page, and then if

22   you see on Page 2, he states:

23           "In the second full paragraph a revised summary plan

24   description reflecting the plan as amended January 1, 1996 is

25   currently being printed.  In its place I have enclosed the SPD

F7MJOSB1                          Peck - cross

1    covering the plan in effect as of December 31, 1995 and a

2    letter to participants which describes the January 1, 1996 plan

3    amendments."

4              Do you see that?

5    A.  I see it.

6    Q.  Does that help you refresh your recollection that the

7    summary plan description for the amended plan didn't go out

8    until towards the end of the year of 1996?

9    A.  No.

10   Q.  Okay.  That's fine.  I'll still ask the questions and I

11   think the questions will still make sense.

12   A.  Okay.

13   Q.  You would have been involved necessarily in approving the

14   summary plan description before it went out, right?

15   A.  Yes.

16   Q.  Now, we touched on yesterday the fact that initially there

17   was an anticipated wear-away reported by Mercer to you and the

18   team of one to two years, and then it became two to three

19   years.  This is in the spring of '95.

20             Then you testified that you then heard in September of

21   '96 that it actually was then anticipated to be a four to five

22   year wear-away.  Do you recall that testimony?

23             MR. RUMELD:  Objection.

24             THE COURT:  Hold on.

25             THE WITNESS:  Yes, I do.

1                    THE COURT:  Hold on.

2                    THE WITNESS:  I'm sorry.

3                    (Pause)

4                    THE COURT:  I'll allow the question.  The objection is

5       overruled.  You may answer.

6       A.  Yes, that's what I said yesterday.

7       BY MR. GOTTESDIENER:

8       Q.  It is what you said yesterday is the truth?

9       A.  Yes.

10      Q.  That letter that we put on the screen, the PX-9 letter,

11      could we have that back up on the screen.  If we go to the

12      third page, it is a two-page letter, and attached to it is a

13      memo from Roger Farah to John Gillespie and John Cannon?

14      A.  Yes.

15      Q.  You received a copy of that memo?

16      A.  The Roger memo.

17      Q.  You learned about it?

18      A.  I learned about it, yes.

19      Q.  Why don't we just have on the screen also PX-113.  So you

20      see here you actually did receive it, didn't you?  This is

21      John --

22      A.  Gillespie.

23      Q.  -- Gillespie, who at this point in time you were reporting

24      to?

25      A.  That's right.

F7MJOSB1                         Peck - cross

1   Q.   Instead of Barry?

2   A.   Correct.

3   Q.   So he said that -- he said Pat -- why don't you translate

4   for us.

5   A.   "Please set up a meeting for us and whomever else is

6   appropriate to meet with Cannon.   Thanks, John."

7   Q.   And then he started to write something, "I don't think our

8   NF" -- and then he scratched that out, do you see that there?

9   Like he had some further thought to convey.   Do you see that?

10  A.   I see it.

11  Q.   So and he is saying he is concerned about that 6 percent

12  interest crediting rate that is guaranteed in the account

13  balance?

14  A.   Roger?

15  Q.   Yes, and he says, "Could you please work up an analysis

16  that shows how this impacts our program.   Also please run the

17  numbers at various interest rates which may help us with some

18  of the deficit in the pension plan."   Do you see that?

19  A.   I see it, yes.

20  Q.   You remember receiving that?

21  A.   Yes.

22  Q.   Then the Mercer letter, this is dated September 10, if we

23  can go back to PX-9, the first two pages of PX-9, you see this

24  is the next day somebody from Mercer -- do you see Jim Cassidy

25  is the person who sent this letter?

F7MJOSB1                          Peck - cross

1   A.  Yes.

2   Q.  You worked with Jim?

3   A.  Yes.

4   Q.  During the review of the plan alternatives before you

5   recommended the cash balance with the wear-away, right?

6           You worked with him as well as Jim Grefig during that

7   process?

8   A.  Yes, we did.

9   Q.  So he is directing this letter to Nancy Herman, and she is

10  who?

11  A.  The manager of corporate finance in the treasurer's

12  department.

13  Q.  You see on the second page at the bottom, you're copied,

14  Pat Peck?

15  A.  Yes.

16  Q.  And then at the top of the first page there's handwriting

17  and it says, "To Pat Peck, the letter from Mercer with Roger's

18  memo attached, Nancy"?

19  A.  Yes.

20  Q.  So you, in fact, got Roger's memo in two ways, from Nancy

21  and from John?

22  A.  Right.

23  Q.  And you understood this was a priority for Roger?

24  A.  Yes.

25  Q.  Looking at the dates, you certainly would agree that this

F7MJOSB1                          Peck - cross

1    is before the summary plan description goes out, and printed on

2    the back of it it says September 30, 1996?

3    A.  Yes.

4    Q.  Could we get up PX-5 and go to the very last page,

5    hopefully it is reproduced, the back cover.  Could you

6    highlight in the right-hand corner -- now it says September 30,

7    1996.  Is that right?

8    A.  Yes.

9    Q.  But you don't have any information that it actually was

10   printed and distributed on that date, correct?

11   A.  No.

12   Q.  But you're fairly confident it was not printed and

13   distributed any earlier than that date?  Is that fair?

14   A.  Right.

15   Q.  So if we look at the letter itself which you have a hard

16   copy in front of you from yesterday, going back to PX-9, and

17   you reviewed that letter in preparation for testifying here

18   today.  Is that fair?

19   A.  I am sorry.  Could you say that again.

20   Q.  Yes.  First of all, you were deposed, and prior to your

21   deposition three years ago, you looked at documents with

22   counsel and you prepared yourself to be examined.  Is that

23   fair?

24   A.  That's fair, yes.

25   Q.  And you went through some process similar to that before

F7MJOSB1                              Peck – cross

1    starting your testimony yesterday.  Is that fair?

2    A.  Yes.

3    Q.  One of the documents that you looked at was this letter?

4    A.  Yes.

5    Q.  You know that the letter says that Mercer believes there is

6    going to be three to four more years of wear-away, correct?

7    A.  Yes.

8    Q.  And you see that the letter itself actually makes

9    references specific to wear-away, it uses that term?

10           MR. RUMELD:  Objection.

11           THE COURT:  Do you want to highlight where you think

12   that term --

13           MR. GOTTESDIENER:  That is one of them.

14           THE COURT:  I'll allow it.  Overruled.

15   BY MR. GOTTESDIENER:

16   Q.  Do you see that?

17   A.  Yes.

18   Q.  That is in the second paragraph.  If you go down, scroll

19   down, the court's indulgence, you see the last paragraph, it

20   also says the wear-away period will be extended a little

21   further?

22   A.  Yes.

23   Q.  And that is in the context of changing the 6 percent

24   interest crediting rate that is at least being explored as a

25   possibility at that time?

F7MJOSB1                          Peck - cross

1   A.  Yes.

2   Q.  So is it fair to say, remember yesterday we talked about

3   you didn't think the term wear-away was used right away, but

4   then it was being used certainly by this time, would you agree

5   that you all were using the term wear-away?

6   A.  Yes, it's here.

7   Q.  Now, at the top of the second page, do you see how

8   Mr. Cassidy says, "As a more extreme measure, the plan may be

9   frozen as of any future date"?

10  A.  Yes.

11  Q.  This is equivalent to reducing the pay credits mentioned

12  above to zero?

13  A.  Yes.

14  Q.  And he's explaining, as the paragraph goes on, that there

15  would be really big savings if that were done.  Is that

16  correct?

17  A.  Yes.

18  Q.  And those savings are on the order of the savings that you

19  saw when you looked at in '95 doing temporary freeze on the

20  current plan?

21          MR. RUMELD:  Objection.

22          THE COURT:  Hold on.  Overruled.  You may answer.

23  A.  Would you repeat that question, please.

24  BY MR. GOTTESDIENER:

25  Q.  Sure.  The savings that Mr. Cassidy tells you and Woolworth

F7MJOSB1                          Peck - cross

1    you could achieve by freezing the plan, this is now the amended

2    plan in '96, they were comparable to the savings that were

3    calculated you could save if you froze the 1995 version of the

4    plan?

5    A.  Okay, yes.

6    Q.  You see he calls that an extreme measure, as a more extreme

7    measure rather, correct?

8    A.  That's what he wrote.

9    Q.  And the way you and the team and the company viewed an open

10   freeze aligned with the amended plan or pre-amended plan, that

11   was how you viewed it, as an extreme measure?

12   A.  Yes.  Well, those are Jim's words, but we had already said

13   we were going to freeze the plan.

14   Q.  But in '96, because these requests for cuts were not

15   stopped, you all at least considered the possibility again of

16   doing a total open freeze of the entire plan?

17   A.  Yes.

18   Q.  And that was rejected because despite the very large

19   savings, you considered the employees would in effect not

20   accept it?  The hit to morale would be too great to do that,

21   correct?

22             MR. RUMELD:  Objection.

23             THE COURT:  Hold on.  So you've got two questions.

24   You need to break it down.

25   BY MR. GOTTESDIENER:

F7MJOSB1                          Peck - cross

1    Q.  In '95 we looked at the plan alternatives, that page in the

2    May dec that was then repeated in the other decs, and you saw

3    that by far the most savings that could be achieved was by a

4    temporary freeze, correct?

5    A.  Yes.

6    Q.  But that was considered unacceptable despite the large

7    amount of savings because of the way employees were expected to

8    react to an open freeze of the existing plan, correct?

9    A.  Yes.  Not just the employees, though.

10   Q.  Wall Street as well?

11   A.  Right.

12   Q.  Customers as well?

13   A.  New, new associates, right.

14   Q.  New associates as well?

15          So the perception was a very -- in fact, that was the

16   driver as to why that was rejected given how much it could have

17   saved, correct?

18   A.  Correct.

19   Q.  And again that was the driver in effect in response to

20   Roger in '96 when it came back on the table, should we freeze

21   the amended plan, correct?

22   A.  Yes.

23   Q.  And so that was not done despite his desire for more

24   savings, correct?

25   A.  Correct.

F7MJOSB1                          Peck - cross

1   Q.  And that's because you and top management, including Roger,

2   took into account the perception of actions that you took with

3   respect to the pension plan?

4          You took into account, I am restating it, you took

5   into account perceptions, the perceptions you expected before

6   doing anything with respect to cutting the pension plan?

7   A.  Yes.

8   Q.  Now, still in this fall 1996 time-frame when at this point

9   in time there's another Roger Farah request for cuts and there

10  is an estimate now that the wear-away is going to last four to

11  five years, you and Mr. Kiley had a meeting with Mr. Farah and

12  Mr. Hippert to discuss these matters, correct?

13  A.  Yes.

14  Q.  What can you tell us you recall about that meeting.

15  A.  Well, I think that was one of the charts that we looked at

16  yesterday, and we just went over it with them and explained.

17         You remember you asked about all the Tom Kiley notes

18  on that page, and we just explained it to Roger and Dale.

19  Q.  What we looked at yesterday that had all those notes that

20  you're referring to was from 1995.  Now we're in 1996.

21  A.  Okay.

22  Q.  In 1996, after Jim Cassidy sent this letter, Roger sent

23  that note, you and Mr. Kiley sat down with Mr. Farah and

24  Mr. Hippert.  Is that correct?

25  A.  I don't recall that Barry wasn't there.

F7MJOSB1                              Peck - cross

1     Q.  You don't recall what?

2     A.  That Barry wasn't there also.

3            THE COURT:  You think Barry, Mr. Thomson was present?

4            THE WITNESS:  It is possible, yes.

5     BY MR. GOTTESDIENER:

6     Q.  Again we are talking about 1996 after the Mercer letter.

7     A.  Okay.

8     Q.  I am jumping around some times, but we do want your best

9     recollection.

10    A.  Okay.  I don't remember the meeting exactly.

11    Q.  After the plan went into effect?

12    A.  After the plan was in effect, right.

13    Q.  Tell us anything you can recall about that meeting, if you

14    can.

15    A.  Yeah.  I don't have anything I recall about that meeting

16    specifically, no.

17    Q.  Let me see if a document that we'll put on the screen and

18    I'll hand you helps refresh your recollection.  This is PX-300,

19    a December 3rd document.

20           MR. GOTTESDIENER:  May I approach, your Honor?

21           THE COURT:  You may.

22           MR. GOTTESDIENER:  Does your Honor need a copy?

23           THE COURT:  I don't.  PX-300?  Hold on.  I have

24    something different.

25           THE WITNESS:  Thank you.  No.  I have got it.  Thank

F7MJOSB1                              Peck - cross

1    you.

2    BY MR. GOTTESDIENER:

3    Q.  This is a memo from Tom Kiley to Pat Peck, signed by Tom,

4    copy to Carol and Marion, and it talks about the retirement

5    plan and the Kinney manufacturing plan statistics.  Do you see

6    that December 3rd?

7    A.  Yes.

8    Q.  And he states, "In follow-up to our meeting of November 12,

9    1996 with Roger Farah and Dale Hippert, I wish to provide you

10   with information regarding the Woolworth retirement plan."

11             And then what he shows is the lump sums paid in 1995

12   and the lump sums paid in 1996 through November 1st of 1996.

13   He then states under the box, based on data from January 1

14   through September 30, 1996, payments processed -- under now the

15   amended plan -- were as follows.  Then he breaks it down by

16   lump sums processed due to terminations, 1651.  Lump sums

17   processed initiated by associates, 510.  Annuities processed or

18   who elected to start and receive an annuity, a smaller number

19   of 143.  Then the last category vested-window closed; entitled

20   to future benefits, 136.

21             Do you see that there?

22   A.  Yes.

23   Q.  Just on that last entry, vested-window closed, what is that

24   a reference to, window closed?

25   A.  I don't know that I know what the window closed is, but we

F7MJOSB1                          Peck - cross

1    had a lot of terminated vested associates in our plan, people

2    who were vested but they had terminated.

3    Q.  Here would this be a reference -- you haven't seen this

4    document recently, I take it?

5    A.  I have not.

6    Q.  If you look again at the sentence that caps off what I just

7    read off, looking at the first three quarters of that year?

8    A.  Right.

9    Q.  Would it make sense to you that the 136 people are people

10   for whom the six-month window after they terminated had been

11   closed.

12   A.  Closed, ah-huh.

13   Q.  And you know --

14   A.  Yes, that makes sense.

15   Q.  Just so the record is clear, that window is if you

16   terminate and you're under 55, you only have six months to

17   elect and start to receive your benefit?

18          If you want a -- if you -- yes?  If you want an

19   annuity, I'll start.  After that, the window closes until you

20   become age 55?

21   A.  Right.

22   Q.  So does this help refresh your recollection about your and

23   Tom's meeting with Roger and Dale about the retirement plan on

24   November 12, 1996?

25   A.  No.

F7MJOSB1                          Peck - cross

1    Q.  Given the context where we've seen the Mercer letter and

2    the facts that you knew about how many people were in

3    wear-away, you don't have any reason to doubt that this meeting

4    involved reporting to Roger and Dale about how lump sums were

5    saving money from the plan?

6            MR. RUMELD:  Objection.

7            THE COURT:  Hold on.  Sustained.  To the extent there

8    is simply an inference which we all can draw, let's not have

9    her speculate.  I think that you should probably move on to the

10   document you're aiming at.  That might actually be the best

11   refresher.

12           MR. GOTTESDIENER:  That is all I have.

13           THE COURT:  You're not going to PX-11?

14           MR. GOTTESDIENER:  Ill go to PX-11.

15           THE COURT:  You don't need to.  I thought PX-11 were

16   slides from that meeting.  Is that not right?

17           MR. GOTTESDIENER:  I don't believe so.  Can you get

18   PX-11 up.  The next one.  Your Honor's correct.  What I was

19   going to go to was -- let me show her PX-11.

20           While I am getting a hard copy, Randall, if you could

21   flip through so the witness could start to see if there is

22   anything there that helps refresh her recollection.

23           (Pause)

24           MR. GOTTESDIENER:  We do not have a hard copy to

25   provide you.

F7MJOSB1                          Peck - cross

1    BY MR. GOTTESDIENER:

2    Q.  This document, if you go to the first page of it, not the

3    cover, but do you see Woolworth retirement plan, November 11,

4    1996?

5    A.  Yes.

6    Q.  And then going to the first page after that, you see this

7    is discussing the section first is benefits department, review

8    of plan options for additional cost savings?

9    A.  Yes.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F7mnosb2                        Peck - cross

1    Q.  And then the second section is treasurer's department, plan

2    sensitivity analysis?

3    A.  Yes.

4            THE COURT:  Do you want to see a hard copy or are you

5    OK on the screen?

6            MR. GOTTESDIENER:  I have one now.

7            THE COURT:  All right.  You do.

8            MR. GOTTESDIENER:  May I approach, your Honor?

9            THE COURT:  Yes.

10   BY MR. GOTTESDIENER:

11   Q.  Is anything about this meeting coming back to you seeing

12   this document?

13           MR. RUMELD:  You can flip through and go to the next

14   page, Randall.

15   A.  The Roger and Dale meeting was -- what was --

16   Q.  The date on that deck is November 11, and the Kiley memo to

17   you references a meeting of November 12?

18   A.  Right.  OK.

19   Q.  So are you recalling that there was one meeting and then a

20   follow-up meeting?

21   A.  Right.  And this looks like, PX 11 looks like a document

22   that we would have done jointly with treasury.

23   Q.  So that meeting would have been a larger meeting with

24   people from treasury and top management as well as Roger and

25   Dale?

F7mnosb2                        Peck – cross

1    A.  Yes.

2    Q.  Are you remembering a meeting subsequent the following day

3    with just you, Roger and Dale and Tom specifically talking

4    about the savings generated by lump sum cash-outs?

5    A.  I don't remember the meeting, no.  It doesn't mean it

6    didn't happen, but I don't remember it.

7    Q.  Thank you.  So let's move to the summary plan description.

8    PX 5.  Do you have a copy of that in front of you?

9          You have the same document in the binder.

10   A.  OK.

11   Q.  Get me give you our copy so you don't have to hassle with

12   the binder.

13          MR. GOTTESDIENER:  May I approach, your Honor?

14          THE COURT:  Yes.

15   A.  OK.  Thank you.

16   Q.  You understood the importance of the SPD in terms of

17   communicating accurately to participants the terms of the

18   amended plan?

19   A.  Yes.

20   Q.  I think you agreed earlier that your approval of this

21   document was necessary for it to be put in final form and

22   distributed, is that correct?

23   A.  Yes.  But not just my approval.

24   Q.  Other people had to approve it?

25   A.  Sure.

F7mnosb2                          Peck - cross

1    Q.  But you were the one -- the buck stopped with you?

2    A.  Yes.

3    Q.  You gave the final approval?

4            MR. RUMELD:  Objection.

5            THE COURT:  Overruled.

6    A.  Yes.

7    Q.  We have the context of you knowing about an anticipated now

8    four- to five-year wear-away, right?

9    A.  Yes.

10   Q.  Also, the context in which you knew at the time, the prior

11   communications that went out, the announcement letter in

12   September, the highlights in November, the plan statement

13   estimated in December or January '96, the March '96 actual

14   statement, the total compensation statement, you knew at that

15   time that all of those communications contained statements that

16   were false for anybody who was in wear-away?

17   A.  For anyone who was in wear-away, yes.

18   Q.  You knew that at the time you gave your final approval to

19   the SPD, correct?

20   A.  Yes.

21   Q.  So did you take the opportunity of the SPD to finally clear

22   things up for participants?

23           MR. RUMELD:  Object to the form.

24           THE COURT:  Overruled.

25   A.  Not explicitly, no.  We did not.

F7mnosb2                         Peck - cross

1    Q.  So you knew explicitly that the wear-away was anticipated

2    to last another three to four years?

3    A.  Yes.

4    Q.  And you knew that the early retirement subsidy was

5    something that people would not obtain the value of if they

6    took a lump sum?

7    A.  Yes.

8    Q.  And you don't explain anything about the early retirement

9    subsidy in the SPD, do you?

10   A.  No.

11   Q.  You don't say anything about lump sums might seem

12   attractive, but you need to also consider you might get a lot

13   more value in the form of an early retirement subsidy?

14   A.  We do not say that.

15   Q.  In the SPD, correct?

16   A.  In the SPD.

17   Q.  Actually, you didn't say that anywhere to participants,

18   correct?

19   A.  Correct.

20   Q.  And you didn't say anywhere to participants, We've got this

21   new cash balance plan that you have now been in, we need to

22   make sure you understand that that whole structure with the

23   account and the growing account isn't going to mean anything to

24   you if it does not exceed the value of what you already earned

25   up to 12/31/95, correct?

F7mnosb2                          Peck - cross

1    A.  We do not say that.

2    Q.  You never said that to participants not just in the SPD but

3    in any communication, written communication, correct?

4    A.  I can't say never.  I don't recall all the documents

5    without going through them again.

6    Q.  But certainly you don't know of any sitting here now that

7    explicitly tells people what I stated in my last question?

8    A.  No.

9    Q.  That would stick out in your mind, wouldn't it?

10   A.  Pardon me.

11   Q.  That would stick out in your mind, wouldn't it?

12   A.  Yes, I would think so, yes.

13   Q.  Because that would be, in effect, not so good news?

14   A.  Right.

15   Q.  That, listen you are not going to earn new benefits for a

16   time, you agree that would be bad news?

17   A.  Yes.  That would be bad news.

18   Q.  And you made an affirmative decision to only talk about the

19   amended plan in terms of good news?

20   A.  In our communications, yes.

21   Q.  You just seemed to caveat in your communications.  Are you

22   thinking of something else?  I'm asking about in your

23   communications to employees?

24   A.  Uh-huh.

25   Q.  Are you referring to your internal discussions with the

1  team that you would discuss that, that there's no new benefits

2  being earned?

3  A.  Well, the team was aware of it.

4  Q.  And the team was aware and you were one of the team

5  members, that it was in fact through the wear-away that the

6  cost savings that Roger wanted were actually achieved, correct?

7  A.  Yes.

8  Q.  So, if we look at page 11 of the summary plan description,

9  at the bottom, do you see where it says, How your retirement

10  benefit is determined?

11  A.  Yes.

12  Q.  It says, Your plan benefit is based on the account balance

13  you accrue, or earn, while a participant.

14  A.  Yes.  That's what it says.

15  Q.  So is that true, ma'am, for people in wear-away?

16  A.  Not for people in wear-away, but for anybody else.

17  Q.  In September, November, October, December of '96 you knew

18  that effectively everybody in the company was in wear-away?

19  A.  There are exceptions.

20  Q.  And you thought it was the exceptions that allowed you to

21  put out a statement that was otherwise false to the vast

22  majority of people?

23  A.  This is how it would be after they were no longer in

24  wear-away, so it's not false.  It's how the plan would work.

25  Q.  True.  For anyone who was in wear-away it was false, do you

F7mnosb2                              Peck - cross

1  agree?

2  A.  It didn't work that way for anyone in wear-away.  That's

3  correct.

4  Q.  When you say it didn't work that way, you know that the SPD

5  is a 20-something-page document, right?

6  A.  Yes.

7  Q.  Essentially the whole document is irrelevant to anybody who

8  was in wear-away?

9  A.  I don't think so, but --

10 Q.  Until you got out of wear-away?

11 A.  Right.

12 Q.  You knew, I think you mentioned you thought there was going

13 to be more terminations in the future, correct?

14 A.  Yes.

15 Q.  So you knew that there were going to be thousands of people

16 perhaps who would never get out of wear-away because they would

17 no longer be employed and be able to work their way out of

18 wear-away, correct?

19 A.  Yes.  That's correct.

20 Q.  Because you understood that in effect to get out of

21 wear-away you have to kind of re-earn the benefit you already

22 earned --

23 A.  Right.

24 Q.  -- through service to the company?

25 A.  Uh-huh.

F7mnosb2                          Peck - cross

1    Q.  In exchange for no additional new benefits, right?

2    A.  Yes.

3    Q.  So, back to the relevance of this 20-something page

4    document, putting aside for the moment the accuracy of it, the

5    entire document is focused on the account balance benefit,

6    correct?

7    A.  Yes.

8    Q.  You mentioned in your deposition, and I'm sure you will

9    discuss with Mr. Rumeld when he asks you questions, that there

10   is arguably some single sentence in this document that you will

11   claim is a reference to the other benefit.

12   A.  Uh-huh.

13   Q.  Is that your -- yes?  I didn't hear your answer.

14   A.  Yes.

15   Q.  Is that fair, that in this document you contend that there

16   is a sentence or two that does tip somebody off to the fact

17   that there is another benefit under the amended plan?

18            Is that fair?

19            MR. RUMELD:  Objection.

20            THE COURT:  Sustained.  Why don't you take the

21   question, because it's got many parts to it now, and make a

22   single question.

23   BY MR. GOTTESDIENER:

24   Q.  You agree I just don't want you, ma'am, or the Court to

25   misunderstand it, I agree that sentence would be relevant.

F7mnosb2                          Peck - cross

1              But assuming the accuracy of your contention, you

2     contend that there is a sentence or two in the 20-page document

3     that refers to the other benefit to which people are entitled

4     under the amended plan, is that correct?

5     A.   Yes.

6     Q.   So, on a rough basis, you do agree that, even according to

7     you, that the document is about 97 percent irrelevant to

8     anybody who is in wear-away?

9     A.   I don't know about 97 percent.

10    Q.   OK.

11    A.   That is a guess.

12    Q.   If there is a sentence or two and there is a 20-page

13    document, you do agree that the vast majority of this

14    discussion in the document is just irrelevant to anybody who is

15    in wear-away and never gets out of wear-away?

16    A.   To anyone who doesn't get out of wear-away, that's correct.

17    Q.   Now, the sentence that you contend is a tipoff that there

18    is another benefit, can you tell us where that is and explain

19    to us how it is that you contend that this would tip somebody

20    off to the fact that the cash balance benefit is irrelevant to

21    them until they get out of wear-away?

22    A.   I would have to go through it again to find that

23    sentence --

24    Q.   Please go through it.

25    A.   -- specifically.

```
 1              There is a reference on page 5 under the compensation
 2      paragraph that refers to other employee welfare plans.
 3      Q.   That is not a reference to the accrued benefit under the
 4      plan prior to 1996 or to wear-away, is it?
 5      A.   OK.
 6      Q.   I'm asking.
 7      A.   Yes, you're right.  So on page 6, we discuss the initial
 8      account balance.  Is that what you are referring to?
 9      Q.   I want to know what you contend is the tipoff that people
10      started in the new plan at a deficit they had to work their way
11      out of before the new benefits.
12      A.   OK.
13      Q.   If you think that's one of or the sentence, just let us
14      know.
15      A.   I don't know where it is exactly.  I would have to go
16      through the whole document right now.  I don't remember exactly
17      where it is.
18      Q.   Well, how about taking the vantage point of the average
19      participant who receives the summary plan description who's
20      already received the announcement letter, the highlights memo,
21      the two plan statements, and the total compensation statement.
22      Approach it that way and see if you can look at it from that
23      vantage point of the average participant.  See if you can --
24      A.   The average participant is not going to read all this
25      22-page SPD generally.
```

F7mnosb2                          Peck - cross

1    Q.  They will read the highlights?

2    A.  They'll read the highlights.

3    Q.  If you would go to the highlights page.  If you could go to

4    page 4.

5    A.  Right.

6    Q.  3 and 4.

7    A.  Uh-huh.

8    Q.  So 3 and 4, anyplace there where the person in wear-away

9    would be able to understand that they are not going to earn any

10   new benefits for a period of time after 1/1/96.

11   A.  No.  Not on the highlight page.

12   Q.  So then go back to imagining a participant who is -- first

13   of all, the average participant -- withdrawn.

14          Did you consider the average participant when giving

15   approval to companywide communications that described the

16   amended plan?

17   A.  Would you ask that again, please.

18   Q.  Sure.  You were responsible for communicating the amended

19   plan to participants, right?

20   A.  Yes.

21   Q.  Did you think about communicating to them at the level of

22   the average participant, what the average participant could

23   understand?

24   A.  I think, yes, we did.

25   Q.  How did you go about doing that?

F7mnosb2                         Peck - cross

1   A.   Well, I mean, we made sure that it wasn't filled with

2   complicated actuarial terms or things like that that most

3   people wouldn't be familiar with.

4   Q.   You think most people --

5   A.   We tried to keep it in plain English.

6   Q.   Most people, were they familiar with the concept that you

7   might not earn any new benefits even though you are in a

8   pension plan for a period of time until you overcame the amount

9   you had already earned?

10           THE COURT:  Why don't you rephrase that.

11           MR. GOTTESDIENER:  Sure.

12           THE COURT:  Whether or not the concept of wear-away,

13   however described, would be a concept you expected participants

14   to be generally familiar with.

15           THE WITNESS:  Generally I don't think they would be

16   familiar with it, no.

17           THE COURT:  OK.  Based upon your knowledge of the

18   level of sophistication of participants in the plan back in

19   this time frame, you don't believe they would have understood

20   that concept just on their own?

21           THE WITNESS:  I don't know.  I think that --

22           THE COURT:  Actually it was poorly worded because that

23   suggests if they were educated to understand the concept they

24   wouldn't have understood the concept.

25           I'm actually asking whether or not you think, based

F7mnosb2                          Peck - cross

1   upon your understanding of the sophistication of these folks,

2   they would have had a prior understanding of at least a general

3   concept of a potential for wear-away in a pension plan.  O is

4   that something --

5            THE WITNESS:  I don't think they had any prior

6   knowledge about wear-away.

7            THE COURT:  So they would need to be, in your view,

8   based upon your understanding of their level of sophistication,

9   would they have had to have been educated as to that concept?

10            THE WITNESS:  Yes.

11            THE COURT:  All right.  You may proceed.

12  BY MR. GOTTESDIENER:

13  Q.  And you had to be educated as to that concept?

14  A.  Pardon me.

15  Q.  You had to be educated as to that concept?

16  A.  Yes.  That's correct.

17  Q.  You had no idea that that was a possibility under the plan

18  until you started attending these meetings --

19  A.  Right.

20  Q.  -- in February 1995, correct?

21  A.  Right.

22  Q.  To this day can you think of anything out in the world that

23  is akin to wear-away that the average person or you might have

24  experienced?

