F7nnosb1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

GEOFFREY OSBERG,

                    Plaintiff,

            v.                              07 Civ. 1358(KBF)

FOOT LOCKER, INC. et al.,

                    Defendants.

------------------------------------x
                                    New York, N.Y.
                                    July 23, 2015
                                    9:00 a.m.
Before:

                    HON. KATHERINE B. FORREST

                                         District Judge

                          APPEARANCES

GOTTESDIENER LAW FIRM, PLLC
        Attorneys for Plaintiff
BY:  ELI GOTTESDIENER
        STEVEN COHEN
        ALBERT HUANG

PROSKAUER ROSE LLP
        Attorneys for Defendants
BY:  MYRON D. RUMELD
        ROBERT RACHAL
        JOSEPH E. CLARK


ALSO PRESENT:
Jon Int-Hout, Trial Technology Specialist
Randall Carter, Trial Technology Consultant

F7nnosb1

1          (Trial resumed)

2          (In open court; case called)

3          THE COURT:  Good morning all of you.  We are going to

4     get into the testimony of Mr. Sher in just a moment, but let me

5     ask, I had previewed last night dealing with the letter motion

6     by the plaintiffs to preclude and/or strike certain aspects of

7     his testimony.

8          Except in one respect, which is minor, I am going to

9     deny the motion for the following reasons:

10          One, I checked back on the docket and didn't find any

11     *Daubert* motion that had been made previously, which would

12     normally be the way in which one would raise issues as to

13     reliability, expertise, and things of that nature.

14          It is frankly difficult to do it on the fly in 24

15     hours, and the better course here is to allow the testimony,

16     and the Court will sort out that which is appropriate from that

17     which is inappropriate.

18          I am not going to rely upon anything that is

19     irrelevant, and anything that is beyond Mr. Sher's expertise is

20     subject to cross-examination, if there is anything that falls

21     into that category.

22          In terms of relevance, there are a number of relevance

23     objections.  If we look at the second page of the plaintiff's

24     letter, which is on ECF at 368, it's the 7/22 letter, there are

25     various ways in which these statements are in fact

F7nnosb1

1    objectionable, and I agree with that.  However, it is also the

2    case that these statements can be associated with points which

3    are relevant and are important to this case.

4              For instance, whether or not -- to take the first

5    bullet point -- the cash balance plan saves money or always

6    saves money, is designed to save money or only saves money with

7    wear-away is an important point to understand if that is one of

8    the items that would be captured within that first bullet

9    point.

10             As to the second bullet point, that really just sets

11   the background.  I don't think that the sustainability of the

12   retirement program is in and of itself a core issue here except

13   as to overall intent.  Ultimately it's the intent as to the

14   communication of the full details of the plan and/or of the

15   benefits that is most relevant.  When I say full detail I don't

16   mean every comma, I mean every major material aspect of the

17   plan relevant to a participant, so I see that point as

18   background.

19             As to the third point, which is if the cash balance

20   plan had not been adopted it's likely that another cost-saving

21   course would have been taken, that is truly something which the

22   Court would ignore, but I take that simply as self-evident in a

23   way in which a company which doesn't save costs in one manner

24   might save costs in another manner.  I wouldn't expect that

25   that is a place where Mr. Sher would spend any time.

F7nnosb1

1          The remaining issues that are in the bullet points

2     really go to what I'm going to call intent.

3          Now, there are different standards which you folks

4     argue are applicable to intent.  I think if the plaintiffs are

5     correct, largely some of this would become irrelevant.  If the

6     defendants were correct, then some of this would be potentially

7     indicative of circumstantial evidence as to good faith and

8     intent in that manner.

9          So I am not going to essentially give a ruling at this

10    point that would determine that issue.  I am obviously thinking

11    a great deal about all legal issues, and among them are the

12    various legal standards applicable.

13         The remaining issues are really subject to

14    cross-examination, including the points relating to the 9

15    percent etc.

16         So that's as to the content.

17         As to the attachments, I have been through them

18    carefully.  I can't really tell what all of them are relating

19    to.

20         MR. RACHAL:  Your Honor?

21         THE COURT:  Yes.  You have solved it?

22         MR. RACHAL:  I think I solved it, or we solved a piece

23    of it.  The draft of my response letter messed the response on

24    that.  Those attachments are not his slides.  I don't know what

25    they are.  The attachments to Mr. Gottesdiener's letter are not

F7nnosb1

1    Mr. Sher's files.  They are something else.  I don't know what

2    they are.  Those are not his slides.

3             THE COURT:  368-1 is the ECF attachment that I had

4    that were indicated as his slides.

5             MR. RACHAL:  Right.

6             THE COURT:  If they are not his slides, so be it.  The

7    only one I thought was something I was going to preclude was

8    the first page.  The rest of it I couldn't tell what it was

9    aimed for, but that is neither here nor there.  If they are not

10   his slides, we won't see them.

11            MR. RACHAL:  You may see them from plaintiff later.

12            THE COURT:  So be it.

13            With that said, let's go ahead and commence.

14            Mr. Rachal, would you like to call the defendant's

15   next witness.

16            MR. RACHAL:  Yes.  Mr. Sher.

17            THE COURT:  Mr. Sher, please take the stand.

18            MR. RACHAL:  Your Honor, would you like a copy of the

19   demonstratives.

20            THE COURT:  Have you given the actual demonstratives

21   to the plaintiffs?

22            MR. RACHAL:  Yes.  We have resolved most of the

23   objections.  There are still a few we have left.  I don't know

24   if you want to do that now or as we go through the testimony.

25   We have most of them resolved, but not all of them.

F7nnosb1

1           THE COURT:  I would rather deal with things at the

2      outset than have testimony interrupted.

3           MR. RACHAL:  OK.

4           THE COURT:  Why don't you give me a set.  Why don't

5      you folks tell me --

6           MR. GOTTESDIENER:  Your Honor, I might suggest, I

7      think the defense might agree that we are narrowing, and the

8      ones that remain that will be disputes I think the Court would

9      benefit from briefly hearing the dispute after having heard

10     some of Mr. Sher so you would have a real feel and you would be

11     able to rule really quickly, because right now we would have to

12     start --

13          THE COURT:  Right.

14          MR. GOTTESDIENER:  -- educating the Court as to which

15     position they have.

16          THE COURT:  I think that is fine with me, if that's

17     the better way to proceed in light of what you folks know about

18     the slides.

19          MR. GOTTESDIENER:  We also have a lot of ground to

20     cover.

21          THE COURT:  Yes.

22          MR. RACHAL:  Two things I would say, your Honor.  We

23     resolved some of the objections.  Just so Mr. Gottesdiener

24     knows, what we just provided the Court has the adjustments or

25     changes we made in light of the discussion, so that set has

F7nnosb1

1    that, and the one that will pop up on the screen should have

2    that.

3            I absolutely agree.  A lot of these objections may get

4    mooted once seen in the context of Mr. Sher's testimony.

5    Mr. Gottesdiener may decide it's not objectionable.

6            I had some of that happen with some of Mr. Deutsch's

7    slides.  Sometimes you are not sure what they are being used

8    for.  One purpose may be OK; another purpose maybe not.

9            THE COURT:  Let's do it this way.

10           I have been handed a set of slides which bear

11   consecutive numbers 1 through 13.  I haven't checked to see if

12   every page is there, but I am going to assume that I have 34

13   pages.

14           Is that right, Mr. Rachal?

15           MR. RACHAL:  Yes.

16           THE COURT:  34 slides.

17           MR. RACHAL:  It should be 405 to 435, and there's one

18   slide, DX 434.  I thought I would give you a heads-up that we

19   are proceeding to resolve the objection.  We are not there yet,

20   but we may be able to resolve it over lunchtime.

21           THE COURT:  The slides are also numbered in the bottom

22   left with DX numbers, with DX 405 running consecutively through

23   DX 435.

24           Thank you.  Let's go ahead and swear the witness.

25     LAWRENCE SHER,

F7nnosb1

1          called as a witness by the Defendant,

2          having been duly sworn, testified as follows:

3               THE COURT:  Mr. Sher, please be seated.  I am sure you

4     understand how important it is that you speak slowly and

5     clearly into the mic.

6               THE WITNESS:  Yes.

7               THE COURT:  Thank you.

8               MR. RACHAL:  Your Honor, do you want me to bring up

9     the reports that he's swearing to, a copy?

10              THE COURT:  Do you have a set?  Does he have a set in

11    front of him?

12              MR. RACHAL:  The witness has a set.  Does the Court

13    want a set.?

14              THE COURT:  No.  I've certainly got a set.

15              MR. RACHAL:  OK.

16              THE COURT:  Mr. Sher --

17              MR. RACHAL:  One other thing.  I hate to interrupt.

18              THE COURT:  Yes.

19              MR. RACHAL:  One other housekeeping thing.

20              We withdrew one of his reports.  There is a back and

21    forth in the letter.  We don't have any objection to it being

22    in the record.  We withdrew it because it is not going to be

23    pertinent to his testimony.

24              THE COURT:  All right.  You had said you don't have

25    any problem having it in.  Does the plaintiff want it in?  We

F7nnosb1

1      are happy to keep it in then.

2                MR. GOTTESDIENER:  Yes, your Honor.

3                THE COURT:  All right.  So Mr. Sher, how are yours

4      numbered?  Mine are numbered 15A through D.  But will you look

5      and see whether or not --

6                MR. RACHAL:  I have it.

7                Those will match up.

8                I can tell you just, so we are sure we are on the same

9      page, we have it as DX 12, which I think is 15 --

10               THE COURT:  DX 12, DX 401, DX 14, and DX 400, correct?

11               MR. RACHAL:  Yes.  That's the DX numbers I have, which

12     I think correlate to 15A through D.  They are the same report.

13     One we had withdrawn, but we are fine keeping them in the

14     record.

15               THE COURT:  Mr. Sher, can you confirm that those are,

16     in fact, your expert reports which you intend to offer as a

17     portion of your direct testimony in this matter?

18               THE WITNESS:  I can on three of them.  The one that

19     had been withdrawn I don't think is in front of me, but if it's

20     what I think it is, I certainly can.

21               THE COURT:  All right.  We will get a copy of it at

22     some point and put it in front of him so that he can confirm

23     that.

24               Do you swear to the truth of the contents of those

25     declarations and those reports?

f7nnosb1                         Sher - direct

1              THE WITNESS:  I do.

2              THE COURT:  All right.  Thank you.

3              You may proceed, Mr. Rachal.

4     DIRECT EXAMINATION

5     BY MR. RACHAL:

6              MR. RACHAL:  Your Honor, briefly I am going to touch

7     upon Mr. Sher's background that we believe that is particularly

8     pertinent to the issues in his testimony here in the case.

9     BY MR. RACHAL:

10    Q.  Mr. Sher, were you a member of A standard settings board

11    for the actuarial profession?

12    A.  Yes.  For six years I was a member of the Actuarial

13    Standards Board, which is a board that provides actuarial

14    standards of practice for all actuaries in the U.S.

15    Q.  Have you ever advised employers and others on cash balance

16    plans and conversions?

17    A.  Yes.  On many occasions, both in terms of my own clients,

18    as chief actuary at the firms, at firms that I worked at, I

19    advised as sort of the go-to person on cash balance issues.  So

20    I advised employers who were clients of some of my colleagues.

21    I have also advised government officials at both private

22    meetings and at public hearings.

23    Q.  Have you conducted any research projects or made any

24    presentations on cash balance plans?

25    A.  To start with the presentations, I have made numerous

f7nnosb1                        Sher - direct

1   presentations at various actuarial and industry meetings over

2   the years.

3           What was the other one?

4   Q.  Oh.  You conducted a research project?

5   A.  Oh, research, yes.  I conducted, I was basically in charge

6   of a survey that was actually attached I believe to my first

7   report when I was at PWC back in 2000.

8           It was a survey of 100 plans that are converted from a

9   traditional defined benefit plan to a cash balance plan.  Also

10  did a follow-up study four years later when the group I was

11  with was acquired by Mellon, Mellon Bank, and in various other

12  research projects over the years involving cash balance plans.

13          THE COURT:  Let me just ask a question since you have

14  raised the survey.

15          Was Woolworth a participant in that survey?

16          THE WITNESS:  Your Honor, I don't know.  Certainly I

17  don't know at this point, and I may never have known, because

18  one of the things that we tried to do was keep the names of the

19  companies sort of off on the side.  When we publish a survey,

20  one of the stipulations in trying to get companies to agree to

21  participate was that their names would not be revealed.

22          THE COURT:  All right.  Thank you.

23          THE WITNESS:  You're welcome.

24  BY MR. RACHAL:

25  Q.  Finally, Mr. Sher, did you testify as an expert in the

f7nnosb1                          Sher - direct

 1   *Amara v. Cigna* case?

 2   A.  Yes, I did.

 3            MR. RACHAL:  Jon, if you would pull up DX 405.

 4            This is just an overview of the topics that Mr. Sher

 5   will be addressing in his testimony.  The first topic we are

 6   going to go to is whether wear-away had dual aspects from a

 7   benefit and cost perspective.

 8            What is your opinion, Mr. Sher, on whether wear-away

 9   had dual aspects from a cost perspective?

10   A.  OK.  I think what you mean, and correct me if I'm wrong,

11   but certainly there would be normal cost savings with respect

12   to individuals while they are in wear-away.  Those benefits are

13   not being added at that point so that the normal cost for them

14   would be zero until they get out of it.

15            On the other hand, when people take lump sums,

16   particularly in those early years, interest rates had come down

17   quite a bit and stayed down for the most part.

18            Every time somebody took a lump sum -- and there were

19   loads of people who did so in all three years, '96, '97, '98,

20   but focusing on '96 for a minute, when people took lump sums

21   invariably there was a loss to the plan because of the

22   favorable rates that those lump sums were being cashed out at,

23   at 6 percent discount or something close to 6 percent, rather

24   than the rate of return that the actuary was assuming, which

25   was 9 percent.  So that differential caused a significant

f7nnosb1                          Sher - direct

1    increase in company cost.

2              THE COURT:  Let me ask, and I don't want to bog us

3    down too much in things you are going to get into in

4    substantial detail later, but does the unfunded liability also

5    take a decrease if a lump sum is paid out?

6              THE WITNESS:  No, your Honor.  Actually it increases

7    when a lump sum is paid out.  What happens is the assets

8    decrease --

9              THE COURT:  I understand that.

10             THE WITNESS:  -- exactly as to what is paid out, but

11   the liabilities don't decrease by as much because the plan is

12   holding a smaller liability with respect to an individual who

13   is paid out because the liability is being discounted at 9

14   percent.

15             So the liability is smaller versus the assets that are

16   paid out.  So what happens is both numbers come down, but the

17   assets come down by more than the liabilities, and you get an

18   increase in the unfunded liability, and then that has to be

19   amortized, kind of like a mortgage, to make up for the deficit

20   over time.

21             THE COURT:  All right.

22             We'll get into that, I'm sure, more.

23             MR. RACHAL:  Yes.

24             THE COURT:  You may proceed.

25   BY MR. RACHAL:

f7nnosb1                          Sher - direct

1   Q.  I am going to go first to the normal cost part of this

2   evaluation.

3           Just for the record, Mr. Sher, what are normal costs?

4   A.  It is an actuarial term.  I will try to describe it pretty

5   simply.  At least in this situation the actuary was Mercer,

6   they were using a particular methodology where the normal cost

7   under that methodology is very simply increase in the benefit

8   that each individual has under the plan the present value, the

9   cost to provide that increased benefit during the ensuing year.

10  So a normal cost is an amount determined for a given year.

11  Q.  Based on your review of the documents from Mercer, did you

12  see any expected reduction in normal cost related to wear-away?

13  A.  Yes, I did.

14  Q.  What did Mercer's cost analysis to Foot Locker show on

15  normal cost savings between the first and subsequent years?

16  A.  I think what they showed is expected normal cost in the

17  first year and then they showed ongoing years.  And, of course,

18  there is a differential.  The savings in the first year is

19  greater, so the normal cost is expected to come down compared

20  to the prior plan by more in the first year than in subsequent

21  years.

22  Q.  Was it your interpretation and understanding that that

23  difference between the first year normal cost and the ongoing

24  normal cost was related to wear-away?

25  A.  Yes.

1           THE COURT:  Is wear-away a necessary feature of the
2     cash balance plan?
3           THE WITNESS:  No, your Honor.
4           There are a variety of ways you can design a cash
5     balance plan.
6           If the objective is to set up opening balances so that
7     all of the individuals' benefits, both the future ones, which
8     are the pay credits added in, as well as the benefits
9     attributable to past service are expressed in the new paradigm,
10    that is, in terms of an account, once you have opening
11    balances, at least in the situations that I have looked at,
12    been involved in over the years, almost invariably there is a
13    chance of there being a wear-away at some point in time,
14    sometimes initially, sometimes maybe not initially.  But down
15    the road, especially when interest rates fall, even plans that
16    have no wear-away up front could end up with wear-away just
17    because interest rates have come down and the value of the
18    prior benefit has gone up, whereas the cash balance is just
19    going up nice and steadily.
20          MR. GOTTESDIENER:  I want to lodge an objection, your
21    Honor, because your Honor's question --
22          THE COURT:  That is OK.  I felt like I got an answer
23    to it.  I did.
24          So overruled.  It is actually in the nature of a
25    motion to strike.  Overruled and denied.

f7nnosb1                          Sher - direct

 1              Thank you.

 2              THE WITNESS:  You're welcome.

 3    BY MR. RACHAL:

 4    Q.  What was your interpretation based on Mercer's breaking out

 5    the normal cost to Foot Locker on the first year versus ongoing

 6    in relation to what it meant on wear-away, potential wear-away

 7    savings?

 8              MR. GOTTESDIENER:  Objection.

 9              THE COURT:  Overruled.

10    A.  Well, my interpretation was that Mercer anticipated that

11    the bulk of the normal cost savings would be in the first year.

12    Otherwise, I would have expected -- you know certainly this is

13    what I would have done -- I would have expected them to show a

14    pattern of decreasing normal costs.  So I guess my

15    interpretation was, is that it must not have been significant,

16    the difference between the second year, what they thought the

17    second year normal cost was and what they showed as ongoing

18    that it was significant they would have shown it.

19              MR. RACHAL:  Jon, would you pull up the Kiley notes,

20    Exhibit PX 129, the first page, and highlight the third

21    paragraph, the whole third paragraph, beginning with the 5 --

22    yes.

23    BY MR. RACHAL:

24    Q.  I'm going to read this and then I have a question for you.

25              The $5,625,000 is a onetime normal cost.  This is

f7nnosb1                          Sher - direct

1    because of GATT, which requires a minimum interest of 8

2    percent.  We calculate at 9 percent.  So in first year you get

3    credit for wear-away.

4              My first question is, and this is dated March of '95,

5    is what was the spread when they were designing the plan in

6    this period between the GATT rate and the discount rate used

7    for the initial account balance?

8              MR. GOTTESDIENER:  Objection.

9              THE COURT:  Overruled.

10   A.  Well, the reference to 8 percent, to GATT, GATT basically

11   is legislation in the mid '90s, I think it was '94, that it was

12   a trade -- the General Agreement on Tariffs and Trade is what

13   it stands for, the acronym.

14             Part of that is, as is typically the case, some bill

15   like that gets some pension changes associated with it, and

16   what that did was it changed the interest rate basis and

17   introduced a mortality table for the first time into Section

18   417(e).  Previously the rates were another basis so-called, as

19   I think Mr. Deutsch explained, the Pension Benefit Guarantee

20   Corporation rates.

21             So 8 percent is about where the 30-year government

22   bond rates, the new basis at the time were at in the early --

23   in early 1995.  I think the rate at the end of '95 was 7.87

24   percent.  So that was, I took that as -- it's about 8 percent.

25             So the differential between that rate and the 9

f7nnosb1                          Sher - direct

1    percent rate which is used to determine opening balances is 1

2    percent.

3            THE COURT:  Let me ask, is it possible --

4            MR. RACHAL:  I'm sorry.  We do have a quick -- go

5    ahead, your Honor, ask your question and we have a correction.

6            THE COURT:  Is it feasible to design a conversion from

7    a career average plan to a cash balance plan which does not

8    save significant cost to the company?

9            In other words, can cost saving an embedded feature in

10   a cash balance plan, or is it something which may or may not

11   accompany a cash balance plan, at least at the outset?

12           THE WITNESS:  I think there are many design elements

13   which go into the cash balance plan.  Certainly, there are ways

14   to design a cash balance plan to produce pretty much whatever

15   level of cost you want, higher, lower, about the same.

16           Opening balances can be determined in a variety of

17   ways.  As a matter of fact, they don't even have to be based on

18   the prior plan accrued benefit.  I have seen that, not often,

19   but sometimes.

20           The pay credits, you know, what the scale looks like,

21   the level of the pay credits and the scale, opening balance

22   enhancements, other features there, are just so many varieties

23   of features that these plans can have that you can pretty well

24   dial in, you know, what you want in terms of cost.

25           THE COURT:  All right.  Thank you.

f7nnosb1                        Sher - direct

1              You may proceed.

2     BY MR. RACHAL:

3     Q.  Mr. Sher, when you said that the 30-year treasury rate was

4     about 7.87 percent, I think your testimony was that it was, at

5     the end of '95 was at --

6     A.  Whoops, '94.

7     Q.  End of '94?

8     A.  It was the rate for December '94.  I got my years mixed up.

9     Sorry.

10    Q.  OK.  Thank you.

11             How do you interpret what Mercer is telling Mr. Kiley

12    about how long to expect the normal cost savings from wear-away

13    based upon his notes?

14             MR. GOTTESDIENER:  Objection.

15             THE COURT:  Sustained.  We don't need him to interpret

16    the notes.  You can ask him questions about one year of cost

17    savings, something of that nature.  But interpreting the notes

18    I think is not necessary.

19             MR. RACHAL:  All right.

20    BY MR. RACHAL:

21    Q.  In these notes, I think you have PX 129 before you, did you

22    see any other reference to cost savings from wear-away other

23    than this reference here, the one that is highlighted, that

24    third paragraph?

25    A.  I will take a minute to look through it.

f7nnosb1                          Sher - direct

1    Q.  Yes, you may.

2    A.  No.

3    Q.  Is Kiley's notes on the normal cost savings here related to

4    wear-away consistent with the later normal cost analysis done

5    by Mercer?  When I talk about later later, in '95.

6              MR. GOTTESDIENER:  Objection.

7              THE COURT:  Overruled.

8    A.  When you say consistent, in terms of -- I am not sure.

9    Q.  Either amount or period of time in which we have the

10   savings or both.

11   A.  OK.  In the later cost illustrations or estimates that I

12   saw -- I think I indicated this already -- there was a

13   first-year normal cost, and I think it was termed ongoing

14   normal cost.

15             I believe that the differential between the two was in

16   the $5 million range.

17   Q.  I am going to turn now to lump sums.  In your rebuttal

18   report, did you analyze the cost of a lump sums to Foot Locker?

19   A.  Yes, I did.

20   Q.  You may have already touched upon this, Mr. Sher, but can

21   you briefly explain why lump sums had costs to the Foot Locker

22   plan.  I'm assuming that a participant was in wear-away for

23   this question.

24   A.  Immediately before electing a lump sum, the plan is holding

25   a liability for an individual which is based on the plan being

f7nnosb1                          Sher - direct

1    able to earn on the assets that are backing that liability a 9

2    percent per year rate.

3          There are also various other assumptions that are made

4    in terms of retirement ages and when people are going to leave,

5    how long they are going to live and so forth.

6          Once a person elects a lump sum, if the lump sum is

7    determined by discounting those future annuity payments that

8    the lump sum is replacing at a rate that is below the 9 percent

9    investment return rate, as I illustrated before, what happens

10   is you get an inflated, relative to the liability you are

11   holding, an inflated amount of assets that are being paid out,

12   but you are only losing the liability based on the 9 percent

13   discount rate, so the plan incurs a loss when that occurs.

14         MR. RACHAL:  Jon, would you pull up DX 406.

15   BY MR. RACHAL:

16   Q.  What does this slide illustrate, Mr. Sher.  Would you --

17   A.  OK.  This is a hypothetical example for an employee age 45

18   on December 31, 1995.  So just before the conversion date with

19   a $10,000 accrual annual age 65 annuity.

20         So it is an annual benefit that is accrued as of the

21   conversion -- just before the conversion date payable as age

22   65.

23         It is the present value of that at the valuation --

24   and the valuation rate that the actuary was using at 9

25   percent -- gets you the $13,959 number, which is shown down at

f7nnosb1                          Sher - direct

1    age 45.

2              Then the line as it's going up shows you the effect of

3    9 percent interest on that, so you see after 20 years, at age

4    65, the number is increased by a factor just because of

5    interest accrual on it, increased by a factor of about 5 or a

6    little bit more than 5, between 5 and 6, getting up to the

7    $78,232.

8              And then the other number that is shown here in red of

9    $29,721, all that is, is taking that $10,000 accrued benefit at

10   age 65 and converting it to a lump sum at the lump sum rate

11   that was then in effect for 1996, the first rate that applied

12   of 6.06 percent, and that gets you a present value of $29,721.

13             So that difference is -- when I talked about a loss

14   before, it's that difference that, for this example, it is a

15   hypothetical example, but it's not too different than might be

16   the case for a lot of people, this relationship would be

17   similar for a 45-year-old at least.

18   Q.  If in this example --

19             THE COURT:  Can I just ask?

20             MR. RACHAL:  Sure.

21             THE COURT:  The assets that are needed to provide the

22   annuity come out of the assets existing within the plan, is

23   that correct?

24             THE WITNESS:  Either existing, or, if there is an

25   unfunded liability, there will be additional contributions put

f7nnosb1                          Sher - direct

1    into the plan to cover any unfunded liability, but ultimately

2    they will be paid from the assets of the plan.  That's right.

3              THE COURT:  Let's just take the examples that occurred

4    in connection with the Woolworth plan and the payments of the

5    lump sums in the '96 to '97 time frame, just that time frame

6    for the moment.

7              Was it your understanding that the lump sums were

8    being paid out of existing plan assets?

9              THE WITNESS:  Well, yes.

10             I mean --

11             THE COURT:  So they wouldn't coming out of ongoing

12   corporate cash flow, for instance?

13             THE WITNESS:  That's correct.  The payments are coming

14   out of existing assets as long as there are assets.

15             THE COURT:  And there were?

16             THE WITNESS:  There were, yes.

17             THE COURT:  Sufficient to cover those lump sums?

18             THE WITNESS:  Yes.

19             THE COURT:  You may proceed.

20             MR. RACHAL:  Thank you, your Honor.

21   BY MR. RACHAL:

22   Q.  If the 417(e) rate for example had dropped down a percent,

23   say to about 5 percent, what would happen to the minimum lump

24   sum that would be paid out in this example?

25   A.  It would increase.

f7nnosb1                        Sher - direct

1    Q.  Conversely if the 417(e) rate rose and came back up to

2    about 8 percent, what would happen to the value of that minimum

3    lump sum paid out?

4    A.  It would drop.

5    Q.  Have you seen actual examples of this lump sum cost to Foot

6    Locker?

7    A.  Yes, I have.

8    Q.  Was Ms. Lerew an example?

9    A.  She is.

10            MR. RACHAL:  Jon, go ahead and pull up DX 407.

11   Q.  So when did Ms. Lerew terminate and take her lump sum

12   distribution?

13   A.  They terminated on January 4 of '96 and took a lump sum on

14   February 1, '96.

15   Q.  What does the blue bar show?

16   A.  The blue bar shows her opening balance, which was -- you

17   can see up at the top was $9,129, with interest added to it.

18   It's interest in this case only for one month, because you see

19   at the bottom it says account balance as of 2/1/96.  It was

20   brought forward with the 6 percent interest crediting rate for

21   one month, about a half a percent.

22            That gets you to $9,175.

23            Then there was a $20 pay credit for whatever she

24   earned during those three or four days up until January 4.  So

25   then you see the total is $9,195.

f7nnosb1                        Sher - direct

1    Q.   What does the green bar show?

2    A.   The green bar shows, it's the actual lump sum paid on

3    2/1/96, $22,693.  It is was determined as the present value of

4    the frozen accrued benefit at the 6.06 discount rate with

5    mortality as well.

6    Q.   What does the gray bar show?

7    A.   OK.  The gray bar is my attempt at estimating what Mercer

8    would have calculated as the liability in their actuarial

9    valuation on behalf of Lorie Lerew.  I have actually done that

10   in two pieces here.

11           The number at the bottom, where I actually give a

12   range to it between $10,000 and $13,000 -- let me just say the

13   reason I gave it a range is because I'm not sure based on the

14   summary that Mercer provided of their processes and assumptions

15   in how they did their calculations, I am not sure how they

16   handled a certain thing which I will describe in a minute.

17           But it is essentially the $10,000 to $13,000 is also

18   discounted at 9 percent, like the opening balance was, but the

19   reason it's higher than in the blue line, the $10,000 to

20   $13,000, is because in the valuation Mercer did reflect and did

21   anticipate the possibility of individuals ultimately being

22   entitled to and electing early retirement benefits, which would

23   have some subsidy.

24           We heard this discussion the other day in terms of

25   subsidized early retirement benefits.  So the plan does make an

f7nnosb1                          Sher - direct

allowance for that.  It's not clear to me exactly how they do

it, particularly if somebody leaves say at age 40.

So they make assumptions that at every age going

forward that someone might leave the company.  They might die,

they might terminate, ultimately they might retire, or they

might continue to work until some later age, 65, or they even

have an assumption of people retiring at late as 70.

So that is all built into the model.  For the people

who are assumed the probability, the portion of each person, if

you will, that is assumed to retire at early retirement age, or

start their benefits at early retirement age, they have an

allowance for that built in.

So that's why the $10,000 to $13,000, I am not sure

how they do it for people particularly who leave before, you

know, before early retirement age, whether they assume they are

going to retire all at age 55 or they are assuming they will

retire at 65 or something in between.  That's why I gave that a

range.

The $17,030, I've added in what I thought was the full

early retirement subsidy.  I'm saying OK, now, once Ms. Lerew

actually terminated on January 4, '96, if Mercer now let's say

knew that this person was going to terminate or they get

information that she actually terminated and they wanted to

value the most valuable early retirement benefit at that point

in time, they would say, OK, let's assume that Ms. Lerew is

f7nnosb1                          Sher - direct

<table>
<tr><td>1</td><td>going to take her benefit at age 55.  What is the present value</td></tr>
<tr><td>2</td><td>of the benefit that she would be entitled to, the annuity</td></tr>
<tr><td>3</td><td>benefit at age 55 reduced for early commencement using the more</td></tr>
<tr><td>4</td><td>favorable rate.  That works out to be $17,030.</td></tr>
<tr><td>5</td><td>Actually, I built in -- I have reflected the fact,</td></tr>
<tr><td>6</td><td>even though we usually use mortality when we pay lump sums, by</td></tr>
<tr><td>7</td><td>law they have to be based on a unisex mortality table.  We</td></tr>
<tr><td>8</td><td>can't can pay males and females different lump sums by law.</td></tr>
<tr><td>9</td><td>But in this case, I have actually anticipated -- I knew that</td></tr>
<tr><td>10</td><td>she was female.  I said, well, Mercer would for purposes of</td></tr>
<tr><td>11</td><td>their valuation assume, treat her as a female and come up with</td></tr>
<tr><td>12</td><td>a slightly larger number, so that's the $17,030.</td></tr>
<tr><td>13</td><td>Q.  Is it correct that is your estimation of the highest cost</td></tr>
<tr><td>14</td><td>that would be associated with Ms. Lerew if she maximized her</td></tr>
<tr><td>15</td><td>early retirement benefit by waiting until age 55 and then</td></tr>
<tr><td>16</td><td>commencing payment at that age?</td></tr>
<tr><td>17</td><td>A.  Yes.  Based on -- again, it is all based on the assumptions</td></tr>
<tr><td>18</td><td>that Mercer is making that the money would sit in the plan, she</td></tr>
<tr><td>19</td><td>wouldn't have to be paid until 55 and earn 9 percent each year</td></tr>
<tr><td>20</td><td>and then continue to earn 9 percent as long as there's still</td></tr>
<tr><td>21</td><td>money on her behalf still in the plan.</td></tr>
<tr><td>22</td><td>THE COURT:  But the $17,000 that you are showing there</td></tr>
<tr><td>23</td><td>in the gray box is a number that does not equate to a cash</td></tr>
<tr><td>24</td><td>balance account number that Ms. Lerew in this example would</td></tr>
<tr><td>25</td><td>have direct access to at any point in time, is that right?</td></tr>
</table>

f7nnosb1                          Sher - direct

1              THE WITNESS:  So if she left -- I guess we are talking

2         about if she left her money in the plan, rather than taking a

3         lump sum?

4              THE COURT:  No.  Let me do it differently.

5              The way I look at these numbers is I look at the

6         $9,000 and I say OK that's her opening cash balance.

7              THE WITNESS:  Right.

8              THE COURT:  As of I guess whatever the date was,

9         2/1/96.

10             Then I look at the green piece and I see that that's

11        $22,600, and that's the lump sum.  So that is the accrued

12        account balance as of 12/31/95.

13             Am I distinguishing those two correctly, valued as of

14        2/1/96?

15             THE WITNESS:  It is the accrued annuity benefit that

16        she had as of the end of '95 converted to a lump sum, so she

17        was entitled to that.  By law she was entitled to, you know,

18        that amount.

19             THE COURT:  Right.

20             THE WITNESS:  That's the frozen accrued -- the

21        frozen -- we call it the protected lump sum value.

