F7RJOSB1                        Sher – direct

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------x

3   GEOFFREY OSBERG,

4                   Plaintiff,

5            v.                          07 Civ. 1358(KBF)

6   FOOT LOCKER, INC. et al.,

7                   Defendants.

8   ------------------------------------x
                                         New York, N.Y.
9                                        July 27, 2015
                                         9:00 a.m.
10
    Before:
11
                        HON. KATHERINE B. FORREST
12
                                         District Judge
13
                            APPEARANCES
14
    GOTTESDIENER LAW FIRM, PLLC
15        Attorneys for Plaintiff
    BY:   ELI GOTTESDIENER
16        STEVEN COHEN
          ALBERT HUANG
17
    PROSKAUER ROSE LLP
18        Attorneys for Defendants
    BY:   MYRON D. RUMELD
19        ROBERT RACHAL
          JOSEPH E. CLARK
20

21  ALSO PRESENT:
    Jon Int-Hout, Trial Technology Specialist
22  Randall Carter, Trial Technology Consultant

23

24

25

F7RJOSB1                          Sher - direct

 1              (Trial resumes)

 2              (In open court; case called)

 3              THE COURT:  Good morning, everyone.  Please be seated.

 4          So we're ready to get going and I want to remind you,

 5     Mr. Sher, you're under oath still from last week.

 6              THE WITNESS:  Yes, your Honor.

 7              MR. RACHAL:  I have one very brief housekeeping matter

 8     I wanted to flag for the court.  On Thursday plaintiffs

 9     introduced -- we didn't object to it -- PX-1394 A that had

10     Mr. Deutsch's analysis of the percentage of those who took lump

11     sums who were cash-outs, 3500 or less.  It was 43 percent.

12          I wanted to flag for the court's attention DX-202,

13     PX-300, it is a memo from Mr. Kiley of December of '96 and it

14     will give a sense of dollar scale of the cash-outs, so how much

15     of it were 3500 and under versus those who were making lump

16     sums greater than 3500.  Again just to call attention to put it

17     in sense of scale, a housekeeping thing.

18              THE COURT:  Thank you.

19              MR. RACHAL:  John, would you pull back up DX-405.

20     LAWRENCE SHER, resumes

21     DIRECT EXAMINATION (Continued)

22     BY MR. RACHAL:

23     Q.  We are in the final point, we get started on it whether A

24     plus B reformation remedies loss paying and interest credits.

25          To reorient very briefly, Mr. Sher, what is an A plus

F7RJOSB1                          Sher - direct

1    B benefit, assuming total benefits paid in a lump sum?

2    A.   The A benefit is the frozen, the lump sum value as of the

3    date of distribution of the frozen protected benefit using the

4    417 (e) rates then in effect, meaning as of the date of

5    distribution.

6         The B benefit represents the sum of the pay credits

7    that are credited, pay credits the individual has plus interest

8    credits on those pay credits.

9    Q.   Does the interest credits in A plus B are just on the B

10   part of the benefit?

11   A.   Yes, that's true.  The interest that natural arises and is

12   credited on the A part as a result of aging since the A part is

13   a present value, we're discounting the age 65 frozen accrued

14   annuity back to a given day.

15        As you move forward a year or two years, whenever, you

16   have less discounting; and, therefore, affects your accruing

17   interest already, so if you don't want to double count

18   interest, so you already have it naturally occurring on the

19   Part A benefit.

20   Q.   Is it correct Mr. Deutsch did an A plus B type analysis in

21   the loss pay credit section of his opening report?

22   A.   Yes, he did.  I believe it was Section 4 or 4 B of his

23   opening report.

24   Q.   Did you agree with all aspects of this analysis?

25   A.   No.  The area I had major disagreement was related to the

F7RJOSB1                         Sher - direct

1    enhancements that, under A plus B type analysis, Mr. Deutsch

2    added in those enhancements, he added in the enhancement as a

3    pay credit.

4    Q.  Did you use a class member to illustrate an enhancement in

5    the pay credits would cause an overpayment of benefits, in your

6    view?

7    A.  Yes, I think that ID No. 4 accomplishes that.

8                MR. RACHAL:  Plus pull up DX-429.

9    BY MR. RACHAL:

10   Q.  In this exhibit, what does the green bar show?

11   A.  The green bar shows the lump sum that was actually received

12   which was comprised of the opening balance.  This individual

13   was entitled to an enhancement, and the enhancement I think was

14   two-thirds of the basic opening balance.  These amounts all

15   have interest enhancement as well as the basic opening balance

16   have interest on them up until the date of distribution,

17   November 1997.

18               Then it shows the pay credits separately with interest

19   on those pay credits of the 10,000 number at the top.  The lump

20   sum received was the combination of those equal to the account

21   balance of 132,572.

22   Q.  Just briefly, what does the yellow bar represent?

23   A.  The yellow bar is the A plus B, A being the present value

24   frozen accrued benefit using the interest rate in effect in

25   1997, and B, B of the pay credits.  The summation is 127,405,

F7RJOSB1                           Sher - direct

1    $5,000.00 less than his actual account balance.

2    Q.  Moving over to the blue bar, what does the blue bar show?

3    A.  It starts off with the same two elements, an A plus B and

4    my understanding from Mr. Deutsch's report as far as how he

5    would calculate an A plus B benefit, so it has the same Part A

6    benefit, the same Part B benefit, and then he proceeds to add

7    in the enhancement.

8           You see notice of that enhancement he adds was already

9    included in what percentage actually received of 48,846 on the

10   green side.  So he would add that in as a pay credit totaling

11   $176,251.00, which means that he would have damages under this

12   calculation of 43,679, which is the difference between 176 and

13   what he actually received, 132.

14   Q.  Does that enhancement represent the difference between

15   Mr. Deutsch's remedy proposed -- analysis let's call it that,

16   and the A plus B benefit?

17   A.  Well, it is the difference between the A plus B benefit, as

18   I would determine it, is less than what he actually already

19   received.  So the difference is really here between the 176

20   total that he gets and the 132 that he received.

21   Q.  Is it correct that Mr. Deutsch in his analysis added the

22   enhancement on top of that A plus B benefit to get to what he

23   contends the benefit should be?

24   A.  Yes, precisely.

25   Q.  Did Mr. Deutsch also do an opening balance approach to

F7RJOSB1                          Sher - direct

1    remedies?

2    A.  Yes, that was later.  It was reported in Section 7.

3    Q.  What is an opening balance approach?

4    A.  Well, under Mr. Deutsch's opening balance approach, he

5    modified the actual open balance approach which was to use 9

6    percent interest rate with pre-retirement mortality included

7    and instead uses 6 percent discount and no pre-retirement

8    mortality reflected.

9    Q.  Did Mr. Deutsch's opening balance approach create larger

10   benefits than an A plus B benefit even for those who did not

11   receive enhancements?

12   A.  Yes, I believe it did so invariably.

13   Q.  Are Ms. Lerew and Mr. Osberg examples of this?

14   A.  Yes.

15            MR. RACHAL:  Go ahead and pull up DX-430.

16   BY MR. RACHAL:

17   Q.  What does this exhibit show, Mr. Sher?

18   A.  Okay.  This shows on the far-right side my understanding of

19   Mr. Deutsch's 6 percent open balance lump sum that he would say

20   under that approach that Lori Lerew would be entitled to.

21            He compares it to both the opening balance with the

22   $20.00 pay credit on the left side, blue numbers to 9175,

23   adding the $20.00 pay credit of Ms. Lerew is a pretty clean

24   exact, as clean as you can get of someone who terminated very

25   very shortly after the plan was converted on January 1 of '96.

F7RJOSB1                        Sher - direct

1              The green is, we saw these numbers the other day, that

2    is the frozen accrued benefit protected lump sum benefit at

3    6.06 percent, the 417 (e) rate in effect in 1996, and that will

4    give us 22,693.  The bottom of the yellow just shows that

5    number, what I would characterize as an A plus B.  It just says

6    okay, the frozen benefit was 22,693 using the current interest

7    rate as required by 417 (e), adding in the $20.00 pay credit.

8              If you paid the 22,713, there would be no loss and the

9    full $20.00 pay credit would have been paid to Ms. Lerew in

10   addition to the full value using 417 (e) of the frozen benefit.

11             The 26,605 total is the explanation of the two sources

12   that cause this A plus B calculation under Mr. Deutsch's

13   opening balance approach to be higher than the A plus B.  One

14   difference, main difference is that his opening balance is

15   determined without using pre-retirement mortality; that is, he

16   only reflects the probability or possibility of somebody dying

17   after age 65, but not in the period between the individual,

18   just about 40 years' old at age 65, whereas the frozen accrued

19   benefit in the middle column under 417 (e) properly reflects

20   mortality at all ages.

21             So that is the main difference.  Then with the

22   other --

23             THE COURT:  Can I put that in slightly different words

24   to see if I have gotten that concept.

25             THE WITNESS:  Okay.

F7RJOSB1                          Sher - direct

1          THE COURT:  Which is that the 6 percent used to

2     calculate the open balance lump sum on the far right of your

3     chart here does not include a mortality assumption.  The green

4     bar, which is the frozen accrued balance, which is calculated

5     at 6.06, the GATT rate, does incorporate a mortality

6     assumption.  Is that correct?

7          THE WITNESS:  Well, almost.  They both reflect the

8     possibility or probability of mortality after age 65, which is

9     the date that the benefit, the frozen accrued benefit begins to

10    be paid.  It is the difference is the pre-retirement, we call

11    it pre-retirement decision, pre-age 65 mortality.

12         THE COURT:  That is, the yellow bar does not reflect

13    pre-age 65 mortality; the 6.06 green bar does?

14         THE WITNESS:  Right.  The reason it does, the green

15    bar, is because under 417 (e) as I understand it, there is no

16    distinction between mortality at different ages, it is just

17    applied.  Somebody can die both after age 65 once payments have

18    start or they can die before they reach age 65, whereas the

19    yellow just assumes that every person is going to live until

20    age 65 with certainty.

21         THE COURT:  All right.  Thank you.

22         THE WITNESS:  And the remainder of $437.00 is the

23    difference between the 6.06 interest rate which is the, is the

24    417 (e) rate applicable for determining present value of frozen

25    benefit on the date of distribution, which in this case is in

F7RJOSB1                         Sher - direct

1   1996, whereas the opening balance on the right side, the

2   yellow, is determined using 6 percent, all right?

3          So it locks it in.  To determine an opening balance,

4   it locks in that interest rate, and he locked it in at 6

5   percent.  So that differential, the lower the rate is going to

6   inflate a little bit compared to using the 6.06 rate in the

7   green.

8   BY MR. RACHAL:

9   Q.  Mr. Sher, is it correct that Ms. Lerew was paid when she

10  terminated, had her distribution $22,693.00 pursuant to 417 (e)

11  and her protected benefit?

12  A.  That's what my understanding is, yes, that is what she was

13  paid.

14  Q.  Is it correct that under an A plus B approach, her loss

15  here was that $20.00 pay credit?

16  A.  Yes, because the A would equal the green, the number in the

17  green column, the A on the right.  The B is just the $20.00.

18  Q.  How does Mr. Deutsch's opening balance remedy relate to the

19  $20.00 she would have under an A plus B approach?

20  A.  Well, the remedy that Mr. Deutsch would provide is about

21  $4,000 higher than an A plus B; so, therefore, one way to look

22  at it, as a result of Ms. Lerew getting a $20.00 pay credit,

23  Mr. Deutsch ends up with a $4,000 remedy.

24  Q.  What is that ratio, Mr. Sher?

25  A.  Well, the ratio between the remedy and what the pay credit

F7RJOSB1                           Sher - direct

1    is about 200 to 1.

2              MR. RACHAL:  John, please pull up DX-431.  This is the

3    Osberg graphic.

4    BY MR. RACHAL:

5    Q.  What does this graphic show, Mr. Sher?

6    A.  The --

7    Q.  Let me start more basically.

8              Just for all of us, if you would, explain what the

9    blue line is, the yellow gold line is, and the difference

10   between them, if you would.

11   A.  This is for Mr. Osberg.  What it shows is over time

12   beginning on the conversion date and it goes out until 2002

13   when Mr. Osberg received a lump sum.  What it does, it shows a

14   comparison like what was done on the previous page, but over

15   time, and this reflects Mr. Osberg, of the A plus B lump sum

16   which is the yellow line as compared to the damages that I

17   understand Mr. Deutsch under his open balance approach had come

18   up with.

19   Q.  Is it correct that for the blue line, that those numbers

20   came from demonstratives that Mr. Deutsch used in his testimony

21   here?  We'll go to the second page, 431-2.

22   A.  Yes.

23   Q.  This is the table back-up that for the graphic that you

24   have, 431, correct, Mr. Sher?

25   A.  Yes.

F7RJOSB1                        Sher – direct

1    Q.  Go back to the 431.

2    A.  So what the observation which you can see the numbers on

3    the next table, but those were just transferred summary of the

4    comparison is transferred over here, that Mr. Deutsch in all

5    years, some more so than others, would show in excess of his

6    damages over an A plus B, and in no year would the blue line be

7    less than the yellow line.

8    Q.  Is it correct that for the damage analysis that you have

9    gone over both for Ms. Lerew and now Mr. Osberg, neither Ms.

10   Lerew nor Mr. Osberg received an enhancement?

11   A.  That's correct.

12   Q.  These are not reflecting the impact of the enhancement,

13   correct?

14   A.  That's right.

15   Q.  It is correct that Ms. Lerew is more a day one approach

16   showing the impact on the first, in the period shortly after

17   the conversion?

18   A.  That's right.

19   Q.  Mr. Osberg shows the difference between the damages over

20   time, correct?

21   A.  That's right.

22   Q.  Is it correct Mr. Deutsch's remedy is always more than A

23   plus B remedy?

24   A.  Yes.

25   Q.  Why is it that the lines start converging around -- or get

F7RJOSB1                          Sher - direct

1   close, I should say, I think it is around 2001 and I think they

2   pretty much follow that trend going forward?

3   A.   Yes.   As it actually occurs in 1999 as well, all of those

4   years where the numbers are very close are years when the 417

5   (e) rate shown at the top was below, below 6 percent.

6            What happens is once you get down to that, to that

7   level, the difference, the remaining difference is what we call

8   or described the other day as a whipsaw effect that's reflected

9   in Mr. Deutsch's calculations, but when I did an A plus B, it

10  was not reflected.

11  Q.   For people who actually had their benefit calculated during

12  this period, did they get the -- participants last week, did

13  they get the benefit of this whipsaw effect?

14  A.   Yes.

15  Q.   Did that protect them or somewhat protect them from when

16  interest rates fell below 6 percent from decreasing benefit

17  protecting, that is, give them more benefits if interest rates

18  fell below 6 percent?

19  A.   Yes, it certainly had the potential to do that.

20  Q.   Is this different in some sense in the Cigna case, this

21  whipsaw protection we have here in our case?

22  A.   Well, the issue of whipsaw, I don't recall that being a

23  major issue arising in that case.

24  Q.   Is it correct that Cigna had a floating interest rate that

25  would float down to 4 and a half percent?

F7RJOSB1                         Sher - direct

1   A.  Yes, it would be 4 and a half percent minimum together with

2   a floating, floating rate.

3   Q.  The substantial majority of the class that left in the 1996

4   to 1998 period, does Osberg illustrate the larger payment costs

5   by Deutsch's opening balance approaches compared to an A plus B

6   approach?

7   A.  Yes.

8   Q.  If you were looking at this graphic or this exhibit, when

9   we see the larger yellow spaces between '96 and, say, '98, that

10  would be indicative of the disparities between an A plus B

11  approach in Mr. Deutsch's opening balance approach for those

12  who left within those periods?

13  A.  Yes, that's right.

14  Q.  Did Mr. Deutsch do what I think you called an enhancement

15  on the enhancement remedy, recalculating opening balances at 6

16  and then enhancement at 6 percent interest instead of 9

17  percent?

18  A.  Yes.  So when someone had an enhancement, Mr. Deutsch would

19  add on his approach, would add on top of the 6 percent opening

20  balance calculation, he would add an enhancement that is

21  determined as a percentage of that higher opening balance to

22  end up with what we call an enhancement on top of an

23  enhancement.

24          MR. RACHAL:  Would you pull up DX-432.

25  BY MR. RACHAL:

F7RJOSB1                        Sher - direct

1   Q.  Does DX-432 illustrate the enhancement-on-enhancement

2   feature you with are talking about or aspect of Mr. Deutsch's

3   analysis?

4   A.  Yes, it does.

5   Q.  Can you explain it briefly for the court.

6   A.  Okay.  Under the opening balance approach, what we see,

7   first of all, the left two columns are precisely what we saw

8   earlier when we were looking at Mr. Deutsch's calculations,

9   132,572 being what was paid.  The 6 percent opening balance

10  with interest, what Mr. Deutsch did, he then added the pay

11  credits appropriately onto the calculation, but then added a

12  very large enhancement on top of that.

13          Not only did he add the original dollar amount of the

14  enhancement which you see is the 48,846 which is off on the

15  left, but he also added an additional enhancement because he

16  took instead of taking in this case 67 percent of the original

17  9 percent opening balance, which gets you to the 48,000 number,

18  he took the 67 percent in this instance of the much higher

19  opening balance, the 137,000 number.

20          That gives you an extra enhancement of another 43,129.

21  So the total enhancement added on in this case would be about

22  $92,000 between the original amount and the --

23  Q.  Go ahead.

24  A.  -- the total of that column would be 240,000, almost twice

25  as much, 80 or 90 percent more than what he was actually paid.

F7RJOSB1                        Sher - direct

1   Q.  So as compared to an A plus B benefit, is it correct that
2   the Class Number 04 received in his account balance more than
3   an A plus B?
4   A.  Yes, he already received more than A plus B in his account
5   balance, the 132 versus 127, correct.
6   Q.  What would Mr. Deutsch give Class Number 04 as an
7   additional remedy under his opening balance approach?
8   A.  Well, the additional remedy would be the difference between
9   the 240 versus the 132, so about, looks like about $108,000
10  additional remedy.
11  Q.  It's correct that based on your analysis, the Class Number
12  04 actually suffered or experienced no wear-away effect?
13  A.  That is the way I would characterize it.  He received more
14  than what he had, what he had already accrued which is the Part
15  A benefit, 11698 as lump zoom and full credits of --
16  Q.  What is the gray bar on the far, the far right, I presume?
17  A.  Just to put this into further perspective, I added in
18  hypothetically what Participant 4 would have been entitled to
19  under the terms of the prior plan had they not been amended,
20  with one exception, and that would have been if a lump sum was
21  added to the plan so that the individual could take a lump sum
22  so we could also compare apples-to-apples here.
23       Everything else is in lump sums.  What it shows is he
24  had -- I used the same 417 (e) rates to determine value for the
25  lump sum.  You see on the bottom right 116,948, that is the

1    same 116,948 you see over here as Part A in yellow, which is

2    just simply the present value of what he accrued at the end of

3    1995 under that prior plan, and then I calculated the

4    additional accrual that he would have under the terms of that

5    prior plan, just adjusted for the period 1996 through November

6    1st when he terminated, which was I think in October of 1997,

7    the additional accrual and he took a lump sum value of that

8    additional normal retirement benefit, and that works out to

9    10,706.  You add the two together and you get $127,654.00.

10   Q.  In your review of the plan communications, did you see

11   anything that told participants that enhancement was part of

12   their pay credits?

13   A.  No.

14   Q.  How was the enhancement calculated under the plan?

15   A.  The enhancement was a percentage depending upon age.  This

16   only applied for people who were at least age 50 with 15 years

17   of service but not age 65.

18          There would be a percentage that would be applied to

19   the regular, I call it regular opening balance, which is what

20   we call basic here, which is determined at 9 percent.  In this

21   case it would be, for this individual, 67 percent which is the

22   maximum increase of the basic opening balance would be the

23   enhancement.

24   Q.  Was it your understanding that if someone qualified for

25   that enhancement, that they received it immediately upon the

1    plan conversion, they didn't have to continue to work to get

2    the enhancement?

3    A.   That's correct.

4    Q.   What was the impact of enhancements?

5    A.   The impact of the enhancements was to -- first of all, it

6    was targeted at those who would have potential most impact in

7    the change to the new program, so it was people who were close

8    to retirement, age 50 with 15 years of service, and then it was

9    added to their accounts and stayed in their accounts even if

10   they left prior, prior to, you know, when they would have been

11   entitled to retire even if they continued to work past age 65,

12   it is a number that would stay in their account and actually

13   continue to grow at the same 6 percent interest that is

14   credited on all the accounts.

15              MR. RACHAL:  Pull up DX-433.

16   BY MR. RACHAL:

17   Q.   In this analysis here, did Mr. Deutsch use a spot 417 (e)

18   rate to do this analysis?

19   A.   Yes, he used the rate that was in effect, in effect in 1996

20   of 6.06 percent.

21   Q.   Do you think that is a correct way to do the analysis?

22   A.   I think that it could leave the impression -- I think it is

23   very problematic -- it could leave or could leave the

24   impression that this wear-away effect is something which is

25   cast in stone, it is predictable, when we know, of course, that

F7RJOSB1                      Sher - direct

1    is not the case.

2              As interest rates go up and down, the wear-away effect

3    would come down or go up or disappear.

4    Q.  With that qualification, do these charts illustrate

5    anything useful?

6    A.  I think when comparing the two charts, the one at the

7    bottom reflects individuals with enhancements.  So what it

8    shows is even under the static approach, it shows what would

9    happen to wear-away on lump sums with for somebody that has an

10   enhancement.

11             THE COURT:  Let's take the time-frame 1995 to 2000,

12   have that as our time period for this question.

13             In your experience, what interest rate or other factor

14   was used to calculate the opening account balances when the

15   company wanted to or effectively eliminate wear-away at the

16   outset?

17             In other words, they can't guarantee a wear-away will

18   never occur, but they're trying to ensure as little of that at

19   the outset as possible?

20             THE WITNESS:  Well, certainly if under the scenario

21   where you do an opening balance approach, the higher the

22   opening balance, however you get there -- and there are a

23   variety of ways to do it.  One is to use a lower interest rate.

24   The lower the interest rate, the higher the opening balance;

25   and, therefore, the less likely, although, as you said, it is

F7RJOSB1                          Sher - direct

1    still going to happen particularly as rates came down, which

2    nobody thought would happen, but as they came down, those that

3    thought they weren't in wear-away would still have it.

4             It certainly reduces the likelihood, and the companies

5    did some other things to either increase the opening balance or

6    they targeted people that they cared most about, like what was

7    done here by either using, in one case, using a lower interest

8    rate which was actually done in Cigna.  They used a lower

9    interest rate, but just targeted people like of what happened

10   here, all right, they used everybody else in effect is similar

11   to what was done here, and in some cases rather than dealing

12   with the opening balance interest rate, they might enhance pay

13   credits.  I they might have supplemental pay credits for

14   certain people.

15            There are so many different ways of sort of targeting

16   the group that is both more likely to be affected and retiring

17   in the not too distant future to try to bridge some of these

18   potential gaps which are kind of naturally occurring when you

19   change from one plan to another.

20   Q.  From your perspective as an actuary, does the enhancement

21   operate like an early retirement subsidy?

22   A.  I would say that it does not because it is something that,

23   as I described before, it is granted and it is not changed

24   other than it grows with interest, as opposed to an early

25   retirement subsidy which we are talking about early retirement

subsidy, it is provided under annuities, it is not available

unless the individual starts their benefit at a given age or in

this case age 55, and for true early retirement subsidy, it

gradually reduces in value as the individual defers retirement

till it gets to a point where at age 65 there is no early

retirement subsidy, but in this case it would still be growing

interest enhancement, so it is different.

Q.   Is it true that generally for early retirement subsidies,

there is a bit of exchange here, exchange for the employee

leaving which may have certain cost benefits, the employee can

capture the value of the early retirement subsidy?

A.   I think traditionally early retirement subsidies for some

people, the earlier defined benefit plans, mostly collective

bargaining plans, were designed for work forces that where

people sort of wear down, heavy industry, encouraging people to

retire early, allowing them to retire early.  It was very

popular particularly for those kind of groups, less popular

today for sure.

Q.   But for the enhancement, it is correct if you met age 50

and at least 15 years of service and you were below age 65,

that you received an enhancement regardless of whether you

stayed at work or left work, correct?

A.   Yes.  Actually, our ID 4 is a perfect example of an

individual that received an enhancement and ended up leaving

and receiving a lump sum distribution at age 53, so the

F7RJOSB1                              Sher - direct

 1    individual leaving didn't have to wait until age 55 to get

 2    something extra as they would if they wanted an annuity,

 3    subsidized annuity.  They got the enhancement.  It wasn't taken

 4    away.  It was included in the balance the individual received.

 5    Q.  Is it correct that under the prior plan, the early

 6    retirement subsidy was available only if elected an annuity to

 7    commence between age 55 and before age 65?

 8    A.  That's correct.

 9    Q.  Post-conversion, how many class members were electing

10    annuities?  What was the percent?

11    A.  It was about -- of those who made an election, including a

12    lump sum election, putting aside those who were forced, forced

13    out because they were under 3500, it was about 5 percent of the

14    elections.

15              THE COURT:  Let me just probe on this a little bit.

16              I understand that the annuity could only begin to be

17    collected at age 55, but if there had been a lump sum option in

18    the prior plan, with all other terms remaining the same,

19    wouldn't there have been some incremental value to the early

20    retirement benefit once the employee had achieved 15 years of

21    service?

22              THE WITNESS:  There would be incremental value if the

23    individual ultimately started the benefit at 55, between 55 and

24    64.

25              However, on the lump sum could in most cases, in my

F7RJOSB1                          Sher - direct

1    experience, it typically is based on the normal retirement

2    benefit.  Even though the plan had an early retirement benefit,

3    let's take a simple case of who is age 55, already could have

4    started their annuity at age 55, has that early retirement

5    subsidy, they kept that subsidy if they took an annuity.  By

6    the plan's terms, the lump sum could be determined as the

7    present value of the normal retirement benefit, therefore, not

8    including subsidy.

9           There are some plans I have seen that do it the other

10   way, say well, we want to include the early retirement subsidy

11   in a lump sum.  There is nothing that precludes them from doing

12   it, but they don't have to do it.  The plan terms should

13   dictate how it is calculated.

14          THE COURT:  Thank you.

15          THE WITNESS:  You're welcome.

16   BY MR. RACHAL:

17   Q.  Does a class member still receive his enhancement in an A

18   plus B approach?

19   A.  Well, yes.  As we saw in the ID 04 example, the benefit,

20   the benefit is included in the A plus B.

21   Q.  What about pay and interest credits in an A plus B

22   approach?

23   A.  Pay and interest credits in A plus B approach are included.

24   The A portion is just the value of the frozen benefit, 417 (e)

25   discounted and separate and apart from that as an add-on, A

F7RJOSB1                          Sher - direct

1    plus B are the pay and interest credits.

2    Q.  What about pay and interest credits for annuities in an A

3    plus B approach, how are those handled?

4    A.  The Part A benefit would be the frozen protected annuity,

5    again adding onto that would be whatever annuity could be

6    provided from those pay and interest credits, so it is an

7    add-onto the frozen annuity.

8    Q.  So is it correct that you don't need to do a different --

9    let me restate it.

10              Is it correct under A plus B approach, someone who

11   elects the annuity is not going to experience any wear-away?

12   A.  That's correct.

13   Q.  How is the early retirement subsidy handled for someone who

14   elects an annuity during the appropriate time-frame, assuming

15   they qualify for it?

16   A.  The annuity on the Part A benefit, frozen protected

17   benefit, would be determined using the early retirement

18   subsidized reduction factors that the individual's entitled to.

19              In fact, even if the individual didn't have 15 years

20   of service at the date of conversion, they could still grow

21   into the 15 year service requirement.  By the time they leave,

22   they have 15 years, they would be entitled to that full on an

23   annuity basis under A plus B, that full subsidized Part A

24   benefit plus again whatever the pay credits would provide as an

25   early retirement annuity.

F7RJOSB1                          Sher - direct

1   Q.   Under Mr. Deutsch's opening balance approach, do you

2   believe that the 6 percent interest rate that Mr. Deutsch used

3   was appropriate or not?

4   A.   Well, to me it is arbitrary; and, therefore, I guess I

5   don't view it as being appropriate.

6   Q.   Why do you say it is arbitrary?

7   A.   Well, I mean just because the rate rounds to the rate that

8   was in effect, the 417 (e) rate that was in effect at the

9   beginning of 1996, which was 417 (e) rate was 6.06 percent, I

10  don't think is a rationale.

11          I also don't think it is a legitimate rationale that

12  just because the interest credit rate happens to be 6 percent,

13  that the opening balance rate is 6 percent.

14          THE COURT:  What were some of the rationales that

15  you're familiar with that you considered reasonable in terms of

16  the selection of an interest rate by companies converting to a

17  cash balance plan at approximately this point in time?

18          THE WITNESS:  Your Honor, the interest rates determine

19  the opening balance or interest credits the decreed.

20          THE COURT:  Interest rates determining the opening

21  balance?

22          THE WITNESS:  I would say certainly one would look to

23  interest rates in the marketplace as one possibility.  They

24  tended to look at various different bond rates, 30-year

25  government bonds, corporate bonds.

1          They also considered the impact on the funding of the

2     plan, the rate that was -- what would happen if they, if, you

3     know, a bunch of people took lump sums and they, you know, they

4     locked in at a higher rate.  And what happens if rates go up?

5          So they considered a bunch of different factors, rate

6     of return on the plan assets, how your rates have been changing

7     recently, if rates have been dropping very rapidly or rising

8     very rapidly, they might not get complete credibility and look

9     back and say what is the trend or where have rates been

10    historically.  It is a combination of factors.

11         It is my experience where at least where the employer

12    is engaged in these discussions, I would present, you know, a

13    bunch of analysis and do some calculations, costs and how it is

14    going to affect people and they would make decisions.  There is

15    no one one thing that they would look at.

16         THE COURT:  Let me ask you whether, as a matter of

17    mathematics, if one were to take the participants in the plan

18    as of January 1st, 1996 and to calculate all of their opening

19    account balances at 6.06, rounded down to 6 percent, wouldn't

20    that equal the unfunded liability to the extent that the prior

21    year's interest rates hadn't been materially different?

22         THE WITNESS:  Well, the unfunded liability of the plan

23    is the difference between the assets and some liability

24    calculation.  The liability calculation that one would do

25    typically reflects a different discount rate.  Back in that era

F7RJOSB1                          Sher - direct

1    companies would typically use an expected return on the plan

2    assets, the discount liabilities of the plan at -- so you might

3    use a rate similar -- what Foot Locker did which was a 9

4    percent rate.

5            So the liabilities of the plan would tend to be lower,

6    so you take any one individual that would be holding a

7    liability for that individual even under the cash balance that

8    is typically lower and in many cases than the account balance,

9    especially if the account balance is determined at a 6 percent

10   rate.

11           THE COURT:  So you could have, in other words, what I

12   am suggesting it is possible -- indeed, likely -- the company

13   was using a 9 percent rate to determine its funding obligations

14   for the plan during that period of time, that there would be an

15   additional unfunded liability that would represent the

16   increment between the 9 percent and the 6 percent?

17           THE WITNESS:  Yes, exactly.

18           THE COURT:  All right.  You may proceed.

19           MR. RACHAL:  This is something that we may zip into

20   that in just a few questions or tie into it, I should say.

21   BY MR. RACHAL:

22   Q.  You stated, Mr. Sher, you evaluate actuarial equivalent

23   based on the purpose for which the calculation was being done,

24   correct?

25   A.  Yes.

F7RJOSB1                          Sher - direct

1    Q.  From the plan's perspective, I think you testified

2    actuarial equivalence would be based on the plan's expected

3    return plus the 9 percent rate?

4    A.  I think that is how an employer would evaluate the

5    exchange, yes.

6    Q.  Would that roughly make the annuity lump sum conversion

7    cost-neutral from the plan's perspective?

8    A.  Yes, that is certainly the intention is to make it

9    cost-neutral or as close to cost-neutral as reasonably

10   feasible.

11   Q.  Just to be clear, prior to the 2006 Pension Protection Act,

12   there was no legal limit on how an annuity to lump sum

13   conversion was done.  Is that correct?

14   A.  For opening balances, that's correct.

15   Q.  How would you view actuarial equivalence from the

16   participants' perspective?

17   A.  I think from the participants' perspective, I would look at

18   various different fixed income obligations.  Certainly, you

19   know, I would look at the 417 (e) rates, although back in that

20   era when they were based on the 30-year treasury rates, my

21   inclination would have been also to look at and I think prefer

22   to study the corporate bond-type rates, more like the rates

23   that were adopted by Congress in 2006 and look at the rates

24   that not just that were in effect on the date that the plan

25   converted, but look at the trend of the rates, with some

F7RJOSB1                         Sher - direct

1    historical rates and then just draw some conclusion based on

2    that.

3    Q.  So keeping in mind that during this period the plan's

4    expected rate, 9 percent, was, based on your experience, not

5    out of line, but you had something like the corporate bond rate

6    that may be a fair exchange for participants, in the 2006

7    Pension Protection Act, did Congress force a convergence of

8    these protections, in effect?

9               MR. GOTTESDIENER:  Objection.

10              THE COURT:  Overruled.

11   A.  Yes, in the sense that Congress, at the same time of

12   changing the 417 (e) basis to reflect corporate bonds, also

13   changed the minimum funding, ERISA minimum funding calculations

14   to require the same type of corporate bonds to be used as the

15   basis to determine the interest rate that they use in their

16   valuation to value the liability.

17              So you could no longer use, unless it works out, the

18   arithmetic worked out that way, no longer use expected return

19   on assets, something like 9 percent, for example.  You have to

20   use something which is based on the same type of corporate

21   bonds as the 417 (e) rates.

