UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
GEOFFREY OSBERG, on behalf of himself                       :
and on behalf of all others similarly situated,             :
                                                            :
                          Plaintiff,                        :
                                                            :        07 Civ. 1358 (KBF)
                                                            :
              -v-                                           :
                                                            :        **(CORRECTED[1])**
FOOT LOCKER, INC. and FOOT LOCKER                           :        OPINION & ORDER
RETIREMENT PLAN,                                            :
                                                            :
                          Defendants.                       :
                                                            :
------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

    In this certified class action[2], current and former employees of Foot Locker,

Inc. ("Foot Locker" or the "Company")—formerly known as the Woolworth

Corporation—seek reformation of their pension plan to conform to the benefits they

---

[1]    This Opinion and Order has been corrected to address the prejudgment interest issue as reflected in letters from counsel on October 2, 2015.

[2]    On September 24, 2014, the Court certified a class defined as follows:

> All persons who were participants in the Foot Locker Retirement Plan as of December 31, 1995, who had at least one Hour of Service on or after January 1, 1996 (as defined under the Plan), and who were either paid a benefit from the Plan after December 31, 1995 or are still entitled to a benefit from the Plan; and the beneficiaries and estates of such persons and alternate payees under a Qualified Domestic Relations Order.

(Opinion & Order dated September 24, 2014 at 12, ECF No. 186.)

    After the Court made its initial determination granting certification (ECF No. 186), Foot Locker moved for reconsideration. The Court then reconsidered its decision and issued an additional decision confirming its initial determination. (ECF No. 220.) The Court notes that the evidence presented at trial overwhelmingly supports the Court's determination. Foot Locker has urged that issues of reliance and the statute of limitations create a predominance of individualized issues. This argument is without merit and is incorrect as a factual matter. There is no evidence in the record that any average Plan Participant ever understood that he or she was subject to wear-away, even once his or her benefits commenced. The evidence overwhelmingly supports a contrary conclusion.

understood Foot Locker had promised them.  The Class's claims are brought under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq.

The Court held a bench trial from July 14, 2015 to July 27, 2015.  Twenty-one fact witnesses testified—15 live[3] and six by deposition.  The parties also called three expert witnesses: actuarial expert Lawrence Deutsch, E.A. and financial economist Clark L. Maxam, Ph.D. testified for the Class, and actuarial expert Lawrence Sher, F.S.A. testified for the defendants.  The Court also received several dozen documents into evidence.  This Opinion & Order constitutes the Court's findings of fact and conclusions of law.

The Class's core claim is that the Company failed to inform its employees (the "Participants") that plan changes that went into effect as of January 1, 1996 implemented an effective freeze on growth of the employees' pension benefits—such that, for a period of time, additional periods of service did not result in additional benefits.  The Class asserts that both class-wide and individual communications failed to clearly describe that the vast majority of Participants would be in a period of "wear-away" during which new accruals would not increase the benefit to which the Participant was already entitled.  By contrast, while Foot Locker does not contest that the vast majority of Participants were in a period of wear-away, it claims that the Plan communications adequately disclosed the necessary details of

---

[3]     Named plaintiff Geoffrey Osberg and class members Ada Cardona, Michael Steven, Richard Schaeffer, Russell Howard, Ralph Campuzano, and Doris Albright testified via declaration and were subject to live cross-examination and re-direct.

changes to the Plan, including an adequate description of the actual benefit a Participant would receive. According to Foot Locker, Participants had the information necessary to inform them they were in a period of wear-away. The Company concedes that it did not describe wear-away explicitly because it believed it was too complicated and its variations and effects too unpredictable. According to Foot Locker, the additional disclosures might have had misled Participants into believing that they were entitled to a greater benefit than that to which they were entitled at termination.

Having considered all of the evidence, at long last the dust on this case has settled and the Court does not believe it presents a close call. The evidence is overwhelming that the changes in the Retirement Plan resulted in an effective freeze of pension benefit accruals—and that this freeze was not adequately disclosed to Participants. Some Participants were severely impacted, some moderately, and a few not at all. In this regard, the evidence is clear that (1) wear-away was an intended feature of the Plan, (2) Plan disclosures and other communications to Participants failed to disclose wear-away, (3) this lack of disclosure was intentional, (4) wear-away impacted thousands of employees—many, including the named plaintiff, terminated employment and were paid benefits while they were still in wear-away, (5) Participants did not understand that, as a result of wear-away, additional periods of service after January 1, 1996 would not and did not increase the benefit received, and (6) Appropriate disclosure would not have

been too confusing and had it been given, Participants would have understood the consequences of wear-away.[4]

Both parties have compared this case to Amara v. CIGNA Corp., which the Court discusses below.  This case presents a more egregious set of circumstances than Amara. In Amara, wear-away resulted, in large part, from fluctuations in interest rates; here, by contrast, the structure of plan conversion guaranteed that most Participants would experience severe wear-away and that this was the expected source of cost savings to Foot Locker.

I.   FINDINGS OF FACTS

Pursuant to Federal Rules of Civil Procedure 52, the Court's findings of fact and conclusions of law are set forth below.[5]

A.   The January 1, 1996 Plan Amendment

Before 1996, benefits under Foot Locker's pension plan were defined as an annual benefit commencing at age 65 and continuing for life.  (Expert Opening Report of Lawrence Deutsch, E.A. ("Deutsch Op. Report") at 5.)[6] This benefit was calculated on the basis of a Participant's compensation and years of service.  (See id. at 2.)  Under the prior Plan, Participants who retired or terminated before age 65

---

[4]     Foot Locker contends that it would have been too confusing to describe wear-away to Participants. The Class's position is that Participants would have understood the information if appropriately disclosed, but instead Foot Locker deliberately obfuscated it.

[5]     The Court makes its findings of fact based on the preponderance of the evidence.  See Scientific Components Corp. v. Sirenza Microdevices, Inc., 399 F. App'x 637, 638 (2d Cir. 2010).  The Court has also considered evidentiary objections lodged by the parties.  With regard to any objections to evidence cited in this Opinion not individually addressed, the Court finds that they are without merit.

[6]     The Court received the experts' reports and declarations as their direct testimony.  They were then subject to cross-examination and redirect.

generally could either wait to start receiving benefits at age 65 or commence early retirement distributions between ages 55 and 65, as further explained below.  (Id. at 5.)[7]  Participants generally did not have the option to receive their benefits as a lump sum.[8]

Foot Locker converted the Plan to a cash balance plan as of January 1, 1996. Under the Amended Plan, Participants' age-65 annual benefit accrued as of December 31, 1995 (the "December 31, 1995 accrued benefit" or the "December 31, 1995 frozen accrued benefit") was converted into an initial account balance that would be used to calculate the benefit under the new formula.  This conversion was effected in three steps:

1. First, the Plan calculated a lump sum value of the Participant's age-65 accrued benefit under the old Plan, as of December 31, 1995.

2. Second, the Plan discounted this age-65 lump sum to January 1, 1996, to reflect the time value of money.

3. Third, the Plan further discounted this January 1, 1996 present value by a mortality discount—to reflect the possibility that the Participant might not live until age 65.

(Deutsch Op. Report at 7.)

---

[7]     To the extent that Defendants object to portions of the Deutsch expert report, this Court has already resolved the admissibility issues at pretrial conferences in pretrial orders.  Any further objections merely go to the weight of the evidence, which this Court has considered.
[8]     There was a "de minimis" exception: if, at a Participant's termination, the present value of the Participant's pension benefit was less than $5,000 (or before July 1, 1998, $3,500), the benefit would be paid out in a single lump sum.  (Deutsch Op. Report at 5 n.5; Deutsch Tr. 118:11-119:1.)

Critically, the conversion at steps 1 and 2 was accomplished using a 9% discount rate.  Following the conversion, however, Participants' account balances were credited with pay credits and an interest credit at a fixed annual rate of 6%. (See id. at 7-8.)  Thus, while Participants' growing account balances created the appearance of pension benefit growth, this appearance was deceptive: the initial conversion was accomplished using a 9% rate (and a mortality discount) but each Participant's account subsequently earned interest only at a 6% rate.  As a result, the account balance under the new formula was—for a period of time (in many cases, years)—smaller than the December 31, 1995 accrued benefit.  (See id.)

The disparity between the December 31, 1995 accrued benefit and the benefit under the new formula triggered ERISA's anti-cutback rule, which (with narrow exceptions inapplicable here) requires that a participant's benefit entitlement, once earned, never be reduced due to a plan amendment.  (Id. at 3.)  To comply with the anti-cutback rule, the new Plan calculated benefits based on a "greater of" formula. Under this formula, a Participant's actual pension benefit was the greater of the December 31, 1995 accrued benefit (the "A benefit") and the Participant's cash balance benefit (the "B benefit").  (Id.)[9]  Until the cash balance caught up to and surpassed the December 31, 1995 accrued benefit, the Participant was in a period of wear-away.  That is, his or her pension benefit did not grow despite continued

---

[9]    The Court uses the terminology "A" and "B" benefits as a specifically defined in this Opinion. The literature on pension plans and case law may use those terms to describe a base benefit (the A) plus additional growth (the B).  Here, as used in relation to the Plan conversion, the A and B benefits are defined differently; the A benefit is the old benefit and the B benefit is the new.  As discussed below, Foot Locker did not intend the A and B benefits to be added together.

service.  (Id. at 3-4.)  As further explained below, the combined use of the 6%
interest rate with the 9% discount rate mathematically guaranteed that most
Participants would experience wear-away.  This was understood by Foot Locker at
the time and relied upon as a source of savings.

The "greater of" comparison between the A and B benefits was an annuity-to-
annuity comparison that was accomplished via the following steps.  First, the A
benefit (the December 31, 1995 accrued benefit) was converted to an annuity.  The
B benefit (the Participant's cash balance benefit) was projected to age 65 with a
fixed 6% interest rate, and converted to an annuity commencing at age 65.  The last
step was accomplished by using either the 6% rate or the applicable rate under
Internal Revenue Code ("IRC") § 417(e) and the applicable mortality table under §
417(e).  (See Deutsch Op. Report at 4, 6.)  For the vast majority of Participants, the
A benefit exceeded the B benefit.  This meant that growth in the B benefit—the
hypothetical account balance—due to additional service and interest credits did not
represent any growth in the actual benefit a Participant would receive.  (See id. at
4.)

Under the new Plan, Participants could choose to receive their pension
benefit as a lump sum or an annuity.  Under ERISA, a lump sum cannot be less
than the present value of a participant's age-65 benefit using the interest rate and
mortality assumptions required by IRC § 417(e).  "Lump sum" wear-away is more
difficult to estimate because the § 417(e) rate—and thus the lump sum value of the

December 31, 1995 frozen benefit—fluctuates from year to year.  (Deutsch Op.

Report at 16.)

The cash balance conversion was also accompanied by a new 401(k) plan.

**Early Retirement Subsidy/Enhancement**.  The prior Plan included an

early retirement subsidy, which worked as follows:  Participants between age 55

and 65 had the option to receive early retirement benefits.  For Participants with

fewer than 15 years of service, early retirement benefits were equal to the

Participant's age-65 benefit reduced by 6% per year for early commencement.

(Deutsch Op. Report at 5; Deutsch Tr.[10] 115:19-20.)  For Participants with at least

15 years of service, early retirement benefits were more favorable: they were equal

to the Participant's age-65 benefit reduced by 4% per year for early commencement.

(Deutsch Op. Report at 5; Deutsch Tr. 115:20-21.)  In other words, if a Participant

younger than 55 accrued at least 15 years of service, he or she was entitled to

60%—that is, 100% minus 4% x 10 years—of his or her accrued benefit payable as

an annuity, though the Participant could not collect the annuity until 55 years old.

(Sher Tr. 1506:12-1507:14.)  For Participants who worked past the age of 55, the

value of their early retirement benefit decreased annually until age 65, at which

point it carried no additional value.  (Sher Tr. 1510:3-13.)  The early retirement

subsidy was an expensive feature of the Plan.  (Deutsch Tr. 127:15-128:1.)

---

[10]    "Tr. P:X-Y" or "[Last name] Tr. P:X-Y" refers to page P, lines X to Y of the trial transcript in this case.  Where transcript dates are included, those citations refer to deposition transcripts.

To receive the value of this subsidy under the new Plan, Participants had to elect an annuity form of payment, not a lump sum.  (Deutsch Tr. 128:2-6.)  However, approximately 97% of Participants elected lump sums.  (Deutsch Op. Report at 16.)

Under the new Plan, Participants who were at least age 50 and had at least 15 years of service on December 31, 1995 received an enhancement to their opening account balance.  (Deutsch Op. Report at 8-9.)  The size of the enhancement varied: at the optimal ages of 50 to 55, the enhancement was a 66.67% increase in the account balance; for Participants older than age 55, the enhancement decreased, disappearing at age 65.  (Id. at 8-9.)

B.      Internal Communications

At trial, the Court heard a significant amount of testimony—and received a large number of documents—regarding the internal process by which the January 1, 1996 Plan amendment was developed and implemented.

In late 1994 or early 1995, Foot Locker's management determined that, in light of the Company's poor financial condition, it was necessary for the Company to cut costs, including in connection with retirement benefits.  (Declaration of Patricia A. Peck ("Peck Decl.") ¶ 3, ECF No. 333.)  Roger N. Farah, Foot Locker's Chief Executive Officer at the time, specifically requested a recommendation with regard to cost savings available through the retirement plan.  (See PX 24 (February); PX 632 (January).)  A task force of four employees from the corporate benefits department was established: Tom Kiley, Carol Kanowicz, Marion Derham, and Pat

Peck.  (See Peck Tr. 1112:3-12; PX 24.)[11]  All four testified at trial (Kanowicz by

deposition).

Peck had been the Vice President of Human Resources during the period at

issue.  In that capacity, she headed the Human Resources Department.  (Peck Tr.

