**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
**GEOFFREY OSBERG**                                          :
                                                            :
**On behalf of himself and on**                             :
**behalf of all others similarly situated,**                :
                                                            :  **Case No.: 07 CV 1358 (KBF)**
                **Plaintiff,**                              :
                                                            :
          **- against -**                                   :
                                                            :
**FOOT LOCKER, INC.,**                                      :
                                                            :
**FOOT LOCKER RETIREMENT PLAN,**                            :
                                                            :
                **Defendants.**                             :
-------------------------------------------------------------X

### MEMORANDUM OF LAW IN SUPPORT OF CLASS COUNSEL'S MOTION FOR ATTORNEYS' FEES AND EXPENSES, AND APPROVAL OF SERVICE AWARDS FOR PLAINTIFF AND TESTIFYING CLASS MEMBERS

Eli Gottesdiener
Steven D. Cohen
Albert Huang
GOTTESDIENER LAW FIRM, PLLC
498 7th Street
Brooklyn, NY 11215
(718) 788-1500
(718) 788-1650

*Attorneys for Plaintiff and the Class*

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ................................................................1

II.    CREATION OF THE 100% RECOVERY, $290 MILLION FUND..........................8

III.   THE REQUESTED FEE IS FAIR AND REASONABLE...........................................10

      A.    The Requested Fee is Reasonable and Appropriate Under
           the Second Circuit's Preferred Percentage-Based Method ...........................10

            1.    The Risks Surmounted and Results Achieved Justify
                   the Request ....................................................................17

                   (i)     The case did not follow on the heels of a government
                              investigation.................................................................17

                   (ii)    When launched, there was no favorable precedent
                              for this kind of case ......................................................17

                   (iii)   Class Counsel faced the real possibility that the
                              evidentiary trail would be stale....................................18

                   (iv)   Class Counsel faced the very high statute of
                                limitations risk.............................................................18

                   (v)    Class certification was highly uncertain ...................19

                   (vi)   Class Counsel was taking on a Fortune 500 company
                                and its high-powered lawyers .....................................19

                   (vii)  Settlement, especially on favorable terms,
                                was unlikely ...............................................................19

                   (viii) Class Counsel bore all these risks themselves ..........................20

             2.    The Case's Complexity and Magnitude Support a
                   One-Third Fee ...............................................................20

             3.    The Fee Is Reasonable in Relation to the Recovery...........................21

             4.    Public Policy Also Strongly Supports the Requested Fee ...................22

      B.    The Time and Effort Required, and the Lodestar "Cross-Check,"
           Confirm the Appropriateness of the Requested Award...................................23

i

**IV.   THE REQUESTED EXPENSE REIMBURSEMENT SHOULD
BE GRANTED** .......................................................................................................**25**

**V.   THE REQUESTED SERVICE AWARDS SHOULD BE APPROVED** ....................**25**

**CONCLUSION** ...................................................................................................................**26**

# TABLE OF AUTHORITIES

**CASES**                                                                                     **Page(s)**

*Allapattah Servs., Inc. v. Exxon Corp.*, 454 F.Supp. 2d 1185 (S.D. Fla. 2006)........... 14-16, 21, 23

*Bd. of Trustees of AFTRA Ret. Fund*,
    2012 WL 2064907 (S.D.N.Y. June 7, 2012) ....................................................................25

*Beckman v. KeyBank N.A.*, 293 F.R.D. 467 (S.D.N.Y. 2013) .......................................................24

*Blum v. Stenson*, 465 U.S. 886 (1984) .........................................................................................24

*Board of Trustees of the Operating Engineers Pension Trust v. JPMorgan Chase Bank*,
    No. 09-cv-09333-KBF, Dkt. 157 (S.D.N.Y. Nov. 8, 2013)................................................24

*Cigna Corp. v. Amara*, 563 U.S. 421 (2011) ...............................................................................18

*Davis v. J.P. Morgan Chase & Co.*, 827 F.Supp.2d 172 (W.D.N.Y. 2011) ................................24

*Donoghue v. Morgan Stanley High Yield Fund*,
    2012 WL 6097654 (S.D.N.Y. Dec. 7, 2012) ....................................................................11

*Florin v. Nationsbank of Ga.*, 34 F.3d 560 (7th Cir. 1994) .........................................................10

*Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000)............................... *passim*

*Haddock v. Nationwide Financial Services, Inc.*,
    01-cv-1552, Dkt. 601 (D. Conn. Apr. 9, 2015).........................................................13, 16

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
    2006 WL 2789862 (S.D.N.Y. Sept. 28, 2006)..............................................................7, 20

*In re Apollo Group Secs. Litig.*, 2012 WL 1378677 (D. Ariz. Apr. 20, 2012) ......................14, 21

*In re Auction Houses Antitrust Litig.*, 197 F.R.D. 71 (S.D.N.Y. 2000)........................................10

*In re Bisys Sec. Litig.*, 2007 WL 2049726 (S.D.N.Y. July 16, 2007)........................................5, 24

*In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001)...............................................................16

*In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467 (S.D.N.Y. 2009) .................................4

*In re Linerboard Antitrust Litig.*, 2004 WL 1221350 (E.D. Pa. June 2, 2004).....................4-5, 12

*In re Relafen Antitrust Lit.*, 231 F.R.D. 52 (D. Mass. 2005) ........................................................22

*In re Remeron Direct Purchaser Antitrust Litig.*,
  No. 03-85, 2005 WL 3008808 (D.N.J. Nov. 9, 2005) ......................................................15

*In re Urethane Antitrust Litigation*, 2016 WL 4060156 (D. Kan. July 29, 2016) ..................14, 21

*In re U.S. Foodservice, Inc. Pricing Litig.*,
  07-md-1894, Dkt. 521 (D. Conn. Dec. 9, 2014) .................................................... 12-13, 16

*In re Veeco Instruments, Inc. Sec. Litig.*, 2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ..............21

*In re Vitamins Antitrust Litig.*, 2001 WL 34312839 (D.D.C. July 16, 2001) ...............................12

*In re WorldCom, Inc.,* 388 F. Supp. 2d 319 (S.D.N.Y. 2005) .......................................................11

*Osberg v. Foot Locker, Inc.*, 907 F.Supp.2d 527 (S.D.N.Y. 2012) .................................................3

*Osberg v. Foot Locker, Inc.*, 138 F.Supp.3d 517 (S.D.N.Y. 2015) ..................................... 1-2, 18

*Osberg v. Foot Locker, Inc.*, 862 F.3d 198 (2d Cir. 2017) ...........................................................2

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Amer. Corp.*,
  318 F.R.D. 19, 27 (S.D.N.Y. 2016) ...............................................................................25

*Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956 (7th Cir. 2013) ...........................................20

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96 (2d Cir. 2005)................................11, 17

*Van Gemert v. Boeing Co*., 590 F.2d 433 (2d Cir. 1978) (*en banc*),
  *aff'd*, 444 U.S. 472 (1980) .................................................................................11, 16, 20

*Yuzary v. HSBC Bank USA, N.A.*, 2013 WL 5492998 (S.D.N.Y. Oct. 2, 2013) ..........................24

**OTHER AUTHORITIES**

5 Rubenstein, *Newberg on Class Actions* § 15:80 (5th ed. Dec. 2017 update) ...................... 11-12

5 Rubenstein, *Newberg on Class Actions* § 15:83 (5th ed. Dec. 2017 update) ...........................10

Brian T. Fitzpatrick,
  *An Empirical Study of Class Action Settlements and Their Fee Awards*,
  7 Empirical L. Studies 811 (2010) ......................................................................... 4, 21-22

Connor & Lande,
  *Not Treble Damages: Cartel Recoveries Are Mostly Less Than Single Damages*,
  100 Iowa L. Rev. 1997 (2015) ..........................................................................................4

