**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
**GEOFFREY OSBERG**                                              :
                                                                :
**On behalf of himself and on**                                 :
**behalf of all others similarly situated,**                    :
                                                                :   **Case No.: 07 CV 1358 (KBF)**
                        **Plaintiff,**                          :
                                                                :
         **- against -**                                        :
                                                                :
**FOOT LOCKER, INC.,**                                          :
                                                                :
**FOOT LOCKER RETIREMENT PLAN,**                                :
                                                                :
                        **Defendants.**                         :
-------------------------------------------------------------X

## DECLARATION OF ELI GOTTESDIENER

I, Eli Gottesdiener, declare under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.      I am lead counsel to Plaintiff and the Class in the above-entitled action and a

partner in Gottesdiener Law Firm, PLLC ("GLF").  I make this declaration based on my personal

knowledge of the facts stated herein.  Reference to "Class Counsel," "us" or "we" is a collective

reference to GLF including myself and the lawyers employed by the firm.

**I.      Overview**

2.      The road from the 2007 complaint to this Court's 2015 trial verdict for the Class,

through the 2016-17 battle in the Second Circuit, and finally ending with the Supreme Court's

denial of *certiorari* in February 2018 was a long and arduous one.  The two-week trial in 2015

was preceded by years of contentious fact and expert discovery (including 40 depositions),

extensive motions practice, two rounds of summary judgment briefing, repeated class

certification briefing and multiple petitions for decertification.  Foot Locker (the successor to

Woolworth), one of the largest companies in the world, assisted by its high-powered litigators at

the Proskauer and Gibson Dunn law firms, used every resource at their disposal to try to derail the Class's claims.

3. The case is now successfully concluded: The parties have stipulated and their actuaries agree that the estimated value of the Class's total recovery under the judgment formula, with interest through June 1, 2018, is $290 million. *See* Ex. 1, Proposed Class Notice at 4 ¶ 1. The judgment amount is 100% of the relief sought in the complaint, a result achieved in class cases rarely if ever.

4. As explained in more detail in the brief accompanying this motion and as detailed below, the case could have easily turned out quite differently. It could have been lost entirely on statute of limitations grounds, or on the Class' alleged inability (according to Foot Locker) to prove actionable fraud, or class-wide mistake, or reliance, or harm, or the uniformity of the Company's communications. Moreover, if trial had the identical outcome it did on liability but Class Counsel had failed to persuade the Court that it should adopt the Class's damages model rather than Foot Locker's, the Class's total recovery would have shrunk to a mere $75 million— $215 million less than it is today.

5. Counsel's brief contains a chart on page 12 providing examples of mega-fund cases that settled where courts have awarded attorneys' fees that equal or exceed the 33% fee sought here, in circumstances involving less risk, less work, less difficulty and/or less than complete recovery of class members' damages. The full citations of the referenced cases are: *Dahl v. Bain Capital Partners*, LLC, No. 07-cv-12388 (D. Mass. Feb. 2, 2015), Dkt. 1051, 1095 (33.3% fee from $590.5 million fund in an antitrust case that settled before class certification); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 510 (S.D.N.Y. 2009) (33.3% fee from a $510 million fund in a securities case that settled before trial); *In re Vitamins Antitrust Litig.*,

2001 WL 34312839, at *10, *14 (D.D.C. July 16, 2001) (34.6% fee from $365 million fund in

that settled before trial and was assisted by criminal prosecutions and guilty pleas); *In re Tricor*

*Direct Purchaser Antitrust Litig.*, No. 05-360, Dkt. 545 at 12 & No. 05-340, Dkt. No. 543 at 10

(D. Del. Oct. 28, 2009 & Apr. 23, 2009) (33.3% of $316 million fund in case settled before trial);

*In re U.S. Foodservice, Inc. Pricing Litig*., 07-md-1894, Dkt. 521 at 5 (D. Conn. Dec. 9, 2014)

(33.3% fee from $297 million fund in case settled prior to summary judgment); *In re Buspirone*

*Antitrust Litig.,* 2003 U.S. Dist. LEXIS 26538, at * 11 (S.D.N.Y. Apr. 11, 2003) (33.3% of $220

million fund in case settled before trial); *DeLoach v. Philip Morris Cos.*, *Inc.*, 2003 WL

23094907, at *11 (M.D.N.C. Dec. 19, 2003) (33.3% award from $212 million cash portion of

pre-trial settlement); *In re Neurontin Antitrust Litig.*, No. 02-1830, Dkt. 114 (D.N.J. Aug. 6,

2014) (33.3% of $191 million fund settled before trial); *In re Relafen Antitrust Litig.*, No. 01-

12239, Dkt. 297 & 459 (D. Mass. April 9, 2004 & Oct. 13, 2005), Dkt. 297, 459 (33% of $242

million in settlements); *In re Titanium Dioxide Antitrust Litig.*, 2013 WL 6577029, at *1 (D. Md.

Dec. 13, 2013) (33.3% fee from $163.5 million fund, settled before trial); *Haddock v.*

*Nationwide Financial Services, Inc*., 01-cv-1552, Dkt. 601 (D. Conn. Apr. 9, 2015) (35% fee

from a $140 million fund in case settled before trial while a motion for summary judgment was

pending).