25            Is there any analogy?

F7mnosb2                              Peck - cross

1          Is it like anything that you can think of out in the

2     world?

3          THE COURT:  I don't think we need to go there.  I

4     don't think that's going to be usable in any way.

5          MR. GOTTESDIENER:  OK.

6     BY MR. GOTTESDIENER:

7     Q.  So you know when you are giving the green light to this SPD

8     that almost everybody is in wear-away, and they are not going

9     to independently be familiar with the concept of wear-away, and

10    you approve statements that for everybody who is in wear-away

11    are false for them:  Your plan benefit is based on the account

12    balance.  Correct?

13    A.  Yes.

14    Q.  But if I understand, you contend that there is something

15    that was inserted into the SPD that you thought made it OK to

16    communicate the plan this way?

17          Is that fair?

18    A.  That's fair.

19    Q.  You are saying that you don't see it so far in the time

20    that we've spent --

21    A.  Right.

22    Q.  If you can't find it, how would the average participant in

23    your view have been able to find it?

24    A.  If you sit down and read this from cover to cover, you will

25    find it.

F7mnosb2                          Peck - cross

1   Q.  But you said the average participant wouldn't do that,

2   right?

3   A.  I don't think they would, no.

4   Q.  And that was your mind set at the time you approved of this

5   going out, that the average participant wouldn't read it cover

6   to cover, correct?

7   A.  Yes.

8   Q.  It's fair to say that you didn't want people to understand

9   the wear-away?

10  A.  No.

11  Q.  You did want people to understand the wear-away.  Is that

12  your testimony?

13  A.  We weren't trying to hide anything, if that's what you are

14  suggesting.

15  Q.  I'm asking a question.  The first was you didn't really

16  want people to understand the wear-away and you said no.  So

17  then, taking your answer, I said, OK, well, are you saying that

18  you actually wanted people to understand the wear-away effect?

19            MR. RUMELD:  Objection.

20            THE COURT:  Sustained.

21  BY MR. GOTTESDIENER:

22  Q.  Did you want people to understand the wear-away effect?

23  A.  Yes.

24  Q.  What did you do to communicate to the average participant

25  the wear-away effect?

F7mnosb2                      Peck - cross

A.   There were people who asked for personal information as to

how their benefit was calculated and where -- you know, what it

would be as an estimate.  So those people learned either from

the information that they received on how it was done, or, if

they called the HROC in Milwaukee, they could learn it there.

Q.   My question was, what did you do?  If you contend that you

wanted people to know, what did you do to communicate --

          THE COURT:  Why don't you ask the assumed premise of

that.

Q.   First, if your response to my question is as you just gave

it, you would agree that your desire to communicate wear-away

was only to people who contacted the company?

A.   Who asked the question, right.

Q.   Who asked the question about wear-away?

A.   No.  About their benefits.  No -- no one was talking about

wear-away.

Q.   So you didn't want plan-wide, companywide to communicate

the wear-away.  You wanted to communicate the wear-away just to

people who contacted the company after receiving the plan-wide

communications?

A.   That's how it happened, yes.

Q.   I'm sorry.  My question isn't how it happened.  My question

is what you wanted.

A.   I'm forced into saying that is what I wanted, but --

Q.   Well, you are forced into saying --

1             MR. RUMELD:  Can she finish her answer.

2             THE COURT:  Sustained.

3             Let me just ask it this way:  Do you recall giving any

4    thought to affirmatively communicating the wear-away concept to

5    all participants who were impacted by the wear-away concept?

6             THE WITNESS:  Right.  No, I do not.

7             THE COURT:  Do you recall wanting to obscure or hide

8    the wear-away concept from people in any way?

9             THE WITNESS:  No.

10            We weren't deliberately trying to hide anything.

11            THE COURT:  So why, if wear-away impacted so many

12   people at this time, was it not featured prominently or in any

13   big way in the SPD?

14            THE WITNESS:  Well, I guess we thought we took care of

15   it with, you know, that sentence, and because not -- it didn't

16   affect everybody.  So we would be, in fact, spelling out

17   something negative that didn't apply to everybody in this

18   summary plan description.

19            THE COURT:  Is it fair to say that you believed you

20   were complying with what you had to comply with, but in a

21   relatively narrowly defined way?

22            THE WITNESS:  Yes.

23            We believed we met all of the requirements of the SPD

24   in this document.

25            THE COURT:  All right.

F7mnosb2                          Peck - cross

1    BY MR. GOTTESDIENER:

2    Q.   Even though you agree that the statements in the SPD for

3    everybody who were in wear-away were false statements?

4    A.   They were -- that's correct.

5    Q.   And the sentence that you just referred to in answer to her

6    Honor's question, you still can't locate it?

7    A.   That's not how I work.  I prefer to sit and just read, and

8    I'm not comfortable doing that here.

9              MR. RUMELD:  Your Honor, this is --

10             THE COURT:  No she's not --

11             MR. RUMELD:  I --

12             THE COURT:  It's fine.  I am not going to require the

13   witness to take the time right now to find it.  I think

14   counsel's questions have been what they have been.

15             MR. RUMELD:  I was merely going to request that

16   Mr. Gottesdiener move to his right or his left.

17             THE COURT:  I'm sorry.  I was responding to sort of a

18   presumed exercise that was about to occur, which we won't put

19   the witness through any further.

20   BY MR. GOTTESDIENER:

21   Q.   You do agree that if you and the company had put your minds

22   to it you could have --

23             THE COURT:  You don't need to go there, because it is

24   not relevant.  Clearly it is the case that if they want to put

25   any words in there they can.  I'm just trying to short circuit

F7mnosb2                         Peck - cross

1    this now because you can't use that quote.  If you are looking

2    for something that you can use, that is not useable.

3              MR. GOTTESDIENER:  I'm sorry.

4              I am not sure what the Court is referring to.

5              THE COURT:  If you're not sure, I strike the question.

6    Move on to the next question.  You can't ask her --

7              MR. GOTTESDIENER:  I'm trying to understand, your

8    Honor.  I'm sorry.

9              THE COURT:  I am not going to give you a tutorial on

10   examination right now.

11             MR. GOTTESDIENER:  Can I ask her --

12             THE COURT:  Pose a new question and I'll determine

13   whether or not it's objectionable.

14   BY MR. GOTTESDIENER:

15   Q.  You agree that you could have easily explained the concept

16   of wear-away in the SPD and other mass communications?

17   A.  I don't -- I think I object to the word easily, because we

18   could write the formula perhaps, but it's not easy to explain

19   to people who are not familiar with it and haven't had an

20   occasion to work with it.

21   Q.  How about your pension is not going to grow for a period of

22   time while the plan transitions from one kind of formula to

23   another?

24   A.  That's possible.

25   Q.  Wouldn't that be an easy statement to make at the top of

F7mnosb2                          Peck - cross

1    page 1 of the SPD?

2    A.  Would it be?  Sure, it would.  But does it make sense?  I

3    don't think so.

4    Q.  And it doesn't make sense because it wouldn't be good news?

5    A.  No.  Because that's not how you start introducing a new

6    plan.

7    Q.  But if the new plan isn't relevant for people for a period

8    of years and for some people will never be relevant, why

9    wouldn't that be in fact the most important thing to start

10   with?

11   A.  We didn't view it that way.

12          MR. GOTTESDIENER:  With the Court's indulgence.

13   Q.  Page 322, line 20:

14   "Q. It is easily communicated, don't you agree?

15   "A. It could have been if -- yes."

16          You gave that testimony, correct?

17   A.  Yes.

18          MR. RUMELD:  I am going to object, your Honor, because

19   he's not impeaching his last question.

20          THE COURT:  Well, that's true.  That is actually true.

21   But I will allow it.  I won't strike it because it's impeaching

22   a prior question that's relatively close.

23   BY MR. GOTTESDIENER:

24   Q.  Do you agree that the message that you were not trying to

25   communicate was your pension is not going to grow until it

F7mnosb2                              Peck - cross

1    exceeds the value of your prior accrued benefit?

2               MR. RUMELD:  Objection.

3               THE COURT:  Sustained.

4               I think you've got basically everything that you can

5    get on this particular topic and you are well served to move on

6    to either another part of the document or to something else.

7               MR. GOTTESDIENER:  Understood, your Honor.

8    BY MR. GOTTESDIENER:

9    Q.  You say that you wanted people to understand wear-away, so

10   I'm understanding your testimony, is that correct?

11   A.  Yes.

12   Q.  But you can't point to anything in the mass communications

13   that would explain to an average participant wear-away,

14   correct?

15   A.  That's correct.

16   Q.  Isn't it the case that you were worried that if people

17   learned about wear-away they would react negatively?

18   A.  I just think it takes more than one sentence to explain the

19   concept to people.

20   Q.  OK.

21   A.  So when they called or asked a question, it was easy to

22   talk to them one on one.

23   Q.  And explain wear-away to them?

24   A.  Well, explain the thought, the concept, yes, but not -- I

25   don't expect them to come away completely versed in wear-away.

F7mnosb2                         Peck - cross

1   Q.  My question was, isn't it the case that you, the company,

2   were worried in communicating to participants that if people

3   actually got it, understood wear-away, learned about it, that

4   they would react negatively to it?

5   A.  Yes.  They would react negatively to it if they didn't

6   understand that they were going to get the greater of their

7   what they earned under the plan prior to 1/1/96 or whatever

8   they have under the '96 plan.

9   Q.  Isn't it the case that you were concerned that if people

10  understood that they were not going to be earning new benefits

11  they would react negatively to it?

12  A.  I don't think it's the case if they knew that they were

13  going to get the greater of and there was going to be a benefit

14  that was, you know, that they had earned, and they were going

15  to get that.

16  Q.  Do you agree that the temporary freeze option would have

17  been very negatively received by people because they would

18  understand they weren't going to earn any additional new

19  benefits, right?

20  A.  Yes.

21  Q.  And under this greater of that you are describing, it's the

22  same situation, they are not going to earn any new benefits for

23  a period of time, correct?

24          MR. RUMELD:  Objection.

25          THE COURT:  Overruled.

F7mnosb2                          Peck - cross

1   A.  Right.  If they were in wear-away, they are not earning new

2   benefits.

3   Q.  So you didn't want people to think that that's what was

4   going on because you didn't want that negative reaction?

5   A.  Of course we didn't want a negative reaction.

6   Q.  My question is, isn't it the case that you didn't actually

7   want people to understand that they were not earning new

8   benefits because you believed it would engender a negative

9   reaction?

10             MR. RUMELD:  Objection.

11             THE COURT:  I will allow it.

12  A.  No.  That's -- no.  We didn't --

13             THE WITNESS:  Can you read that question again.

14             THE COURT:  Let me have the court reporter read the

15  question back.

16             (Record read)

17             THE COURT:  Is there anything that you would like to

18  add?

19             THE WITNESS:  OK.

20             So can you read the question again.  Just the

21  question.

22             THE COURT:  Yes.  The court reporter can read the

23  question back.

24             THE WITNESS:  Please.  Thank you.

25             (Record read)

F7mnosb2                          Peck - cross

1   A.  I need to split that apart, because we did tell people

2   about wear-away when they asked about it.  So it's not like we

3   were trying to hide it.

4   Q.  But you said that they didn't already know about it?

5            MR. RUMELD:  Objection your Honor.

6            She's still answering the question.

7            THE COURT:  She's still answering the question.  Let

8   her give a complete answer.  You may proceed.

9            THE WITNESS:  OK.

10  A.  You know, when they asked the question about their own

11  benefits we explained it to them.  But I would say it's not

12  fair to generalize it that we weren't going to tell anybody

13  anything, we were going to hide this.

14  Q.  Are you done with your answer?

15  A.  I'm done.

16  Q.  You knew people going in didn't have any idea about even

17  the concept of wear-away, right?

18  A.  Correct.

19  Q.  You yourself were surprised to learn that you could be

20  under a pension plan and see a growing account and it turns out

21  that that would not be any addition to your benefit?

22  A.  Yes.

23  Q.  And you knew that you were far more highly educated than

24  the average Woolworth participant, correct?

25  A.  Well, I thought so, yes.

F7mnosb2                          Peck - cross

 1   Q.  This was not in your words a company of engineers or people

 2   with graduate degrees?

 3   A.  Right.

 4   Q.  So you agree that there was no concerted effort made on

 5   your part to explain to people that they may not be earning

 6   benefits for a period of time, correct?

 7              MR. RUMELD:  Objection.

 8   A.  There wasn't --

 9              THE COURT:  Overruled.  You may answer.

10   A.  There was no widespread communication.  There was only

11   one-on-one communications.

12   Q.  You agree that there was no concerted effort, widespread

13   concerted effort to explain, disclose wear-away because of all

14   the ill effects that would have if it had gotten out?

15   A.  No.  That's not the reason.

16   Q.  Page 328, line 7:  Can we play the video, please.

17              MR. CARTER:  I have to do it from the transcript.

18              MR. GOTTESDIENER:  I'm sorry?

19              MR. CARTER:  I have to do it from the transcript.

20              MR. GOTTESDIENER:  I thought you had the clip.

21              MR. CARTER:  It's not working.

22              MR. GOTTESDIENER:  Can we take a quick break, your

23   Honor.  It's important.

24              THE COURT:  We can take our midmorning break now.

25              MR. RUMELD:  I do want to alert your Honor that I

F7mnosb2                              Peck - cross

1    intend to pose an objection, because whether it is on the video

2    or the transcript it's not exactly the same question.

3                THE COURT:  All right.

4                Why doesn't somebody show me that page of the

5    transcript.  Mr. Gottesdiener, you can ask a different question

6    if it is not going to be precisely impeaching, but I don't know

7    if it is or is not, not having seen the quote yet.

8                I do see the question.  So the question is, "Do you

9    agree that there was no concerted effort, widespread concerted

10   effort to explain, disclose wear-away because of all the ill

11   effects that would have" -- happened I think it is supposed to

12   say -- "if it had gotten out?"

13               There is a lot embedded in that particular question.

14               Let me just take a look at the deposition.

15               MR. RUMELD:  It's page 328, line 7.

16               THE COURT:  OK.

17               MR. GOTTESDIENER:  The reason why we need the video

18   your Honor is they are going to contend --

19               MR. CARTER:  Line 6.

20               MR. GOTTESDIENER:  We need it at line 7.

21               THE COURT:  Let's see.

22               Line 6 is all right.

23               The objection is noted.  But let's just go ahead and

24   hear the clip.

25               (The following was played:

F7mnosb2                          Peck – cross

1    "Q. There was no concerted effort to make the wear-away -- the

2    pension freeze known because of all the ill effects it would

3    have had had it gotten out, correct?

4              "MR. RUMELD:  I object to form.

5    "A.   Correct.")

6    Q.  You gave that testimony, didn't you?

7    A.  Yes.

8              MR. GOTTESDIENER:  With the Court's indulgence.

9              THE COURT:  The objection to form is overruled.

10   BY MR. GOTTESDIENER:

11   Q.  One of those ill effects you agree that the company would

12   have been nothing without its people and that you can't really

13   operate the company if people are miserable, correct?

14   A.  Yes.

15   Q.  And you agree that even if you went to people and said

16   we're going through a tough time, we are in real tough shape,

17   this is just going to be temporary but we're freezing your

18   pension benefits, you are going to kill morale?

19   A.  I'm going to what?

20   Q.  Kill morale.

21   A.  Yes.

22             MR. GOTTESDIENER:  Is this a good time for the

23   midmorning break?

24             THE COURT:  I would go for another ten minutes and

25   then we will break at 11 unless somebody needs to take a break

F7mnosb2                              Peck - cross

now.  Otherwise I would go -- we don't need to break.  We will

take our normal break.

          MR. GOTTESDIENER:  OK.  With the Court's indulgence.

BY MR. GOTTESDIENER:

Q.  You agree that the decision, the affirmative decision you

made not to tell people about wear-away and to make the

statements you did in these communications, that those were

decisions that Foot Locker made on its own?

          MR. RUMELD:  Objection.

A.  Or it --

          THE COURT:  Sustained.

          You have to reask that.

BY MR. GOTTESDIENER:

Q.  Didn't Mercer offer their expert services as communicators

to you and you turned them down?

A.  I don't recall that they offered those consulting services

for communications, but they may have.

          MR. GOTTESDIENER:  Page 298, line 15:

"Q. And Foot Locker did not retain the services of any benefit

communications consultants for how to communicate with

employees about the conversion?

"A. I think that's correct, yes.

"Q. So services that Mercer offered during the course of the

actuarial consulting for the design of the conversion were

turned down by Foot Locker?

F7mnosb2                          Peck - cross

1    "A.  Right.  We were saving, not spending."

2    A.  OK.

3              THE COURT:  Now there is an issue with that question

4    in the deposition.  It's embedding a concept which may or may

5    not have appropriate foundation, which is the very question at

6    issue, which is so the services offered.  So I don't know

7    whether the services were in fact offered or not.  It's

8    embedded in the question, but there's no predicate to that in

9    this piece.

10             MR. GOTTESDIENER:  Your Honor, I just want to make a

11   statement that is global for the record.

12             THE COURT:  Yes.

13             MR. GOTTESDIENER:  That it's my understanding that on

14   cross-examination I don't have to lay a distinct foundation

15   which then allows the witness to evade what I'm getting at.

16             THE COURT:  You are wrong about how you are

17   proceeding, if that is your assumption, that you can ask a

18   question that doesn't have an adequate factual foundation and

19   later cite back to that for having established the adequate

20   factual foundation.

21             If you are not, then the question is irrelevant,

22   because it goes to nothing.  If you're asking the question

23   about whether or not Mercer provided services and she says, I

24   don't recall, and you impeach her where you assert that Mercer

25   provided services, no foundation, I can't use it.  You can't

F7mnosb2                          Peck - cross

1   use it, Mr. Rumeld can't use it, and the appellate court can't

2   use it.  So then we are wasting our time.

3            That's the issue.  You can leap into things if you've

4   got a factual predicate elsewhere, but you have to build it up

5   with this witness.

6            MR. GOTTESDIENER:  I do.  I just want to -- so we

7   never have to come back to this, where I assert in the

8   question --

9            THE COURT:  I am not going to talk about it with the

10  witness right now.  We want to get this witness off the stand.

11  She's been on the stand for a very long time.  Let's get her

12  off the stand so she can go back to her life.

13  BY MR. GOTTESDIENER:

14  Q.  You do acknowledge now, seeing the questions and answers,

15  you are refreshed that they did offer their services for

16  communications for the conversion?

17  A.  Looking at this, I would say yes.

18  Q.  OK.

19           THE COURT:  What I want to understand is, do you

20  recall it right now that they offered services?  Do you feel

21  refreshed?  Does that refresh your recollection?  I want to

22  make --

23           THE WITNESS:  Yeah.

24           THE COURT:  -- sure we are not just basing it on

25  testimony by a lawyer, but that you in fact now recall that at

F7mnosb2                          Peck - cross

1    one point in time you knew.

2            THE WITNESS:  Right.

3            THE COURT:  There may be a document.  I think there is

4    a document.

5            MR. GOTTESDIENER:  There is, your Honor.

6            THE COURT:  I know, but you need to show that

7    document.

8            MR. GOTTESDIENER:  I will.

9            THE COURT:  All right.  Let's go for it.

10           MR. HUANG:  PX 207.

11           MR. GOTTESDIENER:  PX 207 is on the board.

12   BY MR. GOTTESDIENER:

13   Q.  Do you see that this is a letter to Tom Kiley from Jim

14   Grefig?

15   A.  Yes.

16   Q.  And it says, With the approaching approval of the change to

17   a cash balance format, I asked one of my colleagues in our

18   communications practice to scope a communications strategy.

19           Do you see that?

20   A.  Yes.

21   Q.  So does that plus the questions and answers in the

22   deposition refresh you that Mercer did offer their services and

23   you turned them down?

24   A.  I haven't seen this letter before.

25   Q.  That's not exactly the question.

F7mnosb2                              Peck - cross

1          THE COURT:  But that needs to be the question, right?

2          MR. GOTTESDIENER:  I'm asking.

3          THE COURT:  This can't refresh her if she hasn't seen

4    it before.  It is a physical impossibility.

5          MR. GOTTESDIENER:  The rules --

6          THE COURT:  Let's go ahead and take our break and talk

7    about how we are going to proceed.  Counsel will stay.  I am

8    going to have the witness step down and take a break.  We have

9    to get ourselves to the end of this road here.

10         THE WITNESS:  OK.

11         (Witness not present)

12         THE COURT:  How much longer do you have,

13   Mr. Gottesdiener.

14         MR. GOTTESDIENER:  I will try to finish up in a few

15   minutes.  I can't predict exactly.  But I certainly am getting

16   the message from the Court, and I am trying to finish it.

17         THE COURT:  If you've got new material, let's go over

18   some new material.

19         MR. GOTTESDIENER:  Yes.

20         THE COURT:  I think at this point asking her questions

21   about state of mind, etc., etc., you have been there, you've

22   done that.  Really it's what you need that's new.

23         Then I think we should wrap up Ms. Peck from the

24   plaintiffs' perspective, and see what questions the defense has

25   for examination and then move on to our next witness.

F7mnosb2                          Peck - cross

1             That is how I would like to proceed.

2             MR. GOTTESDIENER:  Will do, your Honor.

3             THE COURT:  All right.  How much time do you think

4    right now, Mr. Rumeld?  What is your best estimate?

5             MR. RUMELD:  Your Honor, I know your Honor wants to

6    move things along, but Ms. Peck said a lot of things yesterday.

7             THE COURT:  I understand.  So I am asking for an

8    estimate, not a hard-and-fast moment.

9             MR. RUMELD:  I definitely think in a best-case

10   scenario I would be done at lunchtime, being that it is going

11   to be a quarter after 11 before we start again.

12            THE COURT:  All right.

13            MR. RUMELD:  I have mixed feelings about whether that

14   is going to be the case.

15            THE COURT:  I understand.

16            You folks have lined up whoever is to follow.

17            What was the result of the potential witnesses who the

18   plaintiff was thinking of not calling?  Did you have a chance

19   to think about that?

20            MR. GOTTESDIENER:  Taking the hint from your Honor, we

21   are not going to call Ms. Hartman.  We are not going to call

22   Ms. Ratner.

23            THE COURT:  All right.  The subpoena is still out

24   there for Ms. Ratner, so presumably somebody is going to tell

25   her when to show up.

F7mnosb2                         Peck - cross

1           MR. GOTTESDIENER:  We didn't subpoena her, no.

2           MR. RUMELD:  Ms. Ratner has been spoken to.  She is my

3      partner.

4           THE COURT:  OK.  Who's next then after?

5           MR. GOTTESDIENER:  We have two plaintiffs, two class

6      members.

7           THE COURT:  Glickfield and Steven?

8           MR. GOTTESDIENER:  Yes.

9           THE COURT:  All right.  We will hold in abeyance all

10     of the documents that will get moved into evidence, but other

11     than that, your witness testimony, the plaintiff would rest?

12          MR. GOTTESDIENER:  That's right.

13          THE COURT:  And so --

14          MR. RUMELD:  We have ms. Derham if I understand

15     correctly, Mr. Gottesdiener asked her to come in today.  Yes?

16          MR. GOTTESDIENER:  Yes.

17          MR. RUMELD:  I don't know now whether we will

18     definitely finish her.  Obviously we will try to do that.

19          THE COURT:  Ms. Derham?

20          MR. RUMELD:  Correct.

21          THE COURT:  All right.  Fine.

22          That gives us a sense as to where we are going.  Let's

23     come back in a few minutes.  Thank you.

24          MR. RUMELD:  Thank you, your Honor.

25          (Recess)

```
 1              THE COURT:  Let's all be seated.  Mr. Gottesdiener,
 2     you may proceed, sir.
 3              MR. GOTTESDIENER:  Thank your Honor.
 4     BY MR. GOTTESDIENER:
 5     Q.  Ms. Peck, there is a suggestion in your declaration that
 6     you communicated or didn't communicate with participants with
 7     respect to the amended plan based on the advice of counsel?
 8     A.  Okay.
 9     Q.  Is that correct?
10     A.  Well, any communication I sent out, I always had counsel
11     take a look at it, yes.
12     Q.  Okay.  But when you say any communication you sent out you
13     always had counsel take a look at it, you mean after you had --
14     withdrawn -- after it had been developed by the team and was in
15     a form that everyone was satisfied was ready to be eyeballed
16     and okayed by counsel, that is what you did?
17              MR. RUMELD:  Objection.
18              THE COURT:  Hold on.  Sustained.
19     BY MR. GOTTESDIENER:
20     Q.  You said, "Any communication I sent out, I always had
21     counsel take a look at it," right?
22     A.  Yes.  This is restricted to, though, not every single
23     document but, you know, important documents.
24     Q.  Important documents like the ones we were talking about
25     today and yesterday?
```

F7MJOSB3                          Peck - cross

1    A.  Yes.

2    Q.  The announcement letter, the highlights memo, the plan

3    statement?

4    A.  Yes.

5    Q.  The total compensation statement, the SPD, those

6    communications?

7    A.  Yes.

8    Q.  Not, by the way, these one-off communications when somebody

9    contacts the company?

10   A.  Right.

11   Q.  You didn't have those run by counsel?

12   A.  I believe that the format for the response to the

13   participants was run by counsel.

14   Q.  What is the basis for your belief?

15   A.  It's just something that I think I recall that they had

16   made sure that everything they had was, you know, okay with

17   counsel.

18   Q.  What you just said, they made sure.  So you didn't make

19   sure?

20   A.  No, I wasn't doing the letters.  They were doing the

21   letters.

22   Q.  The "they" you're referring to are Tom Kiley, Carol

23   Kanowicz, Marion Derham?

24   A.  Right, and people in Milwaukee.

25   Q.  So you don't have any personal knowledge that they actually

1    provided drafts of letters and got the okay of counsel before

2    sending them out.  Is that correct?

3    A.  I believe that they did, but I don't have any personal

4    knowledge, no.

5    Q.  You didn't make sure that counsel looked at those letters

6    before they went out, correct?

7    A.  I may have done it, but I don't recall now.

8    Q.  In terms of the general communications, the SPD and the

9    other employee-wide communications, you said that you would

10   have counsel take a look at those communications before they

11   were sent out, correct?

12   A.  Yes.

13   Q.  Counsel was not involved in the inception of the drafts of

14   those communications or counsel was involved in the inception?

15   I'll withdraw that question and ask it differently.

16           What did you mean by take a look at it?  Look over to

17   approve that it doesn't contain something wrong, that is a

18   misstatement under the law or the facts, or that it does

19   contain something that has to be in there, that kind of thing?

20           MR. RUMELD:  Objection.

21           THE COURT:  Sustained.

22   A.  All of the above.

23           THE COURT:  Sustained.  Strike the answer.  The answer

24   is struck.  You need to go back and ask discrete questions.

25   BY MR. GOTTESDIENER:

F7MJOSB3                          Peck - cross

1   Q.  What did you mean by counsel take a look at them?  Let's go

2   through the different documents.  Tell me from your

3   recollection what role counsel played in any of the documents,

4   starting with the announcement letter?

5   A.  Right.  They looked at it and would give comments if it was

6   okay the way it is.  If it needed some other information in it,

7   you know, just that.

8   Q.  Just that?

9   A.  If it was, right, if there was something missing, something

10  that needed to be there.

11  Q.  Okay.  So if we assume the accuracy of what's in your

12  declaration, where you say things about who provided

13  comments --

14  A.  Right.

15  Q.  -- in reference to some drafts and edits and so forth,

16  could you tell me what that was preceded by, these comments?

17          Were there meetings held with counsel to discuss what

18  needed to be in these communications?

19  A.  I don't recall meetings, but I would have sent it to them

20  with a cover note, you know, to please take a look at this and

21  tell me if I need anything else in it.

22  Q.  So let's identify the counsel you're talking about.  One is

23  Ms. Clarke, who is in the room?

24  A.  Yes.

25  Q.  And the other is?

F7MJOSB3                           Peck - cross

1   A.  Gary Bahler.

2   Q.  Gary Bahler?  And outside counsel was Ms. Rattner and

3   Ms. Zimmerman?

4   A.  Ms. Zimmerman worked for the company.

5   Q.  At the time, she worked for the company?

6   A.  Yes.

7   Q.  So the only outside counsel that you're aware of?

8   A.  Was Andrea.

9   Q.  Ms. Rattner?

10  A.  Yes.

11  Q.  And you're saying you did not have meetings with counsel in

12  person prior to their review of these communications?

13  A.  Most likely I would have sent it, but I could have stopped

14  by the office and said this is what we're doing, would you take

15  a look at it.

16  Q.  Let's use the SPD as an example from the Fall of '96,

17  whenever that was actually being drafted.  At that point in

18  time you knew that the wear-away had gone from being

19  anticipated one to two years, two to three years, four to five

20  years, right?

21  A.  Right.

22  Q.  Did you sit down or otherwise communicate to counsel, using

23  your own knowledge, Tom Kiley, Jim Grefig, did you make sure

24  that counsel understood what you knew about the length of the

25  anticipated wear-away?

F7MJOSB3                          Peck - cross

1   A.  I don't recall doing that, no.

2   Q.  Did you get an opinion letter from counsel that the

3   approach you described was an okay and legal and lawful

4   approach to communicating with participants?

5   A.  No.

6   Q.  You have admitted with respect to people who were in

7   wear-away that statements made in all of these communications

8   that went company-wide that we reviewed together yesterday and

9   today, some of those statements were false, right?

10  A.  Yes.

11  Q.  Did you really think that counsel's silence, leaving those

12  statements in there, was telling you that it was okay to make

13  false statements to employees?

14  A.  They weren't false for everybody, no, they weren't.

15          You know, they were only false for people who were in

16  wear-away.

17  Q.  You didn't even as a threshold matter make sure that

18  counsel knew they were false for some sizeable number of

19  people, correct?

20  A.  I didn't, but other, other people, Tom or Carol may have

21  said something.

22  Q.  Tom or Carol may have, but you don't have any personal

23  knowledge that they did?