22             THE COURT:  All right.

23             The point really is that the lump sum that we have

24        been talking about which relates to the prior plan is the

25        $22,600.

f7nnosb1                         Sher - direct

 1              Right?

 2              THE WITNESS:  That's right.

 3              THE COURT:  And the $9,175 is her opening account

 4     balance valued as of 2/96, correct.

 5              THE WITNESS:  That's right.

 6              THE COURT:  I just don't get what the 17 is in terms

 7     of -- Ms. Lerew is -- if she retires on February 1, '96, the

 8     $17,000 is irrelevant to her, though it may have relevance to

 9     some calculations the company keeps internally relating to

10     potential costs and/or savings regarding her.

11              Is the $17,000 relevant to her personally?

12              THE WITNESS:  It's relevant in the sense if she

13     didn't, if she did not take the lump sum of $22,693 and instead

14     decided to wait it out, and then when she becomes age 55, which

15     at that point she would be able to then elect from that point

16     forward, age 55 under the terms of the plan, either an annuity

17     or a lump sum, and that would be, OK, if she took an annuity at

18     that point in time, that is what the -- today the $17,000, at

19     February 1, '96, that's how much money would be needed in the

20     plan to fund that benefit.

21              THE COURT:  All right.  I think I get it.

22              THE WITNESS:  OK.  So you don't need any less than

23     what was paid out, the $22,693.  The plan would only need

24     $17,030 if she decided to wait it out and take that annuity at

25     the most valuable age.

f7nnosb1                        Sher - direct

1          THE COURT:  All right.  So this chart really shows me

2     the amounts that the plan needs to have given certain

3     scenarios?

4          THE WITNESS:  I would say that's correct.

5          THE COURT:  All right.

6          Then I understand the chart.  Thank you.

7          MR. RACHAL:  I have I think just one or two final

8     questions to wrap this up.

9     BY MR. RACHAL:

10    Q.  Under these assumptions, is it correct that what the plan

11    paid out in lump sum to Ms. Lerew costed more than it would

12    have cost the plan had she even taken the maximum early

13    retirement subsidy?  Again, this is under the assumption the

14    plan is going to earn 9 percent.

15    A.  Assuming the plan is going to earn 9 percent and other

16    assumptions which aren't as important in terms of how long

17    she'll live, yes, that's true.

18         THE COURT:  Just bear with me for a little bit.

19         THE WITNESS:  Sure.

20         THE COURT:  Because I am not an actuary.  I am not a

21    specialist in any kind of pension plan designs.

22         What I am trying to figure out is if, I am a corporate

23    executive, I am a CEO of a company and I am looking at my

24    entire pension plan and I've got a big chunk of it that's

25    funded and I am happy about that, and I have a chunk of it

f7nnosb1                          Sher - direct

1    that's unfunded and that worries me for a variety of reasons --

2    are you with me so far.

3              THE WITNESS:  Absolutely.

4              THE COURT:  I know I have this large population of

5    U.S.-based employees who have qualified for some amount of

6    participation in that plan.

7              If I know that, number one, I am going to do a lot of

8    layoffs and close a lot of facilities, I will be able to

9    predict that my plan participation is going to go down, right,

10   just as a matter of math?

11             THE WITNESS:  Right.

12             THE COURT:  I may have to pay out or give employees,

13   if I make a choice to have a cash balance plan or a lump sum

14   option even without a cash balance plan, the ability to take

15   funds from the plan, right?

16             THE WITNESS:  Right.

17             THE COURT:  But ultimately I would think that there

18   would be a way of managing my unfunded liability.  That's

19   really what I'm getting at.  That between employee attrition,

20   changing the cash balance formula to differ from the career

21   average formula to result in a slower rate of accrual, I would

22   think the combination of factors with a really good actuary

23   like Mercer would be able to project for me that my unfunded

24   liability is going to squeeze down at least some, even if I am

25   paying out in the short term.  Is that the kind of thing you

f7nnosb1                          Sher - direct

1   would advise people on?  Am I in the ballpark?

2          THE WITNESS:  Yes.

3          I think what we as actuaries, what we tend to do is,

4   when we are in a situation like this, is do -- at least in my

5   practice I would make estimates and projections and look at

6   different scenarios in terms of, OK, what happens if a bunch of

7   people get laid off, which seemed like a pretty reasonable

8   assumption to make at the time, how would these numbers be

9   affected by that?

10          The actuary is kind of in an awkward position.

11   Sitting there at January 1, you're supposed to sort of look, do

12   a snapshot as of the beginning of the year when you are

13   evaluating where the plan, what the funded status is as of that

14   date, what the normal cost is, the total cost is for the

15   following year.

16          An interesting question is, you know, should they be

17   making some type of special assumption that there are going to

18   be an extraordinary number of people laid off.

19          Usually what happens is announcements like that, there

20   is a hesitancy for a public company to announce to its actuary

21   information that is not in the public domain.  So the actuary

22   would almost certainly use the regular assumptions that people

23   are going to terminate in accordance with their regular normal

24   type assumptions, not anything extraordinary until it actually

25   happens or it becomes public that it's going to happen.

f7nnosb1                          Sher - direct

1          So, on the other hand, the actuary behind the scenes

2     should at least, I would at least make some forecasts as to how

3     these numbers are going to look.

4          What this shows -- and this is not a unique situation

5     for 1996, there were a lot of people that had numbers that

6     looked very much like this -- is that as a result of all of

7     these people leaving, and if they leave they're likely to take

8     a lump sum.  This is both because generally when a lump sum is

9     offered even when people are not being laid off, just a normal

10    course of events when lump sums are offered invariably the

11    substantial majority of people take them.

12         In this situation one would think that might even be

13    more the case.  People are being laid off, they need money,

14    they are trying to find another job.  It becomes almost a

15    severance-type benefit.

16         Now, that's going to cost.

17         So we look at it and say, well, that's going to

18    increase the unfunded liability of the plan to the extent of --

19              (Continued on next page)

20

21

22

23

24

25

F7NJOSB2                          Sher - direct

1            THE COURT:  $5,000.00?

2            THE WITNESS:  Like that for each person.  I think

3    Mr. Deutsch calculated an amount which he got from the actual

4    report, something like $20 million is his number just for 1996,

5    that loss.

6            Yes, the plan is incurring a loss and we have to make

7    that money up over time, not have to take it up right away,

8    they can amortize it more over time.  In the meantime, they're

9    saving all this money, as I think you alluded to in payroll

10   costs.

11           THE COURT:  Right.

12           THE WITNESS:  These people for the most part are not

13   going to be replaced.  When you lay off people in this number,

14   you're doing it because you're trying to reduce permanently

15   your level of workforce, so the savings from all of -- not only

16   the future pension benefits, normal costs, you wouldn't have

17   those any more, any longer, payroll costs, you know, social

18   security and so forth, health care costs.

19           THE COURT:  Right.

20           THE WITNESS:  In some cases they have to pay some of

21   that for a while.

22           THE COURT:  When we're talking about costs, it seems

23   like it is appropriate to separate costs to the plan which

24   don't come out of ongoing cash flows except to the extent there

25   has to be a contribution to the unfunded liability at the

F7NJOSB2                         Sher - direct

1     amortized rate, correct?

2               THE WITNESS:  Correct.

3               THE COURT:  Versus costs to the ongoing corporate cash

4     flow which, in fact, could be savings?

5               THE WITNESS:  That's right.

6               THE COURT:  Is that right?

7               You could have, if you look at your balance sheet, you

8     could have savings on one side, so Roger Farah, for instance,

9     is looking at what this will look like for him, I will lay a

10    bunch of people off, save me money over here, the plan, that is

11    somebody else's problem so long as I make the annual

12    contribution for the unfunded liability?

13              THE WITNESS:  I'd say that's right, you know, and

14    ultimately the idea is to save money through layoffs, not to

15    cost it.

16              THE COURT:  Not to cost it?

17              THE WITNESS:  In the short run, you know, you've got

18    the plan itself is going to incur additional costs.  Normal

19    costs would be reduced and they have the benefit.  The

20    allowable pay credits is generally lower than what they were

21    crediting under the prayer plan.  It was a long-run type of

22    thing.  Yes, the plan costs would be lower.

23              THE COURT:  The pay credits, can we go to that one

24    moment and the interest credits.  So long as you're in

25    wear-away on the whole, in the aggregate, if I can use that

F7NJOSB2                          Sher - direct

term, so follow me for a moment because I am sure I am using

the wrong terms, does the company actually have to do anything

more than make a book entry as to interest and pay credits?

          In other words, it calculates its total liability for

the pension plan, right?

          THE WITNESS:  Right.

          THE COURT:  And it knows that its total liability is

at least the lump sum value as the accrued lump sum as of

12-31-95, it is the annuity and then discounted back at the

GATT rate, right?  You have to at least be able to pay out a

hundred percent of what people are entitled tot at 12-31-95,

right?

          THE WITNESS:  Well, not exactly.

          What they would do, what I would do in this situation

as an actuary, I would make an assumption as to -- because I

have to.  It is not communications with employees.  Now, as an

actuary, I have to make an assumption.  Whatever I assume it is

probably going to end up being wrong, so I make some assumption

as to what the 417 (e) rate is going to be in future years

because this, because for any individual, in order to get a

benefit, they first have to terminate, right?

          Then they have to make an election.  So I have

assumptions as to when people will terminate and then what

election they'll make.  To the extent that I am reflecting the

possibility that they're going to take a lump sum, for example,

F7NJOSB2                          Sher - direct

1    I would -- and I think what Mercer did at least in the first

2    year, they have in their valuation, I think they expressed it

3    in maybe the '97 valuation, they assumed that a 7 percent rate,

4    they assumed 8 percent rate which made sense, which is

5    consistent with all of the discussions that Mercer was having,

6    that the rate would be 8 percent, so not the 6.06.

7              So you can imagine what happens to that 22,693 number

8    is you start valuing that at 8 percent, it will come down.

9              THE COURT:  Let me ask it this way, and I am going to

10   give him back to you.  This is what happens when your witness

11   goes last, I get to question him.  I am going to hold up a

12   piece of paper because I want to try to illustrate my question.

13             At the top is something called plan assets, all right?

14   That assets include both what is actually in the account and

15   what is unfunded.  So it is meant to be total funded, unfunded

16   liability, all right?

17             Let's take plan assets as of 12-31-95, okay?  That is

18   our number.  Have you got that?

19             THE WITNESS:  Yes.

20             THE COURT:  The question I have is if the starting

21   cash balance accounts for all plan participants are less than

22   the aggregate plan assets as of 12-31-95, then that wouldn't

23   take any additional contribution as of day one.  Is that

24   correct?

25             THE WITNESS:  Well, as of day one, there is an

F7NJOSB2                          Sher - direct

1    adjustment in that if the actuary is anticipating that this

2    frozen accrued benefit is going to provide more than the

3    account balance, then there would be an additional liability to

4    cover what they anticipate that differential to be.

5              THE COURT:  Okay.  So if the frozen accrued account

6    balance, and there is a GATT rate which might mean somehow the

7    unfunded liabilities or the liabilities of the plan might

8    increase a little bit based on that, there might be a need for

9    a day one contribution, right?

10             THE WITNESS:  Yes, that's right, depending on the

11   level that it is --

12             THE COURT:  So my question gets down to the interest

13   and the pay credits that are part of the formula for the cash

14   balance account, okay?  We have that in mind?

15             THE WITNESS:  Yes.

16             THE COURT:  Let's just take year end 1996 to have it

17   be easy.  At year end 1996 there is a look-back for the

18   interest at 6 percent, correct, under the new plan, correct?

19             THE WITNESS:  There is a 6, right, 6 percent interest

20   credit.

21             THE COURT:  And there is also a pay credit depending

22   upon a particular employee?

23             THE WITNESS:  Right.

24             THE COURT:  Now, if the amounts for interest and pay

25   credits for all employees required at year-end 1996 along with

F7NJOSB2                          Sher - direct

1    the cash balances for those employees is less than the

2    aggregate plan assets as of 12-31-95, right, is it the case

3    that you wouldn't really put the pay credits into the account?

4    You just make a book entry?  You wouldn't have to contribute

5    new cash?

6         THE WITNESS:  Well, because it is a defined benefit

7    plan, the pay credits and interest rates are always just a

8    bookkeeping amount.  What has to be contributed actually

9    dollars to the plan does depend upon the funded status of the

10   plan, assets versus the liabilities which in this case they

11   have unfunded liability.

12        The normal cost, I think in your example that gets to

13   the $5 million number that is in the first year for a lot of

14   people, the cash balance account is still not up to, it was

15   anticipated not to be up to the value of the frozen accrued

16   benefit that the actuary was valuing, would have been valuing.

17        Now, in this case the actuary was actually not even

18   assuming that people would take lump sums.  The actuary was

19   assuming that people would take annuities, which further

20   complicates it because now they have to get into a calculation

21   of the annuity benefits.

22        THE COURT:  That means they were calculating their

23   costs were going to be the 17, not the 22 to the plan?

24        THE WITNESS:  They would have calculated something

25   probably less than that, something more like the 10 to 13 --

F7NJOSB2                              Sher – direct

```
 1              THE COURT:  Right.  Okay.

 2              THE WITNESS:  -- number.  That assumes once the person

 3    leaves, after the person leaves, they meet actually, say, the

 4    person didn't take a lump sum and they actually calculated

 5    liability more like $70,000 number.

 6              THE COURT:  All right.  You may proceed Mr. Rachal.

 7    Thank you for your patience.

 8              MR. RACHAL:  I have some questions that hopefully help

 9    further explain these, I hope.  There this is some complicated

10    stuff.

11    BY MR. RACHAL:

12    Q.  Mr. Sher, did you review Mr. Deutsch's reports analyzing

13    the cost of providing lump sums to participants?

14    A.  Yes.

15              MR. RACHAL:  Would you pull up Joint Exhibit 13 B.

16              THE COURT:  Just so it is clear, it is costs to the

17    plan, correct?

18              MR. RACHAL:  Yes.

19              THE WITNESS:  Yes.

20              THE COURT:  Out of an existing bank account, if you

21    will?

22              THE WITNESS:  Yes.

23              THE COURT:  The money has to be there, right?

24              THE WITNESS:  That's right.  The idea is to fund it in

25    advance.  You don't want to leave this until after somebody
```

F7NJOSB2                          Sher - direct

1    leaves when they're receiving pension payments.  It is called

2    pre-funding.  In theory, you want to get it funded up quickly

3    as they're earning benefits.

4                THE COURT:  Thank you.

5                (Off-the-record discussion)

6                MR. RACHAL:  John, would you put up Page 22, the first

7    paragraph that begins therefore, 3300 -- excuse me, 34 million.

8    There we go.

9                THE COURT:  Which report is this?

10               MR. RACHAL:  This is a Joint Exhibit 13 B.  I don't

11   know if it has a different trial exhibit number.  This is his

12   trial report.

13               THE COURT:  All right.  13 B.

14               MR. RACHAL:  It is Page 22, the first paragraph, yes.

15               MR. GOTTESDIENER:  I want to object because the way

16   the question was asked, it was stating that it was Deutsch's

17   analysis of the reality when, in fact, what he was doing --

18               THE COURT:  All right.  Objection to form sustained.

19               Why don't you re-ask.

20   BY MR. RACHAL:

21   Q.  I am not sure -- let's just break it down.

22               I'll ask a simple question.  What is Mr. Deutsch

23   talking about here when he says, therefore, on 34,383,421 of

24   lump-sum payments, there was a 22,915,116 loss?  What is

25   Mr. Deutsch referring to?

F7NJOSB2                          Sher - direct

A.   Okay.  I think if you go, Mr. Deutsch did refer to the 1996
Mercer version, and he saw that approximately 53 million
benefit payments were not lump sums, so he then was able to
conclude that, therefore, on 34 million of lump sums, you add
the 34 to the 53, you get 88.9 with an interest adjustment.

        So he is concluding, therefore, he concluded based on
the valuation information he saw that there was 34 million of
Lump sum payments and that there was a loss of 22,915,000.

        THE COURT:  Mr. Rachal, could you pull that mike up a
little bit because your height -- there you go.  That is
probably a lot better.

BY MR. RACHAL:

Q.   I had a question.  So what is the $11,468,305.00, what does
that reflect?

A.   That, I believe, is the liability of the plan with respect
to the people who elect, who elected these lump sums.

        So before they elected lump sums, the plan was holding
a liability of 11,468,000.  They paid out lump sums to those
same people of 34 million.  So, therefore, the plan had a loss
of the difference between the two, which is 22.9 million.

        That corresponds when we look at Lerew, for example,
the difference between, if you will, your Honor, the second
column, 10 to $13,000 type-number I believe versus the lump sum
that was paid, that's the 22,9 is sort of if you add them up,
of course, I approximated it in the example.

1          The actuary is doing this thing much more precisely.

2     If you add it up, those differentials, you get 22.9, the

3     difference between lump sum paid and the liability that Mercer

4     was holding for these people.

5     Q.  Does Mr. Deutsch's analysis appear to be reasonable here?

6     A.  Yes, I think this ties to the fact situation here.

7     Q.  Why would that number, the loss number be such a big

8     number, the 22 million, almost 23 million for 1996?

9     A.  Well, I think he adds the paying out lump sums at 6.06

10    percent versus what the actuary was anticipating would be

11    earned in the plan as long as the annuity payments would

12    have -- obviously, until the annuity payments were being made.

13    Q.  Is it correct that during this period Mercer was assuming

14    only annuity payments?  Is that your understanding?

15    A.  That is what is indicated in their '96 and '97 valuations

16    at least.

17    Q.  Do these numbers, the losses, does that reflect any savings

18    on the early retirement subsidy by paying these lump sums?

19    A.  Well, no.  It reflects an increase in costs at least as you

20    were discussing before, at least with respect to the plan.

21         They would have an increase in costs as a result of

22    paying these lump sums that is well beyond what paying the

23    retirement benefits might have been.

24    Q.  What would that $23 million loss do to the unfunded

25    liabilities of the plan, if anything?

F7NJOSB2                        Sher - direct

1   A.   Would it increase the unfunded liabilities directly by that

2   amount.

3   Q.   Is it my understanding the company at its option could

4   basically pay that in over time, amortize that unfunded

5   liability?

6   A.   Yes.

7   Q.   Is it correct that you reviewed Mercer's estimates to Foot

8   Locker on the expected accrued liability, the new cash balance

9   plan?

10  A.   Yes, I do.

11          MR. RACHAL:   Would you pull up PX-298, the second

12  page, and go over to the service-based line.  Would you

13  highlight the $172 million number -- no.  All the way over on

14  the service-based.  Yes, pull that up.  Then pull up next, if

15  you could, the column next to it, the title, the one that has

16  the 100 lump sum at the top.  Put those two together, that

17  would help.  There we go.  Now they line up.

18  BY MR. RACHAL:

19  Q.   What is your understanding that Mercer is showing Foot

20  Locker here?

21  A.   At least at this point in time this is April 7th of '95,

22  they were showing them what the costs would be, estimated costs

23  would be for -- it says service-based.

24          As I recall, they were discussing a bunch of different

25  types of formulas.  I don't know whether, whether this was

F7NJOSB2                         Sher - direct

1   probably not the formula adopted but nevertheless what it shows

2   is the costs on whatever this plan they were looking at,

3   potential plan was.

4           If Mercer assumed that when people left, that everyone

5   would take a lump sum on the one hand, the top numbers, or on

6   the bottom half that everybody would elect annuities, so I

7   think what this meant to me was they were showing what the

8   sensitivity would have been of assuming it will take annuities

9   versus everyone taking lump sums.

10  Q.  What is the difference that we have between the 100 percent

11  lump sum and 100 percent annuity assumption of Mercer?

12  A.  You can see the numbers are all different.  The actuarial

13  liability which represents the benefits earned today on the

14  lump sum side and all the numbers of the case are on the lump

15  sum side, the numbers are higher, looking at the liability,

16  they're already earned, 172 million versus 170 million for

17  annuities.

18  Q.  And then this is another example of the difference of

19  normal costs between first year and ongoing that Mercer was

20  selling to Foot Locker?

21  A.  Yes, the difference, it looks like it is about 5.8 on the

22  top and about 5.3 at the bottom, still in that $5 million range

23  that we discussed before.

24  Q.  I believe you said that difference would reflect expected

25  savings on normal cost on wear-away?

F7NJOSB2                          Sher - direct

1    A.   That's what I think, yes.

2    Q.   Why is it that there is only about a $2 million difference

3    between accrued liabilities, the lump sums versus annuities

4    under Mercer's analysis here, but at 22, $23 million loss

5    appeared for lump sums in 1996?

6    A.   I think there were at least a couple of reasons.  One is

7    that as I indicated before, I think Mercer at this point in

8    time would not have been assuming some type of extraordinary

9    reduction in workforce, they would be using their normal

10   assumptions in terms of when people would leave.

11        If they assumed that all the people left in '96 would

12   leave in '96, then the liability would have been 20 some-odd

13   million higher because that would have been built into their

14   assumptions, particularly if they assumed they were going to

15   take lump sums.  That all would have been increased the 172.

16        By assuming that people were going to continue to work

17   until normally they would leave, and the other element of this

18   is what assumption are they using in terms of the 417 (e) rate,

19   because they're making a long-term assumption, they're not

20   looking at each year and saying oh, '96 we know is going to be

21   6.06 percent, but what actuaries tend to do, they make an

22   average assumption over the course of time.

23        So I believe they were assuming in these lump sum

24   calculations that the 417 (e) rate would be 8 percent as a

25   long-term assumption.  So that, too, would tend to keep these

F7NJOSB2                              Sher - direct

1    numbers from further inflating.  If they assume that the rate

2    would stay at 6 percent, then every time they assume that one

3    would leave and take a lump sum, they come up with a higher

4    benefit amount and the liability benefit amount would be

5    higher.

6    Q.  Is it correct that the drop in the 417 (e) rate that

7    occurred during the plan design process continued on, increased

8    the cost of lump sums to Foot Locker with the qualification for

9    those in wear-away?

10   A.  Yes, because the benefit that is really driving the numbers

11   at that point is the frozen accrued benefit.  So as long as

12   that number is higher than the account, then that would, the

13   fluctuation in that number coming down to 6 percent from where

14   they were had a major effect.

15           THE COURT:  I want to just clarify that answer.

16           Counsel asked you the question is it correct that the

17   drop in the 417 (e) rate that occurred during plan design

18   continued on and increased the cost of lump sums to Foot

19   Locker?

20           Who experienced any increase in cost?  Was it Foot

21   Locker or the plan as a result of any 417 (e) adjustments?

22           THE WITNESS:  Directly, the plan.  Indirectly, of

23   course, Foot Locker is the entity that is -- so at some point

24   through amortization, they are going to have to pay-up that

25   differential.

F7NJOSB2                        Sher - direct

1          THE COURT:  Have you analyzed what any annual increase

2     in cost was to Foot Locker as distinct from the plan for lump

3     sum payments made in connection with this plan change?

4          THE WITNESS:  Well, take 1996, for example.  You're

5     looking at a number of --

6          THE COURT:  I don't want you to do it now.

7          Have you looked at the -- what I am trying to figure

8     out really because I want to distinguish between the costs to

9     Foot Locker for some of these events and occurrences and the

10    costs to the plan --

11         THE WITNESS:  Okay.

12         THE COURT:  -- in an immediate sense and then I

13    understand there may be different long-term impacts, so the

14    question for right now is have you looked at and distinguished

15    between annual costs to Foot Locker versus annual costs to the

16    plan for the lump sum elections which occurred post plan

17    conversion?

18         THE WITNESS:  Well, the lump sum elections as we

19    indicate would affect the plan directly in terms of future,

20    future costs.

21         THE COURT:  My question is not are you doing -- I

22    don't want you to do it now.  Have you look at this

23    distinction?

24         THE WITNESS:  I looked at, I looked at just by virtue

25    of the people leaving, not necessarily electing a lump sum, but

F7NJOSB2                           Sher - direct

just leaving, Foot Locker would gain the payroll and other

costs, and that doesn't matter whether they elected lump sum or

not.  Once they left, if not replaced, Foot Locker would have

savings, payroll and health insurance and other related costs.

            THE COURT:  Those are cost savings?

            THE WITNESS:  Those are cost savings, and that is

independent of whether the individual elected a lump sum or

not.

            THE COURT:  Did the election of minimum lump-sum

payments after plan conversion in the immediate period, couple

of years after plan conversion, cost Foot Locker corporation

any additional money apart from normal cost contributions?

            THE WITNESS:  Well, they saved the normal costs for

these people no longer accruing benefits, but what the costs --

do you remember the annual cost the actuary would calculate

would be higher than they otherwise would have been in those

subsequent years right away.  They would have first hit them in

'97.

            The '96 lump sums, the 29 million, I think those lump

sums and the loss to the plan would have flowed through

beginning in 1997, and the actuary would have -- all other

things being equal -- there would be lower normal cost, you

would have the experience of the plan for investment returns,

but all other things being equal, the cost would be higher than

it otherwise would have been starting in 1997.

F7NJOSB2                            Sher - direct

1          THE COURT:  Does that mean that the -- to put it

2     differently -- did Foot Locker have to make a larger

3     out-of-pocket payment into the plan as a result of the election

4     of lump sums by plan participants in the years immediately

5     following plan conversion?

6          THE WITNESS:  I would say yes, as compared to what

7     would have occurred had those lump sums not been elected.  The

8     answer is yes.

9          THE COURT:  Do you know what I can look at to find

10    that information?  Is there something in the record that would

11    reveal that to me?

12         THE WITNESS:  Well, I don't know if it would reveal it

13    clearly.  That is one of the issues.  There are actuarial

14    reports that were produced by Mercer that identify, what they

15    do is they identify an aggregate.  They may not separate out,

16    and Mr. Deutsch went ahead and was able to figure it out from

17    his own from the evaluation how much was attributable to lump

18    sums.  They could have had gains from other sources like

19    investment.

20         Those occurred anyhow whether people elected lump sums

21    or not.  The isolating effect of just the lump sums, the only

22    way that I think to do it is to do the exercise Mr. Deutsch

23    did, come up with that number and say okay, they have to put in

24    roughly 10 percent of that amount, that loss over the next I

25    think 15 years at the time was the period.

F7NJOSB2                            Sher - direct

 1              THE COURT:  Okay.  As you testify, if you talk about

 2      costs, it would be helpful for me to understand if you're

 3      talking about costs to the plan, so if there is going to be a

 4      cost incurred, whether it is a cost incurred by the plan or a

 5      cost incurred by Foot Locker, or both, or whether or not the

 6      cost is referring to cost savings, it would be useful to

 7      distinguish that as well if it ever comes up.

 8              THE WITNESS:  Okay, I will try.

 9              THE COURT:  You may proceed.

10      BY MR. RACHAL:

11      Q.  Just so it is clear, is it correct, too, that the savings

12      on normal cost is a savings to the plan, not to Foot Locker

13      directly?

14      A.  Well, it would be certainly a savings to the plan.  I think

15      it would be -- assuming that Foot Locker, I should think they

16      were contributing to the plan each year, the normal cost as

17      well as an amortization payment, then the answer is it would

18      affect both the plan and Foot Locker.  In most cases, it is

19      going to affect both the plan and Foot Locker.

20              The plan considers this big loss.  Foot Locker does

21      not have to pay off that loss.  They can pay it off as an

22      amortization, so the plan is out 20 some-odd million dollars.

23      Foot Locker has to pay it through amortization to pay down that

24      loss over time, with interest, with interest added to it, of

25      course, not just taking 1/15th of it as interest plus

1   principal.

2   Q.  That deals with fundamental rules of ERISA that drive that?

3   A.  Yes.

4   Q.  Based on your review of documents related to plan cost, did

5   the cost for lump sums for those in wear-away outweigh the

6   savings and normal cost of wear-away at least for the '96 to

7   '98 period?

8   A.  Certainly for that period, yes.

9         THE COURT:  Is that cost to whom?

10        MR. RACHAL:  The plan.

11        THE COURT:  The cost to?

12        THE WITNESS:  Well, at that point it would be once

13   these people leave the plan, it is true there would be no

14   longer normal cost.  You would say that would go on.  As long

15   as they don't replace those people, that would go on in theory

16   indefinitely, as they would save in payroll indefinitely.

17        Normal costs you can deal with as a percentage of

18   payroll.  Payroll comes down because people left, their normal

19   cost would come down as well.

20        THE COURT:  Got it.  Thank you.

21        MR. RACHAL:  I am going to make sure I am clear on the

22   question and answer.

23   BY MR. RACHAL:

24   Q.  When I am talking about, what I am comparing is, I

25   understand that somebody leaving, there is a savings to payroll

1    and plan contribution.

2            What I am focused on is the wear-away aspects of it to

3    understand the costs to the plan for paying out the lump sums

4    which we talked about earlier was greater than the savings to

5    the plan on the normal cost that the plan achieved for people

6    being in wear-away.

7            What is your answer to that question?

8    A.   Certainly it is a lot more than the cost.  The wear-away

9    was only going to be a temporary thing.  So I mean they would

10   no longer have to deal with that, I know, with paying all the

11   normal costs at all for these people.

12           The 20 some-odd million pales in comparison what their

13   normal cost would have been.

14   Q.   We saw a $22 million cost to the plan of lump sums for '96

15   and we saw an estimated five to six million savings on savings

16   to the plan for normal cost for wear-away at least that was

17   accepted for the the first year.  I am trying to understand the

18   relative cost to the plan for lump sums for wear-away versus

19   normal --

20           THE COURT:  Re-ask the question.  You were so good

21   before about being closer to the mike.

22           MR. RACHAL:  I will.  I am lost in thought.

23   BY MR. RACHAL:

24   Q.   I am trying to get to an understanding of the costs to the

25   plan for lump sums, paying lump sums for those in wear-away and

F7NJOSB2                          Sher - direct

1     I am trying to compare that to the savings to the plan on

2     normal costs for those in wear-away and trying to determine

3     which is greater, and that is my question?

4     A.   The people in wear-away who are a lot of these people,

5     these people took lump sums, not all of them but a lot of them

6     were in wear-away, those people were in wear-away would have

7     little or no normal costs anyhow.  So by virtue of paying the

8     lump sums, it wouldn't affect the normal cost for them because

9     they were in wear-away was zero or close to zero anyhow.

10          All you get is really that loss.  You weren't

11    expecting to pay a normal cost that year for those people

12    anyhow.

13    Q.   One one side we have loss to the plan for paying lump sum

14    or wear-away.  It is correct people were in wear-away, they

15    worked in wear-away, there is a savings to the plan on normal

16    cost?

17    A.   There is a savings to the plan already that is anticipated.

18    Q.   And based on your review of the facts that occurred here,

19    which was greater, the cost to the plan on paying the lump sums

20    while people were in wear-away or the savings to the plan from

21    normal costs while people were in wear-away?

22    A.   The cost of paying the lump sums.

23          THE COURT:  Now, I think that, in fact, you folks,

24    unsurprisingly articulate it very well the point I was so

25    inartfully trying to make earlier with my little chart.

F7NJOSB2                         Sher - direct

1           So let me understand what you just said, Mr. Sher.

2    You said that normal -- I will restate it.  I won't use your

3    exact words.  Tell me if I am wrong.

4           Normal costs for the company are zero on an annual

5    basis for those participants in wear-away?

6           THE WITNESS:  For those participants who are in

7    wear-away based on all of the assumptions that the actuary is

8    making, that is true.

9           THE COURT:  So the normal cost that we see on various

10   documents in the record are costs associated with the segment

11   of participants not in wear-away.  Is that correct?

12          THE WITNESS:  I would say that's right.

13          THE COURT:  Got it.  Thank you.

14          MR. RACHAL:  Thank your Honor.

15   BY MR. RACHAL:

16   Q.  Would the cost to the plan be greater if we talk now of

17   course '96 to '98 period under -- assume the prior plan

18   continued forward, would the cost of the plan be greater during

19   these mass layoffs during the period versus the cost to the

20   plan once it was redesigned to cash balance plan.  Which had

21   the greater cost, I guess?

22          MR. GOTTESDIENER:  Objection.

23          THE COURT:  Hold on a second.  I want to make sure I

24   reread the question.

25          (Pause)

F7NJOSB2                         Sher - direct

1           THE COURT:  Can you restate the question.

2           MR. RACHAL:  Yes, let me try it.

3    BY MR. RACHAL:

4    Q.  Would the plan's cost savings on these mass layoffs, there

5    are cost savings in the 1998, '96 to '98 period be larger under

6    the former plan or under the converted cash balance plan?

7    A.  So the assumption of the former plan is that all of its

8    provisions --

9    Q.  Continued forward?

10   A.  -- remain just as they were before, no lump sum?

11   Q.  Correct.

12   A.  So when these people would have left, they would not have

13   received a lump sum, they would have just received the

14   annuities that they had accrued to the point that they left.

15          The effect, the effect would not have been dramatic, I

16   don't think, on costs on the prior plan.  There wouldn't have

17   been this kind of loss, this $22 million loss.  A $22 million

18   loss is principally, you know, it is because of the lump sums

19   being paid.

20          If lump sums had not been available, they would -- I

21   don't see how they would experience the big loss.  There might

22   have been some -- once people left, there might be some

23   additional chance that they'll take, you know, an early

24   retirement benefit, get a subsidy, but not anything near the

25   cost of paying the lump sums.

F7NJOSB2                         Sher - direct

1              MR. GOTTESDIENER:  I am going to move to strike the

2      answer.  It was speculative.

3              THE COURT:  Denied.  Denied.  It based on his

4      expertise.  Whether or not the court will give it whatever

5      weight the court deems appropriate, you can cross-examine.