22              So there is a convergence there.

23   Q.  It is correct Congress was mandating the use of the same

24   corporate bond rates, not just to do the annuity to lump sum

25   calculation for 417 (e), but for plan funding?

1   A.  For minimum funding, correct.

2   Q.  So that would eliminate some of the disparities that we saw

3   or see in this case between 6.06, 417 (e) in 1996 and the 9

4   percent expected earnings?

5   A.  Yes.  I think some of it, a good deal of it would go away.

6   Q.  From the plan's perspective, if they have to fund at the

7   corporate bond rate, from a participant's perspective, they

8   have to exchange the annuity to corporate bond rate, they

9   somewhat converge?

10  A.  They are definitely converging.

11  Q.  What does this mean at a practical level?

12  A.  Well, at a practical level, I think the minimum funding

13  calculations would not -- because they would no longer be so

14  adversely affected when individuals elected lump sums, that the

15  corporate bond rate would be something that the employer could

16  much more easily live with as the exchange and the employees

17  should be happy with as well.

18  Q.  Did mr. Osberg received a remedy using the corporate bond

19  rate to calculate the wear-away?

20  A.  Okay.  So if we were doing -- I am not sure I understand --

21  if we were doing an A plus B calculation in 2002 when

22  Mr. Osberg took a lump sum --

23  Q.  Today?  You calculate and see whether he would get a remedy

24  with --

25  A.  Okay, yes.  I think he still would get a remedy under an A

F7RJOSB1                          Sher - direct

1   plus B based on the corporate bond rates applied.

2   Q.  If a remedy is to be provided using the alternative to

3   opening balance approach, again again whether it is based on

4   30-year Treasury or the corporate bond rates or something else,

5   what date or dates should be considered in selecting that

6   opening balance, in your opinion?

7   A.  Well, just the same type of analysis that I would perform

8   in the first place, which is you look at the various rates that

9   were applicable at the time.  I look at the corporate bond

10  rates that were in effect, not just on the December of 1995,

11  but look at the corporate rates that were in effect certainly

12  going back at least to the time that they were designing the

13  plan and probably look at the trend over time and some of the

14  averages over time as well.

15          THE COURT:  To comply in terms of your understanding,

16  recognizing you're not a lawyer, that you deal in this area a

17  lot, in terms of what you understand to be ERISA's

18  requirements, if one used the GATT rate in effect as of the

19  date of plan conversion, would that prevent there being a

20  participant who would one day be able to make a claim he was

21  receiving less than he would have been entitled to as of the

22  date of plan conversion?

23          THE WITNESS:  Let me make sure I understand.

24          If the opening balance was determined instead of, all

25  the things being equal, instead of 9 percent, at say 6.06

F7RJOSB1                            Sher - direct

1    percent?

2              THE COURT:  Correct.

3              THE WITNESS:  Could somebody later on make a claim

4    they didn't receive -- yeah, they can make a claim because as

5    interest rates fell, the present value of that frozen protected

6    benefit would increase, yet their account balances just

7    continued to go up steadily by interest, so, yes, they could.

8              THE COURT:  All right.

9    BY MR. RACHAL:

10   Q.  Mr. Sher, is an opening balance approach needed to provide

11   a remedy to assure the wear-away on early retirement annuities?

12   A.  No.

13   Q.  Does Mr. Deutsch's opening balance approach cause an

14   overpayment on lump sums and annuities at least as compared to

15   an A plus B remedy?

16   A.  I would say it does, yes.

17   Q.  Is it correct that Mr. Deutsch stated that under his

18   opening balance approach, that the discount rate must match the

19   interest crediting rate no matter what the rate is to be, in

20   his view, actuarially equivalent?

21   A.  That was my understanding, that even if my recollection is

22   correct, during his cross you asked him or he offered that if

23   the interest credit rate on the plan was zero percent, which

24   may be a little farfetched, but in theory someone could provide

25   a cash balance plan with no interest, I suppose, that the

F7RJOSB1                              Sher – direct

opening balance interest rate would have to match that in order

for the opening balance interest rate to be considered an

actuarial equivalent.  I don't agree with that at all.

              MR. RACHAL:  Pull up DX-435.

BY MR. RACHAL:

Q.  When are you valuing the benefit in this graphic?

A.  Okay, so this is illustrating Mr. Deutsch's opening balance

approach, 6 percent, discounting at 6 percent with no

pre-retirement mortality for an employee aged 45 after

conversion with a $10,000.00 frozen accrued benefit, that is

frozen accrued at age 65 annuity, and then the individual in

theory terminated upon conversion, so what I've done here is

try to isolate the effect just focusing on what the individual

had and what the opening balance would provide either on an

annuity basis, which is the bottom-left side or lump sum basis,

if 417 (e) rates, either those were the rates that were in

effect or the plan just instantly, instantly changed, interest

rates just instantly changed to these rates to try to isolate

the effect of different 417 (e) rates.

              (Continued on next page)

F7rnosb2                          Sher - direct

Q.  So for the approximately 5 percent or so of the class

members that are left with annuities, what does your graphic

show?

A.  The graphic shows that the individual, if the interest rate

was either 6 percent or a lower rate, in this case 4 percent,

that indeed the method would reproduce the $10,000 frozen

accrued benefit at 4 percent.  Intuitively I would have

thought, you know, one might think that the number should be

less than 10,000.  Because I am taking an account balance and

converting it to an annuity at 4 percent, it ought to give me

something less than $10,000.

        We talked the other day about this special feature in

the Foot Locker plan that allows -- that provides a minimum

interest rate when making the conversion from an account

balance to an annuity, the minimum interest rate being 6

percent.  So that feature of the plan kept the $10,000 from

falling at 4 percent.

        Now, what happens at 8 percent is that the annuity

conversion would be done based on an 8 percent 417(e) rate

which would inflate it to $11,577.  So at an 8 percent 417(e)

rate, if that happened to be the rate at the time of the

conversion, or if it changes to that rate, just for

illustration purposes, right away the annuity, the plan would

actually produce under Mr. Deutsch's approach more than the

protected benefit of $10,000 and produce $11,577.

F7rnosb2                         Sher - direct

1    Q.  So is it correct that for annuities under Mr. Deutsch's

2    opening balance approach you receive at or above your protected

3    benefit?

4    A.  Yes.

5    Q.  On the 95 percent or so that elected, of the class members

6    that elected lump sums, what does your graph show on the right

7    side?

8    A.  The same idea looking at different interest 417(e) rates.

9    Let's start with, I think it's the easiest, the middle, which

10   is a 6 percent 417(e) rate.

11            It would seem like all the stars are aligned.  You

12   have a 6 percent rate that determines the opening balance, you

13   have a 6 percent interest crediting rate, and you have a 6

14   percent 417(e).  Yet, the opening balance as Mr. Deutsch would

15   calculate it would be $33,196.

16            You see the dotted line going across.  Yet the 6

17   percent value of the protected benefit, the $10,000 frozen

18   benefit converted at 6 percent interest to a lump sum value,

19   would only be $30,200, the difference being caused by what we

20   have seen in the earlier examples, preretirement mortality.

21            The protected benefit does not have -- it includes

22   preretirement mortality or retirement at all ages, whereas the

23   33,196 opening balance, as we have seen before, would not

24   include preretirement mortality, so that difference is about

25   $3,000.

F7rnosb2                          Sher - direct

1          That's at the 6 percent.

2          Stepping to the right, if interest rates were 8

3   percent, which by the way they were, approximately 8 percent,

4   if the plan had been adopted earlier, a year earlier, they

5   actually were around 8 percent.

6          Under Mr. Deutsch's approach, he would say, well, the

7   interest crediting rate is 6 percent.  Therefore, I continue to

8   use my 6 percent opening balance approach, and you get the same

9   $33,196.  Yet at 8 percent the frozen protected benefit would

10  only be worth $17,949.

11         So you would have that immediate differential of I'm

12  overnight providing, or if my rates happened to be 8 percent at

13  the time of the conversion I would pay $33,196 because that's

14  in his balance.  You would never pay less than the balance.

15  Yet the value of what he already had earned on that day is only

16  $17,949.

17         So I would characterize that as sort of an immediate

18  overpayment.  Remember, there are no pay credits or interest

19  credits.  This is just focusing on the opening account balance.

20  Q.  Is this the conceptual or the flaw that you see in the

21  opening balance approach?  Does it, at least for lump sums,

22  does it correlate to whatever the 417(e) rate is when a benefit

23  is calculated and distributed, a lump sum benefit?

24  A.  I think that is certainly one of the major problems with

25  it, yes.

f7rnosb2                          Sher - cross

1    Q.  Are there any others?

2    A.  Well, the preretirement mortality is another issue.

3            MR. RACHAL:  I'm prepared to tender the witness.

4            THE COURT:  All right.  Thank you.

5            MR. RACHAL:  Just give me one minute.

6            THE COURT:  Yes.

7            MR. GOTTESDIENER:  Could I just have a minute to set

8    up, your Honor.

9            THE COURT:  Yes.

10   CROSS EXAMINATION

11   BY MR. GOTTESDIENER:

12           THE COURT:  You may proceed, sir.

13           MR. GOTTESDIENER:  Thank you, your Honor.

14   BY MR. GOTTESDIENER:

15   Q.  Good morning, Mr. Sher.

16   A.  Good morning.

17   Q.  The Court on Thursday was asking about the distinction

18   between plan costs and company costs.

19           Do you recall that?

20   A.  Yes, I do.

21   Q.  On Thursday you looked at documents that projected a normal

22   cost savings in 1996 that is a result, at least in part, from

23   anticipated wear-away.  Do you recall that?

24   A.  I do recall that, yes.

25   Q.  Did that 1996 anticipated savings from wear-away reduce the

f7rnosb2                         Sher - cross

1   company's out-of pocket cash costs in 1996?

2   A.   The -- I would say the reduction in normal cost would flow

3   through into the minimum funding calculation, in which case the

4   company, they are contributing the minimum which I think they

5   were, that would reduce the minimum required contribution.

6   Q.   So the answer to my question was yes?

7   A.   I think it would flow through in terms of the minimum

8   funding, yes.

9   Q.   So the anticipated wear-away benefit freeze had an

10  immediate bottom-line cash savings for the company?

11  A.   Well, there was also, I believe, an increase, somewhat of

12  an increase in the actuarial liability at the time of the

13  conversion.

14  Q.   OK.  I'm not asking about actuarial liability.  I am first

15  just asking about the anticipated wear-away benefit freeze did

16  have an immediate bottom line cash savings for the company,

17  didn't it?

18  A.   Through the normal cost reduction, yes.

19  Q.   You've stated repeatedly that the addition of the lump sum

20  distribution feature was a cost to the plan.  Is that true?

21  A.   Yes.

22  Q.   Was the addition of the lump sum a cost to the company in

23  1996 versus the plan?

24  A.   I think in 1996 there is some question as to whether, in my

25  mind, as to whether there was a recognition of lump sums or

f7rnosb2                         Sher - cross

1   anticipation of lump sums in the actuary's costing for the

2   plan.

3   Q.  The question, though, is did the company have to increase

4   the amount of cash that it put into the plan in 1996 to pay for

5   that increased cost?

6   A.  I believe that they did, because at least the record as I

7   view, the actuarial valuation reports as I interpret them did

8   have some allowance in the cost, anticipating that individuals

9   would elect lump sums.

10              THE COURT:  I want to make sure I understand your

11  answer, so let me word it a little bit differently.

12              THE WITNESS:  OK.

13              THE COURT:  I may be asking a slightly different

14  question.  I am not sure.  But let's talk about the cash flow

15  of the company during the calendar year 1996.  So we are going

16  to be talking about what they need to pay out of pocket in

17  1996.

18              During 1996, did the company have additional

19  out-of-pocket expenses related to the payment of lump sums for

20  those who elected a lump sum form of benefit?

21              THE WITNESS:  OK.  I think, your Honor, there is a

22  distinction between what the actuary had built into their

23  calculations versus what ended up happening as a result of

24  many, many more people electing lump sums -- terminating first

25  of all and then electing lump sums that they had forecast in

f7rnosb2                        Sher - cross

1   their sort of annual valuations.

2           It is true that the people who elected lump sums, that

3   generated a large what we call actuarial loss during 1996.

4   Why?  Because the benefits, the lump sums that were paid out

5   were greater than the liability that was released.

6           THE COURT:  Right.

7           That is an actuarial loss to the client?

8           THE WITNESS:  Right.  And it will start flowing

9   through in terms of cost over the future years.

10          THE COURT:  Right.

11          For instance, let's assume for the moment that there

12  is an actuarial loss to the plan.  So long as the remaining

13  liabilities for the plan are covered by the funded and/or

14  expected contributions, there wouldn't be necessarily a loss,

15  right?

16          THE WITNESS:  Well, it wouldn't hit the company -- it

17  hits the plan right away in that there is a higher liability or

18  unfunded as a result of those people with the lump sums.

19          It hits the company -- it is as if the company

20  borrowed the money.  The rules allow one, every time they incur

21  losses like that, to not have to pay them off right away.

22          THE COURT:  That is the 30-year amortized.

23          THE WITNESS:  It is amortized.  It would be an

24  actuarial loss that would be amortized over -- I'm trying to

25  remember whether it was 15 years.  It changed to five years at

f7rnosb2                         Sher - cross

1    one point.  But the would be amortized over the future so they

2    would not have to start paying it until the 1997 minimum

3    funding year.

4            So '96 it would not have hit them.  All I was trying

5    to say before was, is that I believe that the actuary's

6    calculations from '96 did anticipate that individuals would

7    elect lump sums.  It didn't anticipate that lots and lots of

8    them would terminate and elect them right away.  It anticipated

9    that over time these individuals would elect lump sums, but

10   that amount is not going to be large, have a large effect

11   compared to the actual election of the lump sums.

12           THE COURT:  All right.

13           Mr. Gottesdiener.

14   BY MR. GOTTESDIENER:

15   Q.  So, in terms of short-term costs, you agree that the

16   company did not have to increase the amount of cash that it put

17   into the plan in 1996 to pay for the lump sum, short term?

18   A.  Well, they got the savings in normal cost.  I agree with

19   that.

20   Q.  Let's explore why they didn't have to do that.

21           You said on Thursday, quoting you:  In this case the

22   actuary was actually not even assuming that people would take

23   lump sums.  The actuary was assuming that people would take

24   annuities.

25           Right?

f7rnosb2                          Sher - cross

1   A.  Yes.  I said that.

2   Q.  I am just asking first, could we just have a baseline you

3   did say that on Thursday, right?

4   A.  I believe I did say it, and now what I would like to do --

5   Q.  I don't have a question beyond that.

6   A.  If I want to correct that or modify it --

7   Q.  Sir, you have redirect examination.

8   A.  OK.

9   Q.  OK.  So you acknowledge that the actuary was actually here

10  not even assuming that people would take lump sums, just

11  assuming that people would take annuities, right?

12  A.  That's what I said on Thursday, correct.

13  Q.  What effect did this have, this assumption have on the

14  company's cash cost in 1996?

15  A.  Well, I think it had the effect of reducing the normal

16  cost, and we have seen that in all of the cost estimates that

17  were provided, reduce the normal cost in the first year by more

18  than the reduction in subsequent years.

19  Q.  It had the effect of zero cost to the company in 1996?

20  A.  For minimum funding for those who were in wear-away, yes.

21  Q.  And minimum funding you mean what I have been asking you,

22  cash, putting cash into the plan?

23  A.  Because they were contributing at minimum funding, yes.

24  Q.  Because they made that assumption, a hundred percent

25  annuities, correct?

f7rnosb2                         Sher - cross

1   A.  That's what I said on Thursday, correct.

2   Q.  Is the reason because if the assumption is made that nobody

3   will elect a lump sum, then the company doesn't need to fund

4   the cost of the lump sum?

5   A.  Certainly on a prefunding basis that would be true.

6   Q.  Because, as far as the company is concerned, according to

7   this assumption, there will be no lump sums and thus no

8   associated cost, right?

9   A.  The way the actuary was making that calculation, that could

10  be correct, if that were true.

11  Q.  So in the short run the company gets immediate cash savings

12  from the wear-away freeze without any offsetting cash cost for

13  the lump sums, right?

14  A.  Under -- if that was the assumption, yes.

15  Q.  You know it was the assumption, right?

16  A.  Well, that's what I thought, but I did some more research

17  over the weekend and I'm no longer at all sure that that was

18  what the actuary did.

19  Q.  We went over all this in your deposition, right?

20  A.  We might have.  We probably did.

21  Q.  So if the goal was to save cash in the short run, the

22  assumption of zero lump sums worked out pretty well, you would

23  agree?

24  A.  I am not sure what you mean by pretty well.

25  Q.  Saving.

f7rnosb2                          Sher - cross

1    A.  It had that result, the result that you described.

2    Q.  Was it a reasonable assumption that no one was going to

3    elect to take a lump sum postamendment?

4    A.  I would not have made that assumption.  Let's put it that

5    way.

6    Q.  Was it a reasonable assumption?  Not whether you would have

7    done it.  Was it a reasonable one?

8    A.  It's the actuary for the plan who would have to answer that

9    question.  I would be disinclined without knowing something

10   else, something about the group or something about the

11   situation that would, you know, that would cause the actuary to

12   make that kind of assumption.  That is why I went back and

13   looked at it again, because my inclination, again, would be to

14   assume at least a high percentage of people would take a lump

15   sum.

16   Q.  On Thursday you said that when lump sums are offered

17   invariably the substantial majority of people take them, right?

18   A.  That's right.

19   Q.  Are you aware of any evidence that Mercer or Foot Locker

20   were not aware that invariably most employees will elect a lump

21   sum if offered?

22   A.  No.

23   Q.  In fact, you know to the contrary, if we could get up PX 8,

24   please.

25          The second page at the top.

f7rnosb2                          Sher - cross

1           You know these are Mr. Kiley's notes.

2           Can you read that for us, please.

3   A.  Yes.  It says, Based on a national survey that Jim Grefig

4   conducted, under 55 100 percent take lump sums.  Over 55, 90

5   percent take lump sums.

6   Q.  You testified that many participants, in fact, terminated

7   in 1996 and 1997 and most elected lump sums, right?

8   A.  Yes.

9   Q.  So you would be surprised to learn that Foot Locker

10  continued to assume for purposes of determining its required

11  cash funding contributions that zero percent of employees would

12  elect lump sums?

13  A.  I was surprised when I thought that was the case, yes.

14          THE COURT:  Let me just ask, because I want you to

15  have a chance to examine it if you chose to do so.

16          Have you changed your view as to whether or not that

17  was the company's projection?

18          And, two, if so, what did you see specifically that

19  caused that change in view?

20          THE WITNESS:  Well, I went back over this weekend and

21  looked at the valuation reports, and the section where it

22  describes assumptions, normally one would expect to see some

23  positive explicit indication as to whether the assumption is

24  everyone is going to elect an annuity or everyone is going to

25  elect a lump sum or 50/50, something that's explicit.  I didn't

f7rnosb2                         Sher - cross

find anything.  And that was no different than in the past.  I
didn't see anything in there.

However, then I started to think, to just presume that
because there is nothing in there that meant that they would
continue to do what they had previously done under the prior
plan, which, of course, they were going to assume that
everybody took annuities, because -- other than a small amount
a cashouts, because nobody had a chance to take something other
than an annuity.

So the plan was silent, understandably, continued to
be silent, which continued to bother me.

So then I found in the 1997 valuation a discussion
that they had changed, that there was a change in the
assumption for purposes of valuing the lump sum value of the
12/31 accrued benefit from 8 percent to 7 percent.

Again, it didn't explicitly say that they are assuming
that everybody was going to elect a lump sum, but the more I
read that, I thought, well, why would they express that in that
way?  They made a change in the assumption.  It talked about
417(e) in the lump sum value and the '97 report, so now I am at
the point where I am not certain what they did.

It's still silent.  If anything, now the evidence
might point -- my interpretation, perhaps they did reflect
either hundred percent lump sums or something else.  They
should have really put -- the right way to do this would have

f7rnosb2                          Sher - cross

1    been to say this explicitly.

2            The other thing I did, I said, well, remember we had

3    costs that were shown I think the top of the page, one of the

4    exhibits that we looked at on Thursday had lump sump, assuming

5    a hundred percent lump sums and assuming 100 percent annuities,

6    and the numbers were different, but they were not so much

7    different, the lump sums versus annuities, remember, because

8    they are not assuming that everyone is going to elect it right

9    away.  And if they are assuming that the 417(e) rate is only 8

10   percent, then that's not going to have nearly as much impact

11   than if they assume it's 6 percent.

12           THE COURT:  OK.

13           So you didn't see anything that explicitly indicated

14   to you what the assumption was in terms of election

15   projections?

16           THE WITNESS:  Right, the election rates.

17           THE COURT:  All right.

18           THE WITNESS:  I did not see it.

19           I am now starting to wonder what did they do.

20           THE COURT:  I hear you.  I hear your point.

21           All right.  You may proceed, Mr. Gottesdiener.

22           MR. GOTTESDIENER:  Thank you, your Honor.

23   BY MR. GOTTESDIENER:

24   Q.  So are you saying that you actually went and looked at a

25   valuation for 1997?

f7rnosb2                          Sher - cross

1   A.   Correct.

2   Q.   Anything else that you looked at to research this?

3   A.   Well, I looked at the -- I believe I looked at the '98 --

4   the only ones that I think I had in my possession went through

5   '98.

6   Q.   The ones that you have in your possession --

7   A.   '96.  I looked at '96 as well, of course.

8   Q.   When you looked at '96 did you look at the 5500 for '96?

9   A.   I don't know if I had the 5500.  I might have -- not this

10  go-around, no, not this time.  I don't think I had it in my

11  possession.

12  Q.   Were you able to be in touch with defense counsel over the

13  weekend and ask for documents if you didn't have them?

14          MR. RACHAL:  Objection.

15          THE COURT:  Well, it's more important to me that, what

16  he did and did not review.  If he didn't see it, if he didn't

17  review it, he didn't review it.

18          MR. GOTTESDIENER:  OK.

19          Could we get PX 95 on the screen, please.

20  BY MR. GOTTESDIENER:

21  Q.   So, this is the 5500 for 1996.  It was attached to

22  Mr. Deutsch's report, I thought.

23          In your report you said you reviewed the 5500s, the

24  IRS 5500, required filings with the government, didn't you?

25  A.   If it's there, then I guess I did.  I don't recall off the

f7rnosb2                          Sher - cross

1    top of my head.

2    Q.  Wouldn't that be customary for you to do?

3    A.  I don't know about customary.  But I might have -- if I had

4    possession of it, I probably looked at it.

5            MR. GOTTESDIENER:  If you could go to the page that

6    has the Bates number FLOSB 00786.

7            If we could look at the entry for spouse's benefit.

8            You see there, sir, that the assumption is that

9    payments are going to be made in the form of annuities,

10   correct?

11   A.  Well, I mean, this is talking about the spouse's benefit.

12   Q.  Sir, it's talking about the participant and the spouse's

13   benefit here, is it not?

14   A.  I'm not sure it can be read that way.  It's talking about

15   spouse's benefit.

16   Q.  And it assumes that, upon retirement the payment is assumed

17   to be in the form of an annuity, right?

18   A.  That's what it says, 50 percent joint survivor annuity.

19   Q.  Right.  They used a 100 percent annuity assumption in 1996,

20   correct?

21   A.  It doesn't say what form.  It is assumed for people who are

22   not married.  You wouldn't have a 50 percent joint survivor

23   annuity for a single person.

24   Q.  No.  But the person does have to elect and they would have

25   to waive their right to any other form of payment, right?

f7rnosb2                         Sher - cross

1    A.  Well, that's true.

2    Q.  Let's look at 1997.

3          The PX for 1997's 5500 is 211.  If we could go to page

4    FLOSB000839.  Item 6.  You will see it says the same thing for

5    1997, correct?

6    A.  Yes.

7    Q.  You didn't look at that over the weekend, right?

8    A.  I looked at the whole thing.  You know, if I was looking

9    for something, I would not expect something to be buried in

10   spouse's benefits section.  I would have expected it to say,

11   you know, optional form election, something like that.

12   Q.  But whether it's buried or not, you see it now, right?

13   A.  I see it.  It's talking about spouses.  It's not talking

14   about single people.

15   Q.  It's talking about -- well, for the single people the 50

16   percent QJSA is the life only, right?

17   A.  The form, unless elected otherwise, would be a life

18   annuity.  But just about everybody is electing a lump sum so --

19   Q.  So you don't have any doubt that this is making a 100

20   percent annuity assumption, right?

21   A.  I think it would be read that way, at least for spouses.

22   Q.  It can't be read as saying 100 percent lump sums, right?

23   A.  No.  I didn't -- I said I didn't see anything anywhere that

24   said explicitly said that.

25   Q.  So you also didn't look at the 1998 5500, is that right?

f7rnosb2                          Sher - cross

 1   A.  Not over the weekend.  I probably looked at it at some

 2   point.

 3            MR. GOTTESDIENER:  OK.  Let's just for completion look

 4   at PX 1546.

 5            Go to FLPL0504.

 6            Item 6.

 7   Q.  It says the same thing again, right?

 8   A.  Yes.

 9   Q.  Did you look at the 1999 valuation by any chance?

10   A.  I don't think I had it.

11            MR. GOTTESDIENER:  Let's look at PX 966.

12            Go to page 4?

13            THE COURT:  Just give me a moment because I'm flipping

14   between binders.

15            All right.  I'm with you.  Thank you.

16   BY MR. GOTTESDIENER:

17   Q.  So on page 4, which is FLOSB 16903, do you see this page is

18   entitled Assumption Changes?

19   A.  I do.

20   Q.  So it says:  The methods and assumptions used are identical

21   to those used in last year's valuation except for the following

22   assumption changes (both funding and FAS87).

23            Do you see that?

24   A.  Yes.

25   Q.  So the second bullet point, it says the assumed form of

f7rnosb2                          Sher - cross

1   payment for post-1995 terminated vested employees is changed to

2   an immediate lump sum from a deferred annuity at age 65.

3   A.  OK.

4   Q.  So now you would agree that the assumption was until this

5   point 100 percent of folks took the annuity at age 65 and that

6   was changed to 100 percent took the immediate lump sum?

7   A.  This seems to be focusing on future terminated vested

8   employees.  It's saying assume that they will take immediate

9   lump sum.  That is what it seems to say, yes.

10  Q.  It seems to say what I said in my question, not what you

11  said before you said it seems to say?

12          MR. RACHAL:  Objection.

13          THE COURT:  Why don't you ask a clean question and --

14          MR. GOTTESDIENER:  Sure.

15  BY MR. GOTTESDIENER:

16  Q.  You started saying something different?

17          THE COURT:  Just ask a question.

18  BY MR. GOTTESDIENER:

19  Q.  This is not just talking about future terminated vests,

20  it's saying right then and there the assumption is that

21  everybody who is taking a payment, the assumed form of payment

22  is now going to be lump sums, whereas before it was annuities,

23  correct?

24  A.  That is what it seemed to say.

25          The first bullet however I still find confusing it was

f7rnosb2                          Sher - cross

1    that same language that you found in the 1997 plan, the assumed

2    long term GATT rate used to value minimum frozen accrued

3    benefits is changed to 6.75 from 7.00.

4    Q.  But that shouldn't confuse you because that's not related

5    to the question that we are talking about, which is the assumed

6    form of payment that people are going to elect, right?

7    A.  Well, if people are going to elect annuities, why would I

8    be making an assumption as to the 417(e) to value the minimum

9    frozen accrued benefit.

10   Q.  In 1995 the assumption was 100 percent annuities, right?

11   A.  The fee plan only had annuities, so it would have been.

12   Q.  So there was no change in assumption from 1995, right,

13   until the 1999 valuation?

14   A.  I don't know.

15   Q.  OK.

16   A.  Have you --

17   A.  I don't know --

18   Q.  Do you have any other information that we haven't heard

19   yet?

20   A.  Well, what I am pointing to is this first bullet is what I

21   saw, I saw the similar bullet for 1997 and I don't know -- I'm

22   not sure what that meant.  It casts some doubt.  I didn't say

23   that I'm not planning to change my mind.  It just casts some

24   doubt.

25   Q.  The first bullet point does not deal with the assumed form

f7rnosb2                          Sher - cross

1    of payment, does it?

2    A.   It does not explicitly say that, but I don't know what the

3    purpose of it would be unless they were valuing the minimum

4    frozen accrued benefit using GATT rates.  What else could it

5    mean -- I don't know what else it could mean other than valuing

6    the present value of that GATT benefit would create a lump sum.

7    Q.   Sir, you know that there were were those cashouts, those

8    forcible cashouts.  That is what that is is talking about.

9    A.   It doesn't talk about cashout.  It's talking about minimum

10   frozen accrued benefit, the minimum is the frozen accrued

11   benefit.  Cashouts are based on someone's full benefit, not the

12   minimum frozen benefit.

13             THE COURT:  I've got enough on this.

14             MR. GOTTESDIENER:  OK.

15             THE COURT:  Why don't you just move on.

16   BY MR. GOTTESDIENER:

17   Q.   Let's assume that there was a finding that indeed they used

18   this 100 percent annuity assumption until they changed it in

19   1999.

20             You would agree that this had the effect of reducing

21   short-term cash funding costs?

22   A.   Yes.  While the wear-away was in effect, yes.

23   Q.   Does using the assumption that the actuary and plan

24   administrator know to be not true comport with the standards

25   governing the termination of a company's funding obligations?

f7rnosb2                          Sher – cross

1    A.  I'm sorry.  I got the first part of it.  I didn't

2    understand the second part of it.

3    Q.  If you use an assumption, the actuary and the plan

4    administrator know the assumption is not true, does that

5    comport with the standards governing the determination of the

6    company's funding obligations?

7    A.  I would say that it's the enrolled actuary who is

8    responsible for signing off on the assumptions.  If the

9    enrolled actuary made an assumption that he or she knew was not

10   reasonable, then I think there could be a problem from the

11   enrolled actuary standpoint.

12   Q.  Isn't a there problem from the plan administrator

13   standpoint because the plan administrator is responsible for

14   supervising the actuary?

15   A.  I don't know.  The actuary is the one who -- you know,

16   clearly would be, would be doing something that's problematic.

17   Q.  On the 5500, if we could call up an example of one, the

18   plan administrator must sign off on the 5500 that includes the

19   actuary's schedule B, correct?

20   A.  Yes.  But the plan administrator is also relying on the

21   actuary for the information on the schedule B.

22   Q.  But you know the plan administrator can't just blindly rely

23   on the actuary, right?

24   A.  I think that the plan administrator on actuarial type

25   assumptions would tend to rely on the actuary.

f7rnosb2                          Sher - cross

1   Q.  But if the plan administrator knows that there is something

2   mistaken in what the actuary is assuming, like 100 percent

3   annuities, wouldn't the plan administrator have some obligation

4   to say something?

5   A.  I think if they knew they would.  In this case, I don't he

6   know how they would know it, know one way or the other, looking

7   at the '96 report, for example, that they assumed a hundred

8   percent annuities, assuming they did that.

9   Q.  You saw the Tom Kiley notes where he wrote that he was told

10  specifically by Jim Grefig that the assumption should be

11  essentially that everybody is going to take a lump sum?

12  A.  That's what they might have assumed was occurring.  If you

13  look at the assumptions in the reports, I could read the '96

14  report either way.

15          MR. GOTTESDIENER:  Can we take the bottom and blow

16  that up.

17  BY MR. GOTTESDIENER:

18  Q.  This is what we were talking about, where the plan

19  administrator needs to sign the 5500.  Do you see that there,

20  the bottom line?  Do you see where it says, Carol Kanowicz

21  10/10/97?

22  A.  Yes.  But it's the actuary who is signing off on the

23  language under penalties of perjury and so forth that the

24  assumptions are reasonable.

25  Q.  Under schedule B which is included in the 5500?

f7rnosb2                          Sher - cross

```
 1   A.  Yes.  But it's the actuary who is signing off on that.  It
 2   is I.  It is not we.
 3            MR. GOTTESDIENER:  Let's take a look at PX 9, please.
 4   Q.  This is the Roger Farah memo that is the third page and the
 5   Mercer letter from 1996.  You know from your review of the
 6   record and being present in court that in response to the CEO's
 7   inquiry Mercer responded with this letter that projected three
 8   to four more years of wear-away.  So now there was four to five
 9   years total, right?
10   A.  I would just like if you could move it up a little.  I want
11   to just read that.
12            OK.  This was written in September of '96.  Whether it
13   meant another three to four years or three to four years
14   including '96 I don't know.
15   Q.  Well, the circumstances are if the CEO of the corporation
16   is asking, presumably Mercer would be providing its best
17   estimate based on current data, right?
18   A.  Yes.  Certainly.
19   Q.  And rates around 7 percent were the prevailing rates around
20   that time?
21   A.  I think that it started -- they were 7 percent in June of
22   '96.  I think they had started coming down a little bit, 6 -- I
23   don't know, mid to upper 6s probably.
24   Q.  So, based on a GATT rate around there, Mercer -- well,
25   let's put up DX 417 to see where rates really were.
```

f7rnosb2                          Sher - cross

1              This is your slide.  In September rates in fact were

2       at 7 percent, right?

3       A.  That's for the month of September.  But when that letter

4       was written they wouldn't have had that rate.

5              So probably looking at 6.84 something like that.

6       Q.  When you say they wouldn't have that rate, they would

7       have -- the September rate, they would have that in October,

8       right?

9       A.  Right.

10      Q.  But they would know where rates were in September, correct?

11      A.  Well, they can look at daily rate to get a sense.

12      Q.  And you would get the sense as you see from your own chart

13      that they were going up from 6.84, right?

14      A.  I would have to lock at the daily rates.  I don't know when

15      during that month -- obviously by the end, if the average for

16      the month was 7, so --

17      Q.  Let's look at, what would the projection have been when

18      rates were at 6 as they were in January of '96, the

19      implementation date.  No longer four to five years, right?  It

20      would be longer?