1103:14-20.)  Peck reported to Barry Thomson, Foot Locker's Chief Administrative

Officer and a member of the Chairman's Group.  (Tr. 1105:14-22.)  Peck was led the

team responsible for coming up with recommended changes to the Plan and

communication to Participants.  She was ultimately the person responsible for

deciding which Plan recommendation and option(s) to present to management.  (See

Tr. 1109:2-6, 1113:5-1114:4; Peck Decl. ¶ 3.)  In understanding this assignment,

Peck understood cost cutting was to play a significant role.  (Tr. 1114:5-7.)  Peck

primarily worked with William M. Mercer Inc. ("Mercer"), the company's actuarial

advisor and Kiley—an individual with the necessary expertise who Peck believed

understood the ins and outs of pension plans.  (Peck Decl. ¶ 3; Tr. 1116:1-7, 1116:12-

1117:2.)  Based on Mercer's advice, Kiley recommended that the Plan be converted

---

[11]     All four of these individuals testified live or via videotaped deposition at trial.  The Court
found Patricia Peck to be particularly credible.  She was forthcoming, careful, and appeared in all
ways to be honest.  The Court evaluated her testimony particularly carefully in light of a medical
condition which had required significant chemotherapy and radiation.  Foot Locker brought this out
at the conclusion of Peck's testimony.  The Court found that Peck's memory as to what had occurred
was nevertheless clear; she differentiated between those events she could recall and those she could
not.  In contrast, the Court found Tom Kiley—who worked for Peck and was in charge of developing
the recommendation to Peck for her to take to senior management—to substantially lack credibility.
He was evasive and, until the Court remarked on his lack of recollection to counsel at a break,
displayed little ability to interpret documents he had authored or received, reviewed, and used in his
work.  Other former employees in the benefits area, Carol Kanowicz and Marion Derham, were
credible, though they had varying levels of recall.  The Court also found the Class member witnesses
credible and compelling.  They uniformly testified to a lack of understanding that they had not
received additional pension growth during the time they were employed after January 1, 1996.

to a cash balance plan—and that this change occur simultaneously with the institution of a 401(k) plan.  (Peck Decl. ¶ 3; Tr. 1118:3-12.)[12]

In February 1995, Peck learned that there was an aspect of the proposed cash balance plan that would have the effect of suspending the accrual of new benefits to employees for a period of time.  (See Peck Decl. ¶ 6; Tr. 1121:31-16; PX 84.)  Notes that Peck took during a meeting with Mercer that month reflect that she was informed that the discount rate used to convert the benefit from the prior plan into an initial account balance interacted with the GATT (General Agreements on Tariff & Trade) rate to create a suspension of new accruals.  (See PX 84; Peck Tr. 1121:17-1122:1.)  Her notes also reflect that she wrote, "does not constitute partial plan termin[ation]; nothing more than plan amendment."  (PX 84.)  She later indicated in the same notes that there would be a "positive effect on P & L & contributions." (Id.)  Peck understood wear-away.  (Peck Tr. 1128:4-8.)  She also understood that it was not a required feature of plan design.  (Tr. 1129:11-14, 1129:24-1130:5.)  In other words, to convert to a cash balance plan did not require wear-away.  The Company had the option of choosing a combination of rates that would cause wear-away—but it could also choose rates that would not cause wear-away.  (Id.)  In terms of Foot Locker's choices, Peck understood that the rates chosen mathematically locked in wear-away.  (Tr. 1130:9-14, 1130:21-1131:4.)  Indeed, she

---

[12] At trial, Kiley testified that he originated the idea of a cash balance plan before cost cutting was even raised.  (Kiley Tr. 943:3-21.)  The Court does not credit this testimony.  The Court credits the testimony of benefits manager Marion Derham and Peck, both of whom viewed Mercer as the originator of the idea.  (Derham Tr. 1409:1-24, 1410:23-1412:7; Peck Tr. 1116:1-19; 1294:23-1295:6.)

conceded that she had to know this in order to do her job.  (Tr. 1131:5-7, 1142:14-18.)

Peck also knew that the Plan conversion created the cost savings that the Company sought.  (Tr. 1131:8-11.)  She understood that the cost savings were based directly on the required feature that Participants would not earn any additional benefits for a period of time.  (Tr. 1131:12-19.)  She also knew that a decline in the GATT rate would worsen the wear-away for Participants.  (Tr. 1132:10-16.)  She further understood that, for a Participant in wear-away, increases in that Participant's cash balance account would not have increased any actual benefit to which that Participant was entitled.  (Tr. 1133:1-9.)  Pension benefits were part of an employee's total compensation.  (Tr. 1135:6-8, 1135:17-23.)  When an employee was in wear-away, his or her pension was not increasing in value; this was an effective decrease in such employee's compensation.  (Tr. 1135:24-1136:4.)

Prior to May 1995, Peck had not made a determination as to the type of plan changes that would be recommended to management.  (Tr. 1120:4-12.)  Peck understood that a lump sum option could have been provided by way of amendment to the prior plan.  (Tr. 1159:7-19.)

On May 1, 1995, Peck made a formal presentation to management regarding her recommendation changes to the pension program.  (Tr. 1145:10-17; PX 10 (with Peck's notes); PX 632 (with Kiley's notes).)  She understood that her assigned task had been to cut costs, not to make the Plan more beneficial for Participants.  (Peck Tr. 1146:24-1147:3.)  The task force had looked at several variations of the cash

balance formula—and chose the particular formula because of the level of savings it provided and because it was service-based, which was appropriate based on the emerging demographics of the Company.  (PX 632; Peck Tr. 1149:6-11.)  Peck's presentation to senior management reflected that an advantage of converting to a cash balance plan was "decreases [in] future company costs;" a disadvantage was that it would lead to a "permanent loss of retirement benefits."  (PX 632.)  The Company viewed announcing a temporary plan freeze as a "morale killer."  (Peck Tr. 1155:16-19, 1164:13-16.)  However, Peck agreed that wear-away was, in effect, a freeze.  (Tr. 1160:10-13.)  It was not announced as such.  Conversion to a cash balance plan had the advantage of being able to obscure what was an effective freeze, without the accompanying negative publicity, loss of morale, and decreased ability to hire and retain workers.  (Tr. 1157:16-1158:1, 1161:11-23.)

On July 20, 1995, a presentation was made to senior management—including Farah and Dale Hilpert, Foot Locker's Chief Operating Officer at the time—regarding the proposed changes in the pension program.  (PX 101.)  The presentation included cost savings expected in large part because of the wear-away effect.  (PX 101.)  Peck testified, and the Court credits, that senior management was involved throughout the decision making process.  (See Peck Tr. 1114:23-1115:25, 1169:3-9, 21-25.)

On August 8, 1995, a presentation regarding the proposed changes in the retirement plan was made to the Company's Retirement Investment Committee.  (PX 19; PX 147.)  That presentation, which was made by Barry Thomson, included a

13

comparison of various defined benefit plan alternatives—and contained various benefit illustrations for the version of the cash balance plan that was ultimately selected.  (PX 19; Peck Tr. 1176:7-10.)

On August 22, 1995, Peck sent the Board an abbreviated version of the August 8, 1995 presentation (PX 91) in order to enable to Board to review the materials in advance of a meeting scheduled for September 13, 1995.  (Peck Tr. 1176:11-15, Tr. 1177:3-9.)  On September 13, 1995, Thomson presented the proposed recommendations to the Board.  (PX 37, PX 40.)  The Board adopted the recommendations and, two days later, on September 15, 1995, a company-wide announcement letter was issued about the changes to the Plan.  (PX 2.)

A year later, in September 1996, Peck learned that the wear-away period would be significantly longer than previously expected—and would last between four and five years.  (Peck Tr. 1141:12-17; PX 9.)  Prior to this point, both Peck and Kanowicz believed that wear-away was only expected to last two to three years. (Peck Tr. 1134:23-1135:5; Kanowicz 3/29/2012 Tr. 167:8-18.)  On September 11, 1996, Mercer informed Foot Locker that the normal cost (e.g., annual cost to Foot Locker) under the new Plan was about $4 million and was expected to rise to about $10 million by the year 2000, when wear-away would end in about four years.  (PX 9; Peck Tr. 1141:22-1142:13.)

Mercer's September 11, 1996 letter referenced wear-away explicitly—and indicated that extending the wear-away period would result "in some additional short term savings."  (PX 9.)  This letter was read by executives at the highest level:

14

Farah clearly read the September 11, 1996 letter because attached to that letter was Farah's memo to John Cannon and John Gillespie, dated September 10, 1996 (one day earlier), requesting a meeting with regard to the interest crediting rate on cash account balances.  (PX 9; <u>see also</u> PX 113.)  Peck informed at least one other senior executive, Barry Thomson, that wear-away was built into the Plan design and that everybody was going to be impacted by it.  (Peck Tr. 1142:22-1143: 12.)  The SPD was not in fact printed and distributed until December 1996, after Foot Locker understood that that wear-away would be prolonged.  (PX 59; Peck Tr. 1227:25-1228:14.)

In November 1996, Peck made another presentation to senior management entitled "Review of Plan Options for <u>Additional</u> Cost Savings."  (PX 11 (emphasis added).)  The presentation referenced that Plan changes had been approved by senior management in July 1995, approved by the Board in September 1995, and implemented in January 1996.  (<u>Id.</u>)  These changes had resulted in savings of $6 million from 1995 to 1996.  (<u>Id.</u>)

C.   <u>Employee Communications</u>

Foot Locker communicated the changes to the retirement plan to employees in a series of communications.  All of the communications—whether intended for company-wide dissemination or to individuals or regional groups—share core common characteristics.  All failed to describe wear-away.  All failed to clearly discuss the reasons for the difference between a Participant's accrued benefit under

the old Plan and his or her cash balance under the new.  The Court finds that all the statements were intentionally false and misleading.

The changes in the pension program were first—and very misleadingly—introduced to Participants in a September 15, 1995 announcement letter from Farah and Hilpert.  (PX 2.)  The Company told employees that it was "excited" to announce that, after "listen[ing] to what associates have told us they would like to see," it had decided to update its pension plan to "give associates a more competitive retirement benefits package."  (PX 2.)  This communication announced the Plan changes as positive news when Foot Locker management knew that in fact the changes were, at best, a mixed bag: an effective temporary freeze of additional benefit accruals (a plain negative) would be accompanied by the introduction of a new 401(k) plan and the ability to take the pension benefit in a lump sum (two positives).  (Peck Tr. 1179:20-25.)  In addition, Foot Locker knew that, once out of wear-away, Participants would accrue additional benefits at a lower and slower rate.  (Tr. 1180:23-1181:2.)  Peck, who was involved in drafting the September 15, 1995 announcement letter to employees, characterized it as a "good news letter"—and that bad news was not included.  (Tr. 1181:13-1182:9, 1184:16-25.)  Peck testified that it was unnecessary to include the bad news because it (the bad news) "didn't apply to everybody."  (Tr. 1184:23-1185:7.)  The evidence was overwhelming, however, that all but a very small number of employees were known to be negatively impacted by the Plan change.

The September 15, 1995 announcement letter to employees states in part as follows:

> The other part of the new retirement benefit program provides several changes to The Woolworth Retirement Plan. These changes will provide participants with more flexibility and a better ability to monitor their benefits. Each plan participant will have an individual account, to which the company will make a yearly contribution. That contribution will be based on a new formula that will reflect percent of pay and years of service. Participants will be able to see their individual account balance grow each year, and know its value.

(PX 2.) Foot Locker knew at the time that the statement, "Participants will be able to see their individual account balance grow each year, and know its value," was false as to almost all Participants, because the account balance would have no "value" to Participants in wear-away. (Peck Tr. 1182:15-1183:17, 1184:2-4, 11:15.) At trial, Peck agreed that Participants would not know the value of their benefit while they were in wear-away unless they were specifically informed that they were in wear-away. (Tr. 1183:18-21.)

The next company-wide communication was distributed on November 17, 1995. (PX 4 (the "Highlights Memo").) Peck had direct involvement in drafting that memo as well. (Peck Decl. ¶ 16.) She again made an affirmative decision to leave out the negative aspects of the Plan changes. (Peck Tr. 1188:12-18.) Wear-away was not disclosed. (Tr. 1188:22-24.) Foot Locker knew at the time that it was a misleading statement for anyone in wear-away to state, as the Highlights Memo did, that "At termination of employment, provided you are vested, you will have the option of taking the lump sum payment equal to your account balance." (PX 4; Peck

17

Tr. 1188:25-1189:10, 1213:24-1214:11.)  This statement obscured the fact that the accrued benefit was the sole true benefit for anyone in wear-away.  (Of course, Participants had a lump sum versus annuity choice; that portion of the statement was true).  The Highlights Memo further referred Participants to forthcoming statements of their estimated benefits.  (PX 4 ("A statement showing your estimated benefits under the amended Plan will be mailed to you during December 1995."))

But as Kanowicz, who worked on the pension design team, explained during her deposition, the Company simply "left [the wear-away] part out" of communications with employees.[13]  Both Kanowicz and Peck testified that they understood that the account balance increases did not mean anything while Participants were in wear-away.  (Kanowicz 3/29/12 Tr. 166:18-167:7; Peck Tr. 1133:6-9).  Furthermore, Kanowicz acknowledged that "if we spelled it out" for the employees, "they would have" understood that their benefits were being frozen. (Kanowicz 3/29/12 Tr. 195:12-16.)  There were a number of ways to explain these effects in the numerous communications with employees.  But the Company "didn't spell it out."  (Kanowicz 3/29/12 Tr. 195:18-19.)  Instead, Foot Locker knew that under its new Plan announcement, employees would mistakenly "perceive the [growth in] their account [balance] as growth in their benefit," but it "made sure that nothing was said to people to disabuse them of that idea" that their benefits

---

[13]     The Court reviewed Kanowicz's videotaped deposition designations, which allowed the Court to make a credibility assessment based on her demeanor as well as the substance of her remarks. The Court found that Kanowicz, who was a defense witness, was forthright in her testimony.  Her testimony supports rather than undercuts the Class's position in this case.

were growing.  (Kanowicz 3/29/12 Tr. 363:19-364:6.)  Although Peck stated that her

original belief was that the wear-away would be a "short period of time" of two to

three years, she agreed that she would want to know if an employer was freezing

her pension for that "short" period.  (Peck Tr. 1134:23-1135:5, 1136:11-14; 1136:25-

1137:5, 1138:16-23.)

The Summary Plan Description ("SPD") was distributed in December 1996.

(See PX 5; PX 59; Kiley Tr. 803:24-804:9.)  The SPD contains a variety of statements

that falsely indicated to Participants that their actual retirement benefits were fully

reflected in their account balances—versus the factually correct statement that

such benefits would often default to the December 31, 1995 accrued benefit under

the "greater of" formula.

The SPD contained a number of intentionally false misstatements.  The

Introduction to the SPD states, "This SPD explains how you qualify for a pension"

and "how that pension is determined."  (PX 5 at FLPL0020.)  The "Highlights"

section contains the following bullet points next to "How Your Retirement Benefit Is

Determined":

- *Account balances* are credited with 6% interest annually.
- *Compensation* credits, arrived at using a formula based on your *years of service* and *compensation*, are added to your *account balance* annually.

(Id. at FLPL0023 (italicization in original).[14])  The Highlights section refers

Participants to page 11, which contains the following information under the heading

"How Your Retirement Benefit is Determined":

> Your *Plan* benefit is based on the *account balance* you accrue, or earn,
> while a *participant*.  That *account balance* is made up of:
>
> - Your *initial account balance*, which is the value of your *Plan* benefit
>   as of December 31, 1995, before the *Plan* was amended;
>
> - interest credited to your *account balance*; and
>
> - additions to your *account balance*, called *compensation* credits,
>   which are based on *years of service* and a percentage of
>   *compensation*.
>
> When your employment terminates, you are entitled to receive
> payments on a monthly basis (an annuity) or in a lump sum.  The
> annuity payable to you is determined in the following manner.  Your
> *account balance* is increased by interest credits (as described below) to
> *normal retirement date*.  The resulting amount is converted to an
> annuity using factors required by federal law and *IRS* regulations.
> The lump sum payable to you is the greater of your *account balance* or
> the amount determined by multiplying the annuity payable to you by
> factors required by federal law and *IRS* regulations.

(Id. at FLPL0030-31 (italicization in original).)  Benefits manager Marion Derham

conceded at trial that the "greater of" language did not disclose wear-away.

(Derham Tr. 1431:19-1432:1.)

    The SPD then contains a subsection entitled "Initial Account Balance."  (PX 5

at FLPL0031.)  This subsection contains a lengthy explanation, including

complicated calculation concepts, followed by a single sentence that states, "Your

---

[14]    Italicized terms are ones that are defined in the "Definition of Terms" section of the SPD.