Cornerstone Research,
    *Securities Class Action Settlements: 2016 Review and Analysis* (2017) ...........................4

David L. Schwartz,
    *The Rise of Contingent Fee Representation in Patent Litigation*,
    64 Ala. L. Rev. 335 (2012) ................................................................................................15

Denise N. Martin, et al.,
    "Recent Trends IV: What Explains Filings and Settlements in
    Shareholder and Class Actions?" (NERA 1996) ........................................................ 21-22

*Manual for Complex Litig*. § 14.121 (4th ed. 2007) ........................................................6

Theodore Eisenberg and Geoffrey P. Miller,
    *Attorney Fees in Class Action Settlements: An Empirical Study*,
    1 J. Empirical Legal Studies 27 (2004).................................................................... 21-22

Theodore Eisenberg & Geoffrey P. Miller,
    *Attorney Fees in Class Actions:  2009-2013*,
    92 N.Y.U. L. Rev. 937 (2017) ........................................................................................22

*Third Circuit Task Force Report*, 208 F.R.D. 340 (January 15, 2002) ........................................15

Counsel for Plaintiff and the Class ("Class Counsel") respectfully submit this memorandum of law in support of their motion under Fed. R. Civ. P. 23(h) for:

- Common fund attorneys' fees of 33% of the $288,479,943 estimated value of the Class's net recovery under the October 2015 judgment formula (Dkt. 399 ¶ 2) calculated as of June 1, 2018;

- Reimbursement from the recovery of $1,520,057 in litigation expenses; and

- Service awards, to be paid out of Class Counsel's award, for Plaintiff Geoffrey Osberg in the amount of $50,000, and for each of the eight Class members who were deposed by Defendants and later testified at trial, in the amount of $15,000 each.

## I.     PRELIMINARY STATEMENT

In February 2007, Class Counsel, on behalf of Geoffrey Osberg and a putative class of similarly situated persons, filed suit challenging the conversion of the Foot Locker Retirement Plan (the "Plan") from a traditional defined benefit pension plan to a "cash balance" plan.

Eight years later, following a two-week trial at which 21 fact witnesses and 3 experts testified, this Court issued its 83-page verdict in favor of the Class, finding the evidence "overwhelming" that Foot Locker had "egregious[ly]" violated ERISA's fiduciary standards of conduct by issuing "intentionally false and misleading" communications to Plan Participants.  The Court said that the evidence presented by Class Counsel left "no doubt that Foot Locker committed equitable fraud.  It sought and obtained cost savings by altering the Participants' Plan, but not disclosing the full extent or impact of those changes."  As the Court explained:  "To participate knowingly and significantly in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense is not to act 'solely in the interest of the participants and beneficiaries,'" as ERISA requires.  Here, the evidence showed that "[f]rom the CFO of Woolworth stores to a cashier, no one understood what was going on."  *Osberg v. Foot Locker, Inc.*, 138 F.Supp.3d 517, 523-24, 537, 551, 558 (S.D.N.Y. 2015).

The Court agreed with the Class that "[t]o remedy Foot Locker's misrepresentations, the

Plan must be reformed to actually provide the A plus B benefit that the misrepresentations inequitably caused Class members to reasonably expect." *Id*. at 560.  *See also* Dkt. 399 ¶ 2 (judgment setting forth the recovery formula).

On appeal, Foot Locker argued that this Court had erred by: (1) awarding relief to participants whose claims should be barred by the statute of limitations; (2) concluding that ignorance of the plan's wear-away provision ("mistake"), a prerequisite to the equitable remedy of reformation, had been shown as to all class members; (3) ordering relief on participants' fiduciary breach claims without requiring individualized proof of detrimental reliance; and (4) using a formula for calculating relief that Foot Locker claimed was overly generous.  The Second Circuit rejected each of these arguments, affirming this Court's judgment in all respects.  862 F.3d 198 (2d Cir. 2017).

Foot Locker retained the powerhouse firm Gibson Dunn to file a petition for a writ of *certiorari* asking the Supreme Court to review this Court's award of "sweeping equitable relief that could exceed $250 million to a class of 16,000 participants in the Foot Locker Retirement Plan." 2017 WL 5256228, No. 17-690 (2017).  The Supreme Court was unmoved by the Company's pleas, denying Foot Locker's petition in February 2018.  2018 WL 942806 (U.S. Feb. 20, 2018).

This Court's October 2015 judgment is now final.  The parties have stipulated and their actuaries agree that the estimated value of the Class's total recovery under the judgment formula (Dkt. 399 ¶ 2), with interest through June 1, 2018, is **$290 million**.  *See* Ex. 1, Proposed Class Notice at 4 ¶ 1; Deutsch Decl. ¶ 2.  This means that, net of requested attorneys' fees ($95,198,381)[1] and expenses ($1,520,057), each member of the 16,400 member Class is now entitled to an additional pension benefit under the Plan with an estimated lump-sum present value of **$11,800** on

---

[1] $95,198,381 is 33% x ($290 million - $1,520,057 expenses), *i.e.*, 33% of the estimated value of the total recovery under the judgment formula calculated as of June 1, 2018, net of reimbursable expenses.

2

average, which the vast majority of Class members can elect to receive, like their original lump sum, on a tax-deferred basis.  Deutsch Decl. ¶ 3.

This is a very substantial recovery for the cashiers, salespeople, warehouse workers, secretaries, supervisors, and managers who went to work every day believing they were earning the pension benefits their employer led them to believe they were earning—and, for Counsel, tremendously gratifying, especially given the obstacles and risks the Class faced when this case began more than 11 years ago.  From its inception and all the way through denial of Foot Locker's cert petition six weeks ago, this case had very high merits risk, very high statute of limitations risk, and very high class-certification risk that could have easily resulted in zero recovery for the Class—as is confirmed by the fact that this Court dismissed the case in its entirety with prejudice on multiple grounds in 2012.  *See Osberg v. Foot Locker, Inc.*, 907 F.Supp.2d 527, 529, 533-35 & n.4 (S.D.N.Y. 2012) (granting summary judgment to Foot Locker on merits and statute of limitations, and suggesting the case could not have been properly certified as a class action anyway).  But Class Counsel overcame that setback and continued to run what ultimately became a more than decade-long gauntlet of risk.  *See* Gottesdiener Decl. ¶¶ 27-49.  The end result was a ruling that "immediately becomes the polestar for claims of this nature."  *See* Ex. 3, *Reflections on Osberg v. Foot Locker*, July 7, 2017.

Courts have long lamented that many plaintiffs' class action lawyers settle cases too early and too cheaply.  That is not what happened here, even though settling would have guaranteed Counsel a handsome fee (at any of several stages of the cases) with no further risk:

- For example, in a November 2015 press release issued two months after this Court's post-trial judgment for the Class, Foot Locker disclosed what it estimated to be "a **$100** million liability resulting from this litigation."  FL 2015 Q3 Results.  But Class Counsel refused to settle, instead electing to (successfully) defend the trial judgment on appeal.

- Two months after the Court of Appeals ruling in 2017, Foot Locker increased its estimated liability to **$150** million.  FL 2017 Q3 SEC Form 10-Q at 22.  Counsel refused to settle.

3

- Foot Locker announced that it had retained Gibson Dunn to file a petition for *certiorari* with the Supreme Court.  Uncowed, Counsel soldiered on.

- In February 2018, the Supreme Court denied cert and Foot Locker increased its estimated liability to **$278** million.  FL 2018 Q4 Results.

- With interest, the parties agree that the final recovery amount has now grown to an estimated value of **$290** million as of June 1, 2018.