## II.      Summary of Legal Elements and Facts Class Counsel Proved at Trial

6.      To create the $290 million fund and win an award equal to 100% of the relief

sought in the complaint, Class Counsel not only had to prove all of the elements of the Class's

claim, but also to convince the Court that the Class's versions of all disputed material facts and

damage calculation models were correct.  Counsel did precisely that.  They proved, under the

heightened "clear and convincing" standard of proof applicable to equitable reformation claims, that:

- <u>Fraud</u>:  Foot Locker equitably defrauded pension plan participants.

- <u>Mistake</u>:  As a result, none of the 16,400 members of the Class understood the adverse impact that the 1996 cash-balance conversion had on their pension benefits.

Class Counsel also established by a preponderance of the evidence that:

- <u>Violation of SPD Standards (ERISA § 102)</u>:  The Summary Plan Description ("SPD") violated ERISA's minimum content standards.

- <u>Breach of Fiduciary Duty (ERISA § 404)</u>:  Other plan communications violated Defendants' fiduciary duty to communicate clearly with participants about the Plan.

- <u>Statute of Limitations</u>:  The Class's claims were not barred by ERISA's 3-year statute of limitations—despite the fact that the complaint was filed in 2007, more than 10 years after the 1996 cash balance plan conversion.

7.     Proving these elements was no simple task, as the intensely litigated, 11-year history of this case reflects.  The Class ultimately prevailed only because, through tireless efforts in discovery and case development, Class Counsel was able to prove to the Court's satisfactions at trial all of the following facts:

- That the SPD and other plan communications promised opening account balances <u>equal</u> to the value of their already-earned pension annuities as of the 12/31/95 cash-balance conversion date.

- That participants' opening account balances were <u>not</u> in fact the actuarially-equivalent value of their already-earned pension annuities as 12/31/95.

- That the SPD did not inform participants they were not, or might not be, earning additional benefits for a period of time following the 1996 cash-balance plan conversion.

- That none of the individualized communications that Foot Locker showed had been given to thousands of participants informed participants that they might not be earning additional benefits for a period of time following the conversion.

- That management was aware of the disconnect between what the plan summaries promised and what the plan actually provided.

4

8.      Establishing the elements of the Class's claim for equitable plan reformation was challenging.  Yet had Counsel proven only these foundational facts and points of law, the Class would have received **less than half** of the relief they sought.  *See* Deutsch Decl. ¶ 5.  To prove entitlement to 100% of the relief sought in the Complaint, Counsel also had to convince the Court of all five of the following <u>additional</u> facts:

- That the only way to fulfill Foot Locker's promise of a no-wear-away conversion was to give participants an <u>opening balance</u> instead of preserving their 12/31/95 annuities (as Defendants urged was the appropriate remedy);

- *And* calculate the opening balances using a discount <u>rate of 6%</u>;

- *And* preclude Foot Locker from applying a pre-retirement mortality discount (<u>no PRMD</u>) in the calculation.

- That Foot Locker should be required to honor its promise to give senior employees an "<u>enhancement</u>" to their equal-value opening balances.

- That Foot Locker should further be required to honor its promise to give employees who received lump-sums a "<u>whipsaw</u>" bonus.

9.      Foot Locker fought each of these "complete relief" facts tooth and nail.  For good reason:  these five additional facts that Counsel were able to prove at trial (and then defend in the Second Circuit) increased the Class's recovery from what would have been about $75 million to $290 million—*i.e.*, **an increase in damages of $215 million**.  *See* Deutsch Decl. ¶ 6.  Clearly, these last $215 million of damages were even harder to win than the baseline $75 million—and it is neither an exaggeration nor immodest for Counsel to say that securing that additional $215 million for the Court is attributable solely to Counsel's refusal to settle for the substantial $75 million damages award participants surely would have been satisfied with, Counsel's determination to press forward to recover the maximum damages possible, and Counsel's exacting preparation, effective advocacy, and skillful presentation (with the able assistance of

Mr. Deutsch) of the Class's damages model showing the Court that properly-calculated opening balances were the only way to make plan participants whole—an exercise Counsel had to repeat in the Second Circuit when the Class's damages model had to be, albeit this time on a more favorable standard of review, defended all over again.

### III.    Detailed Case History and Background

9.      In November 2006, Geoffrey Osberg retained Gottesdiener Law Firm to pursue claims individually, and as a representative of a class of current and former participants in the Foot Locker Retirement Plan (the "Plan"), that Foot Locker, Inc. failed to comply with ERISA and hence unlawfully calculated his and other plan participants' pension benefits—a claim he and the other 16,400 Class members never would have known they had if Class Counsel had not detected it in the course of investigating an entirely separate claim.

10.     Based on our work in consultation with our experts—chief in importance among them being Mr. Deutsch—Mr. Osberg came to understand and claim via this action that he was entitled to additional benefits valued, in today's dollars, of more than $27,321.  *See* Dkt. 1, Complaint ¶¶ 5, 33, 38, 54, 59-62, 72, 75, Prayer for Relief; Deutsch Decl. ¶ 7.

11.     In a fully-informed, arms-length negotiation with Class Counsel, who advised him that the outcome of the case the outcome of the case was impossible to predict "and we will face a determined, well-funded adversary," Mr. Osberg agreed that in the event the lawsuit were successful, Counsel could "seek attorneys' fees out of assets obtained for you or the class as a result of judgment or settlement in such an action (typically known as a 'common fund' payment)" and that "you agree to permit the Firm to request fees not to exceed 33% of the present value of any settlement or verdict in favor of the class."  Ex. 4, 11/22/16 Osberg-GLF Agreement; Osberg Decl. ¶ 3.  Mr. Osberg did so having been advised that contingency fees in

putative class actions compensate attorneys not only for the attorneys' advocacy and the results ultimately obtained—but also for their willingness to expend the enormous time and out-of-pocket expense required to prosecute a major class action against a well-represented defendant, despite the very substantial risk that that massive expenditure of resources would never be compensated. *Id.* ¶ 4.