24  A.  I do not.

25  Q.  So I think I'm understanding that you agree that you didn't

F7MJOSB3                          Peck - cross

1    take from counsel not striking certain sentences a green light

2    to make false statements to people who were in wear-away,

3    right?

4              MR. RUMELD:  Objection.

5              THE COURT:  Sustained.

6    BY MR. GOTTESDIENER:

7    Q.  You didn't think that the lawyers were telling you that it

8    was okay to make false statements to people in wear-away?

9    A.  I wasn't thinking of it that way.

10   Q.  As far as you knew, the lawyers who you sent these

11   documents to, they had little, if any, understanding of

12   wear-away themselves, correct?

13   A.  No, certainly not our outside counsel would know about

14   wear-away.

15   Q.  You're saying outside counsel would know about wear-away?

16   A.  Sure.

17   Q.  However, you you don't know as a fact that outside counsel

18   did know about wear-away?

19   A.  That's correct.

20   Q.  Moreover, to the extent that outside counsel may have known

21   about wear-away, you know as a fact that you yourself -- and

22   you're not aware of anyone else who did this -- did not make

23   sure that outside counsel knew that wear-away could go on for

24   years and years, correct?

25   A.  I did not do that, right.

F7MJOSB3                              Peck - cross

1    Q.  You don't know of anyone that downloading outside counsel

2    or in-house counsel, that the wear-away could last for years,

3    correct?

4    A.  I don't know.

5    Q.  You don't know of anyone who did that?

6    A.  Right.

7    Q.  So educated inside counsel knew about the risk and extent

8    of the potential wear-away, correct?

9    A.  Right.

10   Q.  Did you consider Foot Locker, when it was issuing these

11   communications, to be acting as a fiduciary and describing or

12   informing employees about the conversion?

13   A.  A fiduciary?  How do you mean that?  We are fiduciaries of

14   the company because, you know, we're all officers.

15   Q.  You understood your fiduciary duty -- withdrawn.

16           Fiduciary duty, could you tell us what in general that

17   means, meant to you at the time, a fiduciary duty, and then

18   we'll talk about what you said about the company?

19   A.  Sure.  That I wasn't approving, you know, misusing any of

20   the funds in any way, that what I was doing was appropriate.

21   Q.  This is what your understanding is of a fiduciary?

22   A.  Yes.

23   Q.  That a fiduciary should not misuse funds that they're

24   entrusted with?

25   A.  Right.

F7MJOSB3                              Peck - cross

1   Q.  Are you familiar with any other obligations of a fiduciary
2   other than not misappropriating or misusing funds that they're
3   entrusted with?
4   A.  No.
5   Q.  You said your understanding was at the time that you were a
6   fiduciary to the company?
7   A.  Right.
8   Q.  And the company in this circumstance as to the retirement
9   plan was the sponsor of the retirement plan, correct?
10  A.  Yes.
11  Q.  So your understanding was you are a fiduciary to the
12  company in its capacity as the sponsor and runner of the
13  business versus the company as the administrator of the plan?
14          MR. RUMELD:  Objection.
15          THE COURT:  Hold on.
16          (Pause)
17          THE COURT:  Overruled.
18  BY MR. GOTTESDIENER:
19  Q.  You can answer.
20  A.  Would you ask it again, please.
21  Q.  Sure.  You were a fiduciary to the business, the company,
22  the business, correct?
23  A.  Yes.
24  Q.  You didn't understand your role at the time to be a
25  fiduciary to the company as the plan administrator?

F7MJOSB3                          Peck - cross

1   A.  Right.

2   Q.  You were acting on behalf of the company as the plan

3   administrator.  Is that fair?

4   A.  Yes.

5   Q.  You attended all the RAC committee meetings, right?

6   A.  Right.

7   Q.  Is that right?

8   A.  Yes.

9   Q.  I didn't hear your answer?

10  A.  Yes.

11  Q.  And in '95, at least according to the stipulation, you were

12  actually a member of the committee, but you're not recalling

13  that as I understand it?

14  A.  Right, right.

15  Q.  But you certainly attended, and if I understand, it was

16  kind of the interface between the board, committee and the

17  actual operation of the retirement plan was you.  Is that fair?

18  A.  Yes, okay.

19  Q.  The original question then was phrased differently, I'm

20  understanding that you did not consider yourself and Foot

21  Locker as fiduciaries to participants when drafting and issuing

22  the communications you did?

23  A.  Yes, that's right.

24  Q.  Meaning you did not consider yourself a fiduciary?

25  A.  To the participants, yes.

F7MJOSB3                          Peck - cross

1   Q.  Meaning you also did not consider the company, Woolworth,

2   Foot Locker, you didn't consider them to be a fiduciary to the

3   participants when communicating with participants, correct?

4   A.  Correct.

5   Q.  We touched on this briefly, but given what you've said so

6   far today and yesterday, it's fair to say that you understood

7   from the communications that went out that participants would

8   perceive the growing account balance that they were being shown

9   as showing them growth in their pension benefit?

10  A.  Yes.

11  Q.  And you agree that at the time you understood that for

12  anybody in wear-away, they would be mistaken if they drew the

13  conclusion that growth in their account was growth in their

14  benefit?

15  A.  Yes.

16  Q.  You agree that as a general matter, in circumstances where

17  bad news gets out in the workplace, that it tends to spread

18  very quickly?

19  A.  Yes.

20  Q.  It tends to spread, you might even say, like wildfire?

21  A.  Yes.

22  Q.  You, I am assuming, would agree that there was no wildfire

23  about people not earning any new benefits for a time?

24  A.  Yes.

25  Q.  And you agree you never heard anybody complain, an average

1    participant, hey, you froze my benefit or I didn't earn

2    benefits for a time, you never heard anything like that, right?

3    A.  I did not.

4    Q.  You never heard from anybody on the team or anybody at all

5    that some participants had figured out what had happened and

6    that they had not earned any new benefits?

7    A.  Some people were happy to get the 12-31-95 amount, and

8    because that was higher than, obviously, nothing from the cash

9    balance.

10   Q.  Okay.  I hear your answer, but I think the question was

11   more focused on you never heard from any source whatsoever that

12   anybody figured out, no matter what payment they received, that

13   they had not earned benefits after the amendment went into

14   effect?

15          MR. RUMELD:  Objection.

16          THE COURT:  Sustained.  You need to rephrase.

17   BY MR. GOTTESDIENER:

18   Q.  You never learned from any source that one or more

19   participants had figured out wear-away, in effect?

20   A.  I agree, I never heard that.

21   Q.  This approach that you're telling us that you took with

22   respect to responding to inquiries, could you just explain to

23   us again, you agree that you made the affirmative decision not

24   to put anything explicit about wear-away in any of the

25   class-wide or company-wide communications, right?

F7MJOSB3                          Peck - cross

1    A.  Yes.

2    Q.  You're saying, if I am understanding, there was an

3    affirmative decision to do what, wait for people to make

4    inquiries?

5    A.  When people, people were calling, we gave them an 800

6    number that they could call.  We also made presentations at

7    various facilities.  So if people were looking for more

8    specifics regarding their personal situation, we gave it to

9    them.

10   Q.  But you understood that people would not be looking for

11   specifics about wear-away?

12   A.  No, we weren't using the words wear-away.

13   Q.  I am sorry, I didn't mean to go back.  I am asking you knew

14   that people would not be asking, you know, did I stop earning

15   benefits for a time?

16   A.  I didn't put myself in their shoes.  I don't know.

17   Q.  So you made the decision about how to communicate with the

18   average participant without thinking about how the average

19   participant was going to receive the major communications and

20   then the kinds of inquiries they would then ask you afterwards?

21              MR. RUMELD:  Objection.

22              THE COURT:  Hold on.  I am reading it.

23              (Pause)

24              THE COURT:  Overruled.  You may answer.

25   A.  Can you read the question to me.

F7MJOSB3                          Peck - cross

BY MR. GOTTESDIENER:

Q.  So you made the decision about how to communicate with the

average participant about thinking how the average participant

was going to receive the major communications and the kind of

inquiries they would then ask you afterwards?

            MR. RUMELD:  Objection.

            THE COURT:  Overruled.

A.  Yes.

BY MR. GOTTESDIENER:

Q.  Meaning you agree, correct?

A.  I agree.

Q.  If a participant wrote to Secretary, Retirement

Administrative Committee, as is indicated on Page 19 of the

SPD -- can you get up PX-5 -- whose desk would that land on,

yours?

A.  No.  Somebody in the legal department was the secretary.

Q.  The secretary to the Retirement Administration Committee?

A.  Yes.

Q.  But would you be involved?

A.  Not necessarily.

Q.  Did that ever occur?

A.  Not that I'm aware of.

Q.  So it is fair to say you're speculating that you don't know

of any time where somebody actually wrote in and addressed the

secretary, Retirement Administration, correct?

1  A.  I do not know personally, you're right.

2  Q.  You mentioned this 800 number?

3  A.  Right.

4  Q.  And Milwaukee.  Is that right?

5  A.  Right.

6  Q.  Correct?

7  A.  Yes.

8  Q.  You know that your understanding was that the people who

9  were out there, they also received all the major communications

10  that we went through, correct?

11  A.  Yes.

12  Q.  And they didn't receive any special Jim Grefig, Tom Kiley

13  explanations of wear-away and how they explained that to

14  somebody who called in?

15          MR. RUMELD:  Objection.

16          THE COURT:  Sustained.  You have to re-ask, rephrase.

17  BY MR. GOTTESDIENER:

18  Q.  You know that the people who were out there in Milwaukee

19  answering phones, first of all, most of them were without much

20  formal education, correct?

21  A.  Beyond high school, yes.

22  Q.  You don't have any basis to believe that those people who

23  were answering those calls actually themselves understood

24  wear-away, correct?

25  A.  I don't know the answer to that because they were -- I mean

F7MJOSB3                              Peck - cross

1    me, Carol and Tom talked to them about how to answer these

2    questions and the formulas to use.

3    Q.  Formulas?

4    A.  Ah-huh.

5    Q.  So, first of all, you weren't present, you don't have

6    personal knowledge what Tom and Carol told these people, if

7    they told them anything at all, correct?

8    A.  That's correct.

9    Q.  You know Linda Ine is, correct?

10   A.  Yes.

11   Q.  You never had a conversation with her about wear-away, did

12   you?

13   A.  I don't recall any conversations with her about wear-away,

14   no.

15   Q.  You agree that from your understanding and knowledge and

16   experience, that of anybody out there in Milwaukee, Linda Ine

17   would be the most knowledgeable person about wear-away out

18   there, correct?

19   A.  Yes.  She was the head of the department.

20   Q.  Now, again trying to get to this communicating to people

21   who make inquiries, you would agree that the whole point of an

22   SPD is to make the plan understandable to the average

23   participant, right?

24   A.  Yes.

25   Q.  And it is supposed to explain, in effect, how somebody with

1    their own information could calculate their own benefit if they

2    wanted to, right?

3    A.   Right.

4    Q.   The whole point of the SPD, if it is doing its job, is so

5    people wouldn't have to be calling in in the first place,

6    right?

7    A.   Yes, but we felt it was important to have these people

8    available to answer questions.

9    Q.   But --

10   A.   But that same 800 number exists today, and that is the way

11   we worked.

12        THE COURT:  I thought you only had a few minutes left.

13   We have been going 40 minutes.

14        MR. GOTTESDIENER:  I am sorry, your Honor?

15        THE COURT:  You only had three hours and 15 left when

16   you started after the break, to let you know.  You were down to

17   three hours 15 for your total time for all remaining witnesses.

18   That is now less.  You are under two hours.

19        What is he at?

20        MR. GOTTESDIENER:  I thought the court said at the

21   beginning of the day we were at 5.5.

22        THE COURT:  And you've been -- what has he got?  I

23   thought he was three hours and 15?

24        THE LAW CLERK:  He was three hours.

25        THE COURT:  It was five, and you spent two, so you

F7MJOSB3                          Peck - cross

1    have three left now.

2              MR. GOTTESDIENER:  I thought I had FIVE and

3    forty-five.

4              THE COURT:  You had five, and forty-five this morning

5    when we started.  It is now almost noon.  It is now -- I am

6    giving you fair warning.  I think this could be tied up.

7    BY MR. GOTTESDIENER:

8    Q.  So you knew your approach to communicating with people was

9    you didn't owe them any duty to correct any mistaken impression

10   that they had that their growing account equaled the growing

11   benefit?

12   A.  Say that again, please.

13   Q.  Your approach, do you remember we talked about this in your

14   deposition, your approach in effect was caveat emptor towards

15   the employees after these communications went out, correct?

16   A.  They were welcome to call or write a note if they had any

17   questions, right.

18   Q.  You just answered the end of your answer was, "right."

19              You do agree that the approach you took was in effect

20   caveat emptor?

21   A.  Yes.

22   Q.  You never ordered any study to assess how long the

23   wear-away might last after you learned from Mercer that their

24   own estimates were going up and up, correct?

25   A.  Correct.

F7MJOSB3                         Peck – redirect

 1              MR. GOTTESDIENER:  No further questions.

 2              THE COURT:  Thank you.  Mr. Rumeld.

 3   REDIRECT EXAMINATION

 4   BY MR. RUMELD:

 5   Q.  Good morning, Ms. Peck.

 6   A.  Good morning.

 7   Q.  How long did Roger Farah remain at Foot Locker?

 8   A.  He came in December of '94 and I think he left in about

 9   2001 maybe, 2000 or 2001.

10   Q.  After 2000 and 2001, he was no longer the source of

11   constant requests to cut costs.  Is that right?

12   A.  He was not, right.

13   Q.  You testified earlier about the pension plan changes

14   impacting all the employees of the company.  I just wanted to

15   understand, am I correct the company extends beyond the United

16   States?

17   A.  Yes.

18   Q.  Who did the plan apply to?

19   A.  All the United States.

20   Q.  Within the United States, were all the employees covered by

21   the plan?

22   A.  Yes.

23   Q.  Were there part-time employees in the company?

24   A.  Yes.

25   Q.  Were they covered by the plan?

F7MJOSB3                         Peck - redirect

1   A.   If they got in their thousand hours.

2   Q.   If the employees had fewer than a thousand hours, they

3   weren't covered by the plan?

4   A.   Right.

5   Q.   Do you know if there were a lot of those employees?

6   A.   Yes, there were.

7   Q.   Just locally speaking, do you have a sense as to actually

8   what percentage of the total employees of the company were

9   impacted by this plan?

10  A.   No, I don't, but I don't think it is very large.

11  Q.   Not a large percentage?

12  A.   Right.

13  Q.   Could you describe what you you did after you were first

14  instructed by management to come up with changes to the pension

15  plan.

16  A.   Sure.  I pulled together Tom and Carol and Marion and

17  instructed them to talk with Mercer and let's find out what we

18  can do to save some money from the pension plan.

19  Q.   You instructed them to talk to Mercer?

20  A.   Well, I included myself there.  I mean we all talked to --

21  Q.   Did you all talk together all the time or did they talk

22  separately from you?

23          MR. GOTTESDIENER:  Objection.

24          THE COURT:  Overruled.

25          MR. GOTTESDIENER:  Could I state once what my

F7MJOSB3                        Peck - redirect

1   continuing objection would be then?  She has testified to this.

2            THE COURT:  I don't want you to say it in front of the

3   witness.

4            MR. GOTTESDIENER:  Could I make the objection one

5   time?

6            THE COURT:  Make the objection and we'll talk about it

7   at the break.

8            MR. GOTTESDIENER:  You don't want me to explain it?

9            THE COURT:  Don't explain it right now, wait until the

10  break and you can make your record.  Just make sure you make

11  your record at the break.  You may proceed, Mr. Rumeld.

12  BY MR. RUMELD:

13  Q.  Could you explain the division of labor between yourself

14  and the rest of the team with respect to this process of coming

15  up with the plan changes?

16            MR. GOTTESDIENER:  Objection.

17  A.  Sure.

18            THE COURT:  Overruled.  How in the world could, would

19  you explain the process be an objectionable question?

20            MR. GOTTESDIENER:  My position, you don't want me to

21  explain it?

22            THE COURT:  Come to the sidebar.  My goodness.

23            (At the sidebar)

24            THE COURT:  State your objection for the record.  Keep

25  your voice down.  I don't want the witness to hear.

F7MJOSB3                          Peck - redirect

 1              MR. GOTTESDIENER:  This was all covered by the direct

 2   examination and it is not proper --

 3              THE COURT:  It is absolutely proper.  When you go back

 4   on cross-examination, you open up everything you touch.  You

 5   have touched absolutely everything I can possibly think about

 6   for this witness.  There is no topic that I can imagine right

 7   now Mr. Rumeld can't go into.

 8              MR. GOTTESDIENER:  Very well, your Honor.

 9              THE COURT:  Okay.

10              MR. RUMELD:  I will, nevertheless --

11              THE COURT:  If there is one, your objection can apply

12   to that.  The rest of it is certainly well within the scope.

13              (In open court)

14              THE COURT:  May proceed.

15              MR. RUMELD:  Would your Honor ask the court reporter

16   to read the last question back.

17              THE COURT:  Yes.

18              (Record read)

19              THE WITNESS:  Yes, I think you also asked if I was at

20   every Mercer meeting.

21   BY MR. RUMELD:

22   Q.  Why don't you respond to the most recent question.

23   A.  Okay, the most recent question is that Tom and Carol and

24   Marion were working with Mercer to come up with some

25   alternatives that I could look at and then together we could

1    decide what we were going to go forward with.

2    Q.  What were your expectations of the criteria they would use

3    in coming up with those numbers?

4    A.  The criteria they would use?

5          I think mostly it was the professional opinion of the

6    actuaries, that that was the number one thing that they need.

7    Q.  What were the objectives that you had in mind for these

8    proposals?

9    A.  The objectives were that we would look at all of the

10   proposals that came in and then evaluate them, make sure that

11   they made sense, and then that we were going to both gain some

12   savings but also give something to the associates, which we did

13   in the form of the 401 (k).

14   Q.  Why was it that you were looking to give something to the

15   associates?

16   A.  Because they had been asking for quite a while for a 401

17   (k), and we hadn't provided it.

18         Also when Barry and Roger talked to us about saving

19   money and taking a fresh look at the retirement plan, it had to

20   do with, you know, a three-legged stool was what the example

21   was where a piece of retirement was the responsibility of the

22   company, a piece was the responsibility of the government, and

23   then a third piece was the responsibility of the associate.

24   Q.  Now, did you view the cash balance formula as giving

25   something to the participants?

F7MJOSB3                         Peck - redirect

1   A.  Yes, the value there was that they got a Lump sum rather

2   than, you know, not getting an annuity until they were 65.

3   Q.  So from management's perspective, were they only interested

4   in cost savings?

5            MR. GOTTESDIENER:  Objection.

6            THE COURT:  To the best of your understanding.  You

7   can't speak, obviously, for everybody, but what you understood,

8   from being part of management yourself.

9            THE WITNESS:  Right.  We were definitely supposed to

10  come up with savings out of this plan that we were going to put

11  together, yes.

12  BY MR. RUMELD:

13  Q.  But you also took these other considerations into account?

14  A.  Yes.

15  Q.  You said that you were concerned about employee morale as

16  well?

17  A.  Yes.

18  Q.  What about Mr. Farah, was he as concerned as you were about

19  employee morale?

20            MR. GOTTESDIENER:  Objection; lack of foundation.

21            THE COURT:  Just say the word, "objection."

22            Sustained.

23  BY MR. RUMELD:

24  Q.  Did Mr. Farah communicate to you any concerns about

25  employee morale at this time?

F7MJOSB3                          Peck - redirect

1    A.  Yes, he did because, you know, he had this company to run

2    and he didn't want us to do anything that was going to cause

3    people to want to stop working or have a mass exodus or

4    anything like that.

5    Q.  Now, with respect to the cost savings, what type of cost

6    savings were you looking to achieve?

7    A.  We weren't given a specific dollar goal that we had to

8    save, and so we came up with this combination of the savings

9    under the plan and then the offset being the 401 (k), but

10   because we didn't have cash, we made the matching contribution

11   in the form of stock, company stock.

12   Q.  At the time was your understanding that the cost savings

13   the company was looking to achieve was short-term or long-term

14   cost savings?

15   A.  Long-term.

16   Q.  Before Mr. Kiley and his team came up with a recommendation

17   of the cash balance formula, did you know anything about cash

18   balance plans?

19   A.  Yes.  As a department, we had attended some Kwasha Lipton

20   seminars on cash balance plans, and we knew that some other

21   companies like ourselves who had defined benefit plans for many

22   years were moving toward the cash balance concept.

23   Q.  Before Mr. Kiley came up with this recommendation, had you

24   formed an impression about cash balance plans?

25   A.  Yes.  It sounded good to me because it was going to

F7MJOSB3                          Peck - redirect

```
 1   deliver, you know, lump sums to people and they wouldn't have
 2   to wait, and plus we were offering the 401 (k).
 3   Q.   Why were lump sums so important?
 4   A.   Because it wasn't a group of people who made a lot of
 5   money.  I think the average salary was like $22,000, and so for
 6   them to be able to get extra money if they left their job, that
 7   was important to them.
 8   Q.   Now, you did understand that the cash balance formula would
 9   cost less money than the prior plan?
10   A.   Yes.
11   Q.   It would cost the company less money?
12   A.   Yes.
13   Q.   In that sense, it was a benefit cut?
14   A.   Yes.
15   Q.   So did you still think this was a good change for the
16   employees to go from the old formula to the new one?
17   A.   Yes, because they were going to -- there is the old
18   formula, they could still get that amount of money if that
19   accrual at 12-31-95 was higher than what the cash balance was.
20   Q.   Can you think of any other circumstances, in your
21   experience, where changes made to a benefit program that on the
22   one hand saves money for the company, but on the other hand you
23   would view to be a positive development for employees?
24   A.   Sure.  On the health side, we would change medical plans or
25   maybe we introduced HMOs frequently, so that was something
```

F7MJOSB3                         Peck - redirect

1  where it wasn't all positive for the associate, but there were

2  more positives, the positives outweighed the negatives.

3  Q.  So save money for the employer, but it had positive

4  attributes for the employees?

5  A.  Right.

6  Q.  Did you look at the cash balance formula the same way?

7  A.  Yes.  It was going to benefit the employee if they could

8  get the lump sum.

9  Q.  Would you take a look at Defendant's Exhibit 140.  I think

10  that is appended to your declaration.

11           MR. RUMELD:  Also, your Honor, it is also PX-84.

12           THE COURT:  All right.

13  BY MR. RUMELD:

14  Q.  Do you have it in front of you, Ms. Peck?

15  A.  Yes, it is on the screen.

16  Q.  It is a little hard to read on the screen.  Do you

17  recognize the document?

18  A.  Yes.  Those are my notes from the meeting that I attended.

19  Q.  You notes identify a number of people by first name on the

20  second line there?

21  A.  Yes.

22  Q.  Who are those people?

23  A.  Andrea Rattner from Proskauer, Rina Zimmerman who worked

24  for Foot Locker, Mark Brandeis from Mercer, Tom Kiley from Foot

25  Locker, Carol Kanowicz from Foot Locker, and I'm not sure, I

F7MJOSB3                         Peck – redirect

1    think that was Carol Bahler from Foot Locker in Camp Hill.

2            (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F7mnosb4                          Peck - redirect

1    Q.  Could you just review these notes for purposes of telling

2    me whether they discuss any proposal other than the cash

3    balance proposal.

4    A.  Well, you mean at this meeting?

5    Q.  Yes.

6    A.  This was -- we were talking about the cash balance at this

7    meeting.

8    Q.  And were you talking about anything else?

9    A.  Well, you see that last sentence, where we talked about

10   partial plan terminations, we talked about that and the fact

11   that we didn't feel that this qualified as a partial plan

12   termination.

13   Q.  In your experience under what circumstances would these

14   people Andrea Ratner, Rina Traub, and the other people you

15   mentioned attend a meeting like this?

16              MR. GOTTESDIENER:  Objection.

17   A.  Well --

18              THE COURT:  Overruled.  You may answer.

19   A.  OK.  Rina was our in-house attorney, so -- benefits

20   attorney, so that's why she was there, because we were

21   discussing benefits, and Andrea I believe was the Proskauer

22   person that Gary or Rina or Sheila would talk to when they

23   wanted to talk to -- I believe, I am not sure of this, but I

24   think she was a partner, you know, so that's how come Andrea

25   was involved.

F7mnosb4                          Peck - redirect

1    Q.  Does the fact that they are attending this meeting tell you

2    anything about the status of this proposal?

3    A.  That this is what we wanted to go forward with.  And, you

4    know, we were looking for input from them if they had any

5    reasons to think that we shouldn't do it.

6    Q.  If you could look at the second page of your notes there,

7    towards the bottom, do you see where it says perhaps?

8    A.  Yes.

9    Q.  Can you tell us what that says.

10   A.  Perhaps cash balance 7/1/95.  Very -- I can't really see

11   that word.  OK.  Thank you.  I don't know what that word is,

12   A-d-j.  Then we went on to talk about the 401(k), 1/1/96.

13   Q.  What is your understanding of that line about the cash

14   balance?

15   A.  Very -- as of 7/1/95.  I don't know what those last three

16   letters are.  I'm sorry.

17   Q.  Do you know why you are writing 7/1/95?

18   A.  I think this was all a discussion, if I recall, it was all

19   a discussion with Jim and Mark about the cash balance and

20   interest rates and interest rates having an effect on how we

21   would value someone's credits.

22   Q.  How does the July 1 date come into the picture, if you

23   know.  If you don't remember, that's OK.

24   A.  I don't know.

25           MR. RUMELD:  One moment.

1   A.  I will bet that means aggressive, very aggressive.

2   Q.  Let's take a look at Defendant's Exhibit 143 for a moment.

3           MR. RUMELD:  May I approach, your Honor?

4           THE COURT:  Yes.

5           THE WITNESS:  Thank you.

6           MR. RUMELD:  I think you have it.

7           THE COURT:  I have it.  Thank you.

8   BY MR. RUMELD:

9   Q.  Do you recognize these notes?

10  A.  Yes.  They are Tom's notes.

11  Q.  They are his notes of the same meeting, right?

12  A.  Right, yes.

13  Q.  February 2?

14          THE COURT:  Is this 41?  I am just trying to remember.

15          MR. HUANG:  PX 21, your Honor.

16          THE COURT:  21.  Thank you.

17  Q.  Do you see at the very end of his notes in the last

18  paragraph it says, Target 7/1/95 to implement cash balance?  Do

19  you see that?

20  A.  Yes, I do.

21  Q.  Does that help your recollection at all as to what the

22  7/1/95 may mean?

23  A.  Oh, if we were -- if we moved up the implementation date

24  from '96, moved it back to '95.  That explains, that's why my

25  notes said very aggressive.  It would be very aggressive to try

F7mnosb4                          Peck - redirect

1   to get it all done.

2   Q.  Is it your understanding that as of this time you were at

3   least thinking about possibly implementing this July 1, 1995?

4   A.  Yes.

5   Q.  Let's go back to Defendant's Exhibit 140, your notes?

6   A.  Yes.

7   Q.  I think you testified that Tom may have made this

8   presentation concerning the wear-away effect?

9   A.  I think it was -- yes.  Correct.  Tom with assistance from

10  Mark.

11  Q.  If Tom was making the presentation, you saw his notes?

12  A.  Yes.

13          MR. RUMELD:  Let's go back to his notes for a second,

14  the other exhibit.

15  Q.  If you look at the second page there, he's seemingly

16  describing an example of the effect of wear-away.

17          Do you see that?

18  A.  Yes.

19  Q.  If he were making a presentation, would he be writing these

20  notes down?

21  A.  Yes.

22  Q.  Even if he was making a presentation?

23  A.  Yes.

24  Q.  Sorry to do this.  Let's go back to your notes, Defendant's

25  Exhibit 140.

F7mnosb4                    Peck - redirect

1              Looking at the middle of the page, could you tell me

2      your understanding of what your notes are saying there.  Do you

3      see where it says pay credit one and a quarter, six and a

4      quarter, ten percent?

5      A.  Yes.

6      Q.  What are you describing there?

7      A.  Those were alternatives for increasing the pay credits as

8      people got older.

9      Q.  What do the pay credits relate to?

10     A.  A person's annual compensation.

11     Q.  My question is too ambiguous.  What plan formula is being

12     described here?

13     A.  The cash balance formula.

14     Q.  How does that compare to the formula that was in effect at

15     the time?

16     A.  It was -- lowered the benefit, but provided cash.

17     Q.  What type of benefit formula existed before the cash

18     balance plan?

19     A.  It was accruals.

20     Q.  It was accruals based on what criteria?  Do you know?

21     A.  Compensation again.

22     Q.  Based on compensation and also based on service?  Do you

23     remember?

24     A.  No.  I think we only did that here.

25     Q.  I see.

F7mnosb4                        Peck - redirect

1           THE COURT:  Was it called a career average?

2           THE WITNESS:  Career average plan.

3           THE COURT:  All right.

4           THE WITNESS:  Right.

5  BY MR. RUMELD:

6  Q.  Your notes to the right, what do they say?

7  A.  Replicates existing plan benefit, interest at 5 percent.

8  Q.  What does that mean?

9  A.  That if we used this formula for pay credits, one and a

10  quarter, six and a quarter, ten percent depending on the age

11  grouping, that would replicate the existing benefit interest at

12  five percent.

13  Q.  And replicate the existing benefit how?

14  A.  In terms of what the amount of the benefit would be.  That

15  is all.

16  Q.  How does it relate to the company's costs?

17  A.  Well, it increases our cost.

18  Q.  If it replicates it increases?

19  A.  No.  I'm sorry.  If it replicates the existing benefit,

20  then it would be exactly even.

21  Q.  The cost would be the same?

22  A.  Right.

23  Q.  Now, could we scroll down a couple of lines.

24  A.  Right, yes.

25  Q.  Can you read where it says, Going forward?

F7mnosb4                          Peck - redirect

1    A.  Going forward for 20 percent savings, change pay credits,

2    change the pay credits to 1 percent, 5 percent, and 8 percent.