6              You may proceed.

7      BY MR. RACHAL:

8      Q.  We have a $22 million number for 1996 of lump sums because

9      a lot of people left.  Would you expect there to have been loss

10     costs for the people who left in 1997 or 1998 to the plan who

11     took lump sums?  I assume they took lump sums?

12     A.  I think you're asking would there be a comparable type

13     number.  For '97, the number would have been smaller at least

14     per person.  In '97 was the year that had the largest number of

15     people leaving, I think by far.  The per-person, the number I

16     think would have been smaller.

17             First of all, there would be more people that were out

18     of wear-away.  Interest rates went up by about a half a percent

19     which caused the present value frozen benefit to come down.

20     And for some people, particularly those who had enhancement,

21     enhancement on the balances, there may be much less

22     differential if at all.  There probably would still be some,

23     but it would be less.

24             It would probably be less per-person in 1997.  I

25     haven't done the calculations.  Probably the analysis that

F7NJOSB2                          Sher - direct

1   Mr. Deutsch did for '96 could also be done, maybe he did and I

2   am forgetting, could also be done for '97 as well.

3          '98, the rate came back down, if my recollection is

4   right, the 417 (e) came back down to 6, maybe it was 5.99 or

5   something like that, close to 6.06.

6          Now, if more people are, just because of accruing

7   service, more people are out of wear-away, then at 6 percent,

8   5.99 percent discount rate, I would have expected a fairly

9   hefty number for '98 as well.

10  Q.  If the prior plan had continued forward, offered lump sum

11  cash out, is it correct even if you had these mass

12  terminations, the plan would still be able to have the funds in

13  it with the expected earnings, I think still around 9 percent.

14          Is that correct?

15  A.  Yes.  That is essentially why I indicated that I don't

16  think there would be a dramatic impact, anything near the 22.9

17  million that we saw had the plan continued because the money

18  would just continue.  Again, this is an assumption.

19          There is no guarantee the money will earn 9 percent,

20  but this is what the actuary is assuming.  If that assumption

21  turns out to be right or close to right, then there would not

22  be that kind of loss.

23  Q.  Am I correct that assumption has consequences, though,

24  because that determines the liabilities which under ERISA

25  companies have to fund the plan?

F7NJOSB2                          Sher - direct

1    A.  Yes, that's fundamental to the determination of the

2    liability and the contributions.

3    Q.  You recall hearing Mr. Deutsch use a pipe metaphor for plan

4    cost and benefits?

5    A.  Yes, I recall that.

6    Q.  How would you describe the metaphor?

7    A.  Well, I think in order for, you know, in order for money to

8    flow out of the pipe, which is paying people benefits, money

9    has to come in the other side, has to flow into the pipe, which

10   is essentially contributions from the company.

11   Q.  Is that metaphor complete?

12   A.  Well, he did mention, you know, at some point that there

13   would be interest earnings on the money, the contributions that

14   go in, they're invested, not used or needed to pay benefits at

15   that time, you know, mount up, create the fund, they earn

16   income.

17        When you're assuming a 9 percent return, you're

18   anticipating that a large segment of the outflow from the pipe

19   is going to be provided through income on the monies while

20   they're in there.

21        MR. RACHAL:  John, would you pull up DX 406 again.

22   BY MR. RACHAL:

23   Q.  Does this slide illustrate that concept?

24   A.  Yes.  What this says, if you put $13,959.00 in the plan,

25   the company would make that contribution at age 45, that you

F7NJOSB2                          Sher - direct

1   would get about 65,000, 64,000-plus dollars of that ultimate

2   78,000 you have is from investment income.

3            A lot more of it is from investment in this situation,

4   in this case than the contribution of 13,959 at the outset.

5   Q.  Of course, there is growth using the actuary's assumed

6   investment return of 9 percent?

7   A.  Yes.

8   Q.  Are plans typically funded substantially in advance of when

9   the benefits are paid?

10  A.  Yes, they are.

11  Q.  What was the early retirement subsidy provided by the prior

12  plan?

13  A.  The prior plan, if somebody retired early -- the prior

14  plan, if somebody retired early, if the individual had 15 or

15  more years of service at the time -- and when I say "early," it

16  is as early as age 55, the plan would make a calculation, it

17  would reduce the normal retirement accrued benefit that the

18  individual had to reflect the longer pay-out period, but they

19  do it in what we call a subsidized basis.

20           They would reduce it.  For example, some people

21  starting benefits at age 55 with 15 years of service would get

22  60 percent of the accrued normal retirement benefit as an early

23  retirement benefit.  That is called a subsidy because it is

24  worth more, on an actuarially basis, it is worth more than an

25  actuarially basis would provide, which would be less than that.

F7NJOSB2                              Sher - direct

Q.  From a participant's perspective, even though it was going
to flow out numbers, if you had age 65 benefit that was worth
40 percent, your subsidized benefit under the Foot Locker
locker plan beginning at age 55, assuming 15 years of service,
would be 300 a month.  Is that correct?

A.  The benefit would be 300.  The subsidy is --

Q.  Embedded in it?

A.  -- embedded in it.

Q.  The participants are going to get 300 a month at 55?  At
65, they would get 500?

A.  That's correct.

        THE COURT:  Let me understand how that is working.
Someone is 49 and 362 days old or 364 days old -- 365 days in a
year?  Is that right?

        And so either just on the cusp of turning 50, but they
haven't yet turned 50, if one was to calculate based on the
prior plan the annuity for that individual, one would do it
pursuant to a calculation that does not include an early
retirement subsidy.  Is that correct?

        THE WITNESS:  So let me make sure I understand your
Honor.  This person is almost 50 as of the date they
terminated?

        THE COURT:  The date they're terminating.

        THE WITNESS:  If they had 15 years or more of service
under this plan which is, I would say, I don't want to call it

F7NJOSB2                          Sher - direct

1    unusual, but in the minority of plans that would actually allow

2    this person to be called a terminated, vested employee,

3    entitled to terminated vest benefit, this plan which is

4    generous would allow this person when they reach 55, because

5    they have 15 years of service, to get that subsidized benefit.

6              THE COURT:  At the age of 49?

7              THE WITNESS:  No.  They have to it till 55.  They

8    cannot get it at 49, but they would be entitled to that better

9    benefit at 55.

10             THE COURT:  Oh, I see.  So they hold an entitlement,

11   if you will, to some portion of a better benefit, but they

12   can't collect until 55?

13             THE WITNESS:  Right.  The portion is based on what is

14   accrued at the time they leave.

15             THE COURT:  So the early retirement benefit of age 50,

16   plus 15 years of service, how do you distinguish that from what

17   we have just discussed?

18             THE WITNESS:  Okay.  Well, I think we are talking

19   about the enhancement now?

20             THE COURT:  I am talking about the prior plan, was an

21   employee participant eligible under the prior plan?  I want to

22   nail that first before we get to the enhancement.

23             THE WITNESS:  When the person leaves, regardless of

24   their age, if they have 15 years of service, once they become

25   age 55, they could start a pension, and that pension would have

1    been 60 percent of the accrued normal retirement annuity.

2              THE COURT:  And that embeds, no matter how old they

3    are, if they have 15 years of service, they have an embedded

4    early retirement piece?

5              THE WITNESS:  That this way the plan works.

6              THE COURT:  Does the age 50 have any relevance in the

7    prior plan?

8              THE WITNESS:  No.

9              THE COURT:  That is just really something for the

10   enhancement for the new plan?

11             THE WITNESS:  That's right.  It was decided to have

12   that eligibility requirement that you had to be 50 and 15 on

13   the conversion date.  Then you were entitled to an enhancement

14   regardless of when you retired.

15             THE COURT:  I got it.  Thanks.

16   BY MR. RACHAL:

17   Q.  Based on talking first about the prior plan, based on your

18   experience with plans with similar early retirement subsidies,

19   does everyone who is eligible for that benefit take it?

20   A.  I would say that let's start with the people who when they

21   leave employment are eligible to retire directly from

22   employment, that is, they're over age 55.

23             I would say that most people at those ages are

24   retiring and they would tend to take whatever the retirement

25   benefit is under the plan whether it is subsidized or not.  I

F7NJOSB2                        Sher - direct

1    think they would be encouraged to retire with plans which have

2    very rich early retirement subsidies.

3          For example, in this plan they reduce the benefit 60

4    percent.  There are plans at 55 that don't do this, but there

5    are some plans that actually do, but they might provide a very

6    small reduction, much less than the 40 percent, maybe 20

7    percent, something like that, the better the early retirement

8    provisions are, the more likely it is someone will retire early

9    under those provisions.

10         Then when people retire early, they pretty well

11   invariably take the benefit starting then.  The question is if

12   somebody leaves before 55, let's say that is as in this plan,

13   the date you can first get your pension, so somebody leaves at

14   age 40, I think 40, it is more likely than not under the

15   provisions of the Foot Locker prior plan that that person would

16   not take their benefit when they reach age 55.

17         Most people when they leave at age 40 are not really

18   retiring.  They're looking for another job, and hopefully for

19   them when they get the other job, they'll reach age 55 and

20   could they take the benefit?

21   Q.  Yes, but they're presumably making income and most of them

22   will, in my experience, will defer the commencement of the

23   benefit until they actually retire, 62, 65, it depends when

24   they're actually retiring because there is still a fairly

25   significant reduction.  Why take 40 percent reduction in the

F7NJOSB2                         Sher - direct

1   pension when you can get the full pension at age 65 or get 80

2   percent of it at whatever that is at the earlier age.

3   Q.   Under Foot Locker's prior plan, at least the Woolworth

4   plan, what happened to this early retirement subsidy for those

5   who wanted to continue working past age 55?

6   A.   Talking about the prior plan?

7   Q.   Yes.

8   A.   Well, if they continued to work, they couldn't start their

9   pension.  They would have to leave before they could get the

10  pension.  As they're continuing to work, the value of the

11  subsidy gradually declines and reaches zero once they reach age

12  65 because then you get full normal retirement benefit.  There

13  is no subsidy remaining.

14          THE COURT:  So the value of the early retirement

15  subsidy vests, if you will, or attaches at 15 years of service,

16  correct?

17          THE WITNESS:  I would say that's correct.

18          THE COURT:  And it decreases annually in value

19  following that period until the age of 55, at which point it is

20  effectively zero.  Is that right?

21          THE WITNESS:  65.  In other words, once someone hits

22  55, if they start the benefits at 55, they're entitled to that

23  subsidized benefit, then the full subsidy applies.

24          If they put off retiring or if they have left the

25  company but put off electing to have the benefit start, then

F7NJOSB2                              Sher - direct

1    every year from 55 until 65, the value of that subsidy

2    decreases.

3              THE COURT:  I see.  So the decrease in value is a

4    decrease which occurs annually commencing at 55 when they are

5    entitled to take it to get payments for it until they're 65?

6              THE WITNESS:  Yes.  At age 65 they're just getting a

7    normal retirement benefit.

8              THE COURT:  I understand.  Thank you.

9    BY MR. RACHAL:

10   Q.  So does a participant's decision not to leave work or

11   continue working, are they termed vested?  They decide to wait

12   on taking the benefit until they retire from their other job,

13   age 62, 65, does that impact the expected cost of the early

14   retirement subsidy to the plan?

15   A.  Yes.

16   Q.  DX-407, is that part of what is illustrated there, the

17   difference in the break-off between the 10,000 to 13,000 and

18   17,000?

19   A.  The difference between the 10,000 and 13,000 is because I

20   don't know what Mercer would have assumed.  Some somebody at

21   age 40 when they assume they're going to start, and 15 years of

22   service, say, do they assume those people would take their

23   benefit at 55, which is the most heavily subsidized age, or

24   they assume they're going to take it at age 65 or something

25   in-between?

F7NJOSB2                         Sher - direct

1              That is why there is this range.  It wasn't clear from

2      their evaluation report.  At least it wasn't clear to me how

3      they would handle that.

4      Q.  All of those assumptions of the probabilities of whether

5      someone would take the early retirement subsidy that would

6      maximize the value of the subsidies would impact expected costs

7      to the plan, correct?

8      A.  Yes, and the 17,000 number anticipates -- but it is both

9      the person has left, all right, put that in, and that they

10     would take the benefit, this person who is age 39 would take

11     the annuity, you know, at age 55 which I think is a very

12     conservative assumption.

13     Q.  Since this is dealing with someone who is post-conversion,

14     they also would have to forego the right to a lump sum and

15     elect annuity to give the right to early retirement subsidy?

16     A.  That's right.

17     Q.  What was the early retirement subsidy that was protected in

18     the plan conversion?

19     A.  Okay.  The frozen accrued benefit which was expressed as an

20     age 65 benefit, if somebody ultimately retires early, counting

21     the years of service to get up to the 15, even after the

22     conversion, so if they have 15 years of service by the time

23     they leave, and they commence their benefit, elect to commence

24     their benefit at age 55, then they would be entitled to that

25     subsidy at age 55 through the frozen protected benefit.

F7NJOSB2                            Sher - direct

1           So all the features that are associated with that

2    frozen benefit in the prior plan would be attached to it, to

3    the frozen benefit in the amended plan.

4    Q.  Was any more value added to the early retirement subsidy

5    after the conversion?

6    A.  No.  I think it just retained the value it had.

7    Q.  Is it correct that to receive the subsidy, it had elected

8    an annuity form of benefit, not a lump sum?

9    A.  That is true.

10   Q.  Post-conversion, what was the election rate for annuities

11   versus lump sums?

12   A.  Well, excluding those who cashed out automatically because

13   their benefits were small and just looking at those who

14   actually made elections one way or or another, my recollection

15   is that the election rate for lump sums was 93 or 4 percent and

16   that the remainder, 5 or 6 percent were annuities.

17   Q.  What would someone like Mr. Osberg have to do if he were to

18   receive the early retirement subsidy?

19   A.  He would have had to wait until age 55 to receive it.

20   Q.  Do you recall how many years --

21   A.  And elected an annuity.

22   Q.  -- do you recall how many years he would have had to defer

23   benefit to receive the early retirement subsidy?

24   A.  I think it was between 6 and 7 years.

25   Q.  Did you calculate the value to Mr. Osberg if he had --

F7NJOSB2                              Sher - direct

1    withdrawn.  I know it is in the record.

2              Is it correct Mr. Osberg elected a lump sum form of

3    benefit?

4    A.  Yes.

5    Q.  Did you calculate the value to Mr. Osberg if he would have

6    waited 7 years instead of taking a lump sum form elected

7    annuity with the -- what the value of that subsidy would have

8    been to Mr. Osberg?

9    A.  I calculated what I believe the benefit was under the

10   frozen benefit as you have been describing reduced for early

11   retirement, 60 percent.  He had more than 15 years of service.

12             I also compared that to the benefits that are payable

13   under the 1996 plans as I understand them that would have been

14   payable at age 55.

15   Q.  What was the difference between the subsidized and

16   unsubsidized dates of 55 for Mr. Osberg you calculated?

17   A.  I think it was $7.00 a month.

18   Q.  Why was the early retirement subsidy worth so little to

19   Mr. Osberg?

20   A.  It was worth so little because there is, again as I

21   understand it from what I've seen and looking at his

22   calculations that were made on his actual, actually the date he

23   elected the lump sum and some other calculations for others in

24   the plan, or at least one other I was able to find, that the

25   way in which the '96 plan apparently is being interpreted and

administered or at least was at a point in time was that you

take the lump sum that he would have been entitled to, and in

his case it is the lump sum based on his first protected

benefit because he was still in wear-away, you take his frozen

protected benefit and find the lump sum value of it at age 55,

which is the date we are making the calculation, and then you

convert that to an annuity using a subsidized interest rate,

subsidized at the time because the plan provided for an annuity

conversion that could never be less favorable to the employee

than using a 6 percent interest rate.

Even though rates had dropped lower, lower than 6, the

plan says when you convert lump sum amounts to annuities, you

don't use a rate below 6 percent.

Q.  Why was that valuable to use a greater of 6 percent or the

actual 417 (e) rate to convert a lump sum to annuity?

A.  Just the opposite of lump sum.  You know, if interest rates

go down -- go up, or higher, the lump sum is lower.  Just the

opposite when you convert to an annuity.  If I convert a given

dollar amount to an annuity, the higher the interest rate, the

higher the resulting annuity.  That makes sense when you think

about it.

If you're in a high interest rate environment, you

approach an insurance company, for example, you're going to be

able to get a higher annuity.  Why?  Because the insurance

company will be able to vest the money at a higher rate.

1          The same thing applies here, if I convert it at 6

2     percent rather than 5.48, which is the 417 (e) rate -- that was

3     actually lower than that I am sorry.  Let me correct that.

4          The 5.48 was the rate in effect in 2002 when he

5     actually took a lump sum.  By 2009, the actual rate came down

6     to, it was about 4.4 percent, 4.4, something like that, around

7     4.4 percent, so the differential between 4.4 percent and 6

8     percent was very significant.

9          So that boosted up the annuity attributable to the

10    frozen protected benefit under the '96 plan as I understand how

11    it is being administered.

12    Q.  That's, what you just described here, that is pursuant to

13    the plan and that is different than the other type of whipsaw

14    Mr. Deutsch was talking about earlier related to lump sums?

15    A.  I believe that is true.  When you say pursuant to the plan,

16    Mr. Deutsch said while the plan calls for it, it is the way

17    apparently it is being administered or at least was, you know,

18    in some, you know, examples including Mr. Osberg's example, you

19    know, in his calculation in 2002, also found one, I think it

20    was one other, where it is hard to tell because when you are

21    looking at actual calculation, unless that amount turned out to

22    be higher than the subs subsidized -- in his case it is still

23    $7.00 lower, not quite there, so you might have noticed it.

24    Q.  Let me try it this way.  What causes the benefit to be

25    larger in the lump sum whipsaw, and call this plan annuity

F7NJOSB2                          Sher – direct

1   whipsaw?

2   A.   Well, following 417 (e) rates causes both lump sum whipsaw

3   to be higher and in this case the annuity becomes higher than

4   it otherwise would have been as well.

5            THE COURT:   What do you mean by the word whipsaw?   How

6   do you define that?

7            THE WITNESS:   Okay.   Before Congress in 2006 passed a

8   law that basically said when you pay somebody a lump sum from a

9   cash balance plan, putting aside any minimum benefits, just

10  from the cash balance account, that paying them a lump sum

11  equal to the cash balance account is appropriate and totally

12  fulfills the obligation of the plan.

13           Prior to that there was a methodology that the IRS had

14  been applying, and they came out actually after this, shortly

15  after this plan was converted in early 1996 when the revenue

16  ruling that indicated, and had some details on whether you have

17  to do survey data, what we call a whipsaw or round-trip

18  calculation, where you take the person's cash balance account,

19  you project it with interest to age 65, so based on the number

20  of years and the interest rate, in this case 6 percent, easy,

21  just a flat rate, you convert that to an annuity at age 65

22  based on the plan's conversion factors to convert, you know,

23  accounts to annuities, and then you calculate the present value

24  of that annuity, that cash balance annuity back to the original

25  date when you start to make the projection, the date you're

F7NJOSB2                              Sher – direct

1   paying out the lump sum, you can get an amount that is higher

2   than the account balance.

3          If someone has a $20,000 account balance and if

4   interest rates, 417 (e) rates are, say, 4.5 percent, when I

5   project at my 6 percent interest credit, convert to an annuity

6   and discount back at only 4.4 percent, what is going to happen

7   is you're going to get an amount that is higher than the

8   original account balance.  That is called a whipsaw effect.

9          This plan, this plan incorporated that whipsaw

10  calculation procedure, so there is an effect that has nothing

11  to do with the frozen accrued benefit.  It all has to do with

12  the cash balance account.  There is an effect in the plan that

13  when interest rates fall below 6 percent, or as Mr. Deutsch

14  said, it might not happen until you get to 5 and a half

15  percent, where you would end up under the plan's terms with a

16  lump sum that is higher than the individual's account balance.

17         (Continued on next page)

18

19

20

21

22

23

24

25

F7nnosb3                          Sher - direct

1            THE WITNESS:  (Continuing) Now, in 2006, Congress

2    decided that that really wasn't necessary or appropriate and --

3            MR. GOTTESDIENER:  I am going to just object for the

4    record, your Honor.  I don't want to interrupt.  But we object.

5            THE COURT:  All right.  Motion to strike denied.

6            THE WITNESS:  They affirmed -- in my view and some

7    other views, they changed the law to make it clear that for a

8    plan like Foot Locker that credit 6 percent interest, and this

9    followed IRS regulations, followed that up that you would not

10   have to provide a lump sum with respect to the cash balance

11   account that is any more than the account.  In other words, you

12   pay somebody their account.  That's it.

13           Prior to that, Foot Locker and some other plans out

14   there, there was litigation, a significant amount of litigation

15   on this where the courts basically affirmed the IRS position

16   that one has to go through and do this calculation, this type

17   of calculation.

18           THE COURT:  All right.  Thank you.

19           Is now a good time to take our midmorning break.

20           MR. RACHAL:  It is, your Honor.

21           THE COURT:  Let's go ahead and do that.

22           Thank you.

23           (Recess)

24           THE COURT:  You may proceed, Mr. Rachal.

25           MR. RACHAL:  Thank you, your Honor.

F7nnosb3                          Sher - direct

1    BY MR. RACHAL:

2    Q.  Mr. Sher, the whipsaw that you had just described, does

3    that apply to all cash balance plans during the applicable

4    period?

5    A.  Well, I think there was some question as to whether it

6    applied, but the courts took the position that it applies based

7    largely on an IRS revenue ruling.  But for a plan like Foot

8    Locker where the interest credit is a fixed 6 percent, I think

9    the argument is pretty strong that it ought to have applied.

10   Q.  Was there another feature in the plan, at least that you

11   saw in operation, that provided a benefit different or above

12   this whipsaw feature under the law?

13   A.  Well, I mentioned before that once you get the projected

14   account with interest to age 65, the next step is you would

15   convert that to an annuity based on the annuity conversion

16   factors in the plan.

17            In most plans that I am familiar with, the annuity

18   conversion factor is based on the 417(e) rates, rather than in

19   Foot Locker's case it is the greater of the 417(e) rate or 6

20   percent.  In other words, there is a minimum interest rate for

21   converting that projected account to an annuity in this whipsaw

22   calculation that serves to, when interest rates fall below 6

23   percent, serves to increase the resulting annuity from what

24   would otherwise be the case.

25            So what that does is it -- the higher annuity when you

F7nnosb3                          Sher - direct

take the present value, of course, it's going to come up with a
higher lump sum, whipsaw lump sum than would have resulted had
you just converted it using the 417(e) rate, without the 6
percent minimum.

Q.  When you reviewed Mr. Osberg's calculations of his benefit
did you see that plan feature applied to his calculations, or
did you conclude that it applied to his calculations?

A.  The calculation of his annuity benefit that was on his
election form, that was an annuity benefit shown that he could
have elected a joint and survivor annuity for his spouse, so,
yes, the calculation is consistent with using the 6 percent
interest rate rather than the 417(e) rate to convert a lump sum
to an annuity.

Q.  In light of that, do you still conclude that your early
analysis in your report that the early retirement subsidy was
worth only about $7 a month to Mr. Osberg had he deferred
commencement of his benefit until age 55 and elected an
annuity, does that still hold true?

A.  Yes.  Because I don't see any reason why that calculation
would be any different.  Unless there was a change in the plan
or in the administration of the plan in the interim, I think
that's the kind of calculation that would have been made.

Q.  There's been a suggestion that offering people the option
to take lump sums saved the plan money over paying annuities
beginning at age 55 with an early retirement subsidy, is that

F7nnosb3                        Sher – direct

1    correct?

2    A.   It certainly was not correct in my view in the early years,

3    and for that matter when interest rates fell there was even

4    more of a differential between the 417(e) rate and the 9

5    percent rate, which would generate losses to the plan.

6             MR. RACHAL:  Jon, pull back up DX 405.

7    Q.   I'm moving now to point 2, which is whether the use of a 9

8    percent interest rate to set the initial account balance was

9    actuarially reasonable.

10            First I am going to ask Mr. Sher some questions

11   relating to the background of the plan first.

12            Is it correct that you have advised companies on

13   redesigning their retirement programs?

14   A.   Yes.

15   Q.   Have you advised companies on program redesign when they

16   were facing financial difficulties?

17   A.   Yes, I have.

18   Q.   Did you review Foot Locker's objectives in putting in place

19   the new retirement program that became effective in 1996?

20   A.   Yes.

21   Q.   What was your understanding of the business background in

22   1995 that was leading to the program redesign?

23            MR. GOTTESDIENER:  Objection, your Honor.

24            THE COURT:  I will allow it, consistent with my

25   earlier rulings.  You may answer.

F7nnosb3                              Sher - direct

1    A.  My understanding was that the company was experiencing

2    financial difficulties, was factor number one.  Factor number

3    two was they were restructuring, in the process of

4    restructuring from a general to specialty type retailer,

5    Woolworth's to Foot Locker.

6          Then they were in an environment where when they were

7    looking at what competitors did.  They saw, that is, all of us

8    who were in the industry saw at the time that there was a move

9    away from traditional defined benefit plans to account balance

10   plans, whether they be defined contribution plans or the cash

11   balance plan, which is a defined benefit version of an account

12   balance plan.

13   Q.  What were the stated objectives to the redesign of the

14   retirement program for Foot Locker?

15   A.  Well, one that seemed to be first on the list all the time

16   was cost reduction.  They were definitely looking to reduce

17   cost of the program.

18         The second one was they were looking to modernize the

19   plan, which as I understood it encompassed introducing more

20   portability and flexibility in the kind of benefit

21   distributions.  I read that to mean lump sum distribution.

22         The third one was shared responsibility, which

23   means -- which can mean shifting some costs to employees, but

24   it also means I think in most cases providing incentive for

25   employees to save through a matching scheme, which is what the

1    401(k) plan did.  So it was providing a tax deferred vehicle,

2    401(k), and also providing matching contributions to encourage

3    employees to contribute more.

4    Q.  Do large employers rely on actuarial consultants in

5    converting pension plans to a new design?

6    A.  I think they do in most situations.

7    Q.  Why is that?

8    A.  Except for some very large companies in some isolated

9    situations, usually they don't have actuarial expertise in

10   house, so their inclination is to hire a consulting actuary or

11   a consulting actuarial firm to help them through the process.

12   Q.  Is it correct that large employees almost invariably have

13   substantial financial expertise in house?

14   A.  Yes, they do.

15   Q.  Why does that financial expertise not substitute for

16   actuarial expertise on plan design?

17   A.  The financial executives that I have come in contact with

18   over the years, while they are for the most part very smart,

19   know what they are doing in terms of the bigger company issues,

20   when it comes to pensions, defined benefit plans and all the

21   technical and regulatory aspects of them and actuarial aspects

22   of them, they need the help of an actuary to help them

23   understand all of that.

24   Q.  Do clients typically set the goals of the new plan design?

25   A.  I would say that, yes, that ultimately it's the client who

F7nnosb3                         Sher - direct

1   has an issue or problems, things that they don't like, things

2   they are trying to accomplish that aren't being accomplished

3   currently.

4         I think what the actuary can do in that situation is

5   to help them shape those goals and make sure that the goals are

6   not conflicting.  Often you hear things, we want to improve the

7   benefits, but we don't want to spend any more money.

8         So we come in and we go, well, wait a minute.

9   Something has to give here.

10        So the actuary can help sort of referee, if you will,

11  conflicting objectives that often different people within the

12  organization have to try to make sure that the goals are at

13  least potentially achievable.

14  Q.  Subject to setting these goals, do the clients typically

15  defer to the actuarial consultants?

16        MR. GOTTESDIENER:  Objection.

17        MR. RACHAL:  I'm sorry.

18        MR. GOTTESDIENER:  I thought you were finished with

19  the question.

20        MR. RACHAL:  Do you want me to do the whole question?

21        THE COURT:  It's always better to get the whole

22  question out.

23        MR. RACHAL:  OK.  Good.  Thank you, your Honor.

24  Q.  Subject to setting these goals, do clients typically defer

25  to actuarial consultants on plan design features implementing

F7nnosb3                          Sher - direct

 1    those goals?

 2              MR. GOTTESDIENER:  Objection.

 3              THE COURT:  Overruled.  I will allow it.

 4              Ultimately this question is determined by the fact

 5    witnesses in this case.  He can only say what really happened

 6    here based upon the record that he's seen, and ultimately

 7    that's what is most relevant.  But you can just set the

 8    background for wherever you are going next.

 9              MR. RACHAL:  Thank you, your Honor.

10    BY MR. RACHAL:

11    Q.  Go ahead.

12    A.  Based on my experience I think I have seen it all over the

13    lot to put it that way.  I've seen situations where the company

14    says, or the individuals involved say, OK, I want you to come

15    up with a recommendation for this plan.  What is your best

16    recommendation, and that's what we want to see.  Tell us what

17    it's going to cost.  Tell us how it's going to affect people.

18              The other side of that, the other extreme is, I want

19    to see everything that everyone out there is doing, I want to

20    see variations on everything that they are doing.  And then we

21    will decide, and costs and benefit illustrations and all that,

22    and we will decide what to do, give us the information, and

23    then we will decide what to do.  And then there's everything in

24    between.

25    Q.  Did you review Mercer internal documents relating to the

F7nnosb3                          Sher - direct

1    Foot Locker cash balance conversion?

2    A.  Yes, I did.

3    Q.  Did you review Mercer's documents that were sent to Foot

4    Locker relating to this plan conversion?

5    A.  Yes, I did.

6    Q.  Based on your experience, do these documents show the

7    typical level of deference to actuaries by clients regarding

8    this cash balance conversion?

9              MR. GOTTESDIENER:  Objection.

10             THE COURT:  Can you restate that question, please.

11   BY MR. RACHAL:

12   Q.  Based on your review of these documents, what type of

13   deference, if any, did you see between the actuary Mercer and

14   Foot Locker?

15             MR. GOTTESDIENER:  Objection.

16             THE COURT:  Sustained.

17             I mean, it's not relevant to me what he saw as a level

18   of deference.  If you want to ask him about the particular work

19   that Mercer did, you can do that, but I don't want to have him

20   discussing levels of deference.

21             MR. RACHAL:  Sure.

22   BY MR. RACHAL:

23   Q.  Plan design features like the interest crediting rate and

24   the pay crediting rate for the cash balance plan that was

25   discussed between Mercer and Foot Locker and ultimately adopted

F7nnosb3                           Sher - direct

1    by Foot Locker, what did you see based on your review of the

2    documents?

3                MR. GOTTESDIENER:  Objection.

4                THE COURT:  I'm just reading the question.

5                Can you restate the question.  I mean, I guess the

6    concern I have is are you still asking about deference, because

7    as phrased currently the question is extraordinarily broad,

8    which is what did you see based on your review of the

9    documents.  So that's just too broad.  It could be that I

10   saw --

11               MR. RACHAL:  I understand.

12               I will try to narrow it.

13               THE COURT:  All right.

14   BY MR. RACHAL:

15   Q.  Regarding the pay and interest crediting rates for the Foot

16   Locker cash balance plan, what did Mercer offer or suggest to

17   Foot Locker?

18   A.  Let's start with the pay credits.

19               What I saw was really a variety of possible pay credit

20   schemes.  Some of them were age based, some of them were

21   service based, some of them had what we call, were integrated

22   with Social Security where there is a lower percentage pay

23   credit rate for compensation up to a given level and then a

24   higher percentage above that level.

25               Within at least some of those categories I saw

F7nnosb3                          Sher - direct

1   variations on how many different tiers there were in the

2   formula, anywhere from I think three to at least eight.

3           So I did see, I would say, a pretty good variety of

4   pay credit rates that were, at least at some point in time were

5   looked at.  I don't know how many of them were seriously

6   considered, but at least there were a bunch that were

7   presented.

8   Q.  What about on the interest crediting rates?

9   A.  On the interest crediting rate, from the earlier documents

10  they were talking about, it seemed to be suggesting a fixed 5

11  percent rate.  Later on, as they got towards the final, what

12  turned out to be the actual service-based, eight-tier scale,

13  the interest rate was changed to 6 percent.

14  Q.  What did you see regarding the 9 percent interest rate that

15  was used to set the initial account balance between Mercer and

16  Foot Locker?

17  A.  I just saw 9 percent.  I don't know -- I didn't see any

18  other proposal or I don't even think I saw a discussion, at

19  least in the record, of using an alternative rate.

20  Q.  Did Mercer articulate why it thought that 9 percent rate

21  was a rate to use to set the initial account balance?

22          MR. GOTTESDIENER:  Objection.

23          THE COURT:  Yes.  What I don't want to do, I think

24  it's really not useful for us to spend our time having him talk

25  about what Mercer did or did not articulate.

F7nnosb3                              Sher - direct

1          He can talk about what the 9 percent means, whether or

2     not the 9 percent was reasonable or whatever he wants to say

3     about the 9 percent.  But the did Mercer articulate why, I am

4     not going to rely upon this witness for that factual testimony.

5     That's got to come from a document or something else in the

6     record.

7              MR. RACHAL:  Sure.

8              THE COURT:  You have him talk about the 9 percent to

9     your heart's content, but not in terms of using him as the

10    vehicle to get it into the record and the rationale for it,

11    except in terms of industry rationale for using certain

12    interest rates, etc., etc., and whether what he saw here was

13    consistent with that, things of that nature.

14             MR. RACHAL:  Thank you, your Honor.  I will move on.

15             THE COURT:  All right.

16             MR. RACHAL:  Jon, pull up DX 409.

17    BY MR. RACHAL:

18    Q.  For the prior, preconversion plan what was the benefit it

19    offered?