21      A.  Well, I don't know.  The two to three years that we saw

22      early on, in the early part of '95 --

23      Q.  That was based on very different rates?

24      A.  It was -- it looked like it was based on an 8 percent rate.

25      So sure, if the rates are 6 percent, I mean, Mr. Deutsch has

f7rnosb2                        Sher - cross

his projections based on 6.06 that I think showed -- I don't

know if it was -- it depended on the type of wear-away, but it

was three to four in one, and four to five in another.

Q.  All I am asking is, you would agree that if the rates were

at 6, the projection would be longer than the four to five

years that Mercer is showing in its letter, that is all?

A.  Assuming that they presumed that that rate would remain at

that level.

Q.  That was possible for them to remain at that level, because

as you told us, you know, rates could go down, they could go

up, they could stay the same.  They were all over the place

potentially?

A.  Just about any rate was possible.

Q.  Now, if Foot Locker thought in 1995 that rates would revert

to historical averages -- you had a slide on that, didn't you?

Slide DX 428.

          In this slide, you suggested that maybe it would have

been reasonable to predict that rates would revert back to what

they had been 15 years earlier, right?

A.  Well, I think it's a scenario.  The purpose of it wasn't to

make a prediction.  The purpose of it was to just show what

would happen if the rates -- the rates that occurred over the

last 16 years were to recur over the next 16 years.  None of

these are predictions.  They are just demonstrations.

Q.  OK.  So it was a demonstration, however, of what you

f7rnosb2                          Sher - cross

1  thought might have been reasonable for Foot Locker to think

2  could happen, is that correct?

3  A.  I don't know that I would put it that way.

4         Everybody had -- you know, I have been talking to

5  financial executives.  Everyone had sort of different views on

6  what they thought interest rates might do.  Some thought they

7  would continue to go down, others thought they would continue

8  to go up, others thought they would remain the same.  All this

9  is, is a demonstration --

10        THE COURT:  Let me ask you about the demonstration.

11        Do you have any information that suggests to you that

12  any Foot Locker executives were expecting that interest rates

13  were likely to trend back towards historical levels?

14        THE WITNESS:  Regarding Foot Locker, no.

15        THE COURT:  How about with respect to Jim Grefig?

16        Do you have any information which indicated to you

17  that he had an expectation that interest rates were likely to

18  be on a path towards reverting back towards the 15-year

19  average?

20        THE WITNESS:  I didn't see any, any discussion in the

21  record regarding that.

22        THE COURT:  All right.

23        So DX 428 is really what could happen as opposed to

24  anything that's --

25        THE WITNESS:  Oh, yes.

f7rnosb2                         Sher - cross

1             THE COURT:  -- tied to the actual evidence here?

2             THE WITNESS:  And there are many, many other

3    possibilities.  We could draw lines all over the place on this

4    graph.  Rates could have dropped even more than they dropped.

5    They could have all kinds of funny patterns, as we've seen in

6    the real world based on what happened.

7    BY MR. GOTTESDIENER:

8    Q.  That was something that Foot Locker and Mercer knew at the

9    time they were designing the plan, rates could go in any

10   direction, right?

11   A.  I certainly think that, yes, I would think that people

12   would know that.  Whether they fully understood what the impact

13   might be of rates, certainly the actuary would.

14   Q.  You are aware of notes and testimony that the Foot Locker

15   people said they understood that if the GATT rate fell that the

16   wear-away period would be longer, right?

17   A.  I saw all the information on the 8 percent.  Did I see

18   anything explicit if rates fell the wear-away would be longer,

19   I don't recall that.

20   Q.  So you did a think exercise?  You did a think exercise by

21   showing what would have happened if rates had reverted to what

22   you say were recent historical average was, right?

23   A.  It is a demonstration as to, you know, a different pattern

24   of interest rates that -- could it have occurred exactly like

25   that?  Of course it's very unlikely, all it is, is a

f7rnosb2                            Sher - cross

1    demonstration.

2    Q.  So let's look at your demonstration.

3           Let's assume that somebody actually was thinking that

4    way at the time that the plan was being designed.  I understand

5    that the blue line represents the hypothetical employee's

6    account.  Is that right?

7    A.  Yes.  I determined that 9 percent --

8    Q.  The red line is the projected lump sum, the minimum lump

9    sum, assuming that rates reverted to where they had been 15

10   years prior?

11   A.  Yes.  In mirror image reverse order, correct.

12   Q.  So the difference you are showing on the slide is between

13   the green and the red, what actually happened, and what could

14   have happened if things went in this other pattern, correct?

15   A.  That's right.

16   Q.  I see an 11-year period when the red minimum lump sum line

17   is above the account line.  Am I right?

18   A.  Yes.  The first number of years, correct.

19   Q.  The first number of years, and in total years --

20   A.  About 11 years.

21   Q.  11.  So doesn't this show, even under the scenario you used

22   for this chart, a potentially very long period of wear-away

23   would have been projected?

24   A.  Well, no.  Maybe there would be some wear-away effect, but

25   remember we are not adding any pay credits.  The wear-away

f7rnosb2                         Sher - cross

1    period --

2    Q.   Let's see PX 1516.  We'll add pay credits and show you what

3    happens.  So the 11 years without pay credits -- this is your

4    chart?

5    A.   Where does this come from?

6    Q.   It comes from Mr. Deutsch and our files.  This your chart

7    if you add pay credits in?

8              MR. RACHAL:  Your Honor --

9              THE COURT:  Before we go to the question let's get

10   precisely where the chart is.

11             Mr. Rachal, is that what you are after as well?

12             MR. GOTTESDIENER:  It is a new chart.

13             MR. RACHAL:  Yes.  Maybe not.  I've never seen it

14   before.

15             THE COURT:  All right.  Let me just figure out from my

16   perspective and for all of us and for the record's charity

17   where it is.

18             I see PX 1516, and it says it's the same as DX 428.

19             MR. GOTTESDIENER:  Yes.

20             THE COURT:  All right.  So we will turn to DX 428.  We

21   only need one copy in the record.

22             So DX 428 has got certain differences.  Why don't you

23   walk through them so we can keep them both in the record, but

24   DX 428, and PX 1516 is something else.

25             MR. RACHAL:  Did I have a copy?

f7rnosb2                         Sher - cross

1              MR. GOTTESDIENER:  Yes.

2              MR. RACHAL:  Thank you.

3              THE COURT:  Those are the slides from before.

4              MR. RACHAL:  I think I know what this represents.

5              THE COURT:  Now you may proceed.

6    BY MR. GOTTESDIENER:

7    Q.  It represents actually what you started to say.  The

8    11-year wear-away was without pay credits being added and what

9    we just did here is add the pay credits?

10   A.  What pay credits?  The example did not show any pay credits

11   that I produced.

12   Q.  Right.  It's just taking your example, taking this

13   hypothetical person and showing that they would be getting pay

14   and interest credits.  You started the person off with their

15   benefit under the plan, and you didn't add any pay or interest

16   credits.  So all we are doing is walking that person forward

17   with pay and interest credits.

18             MR. RACHAL:  Your Honor.

19             THE COURT:  Hold on.  Is there an objection.

20             MR. RACHAL:  The objection is if they state the basis

21   for the pay and interest rates.

22             THE COURT:  OK.  I will allow the answer to the

23   question.  You can come back to it.

24             MR. RACHAL:  OK.  I understand.

25             THE COURT:  So the question was:  I think the first

f7rnosb2                          Sher - cross

1    question is, let me just actually restate things so the record

2    is clear, because we have moved away from it.  Do you see the

3    yellow line there on PX 1516?

4                    THE WITNESS:  Yes.

5                    THE COURT:  You have heard from counsel that he's

6    representing that, based upon the key over on the left-hand

7    side, that represents the account with pay credits.

8                    Do you see that, that that's what they are stating

9    that they are representing?

10                   THE WITNESS:  The pay credits and interest credits on

11   that I assume.

12                   THE COURT:  So you see that?

13                   THE WITNESS:  Yes, I do see it.

14                   THE COURT:  Would you agree that the red line on your

15   chart does not include pay or interest credits?

16                   THE WITNESS:  Correct.

17                   THE COURT:  All right.  So there is necessarily a

18   delta between the two if you add any pay or interest credit,

19   whatever the amount, whatever the assumption, just as a

20   mathematical exercise, would you agree?

21                   THE WITNESS:  Yes.  Certainly.

22                   THE COURT:  Zero plus something is going to be zero

23   plus something?  In other words, starting with a base and

24   adding something, X, you could fill in X and it's going to be

25   more than your base, correct?

f7rnosb2                        Sher - cross

1           THE WITNESS:  Yes.  And the account is now growing

2    much more rapidly because it has pay credits and interest

3    credits.  But I didn't have a chance -- I didn't have a chance

4    to review any of these numbers.

5           THE COURT:  I understand.

6           I'm trying to actually move away from the chart and

7    just move to the point I think.  It really becomes I think an

8    argument point after that as opposed to something that he can

9    testify to in terms of the actual numbers.

10          THE WITNESS:  OK.

11          THE COURT:  OK.

12          THE WITNESS:  OK.

13          THE COURT:  So I don't know if the pay and interest

14   has the enhancement or not the enhancement or the retirement

15   subsidy or not the retirement subsidy.  I don't think it's

16   necessary.  I think the point of this chart is red line is

17   different from red line plus some increment of yellow line, and

18   that increment is what it is.  It is not in the red line.

19          MR. GOTTESDIENER:  Right.  Could I just try to wrap

20   this up.

21          THE COURT:  Yes.

22   BY MR. GOTTESDIENER:

23   Q.  In the prior, in your slide, you're showing 11 years of

24   wear-away without pay and interest credits, right?  In your

25   chart?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

f7rnosb2                        Sher - cross

1    A.  Without including any pay and interest credits, that is

2    right.

3    Q.  The whole idea of wear-away is you have a headwind against

4    you.  You have to earn pay and interest credits to wear-away

5    the larger benefit, and at some point you will emerge from

6    wear-away.  Is that right?

7    A.  Depending on interest rate changes pay, increases and form

8    of wear-away, whether it's lump sum annuity.

9    Q.  Right.  There's a lot of factors.

10        You started with the interest rate changes.  We show

11   the interest rate changes here.  We show green and we show red

12   just like you showed, right?

13   A.  Right.

14   Q.  All I am asking you is you agree that it would take some

15   period of time for the person you hypothesize under the facts

16   that you hypothesize to get out of wear-away?

17   A.  Yes.

18        MR. GOTTESDIENER:  Thank you.

19        THE COURT:  Can we take our midmorning break now?

20        Is this a good time?

21        MR. GOTTESDIENER:  Sure.

22        THE COURT:  Let's take our midmorning break and we

23   will come back in 10 minutes.

24        (Recess)

25

F7RJOSB3                          Sher - cross

 1              THE COURT:  Let's all be seated.  You can go ahead and

 2   proceed, Mr. Gottesdiener.

 3              MR. GOTTESDIENER:  Thank you, your Honor.  If we can

 4   get DX-429 on the screen.

 5   BY MR. GOTTESDIENER:

 6   Q.  This slide with Participant 4 was one you discussed at some

 7   length.  The point of the slide was to show that P-4 had

 8   already received more than what you called his actual A plus B

 9   benefit and that Mr. Deutsch's A plus B remedy would provide a

10   windfall?

11   A.  Well, Mr. Deutsch's benefit, benefit would --

12   Q.  Remedy.

13   A.  -- remedy would provide a lot more than what I calculated,

14   it has a lot more than his account.

15   Q.  Is it maybe not a windfall?  I thought you said --

16   A.  I guess I would characterize it as a windfall.

17   Q.  I want to explore that with you.  If we can also look at

18   DX-432, did that slide that you went over with Mr. Rachal in

19   some detail, is that slide also giving that same idea, the

20   Deutsch method provides a windfall?

21   A.  I would say yes.

22   Q.  Let's first get a definition of what you mean by actual an

23   A plus B, a true A plus B.

24   A.  Okay.

25   Q.  How do you define that?

```
1    A.  I define it as the A part, the present value of his frozen
2    protected benefit using -- in this case we used the 417 (e)
3    rate in effect at the time for the purposes of these charts, at
4    the time of his distribution.
5            There is some question in my mind whether there is
6    remedy, whether corporate rates would make more sense.  I think
7    they would, but for the purposes of this demonstration, it is
8    the 417 (e) rate in effect in the year of distribution, 1997 in
9    this case, plus the pay credits and interest credits on top of
10   that.
11   Q.  So stated a little bit more succinctly, your actual or true
12   A plus B method is the value of the 12-31-95 accrued benefit
13   plus pay credits and interest credits?
14   A.  I'd say that is true, yes.
15   Q.  I didn't hear anything in there about the enhancement.
16   Where is it in your method?
17   A.  Well, first of all, he received more than that amount, so
18   because of the enhancement, he received 32,000, so it is there.
19   Q.  I am asking about your method.
20   A.  The A plus B, it is not there, nor do I think it should be.
21   Q.  So the enhancement is not at all in your A plus B remedy
22   method?
23   A.  It can't be.  There is no opening balance.  The enhancement
24   was an adjustment --
25   Q.  I am sorry.  I have a question.  I just want to make sure I
```

F7RJOSB3                           Sher - cross

1   get an answer and then I have another question.

2   A.  It is not there.

3   Q.  I am trying to understand your methods, sir.  Please

4   indulge me.

5          On the B side, your B benefit is the nominal sum of

6   the pay credits and interest credits through the date of

7   payment?

8   A.  I don't know that I would use the term, "nominal."  It is

9   the sum of the pay credits and the interest credits.

10  Q.  Back to the slides, let's look at DX-429.  Do you see in

11  the middle bar the actual, what you call actual A plus B, is

12  the enhancement in there?

13  A.  I thought we were just looking at the same person, the

14  same --

15  Q.  I want to make sure I am clear that the enhancement is not

16  in there, right?

17  A.  In the middle set of numbers, what I call A plus B, there

18  is no enhancement because there is no opening balance to adjust

19  for an enhancement.

20  Q.  So you're doing the A plus B as if the enhancement never

21  existed?

22  A.  The A plus B is, the purpose of it is to guarantee that

23  everybody gets what they had, the value of what they had plus

24  the pay credits.  That guarantees that -- now, if the

25  enhancement turned out to help them and provide even more than

F7RJOSB3                          Sher - cross

1   that, then as is the case here, it would show up in the green.

2   Q.  I am sorry.  For your method it is as if the enhancement

3   never existed, isn't it?

4   A.  If the enhancement never existed, this person would have

5   had a lot less than $132,572.00, they would be down at the 80,

6   they would have had about $83,000.

7   Q.  The parties have been debating since summary judgment where

8   the enhancement fits in any relief that the court might order.

9   You're aware of that, right?

10  A.  I am aware of there is a debate.

11  Q.  I want to make sure because I'm hearing a couple of

12  different things.  You do agree in your proposed remedy, the

13  enhancement plays no role in your remedy?

14  A.  It plays no role in the determination of the A plus B.

15  Q.  On Thursday you said that there were about 950 people like

16  Participant 4 who you said received a lump sum in excess of A

17  plus B, as you define it?

18  A.  I think that's right.

19  Q.  As a threshold issue, looking at the B, why didn't you

20  include the whipsaw value of the compensation credits and

21  interest credits when you conceded on Thursday that the plan by

22  its terms provided for whipsaw, the SPD promises whipsaw and

23  ERISA requires it?

24  A.  Well, I think the fact that Congress eliminated whipsaw,

25  while the SPD has language on it that I think can certainly be

F7RJOSB3                         Sher - cross

1   interpreted as whipsaw, I understand it to be whipsaw, I think

2   from the employees' perspective, the concept of whipsaw is

3   something that I don't think is -- I have seen this in many

4   situations, it is not something that employees would develop

5   some type of expectation that they're going to get some type of

6   a whipsaw effect.

7   Q.  But if they read the SPD and it says they could get more

8   than their account balance because of the application of

9   federal rules and regulations, why would that be unreasonable

10  for them to think that they might get it?

11  A.  I don't know that they would tie it to some kind of whipsaw

12  calculation.

13  Q.  You're not an expert on what people think when they read

14  SPDs, are you?

15  A.  I don't think I would characterize myself as an expert on

16  what people think.  I have seen a lot of SPDs.

17  Q.  If the law requires that it has to be paid, does ERISA say

18  a person doesn't get a required payment because they might not

19  have a subjective expectation of it?

20  A.  I think at the time -- first of all, I think I said this on

21  Thursday.

22  Q.  Would you answer my question.

23          MR. RACHAL:  Objection.

24          THE COURT:  Sustained.

25  BY MR. GOTTESDIENER:

F7RJOSB3                          Sher - cross

1    Q.  You agree that if a payment has to be made, it has to be

2    made whether somebody expects the payment or not, right?

3    A.  If the plan terms call for a payment to be made, it should

4    be made.

5    Q.  You're aware on Thursday, the Second Circuit confirmed that

6    whipsaw was required on cash balance plan payments before 2006

7    regardless of the fact that the law changed in 2006

8    prospectively, correct?

9              MR. RACHAL:  Objection.

10             THE COURT:  Why don't you rephrase.  It doesn't matter

11   what he thinks about the case that came down on Friday.

12   BY MR. GOTTESDIENER:

13   Q.  Let me ask you this.  You talk about about PPA and PPA

14   relief.  You know if a payment became due pre-PPA, and a

15   participant like Mr. Osberg signed the distribution paperwork,

16   that there is no PPA possible relief from making a 417 (e)

17   whipsaw calculation if he signed that paperwork pre-PPA.  Isn't

18   that right?

19             MR. RACHAL:  Objection.

20             THE COURT:  I will allow it.

21   A.  If the plan had the provisions and the plan terms are being

22   interpreted or reinterpreted to provide some benefit, that is

23   one thing.

24   Q.  I am sorry?

25   A.  This is reformation here.  This is changing.

F7RJOSB3                        Sher - cross

1    Q.  I am not asking about that.

2              MR. RACHAL:  Your Honor!

3              THE COURT:  Hold on.  Hold on.  Stop.

4              Let's have you ask a clean question and you give an

5    answer, Mr. Sher.  Try to keep your answers as succinct as you

6    can because he is under the gun in terms of time.  The longer

7    you talk, the fewer questions he gets to ask.  So there is like

8    a tension between that.  I want to give you an accurate answer,

9    but your counsel can bring out some additional points if he

10   wants to.  Mr. Rachal.

11             MR. RACHAL:  I was just --

12             THE COURT:  I have taken care of it.

13   BY MR. GOTTESDIENER:

14   Q.  I want to make sure we are not talking about legal opinions

15   you may have about the way something should be done.  I am

16   asking you about a fact.

17             This plan provided for whipsaw payments by its terms

18   and it did give people whipsaw payments when applicable,

19   correct?

20   A.  When applicable till it was taken away, right.

21   Q.  If somebody signed paperwork under this plan, they could

22   not take it away if they were entitled to a payment and asked

23   for a distribution pre-PPA, they were entitled to receive a

24   whipsaw payment, right?

25   A.  Paperwork being signed by who, the person selecting the

F7RJOSB3                         Sher - cross

1    distribution?

2    Q.  Yes, pre-PPA?

3    A.  If the distribution was made pre-PPA, the plan had whipsaw,

4    the plan would have to abide by it.

5    Q.  No.  I am asking isn't it a fact if it became due, if they

6    signed it before PPA became effective and the payment were

7    delayed for some reason and it was made after PPA, you will

8    agree that they have to do the whipsaw --

9              MR. RACHAL:  Objection.

10   Q.  -- because they signed it pre-PPA?

11             THE COURT:  I will allow it.  It is based on his

12   experience, not based upon a legal conclusion.

13             You can answer.

14   A.  I'm not sure, to be honest.  The question is what is the --

15   BY MR. GOTTESDIENER:

16   Q.  If you're not sure, we'll move on.

17   A.  What is --

18   Q.  If you're not sure, we'll move on.

19             You don't include the enhancement despite the fact in

20   your remedy that is in the plan document Section 1.23 and in

21   the SPD, right?

22   A.  It is in the plan document with respect to the benefits

23   that are provided under the plan which are not in A plus B.

24   Q.  So look, you would agree if the enhancement were considered

25   part of the B benefit, that the people that you claim received

F7RJOSB3                          Sher - cross

1    a lump sum in excess of A plus B would not have received a

2    benefit in excess of the A plus B benefit, right?

3    A.  If I included a whipsaw on the Part B?

4    Q.  I am talking about the enhancement.  We are now on to the

5    enhancement.

6    A.  Okay.

7    Q.  Put the whipsaw to the side.

8    A.  Okay.  That is the part that is confusing me.  Would you

9    please ask me again.

10   Q.  If you consider the enhancement as part of the B, then the

11   people who you claim received the lump sum in excess of A plus

12   B would not have received a benefit in excess of A plus B,

13   right?

14   A.  I am trying to think if the enhancement was included in the

15   Part B as Mr. Deutsch characterizes a pay credit.

16   Q.  However, whether he characterizes it as a pay credit or

17   something else, if they promised to people they had to work an

18   hour for it, however you put it into B, you would agree that

19   those people would not have received in excess of A plus B,

20   they were then in wear-away, right?

21   A.  Are you relating this to one or more of the exhibits that I

22   presented before?

23   Q.  Sure.  We can look in the DX-429.  Look at DX-429.

24          You would agree that if the enhancement is part of

25   their B benefit, then that person would have suffered from

F7RJOSB3                         Sher - cross

1    wear-away?

2    A.   As the enhancement was part of the B benefit in the middle

3    column, in the middle column, okay.

4    Q.   You agree, right?

5    A.   Well, in that case -- I am still struggling with it.

6            If it was included in the B part, you end up with

7    176,251 as an A plus B, which would be a lot more than the

8    present value of the frozen benefit.  Why would this person be

9    in wear-away after receiving 176,251, the person is in

10   wear-away?  They should receive more than that, you're saying?

11   Q.   Because the 176 is more than the 132?

12   A.   Well, we're comparing here, you're saying A plus B,

13   received a lump sum which was less than --

14           THE COURT:  Let me do it this way, and this will also

15   have the advantage of seeing whether or not I am following

16   Mr. Gottesdiener's point.

17           As I understand it, we are on DX-429, the Part A

18   middle column which is in yellow here is calculated as the

19   frozen accrued benefit, right?

20           THE WITNESS:  Correct.

21           THE COURT:  All right.  And the B would be the pay and

22   interest credits, no enhancement.  Are you with me so far?

23           THE WITNESS:  Yes, absolutely.

24           THE COURT:  So the issue is if the enhancement is

25   promised in the SPD, and one was mathematically, therefore, to

F7RJOSB3                        Sher - cross

1     add it to the middle column, first of all, wouldn't you agree

2     with me that as a matter of math, it would exceed what is

3     currently there?  It would have to.  Any additional dollar

4     would exceed what is currently there, correct?

5                 THE WITNESS:  Yes.

6                 THE COURT:  It would go above the red line as shown

7     visually on DX-429, correct?

8                 THE WITNESS:  Yes.

9                 THE COURT:  The point is if we, therefore, were to

10    assume that the enhancement is part of the calculation required

11    to make a participant whole, we're then in the blue column

12    which is greater than the green column.  Would you agree with

13    that?

14                THE WITNESS:  If was required.

15                THE COURT:  That is the point.  We don't need to bang

16    our heads against the wall any more than that.

17    BY MR. GOTTESDIENER:

18    Q.  Why isn't the enhancement properly part of the promised B

19    benefit?  If somebody quit on 12-31-95, would they have

20    received the enhancement?

21    A.  Quit under what plan, the actual plan?

22    Q.  Yes, the actual plan before the amendment went into effect,

23    they quit in December of 1995, would they have received the

24    enhancement?

25    A.  They would receive the enhancement, yes, they would receive

F7RJOSB3                        Sher - cross

1    the enhancement above.

2    Q.  I am sorry, sir?

3    A.  At 9 percent.

4    Q.  Maybe I didn't make my question explicit enough.

5            They left before the amendment, they quit, they quit,

6    they didn't work into 1996.  They had no entitlement to the

7    enhancement under the amendment's terms, right?

8    A.  All they get is an annuity.  They have no lump sum at all.

9    Q.  My focus is on the enhancement.  They wouldn't get the

10   enhancement, correct?  They would get only the annuity without

11   an enhancement because they were pre-amendment, yes?

12   A.  All they have is an annuity.

13   Q.  Without the enhancement, correct?

14   A.  There is no enhancement.

15   Q.  Thank you.  That is what I am trying to get.

16           You agree it is not, the enhancement is not part of A,

17   the benefit accrued under the old plan, right?

18   A.  --

19           (Simultaneous voices)

20   A.  -- the enhancement is tied to the 9 percent opening

21   balance.  They're linked.

22   Q.  But the A, the usual method doesn't have an opening

23   balance?

24   A.  That is why it shouldn't have an enhancement.

25   Q.  You agree the enhancement is not part of A, correct?

F7RJOSB3                          Sher - cross

1   A.  Yes.  A is --

2               (Simultaneous voices)

3   Q.  By process of elimination, doesn't it have to be part of B?

4   A.  No.

5   Q.  Isn't it like the lump sum feature, something that was

6   earned or possessed on 1-1-96 as a result of the conversion for

7   participants who were employed on that date?

8   A.  And they're entitled to it as a link to the 9 percent

9   opening balance.  If we were determining opening balances, if

10  the plan was determining opening balances at 6 percent or 6.06

11  percent, which is the rate in effect, the chances that they

12  would provide an enhancement on top of that I think are small

13  to none.

14  Q.  So it is like you're agreeing that they should get the

15  enhancement on the B?

16  A.  No.  They're getting the enhancement on a 9 percent opening

17  balance is what they're entitled to the enhancement on.  They

18  are linked.

19  Q.  Have you seen evidence that indicates why the enhancement

20  was promised?

21  A.  I have some evidence on it.

22  Q.  Were you here for Ms. Peck's testimony?

23  A.  No.

24  Q.  Her testimony, this was Day Five, Page 1150, starting at

25  Line 24 to 1151 going to Line 7:

F7RJOSB3                           Sher - cross

1            If she testified that the enhancement was intended to

2   replace the early retirement subsidy that Foot Locker knew was

3   going away and the participants requesting lump sums would

4   otherwise be forfeiting, can you point to anything in the

5   record that proves her wrong?

6   A.  Well, I think the record indicated to me that the

7   enhancement, I didn't see anything from Mercer when they

8   recommended it, and I assume that, I think it is fairly clear

9   to me that they recommended it, that said explicitly this is

10  intended to replace or exclusively replace the early retirement

11  subsidy.

12  Q.  The answer to my question is no, you can't point to

13  anything in the record that proves Ms. Peck wrong, right?

14  A.  I don't think, other than this statement here, I don't

15  think there is anything in the record, I don't think there is

16  anything in the record that substantiates other than what she

17  said.

18  Q.  The answer to my question is you can't point to anything in

19  the record that contradicts -- if we can see PX --

20            THE COURT:  I need to get an answer to the question as

21  opposed to your statement.  Why don't you repeat it?  Strike

22  the last statement by counsel and move on.

23            MR. GOTTESDIENER:  I will withdraw it.

24  BY MR. GOTTESDIENER:

25  Q.  PX 1522, please.  There is something in the record,

F7RJOSB3                          Sher - cross

1    actually, that corroborates it.  This is corroboration of what

2    she testified to.  You know that Mr. Grefig was involved

3    principally from the Mercer side in designing the plan.  Is

4    that correct?

5    A.  That was my understanding, yes.

6    Q.  You're familiar with this August 18, 1997 e-mail that he

7    sent, are you not?

8    A.  Is that the date of this?  I am having a hard time reading

9    it.

10           MR. GOTTESDIENER:  May I approach, your Honor, to make

11   sure he has a copy?

12           THE COURT:  Yes.

13   BY MR. GOTTESDIENER:

14   Q.  I am giving you a copy of this.

15   A.  This is what is up on the screen?

16   Q.  Yes.  This is an e-mail chain, and if you look at the

17   bottom of the first page and the back of the second page, Jim

18   is writing to Ellen in response to a request to get some

19   insight as to why the enhancement came about a participant's

20   counsel had asked why the enhancement was in the plan?

21   A.  Okay.

22   Q.  Are you not familiar with this e-mail?

23   A.  I am.

24   Q.  So you know that Grefig said there was concern that

25   participants close to early retirement eligibility at the time

F7RJOSB3                         Sher - cross

 1   of conversion to the cash balance format might have some

 2   slippage in their early retirement benefits, so a subsidy was

 3   added?

 4            Isn't that confirmation for what Ms. Peck said?

 5   A.  Well, it is except Ms. Glickfield didn't entirely agree

 6   with that.  Ms. Glickfield's company, Person 2 --

 7   Q.  Mr. Kiley?

 8   A.  Mr. Kiley.  Sorry.

 9   Q.  He said there is an additional reason as well because the

10   rate of benefit accrual went down so this is going to help them

11   with their rate of benefit accrual, right?

12   A.  Well, he said I believe the purpose of the enhancement --

13   Q.  You're now -- excuse me.  You are now reading what

14   Mr. Kiley says in his e-mail?

15   A.  Yes.

16   Q.  I am asking now about Mr. Grefig.

17            THE COURT:  Hold on.  Your last question was worded in

18   terms of Kiley.  Let's just pose a clean question.  He will

19   repose, and you can object.

20            MR. RACHAL:  He was answering the question.  That is

21   all.  He was cut off.

22   BY MR. GOTTESDIENER:

23   Q.  You're familiar with this e-mail?  You're not reading it

24   for the first time now, right?

25   A.  I have seen it before.

F7RJOSB3                          Sher - cross

1    Q.  You know that Kiley did not disagree with Mr. Grefig that

2    one of the purposes of the enhancement was to replace the early

3    retirement subsidy, correct?

4    A.  It says if I do not completely agree with it..

5    Q.  You know that Kiley testified that Grefig's word was gospel

6    to him and the design team?

7    A.  Well, certainly on actuarial kind of issues.  This goes

8    beyond actuarial.  I don't think he said the word was

9    necessarily gospel on everything.

10   Q.  Isn't the design of the enhancement, the complicated

11   factors that go into it, isn't that actuarial in nature?

12   A.  It has actuarial aspects to it.

13   Q.  Doesn't it?

14   A.  It goes beyond that.

15   Q.  Isn't the actuarial aspect to it essentially you

16   reverse-engineer the early retirement subsidy, sir?

17   A.  Well, the form of it did, but --

18   Q.  The content of it?

19   A.  The content went well beyond the early retirement subsidy.

20   Q.  It fell short of fully taking care of the early retirement

21   subsidy as well.  Isn't that right?

22   A.  In very few instances.

23   Q.  So it was kind of a rough justice but it was modeled, the

24   factors were molded on the early retirement subsidy, correct?

25   A.  It is very rough when it comes to people going out before

F7RJOSB3                          Sher - cross

1    55 or after 65.  If it was early retirement subsidies, it

2    provided much more than that for someone at 65 or after.

3    Q.  So circling back, the enhancement was promised to

4    participants as part of the cash balance benefit -- withdrawn.

5           Let's assume for the sake of argument the court

6    decides the enhancement was part of the cash balance, the

7    promised cash balance B benefit.  Let's get up 429.  We went

8    through this before.  You agree that the middle bar would be

9    the same height as the Deutsch remedy, right?

10   A.  Well, yeah.  They're identical except for that.

11   Q.  That would mean that P-4 in that circumstance was subject

12   to wear-away, correct?

13   A.  The amount that the person received was less than -- you

14   see, to me "subject to wear-away" is still the A benefit.  If

15   someone is subject to wear-away if their benefit is less than

16   the frozen accrued benefit, would there be a wear-away effect?

17   Yes.  Are they subject to wear-away?  No.

18   Q.  Let's see the DX-432 slide.

19          Here you seem to be saying that even if the

20   enhancement should be part of B, it should not be an

21   enhancement to the full value A benefit that P's were assured

22   was being preserved, right?

23   A.  I think that's right.  Even if the court should decide that

24   there is an enhancement, I can't see any justification for

25   being beyond the 48,000.  It is just the actual dollar amount

F7RJOSB3                          Sher - cross

1    of an enhancement.

2    Q.  Let's take a look at PX-1519.  This is the SPD, this is

3    Page 12 of the SPD.

4              You're familiar with that page of the SPD that

5    contains the enhancement, right?

6    A.  Yeah, I am sure I am.

7    Q.  These two lines here, wasn't the promise to give senior

8    participants with 50 years of age and 15 years of service,

9    wasn't it this two-part promise, one, you're going to get the

10   same initial account balance calculation that the younger folks

11   who aren't eligible for it get, and that is going to be

12   multiplied by an enhancement factor?

13   A.  Yes, when the initial balance is determined at 9 percent

14   interest, that is exactly right.

15   Q.  If the court were to order that the plan preserves the full

16   A benefit in all employees' opening accounts, not at 9 percent,

17   or preserves the full value of the A annuity in the form of an

18   annuity, as you prefer, Page 12 says the enhancement should be

19   based on the full value A benefit, doesn't it?

20   A.  No.  What it says is that the account balance, the initial

21   account balance which was determined at 9 percent would be

22   increased by a factor.  It doesn't say if the court should

23   determine some other calculation is necessary, that you have to

24   add the same amount in.

25   Q.  Obviously, the SPD doesn't say that.  You said earlier that

F7RJOSB3                          Sher - cross

1   the enhancement should be applied to whatever the opening

2   account is, correct?

3   A.  Was at 9 percent.

4   Q.  Or is?

5   A.  No.

6   Q.  No?  So that would change?

7   A.  I didn't say that.

8   Q.  Under your method, what are you proposing the court do,

9   give senior participants age 50 with 15 years, one, a different

10  lower initial account balance calculation than what younger

11  people get?  That would be based on 9 percent and PRND, and

12  multiply that balance by an enhancement factor to produce their

13  initial balance?