*accrued benefit* at the time your employment terminates is the greater of the amount determined under the *Plan* as amended on January 1, 1996 or your accrued benefit as of December 31, 1995." (Id. (italicization in original).)

The term "accrued benefit"—italicized in the preceding sentence—is separately defined in the "Definition of Terms" section of the SPD as "[a] *participant's* accumulated *account balance* converted to a Single Life Annuity payable at normal retirement age." (PX 5 at FLPL0024 (italicization in original).) Substituting this definition into the preceding sentence leads to:

> Your accumulated account balance converted to a Single Life Annuity payable at normal retirement age at the time your employment terminates is the greater of the amount determined under the Plan as amended on January 1, 1996 or your accrued benefit as of December 31, 1995.

Deutsch testified—and the Court agrees—that this sentence is incorrect: it states that a Participant's <u>account balance</u>, not ultimate benefit, is the greater of the two formulas. (Deutsch Tr. 302:4-12.) Thus, even if a clever Participant carefully read the SPD and cross-referenced the SPD's provisions with the Definitions section, he or she still would not get a correct statement of the "greater of" comparison.

The term "initial account balance" is also defined in the Definitions section. That definition is as follows:

> If you were a participant in the Plan on December 31, 1995 and on January 1, 1996, you have an initial account balance. That balance is equal to the actuarial equivalent lump sum value of your accrued benefit (as determined under the terms of the Plan in effect on December 31, 1995) as of December 31, 1995. This value is determined actuarially based upon a 9% rate of interest and the mortality table set forth in IRS rulings.

21

(Id. at FLPL0025.)  The SPD contains no further explanation of the meaning of

"actuarial equivalent lump sum value" or "the 9% rate of interest."  That phrase is

highly technical and not accessible to most reasonably educated people, let alone the

average Foot Locker employee, who had a high school level education.   It is not

immediately apparent to the lay person that the "9%" is being used as a discount

rate.

The SPD also references "Interest Credits" as part of the calculation of a

Participant's retirement benefits, stating, in pertinent part:

> Interest credits will help your *account balance* grow.  On the last day
> of each *Plan year*, *account balances*, as of the first day of that *Plan*
> year will be credited with interest at the rate of 6% (1/2% per month).

(Id. at FLPL0031 (italicization in original).)  The SPD fails to mention that this

"growth" in the account balance did not represent any growth in the pension benefit

for the vast majority of Participants.

Peck understood the importance of the SPD in terms of communicating the

terms of the Plan amendment accurately to Participants.  (Peck Tr. 1240:16-19.)

She provided final approval of the SPD.  (Tr. 1224:13-15, 1240:20-23, 1241:3-6.)  At

the time she provided her final approval, Peck knew that wear-away was

anticipated to last for an additional three to four years—and that the Company's

prior communications about the changes to the Plan contained statements that

were false as to all Participants who were in wear-away.  (Tr. 1241:7-20, 1242:1-3.)

Nonetheless, Peck did not use the SPD as an opportunity to correct these false statements.  (Tr. 1241:21-25.)

Peck testified—and the Court agrees—that the statement in the SPD that "Your Plan benefit is based on the account balance you accrue, or earn, while a participant" was false for Participants in wear-away.  (Peck Tr. 1244:12-16.)  In fact, the entire SPD was focused on the account balance benefit (Tr. 1246:3-7) and was irrelevant to Participants in wear-away until they got out of wear-away (Tr. 1245:7-11, 1247:12-16).  Peck knew that, with expected attrition, thousands of employees would terminate and leave the Company without ever getting out of wear-away.  (Tr. 1245:15-19.)  Nonetheless, wear-away was not disclosed anywhere in the SPD.  (Tr. 1242:20-1243:1.)  Peck conceded at trial that she had made an affirmative decision to limit the Company's communications with Participants to "good news"—and not mention that Participants would stop earning additional benefits for a period of time.  (Tr. 1243:15-20.)  Meanwhile, Peck's team was aware that it was through the wear-away that the cost savings sought by Farah were achieved.  (Tr. 1243:25-1244:7.)

Peck acknowledged that she did not expect the average Participant to read the entire SPD—and that the average Participant would instead focus on the Highlights section.  (Tr. 1248:24-1249:2, 1253:4-7.)  She also agreed that the Highlights section does not reference wear-away.  (Tr. 1249:8-11.)  She agreed that Participants would not be familiar with the concept of wear-away and would have to be—as she was—educated about that concept.  (Tr. 1250:12-16, 1250:25-1251:10,

1241:15-16.)  Peck knew at the time she gave final approval to the SPD that almost everyone was in wear-away and would not be familiar with wear-away—and that she approved statements that were false for them, namely, that their Plan benefit was based on their account balance.  (Tr. 1252:7-13.)

Misstatements were made to Participants year after year.  (Tr. 1221:17-21, 1222:8-10.)  For example, beginning in July 1996, employees received booklets setting forth their individualized "total compensation" statements.  (Peck Tr. 1222:11-17; PX 7 at FLPL 3009.)  The booklets listed the employee's current account balance in dollars, and the booklets after 1996 showed the previous year balance and the growth of that balance via compensation and interest credits.  (PX 7 at FLPL 3011; PX 53 at FLPL 3092; PX 54 at FL-OSB 008522; PX 55, FL-OSB 008529; PX 56, FL-OSB 007545; PX 57 at FL-OSB 008365; PX 58, FLPL0017.)  They advised employees, "You will want to compare this statement with those you receive in the future.  It is a measure of your yearly progress, and as your time with the company increases, the value of many of your benefits will also increase."  (PX 7 at FLPL 3008; PX 53 at FLPL 3087; PX 54 at FL-OSB 008519.)  The booklets also claimed that "The cost of your benefits shown in this statement represents a significant portion of your total compensation," and that "Your Company . . . spends a substantial sum of money to . . . [provide] financial security for your retirement years."  (PX 7 at FLPL 3009.)

Participants also received individualized annual pension plan statements, which stated that the account balance was the amount the Participant "could expect

to receive upon termination of employment or retirement if you accrue no further benefits and elect a Lump Sum form of payment."  (PX6; see also PX 23.)  Peck was involved in drafting these annual statements, which  contained two columns—a column entitled "Current Plan," listing the estimated accrued benefit through December 31, 1995, and a column entitled "Amended Plan as of January 1, 1996," listing the estimated account balance as of January 1, 1996.  (See PX 43; PX 6; Peck Tr. 1190:25-1191:5.)  The "Amended Plan" column did not refer to the December 31, 1995 accrued benefit—or state the Participant would be entitled to the "greater of" the December 31, 1995 accrued benefit and the account balance.  (See PX 43; PX 6; Peck Tr. 1192:3-11.)  Instead, the "Amended Plan" column stated that the estimated account balance as of January 1, 1996 was what the Participant "could expect to receive."  (PX 43)

Peck knew that this statement was false for anyone in wear-away.  (Peck Tr. 1194:16-23, 1195:16-19, 1215:13-24.)  In fact, if a Participant were to have been paid on January 1, 1996, the account balance would not be the payment he or she would receive; he or she would receive the December 31, 1995 accrued benefit.  (Peck Tr. 1192:15-1193:4.)  In many cases, the January 1, 1996 account balance was half of the lump sum value of the December 31, 1995 accrued benefit.  (Peck Tr. 1194:11-15.)  But like the annual booklets, Plan statements beginning in May 1997 showed annual account growth, reinforcing the message that the Participant's account size is equal to his benefit size.  See PX 3 at FL-OSB 002244 ("Your benefit is expressed as an account balance that grows each year with interest and pay credits.")

25

Additional materials sent to some Participants describing the benefits they would receive also did not disclose wear-away.  While some Participants – after individual inquiry – received additional statements that listed a "lump sum payable figure that was greater than the "initial account balance" or "accrued benefit" figures, (see, e.g., PX 339, PX 330, PX 390.), the statements did not explain that the differential was due to the fact that the initial account balance was not a meaningful figure that led to increased benefits over time.  In fact, some statements showed the account balances increasing over time.  (See, e.g., PX 330.)

Foot Locker has asserted that its communications with Participants were consistent with legal advice it was provided.  However, the evidence does not support that counsel—inside or outside—had the full array of facts, including those facts necessary to provide a clear understanding of the number of Participants impacted by wear-away.  (See Peck Tr. 1278:17-24.)  Peck also did not ensure that outside counsel knew that wear-away could continue for a period of years.  (Tr. 1277:22-1278:1, 1279:20-1280:6.)  Finally, outside counsel had advised that the annual statements be revised to include the qualifier, "unless your accrued benefit as of December 31, 1995 (set forth in 5 above) is greater, on an actuarial equivalent basis."  (PX 44.)  Inside counsel, however, made no comments on the draft.  (PX 625 ("No comments per Sheilagh Clarke," inside counsel).)  Peck approved the statement's dissemination without change.  (Peck Tr. 1220:8-11.)  A follow-up statement went out in March 1996.  (Tr. 1220:20-23.)

26

Foot Locker has also argued that the Plan changes provided certain benefits to employees—including the ability to receive retirement benefits in a lump sum and a 401(k) plan.  This is supported by the evidence but ultimately irrelevant.  The lump sum option could have been provided without any conversion to a cash balance plan, let alone to a cash balance plan that had mathematically locked-in wear-away. (Deutsch Tr. 124:17-125:7; see also id. 145:1-146:21.)  Additionally, the rollout of the 401(k) cannot make up for the absence of clear communications as to what an employee's actual retirement benefit would be, or the fact and impact of wear-away on that benefit's growth.

D.    Employee Reaction to Plan Communications

Perhaps the clearest indication that wear-away was not understood was the fact that not a single employee ever complained about it.  This absence of complaint was the logical result of Foot Locker's false and misleading communications: employees simply did not know that wear-away was an issue for them.

At the time of the events in this case, the average Foot Locker employee earned an average of $22,000.  (Peck Tr. 1135:14-15.)  To communicate effectively with employees, Foot Locker's benefits employees had an assumption that employees had an eighth-grade level of education.  (Ine Tr. 983:19-23.)

Ada Cardona, a class member who testified credibly at trial, is an example of an average employee.  She worked for the company for a total of 40 years.  (Cardona

Tr. 429:17-18.)[15]  On the date that she retired, that is, after 40 years, she was earning $9.80 per hour.  (Tr. 430:21-22.)  Cardona reviewed the communications relating to the Plan changes sent to her.  (Declaration of Ada Cardona ("Cardona Decl.") ¶ 5, ECF No. 325; Tr. 433:4-11.)  She focused on the fact that the communications indicated that the pension plan would continue; she testified about the announcement letter, "I read it and I just thought the pension was still there, and that was it, you know?"  (Tr. 433:10-11.)  After reviewing the communications, she had no understanding as to what "conversion" the Highlights Memo (PX 4) referred, and did not understand that she would not be receiving additional growth in her pension benefits.  (Cardona Decl. ¶ 12, Tr. 435:1-5.)

Ralph Campuzano, who worked at Woolworth until 1998, also testified credibly at trial.  He testified that he read all of the Plan communications sent to him.  (Declaration of Ralph Campuzano ("Campuzano Decl.") ¶ 5, ECF No. 328.)  He read the Highlights Memo (PX 4) and believed that it indicated that his pension benefits would continue to grow.  (Campuzano Decl. ¶ 9.)  He would regularly receive Plan summaries and carefully saved them in his files.  (PX 53, PX 61, PX 356.)  Unbeknownst to him, they were in fact irrelevant to the pension benefit he actually stood to receive.  Between 1996 and his termination, he was never out of wear-away.

---

[15]     Cardona continues to work at another store for a different company today.

Doris Albright was also very credible.  She worked at Woolworth between 1974 and 1996, and left only when the facility at which she worked was closed down.  (Declaration of Doris Albright ("Albright Decl.") ¶ 1, ECF No. 329.)  During the last two years of her employment, she was the administrative manager at the facility.  In that capacity, she regularly interacted with employees at the facility regarding benefits issues.  (Albright Decl. ¶¶ 2, 16, Tr. 964:24-965:13.)  She did not understand wear-away or that her pension benefits had not grown after the Plan change went into effect.  (Albright Decl. ¶ 4; Tr. 969:20-23, 970:2-4, 9-16.)

Richard Schaeffer is another class member who testified credibly at trial.  He worked at Woolworth between 1975 and 1997, when the facility at which he worked was closed down.  (Declaration of Richard Schaeffer ("Schaeffer Decl.") ¶ 1, ECF No. 326.)  Schaeffer worked first as a forklift driver, then as a forklift supervisor, and finally as a rebuyer.  (Id.)  Based on the communications he received and reviewed about the changes to the Plan, Schaeffer believed that the old Plan formula was no longer relevant, that his benefit was now his account balance, and that this benefit would keep growing as he continued working for the Company.  (Id. ¶¶ 6, 7; Schaeffer Tr. 1085:19-23.)

In 1997, Schaeffer contacted Foot Locker regarding his and his wife's pension benefit because he wanted to know the figure that he would be receiving when he and his wife would be let go.  (Schaeffer Decl. ¶ 8; Schaeffer Tr. 1084:6-1085:10.)  The evidence demonstrated that he intended to and did rely on the information Foot Locker provided.  In reviewing the response he received from Foot Locker, Schaeffer

focused on the bottom line figure and did not fully understand the accompanying calculations.  (PX 390; Schaeffer Decl. ¶ 9; Schaeffer Tr. 1089:12-20.)  He did not understand from the letter and the calculations that his pension benefit had not been growing during 1996 and 1997.  (Schaeffer Decl. ¶ 9; Schaeffer Tr. 1090:6-14.)

Russell Howard also testified credibly on behalf of the Class.  Howard worked for Foot Locker between 1967 and 2003.  (Declaration of Russell Howard ("Howard Decl.") ¶ 1, ECF No. 327.)  Howard testified that he received and read through all of the communications about the Plan changes, skimming certain parts.  (Howard Decl. ¶ 4; Howard Tr. 449:15-450:1, 452:13-18.)  Like his fellow class members, Howard believed, based on the communications he received, that his pension benefit was growing the entire time he worked for the Company.  (Howard Decl. ¶ 3.)  His understanding was that his opening account balance reflected the full value of the benefit he had earned through December 31, 1995—and that this benefit would continue to grow with continued employment.  (Id.)  Howard testified credibly that he never suspected that his pension benefit had stopped growing while he worked for the Company: "I just looked at the growth year to year, saw that it was growing and that was it, yeah."  (Howard Tr. 456:3-5.)  In fact, his benefit was not growing.

Michael Steven, the former Chief Financial Officer of the Woolworth division—who holds a Master of Business Administration ("MBA") in Finance and is a licensed Certified Public Accountant ("CPA")—also testified on behalf of the Class.  (Declaration of Michael T. Steven ("Steven Decl.") ¶¶ 1-2, ECF No. 340.)  He credibly testified that, based on company communications, he believed that his prior

30

benefit was placed into—or somehow became—the basis for his cash balance

account.  (Steven Decl. ¶ 7; Steven Tr. 1367:1-3.)  While he understood that there

was an actuarial conversion process, he did not understand that the conversion

resulted in a lower amount than that to which he was entitled as of December 31,

1995.  (Steven Decl. ¶ 7; Steven Tr. 1367:13-20.)  When he learned that there would

be Plan changes, he asked Foot Locker to prepare an estimate of, as he

characterized it, what his "wealth was worth."  (Steven Tr. 1368:15-17.)  In response

to that request, he received a statement from Kiley dated January 19, 1996.