Counsel are extremely proud of this result, not merely because it is a substantial sum in dollar terms but, more importantly, because that large dollar amount reflects that Counsel obtained for members of the Class something that is rarely if ever achieved in a class action:  **a 100% recovery of the Class's maximum possible damages claim**, as Mr. Deutsch confirms.  Deutsch Decl. ¶ 4.[2]

It is well documented that virtually all class actions end, if not by dismissal or summary judgment in the defendant's favor, by settlement.  *See* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 Empirical L. Studies 811, 812 (2010).  Every settlement, by definition, is a compromise.  Often that compromise means the class's maximum potential damages claim is exchanged for only pennies on the dollar.  *See, e.g., In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 510 (S.D.N.Y. 2009) (granting 33.3% of a $586 million settlement where investors recouped an estimated 2% of losses).[3]  But even those cases that recover a higher damages percentage that courts single out for special commendation still typically recover

---

[2] To illustrate the benefit to Class members of Counsel's dogged persistence in fighting for every last dollar, consider Mr. Osberg.  Had Counsel settled the case after trial for a highly-favorable 60% of the maximum judgment amount ($174 million), Mr. Osberg's gross recovery would have been $16,409.  Attorneys' fees likely would have reduced his net recovery to a figure between **$11,000-$13,000**.  But since Class Counsel fought until the bitter end, Mr. Osberg's actual gross recovery is $27,321.  Deutsch Decl. ¶ 6.  If the Court were to award the standard 33% attorneys' fee for high-risk, high-success cases like this, his net recovery will be **$18,323** – *i.e.*, around *50% larger* than even a very favorable settlement would have given him.

[3] A paltry 2.5% of maximum damages was the median recovery in securities cases concluded in 2016.  *See* Cornerstone Research, Securities Class Action Settlements: 2016 Review and Analysis, at 7 (2017).  Between 1990 and 2015, recoveries in antitrust cases averaged a mere 19% of maximum damages.  Connor & Lande, *Not Treble Damages: Cartel Recoveries Are Mostly Less Than Single Damages*, 100 Iowa L. Rev. 1997, 2010 (2015).

only a limited portion of the value of the class's claims.[4]

Here, by contrast, the $290 million judgment represents a complete recovery of the damages requested in the Complaint and 100% of what the Class could have conceivably have asked for.  "[T]he quality of representation is best measured" by comparing the actual recovery with "**the extent of *possible* recovery**."  *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 55 (2d Cir. 2000) (emphasis added).  Trials in high-stakes class action cases are rare.  Rarer still are cases that go to trial, are decided in the class's favor, and then instead of settling are defended on appeal.  But a case that does all that *and* concludes with the class recovering 100% of their maximum potential damages claim—as happened here—may be unprecedented.  Class Counsel could only have accomplished this feat by doing what plaintiffs' class action lawyers almost never do:  take defendants to trial and then defend the class verdict on appeal to final judgment.

But even that tells only half of the story.  As shown in Section II below, in order to deliver the 100% recovery, $290 million judgment to the Class, Counsel had to pitch the litigation equivalent of the perfect game for their clients—not only convincing the Court that the Class's version of all disputed material facts and points of law were correct, but also that complete relief for Foot Locker's violations could only be accomplished by adopting all aspects of the Class's damages model rather than Defendants' proposed alternatives.  As shown below, if trial had the identical outcome it did on liability, but Class Counsel had failed to persuade as to any material fact or the Class's damages model, the total recovery would have shrunk to a mere *$75 million—* **$215 million less than it is today**.  *Id.* ¶ 5.  Considering the myriad risks of total *non*-recovery Class Counsel also faced throughout the past 11 years, the $290 million, 100% recovery outcome

---

[4] *See, e.g., In re Linerboard Antitrust Litig.*, 2004 WL 1221350 at *4 (E.D. Pa. June 2, 2004) (granting counsel's 30% fee request in a $202 million settlement in part because they recovered a "highly favorable" 42 percent of the class's damages); *In re Bisys Sec. Litig.*, 2007 WL 2049726, at *3 (S.D.N.Y. July 16, 2007) (similarly rewarding counsel because they recovered one-third of class damages, saying "relatively few cases have involved . . . as positive a final result").

makes this case among the most successful class actions ever.  *See* Ex. 2, "Truth or Consequences (180 Million of Them)," *Los Angeles & San Fran. Daily Journal* (Sept. 22, 2017).

As this Court—seconded by the Court of Appeals—ultimately found after "the dust on this case ha[d] settled" following the two-week trial, 138 F.Supp.3d at 523, equity demanded no less than complete relief for the members of the Class.  But that does not mean it was easy getting it for them.  To the contrary, the road from the 2007 complaint to this Court's 2015 trial verdict for the Class, through the 2016-17 battle in the Second Circuit, and finally ending with the Supreme Court's denial of *certiorari* in February 2018, was a long and arduous one.  *See* Ex. 3, *Reflections on Osberg v. Foot Locker*, July 7, 2017 ("anyone who litigates in this area knows that it is very hard – and most circuits have adopted a range of doctrinal hurdles making it so – to get courts to award, on equitable relief grounds, any benefits different than those expressly authorized under the plan's terms, even where there is evidence that the plan communications to the employees did not spell out those benefits accurately").

Now, having carried the Class across the finish line, Counsel request a fee that appropriately reflects the tremendous obstacles and risks they overcame, the enormous expenditures of time and capital that required, the extraordinary results those efforts achieved for the Class—and that shows counsel in future cases that pressing ahead, as Class Counsel did here, to achieve maximum recovery for their clients will be justly rewarded.

If ever there were a case where a one-third fee was appropriate and well-deserved, it is one such as this—which lasted more than a decade, involved a successful trial, two successful appeals, and achieved a 100% recovery for the Class.[5]  As shown below, one-third is comfortably within the range of fees regularly awarded in high-risk cases like this that produce exceptional results.  Indeed, the average or typical fee percentage even in <u>settled</u> class cases is in the 25% to 30% range.

---

[5] Counsel sometimes refer to their 33% request as "one-third" for simplicity.

*See, e.g., Manual for Complex Litig*. § 14.121 (4th ed. 2007) ("attorneys' fees awarded under the percentage method are often between 25% and 30% of the fund").  An average by definition means some are above and some below.  If this 100%-recovery, 11-year litigated-to-judgment case is not above average, it is hard to know what is.

The large size of the common fund is no reason to effectively *deem* this case to be merely average (by reducing the fee percentage) when it obviously is not.  If anything, the size of the fund is a reason to increase the fee percentage in a case like this.  As shown below, there are numerous of instances even in *settled* cases involving large ($100 million-plus) "mega-funds" where courts— including many within this Circuit—have awarded attorneys' fees that equal or exceed the 33% fee sought here, in circumstances that do not approach the efficacy and value that Class Counsel's tenacity and commitment created for the Class here.  It is true that in securities and mass tort cases where a cents-on-the-dollar settlement has produced a large common fund, some courts have found it appropriate to scale down the attorneys' fee.  But Counsel are unaware of even a single case in which a court reduced the percentage award based on the size of the fund in a case like this that produced a successful judgment after trial—much less one that won a ***100% recovery*** for the class.

"[T]he Court's major focus in fashioning a fee award is encouraging the bar to undertake future risks for the public good in tomorrow's cases."  *In re AOL Time Warner, Inc. Secs. & ERISA Litig.,* 2006 WL 3057232, at *15 (S.D.N.Y. Oct. 25, 2006).  Thus, the 33% award requested here is not merely appropriate compensation in light of the risks borne, time and effort expended, and outstanding results achieved, but to show counsel in future meritorious cases that it pays for them to assume the added risk, delay, and difficulties of litigating the case to judgment to secure complete relief for the class, as Counsel did here.  This is a model case in which all of the central players—Class Counsel, Mr. Osberg, defense counsel, and the Courts—performed their jobs exactly the way the system wants them to, and 16,400 hard-working employees got the justice they

deserved.  Class Counsel's compensation should reflect their important role in achieving this exceptional outcome.