12.   Mr. Osberg could not have afforded to pay Counsel an hourly fee plus costs, and would not have retained Class Counsel on that basis.  Osberg Decl. ¶ 3.  Instead, the standard fee agreement in the market for this type of case is a contingency fee where the plaintiffs' counsel expends all of the time and resources necessary to prosecute the case and only receives a percentage of the recovery—if plaintiffs prevail (or settle) and there is a recovery.

13.   For GLF's part, we would not have agreed to undertake the representation if Mr. Osberg had not agreed to permit us to petition the Court for a percentage fee of up to 33%, given the readily-apparent risks and difficulties the case would present, the massive effort and expense that would be required to bring it to as successful a conclusion, and the likelihood that the litigation would last several years.[1]

14.   At the time GLF was considering taking on this case, we had several opportunities that we could have and would have pursued had we not committed to this case, and knew that if we committed to this case we would have to forego those and other future opportunities so long as this case lasted.

---

[1] We are nationally recognized experts in ERISA pension benefit cases.  *See, e.g., Moody v. The Turner Corp.*, 07-cv-692 (S.D. Ohio Oct. 18, 2011), Dkt. 146 ("Plaintiffs selected remarkable, talented—unique maybe—counsel, certainly counsel practicing at a level that few attain"); *Johnson v. Meriter Health Serv. Employee Retirement Plan*, 10-cv-426 (W.D. Wis. Jan. 5, 2015), Dkt. 487 at 16 ("[The class] should take . . . no small amount of satisfaction in the quality of the representation that [it] received." "[T]he . . . representation here by plaintiffs' counsel was outstanding").

15.     No other law firm came forward to offer its services to the Class or individual participants, either before or after our firm filed suit.  No other counsel came forward to compete for control of the case, proposed to the Court that it be appointed lead counsel at a lower fee structure, or offered to share in the case's risk and expense with our firm.

16.     We believe that a one-third fee is also consistent with what Class members would expect, especially given the case's complete success.  The Class is comprised solely of Foot Locker Plan participants who chose not to opt-out after being specifically notified that Class Counsel would seek payment from them out of any recoveries achieved.  *See* Class Opt-Out Notice (Dkt. 194-1) ¶¶ 7-8, 11 (approved by the Court via 11/10/14 Order, Dkt. 221).  The common perception among the general public (reflective of fact) is that counsel's fee in a contingency agreement is 33.3% or more of any recovery.  *See, e.g.,* ABA: What Are Contingent Fees?

17.     By not opting-out, the Class thus effectively agreed to a one-third fee.  *See Van Gemert v. Boeing Co.*, 590 F.2d 433, 441, 439 n.14 (1978) (*en banc*), *aff'd*, 444 U.S. 472 (1980) ("Manifestly, plaintiffs in a 23(b)(3) class action, who have been provided with notice and an opportunity to opt out of the suit, must be said to have accepted the attorneys' services, and the benefits that may flow from them . . . [so] it is appropriate to charge them their Pro rata share").

18.     In February 2007, Counsel filed suit on behalf of Mr. Osberg and a putative class of similarly-situated plan participants.  Plaintiff alleged, among other things, that Foot Locker violated ERISA §§ 102 and 404(a) by, *inter alia*, failing to disclose "wear-away" caused by the Company's introduction of a new employee pension plan—a phenomenon which effectively amounted to an undisclosed freeze in pension benefits.

19.     The case was assigned to Judge Batts, who granted Defendants' motion to dismiss in part and denied it in part.  Dkt. 31.  Over the next several years the case was extensively discovered by both sides, as to both class and the merits.  *See*, *e.g.,* Dkt. 71 ¶¶ 26-38 listing and attaching the deposition transcripts and expert reports.

20.     In November 2011, the case was transferred to Your Honor.  Dkt. 49.  With the Court's consent, Plaintiff filed an amended complaint in February 2012.  Dkts. 53-57.

21.     In May 2012, Defendants moved for summary judgment, arguing that Foot Locker's decision to convert its traditional retirement plan to a "cash balance" plan was a business decision that did not cause actionable harm; and that, in any event, Plaintiff's 2007 complaint challenging the 1996 amendment was time-barred under ERISA's 3-year statute of limitations.  Dkts. 68-71, 99-101.  Defendants also made *Daubert* challenges to three of Plaintiff's experts, including ERISA enrolled actuary Lawrence Deutsch.  Dkts. 107-109, 118. Plaintiff opposed the motions (Dkts. 84-87, 104-105, 114) and moved for class certification. Dkts. 96-98, 110-111, 117.

22.     In September 2012, the Court heard oral argument on Defendants' summary judgment motion and *Daubert* challenges.  *See* Dkt. 136.

23.     In December 2012, the Court granted Defendants' motion and dismissed Plaintiff's case with prejudice.  *Osberg v. Foot Locker, Inc.*, 907 F.Supp.2d 527 (S.D.N.Y. 2012).  The Court found that Foot Locker's decision to prospectively reduce the rate at which employees would accrue pension benefits was a cost-reduction measure the Company had implemented at a time when it was experiencing severe financial difficulties, and that it would be impossible for employees to prove that the pension cuts could be blamed on fiduciary violations rather than an ordinary business cost-cutting decision.  *Id*. at 1, 11-14.