3    Q.  What does that mean?

4    A.  If we want to increase our savings, we lower the pay

5    credits.

6    Q.  So as of this point in time, what was your understanding as

7    to how the cash balance plan would save the company money?

8    A.  As a function of the, what we gave them in pay credits.  So

9    these were different alternatives to how much we were going to

10   save.

11   Q.  Underneath there, there is a discussion of the 9 percent

12   interest rate.

13            Do you see that?

14   A.  Right.

15   Q.  Is this when you first learned about what's been referred

16   to as wear-away?

17   A.  Yes.  I would say yes.

18   Q.  Then on the next page you have that little chart with an

19   example?

20   A.  Yeah.

21   Q.  Before this meeting, did you have any understanding of

22   wear-away?

23   A.  No.

24   Q.  After this meeting, what was your understanding of

25   wear-away?

F7mnosb4                              Peck - redirect

1   A.  What was my understanding?

2   Q.  Yes.

3   A.  Well, that, you know, there was going to be a time period

4   when people would not be increasing their pension amounts, and

5   then -- you know, I mean -- that's what -- what else?

6   Q.  Could you explain a little further why they wouldn't be

7   increasing their pension amounts?

8   A.  Oh, because their accrued benefit from 12/31/95 is actually

9   higher.

10  Q.  At the time did you view this wear-away effect as being a

11  means to achieve cost savings?

12  A.  No.  No, we weren't thinking of it that way at all.

13  Q.  At the time were you thinking of this in terms of the

14  growth in the account balance not counting?

15  A.  No.

16  Q.  Were you thinking of it as a freeze?

17  A.  Not at all.

18  Q.  Did the explanation of wear-away influence in any way the

19  decision as to whether to proceed with the cash balance

20  formula?

21  A.  No.  We went ahead knowing that.

22  Q.  What is the function of the 9 percent interest rate?

23  A.  What is the function of the 9 percent?  Oh, the accrued

24  amounts were factored at 9 percent to come up with an opening

25  balance.

F7mnosb4                      Peck - redirect

1   Q.   So it was used to calculate the opening balance?

2   A.   Right.

3   Q.   Where did the numerical rate come from?

4   A.   I think it was a recommendation from Jim and Mark.

5   Q.   Do you remember whether anyone ever questioned the use of

6   that rate?

7   A.   I do not remember it being questioned.

8   Q.   Was there ever a recommendation to use a different rate?

9   A.   Not that I recall.

10  Q.   Now, how does the 9 percent contribute to the wear-away

11  effect?

12  A.   How does the 9 percent -- well, I can't explain that.

13  Q.   Under what circumstances does it happen that the

14  participant receives a benefit based on the pre-1996 accrued

15  benefit?

16  A.   If when we -- if the interest rates change, and they do

17  every year usually, then it would affect the benefit that we

18  were going to give them credit for.

19  Q.   What interest rate are you talking about now?

20  A.   Well, like, see that 7.83.  That was the GATT rate at that

21  time.

22  Q.   Right.  So there is a difference between the 7.83 and the 9

23  percent?

24  A.   And the 9 percent, right.

25  Q.   Right.  Your understanding is that because that rate is

F7mnosb4                        Peck - redirect

1    lower, a participant could experience wear-away?

2    A.  Yes.

3    Q.  I think you testified yesterday that you could have chosen

4    to use the same 7.83 percent to calculate the starting balance?

5    A.  Yes.

6    Q.  At what point in time do you apply the GATT rate for

7    purposes of determining what the pre-'96 benefit is worth?

8    A.  I don't know the answer to that.

9    Q.  You understand there is a minimum lump sum?

10   A.  Yes.

11   Q.  What does the minimum lump sum correspond to?

12   A.  The minimum lump sum is the minimum that an individual

13   would get.

14   Q.  What is it based on?

15   A.  What is it based on?  The person's earnings and what they

16   have accrued.

17   Q.  Accrued under which formula?

18   A.  Under the old formula.

19   Q.  When is that minimum lump sum calculation performed?

20   A.  At the end of the year, after the interest rates come out.

21   Q.  If a participant is still working, do you make a minimum

22   lump sum calculation?

23   A.  We would probably tell them that they, you know, we're

24   waiting for interest rates before we do the calculation.

25   Q.  When can a participant first take a lump sum?

F7mnosb4                          Peck - redirect

1    A.  Today.

2    Q.  Well, if an employee is still working, can he take a lump

3    sum?

4    A.  Yes.

5    Q.  While he's working?

6    A.  Oh, no, no, when he terminates.

7    Q.  So his entitlement to a lump sum arises when he's

8    terminating his employment?

9    A.  Right.

10   Q.  When is the minimum lump sum calculation made?

11   A.  I don't know exactly.

12   Q.  Do you know what the impact on the company's cost -- do you

13   know what the impact is on the amount of the minimum lump sum

14   if those GATT rates go down?

15   A.  Well, when the rates go down the, you know, the inverse is

16   true for the benefit.

17   Q.  The size of the benefit goes up?

18   A.  Right.

19   Q.  What is the impact on the company?

20   A.  It increases the cost.

21   Q.  Because the company pays those lump sums?

22   A.  Right.

23   Q.  Could we take a look again at Plaintiff's Exhibit 300.  You

24   may still have a copy there.  We looked at this before.

25          Do you remember that this morning, with

F7mnosb4                          Peck - redirect

1    Mr. Gottesdiener?

2    A.  Not today.

3    Q.  Do you understand what this document is showing?  It's

4    addressed to you, right?

5    A.  Yes.  Tom sent it to me.

6    Q.  Do you see it's showing current year lump sums greater than

7    $3500?

8    A.  Right.

9    Q.  What is the significance of the reference to $3500?

10   A.  If people had a pension benefit that was under $3500, we

11   cashed them out.

12   Q.  Was that true on under the old plan or the new plan?

13   A.  Under the old plan.

14   Q.  Under the old plan, if you had more than $3500, could you

15   obtain a lump sum?

16   A.  No.

17   Q.  Only under the new plan?

18   A.  Only under the new plan.

19   Q.  So current year lump sums greater than $3500, those would

20   be lump sums available only under the new plan?

21   A.  I guess so, yes.

22   Q.  And this memo is showing that there were over $23 million

23   in lump sum payments in 1996?

24   A.  Right.

25   Q.  For these over $3500 people?

F7mnosb4                        Peck - redirect

1   A.  For anybody over $3500, right.

2   Q.  Do you think that is a significant sum?

3   A.  Yes, I do.

4   Q.  So, from a cost standpoint, would you agree that the

5   company in fact incurred a lot of cost by virtue of this lump

6   sum option?

7   A.  Yes.

8   Q.  Sitting here now, do you know whether the company actually

9   saved money or lost money by virtue of participants electing a

10  lump sum?

11  A.  I think it cost the company money.

12  Q.  Who would be the best person to answer that question?

13  A.  Probably the actuaries.

14          MR. GOTTESDIENER:  Objection, your Honor.

15          THE COURT:  Now, I'll allow her understanding as to

16  who the person would be.

17          Probably the actuaries?

18          THE WITNESS:  The actuaries.

19          THE COURT:  Do you mean inside the company, somebody

20  with actuarial experience, such as Mr. Kiley or the Mercer

21  folks?

22          THE WITNESS:  The Mercer folks.

23  BY MR. RUMELD:

24  Q.  It would be somebody other than you I take it?

25  A.  Yes, definitely.

F7mnosb4                        Peck - redirect

1    Q.  We looked at your notes of the meetings you attended with

2    Mercer.

3    A.  Uh-huh.

4    Q.  Do you remember whether you attended additional meetings

5    with Mercer after February to discuss the cash balance

6    proposal?

7    A.  I think it was at least one other meeting where Jim Grefig

8    was present.

9    Q.  Generally speaking, would you take notes if you attended a

10   meeting like this?

11   A.  Generally, yes.

12   Q.  Would it be consistent with your practice that other

13   members of the group would attend more meetings with Mercer?

14   A.  Yes, definitely.

15   Q.  Why was that?

16   A.  Because they were working on this every day trying to get

17   this done.  So there were -- I had other things that I had to

18   be working on as well.  So I left Tom and Carol to do the

19   pension work, and so they had meetings without me with Mercer.

20   Q.  You testified earlier about the presentations that were

21   made to management.

22           Do you remember that?

23   A.  Yes.

24   Q.  How would you describe your role as it related to those

25   presentations?

F7mnosb4                          Peck - redirect

1   A.  Well, most of the presentations were put together by Tom

2   and Carol with Mercer.  Then they would -- excuse me, then they

3   would review them with me and give me an opportunity to ask

4   questions, and then I had to present them to Barry and then

5   Barry took it higher generally.

6   Q.  When the materials were presented to you, you had an

7   opportunity to make changes?

8   A.  If there was -- yes, I did.

9   Q.  What types of changes would you make?

10  A.  Mostly it was editorial changes, you know, format changes

11  or that kind of thing.

12  Q.  You didn't make any substantive changes?

13  A.  No substantive changes, no.

14  Q.  Why not?

15  A.  Because I didn't do all the work that went behind it, so I

16  trusted the actuary and Tom to do that.

17           MR. RUMELD:  May I approach, your Honor.  I would like

18  to give the witness Defendant's Exhibit 199.

19           THE COURT:  Yes.

20           THE WITNESS:  Thank you.

21           MR. HUANG:  This is PX 17, your Honor.

22           THE COURT:  17.

23  BY MR. RUMELD:

24  Q.  You say that the draft -- this is a June 30, 1995 draft,

25  the presentation materials.

F7mnosb4                          Peck - redirect

1              Do you see that?

2    A.   Yes.

3    Q.   Do you recognize any of the handwriting on here?

4    A.   Well, on that background page, that would be -- that's my

5    handwriting, that we need the same information for the Kinney

6    plan.

7    Q.   Do you see your handwriting anywhere else in this document?

8    A.   On the next page, the average salary, you know, that word

9    average, and then age bands on the bottom.

10   Q.   If you flip through the document, you will see there are

11   some other handwritten comments.

12              Could you let the Court know whether all of them are

13   your changes.

14   A.   Sure.  Yes, they are all mine.

15   Q.   Are these changes consistent with your recollection of the

16   type of changes you generally made when you reviewed these

17   presentation materials?

18   A.   Right.  And they are not all changes.  Some of them are

19   just questions.

20   Q.   Right.

21   A.   Yes.

22   Q.   But what you see here is consistent with your recollection?

23   A.   Yes, uh-huh.

24   Q.   All right.  Could you take a look at Defendant's Exhibit

25   38, which I think is attached to your declaration.

F7mnosb4                         Peck - redirect

1            MR. RUMELD:  It is also PX 10, your Honor.

2            I'm sorry.  It's not attached to your declaration.

3            May I approach?

4            THE COURT:  Yes.

5            THE WITNESS:  Thank you.

6   BY MR. RUMELD:

7   Q.  Let me ask you first, Ms. Peck, if you would turn to --

8   it's about the seventh page.  It's the document that's Bates

9   stamped 5462 on the bottom.

10  A.  5462, OK.

11  Q.  If you look all the way on the top, there is some sort of

12  fax number there, and then it says page 2 on the right.

13  A.  Yes.

14  Q.  Do you see that?

15            Are you able to tell from looking at that whether

16  these presentation materials are in a finalized form so that

17  they would have been presented as is?

18  A.  I would think so, because they came from Mercer.

19  Q.  Right.  But if you were making a presentation to your

20  superiors, would you use documents that had those fax numbers

21  on the top and no page numbers on the bottom?

22  A.  Well, it's possible.  It happened.

23  Q.  Could you turn to the second page.  It's 5457 on the

24  bottom.

25  A.  OK.

F7mnosb4                          Peck - redirect

1   Q.  There is the statement of objective there?

2   A.  Yes.

3   Q.  Is this a page that you would have reviewed carefully

4   before the presentation?

5   A.  Yes.

6   Q.  It says there that the objective is to decrease long-term

7   company cost.

8           Do you see that?

9   A.  Yes.

10  Q.  Is there any reason not to think that as of this time you

11  viewed the objective as being to save long-term costs?

12  A.  Yes.

13  Q.  Is that --

14  A.  No.  There's no reason to --

15  Q.  As of this time, what was your understanding as to how the

16  long-term costs would be reduced?

17  A.  Well, there is a number of things that are involved in the

18  pension other than just the actual amount of the benefits.  So,

19  you know, there are other expenses that go with it.  So we

20  would reduce the PBGC expense, for instance, because we would

21  have fewer participants perhaps, and then -- you know, things

22  like that, other expenses that are dependent on the number of

23  participants.

24  Q.  You started your response by referring to other things

25  besides the benefits.

F7mnosb4                          Peck - redirect

1    A.  Right.

2    Q.  Did the benefits impact the cost reduction?

3    A.  Ask me that question again, please.

4    Q.  OK.  You were recommending a change in the formula, right?

5    A.  Right.

6    Q.  Did you have an understanding as to whether the change in

7    the formula was going to have an impact on the cost?

8    A.  Yes.  I think I understood that it would have an impact on

9    the cost and lower it.  Uh-huh.

10   Q.  OK.  If you remember, in your notes, it referred to this 20

11   percent reduction in cost?

12   A.  Right.

13   Q.  Is that what you had in mind when these objectives were

14   being prepared?

15   A.  Well, I didn't think we were going to go that far with 20

16   percent, but that's, you know, a possibility.

17   Q.  But did you have an understanding that the pay credits on

18   the formula, on the cash balance formula would be set in a way

19   that there would be some cost savings?

20   A.  Yes.

21   Q.  Would you look at page 5461.

22   A.  OK.

23            MR. RUMELD:  That's not it.  5461 on the bottom.  OK.

24            If you could make that a little larger.

25   Q.  Do you understand what the materials on the right depict

F7mnosb4                         Peck - redirect

1  under cash balance plan?

2  A.   Yeah.  You mean the percent of pay or the formula for the

3  years of service, or what do you --

4  Q.   Right.  What is that showing?

5  A.   It's showing that for associates who have basically up to

6  ten years of service that they would get 1 percent of the first

7  10,800 of their pay plus .85 percent of pay in excess of

8  $22,000.

9  Q.   Is this a description of formula that's being contemplated

10  at this time?

11  A.   At that time, yes.

12  Q.   Underneath there is a description of the impact of that

13  formula on the cost, is that right?

14  A.   Right, the normal -- uh-huh.

15  Q.   Do you see anything in here that has to do with the

16  methodology for determining the starting balance for the use of

17  that 9 percent interest rate?

18  A.   Well, my notes say that the normal cost to fund the current

19  accruals, if that's what you're referring to.

20  Q.   Do you see anything in the materials that specifically

21  refers to how the initial account balance is going to be

22  calculated?

23  A.   No.

24  Q.   If you thumb through these materials, can you let me know

25  whether you see any discussion of wear-away in here?

F7mnosb4                         Peck - redirect

1    A.  OK.  It's not going to be there.

2    Q.  You already know that?

3    A.  Right.

4    Q.  Because you have looked at these materials before?

5    A.  I have looked at the materials before.  I'll finish going

6    through it before I --

7              (Pause)

8    A.  No, I don't see anything about wear-away.

9    Q.  OK.  Do you see anything in there about achieving savings

10   through the election of lump sums?

11   A.  No.

12   Q.  So, when you testified yesterday that you thought one of

13   the ways the company was going to save costs was by encouraging

14   everyone to take lump sums -- do you remember that testimony?

15   A.  Yes.

16   Q.  Would that be something that would be included within these

17   presentation materials at the time you thought that was one of

18   the means to save costs?

19              MR. GOTTESDIENER:  Objection.

20              THE COURT:  Hold on.

21              Sustained.

22   BY MR. RUMELD:

23   Q.  When you reviewed these presentation materials, did you try

24   and make sure they contain anything that you thought was

25   important?

F7mnosb4                        Peck - redirect

1    A.  Would I what?

2    Q.  Try to make sure they contained anything that you

3    considered important at the time?

4    A.  Yes.

5    Q.  Could you look at DX 249.

6            MR. RUMELD:  May I approach?

7            THE COURT:  You may.

8            MR. RUMELD:  It is also PX 227.

9            THE WITNESS:  Thank you.

10   BY MR. RUMELD:

11   Q.  This is a draft dated June 16, 1995.  Do you see that?

12   A.  Yes.

13   Q.  If you turn to the third page, where it lists the

14   objectives?

15   A.  Yes.

16   Q.  It says next to the first asterisk, To decrease long-term

17   company cost by an estimated 20 percent per year.

18            Do you see that?

19   A.  Yes.

20   Q.  Is there any reason not to think that at this time you were

21   still trying to obtain a 20 percent cost reduction?

22   A.  No.

23   Q.  It refers to a 20 percent reduction per year.  Do you see

24   that?

25   A.  Yes.

F7mnosb4                         Peck - redirect

1  Q.  Is there any reason not to think that the method that you

2  had in mind for achieving that reduction would be the same

3  method that was outlined back at that February meeting that you

4  attended?

5  A.  I'm sorry.  I didn't hear it.

6  Q.  Is there any reason not to think that the way of achieving

7  that 20 percent reduction that you had in mind was the method

8  that was described to you back in February?

9  A.  No.  There's no reason.

10          MR. RUMELD:  Just one moment, your Honor.

11          THE COURT:  All right.

12 BY MR. RUMELD:

13 Q.  Could you look at Defendant's Exhibit 38.  I think that is

14 attached --

15          MR. RUMELD:  That's the May 1 one.

16          I just brought it up to you.

17          THE COURT:  PX 10?

18          MR. RUMELD:  Right.

19 BY MR. RUMELD:

20 Q.  Do you have DX 38?

21 A.  Yes.

22 Q.  If you turn to the third page there.  This is the version

23 of the slide deck that's dated May 1, 1995.

24          Do you see that?

25 A.  OK.

F7mnosb4                          Peck - redirect

1    Q.  On the third page do you see there is a listing of

2    alternatives?

3    A.  OK.

4    Q.  What is your understanding of why this page is presented

5    this way?

6    A.  Let me make sure I'm on the same thing.  You are on 458?

7    Q.  Correct.

8    A.  OK.  Why was it presented this way?

9    Q.  What is your understanding of what this list of

10   alternatives was?

11   A.  These were things that the committee or the task force

12   was -- had looked at, and, you know, came up with things that

13   they could have done and what it would have cost.

14   Q.  Is there any reason why this list would have omitted an

15   alternative that the task force looked at seriously?

16   A.  I think only if -- no, I don't think so.  Except for

17   freezes.  We weren't putting in freezes.

18   Q.  Mr. Gottesdiener asked you yesterday about a proposal to

19   add a lump sum option to the existing plan formula.

20           Do you see that proposal listed here?

21   A.  No.

22   Q.  I'm sorry.  Did you answer no?

23   A.  No.

24   Q.  You don't see it there?

25   A.  No.

F7mnosb4                         Peck - redirect

1    Q.  Any reason why it would not be listed if it was a proposal

2    that was being seriously considered at the time?

3    A.  If it was considered, it should be there, but I don't

4    remember it being considered.

5    Q.  Would you like now at DX 41.  It should be attached to your

6    declaration.

7              MR. RUMELD:  And it is also PX 101, your Honor.

8              THE COURT:  All right.  Thank you.

9    BY MR. RUMELD:

10   Q.  This is the --

11   A.  Excuse me, Mr. Rumeld.  What do you want us to look at?

12   Q.  It's Exhibit 41 to your declaration.

13   A.  OK.

14   Q.  That starts with the July 19 memorandum.

15   A.  No.  I'm in the wrong place.  I'm sorry.

16             MR. RUMELD:  May I approach, your Honor?

17             THE COURT:  You may.

18             MR. RUMELD:  I will just give her -- just take this

19   one.

20             THE WITNESS:  OK.  Thanks.

21   BY MR. RUMELD:

22   Q.  Now, am I correct these are the presentation materials that

23   actually went to senior management, is that right?

24   A.  That's right.

25   Q.  Could you look on page 7, which is the page with the

F7mnosb4                         Peck - redirect

1    recommendations.

2    A.   Yes.

3    Q.   Is this something you would have reviewed carefully before

4    it was sent out to senior management?

5    A.   Yes.

6    Q.   These reflect what your recommendations were at the time,

7    is that right?

8    A.   Yes.

9    Q.   So if you look on the first bulleted point three lines from

10   the bottom.

11   A.   Merge the Kinney plan with the Woolworth plan.

12   Q.   No.   Sort of that first paragraph three lines from the

13   bottom.

14   A.   Uh-huh.

15   Q.   It says, Reduces future benefit accruals and lowers future

16   costs.

17            Do you see that?

18   A.   Oh, I see in the first, yes.   OK, got it.

19   Q.   OK.   What's your understanding of that?

20   A.   There won't be as much money that we need to accrue a

21   benefit for, and so that will lower the future cost.

22   Q.   Why won't there be as much money that you need to accrue a

23   benefit for?

24   A.   That's the effect of changing to the cash balance.

25   Q.   How would you describe the effect of wear-away?

1           MR. GOTTESDIENER:  Objection.

2           THE COURT:  Sustained.

3           In terms of what?  In connection with this, or do you

4   just want to get a general explanation.

5   Q.  What does wear-away do to benefit accruals?

6           MR. GOTTESDIENER:  Objection.

7           THE COURT:  I will allow it.

8           You may answer.

9           THE WITNESS:  OK.

10  A.  Can you ask it again now.

11  Q.  When a participant is in wear-away --

12  A.  Right.

13  Q.  -- what happens to the participant's benefit accruals?

14  A.  They go down.

15  Q.  They go down, or they just don't go up?

16  A.  Well, they don't go up.

17  Q.  They remain the same?

18  A.  Right.

19  Q.  Right?

20  A.  Right.

21  Q.  That's why it's been suggested to you that it's like a

22  benefit freeze, is that right?

23          MR. GOTTESDIENER:  Objection.

24          THE COURT:  You can't lead her quite so much.

25          Let's try that again.

F7mnosb4                        Peck - redirect

1          I'm concerned that we may have your testimony and not

2    hers in the last set of answers.

3          MR. RUMELD:  I understand.

4          THE COURT:  We'll strike those.

5          MR. RUMELD:  Let me ask this question.

6    BY MR. RUMELD:

7    Q.  Do you believe that the reference to reducing future

8    benefit accruals has anything to do with the wear-away?

9          MR. GOTTESDIENER:  Objection.

10          THE COURT:  I will allow it.

11          Overruled.

12          THE WITNESS:  Can you read it to me again.

13          THE COURT:  The court reporter may read back the

14    question.  Thank you.

15          (Record read)

16    A.  OK.  Yes, I do.

17    Q.  OK.  It doesn't say suspending benefit accruals, does it?

18    A.  No.

19    Q.  Would you characterize wear-away as the suspension of

20    benefit accruals or reduction of benefit accruals?

21    A.  A reduction.

22    Q.  Why would not characterize it as a suspension if accruals

23    are not increasing?

24          MR. GOTTESDIENER:  Objection.

25          THE COURT:  Overruled.

F7mnosb4                          Peck - redirect

1    A.  Because the hope is the person's not going to be in

2    wear-away forever.

3    Q.  Right?

4    A.  So --

5    Q.  Eventually --

6    A.  Eventually --

7    Q.  -- the benefits --

8              MR. GOTTESDIENER:  Let her answer.

9              THE COURT:  Let her answer.

10             MR. RUMELD:  Sorry.  Strike that.

11   A.  The person is not going to be in wear-away forever, and

12   then the benefit accruals will pick up again.

13   Q.  For the period that people are in wear-away, would there be

14   a suspension of benefit accruals or a reduction in benefit

15   accruals?

16             MR. GOTTESDIENER:  Objection.

17             THE COURT:  I will allow it.  You may answer.

18             THE WITNESS:  OK.

19   A.  During the wear-away period there is, I think there is a

20   suspension.

21             THE COURT:  Now in just a few minutes, just so you are

22   aware, Mr. Rumeld, we are going to be breaking for lunch.

23   BY MR. RUMELD:

24   Q.  You previously identified Mr. Kiley's handwriting on this

25   document.

F7mnosb4                        Peck - redirect

1              Do you remember that?

2   A.   Yes.

3   Q.   Can you turn to the next page.

4              This was a meeting with senior management, is that

5   right?

6   A.   Right.

7   Q.   So would it have been your practice to make a presentation

8   like this to senior management and have Mr. Kiley accompany

9   you, or would Mr. Kiley make a presentation like this?

10  A.   He would have made -- I believe he would have made this

11  one, this presentation, yes.

12  Q.   Is there anything in particular that leads you to say that?

13  A.   Well, because of all of the -- this is the culmination of

14  all the work that they had been doing as a committee, and so I

15  think that he would have made this presentation.

16             THE COURT:  Since we've left behind I think the PX or

17  DX number do you want to just recite that for the record.

18             MR. RUMELD:  I think it's DX 41, your Honor.

19             THE COURT:  All right.

20             Thank you.

21  BY MR. RUMELD:

22  Q.   Could we look back at your notes, which was DX 140.

23             It should be attached to your notebook.  It should be

24  the last tab to your notebook.  You'll see your notes.

25  A.   OK.  I see it.  OK.  I have it.

1   Q.  The tabs correspond to the exhibit numbers, so that's why

2   they don't go 1, 2, 3.

3           You have your notes in front of you?

4   A.  I have the notes in front of me, yes.

5   Q.  Do they contain any information about how long the

6   wear-away period would last?

7   A.  No.

8   Q.  I think you testified to your recollection that at some

9   point you learned that wear-away was expected to last two to

10  three years?

11  A.  In the beginning, right.

12  Q.  Sitting here now, do you actually remember learning that

13  there was a specific period of time that wear-away was expected

14  to last?

15          MR. GOTTESDIENER:  Objection.

16          THE COURT:  Overruled.

17  A.  That's where that, you know, two years came from.

18  Q.  Right.  But do you actually remember being in a meeting or

19  having a discussion with anyone in particular about it?

20  A.  I think that was one of the first things that Jim Grefig

21  presented to us.

22  Q.  Right.  But this meeting was the first time he presented

23  about wear-away, is that right?

24  A.  Pardon me?

25  Q.  This meeting, this February meeting was the first

1   presentation about wear-away?

2   A.   Right.

3   Q.   So it wasn't at that meeting?

4            MR. GOTTESDIENER:  Objection.

5            THE COURT:  Sustained.

6            I think you need to do it a little bit differently.

7            MR. RUMELD:  Apologies.

8   BY MR. RUMELD:

9   Q.   If Mr. Grefig had commented on the length of wear-away at

10  this meeting, do you think it would be in your notes?

11  A.   Well, it probably should be, but I don't think it's there.

12           THE COURT:  Did you have a practice of taking verbatim

13  notes or something less than that in terms of when you were

14  sitting at a meeting?

15           THE WITNESS:  Right.  This was something less than

16  that, because I think a lot of this stuff he was talking about

17  and I was trying to write it, but -- so as much as I attempted

18  to get verbatim notes, I didn't always.

19           THE COURT:  All right.

20           Did you have any regular practice with respect to

21  note-taking, in other words, in terms of what you might be

22  inclined to write down that you could describe?

23           THE WITNESS:  Yes.

24           Well, normally I wrote down things that I felt that I

25  needed more explanation on or that, you know, if they were

1  saying something that was really important then I wrote it, and

2  if I didn't have a presentation then I wrote it down myself,

3  which is why we have that silly diagram here at the end.

4          THE COURT:  Is now a good time to take a break for

5  lunch or do you want to go through?

6          MR. RUMELD:  I want to just ask one more question.

7          THE COURT:  Sure.  Absolutely.  Go ahead.

8  BY MR. RUMELD:

9  Q.  Did you have an understanding of Mr. Kiley's practices with

10 respect to taking notes?

11 A.  He took notes about everything.

12 Q.  And you found his notes to be very complete?

13 A.  Yes.

14         MR. RUMELD:  OK.  Thank you, your Honor.

15         THE COURT:  All right.  Thank you.

16         Let's take our break for lunch and come back at 2

17 o'clock.

18         Is there anything anybody wants to raise before we

19 break for lunch?  No.  All right.  Thank you.

20         (Luncheon recess)

21

22

23

24

25

1          AFTERNOON SESSION

2          2:00 pm

3          (Trial resumes)

4          (In open court)

5          THE COURT:  All right, ladies and gentlemen, let's all

6   be seated.  Mr. Rumeld, you may proceed, sir.

7          MR. RUMELD:  Thank you, your Honor.  May I approach?

8          THE COURT:  You may.

9   PATRICIA A. PECK, resumes

10  REDIRECT EXAMINATION (Continued)

11  BY MR. RUMELD:

12  Q.  Ms. Peck, I am going to show you what has been marked as

13  Defendant's Exhibit 161 and it is also Plaintiff's Exhibit 113.

14  You probably have it there but it is easier if I just hand you

15  the exhibit.

16  A.  Okay.  Thank you.

17  Q.  Ms. Peck, would you just review those materials and give me

18  your understanding of what the subject matter of the discussion

19  is.

20  A.  Okay.  It starts with a note from Roger Farah to John

21  Gillespie and John Cannon, expressing his concern about a 6

22  percent interest that we're guaranteeing on account balances in

23  the pension program.  He is asking for an analysis of how this

24  impacts the program.

25          The next letter is from William Mercer, James Cassidy

1    in particular, to Nancy Herman, explaining what would happen if

2    the reduction of the interest credit was changed from 6

3    percent, what would happen if the annual pay credits are

4    reduced, what would happen if we freeze the plan, and what

5    would happen if we terminate the plan.

6    Q.  Now, I think you can stop there.

7    A.  Okay.

8    Q.  What do you understand to be Mr. Farah's objectives?

9    A.  I think it in that time period, the 6 percent, he was

10   concerned about 6 percent being high.

11   Q.  What did he think it was doing to the costs?

12           MR. GOTTESDIENER:  Objection.

13           THE COURT:  Sustained.

14   BY MR. RUMELD:

15   Q.  Why was Mr. Farah concerned about the 6 percent interest

16   rate?

17           MR. GOTTESDIENER:  Objection.

18           THE COURT:  That is sustained.  You can't ask it that

19   way.