20    A.  Well, as we were discussing I think before, they changed

21    the nature of the plan.  That was a career, what we call a

22    career pay plan.

23             Do you want -- do you want me to talk about the

24    optional forms that were available, payment forms?

25    Q.  Under the prior plan, other than for cash-outs, which I

F7nnosb3                          Sher - direct

1    think were $3500 or under, could you get a lump sum under the

2    prior plan?

3    A.   No.

4    Q.   Could you commence an annuity before age 55 under the prior

5    plan?

6    A.   No.

7    Q.   Was there any distribution flexibility offered by the prior

8    plan?

9    A.   Well, there was some, but limited.  I mean, you could start

10   your benefit as early as 55 in the form of an annuity.  There

11   were various annuity forms that one could elect, a straight

12   life annuity, a joint survivor annuity, for example.

13            But otherwise that was pretty much it.

14            THE COURT:  Let's assume for the moment that I am an

15   employer and I have in place the Woolworth retirement plan as

16   of 12/1/95.  So we are at the beginning of December '95.

17            Could I just amend that plan to include a lump sum

18   option without converting to a cash balance plan?

19            THE WITNESS:  Yes, you could.  You might not want to,

20   but you could.

21            THE COURT:  Are there any particular reasons why you

22   say I might not want to?

23            THE WITNESS:  The reason that many companies in that

24   situation have not provided a lump sum is that the lump sum

25   will fluctuate every year.  As the interest rates change, the

F7nnosb3                          Sher - direct

lump sum is going to go up and down, up and down.

         That is considered to be a difficult provision if you
are going to provide a lump sum.  The idea behind cash balance
is you're creating this account that acts more like a
short-term investment, where you've got principal and interest
guaranteed, and it's always going to go up nicely.  It's never
going to be subject to the ups and downs of the market.

         That's the idea if you are going to provide a lump
sum.  Cash balance design avoids that kind of fluctuation,
which creates problems for everyone, financial problems for
both the company and the individuals.

         THE COURT:  All right.  Let me just ask whether you
are aware of companies which have career average plans, defined
benefit career average plans similar generally speaking to that
which Woolworth had prior to amendment which included a lump
sum option?

         THE WITNESS:  I'm pretty confident there are some out
there.  I can't recall one off the top of my head, but I would
be surprised if there weren't some.  About 25 percent, at least
that's the last time I looked at these numbers, about 25
percent of traditional type defined benefit plans, in other
words, not cash balance type plans, do provide a lump sum
option.  The other 75 don't.  So there are probably some career
average out there.  I just can't think of one off the top of my
head.

F7nnosb3                        Sher - direct

1          THE COURT:  All right.  Let me ask, then, a different

2    question:  As I understand it, there is an ERISA rule which

3    provides for an immediate lump sum payment to those individuals

4    who don't have -- maybe it's an IRS rule -- a specified level

5    of earnings, and that in the '96 time frame that level was

6    $3500.  So if you terminated as $3500 or less you automatically

7    got a lump sum, is that right?

8          THE WITNESS:  OK.

9          There is a provision in the law --

10         THE COURT:  Is that right?

11         THE WITNESS:  -- that lets you.  It is a voluntary

12   provision.  You don't have to have that provision.

13         THE COURT:  Yes.  Is it an IRS or an ERISA regulation?

14         THE WITNESS:  It is an ERISA rule.  The IRS carries it

15   out.  It's in the law.

16         THE COURT:  Is it something which you have to include

17   in your plan, or can you elect year to year to do that?

18         THE WITNESS:  You do not have to have it in your plan.

19   Once it's in your plan, I think there is a way you can get out

20   of it, but in general, you do not have to have that provision

21   in your plan.

22         THE COURT:  Woolworth had that provision in their

23   plan.  Am I correct?

24         THE WITNESS:  Yes.  Woolworth, like most companies I

25   would say, most plans do provide for that.  But the amounts are

F7nnosb3                          Sher - direct

1    small.  It's, let's pay the person out rather than holding it.

2                THE COURT:  It lends itself to easier administration?

3                THE WITNESS:  Yes.

4                THE COURT:  It don't ends up just accruing very tiny

5    participants, is that right?

6                THE WITNESS:  That's right, and participants who are

7    likely to sort of forget they even had it, and you try to

8    contact them for these small annuities and you are paying PBGC

9    premiums to the government as well.

10                THE COURT:  Let me ask.

11                At Woolworth I have heard different things in terms of

12    the prevalency of this $3500 lump sum payout.  What is the

13    denominator, if you will, of all individuals eligible for some

14    form of retirement payment.  And then of that, and you can pick

15    a year or a range of years if it is easier for you to do it

16    that way, and of that overall denominator which includes these

17    $3500 or less folks, what percentage are the $3500 folks?

18                For instance, if we've got 16,000 participants, are

19    10,000 of them $3500 folks?  That's what I am looking for.

20                THE WITNESS:  I don't think the number is that high,

21    but it's several thousand.

22                THE COURT:  So is 16,000 approximately the right

23    denominator?

24                THE WITNESS:  Yes.

25                THE COURT:  And several thousand of those participants

F7nnosb3                              Sher - direct

1    would be $3500 participants?

2              THE WITNESS:  Either they were already because they

3    terminated, or when they terminated they might very well.

4    Although a lot of them, if they terminate, you know, later on,

5    they are going to build up enough benefit where you wouldn't

6    expect it.

7              THE COURT:  So would it be between 10 and 20 percent

8    approximately?  Is that a rough?

9              THE WITNESS:  I really don't recall.  I remember it

10   was a pretty large number when we were looking at some of the

11   years like 1996, '97 and '98.  Whether it was 20 or 30 percent,

12   I real -- it was a pretty good number.

13             THE COURT:  So for those folks, they had a portable

14   lump sum option out of the box, right?

15             THE WITNESS:  Well, it wasn't an option.  It was a

16   mandatory cashout.  They were just paid.

17             THE COURT:  Right.  They could not stay in for an

18   annuity.

19             THE WITNESS:  That's right.

20             THE COURT:  Got it.

21             You may proceed, Mr. Rachal.

22             MR. RACHAL:  Thank you, your Honor.

23             I think the number is in the record.  I think

24   Mr. Deutsch's report.

25             Do you all recall where?

F7nnosb3                          Sher – direct

1              MR. GOTTESDIENER:  In the rebuttal.

2              MR. RACHAL:  In the rebuttal report it does have the

3    percentage of cashout.

4              THE COURT:  I will take it because you are referencing

5    it as a number you don't disagree with.

6              MR. GOTTESDIENER:  I don't think so.

7              MR. RACHAL:  I don't recall us having an issue with

8    it.  You can talk.  He said 40 to 60 percent.

9              THE COURT:  I will take a look at it.

10             MR. RACHAL:  I don't know about that number.

11             THE COURT:  That's fine.

12             MR. RACHAL:  I know it is in the report.  I know we

13   looked at it and didn't have an issue with it.

14             THE COURT:  Can you find that number for me,

15   Mr. Huang, in the report.  Find me the paragraph, since you are

16   the go-to guy for all paragraphs.  You can ask your neighbor if

17   you want.

18             You may proceed, Mr. Rachal.

19   BY MR. RACHAL:

20   Q.  Going back to the prior point, I just had a couple of

21   follow-up questions or closing out questions.

22             What happened if the participant was in poor health

23   under the prior plan and terminated employment?

24   A.  Well, if they were single, I think they would get, you

25   know, before retirement, I don't think anything, they would get

F7nnosb3                         Sher - direct

1   nothing.

2   Q.   They would lose their benefit?

3   A.   If they were married, there would be some type of a joint

4   and survivor partial type benefit payable to the spouse.

5   Q.   Could a participant in poor health take advantage of her

6   knowledge of that poor health to cash out the annuity as a lump

7   sum under the prior plan?

8   A.   No.

9   Q.   Could they in the converted plan elect a lump sum if they

10  were in poor health.

11  A.   As long as they were in poor health and they terminated

12  employment, yes.

13  Q.   For employees, what was the main benefit offered by the

14  postconversion cash balance plan?

15  A.   I would say the main benefit was the ability to get a lump

16  sum cashout.

17  Q.   Was that lump sum what they call portable?

18  A.   Yes.  Portable in the sense that they could take the

19  benefit with them when they left.

20  Q.   How soon did they have to elect the lump sum?  When did

21  they have a window to elect the lump sum under the converted

22  plan?

23  A.   They had a six-month period to elect either an annuity or a

24  lump sum.

25  Q.   After they --

F7nnosb3                              Sher - direct

A.  Right now if they were already over age 55 they could elect

it at any time.  Otherwise, if they passed the six-month

period, they would have to wait until age 55.

Q.  Was it common to provide a window for electing

distributions?

A.  I would say that there is a variety of situations

generally, in a cash balance plan in particular.  I would say

that in some plans it was totally unrestricted.  They could

come in at any time they wanted and make an election.  In other

plans, they might have to wait until age, something like age

55.

         In other plans, you either -- if you wanted a lump sum

you had to elect it right away or you couldn't get it later on.

It is just a onetime, you know, six months, something like

that, all types of varieties, to unrestricted, to restricted,

in various ways.

Q.  What are the options -- now we are talking about under the

converted plan -- does a participant have if she decides not to

take a lump sum distribution at termination?

A.  If they decide not to take the lump sum within the six

months and the person is under age 55 they would have to wait

until 55, in which case the account stays in the plan, and

continues to get credited with 6 percent interest until once

they become 55 or after they either elect to take, you know,

take a lump sum or take an annuity.

F7nnosb3                          Sher - direct

1   Q.   During that six-month window could they also elect an

2   annuity form of benefit?

3   A.   Yes.

4   Q.   When the plan was converted to a cash balance plan, did

5   Foot Locker have to offer lump sums to the prior accrued

6   benefit?

7   A.   No, they didn't have to.

8   Q.   Did creating a portable lump sum for the prior accrued

9   benefit provide financial advantages to participants?

10            MR. GOTTESDIENER:   Objection.

11            THE COURT:   I will allow him to answer that in terms

12   of the theory of it.   Before we get there, let me interrupt and

13   just ask you whether or not cash balance plans typically in

14   your experience are accompanied by a lump sum option?

15            THE WITNESS:   I would say -- I don't want to say

16   invariably, but close to invariably, there are some that, there

17   are certainly some that restrict the lump sum in the ways we

18   just talked about, in terms of timing, and there are some

19   others that restrict lump sums in terms of the portion of the

20   benefit that can be taken in a lump sum, or the dollar amount,

21   you can't get a lump sum up to $20,000 say, something like

22   that.   But the majority of them, the vast majority allow a full

23   lump sum.

24            THE COURT:   Let's go to the next question, which is

25   Mr. Rachal's question, which is, in your experience and based

F7nnosb3                          Sher - direct

1   upon your knowledge of the theory of cash balance plans, the

2   theory behind them, what advantages are they intended to

3   provide financially for participants, if any?

4          THE WITNESS:  Well, I would say, and this goes really

5   for lump sums, generally, an individual can take their lump

6   sum, and they have tremendous flexibility in what they do with

7   it.

8          They can use it to meet current financial, pressing

9   financial needs, health problems.  They can use it to cover

10  pretty much anything.  They can pay down credit card debt

11  that's over 20 percent that they are paying out.  They can use

12  it to invest in a business, or they can invest the money.

13         Of course, that's really I think what most people do,

14  is they roll over at least a portion of a lump sum,

15  particularly when it is a good amount of money in there -- if

16  it's small, they might not bother.  But if they gathered up,

17  you know, a pretty good sum of money, there's a tendency to

18  roll over at least a portion of it to an IRA and then have it

19  invested the way they and their financial advisers recommend.

20         THE COURT:  Are you aware of tax consequences

21  associated with the utilization of lump sum payments other than

22  for retirement purposes when an individual is below a certain

23  threshold age?

24         THE WITNESS:  Well, the -- yes.  When they are below

25  59 and a half, there is an excise tax that is payable in

F7nnosb3                              Sher - direct

1    addition to the regular income tax.

2            THE COURT:  If I took my lump sum, I've got 20 grand

3    I'm 40 years old and I just take it and pay off credit card --

4            THE WITNESS:  You are going to pay a lot of taxes on

5    it.

6            THE COURT:  I am going to pay tax.

7            THE WITNESS:  You are going to pay taxes at whatever

8    your tax rate is.

9            THE COURT:  So long as my tax rate is lower than the

10   credit card interest rate.

11           THE WITNESS:  It might still be worth it, right.

12           THE COURT:  All right.

13           THE WITNESS:  Eventually, when the money is pulled

14   out, whether it's now or any time in the future, even if they

15   invest the money, you know, they are paying, depends on how

16   they invest it, they will be paying some income taxes, unless

17   it's municipal bonds or something like that, but if it's in an

18   IRA, then the tax is deferred, until they pull the money out.

19   Then, of course, they are paying taxes on the whole thing.

20           THE COURT:  I'll really referencing the other ways in

21   which you thought that a participant who had pulled their money

22   out could utilize that money.  Whether or not it makes

23   financial sense to that individual would depend largely upon

24   his or her circumstances.

25           Am I correct?

F7nnosb3                          Sher - direct

1           THE WITNESS:  Of course, yes.

2           THE COURT:  And age is certainly one of those?

3           THE WITNESS:  Yes.

4           THE COURT:  Because otherwise there would be tax

5     consequences that would have to be offset.

6           THE WITNESS:  That's right.

7           THE COURT:  All right.  OK.

8           THE WITNESS:  Also, the other advantage --

9           THE COURT:  We'll wait.

10          THE WITNESS:  OK.

11          THE COURT:  Do you want to have him list any other

12    advantages?

13          THE WITNESS:  I don't know if I covered -- did I miss

14    something you wanted me to cover?

15          THE COURT:  He'll follow up if he needs to.

16          MR. RACHAL:  I will follow up Mr. Sher.

17    BY MR. RACHAL:

18    Q.  This may be what you were referring to.  What was the

19    impact, if any, on the portable lump sum for those who had

20    health issues?

21    A.  Well, I think I said, you know, for -- if they get the lump

22    sum, first of all, which is a good thing, then they can utilize

23    it to pay health expenses.  And if they could get a lump sum,

24    of course, if it is a health condition that's shortening their

25    life expectancy, it could be particularly helpful and they

1    could then pass on money to their heirs.

2              THE COURT:  I'm sorry.  Now I do have to ask this

3    question, which is are you aware of whether any participants in

4    the Woolworth plan who took out their lump sums actually used

5    it for payment of any health-care related expenses?

6              THE WITNESS:  I do not know.  As you said -- this is.

7              THE COURT:  Theoretical.

8              THE WITNESS:  It's theoretical.

9              THE COURT:  Thank you.

10   BY MR. RACHAL:

11   Q.  Talking about the protected lump sum benefit which is

12   converted into an annuity, is it correct that even if someone

13   had a serious health issue, knew they were going to die within

14   the next year or two, that that annuity is not impacted by the

15   person's particular circumstances?  It's going to be the same

16   as if somebody were healthy?  Is that correct?

17   A.  The amount of annuity, the dollar amount of the annuity,

18   that's correct.

19   Q.  That dollar amount of the annuity is going to be converted

20   to a lump sum whether regardless of whether the person was

21   going to live one year, five years, ten years?

22   A.  Yes.  There is a standard mortality table that's used.  It

23   does not take into account different health conditions.

24   Q.  Was converting the prior annuity benefit to an opening

25   balance a common approach for cash balance conversions during

F7nnosb3                            Sher - direct

1    the 1980s and 1990s?

2    A.  I would say not only was it common it was a substantial

3    majority of companies that I am aware of, based on surveys that

4    I have done and also just based on my knowledge, you know, from

5    being around the profession.  It is 85 to 90 percent, something

6    in the area.

7    Q.  Why did the companies do that based on your experience?

8    A.  I think they did it primarily because they really wanted to

9    convert from one paradigm to the other in the most complete way

10   that they could.  That is, they wanted to provide an account

11   balance and a lump sum under the new paradigm not only for the

12   future credits, the pay credits and interest credits going

13   forward, but also for the existing benefits from the prior

14   plan.

15          They felt that employees would rather have that.  You

16   know, otherwise what happens is when you do the conversion, the

17   tendency would be -- if you are only providing a cash balance

18   on the future pay credits, then someone who just leaves shortly

19   after the conversion would get a very small lump sum and most

20   of it would be payable under the prior form, the annuity form.

21   Q.  Is an opening balance approach different than an A plus B

22   approach?

23   A.  In my experience, they're much different.  They are sort of

24   the opposites, opposite side of the coin.

25   Q.  So describe what is the A plus B benefit or A plus B

F7nnosb3                          Sher – direct

1    approach?

2    A.   The A plus B approach, as I understand it, is the A benefit

3    is usually the frozen accrued benefit under the prior plan.

4    Most of the time it is a frozen benefit in terms of both

5    service and compensation.  It is just whatever it was at the

6    time.

7            Usually it's payable in whatever forms the prior plan

8    paid those benefits under, which could have had a lump sum, in

9    which case it would be payable in the lump sum.  But if it

10   didn't, as in the Foot Locker case, in my experience most of

11   the time an A plus B in its purest form would just stick with

12   whatever the optional forms were under the prior plan and then

13   starts fresh.  There is no opening balance.  There are pay

14   credits and interest credits starting with a zero balance.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

F7NJOSB4                         Sher - direct

1    Q.  Using Mr. Osberg as an example, I think his frozen accrued

2    benefit I think was around $6,000, $6100 at the time of

3    conversion.  On an A plus B plan, the A part would be that

4    frozen annuity going forward, correct?

5    A.  That's right, unless there was a decision to pay that as a

6    lump sum as well.

7    Q.  And the B part, what would the B part be?

8    A.  It would be pay and interest credits beginning in 1996.

9    Q.  Can an employer offer a lump sum for the A part of an A

10   plus B benefit?

11   A.  Yes, they can.

12   Q.  Was that common?

13   A.  In my experience, first of all, most of the plans I'm aware

14   of did not do an A plus B in the first place.

15          Among those that did, most of the time, in my

16   experience, if they did not have a lump sum before, they

17   continued that and just started the cash balance.  The only

18   lump sum would be the pay interest credits going forward, the

19   Part B.

20   Q.  Why is it that they would offer a lump sum for the A part

21   in an A plus B benefit?  Would an employer not do that?

22   A.  Because for the same reason a lot of these companies didn't

23   want to have a lump sum in the past.  The notion of embracing a

24   lump sum on that frozen benefit was equally unappealing because

25   of the great fluctuations in the lump sum values due to

F7NJOSB4                          Sher - direct

1    changing 417 (e) rates.

2    Q.  Did Mr. Deutsch's report provide an example, illustration

3    of fluctuating value for this lump sum Part A benefit?

4    A.  I believe it did.  I think he referred to the variability

5    of the value and he took a 30-year old and indicated that a

6    half of a percent change in interest rate would change the

7    value by I think he said about 20 percent.

8           So if interest rates went either up or down half a

9    percent, the approximate effect on the present value of that

10   age 65 annuity benefit, presently age 30, would go up and down,

11   obviously, with interest rates, of course, by about 20 percent.

12          THE COURT:  Can I ask a question.  I am sorry, Mr.

13   Rachal.  I said this is the problem of having the last witness

14   be somebody who is an expert.

15          Let's talk about the A plus B plan.

16          THE WITNESS:  Okay.

17          THE COURT:  Let's assume that what I want to do is

18   implement an A plus B plan in a sounds like traditional way.

19          I am going to have my frozen accrued benefit, it will

20   be frozen in time, and I am going to add separate from that

21   interest and pay credits, and the employee, when he or she

22   retires would the get A, the frozen accrued plus whatever the B

23   is.  Are you with me?

24          THE WITNESS:  Yes.

25          THE COURT:  On day one of that plan implementation,

F7NJOSB4                         Sher - direct

1    switching now to thinking about the liabilities of the plan, my

2    liabilities include zero, now nobody has worked a minute, the

3    liabilities of the plan include a hundred percent of the frozen

4    accrued benefits, correct?

5            THE WITNESS:  That's right.

6            THE COURT:  That means that my liability for the

7    future will be that total accrued liability for the plan plus

8    interest and pay credits as the employee goes along.

9            Is that right?

10           THE WITNESS:  So far I think that is right on.

11           THE COURT:  And that's different, isn't it, from the

12   liabilities of the plan here which during the period of

13   wear-away, for an employee in wear-away did not increase the

14   liability of the plan.  Is that right?

15           THE WITNESS:  Through the normal cost being reduced,

16   which reduction is for people in wear-away, there would be a

17   period, we don't know how long the period is because it depends

18   largely on how those interest rates fluctuate but, yes, there

19   would likely be a period as the actuaries estimated where there

20   would be, liabilities would basically remain stable.

21           THE COURT:  So if I, in doing an A plus B, said to you

22   I don't want to increase plan liabilities for at least

23   substantially for several years, you might recommend I might

24   not do A plus B?

25           THE WITNESS:  No, I don't know that I'd say that.  I'd

F7NJOSB4                          Sher - direct

```
 1   say, first of all, if you do A plus B, if we're talking about
 2   the A not providing lump sums --
 3             THE COURT:  No.  I want to say A is going to provide
 4   lump sums frozen accrued benefit?
 5             THE WITNESS:  That is a different story.  Now you
 6   would get --
 7             THE COURT:  Necessarily?
 8             THE WITNESS:  -- necessarily you're going to get some
 9   increase.
10             THE COURT:  In plan liabilities?
11             THE WITNESS:  In plan liabilities by doing that.
12             THE COURT:  All right.  You may continue.
13   BY MR. RACHAL:
14   Q.  Just to wrap up my point.
15             Is the increase caused by the difference between the
16   plan's expected earning rate, here it was 9 percent and
17   whatever the 417 (e) rate was at the time of the merger?
18   A.  The actuary would make a forecast, again assuming they make
19   some assumption, it is eventually going to hit the books of the
20   plan one way or another.
21             If they're paying out lump sums, whether they assume
22   people take lump sums or not, once they pay them out, there is
23   going to be an impact on costs because of the differential
24   between the rate that is used to calculate the lump sums and
25   the expected earnings rate.
```

F7NJOSB4                              Sher - direct

1   Q.  Going back to the example where a half percent change in

2   417 (e) rate caused a 20-something percent change in the

3   protected lump sum, about 20 to 1 ratio, is that partially a

4   function of A times B factor when you try to figure out the

5   impact of the variability of interest rate changes affecting

6   the protected lump sum?

7   A.  Age --

8              MR. GOTTESDIENER:  Objection.

9              THE COURT:  Hold on.  Let me read this question again.

10             (Pause)

11             THE COURT:  Overruled.  I will allow it.  You may

12  proceed.

13  A.  Somebody age 30, as in Mr. Deutsch's example where he said

14  there was a 20 percent for half of a percent effect, he was

15  talking about an annuity, valuing an annuity beginning at age

16  65.

17             If someone were younger, the effect would be even

18  greater.  If someone was older -- say, age 65 -- the effect

19  would be quite a bit less.  It would vary.  The time horizon,

20  the further a person is away from when benefits are projected

21  to begin, the longer the money is going to be in the plan; and,

22  therefore, the differential of interest rates is going to make

23  a bigger difference.

24             MR. GOTTESDIENER:  I wanted to note for the record our

25  only objection to the question was 20 to 1.  We didn't have a

F7NJOSB4                          Sher - direct

 1    problem with the 20 percent.  That is just for the record, your

 2    Honor.  We weren't objecting to the question.

 3              THE COURT:  I have to say, since I didn't understand

 4    that as a nuance, I didn't understand the objection.  So if you

 5    got what you think you needed, Mr. Rachal, then that is fine.

 6    If you want to re-ask the question, go ahead and re-ask the

 7    question.  I didn't get the nuance.

 8    BY MR. RACHAL:

 9    Q.  Is it the same answer except the ratio would actually be 40

10    to 1, not 20 to 1, half a percent to 20 percent?

11    A.  You're saying for each one percent change in interest rate,

12    it would be about 40 percent change in the value?

13              THE COURT:  That's a little bit different.

14    BY MR. RACHAL:

15    Q.  Let's take Mr. Deutsch's example, a half percent change in

16    interest rate, and it had a 20 percent something change in the

17    protected lump sum value, that is about a 40 to 1 ratio,

18    correct?

19    A.  40 to 1 when you're talking about for each one percent

20    change, you get about a 40 percent change.

21    Q.  I had misstated the nature of the ratio.

22              MR. RACHAL:  Would put up DX 410.

23    BY MR. RACHAL:

24    Q.  I will talk to you about the impact of future interest rate

25    changes upon the plaintiff participants.  What were some of the

F7NJOSB4                         Sher - direct

1    other benefits provided to participants by the post-conversion

2    cash balance plan?

3    A.   Okay.  Well, let's start with the cash balance account

4    provides a guaranteed, stable lump sum benefit that regardless

5    of what happens to interest rates, the account is going to

6    remain the same.  It has got a fixed interest credit rate.  The

7    account is not going to go up and down with interest rates.

8          Normally when interest rates go up, you get, in

9    effect, on an annuity, when you value an annuity benefit like

10   lump sum value of the protected benefit, the interest rates go

11   up, the value of the protected benefit would go down, which

12   would, if somebody, for example, might have been in wear-away,

13   that would take them, reduce the wear-away or take them out of

14   wear-away just by virtue of a rise in interest rates.

15         You know, the individual, if all he had was the

16   protected benefit, and he took a lump sum of that, let's say

17   the prior plan had been frozen, all he did was take a lump sum,

18   interest rates went up, you get whatever the lump sum value is,

19   whereas the cash balance would provide a floor of protection

20   against raising interest rates.

21         THE COURT:  Do you have any recollection, as you sit

22   here today, what your expectation was as to interest rate

23   changes during the '96 time-frame in a sort of a few years from

24   that horizon?

25         THE WITNESS:  Well, I can tell you that I don't recall

whether I had a personal expectation.  My theory has been it is

hard to predict.  I am no expert on predicting where interest

rates are going.

          My recollection is that economists were kind of mixed

at the time, although there was one school of thought that I

think I saw at a lot of companies was that rates would come

down lower, lower than they had been in most of the last 15

years or so and that there was a concern, not necessarily a

prediction, but a concern that inflation could rear its ugly

head again.

          Some of it is just, you know, people who lived through

the 80's and experienced the hyper-inflation when I remember a

lot of economists back then saying you'll never see several

digit inflation again.  There was still some residual feeling

about that.  At least that is what I remember reading at the

time.

          Actuaries tend to be less inclined to change their

views of what is going to happen often than economists, in my

experience.

          Here you have rates coming down.  Actuaries were still

assuming for a long time investment return rates of 9 percent.

It is only really in recent years that you finally see some of

these return assumptions that actuaries are making come down

from the 8 and a half, 9, 9 and a half rates, more like 7

percent even though inflation has been the way it is.  If you

1  keep near, the inflation will come back, the Feds will drop

2  controls and it will be off, not only inflation, but if the Fed

3  drops their controls, it will happen when they fully lift them.

4          I would say the mindset was there was some concern the

5  rates would come back up, so there was a tendency to discount

6  to some extent real short-term rates.  When they saw them

7  coming down, I think there was a tendency in the survey we did

8  revealed that, some tendency to not give that real recent

9  experience a lot of credence.

10          THE COURT:  What is the survey you're talking about?

11          THE WITNESS:  The PWC survey.

12          THE COURT:  The interest rates?

13          THE WITNESS:  The opening balance interest rates, and

14  we analyzed how the level of the rates and the marketplace was

15  affecting the relationship between the 417 (e) rate and the

16  opening balance rate.  The rates were coming down, there was a

17  tendency not to give that a full, you know, full effect.

18          THE COURT:  Thank you.  You may proceed.

19  BY MR. RACHAL:

20  Q.  Let me focus on this part of the slide with the interest

21  rates going down.  It talks about the value of the 6 percent

22  fixed interest credit rate increasing.  I think we will talk

23  about that in a little bit for in a few minutes.

24          In the Cigna plan, did it have a fixed interest rate

25  or floating rate?

1   A.   It had a combination of the two.  It had a floating rate,

2   and at the same time -- what I mean by that, the rate would

3   vary each year depending upon the level of -- their plan was a

4   little complex, as I recall.  It was based on a particular

5   government bond with add-on, I think an add-on adjustment,

6   margin added onto it.

7          They also had a 4 and a half percent floor and I think

8   it was a 9 percent ceiling, each year's rate.

9   Q.   If interest rates in that situation fell from 6 percent to

10  4 and a half percent, the participants would give us money on

11  the interest rate?

12  A.   Yes.  They wouldn't go below the 4 and a half.  If the

13  rates had been up around 6, and until it got down to 4 and a

14  half on that index, they would get 4 and a half.

15  Q.   And then the whipsaw features, I know we talked about two

16  different features.  One is the whipsaw applied to lump sum

17  balances where you go up and back, the account balance.

18          That applied to the Cigna plan, too, correct?  That is

19  a rule of law?

20          MR. GOTTESDIENER:  Objection.

21          THE COURT:  Hold on.  Why don't you rephrase it.

22  BY MR. RACHAL:

23  Q.   Is there a difference on the whipsaw feature between the

24  Foot Locker plan and the Cigna plan?

25  A.   I am trying to recall.  I don't really recall how whipsaw

F7NJOSB4                          Sher - direct

1    was handled in that plan.  It has just been a while since I

2    looked at it.

3            What complicates that is the fact that that plan had a

4    variable rate, and when you project -- what do you project

5    forward to make, determine the longer time benefit in a whipsaw

6    calculation.  Whether that plan even had a whipsaw provision,

7    and some plans resisted putting in whipsaw provisions in until

8    the guidance, they felt guidance was clearly requiring them to.

9            Others like Foot Locker put it in the plan.  I don't

10   recall what Cigna did in that regard.

11           MR. RACHAL:  Would you pull up DX-12, at Page 19,

12   Mr. Sher's opening report that shows the table.

13   BY MR. RACHAL:

14   Q.  First, does this table assume the same starting point for

15   the account balance?

16   A.  Yes.  I don't recall the age of this, but whenever it was,

17   it would be their balance at the beginning of '96.  There was a

18   hypothetical example of an opening balance both at the -- I

19   believe at the 9, the actual 9 percent rate.

20           THE COURT:  What is the corresponding PX if, we have

21   it, to DX-12?

22           MR. HUANG:  I don't believe there is one for this.

23           THE COURT:  No, I don't think so.

24           MR. RACHAL:  It is Mr. Sher's report.

25           THE COURT:  Mr. Sher's report itself?

F7NJOSB4                          Sher - direct

1                MR. RACHAL:  Yes.  It is DX-12.

2                MR. HUANG:  PX-90.

3                THE COURT:  Thank you.

4                MR. GOTTESDIENER:  Could I just ask for clarity for

5      the record, this is discussing not the Foot Locker plan?  This

6      is discussing a not the Cigna plan?  This is just a

7      hypothetical cash balance plan?

8                THE COURT:  Is that right?

9      BY MR. RACHAL:

10     Q.  Mr. Sher?

11     A.  I think the 6 percent interest column is intended to

12     indicate what an individual who has an initial balance of

13     13,959, I am sure I went through a calculation, I would have

14     come up with some-odd number like that unless there was some

15     calculation that developed it.

16               I think that was intended to be a Foot Locker, at 6

17     percent interest per year, that that balance would grow high in

18     the Foot Locker plan.

19               THE COURT:  I see DX-12 is actually your report.

20               MR. RACHAL:  Yes.

21               THE COURT:  DX-12 is not the document.  That document

22     is just an excerpt on the page of the report?

23               MR. RACHAL:  Yes.  This is from Mr. Sher's report.

24               THE COURT:  Got it.

25               THE WITNESS:  It begins on Page 18 and continues onto

F7NJOSB4                          Sher - direct

1    19.

2              THE COURT:  All right.  Fine.

3              THE WITNESS:  This is a person who is 45 years' old,

4    with 15 years of service, who had a $10,000.00 frozen accrued

5    benefit at age 65.

6              (Off-the-record discussion)

7    BY MR. RACHAL:

8    Q.  So the right column, one year Treasury rates, that is not

9    the Foot Locker plan, correct?

10   A.  No.

11   Q.  Why did you select one year Treasury rates as a comparison?

12   A.  What I was saying is if the person took a lump sum right

13   after the plan was converted, January 2nd, 1996, they took

14   their opening account and they invested it in the market, in

15   the outside market, what would they be able to invest in that

16   would give them the same level, the same type of protections

17   that the account balance had in the -- if it is stayed inside

18   of the Foot Locker plan; in other words, an investment where

19   there was a guarantee of principal no matter what happened to

20   interest rates or the marketplace and where the interest was

21   guaranteed as well.

22             So a comparable outside investment where they can get

23   that type of guarantee, basically little or no risk, what kind

24   of investments are in the marketplace?  One year Treasury

25   rates.  There was no fluctuation of value.  It is a guarantee

1  of principal and interest.  That represents a market rate of

2  return that can be achieved with the same level of risk.

3  Q.  Are the post-conversion, are the one year treasury rates

4  actual rates?

5  A.  These are rates that I believe it is in the report, I

6  believe that each year what I assumed was that towards the end,

7  like in December, there be an investment at that point in

8  whatever the one year treasury rates were at that point in

9  time, and that would be held, the investment would be held for

10  a year and then rolled into a new one year treasury rate

11  because it would mature at whatever the rate is at the

12  beginning of the next year, I just took it through until the

13  end.

14  Q.  Did you use the actual one year treasury rates in effect

15  from 1996 to 2011?