14  A.  There were two calculations.  One is what does the plan

15  currently call for.  9 percent opening balance plus an

16  enhancement on top of that plus pay credits, that is

17  Calculation 1.  That is what the individual is currently

18  entitled to under the terms of the plan.

19          Then you'd have a second calculation which is across

20  the board, you know, you're now raising the bar and saying

21  well, now I'm determining A plus B.  The A is the value of the

22  frozen protected benefit just it is whatever the interest rate

23  is at the time plus the pay credits.

24  Q.  If an opening account balance method were used, you agree

25  you shouldn't have two different formulae for people for their

F7RJOSB3                        Sher - cross

1    initial account balance?

2    A.   If the initial account balance is determined at 6 percent,

3    say, which is what Mr. Deutsch is suggesting, what I am saying

4    is by raising the initial account balance up materially from

5    the 9 percent, the idea of then adding on top of that, now

6    increase it substantially, the idea of adding something on top

7    of that, we see it is providing a benefit that is so much more

8    than what could not have been intended to be anything like

9    that.  It is much more than the prior plan.

10   Q.   Doesn't the SPD say the enhancement is supposed to be

11   applied to the same initial account balance used for everyone?

12   A.   The SPD did not envision --

13             (Multiple voices)

14             THE COURT:  You do have to let him finish.

15             By the way, I get the debate.  The debate on the

16   defense side is that the plan design included wear-away; and,

17   therefore, the enhancement was to make wear-away less harmful,

18   if you you will, or have a less of a hit on the older folks.

19             The plaintiffs say you promised what you promised, and

20   if the promise literally read on its face promises the

21   enhancement applied to the B benefit, you have got to pay the

22   promise.  So it is plan design versus plan promise.  I get the

23   debate.  Let me find out how much time you have, Mr.

24   Gottesdiener.

25             MR. GOTTESDIENER:  How much time I have left?

F7RJOSB3                          Sher - cross

1              THE COURT:  You have only 15 minutes left, I want to

2    make sure we know.

3              MR. GOTTESDIENER:  I have a timer that looks like it

4    is one hour and 17 minutes.

5              THE COURT:  That would be about 25 minutes left,

6    right?

7              MR. GOTTESDIENER:  I thought I had two hours.

8              THE COURT:  Two hours altogether.  You were 117 in, so

9    out of two hours.

10             MR. GOTTESDIENER:  I have 45 minutes left.

11             THE LAW CLERK:  40 minutes.

12             THE COURT:  Go ahead.

13             MR. GOTTESDIENER:  Thank your Honor.

14   BY MR. GOTTESDIENER:

15   Q.  So you conceded in your rebuttal report that Mr. Deutsch's

16   approach would eliminate wear-away, right?

17   A.  His approach on 6 percent of balance with no period for

18   mortality, that would eliminate wear-away and more.  It would

19   go beyond that.

20   Q.  You agree it would eliminate wear-away!

21             You don't like that approach because you think it

22   could result in a payment larger than your approach of

23   converting a Part A annuity into cash at the time of payment

24   instead of at the time of conversion, right?

25   A.  I think that's part of it and also that it would produce

F7RJOSB3                        Sher - cross

1     more than as that last exhibit, I think it was 435 showed, it

2     would produce more than what it is purporting to protect.

3     Q.  This the windfall, right?

4     A.  Yes.

5     Q.  You obviously know that we think that there is no windfall,

6     that Mr. Deutsch's method accurately calculates the opening

7     balance promised, but I want to see if we can explore your

8     logic a bit.

9              MR. GOTTESDIENER:  If we can have on the screen

10    PX-1520, please.

11    BY MR. GOTTESDIENER:

12    Q.  Now, if we consider this piggy bank as the participants'

13    bundle of rights under the plan, you agree the A plus B method

14    can be visualized this way in a very big picture sense, right?

15    A.  No.

16    Q.  No?

17    A.  The A plus B method as I've put forth would not have the

18    enhancement in B.  It is an opening balance.

19    Q.  Let's put the enhancement aside.  Let's put the enhancement

20    aside.  You agree the issue is how to best preserve Part A?

21    A.  Well, I think that the purpose of an A plus B is to

22    preserve Part A, so you would add on the pay credits and

23    interest credits and what the value, 417 (e) value that they

24    had before.

25    Q.  You agree the debate is basically about putting the

F7RJOSB3                              Sher - cross

1   enhancement aside, it is how to best preserve Part A, fair, so

2   I can move to my next question?

3   A.  Well, the difference between -- they both have pay credits.

4   You could put it that way.

5          MR. GOTTESDIENER:  Let's look at 1520, PX-1520.

6   BY MR. GOTTESDIENER:

7   Q.  There are two ways to preserve Part A.  We have now changed

8   this and put Option 1 and Option 2.  Yours is Option 2, the

9   annuity.  You keep the annuity in annuity form and either set

10  it aside, or the way I like to think about it, you stuff the

11  annuity promise into the participants' piggy bank account, the

12  bundle of rights view without converting it into cash, right?

13  A.  Well, what you're preserving is what they had before, which

14  was the frozen annuity plus the right to get a lump sum on it.

15  Q.  You like that because it is in pristine form, it is this

16  annuity promise, the A benefit, it is preserved until the

17  employee asks to get paid, right?

18  A.  It is guaranteeing that the person will get what they had

19  before plus the pay credits, nothing more, nothing less.

20  Q.  Okay.  Then you got ahead of me.  Thank you for that.

21          That is the A is preserved and then the B, the

22  benefits attributable to the B part, those are added and then

23  you get a lump sum that is equal to A plus B, correct?

24  A.  Without the enhancement, I would say.  Otherwise, yes.

25  Q.  And you agree that preserving the Part A benefit under

F7RJOSB3                         Sher - cross

1    Option 2 in annuity form is not necessarily the only way to do

2    an A plus B conversion, correct?

3    A.  I think by definition, an A plus B conversion is --

4    Q.  It is not the only way?

5    A.  It is the only way.

6          THE COURT:  Hold on.  You guys really have to allow

7    each other to complete the sentence.  Put a period and then the

8    next person can speak.  So I am actually lost as to where in

9    the answer your question you were.  Re-ask the question and get

10   a complete answer.

11   BY MR. GOTTESDIENER:

12   Q.  Do you agree, you agreed in your deposition, you agreed in

13   your rebuttal report, that there is another way to do an A plus

14   B conversion.  You agreed on Thursday?

15   A.  Do you want to shed some light on --

16   Q.  No.  I am not asking to you shed light.  You had that with

17   your counsel.  You spent hours on the stand.  I am asking as a

18   foundational matter, yours is not the only way to do an A plus

19   B conversion where there would be no wear-away, correct?

20   A.  I don't agree with that.

21   Q.  Yours is the only way?

22   A.  In A plus B definition-ally, not just my definition, it is

23   the definition that is widely used in practice.

24   Q.  It is not Mr. Deutsch's definition, and you withdrew your

25   footnote that said that his method was wrong and didn't

F7RJOSB3                         Sher - cross

1    preserve and didn't eliminate wear-away, didn't you?

2    A.   That is a different question.

3    Q.   It is the same question.

4    A.   I withdrew the footnote because the footnote was incorrect.

5         I did not say that that means that when you have an

6    opening balance, that you can have an A plus B.  Opening

7    balance is not -- when you have an opening balance, it is not

8    an A plus B approach.

9    Q.   Let me ask you a question, please.  Doesn't PPA say it is

10   an A plus B approach?  And don't they use an opening balance

11   and say it is an A plus B, yes or no?

12   A.   No, no.  They say if you want to have an opening balance,

13   you can do it as long as you end up satisfying an A plus B.

14   Well, of course.  It doesn't make an A plus B.  It is something

15   else.

16   Q.   Let's talk about the conversion to an account method.

17        The other way to do it is to convert the annuity

18   promised to cash at the time of the conversion and deposit the

19   cash into the participants' account.  That is Mr. Deutsch's

20   method, correct?

21   A.   Well, it is his method.  I did not characterizing it as an

22   A plus B.  It is an opening balance approach.

23   Q.   That eliminates wear-away?

24   A.   And provides more in some cases.

25   Q.   That is a yes, and provides more?

F7RJOSB3                         Sher - cross

1    A.  No, it is not an A plus B.  It is another, an opening

2    balance approach.

3    Q.  My question is, you agree that this method eliminates

4    wear-away, yes or no?

5    A.  It does and more.

6    Q.  Thank you.

7            Now, the converting the annuity promise to cash at the

8    time of the conversion, depositing the cash into the

9    participants' account, that is actually what Foot Locker told

10   the participants here in 1995 that it was doing, right?

11   A.  At 9 percent.

12   Q.  So the answer is yes?

13   A.  At 9 percent, not at 6 percent.

14   Q.  Well, you agree that the prevalent approach in the 1980's

15   and 1990's was, in fact, this opening balance approach?

16   A.  Yes, which is not an A plus B, correct.

17   Q.  And by far it, was the more popular conversion approach at

18   major companies primarily because employers perceived that

19   employees would prefer to have all benefits expressed under

20   this new paradigm; that is, in terms of a current lump sum

21   value, have the entire benefit valuable in lump sums, yes?

22   A.  Yes.  That is why the opening balance approach was used.

23   Q.  And your survey found, in fact, that fully 87 percent of

24   the respondents used the opening account balance method, right?

25   A.  Yes, with the interest rate assumptions that they selected.

F7RJOSB3                          Sher - cross

1    Q.  Most of which were right around the GATT rate?

2    A.  No.  There were some above, some below, some around the

3    same.

4    Q.  But basically not as radically different as Foot Locker's 3

5    percent spread, correct?

6    A.  There were some.

7    Q.  Yes, but very few, right?

8    A.  Well, again I explained in my rebuttal report and I think

9    my direct testimony as to why under Foot Locker's

10   circumstances, it made a lot of sense to increase the spread.

11   Q.  Now, you would agree that if the court were to decide the

12   opening accounts should be preserved, should be used because

13   that is how Foot Locker designed and communicated the plan, you

14   would agree that any amount calculation that produced opening

15   accounts smaller than Mr. Deutsch's would create a risk of

16   wear-away?

17   A.  Well, they could, and that is why I am suggesting an A plus

18   B approach, that that doesn't happen.

19   Q.  But his doesn't create a risk of wear-away, his?

20   A.  By including, you know, expensive, you know, elements.

21   Q.  Let's look at Page 5 of the SPD, PX-5.  Let's look at the

22   accrued benefit definition and see that maybe you'd agree

23   Mr. Deutsch's approach is the right one.

24            Here is the accrued benefit definition.  Accrued

25   benefit.  A participant's accumulated account balance converted

F7RJOSB3                          Sher - cross

to a single life annuity payable at normal retirement age.

          On January 1, 1996, how would Mr. Osberg calculate his

accrued benefit under the plan?

A.  This is not the plan.  This is the SPD.

Q.  Yes, but it is referring to the plan terms.

          He would calculate his accrued benefit by taking his

account balance, projecting it at 6 percent to age 65, then

converting it to an annuity, correct?

A.  By converting it into annuity at some tech rate.

Q.  I am sorry.  You spoke repeatedly to the court about the

conversion, in fact, the formula in the plan document.  It said

6 percent or --

A.  You have to get the factor to know what the factor is based

on the interest rate at the time.

Q.  Right.  So if you take his 12-31-95 annuity benefit and you

discounted it at 6 percent to produce an opening account, won't

that account when projected to age 65 at the same 6 percent

generate the same annuity?

A.  It will because if interest rates, 417 (e) rates are 6

percent or lower, it will produce a higher amount, as I showed

in 435 if interest rates are higher.

Q.  Set aside the annuity conversion factor for the moment.

Let's look at PRND.  If PRND, pre-retirement mortality

discount, if that is applied and as an additional discount, the

opening balance, you would agree, would not project back up to

F7RJOSB3                           Sher - cross

1    the same 12-31-95 annuity, would it?

2    A.  Well, it would be short of it in terms of the balance.

3    Q.  You said it would be short?

4    A.  What the interest rate is to convert it back to an annuity

5    I need to know.

6          THE COURT:  You guys just need to wait for each other.

7    BY MR. GOTTESDIENER:

8    Q.  And the reason it would not convert, it would not project

9    back up to the same annuity and would fall short, as you say,

10   is because the projection would be using just a straight 6

11   percent up, not 6 percent plus positive PRND or survivorship,

12   correct?

13   A.  Yeah.  An interest credit has nothing to do with mortality.

14   Q.  Right.  You said you agree it would fall short, and I was

15   just explaining for the benefit of the Court that you agree

16   that it would fall short because if you discount down with

17   mortality, but you don't go back up with positive mortality or

18   what is called survivorship, it would fall short?

19   A.  Of the projected account versus the value of the annuity at

20   65, but --

21   Q.  Right, the 12-31-95 --

22   A.  I still have to convert it to an annuity.

23   Q.  Putting aside if that was not a factor in it, it would not

24   equal the 12-31-95 annuity?

25          It would fall short, correct?

F7RJOSB3                          Sher – cross

1    A.   You say putting aside the annuity conversion.   That is part

2    of the conversion.

3              (Continued on next page)

F7rnosb4                          Sher - cross

1    Q.  Right.  It didn't make a difference.  If the 417(e) didn't

2    make a difference.

3    A.  The 417(e) rate was 6 percent or lower.

4    Q.  Yes.

5    A.  I have already acknowledged that is his method.  That is

6    what I did on 435.

7    Q.  You concede --

8              THE COURT:  If you cares whether or not I've following

9    you, there have been so many bits and pieces that like I am

10   lost at this point.  I think I know where you are going and the

11   point you want to make, but the questions are no longer

12   particularly useful or the answers at this point.  They are

13   just all over the place.

14             MR. GOTTESDIENER:  Thank you.  That is very helpful.

15   Because I can see that.

16   BY MR. GOTTESDIENER:

17   Q.  How about just this?  How is it a windfall to give

18   Mr. Osberg an opening account that represents the same accrued

19   benefit on 1/1/96 as he had the day before, on 12/31/95?

20   A.  When did I say that?  What is a windfall in particular is

21   adding in, on top of that, now that I have an inflated opening

22   balance, what is a windfall is providing enhancements above

23   that in my view.

24   Q.  Now you are agreeing that is the only point of

25   disagreement?

F7rnosb4                        Sher - cross

1    A.   No.

2    Q.   Oh, there is something else?

3    A.   No.   I don't see getting back and having absolutely no

4    wear-away under that method -- if you don't want to have

5    wear-away, I've given you a way not to have wear-away.   Now you

6    are trying to change the paradigm into some other approach that

7    could potentially provide wear-away and tries to pigeonhole the

8    method so that it doesn't produce wear-away, but can produce

9    higher numbers.

10   Q.   You talked about annuity conversion at 6 or another rate

11   because the annuity conversion at age 65 of the account that is

12   at age 65 converted to an annuity is done at the better of 6

13   percent or the 417(e) rate, is that correct?   This is just

14   foundational for the Court's benefit.   The annuity conversion.

15   A.   The annuity conversion is done, under the terms of the

16   plan --

17   Q.   Yes.

18   A.   -- it's done at the better of 6 percent or the 417(e) rate.

19   Q.   If Mr. Osberg or anyone else were to terminate in a year

20   when the 417(e) was below 6 percent, as it was in most years

21   following conversion, what would be the annuity conversion

22   rate?

23   A.   Under the plan it would be 6 percent.

24   Q.   So, using 6 percent for both the discount rate and the

25   projection rate, sir, ensures that the account will never

F7rnosb4                          Sher - cross

1   generate an annuity smaller than the 12/31/95 accrued benefit

2   no matter what the GATT rate at benefit payment, right?

3   A.   If the GATT rate or the 417(e) rate is 6 percent or lower

4   under Mr. Deutsch's approach, I have acknowledged that you get

5   back the accrued benefit that you started off with.

6   Q.   If the promise is construed to be that the account would

7   represent an accrued benefit that was no less than the 12/31/95

8   benefit, no matter what the price of the 30-year treasury or

9   crude oil or pork bellies, does Mr. Deutsch's approach fulfill

10  that promise?

11  A.   If the commitment was to provide that --

12  Q.   An account that represents an accrued benefit --

13  A.   The value of the accrued --

14  Q.   -- under the account balance plan.

15  A.   The accrued benefit or the value of the accrued benefit?

16  Q.   An accrued benefit that was no less than his 12/31/95

17  accrued benefit.  Would you agree that Mr. Deutsch's approach

18  fulfills that promise?

19  A.   Let me make sure.  I am going to repeat because I want to

20  make sure that I am not agreeing to something that I don't

21  really agree with.  If the promise was that the opening account

22  balance would at least, under all circumstances replicate the

23  accrued benefit, which was the benefit that went into the

24  opening balance, if it said that explicitly, that it was going

25  to guarantee that that would be the case, then, you know, then

F7rnosb4                         Sher - cross

1   I would -- you would have to rig up the, you know, the account

2   balance.  If one wanted to do that --

3   Q.  Could you finish your sentence.

4   A.  You can do an A plus B if you wanted to do that.

5   Q.  Then you agree that his approach would fulfill that --

6   A.  It would do at least that.  It would do more in certain

7   circumstances.  That's my point.

8   Q.  On Thursday you and Mr. Rachal brought up *Amara*, and you

9   referenced it again today, right?

10  A.  Yes, I believe so.

11  Q.  And you will recall that the discount rate that Cigna used

12  to calculate opening balances in *Amara* for most people was the

13  GATT rate in effect on the amendment effective date, right?

14  A.  Well, it was actually -- I think it was based on -- it

15  wasn't based on the GATT rate.  It was based on a margin, I

16  think either a quarter of a percent above a shorter term

17  treasury rate.  It was not using the 30-year treasury, using a

18  shorter term treasury rate with an add-on for most people and

19  then a subtraction for the older people, older and longer

20  service people.

21  Q.  PX 1558.  You testified in the *Amara* case, didn't you?

22  A.  Yes.

23  Q.  You testified that it was the GATT rate that was in effect

24  for most people, their conversion was set at the GATT rate,

25  isn't that right?

F7rnosb4                          Sher - cross

 1   A.  I don't know.  I would have to see it.  It might have been

 2   close to the GATT rate, but I don't think it was exactly the

 3   GATT rate.

 4                MR. GOTTESDIENER:  With the Court's indulgence.

 5   Q.  The GATT rate, while I am finding the page, you do recall

 6   this was 6.5 percent on the conversion date?  Yes?

 7   A.  I don't --

 8   Q.  Page 981.

 9   A.  We are talking about -- wait a minute.  We are talking

10   about a conversion date that's not the same as it is in this

11   case.

12   Q.  Yes, sir.  Forget the number.  Let's just get to your

13   transcript to show you what you testified.  981.  Page 981 of

14   the transcript.

15                You said, The plan indicates that you use the

16   statutory lump sum interest rate, 30-year treasury bond rate in

17   that calculation.

18   A.  Can I see what it says up above that.  I don't even know

19   what calculation we are talking about here.

20   Q.  You want to spend the time to do it?

21                Just so the Court is oriented, you agree that there

22   were three groups of people in *Amara*.  Most people were GATT.

23   There was a second group, it was the five-year plus on the

24   margin of 25 basis points, and then there were the early

25   retirement subsidy people, five years minus 75 basis points.

F7rnosb4                          Sher - cross

1              Does that sound familiar?

2   A.  I recall that the -- I don't recall that most people got

3   GATT.

4   Q.  OK.  Does it sound familiar that there were three different

5   groups?

6   A.  I thought that the GATT rate was for new participants that

7   came in and perhaps were granted opening balances.  I thought

8   that everyone at the time of the conversion who was not

9   grandfathered into the old plan got one of two rates, both of

10  them based on the, not the GATT rate but based on a shorter

11  term treasury rate.

12  Q.  OK.  If we could slow down.

13          MR. GOTTESDIENER:  Go a little higher, Randall.  Go a

14  little higher.

15  Q.  You are giving an answer about the first category.  You see

16  there on line 13 where you say you would think it would be the

17  rehires?

18  A.  Right.  I think if these are the people that got the GATT

19  rate, everybody else got something else.

20  Q.  Then on line 25, you say, So the discount rate is, of

21  course, very important in making that calculation?

22  A.  OK.

23  Q.  Interest rate's being used to discount, so I call it a

24  discount rate.  Do you see that?

25  A.  OK.

F7rnosb4                              Sher - cross

1    Q.  Then you say on line 3, The plan indicates that it's the

2    GATT rate.  I'm summarizing.

3    A.  But I think I was referring to --

4    Q.  Right.

5    A.  -- the rehires.

6    Q.  I will show you the rest of your testimony.  I am trying to

7    help go through it.  You see at line 3 and following, that

8    paragraph, you are talking about people who got the GATT rate.

9    A.  Right, the rehires.

10   Q.  Now look at the question on line 10:

11   "Q.  OK.  Now let's talk about the other two categories.  Let's

12   talk about, which I believe to be the majority of people, and

13   that is everybody who is going to be converted at the end of

14   1997."

15   A.  Yes.  The majority of people, but there were the third

16   category, which were the older, longer service people.

17   Q.  Let's try it this way.  You do agree that, whatever the

18   exact conversion rate was, that the conversion rate for, the

19   conversion rate for the majority of people, the people who were

20   the subject matter, and the focus of the litigation over

21   wear-away was, if not at the GATT rate, around the GATT rate?

22   A.  It might have been.  I don't recall at this point.

23   Q.  OK.  Let's try it this way.

24          It was not something -- there was not some spread

25   between the interest crediting rate and the discount rate like

F7rnosb4                        Sher - cross

1    3 percent, like there is in this case?  Fair?

2    A.  The interest crediting rate?

3    Q.  Yes.  The interest crediting rate.  That's why you --

4    A.  Now we would have to look at what the interest crediting

5    rate was, but --

6    Q.  You know the interest crediting rate was they were using

7    the same T bill.  They discounted, and then they used the same

8    interest crediting rate to build the benefit back up, right?

9    A.  Well, but it's a variable rate.

10   Q.  OK.  That's fine.

11   A.  If that rate goes down and it's 4 and a half percent, you

12   are going to have wear-away.

13   Q.  That is what I want to get to.  Just so it's clear, they

14   were using as an discount and interest crediting rate T bills

15   that were either at the GATT rate or around the GATT rate?

16   A.  Maybe.  I don't remember what the interest crediting rate

17   was it was too long ago.

18   Q.  Why was there a wear-away problem in *Amara*, sir?

19   A.  Well, I think that the plaintiffs claim that because of,

20   basically because of falling interest rates that that caused

21   the wear-away.

22   Q.  Put aside the plaintiff's claim.  The judge when he

23   rendered a decision and all the courts, why was there a

24   wear-away problem?

25   A.  I think a good part of it was early retirement, which was

F7rnosb4                          Sher - cross

1  quite rich in their case under the prior plan.

2  Q.  How about for people who were not eligible for early

3  retirement.  You do agree there was still a wear-away problem

4  for those people, correct, that was identified by the courts?

5  A.  I -- maybe.  I don't remember.

6  Q.  Weren't there two problems by the courts identifying these

7  two problems.  One was the use of preretirement mortality

8  discount.  That was one of the problems, right?

9  A.  It might have been.  I don't remember.

10  Q.  And the other was the risk that an interest rate reduction,

11  as you have been talking about, could cause wear-away?

12  A.  Or increase the wear-away effect.

13  Q.  Increase the wear-away.  Thank you.

14  A.  Yes.

15  Q.  So both of these things were found by the Court's ruling to

16  be inconsistent with the promise to participants of an A plus

17  B?

18  A.  I thought there was an early retirement, too, but maybe

19  not.  I thought that was in it.  I thought -- actually, my

20  recollection is that there was more made of the early

21  retirement in this case than anything else.  That could be my

22  memory.

23  Q.  Let's put that aside for the moment and ask, you do agree

24  that there was a preretirement mortality discount issue?

25  A.  There might have been.  I don't remember.

F7rnosb4                          Sher - cross

1    Q.  You did read the United States Supreme Court decision in

2    the *Amara* case?

3    A.  Years ago at this point, yes.

4    Q.  It interested you in particular because you were an expert

5    in the case and it was the United States Supreme Court giving

6    its opinion in the case, correct?

7    A.  As best as I can understand it.  I had trouble

8    understanding it, to be honest.

9    Q.  OK.  Well, you do remember that Justice Breyer spent quite

10   a lot of time talking about preretirement mortality, didn't he?

11   A.  He might have.  I don't remember.

12   Q.  Isn't the fact pattern in this case a lot worse than *Amara*

13   because using 9 percent instead of a GATT rate meant that

14   interest rates did not need to drop to cause a problem?  There

15   would be a wear-away problem if rates stayed basically the

16   same?

17            MR. RACHAL:  Objection.

18            THE COURT:  Well, if he recalls.  Ultimately, this can

19   be done in argument.

20   A.  Again, my recollection was, is that *Amara* had a much richer

21   early retirement benefit.  It had a supplement, an extra

22   benefit payable until I think age 62.

23   Q.  Let's put up --

24   A.  I thought that was the more of the dominant factor, but

25   that's -- I could be wrong.  That's all I can recall at this

F7rnosb4                          Sher - cross

 1    point.

 2                 MR. GOTTESDIENER:  PX 1517, please.

 3    BY MR. GOTTESDIENER:

 4    Q.  This is Judge Kravitz's opinion from 2008.  You testified

 5    in front of Judge Kravitz, right?

 6    A.  Yes.

 7    Q.  He said, In this case, however, wear-away was both a

 8    structural phenomenon and one that Cigna could, and did,

 9    predict, despite the fact that it resulted from the interaction

10    of several plan provisions and falling interest rates.  As a

11    matter of fact, various choices made by Cigna in structuring

12    the opening account balances under part B practically ensured

13    that wear-away would occur if interest rates fell.

14                 Does that refresh your recollection as to what was

15    identified by the courts as one of the key factors as to what

16    caused wear-away in that case?

17    A.  Well, falling --

18    Q.  Does it refresh your recollection?  That's the question.

19    A.  I'm reading this now.  I don't remember it.

20    Q.  It doesn't refresh your recollection?

21    A.  I don't remember it at this point.

22    Q.  A little?

23    A.  I mean, I see what it says and I take it that he said that.

24    I don't remember it.

25    Q.  You said earlier that, on Thursday and today you said that

F7rnosb4                        Sher - cross

1   interest rates falling cause the wear-away problem, at least in

2   part, right?

3   A.  Yes.  And --

4   Q.  And when the judge asked you about, today, when she asked

5   you about what did employers at the time who were concerned to

6   eliminate, not have wear-away, what were they doing with their

7   opening balances, you answered her, and part of your answer was

8   still interest rates could fall no matter how nice of an

9   interest rate they used, correct?

10  A.  That is part of the opening balance approach.

11  Q.  Now, here tell me if you agree or disagree on the slide.

12  In this case wear-away was both a structural phenomenon and one

13  that Foot Locker could and did predict despite the fact that it

14  resulted from the interaction of several plan provisions and

15  falling interest rates.  As a matter of fact, various choices

16  made by Foot Locker in structuring the opening account balances

17  under part B ensured, not practically ensured, but ensured that

18  wear-away would occur unless interest rates rose to more than 9

19  percent by 1/1/96 and then remained there.

20  A.  Look, I think there's no question that by setting opening

21  balances the way they were set there was the likelihood that

22  there would be some wear-away.  The question is, how much?

23  Q.  Right now --

24  A.  And it is all over the lot --

25  Q.  That is not my question.

F7rnosb4                           Sher - cross

1    A.   -- in terms of how much wear-away there might be, and no

2    one could have known that.

3    Q.   It ensured that there would be wear-away in this case,

4    unless interest rates shot up to more than 9 percent and stayed

5    there, correct?

6    A.   Well, wear-away -- no, the wear-away would disappear

7    because of pay and interest credits at some point.  The

8    wear-away --

9    Q.   You mean --

10   A.   Someone's out of wear-away, they could be out of wear-away

11   because of pay and interest credits accumulating.

12   Q.   Let's distinguish between the wear-away period versus the

13   wear-away effect.

14   A.   OK.

15   Q.   You agree, don't you, that here there was wear-away unless

16   interest rates rose to and above 9 percent, correct?

17   A.   Here?  You're pointing to here?

18   Q.   In this case.

19   A.   I thought you were pointing to Cigna here.

20   Q.   In this case.  You know that's the case, right?

21   A.   There would be -- well, if people have enhancements,

22   there's little or no wear-away.

23   Q.   Put aside those 400 people, 2.5 percent of the 16,000 class

24   members.  Put those people aside.

25   A.   How many?

F7rnosb4                         Sher - cross

1   Q.   400.

2   A.   No, there were 900 that ultimately had no wear-away.

3   Q.   No.  Those were people who, if you did whipsaw for them,

4   the number went down to 400.  You agreed with that earlier, 2.5

5   percent.  You agree that there is only 400 people --

6   A.   There were 400 people in 1997 alone who had an A plus B

7   that was greater than their account balance.

8   Q.   The record will --

9   A.   Account balance that was greater than the A plus B.

10              MR. GOTTESDIENER:  The record will be what it is.

11              THE COURT:  You have only got a few minutes left.

12   Your clock will show you that, too.

13              MR. GOTTESDIENER:  I am aware.

14              Thank you, your Honor.

15   BY MR. GOTTESDIENER:

16   Q.   So you agree that for everybody who is not in the 400 or

17   900, whatever small group of people you are talking about, if

18   you put them to the side, there would be wear-away unless

19   interest rates shot up to 9 and stayed there?  Yes or no?

20   A.   Shot up?  You mean they were 8 percent at the beginning of

21   the year.

22   Q.   Rose to 9 percent?

23   A.   All it would have taken is a one percent increase from

24   where they were at the beginning of the year.

25   Q.   The answer yes?  You are agreeing with me, right?

F7rnosb4                    Sher - cross

1   A.  If interest rates stayed at what level, 6, 8?

2   Q.  They needed to be at 9 percent, above 9 percent actually

3   because of the way this was structured, for there not to be a

4   wear-away effect, correct?

5   A.  They would have had to increase from where they were.

6              MR. GOTTESDIENER:  I think we have your answer.

7              Very quickly, PX 1515.  Last line of questions.  Very

8   fast.

9              THE COURT:  Don't go too fast.  Just make sure we can

10  get it.

11             MR. GOTTESDIENER:  Thank you, your Honor.

12  BY MR. GOTTESDIENER:

13  Q.  This is your slide DX 419, with the account added.

14             Let me hand this to the witness, a copy for counsel.

15             You have your slides in front of you, sir, right?

16  A.  Yes.

17  Q.  You can look at 419.

18             You can see that we have added in 419.  Let's take a

19  quick look at 419 together.

20             You see in 419 this green line where you are showing

21  Mr. Osberg's minimum lump sum, his 12/31/95 lump sum had he

22  requested his benefit at that time, right?

23  A.  Yes.

24  Q.  If I understood the point you were making during your

25  testimony, it was that you thought it was OK to not tell

F7rnosb4                          Sher - cross

1  Mr. Osberg about this green line because it would just confuse

2  him, so just better to give him just a straight line like on PX

3  515, our blue line, the account?

4          MR. GOTTESDIENER:  Randall, if you could show 1515.

5  Q.  You see the account that you put in there?

6  A.  Yes.

7  Q.  That's Mr. Osberg's account.  If I understood your

8  testimony, you were suggesting that telling people their actual

9  entitlement would just confuse them because it changes, so it's

10 better just to give them their account, even though that is not

11 the lump sum that they would receive?  Is that fair?

12 A.  Well, I just want to make sure.  First of all, we don't

13 know what that green line is going to look like back in 1996.

14 We only know at the beginning of each year when interest rates

15 have changed what that green line looks like.  So I couldn't

16 give him that green line up front because I don't know what

17 it's going to like.

18 Q.  You could give him the green line at the point in time like

19 he gets his annual statement and it says this is the amount

20 that you would get paid if you left and asked for your money on

21 1/1/96 or '97.  That calculation could be done, right?

22 A.  Yes, and I think that would be -- in my view, that would be

23 very misleading.

24 Q.  It would be misleading to actually say this is the amount

25 you would get if the account balance is thousands of dollars

F7rnosb4                          Sher - cross

1    below what he actually would have gotten?  You think that's

2    misleading?

3    A.  I think it would have been -- yeah, because the next year

4    it goes down.  Once you give someone a number like that, in my

5    experience, no matter how you caveat, it sticks with them.

6    They remember that number.  And I can tell you that employers

7    that I was involved with in all of this didn't want to do that

8    because of what I've described here.

9    Q.  So a number sticks with somebody.  So when you tell

10   Mr. Osberg on 1/1/96 that the full value in a lump sum form of

11   his accrued benefit is only $6,000, you would agree that that

12   number is going to stick with him, right?

13   A.  If you gave him the higher number --

14   Q.  I'm asking about you gave him the number and it was his

15   account balance number, that's going to stick with him?

16   A.  And it should because it is guaranteed it is not going to

17   go down.  It is going to go up.

18   Q.  But they don't say that you are going to get a minimum of

19   this but you are entitled to a higher benefit that is actually

20   $14,000, but don't count on that?  You can count on the 6, but

21   you might get if you left today -- not you might get, you would

22   get $14,000?  They don't say that in the disclosures there?

23   A.  They don't say it there, but they say it when people come

24   in and ask, people are serious about leaving, come in and ask

25   for estimates.  Then they told them.

F7rnosb4                          Sher - cross

1    Q.  Then they also say --

2              THE COURT:  I just don't not to put too fine a point

3    on it.  We have been over this.  This is sort of like the theme

4    of our trial.  Is there some wrap-up question?

5    BY MR. GOTTESDIENER:

6    Q.  Final question.  You know that these estimates you, have

7    seen them they say the minimum lump sum could go up or down

8    depending on interest rates they warned people about that,

9    right?

10   A.  When they had individual or group -- or some group

11   meetings.