(Steven Decl. ¶ 15; PX 329.)  Comparing the estimated lump sum benefit in this

statement to his opening account balance, Steven learned that the lump sum benefit

was larger—but he assumed that the difference was due to various actuarial

calculations.  (Steven Decl. ¶ 15; Tr. 1369:20-1370:7.)  His understanding from the

estimate was that his pension would continue to increase with additional service.

(Id.)  In fact, it did not.  The evidence established that Steven intended to and did

rely on this information.

Steven made a second request later in 1996—and received another response

from Kiley.  (Steven Decl. ¶ 16; PX 330.)  Even putting these two communications

regarding his pension benefit together and seeing the differences between them did

not reveal to him that he had not earned additional benefits during the intervening

period of employment.  (Steven Decl. ¶ 18.)  For instance, when he saw the

calculation of his initial account balance, he did not understand that the "9%"

shown in the calculation had been used as a discount rate.  (Steven Decl. ¶ 17; Tr.

1373:25-1374:4, 22-23.)  At trial, counsel for Foot Locker walked Steven through the calculations provided to him—clearly with the view of demonstrating that he had all of the information that he needed before him to understand wear-away.  This line of examination did not assist Foot Locker.  Steven very credibly agreed to that with which he could agree, and very credibly indicated a lack of real understanding as to what the calculation showed.

Named plaintiff Geoffrey Osberg has spent over eight years litigating this case on behalf of the Class.  He was a sales associate at Foot Locker and rose to the level of store manager; he is now a sales associate at a department store in Illinois. (Declaration of Geoffrey Osberg ("Osberg Decl.") ¶¶ 2-3, ECF No. 331.)  His former colleagues at Foot Locker have been represented by him in this case.  He testified credibly at trial that while he reviewed the Plan communications, he did not understand that his pension benefit was not growing with additional years of service.  (Osberg Decl. ¶¶ 6-8; Tr. 418:12-25.)  He recalled having received the initial communication in the fall of 1995 from Farah and Hilpert announcing the coming changes to the Plan.  (Osberg Decl. ¶ 10.)  He testified credibly that he recalled taking away from the letter that he should be "excited" about the changes and that they were positive changes for employees.  (Id.)

The evidence at trial overwhelmingly supports that the Company intended Participants to rely on Plan communications, that they did, and that the communications failed to inform them of wear-away.  Indeed, those communications were designed to conceal that information.  Named plaintiff Osberg and class

members Cardona, Schaeffer, Steven, Howard, Campuzano, and Albright all testified credibly that despite receiving the company communications, they did not understand that they had ceased to earn additional pension benefits despite continued employment.  From the CFO of Woolworth stores to a cashier, no one understood what was going on.

But there is even more evidence of the misleading nature of the communications than this.  Even employees directly involved in pension benefits calculations did not understand the concept of wear-away—or that their accruals were effectively frozen for a period of time after the Plan conversion.

Ellen Glickfield testified on behalf of the Class.  One of her job responsibilities in her 14-year employment as a pension clerk at Foot Locker was to calculate pension benefits, including after the January 1, 1996 Plan amendment. (Declaration of Ellen Glickfield ("Glickfield Decl.") ¶¶ 3-4, ECF No. 351.)  She believed that her December 31, 1995 accrued benefit became an opening cash account balance.  (Glickfield Decl. ¶ 15.)  Even when she received a larger minimum lump sum ("MLS") than the cash balance, she did not understand what had occurred.  When she noticed that the MLS was larger than her cash balance account, she attributed the difference to governmental regulations: "The MLS was just a possible extra amount that someone might get, even more than his or her account, because of a calculation the IRS required at the time of payment depending on interest rates."  (Id. at ¶ 19; see also Glickfield Tr. 1400:5-23, 1402:4-8.)

Similarly, HR Department employee Sherry Flesses, who testified by

deposition, thought she was "earning more pension benefits" and "had no idea that

there was a freeze of [her] earning any pension benefit at the time"; she conceded

that she would be "surprised" to learn that she had earned no new

benefits.  (Flesses 3/20/12 Tr. 127:17-128:3, 157:18-158:3.)  Ms. Flesses "understood

that you always were starting out with what you already earned, and then moving

forward, you earned more."  (Flesses 3/20/12 Tr. 154:18-22.)  Ms. Flesses further

testified that she "did not, in [her] wildest dreams, have any suspicion that

Woolworth was creating opening account balances that were not of equal value to

what somebody would have received the next day."  (Flesses 3/20/12 Tr. 119:2-6.)

E.    <u>Fiduciary Responsibilities</u>

The plan administrator is an ERISA fiduciary.  <u>See, e.g.</u>, <u>Ladouceur v. Credit</u>

<u>Lyonnais</u>, 584 F.3d 510, 512 (2d Cir. 2009).  Foot Locker was the plan administrator

for the Foot Locker Retirement Plan.  Nonetheless, the Company operated on the

principle of caveat emptor with regard to Plan communications.  (Peck Tr. 1290:13-

21.)

Peck testified that she was a fiduciary of the Company.  (Tr. 1280:10-14.)

However, she had a poor understanding of her fiduciary duties.  She testified that

her responsibility included ensuring that funds were not misused; she did not

express any understanding that she had a separate fiduciary duty as the plan

administrator—though she conceded she was a plan administrator.  (Tr. 1280:16-

1281:4, 1282:2-4.)  She testified that she did not consider either herself or the

Company a fiduciary to the Participants when drafting and issuing communications relating to the Plan changes.  (Tr. 1282:19-1283:4.)

Woolworth's CEO at the time of the plan change, Roger Farah, testified live at trial.  He was clearly annoyed at having to be present at the trial and was short tempered and resistant.  Remarkably for a man in his position, he denied understanding what a fiduciary's obligations are and that he was a fiduciary with respect to Plan Participants.  (Farah Tr. 539:14-20, 543:2-16.)

      F.    <u>The Expert Witnesses</u>

          1.    Deutsch

Deutsch is a very knowledgeable actuary.  He testified as to a number of different topics—and the Court found his testimony highly credible in every respect.

Deutsch testified that "actuarial equivalent lump sum value" of a future payment is the amount which, when increased at an assumed rate of interest to the date of the future payment, equals the amount of the future payment.  (Deutsch Tr. 120:16-121:2; <u>see also</u> Deutsch Op. Report at 2-3.)  Deutsch opined—and the Court credits—the "actuarial equivalent lump sum value" of the December 31, 1995 accrued benefit could be reasonably calculated by using one of two alternative assumptions about the lump sum: (1) that the lump sum would be immediately cashed out and invested by the Participant at the 417(e) interest rate (6.06% at the time of the conversion), or (2) that the lump sum would remain in the Plan in the form of a Participant's opening account balance and be "invested" under the terms of the Plan (at a fixed 6% rate).  (Deutsch Op. Report at 2-3; Tr. 180:19-181:20.)

Foot Locker's use of a 9% discount rate and a further mortality discount resulted in opening account balances that were <u>not</u> actuarially equivalent to the December 31, 1995 accrued benefit.  (Deutsch Op. Report at 3; Tr. 153:2-25, 179:4-180:8, 184:6-25.)  At trial, Kiley agreed that the use of a 9% discount rate did not result in a value that was actuarially equivalent to the December 31, 1995 accrued benefit. (Kiley Tr. 629:2-3, 629:7-15.)  Accordingly, this testimony supports the Court's determination that Plan communications referring to a conversion to an actuarial equivalent lump sum were false and misleading.

With regard to mortality, Deutsch testified that any mortality discount used in calculating opening account balances needed to be accompanied by corresponding "survivorship" credits to the account over time—which was not done here.  (Deutsch Tr. 183:12-184:2.)

Deutsch testified that a company's contribution to fund a pension plan generally consists of two parts: (1) the unfunded liability, which is the difference between the already earned liability and the assets, and (2) the annual normal cost. (Deutsch Tr. 132:16-133:25.)  Under the unit credit funding method—which was used by the Plan both pre- and post-amendment—the unfunded liability is set as the value of the pension benefits earned to date, and the normal cost is set as the value of benefits earned during the year.  (Deutsch Tr. 132:25-133:5; <u>see also</u> Sher Tr. 1459:3-10.)  While unfunded liability is fixed and cannot be reduced, savings can be achieved in the normal cost by reducing future accrual of benefits.  (Deutsch Tr. 133:6-11; Sher Tr. 1459:11-25; <u>see also</u> PX 9.)  Foot Locker did just that by choosing

36

a conversion rate of 9%—which automatically resulted in a temporary suspension of future accruals for almost all employees.

Deutsch disagreed with Foot Locker's position that, under the new Plan, an employee only earned the right to a lump sum at the point that it was paid; according to Deutsch, every employee possessed the right to a lump sum on and after January 1, 1996, when the Plan was amended, even though the exact amount of that lump sum would not become known until it was paid.  (Deutsch Tr. 161:13-163:18.) The Court agrees.

Deutsch testified that wear-away is, factually and by definition, equivalent to a temporary freeze.  (Deutsch Tr. 169:6-12, 174:3-13.)  Deutsch analyzed wear-away both in terms of "annuity" wear-away (analyzed by comparing the opening account balance and the December 31, 1995 accrued benefit on an annuity-to-annuity basis) and in terms of "lump sum" wear-away (analyzed by performing a lump sum-to-lump sum comparison).  According to Deutsch, all Participants, even those who received the enhancement, experienced annuity wear-away.  (Deutsch Op. Report at 12, 15.)  With respect to lump sum wear-away, Deutsch acknowledged that there were a few people (only 223 out of many thousands) whose initial account balances were larger than the lump sum value of their December 31, 1995 frozen accrued benefit.  (Deutsch Op. Report at 16; Tr. 196:4-25.)  For the remaining 98.6% of Participants, however, the lump sum value of the December 31, 1995 frozen accrued benefit, as of January 1, 1996, exceeded the initial account balance by some amount. (Deutsch Op. Report at 16.)

37

2.     Sher

Sher is also a knowledgeable actuary.  He is plainly a qualified expert in pension plan design.  The Court found his testimony helpful.  Ultimately, however, his testimony clarified rather than undercut the Class's positions.  That was ultimately due to the fact that the rationale for plan conversion—a topic on which Sher was articulate and clear—is ultimately irrelevant to the question of whether once the Plan was amended (for whatever reason), the Company fulfilled its fiduciary responsibilities to Participants and appropriately communicated the changes to them.

Sher conceded that there are a variety of ways in which cash balance plans can be designed.  (Sher Tr. 1460:4-5.)  The design can be adjusted to achieve whatever level of cost savings a company seeks to achieve—including none at all.  (Tr. 1463:6-24.)  Sher further agreed that wear-away is not a necessary part of the design of a cash balance plan (Tr. 1460:1-3), but that wear-away was expected for some period of time in connection with the design for the Foot Locker Retirement Plan.  (Tr. 1459:11-21.)  Sher's analysis estimated that, at the time of conversion, a two- to three-year period of wear-away was expected for most Participants.  (Tr. 1578:25-1579:19.)

Sher testified that "actuarial equivalence" is a conversion of a pension benefit from one form to another using actuarial factors—and that this conversion should be cost-neutral from the perspective of the Plan.  (Sher Tr. 1571:2-1573:1.)  He testified that the January 1, 1996 Plan conversion had dual aspects from a cost

38

perspective.  On the one hand, wear-away resulted in normal cost savings: the normal costs for employees in wear-away would be zero until they got out of wear-away; ongoing normal costs were only attributable to the relatively small segment not in wear-away.  (Tr. 1457:8-14,1496:11-1497:1, 1500:4-12.)  Normal cost savings from anticipated from wear-away directly reduced the Company's out-of-pocket costs.  (Tr. 1712:25-1713:8.)  These amounts flowed through to the minimum required contribution.  (Id.)  In other words, the anticipated wear-away resulted in an immediate bottom line cash savings to Foot Locker through normal cost reductions.  (Tr. 1713:14-18.)

On the other hand, Sher testified that Participants' overwhelming selection of the lump sum option after January 1, 1996 resulted in certain increased costs.  (Tr. 1457:15-1458:1, 1465:20-1466:13.)  However, Sher agreed that these costs were to the Plan because the lump sums were paid out of the existing Plan assets (which were sufficient to cover them); the Company itself did not have to pay those amounts out of corporate cash flows.  (Tr. 1468:3-18.)  Moreover, the Company incurred savings through lower payroll costs as employees terminated and elected lump sum payments.  (Tr. 1479:8-1480:15, 1493:24-1494:8.)

On cross-examination, Sher agreed that the Company did not have to increase the amount of cash that it put into the Plan in 1996 to pay for the costs of lump sum distributions.  (Tr. 1716:15-19.)  At that time, the Company's assumption

was that 100% of Participants would take an annuity.  (Tr. 1716:21-1717:1.)[16]  As a

result of this assumption, the Company—which was contributing at minimum

funding—incurred no cost as to Participants in wear-away.  (Tr. 1717:19-1718:1.)

On a prefunding basis, so long as the Company assumed that no one would elect a

lump sum, the Company did not need to fund the cost of a lump sum.  (Tr. 1718:2-

5.)  As a result, in the short term, the Company received immediate cash savings

from the wear-away effect without any offsetting cash costs for the lump sums.  (Tr.

1718:11-14.)

Sher had worked on a survey of companies that had undergone cash balance

conversions.  (Sher Tr. 1456:5-12; Sher Op. Report App'x. 3, ECF No. 338.)  He

testified that the survey showed that a significant majority of these companies

highlighted the cash balance benefit in their annual benefit statements—and did

not include information on the frozen protected benefit.  (Sher Tr. 1596:11-25.)  Sher

also testified—based on his experience reviewing SPDs and advising companies

undergoing cash balance conversions—that other companies' SPDs included

information on wear-away only in that they set forth a "greater of" comparison

between the benefit accrued under the prior Plan and the benefit accrued under the

new formula.  (Tr. 1609:12-1610:8.)  Sher did not recall seeing any SPDs that told

---

[16]     On cross-examination, Sher testified that he was no longer sure that the Company had made
a 100% annuity assumption.  (Sher Tr. 1720:16-1722:19.)  However, the 5500s—a required filing that
ERISA plans must make to the U.S. Department of Labor—for 1996 (PX 995), 1997 (PX 211), and
1998 (PX 1546) indicate an assumed 100% annuity election.  (See Sher Tr. 1723:19-1726:8.)
Kanowicz signed the 5500s as the plan administrator—signing off on this assumption.  The
assumption changed in 1999 to 100% immediate lump sum.  (PX 966 at FLOSB 16903; Sher Tr.
1726:9-1727:3, 1727:19-24.)

participants that additional periods of employment would not increase the frozen accrued benefit—or that additional work post-conversion would not result in growth of their pension benefit. (Tr. 1611:1-11; see also id. 1602:8-20.) Ultimately, these points are irrelevant to the Court's determination to whether here, Foot Locker fulfilled its legal obligations.

This portion of Sher's analysis was, in all events, flawed: in analyzing other companies' communications, Sher did not distinguish between companies that had converted using a formula that resulted in no wear-away or nominal wear-away and those whose conversion formulas did create wear-away. (Tr. 1598:25-1599:8.) Sher also did not track companies whose conversion formulas did not initially result in wear-away but created wear-away down the line. (Tr. 1599:9-1600:13.) In addition, Sher did not have any information as to the educational level or sophistication of the population reading the other companies' communications. (Tr. 1590:10-15, 1594:9-1595:5.) These flaws render Sher's testimony as to the industry practice with regard to communications irrelevant. Without knowing whether or not other companies' employees were of similar educational levels, and therefore could understand benefits information in a similar way to the class members here—and without knowing whether and when other companies' conversions to cash balance plans resulted in wear-away—the Court cannot meaningfully compare the communications at issue here with the communications issued by other companies.