## II.     CREATION OF THE 100% RECOVERY, $290 MILLION FUND

As outlined above, to achieve the extraordinary result in this case, Counsel not only had to prove all of the elements of the Class's claims at trial (on a class-wide basis for all 16,400 members of the Class), but also to convince the Court that the Class's versions of all disputed material facts and damage calculation models were correct.  Counsel proved, under the heightened "clear and convincing" standard of proof applicable to equitable plan reformation claims, that:

1.     <u>Fraud</u>:  Foot Locker equitably defrauded pension plan participants.

2.     <u>Mistake</u>:   As a result, none of the 16,400 members of the Class understood the adverse impact that the 1996 cash-balance conversion had on their pension benefits.

Class Counsel also established by a preponderance of the evidence that:

3.     <u>Violation of SPD Standards (ERISA § 102)</u>:  The Summary Plan Description ("SPD") violated ERISA's minimum content and clarity standards.

4.     <u>Breach of Fiduciary Duty (ERISA § 404)</u>:  Other plan communications violated Defendants' fiduciary duty to communicate clearly with participants about the Plan.

5.     <u>Statute of Limitations</u>:  The Class's claims were not barred by ERISA's 3-year statute of limitations—despite the fact that the complaint was filed in 2007, more than 10 years after the 1996 cash-balance conversion.

Proving these elements was no simple task, as the intensely litigated 11-year history of this case reflects.  The Class ultimately prevailed only because, through tireless efforts in discovery and case development, Counsel was able to prove to the Court's satisfaction at trial:

1.     That the SPD and other communications promised opening account balances <u>equal</u> to the value of their already-earned pension annuities as of the 12/31/95 conversion date.

2.     That participants' opening account balances were <u>not</u> in fact the actuarially-equivalent value of their already-earned pension annuities as 12/31/95.

3.     That the SPD did not inform participants they were not, or might not be, earning additional benefits for a period of time following the 1996 cash-balance plan conversion.

4.     That none of the individualized communications that Foot Locker showed had been

given to thousands of participants informed participants that they might not be earning additional benefits for a period of time following the conversion.

5.    That management was aware of the disconnect between what the plan summaries promised and what the plan actually provided.

Establishing the elements of the Class's claim for equitable plan reformation was challenging.  Yet had Counsel proven only the foundational facts and points of law just summarized, the Class would have received *less than half* of the relief they sought.  *See* Deutsch Decl. ¶ 5.  To prove entitlement to 100% of the relief sought in the Complaint, Counsel also had to convince the Court of all five of the following *additional* facts:

1.    That the only way to fulfill Foot Locker's promise of a no-wear-away conversion was to give participants corrected opening balances instead of preserving their 12/31/95 annuity-based accrued benefits (as Defendants urged was the appropriate remedy);

2.    *And* to calculate the opening balances using a discount rate of 6%;

3.    *And* to preclude Foot Locker from applying a pre-retirement mortality discount (no PRMD) in the calculation.

4.    That Foot Locker should be required to honor its promise to give senior employees an "enhancement" to their equal-value opening balances.

5.    That Foot Locker should further be required to honor its promise to give employees who received lump sums a "whipsaw" bonus.

Foot Locker fought each of these "complete relief" facts tooth and nail.  For good reason: these five additional facts that Counsel were able to prove at trial (and then defend in the Second Circuit) increased the Class's recovery from what would have been about $75 million to $290 million—*i.e.*, *an increase in damages of $215 million*.  *See* Deutsch Decl. ¶ 6.  Clearly, these last $215 million of damages were even harder to win than the baseline $75 million.  And it is neither an exaggeration nor immodest for Counsel to say that securing that additional $215 million for the Class is attributable solely to Counsel's refusal to settle for the substantial $75 million damages award participants surely would have been satisfied with, Counsel's determination to press forward to recover the maximum damages possible, and Counsel's exacting preparation, effective advocacy, and skillful presentation (with the able assistance of Mr. Deutsch) of the Class's

damages model showing the Court that properly-calculated opening balances—plus the promised seniority enhancement and whipsaw bonus—were the only way to make plan participants whole.

## III.   THE REQUESTED FEE IS FAIR AND REASONABLE

### A.   The Requested Fee is Reasonable and Appropriate Under the Second Circuit's Preferred Percentage-Based Method

Class Counsel recognize that the $95.2 million fee requested—33% of the $290 million fund created by the judgment minus expenses—is a lot of money.  But a 33% fee in this case is both appropriate and well-deserved.  Class Counsel devoted more than a decade of time and effort to a complicated and difficult case that, it was clear from the outset, could have been lost or derailed at any number of stages, starting with motions to dismiss through class certification, summary judgment, *Daubert* challenges, multiple petitions for decertification, trial, two Second Circuit appeals, Foot Locker's bid for Supreme Court review, and much more in between. "[T]here is no injustice in requiring plaintiff class members to shoulder the burden of compensating counsel for prosecuting the class's case without any assurance of compensation," *Florin v. Nationsbank of Ga.*, 34 F.3d 560, 565 (7th Cir. 1994) (ERISA case), especially a case that, due to Counsel's skill and effort, yielded such an unparalleled outcome for the Class.

Plaintiffs' counsel routinely receive on average around 27% fees in cases that often settle for cents on the dollar, *see Newberg on Class Actions* § 15:83 (5th ed. Dec. 2017 update) (26.9% in this Circuit for the 2006-2011 period).  To award less than one-third in this 100%-recovery, tried-to-verdict, defended-on-appeal case could make counsel in future cases doubt that taking a defendant to trial is worth the extra risk and trouble:  settling may seem more safe, predictable, and profitable.  *See In re Auction Houses Antitrust Litig.*, 197 F.R.D. 71, 80 (S.D.N.Y. 2000) (reducing counsel's percentage as size of fund increases "can create an incentive to settle quickly and cheaply when the returns to effort are highest" and discourage counsel from "investing additional time and

maximizing plaintiffs' recovery").  As the Second Circuit held long ago, sitting *en banc* in a rare litigated-to-judgment class case, "[f]ee awards should not be so structured as to encourage such conduct."  *Van Gemert v. Boeing Co*., 590 F.2d 433, 441 (2d Cir. 1978) (*en banc*), *aff'd*, 444 U.S. 472 (1980) (holding that when counsel obtain a greater recovery for the class by taking the case to trial, counsel must be rewarded out of that additional upside attributable to the increased risk and effort of trial).

Applying the "percentage method" of fee calculation favored in this Circuit confirms that the requested fee is reasonable.  *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 121 (2d Cir. 2005) ("The trend in this Circuit is toward the percentage method").  The percentage method provides "appropriate financial incentives" necessary to "attract well-qualified plaintiffs' counsel who are able to take a case to trial" and "directly align[s] [the] interests of the class and its counsel."  *In re WorldCom, Inc.,* 388 F. Supp. 2d 319, 355 (S.D.N.Y. 2005).  The fee request for 33% of the common fund is reasonable on its face.  *E.g., Donoghue v. Morgan Stanley High Yield Fund*, 2012 WL 6097654, at *2 (S.D.N.Y. Dec. 7, 2012) ("attorney[s]'s fees of one-third or less of the settlement amount are customarily found to be reasonable") (collecting cases).