24.     The Court also held that Plaintiff's claim was time-barred under ERISA's three-year statute of limitations, since the complaint was filed in 2007, more than 10 years after the 1996 cash-balance conversion and 5 years after Plaintiff retired and received his lump sum distribution of pension benefits.  *Id*. at 9-11.

25.     Regarding Plaintiff's motion for class certification, the Court said that "while the Court does not need to decide class certification in light of its decision herein, there would be significant issues with respect to commonality and typicality with any class: each class member may have been harmed or not harmed by the cash balance plan based upon their years of service and pre-and post-1996 plan balances.  An inquiry into those claims would likely need to be individualized and plaintiff has not suggested a feasible means by which the Court could create subclasses that would meet the requirements of Fed.R.Civ.P. 23."  *Id*. at 14 n.4.

26.     Plaintiff appealed.  The Court of Appeals reversed in part, ruling that employees were not required to prove that Foot Locker's ERISA violations caused "actual harm."  Rather, employees could seek the equitable remedy of plan reformation if they could prove by clear and convincing evidence that the violations constituted fraud which caused them to be mistaken about the benefits they were earning.  *Osberg v. Foot Locker, Inc.*, 555 Fed.Appx. 77, 80-81 (2d Cir. 2014).  The case was remanded for a determination whether employees could prove those elements.  *Id*.  The Court of Appeals declined to address whether this Court had correctly concluded that Plaintiff's ERISA § 102 SPD claim was time-barred.  *Id*. at 80.

27.     On remand, Plaintiff faced two immediate hurdles to keep the case alive:  the statute of limitations and class certification.  Plaintiff moved for reconsideration of the Court's 2012 ruling finding the SPD claim time-barred.  Dkts. 161-62, 169, 173.  Plaintiff also asked the

Court to take a fresh look at his request for class certification and allow him to update his 2012 motion, which the Court agreed to.  Dkts. 150, 157-58, 174-76.

28.     In September 2014, the Court granted Plaintiff's motion for reconsideration of the dismissal of the SPD claim, reinstating that claim.  Dkt. 186 at 12-14.

29.     In the same Order, the Court also granted Plaintiff's motion to certify the case as a class action, but limited certification to Plaintiff's § 404 breach of fiduciary duty claim.  *Id.* at 1-12; *see also* Dkts. 187-190 (endorsement of Defendants' request to defer consideration of the class certifiability of Plaintiff's § 102 SPD claim until after trial).

30.     Defendants petitioned the Court of Appeals to grant review of the certification of the § 404 breach claim, which Plaintiff opposed.  Dkts. 191, 204, 216.  For his part, Plaintiff moved the Court to reconsider its decision to certify only the § 404 claim, which Defendants opposed.  Dkts. 192-193, 210-211, 218.  On November 7, 2014, the Court granted Plaintiff's motion to extend class certification to the § 102 SPD claim.  Dkt. 220.  Defendants then filed a second petition with the Court of Appeals seeking review of the Court's amended certification ruling, which Plaintiff opposed.  Dkts. 230, 232.  Several weeks later, the Court of Appeals denied both of Defendants' petitions.  Dkt. 274.

31.     Meanwhile, Plaintiff pursued a request that the Court sanction Foot Locker for its spoliation of evidence.  Dkts. 102, 115, 126-29, 132, 153, 156.  In July 2014, the Court agreed with Plaintiff and found that Foot Locker had improperly destroyed evidentiary material that would have been favorable to Plaintiff's case.  Dkts. 165-68, 171-72.

32.     With the case now certified as a Rule 23(b)(3) class action, in November 2014 the Court approved the parties jointly-agreed opt-out notice to the approximately 16,400 members of the covered class.  Dkt. 221.  The notice informed class members that:  "If you timely submit a

notice that you wish to be excluded from the Class, the Court will exclude you from the Class, you will not share in any money recovered by or on behalf of the Class, and you will not be bound by any judgment in this class action." Dkt. 194-1, ¶ 8. The notice explained that for individuals who decided to remain in the Class: "If there are additional payments to be made – either as a result of a decision by the Court or a Court-approved settlement – you will also receive notice and an opportunity to be heard as to the reasonableness of any fees and expenses Class Counsel would ask the Court to approve to be paid out of such award." *Id*. at ¶ 7. A total of 21 people opted-out, some of whom were defense witnesses at trial or during depositions.

33.    In October 2014, Defendants filed another motion for summary judgment, this time focusing on the "enhancement" that Foot Locker had added to the opening account balances of senior participants and the pre-retirement mortality discount ("PRMD") that had been used to calculate the opening balances of all participants. Dkts. 199-201, 286. Defendants asked for a preemptive ruling stating that if, after trial, the Court were to both rule for the Class on the merits and accept the Class's damages model—which called for recalculated opening account balances rather than mere preservation of participant's already-earned annuities—then those opening balances should be reduced by PRMD and the amount that senior participants had received as account enhancements. Defendants' proposal, if accepted, would have had the combined effect of reducing the damages claimed by the Class by about 50%. *See* Deutsch Decl. ¶ 8. Plaintiff opposed. Dkts. 277-80.