20   BY MR. RUMELD:

21   Q.  What was your understanding why Mr. Farah was concerned

22   about the 6 percent interest rate?

23           MR. GOTTESDIENER:  Objection.

24           THE COURT:  I will allow it.  You may answer.

25   A.  Okay.  I think his concern was that it was too high, 6

F7MJOSB5                          Peck - redirect

1    percent, and so could we look at some other alternatives.

2    BY MR. RUMELD:

3    Q.  What were the objectives of the various alternatives that

4    were being considered?

5              MR. GOTTESDIENER:  Objection.

6              THE COURT:  Overruled.  You may answer.

7    A.  Okay.  Would you ask it again, please.

8    BY MR. RUMELD:

9    Q.  What did you understand the objectives to be of these

10   various alternatives that were being considered by Mercer?

11   A.  The objective was from the get-go to save money and to, you

12   know, give the associates a plan that they could live on

13   between the lump sum cash-outs and the 401 (k).

14   Q.  Now, as the note on the top indicates, this letter from

15   Mercer was forwarded to you.  What was your role in this

16   discussion?

17   A.  I was not -- I didn't have any role in the discussion with

18   James Cassidy and Nancy, only in trying to set up a meeting

19   afterwards, as Roger and John Gillespie requested.

20   Q.  Did you have a role in addressing this substance of Mr.

21   Farah's request?

22   A.  No, I did not.

23   Q.  Would you look with me -- I am looking at the Mercer

24   letter, the September 11th letter.  Do you have that in front

25   of you?

F7MJOSB5                          Peck - redirect

1   A.  I do.

2   Q.  I am just going to read a couple of sentences from the

3   second paragraph there.

4           "As way of background, the only area in which

5   significant cash savings can be realized is in the future

6   accrual of benefits (i.e., the normal cost) under the current

7   plan provisions, the normal cost is about $4 million for 1996

8   and is expected to rise to about $10 million by the Year 2000.

9   The increase is due to short term savings built into the plan

10  design which wear away over the next three to four years."

11          Do you see that?

12  A.  Yes.

13  Q.  So, first of all, do you think you read this at the time?

14  A.  Who, Roger?

15  Q.  Did you read this letter at the time?

16  A.  Oh, I am sorry.  Yes, when Nancy sent it to me, but I had

17  already gotten it from John Cassidy.

18  Q.  Were you focused on the substance of this letter?

19  A.  Yes, I was because I thought this was telling that he

20  expected we would be able to, you know, increase the normal

21  costs, which to me meant wear-away was going to go away.

22  Q.  Would you explain what you mean by that.

23  A.  Well, the current, the normal cost currently was 4 million,

24  but he was saying that in four years he thought it would go up

25  to 10 million.

F7MJOSB5                        Peck - redirect

```
 1    Q.  Right.

 2    A.  So he thought that was because of the savings that were

 3    built into the design.

 4    Q.  Do you know whether at the time you connected those two

 5    sentences to the wear-away effect that you had been discussing

 6    when you first talked about the cash balance plan?

 7              MR. GOTTESDIENER:  Objection.

 8              THE COURT:  I'll allow it.  Overruled.

 9    A.  I don't think I did.

10    BY MR. RUMELD:

11    Q.  How were you thinking?  What did you understand when you

12    were thinking about the wear-away effect?

13              MR. GOTTESDIENER:  Objection.

14              THE COURT:  I'll allow it.

15    A.  What did I understand?

16    BY MR. RUMELD:

17    Q.  Right.  You went to that meeting back in February?

18    A.  Right.

19    Q.  And you gained some understanding of wear-away?

20    A.  Yes.

21    Q.  So when you were thinking of wear-away --

22    A.  Ah-huh.

23    Q.  The way we have been using it in this case, what did you

24    connect it to?  What did you think about it?

25              MR. GOTTESDIENER:  Objection.
```

F7MJOSB5                              Peck - redirect

1          THE COURT:  What is her definition or what is her

2    view?

3    BY MR. RUMELD:

4    Q.  What was your understanding about what wear-away meant?

5          THE COURT:  The definitional question, okay.

6    A.  Okay.  It meant that people would not be getting the

7    credits that they -- the materials that they would get, and it

8    also meant that it would take them a couple of years before

9    they got into the space where they would again start earning

10   credits.

11   Q.  So you looked at it from the perspective of the

12   participant's benefits?

13   A.  Yes.

14         MR. GOTTESDIENER:  Objection.

15         THE COURT:  Overruled.

16   BY MR. RUMELD:

17   Q.  Did you ever connect that understanding of wear-away to

18   cost savings issues?

19   A.  No, not really, other than seeing something like this, but

20   no.

21   Q.  Now, do you know what became of Mr. Farah's request to

22   reconsider the 6 percent interest rate?

23   A.  No, I don't.

24   Q.  Do you know if the 6 percent rate was ever changed?

25   A.  To the best of my knowledge, it was not.

F7MJOSB5                        Peck - redirect

1   Q.  Do you recall there being any other changes to the cash

2   balance formula that reduced costs?

3   A.  No.

4   Q.  Now, you gave some testimony this morning and yesterday

5   about the company-wide communications.

6   A.  Yes.

7   Q.  In reviewing those communications, did you feel any

8   responsibility towards the plan participants?

9   A.  Responsibility for the plan participants?

10  Q.  Yes.  Did you feel you owed them any responsibility in

11  connection with those communications?

12  A.  No, I did not.

13  Q.  Only to the company?

14  A.  Only to the company.

15  Q.  Did you feel any responsibility as to whether the

16  communications needed to be accurate in some way?

17  A.  Yes, I thought they had to be accurate.

18  Q.  Why did you feel that way?

19  A.  That's the way the department operated that, you know,

20  anything that we got out should be accurate.

21  Q.  You also said that your department was concerned about

22  employee morale?

23  A.  Yes.

24  Q.  Would you say your department was concerned about the

25  general welfare of the employees?

F7MJOSB5                          Peck - redirect

1    A.  Yes.

2              MR. GOTTESDIENER:  Objection.

3              THE COURT:  Overruled.

4              THE WITNESS:  Sorry.

5    BY MR. RUMELD:

6    Q.  Did your concerns about the employees influence in any way

7    what you thought you were doing when you were reviewing these

8    communications?

9              MR. GOTTESDIENER:  Objection.

10             THE COURT:  Overruled.

11   A.  Can you ask that again, please.

12   BY MR. RUMELD:

13   Q.  Well, did the fact that you were concerned for the general

14   welfare of your employees --

15   A.  Right.

16   Q.  -- influence the approach you took when you were reviewing

17   these communications?

18   A.  No, it did not.

19   Q.  You didn't have any concern for the employees'

20   understandings of these communications?

21             MR. GOTTESDIENER:  Objection.

22             THE COURT:  Overruled.

23   A.  I felt that that was being taken care of by the other

24   members of my department who were going to different sites and

25   meeting with the employees and having meetings to explain it.

F7MJOSB5                          Peck - redirect

1    BY MR. RUMELD:

2    Q.  Now, you described that announcement letter from the

3    president, the newsletter?

4    A.  Yes.

5    Q.  At the time did you think what the letter was describing

6    was good news?

7    A.  Yes.

8    Q.  Why is that?

9    A.  Because the pension plan was going to have a cash balance

10   feature -- excuse me -- the lump sum feature which the current

11   plan did not have and also because we were introducing a 401

12   (k).

13   Q.  Did you feel that there was anything misleading about the

14   letter characterizing the changes as good news?

15   A.  I did not, no.

16   Q.  At the time you were aware these changes were going to save

17   the company costs?

18   A.  Yes.

19   Q.  Is that right?

20   A.  Yes.

21   Q.  Did you view that as bad news for the participants?

22   A.  No.

23   Q.  Now, who do you think drafted this letter?

24   A.  Which one?

25   Q.  Let me ask it this way.  Do you think you drafted the

1    initial announcement letter?

2    A.   The good news-bad news?

3    Q.   Right.  I think you described it as the good news.

4    A.   Right.  I understand.  I probably did it first and then

5    gave it to Barry.

6              THE COURT:  PX-9?

7              MR. GOTTESDIENER:  2.

8              THE COURT:  2?  Sorry.

9    BY MR. RUMELD:

10   Q.   Would you look at Paragraph 17 of your declaration.

11   A.   Yes.

12   Q.   So it says there even with, "Even with respect to these

13   communications, my role was limited, in that each was initially

14   drafted, in collaboration with the staff at Mercer, by someone

15   else in the corporate benefits department, someone on Foot

16   Locker's internal legal staff, or W. Barry Thomson, Foot

17   Locker's chief administrative officer at the time."

18             Do you see that?

19   A.   Yes.

20   Q.   You did review this declaration carefully before you signed

21   it?

22   A.   Pardon me?

23   Q.   You reviewed this declaration carefully before you signed

24   it?

25   A.   I did.

F7MJOSB5                          Peck - redirect

1   Q.  Is that statement still accurate?

2   A.  Yes.

3   Q.  Do you understand that statement to mean you drafted the

4   announcement letter or somebody else did?

5   A.  No.  I think, you know, I may have given them an outline of

6   what I thought should be in it, but I didn't draft the letter.

7           I think it was done by Mercer and the benefits

8   department together and then eventually get moving until it was

9   ready to go.

10          MR. RUMELD:  May I approach, your Honor?

11          THE COURT:  You may.

12  BY MR. RUMELD:

13  Q.  I am going to show you what has previously been marked as

14  Defendant's Exhibit 16.

15  A.  Thank you.

16  Q.  Do you recognize the notations on this document?

17  A.  Yes, I do.

18  Q.  Whose are they?

19  A.  Mine.

20  Q.  So you're marking up the draft.  Is that right?

21  A.  Yes.

22  Q.  Do you see in the third paragraph there were some lines

23  over the sentence the Woolworth retirement plan and the Kenney

24  manufacturing plan will be converted into the cash balance plan

25  and benefits accrued under these plans will become the opening

F7MJOSB5                          Peck - redirect

1  balance of the cash balance accounts for participants in those

2  former plans.  Do you see that?

3  A.  Yes.

4  Q.  I want to first understand, were you meaning to cross that

5  sentence out?

6  A.  Yes.

7  Q.  Do you know why you crossed that sentence out?

8  A.  No, I don't know why I did it at the time.

9  Q.  If you look on a couple of sentences down, there is a

10  sentence that says participants will be able to see your

11  individual account balance grow each year and know its value.

12          Do you see that?

13  A.  Yes, I do.

14  Q.  Now, at the time you reviewed this, what did you think the

15  word, "value" meant?

16  A.  Is there something else?

17  Q.  Well, how did you understand that sentence at the time, if

18  you remember?

19  A.  Increase, increase.  I think it was synonymous with

20  increase.

21  Q.  You reviewed this sentence -- did you prepare this

22  sentence?

23  A.  No.

24  Q.  Someone else did because it is already here?

25  A.  Right.

F7MJOSB5                          Peck - redirect

1   Q.  Do you think that when you reviewed this sentence, you

2   thought it was false?

3   A.  I thought it was what?

4   Q.  Do you think that when you reviewed this sentence, you

5   thought it was false at the time?

6   A.  Oh, okay.  No, I didn't think it was false.

7   Q.  Would it be your practice to raise a question or change a

8   sentence that you thought at the time was false?

9   A.  To raise a question if I thought it was false, yeah.

10  Q.  Now, in your declaration you testified that you received

11  input from various people about the content of this letter?

12  A.  Yes.

13  Q.  I just read this a minute ago, but the people who

14  contributed to the letter included Mr. Thomson, Mr. Bahler, the

15  general counsel, and outside counsel.  Is that right?

16  A.  Right.

17  Q.  Mr. Bahler is the general counsel, isn't he?

18  A.  Yes.

19  Q.  And what was your understanding as to what they were doing

20  when they were reviewing this letter?

21  A.  Well, they would come back with comments that they had.

22  Q.  Was it your expectation that they would similarly raise

23  questions about any sentences in the letter that they thought

24  were false?

25  A.  Yes.

F7MJOSB5                          Peck - redirect

1    Q.  I think you have Defendant's Exhibit 19 attached to your

2    declaration.  That would be PX 167.

3              MR. RUMELD:  Mr. Clark doesn't think you have it, your

4    Honor.  You should have it attached.  (Pause)  I'll give the

5    witness another copy because I can get it easier for her.

6              (Off-the-record discussion)

7    BY MR. RUMELD:

8    Q.  Now, you testified earlier that Mr. Bahler and outside

9    counsel were often in the loop on these types of

10   communications?

11   A.  Yes.

12   Q.  And from looking at the fax cover sheet, you see that this

13   was sent by Mr. Bahler to Andrea Rattner to review?

14             MR. GOTTESDIENER:  Objection, your Honor.

15             THE COURT:  Hold on a second.  Overruled.  You may

16   answer.

17   A.  Yes, I see that.

18             THE COURT:  You need to lay a foundation with this

19   witness for this document, don't you?

20   BY MR. RUMELD:

21   Q.  What was your understanding of the process pursuant to

22   which outside counsel was consulted on plan communications?

23             MR. GOTTESDIENER:  Objection.

24             THE COURT:  Overruled.

25   A.  I know any time there was something going out to all

F7MJOSB5                           Peck - redirect

1   associates that committed the company to something, that our

2   internal legal department would discuss it with outside

3   counsel.

4   BY MR. RUMELD:

5   Q.  So the communication with outside counsel was conducted by

6   the company's lawyers, not by you directly?

7   A.  Correct.

8   Q.  Did you ever speak to outside counsel directly about

9   communications like these?

10  A.  Ever?  Probably I did in 37 years, yes.

11  Q.  I apologize.  That question was too open-ended.

12          Was the general process to have Mr. Bahler or somebody

13  on his team speak to outside counsel?

14  A.  Yes.

15  Q.  So you don't see anything unusual here that Mr. Bahler

16  would be communicating with Ms. Rattner about this?

17  A.  Oh, no, no.

18  Q.  You do know who Ms. Rattner is?

19  A.  Pardon me?

20  Q.  You you do know who Ms. Rattner is?

21  A.  Oh, sure.

22  Q.  You say oh, sure?

23  A.  Yes, yes.

24  Q.  Why are you so familiar with her?

25          MR. GOTTESDIENER:  Objection.

F7MJOSB5                          Peck - redirect

1              THE COURT:  Overruled.

2   A.  Because we've worked with her now for years, so I know who

3   she is.  As I said earlier, I believe that she is a partner, if

4   that is the title, in the law firm.

5   BY MR. RUMELD:

6   Q.  She was the one who attended that meeting back in February?

7   A.  Yes.

8   Q.  So she was at the meeting that you were at when you got

9   your first explanation of wear-away?

10  A.  Yes.

11             MR. GOTTESDIENER:  Just for the record, if he is

12  holding onto this document, I submit there was never any

13  foundation laid for that testimony.  We object.

14             THE COURT:  The application is denied.

15  BY MR. RUMELD:

16  Q.  Could you look for Defendant's Exhibit 27 attached to your

17  declaration.

18  A.  Yes.

19             MR. RUMELD:  Your Honor, I have another copy for you.

20             THE COURT:  I know I have this one.

21             MR. HUANG:  PX-29, your Honor.

22             THE COURT:  29?  Thank you.

23  BY MR. RUMELD:

24  Q.  Do you have it in front of you, Ms. Peck?

25  A.  Yes, I do.

F7MJOSB5                        Peck - redirect

1  Q.  Now, you see here's a fax cover sheet from Mr. Kiley to Mr.

2  Grefig.  Do you see that?

3  A.  Yes, I do.

4  Q.  Mr. Kiley is soliciting Mr. Grefig's comments on this

5  November memo?

6          MR. GOTTESDIENER:  Objection.

7  A.  Yes.

8          THE COURT:  To the extent she is simply reading off

9  the document, I will allow it.  Why don't you either lay a

10 foundation for this witness for this particular document or

11 talk about general practices or something else.

12         MR. RUMELD:  Right.  Okay.  Thank you, your Honor.

13 BY MR. RUMELD:

14 Q.  You did testify in your declaration that your understanding

15 was that Mr. Grefig or someone from Mercer was also asked to

16 review the plan communications?

17 A.  Yes.

18 Q.  And this was true not withstanding the fact that Foot

19 Locker did not hire Mercer's communications services?

20 A.  That's correct.

21 Q.  Do you think there was anybody who was more knowledgeable

22 than Mr. Grefig about the expected period of wear-away at this

23 time period?

24 A.  I wouldn't know.

25 Q.  He was certainly more knowledgeable than you would be?

1            MR. GOTTESDIENER:  Objection.

2    A.  Yes.

3            THE COURT:  Overruled.  In terms of your

4    understanding?

5            THE WITNESS:  Yes, he is an actuary.

6    BY MR. RUMELD:

7    Q.  What was the purpose of sending these communications to Mr.

8    Grefig?

9            MR. GOTTESDIENER:  Objection.

10           THE COURT:  Why don't we talk about it apart from this

11   document which is DX-27 or PX-19, whatever it is -- 29, and

12   just talk generally.

13   BY MR. RUMELD:

14   Q.  Why was Mr. Grefig sending plan communications to you?

15   A.  Because he has been part of this, you know, adviser to the

16   task force all along, so Tom was just saying this is what we

17   are planning on sending out, would you take a look at it and

18   tell me if you have any comments.

19   Q.  If Mr. Grefig found any sentences in the communication that

20   he thought to be false, would you expect him to raise that with

21   you or with Tom?

22           MR. GOTTESDIENER:  Objection.

23   A.  Yes.

24           THE COURT:  Overruled.  Has there ever been any

25   instances when you received comments back from Mr. Grefig

F7MJOSB5                              Peck - redirect

1   directly relating to employee communications, whether in

2   connection with the efforts for the amended plan or something

3   else?

4             THE WITNESS:  I didn't receive them personally, but I

5   would think that Tom did.

6             THE COURT:  All right.  Do you know whether or not Mr.

7   Grefig had a practice, putting aside your expectation, but had

8   a practice of raising with Mr. Kiley matters which he viewed as

9   wrong?  Or is it just your reasonable expectation that he

10  would?

11            THE WITNESS:  That is definitely my reasonable

12  expectation.

13            THE COURT:  You don't really know what Mr. Grefig's

14  practices were with respect to conveying comments and what he

15  would convey and wouldn't convey?

16            THE WITNESS:  Right.  Yes, that's correct.

17            THE COURT:  Thank you.

18  BY MR. RUMELD:

19  Q.  Could you just turn to the last two pages of that exhibit.

20            Do you see there are handwritten notations there.  Do

21  you have that on your copy?  Do you see on 2266 and 2267, do

22  you see that?

23  A.  Yes, I see it.

24  Q.  Do you know whose notations those are?

25  A.  Tom's.

F7MJOSB5                              Peck - redirect

1  Q.  Do you know, are you able to tell whether these are his

2  corrections or corrections that he took down for Mr. Grefig?

3  A.  No, I wouldn't know.

4  Q.  Do you know whether Tom had a practice of soliciting

5  comments on the telephone and taking them down?

6  A.  From whom?

7  Q.  Did Tom have a practice of soliciting comments on the

8  telephone and then writing those comments down?

9  A.  Oh --

10         THE COURT:  Again don't speculate.  If you can recall

11 even generally, then we'll take your best recollection.  I

12 don't want you speculating.

13         THE WITNESS:  Right.  I don't know if he would.  I

14 mean I don't know that it would be regular.  It would have to

15 be an exceptional circumstance for John to call rather than --

16         MR. HUANG:  If I may clarify, DX 27 has two PX

17 numbers.  It is PX-29, and the part on the screen right now is

18 PX-614.

19         THE COURT:  614?  Thank you.

20         MR. RUMELD:  That memo appears twice in ours.

21 BY MR. RUMELD:

22 Q.  Now, Ms. Peck, you were also shown a copy of the estimated

23 pension statement that went out shortly after the cash balance

24 conversion.  Do you remember that?

25 A.  Yes.

F7MJOSB5                           Peck - redirect

1   Q.  Who worked on that statement?

2   A.  Tom and Carol, to my knowledge, with Jim.

3   Q.  Do you know if Marion worked on the statement?

4   A.  I don't know that for sure.

5   Q.  When these employees worked on benefit statements, did they

6   report back to you if they had any comments or changes?

7   A.  Yes.

8   Q.  Would you expect them to point out to you anything in the

9   statement that they found to be false?

10  A.  Yes.

11  Q.  Do you remember them ever calling to your attention

12  anything in the statements that they found to be false?

13  A.  No.

14  Q.  You do remember that when Mr. Gottesdiener was questioning

15  you, you testified that one of his sentences in the statement

16  was false with respect to anyone in the Southern Railway?

17  A.  Yes, all right.

18  Q.  Do you remember thinking about that sentence back in the

19  1990's, that it was false?

20  A.  I don't remember that then, no.

21  Q.  So when you say you knew it was false, what did you mean by

22  that?

23              MR. GOTTESDIENER:  Objection.

24              THE COURT:  Overruled.

25              THE WITNESS:  Can we go back and look at the sentence?

F7MJOSB5                              Peck - redirect

1          MR. RUMELD:  Sure.  So I am going to show you

2    Defendant's Exhibit 310.

3          THE WITNESS:  Thank you.

4          MR. HUANG:  PX-43.

5    BY MR. RUMELD:

6    Q.  If you look at the right side of the statement, okay,

7    towards the top, it first says your estimated account balance

8    as of January 1st, 1998.  Do you see that?

9    A.  As of '96.

10   Q.  I am sorry, 1996.  Right.  My eyesight is failing.

11         Underneath there it says, "The amount shown above is

12   what you could expect to receive upon termination of employment

13   or retirement if you accrue no further benefits and elect a

14   lump sum form of payment."

15         Do you see that?

16   A.  I see that.

17   Q.  Would you agree that -- you testified, you testified

18   earlier you found that statement to be false --

19         MR. GOTTESDIENER:  Objection.

20   Q.  -- with respect to anyone who was in --

21         MR. GOTTESDIENER:  Objection.

22         THE COURT:  I will allow it.  The answer was

23   previously given.  What it is is in the record.  In order to

24   make the connection, I will allow counsel to pose the question

25   in the manner that he has.  You may answer.

F7MJOSB5                          Peck - redirect

1   A.  Okay.  I am just reading it again.  I don't know that it

2   was false, actually, as I reread it now because unless someone

3   was not in wear-away, most likely it wasn't going to change.

4   BY MR. RUMELD:

5   Q.  Do you have any memory of thinking about this sentence in

6   1995 or 1996 and thinking that the sentence was false?

7   A.  I do not recall that, no.

8   Q.  Since the time this lawsuit started, you spent a lot of

9   time thinking about these issues.  Is that right?

10  A.  I have.

11  Q.  Do you feel you have the ability to separate what you're

12  thinking about now about these sentences from what you were

13  thinking about 20 years ago?

14  A.  They sort of run together sometimes.  I try to separate

15  them, but it is hard.

16  Q.  Now, back in 1995 and 1996, there were a lot of employees

17  leaving the company.  Is that right?

18  A.  That's correct.

19  Q.  Anyone leaving, a person leaving the company in 1996 was

20  likely to have experienced wear-away.  Is that right?

21  A.  Yes.

22  Q.  Did you think an employee whose employment terminated in

23  1996 was better or worse off as a result of the plan

24  amendments?

25          MR. GOTTESDIENER:  Objection.

F7MJOSB5                          Peck - redirect

1              THE COURT:  Overruled.

2    A.  Better.

3    BY MR. RUMELD:

4    Q.  Why was that?

5    A.  Because they were going to get the value of the, the

6    accrued value from 12-31-95 as a lump sum.

7    Q.  Did you feel that way notwithstanding the fact that those

8    employees would have no new accruals under the new plan?

9    A.  They were leaving the company, so yes.

10   Q.  Now, an employee reading a statement like the one in front

11   of you --

12   A.  Ah-huh.

13   Q.  -- if he or she did not understand wear-away, what

14   information would he be lacking?

15              MR. GOTTESDIENER:  Objection.

16              THE COURT:  Sustained.  Ask a different question.

17   BY MR. RUMELD:

18   Q.  Well, in your mind, Ms. Peck --

19   A.  Yes.

20   Q.  -- you've testified that you didn't expect that

21   participants would readily understand wear-away?

22              MR. GOTTESDIENER:  Objection.

23              THE COURT:  Again the testimony answered previously

24   given will stand in the record as it stands.  To make the

25   connection, I will allow counsel to ask the question this way.

F7MJOSB5                          Peck - redirect

1    You may answer.

2    A.  Okay, yes.

3    BY MR. RUMELD:

4    Q.  You understood it to be a difficult concept?

5    A.  Yes.

6    Q.  And participants were not readily going to understand it?

7    A.  Right.

8              MR. GOTTESDIENER:  Objection.

9              THE COURT:  Overruled.

10   BY MR. RUMELD:

11   Q.  In your mind, if a participant received the benefit

12   statement that said this is the amount you could expect to

13   receive when you leave --

14   A.  Ah-huh.

15   Q.  -- and the participant was not aware about the minimum lump

16   sum --

17   A.  Right.

18   Q.  -- in your mind, what was the consequence of the

19   participant not being aware of the minimum lump sum?

20   A.  There was no consequence.  It was a good thing because they

21   got more money than they expected they would get and they got

22   it immediately.

23   Q.  So back in 1995 and 1996, did you believe that there was

24   any harm being inflicted on participants if they did not

25   understand about the minimum lump sum?

F7MJOSB5                          Peck - redirect

1              MR. GOTTESDIENER:  Objection.

2              THE COURT:  Overruled.

3   A.  No, because they got more money than they expected they

4   were going to get.

5   BY MR. RUMELD:

6   Q.  You testified this morning that the summary plan

7   description was irrelevant for any employees who were still in

8   wear-away.  Do you remember that testimony?

9   A.  Yes.

10  Q.  Did the SPD inform participants about their lump sum

11  option?

12  A.  Yes, I believe it does.

13  Q.  If a participant only had the prior SPD from the old plan,

14  would he or she be aware of the lump sum option?

15  A.  No.

16  Q.  Because there was no lump sum option --

17  A.  There was no lump sum option.

18  Q.  -- in the old SPD?

19  A.  Right.

20  Q.  A participant in wear-away would get his benefit based on

21  the pre-'96 accrual, but he could get it in the form of a lump

22  sum.  Is that correct?

23  A.  Right.

24             MR. GOTTESDIENER:  Objection.

25             THE COURT:  Overruled.

F7MJOSB5                         Peck - redirect

1  BY MR. RUMELD:

2  Q.  Would you agree with me that the SPD was relevant at least

3  for the purposes of explaining the lump sum option?

4           MR. GOTTESDIENER:  Objection.

5           THE COURT:  Overruled.

6  A.  Yes.

7  BY MR. RUMELD:

8  Q.  Who was principally responsible for preparing the summary

9  plan description?

10  A.  Tom and Carol, with Jim.

11  Q.  Do you know if the general counsel or outside counsel had a

12  role with respect to the summary plan description?

13  A.  Oh, yes, of course they would have it.

14           It would have come to me, and then we would also send

15  it to Gary and Rina would have looked at it and the tax,

16  Jeremy, the tax guy, would have looked at it.  Anybody who had

17  any professional knowledge that was addressed in there would be

18  included, in our view.

19  Q.  Why do you say, "of course"?

20  A.  Sorry.  Take it out.

21  Q.  Why are you so certain that counsel needs to be involved

22  when it comes to the summary plan description?

23  A.  Because we thought of it as a legal document, and so we

24  would have been very careful about what we put in it and made

25  sure that we covered everything that we were supposed to.

F7MJOSB5                         Peck - redirect

1   Q.  Would you say you also made sure that the summary plan

2   description did not contain any statements that you believed to

3   be false at the time?

4   A.  Yes.

5            MR. RUMELD:  May I just have a moment, your Honor?

6            THE COURT:  Yes.

7            (Off-the-record discussion)

8   BY MR. RUMELD:

9   Q.  You testified earlier about the responsibilities of th

10  ehuman resources people in Wisconsin?

11  A.  Yes.

12  Q.  Did there come a time when there was a change in the

13  delegation of the administrative responsibilities?

14           THE COURT:  You mean for pension plan communications

15  to participants?

16           MR. RUMELD:  I was trying to keep it open-ended.

17           THE COURT:  It may be so open-ended that it is a

18  little tough.

19  BY MR. RUMELD:

20  Q.  Do you remember whether there was a time when some of these

21  responsibilities were outsourced?

22  A.  Outsourced the actual writing of the document or printing?

23  Q.  What about calculating the benefits?

24  A.  They were doing it in the office.

25  Q.  Did there come a point in time when Mercer took over those

F7MJOSB5                          Peck - redirect

1    responsibilities?

2    A.   Actually, Mercer still does the calculations today.

3    Q.   Were those responsibilities taken over from people in

4    Wisconsin?

5    A.   Yes.

6    Q.   Do you know when that occurred?

7    A.   No, not offhand.

8    Q.   Do you know whether it occurred a long time ago?

9    A.   Yeah, it has been a while, but I don't know exactly when we

10   signed the contract with Mercer, I don't.

11   Q.   Do you know specifically what responsibilities Mercer took

12   over?

13   A.   Well, right now if someone wants to retire, they call

14   Mercer's call center, and Mercer sent out the retirement papers

15   with all that's required, and then they estimate the benefits.

16   Then the employee fills everything out in order to commence

17   their retirement.

18   Q.   If an employee calls up for an estimate, does he get that

19   information from Mercer now?

20   A.   Yes.

21   Q.   You said that Mercer handles a call center?

22   A.   Yes.

23   Q.   Is that in place of the call center that used to be handled

24   out of Wisconsin?

25   A.   That call center is still there, but now they do other

F7MJOSB5                          Peck - redirect

1   things so, yes, it did replace what was being done in

2   Milwaukee.

3   Q.  It replaced what was being done in Milwaukee for pension

4   issues?

5   A.  Correct.

6   Q.  I apologize for asking this, Ms. Peck, but could you just

7   tell the court about your health circumstances.