16  A.  Yes.

17  Q.  What did you you get for 2016?

18  A.  After 2011, I assumed the rates remained at the same level

19  they were at for 2011.

20  Q.  Does this table illustrate the type of benefits a

21  participant received or would receive if rates fell

22  post-conversion?

23  A.  So if rates fell post-conversion, which they did, the plan

24  6 percent is what they would receive in their cash balance

25  account.  Again this is just looking at an opening balance.

1          There are no pay credits, just focusing on the opening

2     balance.  It would grow to, in 2016, 20 years later, at 6

3     percent interest, to 44,768.  On the other hand, if they turned

4     and took the money and invested it in one year treasury rates,

5     rolled it over each year, they would end up with 23,000.

6          THE COURT:  What if we took the starting amount is the

7     $10,000.00, is that what you started with?

8          THE WITNESS:  No.  It was the 13.  The 10,000, your

9     Honor, was the accrued benefit age 65 that was converted to an

10    open balance.  The opening balance for this 45-year old who had

11    a $10,000.00 accrued benefit discounted at 9 percent with

12    mortality, like the plan did, that is the 13,000, the opening

13    balance.

14         THE COURT:  So I was trying to think of the

15    plaintiffs' position is that if you took the same 10,000 and

16    you discounted it at the GATT rate in effect at that time, it

17    would be 6.06 versus 9 percent, then you'd end up somewhere

18    north of the 13,000.  Is that right?

19         THE WITNESS:  If you discounted the GATT rate and it

20    earned how much?

21         THE COURT:  Well, you discount at 6 point, GATT rate

22    of 6.06 percent?

23         THE WITNESS:  The opening balance is higher.

24         THE COURT:  The opening balance is higher, and then it

25    would remain higher as the 6 percent is added to it and it

F7NJOSB4                          Sher - direct

 1    would remain higher than the one year treasury rate?  I am

 2    adding another column.  If I add another column --

 3              THE WITNESS:  There is actually another chart in the

 4    report that sort of goes through that.  I think it is pretty

 5    well right after this one.  I took someone who is --

 6              MR. RACHAL:  Page 20.

 7              THE WITNESS:  In general, I think you're right that it

 8    depends on the age and how long one is in the plan in terms of

 9    whether it would catch up.  If the person is young enough and

10    treasury rates stay at the rate they're at, eventually it would

11    catch up and exceed.  Here I did something a little different.

12    I have determined the opening -- how old this person was, I

13    think was --

14              MR. RACHAL:  You have your report there, too.

15              THE WITNESS:  Let me find it in my report.

16              THE COURT:  45, 15 years of service, right, Paragraph

17    46?

18              THE WITNESS:  Now we are on to 49.

19              MR. RACHAL:  49, your Honor.

20              THE COURT:  You don't carry it through the same age

21    assumptions?  Oh, 50 rather than 45, I see, Paragraph 49.

22              THE WITNESS:  This person, in fairness, this person

23    now does have the enhancement, so this is sort of showing what

24    the combination of opening balance is, actual opening balance

25    with 6 percent interest.  You see the 36,163?

F7NJOSB4                              Sher - direct

1            THE COURT:  Yes.

2            THE WITNESS:  That is the opening balance at 9 percent

3   but with the enhancement that this person would be entitled to

4   at age 50, okay?

5            The person is aged 50 and had 15 years of service.

6   This person, so with the enhancement, this person would have a

7   $36,163.00.  That would earn 6 percent interest a year.  You

8   see what those numbers look like?

9            MR. GOTTESDIENER:  The right column doesn't have the

10  enhancement.

11           THE WITNESS:  I didn't say that.  I haven't gotten to

12  the right-hand column yet.  The right-hand column is saying

13  okay, what if the opening blance were determined at 6 percent,

14  but as Mr. Gottesdiener has said, without the enhancement.

15           So just to sort of say okay, what is the effect of

16  just changing without introducing the enhancement in that

17  column, the theory here is that, look, on the left column it is

18  a given we have the enhancement because that is the plan, 9

19  percent opening balance with enhancement.  That is the actual

20  plan.

21           On the right side I said okay, if the opening balance

22  was determined at 6 percent, there is some real question as to

23  whether an enhancement would be necessary or appropriate

24  because the opening balances are so much higher.  44,000, you

25  see the opening balance even without enhancement is 44,000

1   compared to 36,000.  It is quite a bit higher than the actual

2   opening balance for the person with an enhancement.

3           So then I said all right, what if we take that 44,423

4   and take that and invest it in the open market, and then you

5   see it crosses over at some point, it takes about 10 years.  It

6   starts off with a plan that is lower.  Again the 6 helps.

7           It is a package.  This is the way plans are generally

8   designed.  They're designed with a lot of moving parts.  The

9   package here is the 9 percent opening balance discount rate,

10  the 6 percent interest crediting rate and the enhancement.

11          What I am suggesting is that another package might

12  have been a straight 6 percent opening balance and the plan

13  might have actually credited one year treasury rates.  There

14  were a lot of plans, particularly early on, that credited the

15  most popular rate, and this comes again from that survey, the

16  most popular crediting rate in the early years was either a one

17  year treasury rate or variable would change each year, interest

18  crediting rate, sometimes with a margin added on, half a

19  percent, maybe up to a percent.  So that is sort of the idea of

20  this table.

21          THE COURT:  Then in that survey you say that -- do you

22  have your report with you?

23          THE WITNESS:  Yes, I have it.

24          THE COURT:  On Page 29 of that survey you say there is

25  a block which says using high interest rates in determining

F7NJOSB4                            Sher - direct

1   open balances, thereby causing the wear-away effect is not

2   common practice.  Can you describe that to me.

3              THE WITNESS:  I would say that in most situations, the

4   opening balance interest rate is determined using an interest

5   rate which is closer to, not necessarily equal to, but closer

6   to the 417 (e) rate, at or near the five-month period of the

7   survey.

8              We looked at 417 (e) rates within a five-month period

9   and then ranked them, how many plans had an open balance, which

10  was higher or in that range or lower than the range, and the

11  survey revealed that, you know, it had large segments, each

12  were higher in the range or lower in the range, but there

13  wasn't in the survey some tenancy to, you know, at least in

14  many plans to, you know, to have that much or much of an

15  initial wear-away.

16             THE COURT:  All right.  Thank you.

17             MR. RACHAL:  Your Honor, can I take a one-minute

18  break?

19             THE COURT:  Sure.

20             MR. RACHAL:  It will be very short.

21             THE COURT:  All right.  Go for it!

22             (Recess)

23  BY MR. RACHAL:

24  Q.  I'll shift topic a little bit.  What was the 417 (e) rate

25  based on prior to the 2006 -- excuse me -- Pension Protection

F7NJOSB4                          Sher - direct

1    Act?

2    A.  Well, it varied by the time.  Before 1985 there was no 417

3    (e) rate.  The rates just had to be reasonable like any other

4    assumption.

5           Then starting in it was I believe 1985, the one set of

6    rates came into being, the BBC rates and in '91, '95, the

7    30-year treasury rates were incorporated into the 417 (e).

8    Q.  What happened with the 2006 Pension Protection Act?

9    A.  In the 2006 Act, Congress changed the 417 (e) rate from the

10   30-year treasury rate to what we're calling for simplicity

11   corporate bond, the corporate bond rate.

12   Q.  I know you referred to this report.  What was your

13   understanding of why Congress was making that change?

14          MR. GOTTESDIENER:  Objection, your Honor.

15          THE COURT:  I'll allow it, but ultimately obviously he

16   is not seeing into the mind of Congress.  I assume he has a

17   basis for it based on legislative history which I can also

18   read.  To short-circuit that, let's hear his version.

19          THE WITNESS:  Well, based on, to some extent based on

20   legislative history and to some extent based on my

21   understanding of what was leading to the change was a concern

22   that many had, particularly in the employer side, saying the

23   30-year treasury bond rate was providing too low of an interest

24   rate, something like when they adopted the corporate bond rate

25   would make more sense.

F7NJOSB4                          Sher - direct

1  BY MR. RACHAL:

2  Q.  Based on the actuarial consulting experience, during the

3  mid-1990's did employers consider the 30-year treasury rate to

4  be the correct rate to convert annuities to lump sums?

5  A.  Well, it was correct in the sense of that is what the law

6  required, but it was not something that employers felt --

7          MR. GOTTESDIENER:  Objection, your Honor.

8          THE COURT:  Overruled.  All of this is not based upon

9  his speaking for the employers.  It is based on his experience

10  in assembling information, so it is appropriate.

11          You can continue.

12  A.  Yes, based on my experience with, talking with employers.

13  Sometimes it was just talking with employers who were

14  considering putting a lump sum option in their plans.  When

15  they saw what effect that would happen on their costs, they, a

16  lot of them backed off.  They felt that a 30-year treasury rate

17  cost of the plan, payout 30-year treasury rate, it would cost

18  the plan too much money.

19  BY MR. RACHAL:

20  Q.  Based on your discussions with those employers, when you

21  advised employers during mid-1990's, did they have concerns

22  interest rates would be rising again?

23  A.  As I said before, some of them, at least some of them had,

24  definitely had that concern, most of them I dealt with.

25  Q.  What about during the 1995-1996 period, what was the

1   30-year treasury rate doing during that period?

2   A.  I know at the end of 1994, the 30-year treasury rate was up

3   close to 8 percent.  I think it was actually over 8 percent

4   very late in 1994.

5        Then during 1995 it started to reduce, so it was up

6   around 8 percent, started to reduce.  Part of the way through

7   the year, especially during the end of the year it reduced

8   pretty rapidly and ended up about 2 percent, just about 2

9   percent lower than it was the year earlier.

10  Q.  What happened in 1996, do you recall?

11  A.  In 1996, in the first six months of the year, it was down

12  to 6.06 percent, had increased in June, six months later, by

13  exactly 1 percent, up to 7.06 percent.

14  Q.  Did this interest rate volatility indicate any market

15  uncertainty to you?

16  A.  Well, it certainly is volatile.  I guess along with

17  volatility, it is an indication there is some uncertainty in

18  the markets, I guess I would agree with that.

19  Q.  Did the use of the 30-year treasury rate confer any

20  financial advantage to the class members?

21       MR. GOTTESDIENER:  Objection.  Your Honor, this was

22  required by law.

23       THE COURT:  What is that?

24       MR. GOTTESDIENER:  It was required by law.

25       THE COURT:  That's all right.  He can answer.

F7NJOSB4                          Sher - direct

1    A.  Well, I think certainly it does.  Just because the law

2    requires something, in my view, it doesn't necessarily convey

3    more than an appropriate economic value.

4          I think that again many employers felt -- and as an

5    actuary I was inclined to agree with it -- that the 30-year

6    rate was a generous, 30-year was a generous rate.  So in that

7    sense I would say it did convey value that was more than the

8    value that I would attribute to the annuity that it was

9    replacing.

10   Q.  Did you analyze when class members terminated?

11   A.  Yes.

12         MR. RACHAL:  Would you pull up DX-411.  I am sorry.

13   It is not 411.  Yes, it is DX-411.

14   BY MR. RACHAL:

15   Q.  Do you have that in front of you?

16   A.  Yes.

17   Q.  What does this graphic show?

18   A.  This shows among the 16,411 members, that about two-thirds

19   of them had terminated employment in the first three years

20   after the conversion, '96, '97 and '98.

21         THE COURT:  Does this number include those individuals

22   who would have received lump sums by virtue of that $3,500 rule

23   that we talked about?

24         THE WITNESS:  Yes.  We're starting with all, this is

25   all the members who terminated in those years.  So the 11,000,

F7NJOSB4                              Sher - direct

1    there are just talking about the 11,000, that is all of the

2    employees or the class members who terminated employment in

3    those three years.  That is why we haven't made any -- there is

4    no distinction through what they've done.

5                THE COURT:  You may proceed.

6    BY MR. RACHAL:

7    Q.  During this period in which the participants were receiving

8    lump sums, electing on par with those for values under 3500

9    cash-outs, what was the 417 (e) rate that was applied assuming

10   they were in wear-away?

11   A.  The 30-year treasury rate.

12   Q.  What did that mean for this group as compared to the

13   corporate bond rate applied during that period?

14               MR. GOTTESDIENER:  Objection.

15               THE COURT:  Overruled.

16   A.  That means they value the present value, lump sum present

17   value of their frozen protected benefits would have been lower

18   using a rate that might have been one and a half percent or so

19   higher than the Treasury rate.

20   BY MR. RACHAL:

21   Q.  Do you consider the 9 percent rate used to set the opening

22   balance to be an actuarially reasonable rate?

23   A.  I do.

24               MR. GOTTESDIENER:  Objection.

25               THE COURT:  Overruled.

F7NJOSB4                          Sher - direct

1   BY MR. RACHAL:

2   Q.  Is there any one definition of actuarially equivalence used

3   in the actuarial profession?

4   A.  No.

5   Q.  Is there anything that the actuarial standards and practice

6   require on actuarial equivalence?

7   A.  Not that I'm aware of.

8           THE COURT:  By how much can it vary?  I'll just leave

9   it at that.

10          THE WITNESS:  It depends on the purpose for which

11  you're determining an actuarial equivalent.  In all cases, you

12  know, one needs to look at what it is you're trying to

13  accomplish by making the actuarial.

14          Once you do that, there is still variation.  In my

15  view, there is a judgment element that if you ask five

16  different actuaries what they think is reasonable, many of them

17  would either come up with a particular number or give you

18  ranges, this is a range of reasonableness, but again the

19  purpose of the measurement is critical, what you're trying to

20  accomplish.

21          Sometimes there is actuarial equivalent that is set by

22  law, you have no choice, by 417 (e), and that's using 30-year

23  treasury rates using lump sums.  You can characterize that as

24  an actuarial equivalent in a sense even if some of us feel it

25  was overpaying people.  In a sense it is actuarial equivalent

F7NJOSB4                          Sher - direct

1    because the law requires it.

2             THE COURT:  What does actuarial equivalent mean?

3             THE WITNESS:  It is usually used in the context of

4    converting one form of pension benefit to another, and it is

5    used -- for example, many plans until -- many plans going back

6    a ways, when a lot of them were insured, insurance companies

7    provided the benefits, they would have an actuarial equivalent

8    rather than having like Foot Locker has early retirement, where

9    they have 4 percent per year scale like that, they would have a

10   scale that varies.

11            The difference in each year is a little bit different

12   and that would be based on some type of interest rate and

13   mortality assumption, and the idea there was they're trying to

14   protect, protect their interest.  They don't want to subsidize

15   anything at least knowingly.

16            So then we have this flat rates of 4 percent or 6

17   percent a year.  In a sense, in a broad sense those can be

18   viewed as either actuarial equivalent -- maybe a steeper scale

19   is closer to an actuarial equivalent.  The 4 percent is

20   subsidized to an extent.  So the term "actuarial equivalent" is

21   used in different ways, but it is to convert one form -- some

22   might convert a life annuity to a joint survivor annuity.

23            THE COURT:  What is on the other side of the equal

24   sign?

25            THE WITNESS:  You start off with a thousand dollars a

F7NJOSB4                          Sher - direct

month life annuity at age 65, and the plan has, and the Foot

Locker plan has factors that are referred to that convert that

thousand dollars.  You only get $9,100.00 a month as a joint

and 50 percent survivor annuity.

        So to a spouse, a thousand dollars they're paid while

I am alive, $910.00, and then half of that after I die, my

spouse is still alive, she receives half of that for the

remainder of her life.

        Those are meant to be or characterized as being

actuarial equivalent to one another.  What does that mean?

That means if things on average work out, the plan will pay

about the same amount of money out on one form versus the

other.  It is neutral from the plan's perspective.  The plan is

not expected to gain or lose from that transaction.

        Will they gain or lose on an individual?  Yes.  It

depends on how long people live.

        THE COURT:  So actuarial equivalence ought to be

neutral from the plan perspective?

        THE WITNESS:  That is certainly one way to look at it.

        THE COURT:  Is that the most common way?

        THE WITNESS:  That is the way it originated.

        I would say from the plan's perspective, actuarial

equivalent is supposed to be neutral or close to neutral from

the plan's perspective, so the plan would not care, and it

shouldn't make any difference in their costs at least over the

F7NJOSB4                         Sher - direct

1    long run.

2             Now then the question is, you know, what about from a

3    participant's perspective, does the participant have a

4    different perspective on all of this?  The answer is maybe.

5    The participant may view an actuarial equivalent differently

6    than a company would because it is their benefit.  It is their

7    finances.  It is what do they think is fair and appropriate.

8             So from my perspective, there is a certain balancing

9    act, there is judgment, and I think there is leeway as well.  A

10   company, you know, that is, you know, companies that are in

11   real good financial condition might say well, let's determine

12   opening balances and be more on the generous side.  If we think

13   30-year treasury rates are too low, we'll do it that way anyhow

14   and it will cost the more money than it otherwise would, but we

15   can afford it.  They'll do that or trim back other features of

16   the plan.

17            It is all what can you afford, what is reasonable, and

18   there is a lot of judgment, in my view.

19            THE COURT:  Thank you.

20   BY MR. RACHAL:

21   Q.  At the time of the Foot Locker cash balance conversions,

22   were there any legal requirements on how a plan can calculate

23   the opening balance?

24   A.  I would say there was no explicit legal requirement.

25   Q.  Was the addition of lump sums using the 9 percent rate to

1  set the initial account balance, in fact, cost-neutral for the

2  Foot Locker plan?

3         MR. GOTTESDIENER:  Objection.

4         THE COURT:  I'll allow it.  You may answer.

5  A.  I think the intention, seen from reading through the

6  documents --

7         MR. GOTTESDIENER:  Objection.

8         THE COURT:  Overruled.

9  A.  -- that what I read, how I interpreted it, the documents,

10  was that the intention was to tie it to the expected return on

11  plan assets was to settle the balances to provide a

12  cost-neutral effect.

13         There ought to have been some anticipation that,

14  indeed, they would have to pay out lump sums at least in the

15  short run, and maybe in the long run that are, you know, that

16  are based on 417 (e) rates that are below 9 percent.

17         When in 1996, in the first year the rates were 6

18  percent, it turned out not to be as cost-neutral.  It turned

19  out not to be cost-neutral in those years and in subsequent

20  years it ended up costing money, as we have seen in the

21  samples.

22  Q.  To kind of close the loop on that, why did it cost the plan

23  money during that period?

24  A.  Because at least for the people, which is most of the

25  people who were in wear-away, when they took lump sums, they

1    received those lump sums based on the frozen protected benefit

2    discounted at the 6.06 rate, the statutory 30-year treasury

3    rate versus the liability that was being held for them at a 9

4    percent rate.

5              THE COURT:  We can break for lunch whenever is a good

6    time for you.  We don't have to break now.  We can break in 10

7    minutes, but just be aware we'll break certainly by 1:00

8    o'clock.

9              MR. RACHAL:  I have five questions that probably

10   will --

11             THE COURT:  Sure.  Absolutely.

12   BY MR. RACHAL:

13   Q.  Based on your review of the documents, did Mercer recommend

14   using the 9 percent rate to set the opening balances?

15   A.  That's what seemed pretty apparent to me that they did.

16             MR. GOTTESDIENER:  The same objection, your Honor.

17             THE COURT:  I was waiting for the objection.  You

18   should leap to it.

19             MR. GOTTESDIENER:  Sorry, your Honor.

20             THE COURT:  That is okay.  I don't want him to be

21   testifying just about what the meaning of the documents are.

22   If you want him to have him apply his expertise, that is a

23   better way to use his time.  Let me strike the last answer.

24   BY MR. RACHAL:

25   Q.  Based on your review of the record, was Mercer's

F7NJOSB4                          Sher - direct

1   recommendation to Foot Locker on how to set the opening balance

2   reasonable?

3            MR. GOTTESDIENER:  Objection.

4            THE COURT:  No.  That is certainly appropriate.  You

5   may answer.

6   A.  I think it is, yes.

7   BY MR. RACHAL:

8   Q.  Why is that?

9   A.  Well, I assume we are talking about the recommendation

10  being 9 percent.  I think that again this design was the first

11  item, the first objective was saving costs.  I think there is a

12  range of reasonableness for actuarial equivalence.

13            I think it is reasonable for the actuarial equivalence

14  to be set at the plan's expected rate of return.  That is what

15  they did.  They certainly could have used a lower rate.  It

16  would have increased costs if they did.  Increased costs means

17  that something else either would have had to accept the

18  increased costs or they would have had to find something else

19  in the plan or elsewhere to offset it.

20            MR. RACHAL:  Your Honor, this would be a good breaking

21  point.

22            THE COURT:  Thank you.  Let's take our lunch break and

23  we'll come back at 2:00 o'clock.

24            (Luncheon recess)

25            (Continued on next page)

1           A F T E R N O O N   S E S S I O N

2                          (2:05 p.m.)

3           THE COURT:  Mr. Rachal, you can proceed whenever

4     you're ready.

5           MR. RACHAL:  Thank you, your Honor.

6           I just had one quick housekeeping.  We are going to go

7     ahead and withdraw Demonstrative Exhibit 434.  It's 434-2.

8     It's basically a graph.  It's this one in the back and the

9     table that goes with it.

10          We are going to withdraw it.

11          THE COURT:  Thank you.

12          That's withdrawn.

13    BY MR. RACHAL:

14    Q.  All right.  Going back to the 9 percent interest rate that

15    was used to set the initial account balance, how did that 9

16    percent rate compare to historical rates?

17    A.  Well, looking -- I know I looked at a couple of different

18    periods in my report.  I think it was 15 years and 20 years I'm

19    pretty sure.

20          MR. RACHAL:  We can go ahead.  Let's go ahead and pull

21    up Exhibit DX 412.  Thank you.

22    BY MR. RACHAL:

23    Q.  Does this graphic represent the analysis you did?

24    A.  Yes, it is actually 10 years and 15 years I wrote.  So I

25    looked at the average of the 30-year bond rates in the 10 years

F7nnosb5                              Sher - direct

1    ending through 1995.  And that worked out to 7.9 percent.

2             And I looked at the 15-year average, which would have

3    started from 1981 through 1995, and that worked out to 9.3

4    percent.

5    Q.  Did you go back and look at the 30-year treasury bond rates

6    since they first started publishing it I think in the '70s

7    sometime?

8    A.  I think it was February of 1977 when they first started

9    publishing these rates, and the average was just about the same

10   as the 15 year average, 9.3 percent.

11   Q.  I know you talked about this earlier.  Does this graphic

12   illustrate what was occurring with the 30-year treasury bond

13   rate in the '95 period when the cash balance plan was designed?

14   A.  Yes, it does.

15   Q.  What does it show?

16   A.  It shows the rate at the beginning of the year, which was

17   based on a December 1994 rate, which was 7.87, and then it

18   dropped by the end of '95, December of '95, to 6.06 percent.

19   Q.  What was the expected wear-away under the 7.87 percent rate

20   when the cash balance plan design began?

21   A.  Based on the record, I think it was Mr. Kiley's notes, one

22   of them, there was an indication and I think -- I'm pretty sure

23   that it came from Mercer, they expected about a two- to

24   three-year wear-away period.

25   Q.  Was that an average or was that the total period, expected

F7nnosb5                              Sher - direct

1   period?

2   A.  I'm not sure what it meant.  It said two to three years, so

3   I would presume that it might have been an average.

4           THE COURT:  Did you do any work yourself to confirm

5   one way or the other whether or not that was a reasonable

6   expectation for wear-away, given the various factors that were

7   in play with respect to this plan and the number of

8   participants, etc.?

9           THE WITNESS:  I don't think, your Honor, that I did

10  anything in -- indicated any of that information in my reports.

11          THE COURT:  Did you just accept that was their

12  going-in view as to the expected duration of wear-away?

13          THE WITNESS:  Well, I have done -- subsequent to

14  issuing my reports I have done some -- you know, it's been

15  three years.  So I looked at that, and I think I pretty well

16  confirmed that on average it was two to three years or

17  something just a little bit longer, and some at that rate had

18  none or virtually none, especially with people with

19  enhancements.

20          THE COURT:  All right.  Thank you.

21  BY MR. RACHAL:

22  Q.  Mr. Sher, did you do any analysis to determine what the

23  corporate bond rates that were later approved by Congress would

24  have been during this period?

25  A.  Yes.  Yes, I did.

F7nnosb5                              Sher - direct

1              MR. RACHAL:  DX 413.

2   Q.  This graphic, does that report your analysis of what those

3   corporate bond rates would have been?

4   A.  Yes, it does.

5   Q.  What were you finding on the corporate bond rates during

6   this period, the difference between them and the 30-year

7   treasury rate?

8   A.  That the spread between the two was about one and a half

9   percent, focusing on, again, for opening balance purposes, the

10  vast majority of the people I think it was 70 percent were age

11  45 or under.  And that spread would be applicable for that

12  group of people, for the majority.

13  Q.  Did the addition of the enhancement impact your views as to

14  whether the use of 9 percent rate with the initial account

15  balance was reasonable?

16             MR. GOTTESDIENER:  Objection.

17             THE COURT:  Overruled.

18  A.  As I was saying before, I think, at least in my experience

19  when I look at designing these type of plans, any retirement

20  type study, you look sort of a combination of the impact of the

21  various elements, so I would look at a package like this and

22  believe that the actuary and those who were considering it

23  would look at the package as a whole.

24  Q.  What was the impact of the enhancement on the group that

25  qualified for the enhancement vis-a-vis wear-away?

F7nnosb5                              Sher – direct

1    A.   These were the people who were age 50 with at least 15

2    years of service on January 1, 1996.  Their opening account

3    balances determined, otherwise determined would be increased up

4    to 67 percent for those who were 55 and under.  So between 50

5    and 55 would be a 67 percent increase, grading down as you go

6    through the period from 65, from ages 55 through 65.

7    Q.   I have some final questions relating to this topic.

8              It's correct that in 2000 your firm, I think it was

9    PricewaterhouseCoopers conducted a survey of cash balance

10   plans, the one you referred to earlier?

11   A.   Yes.

12   Q.   That survey is attached to your report.  I think Judge

13   Forrest has it.  Everybody has it.

14   A.   Yes.

15   Q.   I think you were asked earlier, it's correct you don't know

16   whether the Foot Locker plan was included in the survey?

17   A.   I do not know.

18   Q.   Did this survey include any information on the spread, if

19   any, between the 417(e) rate at the time of conversion and the

20   discount rate used to set the opening balances?

21   A.   Yes.  What it actually did is it looked at the range of

22   417(e) rates in the five-month period before the plan's

23   conversion date, and then compared that range to the actual

24   opening balance interest rate and then ranked the plans as to

25   whether they were within the range, below the range, or above

F7nnosb5                          Sher - direct

1    the range.

2    Q.  What did your survey find on this issue?

3    A.  In general, it found that there were a good number of plans

4    that had rates that were within the range, above the range, and

5    below the range.

6    Q.  For the period from 1995 forward after the 417(e) rate, the

7    417(e) basis was a 30-year treasury rate, how many plans in the

8    survey were more than 2 percent above that rate or that range?

9    A.  I believe there were two out of -- I think it was -- it was

10   4 percent.  2 out of 52 I think.

11   Q.  Was it correct that Foot Locker's spread was 3 percent?

12   A.  No.  Their spread -- when we are looking at the spread, we

13   are not comparing the interest crediting rate to the opening

14   balance interest rate.  What we're comparing is the 417(e) rate

15   during the five-month period to the opening balance rate.

16        When you look at that, I think it's 2.1 or 2.2 percent

17   above the range.

18   Q.  Is Foot Locker an outlier on the spread based on these

19   survey results?

20   A.  I would say certainly on its face it would seem that way.

21   Q.  Is there anything that would qualify your views on this?

22   A.  I think there are two things.  One is I think I mentioned

23   earlier that this was a period, as we've seen, where rates,

24   rates had been coming down just about 2 percent from the

25   beginning of '95 to the end of '95.

F7nnosb5                          Sher - direct

1          And I know that and the survey shows that when rates

2     are at a low end, which I think people perceived they were at

3     that point in time compared to all the history that we're

4     looking at, there was a tendency to sort of discount at least

5     to some degree the recent reduction in rates, a tendency

6     therefore to use a rate that's somewhat higher than the 30-year

7     bond rate.

8          The other element here, and this is something that I

9     don't usually like to admit, but I think the survey was

10    somewhat flawed, and was a correction made in the later survey.

11    The five-month period look back, I think was too short for many

12    companies, especially for Foot Locker, but for many companies,

13    not just Foot Locker.

14         We found and I found, you know, looking back at how

15    long it takes companies to get from the point where they pretty

16    much make a decision and now they are just working out the

17    details, the administration of the plan, the plan documents,

18    whatever else, communication materials and finalizing, putting

19    the final touches on the design, it takes at least six months,

20    in some cases, like Foot Locker, closer to a year.

21         So I think that that period was too short, and

22    actually the next study that we did when I was at Mellon, which

23    was a follow-up study, used a nine-month look back period

24    because, again, we thought at the time that was more realistic,

25    even though I think that's still a little bit short for many

F7nnosb5                              Sher - direct

1      companies.

2                     MR. GOTTESDIENER:  Your Honor, we don't have this

3      study that he's talking about.  I would object.

4                     He didn't supplement his report.

5                     THE COURT:  You can cross-examine him on whether it

6      exists.  Don't people talk about all kinds of things as part of

7      their expert testimony, not all of which has to be provided.

8                     It had not been mentioned before?

9                     Have you not mentioned this study before?

10                    THE WITNESS:  I don't think I did, no.

11                    THE COURT:  Why did you include the survey that you

12     included as an attachment to your report if you thought it had

13     some flaws?

14                    THE WITNESS:  Well, I don't think I was focusing so

15     much on this section of the survey in my report.  I think it

16     was focusing on a different section.

17                    Then plaintiffs pointed out I think it was maybe in

18     Mr. Deutsch's rebuttal report, you know, that section of the

19     survey, and afterwards I took a look at it, and I realized that

20     I had done a later survey.

21                    The reason I included the earlier survey is because I

22     wanted to, I thought it was more appropriate to include the

23     data that was closer in time.  I didn't really want to include

24     conversions that occurred after 2000.  So I thought the earlier

25     survey would be more appropriate in this case.

F7nnosb5                          Sher - direct

1                THE COURT:  The version of the survey that I have

2       attached in color to your declaration -- and we will be clear,

3       it's your first report.  And the date, so we're absolutely

4       clear about it, it is the last page of the first report, May

5       10, 2012.  That version has what looked to be nonoriginal

6       highlights in green in various places.

7                MR. RACHAL:  Your Honor, I will confess those are my

8       highlights.

9                THE COURT:  All right.  OK.

10               I took these as pieces of the report that you weren't

11      disavowing certainly, and in particular, turn to page 28.

12               THE WITNESS:  Which document is that in?

13               THE COURT:  Which what?

14               THE WITNESS:  Is that attached to my report?

15               THE COURT:  It should be.  It's attached to my

16      version.

17               THE WITNESS:  OK.

18               MR. RACHAL:  Do you have it?

19               I should have an extra copy if you don't up there.

20               THE WITNESS:  That's DX 12?

21               MR. RACHAL:  Yes.

22               THE COURT:  This survey.

23               THE WITNESS:  I don't believe it's -- at least it is

24      not attached.  There is a page that says appendix 3.  That's

25      the last page of that document.

F7nnosb5                        Sher - direct

1              THE COURT:  It's table 10-B, which is what I'm looking

2       for.

3              THE WITNESS:  I know I don't have it here.

4              THE COURT:  Let me just show you mine.

5              THE WITNESS:  OK.

6              THE COURT:  Let me hand this over.  I don't know,

7       Mr. Gottesdiener, if yours had the green on it or not.

8              MR. GOTTESDIENER:  No, your Honor.

9              THE COURT:  But attached to mine, and then I will show

10      it to Mr. Gottesdiener, you will see that there is some green

11      highlighting on that page 28.

12             Do you see that?

13             THE WITNESS:  Yes, I do.

14             THE COURT:  That's not yours?

15             THE WITNESS:  No.

16             THE COURT:  All right.

17             THE WITNESS:  No, it's not.

18             THE COURT:  I think Mr. Rachal has represented that

19      it's his.

20             That page and then the page or two after that, which

21      relate to interest rates, is that something that you now think

22      is not as relevant to Woolworth, or do you think that it's

23      still relevant to your discussion here?

24             THE WITNESS:  Well, I think, given that I changed it,

25      we changed it in the next survey, we changed an element of it,

F7nnosb5                          Sher - direct

1   which changes the relationships to some degree, I think in

2   retrospect, we did not do it the way we should have done it.

3          THE COURT:  All right.

4          Mr. Gottesdiener, have you seen the green highlights.

5          MR. GOTTESDIENER:  No.  I was just wondering for the

6   record if maybe the Court can put in the page and the lines.

7          THE COURT:  Yes.  It's page 28.  It's the last three,

8   four, and five lines on the page, starting at "When prevailing

9   rates."

10          It skips the next line and then picks up.

11          Then on the next page, it's on page 29.  There is a

12   green circle around the first two interest rate ranges where

13   the number 8 and the number 10 are in the fourth column over.

14          Then there's highlighting throughout that paragraph.

15   There are a few other places in this where there's highlighting

16   as well.

17          All right.  You may proceed, Mr. Rachal.

18          MR. RACHAL:  I just want to note, too, for the record

19   that the one that was ECF filed unfortunately has the green

20   highlights.  You can find it there.  It goes from docket 338-13

21   to about 338-32.  It had a lot of highlights.

22          THE COURT:  All right.

23          MR. RACHAL:  That's the one that is ECF filed, so

24   counsel also has had access to the highlights.