12             MR. GOTTESDIENER:  Thank you.

13             THE COURT:  All right.  Thank you.  Do you have some

14   limited redirect?

15             MR. RACHAL:  I do, your Honor.  But I would ask the

16   Court can I take a one- or two-minute break?

17             THE COURT:  Yes.  Why don't we take a short break.

18   When we come back we will do the limited redirect.  I would ask

19   people, I assume you have revised exhibits lists.  Can you hand

20   those up if you have got them so we they can go in the record.

21             MR. CLARK:  We are going to file them.

22             THE COURT:  You are going to file them?

23             MR. CLARK:  Yes.

24             THE COURT:  That is fine.  If you folks have worked

25   that out, that's fine.  Are there going to be any issues with

F7rnosb4                         Sher - redirect

1    them.

2              Let's come back and talk about it after the witness is

3    off the stand.  OK.  We'll come back in two minutes.  Take a

4    very short break.

5              (Recess)

6              THE COURT:  Mr. Rachal, you may proceed.

7    REDIRECT EXAMINATION

8    BY MR. RACHAL:

9    Q.  Mr. Sher, in the cross-questioning it was said that this

10   A-plus-B remedy was your remedy, correct?

11   A.  Well, it is the one that I suggested made sense to me.

12   Q.  Is it in fact the remedy that was awarded in the *Amara*

13   case?

14             MR. GOTTESDIENER:  Objection.

15             THE COURT:  Well, I will allow the question to be

16   asked.  The *Amara* case by the way, for everybody, I will

17   actually be able to decide what the *Amara* case stands for just

18   gemmily because it is fortunately all published.

19             But your recollection you can answer.

20             MR. RACHAL:  Sure.

21   A.  My recollection and understanding is that they did adopt,

22   the Court did adopt as a remedy an A plus B approach.

23             MR. RACHAL:  Jon, if you would pull up part of the

24   *Amara* opinion, the first opinion.

25   BY MR. RACHAL:

F7rnosb4                         Sher - redirect

1    Q.   It says, Under A plus B an employee would receive all of

2    her part A benefits in the form those benefits were previously

3    offered under part A.  Let me stop there.

4              In your A-plus-B remedy that you proposed, is that

5    what you did?

6    A.   The A was the benefit that was previously offered, the

7    accrued benefit.  That is how I understand that.

8    Q.   Correct.  Under the benefit that was previously offered,

9    that A part, is it correct that enhancement was never part of

10   part A?

11             MR. GOTTESDIENER:  Objection.

12             THE COURT:  Well, the best to the best of your

13   recollection.

14             MR. GOTTESDIENER:  Are we talking about this case?

15             THE COURT:  We are talking about the *Amara*.

16             MR. GOTTESDIENER:  There was no enhancement.

17             THE COURT:  This is the point.  The *Amara* case is what

18   it is.  If it doesn't say it on its face, I'm not going to

19   suddenly embed it.

20             MR. RACHAL:  Sure.

21             THE COURT:  So what is your recollection, Mr. Sher?

22             THE WITNESS:  Well --

23             MR. RACHAL:  Actually, your Honor.  I'm sorry.  I was

24   asking with here?

25             THE COURT:  I'm confused.

F7rnosb4                          Sher – redirect

1              MR. RACHAL:  It was a bad question on my part.

2              THE COURT:  That is OK.  Let me finish also.  Treat me

3     just like the witness so I can finish my full sentence.

4              Go ahead and restate the question and we will have it

5     nice and clean.

6              MR. RACHAL:  Thank you, your Honor.

7     BY MR. RACHAL:

8     Q.   In the Foot Locker plan is it correct that under the prior

9     plan there was no enhancement offered for that benefit?

10    A.   Yes.  The benefit was just the annuity.

11    Q.   That is what you called and treated as part A in your part

12    A-plus-B benefit analysis, correct?

13    A.   Part A would be either the annuity that was accrued or it

14    would be the lump sum value of that annuity.

15    Q.   And then the part B benefit, what is that in your analysis?

16    A.   In Foot Locker?

17    Q.   Yes.

18    A.   To me part B is simply the pay credits and interest credits

19    that were being provided under the terms of the plan.

20    Q.   Is it correct that, at least under your understanding of

21    the Foot Locker plan, that when you qualify for an initial

22    account balance, that if you had age 50 and 15 years of service

23    you automatically qualified for the enhancement, they were

24    linked?

25    A.   Yes.

F7rnosb4                        Sher - redirect

 1   Q.  If you didn't have an initial account balance, you wouldn't

 2   get an enhancement, correct?

 3   A.  Yes.  That's true.

 4   Q.  But if you did, and you had age 50 and 15 years of service

 5   you were entitled to the enhancement from that day forward,

 6   correct?

 7   A.  Yes.  It would permanently be in your account balance.

 8   Q.  In your view and understanding of how the plan works, is it

 9   correct that you never viewed that as part of a pay credit

10   going forward?

11   A.  No.  To me the pay credits are what the plan provides as

12   pay credits.

13   Q.  Under ERISA, is the enrolled actuary responsible for

14   figuring out the plan's funding obligations?

15           MR. GOTTESDIENER:  Objection.

16           THE COURT:  He's not going to give a legal opinion.

17           You can give your understanding.  We have allowed

18   questions of that type before.

19   A.  Let me make sure I understand.  You asked me if the

20   enrolled actuary is in charge --

21   Q.  Let me ask a different question, Mr. Sher.

22           What are the enrolled actuary's responsibilities

23   regarding calculating the plan's funding obligation?

24   A.  The enrolled actuary must certify as to the minimum funding

25   calculations once a year.  What was characterized as schedule B

F7rnosb4                         Sher - redirect

1   now has a different name, but back then it was called schedule

2   B, which was an attachment to the form 5500.

3           And the enrolled actuary must, as we saw a signature

4   when we looked at that earlier, must certify as to the

5   correctness of that number based on the data and the

6   assumptions that the enrolled actuary must attest as being

7   reasonable.

8   Q.  In the enrolled actuary attestation that they are

9   reasonable, the enrolled actuary has to come to that

10  conclusion, is that correct?

11  A.  It's the enrolled actuary's responsibility to, in his or

12  her opinion and judgment that those assumptions are reasonable.

13  Q.  Is it year understanding that ERISA enforces those

14  obligations of the enrolled actuary?

15          MR. GOTTESDIENER:  Objection.

16          THE COURT:  I will allow it, but I think it is

17  actually irrelevant.  The point I think is different from this

18  particular point.  It is not whether there is a violation of

19  ERISA in connection with this funding.

20          But I will allow you to answer it.

21          MR. RACHAL:  OK.

22  A.  The enrolled actuary, ultimately if the enrolled actually

23  both the plan and ultimately the enrolled actuary can be

24  audited by the Joint Board for Enrollment of Actuaries, and the

25  enrolled actuary would be in trouble if he signed off on

F7rnosb4                          Sher - redirect

1    something that was found -- or could be in trouble, found to be

2    unreasonable.

3              MR. RACHAL:  Jon, if you would pull up PX 1516.

4    Q.  You had been asked some questions about predicting

5    wear-away.  Let's first talk about the length of wear-away.

6              Using the red line as overlaid with the yellow line,

7    what almost happened in the first year after under this

8    scenario here with wear-away?

9    A.  Comparing the red line and the yellow line, it looks like,

10   due to the reduction in the value of the protected benefit, the

11   red line came down as interest rates would have gone up, and it

12   almost hit the yellow line at that point.  So the wear-away was

13   just about almost over then.

14   Q.  If the interest rates would have gone up a little bit more,

15   the accurate, if you could have made a prediction, the

16   prediction would have been this person would have been subject

17   to wear-away for one year, correct?

18   A.  Right.  If rates instead of gyrating had stayed at that

19   level, which looks like it was -- I am trying to find it.  I

20   don't have it in front of me.  I can't see it here.  My screen

21   is also now not showing in front of me for some reason.  My

22   eyes are not great.

23             MR. RACHAL:  May I approach, your Honor?

24             THE COURT:  Yes.

25   Q.  Here you go, Mr. Sher.

A.  So, in the first year after the initial balance was

determined the rate went from 6 percent to 8 percent under this

mirror image, which actually corresponds to the 8 percent that

was the 417(e) rate at the end of 1994.

        So, again, this is the mirror image going backwards in

time.  Yeah, if that rate had been a little bit more, a little

bit higher than 8, we would have seen the red go below the

yellow line.

Q.  So in one scenario here the wear-away would have ended in a

year, correct?

A.  Well, the issue is it would have ended, but then it would

have started up again.  You go in and out of wear-away.  That's

part of the unpredictability as to whether someone is going to

be in wear-away, out of wear-away.  What the effective

wear-away is at any given point in time is going to vary.

Q.  Taking some extremes here, in one scenario you have the

person going out of wear-away in one year.  Is it correct that

under the green line, with what happened with the actual drop

in 417(e) rates the person didn't go out of wear-away for how

many years?

A.  Under the green line it looks like it's in about 2007.  It

looks like it's about 11 years.

Q.  Starting from day one, is there any reason to know the

answer whether it would have been one year or eleven years?

A.  Certainly there would be no way to know it was going to be

F7rnosb4                          Sher - redirect

1    11 years or anything like 11 years.  The green line could have

2    had all kinds of shapes.  It could have looked more like the

3    red line.  It could have looked like something in between,

4    something even higher.  There would be no way of knowing.

5    Q.  Could you have predicted with any accuracy not knowing the

6    future interest rates what this person's expected wear-away

7    time would be?

8    A.  No.

9    Q.  I'm sorry?

10   A.  No.

11   Q.  On the amounts, I think you testified earlier that, like

12   Mr. Osberg, he had, for example, one year a 25 percent drop in

13   the amount.  Even though he was still in wear-away, his

14   protected lump sum went up and down pretty dramatically?

15   A.  As interest rates changed, we were seeing large swings, 20,

16   25 percent or even more I think in one year.

17   Q.  Because of the plan's terms, you could have a pretty good

18   idea of the what the applied interest rate would be for that

19   year, but the next year it changed dramatically?

20   A.  In many years it changed quite a bit from one year to the

21   next.

22          MR. RACHAL:  Jon, if you would pull up DX 146.

23          If you would highlight the starting cash balance the

24   paragraph.  It's about the fourth.  There you go.  That one.

25   Can you blow it up a little bit?

F7rnosb4                         Sher - redirect

1    BY MR. RACHAL:

2    Q.  Can you see that Mr. Sher?

3    A.  Can you make it a little bit bigger?  Pretty much.

4    Q.  I am going to read it.  Then I will ask you a couple of

5    questions.  Starting -- let's back up for a second.

6            Just for the record, this is Mr. Kiley's notes from

7    March of '95.  And it has, Starting cash balances are enhanced

8    for people age 50 with 15 years of service.  This is an

9    arbitrary age and service, but provides time to build up

10   capital before early retirement.  About 66,000 are over age 50.

11           When he's talking about building up capital, what is

12   your understanding of what they are talking about here?

13   A.  Does that say 6600?

14   Q.  6600.

15   A.  I'm having trouble seeing it.  I think this is consistent

16   with Mr. Kiley's response to Mr. Grefig that he just, you know,

17   thought that this was intended to build up their balances.  He

18   doesn't tie it directly or even indirectly at least in this

19   sentence to early retirement.  It's just to build up their

20   balances.

21   Q.  Is that consistent with how the enhancement operated in

22   fact when it was offered by the Foot Locker plan?

23   A.  Yes.  It was immediately available whether or not the

24   individual actually continued to work until early retirement,

25   whether or not the person retired at an early retirement age.

F7rnosb4                         Sher - redirect

```
 1   Q.  So if someone was age 50 and 15 years of service, they got
 2   the enhancement on day one, your understanding?
 3   A.  Yes.
 4   Q.  And they were entitled to it from day one, correct?
 5   A.  Permanently in their account balance.
 6   Q.  All right.  If they retired at age 70, did they still get
 7   the enhancement?
 8   A.  Yes.
 9   Q.  After that, after they received the enhancement, it didn't
10   matter whether they left or stayed at work, correct?
11   A.  That's correct.
12           MR. RACHAL:  Bear with me for one second, your Honor.
13           THE COURT:  Yes.
14           MR. RACHAL:  I have no further questions.
15           THE COURT:  All right.  Thank you.
16           Sir, you may step down.
17           THE WITNESS:  Thank you.
18           (Witness excused)
19           THE COURT:  Ladies and gentlemen, I understand there
20   are -- all gentlemen.  I guess there is a lady in the audience.
21   I understand that the evidentiary record is closed.
22           Am I correct about that?
23           MR. GOTTESDIENER:  Yes, your Honor.
24           MR. RUMELD:  I guess, just subject to filing the
25   exhibits we talked about a few minutes ago.
```

F7rnosb4                      Sher - redirect

1            THE COURT:  Right.

2            Let's talk about what the evidentiary record consists

3     of so that we are absolutely clear.  It consists of the

4     exhibits which were presented and used at trial, subject to the

5     objections lodged either during trial or pretrial, the exhibits

6     that are referenced in the deposition designations.  To the

7     extent that there are any additional exhibits, we have talked

8     about that.  Those are also subject to any objections.

9            In addition, there are the deposition designations

10    which the Court has received in typewritten form, along with

11    certain depositions where the Court received an additional

12    version of the deposition which was in videotape.  This was for

13    Ms. Kanowicz, Mr. Thomson, and Ms. Flesses I think is her name.

14           Those are actually duplicates, because I've got it

15    both in typewritten form and videotape form.  I will use the

16    videotape form in preference to the typewritten form for those

17    individuals.  Again, that's subject to the objections lodged to

18    the designations.

19           Then, lastly, of course, the evidentiary record that's

20    been developed here at trial, which consists of all of the

21    testimony the Court took into evidence at trial, both what was

22    live and also the declarations.  The declarations have certain

23    objections also pending as to certain specific language, and

24    the Court takes the declarations subject to those objections as

25    well, unless otherwise already ruled on.

F7rnosb4                          Sher - redirect

1          Is there anything that I have left out?

2          For instance, the one thing that I have not mentioned

3     is I am not incorporating exhibits which were not presented at

4     trial.  So if there is a group of exhibits which were not used

5     or relied on, that's not part of what I have just said.  If you

6     intend for those to be part of what you expect to have

7     admitted, you need to tell me.  That's what I know I've left

8     out.

9          MR. HUANG:  Your Honor, I believe we are going to

10    bring in what is remaining on our exhibit list into the record.

11         THE COURT:  So, Mr. Huang, from your perspective, you

12    are saying there are some additional exhibits which nobody has

13    pointed to during the course of trial or in the deposition

14    designation but that you expect to rely on.

15         MR. HUANG:  Yes.  Both sides is my understanding.

16         THE COURT:  How many exhibits does that constitute?

17         I said to you, I think, at the beginning I will look

18    at these.  I need to have you folks, number one, give me a

19    heads-up on how many we are talking about.  But, number two, I

20    need you to flag for me in some way which of those on your list

21    it is, because I am going to just go and make sure I look at

22    those.

23         I have looked at everything you have pointed to as we

24    have gone along.  I want to be sure I then turn specifically to

25    those exhibits before I write anything to see whether or not

F7rnosb4                        Sher - redirect

1    what I am writing might change.

2            So how many approximately, and can you flag them?

3            MR. HUANG:  I don't have an exact count at moment, but

4    we can flag it.

5            THE COURT:  What I would like you to do is to

6    eliminate as many of those as possible.  If you don't really,

7    really need them, I would like them gone.

8            Otherwise, if you are going to hand me -- let's put a

9    number on it.  If anybody hands me more than 50 documents that

10   I have not already seen, I am going to stop looking at them at

11   50 and I am going to start looking at them at the beginning.

12           If number X I haven't seen before, Y I haven't seen

13   before, Z I haven't seen before, I'll do 50 each.  Then I am

14   going to stop.  You can't have me look at more than 50

15   documents.

16           MR. RUMELD:  Your Honor, in light of the Court's

17   advice, I am just wondering whether we should postpone the

18   deadline to -- I think both sides were intending to file

19   additional exhibits that were not specifically referred to at

20   trial.  But in light of your Honor's advice and the fact that

21   we will be here this afternoon I'm wondering whether we should

22   wait until tomorrow.

23           THE COURT:  If you could cut it down based on a little

24   additional hard look at your lists, that would be terrific.

25           Obviously I have the paper here, I think, right?  I

F7rnosb4                          Sher - redirect

1    should have all the paper up here.  So the question is, is it

2    something you haven't turned my attention to, and do you need

3    to?

4            If you can eliminate some of those, all the better,

5    Mr. Rumeld.

6            How much time do you think you need?  A couple of

7    days?

8            MR. RUMELD:  I suggest that both sides submit sometime

9    tomorrow.

10           THE COURT:  Yes, terrific.

11           MR. RUMELD:  If the parties agree on a simultaneous

12   submission, if that is OK with your Honor.

13           THE COURT:  Mr. Huang, does that work for you?

14           MR. HUANG:  I think so, yes.

15           THE COURT:  Why don't you folks try to do that

16   sometime tomorrow.  Give me your lists.  And then shade or do

17   something if you think -- I am not trying to put you folks to

18   an extraordinary amount of work where for the very first time

19   you are trying to figure out if this is ever mentioned before,

20   presumably you have your main working list of documents and

21   then there is the other.

22           MR. HUANG:  I think we should be able to generate

23   something.

24           THE COURT:  OK.  What else do you folks think should

25   be included in the evidentiary record that is not?  Anything?

F7rnosb4                        Sher - redirect

1              All right.  I would also ask you folks just for your

2      own purposes to double check the record after the exhibit lists

3      are filed tomorrow to ensure that reflected in the record is

4      all that you expect to be reflected in the record, because

5      afterwards you won't be able to reopen the trial record.

6              When I say afterwards, I am not suggesting that the

7      trial record is open until tomorrow.  It's going to close right

8      now except for the exhibits.  But just make sure that no paper

9      that you think is on the docket that reflects the record has

10     not been filed.

11             So the deposition designations should all be on there,

12     including the Flesses, for instance, last page that was added,

13     that had just gotten left off logistically, you know, that kind

14     of thing.

15             Make sure your record is what you want it to be.

16             All right.  So we are going to break now and then we

17     are going to pick up with closings at 2 o'clock.

18             We've got a total of three hours, but 15 minutes of

19     that needs to be for a break.  So that is going to be two hours

20     and 45 minutes.  So it's about an hour twenty apiece.  I am not

21     going to cut the plaintiffs off, so if you use up your entire

22     hour twenty at the outset, there won't be any rebuttal.  If you

23     want to save some time, just use that handy watch that you were

24     using earlier today.  It is about an hour twenty apiece.  Does

25     that sound like what you were planning on?

F7rnosb4                          Sher - redirect

1              MR. RUMELD:  That is fine, your Honor.

2              THE COURT:  All right.

3              MR. GOTTESDIENER:  Does your Honor have a plan for the

4     break, if --

5              THE COURT:  I think I have something in here at 1:30.

6              In this room you mean?

7              MR. GOTTESDIENER:  No.  I mean during closings, for

8     the afternoon break.

9              THE COURT:  Why don't we just do it right after you

10    end and before Mr. Rumeld gets up.  That should be about an

11    hour and maybe five minutes in.  I don't know how much you are

12    going to do on rebuttal.  Assuming the bulk of it is going to

13    be the first part of your statement, that would make sense.  If

14    you want to do it in a different time frame, that is fine with

15    me, too.  But that I think makes the most sense.

16             MR. GOTTESDIENER:  OK.  Thank you.

17             THE COURT:  That way you get to go a whole big chunk,

18    Mr. Rumeld gets to go and do a whole big chunk, and then you

19    will just wrap it up at the end.

20             All right.  Folks, I will see you at 2 o'clock.  I

21    will need the room a little bit at 1:30.

22             MR. CLARK:  One question on the exhibits.  On the

23    exhibits that we are adding to our lists of those that haven't

24    been submitted in hard copy that we are updating our list

25    tomorrow, I would like to know how best you would like us to

F7rnosb4                         Sher - redirect

1    actually submit these into the Court.

2              THE COURT:  Probably with three-hole punches with a

3    tab, you know, just as you have before, but not inserted into

4    the binder, because I will take a look at what you are giving

5    me.

6              If you haven't handed me something before and you

7    think I really need it, I will tell you, I'm sort of skeptical

8    because I assume you guys have really focused on what matters,

9    but nevertheless it will be easier for me to flip through it

10   rather than hunting for it.

11             MR. CLARK:  All right.

12             THE COURT:  Thanks.

13             See you folks at 2.

14             (Luncheon recess)

15

16

17

18

19

20

21

22

23

24

25

1            AFTERNOON SESSION

2            2:00 pm

3            (Trial resumes)

4            (In open court)

5            THE COURT:  Let's all be seated.  Thank you.

6            All right, Mr. Gottesdiener, you may proceed, sir.

7            MR. GOTTESDIENER:  Thank your Honor.  May it please

8    the court.

9            Your Honor, respectfully, we believe that at this

10   point in the trial that neither the facts nor the law are

11   reasonably disputed and that we have more than amply

12   demonstrated our entitlement to judgment on liability as well

13   as on relief.  We respectfully request judgments under both

14   Counts 3 and 4.  The 404 violation is Count 4 of the fiduciary

15   duty breach.  Count 3 is the summary plan description.

16           First of all, there is no dispute that wear-away was a

17   fact and was a devastating fact.  There was a severe wear-away.

18   Mr. Osberg, who earned no benefits over a period of 7 years

19   working for the company, was not an outlier.

20           The slide in front of your Honor is just one of the

21   many ways that Mr. Deutsch analyzed both the expected and

22   actual wear-away here, and this was one of the aspects that we

23   didn't focus on during the trial.

24           More than 10,000 participants of the 16,000 class

25   members didn't accrue any further benefit after the amendment.

1    That was anticipatable and was expected, but this is what

2    actually happened.  The vast majority of employees actually

3    earned nothing for years on end.  So the Osberg seven years was

4    not unusual.  Of course, the new plan was billed as exciting,

5    but it was actually devastating.

6          This is a chart in Mr. Deutsch's report, his rebuttal

7    report.  None of the analysis other than the remedy proposed,

8    your Honor, did Mr. Sher dispute.  In fact, he adopted largely

9    all of Mr. Deutsch's analyses.  This is not disputed.

10          Prior to the amendment, the average rate of benefit

11   accrual was about 1.3 percent of compensation annually.  Look

12   at what the effect of the new plan was, principally the

13   wear-away, but also the lower rate of benefit accrual which was

14   also not disclosed.

15          The average rate of accrual the employees earned, that

16   purple bar, it goes straight up, that is all zero, that is

17   10,000 people who earned nothing.  The other people, they did

18   somewhat get out of wear-away to earn something, but look,

19   their rates of benefit accrual are so low that they are below 1

20   percent for most of them, more than 99.9 percent of the members

21   of the class, at that point the proposed class for whom we had

22   useable data out of 16,000, your Honor has heard reference to

23   some of the data was not useable, ended up with an average

24   annual rate of accrual that was far less than the average under

25   the old plan, and again 10,000 of them earned nothing

F7RJOSB5                          Summation – Mr. Gottesdiener

1    additional.

2              So there is no dispute that wear-away was a fact, that

3    wear-away was severe, and there is also no dispute, no

4    reasonable dispute, we submit, that people expected benefit

5    growth and they expected benefit growth because of violations

6    of ERISA, because we've proven that fiduciaries, Foot Locker,

7    the plan, the people acting on behalf of the plan and Foot

8    Locker violated the statute by putting out summaries that told

9    people, wrongly told people that their opening account balances

10   represented the same benefit that they earned under the old

11   annuity plan as of 12-31-95 and that growth in the account was

12   growth in their benefit.

13             Your Honor heard from many, many class member

14   witnesses including people who used to work in the HR

15   department at Foot Locker, and I think some of them are here

16   today.  The court may recognize some of them.  These are people

17   from all walks of life.  These are people who paid attention to

18   the materials.  The Department of Labor looked at all this and

19   concluded that what these materials were doing was telling

20   people that the cash balance plan would pay them benefits under

21   an A plus B approach, they would be entitled to their accrued

22   benefit, the full thing, the full value under the pre-'96 plan,

23   Part A, plus their additional benefits, pay credits, interest

24   credits and for people like Ada Cardona, the enhancement that

25   they were promised as part of the through-cash balance.

F7RJOSB5                        Summation - Mr. Gottesdiener

1          She was promised and she testified she understood she

2     was going to do better than others because she was loyal, she

3     spent 40 years working for the company, with 16 absences over

4     40 years, and specifically testified that she worked overtime

5     because she believed she was growing her pension.

6          The court pretrial made the comment about that it was

7     devastating that nobody complained, nobody complained because

8     the way this was presented, everything sounded rosy and

9     everything made sense.

10         Your Honor's heard, including from Ms. Peck, from

11    Mr. Steven, people who are sophisticated.  They don't know of

12    wear-away outside of this pension phenomenon.  It is just not

13    something that any of us experience out in the world, so they

14    wouldn't anticipate or expect this.

15         Foot Locker, whether it intended to do this at the

16    outset or not, I will come back to this intention question, the

17    intent, but whether they intended to do it or not, at the

18    outset or once it got under way is preside the point for the

19    violations.

20         They clearly misled people into thinking that growing

21    accounts meant a growing benefit.  Again this is the Department

22    of Labor's conclusion.  The disclosures here suggested that

23    participants would continuously accrue benefits under the cash

24    balance plan, and everyone who came in and testified, every

25    walk of life, pension clerks to people who were -- well, Ms.

1    Welz, for example, she was Ms. Peck's assistant vice president,

2    a very sophisticated person.  She was the one who actually

3    taught Ms. Kanowicz and Ms. Derham to do calculations under the

4    old plan, she was fooled.  The message that was conveyed by the

5    SPD, to say nothing of the November memo, this is again the

6    Department of Labor, was inexorable benefit growth.

7         In addition to violations, we have to prove the class

8    was mistaken, and we have proven that by clear and convincing

9    evidence that this conduct of Foot Locker by putting out false

10   and misleading communications about the plan caused people not

11   to know the truth about their benefit, that they were started

12   in a hole at a great deficit and they would have to work a

13   period of time, mostly a period of years for most people before

14   they would earn an additional pension dollar.

15        This is Amara V, the Second Circuit decision from last

16   year.  What we have to prove is mistake as to the truth.  They

17   didn't know the truth.  There was a suggestion by defense

18   counsel in his opening statement that he was going to be able

19   to prove that some of the people coming and testifying really

20   knew that their benefit was frozen.  Your Honor will make up

21   her own mind, but we don't think so.

22        These people all had different ideas as to what it was

23   that was being said exactly because it was complicated, but one

24   thing they had the same idea about was this is simple.  Now I

25   have an account.  My account, inside of it, has everything I

F7RJOSB5                    Summation - Mr. Gottesdiener

1    earned to date and I pick up where I left off.  In fact, those

2    were the words of Ms. Ine, the head of HROC in Milwaukee.  She

3    came in and she said several different things, and she was

4    impeached with her videotape testimony.

5         It is clear whatever you believe she believed, that

6    she was confused, that she believed largely at best under their

7    version of events, this is the person who was in charge of the

8    people who communicated with other people, other participants,

9    she was surprised.  She testified she was surprised to learn

10   that her benefit had been frozen.  She came lawyered to that

11   deposition.  She was on breaks with them.  They asked her

12   questions after those moments that your Honor saw.  She didn't

13   say she was confused.  She had 30 days to revise her transcript

14   and say no, I was confused.

15        Your Honor has the videotape of Ms. Flesses.  Ms.

16   Flesses worked under Ms. Ine.  She was one of the outlaws.

17   Remember there was the outlaws and then there were the ducks.

18   The ducks were the people who answered the phone.  The outlaws

19   were their supervisors.

20        Please take a look at that video.  Ms. Flesses, her

21   jaw dropped when she learned.  She is the one doing these

22   calculations, these MLS calculations.  She herself thought her

23   benefit was growing because this is complicated stuff.

24        Ms. Glickfield, who did the calculations in the New

25   York office under Ms. Derham, the same thing.  She was

1    mistaken.  If someone like her, if someone like Ms. Flesses,

2    Ms. Ine, an executive like Mr. Steven, if they don't know, it

3    is pretty safe to say the court can infer class-wide the class

4    was mistaken as to the truth.

5         The fact is, as your Honor pointed out, that nobody

6    complained.  16,000 people, 10,000 of whom never earned any

7    additional benefit, nobody complained.  It is pretty clear

8    there is class-wide mistake.

9         That is why we say the evidence is truly overwhelming

10   and effectively uncontested.  I am sure counsel will say it is

11   contested, but it is effectively uncontested if following the

12   conversion people were literally laboring under the

13   misimpression for years that they were earning pension benefits

14   in exchange for their service to the company.

15        So the belief here was that the amendment meant for

16   them growing A plus B benefits, again for people like

17   Ms. Cardona, an enhancement on top of it for those senior,

18   long-service employees.  And you heard ample confirmation, as I

19   mentioned, literally from every walk of life, we had shoe

20   salesmen, pension clerks, top executives, assistants to

21   executives, everybody was fooled.  No one complained because no

22   one knew that their benefit had been frozen.

23        Now, Foot Locker was the class' fiduciary, and Foot

24   Locker is solely responsible for the fact people were mistaken

25   as to their benefits.  That was entirely Foot Locker's fault.

F7RJOSB5                    Summation - Mr. Gottesdiener

1    They were the fiduciary, they were in charge of the

2    communications, and Foot Locker profited from this mistake.

3             As a result, as in the Amara case, Foot Locker was

4    able to effect a reduction in total compensation class-wide,

5    company-wide without the risk of a negative reaction, and that

6    is the undue advantage element to equitable fraud or

7    inequitable conduct that I'll speak about in more detail in a

8    moment, that Amara V identified occurred in Amara.

9             Effectively what happened is they cut everybody's pay

10   without them knowing it.  They picked their pocket by about 10

11   to 15 percent.  People thought they're coming to work for the

12   package, the total compensation package, the statements your

13   Honor saw, people got year-after-year you're building your

14   retirement benefit with the company.  We're telling you don't

15   just look at your paycheck, look at all the benefits we give

16   you.  That costs us a lot of money and you should appreciate it

17   as part of your total compensation.

18            Those statements kept coming out and they kept showing

19   growing account balances, but they didn't mean anything.  The

20   company saved on their normal costs.  People didn't actually

21   get pension benefits.

22            The issue is not what would have happened had they

23   told the truth.  The issue is did they get an undue advantage

24   as a result of this misconduct.  Again we'll come in a moment

25   to intent, but we saw before in the earlier slides talking just

1    about the violation, the SPD rules, the fiduciary standards.

2    They don't have any element of intent there.  They have to

3    communicate the plan accurately and fairly and they have to

4    warn people.  That whole panoply of obligations no question was

5    violated here.

6            You heard from Mr. Deutsch.  You can see for yourself

7    the communications are inaccurate at best.  So we have

8    violation of duty, we have causation.  The violation of duty

9    caused people to be mistaken because they believed what was

10   being said to them.  Who wouldn't?  It all made sense.

11           So we have violation, causation and mistake.  We have

12   the fiduciary solely responsible for people's mistake and we

13   have the final element which is the fiduciary benefited.  We

14   think we can prove and have proven beyond a shadow of the doubt

15   it was intentional, but that is not the focus of the undue

16   advantage or equitable fraud or inequitable conduct standard.

17   It is a fiduciary, they fell down on its duty, and as a result,

18   did it benefit vis-a-vis its awards.

19           Here they got this pay cut without having to deal with

20   the negativity that was going to come with it.  Even if they

21   could have pushed it through, there is testimony that they

22   couldn't have pushed it through.  There is testimony that they

23   didn't even dare openly say that they were reducing the pension

24   because of the fear of backlash, fear of Wall Street reacting

25   negatively, but principally fear of a morale hit.  Fear of

F7RJOSB5                    Summation - Mr. Gottesdiener

1    maybe it would all be rolled back, they wouldn't be able to do

2    it.  We don't have to prove what would have happened.  All we

3    have to prove is they got a benefit, and the benefit was they

4    avoided the risk of the negative reaction.

5           So we have undue advantage.  We get to the heart of

6    equitable fraud and/or inequitable conduct.  The evidence is

7    clear and convincing that by issuing these false and/or

8    misleading statements and omissions about benefits, they

9    obtained this undue advantage, and that is the fraud or

10   inequitable conduct in the equitable sense of those terms.  You

11   have got a fiduciary.  They violated their duties and, gee, it

12   drops in their lap that they get this terrific thing which is

13   risk-free, they cut everybody's pay without them knowing it.

14          We do not, because you are sitting in equity, have to

15   connect those two.  You have breach and causation with mistake,

16   and they obtained a benefit.  Equity will not allow that

17   situation.  It is just not right.

18          This Court is sitting in equity.  Amara revived the

19   promise of 502 (a)(3) which laid dormant for many years until

20   the Supreme Court, 7 to 2, breathed new life into it.  It was

21   always there, but the courts had not paid attention to it.  It

22   entitles participants to probably equitable relief and redress

23   for any act or practice which violates any provision of the

24   statute.

25          We seek equitable plan reformation for their alleged

F7RJOSB5                    Summation - Mr. Gottesdiener

1   violation of 102, the statutory SPD standards and/or 404, the

2   statutory fiduciary standards.

3          The Supreme Court said 502 (a)(3) invokes the

4   equitable powers of your Honor.  The Second Circuit said equity

5   provides that a contract may be reformed where one party is

6   mistaken -- no question here on this side -- and the other

7   commits fraud or engages in inequitable conduct, and that is

8   the situation here.  We have shown they committed common law

9   fraud, but we don't have that burden.  Equitable fraud does not

10  require a showing of scienter.  Reformation is an equitable

11  remedy.  It is available under the statute and it doesn't

12  require bad intent or bad motive.