Sher also testified as to the volatility of interest rates. He testified that the post-conversion 30-year Treasury rates were "extremely volatile" (Tr. 1619:6-11)

and opined that such volatility made predictions of the likely value of the frozen accrued benefit risky and perhaps misleading (Tr. 1625:1-24.)  Sher supported this testimony with reference to his analysis of plaintiff Osberg's frozen accrued benefit at the beginning of each year.  (Sher Tr. 1620:19-1623:13; DX 419.)  As interest rates rose and declined, the lump sum value of Osberg's frozen accrued benefit rose and fell.  For instance, in 1999, the value of his accrued benefit was $23,432, but in 2000 it had fallen to $17,605.  (Sher Tr. 1622:14-19; DX 419.)

However, Sher acknowledged that, at least during 1996, even with the one-point swing referenced in an internal Foot Locker document as a rationale for not disclosing the frozen lump sum benefit (PX 164), a Participant who did not receive an enhancement would nonetheless still remain in wear-away—that is, his frozen accrued benefit would be higher than his initial account balance.  (Sher Tr. 1631:2-1633:12.)

Actual interest rates are reflected in DX 417.  The trend was downward—leading to an increase in the duration of the wear-away period.  There is no evidence that Foot Locker or Mercer were predicting that rates would revert back to where they were over the past 15 years.  (Sher Tr. 1735:11-21.)  Foot Locker and Mercer, as sophisticated business parties, knew that there could be variability in interest rates.  (Tr. 1736:2-13.)  Mathematically, any decrease in rates would prolong wear-away for certain Participants.  Under such circumstances, it was a breach of fiduciary duty for Foot Locker to have shifted the risk of interest rate variability to Participants.

Sher also testified about the effect that the enhancement that some Participants received under the new Plan on wear-away. To qualify for the enhancement to the opening account balance, Participants had to be age 50 and above and at least 15 years of service on December 31, 1995. The enhancement factor formula was as follows: the qualifying Participant's opening account balance was multiplied by $1 / [1 - 4\% \text{ x (years to age 65, up to 10 years)}]$. The enhancement factor was highest for qualifying employees aged 50-55, who received a 66% increase in their account balances. (See Deutsch Op. Report at 8-9; Sher Tr. 1507:20-14). According to Sher, because of the enhancement, certain Participants never entered lump sum wear-away.[17] Sher testified that while there were not many such Participants (in the vicinity of several hundred, not thousands), they did exist. (Sher Tr. 1644:20-1645:1.) For example, for Participant 004—who took a distribution on November 1, 1997—the account balance on November 1, 1997 exceeded the sum of the frozen accrued benefit as well as interest and pay credits (the "A plus B" benefit). (Sher Tr. 1637:23-1639:25, DX 421.) According to Sher, if a Participant's account balance is greater than the A plus B benefit, the Participant has received the full value of his or her accrued benefits and the interest and pay credits. (Tr. 1640:8-11.) According to Sher, Participant 004 was in wear-away during 1996 but was out of wear-away by January 1, 1997—and thus experienced

---

[17] Deutsch's position, on the other hand, is that all Participants were in annuity wear-away, even if some were not in lump sum wear-away as a result of the enhancement. (Deutsch Op. Report at 12, 15.)

no "wear-away effect." (Tr. 1640:12-21.)  However, if the enhancement were included as part of the B benefit (which is, according to Sher, inappropriate), then Participant 004 would be subject to wear-away.  (See DX 429.)

In another example that Sher discussed, a Participant received a distribution of her benefit on November 1, 1996.  (DX 425.)  While this Participant's initial account balance (which included the enhancement) was less than the lump sum value of the December 31, 1995 frozen accrued benefit, her account balance ultimately surpassed this value as a result of pay credit additions.  (Sher Tr. 1641:18-1642:3.)  As a result, this Participant's distribution was her account balance.  (Tr. 1642:1-3.)  Sher agreed that while this Participant was out of wear-away when she took her distribution, she had nonetheless experienced the wear-away effect.  (Tr. 1642:25-1643:9.)  According to Sher, had this Participant waited two additional months before receiving her distribution, she would not have experienced the wear-away effect.  (Tr. 1643:21-1644:19.)

G.    The Appropriate Remedy

The parties' experts disagree as to the appropriate remedy in the event that the Court finds that reformation is warranted.

According to Deutsch, the appropriate remedy is to convert the December 31, 1995 frozen accrued benefit into an initial account balance as of January 1, 1996 using a 6% interest rate with no pre-retirement mortality discount; increase the initial account balance as provided in the SPD for those Participants entitled to an enhancement; credit the resulting account balance with pay and interest credits

from January 1, 1996 through the date of benefit distribution; and projecting this figure using the "whipsaw" calculation to account for changes in interest rates.[18] (Deutsch Op. Report at 43-44.)

Sher agreed that Deutsch's approach eliminates wear-away—but testified that such an approach is properly called an "opening balance approach," not an "A plus B" approach.  (Sher Tr. 1768:17-1769:5.)  According to Sher, in an A plus B approach, the A benefit is the usually frozen accrued benefit under the prior Plan—and it is usually payable in whatever form was available under the prior Plan (here, generally an annuity).  (Tr. 1545:2-14.)  In Sher's version, there is no opening balance—and the B benefit consists of pay and interest credits starting in 1996.  (Tr. 1545:13-1546:8.)[19]  This A plus B approach was the approach used in Amara.  See Amara v. CIGNA Corp., 925 F. Supp. 2d 242, 265 (D. Conn. 2012) ("Amara IV") (ordering class members "to receive (1) the full value of 'their accrued

---

[18]     A "whipsaw" calculation accounts for the "difference between the hypothetical value of a cash balance plan account at any given time and the value of the account as an annuity payable at normal retirement age."  Laurent v. PricewaterhouseCoopers LLP, 794 F.3d 272, 275 (2d Cir. 2015).  It is performed by taking a participant's account balance and projecting it to the normal retirement age using the plan's interest crediting rate, then converting that number to an annuity using the applicable interest rate, mortality table described in IRC § 417(e), and IRS regulations, then calculating the present value of that annuity by using the applicable interest rate, mortality table, and IRS regulations.  According to Deutsch, this has nothing to do with the Participant's frozen accrued benefit as of December 31, 1995.  (Deutsch Op. Report at 49-50.)

[19]     Converting to Sher's version of an A plus B plan here would have locked in the frozen accrued benefit and required all new interest and pay credits to be additive to the overall Plan liability.  (Sher Tr. 1547:17-1548:10.)  Similarly, if the full value of the frozen accrued balance was used as the starting account balance, all interest and pay credit additions would add to overall Plan liability.  By contrast, creating, as Foot Locker did here, an opening account balance that was lower than the full value of the frozen accrued benefit resulted in a period of wear-away during which the Plan liability did not increase.  (Sher Tr. 1548:11-20.)

benefits under Part A,' including early retirement benefits, in annuity form; and (2) 'their accrued benefits under Part B,' in annuity or lump sum form").

According to Sher, the appropriate remedy is to calculate the present value of a Participant's December 31, 1995 frozen accrued benefit using the § 417(e) rate in effect in the year of termination (the "A") and add in pay and interest credits (the "B"). (Sher Tr. 1743:22-1744:10.)

The Court finds that Deutsch's approach—whether properly called an A plus B approach or, as Sher contends, an "opening balance" approach—is the appropriate approach here. Sher agreed that Deutsch's approach—by which December 31, 1995 frozen accrued benefit was converted into cash as of January 1, 1996 and nominally placed in the Participant's account—was the approach that was in fact promised to Participants, albeit using a 9% interest rate. (Sher Tr. 1769:7-13.) Sher also agreed that it was the prevalent approach in the 1980s and 1990s. (Tr. 1769:14-16.) Finally, Sher agreed that if Foot Locker promised employees that their opening account balance would at least replicate the December 31, 1995 accrued benefit, Deutsch's approach would fulfill that promise (and, in some circumstances, do more). (Tr. 1776:6-1777:7.) As further explained below, Foot Locker did make that promise—and it must be fulfilled.

The Court also agrees that Deutsch's calculation of the opening account balance—using a 6% interest rate and no further pre-retirement mortality discount—is appropriate. Sher testified that the determination of the interest rate used to calculate initial account balances is typically the result of significant

analytical work by companies planning a conversion.  (Sher Tr. 1700:14-1701:15.)

Among the facts to which a company would look would be prevailing corporate bond

rates and 30-year Treasury rates; the potential impact on the funding of the Plan;

and the potential volatility of interest rates.  (Id.)  Here, the § 417(e) rate in effect at

the time of the Plan conversion was 6.06%—reflecting the average of the 30-year

Treasury rates—and the Plan's interest crediting rate was 6%.  Choosing 6% is

therefore reasonable.  Indeed, Sher agreed that any calculation that produced

opening account balances that were smaller than those proposed by Deutsch would

create a risk of wear-away.  (Tr. 1770:11-20.)  In particular, Sher agreed the use of a

pre-retirement mortality discount in creating opening account balances would

create wear-away in the absence of corresponding survivorship credits (which were

not made here).  (Tr. 1771:22-1772:13.)

**The enhancement**.  One of the main disagreements between the parties is

whether the enhancement for employees of a certain age and with years of service

at the time of conversion provided for under the new Plan should be included as

part of the remedy. The Class's position is that the enhancement should be included

because it was expressly promised to Participants.  According to the Class, once

promised it cannot be withdrawn, even if Foot Locker would now prefer not to have

made that promise.  Foot Locker's position is that the enhancement should not be

included because Participants' entitlement to the enhancement was tied to the use

of a 9% discount rate; had Foot Locker used a 6% or 6.06% discount rate—that is,

had the plan design not embodied wear-away—the enhancement likely would not

47

have been included.  (Sher Tr. 1744:15-20, 1746:12-14, 1755:5-13.)  According to Foot

Locker, if the Court orders the Plan reformation to eliminate wear-away, the

justification for the enhancement disappears and its inclusion would therefore

provide an inappropriate windfall to the Class.

The Court finds that the enhancement is appropriately included as part of

the B benefit.  It was expressly promised to Participants in the SPD.  Specifically,

page 12 of the SPD provides:

> Account balances for participants who were age 50 or older with at
> least 15 years of service for vesting purposes as of December 31, 1995
> were enhanced by a one-time formula.  The initial account balance for
> participants who met these requirements was increased by a factor.
> The factor was determined as follows:
>
> > 1 minus 1/3 of one percent for each month from the later of your
> > age on December 31, 1995 or the first day of the month nearest
> > age 55 to normal retirement date.

(PX 5 at FLPL0031 (italicization omitted).)  In other words, Foot Locker made a

two-part promise to certain senior Participants: first, Foot Locker promised that

these Participants would receive the same initial account balance calculation as the

other Participants; second, Foot Locker promised that the (full) initial account

balance would be multiplied by a factor (and the resulting sum deposited into the

account).  This clear promise must be enforced, regardless of whether Foot Locker

would have made it had it decided not to build wear-away into the new Plan.  See

Amara v. CIGNA Corp., 775 F.3d 510, 524-25 & n.11 (2d Cir. 2014) ("Amara V")

(explaining that the reasonable perceptions of the beneficiaries, not the employer's

intent, determine the nature of the reformation remedy).

48

In any event, the evidence in the record contradicts Sher's position that the enhancement is tied to the use of a 9% discount rate in creating opening account balances. Peck testified that the enhancement was to replace the early retirement subsidy that went away. (Peck Tr. 1150:24-1151:7.) Mercer—whose word Kiley took as "gospel" (Kiley Tr. 504:25-505:1)—similarly stated that "there was concern that [P]articipants close to early retirement eligibility at the time of conversion to the cash balance format might have some slippage in their early retirement benefits, so a subsidy was added." (PX 1522.) In other words, there is evidence in the record that the enhancement would have been provided in lieu of the early retirement subsidy even in the absence of the structural wear-away that Foot Locker built into the Plan.

**Whipsaw**. The parties also disagree as to the Class's entitlement to so-called "whipsaw" payments. The Second Circuit defined and discussed the whipsaw calculation—which comes into play when a vested employee terminates before reaching normal retirement age—in its recent decision in Laurent v. PricewaterhouseCoopers LLP, No. 14-1179, 2015 WL 4477191 (2d Cir. July 23, 2015). The whipsaw calculation is performed to ensure that the terminated employee's cash balance account reflects interest credits that would have continued to accumulate through the employee's normal retirement age. Id. at *3. Under the whipsaw calculation, the account balance is increased by the plan's interest rate (here, 6%) multiplied by the time to normal retirement age, then discounted back to present value at a set rate (here, the § 417(e) rate). Id. Here, the whipsaw

49

calculation would result in an additional benefit to the employee whenever the § 417(e) rate was lower than 6% or 5.5%. (Deutsch Tr. 354:7-20, 396:8-397:1, Sher Tr. 1518:3-8.)

Prior to 2006, ERISA required whipsaw payments. See, e.g., Esden v. Bank of Boston, 229 F.3d 154, 172-73 (2d Cir. 2000). In 2006, however, Congress passed the Pension Protection Act ("PPA")—which "provided that plans did not fail to satisfy ERISA solely because they did not provide actuarial equivalence for participants who terminated employment before normal retirement age and took a lump-sum payment, and thus eliminated mandatory whipsaw payments." Laurent, 2015 WL 4477191, at *3 (citing 29 U.S.C. § 1053(f)(1)(B)).

The Class argues that whipsaw payments were indefeasibly part of the benefit that Foot Locker expressly promised Participants in the SPD. (Ltr. dated July 24, 2015, ECF No. 370.) By contrast, Foot Locker argues that, as a result of Congress's elimination of whipsaw in the PPA, the Plan is no longer subject to any whipsaw requirement. (Ltr. dated July 24, 2015, ECF No. 371.)

The Court finds that whipsaw payments are appropriately part of the benefit that Foot Locker promised to Participants. The SPD states that Participants may receive a lump sum that is higher than their account balance based on the requirements of "federal law and IRS regulations." (SPD at FLPL0031, FLPL0033.) Sher agreed that this language provided for whipsaw payments. (Sher Tr. 1518:9-10; see also id. 1520:2-9.) Sher testified that whipsaw could cause a Participant's benefits to be greater that the account balance—and that whipsaw would "of course"

50

"apply to this type of calculation," referring to page 14 of the SPD.  (Sher Tr. 1617:5-15; see also id. 1617:13-15 ("I would have read [SPD page 14] to encompass . . . whipsaw, that is what was intended here").)  While Sher initially testified that Participants may not have associated the reference to "federal law and IRS regulations" with whipsaw, he later conceded that "[i]f the plan terms call for a payment to be made, it should be made," regardless of whether Participants expected whipsaw payments.  (Sher Tr. 1747:7-12, 1748:1-4.)