As noted above, the large size of the recovery here is no reason to reduce Counsel's fee percentage, particularly in a litigated-to-judgment case like this where the last $215 million of damages were harder to win than the baseline $75 million.  Reducing the fee percentage with the size of the common fund can make sense in the *settlement* context if (i) a case settles very quickly, (ii) was aided by a prior government investigation, (iii) required comparatively little work, (iv) exposed counsel to comparatively little risk, (v) yielded a large amount but a disappointingly small percentage of individual class members' damages, and/or (vi) where the large size of the recovery is simply the mathematical result of the class's size, not anything plaintiffs' lawyers can legitimately claim credit for bringing about.  *See* 5 Rubenstein, *Newberg on Class Actions* § 15:80

(5th ed. Dec. 2017 update).  But there is obviously nothing like that going on here.[6]

Even in cases that *settled*, there are numerous instances involving mega-funds where courts, including many within this Circuit, have awarded attorneys' fees that equal or exceed the 33% fee sought here, in circumstances plainly involving less risk, less work, less difficulty and/or less than complete recovery of class members' damages:

| CASE | SETTLEMENT | PERCENTAGE AWARDED |
|------|-----------|-------------------|
| Bain Partners | $590 million | 33.3% |
| IPO (S.D.N.Y. 2009) | $510 million | 33.3% |
| Vitamins | $365 million | 34.6% |
| Tricor | $316 million | 33.3% |
| U.S. Food Service (D. Conn. 2014) | $297 million | 33.3% |
| Relafen Direct RX Purch. | $242 million | 33.3% |
| Busiprone (S.D.N.Y. 2003) | $220 million | 33.3% |
| DeLoach v. Phillip Morris | $212 million | 33.3% |
| Neurontin Antitrust | $191 million | 33.3% |
| Titanium Dioxide Antitrust Lit | $163.5 million | 33.3% |
| Haddock (D. Conn. 2017)(ERISA)[7] | $140 million | 35% |

These settled cases show that this Court could award Class Counsel a 33.3% fee without leaving the beaten path.  Consider, for example, *In re U.S. Foodservice, Inc. Pricing Litig*., a fraud case in which class counsel faced a high class certification risk similar to that Class Counsel faced here.  When *U.S. Foodservice* settled, for $297 million, the court, applying the *Goldberger* factors, awarded plaintiffs' counsel a full 33.3% fee.  *Id.*, 07-md-1894, Dkt. 521 at 5 (D. Conn. Dec. 9, 2014).  Before it settled, *U.S. Foodservice* had been to the Court of Appeals on a Rule 23(f)

---

[6] This case did not settle and took more than a decade.  Not only was Counsel unaided by any prior or subsequent government investigation, the case concerned wrongdoing that would have forever remained hidden had Counsel not detected it; prosecuting it took an enormous amount of work and investment of Counsel's time and money; the clients could not have asked for a better result; and the fund reached mega-fund proportions solely because of Counsel's skill, effort, and clear presentation at trial (and again on appeal) of the appropriate make-whole damages model.  *See Linerboard*, 2004 WL 1221350 at *31 (because highly favorable settlement was attributable to counsel's skill, it would "penalize them for their success" to apply the mega-fund "increase-decrease" approach in that $200 million case); *In re Vitamins Antitrust Litig.*, 2001 WL 34312839, at *11 (D.D.C. July 16, 2001) (awarding 34.6% of $365 million, saying "it is not fair to penalize counsel for obtaining fine results for their clients").

[7] *See* Gottesdiener Decl. ¶ 5 for full citations.

petition (the instant case was reviewed twice on the merits by the Court of Appeals, which in addition also twice declined Foot Locker's Rule 23(f) petitions), it had been pending 8 years (the instant case has been pending 11 years), and the parties engaged in considerable discovery:  for example, plaintiffs' counsel took 37 depositions (as compared to the 40 depositions taken in the instant case, *see* Gottesdiener Decl. ¶ 2).  Dkt. 510-1 at 1-5.  But counsel in *U.S. Foodservice* were clearly exposed to less risk than Class Counsel here because that case settled ***prior to any ruling on summary judgment***, *id.*, whereas here Class Counsel endured *two* rounds of defense summary judgment motions, a full-blown trial, and Defendants' challenges of the judgment in the Court of Appeals and on a petition for *certiorari* in the Supreme Court.  Moreover, whereas in this case Counsel recovered 100% of Class members' damages, the best that counsel could say in *U.S. Foodservice* was that they had recovered a "significant" percentage of class members' damages and, in requesting approval of the settlement, cite a case which held approval was appropriate where class members were receiving a mere *8%* of the damages they suffered.  Dkt. 510-1 at 26; Dkt. 499-2 at 10; *id.* Dkt. 499-3 ¶ 5.

There is thus ample precedent for a one-third fee from recoveries in high-risk mega-fund cases like this, even in those where the result was not nearly as impressive as the one achieved here.  Indeed, here, because Class Counsel (1) took the case through a successful trial, a successful appeal, and to the steps of the Supreme Court; *and* (2) pitched the perfect game that was necessary to achieve a 100% recovery of the Class damages, a fee of *more* than 33% could readily be justified.  *Compare Haddock v. Nationwide Financial Services, Inc*., 01-cv-1552, Dkt. 601 (D. Conn. Apr. 9, 2015) (awarding, under *Goldberger*, **35%** of a $140 million settlement in an ERISA fiduciary breach case which lasted 13 years but was settled before trial while a motion for summary judgment was pending, *see id.* Dkt. 598-1 at 3-10).

While few class cases go to trial and result in multi-hundred-million-dollar verdicts, and

fewer still are reviewed on (and survive) appeal, research reveals three cases roughly comparable to this one, each confirming the reasonableness of a one-third fee here.  The leading and most impressive of these cases is *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006), which also lasted more than a decade, went to trial, was appealed to the Supreme Court, and delivered a billion dollar mega-fund recovery.  *Id.* at 1193-97.  The court would have awarded 33.3% but for counsel's voluntary 2% reduced fee request (to 31.33%) in recognition of the fact that they *ultimately settled* the case, lowering the class's recovery to 92% of claimed damages.  *Id.* at 1203-05.[8]

It is unsurprising, consistent with the discussion above, that *Allapattah* flatly rejected an objection that the amount of counsel's fee should decline as the recovery amount increases, explaining that "while [this so-called "megafund approach"] may have validity when there is a large settlement ***short of a full trial*** . . . the rationale has no reasonable application" in the subset of rare cases like this one involving a large recovery secured after a risky trial and appeal.  *Id.* at 1212-13 (emphasis added).  *Accord Urethane*, 2016 WL 4060156, at *6.  Indeed, *Allapattah* observed that class cases that counsel take to trial and win are so infrequent, and so unlike cases that settle—in terms of the risks assumed, efforts expended, and recoveries achieved—that "the more appropriate measure of a reasonable percentage" in cases like this is "by reference to the market rate for a contingent fee in private commercial cases tried to judgment and reviewed on appeal," *Allapattah*, 454 F. Supp. 2d at 1203, 1211.  This is consistent with *Goldberger*, which

---

[8] Two other cases like *Allapattah* and roughly comparable to this one, with high percentage recoveries for class members that went to trial and on appeal before settling, are *In re Urethane Antitrust Litigation*, 2016 WL 4060156, at *6-7 (D. Kan. July 29, 2016) (awarding 33.3% fee in case that settled for $835 million after a trial that produced a $1.06 billion judgment due to trebling, explaining "the circumstances of this case justify the highest award, and in light of the great risk assumed by counsel, the requested one-third award would not provide an excessive or improper windfall to counsel in this case"); and *In re Apollo Group Secs. Litig.*, 2012 WL 1378677, at *7 (D. Ariz. Apr. 20, 2012) (awarding 33.3% following $145 million post-judgment settlement, noting that this "exceptional result" "could not have been achieved without Class Counsel's willingness to pursue this risky case throughout trial and beyond").

emphasizes that district courts should strive to replicate market compensation. *Goldberger*, 209 F.3d at 52 ("market rates, where available, are the ideal proxy for [class counsel's] compensation"). Since *Goldberger*, there is a clear recognition in the courts that in non-class commercial contingency fee litigation, a 30% to 40% contingency fee is typical, confirming the reasonableness of Class Counsel's 33% request here.[9]

     *Allapattah* recognized that from a market perspective, when counsel's and the class's economic interests are aligned as they are under the percentage-of-the-fund method, fee-setting is a positive-sum game, not a zero-sum competition. The relevant question becomes not "What is the lowest possible fee?" but "What fee would a group of claimants rationally have agreed to pay when this lawsuit began?"[10] Informed purchasers of contingent legal services know that a higher attorney's fee can mean a larger expected net recovery for a claimant because a skilled lawyer will take the case, expend effort on it, and increase the value of the client's claim by an amount that exceeds the lawyer's fee. That is perfectly illustrated in this case. Lawyers who thought that their recovery would not be directly commensurate with what they won for the class (*e.g.,* would be capped or subjected to arbitrary declining percentage reductions) would never have run the risks Class Counsel ran here.