34.    In April 2015, following oral argument (Dkts. 299, 309), the Court denied Defendants' request that it make a preemptive ruling regarding PRMD and the enhancement, Dkt. 302, but said it would focus on both issues at trial. Dkt. 309 at 9, 62-63, 68. The Court said

at the hearing that "the real swing I think is the enhancements, which I'm not sure I entirely get" and wanted the benefit of trial testimony. *Id*. at 9, 80-81.

35.     Meanwhile, in January 2015, Defendants filed a letter arguing that the Court should reconsider its certification of the class in light of evidence proving "that there were numerous other communications – both written and oral – sent to thousands of participants, which described the operation of the Plan and its wear-away effect in much greater detail than the handful of company-wide communications identified by Osberg. . . .  These communications defeat any finding, based on generalized evidence, that the entire class mistakenly thought they had been promised an 'equal value' benefit that would prevent any wear-away."  Dkt. 260 at 4. Specifically, Foot Locker argued on page 4 of its letter that:

> The evidence of these communications will demonstrate that many participants had or should have had an understanding of their cash balance benefits that was very different from what Osberg would have the Court believe, and that these participants were in fact specifically advised that the starting balances in their cash balance account might be significantly less than - even as little as half as much as - the lump sum value of their pre-1996 accrued benefit.  For example:  In advance of the numerous closures of locations in the 1996-1997 time period, Human Resources ("HR") personnel visited the worksites being closed to provide explanations to departing employees about their benefits. Documentation of the communications at one such location in Greenville reveals that participants were also provided with illustrations showing precisely how the cash balance account and minimum, pre-1996 benefit was calculated. . . .  Foot Locker's files [also] contain correspondence sent to inquiring participants providing an explanation of how the minimum benefit was calculated, and why that benefit would exceed the amount in the cash balance account. . . .  [The letters] advised that '[b]ecause we just recently converted to an account balance plan and balances have not yet had a chance to build up very much, the minimum lump sum generally works out to be greater than the account balance.'  [And] these same letters were used to guide the HR employees in Wisconsin when responding to the numerous telephone inquiries by participants seeking to understand how their cash balance benefits were calculated.

*Id*. at 4 (citations omitted).  This clearly had an impact on the Court and raised anew the specter that the Court might be returning to the view it had expressed earlier in the case (*Osberg*, 907 F.Supp.2d at 14 n.4) that the case was uncertifiable—because two days later, the Court warned

"that the further development of the facts on page 4 of defendants' letter is potentially relevant to the long-term viability of the class and its composition." Dkt. 266.

36.     In mid-April 2015, Defendants followed up with another brief arguing that in scores of "individualized" communications, "Foot Locker specifically alerted participants to the use of the mortality assumption, the use of the 9% interest rate, and the fact that the rate used to determine the lump sum value of the pre-1996 benefit was a lower rate that would generate a higher amount.  As noted above, Foot Locker also provided examples showing the wear-away caused by these terms." Dkt. 301 at 4 (citations omitted).  Defendants asserted that "[b]ecause the [individualized] communications here did alert participants to the facts giving rise to wear-away, . . . they demonstrate why class-wide liability and relief cannot be ordered here" and that, accordingly, "the Court should decertify the class." *Id*. at 5.

37.     At an April 30, 2015 hearing addressing the communications and several other issues, the Court said it had "learned a lot more about arguments and learned a lot more about different, I would say, vulnerabilities in certain arguments on both sides." Dkt. 309 at 82.  "I do think that, frankly, there is a lot of stuff on the individual communications." *Id.*  "[T]hey're particularly relevant to reformation" and "whether there is clear and convincing evidence of fraud.  I think that is both a legal standard question and a fact issue." *Id*.  "[A]ll of the various individualized communications, the call center, the letters and the exhibits. That inferentially could be used to suggest that there is not clear and convincing evidence of fraud because it would seem to suggest gosh, it is not a very good fraud, at the time you're purporting to pursue your fraud, you're telling some people the truth." *Id*. at 3-4.

38.     In light of the Court's remarks, Class Counsel tracked down all members of the Class who Foot Locker said had received the individualized communications and proposed that

all those willing to travel to New York (at Class Counsel's expense) be permitted to testify at trial.  Dkts. 312, 321-3.   The Court agreed, and postponed the trial to allow Defendants to depose the witnesses identified on the Class's trial witness list who had not been previously deposed.  Dkt. 312.  Foot Locker proceeded to depose the broad cross-section of witnesses Class Counsel had located, including former cashier Ada Cardona, forklift driver Richard Schaeffer, manager Doris Albright, CFO Michael Stevens, and several other Class members the Court said in its post-trial order were critically important to the Class's case.  *Osberg v. Foot Locker, Inc.*, 138 F.Supp.3d 517, 535-37 (S.D.N.Y. 2015).

40.     The Court presided over a two-week bench trial in July 2015 at which twenty-one fact witnesses (15 live and six by deposition) and three expert witnesses testified.  The Court also received several dozen documents into evidence.  *Id.* at 523.