8   A.  My health?

9   Q.  Yes.

10  A.  In November of 2013, I was diagnosed with lung cancer.

11  Since that time I've had 53 radiation treatments to my brain,

12  my femur, adrenal gland and the lung.  I get chemo once every

13  three weeks.

14  Q.  Do you feel that those experiences have had an impact on

15  your ability to remember things?

16  A.  Yes, they definitely have.  There is a big article in the

17  Wall Street Journal a couple of weeks ago about what the

18  radiation does to your brain because that's where most of the

19  radiation treatments were to my brain, whole brain and it is

20  called whole brain radiation.  That is the downside of whole

21  brain radiation, is that it affects your cognitive abilities.

22          MR. RUMELD:  Nothing further.  Thank you.

23          THE COURT:  You're done, Ms. Peck.  You may step down.

24  You're excused.

25          (Witness excused)

F7MJOSB5                          Peck - redirect

1              THE COURT:  Mr. Gottesdiener, would you like to call

2      your next witness.

3              MR. GOTTESDIENER:  Yes, your Honor.

4      MICHAEL T. STEVEN,

5           called as a witness by the Plaintiff,

6           having been duly sworn, testified as follows:

7              THE COURT:  Mr. Steven, please be seated as you are.

8              You might want to adjust your chair and pull it up

9      right there to the microphone and it will be very important

10     that you speak clearly into the microphone.  Thank you.  All

11     right.  Mr. Gottesdiener, you may proceed, sir.  Do you have

12     his declaration?

13             MR. GOTTESDIENER:  Yes, your Honor.

14             THE COURT:  Mr. Steven, we are going to start by

15     having you look at that declaration that has been placed before

16     you and confirm that that is, in fact, your declaration that

17     you intend as your direct trial testimony in this matter?

18             THE WITNESS:  I do.

19             THE COURT:  Do you swear to the truth of the contents

20     of that declaration?

21             THE WITNESS:  Yes.

22             THE COURT:  The court does accept the witness's

23     declaration as his direct trial testimony, and he is turned

24     over for cross-examination.  Mr. Rumeld, it is now your turn.

25             (Continued on next page)

F7mnosb6                          Steven - cross

1    CROSS EXAMINATION

2    BY MR. RUMELD:

3    Q.  Good afternoon, Mr. Steven.

4            You enjoyed working for Woolworth, am I right?

5    A.  Yes, very much.

6    Q.  In fact, you testified that your experience with Woolworth

7    was wonderful?

8    A.  Exactly.

9    Q.  You also state in your declaration that the company was not

10   months away from bankruptcy as we have alleged?

11   A.  Yes.

12   Q.  And you don't have any recollection, do you, about what the

13   company's stock was doing back in 1995 or 1996, do you?

14   A.  It had taken a plunge certainly.  I don't have an exact

15   recollection, but it did go down.  I think at one point it was

16   up in the 60s, and then down into the teens.

17   Q.  You would agree that the Woolworth division was in a loss

18   position, correct?

19   A.  Yes.

20   Q.  In fact, that division ultimately closed?

21   A.  Yes.

22   Q.  You also agree that you were part of an initiative to save

23   a significant amount of money for the company?

24   A.  My department, which was the financial planning and

25   analysis group, was charged with monitoring the challenge that

F7mnosb6                          Steven - cross

1    Roger Farah had given to enact a $100 million cost savings.

2    Q.  You retired from the company in 1997, correct?

3    A.  Yes.

4    Q.  Your decision to retire was not impacted by your

5    understanding of your retirement benefits, correct?

6    A.  My decision to retire, I had planned to do 15 years of

7    service.  My wife and I had both.  I wanted to retire early,

8    and on May 1 it was 15 years.

9    Q.  When you retired you took a lump sum, correct?

10   A.  Yes.

11   Q.  You took your benefit in the form of a lump sum because you

12   thought you could do better on your own, correct?

13   A.  Exactly.

14   Q.  In fact, you did very well?

15   A.  Yes.

16   Q.  Before the plan conversion you would not have been able to

17   take your benefits in the form of a lump sum, correct?

18   A.  Yes.

19   Q.  So, if you had actually reached your 15 years two years

20   earlier, you would not have had that opportunity to take a lump

21   sum?

22   A.  Right.  I would have had to have taken an annuity.

23   Q.  You understood that after the plan amendment you were going

24   to have a starting account balance, correct?

25   A.  Yes.

1   Q.  In your declaration you say that you thought your old

2   benefit was being deposited into your cash balance account?

3   A.  Yes.

4   Q.  You are an MBA and a CPA, correct?

5   A.  Yes, retired.

6   Q.  So you knew that you can't simply deposit an annuity

7   benefit into a cash balance account, right?

8   A.  I have lost your question.

9   Q.  You can't just --

10  A.  This was an account balance that they had.

11  Q.  Right.

12  A.  Which was a cash account balance I assume.

13  Q.  So you understood that there had to be some conversion

14  process --

15  A.  Yes.

16  Q.  -- to convert the annuity into cash, as you say?

17  A.  Yes.

18  Q.  That conversion was an actuarial conversion?  You

19  understood that?

20  A.  Yes.

21  Q.  Shortly after the conversion you were aware that your

22  initial account balance was about $140,000, right?

23  A.  Yes.

24  Q.  Could you take a look at Exhibit 329 attached to your

25  declaration.

F7mnosb6                          Steven - cross

1    A.  I don't see 329 attached.

2    Q.  It is hopefully the second from the last.

3    A.  I have the declaration, but --

4    Q.  You don't have the exhibits?

5            MR. GOTTESDIENER:  Yes, he does.

6            THE COURT:  Why doesn't somebody show him where they

7    are so he is --

8            THE WITNESS:  Maybe it's under this one.  Hold on.

9            PX 329.  Thank you.

10   BY MR. RUMELD:

11   Q.  It's the memo dated January 19, 1996?

12   A.  Yes.

13   Q.  This is a communication that you received in response to a

14   request for a benefit estimate, is that right?

15   A.  Yes.  Roger and Dale had put out a notice about the new

16   plan and conversion, and I was interested in finding out what

17   my wealth was worth.

18   Q.  Right.  You, in fact, made this request even before the

19   effective date of the new plan?

20   A.  Yes.

21   Q.  You directed that request to Mr. Kiley, Tom Kiley?

22   A.  Yes.

23   Q.  Because you knew him?

24   A.  Yes, I knew him.

25   Q.  According to this memo, if we assumed a termination date of

F7mnosb6                        Steven - cross

1    June 1, 1996, your estimated lump sum would be about $217,000,

2    is that right?

3    A.   That's what it says.

4    Q.   You saw that back at the time when you got this letter?

5    A.   Yes.

6    Q.   At the time, even though your account balance isn't listed

7    here, you were aware that this estimated lump sum was

8    significantly larger than your initial account balance, is that

9    right?

10   A.   Not having seen the account balance, I wasn't totally sure,

11   but I assumed it was.

12   Q.   I think you told you also a few minutes ago that you knew

13   your initial account balance was --

14   A.   That came out later than this.

15   Q.   OK.  So when it came out, you saw that --

16   A.   Yes, then I saw.  But I didn't see it up to this point.

17   Q.   OK.  And your initial account balance came back early in

18   1996, is that right?

19   A.   Yes, sir.

20   Q.   Is it fair to say that you were pleasantly surprised at the

21   time to see that your lump sum was much bigger than your

22   account balance?

23   A.   Yes.

24   Q.   You claim that you didn't understand why it was bigger, why

25   the --

F7mnosb6                          Steven - cross

1  A.  Well, I think.

2  Q.  -- the lump sum was bigger?

3  A.  -- what I interpreted it, if you did see that final

4  statement, which is a litany of items, that it was actuarily

5  done, it was done according to legal requirements from the IRS

6  and from long-term bond rates, and it was done by our company

7  in a fiduciary capacity.

8  Q.  Let's just stay on this letter first.  When you got this

9  letter or this memo, you didn't ask any questions, did you,

10  about why the lump sum was bigger than your account balance?

11  A.  No.  To the best of my knowledge.

12  Q.  Then later in 1996 you made a second request for a benefit

13  estimate?

14  A.  Yes.

15  Q.  This time you requested an estimate as of May of 1997, is

16  that right?

17  A.  Yes.

18  Q.  Because that is when you were planning to leave?

19  A.  Yes.

20  Q.  In response to that, you received plaintiff's Exhibit 330,

21  is that right?

22  A.  Say that again.

23  Q.  In response to your request -- you again requested this

24  from Mr. Kiley?

25  A.  Yes.

F7mnosb6                          Steven – cross

1   Q.  In response to the second request for an estimate, you

2   received the memo and the attachments that appear in Exhibit

3   330?

4   A.  Yes.

5   Q.  Now, if you look first at the cover memo, the second

6   paragraph says, Initial cash balances were based upon the 1983

7   group annuity table of mortality and an interest rate of 9

8   percent.

9         Do you see that?

10  A.  Yes.

11  Q.  You understood what a table of mortality was at the time,

12  right?

13  A.  Yes.

14  Q.  You thought that it was appropriate to use such a table in

15  calculating the initial account balance?

16  A.  From an actuarial point of view, yes.

17  Q.  Now, the next sentence says, For --

18  A.  Can I make one comment.  You say the 9 percent.

19         MR. RUMELD:  Move to strike, your Honor.

20         THE COURT:  Well, your lawyer will have an opportunity

21  to come back and bring out some additional materials.

22         You may proceed.

23  BY MR. RUMELD:

24  Q.  The second sentence says, For 1996, minimum sums are based

25  upon a table of mortality as specified under federal law (GATT)

F7mnosb6                              Steven - cross

1    and the interest rate for 30-year treasury bills in effect on

2    January 1, 1996, which was 6.06 percent.

3              Do you see that?

4    A.  Yes.

5    Q.  You understood at the time what the reference to the

6    30-year treasury rate was, is that right?

7    A.  Certainly.

8    Q.  The letter also says that this GATT rate will change for

9    terminations in 1997.

10             Do you see that?

11   A.  Yes.

12   Q.  You understood why that was so?

13   A.  Yes.

14   Q.  Because the treasury rate moves up and down all the time?

15   A.  Yes.

16   Q.  The letter says that for that same reason Mr. Kiley would

17   not be giving you an estimate of your minimum lump sum as of

18   May 1, 1997?

19   A.  Yes.

20   Q.  That is something that you read and understood at the time,

21   correct?

22   A.  Yes.

23   Q.  But he did provide you with the minimum lump sum as of the

24   end of 1996, am I correct?

25   A.  Yes.

1   Q.  So if you could turn to the second page.

2           Do you have that in front of you?

3   A.  Yes, I do.

4   Q.  Under your name and next to your date of birth it says,

5   annual accrued benefit as of 12/31/95.

6           Do you see that?

7   A.  Yes.

8   Q.  $32,006.66.  Do you see that?

9   A.  Yes.

10  Q.  You understood that that was the annuity benefit that you

11  were entitled to under the old plan?

12  A.  I assumed that, yes.

13  Q.  You also understood that that number was fixed?

14  A.  That it was actuarially summarized.

15  Q.  Under the old plan you were entitled to an annuity benefit,

16  correct?

17  A.  Yes.

18  Q.  And that was it, right?

19  A.  Yes.

20  Q.  In the next four lines you start with that $32,000.  It's

21  multiplied a factor, and then you arrive at an initial account

22  balance of $140,667.67.

23          Do you see that?

24  A.  It is discounted by a factor of 9 percent.

25  Q.  You understood that the $140,000 was your initial account

F7mnosb6                          Steven - cross

1    balance?

2    A.  I understood it from this calculation.  I didn't understand

3    that it was a discounted because they didn't use the term

4    discounted.

5    Q.  You understood that it was derived from your pre-'96

6    benefit?

7    A.  Yes.

8    Q.  You also understood that the interest rate that was used to

9    discount it, using your word, was 9 percent because it says

10   that right there, right?

11   A.  It doesn't say discounted.

12   Q.  Right.  But it did say 9 percent?

13   A.  Which is an interest factor.

14   Q.  Excuse me?

15   A.  It is an interest factor --

16   Q.  Right.  It is an interest factor.

17   A.  -- where you earn money --

18   Q.  It was arrived at --

19           THE COURT:  You do have to let him finish.

20           MR. RUMELD:  My apologies.

21           THE COURT:  Go ahead.  It was an interest factor.

22   A.  When you say 9 percent, you think of it as growing, not

23   discounting.

24   Q.  If we continue, it shows you $140,000 starting balance --

25   just one second.

1           You proceed from your $140,000 initial account balance

2     and then interest is added at 6 percent.

3           Do you see that?

4     A.  Uh-huh.

5     Q.  And then there are compensation credits totaling $5,127.

6           Do you see that?

7     A.  Uh-huh.

8     Q.  Is this all consistent with your understanding of how the

9     cash balance formula worked?

10    A.  You mean the -- for increased higher salaries you are

11    talking about?

12    Q.  You received --

13    A.  Yes.

14    Q.  -- interest credits and compensation credits.

15    A.  Yes.  I wasn't too keyed on the compensation credit, but

16    interest credits are very easy to understand.

17    Q.  But from reading this you understood that as a result of

18    adding those credits you were up to $154,234.73 as of the end

19    of 1996?

20    A.  Uh-huh.

21    Q.  So that is your account balance at the end of 1996, agreed?

22    A.  Yes.

23    Q.  Then the next section calculates your minimum lump sum as

24    of December 31, 1996, correct?

25    A.  Uh-huh.

F7mnosb6                          Steven – cross

Q.  And it takes that same $32,000 figure from the top, your

annual accrued benefit as of 12/31/95.

          Do you see that?

A.  Uh-huh.

Q.  And it applies the 6.06 percent GATT rate that's referred

to on the first page of the letter.

          Do you see that?

A.  Yes.

Q.  And that's how they arrive at the $224,000 minimum lump sum

as of 12/31/96?

A.  Uh-huh.

Q.  So, in other words, the minimum lump sum was calculated by

taking the present value of the pre-'96 annuity, using the

30-year treasury rate as the basis for performing that present

value calculation.  Would you agree?

A.  Yes.

Q.  You understood at the time that, depending on interest rate

fluctuations, that minimum lump sum, even though it's based on

a fixed number, that annuity, it could be higher, it could be

lower?

A.  Yes.  I probably actually felt more comfortable with it

later on.  I'm not sure I paid as much attention back then.

Q.  You also state in your declaration that you thought that

your benefit under the new plan was growing by at least as much

as your account balance?

F7mnosb6                         Steven - cross

1                  Do you remember making that statement?

2   A.  Yes.

3   Q.  So if you look back and compare Exhibit 329 with 330, 329

4   the lump sum estimate you received was $217,000, do you see

5   that?

6   A.  Was potential, yes.

7   Q.  And the minimum lump sum as of 12/31/96?

8   A.  $224,000.

9   Q.  Correct.

10  A.  So it was a nice increase.

11  Q.  $7,000 bigger?

12          MR. GOTTESDIENER:  Objection, your Honor.  I am not

13  sure --

14          THE COURT:  You will be able to go back over it.

15          MR. GOTTESDIENER:  I'm sorry, your Honor.  He's

16  showing, at least the visual guy here is showing the second

17  page of that document.  That is not --

18          THE COURT:  Do you have the whole document in front of

19  you?

20          THE WITNESS:  I have this document here.

21          THE COURT:  All right.

22          So is that 329 on the front?

23          THE WITNESS:  Yes, ma'am -- no, 330.

24          THE COURT:  Do you have 329?

25          Why doesn't somebody hand him 329.

F7mnosb6                         Steven - cross

 1              THE WITNESS:  I have 329.

 2              THE COURT:  You do?

 3              THE WITNESS:  I do, yes.

 4              THE COURT:  If he's misinterpreting it or there is

 5       another part that you want to lead him to, you will be able to

 6       do it on redirect.

 7              MR. GOTTESDIENER:  That's not it.  He's being shown,

 8       or he was shown a document that this gentleman never received.

 9       It was a highly internal --

10              THE COURT:  I thought it was 329.  I thought we were

11       dealing with -- hold on.  Let's level set.  I thought we were

12       dealing with two documents, 330 and 329.

13              Is that what we are dealing with, Mr. Rumeld.

14              MR. GOTTESDIENER:  On the second page of 329 that was

15       produced out of Woolworth's files, the gentleman for the

16       defense running that was showing the second page --

17              THE COURT:  Take out the second page.

18              Is the second page something that was included?

19              MR. CLARK:  It looks like it was.

20              MR. RUMELD:  I was referring to the 217,000 on the

21       first page.

22              THE COURT:  That's how I understood it as well and the

23       delta between the 217 and the 224.

24              Why don't you go back over that question, Mr. Rumeld,

25       and we'll take it from there.  I don't think there is any

 1  confusion.  If there is, the record will speak for itself.

 2           MR. GOTTESDIENER:  The issue, was simply, your

 3  Honor --

 4           THE COURT:  I understand.  I just want to move on.

 5           Go ahead.

 6           MR. RUMELD:  Hold on one second.

 7           I will move on.  I don't want the witness to be

 8  confused.

 9  BY THE COURT:

10  Q.  You see, if you go back to 330, the second exhibit --

11  A.  Uh-huh.

12  Q.  -- you take this forward, you see that your estimated

13  account balance as of May 1, 1997, is arrived at there?

14  A.  Yes.

15  Q.  And again, it takes the $154,000, it adds the pay and the

16  interest credits, and you have an estimated account balance as

17  of May 1, 1997 of $159,000.

18           Do you see that?

19  A.  Right.

20  Q.  You also see that as of the end of '96 your minimum lump

21  sum is 224,000?

22  A.  Yes.

23  Q.  So you can see from this page that, at least as of the end

24  of 1996, your minimum lump sum was considerably higher than

25  your account balance even as estimated through the end of May?

F7mnosb6                          Steven - redirect

1   A.  Right.

2   Q.  So would you agree that unless there was a substantial

3   change in the interest rates, your minimum lump sum was going

4   to be higher than your account balance at the end of May?

5   A.  I guess I also interpreted what they said in the letter,

6   which was this is what was required by the IRS and also by

7   GATT, so I assumed that this was a legal requirement to do

8   this.

9   Q.  My question, sir, is whether you could see from reviewing

10  this letter that your minimum lump sum was going to be higher

11  than your account balance?

12  A.  Yes.

13  Q.  You understood at the time that as long as your minimum

14  lump sum remained larger than your account balance the credits

15  referred to on this page that were added to your account

16  balance didn't matter, isn't that right?

17  A.  Yes.

18          MR. RUMELD:  I have nothing further.

19          THE COURT:  Thank you.

20          Mr. Gottesdiener, anything from you?

21  REDIRECT EXAMINATION

22  BY MR. GOTTESDIENER:

23  Q.  The credits didn't matter.  What did you believe your

24  benefit was under the plan?

25  A.  My benefits was my years of service, and my salary and also

F7mnosb6                          Steven - redirect

1    additional compensation for my salary level.

2    Q.  And when the plan changed, you explained you read, received

3    the material about the plan.  Prior to the change it was an

4    annuity form of benefit, and then after you believed your

5    benefit was an account, is that correct?

6    A.  Yes.

7    Q.  What I'm not understanding is the contention that you were

8    told by Mr. Kiley that there is a federal requirement and that

9    under some circumstances you might get more than your account,

10   is that right?

11   A.  Yes.

12   Q.  Did that tell you that your benefit had been frozen?

13   A.  No, not at all.

14   Q.  Did you have any idea that your benefit had been frozen?

15   A.  Absolutely not.

16   Q.  You are a CPA, right, or were a CPA?

17   A.  Yes.

18   Q.  Had you ever done actuarial calculations before?

19   A.  No, I hadn't.

20   Q.  Did you have an understanding of what an actuarial

21   conversion really was?

22   A.  Just that it had to be according to some standards, just

23   like a CPA would have to perform some services.

24   Q.  Did you think that there was one way or more than one way

25   of doing an actuarial conversion?

F7mnosb6                          Steven - redirect

```
 1    A.  No.
 2    Q.  Either one way or more than one way?
 3    A.  Only one way.  I mean, it's one standard.
 4    Q.  So you thought there was only one way of doing things in an
 5    actuarial conversion, is that correct?
 6    A.  Yes.
 7    Q.  And you now know differently, is that fair?
 8    A.  Yes.
 9    Q.  Would you be here today if you had any suspicion back then
10    that your benefit was frozen?  Would you be testifying here
11    today on behalf of the class?
12    A.  I'm testifying here because I think there was a way in
13    which they were hiding some important factors about freezing
14    your account balances.
15    Q.  You were asked by Mr. Rumeld about a comment that you were
16    pleasantly surprised when you received the payment that was
17    more than your account balance.
18              Do you remember that?
19    A.  Yes.
20    Q.  Were you pleasantly surprised to learn earlier last year
21    that your benefit had actually been frozen as of 1/1/96 and you
22    earned nothing for the additional year and a half you worked
23    for the company?
24    A.  I would have been very surprised, yes.
25    Q.  And you were not pleasantly surprised I am assuming?
```

F7mnosb6                          Steven – redirect

1    A.  Right.

2    Q.  And you were asked why didn't you ask any questions.  You

3    got all of what you described in your declaration as actuarial

4    information from Mr. Kiley.  Why didn't you ask any questions?

5    A.  The issue here is, first of all, I must say looking at this

6    document it is almost like a Chinese menu.  Take one from group

7    A, one from group B, subtract this, go up to here.  It is a

8    very difficult analysis to look at on an overall basis.

9            Secondly, great respect for Tom Kiley and the HR

10   group, integrity, fiduciary responsibility, and according to

11   actuarial computations.  So I put my trust in that.

12   Q.  So I'm hearing you saying that you thought you understood

13   it, and there was nothing you needed to ask?

14           MR. RUMELD:  Objection.

15           THE COURT:  Sustained.

16           You don't need to repeat or summarize the testimony.

17   BY MR. GOTTESDIENER:

18   Q.  You said in questioning that the 9 percent was never

19   described -- withdrawn.  In the memo that covers these

20   calculations, was the 9 percent described as a discount rate?

21   A.  No, it was never described as that.  And the first time I

22   actually saw the rationale behind it was at the deposition when

23   counsel showed me the document, and I was quite surprised when

24   it said the 9 percent was just an assumed rate.

25   Q.  When you as a CPA see 9 percent interest rate, what do you

F7mnosb6                         Steven - redirect

1    think?

2    A.  It's adding to, not subtracting from, unless it's defined.

3    If it's defined as discount, then you understood it very

4    clearly.

5    Q.  If it says interest rate, is there any circumstance that

6    you can think of as a CPA where it states interest rate doesn't

7    state discount rate but you're somehow supposed to know that it

8    is used as a discount rate?

9    A.  First of all, it would never ever be by itself without DCF

10   or some way of defining that.  In any, you know, legal document

11   or any financial document you would describe the 9 percent,

12   what it was.

13   Q.  So did you think the 9 percent was a good thing or a bad

14   thing for your benefit?

15   A.  It is interesting you say that.  The way it's shown you

16   have the 32 and then you have a multiplication of a number,

17   which actually looks like it's adding to but it's really

18   discounting back.  So you can look at it that way.  For me very

19   clearly you could see it that way.

20   Q.  You were one of a handful of people who were executives who

21   were in the excess plan?

22   A.  Yes.

23   Q.  Did you have occasion to be in meetings with Tom Kiley on

24   topics other than these estimates?

25   A.  When my department put together the budgets, the long-range

F7mnosb6                          Steven - redirect

1    plans, capital expenditures, we monitored performance, so I am

2    sure in the case of the budget we would have to interact and

3    get assumptions on salaries and stuff.  And, of course, we were

4    very, in close proximity at the office, so we would pass and

5    chat.

6    Q.  And he was lower down in the hierarchy I would imagine than

7    you were?

8    A.  Yes.

9    Q.  But you have a clear memory of him?

10   A.  Oh, absolutely, yeah, sure.  I knew all the top-level

11   people at the corporate level.

12   Q.  Did you know anything about wear-away?

13         Had you ever heard of wear-away before you got

14   contacted about this case?

15   A.  No, I had never heard of wear-away.  I did research it

16   afterwards on the Internet and got some legal opinions about

17   it, and it kind of opened my eyes.

18   Q.  So, despite being CFO of the Woolworth division, having a

19   CPA, up until you learned about the pendency of this class

20   action, wear-away was a completely new concept to you?

21   A.  Yes.

22   Q.  There's been assertions in the case, some testimony and

23   some assertions, as I know you have heard, that the company,

24   the corporation as a whole, not just the F.W. Woolworth

25   division, was on death's door, just a few months away from

F7mnosb6                       Steven - redirect

1    bankruptcy.

2              Do you have anything that you would like to say in

3    response to that based on your factual knowledge being there at

4    the time?

5    A.  Yes, I will --

6              MR. RUMELD:  Object, your Honor.  If he wants to

7    respond to my cross, that's one thing, but if he's responding

8    to other testimony in the case I think it's beyond the scope.

9              THE COURT:  No.  I think that you raised in one of

10   your first questions on cross the statement in his declaration

11   relating to the financial health of the company.  So to that

12   extent I will allow this question.  You may answer.

13   A.  In my role with all the management requirements and, you

14   know, literally we were on top of all the management

15   information systems, interacted with the board of directors,

16   interacted with the executive committee.  We had created at

17   Woolworth a very sophisticated financial system, and that

18   system monitored down to the lowest profit center.  So we could

19   easily determine the contributors and noncontributors.

20             Our internal investment criteria was a total return on

21   investment using cost of capital for equity and the normal

22   interest rates, after tax.

23             So when I would state a return number, it was like you

24   were getting 6 percent, and after 50 percent you only got 3

25   percent.  The 17 was the full return.

F7mnosb6                          Steven - redirect

1          We prepared in '92 I would say a bunch of analyses for

2   the executive committee, and that showed rankings -- because we

3   had -- we must have had like 25 profit centers.  They just kept

4   coming and coming.  At the very top, of course, was Foot Locker

5   at a 17 percent return.

6          Lady Foot Locker had a 12 percent return.

7          Kids Foot Locker had a high return.

8          Northern Reflections, which was a Canadian operation,

9   high returns.

10          Then, as you gradually went down, you got smaller and

11   smaller.

12          And anything under 10 percent would be considered not

13   meeting margin, so then you go down to the loss divisions.  But

14   on a whole, the company as a whole without restructuring was

15   still very viable.  Restructuring was the whole issue, and the

16   restructuring could have been done many years earlier.  It was

17   kind of pushed off to the end, where it got worse because you

18   had not tended to the flock.

19          But in reality, they were a healthy company.  They

20   weren't in difficulties.  I actually put together the bank

21   proposition that got us the loans with the -- so I know the

22   level of it.

23          But Woolworth itself had these most valuable leases,

24   unbelievable.  They negotiated leases at 50 cents per square

25   foot in perpetuity which were never on the books.  So there was

F7mnosb6                          Steven - recross

1   a great value which could be materialized.  You go now and see

2   where Foot Locker's offices are.  That is an old Woolworth

3   facility where they pay 50 cents a square foot.

4              THE COURT:  All right.  Thank you.

5              THE WITNESS:  The point I'm making is that they were

6   not at the point of bankruptcy.

7              THE COURT:  All right.  Thank you.

8              Mr. Gottesdiener, you are all set?

9              MR. GOTTESDIENER:  Yes.  Thanks.

10             THE COURT:  Thank you.

11             MR. RUMELD:  One more question, your Honor.

12             THE COURT:  Yes, Mr. Rumeld.  You may proceed.

13             MR. RUMELD:  I just want to hand up to the witness

14  Defendant's Exhibit 54.

15             THE COURT:  All right.

16  RECROSS EXAMINATION

17  BY MR. RUMELD:

18  Q.  Mr. Steven, you mentioned a few minutes ago that during

19  your deposition you had been shown a document that alerted you

20  for the first time about the fact that the starting balance was

21  discounted, is that right?

22  A.  I found that out later, yes.

23  Q.  Is this the document you were referring to that was shown

24  to you at your deposition?

25  A.  I can't be totally sure of that.  There are so many

F7mnosb6                              Steven - recross

1    documents.

2    Q.  Well, you looked at the footnote at your deposition?

3    A.  I see the interest rate was 9 percent, assumed rate, yeah.

4    Q.  And in the --

5    A.  I remember seeing something to that effect, yes.

6    Q.  Do you remember seeing -- do you remember reading, if you

7    look at the footnote, actuarial --

8    A.  Yes, now I do.

9    Q.  You do.  That's the footnote you saw at your deposition?

10   A.  Uh-huh.

11   Q.  Yes?

12   A.  Yes, sir.

13              MR. RUMELD:  Thank you.

14              I have nothing further.

15              THE COURT:  Thank you.

16              You may step down, sir.

17              Ladies and gentlemen, let's take our midafternoon

18   break.  Then when we come back who is on deck and who will be

19   called Mr. Gottesdiener.

20              MR. GOTTESDIENER:  Ms. Glickfield.

21              THE COURT:  Ms. Glickfield.  All right.

22              Thank you.

23              (Recess)

24              THE COURT:  I was just checking on Mr. Gottesdiener's

25   time.  So he understands he has two hours and 15 minutes left.

F7mnosb6                         Steven - recross

1               Would you call your next witness.

2               MR. GOTTESDIENER:  Ms. Glickfield.

3               THE COURT:  Ms. Glickfield.

4         ELLEN GLICKFIELD,

5           called as a witness by the Plaintiffs,

6           having been duly sworn, testified as follows:

7               THE COURT:  All right.  Ms. Glickfield, please be

8    seated.  It is important for you to pull the chair up so you

9    are close to the mic.  You want to be close to it when you

10   speak, but not too close, there's sort a sweet spot, so it

11   doesn't fuzz up and you get the sound clearly.

12              There is a declaration in front of you, and I want to

13   start by having you confirm for the Court that is in fact your

14   declaration that you intend to have as your direct trial

15   testimony in this matter.

16              THE WITNESS:  Yes.

17              THE COURT:  All right.  Do you swear to the truth of

18   the contents of that declaration?

19              THE WITNESS:  I do.

20              THE COURT:  The Court does accept Ms. Glickfield's

21   declaration as her direct trial testimony, and the witness is

22   turned over for cross-examination.