25          THE COURT:  All right.  That's fine.

F7nnosb5                      Sher – direct

1   BY MR. RACHAL:

2   Q.  Based upon looking at a longer look back period during the

3   plan design process, how does Foot Locker's interest rate that

4   it used with the starting balance compare with that longer look

5   back period?

6   A.  It lowers it.  The amount above the range comes down to

7   under 2 percent, between 1 and 2.

8   Q.  In your view, was it actuarially reasonable to discount the

9   initial account balance for mortality?

10  A.  Yes.

11  Q.  Why is that?

12  A.  Because what you are taking is a normal retirement annuity.

13  That's how it's defined.

14          You take the accrued normal retirement annuity, and

15  you convert it to a present value at the conversion date based

16  on the employee's age at that time.

17          There is a real probability that between that age at

18  conversion and age 65 that the employee will not survive, just

19  like there is a probability that he or she won't survive

20  between age 65 and 66, 66 and 67 and so forth.

21  Q.  What does that preretirement mortality discount reflect?

22  A.  It reflects the probability that the person will not make

23  it to age 65 when he or she would have been entitled to

24  commence a normal retirement benefit as an annuity under the

25  prior plan.

F7nnosb5                              Sher - direct

1   Q.  Are there tables used to make this mortality discount?

2   A.  I'm sorry.  Are there tables used?  Yes, mortality tables.

3   Q.  Yes.  Let me ask you more directly.

4           Does the IRS publish a table used to make this

5   mortality discount?

6   A.  Well, they publish tables to make mortality discounts for

7   Section 417(e).  I believe that those same tables were used to

8   determine opening balances.  Actually, it is a table.  It is a

9   single table.

10  Q.  Does the IRS mortality table for 417(e) distinguish between

11  pre- and postretirement mortality?

12  A.  No, it is just a table that has rates, you know, by age, at

13  all ages, you know, from very young ages to very old ages.

14  Q.  Other than death obviously, are life events reflected in

15  its mortality tables, such as leaving work, retirement, that

16  type of thing?

17  A.  No, it's just by age.

18  Q.  Did you see the IRS mortality tables referred to in the

19  plan communications?

20  A.  Yes, I saw some mention of them in the plan communications.

21  Q.  Do you recall where?

22  A.  I believe there is a mention in the SPD, and I think in

23  some other communications as well.

24          MR. RACHAL:  Jon, pull up DX 405 again.

25          Now I am going to switch.  We are finished with point

F7nnosb5                          Sher - direct

```
 1   two, and I am going to switch to point three, whether Foot

 2   Locker's communications were consistent with mainstream

 3   practices at the time.

 4   BY MR. RACHAL:

 5   Q.  As part of the PricewaterhouseCoopers survey that you were

 6   talking about earlier, did you survey communications on cash

 7   balance conversions over the period in which Foot Locker

 8   converted its plan to a cash balance plan?

 9   A.  Yes, the survey included certain information on that.

10          THE COURT:  Did you obtain as part of that information

11   the average educational level of the participants in a given

12   respondent?

13          So, there's an employer, it responds to the survey.

14   Did you obtain any information relating to its population as

15   regards educational level?

16          THE WITNESS:  No.

17          Other information regarding the company, but I don't

18   recall, I don't think we did that, no.

19          THE COURT:  Let me just be very blunt about what I am

20   trying to figure out when we get into this, because this came

21   up when I was reading through it in your report.

22          One of the points of the communications is to convey

23   information to the participants, is that right?

24          THE WITNESS:  Yes.

25          THE COURT:  The ability of a participant to understand
```

F7nnosb5                         Sher - direct

1    that information would depend logically in part upon his or her

2    level of sophistication?

3              THE WITNESS:  I think that's true.

4              THE COURT:  So I guess the question is, in terms of

5    the relevance of other employers who may have demographically

6    similar populations, I understand the relevance of how they

7    communicated something to a demographically similar population,

8    but I am not sure that there would be as much relevance in

9    terms of employers communicating to a differently constituted

10   population.

11             Do you see my point?

12             THE WITNESS:  Yes.

13             I am not sure where that leads in terms of how we

14   change the communications approach, but --

15             THE COURT:  Well, it depends on your view as to what

16   the obligation is I suppose.

17             THE WITNESS:  Right.

18             THE COURT:  But let's assume for the moment that you

19   have a sophisticated high-tech employer.  One might view that

20   group of employees as better able to comprehend certain

21   communications.

22             Would you agree?

23             THE WITNESS:  I would agree.

24             THE COURT:  That would be in contrast perhaps to an

25   hourly warehouse worker who might not understand things at the

1    same level without additional explanation or wording, further

2    explained in some manner?

3              THE WITNESS:  Yes.

4              But I would like to add to that.  That is, in my

5    experience when employers, when you have an organization where

6    there is a lower level of understanding perhaps, they have to

7    make a choice.

8              The choice is, do we provide more information that

9    might have some chance of being really understood and not

10   misused, and that runs the risk of, it is going to be hard to

11   explain this.  It's very complicated stuff, which this is.

12             Or, do you communicate to them -- or it can turn them

13   off from reading it entirely if it gets too complicated.

14   You're trying to explain it, but it's just complicated stuff.

15   It is hard to explain.

16             Or, do you just explain to them sort of the more

17   rudimentary things and then say, you know, if you really need

18   help go get it?

19             Because it's going to take a sitdown.  It's going to

20   take sitting down with someone or really a meeting where it's

21   explained very carefully these concepts that, you know,

22   especially in broad-based communications are very hard to get

23   across.

24             THE COURT:  So to figure out where you want to fall in

25   that spectrum -- let me put it differently.  In your experience

F7nnosb5                          Sher - direct

1    advising different employers on -- let me ask you starting from

2    before that.

3          Did you ever advise any employers plan communications?

4          THE WITNESS:  I would say that I reviewed the

5    communications and made suggestions.  I do not consider myself

6    a communication expert, but I have seen a lot of different

7    communications a lot of different styles.  Some of them getting

8    much more complex and some of them more basic.  It's really --

9    I think it comes down to a style that some employers are much

10   more, you know, want to get more involved and really get into

11   details and others have the philosophy that it's just not going

12   to be, you know, they are going to pick it up and they're going

13   to put it down.

14         THE COURT:  Now, in regards to the comments that you

15   would make on employer communications, did you consider the

16   audience, and by the audience I mean the participant group who

17   would be reading them when you were making your comments?

18         THE WITNESS:  I would say yes, if I felt that the

19   participant group was clearly sort of the two extremes that you

20   articulated, where it was clear that there are, you know, that

21   a good portion of their workforce was either very capable of

22   understanding, very technical maybe an engineering company,

23   where, you know, the people are going to tear it apart and

24   they're going to figure it all out one way or the other, they

25   are going to get to the bottom of it; or if it was a company

F7nnosb5                         Sher - direct

1    that had, you know, I don't want to say sixth grade or

2    whatever, eighth grade level.  Yes.  I think that -- I think

3    that most of the HR people that I've come in contact with were

4    sensitive to, OK, who are we communicating to.  And certainly

5    the communications experts either internally or that they used

6    consultants on the outside, I mean, I would think would have

7    been in tune with that, who's the audience.

8              THE COURT:  All right.

9              So then let me circle back now to where I started at

10   the beginning, which is, in terms of the survey and the

11   companies encompassed within the survey, do you have sufficient

12   information to relate any of their populations to the Woolworth

13   population?

14             I don't want you to speculate, but I'm trying to

15   figure out if we've got apples to apples here or whether or not

16   it is a hodgepodge of fruit, some of which are grapes and some

17   of which are nectarines, and there may be an apple thrown in,

18   but we are going to have to dig for it.

19             THE WITNESS:  When we did the survey, we did not try

20   to get that kind of information or try to record it.  There are

21   a lot of things in the survey that in retrospect,

22   cross-relationships is what we are talking about here, that

23   people have come in and said why did you do this or could you

24   have done that.  And the answer in almost all cases is, yes, we

25   could have done that.  We also wanted to get it done and

F7nnosb5                          Sher - direct

1    published, and we wanted to sort of get some basic information

2    out there on what the practices are, hoping that people aren't

3    going to take it and run with it, but they might get some value

4    out of it when they're they themselves are going through one of

5    these conversions.  That's what we were trying to do.

6              THE COURT:  All right.

7              Well, in light of that I have to say I am not sure

8    what relevance the industry practice as associated with the

9    survey will have in terms of direct relationship to the

10   adequacy of the communications here.

11             With that said, I am going to let you develop your

12   testimony, but I just want to give you a heads-up that I do

13   view the communications as needing to be provided to a

14   particular demographic.  If we don't have a correlation between

15   demographics, I can't really use it.

16             To the extent -- but go ahead and develop it and then

17   you folks can make your arguments as you see fit afterwards on

18   this particular point.

19             MR. RACHAL:  Yes.

20             THE COURT:  All right.

21             MR. RACHAL:  Your Honor, with that qualification, I'm

22   mainly using the survey to show what the practices were, not

23   whether they were correct or wrong or right or --

24             THE COURT:  I understand.

25             MR. RACHAL:  Yes.

F7nnosb5                              Sher - direct

1           THE COURT:  I just think if the practices were

2     different for a different population, they may or may not be

3     translatable here.  But we can argue that.

4           Why don't you go ahead.  I am not going to preclude

5     you.  Go ahead and develop that testimony.

6           MR. RACHAL:  I will just have a few questions on it

7     that will simplify it.

8     BY MR. RACHAL:

9     Q.  What did the survey show regarding communications practices

10    related to wear-away?

11    A.  The survey focused on ongoing what I would characterize as

12    annual, usually annual benefit statements, annual benefit

13    statements which are similar to the ones that we have seen in

14    this case, where each year they provide an update on the

15    progress of the benefits that are being earned under the plan.

16          The survey showed, I think it was for a pretty

17    significant majority, that in those annual communications what

18    was highlighted was the cash balance benefit.  And that while

19    there were some companies that included some information on the

20    frozen protected benefits or for that matter on other minimum

21    benefits that go beyond the frozen protected benefit, beyond

22    the requirement of the law, that most -- that the vast majority

23    did not provide any of that information.  Some of them did

24    provide some degree of information.  That's what the survey

25    shows.

F7nnosb5                          Sher - direct

1    Q.  Did you discern or did you collect data on whether there

2    were any differences on the type of companies involved that had

3    different types of information they were providing on this?

4    A.  I don't think so.  I think that it was either did you

5    provide information on the any grandfathered benefits or

6    minimum frozen type benefits on those benefit statements, just

7    any information, and then the answer was either yes or no.

8           We didn't try to get into, at the time, you know --

9    obviously in hindsight it would have been nice to have a survey

10   that for those who did provide information to get some

11   indication as to what information they provided, but we had to

12   draw a line.  You ask too many questions and what happens is

13   you get no answers.

14   Q.  Did these communication practices --

15          THE COURT:  Can I have you hold on for one moment.

16          MR. RACHAL:  Sure.

17          THE COURT:  I just want to read the answer.

18          I just want to be able to condense down what you have

19   said, but I don't want to change what you have said.

20          All right?

21          THE WITNESS:  OK.

22          THE COURT:  Are you saying that in the companies with

23   which you're familiar and that have undergone cash balance

24   conversions and you were familiar with their communications

25   that they did not typically provide specific information on

F7nnosb5                        Sher - direct

1   wear-away?

2              THE WITNESS:  Well, I think -- I don't think I've said

3   that yet.  I think what I was focusing on, at least for now, is

4   the survey.  I can get beyond that.

5              THE COURT:  Let's stick with the survey.

6              In terms of the companies included in the survey, is

7   it your view that their communications relating to the cash

8   balance conversion did not typically include information on

9   wear-away?

10             THE WITNESS:  I think the survey question was focusing

11  on, not on the information at the time of the conversion, but

12  the information on an annual basis after --

13             THE COURT:  More like the retirement summaries or

14  benefit summaries that an employee might receive, is that

15  right?

16             THE WITNESS:  Yes, once a year typically.

17             And I think that is what happened at Foot Locker.

18  Once a year they would get an updated statement or -- it can be

19  either a pension statement by itself, it could be embedded

20  within a broader based employee benefit statement.  That would

21  have information on the progress of their pension benefits.

22             Those were the kind of, you know, continuing periodic

23  communications that the survey was focusing on with regard to

24  wear-away.

25             THE COURT:  Did you separate those into buckets or

F7nnosb5                        Sher - direct

1    piles, if you will, as to the companies whose cash conversion

2    resulted in effectively no wear-away versus those where the

3    formula resulted in wear-away, or were they all grouped

4    together?

5            Do you understand?

6            THE WITNESS:  Yes, I think they were all grouped

7    together.  I don't think there was a distinction in the survey

8    among the different situations like that.

9            THE COURT:  And is it true that in your view there

10   would have been some of the cash conversions where the formula

11   used would have resulted in no wear-away or at least nominal

12   wear-away with that small fluctuation you talked about as

13   possible?

14           THE WITNESS:  Well, I would say in a number of cases

15   there would have been little or no initial wear-away, but as

16   you went through this period and interest rates declined, it

17   allowed those situations where they didn't think they would

18   have any wear-away and they suddenly had wear-away because the

19   value of the frozen benefit went up as interest rates came down

20   and the cash balance benefit stayed where it was, on the same

21   track that it was on.

22           THE COURT:  When you were looking at the

23   communications that you have described, which were annual plan

24   statements or whatever they were, do you have a sense as to

25   where in that process some of those companies may have been?

F7nnosb5                              Sher - direct

1              In other words, whether they were in wear-away or not

2       yet in wear-away or coming out of wear-away?

3              THE WITNESS:  Not directly.

4              I mean, we did a survey in 2000, and we had a number

5       of plans that had converted as early as mid 1980s, although

6       there were some other plans that converted very recently, in

7       the late '90s.  So it was a mixed bag.

8              But, no, there was not an attempt to try to break it

9       down like that.

10             Again, it was just, you know, not one of the things

11      that was on our radar screen.

12             We were trying to get some basic information at the

13      time.

14             THE COURT:  Right.

15             Mr. Rachal.

16      BY MR. RACHAL:

17      Q.  As a general matter, what type of companies were included

18      in the survey?  Who were you surveying?

19      A.  I would say they were primarily larger type public

20      companies, companies that were clients of ours and clients of,

21      you know, not clients of ours, or companies that maybe where we

22      designed, helped design the program, and some where other

23      consultants designed the program.

24             But we managed to just gather information.  Almost all

25      of them would have been companies of two or three thousand

F7nnosb5                              Sher - direct

1    employees or more and some of them much more.

2    Q.  Moving beyond the survey to talk about your experience,

3    what you saw, your advice and such that you were doing on cash

4    balance conversions in this period, what did you see companies

5    do regarding wear-away, or at least what was your experience?

6    I am talking about disclosures.

7    A.  If we are -- let's first at least address maybe all you

8    want to address is these ongoing annual --

9                (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F7NJOSB6                              Sher - direct

Q.   I am talking about the conversions, the whole thing.

A.   I would say that it varied, it varied, you know, on

conversion it varied a fair amount in terms of what would be

communicated.   Sometimes again the communication -- the

question is do you communicate this on some broad-based one or

two or three page communication or do you try to communicate it

in some other way, through group meetings, individual meetings.

         You know, it varied, but I would say that, that once

the employer understood how, just how variable, if there was a

chance of wear-away, reasonable chance of it, of it occurring,

there was a lot of companies there was reluctance to try to

communicate that in some broad way other than to use something

like I interpret what was going on here in the SPD, and that is

your benefits can be subject to a minimum benefit based on the

prior plan accrued benefit.

         That was fairly common to have that kind of language,

but getting into how much wear-away affect might be and how it

might be affected by changes in interest rates or by people's

pay levels and how long they work, there was a real hesitancy

to get into that.

Q.   Do you see these communication practices changed after Foot

Locker's cash balance conversion, talking about as a general

matter?

A.   I didn't notice anything until Congress passed a law in

2001, and IRS regulations came out hoping to interpret that law

F7NJOSB6                              Sher - direct

1   in 2003, having to do with changes to Section 204 (h) of ERISA.

2   Q.  I might have some follow-up questions, but just as a

3   general matter, what was that change?  What did it require

4   disclosures regarding wear-away?

5   A.  Well, regarding wear-away, the guides in IRS is question

6   and answer format, Question 11 that goes on for several pages.

7   Essentially what it wants employers to do when it has one of

8   these conversions is to provide a set of examples of people in

9   different ages and service categories where it shows the effect

10  of the amendment on people.

11          If there is a wear-away, the example should show how

12  much wear-away there might be.  That was essentially -- and

13  then there can be some descriptive language along with that,

14  you know, explaining, explaining it.

15  Q.  Based on your review of the communication materials here,

16  did Foot Locker disclose the prior minimum lump sum amounts

17  post-conversion and compare them to the account balances?

18          MR. GOTTESDIENER:  Objection.

19          THE COURT:  Let me just see how this question is

20  worded.

21          (Pause)

22          THE COURT:  Overruled.  I'll allow it.

23  A.  If I understand the question, in terms of broad-based

24  communications, I don't think so.  They had these memos and

25  Greenville and Phoenix and there were a bunch, bunch of letters

F7NJOSB6                          Sher - direct

1    and memos that were introduced that showed that when it came

2    down to an individual who has asked for numbers and were

3    thinking about leaving or retiring in a given year, I saw

4    certainly some information in that regard.

5    Q.  Did you see any benefit estimates that provided that

6    information?

7    A.  Yes.

8    Q.  Do you recall a GAO, Government Accounting Office, report

9    to Congress around 2000 assessing cash balance conversions?

10   A.  Yes, I remember that.

11          MR. GOTTESDIENER:  Your Honor, this was one of the

12   slides we had objections to because it is talking about 204 (h)

13   as opposed to the SPD.

14          THE COURT:  Don't spend a lot of time on it, but I'll

15   allow it.

16   BY MR. RACHAL:

17   Q.  There are two highlighted sections.  Under current

18   disclosure requirements, firms may have broad flexibility in

19   the type of information they provide participants about plan

20   changes.  And then it goes down and it says, however, the law

21   does not specifically require that plan sponsors articulate the

22   nature of the formula amendment or identify groups of

23   participants who may be adversely affected.

24          Is this consistent with what you were seeing about the

25   plan communication practices prior to the change in 204 (h)

F7NJOSB6                          Sher - direct

1    notice requirements?

2    A.  I would say it is, yes.

3         MR. RACHAL:  Go ahead to 415-2, the second page.

4    BY MR. RACHAL:

5    Q.  The matters highlighted, matters for Congressional

6    consideration, the parts that I have highlighted from Page 39

7    of the report are matters for Congressional consideration.

8         It says to improve disclosure related to pension

9    plans, the Congress should consider amended ERISA so that it

10   specifically requires firms to provide participants with more

11   timely information, in plain language, about plan changes that

12   can reduce future pension benefits.

13        This is consistent with what you recall on plan

14   communication practices that were being changed because of 204

15   (h)?

16   A.  I would say that this report was building the case that in

17   GAO's opinion, some improvement in communications should be

18   adopted by Congress.

19   Q.  Did you form an opinion on what Foot Locker would have had

20   to disclose related to wear-away had the changed 204 (h) notice

21   requirements applied to it?

22   A.  Well, again I think they would have had to show some

23   examples illustrating it and perhaps some language discussing

24   it.  I think that one of the key elements in determining the

25   potential amount of wear-away is what assumption is made in

F7NJOSB6                              Sher - direct

1    terms of any of the variable rates that are embedded into a

2    plan.

3           In this plan, the variable rate can make a huge

4    difference in making comparisons, and the calculations under

5    the plan is the 417 (e) rate.  What Congress -- and this is

6    brought out more subtle in IRS regulations that were finalized

7    in 2003 -- indicate that the calculation should be made by

8    determining the value of that variable rate at a period of time

9    close to the time when 401 (h) notice is sent.

10          They basically said what's the plan rate that would

11   apply at that point in time, lock it in and just do the

12   calculation on that single basis.  I am saying single basis

13   because actually I was somewhat surprised that maybe they

14   didn't go further.

15          I think out of practicality, they decided not to go

16   further than that and ask for multiple scenarios where the rate

17   might be 5 percent, 7 percent, 9 percent because the difference

18   in the outcome can be very dramatic, but they didn't, they

19   locked in on that rate.

20   Q.  Why does Foot Locker, what was your opinion if this applied

21   to Foot Locker?  What does this --

22   A.  The way I interpret the regulation, the rate that would

23   have been in effect when the 204 (h) notice went out was the

24   rate in effect for the year of 1995 based on the December 1994

25   rate, which was 7.87 percent.

F7NJOSB6                          Sher - direct

1   Q.  What would you have expected those disclosures to show on

2   wear-away using the 7.87 percent rate?

3   A.  Based on what we discussed earlier, the two to three year

4   average, I would expect, depending upon the particular example,

5   were examples were shown to see periods that were, you know, in

6   two to three year range, maybe some shorter, some longer.

7        I think there would have been examples for people,

8   where enhancement were shown, either none, virtually no

9   wear-away.

10  Q.  I will ask a little about SPD summary plan descriptions and

11  discuss whether SPD discusses wear-away.  You recall

12  Mr. Deutsch's testimony he had not seen an SPD discussed in

13  wear-away?

14  A.  I do recall that, yes.

15  Q.  Have you seen any summary plan descriptions discuss

16  wear-away, this can be either pre or post the change in the

17  law --

18        THE COURT:  In light of the questions before, why

19  don't you go back and build a foundation so you can do it and I

20  don't need to.

21        MR. RACHAL:  I appreciate that.

22  BY MR. RACHAL:

23  Q.  Corrected as part of the plans for how long you have been

24  advising for cash balance conversions, you reviewed a good

25  number of SPDs?

F7NJOSB6                          Sher - direct

1   A.  Reviewed, made comments on, drafted some sections when I

2   was called upon to do that, yes.

3   Q.  Even behind your advising plans, do you look at SPDs

4   related to cash balance conversions?

5   A.  Yes.

6   Q.  On any of those SPDs do you recall seeing any discussion of

7   wear-away other than what --

8            MR. GOTTESDIENER:  Objection.

9   Q.  -- other than what you had mentioned about the kind of

10  greater of provision?

11           MR. GOTTESDIENER:  Objection.

12           THE COURT:  Sustained.  Why don't you rephrase it.

13  BY MR. RACHAL:

14  Q.  On those SPDs, did you see that you reviewed and asked, do

15  you recall seeing any discussion of wear-away?

16           MR. GOTTESDIENER:  Foundation, your Honor; objection.

17           THE COURT:  No.  I will allow it.  There is a missing

18  piece of foundation.  Let me sort of get to it.  You

19  understand?

20           THE WITNESS:  Yes.

21           THE COURT:  Were there instances when you were

22  reviewing SPDs, when you understood -- I want to start

23  differently from that.  Take ourselves back to pre-law

24  amendment, all right, so we are back in the world before the

25  amendments that you were just talking about occurred.

F7NJOSB6                            Sher - direct

1          Are you with me?

2          THE WITNESS:  Yes.

3          THE COURT:  We are back in the time-frame here most

4    relevant here, which is sort of the '96 to 2000 time-frame, all

5    right?

6          THE WITNESS:  Okay.

7          THE COURT:  In that context, do you recall whether or

8    not there were companies that you were advising on their SPDs,

9    whose participants, at least some of whose participants were

10   experiencing wear-away?

11         THE WITNESS:  Yes.

12         THE COURT:  In connection with that, so let's take

13   that so you have a group of SPDs you're reviewing, at least

14   some of those have participants where there is some amount of

15   wear-away, do you recall whether or not there was any

16   disclosure or discussion of that wear-away?

17         THE WITNESS:  I would say --

18         THE COURT:  I want to make sure so you understand, it

19   is a pretty narrowly focused question.

20         THE WITNESS:  Yes.  I would say I have not seen

21   anywhere -- let's keep it to that time-frame for now, as you

22   wished that used the term wear-away.

23         There are, I would say, many of them did have language

24   in the SPD that said something to the effect that in the event

25   that the benefit accrued under the prior plan as of the date of

F7NJOSB6                            Sher - direct

conversion, whatever that day was, provides a higher benefit,
it will be entitled to the higher benefit.  They did it in some
way or another somewhere in the SPD.

          Sometimes it was right in the forefront, right when
they're describing the formula.  Sometimes it was later on when
they're talking about general kinds of things.  It is kind
of -- and in the event that the prior plan frozen benefit
comes, works out to be more, you're entitled to more.

          THE COURT:  That sounds somewhat similar to what we're
talking about here in connection with the SPD language here?

          THE WITNESS:  Certainly the way I would read that
language, at least the language as intended, it may not have
been the best language in the world, but it seems like it was
intended to convey that, that there is this 12-31-95 benefit.

          If there was no chance of that benefit being larger,
there would have been no reason for that in there.  By virtue
of it being in there, in my experience, I would only suggest
that someone put it in there if there is going to be any
possibility of it being applied.

          Otherwise, it will be really --

          THE COURT:  Let's take it one step beyond that.  I
understand that language may have some, shall we call it,
conceptual overlap with language you saw in other SPDs relating
to or distributed by companies that had some participants in
wear-away.

1           Do you recall whether or not any of those SPDs

2   discussed whether or not in certain situations that would mean

3   that additional periods of employment would not increase the

4   frozen accrued benefit, or that their frozen accrued benefit

5   might mean that their work since the time of conversion had not

6   resulted in a growth in their benefit?

7           THE WITNESS:  Yes.

8           THE COURT:  There is lots of ways to word this.

9           THE WITNESS:  I understand.  No, I don't recall seeing

10   any of them put it in that way.  I can understand why they

11   wouldn't want to put it that way.

12           I would probably recommend they not put it that way.

13   I think that is confusing.  I think in these cash balance plans

14   the focus, the sort of center of the universe is the account

15   balance.  It is the only thing that is guaranteed, it is the

16   only thing they know for sure is going to keep growing.

17           This other number while at any number given point in

18   time, this froze benefit may be higher, interest rates go down,

19   we have seen them change 1 percent, 2 percent, 1 percent over

20   six months, 2 percent over a year, they can easily turn that

21   around.

22           THE COURT:  Isn't it the GATT rate in effect at year

23   end?

24           THE WITNESS:  It is in effect at year end, but it only

25   applies to people that actually both leave and take a benefit

F7NJOSB6                          Sher - direct

1   within the next year.

2              THE COURT:  Right.  But I mean for that population,

3   you're certain as of January 1st as to how you would calculate

4   their frozen accrued benefit for the remainder of the calendar

5   year.  Am I right?

6              THE WITNESS:  That is true.

7              THE COURT:  It is not fluctuating, for instance, like

8   LIBOR, not going up and down and all around?

9              THE WITNESS:  Some places it changes more often, but

10  most are annual.  I have seen some quarterly, but most of them

11  are annual.  To me, it is not the place.  An SPD is supposed

12  to, in my mind, supposed to provide a summary, general

13  information, giving people a good idea what the plan is about.

14             To tell someone that, well, here is what the effect

15  would be this year, then you almost have to go on and say what

16  it might be in future years and then it creates a level, I

17  think a level of confusion.  Well, what does that mean for me

18  and how do my numbers work out.

19             The best way to deal with any of that is on an

20  individual level when someone is serious about leaving, okay, I

21  am going to leave this year, I need an estimate.  Of course,

22  you give an estimate.  Now you know what the estimate is for

23  the current year.  You lock in the rates.

24             You still have to warn them.  If you don't leave and

25  leave in a subsequent year, that number we gave you could

F7NJOSB6                              Sher - direct

1    change, and then you could explain to them when you're sitting

2    down with them that, okay, here's how it works and you can have

3    that one-on-one discussion and maybe get a little better

4    understanding.

5              Once you give someone a number, in my experience, it

6    just sticks with them.  You can caveat it to death, and they

7    remember where -- we are numbers people, we remember numbers.

8    Oh, $37,500.  Next year they see it is 31,000.  I told you it

9    was going to go down.  No, you didn't.

10             THE COURT:  Thank you.

11             MR. RACHAL:  John, could you pull up PX-5, that is the

12   summary plan description for the retirement plan.  Would you

13   view Page 12.  If you can, there is a section on additional

14   account balances.

15   BY MR. RACHAL:

16   Q.  Let me ask you first on this section, is this going to

17   apply to everyone who is given this SPD?

18   A.  No.  It would only apply to people who were around before

19   December 31st of '95, having accrued benefits at that point.

20   Q.  For the folks in this initial account balance section

21   applied to, would you look at the bottom, your accrued benefit,

22   and then blow it up if you could.  Your accrued benefit at the

23   time your employee terminates is the greater of the amount

24   determined under the plan, accrued benefit plan as amended on

25   January 1, 1996 or your accrued benefit as of December 31,

F7NJOSB6                          Sher - direct

1    1995.  Is that the greater of provision you referred to

2    earlier?

3    A.  Yes.

4    Q.  How do you interpret that provision?

5    A.  I interpret it that you go through the calculations under

6    the new plan, which is essentially the cash balance benefit,

7    where that would provide -- that is the plan as amended, so I

8    interpret that.  Then you check to see as a final step whether

9    the calculation, accrued benefits as of December 31, 1995 was,

10   you know, was only under the prior plan, that is clearly what

11   you're referring to.  If that is greater, the person gets that

12   benefit.  That is how I read it.

13   Q.  What about the fact that the accrued benefit, your accrued

14   benefit at the time your employment terminates, is the

15   italicized term, does that impact your analysis here?

16   A.  You know, after Mr. Deutsch's testimony, I went back and

17   read this for the 5th or 6th or 7th time.  I think that, you

18   know, the language here is not as elegant as maybe it could

19   have been in terms of tying it all together.

20          I view this as you've got a basic definition in the

21   front which applies to most or many situations including for

22   new employees.  Then you've got this sort of special provision

23   here that is telling you, you know, look, this is what we mean

24   by accrued benefit for all the stuff that we have been talking

25   about on this page here, and it either -- I don't know if I

F7NJOSB6                          Sher - direct

```
1    would say it modifies it or -- you know, it grows out from the

2    definition.

3            I don't view it as an inconsistency and, therefore, an

4    excuse to drop that whole language at the end, I think that

5    language at the end, whatever put there, unless you put some

6    intended meeting that you have.

7    Q.  When you referred to the language at the end, what are you

8    referring to?

9    A.  The greater of, and it is including your accrued benefit as

10   of December 31, 1995.

11           MR. RACHAL:  Can you put up Page 14, the example of

12   the SPD, PX-5.

13   BY MR. RACHAL:

14   Q.  You recall Mr. Deutsch's opining on this example?

15   A.  Yes.

16   Q.  Does this example state whether it is illustrative?

17   A.  Yes.  It starts off saying the following chart shows how

18   this participant's account balance will accumulate.

19   Q.  Go to the bottom of the page.  Is that what you were

20   referring to?

21   A.  Yes.  To me, this table was very simply intended to just

22   show how an account with some given opening balance of $7,000,

23   doesn't get, doesn't get into how was that calculated, how old

24   was the person, when are they going to terminate or any of

25   that.
```

F7NJOSB6                         Sher - direct

1              All it does, here is what the opening balance is.  How

2    does your account grow from year-to-year.  You have an interest

3    credit on that opening balance in the first year, you've got a

4    pay credit, you've a balance at the end of the year and it

5    brings that balance over.  It shows after three years you have

6    a cash balance of 9676.  It doesn't talk about you can

7    terminate or any of that stuff.  It is just meant to be an

8    illustration.  I have seen something like this in a lot of cash

9    balance SPDs.  It is kind of Cash Balance 101.  Here is how

10   your account balance works.

11   Q.  Does this illustration also contain a greater of

12   notification --

13              MR. GOTTESDIENER:  Objection.

14   Q.  -- statement?

15              THE COURT:  I'll allow it.

16   A.  Remember this now, these is focusing on development of the

17   account balance.  It talks about below all this, these

18   calculations, it has interest credits and opposition credits

19   continue to be determined as indicated above for each year of

20   service and so forth at the end.  It says lump sum payable to

21   you is greater than your account balance or the amount

22   determined under federal law and IRS regulations.

23              It doesn't have quite the same language referencing

24   the accrued benefit, but I don't know that I would have

25   expected it to in that this is really an illustration of how

F7NJOSB6                          Sher - direct

the account balance works.  It is sort of a new benefit under

the plan, the cash balance benefit.  It is not trying to, as

Page 12 was trying to do, sort of wrap it all up and tie in the

12-31-95 benefit.

Q.  What we were talking about earlier, did the whipsaw aspect

of the plan cause the benefits to be greater than the account

balance?

A.  Yes, and that whipsaw, of course, would apply to this type

of calculation.  So when you're done here, the individual left

and had an account balance of 9676, and interest rates were low

enough, you have to go through a special calculation that is

under the plan and determine under federal law and IRS

regulations.  I would have read that to encompass in this

place, I would envision that encompasses whipsaw, that is what

was intended here.

            MR. RACHAL:  Pull back up the first of DX 405.

BY MR. RACHAL:

Q.  So now I am moving onto Topic 4, which is whether there was

volatility of interest rates made the cash balance account the

only certain lump sum benefit.

            It is correct, Mr. Sher, you had analyzed the 30-year

treasury rates previously used for 417 (e) before Congress

changed its corporate bond rate?

A.  Yes.

            MR. RACHAL:  Go ahead and pull up DX 416.

1    BY MR. RACHAL:

2    Q.  Is that showing your analysis of the 30-year treasury rates

3    during this period?

4    A.  Yes, this looks very similar to the chart I saw before.

5    Q.  Did you consider these higher rates showing here, the

6    average over, for example, 15-year period, and you can see the

7    chart in the treasury bond rates are pretty high there to be

8    historical anomalies?