13         The Supreme Court explained in the Capital Gains case

14  that fraud has a broader meaning in equity than at law.  We

15  don't have to prove legal common law fraud.  Intention to

16  defraud or to misrepresent is not a necessary element, and

17  that, your Honor, was the holding of the case.

18         Because equity doesn't require a plaintiff to prove

19  his fiduciary acted with intent to defraud, the Supreme Court

20  held in that case that the nondisclosure of material facts

21  constitutes equitable fraud, no further questions asked.

22  Fiduciary fraud is a different standard than the mores of the

23  marketplace.

24         As the Supreme Court explained in Capital Gains, and

25  there are dozens of cases we cite in our proposed findings,

F7RJOSB5                    Summation - Mr. Gottesdiener

going back, you look at New York authority, you look at Federal

authority, it is all of the same vein, the treatises, they all

say the same thing.  Fraud in a court of equity includes any

act or omission or concealment which involves a breach of duty

which results in the receipt of an undue advantage.  It doesn't

matter whether the fiduciary sought that advantage at the

outset or even in the middle of things.  That is the critical

point to bear in mind.

          We think we have proven clearly and convincingly that

they did seek that, but we don't have to prove that.  We just

have to prove we have these breaches, we have causation, we

have mistake, and we have an undue advantage that they

obtained.  It doesn't matter that they sought it or not.  Your

Honor is sitting in equity.  So whether they set out to obtain

it by failing to properly communicate the amended plan, they

obtained it, and that is all we need to prove.

          It is not seriously disputed that Foot Locker feared

the potentially severe adverse consequences that they thought

would have resulted if they openly announced cessation or

reduction of future accruals.

          Remember, your Honor, those decs, the July decs that

went to senior management.  They had the pros and the cons,

loss of associate morale, negative publicity, they were focused

on that.  When it came to cash balance, they didn't have those

in there, but that is going to the intent question.  The undue

F7RJOSB5                        Summation - Mr. Gottesdiener

1    advantage is they didn't have to deal with the backlash, the

2    flack, the drop in morale.

3         Morale that was very important to them, Mr. Hippert's

4    testimony, one of the deposition designations.  Ms. Peck said

5    the same thing, you have to open doors.  You have to have

6    people motivated.  In fact, even Mr. Farah was saying people's

7    morale was important.  He had to buck up their morale, we think

8    with very misleading statements, not disclosing the point was

9    to cut costs, but they had their temperature, their finger on

10   the pulse of their employees.  They were going through a tough

11   restructuring, so they needed to keep people motivated.  They

12   couldn't suffer a further morale hit.

13        By communicating the changes the way they did, they

14   were able to avoid the risk of all those adverse consequences,

15   and they got at least some of the cost savings they wanted.  We

16   have heard that.  That is undisputed.

17        This verge of bankruptcy defense, even if Foot Locker

18   absolutely had to make the benefit cuts that it did, and it

19   didn't, Dr. Maxam made that clear.  Mr. Steven made that clear.

20   He was the head of the division.  He suggested that it

21   ultimately be closed, the Woolworth Division, because it wasn't

22   running a profit.

23        It is a multi-billion dollar corporation.  Foot Locker

24   was firing on all cylinders.  I had a 17 percent rate of

25   return.  Yeah, it had the traditional Woolworth Division that

F7RJOSB5                    Summation - Mr. Gottesdiener

1    was in trouble to the point where they had to close it, but the

2    corporation got huge loans that both Dr. Maxam -- and this is

3    all coincidental.  Mr. Steven testified.  By the way, we found

4    Mr. Steven because of their use of one-offs, to try to suggest

5    you know that they actually made disclosure to some people.  We

6    didn't know who any of these people were.

7         They gave us redacted names.  So once the class was

8    certified, we thought -- and your Honor wanted to hear from

9    class members -- we thought okay, they keep talking about these

10   one-offs like they're complete disclosure and they're grabbing

11   people by the lapels and saying we are freezing your benefit,

12   let's find out, let's hear from some of these people.

13        That is mostly who you heard from.  These people you

14   heard from got those great disclosures.  One of them was

15   Mr. Steven.  Mr. Cohen here was just calling around, it was a

16   cold, total surprise that turned out the guy was the CFO of the

17   Woolworth Division, and he was flabbergasted.

18        Your Honor heard from him.  So we've got a verge of

19   bankruptcy defense that really is kind of a veiled way of

20   saying to your Honor, yeah, it didn't really matter whether we

21   leveled with people because we were going to have to cut their

22   benefits anyway.  No.  Factually, it is not right.  But more

23   important, it is irrelevant.  It is irrelevant to the undue

24   advantage inquiry because they got the undue advantage making

25   these cuts without having to tell people, causing people to

1    believe they were earning current benefits when they were not

2    meant that Foot Locker was able to do this, cut their total

3    compensation without them knowing it, without the risk of

4    negative reactions.

5            The Second Circuit addresses this kind of argument.

6    Courts don't take kindly to arguments by fiduciaries who breach

7    their obligations, that if they had not done this, everything

8    would have been the same.  The Department of Labor looked at

9    the evidence and concluded this is equitable fraud or

10   inequitable conduct.

11           When you issue SPDs, Foot Locker engaged in

12   inequitable conduct by issuing SPDs that were at best unclear

13   and at worst misleading and otherwise actively encouraged

14   people to believe they would receive additional benefits as

15   they performed their work each day, when Foot Locker well knew

16   their benefit accruals were frozen.

17           (Tape played)

18           MR. GOTTESDIENER:  That is fraud.  That is fraud even

19   without a fiduciary duty.

20           (Tape played)

21           MR. RUMELD:  Your Honor --

22           THE COURT:  Hold on.  What was the objection?

23           MR. RUMELD:  We have the live witness here.  I don't

24   know why he is showing deposition testimony that is no longer

25   in the record.

1          MR. GOTTESDIENER:  Because I impeached her with it and

2     it becomes substantive evidence.

3          THE COURT:  Impeachment becomes a credibility issue as

4     opposed to refreshing recollection with it.

5          Technically, Mr. Rumeld is correct, but I understand

6     the point and the testimony ultimately is in the record.  So

7     whether it is shown I think with her deposition saying it or by

8     memory of her satisfying it on the stand, it is one and the

9     same point.  You can go ahead and proceed.  Why don't you skip

10    this clip.  I remember her testimony very well.

11         MR. GOTTESDIENER:  And what she said was she gave the

12    testimony that there was no concerted effort to make this known

13    because of all of the ill effects that they thought would

14    result if the truth came out.  That is fraud.

15         Now, at this point, Foot Locker comes around and has a

16    new defense that it submitted in its proposed findings.  Now

17    they're saying well, this is now so complicated, we didn't

18    actually try to disclose this, contrary to what they have been

19    saying for 8 years.

20         Now they're saying well, we thought it was best to

21    limit disclosure because this is just so complicated, people

22    would just be confused, so we were going to wait until somebody

23    contacted us even though Ms. Peck agreed nobody is figuring

24    this out.  Ms. Kanowicz agreed nobody figured it out.  Their

25    current theory is they were going to wait for people to contact

F7RJOSB5                    Summation - Mr. Gottesdiener

1    them and then do what?  Explain wear-away?  They didn't explain

2    wear-away then.  They didn't explain wear-away at any time.

3              (Tape played)

4              MR. GOTTESDIENER:  And the evidence is that they never

5    disabused participants, knowing that they were mistaken,

6    knowing that they would think the only thing they could think

7    based on these communications, that their account growth meant

8    benefit growth.

9              Your Honor may recall two weeks ago in opening

10   statement, I explained there is a whole vein of common law

11   fraud that says just that is common law fraud.  Even if you

12   don't start out intending to defraud somebody, if you're about

13   to enter into a transaction with them, and then you realize,

14   they say something where they have a big mistake about a

15   material part of the transaction, you have an obligation at

16   that point, to the point that if you don't fulfill it, you're

17   guilty of fraud, to tell them hey, wait a minute.

18             That was the story of the piano story, where somebody

19   comes in off the street -- this is referenced in our

20   pleadings -- they come in off the street, this woman comes in,

21   she sees a piano, the way it is set up, the owner set it up in

22   a way to suggest that it was new, and the woman made clear

23   during the discussion she thought it was new, but it was used.

24   That is common law fraud.  We don't have to prove common law

25   fraud, but we did prove common law fraud.

F7RJOSB5                          Summation - Mr. Gottesdiener

1          They knew people were mistaken.  They had the

2     obligation, even putting aside their fiduciary obligation, they

3     had the obligation out there in the marketplace, you have the

4     obligation not to go ahead with the transaction when you know

5     somebody is mistaken about a material part of it.

6          In a way the center of gravity of the facts here come

7     down to September of 1996.  Your Honor early in the case, I

8     think it was even in opening statement, asked questions of

9     defense counsel who was giving a version of events that was

10    inconsistent with PX-9.  Your Honor said PX-9.  PX-9 shows

11    Mercer communicating directly to Pat Peck years more of

12    wear-away, almost 99 percent of the people in 1996 who left

13    were in wear-away, as far as the eye can see, she knows this.

14         It is September '96, and notwithstanding that, in

15    December they issue the SPD, and the SPD, Ms. Peck admitted,

16    was absolutely false and it was known at the time that it was

17    false.  Here Mercer specifically is saying listen, the normal

18    cost is going to continue to be low.  Short term savings built

19    into the plan design, they wear away over the next three to

20    four years.  Mr. Sher admitted that where interest rates were

21    at that time, they went down.  It would have been even longer

22    than the four to five years that Ms. Peck agreed she knew at

23    the time.

24         And still they issue an admittedly false and

25    misleading SPD.  The heart of it is how is your benefit

F7RJOSB5                    Summation - Mr. Gottesdiener

1    determined?  It is just false.  Your plan benefit is the

2    greater of one or the other, that horse race we talked about.

3    Your plan benefit is based on the account balance.  It is just

4    false.  She admitted it was false.  She admitted all the

5    communications at the time she knew were false, and what was

6    her story?  Her story was well, it wasn't false as to

7    everybody.  So you got 16,000 people, you send out a summary

8    plan description, and because a handful of people, 400 people,

9    according to Mr. Sher, who don't want to treat the enhancement

10   as the promise that it was, 400 people out of 16,000, 2.5

11   percent of people were not in wear-away.  Mr. Kiley tried the

12   same thing, if you recall.  He said oh, yeah, but, no, there

13   were people who got the enhancement.

14        That's their explanation for why they put out

15   something that was false and misleading?  They admit they knew

16   at the time for everybody who was in wear-away.

17        THE COURT:  Where is the exhibit that shows the 400?

18        Maybe Mr. Cohen can find it or Mr. Huang.

19        MR. GOTTESDIENER:  I think it is also in Mr. Deutsch's

20   report.

21        THE COURT:  It is in the report and I am wondering --

22   you made reference to an exhibit number -- I am wondering if

23   there is an exhibit number that separately sets that out.  Go

24   ahead and they can tell me at the conclusion.

25        MR. GOTTESDIENER:  So except for those people, again

F7RJOSB5                    Summation - Mr. Gottesdiener

remember Mr. Sher today grudgingly admitted that if the

enhancement counts as part of the B benefit, everybody is in

wear-away, even Mr. P-4, P-4 who in the opening statement and

the examination of Mr. Sher they make such a big deal about and

they say, you know, is he unique?  No, he is not you unique.

          Of course, he is unique.  There is only 2.5 percent of

the people who will be like that person, and again that is even

assuming he did not have a real entitlement to the enhancement

because if you count the enhancement, as you should as part of

the B benefit promise, everyone is in wear-away.

          What we have here is simply an egregious breach of

duty, whether at the outset or once it got going.  Maybe at the

outset they didn't understand how bad it would be, but they did

as 1995 went on, and here in 1996 when they put this out, they

just have no excuse for doing this.

          So our right to equitable relief has been established

beyond a shadow of a doubt.  We're entitled to reformation to

remedy the false or misleading information Foot Locker

provided, and as the district court recently noted, the Supreme

Court suggested in Amara that it would be the rare case,

indeed, in which a fiduciary breach causing injury to a

participant would be without redress.

          So the balance of the time that I'm going to spend, I

see I'm around 40 something minutes, is on the appropriate

equitable relief here.  Your Honor should respectfully adopt

1    the method described in Mr. Deutsch's report as the appropriate

2    method.  Defendant's remedy proposal, your Honor, would not

3    make participants whole.  It would conflict with governing law

4    and it would effectively reward their misconduct.

5           This is Section 1.23, the initial account balance

6    provision of the amended plan.  All your Honor would have to do

7    to implement the reformation we seek is effect these changes,

8    effectively order Foot Locker to amend the plan in this way.

9           The underlines added to reflect proposed new language,

10   the strike-throughs reflect deletions.  All that has to be done

11   is to in effect get rid of the 9 percent and use the 6 percent.

12   Mr. Sher acted like this was some kind of strange proposition.

13   He acted like well, Mr. Deutsch was rounding down from 6.06

14   down to 6.

15          Then he finally got around to the point it has nothing

16   to do with rounding down.  It is because the benefit, actuarial

17   equivalence is you have to replace the account projected at 6,

18   without mortality would get you back to the 12-31-95.  If you

19   discount at 6 without mortality, you end up with an exact

20   benefit.  That is what people were promised.  They were

21   promised the full value of their benefit.

22          So we're the ones who are recommending the least

23   invasive, intrusive changing of the plan.  The plan had an

24   opening account balance method.  Mr. Sher testified that was

25   what was prevalent.  We know that is what was said to people.

1        We know from defense counsel that's what they wanted

2   to do and how they communicated it to people.  That is what

3   your Honor respectfully should do is just make the promise true

4   instead of the untrue statements they made to people.  So

5   provide the full value of A, that is how it is done, plus B.

6   So this simple modification would fully remedy the violations

7   because it would align the plan's terms with what the

8   fiduciaries led people to reasonably expect.

9        In A plus B, and ours is the true A plus B, based on

10   opening account balance, representing a benefit that was equal

11   to the benefit people already earned, plus additions to that

12   equal benefit account promised under the cash balance formula,

13   pay credits, interest credits and where applicable, the

14   enhancement, so the modification that we saw back here to this

15   first sentence, that would just require the plan to recalculate

16   the initial account balance using 6 percent, 6 percent discount

17   rate, the standard mortality table, but without an additional

18   reduction for PRND, pre-retirement mortality discount, which as

19   I'll mention at some point, either now or in rebuttal, was the

20   big factor in Amara.

21        Falling interest rates as well, but when your Honor

22   goes back and re-reads Justice Breyer's opinion, he is going on

23   and on about pre-retirement mortality because that is a

24   discount that is not being given back under the formula, so

25   they discount starting you off with mortality, well, you can do

F7RJOSB5                          Summation - Mr. Gottesdiener

1   that, but you would then have to increase going back with

2   survivorship or positive PRND.

3          They don't do that.  Mr. Sher admitted, his words, a

4   shortfall.  He agreed that if you don't do this, you'll get a

5   shortfall.  As we'll see in a second, his objection is

6   rhetorical.  He is making claims that people are going to get a

7   windfall.  There is no windfall, but he agrees that the Deutsch

8   method would prevent wear-away because it is perfect and it is

9   perfect.  Why?  Because of the way Foot Locker designed the

10  plan with a fixed interest crediting rate of 6 percent.

11         Remember there was that moment when Mr. Kiley, where I

12  said is that actuarial equivalence?  You give people an account

13  and then you promise them future interest credits at 6?  But

14  you started them out squaring them down at 9?  He said he

15  agreed that is not actuarial equivalence.  That is what we are

16  seeking here, provide class members with the full value of

17  their B benefit, the enhancement pursuant to the unchanged

18  second sentence of 1.23.

19         That is where the enhancement is in the plan document.

20  It is on Page 12 of the SPD.  We say --

21         THE COURT:  In your proposal, the enhancement only

22  applies to those participants who had attained the age of 50

23  and completed at least 15 years of service as of conversion?

24         MR. GOTTESDIENER:  Exactly.

25         THE COURT:  So somebody who was 40 at the date of

1    conversion doesn't get the enhancement under your remedy

2    scenario.  Is that correct?

3              MR. GOTTESDIENER:  Correct.  Your Honor is pointing

4    out, and I think your Honor had questions during the trial,

5    that we could have been more aggressive with our proposal

6    because there was the right to the early retirement subsidy.

7              But we're only asking what was promised to people.

8    The enhancement under those terms, as your Honor just said,

9    that was promised flat-out, and as we'll see in a moment, there

10   is just literally no basis in law or fact for the court to

11   rewrite that term of the plan.

12             THE COURT:  I guess it is a philosophical issue as to

13   reformation in terms of where you folks differ in large part.

14   One is you go with the promises as reasonably understood by

15   participants, plaintiff's version, or the defendant's, which is

16   if you assume that the participants were promised a particular

17   conceptual version of a benefit, they should get that, but they

18   shouldn't get the other things which were only there to support

19   the misconception?

20             MR. GOTTESDIENER:  I would agree with your Honor with

21   one important caveat.  Their theory falls apart when you

22   scratch the surface because the only way -- let meet put it

23   this way.  It is an enhancement.  They communicated an

24   enhancement.  In fact, what they're saying is this was an

25   intentional -- the whole, everything was intentional.  We

F7RJOSB5                    Summation - Mr. Gottesdiener

1    intended this vicious wear-away and we knew it was so bad that

2    we were going to make it less bad for people.  That is not an

3    enhancement and that is not what is being communicated.

4           What was being communicated was you're going to get

5    better than someone else, and we believe we have shown beyond a

6    shadow of a doubt that they were being promised equal benefit.

7    Your benefit was in the form of an annuity, and now it is an

8    account.  That is a promise many times over through those

9    communications when they kept showing that is your payment is

10   the account.  There is only one logical conclusion which is

11   growth in the account is growth in the benefit.  I was started

12   out at an account that is equal in value to the benefit I

13   already earned.

14          So their theory collapses upon inspection.  You can't

15   have an enhancement when you didn't disclose the wear-away.  If

16   they went to people and said we're dropping you all into

17   wear-away, into a pension hole, but we're going to enhance the

18   intentional deficit and give some of you less time that you're

19   going to have to spend re-earning your benefits, then I guess

20   conceivably they could call it whatever they wanted, but that

21   is not what happened.

22          They presented this as an equal value exchange, and

23   some people like Ms. Cardona were going to do better because

24   they deserved it.  That is not an enhancement, however they

25   want to term it.

F7RJOSB5                         Summation - Mr. Gottesdiener

1            So we would not have the court touch the second

2    sentence, just the first to make make it an equal value

3    exchange.  Pursuant to the unchanged second sentence of 1.23,

4    senior participants would keep the enhancement they were

5    promised and they have already received.  Under the remaining

6    unchanged provisions of the plan, participants would receive

7    the compensation and interest credits described in the SPD, and

8    everything else would remain intact.

9            THE COURT:  And under the plaintiff's version, and I

10   can go back to Mr. Deutsch's report to go back and forth and

11   figure this out, but just give me your view, are there any

12   participants in the class who have not experienced some form

13   of, "loss"?

14           MR. GOTTESDIENER:  No.  Everyone has lost something.

15           Mr. Deutsch's report does explain, and there has been

16   reference to it from the defense, that wear-away continues or

17   it happens even when you're ultimately out of wear-away because

18   there is a period of time where you lost the pay credits

19   because the pay credits were being used in effect to burn away

20   the wear-away.

21           The same thing with the enhancement.  Everybody lost

22   either pay credits or the enhancement to some degree.  Most

23   participants, in fact, who were eligible for the enhancement,

24   they lost most of it.  There is no one who was better off, and

25   everyone suffered wear-away because of the 6-9 arbitrage that

F7RJOSB5                    Summation - Mr. Gottesdiener

1    Foot Locker baked into the cake for the conversion.

2           We submit that the Deutsch method is the appropriate

3    way to provide class members with full A plus B benefits.  The

4    method would require the plan, as I mentioned before, to

5    recalculate the initial balances using the 6 percent discount

6    rate, mirroring the interest crediting rate, the fixed interest

7    crediting rate.

8           So I digress for a second.

9           All that stuff your Honor heard from Mr. Sher,

10   respectfully, we submit the bobbing and weaving about the

11   variable rates, that is all irrelevant here because we have a

12   nice fixed 6 percent interest crediting rate.  So we just

13   mirror it backwards.  That is the discounting.

14          If you use the standard mortality table but don't take

15   an additional reduction for mortality because again growing it

16   back, there is going to be a shortfall, this would fully remedy

17   the violation.  We have been over this in a prior slide.  It

18   would align the plan terms with what they led people to

19   believe.

20          THE COURT:  One thing that you heard me ask Mr. Sher

21   was whether or not, because of the variability of the GATT

22   rate, there would be a possibility that if a termination date

23   occurred when the interest rates had dropped even more, that

24   the participant could get a different and potentially higher

25   lump sum, minimum lump-sum payment; and that, therefore, the

F7RJOSB5                          Summation - Mr. Gottesdiener

1    question is, can one with variable GATT rates perform the

2    methodology as you have suggested and not encounter a potential

3    issue with ERISA, where the person is getting less than they

4    were entitled to on date of conversion?

5              MR. GOTTESDIENER:  Yes, this method completely works.

6              It is Mr. Sher who wants to, respectfully, violate

7    ERISA by not applying 417 (e).  He wants to use today's

8    corporate bond rates.  He wants to not to do the whipsaw

9    calculation because he personally believes it is a windfall,

10   and the Second Circuit just Thursday reaffirms that it is the

11   law.  Our method is completely consistent with the law.  Their

12   method is not.

13             Mr. Deutsch is sending me a note, pointing out there

14   is variability because of the GATT rate and because of the

15   whipsaw when the rates fall below 5.5 percent.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1    MR. GOTTESDIENER:  (Continuing) But that is life under

2    GATT.  All kinds of defined benefit plans, not just cash

3    balance plans allow lump sums.  There is variability based on

4    where the GATT rate is.

5           So that is just a fact of life.

6           THE COURT:  Is there anybody who could already have

7    been paid out, who as we talked about sort of, or it was

8    referenced in the proposed findings, would end up in a

9    situation of not having to repay but effectively not recovering

10   because they had already received more than that to which they

11   would be entitled under the plaintiff's formula?

12          MR. GOTTESDIENER:  No, absolutely not.  That is flat

13   out no question.

14          I mentioned this before.  The Deutsch opening account

15   A-plus-B method is more appropriate than defendant's

16   zero-balance account method.  That's the way to think of what

17   Mr. Sher is proposing.

18          Let's not use an account at all.  That advantages them

19   because they can say, well, it is easier for them to disappear

20   the enhancement that way.

21          Where's the enhancement in your calculation, Mr. Sher?

22   It doesn't show up.

23          It also allows them to start arguing -- again contrary

24   to law -- that the court should allow them not to perform a

25   whipsaw calculation in the years where that calculation has to

F7RNOSB6                    Summation - Mr. Gottesdiener

1    be performed and to allow them to use the corporate bond rate

2    as the discount rate as opposed to the rate that applied when

3    people took their money.

4           It is a zero-balance account method.  It is not

5    appropriate, because, as Mr. Sher concedes, the opening account

6    balance method was how the plan communicated it to participants

7    here, and it reflected the popular practice in the '90s to

8    provide people with opening account balances reflecting the

9    cash value of their accrued benefits that they had earned up to

10   the date of the change.  That is just his report admitting

11   that, saying that.

12          We heard from him this morning.  He admitted that in

13   his survey 87 percent of the respondents said they did the

14   opening account method, and he cites a GAO study that similarly

15   found that only 17 percent transitioned people the way he's

16   saying that should be done here now.

17          Mr. Deutsch's opening report explained that creating

18   the opening balance at 6 percent solves the wear-away problem

19   here.  Just because I am conscious of time and want to save

20   some, I will move through these slides a little quicker.  You

21   heard a lot of this, this morning.

22          Mr. Sher said, Mr. Deutsch was wrong, he was all wet,

23   that he didn't know what he was talking about.

24          This approach, the Deutsch approach is not guaranteed

25   to eliminate wear-away on lump sums due to declining interest

F7RNOSB6                         Summation - Mr. Gottesdiener

1    rates.

2                   THE COURT:  I think that's the point that I was

3    referring to in part.  OK.

4                   MR. GOTTESDIENER:  So he was just wrong.  It is not

5    Deutsch who was wrong, it was Mr. Sher who was wrong.

6                   That came up in his deposition.

7                   So in the second question the thrust is that of the

8    guy, and that means Mr. Deutsch didn't even get it right.

9    There's leakage, you're still going to have wear-away.

10                   That's your point?

11                   Mr. Sher at this point he's back pedaling:  That was

12   my point when I wrote my report.

13                   Is that your point now, or are you backing off?  Are

14   you not sure anymore?

15                   I would have to rethink that, yeah.  Yes, as I'm

16   sitting here now I am not so sure.

17                   Mr. Sher was no longer sure.

18                   Now he puts in his rebuttal report.  And he confesses,

19   I was wrong.  Plaintiff's counsel questioned me about this

20   footnote in my deposition.  Now that I think about it, I have

21   to backtrack.  The footnote is incorrect.  I was wrong to say

22   that Deutsch didn't know what he was talking about.  Now, here

23   at trial, defendants attempt to bury that admission by

24   withdrawing the rebuttal report as a trial exhibit.

25                   The point here is, your Honor, that A plus B is not a

F7RNOSB6                        Summation - Mr. Gottesdiener

1    complete remedy without the enhancement.  The opening account

2    method it is conceded by Mr. Sher does eliminate wear-away.

3    The key here is the enhancement at this point in time.

4           The A-plus-B opening account method is B is the

5    benefit based on cash balance pay and interest credits.  The A,

6    of course, is the 1/1/96 present value of the prior benefit

7    payable at age 65.

8           But the problem with the Deutsch method, unless the

9    enhancement is added, which is why he does, and the Sher method

10   is, Where is the value of the early retirement subsidy earned

11   by people who had 15 years of service or more?

12          This is the Deutsch method -- sorry, this is the Sher

13   method, the zero-balance account method.  Again, where is the

14   value of the early retirement subsidy, the promised

15   enhancement, and the value of the early retirement subsidy?

16   They just vanish in Mr. Sher's world.

17          The enhancement makes the remedy, your Honor, complete

18   because now we have, the benefit is based on pay and interest

19   credits plus the enhancement that's based on the early

20   retirement subsidy factors.

21          They reverse engineered them.  The value of the early

22   retirement subsidy is reflected in the enhancement, and senior

23   participants like Ms. Cardona are made whole.  Here -- we don't

24   have to repeat this.  We just saw it earlier today.

25          Ms. Peck acknowledged that was what the enhancement

F7RNOSB6                    Summation - Mr. Gottesdiener

1    was intended to do, to replace the early retirement subsidy

2    that Foot Locker knew was going away and that people requesting

3    lump sums would otherwise forfeit.

4           THE COURT:  This, again, is I think another

5    philosophical difference where the plaintiff's reference the

6    enhancement as the replacement of the early retirement subsidy,

7    and it appears -- and Mr. Rumeld will say exactly what they

8    think of it as -- but it appears that the defense thinks of it

9    instead as support for individuals with certain amount of

10   seniority and a certain age in the context of a converted plan,

11   not as necessarily value for the early retirement subsidy,

12   really as support in the context of frankly likely wear-away.

13          MR. GOTTESDIENER:  And the problem with their argument

14   is they are ignoring the promise.

15          So we are pointing to this evidence secondarily in

16   effect, your Honor, to show from Grefig, from Peck, even from

17   Kiley that this was the intent, at least in part, behind the

18   enhancement.

19          But first and foremost it is a promise.  The promise

20   needs to be kept.  That is what *Amara* is about.  So the

21   philosophy behind it, respectfully, is secondary.  It's support

22   for the overarching point was that it was promised.

23          Enhancements like this were common.  We point out the

24   GAO study points this out.  This is in our briefing.  So I will

25   just move forward.

F7RNOSB6                    Summation - Mr. Gottesdiener

1          Where I want to end up is just to show we did this

2     with Mr. Deutsch and it was very clear, he was not

3     cross-examined about this or questioned about it in any

4     meaningful way.  This shows the bump-up at age 50, the value of

5     the benefit calculated using the 6 percent discount rate.

6          Remember, we went through this with Mr. Deutsch, and

7     we showed using Ms. Cardona as an example if you remove the

8     enhancement, which is there in the plan document, it's in the

9     SPD, what's going to happen is that value between the orange

10    and blue line, that's all going to be lost.

11         So the opening accounts would be less valuable than

12    the already earned benefit for people like Ms. Cardona.  So she

13    would get under the remedy that we seek -- in the right-hand

14    column you see the 593.76.  That's what she's getting now.

15    That's her wear-away frozen accrued benefit that she's being

16    paid.

17         Under our remedy she would get approximately 140

18    additional dollars a month, because what's going to happen then

19    is her account balance in the left-hand column is going to be

20    started out correctly at 6 percent, as promised.  And I don't

21    mean literally.  I am sure counsel is going to jump up and say

22    it was promised at 6 percent.  The substance was it was

23    promised as an equal benefit.  You need to do that using 6

24    percent.  Her account balance so calculated with the

25    enhancement then achieves $99,000, the cash balance benefit,

F7RNOSB6                       Summation - Mr. Gottesdiener

1   that that is $735.  She is out of wear-away and she would be

2   receiving, under our remedy, $140 additional a month, which I

3   guess Mr. Sher would find a windfall.

4           THE COURT:  And then presumably she would receive the

5   back amounts as well?

6           MR. GOTTESDIENER:  Yes.

7           THE COURT:  At what rate of interest?

8           MR. GOTTESDIENER:  I would think 417(e) -- I think she

9   would get 6 percent.  It would be 6 percent because it's kind

10  of in there in the plan, so it would be the plan rate.  The

11  plan interest crediting rate is 6 percent.  In effect, they are

12  holding on to what belongs to her.

13          So here is what happens when the defendants get their

14  way and she doesn't get the enhancement.  She's back in

15  wear-away.  She's stuck at $593 even under the remedy that they

16  want.  Oh, Judge, just limit it to A plus B.  Everybody will be

17  made whole.  No, Ms. Cardona is going to be stuck in wear-away.

18          THE COURT:  Do you want to have ten minutes left?

19          MR. GOTTESDIENER:  Yes, I do.

20          THE COURT:  You've only got ten minutes now.

21          MR. GOTTESDIENER:  Thank you.

22          I only have two slides.  So I will just do them

23  quickly.

24          THE COURT:  Do you have a copy of these slides?

25          MR. GOTTESDIENER:  Yes, I will hand them up.

F7RNOSB6                          Summation – Mr. Gottesdiener

1          THE COURT:  If the defense has them, I will take any

2     slides that folks want to give me.  Not as part of the record

3     but just as something -- they are not evidence, they are

4     guidance, demonstratives.

5          MR. GOTTESDIENER:  We say there is no basis for

6     removing the enhancement from the plan.  It is not a windfall

7     to pay people the benefit that they were explicitly promised.

8     The SPD could not have been clearer.

9          Last week the Second Circuit basically said the same

10    thing.  There is no basis for removing the enhancement from the

11    plan.  In the *Laurent* case they said, Listen, we are going to

12    hand it back down to Judge Oetken, but we note that age 65,

13    they tried to do a work around from the whipsaw requirement,

14    age 65 is part of the plan document.  The part that we struck

15    down is illegal, so that's gone.  It is a lawful term of the

16    plan.  So PWC may be compelled to act in accordance with the

17    documents and instruments governing the plan insofar as they

18    accord with the statute.

19         There is no argument that the enhancement is illegal.

20    The enhancement is in the plan document.  It's in the SPD.

21         With that, your Honor, I reserve the balance of my

22    time.

23         THE COURT:  All right.  Thank you.

24         Let's take a short break and come back and it will be

25    Mr. Rumeld's turn.

F7rnosb6                    Summation - Mr. Rumeld

1              (Recess)

2              THE COURT:  Mr. Rumeld.

3              MR. RUMELD:  Thank you, your Honor.

4              THE COURT:  You may proceed.

5              MR. RUMELD:  Before turning to the evidence and what

6    it shows, I thought I would review the various elements that

7    the class must prove and what the potential legal issues are

8    that are embedded in this analysis.

9              First, the class must prevail on its claim for an SPD

10   violation or its claim for breach of fiduciary duty.

11             If the class prevails on either of these claims, then

12   it must prove by clear and convincing evidence the elements of

13   a claim for reformation relief.

14             This includes proving misunderstanding by the class

15   and fraud or inequitable conduct on Foot Locker's part.  Should

16   the Court conclude that the class has sustained its burden of

17   proving entitlement to reformation relief, the Court must then

18   decide what type of equitable relief is appropriate.

19             With the Court's permission, I am going to leave that

20   part to Mr. Rachal a little bit later.  But let me just say

21   preliminarily that what your Honor's responsibility is, is to

22   match the relief to what the claimed misrepresentation-

23   /misunderstanding was.

24             This is not a case where we are reforming a plan

25   because there was anything wrong with the plan terms.  I think

F7rnosb6                    Summation - Mr. Rumeld

1    both sides agree with that.  It is what is the misunderstanding

2    and how does the Court, as the Court in equity, narrowly tailor

3    that relief to what the class misunderstanding is.

4            As best as I can tell from what I have heard today and

5    throughout these proceedings the misunderstanding is that

6    people thought they were getting the benefit of their pay and

7    interest credits when in fact they weren't if they were still

8    in wear-away.

9            The Court must also find that each of these elements

10   of proof were satisfied for the entire class because no class

11   member should be allowed to obtain relief that she or he would

12   otherwise not be entitled to were it not for the class being

13   certified.

14           Now let me break each of these elements down a little

15   bit further.

16           First the SPD claim.

17           We have already directed the Court to the legislative

18   history, which we believe convincingly demonstrates that there

19   was no statutory requirement during this time period to

20   disclose in the summary plan description the wear-away effect

21   or, more generally, the effects of a plan amendment.  Rather,

22   the obligation was to accurately describe the terms of the new

23   plan formula, which we did.