While the PPA eliminated mandatory whipsaw payments in 2006, the law is clear that the PPA is not retroactive.  See Laurent, 2015 WL 4477191, at *3 (the "Pension Protection Act does not apply retroactively" (citing West v. AK Steel Corp., 484 F.3d 395, 412 (6th Cir. 2007))).  As long as a Participant signed the distribution paperwork before the passage of the PPA, that Participant is entitled to whipsaw payments.  See Laurent, 2015 WL 4477191, at *3 ("Plaintiffs filed this suit in 2006, and the distributions at issue in it predate the passage of the Pension Protection Act.  The parties therefore agree that the Act does not apply to this case.").[20]

---

[20]      Sher agreed that "[i]f the distribution was made pre-PPA, the [P]lan had whipsaw, the [P]lan would have to abide by it."  (Sher Tr. 1750:3-4.)  The disagreement between the parties thus appears to be as to Participants who signed the distribution paperwork pre-PPA but whose actual distribution took place post-PPA.  The Court does not know how many such Participants there are, but the Class is correct that they are entitled to whipsaw payments.  Signing the paperwork was the last step to effectuate the distributions.  At that point, the employer made a commitment to a set distribution amount governed by the prevailing federal law at the time.  Once the distribution paperwork was signed, the Participant was entitled to receive the amount provided for in that paperwork and required by law at the time, including any whipsaw payments—even if the actual distribution were delayed and the law changed in the meantime.

II.     CONCLUSIONS OF LAW

ERISA § 502(a)(3) entitles plan participants to "appropriate equitable relief" as redress for "any act or practice which violates any provision of [ERISA]."  29 U.S.C. § 1132(a)(3).  The Class claims that Foot Locker has violated sections 404(a) and 102(a) of ERISA by issuing materially false and misleading statements in the December 1996 SPD and various Summaries of Material Modifications ("SMMs")—including the September 1995 Announcement Letter, the November 1995 Highlights Memo, and the January 1996 Benefits Statement.

To obtain reformation, plaintiff must show: (1) violations of ERISA §§ 404(a) and 102(a), based on the preponderance of the evidence; (2a) mistake or ignorance by employees of "the truth about their retirement benefits," based on clear and convincing evidence; and (2b) "fraud or similar inequitable conduct" by the plan fiduciaries, based on clear and convincing evidence.  Amara v. CIGNA Corp., 775 F.3d 510, 525-31 (2d Cir. 2014) ("Amara V").  Here, the Class has shown all of these elements and is therefore entitled to reformation of the Plan as further explained below.  Before turning to these elements, the Court provides an overview of the Amara litigation—which has been cited repeatedly by the parties and is relevant to many of the issues here.

A.     The Amara Litigation

The Amara litigation arose from the 1998 conversion of CIGNA's defined retirement benefit plan ("Part A") to a cash balance plan ("Part B").  CIGNA's original plan—Part A—granted beneficiaries defined benefits upon retirement,

generally in the form of an annuity determined based on a number of factors, such as the employee's salary, years of service, and age at retirement.  CIGNA's new plan—Part B—provided benefits in the form of a cash balance, calculated on the basis of defined annual contributions.  Employees who participated in the Part B plan[21] received a hypothetical opening account balance that was calculated by taking the participant's current annual benefit at normal retirement age (age 65), and computing the actuarial value of that benefit based on a 6.05% (or for some employees, 5.05%) interest rate and a GATT mortality table.  Amara v. Cigna Corp., 534 F. Supp. 2d 288, 301 (D. Conn. 2008) ("Amara I").  The Part B account balances were subsequently supplemented with pay and interest credits.  Id.  The interest credits were based on a floating interest rate that was tied to yields of five-year Treasury bonds and subject to change at the beginning of each calendar year.  Id. at 302.  Under the Part B plan, an employee could choose at retirement to receive his or her account balance in lump sum form or as an annuity.  Id.  As here, CIGNA's new plan guaranteed—through an "A or B" formula—that employees would receive at least the value of their already accrued Part A benefits.  Id.

Because of how opening balances were calculated under Part B, an employee's opening account balance was not always equivalent to the value of the employee's Part A accrued benefit, resulting in wear-away for "many, though by no means all, employees."  Id. at 303.  The wear-away effect was due to fluctuating

---

[21]      Some employees were "grandfathered" under the old Part A plan.  See Amara v. Cigna Corp., 534 F. Supp. 2d 288, 300 (D. Conn. 2008).

interest rates, as well as the fact that Part B benefits opening account balances were "discounted to account for the risk of pre-retirement mortality and did not include the value of certain benefits," such as a Social Security supplement.  Id. Unlike here, however, wear-away was not structurally built into the conversion.

Through various communications, including two SPDs, CIGNA told employees that the new plan would "significantly enhance its retirement program," that "your benefit will grow steadily throughout your career," and that the opening balance in the new Part B plan was "equal" to the lump sum value of the pension benefit earned through December 31, 1997.  Amara v. CIGNA Corp., 775 F.3d 510, 515 (2d Cir. 2014) ("Amara V").  Through individualized reports, CIGNA assured each employee that his or her initial account balance "represent[ed] the full value of the benefit [he or she] earned for service before 1998 payable to you at age 65."  Id. CIGNA also stated in a newsletter introducing the new plan that it would not receive any cost savings from the conversion from Part A to Part B.  Id.  This was false: a contemporaneous internal expense projection revealed anticipated cost savings of approximately $10 million.  Amara I, 534 F. Supp. 2d at 306.

In 2001, several plan participants filed a putative class action against CIGNA and the CIGNA pension plan.  Plaintiffs claimed, inter alia, that defendants violated ERISA §§ 102(a) and 204(h), 29 U.S.C. §§ 1022(a) and 1054(h), by failing to give them proper notice of their benefits and misleading them regarding the nature of their benefits.

The district court granted plaintiffs' motion for class certification and, after trial, agreed that CIGNA had violated ERISA.  Amara I, 534 F. Supp. 2d at 363.  In particular, the district court found that CIGNA violated ERISA § 102 by failing to sufficiently disclose the possibility of wear-away, id. at 346, which "was both a structural phenomenon and one that CIGNA could, and did, predict," id. at 347.  The district court determined that "various choices made by CIGNA in structuring the opening account balances under Part B practically ensured that wear-away would occur if interest rates fell."  Id. at 347.  The district court explained that "[t]he fact that wear-away might not have been intentional or the result of a single plan provision" was "irrelevant"—and noted that there was evidence indicating that CIGNA was in fact aware of the possibility of wear-away.  Id. at 348.  The district court rejected CIGNA's argument that "it was not required to provide notice of the possibility of wear-away because only a small number of employees were affected." Id.

The district court issued a separate decision regarding the appropriate relief. Amara v. CIGNA Corp., 559 F. Supp. 2d 192, 222 (D. Conn. 2008) ("Amara II"). Although plaintiffs indicated a preference for a declaration that Part B is void and an injunction ordering a return to Part A, the court ordered "A plus B" relief pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) [22], whereby the CIGNA

---

[22]      ERISA § 502(a)(1)(B) allows a plan "participant or beneficiary" to bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

plan would provide class members with "all accrued Part A benefits in the form those benefits were available under Part A, plus all accrued Part B benefits in the form those benefits are available under Part B."  Id. at 214.  The Second Circuit affirmed by summary order, Amara v. CIGNA Corp., 348 F. App'x 627 (2d Cir. 2009), and both parties petitioned for certiorari.

The Supreme Court granted defendant's petition for certiorari and, in a decision issued on May 16, 2011, vacated the Second Circuit's judgment and remanded the case—concluding that it was inappropriate to grant the "A plus B" remedy under § 502(a)(1)(B) because documents summarizing the plan could not "constitute the terms of the plan for purposes of § 502(a)(1)(B)."  CIGNA Corp. v. Amara, 131 S. Ct. 1866, 1878 (2011) ("Amara III") (emphasis in original).  The Supreme Court instructed the district court to consider on remand whether plaintiffs are entitled to relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), which provides for "appropriate equitable relief" to redress specified violations of ERISA or of plan terms.  Id. at 1882.[23]  The Court stated that "the relevant standard of harm will depend upon the equitable theory by which the District Court provides relief."  Id. at 1871.

On remand, the district court denied CIGNA's motion to decertify the class and again ordered CIGNA to provide plaintiffs with A plus B benefits and new or

---

[23] On May 23, 2011, the Supreme Court also granted plaintiffs' petition for certiorari, see Amara v. CIGNA Corp., 131 S. Ct. 2900 (2011), which requested the Supreme Court to review the Second Circuit's affirmance of the district court's decision to order A plus B benefits rather than a return to the Part A plan.

corrected notices, this time under § 502(a)(3).  Amara v. CIGNA Corp., 925 F. Supp.

2d 242, 265-66 (D. Conn. 2012) ("Amara IV").

On appeal, the Second Circuit affirmed.  Amara v. CIGNA Corp., 775 F.3d

510 (2d Cir. 2014) ("Amara V").  The Second Circuit explained that reformation is

properly analyzed under contract principles, id. at 525, and that the reasonable

perceptions of the beneficiaries—not CIGNA's intent—determine the nature of the

reformation remedy, see id. at 524-25 & n.11.  Applying the principle that "[a]

contract may be reformed due to the mutual mistake of both parties, or where one

party is mistaken and the other commits fraud or engages in inequitable conduct,"

id. at 525 (citations omitted), the Second Circuit determined that plaintiffs "were

required to show that defendants committed fraud or similar inequitable conduct

and that such fraud reasonably caused plaintiffs to be mistaken about the terms of

the pension plan," id. at 526 (citation omitted).[24]  The Second Circuit addressed each

of these requirements in turn.

The Second Circuit explained that equitable fraud "generally consists of

'obtaining an undue advantage by means of some act or omission which is

unconscientious or a violation of good faith.'"  Id. at 526 (citation omitted).  In that

regard, the Second Circuit cited the district court's findings in Amara I that (1)

CIGNA employees experienced a lack of accurate information about the new plan,

(2) CIGNA was aware of this fact, and (3) "CIGNA's misbehavior was designed to

---

[24]     The Second Circuit held that "[t]raditional equitable principles do not require a separate
showing of harm for reformation."  Amara V, 775 F.3d at 525 n.12 (citations omitted).

'ease the transition to a less favorable retirement program.'" Id. at 526-27 (citations omitted). Based on these findings, the Second Circuit held that "the district court did not err in finding that defendants obtained undue advantage through these actions by avoiding adverse employee reactions." Id. at 527 (citation omitted). The Second Circuit noted that CIGNA had "concealed the possibility of wear-away from its employees and misled them about the conversion of their accrued benefits into the Part B plan"—and that "[b]y hiding the truth about the plan, CIGNA prevented all of its employees from becoming disaffected, spreading knowledge regarding the plan to others who stood to lose more from the benefit conversion, and from planning for their retirement." Id. (emphasis in original).

As to mistake, the Second Circuit rejected CIGNA's argument that determining mistake required an individualized inquiry into each class member's state of mind. Id. at 529. Rather, mistake could be proven through generalized circumstantial evidence, particularly where "defendants have made uniform misrepresentations about an agreement's contents and have undertaken efforts to conceal its effect." Id. (citations omitted). The Second Circuit held that the district court did not clearly err in determining that CIGNA's misrepresentations about the contents of the retirement plan were uniform—made through two SPDs, an SMM, and a 204(h) notice—"and helped to establish that the plaintiffs did not know the truth about their retirement benefits." Id. at 529-30 (citations omitted). Notably, the Second Circuit observed that CIGNA had not presented any evidence that any employee understood the plan change or its wear-away effect—and found no error

in "the district court's inference that informed employees, aware that their pension benefits were less valuable, would have protested the change, requested a higher salary, filed a lawsuit, or left for another employer." Id. at 530 (citation omitted). The Second Circuit also noted that CIGNA had "intentionally withheld details that would provide employees with a direct comparison of their benefits under Part A with their anticipated benefits under Part B." Id.[25]

The Court will now address each of the elements that the Class is required to prove in order to obtain reformation of the Plan.

B.      ERISA's Fiduciary Duty and Disclosure Standards (§§ 404(a), 102)

Section 404 sets forth the fiduciary duty standards under ERISA. It provides, in pertinent part:

> (a) Prudent man standard of care
>
> (1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
>> (A) for the exclusive purpose of:
>>
>>> (i) providing benefits to participants and their beneficiaries; and
>>>
>>> (ii) defraying reasonable expenses of administering the plan;
>>
>> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the

---

[25]     The Second Circuit also affirmed the district court's decision denying CIGNA's motion to decertify the class, Amara V, 775 F.3d at 519-24, and held that the district court did not abuse its discretion in limiting relief to A plus B benefits rather than ordering a return to the terms of CIGNA's original retirement plan, id. at 531-32.

> conduct of an enterprise of a like character and with like
> aims . . .

29 U.S.C. § 1104(a) [ERISA § 404(a)].

ERISA provides that a person is a fiduciary with respect to a plan—and therefore subject to ERISA fiduciary duties—"to the extent that he or she exercises any discretionary authority or discretionary control respecting management of the plan, or has any discretionary authority or discretionary responsibility in the administration of the plan." Bouboulis v. Transp. Workers Union of Am., 442 F.3d 55, 63 (2d Cir. 2006) (citing Varity Corp. v. Howe, 516 U.S. 489, 498 (1996) (internal quotation marks omitted)); see also 29 U.S.C. § 1002(21)(A). Thus, fiduciary status is imposed both on those "who have actually been granted discretionary authority, regardless of whether such authority is ever exercised" and on "those who exercise discretionary authority, regardless of whether such authority was ever granted." Bouboulis, 442 F.3d at 63. "The Supreme Court has held that when an employer communicates with plan participants about the contents of the plan, and when 'reasonable employees . . . could have thought that [the employer] was communicating with them both in its capacity as employer and in its capacity as plan administrator,' the employer can be found to be acting as a fiduciary under ERISA." Id. at 65 (quoting Varity, 516 U.S. at 503).

Here, the SPD explicitly provides that Foot Locker is the plan administrator (PX 5 at FLPL0026) and enjoys discretionary authority in the administration of the Plan:

> The company and the Retirement Investment Committee ("RIC") and Retirement Administration Committee ("RAC") of its Board of Directors administer the operation of the Plan.  RIC is responsible for the selection of the investments of the Plan.  RAC, on behalf of the company, is responsible for the general administration of the Plan.  In carrying out its duties with respect to Plan administration, RAC has the exclusive right, power and authority, in its sole and absolute discretion, to administer, apply and interpret the Plan.  RAC's decisions will be final, conclusive and binding on all parties.

(PX 5 at FLPL0037 (italicization omitted).)  Thus, Foot Locker was a fiduciary by virtue of being plan administrator and having discretionary authority as set forth in the SPD.  Moreover, there is an additional ground to find that Foot Locker owed the Class a fiduciary duty because reasonable employees would have believed that Foot Locker communicated with them as both an employer and a plan administrator in informing them about the changes to the Plan.  See Bouboulis, 442 F.3d at 65-66.

The SPD itself describes Foot Locker's fiduciary obligations as follows:

> ERISA imposes duties upon the people who are responsible for the operation of an employee benefit plan.  The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries.  No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a benefit or exercising your rights under ERISA.

(PX 5 at FLPL0040 (italicization omitted).)