     *Allapattah* also discussed some of the cases Counsel cites above in the chart on p.12 that awarded 33.3% fees in settled mega-fund cases, explaining that:

---

[9] "[A] one-third fee is a common benchmark in private contingency fee cases. That bench mark is then often adjusted upward to 40% or higher in the event of an appeal." *Allapattah*, 454 F.Supp.2d at 1212 (citations to studies and reports omitted). *Accord* David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation*, 64 Ala. L. Rev. 335, 360 (2012) (one-third or more); *In re Remeron Direct Purchaser Antitrust Litig.*, No. 03-85, 2005 WL 3008808, at *16 (D.N.J. Nov. 9, 2005) (finding "contingent fees between 30% and 40%" the norm in all cases, including cases brought by business entities "in non-class, commercial litigation").

[10] *See Third Circuit Task Force Report*, 208 F.R.D. 340, 373 (January 15, 2002) ("[t]he goal of appointment [of class counsel] should be to maximize the net recovery to the class and to provide fair compensation to the lawyer, not to obtain the lowest attorney fee. The lawyer who charges a higher fee may earn a proportionately higher recovery for the class than the lawyer who charges a lesser fee").

decisions involving fee awards in class action *settlements* should not control the determination of an appropriate fee award in this [tried-to-verdict, defended-on-appeal] case.  On the other hand, even many of those decisions have approved fee awards comparable to or higher than that requested here… [and] these decisions support the fee award requested here.

454 F. Supp. 2d at 1210-11 (emphasis added).  The same is true in this case:  none of the 33%-plus cases described above, such as *U.S. Foodservice* (33.3%) and *Haddock* (35%), were more impressive than this case in terms of risk, complexity, degree of effort required, difficulty, duration—and certainly not end result.

Further evidence that 33% was and is the market rate (or lower than the market rate) for Class Counsel's services in this case can be found in the fee agreement Mr. Osberg and Counsel made in late 2006, under which Mr. Osberg agreed that in exchange for Counsel's commitment to undertake the representation of him and the putative class on a wholly contingent basis, Counsel could seek a 33% common fund award.  Osberg Decl. ¶¶ 3-5; Gottesdiener Decl. ¶¶ 6-11 & Ex. 3.  In small stakes cases, this agreement would not have much weight, but Mr. Osberg, like most Class members, had a significant ($27,000-plus) claim, so his agreement to a pay one-third of any recovery to Counsel is objective evidence that it is the market rate.[11]

\*         \*         \*

The reasonableness of the requested fee award here is also confirmed using the six-factor *Goldberger* test under which courts weigh "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of

---

[11] *Cf. In re Cendant Corp. Litig.*, 264 F.3d 201, 282 (3d Cir. 2001) ("[U]nder the PSLRA, courts should accord a presumption of reasonableness to any fee request submitted pursuant to a retainer agreement that was entered into between a properly-selected lead plaintiff and a properly-selected lead counsel").  Class members, by not opting-out after being informed that Counsel would ask to be paid out of whatever award they obtained for the Class, effectively agreed to a one-third fee, since the common perception among the general public (reflective of fact) is that counsel's fee in a contingency agreement is 33.3% or more of any recovery.  *Boeing*, 590 F.2d at 439 n.14 ("Manifestly, plaintiffs in a 23(b)(3) class action, who have been provided with notice and an opportunity to opt out of the suit, must be said to have accepted the attorneys' services, and the benefits that may flow from them . . .  [so] it is appropriate to charge them their Pro rata share"); *see, e.g.,* ABA: What Are Contingent  Fees? (describing typical "one third" contingency fee).

representation; (5) the requested fee in relation to the [recovery]; and (6) public policy

considerations." *Goldberger,* 209 F.3d at 50.

### 1.    The Risks Surmounted and Results Achieved Justify the Request

As the discussion above reflects, under *Goldberger,* success and risk are the two most

important factors in determining the reasonableness of attorneys' fees. *See id.* at 54-55.  Here, the

risks that Class Counsel confronted and surmounted, and the 100% damage recovery they achieved

for the Class, clearly put this case in the very upper echelon of successful class actions and

demonstrate the reasonableness of the requested fee.  Class Counsel prevailed on every claim and

damages theory and overcame every defense at trial and on appeal, and thus a full and complete

recovery was achieved on behalf of the entire Class and every individual Class member.  Counsel

should receive a generous fee.

*Goldberger* clearly establishes that the riskier the case, the higher counsel's fee should be.

209 F.3d at 54.  The magnitude of the risk undertaken by Class Counsel in this case is hard to

overstate and beyond that in most reported cases.  Eight points demonstrate that this was a very

risky case indeed:

**(i)  The case did not follow on the heels of a government investigation.**  Class Counsel

themselves detected the wrongdoing and then independently investigated the facts and enforced the

law, without being able to rely on any parallel government investigation.  They alone shouldered

the burden of proving this case and, as discussed above and described below, there was significant

risk in doing so.  The case law recognizes that this supports a higher fee.  *See, e.g., Wal-Mart*

*Stores*, 396 F.3d at 122 ("extraordinary fee" warranted where "plaintiffs' counsel did not have the

benefit of 'piggybacking' off of a previous [government action]").

**(ii)  When launched, there was no favorable precedent for this kind of case.**  When this

case was filed in 2007, there were no favorable precedents for a case of this kind.  *See* Signorille

Decl. ¶ 12 (AARP senior attorney who has specialized in pension and employee benefit litigation for 40 years and was responsible for monitoring cash balance conversion litigation since the mid-1990's). In fact, even after the landmark 2011 ruling by the Supreme Court in *Cigna Corp. v. Amara*, 563 U.S. 421 (2011), considerable risk remained, as this Court's merits dismissal in 2012 confirms. In 2007, given the lack of favorable precedent, few counsel, including few experienced ERISA counsel, were willing to commit to this kind of risky litigation that was certain to be a long, expensive, drawn-out fight under the best of circumstances. *See* Signorille Decl. ¶ 12 ("I am aware that several attorneys prominent in the ERISA plaintiffs' bar turned away cases involving cash balance conversions during that period as too risky"). This too suggests a higher fee is appropriate.