40.     After taking the case under advisement, the Court ruled in late September 2015 in an 83-page opinion and order that the Class had successfully carried its burdens of proof at trial on liability and damages (some elements of which, as noted above, required proof of "clear and convincing" evidence), found in favor of the Class on all claims and granted the Class all of the relief it sought.  *Osberg*, 138 F.Supp.3d at 538.  The Court ruled that Foot Locker had violated §§ 102 and 404(a) of ERISA and ordered that the Plan be reformed pursuant to § 502(a)(3) to conform to participants' mistaken but reasonable beliefs resulting from Foot Locker's materially false, misleading, and incomplete disclosures.  *Osberg*, 138 F.Supp.3d at 560.  Specifically, the Court found Foot Locker was liable to pay participants the difference between the benefits they had actually received and a full "A+B" benefit, *i.e.,*

(A)     The full value of the benefits that they had earned under the defined benefit plan for their service through December 31, 1995 consisting of an initial account balance as of January 1, 1996 equivalent to the value of their benefits under the defined

benefit plan as of December 31, 1995, discounted to present value using a six-percent rate and without the application of a mortality discount *plus*

(B)     The benefits that Foot Locker told participants that they would earn beginning on January 1, 1996 under the cash balance plan—that is, credits for continued service and interest, and certain adjustments required under federal law (often referred to as "whipsaw"), as well as the one-time seniority enhancement available to those who were at least age 50 and had at least 15 years of service on December 31, 1995 that would be applied to the initial account balance as calculated in the "A benefit."

The Court specified in the judgment that the additional benefits Class members are due is the dollar amount equal to the result of the following formula:

(1) the excess, if any, of the A plus B benefits described in Section II.G of the Court's Order [Dkt. 398], over any such benefits already paid to the Participant; *plus* (2) prejudgment interest at a rate of 6% on any amounts due retirees for prior payments; *minus* (3) the Participant's allocable share of any approved common benefit attorney's fees and expenses . . . as ordered by the Court.

Dkt. 399 ¶ 2.

41.     As reflected in element (3), and specified elsewhere in judgment, the judgment authorizes Class counsel, following the exhaustion of Defendants' rights of appeal, to apply to the Court for an allocation of "common benefit attorney's fees and expenses" from the common fund created by the judgment – *i.e.*, the sum of the amounts calculated under formula elements (1) and (2) for the benefit of Class members. *Id.* ¶¶ 2-3.  The judgment also enjoined Foot Locker, after resolution of Class counsel's common-fund fee application, to enforce the Plan as reformed per item (1) and (2) above – *i.e.*, to pay the additional benefits won for Class members equal to the amounts calculated under the judgment formula. *Id.* ¶ 3.

42.     Defendants filed their notice of appeal on November 3, 2015.  Dkt. 400.  Second Circuit briefing occurred in 2016, with both sides supported by amicus filings.  *See* Dkt., No. 15-3602 (2d Cir.).  Defendants presented four related but distinct grounds for reversal.  Defendants argued that this Court erred by: (1) awarding relief to Plan participants whose SPD and/or

fiduciary breach claims were barred by the applicable statute of limitations—which, according to Defendants, was essentially all members of the Class; (2) ordering class-wide relief on participants' fiduciary breach claims without requiring individualized proof of detrimental reliance; (3) concluding that Plaintiff had proven mistake as to any Class member who had not testified at trial by clear and convincing evidence; and (4) using a formula for calculating relief that resulted in what Defendants termed a "windfall" to significant segment of the Class. *See* Defs.-Appellants' Br., 2016 WL 691188, 2d Cir. No. 15-3602 (Feb. 16, 2016).

43.     If accepted, either argument (1) or argument (3) would have resulted in no or virtually no Class member receiving any relief whatsoever.  Had either argument (2) or argument (4) been accepted, it would have reduced Class damages to a small fraction of the amount awarded in this Court's judgment.

44.     Oral argument was held on January 25, 2017; the Court of Appeals issued its decision on July 6, 2017.  It unanimously rejected each of Defendants' arguments and affirmed this Court's judgment in all respects.  *Osberg v. Foot Locker*, 862 F.3d 198 (2d Cir. 2017). Regarding remedy, the Court of Appeals said "Defendants' arguments are not completely without theoretical appeal," but this Court had appropriately exercised its discretion in remedying the violations it found.  *Id.* at 215.

45.     Defendants petitioned for rehearing, 2d Cir. No. 15-3602, Dkt. 137, but their petition was denied.  *Id.*, Dkt. 145.

46.     On November 8, 2017, supported by the U.S. Chamber of Commerce as amicus, Foot Locker filed a petition for certiorari in the Supreme Court.  Defs. Cert. Pet., No. 17-690, 2017 WL 5256228, *2 (Nov. 8, 2017).

47.     Defendants presented two distinct questions for review.  Defendants' first question presented asserted that this Court's judgment and the Court of Appeals decision affirming the judgment not only violated Fed. R. Civ. P. 23 and conflicted with decisions in other federal circuits, but deprived Defendants of due process of law and violated the Rules Enabling Act because the Court "reliev[ed] [P]laintiff[] of [his] burden of proving individualized elements of [his] claims in order to facilitate class certification."  *Id.* at *2.  In their second question presented, Defendants argued that review was needed because this Court improperly "eased the class's burden of proof in a second respect when it held that detrimental reliance is not an element of a claim for breach of fiduciary duty under ERISA § 404(a)" which, Defendants argued, "is flatly inconsistent with decisions from the Third and Sixth Circuits reaffirming in the wake of this Court's decision in *CIGNA Corp. v. Amara,* 563 U.S. 421 (2011), that detrimental reliance is an element of an ERISA breach-of-fiduciary-duty claim."  *Id.* Defs. *Amicus* Br., 2017 WL 6350634, No. 17-690 (Dec. 11, 2017).