23              Mr. Rumeld, you may proceed, sir.

24              MR. RUMELD:  Thank you, your Honor.

25   CROSS EXAMINATION

F7mnosb6                         Glickfield - cross

1   BY MR. RUMELD:

2   Q.  Ms. Glickfield, you enjoyed working for Woolworth, is that

3   right?

4   A.  Yes, I did.

5   Q.  You were not surprised when you were laid off in January

6   2000, is that right?

7   A.  No.

8   Q.  Because things had been falling apart?

9   A.  Yes.

10  Q.  In fact, you testified that this was a very hectic time for

11  you because a lot of terminated employees needed benefit

12  estimates, right?

13  A.  Yes.

14  Q.  And that was one of the things you were responsible for?

15  A.  Yes.

16  Q.  While working for Woolworth, you prepared these benefit

17  estimates when employees were leaving employment, is that

18  right?

19  A.  Yes.

20  Q.  And you also prepared them upon request?

21  A.  Yes.

22  Q.  And you were supervised by Marion Derham?

23  A.  Yes.

24  Q.  But you did more estimates than she did, is that right?

25  A.  Yes.

F7mnosb6                    Glickfield - cross

1   Q.  You also fielded telephone calls?

2   A.  Yes.

3   Q.  People who had questions about their benefits?

4   A.  Yes.

5   Q.  You received about 30 calls a week, is that right?

6   A.  Yes.

7   Q.  Now, if you received a more difficult question you would

8   consult with Ms. Derham?

9   A.  Yes.

10  Q.  And sometimes you would respond to a phone inquiry by

11  writing a letter, is that right?

12  A.  Yes.

13  Q.  And sometimes Ms. Derham would help with that as well?

14  A.  Yes.

15  Q.  You testified that you often worked on benefit estimates

16  where the minimum lump sum was larger than the account balance,

17  is that right?

18  A.  Yes.

19  Q.  In fact, in most cases the benefit that based on the

20  participant was based on a minimum lump sum, is that right?

21  A.  Yes.

22  Q.  And in some cases you found that the minimum lump sum was

23  more than twice as much as the account balance?

24  A.  Yes.

25  Q.  Now, when the benefit was based on the minimum lump sum

F7mnosb6                        Glickfield - cross

1    rather than the account balance, you understood, didn't you,

2    that the credits, the pay and the interest credits really

3    didn't count toward that benefit, right?

4    A.   I should -- yes.

5    Q.   In your declaration you say that you thought the minimum

6    lump sum was some kind of IRS required additional payment?

7    A.   Yes.

8    Q.   In your deposition, am I right that you described the

9    minimum lump sum a little differently?

10             MR. GOTTESDIENER:  Objection.

11   Q.   Didn't you previously --

12             THE COURT:  Sustained.  Why don't you rephrase.

13             MR. RUMELD:  Yes.

14   BY MR. RUMELD:

15   Q.   Didn't you previously describe the minimum lump sum as an

16   enhancement of the December 31, 1995 benefit?

17             MR. GOTTESDIENER:  Objection.  If he's going to

18   impeach --

19             THE COURT:  No.  He can't impeach until she's made a

20   statement that she contradicted.  He was going back and doing

21   that.  It is perfectly appropriate.  Why don't you reask the

22   question.

23   BY MR. RUMELD:

24   Q.   Did you at one point understand the minimum lump sum to be

25   an enhancement of the pre-'96 benefit?

F7mnosb6                          Glickfield - cross

1          MR. GOTTESDIENER:  Objection.

2          THE COURT:  Overruled.

3  A.  Yes.

4  Q.  What you would do in completing these estimates was perform

5  a mathematical calculation to the pre-'96 benefit in order to

6  arrive at the minimum lump sum, is that right?

7  A.  Yes.

8  Q.  Part of that mathematical calculation involved the use of

9  the prevailing interest rate?

10  A.  Yes.

11  Q.  Now, in your declaration, you refer to an e-mail that you

12  received from Marion Derham that instructed you not to provide

13  the minimum lump sums for participants who were not terminating

14  employment within six months.

15          Do you remember that?

16  A.  Yes.

17  Q.  Do you remember saying that in your declaration?

18  A.  Yes.

19  Q.  Now, in light of that e-mail, you now dispute the assertion

20  that the minimum lump sum could not be projected into the

21  future?

22          MR. GOTTESDIENER:  Objection.

23  Q.  Is that your contention?

24          MR. GOTTESDIENER:  Objection.

25          THE COURT:  Overruled.

F7mnosb6                        Glickfield - cross

1   A.   There was a caveat that we used.  If we gave the date of

2   the estimate, and the factor involved and explained that it

3   could change, it could either go up or down.

4   Q.   Am I correct that you do agree that if you projected the

5   minimum lump sum for sometime into the future, whatever figure

6   you projected would be subject to changes based on the movement

7   of interest rates?

8   A.   Yes.

9            MR. RUMELD:  May I approach, your Honor?

10           THE COURT:  You may.

11           MR. RUMELD:  I'm going to show you what's been marked

12   as Defendant's Exhibit 93.

13   BY MR. RUMELD:

14   Q.   Defendant's Exhibit 93 are --

15           MR. HUANG:  This is also plaintiff's number PX 1062.

16           THE COURT:  Thanks.

17           MR. RUMELD:  Thank you.

18   BY MR. RUMELD:

19   Q.   These are benefit estimates that were prepared by

20   Ms. Derham?

21   A.   Yes.

22   Q.   You can tell because it says that in the bottom of each

23   page?

24   A.   Yes.

25   Q.   Do these look consistent with the type of estimates that

F7mnosb6                          Glickfield - cross

1   were prepared out of your office?

2   A.   I never formalized them this well.

3   Q.   These are more formal than the ones you did?

4   A.   Yes.

5   Q.   Would you agree that both estimates are for the same

6   participant, the same date of birth, the same date of hire, the

7   same normal retirement date?

8            Do you see that?

9   A.   Yes.

10  Q.   Now, the first estimate is for a benefit payment date of

11  11/1/1998.

12           Do you see that?

13  A.   Yes.

14  Q.   What does that mean, benefit payment date?

15  A.   When the benefit would be paid out.

16  Q.   So --

17  A.   It was a projection.

18  Q.   It was a projection based on when the participant expected

19  to leave?

20  A.   Yes.

21  Q.   Or for a date the participant asked for an estimate?

22  A.   It would have been the date that he asked for the estimate.

23  Q.   Right.  So a participant can call up and say could you give

24  me an estimate that assumes that my termination date will be

25  11/1/1998?

F7mnosb6                          Glickfield - cross

1   A.  Yes.

2   Q.  In this case the estimate was prepared less than a month

3   earlier, right, because it's dated 10/9/1998?

4           Do you see that?

5           Do you see on the bottom it says date prepared?

6   A.  10/9/98, yes.

7   Q.  So in this case the estimate is prepared just a few weeks

8   before the benefit payment date?

9   A.  Yes.

10  Q.  So the interest rate is known in this case?

11  A.  Yes.

12  Q.  It's not going to change between October 9 and 11/1?

13  A.  No.

14  Q.  In this case you see the minimum lump sum is being

15  provided, correct?

16  A.  Yes.

17  Q.  If you could turn to the second page.

18          In this case the benefit payment date is 6/1/2008.

19          Do you see that?

20  A.  Yes.

21  Q.  It's ten years into the future, right?

22  A.  Yes.

23  Q.  Which means if you tried to do a projection, it would be

24  subject to the movement of interest rates?

25  A.  Yes.

F7mnosb6                          Glickfield - cross

1   Q.   And the minimum lump sum could go up or down depending on

2   how the interest rates moved?

3   A.   Yes.

4   Q.   Would you agree with me that in this case there is no

5   minimum lump sum provided?

6   A.   That's correct.

7   Q.   If you look at the paragraph in the middle below the bolded

8   sentence that says, This statement is an estimate and is not a

9   guarantee of benefits.

10        Do you see that?

11  A.   I'm sorry.  Where are you?

12  Q.   You see there --

13  A.   It's an estimate, yes.

14  Q.   Underneath there's the following paragraph:  The lump sum

15  payment indicated above represents your estimated account

16  balance on your normal retirement date.  This amount was

17  arrived at by projecting your January 1, 1998, account balance

18  with 6 percent interest through your normal retirement date.

19  The lump sum actually payable will be greater of your account

20  balance or a minimum lump sum.  The minimum lump sum will be

21  determined by multiplying your annual accrued benefit by a

22  factor that is based on the mortality table and interest rate

23  in effect on your benefit payment date.  Since we do not know

24  what interest rate will be in effect on your normal retirement

25  date, we are not able to calculate the minimum lump sum payable

1    on that date.

2    A.  Yes.

3    Q.  Do you find anything inaccurate in that paragraph?

4    A.  No.

5    Q.  That's consistent with the type of disclaimer that you

6    referred to in your declaration?

7    A.  Yes.

8            MR. RUMELD:  Nothing further.

9            THE COURT:  All right.

10           Thank you.

11           Mr. Gottesdiener, anything from you?

12           MR. GOTTESDIENER:  Very briefly.

13   REDIRECT EXAMINATION

14   BY MR. GOTTESDIENER:

15   Q.  Ms. Glickfield, you have a high school education?

16   A.  Yes.

17   Q.  Any post high school education?

18   A.  No.

19   Q.  Any training in doing an employee benefit calculations

20   other than on the job?

21   A.  No.

22   Q.  Did you need to understand what the factors meant that you

23   applied when you were doing calculations?

24   A.  No.

25   Q.  You were asked by defense counsel questions that suggested

F7mnosb6                         Glickfield - redirect

1   that you had been inconsistent.  Did you use both the term

2   kicker and enhancement in your deposition to explain what you

3   thought the minimum lump sum was?

4   A.  Yes.

5   Q.  What was your understanding based on all of the plan

6   materials you got as a participant as well as somebody who

7   worked in benefits was happening at the point of the change

8   from the old plan to the new plan in terms of what your benefit

9   was?

10  A.  My frozen 12/31/95 accrual was changed into a cash balance

11  account.

12  Q.  Did you think that was done at full value, full benefit?

13  A.  I thought so.

14  Q.  And you thought it was picking up where you left off --

15  A.  Yes.

16  Q.  -- and then adding new credits?

17           Then what did you think when you were doing

18  calculations and people got more than their account with this

19  minimum lump sum that you were calculating?

20           What did you think that was?

21  A.  At that time I thought it was great, that it was the

22  government stepping in with a provision, and I could offer them

23  the bigger number.

24  Q.  Did you have any idea that the benefits you were

25  calculating in your own benefit, it was actually frozen and

F7mnosb6                    Glickfield – redirect

1    that you weren't earning anything after 1996?

2              MR. RUMELD:  Objection.

3              THE COURT:  Hold on.  Sustained.

4              Why don't you rephrase.

5    BY MR. GOTTESDIENER:

6    Q.  Did you believe that that minimum lump sum was actually a

7    representation that the company had frozen everybody's benefit?

8    A.   I am not sure I know what you mean, which benefit?

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F7MJOSB7

1    Q.  From 12-31-95 you said you thought you got full value and

2    that you were adding to it in your account.  Is that fair?

3    A.  That's correct.

4    Q.  And then you said that you thought the minimum lump sum was

5    a great additional enhancement or kicker that people got

6    sometimes depending on interest rates that the federal

7    government required.  Is that fair?

8    A.  Yes.

9    Q.  My question is, did you have any idea that that was, in

10   fact, not true while you were there on the job and that it was

11   kind of the other way around?

12   A.  No.

13   Q.  If you had known, if you had known what you know now, what

14   do you think you would have done?

15   A.  I would have been upset.  I would have been very vocal.

16            MR. GOTTESDIENER:  No further questions.

17            THE COURT:  Anything from you, Mr. Rumeld?

18            MR. RUMELD:  No, your Honor.

19            THE COURT:  Thank you.  You may step down,

20   Ms. Glickfield.

21            (Witness excused)

22            THE COURT:  Who is going to be the next witness?

23            MR. RUMELD:  The next witness will be Marion Derham.

24            THE COURT:  Is Mr. Gottesdiener, do you have any

25   additional witnesses from the plaintiff?

F7MJOSB7

1              MR. GOTTESDIENER:  No, your Honor, no.

2              THE COURT:  Subject to the receipt of all the

3     documents into evidence, and the court has already received the

4     deposition designations subject to the objections, does the

5     plaintiff rest?

6              MR. GOTTESDIENER:  Yes, your Honor.

7              THE COURT:  So will the defense, please, call their

8     first witness.

9              MR. RUMELD:  We call Marion Derham.

10             THE COURT:  So there is no declaration for Ms. Derham.

11    Am I correct?

12             MR. RUMELD:  Correct.

13             THE COURT:  I want to make sure the absence of one is

14    expected.

15             MR. RUMELD:  Can I just ask your Honor while we are

16    waiting, it is about 4:00 o'clock.  I believe I am going to

17    need the remaining time to complete my examination.  I could

18    call Mr. Rachal and Mr. Sher to come down because he would be

19    the only remaining witness, but I am kind of assuming if I

20    succeed in finishing Ms. Derham, we'll just start tomorrow

21    morning?

22             THE COURT:  Don't call and have them come down.  We

23    can deal then with logistical issues.  Don't expand the

24    testimony beyond where it needs to go, but I won't then require

25    you to call Mr. Sher this afternoon.  We'll start with him, I

F7MJOSB7                          Derham - direct

1    would hope, in the morning then.

2              MR. RUMELD:  Yes.

3              THE COURT:  Please be seated.  It will be important --

4    actually, Joe, a little knob on the microphone sort of has come

5    off its thing.  There we go.  All right.  Easy as that!

6              It will be important for you to speak directly into

7    the mike so we can get a good sound, all right?

8              THE WITNESS:  Yes.

9              THE COURT:  If you need to pull up your chair, you can

10   do that.

11    MARION DERHAM,

12        called as a witness by the Defendant,

13        having been duly sworn, testified as follows:

14   DIRECT EXAMINATION

15   BY MR. RUMELD:

16   Q.  Good afternoon Ms. Derham.  Do you remember meeting me once

17   before?

18   A.  You look familiar.

19   Q.  Do you remember having your deposition taken in this case a

20   couple of years ago?

21   A.  Yes.

22   Q.  Do you remember seeing me at that deposition?

23   A.  It could be from then, yes.

24   Q.  Did we ever get together to go over your testimony, prepare

25   your testimony?

F7MJOSB7                          Derham - direct

1    A.  No.

2    Q.  Did any other lawyers for Foot Locker ever prepare you for

3    testimony?

4    A.  No.

5    Q.  You're here by virtue of the subpoena that the plaintiffs

6    served on you?

7    A.  Correct.

8    Q.  Could you tell me about your employment with Woolworth or

9    any affiliate of Woolworth.

10   A.  Okay.  I started in 1979 with Kenney Shoe Corporation in

11   the medical area, I believe it was the medical insurance

12   enrollment.  I did some medical claims.  I worked in the

13   retirement plan area, the stock purchase plan area and 401 (k)

14   plan area.

15   Q.  Through what period of time was that?

16   A.  I worked through, it was November of 2006.

17   Q.  Are you able to remember what you were doing in the

18   mid-1990's?

19   A.  Yes, I worked in the retirement plan area.  The 401 (k)

20   plan was started in the mid-1990's and the stock purchase plan

21   as well.  I wasn't in the medical area at that point.

22   Q.  Do you remember whether it was a stock purchase plan or a

23   cash balance plan, or are you talking about a different plan?

24   A.  Two different plans.  There was an employee stock purchase

25   plan.  There was a retirement plan and a 401 (k) plan, so three

F7MJOSB7                        Derham - direct

1   different plans actually.

2   Q.  Did you work on the retirement plan as well?

3   A.  Yes, yes, that is what I said.

4   Q.  What specifically were your responsibilities?

5   A.  My responsibilities?

6         Well, I worked in the administrative section of the

7   retirement plan.  I worked under several different people.  I

8   did retirement calculations.  I did communications to people,

9   things to that effect.

10  Q.  Who was your immediate supervisor?

11  A.  Carol Kanowicz.

12  Q.  Anyone else?

13  A.  No.  She was -- well, she left just before I did in 2006,

14  and I think after she left I believe Julie Bloom was my

15  immediate supervisor if I remember correctly.  It could have

16  been Julie.  It might have been Kevin, but I think it was

17  Julie.

18  Q.  Have you been employed since leaving Foot Locker in 2006?

19  A.  I have done volunteer work, not employed for monetary

20  purposes, no.

21  Q.  Have you done any pension-related work since 2006?

22  A.  No, no, not at all, no.

23  Q.  Now, while you were employed at Foot Locker, you were

24  located in the New York office?

25  A.  Yes.

F7MJOSB7                              Derham - direct

1    Q.  Did you work with people in Milwaukee?

2    A.  Yes.

3    Q.  How did your job relate to theirs?

4    A.  Milwaukee did the day-to-day administration.  They took a

5    lot of phone calls from people and they ran calculations and

6    they consulted with the New York office.  We provided them with

7    direction on what they should be doing.

8    Q.  Were you one of the people who provided direction?

9    A.  Yes.

10   Q.  Were you one of the principal contacts for the people?

11   A.  Yes, I was a principal contact, yes.

12   Q.  Did there come a point in time when the responsibilities of

13   the folks in Milwaukee changed?

14   A.  Yes, I would say yes, but I don't know, I don't remember

15   the details of how the responsibilities changed.

16   Q.  Do you remember whether at some point their

17   responsibilities were outsourced?

18   A.  Outsourced, yes, yes, yes, I was just thinking about it

19   and, yes, I did remember that.

20   Q.  To whom were these responsibilities outsourced?

21   A.  Mercer, William Mercer did calculations after they did.

22   Q.  After Milwaukee did, Mercer did?

23   A.  Yes.

24   Q.  Do you know when that transition took place?

25   A.  If I remember correctly, it was in the Year 2000 because

F7MJOSB7                          Derham - direct

1    the systems were not ready for the Y2K and they couldn't handle

2    any of the upgrades, so those financials were transferred out.

3    Q.  So a participant leaving the company after 2000 would get

4    his retirement package from Mercer, not from Milwaukee?

5    A.  I believe so, yes.

6    Q.  And a participant who had inquiry about the calculation of

7    his or her benefits, if the inquiry was after 2000, it would be

8    made to Mercer and not to Milwaukee.  Is that right?

9    A.  I believe so, but I am not a hundred percent on that, but I

10   believe so.

11   Q.  A participant requesting a benefit estimate after 2000,

12   would that come from Mercer or from Milwaukee?

13   A.  You know, I think Mercer, but logically from what we're

14   talking about it would be Mercer, but my memory is not clear on

15   that, but I would think it would be Mercer.

16          THE COURT:  It is important that we get your best

17   recollection.

18          THE WITNESS:  Okay.

19          THE COURT:  It is a long time ago, so if you don't

20   recall, just say you don't recall.  We don't want you to

21   speculate.

22          THE WITNESS:  Okay.  I honestly don't recall

23   specifically.

24          THE COURT:  Thank you.

25   BY MR. RUMELD:

F7MJOSB7                         Derham - direct

1    Q.   Now, you do you have a recollection of the defined benefit

2    plan being amended in the mid-1990's?

3    A.   Yes.

4    Q.   What do you recall about that?

5    A.   It was changed from a traditional defined benefit plan to a

6    cash balance plan.

7    Q.   How did that change come about?

8    A.   All of the plans were reviewed, meaning I think the

9    retirement plan and the medical plans, they were reviewed in

10   order to do cost containment and cost cutting, and that's how

11   the change came to take place.

12   Q.   Did you have a role in coming up with the change?

13   A.   Not coming up with the change necessarily, but as I recall,

14   our actuary provided different scenarios to review, so I

15   believe the scenarios were brought up by the actuary.  We did

16   not internally come up with the scenarios or the changes that

17   could take place.

18   Q.   Could you explain what you you mean by, "scenarios."

19   A.   I think there were several different changes to the

20   retirement plan that were suggested, one of which was the cash

21   balance plan.  If I remember correctly, other changes, other

22   potential changes were to reduce the formula.

23            One of the changes was to terminate the plan, reduce

24   the formula.  That is all I can recall at this point.

25   Q.   Who was involved with working with Mercer over these

F7MJOSB7                          Derham - direct

1    alternative proposals?

2    A.   Initially there was myself, Carol, Tom and Eileen I believe

3    the woman's name was.  She worked for Tom.  There was a group

4    of us that worked on preparing the different scenarios for

5    further review.

6    Q.   Why was the cash balance plan chosen amongst those

7    scenarios?

8    A.   I don't recall specifically why.  I don't recall

9    specifically why.

10   Q.   Do you remember any features of the cash balance design

11   that you viewed to be more favorable than the other scenarios?

12   A.   The cash balance plan had a lump sum feature that was

13   thought to be favorable.  The fact that you could take the lump

14   sum as long as you were vested, you could take the lump sum

15   when you left.  You didn't have to wait until retirement age to

16   collect the benefit.  That's the only feature I remember, the

17   one I remember.

18   Q.   Is it also the case that amending the defined benefit plan

19   to a cash balance formula was expected to save money?

20   A.   Yes, yes.

21   Q.   That was still the objective?

22   A.   Yes, the overall objective was to save money, yes.

23   Q.   Do you remember who initially recommended the cash balance

24   alternative?

25   A.   It was recommended by the actuary, by Mercer who was our

F7MJOSB7                          Derham - direct

1    actuary, Foot Locker actuary at the time.

2    Q.  Did Mercer make this recommendation to your group, the four

3    people you you described?

4    A.  Yes.

5              THE COURT:  Do you recall that clearly or is it -- let

6    me put it differently.

7              THE WITNESS:  Okay.

8              THE COURT:  The question was do you remember who

9    initially recommended the cash balance alternative, and your

10   recollection is Mercer?

11             THE WITNESS:  My recollection is that it was Mercer.

12             THE COURT:  Okay.

13             THE WITNESS:  Yes.

14             THE COURT:  How clear is that recollection?

15             THE WITNESS:  None of my recollections regarding this

16   testimony are completely clear.  I remember that that was the

17   way it happened, but to the best of my recollection.

18             THE COURT:  Let me ask it this way.

19             Do you recall whether or not Tom Kiley came up with

20   the idea of a cash balance plan first or whether or not, in

21   your recollection, it was Mercer that came up with it first?

22             THE WITNESS:  I don't remember.  I don't remember if

23   it was Tom or Mercer first.  I don't remember.

24             THE COURT:  All right.  Right now your best

25   recollection is it was Mercer?

F7MJOSB7                          Derham - direct

1            THE WITNESS:  My best recollection.  Could it have

2       been Tom?  I suppose.

3            THE COURT:  I don't want you to guess.

4            THE WITNESS:  I am not.

5            THE COURT:  Do you remember Tom Kiley coming up --

6            THE WITNESS:  I don't remember that he came up with it

7       first, no, I don't remember that.

8            THE COURT:  You may proceed.

9       BY MR. RUMELD:

10      Q.  Do you remember whether one of the alternative scenarios

11      that your group considered was a temporary freezing of the

12      benefits?

13      A.  Yes.

14      Q.  What became of that alternative?

15      A.  It was declined.

16      Q.  Do you know why?

17      A.  I don't recall.

18      Q.  Do you recall anyone ever suggesting to you that the cash

19      balance conversion was like a temporary freeze in the benefits?

20      A.  If I recall it clearly?  I am sorry, but, yes, I recall

21      that, yes.

22      Q.  How did the cash balance plan operate?

23      A.  It changed the benefit payable at normal retirement date to

24      a lump sum that was paid when the participant left.  It

25      converted it.

F7MJOSB7                          Derham - direct

1   Q.   There was an account balance?

2   A.   There was an account balance.  The first part of it was an

3   account balance.  The person's accrued benefit was changed to

4   an initial account balance, and then that was increased over

5   time.  I don't remember the exact formula, but it was increased

6   with -- I believe the term was pay credits and interest.  I

7   don't remember what interest rate it was increased by.

8   Q.   How was the benefit calculated when the participant

9   terminated employment?

10  A.   The cash balance amount, the account balance was brought up

11  with those two items and that would be the person's account

12  balance.  There was another calculation done.  It was called

13  the minimum lump sum.  I don't remember exactly how that was

14  calculated, but it was -- I don't remember the exact

15  calculation to get a minimum lump sum, but there were two, two

16  things, the account balance and the minimum lump sum that were

17  compared, and the person would get the higher of the two

18  amounts.

19  Q.   Do you know what the minimum lump sum was based on?

20  A.   It was based on the accrued benefit, and there was some

21  formula applied to the accrued benefit.  I don't remember what

22  the formula was.

23  Q.   What do you mean by the, "accrued benefit"?

24  A.   An accrued benefit is an amount that would be paid at

25  normal retirement age.  You're looking at me --

F7MJOSB7                        Derham - direct

1   Q.  I get to ask the questions.

2   A.  -- you're looking at me like I have two heads, okay?

3   Q.  Do you know through what date the accrued benefit was

4   calculated?

5   A.  It was calculated -- I don't recall.  I don't recall.  I

6   was going to speculate, but I don't recall.

7   Q.  Now, what was your understanding of a plan freeze?

8   A.  A plan freeze meaning, well, that there was nothing added

9   to what was already accumulated.

10   Q.  In your mind, was that what was happening in the cash

11   balance plan?

12   A.  No, no, because there was an addition to the account

13   balance.

14   Q.  Now --

15   A.  Did I answer that correctly?

16          THE COURT:  We just want to get your best

17   recollection, so don't worry about what we think about the

18   answers.  It is not a test, just getting your best

19   recollection.

20          THE WITNESS:  Okay.

21   BY MR. RUMELD:

22   Q.  Did you have any responsibilities in connection with the

23   communications that were sent to the plan participants about

24   the cash balance amendments?

25   A.  Yes, there were communications, yes, and I was part of

F7MJOSB7                         Derham - direct

1   that, part of preparing the drafts of the communication, yes.

2   Q.  Do you remember specifically what communications you were

3   involved with?

4   A.  There were retirement packages that were sent out to people

5   who said they wanted to retire.  There were letters sent out to

6   people who left but didn't want to collect their benefit at

7   that time.  There were summary plan descriptions, the booklets.

8   Q.  Anything else?

9   A.  There must have been more, but there were a lot of

10  communications prepared, but I can't recall offhand anything

11  else.

12  Q.  If I were to separate the individual communications from

13  communications sent generally to all the employees, did you

14  work on the communications that went to all the employees?

15  A.  Yes.

16  Q.  Who else worked on those communications?

17  A.  The group of four that I mentioned, and after we prepared

18  the drafts, the communications were reviewed by the internal

19  legal department, and I recall that they were reviewed by Pat

20  Peck and -- who else?  I don't recall anyone else.

21  Q.  When you were involved in these communications, what

22  specifically were you trying to do?

23  A.  The SPD was meant to provide a description of the plan to

24  the participants, how the formula worked and what they had to

25  do when they went to collect their benefit, things to that

F7MJOSB7                        Derham - direct

1   effect.  The retirement packages had specific benefit

2   information and benefits.  The form of benefit election was on

3   there.  People had to choose what form they wanted their

4   benefit in, a lump sum, a monthly payment, like that.  It was

5   generally about providing information to the participants about

6   the plan, provisions of the plan and benefits derived from the

7   formula.

8   Q.  Did you ever have any concerns that these communications

9   were false?

10  A.  No.

11  Q.  Did you ever have any concerns that they were misleading?

12  A.  No.

13  Q.  Did you ever receive any instructions not to provide

14  certain types of information to participants?

15  A.  Not that I could recall, no, not that I recall.

16  Q.  I want to show you what has previously been marked as

17  Exhibit 29.

18          MR. RUMELD:  May I approach, your Honor?

19          THE COURT:  You may.

20          THE COURT:  Is it 29, DX or PX?

21          MR. RUMELD:  That is the DX.  I am sure somebody will

22  provide the PX.

23          THE COURT:  That is 2 or 4?  I've got it.  Thank you.

24  BY MR. RUMELD:

25  Q.  Ms. Derham, I see you looking at this document.  I want to

1   know whether it looks familiar to you?

2   A.  It looks familiar.

3   Q.  Do you know what it is?

4   A.  Reading the subject, yes, the highlights of the amended

5   retirement plan.

6   Q.  Did you work on this document at the time?

7   A.  I don't recall this specific document.  I don't recall.

8   Q.  Is there any reason why you would not have been involved?

9   A.  No, there is not that I, not that I can think of, no.

10  Q.  It would be consistent with the practices of your group

11  that these types of communications you would work on?

12  A.  Yes.

13          THE COURT:  Let me ask so it is clear.  Was it

14  generally the case that you would work on each of the mass

15  communications that would go to all employees relating to the

16  pension area?

17          THE WITNESS:  Yes, that was generally the case.

18          THE COURT:  Thank you.  You may proceed, Mr. Rumeld.

19  BY MR. RUMELD:

20  Q.  Would it be part of your responsibilities to make sure that

21  documents like these were accurate?

22  A.  Yes.

23  Q.  Do you remember there were annual pension statements given

24  to the participants?

25  A.  Yes.

F7MJOSB7                          Derham - direct

1   Q.  Did you work on those as well?

2   A.  Yes.

3           THE COURT:  Why don't you hand that to the witness and

4   let me have counsel over the the sidebar briefly.  Give it to

5   the witness so she can look at it so we don't take up too much

6   time.

7           (At the sidebar)

8           THE COURT:  I just want to find out how much you have

9   left because I don't think we should have her back tomorrow.  I

10  want to turn her over to cross.  How much cross do you think

11  you have?

12          MR. GOTTESDIENER:  Very little.

13          THE COURT:  If he leaves you 10 minutes, are you going

14  to be good?

15          MR. GOTTESDIENER:  I think.

16          THE COURT:  We are going to get her off the stand.  I

17  want to get a sense of how long you think you need?  10

18  minutes, do you need more than that?