9    A.  I think it is difficult to pinpoint any period of time and

10   characterize it as an anomaly.  I think people who live through

11   it, and I being one of them, remember, remember what the

12   environment was like and again people felt like that's the way

13   the world was going to be.

14        Yes, there were some things going on in the economy

15   that caused all of that, but there are always things going on

16   in the economy that cause things.

17        So I think it is history.  It happened.  I wouldn't

18   characterize it as an anomaly.  I don't see why.

19   Q.  Is it correct you didn't have any certain view as to what

20   the rates of, start with, say at the time of the conversion,

21   1-1-96 as to the future movement, direction of interest rates,

22   whether they're going to go up or go down?

23   A.  I think again maybe my personal sense and a lot of people I

24   knew and respected felt it was more likely that rates would go

25   up and down, say, reach 6 percent.  Many economists would say

F7NJOSB6                          Sher - direct

1    that rates at any point in time, rates are just as likely to go

2    up as go down.  You have to sort of take that for what it is

3    worth.

4    Q.  Did you review the 30-year treasury rates post-conversion?

5    A.  Yes.

6    Q.  What did it show on volatility post-conversion?

7    A.  Well, the rates continued to be extremely volatile.  Once

8    we got into '96, the rates jumped up within six months by a

9    percent.  Then they leveled off a little bit and started coming

10   back down some, but were higher at the end of the year by half

11   a percent than they were at the beginning of the year.

12            MR. RACHAL:  Would you pull up DX 417.

13   BY MR. RACHAL:

14   Q.  Does this graphic illustrate the monthly 30-year treasury

15   rates in 1996?

16   A.  Yes, it does.

17   Q.  And that is what you were talking about where it went from

18   6 percent to a little over 7 percent in the first several

19   months of 1996?

20   A.  Yes.

21            MR. RACHAL:  Pull up DX 418.

22   BY MR. RACHAL:

23   Q.  What does this slide show about the 30-year treasury rates

24   post-conversion?

25   A.  Well, for the most part with some little blips, exceptions

F7NJOSB6                        Sher - direct

1    here and there, they headed down quite a bit.

2              By the time you got to 1999, they were quite a bit

3    lower.  Then we start seeing volatility again, there they go

4    back up quite a bit, it looks like a percent or more than a

5    percent, close to 2 percent over the course of a couple of

6    years there.  Then they start to level back, trending downward.

7    Q.  Do you recall what the 30-year treasury rates did after

8    2002 as a general trend?

9    A.  I think they trended still somewhat even more downward than

10   what they were at this point.  They got into certainly the 4s.

11   Q.  Do you recall earlier when I was talking about

12   Mr. Deutsch's analysis on the 401 (h) ratio between change in

13   the interest rate and the change in the protected lump sum

14   benefit?

15   A.  Yes.

16   Q.  What was your opinion on Deutsch's analysis on that point?

17   A.  Well, I think it was fine in terms of he was looking at the

18   30-year old, and I didn't see anything wrong with it.

19   Q.  Did you review Mr. Osberg's protected benefit

20   post-conversion?

21   A.  Yes.

22             MR. RACHAL:  Would you pull up DX 419.

23   BY MR. RACHAL:

24   Q.  What did your analysis show of Mr. Osberg's benefit

25   post-conversion, at the time of the conversion to the time he

F7NJOSB6                        Sher – direct

1    took his benefit in 2002 show?

2    A.  Just to explain what is on here a little bit, the purple

3    line is meant to, meant to show what the present value of that

4    benefit would have been if the rates had remained at 6.06

5    percent, which is the rate in 1996.  It is just meant to sort

6    of show the trend line.

7            As the person ages, there is one less year of interest

8    discount to age 65, so you're going to see this value go

9    continuously upward.

10           The green line shows the same point, the same place at

11   the beginning of '96 because it was also based on 6.06 percent

12   at that point in time, but it now shows the annual changes,

13   where that present value, that protected benefit actually was

14   at various points in time beginning with each year specifically

15   all the way up until the very end which was the distribution

16   date which was October 1st of 2002 when Mr. Osberg received his

17   lump sum.

18           (Continued on next page)

19

20

21

22

23

24

25

F7NNOSB7                          Sher - direct

1   Q.  If you look at the graphic that we are showing, the 417(e)

2   rate, and it shows by year, 6.06, 6.5, 5 percent and so forth,

3   that is what you talked about earlier, how the 417(e) rate is

4   locked in for one year based on the prior December, is that

5   correct?

6   A.  That's correct.

7   Q.  But each year it varies depending on what the prior

8   December rate was, correct?

9   A.  Correct.

10  Q.  What does it show happened to Mr. Osberg's protected lump

11  sum benefit between, I think it's 1999 and 2000?

12          Let me give a backup question.  What happened to the

13  417(e) rate between 1999 and 2000?

14  A.  OK.  In 1999, the 417(e) rate was 5.06 percent, and in 2000

15  it went up to 6.35 percent.  So about a 1.3 percent increase.

16  Q.  What happened to the value of Mr. Osberg's protected lump

17  sum benefit with that change in the rates?

18  A.  OK.  It decreased by 25 percent from 23,000 to about

19  17,000.

20  Q.  So if we were to have told Mr. Osberg his protected lump

21  sum benefit in 1999, we would have been telling him that he

22  could expect about 23,000?

23  A.  Actually, we would have told him he would expect 23,000

24  plus interest on it, you know, at about the 6 -- you know, 5

25  percent at least, 6 percent, 5 or 6 percent.  So that benefit

F7NNOSB7                          Sher - direct

 1    would have even grown a little bit further like the way you see

 2    this trend line growing, the purple line.

 3              So this decrease of 25 percent actually has embedded

 4    in it and is softened because of about a 6 percent increase.

 5    So if it hadn't been for that natural increase, it would have

 6    decreased by over 30 percent.

 7    Q.  What benefit would Mr. Osberg receive had he terminated and

 8    taken a distribution in 2000?

 9    A.  I believe he would have, his frozen accrued benefit was,

10    looking at that $17,600 number, we would have to compare it to

11    his account, but I think it was still it was above -- I think

12    it was still somewhat above his account balance at that time.

13    It was getting fairly close, but it would be $17,605.

14              MR. RACHAL:  Jon, go ahead and pull up DX 420.

15    BY MR. RACHAL:

16    Q.  What is different between this slide and the slide we

17    discussed earlier, Mr. Sher?

18    A.  This slide is a hypothetical.  It takes Mr. Osberg and

19    shows what the impact would have been had he or somebody like

20    him was age 30 rather than his actual age, which I think was 41

21    or 42, which was intended to essentially sync up with

22    Mr. Deutsch's age 30 numbers to show what the impact would be

23    on a younger person, and you can see the impact would be even

24    greater.

25    Q.  So why was it that the impact of the change on interest

F7NNOSB7                              Sher - direct

 1   rates in the protected lump sum benefit is larger at age 30

 2   versus I think Mr. Osberg was in his mid 40s?

 3   A.  It is just more years for the differential in interest

 4   rates to operate.  Instead of, you know, starting at age 40 to

 5   age 65, you are starting at age 30.  So, another 11 years of

 6   that differential between the two interest rates causes, on a

 7   compound basis causes an even greater increase or decrease when

 8   the rates change.

 9   Q.  Using the hypothetical Mr. Osberg, about 15 years younger,

10   what does it do to the change in his benefit, protected lump

11   sum benefit?  We are going to assume he's in wear-away here

12   between 1999 and 2000.

13   A.  It is now showing a 35 percent decrease.

14   Q.  Based on your experience as an actuary, would a 35 percent

15   decrease in a person's expected retirement benefit be

16   problematic?

17             MR. GOTTESDIENER:  Objection.

18             THE COURT:  Why don't you rephrase.

19   Q.  In advising companies does variation in the retirement

20   benefit such as this, showing the up-and-down nature of

21   retirement benefits expected for participants, cause HR

22   problems for the companies you advise?

23             MR. GOTTESDIENER:  Objection.

24             MR. RACHAL:  Human resources problems I mean.  HR.

25             THE COURT:  Hold on.  Let me just read this.

1           THE COURT:  Why don't we do it a little differently,

2    which is, what impact, if any, do you think or do you know it

3    may have to describe retirement benefits that include this

4    up-down interest rate volatility?

5           THE WITNESS:  Well, I think that this is a problem in

6    terms of employee, you know, in terms of employee

7    communication.  And if someone was planning on leaving -- and

8    obviously this person is very young, but maybe they were

9    planning on leaving and taking a lump sum and they thought the

10   benefit was going to be $12,980 and it could be, shortly

11   thereafter it becomes $8440, and it's because that is the way

12   the government rules work, that is an issue that the HR people

13   are very uncomfortable with.

14          And for that reason, we were talking earlier about

15   lump sums being provided under traditional plans where they

16   jump all over the place not being nearly as common as they are

17   in a cash balance plan.  That's why for the most part.  It's

18   these ups and downs.

19          And then you start having to sort of figure that out,

20   you know, you don't know where rates are going to go.  You

21   can't figure it out.  That's the problem with this, all this

22   volatility -- we talk about expectation and using some type of

23   projection, but what projection?  What's the right answer?  I

24   don't know what the right answer is.

25          THE COURT:  All right.

1              THE WITNESS:  So that's really –– it's a dilemma.

2              THE COURT:  Why don't we take our midafternoon break

3   here.

4              Is this a good time?

5              MR. RACHAL:  Yes, your Honor.  This is a great time.

6              THE COURT:  All right.  Let's take our mid afternoon

7   break.  We'll come back in 10 minutes.

8              (Recess)

9              THE COURT:  Mr. Rachal, you can proceed.

10             MR. GOTTESDIENER:  Your Honor, just real quick.  Can I

11   hand up to the Court PX 1394A.  This concerns the Court's

12   inquiry as to the percentage of folks who didn't need the

13   amendment.  They received a lump sum as the de minimus cashout.

14             THE COURT:  Correct.

15             MR. GOTTESDIENER:  This is a paragraph of

16   Mr. Deutsch's rebuttal that we had deleted because it was

17   mainly in the context of rebutting Dr. Niden's report, but the

18   parties have agreed to bring this paragraph in to be responsive

19   to the Court's request for data as to how many folks were in

20   the de minimus lump sum category.

21             The denominator the Court has up there is, from data

22   that was available, 15,000 folks, and I don't have it in front

23   of me but the result is about 43 percent.

24             THE COURT:  OK.  Thank you very much.

25             MR. GOTTESDIENER:  The way we have numbered it, your

F7NNOSB7                        Sher - direct

1    Honor, is we just put an A, that's the number of Mr. Deutsch's

2    report.  So in the event your Honor has marked up your copy,

3    you don't have to replace it.

4              THE COURT:  All right.  Thank you.

5    BY MR. RACHAL:

6    Q.  Mr. Sher, do you recall testimony that Foot Locker had

7    benefit registers run estimated protected lump sum amounts for

8    everyone for 1996?

9    A.  Yes, at least for part of, I remember something through

10   June and maybe there was another one, but I do remember that

11   discussion.

12   Q.  Would these registers or these estimates be accurate beyond

13   the year in question, 1996?

14   A.  My understanding from the testimony is that those registers

15   were calculations, I think by individuals of their frozen

16   protected benefits in 19 -- I think it was 1996, in that year,

17   so they all would have reflected the 6.06 percent rate, but

18   that they were only intended to be used for that year.

19   Q.  Is the problem with trying to use those estimates beyond

20   that year what is reflected in DX 420, the graphic?

21   A.  Well, yes.  I mean, if you look at the 7,407 number at the

22   beginning of '96, as soon as you move forward to January 1 of

23   '97 when the rate went up to 6.55, you see that there is a 13

24   percent decrease due to that change.

25   Q.  Do you recall seeing these concerns about the changes in

F7NNOSB7                              Sher - direct

1     the protected lump sum benefit going back to participants being

2     discussed in Foot Locker?

3     A.  Yes, again, I believe it was -- I think it was in, it might

4     have been Mr. Kiley's testimony when I -- I know I was here for

5     that, when there was I think an e-mail chain where that

6     discussion, there was some discussion in there.

7                 MR. RACHAL:  Jon, could you pull up PX 164.

8                 This is an e-mail chain.  Go --

9     Q.  Is this the e-mail chain you were recalling?

10                MR. RACHAL:  I'm sorry.  Let's go back to the first

11    page.

12                THE COURT:  What is the opinion that you want from him

13    on this?  Because I don't want him to just march through the

14    record.  We have been over these documents.

15                MR. RACHAL:  I think there was a little bit of

16    confusion as to what is being referred to, at least from an

17    actuary's point of view.

18                He can tell you this is what I think they are doing,

19    and he's got a pretty good basis for it, at least I would

20    contend.

21                It would show what is going on here from an actuarial

22    point of view as to why they were expressing these concerns.

23                That's all, your Honor.

24                THE COURT:  All right.

25    BY MR. RACHAL:

F7NNOSB7                          Sher - direct

1    Q.  Is this the e-mail you recall?

2    A.  Yes, that's right.  This is very familiar.

3    Q.  Go ahead and go to the last -- the first e-mail actually in

4    the chain.  It is a chain of e-mails.  I think it's dated

5    6/13/96.  We would like to see the figures should he decide to

6    retire 6/1/97 and 6/1/98.

7    A.  I see that, yes.

8    Q.  And at least for someone who was or could be in wear-away,

9    what's the problem with giving them figures for one and two

10   years past 1996?

11   A.  It looks like it was pretty well a year and two years after

12   June of '96.  Well, for the '97 one you can have a change in

13   interest rates, likely to have it as of the beginning of the

14   year, and then possibly another or likely another one at the

15   beginning of 1998.  That could change the calculations

16   considerably.

17           MR. RACHAL:  Jon, go to the first page of the e-mail.

18   I think it's the third paragraph down if you would.

19           That one.  Would you blow it up.

20   BY MR. RACHAL:

21   Q.  Can you see that e-mail up there, Mr. Sher?

22   A.  Yes.

23   Q.  It says, As we cannot determine the rate of interest in

24   successive years, it is virtually impossible to produce a

25   projection that has any value.  We currently are seeing a rate

F7NNOSB7                          Sher - direct

1    swing of over a full point in this year alone.

2             You see the date of the e-mail?  It is dated June of

3    1996, correct?

4    A.  Yes.

5    Q.  What rate had changed over a full point as of June 1996?

6    A.  The 30-year treasury rate changed by a point.

7    Q.  All right.

8    A.  Over a full point.  It's about a point.

9    Q.  If the current monthly rate holds to the end of the year,

10   benefit calculations will be significantly impacted in 1997.

11            What do you understand Ms. Kanowicz to be referring to

12   there?

13   A.  The rate's already gone up by 1 percent.  You know, there

14   is no assurance that that rate in June, absolutely no assurance

15   that that rate in June is going to hold up until the end of the

16   year and be effective in the following year.  Basically I think

17   she's saying that we are seeing the kind of volatility we have,

18   and it's, you know, that pattern may very well continue.  We

19   don't know where it's going.

20   Q.  And those 1 percent rate, change in rates would cause the

21   20 or 30 percent change in the value of the lump sum protected

22   benefit, depending on someone's age?

23   A.  We would have to -- at the age of this person, it would be

24   significant.  Even for someone age 65 it would have some

25   significance, but even for someone younger it would have

F7NNOSB7                          Sher - direct

1    increasingly more significance.

2                    THE COURT:  Let's take the 1996 time frame for a

3    moment, and let's assume that there is going to be a 1 percent

4    swing.

5                    In terms of what you know about the average amount of

6    wear-away, not in real dollars, but in percentage terms for

7    those participants affected, would a 1 percent interest rate

8    swing have eliminated wear-away, or would the lump sum benefit

9    nevertheless have been greater than the cash account balance?

10                   Do you understand what I am saying?

11                   THE WITNESS:  I would say that it depends.  For people

12   with enhancements, it could very well -- and I've seen

13   examples, several, where the rate went up enough during '96

14   just a half a percent, it swung them over to the other side

15   where they are out of wear-away completely.

16                   For others, all it's going to do is bring them closer

17   to getting out of wear-away.

18                   But what it's doing is, nevertheless it's just

19   changing the amount of benefit that they would be entitled to

20   if they left, even if it's not going below the account.

21                   THE COURT:  But you could have a situation, where, for

22   instance, their initial account balance is determined at or was

23   determined in part with respect to a 9 percent discount rate,

24   right?

25                   THE WITNESS:  Yes.

F7NNOSB7                          Sher - direct

1           THE COURT:  And then the lump sum at the GATT rate,

2     the beginning of '96 might be 6.06 or it might be 5.95 or 7.87,

3     which was it going to be?  Was it going to go down or up?

4           THE WITNESS:  From when to when?

5           THE COURT:  '96 to '97.

6           What's the 1 percent swing?

7           THE WITNESS:  It was going up.  During '96 it went up

8     1 percent from January to June.

9           THE COURT:  Is that the seven point --

10          THE WITNESS:  7.06.

11          THE COURT:  7.06.  So it goes up a percent.  There's

12    still almost a two percent difference, so a 1.8 percent

13    difference between the 9 percent and the 7.1 or 2, right?

14          THE WITNESS:  Yes.

15          In '96, there's very little pay credits added, yeah.

16          So at that point in time, you're right.  The

17    differential may be, for someone who does not have an

18    enhancement they will still not be out of wear-away, but their

19    frozen protected benefit has changed in value.

20          THE COURT:  But it's likely still above their initial

21    account balance?

22          THE WITNESS:  It's likely that it's still for people

23    without enhancements, at least people with longer service.

24    People with shorter service, their pay credits could start

25    adding up and meaning something, although it's still 1996, so I

F7NNOSB7                          Sher - direct

1   doubt it.

2            THE COURT:  For those people in wear-away in 1996, did

3   the majority receive an enhancement or the minority receive an

4   enhancement?

5            THE WITNESS:  I would say a minority.  There were

6   about 2,000 people who, class members who received

7   enhancements.  And, of course, most of them -- they were all

8   over age 50.  There was a tendency for them to, for many of

9   them to leave in '96 and '97, proportionately maybe even more

10  so than people who did not have enhancements.  But, I mean,

11  it's 2,000 out of 16,000.  That's about 12 or 13 percent,

12  one-eighth, thereabouts.

13           THE COURT:  OK.  Thank you.

14           THE WITNESS:  You're welcome.

15  BY MR. RACHAL:

16  Q.  Can we turn to the SPD for just a few minutes, Mr. Sher.

17  Is it correct that you testified that you did not see SPDs

18  discuss wear-away in any detail.

19           Is that correct?

20  A.  Yes.  I would say that's correct.

21  Q.  I want to focus not on the survey but on the clients that

22  you advised in the '80s and '90s I guess in cash balance

23  conversions.  Did some of those clients use opening balances

24  that had wear-away or the risk of wear-away?

25  A.  I would say virtually all of them had the risk of

F7NNOSB7                          Sher - direct

1    wear-away, and some of them had some initial wear-away.

2    Q.  Did any of those SPDs, those balance, cash balances

3    conversions that you reviewed, did any of them discuss

4    wear-away?

5    A.  I don't recall.  I don't think so.  I don't recall any of

6    them doing that, no.

7    Q.  For the employers that you were advising, did they have

8    mixes, employees educated?  Uneducated?  What type of employees

9    did they have?

10            MR. GOTTESDIENER:  I'm sorry.  I am going to object.

11   I thought we did this testimony before.

12            THE COURT:  I will allow it.  I was the one asking the

13   questions.

14            In light of that, if Mr. Rachal wants to ask

15   questions, I will allow it.

16            MR. GOTTESDIENER:  OK.

17   BY MR. RACHAL:

18   Q.  Go ahead.

19   A.  I would say that many of these are very large companies,

20   and they have the full gamut of employee types, from executives

21   and senior management, middle management, clerical people,

22   sales staff.  A lot of the companies had a pretty diverse

23   workforce is the way I would describe it.

24   Q.  I am going to move on to another topic now.

25            I just want to be clear on the terminology we are

F7NNOSB7                          Sher - direct

```
 1   going to be using, because it will impact our further
 2   discussion.
 3          Your understanding, what is an A plus B benefit,
 4   assuming that the prior annuity benefit is now offered as a
 5   lump sum.
 6   A.  I would say that the A benefit is the frozen accrued
 7   benefit as of the date of conversion.  That may be payable in
 8   any of the forms, including, if they had a lump sum, whether
 9   they had it before or they added it at the conversion.  It
10   would therefore include a lump sum form, early retirement
11   benefits, whatever was associated with that accrued benefit, at
12   least before, and then whatever is added into it, like a lump
13   sum.
14   Q.  When in an A-plus-B benefit, assuming they take it as a
15   lump sum, when is that A benefit valued?
16   A.  If they are taking a lump sum, the A benefit would be
17   valued, it would -- invariably at the date that the lump sum
18   distribution is taken.
19   Q.  Not the date of conversion, the date of distribution?
20   A.  No.
21   Q.  What does B represent in this A plus B scenario?
22   A.  B are the pay credits and interest credits.  So it's, the
23   account balance is derived from the pay and interest credits
24   after the conversion date.
25   Q.  Does the A-plus-B benefit, or construction eliminate any
```

F7NNOSB7                          Sher - direct

1    wear-away for the lump sums?

2    A.  Yes.

3    Q.  Is this A plus B type of benefit the remedy that was

4    awarded in *Amara v. Cigna*?

5    A.  That's definitely my understanding.

6    Q.  OK.  Is it correct that under the Foot Locker cash balance

7    plan at date of conversion, that there were at least some group

8    of participants who didn't, who had -- excuse me, let me just

9    state it more accurately -- who had an account balance that was

10   larger than the protected lump sum benefit?

11   A.  Yes.  There were some who did initially, not a lot, but

12   some who did initially, because of the enhancements.

13   Q.  Do you recall about how many there were?

14   A.  Mr. Deutsch I think said there were about 200 of them, and

15   I think that that's about the number that I got.

16   Q.  Did the 417(e) rate rise between 1996 and 1997?

17   A.  Yes.

18   Q.  Did that rise in the 417(e) rate ultimately impact the

19   number of participants who had no wear-away on the lump sum

20   benefit?

21              MR. GOTTESDIENER:  Objection.

22   A.  With the rise in --

23              THE COURT:  Hold on.

24              THE WITNESS:  I'm sorry.

25              THE COURT:  Sustained.

F7NNOSB7                              Sher - direct

1          Why don't you reask it.

2     BY MR. RACHAL:

3     Q.  Did the rise in the 417(e) rate result in participants

4     having no wear-away effect on the lump sum benefit when they

5     took distribution?

6          MR. GOTTESDIENER:  Objection.

7          THE COURT:  Hold on.

8          Why don't you do it this way:

9          What impact did the rise in the 417(e) rate have on

10    different segments of participants?

11         Why don't you describe that.

12         THE WITNESS:  OK.

13         I think, for people who had enhancements, who took

14    lump sums in 1997, there were many of them, I think it was

15    about 400 of them, who ended up receiving a lump sum

16    distribution that was both larger than the present value of the

17    accrued benefit, but also larger than the present value of the

18    accrued benefit, plus the pay and interest credits, in other

19    words, larger than how I'm defining an A plus B.

20    Q.  Did you analyze any of these participants to see what

21    happened with their benefits postconversion?

22    A.  Yes, I did.

23    Q.  And was participant -- I am going to call him 04 -- one you

24    analyzed in depth?

25    A.  Yes.  This is ID, we'll call it ID 04.

F7NNOSB7                          Sher - direct

1   Q.  Did you do a similar analysis for class member Sue

2   Hartmann?

3   A.  Yes.

4           MR. RACHAL:  Jon, pull up I guess I'll start with DX

5   421.

6   BY MR. RACHAL:

7   Q.  Does this graphic represent your analysis of 04's benefit?

8   A.  Yes, it does.

9   Q.  What does the blue line represent?

10  A.  OK.  The blue line is the account balance, the actual

11  account balance.  Now I should point out that we see a little

12  notch that's in there.  It really should, ideally it would have

13  been better if you just showed this as a smooth line.  It

14  wouldn't have that little step in it at the very beginning of

15  1997.

16          Also, these other lines that are slanted down, which I

17  will get to I am sure in a few minutes, the A plus B, the

18  orange line and the green line would have been virtually

19  vertical, because all we are doing is changing by one day.  We

20  are crossing over from December 31 to January 1, but the only

21  way to really illustrate it without having visual problems was

22  to show a little bit of a slant, a little bit of a notch for

23  that one day.  So that one day has been magnified.

24  Q.  Does the change between December 31, 1996 and January 1,

25  1997 impact the value of the account balance?

F7NNOSB7                              Sher - direct

1  A.  No.  The account balance just keeps going up steadily.

2  Q.  So what does the green line represent in this graphic?

3  A.  The green line is the present value of the frozen protected

4  benefit.

5  Q.  And what does the -- I am going to call it the yellow

6  line -- represent?

7  A.  The yellow line is what I have described as the A plus B.

8  It's the present value of the frozen protected benefits.  It's

9  the green line plus the pay and interest credits added on top

10  of that.

11  Q.  And when did participant 04 take his distribution?

12  A.  As it indicates, he or she -- I don't know which it is --

13  took their distribution at November 1, 1997.

14  Q.  What did you conclude based on when 04 took his or her

15  distribution?

16  A.  Well, we can see that the highest line here is the blue

17  line, which is the account balance of 132,572.  This person had

18  an enhancement, I think.

19          Is there a footnote?

20  Q.  Yes.  It's noted.

21  A.  I wasn't sure if everybody had that.  What happened to this

22  person is the account balance now exceeds not only the green

23  line, which is the present value of the frozen benefit, but

24  also the summation of the, what I characterize as the A

25  benefit, plus the B benefit, which is 127,406.

F7NNOSB7                          Sher - direct

1   Q.  Does 04, participant 04, illustrate the distinction between

2   being in wear-away and the wear-away effect?

3   A.  I think it does.

4        I would characterize it, as if somebody's in wear-away

5   that means that their frozen protected benefit exceeds their

6   cash balance account.  A wear-away effect can continue after

7   somebody gets out of wear-away depending upon the relationship

8   between the A-plus-B benefit and their account.  But if their

9   account is greater than the A-plus-B benefit that means that

10  their account has given them enough to cover their full value

11  of their accrued benefit, plus the pay and interest credits.

12  Q.  So when was 04, I guess, in wear-away?

13  A.  04 was in wear-away during 1996.  We see that the green

14  line is above the blue line until we hit January 1, 1997, when

15  the green line drops down because of the higher interest rate,

16  and the blue line just keeps going off the way it was going.

17  So on January 1, this individual was out of wear-away.

18  Q.  Is it correct that in fact 04 had no wear-away effect

19  because of that drop in interest rates?

20  A.  That's what I would characterize it as.  The person had no

21  wear-away effect.

22  Q.  Have you ever seen this type of analysis attempted to be

23  explained to participants?

24  A.  I don't know that I have seen any of that attempted to

25  explain it quite in this way.  I have seen examples of, again,

F7NNOSB7                          Sher – direct

 1    individuals, you know, when there is an individual discussion

 2    with these concepts being discussed, although I am not sure

 3    that they get into multi-year discussions.

 4              Usually they just talk about, you know, here's what it

 5    is now, and it's subject to change because this green line,

 6    this green line can jump up and down as interest rates go down

 7    or up.

 8    Q.  Did you conduct a similar analysis for the class member Sue

 9    Hartmann?

10    A.  Yes.

11              MR. RACHAL:  Jon, if you would pull up DX 425.

12    BY MR. RACHAL:

13    Q.  Real quickly, what are the blue and the green lines here?

14    A.  Well, again the blue line is the account balance and the

15    green line is the present value of her frozen protected

16    benefit.  This is all now within one year, 1996, because she

17    received a distribution on November 1 of '96.

18    Q.  So what happened with Ms. Hartman vis-a-vis wear-away

19    during 1996?

20    A.  She began the year where her account balance which, which

21    also included an enhancement, was less than the present value

22    of the frozen benefit, the frozen protected benefit.  Then

23    sometime during '96 when she started to receive pay and

24    interest credits, she got to the point where it -- the actual

25    account balance would have exceeded the present value of the

F7NNOSB7                          Sher - direct

frozen benefit.  And then by the time she left, you know, her

account balance was $31,600 versus the present value frozen

benefit of $30,937, so she received the account balance.

          THE COURT:  It would have been just pay credits she

received, right, because the interest is a look back?  Or the

cash account balance?

          THE WITNESS:  That's right.

          I don't think there would have been any interest on

the pay credits because you're still in the year.  You do not

earn interest until the following year.

          THE COURT:  But she would have received the pay credit

on a quarterly basis, is that right?

          THE WITNESS:  I think that's right.

          THE COURT:  All right.

          MR. RACHAL:  Jon, go ahead and pull up DX 426.

          This may also speak to this a little bit.

BY MR. RACHAL:

Q.  What was added to this slide?

A.  What was added to this slide were the pay credits.  So

above the green line you can see as the year goes on they start

off the same because there are no pay credits as of the

beginning of the year, but as the year went on you have a

yellow line, which is now an A plus B.  It is a sum of the

benefits.

Q.  Is it accurate that Ms. Hartman was out of wear-away when

F7NNOSB7                         Sher - direct

1   she took the distribution, but she had a wear-away effect?

2   A.   That's the way I would characterize it.  So she had, the

3   difference between the $33,429 and what she received $31,600

4   was a wear-away effect.  So she received a portion of her pay

5   credits, which you can see here is the difference between the

6   other two numbers, the lower two numbers.

7   Q.   Then under the A-plus-B remedy Ms. Hartmann would receive

8   the sums that would gross her up to $33,429?

9   A.   That's how I would apply that type of remedy, correct.

10          MR. RACHAL:  Would you pull up DX 427.

11  BY MR. RACHAL:

12  Q.   What does this slide show now?

13  A.   This slide is -- it is a hypothetical, that if she decided

14  to delay her distribution, her lump sum for I guess it's two

15  months -- she received it in November, so if she decided to

16  delay it until January or sometime early next year, but this is

17  calculated as of January 1, we can see the effect on both the

18  green line and therefore the yellow line of the increase in

19  interest rate from, you see at the top 6.06 to 6.55 right at

20  the beginning of 1997.

21  Q.   Is it correct that, had she waited two months, she would

22  have had no wear-away effect?

23  A.   If she waited two months, yes, she would have had the

24  wear-away effect.

25  Q.   She would have had or would not have had?

F7NNOSB7                         Sher - direct

1    A.  I'm sorry.  She would not have had the wear-away effect

2    because the account balance, the blue line, would now be above

3    the green line.

4    Q.  This is an example of someone going from having some impact

5    to wear-away to not having impact to wear-away based on the

6    change -- under the hypothetical, based on the change in

7    interest rates between 1996 and 1997?

8    A.  Yes.  And just to add to that, the A-plus-B amount would

9    now be $30,959, lower than the account balance.

10          So, to me, what that would mean is that, just by

11   virtue of the interest rate change in 417(e), as of that

12   January 1, she would not only be out of wear-away but would

13   have no wear-away effect.  In other words, the 31,877 would

14   have been exceeded the present value of her frozen benefit plus

15   the pay credits.

16          So, you know, while she could say, earlier I think she

17   did say in testimony that she had, she didn't get all of her

18   pay credits, I don't think she can say that if she had taken

19   her distribution two months later.

20   Q.  Were participant ID 04 and Ms. Hartmann anomalies?

21   A.  I wouldn't characterize them as anomalies.

22          I mean, if the people who had the enhancements and

23   went out in 1997, I think were likely to have an effect like

24   this.  All of them probably not, but a good number of them

25   would have, and I think I determined there were about 400

F7NNOSB7                          Sher - direct

1   people that were in this very similar situation.

2   Q.  What about the whipsaw feature that you discussed earlier.

3   Did that have any impact on whether people had a wear-away

4   effect?

5   A.  The whipsaw feature is only going to apply when interest

6   rates get low enough, so it doesn't apply in these examples

7   that we have been looking at so far.

8           But when we get to some of the years when the interest

9   rates get down to five and a half percent or lower, then what

10  happens is you still have all this volatility from changes in

11  interest rates in terms of the total benefit that someone may

12  be entitled to, but the wear-away, the cash balance benefit

13  would get, account would get grossed up for the lower interest

14  rates in addition to the frozen protected benefit.

15  Q.  Did you determine how many participants fell in the

16  category that the whipsaw had the effect of eliminating any

17  wear-away effect?

18  A.  At some point I did.  I don't know that I did it in my

19  reports, but there were a good number of them.

20  Q.  Did you come up with a conclusion as to how many people had

21  an account balance that they were paid lump sum distribution

22  account balance that was larger than what would be an A-plus-B

23  benefit?

24  A.  I think it was 900 -- about 950.

25  Q.  With Mercer's help could Foot Locker have accurately

F7NNOSB7                         Sher - direct

1    forecast those like 04 Ms. Hartmann who went in and out of

2    wear-away postconversion?

3    A.   When you say accurately forecast, I mean, they would have

4    had to have had some type of crystal ball to do it.  I mean, in

5    hindsight it's easy to see what happened, but if you are

6    sitting there trying to make a projection, no one single

7    projection is going to tell the story.

8    Q.   Is it correct that you could make a reliable prediction for

9    the year in question, but you couldn't predict for the

10   following year?

11   A.   For the year in question, because you know what the rates

12   are, you can certainly make a good estimate.  You may not know

13   exactly what the person's compensation is, but you can usually

14   get pretty close and calculate their benefits.

15        Sometimes the compensation may not matter.  If they

16   are in wear-away, it would just be a matter of recalculating

17   the frozen accrued benefit as a date sometime later in the same

18   year.