24           Unlike in *Amara*, our SPD did not contain affirmative

25   misrepresentations, as we previously explained in the summary

F7rnosb6                    Summation - Mr. Rumeld

1     judgment papers and our proposed findings of fact and

2     conclusions of law.

3          Our proposed findings already contain a pretty

4     extensive discussion of this legislative history, but I just

5     want to direct the Court to certain passages from the GAO

6     report and the committee report because I think they help to

7     capture our point that prior to the amendment of 204(h),

8     several years after these events, there was no statutory

9     requirement to affirmatively disclose wear-away, and even then

10    the focus was on amending 204(h), not the rules governing

11    summary plan descriptions.

12         The GOA report from September 2000 states, among other

13    things, that under current disclosure requirements, firms may

14    have broad flexibility in the type of information they provide

15    participants about plan changes.

16         ERISA specifically requires that plan sponsors notify

17    plan participants about any plan amendment that may

18    significantly reduce the rate of benefit or future benefit

19    accruals for some or all employees.  Then it talks about the

20    fact that that requirement is the one in 204(h) to be delivered

21    in advance of a plan amendment.

22         And then later it says, However, the law does not

23    specifically require that plan sponsors articulate the nature

24    of the formula amendment or identify groups of participants who

25    may be adversely affected.

F7rnosb6                    Summation - Mr. Rumeld

1         Then there is the House Ways and Means report, which

2    also came out in 2001 at the time of these amendments.

3         Among other things, it says, The committee is aware of

4    recent significant publicity concerning conversions of

5    traditional defined benefit plans to cash balance plans with

6    particular focus on the impact such conversions have on the

7    affected workers.

8         The purpose of this committee report was to address

9    directly the same problem the Court is grappling with in this

10   lawsuit.

11        Then it goes on to say, The committee believes that

12   employees are entitled to meaningful disclosure concerning plan

13   amendments that may result in reductions of future benefit

14   accruals.  The committee has determined that present law does

15   not require employers to provide such disclosure, particularly

16   in cases where traditional defined benefit plans are converted

17   to cash balance plans.

18        As we pointed out in our papers, the outcome of this

19   Congressional discussion was an amendment to Section 204(h) of

20   ERISA as Congress recommended, agreed that the SPD, the

21   document that comes out only sometime after the amendment goes

22   into effect, was not a suitable vehicle for rectifying the

23   issue that Congress had identified.

24        So before all this Congressional activity there is no

25   rules at all, and even after this Congressional activity the

F7rnosb6                    Summation - Mr. Rumeld

1    change is made to Section 204(h) and not to the SPD

2    requirement.

3            I would also refer the Court to Mr. Sher's testimony

4    during which he stated that no one during this period of time

5    included anything in their SPDs beyond the same type of

6    statement that we included to the effect that a participant

7    would receive his accrued benefit under the prior plan if it

8    was worth more than his accrued benefit under the current plan.

9    This was true for all of his clients, regardless of their

10   particular jobs or educational background.

11           And Mr. Deutsch last not identified a single SPD from

12   this period that provided otherwise.

13           So, in short, your Honor, to find that Foot Locker

14   violated Section 102 of ERISA, the provision governing SPD

15   requirements, would be tantamount to legislating retroactively,

16   because there was no requirement in the 1990s that wear-away be

17   disclosed in summary plan descriptions.  The Court's evaluation

18   of our conduct should be limited to whether the communications

19   in the aggregate fulfilled the company's fiduciary

20   responsibilities.

21           Let me just point out parenthetically, even with

22   respect to the fiduciary standards, it's helpful to keep in

23   mind that the leading case on the subject about fiduciary

24   communications, the *Varity* decision by the Supreme Court

25   actually came out in 1996, sometime after the cash balance

F7rnosb6                    Summation - Mr. Rumeld

1    amendment went into effect.

2            Twenty years later it's kind of hard to picture this,

3    but there is an evolution to ERISA, and it took until the late

4    1990s until there was even a clearcut recognition that the

5    company's communications with plan participants about changes

6    to benefits are also the level of breach of fiduciary duty.  I

7    accept the fact that your Honor is going to judge us based on

8    those standards and the case law that came out afterwards, but

9    it is really helpful to keep in mind how much things have

10   changed since 20 years ago.

11           Now, with respect to the fiduciary duty claim and

12   based on the case law that came out since the 1996 *Varity*

13   decision, the class must prove both that there was a

14   misrepresentation or material omission on Foot Locker's part

15   and also detrimental reliance on the part of the class.

16           The pre-*Amara* law in this circuit requiring a showing

17   of detrimental reliance has not been changed.  The testimony of

18   the class representatives demonstrates that the class has not

19   proven classwide detrimental reliance, at least among the

20   witnesses called.

21           The typical class member left Foot Locker for a job

22   with no defined benefit plan at all and in many cases for less

23   pay.  There is no rational basis from that testimony to

24   conclude that these class members, let alone all the class

25   members, would have left Foot Locker sooner if they knew they

F7rnosb6                        Summation - Mr. Rumeld

weren't accruing new benefits under the cash balance plan or
that they were taking any other action with respect to their
employment.

          Now, with respect to fraud or inequitable conduct, the
parties appear to be in agreement on what constitutes fraud,
but there definitely is a disagreement on the standard for
inequitable conduct, and specifically whether inequitable
conduct requires intent to gain an undue advantage over the
participant.

          I think your Honor will find when she reviews the
various cases cited by both parties in their proposed findings
that these cases, when read properly, support the position that
the Court imposes reformation only when the offending parties
knowingly gain a material unfair advantage by virtue of
purposely keeping the other party in the dark as to the
misunderstanding.  There still needs to be some showing of
intent.

          It may be true that the origins of the
misrepresentation could be innocent.  But if you read the
cases, there is this intent to cling to the misunderstanding
that was perpetrated on the other party, because none of these
cases is a real ERISA case.  They all come in other kinds of
contexts.  And there has to be some volitional, intentional
conduct to maintain and perpetuate that misunderstanding for
the sake of gaining and maintaining that undue advantage.

F7rnosb6                    Summation - Mr. Rumeld

1          And the undue advantage, your Honor, is one that has

2     to be attributable to the miscommunication itself, which in

3     this case would mean that we gained an advantage by virtue of

4     the participant's not understanding wear-away, not some

5     separate advantage that we gained by virtue of a cash balance

6     amendment.

7          I will discuss a little later why we don't believe

8     there is any basis for finding inequitable conduct regardless

9     of precisely how the standard is applied, but we do believe

10    that the case law requires a showing of intent of volitional

11    conduct.

12         I would also point out parenthetically that if there

13    is a finding of inequitable conduct but not a finding of common

14    law fraud, the class for the fiduciary breach claim does need

15    to be limited to six years.

16         I know your Honor previously mentioned that the

17    statute of limitations issue seems to have disappeared, but the

18    breach of fiduciary statute of limitations runs six years from

19    the breach, except in the case of fraud.

20         This is not inequitable conduct.  This is fraud

21    according to the statute.  And the *Caputo v. Pfizer* case, which

22    is a Second Circuit opinion, has an expensive discussion about

23    this issue.  If your Honor finds inequitable conduct but not

24    fraud, there is a need to revisit the statute of limitations

25    issues.

F7rnosb6                         Summation - Mr. Rumeld

1          Separate and apart from the need to demonstrate fraud

2     or inequitable conduct on our part, there's the need to prove

3     classwide misunderstanding.

4          I know your Honor previously stated, at the pretrial

5     conference, I believe, that this element appeared to have

6     already been satisfied and that everyone seemed to have been

7     laboring under a misunderstanding about the wear-away effect of

8     the plan design.  And your Honor specifically made the comment

9     that no one seems to have complained.

10          In fact, however, two of the nine witnesses who

11    appeared here specifically admitted that they did understand

12    that for participants receiving the minimum lump sum based on

13    the pre-1996 benefit, pay and interest credits were not

14    counting towards their benefit earned.

15          That's both Mr. Steven, whose testimony is up there.

16    I specifically asked him the question:  "You understood at the

17    time that as long as your minimum lump sum remained larger than

18    your account balance, the credits referred to on this page that

19    were added to your account balance didn't matter, isn't that

20    right?

21          "Yes."

22          That was not just me sort of coaxing him into some

23    position.  It's because he got this incredibly detailed

24    statement that showed how his minimum lump sum balance was

25    calculated, that showed how his starting balance was

1  calculated, that showed how the pay and interest credits were

2  added to the starting balance, and that showed that the minimum

3  lump sum based on the pre-1996 benefit, like he referred to as

4  the one that remained constant, was still bigger than his

5  account balance.

6      Similarly, Ms. Glickfield, who was in the business of

7  calculating minimum lump sums, similarly admitted specifically

8  to the same question that she was aware that the pay and

9  interest credits when added to the account would not ultimately

10 count if a participant received a benefit based on the pre-1996

11 minimum lump sum.

12      So they may have been laboring under some sort of

13 misunderstanding, but if the class claim is, We didn't realize

14 our credits weren't counting, I think these two individuals

15 have admitted otherwise.

16      I would also point out that there were in fact

17 complaints or at least inquiries which we directed your Honor

18 to during the trial proceedings.  Your Honor may recall that

19 there was internal e-mails where a participant specifically

20 inquired about, Why is my approved benefit remaining the same?

21      There were so, so many of those questions that the

22 folks in Wisconsin consulted with the folks in New York to

23 develop a model response to those questions which explained to

24 them that there's this minimum lump sum, and the amount of

25 minimum lump sum depends on the movement of interest rates, and

F7rnosb6                      Summation - Mr. Rumeld

1    it could go up and it could go down.  So there is in fact some

2    evidence, notwithstanding the fact that we have issues about

3    dated memories and dated documents, there is in fact evidence

4    that there was an accumulation of people who specifically

5    inquired why is my accrued benefit not changing, which seems

6    pretty near close to specifically raising questions about the

7    wear-away issue.

8           Finally, Rita Welz, the vice president of benefits

9    administration, admitted that had she paid closer attention to

10   provision in the SPD she could have realized that this meant

11   that she might not be accruing benefits under the cash balance

12   plan or that her accruals under the old plan would be worth

13   more than those under the cash plan.

14          But she didn't pay attention to this clause, which

15   means that her misunderstanding was not caused by the clause in

16   the SPD.  It was caused by her failure to refer to it.

17          In short, your Honor, the evidence does not support

18   the finding of a classwide misunderstanding, at least not one

19   that is attributable to a misrepresentation that was made by

20   Foot Locker.

21          People may have labored under misunderstandings based

22   on their faith in the company based on what they believed was

23   happening.  But in order for there to be a claim, this needs to

24   be a misunderstanding that's attributable to what we actually

25   did.  And then the relief, if your Honor wants to impose

F7rnosb6                      Summation – Mr. Rumeld

1    relief, has to connect those two things together.

2              This leads to my next point, your Honor, which is that

3    even if the Court should find a substantive violation either of

4    the SPD rule or breach of fiduciary duty, it must separately

5    consider whether the violation occurred classwide and, if so,

6    the scope of the class relief.

7              As I mentioned, I am going to leave the discussion of

8    what type of relief should apply to Mr. Rachal, but I want to

9    just distinguish from his discussion what I view to be the

10   independent question of who within the class should be entitled

11   on any equitable relief at all because I think that that helps

12   guide the Court in deciding what type of equitable relief would

13   be appropriate in a case like this.

14             So, first of all, there are the folks who may have

15   understood that their pay and interest credits weren't

16   counting, like Mr. Steven and Ms. Glickfield.  I would argue

17   that they should not be in the class.

18             And, in addition, participants like Mr. 00004, who I

19   know we have talked about ad nauseam here, but anybody who

20   received a benefit equal or exceeding the A–plus–B benefit

21   should not be getting relief in this case, and there are close

22   to a thousand people in that category.

23             Let me just clarify for the moment.  Mr. Rachal will

24   come back to this as well.  No one is saying that Mr. 00004

25   should have his enhancement taken away from him.  He receives

F7rnosb6                    Summation - Mr. Rumeld

his enhancement, and he can keep it.

          The question is whether it is appropriate for your
Honor to kind of double down on that enhancement by giving a
form of relief that doesn't take into account the fact that in
light of the enhancement, he suffered a very small wear-away.

          If his claim is I didn't get the benefit of pay and
interest credits, if that's the claim, and if by virtue of the
enhancement he did get the benefit of all his pay and interest
credits, then he is just not entitled to relief regardless of
whatever misunderstanding he was laboring under.  He got that
which he thought he was getting.  If that's the claim, he gets
no relief.  That's the point.  It is not a question of taking
his enhancement away from him.

          Furthermore, for the SPD claim there shouldn't be any
relief under any circumstances for the approximately 3500
participants who left in 1996 and thus couldn't have been
influenced by an SPD that wasn't issued until the end of 1996.

          Finally, I think the Court should consider whether for
those participants who left within the couple of years
immediately after the conversion equity would actually call for
or require any relief in light of the value that they actually
got out of taking this lump sum benefit that was otherwise not
available to them.

          I will let Mr. Rachal elaborate on that, but let me
just point out parenthetically Mr. Gottesdiener mentioned the

F7rnosb6                    Summation - Mr. Rumeld

1    10,000 participants who never got out of wear-away.  It is

2    helpful to keep in mind that about half of the 16,000

3    participants in this class were all gone within a year or two

4    by virtue of the many terminations that took place or they were

5    leaving volitionally.

6         So most of them did not have Mr. Osberg's experience

7    not only because their mathematical circumstances were

8    different but because they could only have a couple of years of

9    wear way if they left after a couple of years.

10        In those circumstances your Honor should consider

11   acting as a judge in equity.  What really was the cost benefit

12   of them of losing a modest amount of pay credits, particularly

13   the people who left in January of 1996 versus what it is that

14   they got out of the cash balance plan.

15        With that backdrop, I want to summarize some of the

16   key evidentiary points as they relate to the fiduciary breach

17   claim and the claims for fraud and inequitable conduct.

18        I really want to emphasize here, your Honor, I know

19   the Court is really very familiar with the record, so I'm

20   really picking out what we view to be some of the highlights of

21   the evidence.  This is by no means an effort to be

22   comprehensive.

23        For organizational purposes, I think we can divide the

24   evidence as follows:

25        There is evidence relating to the motivation for the

F7rnosb6                    Summation - Mr. Rumeld

1     cash balance design, there's evidence regarding what the HR

2     personnel understood about that design, and then there's the

3     evidence regarding the rationale for the plan communications

4     themselves.

5             The evidence confirms that there is no logical basis

6     for connecting the plan design recommendation to an intention

7     to implement an undisclosed plan freeze, as the class alleges.

8             The witnesses all testified that the plan was designed

9     to create a more affordable benefit with a lump sum option and

10    to achieve long-term savings through a change in the formula

11    through which benefits would be accrued on a going-forward

12    basis.

13            None of the members of the task force who came up with

14    this design recommendation had any knowledge of wear-away until

15    February of 1995 when they had that meeting with Mercer.  And

16    even then, during that meeting, the 20 percent cost savings

17    that Mercer referred to and that they had in mind was clearly

18    linked to the change in the formula, not to wear-away.

19            In any event, by this time the cash balance proposal

20    was well on its way to implementation, which is evident from

21    the fact that not only did Ms. Peck attend this meeting,

22    because she was the one who delegated to the others to come up

23    with a recommendation, not only did she attend, but inside and

24    outside counsel attended this meeting.

25            So, as she testified, none of those people would be

F7rnosb6                      Summation - Mr. Rumeld

1   attending unless this proposal was really a concrete proposal

2   that they were ready to run with.

3          In fact, the notes reflect the fact that in this

4   February meeting they were thinking about a July rollout date.

5   So by the time anybody is even getting their education on

6   wear-away, this cash balance plan design has been thumbs upped

7   and there are people ready to run with it and specifically the

8   people in this task force who are later responsible for the

9   communications.

10         Even after receiving the explanation of wear-away, no

11  one in this group perceived the wear-away effect as akin to

12  freezing benefits.  There is no indication that Mercer ever

13  suggested that they should.

14         To the contrary, even in communications with the

15  company in late 1996, during that time when Mr. Farah asked

16  whether there were additional ways to generate cost savings,

17  Mercer explicitly characterized the plan freeze as an option

18  distinct, completely distinct from the cash balance design that

19  had been implemented.  That's in DX 161.

20         This is not to say that there was not an eventual

21  recognition that wear-away would independently generate

22  short-term cost savings.  I don't think there is any question

23  that Mercer in a number of places communicated to the

24  management that there would be a first-year normal cost

25  savings, which the Court inquired about, and that that

1    information was relayed to senior management.

2           We concede that.  We don't deny it, that, at least in

3    Mercer's mind there was a connection between wear-away and cost

4    savings.

5           However, it's also true that the presentation

6    materials themselves nowhere explicitly refer to wear-away as

7    being the source of those savings.  There is no evidence that

8    there was any discussion of wear-away, just that there was a

9    discussion about the fact that there would be a reduction in

10   normal cost savings during the first year.  And there's nothing

11   that would connect those savings to what the original

12   intentions were of the task group that long before came up with

13   the cash balance recommendation.

14          THE COURT:  Let me just ask you, do you take the

15   position that Ms. Peck was not enough in terms of awareness of

16   wear-away, and that Mr. Hilpert and Mr. Farah had to separately

17   have been aware of wear-away?

18          Let's assume for the moment that the other pieces

19   lined up and that there needed to be a type of disclosure that

20   wasn't there and one is trying to figure out who is on the hook

21   for this.  Would Ms. Peck be enough?

22          MR. RUMELD:  I think, if I understand your Honor's

23   question, she would be enough, but then there would be the

24   question, certainly if the allegation is fraud and the fraud is

25   tied to why did Ms. Peck design this plan, I think it's clear

F7rnosb6                    Summation - Mr. Rumeld

from her testimony and the documentation of the sequence of

events that she was in favor of the cash balance plan long

before she had an awareness of wear-away.  She did not

recommend the design of the plan with wear-away on the brain.

So, yes, it's sufficient for purposes of your Honor's

evaluation of what type of communications we should have had,

etc., that Ms. Peck was aware of wear-away, even if there isn't

evidence that that awareness filtered up.

I accept the fact that she was acting on behalf of

management with respect to the plan communications, and I think

that's very typical, you know, for this type of thing.  But

that is a different question than, Did Ms. Peck design the plan

with wear-away in mind.

She designed the plan with long-term savings in mind.

That's why those additional presentations all refer to

long-term savings.

And she designed the plan because, based on her

attendance at the meeting and her discussions with Mr. Kiley,

they thought this was a good thing to do for participants and

wear-away came into the picture later.

That's my point on it.

So Mr. Farah may have been extremely happy if he saw

short-term savings given the company's financial position.  I

am not doubting the fact that short-term savings, if in fact

they were perceived that way, would have looked good for the

F7rnosb6                    Summation - Mr. Rumeld

1    company.  It just doesn't have to do with why this design was

2    recommended.

3            Let's now consider what the HR group's understanding

4    was about wear-away and how it fits within the overall plan

5    design.

6            The task force, and Kiley in particular, were fully

7    conversant with the plan terms.  Kiley testified to having

8    participated actively in determining the various plan terms,

9    the pay credits, the interest credits, etc., but he

10   understandably looked to Mercer to determine what specific

11   numerical terms were needed to generate the cost savings that

12   the company was targeting.

13           So, for example, it was Mercer that advised what

14   assumptions should be used to generate the initial account

15   balance, and it was Mercer that advised on what the

16   implications were in terms of wear-away.

17           The evidence shows that there was a consistent

18   recollection amongst the task force of being told that

19   wear-away would be relatively a short-term consequence and thus

20   something that played a dominant role in determining how to

21   explain the cash balance plan to participants.

22           These recollections are corroborated by Mr. Kiley's

23   internal notes, which show Mercer advising that wear-away would

24   last two to three years and then it would be over.  The various

25   scenario analyses that Kiley appears to have been shown, some

F7rnosb6                    Summation - Mr. Rumeld

of which suggest a longer wear-away period, but several of

which were entirely consistent with approximately a three-year

wear-away, they were all irrelevant because they depict plan

formulas that were never actually adopted.

I went through that with him, and they all had to do

with plan designs that were different than the plan design that

was adopted.  So I am not sure why they are proving anything.

Similarly irrelevant is this memo from Mercer, the

late 1996 which my adversary keeps referring to, which deals

with a response to a request by Mr. Farah to look into the

interest rate.

There is simply no indication that just because

Ms. Peck received a copy of this memo she actually translated

this reference to cost savings that would wear-away in a few

years into, oh, wear-away is going to last a year or two

longer.

I realize with the benefit of hindsight and with some

suggestive questioning she gave some inconsistent testimony on

that, but when I finally asked her if she thinks she connected

these two things at the time, she could not remember doing so,

and I really don't think it's logical that she did.

So the only documentary evidence of what was

communicated to the core group was that wear-away would last

two or three years and then be over.

Separate and apart from the issue of what the HR team

F7rnosb6                    Summation - Mr. Rumeld

1    understood about the length of wear-away, is the issue of what

2    they understood about the consequences of wear-away from a

3    participant's standpoint.

4           With the benefit of hindsight, wear-away is portrayed

5    by the class as this really bad fact that participants should

6    have been made aware of, but at the time the view was simply

7    that by virtue of wear-away participants had an opportunity to

8    get this larger benefit than the one that they would otherwise

9    be expecting from looking at the cash balance account, and that

10   this larger benefit was due to a legislative requirement that

11   the plan provide the lump sum value of the previous benefit if

12   it was worth more than the current benefit.

13          So, as Pat Peck testified, this was viewed to be a

14   good opportunity, not a bad opportunity, because nobody reverse

15   engineered this the way we are doing now and saying, oh, this

16   translates into a benefit freeze.

17          From the perspective that the task force had, that HR

18   had, it becomes much easier to understand why the HR

19   professionals kept the focus of their communications, at least

20   the global ones, on the cash balance account.  The amount in

21   the cash balance account was the amount that was certain and

22   hence the amount that participants could expect to receive.

23          The minimum lump sum was this moving target.  For all

24   the reasons we have discussed, it depended on interest rates.

25          As Carol Kanowicz stated in this early internal e-mail

F7rnosb6                    Summation - Mr. Rumeld

1    that we looked at a number of times that explained why

2    long-term projections based on the minimum lump sum would not

3    be provided, the minimum lump sum could go down significantly

4    if interest rates went up, and this would cause participants to

5    mistakenly believe that they would be receiving more than they

6    ultimately were entitled to.

7              This was the contemporaneous thought process of the HR

8    people.  We don't want participants to find out that they are

9    getting less than they thought they were getting.  That was the

10   reason the projections weren't done.

11             Furthermore, the entire concept about how this minimum

12   lump sum worked and its relationship to the cash balance

13   benefit was I think we can all agree a difficult one that

14   didn't lend itself to any shorthand explanation in companywide

15   communications.

16             As Mr. Sher testified, once told the amount of the

17   minimum lump sum, a participant was going to bank it, now

18   matter how it was caveated in some public statement.  So the

19   decision was made to limit the disclosures in the companywide

20   communications to an explanation of how the new formula worked

21   and what participants could expect to receive in the new

22   formula.

23             In other words they were told what was certain, and

24   the minimum lump sum was discussed when participants were

25   leaving and needed to know what they were getting or,

F7rnosb6                    Summation - Mr. Rumeld

1    alternatively, when participants made a specific inquiry and

2    there was an opportunity to engage in a one-on-one discussion

3    in how benefits were calculated.

4            The wisdom of not making general disclosures of the

5    minimum lump sum before participants were leaving is actually

6    borne out by the actual experience that we can see in the

7    documentation, because the internal communications showed that

8    by 1997 the Wisconsin office had received a series of inquiries

9    from participants complaining that their benefit seemed to have

10   gone down, and that was presumably because they had gotten

11   successive statements or estimates and their minimum lump sum

12   estimate in one year was higher than it was in the next year.

13           So the actual experience proved the point made in

14   Ms. Kanowicz's e-mail that telling people what they are going

15   to get if it's based on the minimum lump sum was fraught with

16   peril.

17           So they did prepare a template letter to respond to

18   those inquiries, which we had looked at.  But clearly, rather

19   than explain after the fact why participants were getting less

20   than they were already expecting, the better course was not to

21   generate frustrated expectations in the first place.

22           So, while the benefits group continued to include the

23   minimum lump sum in benefit estimates that projected benefits

24   within the same year, it generally did not include the minimum

25   lump sum when projecting benefits well into the future.

F7rnosb6                         Summation – Mr. Rumeld

1              I reviewed an exhibit with Ms. Glickfield that

2      specifically contrasted two benefit estimates for the same

3      participants.  One benefit estimate was for the current year,

4      and the minimum lump sum was provided.

5              And the other estimate was for I think ten years into

6      the future, 2008.  And, instead of providing the minimum lump

7      sum amount, the estimate simply said that there is this minimum

8      lump sum that may have been bigger.  It explains how it's

9      determined and then says we can't tell you what it will be

10     because it's subject to interest rate movements.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F7RJOSB7                    Summation - Mr. Rumeld

1              MR. RUMELD:  (Continuing) And for the same reason, the

2    minimum lump sum benefit was not provided in the annual benefit

3    statements.  I think it is important to keep in mind here that

4    the benefit statements that participants had been receiving

5    under the old plan projected what participants would get at

6    normal retirement date which could be 20 years into the future.

7    If we did the same thing here, the numbers would be all over

8    the place because of the movement of interest rates.  So it was

9    kind of hard to give the participant the what am I going to get

10   number without running the risk of misleading the participants.

11             Now, the classes contend that even if you couldn't say

12   the amount of the minimum lump sum, we could have simply

13   alerted participants in the benefit statement there was this

14   larger number based on the pre-1996 benefit that they could

15   have received.  I suppose we could have done that, but to what

16   end?  Even when we provided the actual minimum lump sum

17   figures, the participants did not seem to grasp the

18   implications, at least not the implications that the classes

19   drawing now in this lawsuit.

20             Consider, for example, the Greenville memo which

21   showed the examples of this is what you're starting with and

22   this is the bigger amount, twice as much you get if you are

23   going to leave tomorrow.  This, Ms. Albright testified looking

24   at the example closest to her circumstance and she didn't at

25   that time translate into some kind of increase.

F7RJOSB7                        Summation - Mr. Rumeld

 1              Both sides have been talking about Mr. Steven who got

 2    the most, a very, very detailed statement, and even though it

 3    showed him his minimum lump sum was bigger than his accumulated

 4    account, he says I didn't connect this to some kind of freeze

 5    or I started less than I was entitled to.

 6              There is no indication that providing some additional

 7    clause in the statement would have made much of a difference.

 8    It, frankly, would have been the same clause in the SPD.

 9    Ultimately what the plaintiffs are complaining about was the

10    failure to state a company-wide communications that their

11    benefits may be frozen for a period of time such that they

12    might not be accruing additional benefits during that period of

13    time.

14              The short answer to why that wasn't done, as each of

15    the  HR people testified, they did not equate wear-away with a

16    freeze at the time and they did not contemporaneously review

17    wear-away as translating into participants working for nothing.

18              The addition of credits was viewed as meaningful, just

19    subject to the minimum lump sum.  In any event, the

20    communication posited by the class would have caused more harm

21    than good, in our view, by unnecessarily frightening everybody.

22    To the average participant, freezing is not evaluated from the

23    standpoint of accrued benefits, rather it means not adding to

24    the dollar amount of the pension.

25              From this perspective, there was no freezing of

1    benefits.  People's benefits did go up in dollar amount and in

2    many cases because interest rates were going down, they went up

3    a lot.  In fact, for people like Ms. Hartman, they were better

4    off in rather than out of wear-away because they benefits were

5    higher than in wear-away than not and their amount of benefit

6    went down.

7             Trying to straighten this out with participants in the

8    publicly-issued communications would have just caused people to

9    be very concerned when, in fact, if they're interested in what

10   am I going to get, the discussion of wear-away wasn't

11   necessarily going to help them.

12            Even if with the benefit of hindsight the court would

13   make different choices for our HR folks and said they should

14   have made additional disclosures, this does not translate into

15   a future fiduciary duty.  What the record is clear about is all

16   of these communications were reviewed by a number of

17   professionals, including Mercer and outside counsel, and there

18   is no question that they were both fully apprised of the

19   wear-away situation.  Certainly Mercer was and outside counsel

20   was invited to the same meeting.  They all reviewed these

21   documents and the very sentences that the class says were

22   "false," those sentences were left intact after those reviews.

23            I simply think this is an indication of how the entire

24   legal and actuarial community was looking at wear-away at the

25   time as being two benefits running at the same time, and if you

F7RJOSB7                        Summation - Mr. Rumeld

1    compare the two formulas and see which is bigger, it is not

2    viewed as this bad thing to conceal from participants or one of

3    them would have advised to do.

4           Mr. Gottesdiener has cited one example of a clause

5    that was recommended in the statement by outside counsel.  If

6    you look in context in the comments here, the vast majority of

7    which were never adopted, that entire statement was changed

8    into another one before it went out the door and there is no

9    way to infer from that there is no volitional idea of rejecting

10   counsel's advice.  We just ended up with a completely different

11   statement for whatever reason and no one, no one made an effort

12   to call any of the witnesses who were actually party to those

13   discussions.  So we don't have any evidence as to actually what

14   happened.

15          So in short, your Honor, consistent with the

16   understanding of what was required at the time, an

17   understanding not changed until years later when the world

18   changed, the approach that Foot Locker took, an approach

19   endorsed by its professionals, was to limit the company-wide

20   communications to stating that every participant -- stating

21   whatever participant could bank on, so the typical participant

22   focused on what he or she was getting, would not be

23   disappointed and then to invite these participants to ask

24   questions and get additional information on a one-on-one

25   conversation or communication that could be geared specifically

F7RJOSB7                        Summation - Mr. Rumeld

1    to the information they received.

2              I hate to speed up to leave time for Mr. Rachal.  With

3    respect to foreign or inequitable conduct, regardless of how

4    your Honor comes out on whether there was imprudence here or

5    whether we should have done something differently, there really

6    is no basis for finding any intent to mislead or to conceal.

7    The record is -- there is no fraud and there is no inequitable

8    conduct when there are truthful statements.  I think the law is

9    pretty clear on that point.

10             There is abundant testimony here from all the

11   witnesses we called about the very good-faith efforts that were

12   made to tell people the right information when they called and

13   asked for it, and there is abundant communications, benefit

14   estimates, benefit calculations and the like that were all sent

15   out and that contained much more fulsome information, more

16   information than people asked for, including what Mr. Steven

17   got and what Ms. Cardona got, very detailed statements that had

18   the information that basically revealed the wear-away, whether

19   people understood it or not, truthful communications, and they

20   basically undermine the claim of fraud or claim of inequitable

21   conduct.

22             I should point out that as Ms. Stern testified, Ms.

23   Peck testified, starting in 2000, Mercer picked up the

24   responsibilities for these communications because this whole

25   project was outsourced.  The benefit package that Mr. Osberg

1   received actually came from Mercer because it was after 2000.

2   There is no indication that even after it was handed over to

3   the professionals, the communications were any more fulsome

4   than the ones we were doing beforehand, before we handed the

5   responsibility to Mercer.

6          Mr. Gottesdiener has suggested that it doesn't matter

7   what we intended because we gained an advantage.  As he said, I

8   think the case law shows that we -- your Honor has to find that

9   we intended to gain this advantage, to take advantage of

10  people, and I don't think the evidence shows that.  The

11  testimony is to the effect that the participants -- that the HR

12  folks were trying to be forthcoming with the information they

13  provided.  To the extent they didn't say more about wear-away,

14  it wasn't because they viewed it as some bad thing that people

15  needed to know about.

16         I also think it is important to point out that there

17  was no gain here.  At the end of the day given Foot Locker's

18  financial situation, there is no reason to believe that the

19  participant complaints that were allegedly warded off by

20  leaving this information out of the company-wide

21  communications, there is no information to suggest that would

22  have lead to some different plan design.

23         It is very clear there had to be substantial benefit

24  cuts to save the company.  If it wasn't a wear-away generating

25  benefit, it would have been some other benefit.  Your Honor

F7RJOSB7                    Summation - Mr. Rumeld

1    already found that that whole theory was too speculative to

2    proceed with.  That part of your Honor's ruling has not been

3    overturned because it was right in the first place.

4         There was no gain in the form of gaining an advantage

5    over the participants insofar as we're accused of keeping

6    people in the dark.  People may be kept in the dark.  Maybe

7    people complained, but we didn't gain anything by the fact they

8    didn't complain.

9         Finally, there isn't any evidence anybody succeeded in

10   some part in keeping, in keeping wear-away undisclosed because

11   the evidence was from Ms. Kanowicz and also from the memo that

12   Mercer prepared a year later when the study -- it specifically

13   said morale was bad as a result of the amendments because

14   people did understand it was a benefit cut.  We didn't, in

15   fact, gain some advantage.

16        Finally, I would refer the court, and if you take the

17   time is listen, I will skip to the video, but I do think it is

18   important to keep in mind the full gamut of Ms. Kanowicz's

19   testimony because when asked the direct question, she said was

20   wear-away swept under the rug, she testified no, I can't say

21   that.  When we were up in front of a group of warehouse group,

22   say, all right, there is a couple of people, trust me, every

23   one of them asked are my benefits being cut, and we were

24   totally up front in telling them the plan is being changed and

25   cut because the company is in financial problems.

1    If your Honor reviews the transcript, there were

2 several places, notwithstanding some of the confusion in her

3 testimony, she said we did not conceal anything, we were up

4 front with people.  That is what all the witnesses testimony.