ERISA's fiduciary standards of conduct are "the highest known to the law." LaScala v. Scrufari, 479 F.3d 213, 219 (2d Cir. 2007) (quoting Donovan v. Bierwirth, 680 F.2d 263, 272 n.8 (2d Cir. 1982)) (internal quotation mark omitted).  They impose an unswerving "duty of loyalty" that requires a fiduciary to "discharge his

duties with respect to a plan solely in the interest of the participants and beneficiaries."  29 U.S.C. § 1104(a) [ERISA § 404(a)]; see also Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co., 302 F.3d 18, 26 (2d Cir. 2002) (referring to this duty as a duty of loyalty).  "To participate knowingly and significantly in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense is not to act 'solely in the interest of the participants and beneficiaries,'" as ERISA requires.  Varity Corp. v. Howe, 516 U.S. 489, 506 (1996) (quoting ERISA § 404).

ERISA § 404(a) also imposes a "duty of care" that requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  Prudence is "measured according to the objective prudent person standard developed in the common law of trusts."  Chao v. Merino, 452 F.3d 174, 182 (2d Cir. 2006) (quoting Katasaros v. Cody, 744 F.2d 270, 279 (2d Cir. 1984)).

Proper execution of fiduciary duties requires that fiduciaries' decisions "be made with an eye single to the interests of the participants and beneficiaries." Donovan v. Bierwirth, 680 F.2d 263, 271 (2d Cir. 1982).  Under ERISA § 404(a)(1), a fiduciary is not permitted to balance the interests of plan participants and the plan's sponsor: the focus on participants must be "exclusive."  29 U.S.C.

§ 1104(a)(1).  As the facts above make clear, Foot Locker placed its interests above those of Plan Participants, thereby breaching its fiduciary duties.

"The most important way in which the fiduciary complies with its duty of care is to provide accurate and complete written explanations of the benefits available to plan participants and beneficiaries." <u>Kenseth v. Dean Health Plan, Inc.</u>, 610 F.3d 452, 471 (7th Cir. 2010); <u>see also</u> <u>Bixler v. Central Pa. Teamsters Health & Welfare Fund</u>, 12 F.3d 1292, 1300 (3d Cir. 1993) (The duty to fully and accurately disclose and explain material information to plan participants "is the core of a fiduciary's responsibility" (citation and internal quotation marks omitted)). "Fiduciaries may be held liable for statements pertaining to future benefits if the fiduciary knows those statements are false or lack a reasonable basis in fact." <u>Flanigan v. Gen. Elec. Co.</u>, 242 F.3d 78, 84 (2d Cir. 2001) (citation omitted). Fiduciaries may also be "liable for non-disclosure of information about a current plan when the omitted information was necessary to an employee's intelligent decision about retirement." <u>Id.</u> (citation omitted).  In other words, "[w]hen a plan administrator affirmatively misrepresents the terms of a plan or fails to provide information when it knows that its failure to do so might cause harm, the plan administrator has breached its fiduciary duty to individual plan participants and beneficiaries." <u>Devlin v. Empire Blue Cross & Blue Shield</u>, 274 F.3d 76, 88 (2d Cir. 2001) (citation and internal quotation marks omitted omitted); <u>see also</u> <u>Bixler</u>, 12 F.3d at 1300 (the duty to inform "is a constant thread in the relationship between beneficiary and trustee; it entails not only a negative duty not to misinform, but

63

also an affirmative duty to inform when the trustee knows that silence might be harmful"); Mullins v. Pfizer, Inc., 23 F.3d 663, 669 (2d Cir. 1994) ("[A] plan administrator may not make affirmative material misrepresentations to plan participants about changes to an employee pension benefits plan." (citation and internal quotation marks omitted)).  Importantly, the duty to inform "recognizes the disparity of training and knowledge that potentially exists between a lay beneficiary and a trained fiduciary.  Thus . . . the fiduciary's obligations will not be excused merely because [a participant] failed to comprehend or ask about a technical aspect of the plan."  Bixler, 12 F.3d at 1300.  Here, the facts found by the Court demonstrate inaccurate and incomplete explanations of benefits and known falsity of certain statements.  Foot Locker knew and expected that employees would rely on its statements to their detriment.  There can be little doubt that acting under a mistaken belief additional work leads to additional benefits works to the actual detriment of the employer.

A court should not find that a fiduciary acted imprudently in violation of ERISA § 404(a)(1)(B) merely because, with the benefit of hindsight, a different decision might have turned out better.  See DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 412, 424 (4th Cir. 2007).  The proper inquiry is whether under the circumstances then prevailing—not as seen in hindsight—the prudent person standard was met.  29 U.S.C. § 1104(a)(1)(B); see also Chao, 452 F.3d at 182.  Here, Foot Locker intended to save money by implementing a plan conversion that effectively eliminated additional benefit growth for a period of years.  The wear-

away effect was not the result of an unexpected change in economic conditions—for instance, a falling interest rate environment.  It was the precise goal sought.

"While a trustee has a duty to seek independent advice where he lacks the requisite education, experience and skill, the trustee, nevertheless, must make his own decision based on that advice."  <u>United States v. Mason Tenders Dist. Council of Greater N.Y.</u>, 909 F. Supp. 882, 886 (S.D.N.Y. 1995) (citations omitted).  Here, while Foot Locker reasonably sought the advice of Mercer, its actions in adopting a conversion that resulted in wear-away and failing to disclose that fact was ultimately a responsibility that it must bear as the plan fiduciary.  ERISA supplements these general fiduciary standards with specific requirements governing the presentation and content of SPDs and SMMs.  ERISA § 102 provides, in pertinent part:

> (a) A summary plan description of any employee benefit plan shall be furnished to participants and beneficiaries as provided in section 1024(b) of this title [ERISA § 104(b)].  The summary plan description shall include the information described in subsection (b) of this section, **shall be written in a manner calculated to be understood by the average plan participant**, and **shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan**.  A summary of any material modification in the terms of the plan and any change in the information required under subsection (b) of this section shall be written in a manner calculated to be understood by the average plan participant and shall be furnished in accordance with section 1024(b)(1) of this title [ERISA § 104(b)(1)].
>
> (b) The summary plan description shall contain the following information: . . . the plan's requirements respecting eligibility for participation and benefits; a description of the provisions providing for nonforfeitable pension benefits; **circumstances which may result in disqualification, ineligibility, or denial or loss of benefits** . . . .

29 U.S.C. § 1022 [ERISA § 102] (emphases added).

"SPDs are central to ERISA."  Frommert v. Conkright, 738 F.3d 522, 531 (2d Cir. 2013).  The SPD is supposed to be "a thorough and easy to understand summary of the benefit plan" that is "sufficiently accurate and comprehensive to apprise [plan] participants and beneficiaries of their rights and obligations under the plan."  Layaou v. Xerox Corp., 238 F.3d 205, 209-11 (2d Cir. 2001); see also McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007) ("Section 102 and related provisions of ERISA require that a summary plan description be furnished to all participants and beneficiaries of an employee benefit plan and that it reasonably apprise participants and beneficiaries of their rights and obligations under the plan." (citations omitted)).

The same standards apply to SMMs which are required to be provided to employees when there is a "material modification in the terms of the plan and any change in the information required under [ERISA § 102(b)]."  29 U.S.C. § 1022(a). See Amara III, 131 S. Ct. at 1874-75; Amara I, 534 F. Supp. 2d at 344-48.

The SPD and the SMM work in tandem: the SPD must "clearly identify" in an understandable manner all the "circumstances which may result in disqualification, ineligibility, or denial [or] loss of benefits" and the SMM must describe "any change" in those circumstances.  29 U.S.C. § 1022(a), (b) [ERISA § 102]; 29 C.F.R. §§ 2520.102-3(1) and 2520.104b-3(a).

66

Department of Labor regulations explain the role of SPDs and SMMs in accurately and accessibly educating participants about how their plan works.  See 29 C.F.R. § 2520.102-2, 102-3.  In fulfilling the requirements of ERISA § 102, fiduciaries are required to "exercise considered judgment and discretion by taking into account such factors as the level of comprehension and education of typical participants in the plan and the complexity of the terms of the plan."  29 C.F.R. § 2520.102-2(a).  Consideration of these factors will usually require fiduciaries to limit or avoid "technical jargon" and include "clarifying examples and illustrations" of how the plan works in practice.  Id.

The regulations are insistent as to the fiduciaries' affirmative duty to make participants clearly "see" circumstances under which they will not receive the benefits described in the summary that they might otherwise reasonably expect to receive.  The SPD thus must:

> clearly identif[y] circumstances which may result in disqualification, ineligibility, or denial, loss, forfeiture, suspension, offset, [or] reduction, or recovery . . . of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide on  the basis of the description of benefits [provided elsewhere in the summary].

29 C.F.R. § 2520.102-3(l).

Underscoring this affirmative duty to warn participants of the circumstances when they might not actually receive benefits the summary otherwise seems to be telling them they can expect, the regulations specifically direct that "[a]ny description of exception, limitations, reductions, and other restrictions of plan

benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant."  29 C.F.R. § 2520.102-2(b); see also id. (requiring further that "[s]uch exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner not less prominent than the . . . prominence used to describe or summarize plan benefits").  Restrictive plan provisions must be clearly cross-referenced with the description of the benefit.  See id.  The regulations expressly forbid fiduciaries from either playing up the positive features of the plan or downplaying the negative: "[t]he advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations."  Id.; see also id. (warning that the format of the SPD "must not have the effect to misleading, misinforming or failing to inform participants and beneficiaries").

The SPD must explain the "full import" of the plan's material terms.  See Layaou, 238 F.3d at 211; see also Frommert, 433 F.3d at 260 (requiring an SPD to "set out in full" the plan's benefit calculation mechanics in a manner employees can appreciate); Wilkins v. Mason Tenders Dist. Council Pension Fund, 445 F.3d 572, 584 (2d Cir. 2006) ("Here, the Fund's SPD does not even mention the Policy, let alone explain its full import . . . .  Obviously, it falls short of the high standards of clarity and completeness to which SPDs are held.").  "[I]n addition to describing the individual provisions of the retirement plan and their import, an employer must also describe the interaction among those provisions if the result is likely to be material to plan participants."  Amara I, 534 F. Supp. 2d at 345 (citations omitted);

68

see also Layaou, 238 F.3d at 209-11 (finding violation where SPD failed to warn employees about how an offset formula interacted with the plan's other formulas to reduce employees' benefits).

There is no doubt here that the SPD was not written clearly; Participants from a CFO level down failed to understand how their actual benefits would be calculated. The "actuarial equivalence" language on which Foot Locker relies, (PX 5 at FLPL 0025), is sufficiently removed from the comprehension of the average Plan Participant that Foot Locker could not have expected it to awaken them to the full import of what was occurring. Indeed, as Deutsch testified and this Court has credited, the conversion methodology did not, in any event, result in actuarial equivalence. (Deutsch Op. Report at 3; Deutsch Tr. 153:2-25, 179:4-180:8, 184:6-25.)

The Class has shown by a preponderance of the evidence that Foot Locker, acting as plan administrator, violated ERISA §§ 404(a) and 102 by providing participants materially false, misleading, and incomplete descriptions of the amended Plan. Foot Locker knew that virtually every Participant's pension earnings would be effectively frozen for a period of time as a result of the wear-away effect built-in to the January 1, 1996 Plan amendment. (See, e.g., Peck ¶ 6; PX 84; Peck Tr. 1121:11-16, 1128:4-8, 1130:9-14, 1130:21-1131:4.) Wear-away was certainly a material fact regarding the amended Plan, as virtually all Participants suffered from the phenomenon, and many employees' pension benefits did not grow for several years. Having knowingly created a pension plan that mathematically

locked in wear-away, Foot Locker had a duty to disclose and explain the wear-away effect "in a manner calculated to be understood by the average plan participant." ERISA § 102(a); see also Amara I, 534 F. Supp. 2d at 348 ("[t]he possibility of wear away was certainly a material fact [that was required to be disclosed under] 29 C.F.R. § 2520.102-2(b)"); id. (CIGNA had "a duty to inform plan participants of the possibility of wear-away in [the] notices and disclosures regarding [the new plan design]").

Foot Locker's disclosures in the SPD and other company-wide communications fell far short of the statutory requirements. The Court finds that not only did commonly available documents such as the SPD created class-wide misrepresentation, individualized communications with Participants also did nothing to disabuse Participants of the idea that their benefits were growing with their time of service. In fact, individualized plan statements reinforced the idea that the ever-changing account balance was – or at least was the basis of – what a Participant could expect to receive upon retirement. Individual communications with Participants also did not clarify the issue.[26]

As, inter alia, Kanowicz and Peck's testimony demonstrated, Foot Locker knew that employees would have the mistaken belief that a growing account

---

[26] Even those who received communications that there existed a minimum lump sum payment that may exceed their account balance were not told that the minimum lump sum was merely the equivalent of what they were entitled to under the old Plan. Indeed, testimony from those class members who received this information indicated that they were led to believe the minimum lump sum was based on the account balance plus a federal actuarial calculation. (See, e.g., Steven Decl. ¶ 15; Tr. 1369:20-1370:7.)

balance meant a growing benefit; it knew that it was leaving out wear-away, a concept that it could have easily explained and that employees would have easily understood.  (See Kanowicz 3/29/12 Tr. 195:12-16; Peck Tr. 1243:15-20, 1244:12-16, 1242:20-1243:1; 1252:7-13.)

C.    Class-Wide Reliance

The Court has already ruled that proof of class-wide misrepresentation does not require proof of individualized reliance.[27]  (Opinion & Order, Nov. 7, 2014, ECF No. 220 at 4-12.)  The evidence at trial does not prompt the Court to revisit its class certification decision.  In fact, there is overwhelming trial evidence that, if legally necessary, plaintiffs have proven a reasonable inference of class-wide reliance.

The Court credits plaintiff's strong evidence of generalized reliance.  No Participant would have ignored the fact that their benefits were frozen without their knowledge.  Indeed, Foot Locker admitted at trial that the very purpose of keeping wear-away a secret was to avoid negative publicity, loss of morale, and inability to hire and retain employees.  The Court further credits Class members' testimony that they read the Plan change announcements and believed that their benefits were growing, and that credits—including compensation credits based on their service—were contributing to that growth.  Indeed, the fact that Foot Locker issued annual individualized account statements portraying the same picture is

---

[27]    In any event, the Court also finds that the Class has demonstrated by a preponderance of the evidence that class members relied detrimentally on Foot Locker's misrepresentations.

strong evidence that Participants were expected to use the growing account balance as an indication that their continued service yielded growing benefits.

As a result of the company's failure to communicate wear-away, no employees lodged complaints against Foot Locker.[28]  Affirmative evidence from Schaeffer and Steven showed that Participants were under the belief that their accrued benefits under the prior Plan was the foundation for an ever-growing retirement payout, since they requested more detail about the size of their pension benefits as useful information for understanding their financial status at retirement or termination. They had no idea that the size of their ultimate benefit did not correspond to their additional service at the company.  (See, e.g., Steven Decl. ¶¶ 14, 29; Schaeffer Decl. ¶ 8, 7.)  Finally, the Court also finds that defendant's arguments that some class members enjoyed working for Foot Locker for reasons other than retirement benefits and that some class members may not have had the ability to change their investment portfolios as an entirely meritless response to the core issue.

D.    Class-Wide Mistake

Proving mistake for purposes of reformation requires showing that a party entered a contract "in ignorance or mistake of facts material to its operation." Amara V, 775 F.3d at 529.  ERISA's central objective is to "protect employees' justified expectation of receiving the benefits their employers promise them."