      **(iii)  Class Counsel faced the real possibility that the evidentiary trail would be stale.**
When these claims were discovered in 2006 and the case filed in early 2007, more than 10 years had passed since the 1996 Plan conversion that was at the heart of the case. Counsel therefore faced the real possibility that the evidentiary trail would be stale or to some degree unrecoverable, making it all the more difficult to prove the putative class's claims. That indeed that turned out to be true because of Defendants' spoliation of a considerable cache of Foot Locker HR manager Carol Kanowicz's files, which greatly prejudiced Counsel during depositions and discovery. Tackling a vintage case raised the risks both legally and factually.[12]

      **(iv)  Class Counsel faced the very high statute of limitations risk.**  As noted above, taking on a case where the key, operative events occurred more than 10 years prior to the filing date also entailed a significant risk of failure due to time-bar or laches (since this was an equitable action). The risk was always very high that this Court or the Court of Appeals would embrace

---

[12] Although the spoliation yielded the Class an adverse-inference instruction, *see* Dkt. 156, one cannot use an inference (like one can use documents) to control non-cooperative witnesses during questioning. Despite being hamstrung in this manner, Counsel so overwhelmingly proved the Class's case anyway that this Court had no need for the inference. *Osberg*, 138 F.Supp.3d at 559 n.29.

Defendants' accrual-upon-payment position and dismiss the case with prejudice, as this Court did as to Plaintiff's SPD claim in 2012, in a ruling that, if this Court had not reversed itself in 2014, almost certainly would have also doomed his fiduciary breach claim and this case in its entirety.

(v) **Class certification was highly uncertain.** As the Court's 2012 comments clearly indicated, class certification—a relatively low-risk proposition in many securities cases, due in part to the presence of the "fraud-on-the-market" presumption of reliance—was always a high-risk proposition in this case. This was essentially a fraud case, and courts are notoriously hesitant outside the securities context to certify such cases for class treatment: the reliance element in a fraud case is typically individualized in nature, meaning that common issues often do not predominate. So too Defendants could be expected to—and did—argue that individualized issues as to "mistake" (*i.e.*, who believed what, based on the individualized communications different members of the 16,400 Class received) and the statute of limitations (ditto). As the Court's own post-certification comments several months before trial indicated, *see* Gottesdiener Decl. ¶¶ 35-37, the risk was substantial that even after counsel surmounted the numerous hurdles to get the case certified, the class could nevertheless be decertified at a subsequent point, sending years of work and millions of dollars of time and money invested down the drain.

(vi) **Class Counsel was taking on a Fortune 500 company and its high-powered lawyers.** It was clear from the outset that anyone representing the putative class here would be required to both outlast and overcome a well-financed adversary with abundant financial and legal resources at their disposal. That was indeed the case.

(vii) **Settlement, especially on favorable terms, was unlikely.** ERISA cases are structurally riskier than the kind of relatively low-risk securities case addressed in *Goldberger*. There are only a handful of ERISA lawyers around the country prosecuting actions like the instant case, as most large class-action firms and ERISA lawyers shun them because the firms lack the

requisite expertise and the cases are too risky.  *See* Signorille Decl. ¶ 12.  This lack of enthusiasm

contrasts sharply with the interest in securities-related cases.  *See In re AOL Time Warner, Inc. Sec.*

*& ERISA Litig.*, 2006 WL 2789862 (S.D.N.Y. Sept. 28, 2006) (18 law firms sought lead counsel

role, 24 law firms appeared for plaintiffs).  Unlike securities and anti-trust defendants, ERISA

plans and plan sponsors typically have very little incentive to settle even highly meritorious cases

because they do not face the risk of jury trials, or of paying consequential or punitive damages, or

liquidated double or treble damages.  *See* Signorille Decl. ¶ 10.  ERISA defendants know that if

they lose, they will merely have to pay what they should have paid initially, with interest that is

probably less than what the defendant is earning on the withheld funds.  *Id*.

  **(viii) Class Counsel bore all these risks themselves.**  Typically, multiple plaintiffs' law

firms file separate actions and then vie to be appointed lead counsel.  But in this case, no other firm

stepped forward to share in the risk and costs of prosecuting this action, let alone to compete for

lead counsel role.  Gottesdiener Decl. ¶ 12.  Courts recognize such lack of competition "implies a

higher fee" and that the plaintiffs' class action bar "saw this litigation as too risky for their

practices."  *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) (affirming

27.5% fee award from $200 million settlement).

  Class Counsel's willingness to stare down all these risks, and to persevere for 11 years

without any guarantee of payment and in the face of painful setbacks, coupled with the 100%

recovery of Class's damages, strongly supports the standard 33% fee percentage awarded in high-

risk cases.  *See Boeing*, 590 F.2d at 441.

    **2.  The Case's Complexity and Magnitude Support a One-Third Fee**

  This was an extraordinarily difficult and complex case that required great dexterity and

creativity to manage.  The case's scope was also well above average both in terms of the period of

time covered by the Class's claims (well over 20 years), and in terms of how long the litigation

itself has lasted—more than 11 years, which is nearly *four times* as long as the average class action, *See* Fitzpatrick, *Empirical Study*, at 820.  Defendants contested nearly every aspect of this lawsuit, raising lack-of-standing objections, arguing that the case was time-barred, opposing class certification and filings two Rule 23(f) petitions in the Second Circuit, battling over discovery requests, twice moving for summary judgment, challenging expert witnesses and evidentiary proffers, vigorously defending on the merits, and advancing numerous alterative damages proposals in an effort to thwart the Class's complete recovery.  Class Counsel were forced to litigate all of these issues—often more than once.  Moreover, Counsel "faced the difficult task of proving their case almost exclusively through the testimony of [Defendants'] employees and former employees, who could be considered hostile witnesses."  *In re Veeco Instruments, Inc. Sec. Litig.*, 2007 WL 4115808, at *7 (S.D.N.Y. Nov. 7, 2007).

### 3.     The Fee Is Reasonable in Relation to the Recovery

Under *Goldberger*'s "fair percentage of the settlement [or recovery]" test, 209 F.3d at 50, courts evaluate the reasonableness of requested fee by looking to awards found reasonable in comparable cases.  *E.g., In re Veeco*, 2007 WL 4115808, at *7.  As shown above, a fee award representing 33% of a common fund of this size is well in line with practice in the federal courts even in many large *settlement* cases, including cases like *Allapattah*, *In re Urethane*, and *Apollo Group* that went to trial and were reviewed on appeal.

Empirical studies confirm that an award of 33% here would compare favorably with the fees awarded in other cases, even ignoring that this case was tried to verdict, reviewed on appeal, and the clients received everything they could possibly ask for.  Miller & Eisenberg's 2004 study found "a remarkable uniformity in awards between roughly 30% to 33% of the settlement amount," regardless of the size of recovery.  *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Studies 27, 33 (2004); *accord* Denise N. Martin, et al., "Recent Trends IV:

What Explains Filings and Settlements in Shareholder and Class Actions?" at 12-13 (NERA 1996) ("Regardless of case size, fees average 32% of the settlement").  Miller & Eisenberg's most recent study found that among class action settlements in this Circuit between 2009 and 2013 (116 cases), the mean fee was 28% and the median fee was 30%, *Attorney Fees in Class Actions:  2009-2013*, 92 N.Y.U. L. Rev. 937, 950 (2017), making Class Counsel's request of 33% (in this 100% recovery litigated-to-judgment case) reasonable on its face.

Even looking solely at settled "mega-fund" cases, the data show Class Counsel's request (in this non-settled case) is also reasonable.  Professor Fitzpatrick's study found that the mean and median percentages awarded for settlements between $250 million and $500 million were 17.8% and 19.5%, respectively, with a standard deviation of 7.9%.  *See* Fitzpatrick, *Empirical Study*, *supra* at 839.  Miller & Eisenberg say their data show that if a fee request falls within one standard deviation above the mean, it is presumptively reasonable; if within two standard deviations, it is reasonable if affirmatively justified.  *See* Eisenberg & Miller (2004) at 74.  Here, the unprecedented 100% recovery, the increased risks and difficulty posed by taking the case to trial and defending the judgment on appeal all the way to the Supreme Court, and the long duration and complex nature of the litigation easily meet the "affirmative justification" requirement.  *See In re Relafen Antitrust Lit.*, 231 F.R.D. 52, 81 n.22 (D. Mass. 2005) (granting 33% fee from $75 million settlement where "the amount requested here falls just outside of one standard deviation," per Eisenberg & Miller).