48.     In two briefs filed in the Supreme Court, Plaintiff opposed Defendants' petition, arguing that, contrary to what Foot Locker, urged, the case was not worthy of Supreme Court review and, in any event, was correctly decided.  *See* Pl.-Resp. Br. in Opp., No. 17-690, 2018 WL 389112 (Jan. 10, 2018); Pl.-Resp. Suppl. Br., No. 17-690, 2018 WL 637666 (Jan. 26, 2018).

49.      In February 2018, the Supreme Court denied Foot Locker's petition for a writ of *certiorari*.  2018 WL 942806, No. 17-690 (U.S. Feb. 20, 2018).

## IV.  Security for the Final Judgment

50.     Security for the judgment comes in the form of a Treas. Reg. §1.468B-1(c)(1) qualified trust that Foot Locker funded with a cash payment of $150 million on February 1, 2018.  *See* FL 2017 Q4 Results (describing "the pre-funding of $150 million of the pension

litigation liability").  The trustee is Wells Fargo Bank, NA and the trust corpus is invested in a Wells Fargo money market account.  The balance of the net payments that will be made to Class members under the judgment are secured by the Defendant Plan's trust which is running a substantial surplus, *see* Deutsch Decl. ¶ 9.

51.     Foot Locker has indicated that it will pay the amount that the Court authorizes as attorneys' fees and expenses from the $150 million Wells Fargo fund.  Foot Locker has advised the Class that it is also committed to make, in or before September 2018, an additional cash contribution to the Plan in the amount of no less than $127.5 million, and that the remaining portion of the fund with Wells Fargo will be available to provide further funding to the Plan, as needed, to satisfy the judgment.  Because the Plan was substantially overfunded before the judgment, the availability of this funding should insure that the Plan will remain substantially overfunded even after the judgment.

## V.     Facts Regarding the Representation

52.     Substantial time and effort has been expended to prosecute this action over the past 11 years.  Between 2006 and today, our firm—together with appellate and Supreme Court specialist Julia Penny Clark of Bredhoff & Kaiser, PLLC, brought on board after trial to assist Class Counsel defend the judgment on appeal—has spent a combined total of 33,744.45 attorney and other professional support hours on this matter (excluding time spent on this petition), representing $19,666,331.50 in lodestar, based on hourly rates that reflect "prevailing [rates] in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation," *see Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984), *i.e.*, the Southern District of New York.  *See Farbotko v. Clinton Cnty.*, 433 F.3d 204, 208 (2d Cir. 2005) (relevant community is "the district in which the court sits").

53.     The determination of a reasonable rate entails "a case-specific inquiry into the prevailing market rates for counsel of similar experience and skill to the fee applicant's counsel," which may include "judicial notice of the rates awarded in prior cases and the court's own familiarity with the rates prevailing in the district." *Farbotko*, 433 F.3d at 209.  Class Counsel's hourly rates range from $970 to $990 for partners, $725 for senior counsel, $495 to $695 for associates, and $125 to $240 for paralegals.  These rates are lower than or comparable to the rates charged by Proskauer, counsel Defendants retained for this litigation, whose "standard hourly rates" range from "$935 to $1,550 for partners; $935 to $1,195 for senior counsel; $545 to $1,075 for associates; and $215 to $460 for paraprofessionals." *In re Breitburn Energy Partners, L.P.,* No. 16-11390 (S.D.N.Y. Bankr. Jan. 22, 2018), Dkt. 2144 ¶¶ 5, 7 (declaration of Proskauer partner in bankruptcy matter, specifying that these are "the standard hourly rates Proskauer charges clients in both bankruptcy and non-bankruptcy matters").  Counsel's rates are also lower than or comparable to rates found reasonable in other cases.  *See, e.g., Anwar v. Fairfield Greenwich Ltd.*, 09-cv-118 (S.D.N.Y. May 6, 2016), Dkt. 1569 ¶¶ 21-23 (approving rates up to $1150 for partners, up to $950 for counsel, and up to $720 for associates, per Dkt. 1560 at 22 (citing similar cases)).

54.     Counsel's brief contains a chart on page 24 providing examples of cases in which courts have approved multipliers of 5 and higher as reasonable in large settled cases.  The full citations of the referenced cases are *In re Doral Financial Corp. Secs. Litig.*, No. 05-md-01706 (S.D.N.Y. July 17, 2007), Dkt. No. 107 at 5 ($130 million settlement, multiplier of 10.3); *In re Buspirone Antitrust Litig.,* No. 01–MD–1410, 2003 U.S. Dist. LEXIS 26538, at * 11 (S.D.N.Y. Apr. 11, 2003) ($220 million settlement, multiplier of 8.5); *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, 2009 WL 2408560, at *2 (D. Mass. Aug. 3, 2009) ($350

million settlement, multiplier of 8.3); *Ramah Navajo Chapter v. Jewell* 2016 WL 825710, at \*23 (D.N.M. March 2, 2016) ($940 million settlement, multiplier of 7.1); *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587, 589 (E.D. Pa. 2005) ($126 million settlement, multiplier of 6.9); *In re Credit Default Swaps Antitrust Litig.*, 2016 WL 2731524, at \*17 (S.D.N.Y. Apr. 26, 2016) ($1.9 billion settlement, multiplier of 6.2); *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 768 (S.D. Ohio 2007) ($600 million settlement, multiplier of 6); *Roberts v. Texaco, Inc.*, 979 F.Supp. 185, 198 (S.D.N.Y.1995) ($115 million settlement, multiplier of 5.5).