19          MR. GOTTESDIENER:  I don't think so.

20          MR. RUMELD:  I think I can try in 15 minutes.  I have

21  a little discretion and I have the same concern.  I think your

22  Honor can appreciate why.

23          THE COURT:  I understand.  I want to make sure we get

24  her off the stand today.  Take your best questions till a

25  quarter of and then turn her over to Mr. Gottesdiener.

1                    (In open court)

2    BY MR. RUMELD:

3    Q.  Ms. Derham, does this statement look familiar to you?

4    A.  It does look familiar, yes.

5    Q.  Do you remember working on this statement?

6    A.  Yes.  I don't remember specifics about working on it, but,

7    yes, I remember this statement, yes.

8                    MR. RUMELD:  My apologies, your Honor, but since we

9    did the sidebar, I didn't announce the exhibit numbers.

10   BY MR. RUMELD:

11   Q.  Defendant's Exhibit 311, you do remember working on it?

12   A.  Yes, yes.

13   Q.  Would it have been your practice to review this statement

14   with a view towards making sure it was accurate?

15   A.  Yes.

16   Q.  If there was anything in here that you felt was inaccurate

17   or misleading, would you have called it to the attention of

18   your peers?

19   A.  Yes.

20   Q.  Now, you had responsibilities in connection with the

21   preparation of pension estimates?

22   A.  Yes.  I actually prepared some estimates myself and

23   reviewed calculations of estimates that were prepared

24   elsewhere.  Not all of them, but some of them.

25   Q.  "Elsewhere," meaning?

F7MJOSB7                          Derham - direct

1    A.  Meaning either Milwaukee when they were prepared there or

2    Mercer when they were prepared there.

3    Q.  Did you work with Ellen Glickfield?

4    A.  Yes.

5    Q.  She worked for you?

6    A.  Yes, yes, she reported to me.

7    Q.  Did she also prepare estimates?

8    A.  Yes, yes, yes, she did.

9    Q.  Under what circumstances were estimates prepared?

10   A.  Based on the request of the participant, and we also

11   prepared estimates for or reports of who requested them.

12          Occasionally, we were requested to provide estimated

13   retirement benefits on certain employees, to the vice president

14   and people like that.

15   Q.  What about when a participant's employment was terminated,

16   would an estimate be prepared then?

17   A.  Well, a vested letter would be prepared, yes, which was the

18   form of an estimate, a letter saying what they would be

19   entitled to receive, yes.

20          MR. RUMELD:  May I approach, your Honor?

21          THE COURT:  You you may.

22   BY MR. RUMELD:

23   Q.  I am going to show you what has been previously marked as

24   Defendant's Exhibit 95.

25   A.  Okay.

1            MR. HUANG:  The same as PX-1066, your Honor.

2            THE COURT:  Thank you.

3  BY MR. RUMELD:

4  Q.  Does that document look familiar to you?

5  A.  Yes, it does.

6  Q.  It says on the top, "Estimated Pension Benefits."  Is that

7  what you would refer to as an estimate?

8  A.  Yes.  I don't recall this specific document.  It looks

9  familiar, but yes.

10 Q.  Is the form of the document consistent with the type of

11 information you would provide?

12 A.  Yes.

13 Q.  If it says on the bottom, "Prepared by Marion Derham," is

14 it safe to assume you prepared this document?

15 A.  I could have, yes.

16 Q.  Well, I am trying to understand procedurally, would the

17 name on the bottom --

18 A.  It would be consistent with procedures, yes.

19 Q.  For example, if Ellen Glickfield prepared an estimate,

20 would she have her name on the bottom?

21 A.  Yes.

22 Q.  Is it fair to say that you prepared a lot of estimates that

23 looked like these?

24 A.  Yes.

25 Q.  Did you ever experience any issues where the participant

F7MJOSB7                              Derham - direct

1    complained they didn't understand the estimates?

2    A.  Yes, but I don't remember specifics about that.

3    Q.  Were there occasions when you would follow up with a

4    participant who had questions?

5    A.  Yes.

6    Q.  Participants were able to reach out to you if they had

7    questions?

8    A.  Yes.

9    Q.  Do you remember whether participants had questions about

10   the calculation of the minimum lump sum?

11   A.  Yes, some did.

12   Q.  What would you tell them?

13   A.  I don't recall exactly what I told them.

14           THE COURT:  Don't speculate if you don't recall.

15           THE WITNESS:  I don't recall exactly what I told them.

16   BY MR. RUMELD:

17   Q.  Was it generally your practice to be as informative as you

18   could be?

19   A.  Yes.

20               (Continued on next page)

21

22

23

24

25

F7mnosb8                          Derham - direct

1    Q.  Do you remember whether there were any restrictions on

2    providing minimum lump sum information into the future?

3              THE COURT:  You mean whether or not, for instance, if

4    Ms. Derham received a question from a participant about a

5    minimum lump sum, and the question was requesting information

6    relating to a minimum lump sum in the future, whether you were

7    restricted or otherwise --

8              THE WITNESS:  You mean --

9              THE COURT:  -- told not to provide that information?

10             THE WITNESS:  Do you mean something that would be

11   paid, like if someone asked me for something today, a minimum

12   lump sum that would be paid a year from today?

13             Is that what the --

14             THE COURT:  It could be a year from today, six months

15   from today, and they may not even have a termination date.  Any

16   of those scenarios.

17             THE WITNESS:  Yes.  There were restrictions on

18   providing minimum lump sums at future dates.

19             THE COURT:  What was your understanding as to what

20   those restrictions were?

21             THE WITNESS:  I don't recall how far in the future the

22   restrictions went.  I believe the restriction was put in place

23   to my recollection because of something having to do with the

24   interest rates and, depending on what the interest rates were,

25   the minimum lump sum could be different, calculated using a

F7mnosb8                          Derham – direct

1   different interest rate.

2              THE COURT:  All right.  Thank you.

3              Were you done or did you have more to add?

4              THE WITNESS:  No.  That's basically it.

5   BY MR. RUMELD:

6   Q.  I would like to show you what's previously been marked as

7   Defendant's Exhibit 112.

8              MR. RUMELD:  May I approach, your Honor?

9              THE COURT:  You may.

10             MR. HUANG:  This is PX 162.

11             THE COURT:  All right.  Thank you.

12             THE WITNESS:  OK.  I'm ready.

13   BY MR. RUMELD:

14   Q.  Do you remember this e-mail?

15   A.  No, I don't recall this e-mail.

16   Q.  Do you remember providing information to employees in

17   Greenville about their retirement benefits?

18   A.  Not specifically.  Not specifically to Greenville, but I --

19   Q.  Do you remember generally providing --

20   A.  We generally provided information to associates, yes.

21   Q.  Let me show you what's previously been marked as

22   Defendant's Exhibit 47.

23   A.  OK.

24             MR. RUMELD:  May I approach?

25             THE COURT:  Yes.

 1              MR. RUMELD:  I think your Honor has this one.

 2              MR. HUANG:  PX 99.

 3              THE WITNESS:  This does look familiar.  OK.

 4     BY MR. RUMELD:

 5     Q.  Do you remember preparing those materials?

 6     A.  I don't specifically remember preparing these, but they do

 7     look familiar.

 8     Q.  Do you know whether materials like these were provided to

 9     various locations?

10     A.  I don't recall.

11     Q.  Do the examples look familiar to you?

12     A.  They do.

13     Q.  Do you know if you prepared them?

14     A.  This looks to me as if I prepared them, but I don't recall

15     doing it.  I --

16     Q.  You don't recall whether these same examples might have

17     been used elsewhere?

18     A.  Excuse me?  Could you repeat.

19     Q.  Do you recall if these examples were used in other

20     locations besides Greenville?

21     A.  Something is saying that -- I don't recall specifically.

22     They may have been.  They may have been used for other

23     locations, but I don't recall specifically.

24     Q.  Well, was generally your practice to prepare template

25     materials for use at multiple locations?

F7mnosb8                         Derham - cross

1   A.  Yes, it was.

2   Q.  Did you also visit locations to provide information?

3   A.  Yes.

4   Q.  How frequently did you do that?

5   A.  Oh, gee.  Well, OK, we are looking at the year 1996 here.

6   There were, at the time the plan changed in 1996, I visited

7   several locations, as did Carol and Rita.  After that point, I

8   don't remember exactly when we visited and how many locations,

9   but there were -- during the plan change there were quite a few

10  visits to different locations.

11  Q.  One more question.  When you visited these locations, were

12  you ever placed under any restrictions as to what type of

13  information to provide the employees?

14  A.  Not that I can recall, no.

15          MR. GOTTESDIENER:  Thank you very much.

16          THE WITNESS:  You're welcome.

17          THE COURT:  Mr. Gottesdiener.

18  CROSS EXAMINATION

19  BY MR. GOTTESDIENER:

20  Q.  Good afternoon, ma'am.

21          Do you recall that I took your deposition a few years

22  ago in this case?

23  A.  Yes.

24  Q.  You said at the top of the questioning by defense counsel

25  that the team, or the four of you were seriously considering a

F7mnosb8                           Derham - cross

 1  range of options for saving money, a temporary plan freeze, a

 2  reduction in the formula of the existing plan, and possibly

 3  terminating the plan?

 4  A.  Yes, I did say that.

 5  Q.  You said at one point that someone suggested during the

 6  course of your review that the cash balance conversion that was

 7  ultimately adopted, that it operated like a temporary freeze?

 8  A.  Um -- yes.

 9  Q.  That was the wear-away effect?

10  A.  You know, you asked me about that wear-away the last time,

11  and I would say based on the last -- based on the deposition,

12  yes, that was the wear-away effect, yes.

13            THE COURT:  Did you ever use the term or hear the term

14  used wear-away?

15            THE WITNESS:  I have heard the term used, specifically

16  in, in what specific situations, I don't recall, but I --

17            THE COURT:  Do you recall whether or not you heard

18  that term back in the late '90s when the plan changes went into

19  effect, sometime in the couple of years --

20            THE WITNESS:  It could very well be, yes.

21            THE COURT:  You don't recall right now?

22            THE WITNESS:  I don't recall specifically when that

23  term was used, no.

24            THE COURT:  All right.

25  BY MR. GOTTESDIENER:

F7mnosb8                          Derham - cross

1    Q.  Let me just try this because it was a while ago.

2    A.  OK.

3    Q.  Page 77, line 17:

4    "Q. And wear-away is a phenomenon where for one reason or

5    another there's no growth in someone's pension benefits for a

6    period of time.

7              "Does that sound familiar?"

8    A.  That sounds familiar.

9    BY MR. GOTTESDIENER:

10   "A. It sounds familiar, yes.

11   "Q. And that was something that Jim and others on the task

12   force talked about and knew about would be a potential

13   consequence of the conversion?

14   "A. Yes."

15   A.  Yes.

16   Q.  You gave that testimony, right?

17   A.  It sounds familiar.

18              MR. RUMELD:  Objection.

19              THE COURT:  You are not impeaching her and one of the

20   questions has an embedded problem in terms of what Jim or

21   whoever else would have known.  If you would like some

22   testimony, why don't you on those topics, just ask her and you

23   will have it clearly in the record.

24   Q.  You heard the term wear-away before in connection with the

25   consideration of changes to the plan in the '90, correct?

1    A.  Yes.

2    Q.  And you understood that what that phenomenon meant was that

3    people would not be accruing any new benefit for a period of

4    time?

5    A.  Yes.

6    Q.  The communications that you assisted in preparing that went

7    out to all participants as well as individual participants, you

8    agree that in none of those communications did you ever see any

9    communication that communicated wear-away, the wear-away effect

10   to anybody?

11   A.  Not that I recall.

12            MR. RUMELD:  Objection.

13   A.  Not that I recall.

14            THE COURT:  Overruled.

15            MR. RUMELD:  Your Honor, could I just --

16   A.  I remember going over this at the deposition.

17   Q.  Uh-huh.

18   A.  And I believe we read through several different documents

19   that didn't have any information to that effect in them.

20            THE COURT:  All right.  Let me just hear --

21            MR. RUMELD:  I would like to get a clarification.  I

22   don't want to gum things up here, but this is a witness who is

23   still a class member and both sides identified her as a

24   witness.  I just want to know whether Mr. Gottesdiener is

25   expected to be able to ask leading questions under these

F7mnosb8                        Derham - cross

1    circumstances.

2              THE COURT:  If you object as leading, I would not

3    allow either of you to lead.  But until there is an objection,

4    I just let it go.  So try not to lead.

5              MR. RUMELD:  Well --

6              THE COURT:  All right.  The witness is not identified

7    as hostile to either party, and therefore neither party should

8    lead.

9    BY MR. GOTTESDIENER:

10   Q.  So, if I am understanding your last answer, you recall

11   reviewing communications at the deposition --

12   A.  Yes.

13   Q.  -- that you worked on?

14   A.  Yes.

15   Q.  Did any of those communications tell participants that the

16   purpose of the change was to save the company money?

17   A.  No, not that I recall.  No.

18   Q.  Did any of those communications tell participants that the

19   effect of the change for a large number of participants would

20   or might be that they would stop accruing new benefits for a

21   period of time?

22             MR. RUMELD:  Objection.

23   A.  Not that I recall.

24             THE COURT:  Hold on.

25             THE WITNESS:  Oh.

F7mnosb8                              Derham - cross

1            THE COURT:  Sustained.  You have to ask it

2     differently.

3     BY MR. GOTTESDIENER:

4     Q.  Did you see in any of communications that you --

5            THE COURT:  I think you are going to run into the same

6     problem.  You can try it.

7     BY MR. GOTTESDIENER:

8     Q.  In the communications that you worked on, did they discuss

9     growing account benefits?

10    A.  Yes.  Growing account benefits, yes.

11    Q.  Did any of the communications you worked on inform the

12    participants that growth in their account was not necessarily

13    also growth in their benefit?

14    A.  I don't think so, not that I recall.  I don't recall

15    anything like that being in there.

16    Q.  Do you remember you testified in response to counsel's

17    questions about a minimum lump sum?

18    A.  Yes.

19    Q.  Do you believe that disclosure of the concept and the

20    existence of the minimum lump sum or a greater of this or that,

21    do you think that that disclosed a wear-away to participants?

22    A.  Specifically disclosed a wear-away, no.

23    Q.  You agree that just disclosing the existence of this

24    greater of or minimum lump sum, it doesn't disclose the

25    wear-away?

F7mnosb8                          Derham - cross

 1   A.  Correct.

 2            MR. GOTTESDIENER:  The Greenville document.  If you

 3   put on the screen PX 99 for a moment.

 4            THE WITNESS:  DX 99?

 5   Q.  I don't think you have it in front of you.  It is the same

 6   document.  It is just our version of it.

 7            Do you see your signature there?

 8   A.  Yes.

 9   Q.  It's directed to Doris Albright?

10   A.  Yes, I see it.

11   Q.  Did you know Doris Albright?

12   A.  I don't recall meeting her, but I may have.

13   Q.  You would agree that the document and the examples that are

14   attached does not disclose that there were no benefits being

15   accrued after 12/31/95?

16   A.  I haven't read through it that specifically, but -- I would

17   have to read through it specifically in order to determine

18   that.  I don't recall exactly what was in this document, so I

19   can't --

20   Q.  OK.  At your deposition --

21   A.  Uh-huh.

22   Q.  -- do you remember we talked about the document at your

23   deposition?

24   A.  I remember talking about many documents.  I don't recall

25   speaking about this specific document.

F7mnosb8                          Derham - cross

1   Q.  OK.  Line 15, page 315, of your deposition we are talking

2   about this document and I asked you:  "Does it disclose the

3   concept?"  That is, of the wear-away.

4   "A. There was no -- it doesn't disclose that there were no

5   accrued benefits from -- after 12/31/95.  No, it does not

6   disclose that."

7            You gave that testimony, didn't you?

8            MR. RUMELD:  Objection.

9   A.  I don't deny that, yes.

10            THE COURT:  Well --

11            THE WITNESS:  I recall reading through.

12            THE COURT:  I will allow it as impeachment.

13            You may answer.

14            THE WITNESS:  OK.

15            THE COURT:  The question is only do you recall giving

16   the testimony?

17            THE WITNESS:  OK.

18            I recall, I recall the testimony, yes.

19            THE COURT:  All right.

20   BY MR. GOTTESDIENER:

21   Q.  You also remember that this was a snapshot of -- telling us

22   that it was a snapshot of a day?  It was not moving through

23   time disclosing wear-away?

24            THE COURT:  What's the "it"?

25            MR. GOTTESDIENER:  The Greenville summary.

1              THE COURT:  PX 99?

2              MR. GOTTESDIENER:  Yes.

3              THE COURT:  All right.

4              MR. GOTTESDIENER:  With those examples.

5              THE COURT:  I will allow it.

6    A.  If I recall that?  Yes, it's a snapshot in time.

7    Q.  So it's not moving through time disclosing wear-away,

8    correct?

9    A.  It's not moving through time, correct.

10   Q.  Disclosing wear-away?  No new benefit accruals?  It doesn't

11   disclose that?

12   A.  It doesn't specifically state no new benefit accruals,

13   correct.

14   Q.  Or show that?

15   A.  Or show it, right.

16             MR. GOTTESDIENER:  No further questions.

17             THE COURT:  All right.  Thank you.

18             OK.  Ms. Derham you may step down.  You are excused.

19             Thank you very much.

20             THE WITNESS:  Thank you.

21             THE COURT:  Be careful getting off the witness stand

22   there.  There is a step.  We will talk about a few logistics

23   and then we will end for the evening ourselves.

24             (Witness excused)

25             THE COURT:  In terms of next witnesses, as I

F7mnosb8                         Derham - cross

 1    understand it, the witness that is left is Mr. Sher.

 2              Am I correct?

 3              MR. RUMELD:  Correct, your Honor.

 4              THE COURT:  He would be called first thing tomorrow

 5    morning.  Also correct?

 6              MR. RUMELD:  Also correct.

 7              THE COURT:  Is that the only witness the defendant

 8    intends to call at this point?

 9              MR. RUMELD:  Also correct.

10              THE COURT:  All right.  Terrific.

11              How long do you expect Mr. Sher's direct testimony to

12    last?

13              MR. RUMELD:  It is always hard to tell.  I won't be

14    surprised if it takes all or most of Thursday.

15              THE COURT:  All right.

16              So we've got Thursday and we've got Monday.  In any

17    event, Mr. Gottesdiener only has about how much time left?

18              THE LAW CLERK:  About two hours.

19              THE COURT:  About two hours.

20              We have to leave him two hours.

21              MR. GOTTESDIENER:  Your Honor, I guess I didn't make

22    it prominently enough, but we filed a letter today.

23              THE COURT:  Yes, I have seen that the letter has come

24    in.  I started reviewing it at lunch.  I have not concluded my

25    review of it because there are a bunch of different subparts

F7mnosb8                        Derham - cross

1   that I want to think about.  I know you have made an

2   application to preclude much of Sher's testimony.

3           The application is very likely to be denied because

4   most of it goes to the weight, which at this point I can take

5   into consideration.  You've got two hours in any event, and

6   that was before making the application.

7           I mean, it's not going to change anything that's going

8   to happen at this point.  So the defendant can do their direct

9   examination as they see fit and you will take your best shots.

10  There is a point about the withdrawal of one of the reports.

11          I don't know anything about the withdrawal of the

12  reports yet.  I had assumed that the reports that were handed

13  to me as part of the joint pretrial order are the reports.

14          So those are the reports that I have looked at and

15  been thinking about.  I have now studied them quite closely.

16  So I am curious to know what is happening with that.

17          But, Mr. Gottesdiener, I will give you a better view

18  of it tomorrow because it seems like a lot of it was frankly

19  similar potentially to what had been done with Mr. Deutsch, at

20  least it's difficult for me to distinguish.

21          You folks are closer to it, so it's easier for you to

22  distinguish.  For me it seems to go to weight, and things I can

23  eliminate I can eliminate.  I am not going to let any witness

24  become the fact-finder or substitute for factual testimony that

25  ought to come from fact witnesses.  But if they use a series of

F7mnosb8                        Derham - cross

 1    documents to inform their opinions at this point, I am just

 2    going to let them march on through to get to the bottom line.

 3              MR. GOTTESDIENER:  There are also 34 slides that we

 4    detailed.

 5              THE COURT:  The slides, though, you had a whole bunch

 6    of slides, too.  I am very --

 7              MR. GOTTESDIENER:  But the nature of our objections,

 8    your Honor, are completely different than theirs.

 9              THE COURT:  I understand.

10              The objections, you should take a look at your slides

11    and take a look at the objections that were originally lodged.

12              MR. GOTTESDIENER:  When they raised something --

13              THE COURT:  Hold on.

14              Let me just go through a couple of little things.

15              One, don't chew gum in my courtroom anymore.  OK?

16              Two, don't argue with me.

17              And, three, can you stop the facial expressions.  It

18    is driving me out of my mind.  You do it with witnesses; you do

19    it with me.

20              I actually have, I think, the patience of, more

21    patience the most judges I know.

22              Don't argue with me.  I told you what I will do

23    tomorrow is make a ruling.  If you disagree, you have lodged

24    your objection.  It is there for appeal.

25              All right.  Mr. Rumeld, with Sher, what are you

F7mnosb8                        Derham - cross

1  withdrawing, if anything?  I have only heard about this from

2  Mr. Gottesdiener's letter.

3         Are you putting in a response to the letter?

4         MR. RUMELD:  So, first of all, with apologies, your

5  Honor, I think you can see there is a division of labor.  Here

6  and Mr. Rachal is back at the office.

7         I do understand there will be a response to

8  Mr. Gottesdiener's letter that we can send in this evening.

9  The report that's being withdrawn is the June 27, 2012,

10  rebuttal report.  We are simply withdrawing it as a trial

11  exhibit.

12         THE COURT:  As a trial exhibit?

13         MR. RUMELD:  Correct.

14         THE COURT:  All right.

15         Then as a trial exhibit it is withdrawn.  But the fact

16  of it having formed the basis for opinions still leaves it open

17  for cross-examination and doesn't change or alter the

18  statements that Mr. Deutsch made in response to it because all

19  of that was done pretrial and in preparation for trial.  So

20  that all remains.  You are just not putting it forward

21  affirmatively.

22         MR. RUMELD:  I think that's right, your Honor.

23         THE COURT:  So it doesn't change Mr. Deutsch's

24  opinions and what he said from his perspective at trial at all.

25         The other issues.  For Kanowicz, I have watched quite

F7mnosb8                         Derham - cross

1    a bit of Kanowicz.  There's over four hours of Kanowicz

2    videotape.  It would be helpful for me if people could focus

3    me, now that I have watched her discuss the Ducks and the

4    Outlaws and her view of this person and that person, I think I

5    have a sense of her as a witness.

6            I would like to focus on those parts that you believe

7    are particularly important for her credibility.  I have read

8    her deposition designations before.  I am really watching the

9    videotape to get a sense of what people think is important to

10   see on camera.

11           I haven't gotten to it yet.  I am a ways in.  I know

12   there's stuff there.  I mean, I could predict which I think are

13   the big moments people want me to watch, but I want to give you

14   folks an opportunity.  I can't watch the whole four hours.  All

15   right.

16           If you want to generally, you can point me to pages in

17   the transcript, I can actually find that.  You don't have to

18   give me hours or minutes, because it's easy enough for me just

19   to slide my cursor across the screen, but just something to

20   guide me.

21           Exhibits.  I need to understand before we end on

22   Monday or as we end on Monday, what's coming off your list.

23   And this is like I should say lists, because it's your

24   respective lists.  The plaintiffs have actually gone through a

25   fair number of their exhibits, but not all.

1   The defense it's just with the back and forth and the

2   numbers, it's unclear to me.  I don't know if you folks have a

3   cross-reference number.  I know that Mr. Huang does.

4   It's Huang, right?

5   MR. HUANG:  Yes.

6   THE COURT:  So somehow if people could give me a

7   revised set of lists so that I could make sure we get entered

8   into evidence that which people are expecting we are going to

9   enter into evidence, that would be very helpful.

10   We will do that then formally by, I'll then state it's

11   received into evidence subject to the objections which have

12   previously been lodged, which I told you I would resolve when I

13   decide what I am relying on.  I will then just literally attach

14   the revised exhibit lists.

15   OK.  I think that's what I had on my list.

16   All right.

17   Mr. Rumeld, you are going to talk to Mr. Rachal about

18   the Sher response?

19   MR. RUMELD:  Yes.  We already have an e-mail that

20   indicates he's planning to send a response in.

21   THE COURT:  You should ask him if he can meet and

22   confer with Mr. Gottesdiener about the demonstratives, so that

23   at least I don't hear from the first time if only he had talked

24   to me about this we could have changed the following thing.

25   All right?

F7mnosb8                          Derham - cross

1           MR. RUMELD:  All right.

2           THE COURT:  I am not saying you are going to reach a

3    resolution, but I think the process does need to occur.

4           Thanks.  I will see you folks in the morning at 9.

5           MR. GOTTESDIENER:  Your Honor, I'm sorry.

6           THE COURT:  Yes.

7           MR. GOTTESDIENER:  If we are only two hours, this

8    raises a question.  If the Court is going to allow Mr. Sher to

9    give lengthy testimony, I don't know that I would need all that

10   time, but I would think if the Court is going to receive even

11   half of what he is offering, that raises a question about

12   Monday and about closing arguments.

13          THE COURT:  For Monday, we would come back.  If people

14   are still going and we have time left on the clock, we will be

15   back on Monday, and people should plan for that.

16          In terms of closings, let's see where we are.  I at

17   this point in time am not feeling like I really need closings

18   because I got the proposed findings of fact, the proposed

19   conclusions of law, I have heard the witnesses, I have been

20   following the documents, but I don't want to preclude people

21   who believe that they have heard it come in and they are very

22   much wanting to give their overview of how it all fits

23   together.

24          In that case, what I will do is we can do that.  So

25   it's not unfair we can do it outside the witness time, but give

F7mnosb8                          Derham - cross

1    it a limited amount time.  Do you know what I mean?

2              I'm not going let Mr. Rumeld give a closing and not

3    Mr. Gottesdiener.  What I do is preclude you both.

4              So, to make it fair, if either you really feels

5    strongly that you would like something, I would like to keep it

6    limited and I'll keep you both on a clock, but that's how we

7    will do it.

8              That gives you two hours for Mr. Sher.

9              MR. GOTTESDIENER:  OK.

10             THE COURT:  But only two hours for Mr. Sher.  So if

11   he's on for a day and a day plus two hours, your cross is still

12   just two hours.

13             MR. GOTTESDIENER:  I understand.

14             Could I also just please, your Honor, apologize to the

15   Court about the gum.  I take allergy medication, and every day

16   when I go to the cafeteria, I forget they don't sell mints.  So

17   I need to keep something in my mouth.

18             THE COURT:  I will give you a little pointer, which is

19   downstairs, the news guy downstairs, they actually sell not

20   only mints but they also sell Hostess cupcakes, not made by

21   Hostess, made by a knockoff of Hostess.  I have found them also

22   to hit the spot.

23             MR. GOTTESDIENER:  I thought that was imperceptible,

24   but as your Honor said at the beginning of the trial, you see

25   everything.

F7mnosb8                        Derham - cross

 1              THE COURT:  This is the problem.  I understand that

 2      I'm much more blunt about that than a lot of people, but I also

 3      think that it is important that you guys make your record and

 4      you understand if there are other things that are getting in

 5      the way of everything.  And so here we are.  It is all good.

 6              MR. GOTTESDIENER:  Thank you, your Honor.

 7              THE COURT:  The case is going to be decided absolutely

 8      on the merits, not based upon whether people are drinking

 9      coffee, spilling coffee, chewing gum, or otherwise.

10              MR. GOTTESDIENER:  Making facial expressions.

11              THE COURT:  Making facial expressions.  It is on the

12      merits.

13              MR. RUMELD:  I can just ask one more question, and we

14      can take this up tomorrow.  It seems to me not unlikely that

15      about lunchtime Monday we will be done with Mr. Sher.

16              THE COURT:  OK.

17              MR. RUMELD:  If there are going to be closing

18      statements, and I will volunteer in advance that given a choice

19      I would like to make a closing statement, would we proceed

20      straight to that Monday afternoon or schedule another time?

21              THE COURT:  I will look at my calendar and I will know

22      better -- you need to know Friday.  I think we can schedule

23      another time.  I told you have I have a bench trial right

24      behind you on Tuesday, but it is very short.  So it's possible

25      that I could, depending on your schedules, set something up

F7mnosb8                          Derham – cross

1   before the 31st.

2           But that is what we would be looking at.  For the

3   month of August I am doing only criminal things or I am away

4   for a week.

5           MR. GOTTESDIENER:  I, too, would like a closing.

6           THE COURT:  What I would think is, why don't you folks

7   talk about how much time you would like, whether you would

8   prefer to do it right away, or if you don't, if there is a day

9   when you are both free and I'll try to see if I can be free.

10          Or is that too much to ask for, that level of

11  cooperation?

12          MR. GOTTESDIENER:  I think we have been cooperating.

13          THE COURT:  OK.

14          MR. GOTTESDIENER:  We just object to Mr. Sher.

15          THE COURT:  All right.  Meet and confer over that

16  topic, and we will talk about it tomorrow.

17          All right.  Thanks.  We are adjourned.

18          (Adjourned to Thursday, July 23, 2015 at 9 o'clock

19  a.m.)

20

21

22

23

24

25

1

INDEX OF EXAMINATION

2   Examination of:                            Page

3   Cross By Mr. Gottesdiener  . . . . . . . . .1211

4   Redirect By Mr. Rumeld . . . . . . . . . . .1291

5   MICHAEL T. STEVEN

6   Cross By Mr. Rumeld  . . . . . . . . . . . .1365

7   Redirect By Mr. Gottesdiener . . . . . . . .1380

8   Recross By Mr. Rumeld . . . . . . . . . . . .1388

9    ELLEN GLICKFIELD

10   Cross By Mr. Rumeld  . . . . . . . . . . . .1391

11   MARION DERHAM

12   Direct By Mr. Rumeld . . . . . . . . . . . .1404

13   Cross By Mr. Gottesdiener  . . . . . . . . .1426

14

15

16

17

18

19

20

21

22

23

24

25