19        MR. RACHAL:  Pull up DX 419.

20   BY MR. RACHAL:

21   Q.   Mr. Osberg.  From your review, was Mr. Osberg more on the

22   higher end of those who had been subject to wear-away?

23        THE COURT:  In terms of duration?

24        MR. RACHAL:  Yes.  I'm sorry.  Correct.

25   A.   I would say yes, that his situation, he had a good amount

F7NNOSB7                         Sher - direct

1    of service, and he was into his 40s.  I would say the answer to

2    that is yes.

3    Q.  What about estimating wear-away for those who had this

4    larger spread between the account balance and the protected

5    benefit like Mr. Osberg.  What about predicting that wear-away?

6    A.  You might be able to predict that they will be still in

7    wear-away with a fair amount of reliability knowing that

8    interest rates would have to increase very dramatically, you

9    know, over a short period, given they don't have an

10   enhancement, but that still leaves you the problem that the

11   benefit itself, the value of the frozen protected benefit could

12   change very much.

13        So if the idea is to try to predict how the value of

14   their frozen benefit, which is what they -- a person like that

15   would end up receiving in all likelihood, you really can't do

16   that.

17   Q.  Is it correct for somebody like Mr. Osberg you could do a

18   probability analysis of what the length or duration of the

19   wear-away may be under different interest rate scenarios?

20   A.  I suppose you could do some type of an analysis.  My

21   preference would be to do something, not to try to predict

22   probabilities, but just to show what it might be under

23   different scenarios.

24        I think it still would be confusing, which is the

25   right scenario, you know, and -- what does it mean?  Well, it

1   shows your benefit is going to jump all over the place.  I have

2   no idea what it's going to be.

3   Q.  Is it fair to say you couldn't predict with any certainty,

4   though, whether you could estimate the duration of wear-away?

5   A.  Yes.  For the same reason, you would have no way.  Not only

6   you couldn't estimate the duration, but that you go in and out

7   of wear-away is something.  Maybe not for somebody like

8   Mr. Osberg, who will take a longer period to get that cash

9   balance account up closer to their value of the protected

10  benefit, but as time goes on, that's going to become an issue,

11  too, going in and out of wear-away.

12  Q.  What about the amount of Mr. Osberg's benefit?  Is it fair

13  to say that you really can't predict what the amount of his

14  protected benefit would be without knowing what the interest

15  rate is going to be in subsequent years?

16  A.  That's correct.

17  Q.  Did you've conduct any analysis of what would have happened

18  with the protected lump sum benefit had the 30-year treasury

19  rates reverted to their recent historical averages?

20  A.  Yes, I did.

21  Q.  What did you call that analysis?

22  A.  What I called it was a mirror-image analysis, where if you

23  look at the next, you know, I think it was 16 years after the

24  conversion, we know what actually happened, but the scenario

25  is, what if the rates reverted to what they were in the last 16

F7NNOSB7                         Sher - direct

1   years?

2              And I did it on what I call a mirror-image basis,

3   which is, rather than starting off with the first year's rate

4   being the rate in effect 16 years prior to 1996, I did it in

5   reverse order.

6              I said, let's take the first year, I would take the

7   difference in the interest rate and work my way backwards, the

8   difference in the interest rate between one year, you know, at

9   1/1996 and 1995, and then I would move forward with that

10  difference and I would work my way backwards in time and create

11  a mirror image.

12             MR. RACHAL:  Jon, could you go ahead and pull up DX

13  428.

14  BY MR. RACHAL:

15  Q.  Is this the mirror-image analysis you were describing?

16  A.  Yes.

17  Q.  If you would, just go ahead and tell us what the three

18  different lines, the blue, the red, and the green line

19  represent?

20  A.  OK.  So this is for someone who is age 40.  It's, you know,

21  a hypothetical, somebody who was age 40 with a $10,000 accrued

22  benefit payable at age 65.

23             And the blue line represents the -- you see the

24  opening balance.  It was around 9,300, something like that.

25             And it shows, you know, how the account balance would

F7NNOSB7                          Sher - direct

1  change over time.  And this is actually just the opening

2  account balance.

3          None of these lines here have any pay credits in it.

4  The analysis is just intended to focus on the difference

5  between the opening account balance with interest and the

6  present value of the frozen benefit.

7          So neither of those have any pay credits, none of

8  these lines have any pay credits in them.  So the account

9  balance just grows by 6 percent every year.  It doesn't matter

10 what the interest rate scenario is, it's always going to grow

11 by 6 percent a year.

12 Q.  What does that line represent?

13 A.  Do you want to start with maybe the green line.

14 Q.  I'm sorry.  Let's go ahead and start with the green line.

15 A.  The green line, you see the interest rates above, which are

16 in green, the actual 30-year treasury.  I have rounded these,

17 just for simplicity, to I think the nearest half a percent.  So

18 6 percent was the 1996 rate, 6.56, and so forth.

19         Those are the rounded actual rates in all of the years

20 going out 16 years to starting in '96, so it would be 2002 --

21 I'm sorry, 2012, which you can see on the bottom.

22         All right.  So that represents -- the green line

23 represents the present value of the frozen accrued value.

24         MR. RACHAL:  Jon?

25         Technical difficulty.

F7NNOSB7                          Sher - direct

1          MR. GOTTESDIENER:  That's proof that they are now out

2     of wear-away.

3          THE WITNESS:  Could be.

4          THE COURT:  I have had a few wear-away jokes over the

5     last week.

6          MR. RACHAL:  It is not up.

7          THE COURT:  I have the slide here.

8          THE WITNESS:  We can talk from this.

9          MR. RACHAL:  There we are.  OK.  We have it.

10    BY MR. RACHAL:

11    Q.  Go ahead.  I'm sorry.

12    A.  So the green line is just the present value of the frozen

13    protected benefit at those various interest rates.  Again,

14    these are the rounded actual rates.

15         We can see that we are coming down the first year,

16    going up for two years.  The same pattern we were looking at

17    before.  It just takes it on further than what we looked at for

18    anyone before, all the way up to 2012.

19         You can see those very low rates and high values as we

20    get into more recent years.

21         The red line is you can see the rates up top, so in

22    the first year it goes from 6 to 8.  Now why 8?  Because 8 was

23    the rate at the beginning of 1995.

24         And 6.5 was the rate at the beginning of 1994.

25         And the next year, 1993.

F7NNOSB7                              Sher - direct

         So working our way backwards 16 years from 1996 takes

us back to around 1980.  The 10 percent rate that you see at

the end here is the actual rate rounded, I believe it was in

1980 if I did my arithmetic correctly.

         What it shows is that if the rates had reverted in

that mirror image that the line would generally be much lower.

         Why?

         Because the rates in the past were higher.  As you can

see, the red line is always below the green line.  It's because

you can see the rates, the historical rates going backwards in

time were always higher.  And in fact 16 years, 1980, it was 10

percent.

         So what this shows is that there would have been, if

the rates had -- you know, everybody says, well, look, the

rates have come down.  Why are you discussing this?

         The reason I'm discussing it is because when we're

sitting there in 1996, you know, we didn't know where the rates

were going to go.  The rates could have reverted back to a more

similar pattern that was historical.  If they had, then we

would have had very little of wear-away effect, because the

difference between the blue line and the red line is the

wear-away effect.

         Remember the pay credits are not included in either

line, in any of these lines.  And then, in fact, it would have

dipped below the blue line at, you know, towards the end of the

F7NNOSB7                        Sher - direct

1    period.

2              That's what this illustrates.  It is just that it's

3    easy to, you know, Monday morning quarterback all this and say,

4    look, rates have gone up.  Of course, by virtue of the rates

5    going up that meant that the value of the protected benefit

6    went up, and it meant anybody affected by it was getting a

7    higher lump sum than they might have gotten had interest rates

8    gone up rather than gone down.

9              MR. GOTTESDIENER:  I think you meant --

10             THE WITNESS:  Did I goof that up?

11             MR. GOTTESDIENER:  I think you meant down.

12             THE WITNESS:  Yes, I've got it confused.

13             It's getting later in the day I guess.

14             MR. RACHAL:  Yes.

15             THE WITNESS:  Right.  Rates have gone down, which

16   caused the green line to go up, as compared to the red line

17   where it has higher rates.

18             And while there's less, much less wear-away effect

19   with the red line with the higher rates, the present value of

20   the frozen protected benefits are a lot higher when the green

21   line, when the rates have gone down, and, you know, if that

22   applied, if indeed the person was still in wear-away effect, at

23   least they got the, in addition to getting the cash balance

24   account as a floor, as a guarantee, they would have received

25   the benefit of the increase in the value of the reduced

F7NNOSB7                              Sher - direct

1    interest rates.

2    Q.   Under your analysis here, Mr. Sher, you used the 30-year

3    treasury rates for both actual and historical, correct?

4    A.   Yes.

5    Q.   Is it correct that -- you've already done it -- congress

6    later raised the 417(e) rate to the corporate bond rate,

7    correct?

8    A.   Yes.

9    Q.   What would have happened to this analysis, how would it

10   modify your analysis if you applied the corporate bond rates to

11   these periods?

12   A.   OK.  Just by way of approximation, if you take the

13   difference of the corporate rates over a 30-year bond rates and

14   accept that it's close to one and a half percent, what would

15   happen is, because the rates would all be higher by one and a

16   half percent, both the green line and the red line would go

17   down kind of in parallel to where they are.

18        And the red line would cross probably, either entirely

19   or almost entirely the blue line, especially in some of these

20   later years, even more so than it already does in the later

21   years.  And the green line would also come down and be very

22   close to, maybe not quite crossing the blue line, but being

23   much closer to it.

24   Q.   Regarding the protected lump sum benefit, I am talking

25   about in the Foot Locker plan, is it correct that you saw the

1  value of that protected lump sum benefit increase substantially

2  for participants when the 417(e) rate rose?

3  A.  Can you repeat that?  I am not sure I got it.

4  Q.  Let me make sure I stay close to the mic, too.

5       Regarding the protected lump sums, is it correct that

6  you saw the value of the protected benefit decrease

7  substantially for participants when the 417(e) rate rose?

8  A.  When the 417(e) rate rose, the value of the protected

9  benefit came down.

10  Q.  Was Mr. Osberg an example?

11  A.  Mr. Osberg -- well, by the time Mr. Osberg left, the 417(e)

12  rate had come down, thereby raising the value of the protected

13  benefit.

14  Q.  But during the period between conversion and

15  distributions --

16  A.  Yes.  There were times, I think twice during that period

17  where there was an increase in the rate, which brought the

18  protected, the value of the protected benefit down during that

19  period, yes.

20  Q.  For account balances, did you ever see the account balance

21  decrease for anyone?

22  A.  No, it shouldn't.  It should always increase.

23  Q.  Was anyone ever due less than his account balance plus

24  postconversion pay and interest credits?

25  A.  No.

F7NNOSB7                          Sher – direct

1    Q.  From your perspective as an actuary, was there a certain

2    reliable benefit provided by the cash balance plan?

3    A.  Well, the cash balance benefit, as we've seen in these

4    illustrations, was very predictable, reliable, you know, you

5    knew how it would grow for interest.

6           You could certainly estimate the pay credits for

7    someone pretty closely.  It just depends on their pay and their

8    service, which was predictable.

9    Q.  How do you view the protected lump sum benefit?

10   A.  It's certainly a benefit that the plan by law has to

11   provide.  But in terms of the amount of the benefit, it's

12   variable, you could say contingent on what interest rates

13   happened to be at the time.  It's not reliable or predictable.

14              MR. RACHAL:  Can I have one second, your Honor.

15              THE COURT:  Yes.

16              MR. RACHAL:  Jon, if you would go back and pull up DX

17   405.  Now we are going to move to a topic 5, which is whether

18   an A-plus-B reformation remedies lost pay and interest credits.

19   BY MR. RACHAL:

20   Q.  Again, to refresh, for lump sums in an A-plus-B benefit,

21   how is the A benefit calculated?

22   A.  Present value using 417(e) rates of the frozen protected

23   benefit.

24   Q.  At what time?

25   A.  At the time of distribution.

F7NNOSB7                              Sher - direct

1   Q.  And, unless somebody was I think 70 or above, is it correct

2   that they would have to terminate employment to be able to

3   elect a lump sum distribution?

4   A.  Yes.

5   Q.  Does this A-plus-B benefit preclude any wear-away for lump

6   sums?

7   A.  Yes.

8   Q.  How does it do that?

9   A.  Well, the frozen protected benefit by definition is what

10  the person had earned under the pre-1996 plan.  And by paying a

11  lump sum equal to the present value, under 417(e) of that

12  frozen protected benefit, that is exactly the value of that

13  benefit.

14          And then you would add on to that the pay and interest

15  credits under the plan so the person automatically would be

16  receiving the sum of their, what they had prior to the

17  amendment, and the pay and interest credits under the cash

18  balance formula.

19          MR. RACHAL:  Jon go ahead and pull up DX 429.

20  BY MR. RACHAL:

21  Q.  Regarding wear-away in an A-plus-B benefit, what does this

22  slide show?

23  A.  Well, it shows the A -- the A-plus-B benefit is in the

24  middle yellow column.  It's the sum of the protected -- the

25  present value 417(e) basis of the protected benefit, the

F7NNOSB7                          Sher - direct

1    116,948 and the sum of the pay and interest credits.  This is

2    again for participant ID 4.

3            So, it shows -- though it's hard to see I don't know

4    why -- the sum that is $127,405.  It's very light on the --

5    lightly above that bar.

6            And then so that is the A-plus-B benefit as I have

7    defined it.

8            And lump sum actually received there is $132,572

9    total.  What I have done, which you can see, is higher than the

10   A plus B benefit, which we have seen before for this

11   participant.  All this does is split up the opening balance

12   between what I am characterizing as a basic opening balancing,

13   which is before reflecting the enhancement of $73,269, and this

14   would include interest at the 6 percent rate between the period

15   January 1, 1996 and November 1, 1997.

16           And the enhancement is in this case 67 percent, the

17   maximum enhancement this person was entitled to of the -- of

18   the basic opening balance, so the enhancement was $48,846,

19   again with interest.

20           And there are the pay credits that were added to the

21   account along the way, so the total ended up at 132,572, about

22   $5,000 more than the A-plus-B benefit.

23   Q.  Why was there no wear-away for a participant 04?

24   A.  Well, there's no wear-away -- two reasons.  The

25   enhancement, number one, it is a very important reason.  And

1    the other one is remember, you will recall before that we

2    showed that the part A benefit, the 116,948 in the middle.

3    That frozen protected benefit came down in value as a result of

4    the change in interest rates from 6.06 to 6.55 at the beginning

5    of 1997.

6    Q.   What happens with mortality under the A-plus-B approach?

7    A.   The part A benefit reflects a mortality in its calculation,

8    but only future mortality from the time of November 1, 1997,

9    going forward from that point in time.  So it does reflect

10   mortality both in the preretirement period and in the

11   postretirement period.

12   Q.   Is it correct that it is reflecting mortality not until

13   date of conversion but until date of distribution?

14   A.   Yes.  The fact that the person has lived until this point

15   in time for the almost two years, it would only reflect

16   mortality from that date, the November 1997 date forward.

17   Q.   Under 417(e), what does this mortality discount to payment

18   reflect?

19   A.   It reflects the probability that the individual will die at

20   various points in time both prior to age 65, when the annuity

21   would start.  It's converting into a lump sum and for the rest

22   of the person's life there is a probability each year that the

23   person will die.

24   Q.   Earlier we had talked about actuarial equivalents, and what

25   you are converting in this is an annuity that begins at age 65,

F7NNOSB7                          Sher - direct

 1  correct?

 2  A.  Yes.

 3  Q.  And you are getting a certain payment at whatever age -- I

 4  don't know what the age was, he or she was.  So is it

 5  reflecting the risk that someone may die between this, before

 6  they would receive their annuity, the preretirement mortality

 7  aspects of it would get them to age 65?

 8  A.  Yes, it reflects mortality at all ages.  It wouldn't even

 9  have gotten to the first annuity payment.

10  Q.  Is mortality discount required in your view to make an

11  annuity payable at age 65 equivalent to a lump sum payable at

12  let's say 45?

13  A.  I think it's the appropriate way to make the calculation.

14  Q.  Did you analyze what the remedies would be classwide under

15  an A-plus-B approach?

16  A.  Yes I did.  I think it was in my -- I think it was in my

17  rebuttal report.

18  Q.  Do you recall the numbers or do you --

19  A.  I think we ought to look at them.

20          MR. RACHAL:  If you would, go ahead, Jon, and pull up,

21  I think it's DX 401, the Sher rebuttal report.  I think it's

22  around paragraph 81 that's where it starts.  Would you go ahead

23  and pull up the table, too, I believe under that.

24          Thank you.

25  BY MR. RACHAL:

F7NNOSB7                          Sher - direct

1    Q.   So is this your analysis of an A-plus-B benefit, at least

2    in part?

3    A.   Yes, it is.

4    Q.   Does this reflect the A-plus-B benefit just for those who

5    took lump sums or received lump sum distributions?

6    A.   Yes.

7    Q.   And you valued them I think, because that's when the expert

8    reports were done, you were valuing as of what time period?

9    You had data through when?  Do you recall?

10   A.   I think it was either January 1, 2011 or January 1, 2012.

11   Q.   That time sounds about right.

12        What did you conclude the A-plus-B remedy would be for

13   lump sums before prejudgment interest?

14   A.   It looks like it was 20.8 million.

15   Q.   Does that reflect interest under the plan until date of

16   distribution, the 6 percent interest credits?

17   A.   Yes, everything is calculated as of the various individual

18   distribution dates.

19   Q.   But that doesn't reflect any post-- excuse me, prejudgment

20   interest after the distribution, correct?

21   A.   The 20.8 million does not, correct.

22   Q.   Do you recall about what you quantified what the A-plus-B

23   remedy would be for those in annuity or who hadn't taken

24   distributions?  You might want to look at your report.

25   A.   It looks like my estimate was about two and a half million

F7NNOSB7                          Sher - direct

1    dollars.

2    Q.  So that would be on top of the 21 million, correct?

3    A.  Right, yes.

4    Q.  Did you do an estimate of what the remedy would be if the

5    prior subsidized -- excuse me.  Strike that.  Did you do an

6    estimate of what the remedy would be if the prior 30-year

7    treasury rate was replaced with the corporate bond rate?

8    A.  Yes.  I -- I believe I did a, an estimate at seven and a

9    half percent interest.

10   Q.  And that would have been the corporate bond rate at the

11   time of conversion?

12   A.  Approximately, yes.

13   Q.  What did you conclude in that estimate?

14       How would that change the numbers, the lump sums?

15   A.  I believe it would reduce the 20.8 million to about 14

16   million.  That's in paragraph 84.

17   Q.  Are there any qualifications you have to that estimate for

18   the corporate bond rate, the seven and a half percent rate?

19   A.  Well, I used the seven and a half percent, which was the

20   rate at the time, approximately the rate at the time.

21       What I think would be a better approach would be to

22   use the, if we are going to use corporate bonds, to actually

23   use the corporate bond, the actual corporate bond rates as

24   amended and introduced in Section 417(e) by Congress in 2006,

25   those so-called segment rates, which would reflect the actual

F7NNOSB7                            Sher - direct

1   rates in effect at the time that each person took a

2   distribution.

3   Q.  And those rates overall have, like the 30-year treasury

4   rate have decreased since 19 -- excuse me, yes, since 1997.

5   A.  For the most part that's correct.

6   Q.  The seven and a half percent that you're using as a -- I

7   will call it a spot rate here, since the rates have overall

8   declined -- would that increase your number slightly?

9   A.  Yes, somewhat.  That would increase it somewhat.

10              MR. RACHAL:  If you would pull up DX 411, the class

11   letter.

12   Q.  If you assume that there is a remedy appropriate to -- if

13   you assume a remedy is appropriate to remedy wear-away, what

14   does this slide show you?

15   A.  Well, in terms of the people who are -- who went out in '96

16   through '98, they didn't really have a chance to, because they

17   left so soon, they didn't have very much in the way of pay

18   credits.

19              They might have had as much as three years for those

20   who went out late in '98 and as little as $20, like Lorie

21   Lerew.  It varied, but, you know, it would be anywhere from

22   virtually zero to three years of pay credits, and that's the

23   most they could have lost.  At the very least everybody the

24   part A benefit, and some people got more than that and, you

25   know, as we've seen in the examples, particularly the people

F7NNOSB7                          Sher - direct

1  with enhancements, they already got their enhancements, so they

2  would -- to get up to an A plus B, they may not need anything

3  more.

4  Q.  For all of those folks, their wear-away would have at least

5  been capped when they terminated employment, they would no

6  longer be experiencing wear-away.  Is that accurate?

7  A.  That is right.

8  Q.  During this period, the 417(e) rate that was being applied

9  was the 30-year treasury rate, correct --

10 A.  Correct.

11 Q.  -- to calculate the protected lump sum?

12 A.  That's correct.

13 Q.  In your view, is that a correct rate or a subsidized rate

14 to convert annuities into lump sums?

15 A.  Well, it was required by law, but, again, just because it

16 was required by law doesn't mean that it wasn't subsidized.

17 And I think -- my view even before Congress made the change was

18 that the 30-year bond rate is a subsidized rate.

19 Q.  Is it fair to say that participants, the class members who

20 cashed out their lump sums during this period were able to

21 change their annuities that they acquired under the prior plan

22 into a favorable interest rate?

23 A.  I would say they were, yes.

24 Q.  Did you review Mr. Deutsch's damages analysis?

25 A.  Yes.

F7NNOSB7                            Sher - direct

1   Q.  In Section 4.B of his opening report?

2   A.  Yes, I did.

3   Q.  Did Mr. Deutsch do what you considered an A-plus-B analysis

4   of damages?

5   A.  He did a version of an A plus B, what I would consider an

6   A-plus-B analysis, yes.

7   Q.  Did Mr. Deutsch calculate the value, in this section 4.B of

8   his report, did Mr. Deutsch calculate the value of the

9   protected benefit based on 417(e) rate in effect when the

10  participant terminated?

11  A.  In his Section 4.B I think, yes, I think he did.

12  Q.  And in his Section 4.B analysis, I think it was called like

13  a lost pay credit analysis, did Mr. Deutsch include a discount

14  for preretirement mortality?

15  A.  I believe he did in that section, yes.

16  Q.  Do you agree with all aspects of Mr. Deutsch's analysis in

17  that section 4.B?

18  A.  No.

19  Q.  What parts don't you agree with?

20  A.  Well, the part that I don't understand, don't agree with,

21  is Mr. Deutsch treating under an A-plus-B analysis, where there

22  are no opening balances, adding in an enhancement onto an

23  opening balance.

24        I can't see how one can add an enhancement on an

25  opening balance when the A plus B doesn't have an opening

F7NNOSB7                           Sher - direct

1    balance.

2              He treated it as a pay credit.  It is not a pay credit

3    under the plan.  He just added it in.

4    Q.  Do you recall about how much that adding in the enhancement

5    caused the variance between Mr. Deutsch's numbers and your

6    numbers on an A-plus-B approach?

7    A.  I believe it was about $20 million.

8    Q.  Was there any other major differences you had between you

9    and Mr. Deutsch how you calculated the A-plus-B benefit?

10   A.  I think there was a whipsaw that Mr. Deutsch added on to

11   his part B benefit, a whipsaw calculation, whereas I didn't

12   because I felt, first of all, whipsaw is no longer required, no

13   longer provided under the plan.  And if the point is to provide

14   a true A-plus-B benefit, I don't think employees -- the whole

15   concept of whipsaw is not something that employees generally

16   understood that they were, might be entitled to.  It's

17   something that at one point was required by the IRS, but I

18   mean, I don't see -- I don't have an expectation of receiving

19   whipsaw.

20   Q.  Do you recall about how much whipsaw, that the dollar

21   amount of that whipsaw cost between you and Mr. Deutsch's

22   A-plus-B analysis?

23   A.  I think it was something like 3 or 4 million dollars.

24   Q.  Did you use a class member to illustrate the difference

25   between you and Mr. Deutsch on how you calculated an A-plus-B

1    benefit?

2    A.  Yes.

3    Q.  Was that 04 again?

4    A.  I believe it was, yes.

5          MR. RACHAL:  Can you pull up DX 429.

6    Q.  I think this time we will go more into -- tell me what the

7    green bar consists of?

8    A.  All right.  The green bar, again, on the left is the lump

9    sum that he actually received, which was his basic opening

10   account balance with the enhancement added on to it with

11   interest and the pay credits, equaling $132,572.  That's what

12   he received.

13   Q.  The yellow bar, again what is that?

14   A.  That I characterized as A plus B, the present value frozen

15   accrued benefit, the interest and mortality at the time, the

16   distribution November 1, 1997, plus the sum, part B, the sum of

17   the pay and interest credits.

18   Q.  Is it correct that 04 did not experience any wear-away as

19   of his date of distribution?

20   A.  That's correct.

21   Q.  What does the blue bar show?

22   A.  The blue bar shows what I understand from Mr. Deutsch's

23   section 4.B is the way he would determine that type of remedy.

24   Q.  How did he get there?

25   A.  Well, the two of us start off the same.

Sher - direct

1              The part A benefit is the $116,948.

2              The pay credits are $10,457.

3              Because this is in 1997, there is no whipsaw effect

4     for this person, because the interest rates were, you know,

5     were not below six or five and a half percent or so.

6              So, so far we are in sync.  And then what Mr. Deutsch

7     did is he took those same enhancement that was over here --

8     what he would do, as I understand it, is he would take the same

9     enhancement that's over here on the left that he already

10    received, the $132,572, and then add it on top of this A plus B

11    as a so-called pay credit.

12    Q.  Did you see that enhancement described as a pay credit in

13    any plan communications?

14    A.  In I saw it in Mr. Deutsch's report.  Any plan

15    communications?

16    Q.  Plan communications?

17    A.  Yes.

18    Q.  How was the enhancement described in plan communications?

19    Do you recall?

20    A.  I think it was described as for the people who were over

21    age 50, with 15 years of service as an add-on, an adjustment to

22    their opening account balance at 9 percent.

23    Q.  Was the formula actually tied to the initial account

24    balance to create the enhancement?

25    A.  It was a percentage of that 9 percent initial account

1    balance.

2              MR. RACHAL:  Your Honor, do you want to break now?

3         I can keep going.

4              THE COURT:  If you've got more --

5              MR. RACHAL:  I have probably about an hour and a half

6         and a half.  That is my best guess.

7              THE COURT:  That is fine.

8              We had previewed yesterday when you folks were off,

9         probably getting ready for today, that you might take some time

10        to Monday to complete the direct.

11             So why don't we go ahead and break.  You can just go

12        back to your other table and step down for the day.

13             Let's just talk about logistics and talk about whether

14        you folks have conferred about whether you would like to have

15        closing arguments, what you think is equitable in the

16        situation, time, etc.

17             Did you folks have a chance to talk?

18             MR. GOTTESDIENER:  We did.

19             MR. RUMELD:  You can go first.

20             MR. GOTTESDIENER:  You can stand up, too.

21             MR. RUMELD:  I have been sitting for so long today.

22             MR. RACHAL:  I have been standing.  I'm glad to sit.

23        Thank you, your Honor.

24             THE COURT:  All right.

25             MR. GOTTESDIENER:  Mr. Sher's not yet done with his

 1   direct.  It's conceivable that -- I would hope we would be all

 2   done by lunch.

 3           MR. RACHAL:  My best estimate is an hour, an hour and

 4   a half.  I feel pretty good about that.

 5           THE COURT:  Let's just say 10:30-ish.  Then you would

 6   have a maximum of two hours.  So then we would be done just

 7   before lunch including the break.

 8           MR. RACHAL:  I may have a little redirect.  It just

 9   depends.

10           THE COURT:  You might have a little redirect, right.

11           You've got plenty of time.  The question is, do you

12   want to do something Monday afternoon, which we would have then

13   time for, or would you be prepared to take some time?

14           There are pros and cons.  Getting it over with is a

15   big pro.  And we power on through.  What do you folks think?

16           MR. RUMELD:  I am amenable to either solution.

17           MR. GOTTESDIENER:  So am I, your Honor.  Whatever is

18   best for your Honor.

19           THE COURT:  If you folks want to use that time in the

20   afternoon, that's totally fine with me.  From my perspective,

21   getting it done is useful, because it's all in my head at the

22   same time.

23           But if you folks want a couple of days, we can try to

24   work out another time, but I would want to do it within a

25   couple of days.

F7NNOSB7                              Sher - direct

1            MR. GOTTESDIENER:  Does your Honor have a couple of

2     hours open a couple of days after Monday?

3            THE COURT:  Not really, but I could find time.  I

4     could maybe swap some things around.

5            I've got a bench trial starting, as I told you folks,

6     on Tuesday.  That is going to take all day.

7            We have a full day Tuesday.  We are better off Monday.

8     Because it looks like somebody has filled up my calendar on

9     Tuesday.  I have a trial starting on Tuesday.

10           So I am going to have to find a spot for some of that

11     stuff already before I slot you folks in.

12           Can you do it Monday?

13           MR. RUMELD:  I can do it Monday.

14           MR. GOTTESDIENER:  Yes, your Honor.

15           THE COURT:  All right.

16           MR. RUMELD:  If it is OK with the Court, I think I

17     would like to have and understanding that if we get done a

18     little before lunchtime we start after lunchtime, just so we

19     can regroup during the lunch break.

20           THE COURT:  Yes.  You will want to regroup, talk to

21     people about anything that may have come up.  But basically, it

22     sounds like we are into the damages piece and so we are at that

23     phase.  So I think it's limited.

24           we have been through the bulk of it.

25           Right, Mr. Rachal?

F7NNOSB7                          Sher - direct

1              MR. RACHAL:  Yes, your Honor.

2              THE COURT:  How much time do you folks think you need.

3     We have three hours Monday afternoon, I would say two hours and

4     50 minutes to be fair, because we have to take a ten minute

5     break, somewhere in there.

6              So two to five with a ten-minute break.  I am happy to

7     sit that entire time.

8              MR. RUMELD:  That works for me.

9              THE COURT:  Do you want like a little under an hour

10    and a half apiece then, right?

11             MR. GOTTESDIENER:  I would reserve --

12             THE COURT:  Hour and ten minutes apiece?

13             MR. GOTTESDIENER:  I would reserve some of my -- I

14    would go first.

15             THE COURT:  You haven't been very good about reserving

16    time.  You can reserve, but I will leave it up to you to stop.

17             MR. GOTTESDIENER:  Right.

18             THE COURT:  I am not going to cut you off.  If you

19    will use all your time, you will use all your time.

20             MR. GOTTESDIENER:  He will pull on my suit jacket.

21             THE COURT:  However you arrange it.

22             MR. GOTTESDIENER:  Yes.

23             THE COURT:  Let's do that.

24             We will take the two hours and change, and we'll split

25    it evenly.

1    All right.  Thank you, folks.  I will see you Monday

2    morning at 9 a.m.

3         I do have a full calendar tomorrow Joe is reminding

4    me.  I need you to push things down.  I only need from the

5    first table over.

6         MR. RUMELD:  I had one another question.

7         THE COURT:  Go for it.

8         MR. RUMELD:  Your Honor I think had asked for a pared

9    down Carol Kanowicz video.  Should we arrange --

10        THE COURT:  I don't need it to really be pared down

11   physically, because I can find on the videotape what I need to

12   find.

13        I just was wondering whether you wanted to direct me

14   by page and line -- you don't even have to direct me by minute

15   or hour.  If there are things in particular you want to make

16   sure I don't miss because just don't want to have to watch four

17   hours after having already read her designations.

18        MR. RUMELD:  I wasn't sure whether your Honor was

19   expecting it, or should we just make sure it is done by the

20   close of the case?

21        THE COURT:  Actually, if you guys could send in a

22   letter tomorrow, short, just one line.

23        MR. GOTTESDIENER:  That is what we were we planning.

24        THE COURT:  That would be terrific, because I could

25   finish watching it own over the weekend.

F7NNOSB7                          Sher - direct

1             If it's in the beginning, if it is in the first half,
2    I've already seen it.  If it's in the second half, I'm trying
3    to cut it short.
4             Then you also were going to do the revised exhibit
5    list, so we can get those into the record, Mr. Huang?
6             MR. HUANG:  I think would be for Monday.
7             THE COURT:  All right.  Terrific.
8             MR. HUANG:  I think we just submitted video for
9    Thomson and Flesses, too.
10            THE COURT:  Now that I know that you folks include
11   everything, how long do those folks go on?
12            I will look at some in the beginning to see how he is
13   and who he is at the beginning.  Then it's two or three hours.
14   I will want to skip after some introductory bit when I get a
15   feel for him to what's important.
16            I have also already read his written designations his
17   transcript designations.
18            MR. HUANG:  It is about two hours each for Thomson and
19   Flesses.  The letter will include that.
20            MR. GOTTESDIENER:  In the letter we would target --
21            THE COURT:  Terrific.
22            I will look at, again, other parts of it as well that
23   you folks have designated, just again to get a feel for the
24   witness, but it would be helpful to be pointed in the right
25   direction.

F7NNOSB7                          Sher – direct

1          All right.  That's it from my perspective.

2          Anything else from you folks?  No?

3          All right.  I'll see you Monday morning at 9.  Thank

4     you.

5          MR. GOTTESDIENER:  Thank you, your Honor.

6          (Adjourned to Monday, July 27, 2015, at 9:00 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

 LAWRENCE SHER

Direct By Mr. Rachal . . . . . . . . . . . .1455