5    I will hand this over.

6    THE COURT:  Do you have a Page 24 that matches the

7 Page 24 here?  My Page 24 that you've given me is different.

8 You have got that?  Thank you you.  Already, Mr. Rachal.

9    MR. RACHAL:  Good afternoon, your Honor.

10    THE COURT:  Good afternoon.

11    MR. RACHAL:  I am going do to to go ahead and focus on

12 the remedies aspect.  These are basically four topics I will

13 talk about, that appropriate equitable relief under ERISA 502

14 (a)(3), and that is a term of art, appropriate equitable

15 relief, to factor inequities of the case when fashioning the

16 relief.

17    The second topic will be A plus B remedies, the

18 claimed harm here.  We talked about in testimony both to pull

19 it together in argument to make it clear.

20    The point is Deutsch's opening balance remedies

21 creates windfalls.  I mean a remedy beyond wear-away.  He does

22 remedy wear-away and he goes beyond that.  That is our point.

23    Finally, any remedy should reflect the current state

24 of the law on 417 (e), the corporate bond rate.  Those are

25 pretty much the four topics that I will talk about.

1          To go into the first topic, on appropriate equitable

2     relief --

3              THE COURT:  Do you have copies of your slides?

4              MR. RACHAL:  I do, your Honor.  This is really--

5              THE COURT:  That is fine.  If that is all there is,

6     that is fine.

7              MR. RACHAL:  I have other slides, but they're DX

8     exhibits referred to earlier.  I think your Honor has them.

9     These is the only new slide, overview summary slide.

10          Under their the appropriate equitable relief part,

11     ERISA 502 (a)(3) itself limits relief to appropriate, using

12     that term, equitable relief.  In remedying an ERISA violation,

13     the aim of ERISA is to make the plaintiffs whole, but not give

14     them a windfall; for example, the Henry v. Champlain Enterprise

15     case in the Second Circuit, is pretty much standard throughout,

16     makes a plaintiff whole but not windfall.

17          The equitable aspect we talked about in the testimony

18     and I want to call attention to two-thirds of the class left

19     within three years of the conversion.  As Mr. Sher noted,

20     subject only to minimum, to no wear-away, they take the newly

21     acquired lump sum, that right did not exist before, to exchange

22     that right to cash out the former annuities that was favorable

23     to subsidized rates.

24          That is not my terminology.  That is actually Congress

25     when it changed the corporate bond rate.  These rates are too

1    low and creating inflated lump sums.  The people who left

2    within the first few years were able to have take advantage of

3    that change while being subject to the minimum to no wear-away.

4    Ms. Lerew actually states this.  For the price of a $20.00 pay

5    credit in wear-away, she acquired a lump sum worth thousands

6    more than fair value, as later recognized by Congress.

7         Another key part of this is going to the A plus B

8    remedies, the claimed harm here.  The nature of the

9    misunderstanding, it is no dispute that Foot Locker took -- no

10   dispute that Foot Locker told class members that their initial

11   account balance was set using 9 percent mortality, that they

12   were given account statements showing the precise dollar amount

13   of the account.

14        Many were also told the balance were the protected

15   lump sums and anyone could request estimate of this each year.

16   As a consequence, Mr. Rumeld talked about where people got an

17   estimate in '96 that was larger than the estimate in '97.  That

18   was a right that each participant in the plan had an estimate.

19   The estimate would include the value of the minimum protected

20   lump sum as of that year.

21        We didn't get that.  The confusion here is over what

22   this meant, over what is called wear-away.  What did this,

23   having this account balance, the participants, from what we

24   have heard, from the case, didn't understand that this meant

25   that maybe a period of time in which they are paid in interest

F7RJOSB7                       Summation - Mr. Rachal

1    credits did not count to increase the actual benefit.  They

2    wore away.  That is what wear-away is.  That is what the

3    confusion is about, and any remedy should be shaped under

4    equitable reformation to remedy that issue, that confusion.

5           In an A plus B benefit, A represents the annuity or

6    the lump sum value of the prior approved been under 417 (e),

7    and B represents the pay and interest credits, often those pay

8    credits earned post-immersion.  A is simply the frozen accrued

9    benefit for lump sums.

10          A is basically because of ERISA requirement under 417

11   (e) value of the annuity at the date of distribution, not date

12   of the plan conversion, we have seen how that is dramatically

13   changes the value of someone's protected lump sum.  Mr. Osberg

14   had his lump sum decrease in value 25 percent between 1999 and

15   2000, 23,000 to 17,000.

16          What is critical here is A plus B benefit or remedy

17   precludes any and all wear-away for lump sums are for

18   annuities, and it includes any early retirement subsidies for

19   those who elect subsidies during the appropriate period between

20   age 55 and 65.  It is in the A plus B remedy because it will be

21   part of the A protected balance at the time of the conversion.

22          Stated most simply, under A plus B, every dollar paid

23   in interest credits counts towards increasing the benefit paid.

24   I will be discussing a few minutes A plus B remedy means class

25   members receive every dollar of their enhancement.  They just

1    don't receive beyond that.

2           Now, when talking about liability, class counsel has

3    mentioned our case repeatedly.  However, it is telling there is

4    no discussion of the Amara case when we talk about remedies.

5    Amara has already dealt with.  Amara has gone on for 7, 10

6    years.  It helped out with the situation in which the claim was

7    that people were misleading, equal value benefit when they had

8    wear-away.  In remedy awarded in Amara and earned by the Second

9    Circuit 7 years later was A plus B.

10          There is another aspect, and it is a bit of slog to

11   read through the Amara opinion, but Amara did include an

12   enhancement.  You see that at 534 F.Supp. 2d. at 301, the first

13   opinion.  They used a lower discount rate, lower than the 417

14   (e) rate.  This had the opening balance for those who I think

15   age and service totaled 55, net increased, that created an

16   enhanced opening balance benefit for older longer-service

17   employees.

18          Later when the remedy decision came out, the remedy

19   awarded was A plus B.  The enhancement did lower or change or

20   modify the A plus B remedy, the same scenario we have here, we

21   have enhancement, and enhancement is factored in what is to be

22   remedied, but not added to it.  Also the A plus B remedy,

23   besides being the one approved and affirmed by the Second

24   Circuit in Amara, the A plus B remedy is what we talk about as

25   A being the value of the prior frozen benefit, B pay and

1    interest credits, is also the plan structure that is approved

2    by the 2006 Pension Protection Act.

3             This is not just a made up remedy here.  This is a

4    remedy that guarantees that someone does not experience or

5    suffer any wear-away, but it doesn't pay beyond that.  That is

6    the remedy that is targeting to fix, at least in the Amara

7    case.  We submit additional remedy in that case is that remedy.

8             Finally, I know plaintiff's counsel cited a case,

9    LaRant case.  In there they were talking about changing the

10   terms of the plan.  Here the terms of the plan, plaintiff's

11   counsel popped up up there, had the 9 percent.  The reformation

12   that is being done is not 6 to 9, it is taking the 9 percent,

13   taking a plan that isn't and come up with a remedy that

14   remedies the claimed harm here, and the claimed harm here is

15   people are confused about wear-away.  The remedy that remedies

16   wear-away is A plus B is found by the Amara court and approved

17   by the Second Circuit now, the enhancement.

18            Now, the enhancement is also included in the A plus B

19   remedy and simply lowers or eliminates any harm for wear-away

20   from the targeted group, keeping in mind that is what the focus

21   should be focused on and targeted.  Would you put up DX-429

22   which we have seen many times.

23            Here the enhancement is factored into the account

24   balance that the person received.  That is what the plan

25   provides.  That is the plan terms set forth in the SPD to the

F7RJOSB7                         Summation - Mr. Rachal

1   participants with the basic opening balance calculated at 9

2   percent, enhancement added to it and pay and interest credits

3   added to that.

4           Where A plus B comes in, Part A is the benefit that

5   was earned under the prior plan which clearly does not include

6   the enhancement.  Part B are pay and interest credits do not

7   include the enhancement.  You compare the two, and if A plus B

8   is larger, then the account balance, you pay the difference, a

9   wear-away remedy.  What Mr. Deutsch did, he added enhancement

10  on.  In his report he sought to justify and treat it as if it

11  was a pay credit, and it is just not.  It is tied to the

12  initial account balance.

13          THE COURT:  Now, as I understand the plaintiff's

14  argument, it is not that it is a pay credit in the sense that

15  other pay credits.  It's that the enhancement was something

16  which was separately promised which you can come up with

17  various ex-post justifications for it, the justifications not

18  set forth in the SPD.

19          One of them would be value of the early retirement

20  subsidy.  Another one might be trying to boost more senior

21  employees in terms of their ability to accrue, since there is

22  an expected wear-away impact.  Only you folks seem to be

23  talking about it as pay and interest credits it, a type of pay

24  credit.  I don't see anywhere where they talk about it as pay

25  credit.

1    MR. RACHAL:  In Mr. Deutsch's report when he did use

2    pay credit, how could you have an enhancement when you do A

3    plus B, and he treated it as if it was a loss pay credit.  I

4    agree, the issue you're talking about and they shifted the

5    argument, I understand that, is okay, what was -- was there a

6    process of enhancement and, yes, there was, but the promise was

7    linked to the initial account balance and how it was

8    calculated, and just in a practical level, people would get

9    account statements and it would show, let's take class member

10   04, it would show that his account balance was going to be

11   whatever the 734800 was, what would that be, about 110,000,

12   120,000, I guess, whatever it is, that is what he was told was

13   his account balance.  He understood that.  He understood it had

14   something that brought him up to that $110,000.

15   What he may not have understood was that how that

16   impacted, how he stood vis-a-vis whether he was aware of it.

17   In fact, for him, for a group of people that was probably about

18   400 people in 1997, they being, in fact, were better off than A

19   plus B benefit.

20   Under this remedy, the enhancement was never taken

21   away.  If they end up with a balance that is greater than A

22   plus B, as he does, 132,000 versus 127,000, he keeps it.  No

23   one is claiming that is due back.  He was due that under the

24   terms of the plan.

25   The terms of the plan based enhancement starting

1  account balance is 9 percent.  This gets back to the point I

2  was making about what's the nature of the confusion.  What is

3  the nature of the remedy that you targeted to make it an

4  equitable remedy.  The nature of the confusion is not that they

5  didn't understand what their account balance was.  They did.

6  They didn't understand what it meant.

7       THE COURT:  If we went to Mr. Gottesdiener's language

8  as to the reformation and we looked at the reformation slide,

9  I'll see if we can get that slide up there, but basically the

10  point is that is it the defense argument that if one was to

11  award reformation, the proper reformation would be the

12  insertions at the beginning, in that first sentence, if you

13  will, of the SPD and deletion of the second sentence?

14       MR. RACHAL:  Without having it in front of me, I don't

15  think so, your Honor, because the defense contention is pretty

16  simple.  If there is going to be a remedy for wear-away, there

17  is really only one way to do it, in the form that the Amara

18  court did, the A plus B, because that eliminates it, with the

19  caveat you never take away anything that somebody receives, it

20  is P-4 that received the enhancement and opening balance that

21  was larger than A plus B, he is entitled to that under the

22  terms of the plan.  We don't seem to take that back.

23       THE COURT:  Let me find this because I think we are

24  talking about the same thing but I want to make sure of that,

25  Slide 36.

1          MR. RACHAL:  I don't have it.

2          MR. GOTTESDIENER:  I can hand it to counsel.

3          MR. RACHAL:  Put it up so we all know we are looking

4     at the same thing.

5          THE COURT:  Slide 36, Mr. Carter, and I just want to

6     understand if what you were thinking of is you would -- I am

7     not saying you agree with this, but if one was to agree with

8     the plaintiff's argument, your view is that the reformation

9     that would occur would be to take the first paragraph with the

10    additions and deletions referenced, but to strike altogether

11    the second paragraph which is, "with respect to a participant

12    who had attained age 50," et cetera?

13         MR. RACHAL:  I don't think plaintiffs take that

14    position that that means they would eliminate the enhancement.

15         THE COURT:  No, no.  I understand.  I am just saying

16    plaintiffs believe this is the right reformation.

17         MR. RACHAL:  Right.

18         THE COURT:  My point is, is it your assertion that if

19    the court were to agree that some reformation was appropriate,

20    that the appropriate reformation would be take the first

21    paragraph as set forth on Slide 36 with the changes made there,

22    but strike the second paragraph?

23         That then, as I understand it, brings it back to the

24    alleged, you know, sort of full A and would allow then for the

25    B, but doesn't include the enhancement.

1          Where am I wrong and what is your counterproposal if

2     that is not right?

3          MR. RACHAL:  There are two aspects to this.

4          One is probably from a dollars and cents, that would

5     probably get pretty close to the same, but it is conceptually

6     flawed.  The reason it is flawed, if you are trying to

7     eliminate wear-away, and this was the point that the Amara

8     court said, you can't distill part of A or B.  If you have an

9     initial account balance, you have to compare it against

10    something.

11         Unless you use the terms so favorably like Mr. Deutsch

12    did, you can never have wear-away.  Of course, you create

13    something else that is greater than a wear-away remedy, you

14    can't, it doesn't work in eliminating wear-away.  The proper

15    way to eliminate wear-away, you have to get away from the

16    initial account balance.  Instead you take what the plan paid,

17    the initial account balance with any enhancement was paid,

18    interest credit is paid and you put that on one side.

19         On the other side you say what would the person have

20    received had she had no wear-away on anything, lump sums,

21    annuity, early retirement subsidies under Part A and B.  Part A

22    is the value of the frozen benefit converted if it is a lump

23    sum when they terminate, Part B is.

24         Part A is measured at the time of termination if it is

25    a lump sum.  Part B are paid in interest credits on those pay

1    credits and that eliminates wear-away.  If you compare the two

2    like we have with 04, 04 is in the small group, the small

3    group, about maybe 900 people total, 950 who their account

4    balance under the plan was greater than A plus B.  04 are the

5    ones where A plus B is greater, they did the difference, get

6    the difference.  That is the disparity.

7         I don't think conceptually you can fit an account

8    balance remedy to remedy wear-away using an opening balance

9    unless you do something Mr. Deutsch did, which is greater than

10   wear-away remedy.  That is our complaint, our context, it is

11   not tied to the alleged wrong.  It is not proper reformation

12   because it is not remedying what the misunderstanding was,

13   which was wear-away.

14        There another aspect of your question, your Honor,

15   which was on the early retirement subsidy, and I think we

16   pointed out it could operate as that, but it is not the same.

17   It doesn't function as an early retirement subsidy.  The early

18   retirement subsidy in the prior plan was protected, it had to

19   have been.  If someone took an annuity and took it between 55

20   and 65, they would receive that annuity under the A plus B

21   approach.  They would also receive it just as part of 417 (e)

22   if they took an annuity.  Then it was protected.  Going forth,

23   people didn't get that benefit and we didn't have to offer it.

24   We didn't promise to offer it.

25        The early retirement subsidy provided if there was a

F7RJOSB7                       Summation - Mr. Rachal

1    benefit started get to a broader people, 55, 50 to 65 and it

2    paid it in lump sum, increased the account regardless of when

3    they left work, so I think I asked Mr. Sher if someone got this

4    after age 50 and up to 70, they -- so it doesn't operate as an

5    early retirement subsidy.

6         It could, and I think I missed this before, dollars

7    are fungible.  It could in a sense help replace it, but that

8    wasn't how it operated, replacing retirement subsidy.  It was

9    an enhancement that increased the benefit.  The flip side of it

10   was, it also lessened wear-away.  If people had a

11   misunderstanding of wear-away, that meant they didn't have a

12   loss in regards to wear-away.  Some did.  Some did.  That is

13   the nature of that remedy.

14        Deutsch's opening balance remedy also creates, if you

15   would go to 432, and this was a slide we talked about earlier,

16   when your Honor asked about the plaintiff's proposed change to

17   the plan, that is what happens if you implement plaintiff's

18   proposed change to the plan and keep an opening balance remedy.

19        That happens because you float the 6 percent, that

20   formula and all of a sudden you have enhancement that was

21   promised that 48,589 percent becomes something like about

22   92,000 added onto 6 percent opening balance, you get a remedy

23   in which someone gets 240,000, even though A plus B was

24   127,000, even though their prior plan benefit had been

25   discontinued at 127,000, no one could have expected -- if they

1   were receiving, intended to receive, misunderstood that they

2   were getting that type of benefit and yet that is exactly what

3   happened if you applied plaintiff's strike-out of the 9 percent

4   replaced with 6 percent.  It has nothing to do with any wrong

5   or miscommunications in the case.  That is part of our point

6   about Mr. Deutsch's remedy creating a windfall.

7           We submit that is a windfall.  It is even beyond that.

8   It is not just on the enhancement.  It is, if you would pull up

9   DX-430, which is Ms. Lerew, and under Ms. Lerew's circumstance,

10  she received 22,693 because she left right after the

11  conversion.  She had $20.00 of wear-away.  The A plus B remedy

12  would be $20.00.  That is what she wore away.  That is the pay

13  credit she got, she tendered, and it turned out she didn't

14  because she was already entitled to 206,093.

15          Mr. Deutsch's remedy on day one provides Ms. Lerew

16  4,000 more than that because he doesn't factor in mortality

17  pre-retirement mortality or the correct interest rate.  He used

18  the 6 percent instead of the 6.06 percent even though 417 (e)

19  was 6.06 percent at this time, even though Ms. Lerew took a

20  lump sum.  So we end up with a ratio of a remedy for Ms. Lerew

21  of 200 to 1, $4,000 for $20.00 loss pay credit.  That is day

22  one example.

23          If you would pull up DX-431, Mr. Osberg.  Mr. Osberg

24  illustrates this distinction going out over time, and the

25  difference between the blue line and the yellow line in that

1    spread is, this is for somebody like Ms. Lerew, Mr. Osberg

2    didn't receive an enhancement.  This is an additional benefit

3    that Mr. Deutsch provides beyond A plus B.  Again this is not

4    just Mr. Sher's A plus B, this is the A plus B remedy awarded

5    to Amara and approved by the 2006 Pension Protection Act.

6            This is not a made-up remedy.  It is a remedy we

7    submit correlates to the claim misunderstanding.  I thought I

8    was earning pay and interest credit.  I was in wear-away.  I

9    didn't understand that.  This wear-away, that misunderstanding

10   ties to the equal balance.  I thought the balance was equal and

11   every dollar counted going forward.  In fact, it didn't.  We

12   talked about the reasons, 417 (e), the rates.  This remedies

13   that.  It is the same remedy approved in Amara even where they

14   had enhancement.

15           The pre-retirement mortality, we talked about that a

16   little bit.  The basic bottom line is 417 (e), which if you

17   talk about actuarial equivalent, you must use actuarial

18   equivalence under the law, does not distinguish between pre and

19   post-retirement mortality.  Why would it?  Logically, why would

20   it?

21           Some people retire between 45 and 65.  Some people

22   retire after 65.  There is still risk.  If you take a annuity

23   that was not payable until age 65, and you convert it to a lump

24   sum payable today, you are avoiding that mortality risk.  That

25   is why it is factored in.  That is how plans value the

1    liabilities and that is also what 417 (e) says is permitted.

2    It doesn't require it, but it does permit.

3         That is what Mr. Osberg illustrates is overpayment

4    under Mr. Deutsch's approach as compared to an actual A plus B.

5    If you use the actual A plus B, we submit that is A plus B.

6         Finally -- I have two final points.  One is we believe

7    as an equitable remedy, any remedy should reflect current state

8    of the law, 417 (e) today, the corporate bond rate.  There are

9    several reasons why the remedy is -- which at the time of the

10   conversion was about 1 and a half percent higher than the 417

11   (e) rate, about 7 and a half percent, when the 417 (e) rate was

12   6.06 percent.

13        It doesn't mean it was fixed.  That was an

14   approximation.  It varies over time, and we submit the correct

15   way to do it is use the corporate bond rate when someone

16   terminates, not necessarily the spot rate, the data conversion,

17   the same reason you have to use 417 (e) generally when someone

18   terminates.

19        First, the equitable remedy is being awarded today,

20   2015, and should reflect Congress's statement what constitutes

21   a fair exchange between annuities and lump sums.  It is

22   particularly important in changing 417 (e), Congress noted that

23   converting annuities to lump sums based on the 30-year treasury

24   rate had resulted in inflated lump sums, which are not, and

25   this is Congress's words in the legislative history, not mine,

F7RJOSB7                          Summation - Mr. Rachal

1    actuarial equivalent of lifetime annuity.  It created a

2    subsidized, overpaid annuity.  If the court is doing equitable

3    remedy in 2015, we submit it should factor in that.

4           Second, it comports tore with the 8 percent 30-year

5    treasury rates that Foot Locker and Mercer factored in when

6    considering the plan reconsidered, equitable correlates the

7    remedy to what Foot Locker could have reasonably expected in

8    this plan.  You saw numerous notes from Mercer where say 8

9    percent, around 8 percent when they were going too Mr. Kiley's

10   notes and Mercer's analysis of what they expect wear-away was

11   during the plan design.

12          It comports what Foot Locker would have to disclose on

13   wear-away had Foot Locker complied with the detailed subsequent

14   204 (h) notice requirements.  They would have required Foot

15   Locker to use in December 1994, 417 (e) rate at 7.87 percent,

16   and this is something Mr. Sher testified to, and the wear-away

17   effect describes class members would have been based on this

18   rate.  We submit that it would not be equitable to enforce a

19   remedy that would be harsher on Foot Locker than what would

20   have happened had Foot Locker been held to comply with

21   subsequently enacted best practices.

22          I have a final closing point on remedies and I will

23   turn it back to Mr. Rumeld just for a minute.

24          An appropriate equitable remedy under ERISA 502 (a)(3)

25   ought to distinguish, if there will be a remedy between Ms.

1    Lerew and Mr. Osberg, Ms. Lerew and the majority of the class

2    were able to exchange their annuities for large lump sums, we

3    submit, overly large lump sums using the subsidized 30-year

4    Treasury rate.  This illustrates this.  The cost of the $20.00

5    pay credit she acquired in lump sum is worth thousands more

6    than Congress determined was actuarially equitably fair value.

7           In contrast, Mr. Osberg worked for 7 years because of

8    the low point 417 (e) rates post-conversion.  Because he just

9    missed qualifying for the enhancement, his pay and interest

10   credits ultimately did not increase the value of his final

11   benefit.  We believe the law provides principal grounds to

12   distinguish then these situations.

13          One is that it the statute of limitations defense

14   noted by my colleague, Mr. Rumeld.  The other is applying the

15   corporate bond rate to properly evaluate whether and to what

16   extent new class members suffered wear-away.  Under this

17   approach, Osberg would have noted extensive wear-away would

18   have some remedy.  With somebody like Lerew's cast-out at a

19   favorable rate in a short period of time after the conversion,

20   they would be able to keep the fruits of their favorable

21   exchange.  We don't say they owe anything back, but they're not

22   entitled to any more relief.  With that, I'll turn it back over

23   to my colleague.

24          MR. RUMELD:  Your Honor, I we have three minutes left,

25   and I need less than that.  I really just want to reiterate one

F7RJOSB7                    Summation - Mr. Rumeld

point prior to what Mr. Rachal said.  I think your Honor would

agree that it is the theme of mine has been not to judge us

with the benefit of hindsight retrospectively things we know

now, based on changes in legislation and the like.

        In much the same way I made that point with respect to

liability, I think it applies with respect to relief as well.

We believe it is unfair and inappropriate to say that we did

anything wrong when we used the 9 percent rate to determine the

initial account balances and to characterize that as

actuarially equivalent because at the time that there was

nothing wrong with characterizing it that as actually

equivalent.

        Notwithstanding that, if your Honor finds we did

something wrong, surely why would your Honor not take the

benefit of the legislation that has come out since then when

Congress finally woke up and tried to fix this problem.  One of

the things they did was they determined how to do a Kosher,

shall we say, cash balance plan, instead do it with an A plus B

benefit, the same one Mr. Rachal has been referring to.

        Similarly, when Congress woke up and finally decided

what is the best way to determine the present value of a future

stream of benefits, take into account both the participants and

their interests, they came up with this corporate bond rate in

lieu of the treasury rate.  If your Honor is going to judge us

with the benefit of hindsight, please keep in mind hindsight

1    with the form of legislative developments and what Congress has

2    evaluated in deciding a fair remedy.

3              THE COURT:  Thank you, Mr. Rumeld.

4              Mr. Gottesdiener, you have 10 minutes.

5              MR. GOTTESDIENER:  Congress knows what to do about

6    hindsight.  It is called fixing things retroactively.  Congress

7    did not make the changes to the law, in particular the 417 (e)

8    GATT rate.  They didn't make those fixes retroactive.  The

9    LaRant case that came down on Thursday makes very clear that

10   whipsaw and the application of 417 (e) using the 30-year

11   Treasury rate, the changes that Congress enacted in PPA in 2006

12   are not retroactive.  They're prospective.

13             PPA had a bundle of compromises under which Congress

14   made changes to the law, some favoring employees, some favoring

15   employers.  It was a compromise.  They're trying to pick and

16   choose, and this contention that this is all in hindsight is

17   just wrong.  They're not entitled to go back on the law.

18             This statement of Mr. Rachal's that Congress

19   subsequently determined that it was wrong, again when Congress

20   determines that it was wrong for the past, it retroactively

21   changes the law.  It didn't do that.  The law is the law.

22   Whipsaw was the law.  417 (e), using the 30-year treasury rate

23   was and is the law that should govern this case.

24             More generally, this contention that subsequent focus

25   on 204 (h) somehow means that there were not egregious SPD and

F7RJOSB7                    Rebuttal Summation - Mr. Gottesdiener

1   fiduciary breach violations here is just a complete red

2   herring.  The SPD, Mr. Rumeld, Mr. Rumeld is just wrong.

3   You're not required in an SPD to describe a new formula.

4   You're required to describe the plan formula, and the plan

5   formula here was a two-part horse race.

6           We have fraud because they made people think there was

7   no former benefit any more.  They made people think that

8   everything you earned to date was now put into the form of an

9   account.  Look at the first paragraph of the highlights memo

10  before.  Before '96 you had an accrued benefit and annual

11  benefits starting at age 65.  Afterwards, it is an account.

12          It is absolute malarkey to say well, we put out all

13  this truthful information that somehow negates fraud.  Witness

14  after witness testified that at the time they knew the

15  statements they were making were false.  It was a false

16  statement to tell somebody that their account balance was their

17  payment.  They made that statement repeatedly.

18          Mr. Rumeld talks about wear-away on the brain, they

19  brain-washed everyone.  Mr. Osberg, at $6,000 to believe that

20  that account balance was their entire benefit.  They knew what

21  they were doing.  They made people believe that was the full

22  extent of what they were entitled to, and this MLS, did they

23  ever explain that?  Did they ever in plain English once

24  anywhere say what was going on?  No.

25          Mr. Steven and Ms. Glickfield, again this is a red

1  herring.  We did this with Ms. Ine.  I put a chart up and I did

2  this MLS greater of.  The court will remember.

3          The fact that you see that your pay credits and

4  interest credits may not, because of the MLS, contribute

5  directly to your payment, that doesn't tell you that your

6  benefit was frozen.  When you're told that the only benefit

7  that you have is the account, but then there is this magic IRS

8  parachuting in MLS, that they never explained.  It is

9  incredibly dense even in these one-offs, what they say about

10 this federal minimum requirement.  They never talked plain

11 English.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. GOTTESDIENER:  (Continuing)  That's why

2    Mr. Steven's so-called admission doesn't mean anything.  That's

3    why Ms. Flesses, she knew about the MLS.  She calculated the

4    MLS.  She testified she had no idea that the MLS was actually

5    the old frozen benefit and that was the baseline and that she

6    then started out in a hole.

7          What the testimony of Glickfield and Steven proved is

8    that this was so easy for them to put out little bits of

9    truthful information because they knew nobody would figure this

10   out because it is so complicated.

11         So what happens?  They see in the examination, oh,

12   yeah, I can see that my MLS was the benefit -- I'm sorry, the

13   payment that I got that is bigger than the account.  But it

14   doesn't translate.

15         Ms. Derham admitted that knowing the MLS doesn't mean

16   you are in wear-away.  What it means is, as Ms. Glickfield

17   said, you believe that the federal government has come in and

18   required for some reason some calculation of factor.  It's the

19   12/31/95 benefit times some mystery IRS factor.

20         And what does it do?  It vaults the payment over the

21   account balance payment.  So it is a good thing, as

22   Ms. Glickfield testified.  It is not the truth that we all know

23   in hindsight.  Hindsight bias is essentially what the defense

24   is guilty of.

25         Ms. Glickfield and Mr. Steven believed that, oh, that

1    is an additional payment.

2            So it is a red herring that they could see that the

3    pay credits and interest credits that were added to their

4    account did not literally contribute to their payment because

5    they thought it was Christmas in July, that they got even more.

6            To tick down some points that I only have a couple of

7    minutes to tick down:

8            The suggestion is wrong that people who took their

9    benefit out before 1996 the end of the year do not have an SPD

10   claim.  Page 61, note 33, describes in detail they have the

11   identical SPD claim.  It's just called an SMN claim, subject to

12   the identical standard.

13           There is a suggestion that there is advice of counsel

14   defense here.  No, there is not.  The advice of counsel defense

15   requires at a minimum, first of all, fiduciaries cannot

16   abdicate their obligation by hiring others to assist them in

17   their duties.  They have to make the determination of what is

18   right.

19           But you can only in all fields of practice invoke it,

20   advice of counsel, your Honor, when you fully inform counsel of

21   all the facts.  We established through Ms. Peck the fact that

22   counsel attended some early meeting where wear-away was

23   referenced.  There is no evidence from the defense that counsel

24   even understood wear-away as a theory, more important, there is

25   no evidence that counsel told Ms. Peck or Mr. Kiley or

F7rnosb8                    Rebuttal Summation - Mr. Gottesdiener

1   Ms. Kanowicz, those three, knew the wear-away was going to last

2   years.

3          Oh, it's OK, you can just tell people what you want to

4   and tell them it is their account balance.  They would have

5   needed to put on fulsome, in his words, evidence that they

6   fully downloaded counsel and then counsel said, well, this is

7   OK.  No such evidence.

8          In addition, we disagree completely with this fraud

9   standard.  Your Honor will read the cases.

10          But don't forget spoliation.  Just think how much more

11   we would be able to get out of these witnesses.  Your Honor has

12   already found they spoliated Kanowicz's documents.  We are

13   entitled to an inference that they intentionally concealed the

14   wear-away.

15          In addition, Mr. Rachal said there is no way that

16   somebody could have expected enhancement on the full value of

17   the 12/31/95 accrued benefit.  That is exactly what the SPD

18   promised.

19          The suggestion that this was all innocent behavior on

20   their part is just baseless.  Peck, Kiley, Kanowicz admitted

21   that they knew wear-away was expected to last for years, and

22   they knew that meant people were not earning new benefits.

23          It doesn't matter if they thought of it as a plan

24   freeze.  They knew it was a benefit freeze.  How could anyone

25   in their position possibly think that freezing benefit growth

F7rnosb8                              Rebuttal Summation - Mr. Gottesdiener

1    for years was not material to participants?  It's impossible to

2    believe that that's what they really thought, and the facts

3    from the witness stand should speak for itself.

4              THE COURT:  You have one minute left.

5              MR. GOTTESDIENER:  Thank you, your Honor.

6              Also, the evidence is clear, first of all, no fraud

7    when truthful information is out there.

8              Again, the truthful information, 9 percent, things

9    like that, hidden in the weeds, said in a way that is

10   absolutely false.  Relevance.  When they make statements like,

11   That's the rate of return on plan assets, they imply in these

12   one-offs that that is influencing somebody's benefit payment.

13             It had nothing to do with their benefit payment.  It's

14   very deceptive.  What we have here are indeed stratified layers

15   of deception.  The evidence is also undisputed that they could

16   not have obtained the 20 percent savings without wear-away.

17   Wear-away was, therefore, a necessary part of the design, and

18   it is irrelevant that Ms. Peck at the outset may not have

19   thought about wear-away because she then learned that it was

20   part of the design.

21             Wear-away was a fact, and the wear-away here was so

22   much more severe than it was in *Amara*.  In *Amara* the Court will

23   see there was nothing like the false statements that were made

24   here.  There was not a single document.  You will see, your

25   Honor, when you look at the case, there was not a single

1    document where they flat out misrepresented what the payment

2    was.  Like here, they only showed the account balance, but in

3    *Amara* they never made the repeated false statements they made

4    here which is, this is the payment you would receive if you

5    asked for it today.

6                THE COURT:  Thank you.

7                Ladies and gentlemen, we have concluded the trial in

8    this matter, and I am going to be drafting a decision.  As you

9    know I have been making notes, and I would hope to get you

10   folks something I would say in the next month to six weeks.  I

11   think that's the likely time frame.

12               If it's going to be significantly longer than that, I

13   will let you know.  Things come up sometimes.  I do have a

14   criminal trial that is starting in September, so I would like

15   to get it done before that starts, because that will be a

16   couple of weeks.

17               So that is where we are.  I am going to get the

18   exhibits tomorrow.  When I say exhibits, I mean a list.  And

19   you folks, Mr. Huang and the other Mr. Carter, right, are going

20   to indicate the new additions.

21               MR. HUANG:  Yes, your Honor.

22               THE COURT:  I will have that.

23               There you are.  Mr. Carter.

24               MR. CLARK:  Clark.

25               THE COURT:  Sorry about that.  It's been a long day,

F7rnosb8                          Rebuttal Summation – Mr. Gottesdiener

1    Mr. Clark.  And you keep changing your hair.  You have short

2    hair and then a tiny bit longer and then short again and tiny

3    bit longer and short again.

4          Thank you all very much, and you will work with Joe to

5    get the materials out.

6          Thank you.

7          We are adjourned.

8          (Trial concluded)

9

10                        INDEX OF EXAMINATION

11   Examination of:                              Page

12   [ ]*[,]                                      1678

13   Cross By Mr. Gottesdiener  . . . . . . . . .1712

14   Redirect By Mr. Rachal . . . . . . . . . . .1792

15

16

17

18

19

20

21

22

23

24

25