---

[28]    The Court also finds persuasive the idea—shared by Foot Locker—that retirement benefits are part and parcel with the totality of the employee's compensation.  (See Peck Tr. 1135:24-1136:4.) It is simply incredible to believe that any employee would not rely upon a representation that their compensation was growing with their continued service.

Amara V, 775 F.3d at 529 (citation omitted).  "In the context of ERISA plans, mistake is measured by comparing the actual terms of the plan to the baseline of the beneficiaries' objective, reasonable expectations about the scope of benefits provided."  Amara IV, 925 F. Supp. 2d at 253 (citations omitted), aff'd, Amara V, 775 F.3d at 529 (2d Cir. 2014) (agreeing that CIGNA's benefit summaries were "evidence of . . . what CIGNA's employees understood" and "helped to establish that the plaintiffs did not know the truth about their retirement benefits").   The "reasonable expectations" of plan participants are based on what the plan's sponsor and fiduciaries communicate to employees about the plan.  Layaou, 238 F.3d at 209.

The Class has proven by clear and convincing evidence that, as a result of Foot Locker's false, misleading, and incomplete Plan descriptions, employees were ignorant of "the truth about their retirement benefits."  Amara V, 775 F.3d at 529. Specifically, class members' testimony and other evidence demonstrated that the class members reasonably but mistakenly believed that growth in their cash balance benefit equaled growth in their pension benefit.  In other words, Participants reasonably but mistakenly believed that their pension benefits were equal to the sum of (A) the benefit each Participant earned under the Plan's traditional "defined benefit" annuity formula for service through December 31, 1995, plus (B) the benefits Foot Locker told Participants they were earning under the Plan's "cash balance" account formula for service after January 1, 1996.

E.    Fraud or Inequitable Conduct

To obtain plan reformation under ERISA § 502(a)(3), the Class must show that Foot Locker engaged in "fraud or inequitable conduct."  See Amara V, 775 F.3d at 525.

**Equitable fraud.**  In Amara V, the Second Circuit explained that equitable fraud "generally consists of obtaining an undue advantage by means of some act or omission which is unconscientious or a violation of good faith."  Id. at 526 (internal quotation marks and citation omitted); see also Sec. & Exch. Comm'n v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 194 (1963) ("Fraud . . . in the sense of a court of equity properly includes all acts, omissions and concealments which involve a breach of legal or equitable duty, trust, or confidence, justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another." (citation and internal quotation marks omitted)).

The law is clear that equitable fraud does not require a showing of intent to deceive or defraud.  See Capital Gains, 375 U.S. at 193 ("Fraud has a broader meaning in equity (than at law) and intention to defraud or to misrepresent is not a necessary element." (citation and internal quotation marks omitted)); Fed. Trade Comm'n v. Algoma Lumber Co., 291 U.S. 67, 81 (1934) ("[T]here is a kind of fraud, as courts of equity have long perceived, in clinging to a benefit which is the product of misrepresentation, however innocently made." (citations omitted));  United States v. Von Barta, 635 F.2d 999, 1005, n.14 (2d Cir. 1980) ("Actual frauds are intentional frauds.  Constructive frauds involve breaches of fiduciary or equitable duties where

74

an intent to deceive is lacking." (citation omitted)); <u>Hammond v. Pennock</u>, 61 N.Y. 145, 152 (1874) ("In equity, the right to relief is derived from the suppression or misrepresentation of a material fact, though there be no intent to defraud . . . .  It is inequitable and unconscientious for a party to insist on holding the benefit of a contract which he has obtained through misrepresentations, however innocently made." (citations omitted)); <u>D.R. Paskie & Co. v. Commercial Cas. Ins. Co.</u>, 229 N.Y.S. 121, 129 (N.Y. App. Div. 1928) ("The fraudulent intent need not be proven in an equity action, while at law such intent must be established." (citation omitted)).

The equitable fraud doctrine is not equivalent to strict liability because there is an "undue advantage" requirement.  <u>Compare</u> <u>Hay v. Star Fire Ins. Co.</u>, 77 N.Y. 235, 240 (1879) (holding an insurer committed equitable fraud and plaintiff was entitled to reformation when, without proper notice to plaintiff, the insurer renewed but changed the policy-contract in a way that reduced the plaintiff's coverage and advantaged the insurer), <u>with</u> <u>AMEX Assurance Co. v. Caripedes</u>, 316 F.3d 154, 161 (2d Cir. 2003) (equitable fraud not found because although defendant inadequately disclosed the policy change, the change did not benefit defendant; "[o]n the other hand, the undisclosed change made by the insurer in <u>Hay</u> was for its own benefit; for that reason, the insurer's failure to draw the insured's attention to it was described as a fraud").  Here, there is no doubt that Foot Locker committed equitable fraud. It sought and obtained cost savings by altering the Participants' Plan, but not disclosing the full extent or impact of those changes.

**Inequitable conduct.**  "Inequitable conduct includes deception or even mere awareness of the other party's mistake combined with superior knowledge of the subject of that mistake."  DS Parent, Inc. v. Teich, No. 5:13-CV-1489 LEK/DEP, 2014 WL 546358, at *4 (N.D.N.Y. Feb. 10, 2014) (citations omitted); see also Koam Produce, Inc. v. DiMare Homestead, Inc., 329 F.3d 123, 127 n.3 (2d Cir. 2003) ("Under New York law, in order for a court to allow rescission of a contract on the basis of a unilateral mistake, a party must establish that (i) he entered into a contract under a mistake of material fact, and that (ii) the other contracting party either knew or should have known that such mistake was being made." (quoting Kraft Foods, Inc. v. All These Brand Names, Inc., 213 F. Supp. 2d 326, 330 (S.D.N.Y. 2002)) (internal quotation marks omitted)); Middle E. Banking Co. v. State St. Bank Int'l, 821 F.2d 897, 906 (2d Cir. 1987) ("New York courts will, in some cases, rescind contracts and void releases even in the absence of fraud where unilateral mistake is established" and the mistake is "one which is known or ought to have been known to the other party" (citations and internal quotation marks omitted)).

The Second Circuit applied the "inequitable conduct" doctrine in Tokio Marine & Fire Ins. Co. v. Nat'l Union Fire Ins. Co., 91 F.2d 964 (2d Cir. 1937).  In Tokio, an action to recover on a reinsurance policy, the defendant-appellee reinsurer (National) sought reformation of the policy on the ground of unilateral mistake coupled with inequitable conduct.  Id. at 964.  National's mistake arose because the final draft of the policy as provided by the primary insurer, plaintiff-appellant

Tokio, contained a change from the parties' informal understanding (reflected in an insurance "binder")—a change which National had not noticed.  Id. at 966.  Tokio— acting through its brokers—had "a well-settled practice" in its dealings with National "to call its attention to important changes by the submission of new binders with the forms"—but had not do so with respect to this particular change. Id. at 965.

The district court ordered reformation, and the Second Circuit affirmed.  The Second Circuit explained that "the change made was such as to raise a reasonable inference of knowledge by the appellant of the mistake committed by the appellee"—and that "[m]istake was implicit" "in the silent acceptance of the altered agreement under the circumstances which prevailed."  Id.  Under such circumstances, "reformation would follow as of course."  Id.  The Second Circuit further noted that even though the district court had not made a finding of knowledge, "[t]he fact still remain[ed] . . . that the submission of the form under the circumstances related entailed a representation, however innocent and unmalicious, which induced the appellee's mistake."  Id.

The Class has proven by clear and convincing evidence that Foot Locker has engaged in equitable fraud or inequitable conduct with respect to the January 1, 1996 Plan amendment.[29]

---

[29] The Court notes that it makes this finding solely based on the evidence adduced at trial. While the Court had previously found that Foot Locker had spoliated documents, and determined that imposition of an adverse inference is warranted, the Court has not applied such an inference in reaching its determinations.

F.    <u>Statute of Limitations</u>

Foot Locker argues that before relief may be imposed, the Class must be reduced to exclude class members whose claims are not within the applicable statute of limitations.  As further explained below, no exclusions are warranted.

This Court previously determined that an SPD claim is subject to a three-year statute of limitations.  <u>See</u> <u>Osberg v. Foot Locker, Inc.</u>, 907 F. Supp. 2d 527, 533 (S.D.N.Y. 2012), <u>aff'd in part, vacated in part</u>, 555 F. App'x 77 (2d Cir. 2014) (summary order).[30]  An SPD claim accrues when a plaintiff has sufficient information to allow him to understand the basis for his claim.  <u>See</u> <u>Novella v. Westchester Cnty.</u>, 661 F.3d 128, 147 & n.22 (2d Cir. 2011) (plaintiff is on notice of a claim when that claim is readily discoverable from information provided); <u>Osberg</u>, 907 F. Supp. at 533.

A breach of fiduciary duty claim must be brought within six years from the date of the breach, or, if a plaintiff has actual knowledge of the breach, within three years from such knowledge.  29 U.S.C. § 1113.  This rule is subject to an exception in cases of fraud or concealment, in which case the limitations period runs six years from when the participant discovered the breach.  <u>See</u> <u>id.</u>  The fraud or concealment exception applies in "cases in which a fiduciary: (1) breached its duty by making a knowing misrepresentation or omission of a material fact to induce an employee/beneficiary to act to his detriment; or (2) engaged in acts to hinder the

---

[30] On appeal, the Second Circuit did not reach the question of whether an SPD claim is subject to a three- or six-year statute of limitations.  <u>See</u> <u>Osberg v. Foot Locker, Inc.</u>, 555 F. App'x 77, 80 (2d Cir. 2014) (summary order).

discovery of a breach of fiduciary duty." <u>Caputo v. Pfizer, Inc.</u>, 267 F.3d 181, 190

(2d Cir. 2001) (citation omitted).  Based on the evidence presented at trial, the

Court finds that the fraud or concealment exception applies.  The evidence at trial

overwhelmingly established that Class members did not understand that they were

subject to wear-away as a result of Foot Locker's misrepresentations and omissions.

This was so even after they had received or begun receiving their Plan benefits.

Plaintiffs' claims accrued when they learned – through counsel – of wear-away in

2005.  (Osberg Decl. ¶¶ 4-5.)  There is no evidence of a single Class member who

was aware or reasonably could have been aware of wear-away outside of the

statutes of limitations.

Foot Locker argues that class relief would be not be available to class

members who terminated their employment more than three years (in the case of

SPD claims) or six years (in the case of fiduciary breach claims) before suit

commenced because there are individualized issues as to whether these

Participants were on notice of their claims on or before the date of termination.

This argument is without merit.  As this Court previously determined, class

members' receipt of benefits was insufficient to arm them with the information they

needed to be on notice of their claims.[31]  (Opinion & Order dated November 7, 2014

---

[31]     Foot Locker contends that "Ada Cardona requested a clarification of her annuity benefit in
2003, six years after her employment terminated, and in response received a detailed explanation
that put her fully on notice of the fact that her benefit had been calculated based on the pre-1996
accrued benefit and that her compensation and interest credits that had accumulated in her account
did not contribute to her benefit."  (Defs.' Proposed Findings of Fact & Conclusions of Law at 75, ECF
No. 339.)  However, at trial, Cardona credibly testified that she did not understand the calculations
in the 2003 communication.  (Cardona Tr. 438:16-439:11, 443:9-16; PX 160.)

at 14, ECF No. 220.)  Moreover, there is no evidence that any of the communications that Foot Locker had provided to Participants informed the Participants that they were be subject to wear-away, even after their benefits were distributed.  Mere transmission of cryptic communications—which were not generally comprehensible to Participants—is not sufficient to put those Participants on notice of their claims and trigger the statute of limitations.  The world does not yet have commercially available x-ray vision; logically, Participants cannot see that which is hidden from them.  Accordingly, the statute of limitations does not require any exclusions from the Class as certified.[32]

G.   Remedy

In sum:  The Class has proven by a preponderance of the evidence that Foot Locker violated ERISA §§ 404(a) and 102 by issuing false, misleading, and incomplete Plan descriptions.  The Class has also proven by clear and convincing evidence that, as a result of Foot Locker's ERISA violations, employees reasonably but mistakenly believed that growth in their cash balance benefit equaled growth in their pension benefit—and that Foot Locker obtained an undue advantage vis-à-vis its workforce.

---

[32]    Foot Locker also argues that any class members who terminated employment with Foot Locker before the SPD was distributed should be removed from the class for purposes of awarding relief.  This argument also fails.  The SPD was only one of the false and misleading communications that class members received; class members who left before the SPD was distributed are still entitled to relief on their claim for breach of fiduciary duty based on other false and misleading communications, such as the September 1995 Announcement Letter and the November 1995 Highlights Memo.

To remedy Foot Locker's misrepresentations, the Plan must be reformed to actually provide the A plus B benefit that the misrepresentations inequitably caused Class members to reasonably expect.

Starting with the A benefit, the September 1995 Announcement Letter, the November 1995 Highlights Memorandum, the January 1996 Plan Statement, the December 1996 SPD, and other Plan summaries promised that each Participant's December 31, 1995 accrued benefit would be fully preserved in the form of an account balance.  The only way for the Plan to fulfill that promise is to give Participants an initial account balance as of January 1, 1996 equal to the December 31, 1995 accrued benefit discounted to present value using a 6% rate, with no further reduction for pre-mortality risk.  (See Deutsch Op. Report at 43.)

 As to the B benefit, to fulfill Foot Locker's promise that a Participant's pension benefit would include all of the benefits earned under the cash balance formula, the Plan must add to each Participant's initial account balance (the "A" benefit) the sum of: (1) any one-time enhancement to which the Participant is entitled under the terms of the Plan, applying the enhancement formula to the Participant's initial account balance as determined above; (2) compensation credits that the Participant was promised; (3) interest credits at the annual 6% rate promised under the Plan; and (4) any adjustments required by "federal law and IRS regulations" at the time of payment as described on pages 12 and 14 of the SPD. (See PX 5; PX 38; Deutsch Op. Report at 43-44.)

With respect to class members who have already retired, the Court orders that retirees and former employees shall be entitled to receive the difference in value between the full value of the A plus B benefit to which they are entitled and the benefit they received; and orders that any class member who has retired is entitled to prejudgment interest at a rate of 6% per annum (because it would be treated as an unpaid account balance, which would be credited with interest at 6%). (Deutsch Op. Report at 45.)  Retirees and former employees shall receive past-due benefits in the same form the Participant elected at the time his or her benefit originally commenced.

For Class members who elected an annuity, the full value of the A plus B benefit would be equal to the A benefit (determined as the larger of the protected benefit or the A benefit converted to an annuity under the post amendment terms) and the B benefit (converted to an annuity under the post amendment terms).  (Id. at 45-46.)

Accordingly, the Court orders that the Foot Locker Retirement Plan be reformed to provide the pension benefits described above, and orders and enjoins Foot Locker to enforce the Plan as thus reformed.  The Court orders that all of the remedies provided in this Opinion & Order are to be stayed to allow the parties to pursue an appeal, if they so choose.

III.    CONCLUSION

For the reasons set forth above, the Court finds in favor of the Class on all claims.  The appropriate remedy is reformation of the Plan as discussed above.  The parties shall submit an appropriate form of order not later than **October 13, 2015**.  The Clerk of Court is directed to terminate this action.


        SO ORDERED.

Dated:       New York, New York
             October 5, 2015


_____
        KATHERINE B. FORREST
        United States District Judge

83