### 4. Public Policy Also Strongly Supports the Requested Fee

Usually, this *Goldberger* factor boils down to asserting the need to "provid[e] lawyers with sufficient incentives to bring common fund cases that serve the public interest."  209 F.3d at 51.  This, however, was no run-of-the-mill case or even garden-variety mega-fund case:  it presents a model of how our civil justice system wants class counsel to act when undertaking a contingency

fee representation that has enormous potential value for the client, but poses great uncertainty and high risk, exceptional difficulty, and sometimes mind-numbing complexity.  Counsel proceeded in exemplary fashion, with utter commitment, focused intensity, and a never-say-die attitude always centered on delivering the maximum recovery possible.

An additional reason for rewarding Counsel with the standard 33% contingency fee in a case like this is the policy imperative of demonstrating to other class counsel that once they bring a case, they need not fear that if they litigate the case to judgment and generate a mega-fund-size recovery for their clients, they will be rewarded at a rate lower than if they had settled for a lower recovery.  Noting that "'litigated judgments are few, cheap settlements are common,'" the *Allapattah* court concluded:

> Absent an award of fees that adequately compensates Class Counsel [for having litigated the case to judgment], the entire purpose and function of class litigation under Rule 23 of the Federal Rules of Civil Procedure will be undermined and subverted to the interests of those lawyers who would prefer to take minor sums to serve their own self interest rather than obtaining real justice on behalf of their injured clients.

454 F.Supp.2d at 1217.  If reasonable market rates are not awarded to successful attorneys, the most competent professional talent will employ their skills in other ways.  Thus, public policy strongly favors the requested award.  *Id*.

### B.   The Time and Effort Required, and the Lodestar "Cross-Check," Confirm the Appropriateness of the Requested Award

The substantial time and effort required to prosecute this action for 11 years, as well as the lodestar "cross-check," also confirm the reasonableness of the requested fee.  "[W]here [the lodestar method is] used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court.  Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case."  *Goldberger*, 209 F.3d at 50.

Between 2006 and today, Class Counsel's firm—together with appellate and Supreme

Court specialist Julia Penny Clark of Bredhoff & Kaiser, PLLC, brought on board after trial to

assist Class Counsel defend the judgment on appeal—has spent a combined total of 33,744.45

attorney and other professional support hours on this matter (excluding time spent on this petition),

representing $19,666,331.50 in lodestar based on hourly rates that reflect "prevailing [rates] in the

community for similar services by lawyers of reasonably comparable skill, experience, and

reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984).  *See* Gottesdiener Decl. ¶¶ 53-57 &

Ex. 5 (summary compilation of detailed time entries); Ex. 6 (detailed time entries).[13]

Thus, Counsel's request of 33% of the net judgment fund represents a 4.8 multiplier, which

falls comfortably within the range of multipliers that courts regularly find reasonable.[14]  The

multiplier should reflect "the risk of the litigation, the complexity of the issues, the contingent

nature of the engagement, the skill of the attorneys, and other factors."  *In re Bisys Sec. Litig.*, 2007

WL 2049726, at *3.  Larger multipliers have been approved even in large *settled* mega-fund cases:

| CASE | SETTLEMENT | MULTIPLIER |
|---|---|---|
| Doral (S.D.N.Y. 2007) | $130 million | 10.3 |
| Busiprone (S.D.N.Y. 2003) | $220 million | 8.5 |
| New England Carpenters | $350 million | 8.3 |
| Ramah | $940 million | 7.1 |
| Rite-Aid | $126 million | 6.9 |
| Credit Default Swaps (S.D.N.Y. 2016) | $1.9 billion | 6.2 |
| Cardinal Health | $600 million | 6 |
| Roberts v. Texaco (S.D.N.Y. 1995)[15] | $115 million | 5.5 |

In this litigated-to-judgment case, the 4.8 multiplier is a mathematical expression of two

positive features of this case:  (1) the efficiency of the Class's lawyers working an intensely

---

[13] By letter filed simultaneously herewith, Class Counsel request permission to tender their detailed time entries *in camera*, as the Court allowed in *Board of Trustees of the Operating Engineers Pension Trust v. JPMorgan Chase Bank*, No. 09-cv-09333-KBF, Dkt. 157 (S.D.N.Y. Nov. 8, 2013).

[14] *See, e.g., Davis v. J.P. Morgan Chase & Co.*, 827 F.Supp.2d 172, 185 (W.D.N.Y. 2011) (approving 5.3 multiplier); *Yuzary v. HSBC Bank USA, N.A.*, 2013 WL 5492998, at *11 (S.D.N.Y. Oct. 2, 2013) (approving 7.6 multiplier) *Beckman v. KeyBank N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. 2013) (approving 6.3 multiplier).

[15] *See* Gottesdiener Decl. ¶ 54 for full citations.

demanding, complex matter over a long period, coupled with (2) their extraordinary achievement of a 100% recovery, $290 million fund.  Especially when compared with cases of less complexity or achievement which resulted in multipliers larger than that sought in this case, this fee application cross checks well.

## IV.     THE REQUESTED EXPENSE REIMBURSEMENT SHOULD BE GRANTED

Counsel are also seeking reimbursement of the $1,520,057 in out-of-pocket expenses they incurred prosecuting this lawsuit.  The vast majority of these charges were for experts, including the Class's actuary, Mr. Deutsch, who has actively worked on the case for more than 11 years.  The balance was for transcripts, class notices, computerized research, database management, duplication of documents, and other incidental expenses typical of complex litigation that customarily would be charged to clients in non-contingency cases.  *See* Gottesdiener Decl. ¶ 58 & Ex. 7 (detailing same).  Where, as here, the expenses requested "reflect[ ] the typical costs of complex litigation . . . courts should not depart from the common practice in this Circuit of granting expense requests."  *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Amer. Corp.*, 318 F.R.D. 19, 27 (S.D.N.Y. 2016).

## V.     THE REQUESTED SERVICE AWARDS SHOULD BE APPROVED

The Court should also authorize Counsel to pay out of their fee award a $50,000 service award to Plaintiff Geoffrey Osberg and $15,000 awards to Ada Cardona, Russell Howard, Rita Welz, Ralph Campuzano, Doris Albright, Richard Schaeffer, Michael Steven, and Ellen Glickfield who (like Mr. Osberg) were deposed and testified at trial—to compensate them for their efforts on behalf of the Class.  These payments are well-deserved given Plaintiff's and these Class members' contribution in this action, *see* Gottesdiener Decl. ¶ 59, and as well within the range of previous awards of this kind.  *E.g., Bd. of Trustees of AFTRA Ret. Fund*, 2012 WL 2064907 at *3 (S.D.N.Y. June 7, 2012).

## CONCLUSION

WHEREFORE, for the reasons stated and such other reasons as may appear to the Court, Class Counsel respectfully request that the Court grant the instant motion in all respects.

Dated:  April 5, 2018                                  Respectfully submitted,


                                                       s/ Eli Gottesdiener
                                                       Eli Gottesdiener
                                                       Steven D. Cohen
                                                       Albert Huang
                                                       Gottesdiener Law Firm, PLLC
                                                       498 7th Street
                                                       Brooklyn, New York 11215
                                                       Telephone:   (718) 788-1500
                                                       Telecopier:  (718) 788-1650
                                                       Email:       eli@gottesdienerlaw.com

                                                       *Attorneys for Plaintiff and the Class*