55.    Exhibit 5 hereto is a summary by professional timekeeper of our detailed time entries for the work the firm's attorneys and paralegals performed in this case from 2006 to the present; Exhibit 6 is the detailed time entries themselves in chronological order including the timekeeper's initials and total billable time per entry.  These billing compilations were compiled directly from the timekeeper's contemporaneously maintained timesheets and confirmed and in many instances modified (typically downward, in the exercise of billing judgment) based on other firm records reflecting the timekeeper's work.  In the exercise of billing judgment, I instructed associates and the paralegals assisting them to locate and remove time records that were insufficiently described and/or that reflected time spent on arguably duplicative or unnecessary work that would not or may not have been billed to a fee-paying client.

56.    The time claimed excludes the time devoted to preparing the instant motion and the time that counsel will be required that has not yet been billed, including for anticipated work in continuing to assist Class members in understanding the case's outcome and returning their election forms, responding to any objectors, and preparing for and appearing at the forthcoming hearing on this petition and, presumably, the entry of an amended final judgment.  It also excludes the future time that will be spent after entry of the amended final judgment working

with Mr. Deutsch to render any other needed assistance to members of the Class or Defendants in connection with implementation of final judgment.

57.     As detailed in Exhibit 7, Class Counsel request that the Court authorize reimbursement for the $1,520,057 out-of-pocket expenses advanced to prosecute this litigation since its inception in 2007.  The vast majority of these expenses were for experts, including the Class's enrolled pension actuary who has actively worked on the case for more than 11 years and testified at trial:  expert fees amount to $974,510.96.  *See* Ex. 7 (detailing amounts charged by each expert).  The remaining expenses, broken down in Ex. 7 by vendor where applicable, are: $142,210.48 for court reporter-deposition, court hearing and trial transcripts; $110,300.00 in notice administration costs from the 2014 and 2018 notices; $30,064.96 arising from travel required for some depositions and some experts (airfare, lodging, meals, cab fare); $147,867.60 for e-discovery consulting, database management, document processing, technical support, and related services; $26,923.32 for online legal research; $25,444.73 for two mediators; $21,336.35 for duplication (in-house and outside); $15,156.12 for lawsuit website hosting, maintenance, and design $4,282.70 for process servers; $2,754.25 for long distance telephone; $1,979.48 for overnight and regular mail; $928.00 for messenger services; $605.00 for district court and court of appeals filing fees, and $15,693.05 for other miscellaneous expenses directly related to the prosecution of this action.  *Id.*  All claimed expenses were necessary to the prosecution of this litigation, would normally have been billed to a client paying for counsel's services on a regular basis, and reasonable for a case of this duration and complexity.  Receipts for all claimed expenses (or other proofs in the few cases where receipts could not be located) have been compiled and can be promptly supplied upon request.

58.    The Court should also approve the service awards requested for Plaintiff Geoffrey Osberg in the amount of $50,000 and $15,000 each for Ada Cardona, Russell Howard, Rita Welz, Ralph Campuzano, Doris Albright, Richard Schaeffer, Michael Steven and Ellen Glickfield, the eight Class members who (like Mr. Osberg) were deposed and testified at trial. With the Court's permission, Class Counsel would pay these awards out of their own fee and expense award.  These payments are well-deserved given Plaintiff's and these Class members' service in this action.  Mr. Osberg in particular assisted enormously, in becoming well-prepared for his deposition upon which in some senses the viability of this entire action depended, attending (an unsuccessful) 2012 mediation session, and staying actively engaged and informed in all major aspects of the case over its long 11-year history. *See* Osberg Decl. ¶¶ 7-8.  He of course also attended trial and testified as well. *Id.*  The eight listed Class members also performed vital service in agreeing to undergo deposition and questioning at trial, which in many cases required out-of-town travel.  All Class members for whom service awards are sought (including Mr. Osberg) were also required to respond to discovery requests, produce documents, and answer interrogatories.  They all rendered exemplary service.

59.    Exhibit 1 hereto is a true and correct copy of the Proposed Class Notice, *i.e.,* "Important Notice About Increased Retirement Benefits from the Foot Locker Retirement Plan and Proposed Attorneys' Fee and Expense Award."  Defendants through counsel authorized undersigned to represent that the parties reached agreement on the content and wording of the Notice.

60.    Exhibit 2 hereto is a copy of "Truth or Consequences (180 Million of Them)," *Los Angeles & San Francisco Daily Journal* (Sept. 22, 2017).

61.     Exhibit 3 hereto is a copy of "*Reflections on Osberg v. Foot Locker*," Boston ERISA & Insurance Litigation Blog (July 7, 2017).

62.     Exhibit 4 hereto is a true and correct copy of the November 22, 2006 agreement between Geoffrey Osberg and Gottesdiener Law Firm, PLLC ("Osberg-GLF Agreement").

63.     Exhibit 5 hereto is summary of Counsel's detailed billing entries, by timekeeper, role, hours, rate and lodestar (subtotals and total).

64.     Exhibit 6 hereto is Counsel's detailed billing entries by timekeeper, hours, rate and lodestar (subtotals and total).

65.     Exhibit 7 hereto is a listing of Counsel's out-of-pocket expenses, by category, vendor and amount.

I, Eli Gottesdiener, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: April 5, 2018                                    Respectfully submitted,


                                                       */s Eli Gottesdiener*
                                                        Eli Gottesdiener